## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| **JULIE GIVENS and** | ) |
| **MONICA GREENE,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **Case No. CV 2:06 CV852-1D** |
| | ) |
| **DOUGLAS CHAMBERS,** | ) |
| **Individually and in his capacity** | ) |
| **As President of INGRAM STATE** | ) |
| **TECHNICAL COLLEGE; JAMES** | ) |
| **WILSON, Individually and in his** | ) |
| **Capacity as Dean of Students of** | ) |
| **INGRAM STATE TECHNICAL** | ) |
| **COLLEGE** | ) |
| | ) |
| **Defendants.** | ) |

### MOTION FOR SUMMARY JUDGMENT

COME NOW Defendants **J. Douglas Chambers** (hereinafter referred to as "President Chambers"), individually and in his capacity as president of J.F. Ingram State Technical College; and **James Wilson** (hereinafter referred to as "Dean Wilson"), individually and in his capacity as Dean of Students of J.F. Ingram State Technical College, and, by and through their counsel of record, moves this Honorable Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, to enter a summary judgment in its favor dismissing this action and each count thereof, separately and severally on the grounds that there is no genuine issue of material fact and that this defendant is entitled to a judgment as a matter of law.

This motion is based upon the following:

        1.      All pleadings in this case;

2.      Exhibits 1 – 9;

3.      Deposition of James Wilson with Exhibits;

4.      Deposition of Dr. Douglas Chambers with Exhibits;

5.      Deposition of Monica Greene with Exhibits;

6.      Deposition of Julie Givens with Exhibits; and

7.      Narrative Statement of Undisputed Facts and brief in support of Motion for Summary Judgment.

Respectfully Submitted,

/s/ Andrew W. Christman_____
Andrew W. Christman (CHR024)
J. Douglas Chambers, individually
and in his capacity as President of J.
F. Ingram State Technical College
and James Wilson, individually and
in his capacity as Dean of Students
and Support Services at J.F. Ingram
State Technical College

OF COUNSEL:
Gidiere, Hinton, Herndon
  & Christman
P. O. Box 4190
Montgomery, AL 36103
Telephone: (334) 834-9950
Facsimile:  (334) 834-1054

CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing was served on the following by placing a copy of same in the United States mail, postage prepaid and properly addressed this 18th day of September, 2007:


Jim L. DeBardelaben
Attorney at Law
1505 Madison Avenue
Montgomery, AL  36107


/s/ Andrew W. Christman_____
Of Counsel

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JULIE GIVENS and<br>MONICA GREENE, | ) <br> ) <br> ) |
| **Plaintiffs,** | ) <br> ) |
| v. | )    **Case No. CV 2:06 CV852-1D** <br> ) |
| DOUGLAS CHAMBERS,<br>Individually and in his capacity<br>As President of INGRAM STATE<br>TECHNICAL COLLEGE; JAMES<br>WILSON, Individually and in his<br>Capacity as Dean of Students of<br>INGRAM STATE TECHNICAL<br>COLLEGE | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| **Defendants.** | ) |

## DEFENDANTS' NARRATIVE STATEMENT OF UNDISPUTED FACT AND BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COME NOW Defendants **J. Douglas Chambers** (hereinafter referred to as "President Chambers"), individually and in his capacity as president of J.F. Ingram State Technical College; and **James Wilson** (hereinafter referred to as "Wilson"), individually and in his capacity as Dean of Students and Support Services at J.F. Ingram State Technical College, and, by and through their counsel of record, hereby file this narrative statement of undisputed facts and brief filed in support of its motion for summary judgment.

## INTRODUCTION

In this case, Plaintiffs Givens and Greene have sued Defendants Chambers and Wilson making what appeared to be two claims of discrimination. Plaintiffs allege that

Chambers and Wilson discriminated against them based upon their race and gender in violation of Title VII by creating a "racially hostile working environment." (See Complaint "First Cause of Action.") Plaintiffs also make an allegations of disparate treatment under the Equal Protection Clause. The Plaintiffs appear to be asserting this claim via 42 USC § 1981. (See Complaint "Second Cause of Action" and "Third Cause of Action.") Plaintiffs claim that Defendants Chambers and Wilson have treated them differently than similarly situated male employees denying them the equal protection of the law. Finally, the Plaintiffs allege that Defendants Chambers and Wilson have harassed them in violation of State law. All of the Plaintiffs' claims fail as they cannot demonstrate a prima facia case of hostile environment, and they cannot demonstrate a prima facia case of disparate treatment in violation of the Equal Protection Clause. Further, to the extent that they have successfully alleged a prima facia case of disparate treatment, the Defendants have legitimate nondiscriminatory reasons for their employment actions for which the Plaintiffs cannot prove pretext.

## NARRATIVE STATEMENT OF UNDISPUTED FACTS

### J. F. Ingram State Technical College

J. F. Ingram State Technical College is a two-year Alabama technical college located in Deatsville, Alabama that was established exclusively to provide occupational training to inmates, male and female, at the adult state correctional institutions in Montgomery and Elmore Counties. (Exhibit 1, Affidavit of Chambers). All of its students are adult inmates who have been convicted of one or more felonies and who are assigned by the Alabama Department of Corrections to be students at Ingram. (Exhibit 1). In addition to occupational training at the associate degree level and the certificate

level, Ingram provides remedial education and special education services. (Exhibit 1). It is the only college in Alabama whose student body is composed exclusively of student inmates. (Exhibit 1).

The State Board of Education serves as the board of control for Ingram, and the other community and technical colleges in the Alabama college system. (Exhibit 1). The Chancellor of the Alabama Department of Post Secondary Education serves as the chief executive officer for the system. (Exhibit 1). All statewide policies that apply to Ingram are adopted by the State Board at the recommendation of the Chancellor. (Exhibit 1). Once the state wide policies are adopted, the Chancellor is charged with the responsibility of interpreting and enforcing those policies. (Exhibit 1). The Code of Alabama 1975, Section 16-60-111.5 states: " … the Chancellor shall; 1) execute and enforce the rules and regulations of the State Board of Education governing the junior colleges and trade schools, 2) Interpret the rules and regulations of the Board concerning the junior colleges and trade schools. … 4) Have the authority to take any and all actions necessary and proper to administer policies, rules and regulations of the Board in carrying out its responsibility for the management and operation of the junior colleges and trade schools."

At the institutional level, the president of each college is charged with administering the institution in accordance with the State Board's policies, local institutional policies and applicable federal, state, and local laws.  Code of Alabama Section 16-60-111.6. The President is also given the authority to "appoint the faculty and staff … according to qualifications prescribed by the Board and such other regulations

which may be adopted by the Board in accordance with Section 16-60-111.4." Chambers

is the President of Ingram and has been since May 1, 1996. (Exhibit 1).

Plaintiff Monica Greene is currently the Dean of Fiscal Affairs at Ingram State Technical

College. (Greene Depo. p. 39 ln. 7-10). She was placed in that position by former the

President of Ingram, Murray Greg. (Greene p. 32 ll. 16-17).

### Greene's Education and Employment History

In terms of education, Ms. Greene has a two year Associates Degree from

Alabama Christian, which is now Faulkner University in Montgomery, Alabama.

(Greene p. 13). She finished her Bachelor's Degree at Auburn University in

Montgomery with a Bachelor of Science in Business Administration. Id. She then

received a Master's in Business Administration from Troy State in Montgomery in 1993.

(Greene p. 14). In terms of work history, Greene testified that she worked as a desk clerk

for two summers out of high school at a hotel in Bay Minette, and then at Gayfers in

Montgomery until 1985. (Greene p. 15). She worked as a teller after college and then

got a job at Atmore State Technical College in Atmore, Alabama. (Greene p. 16). At

Atmore she performed duties in payroll, accounting, and general ledger. Id.

Greene started at Ingram in September of 1989 as a junior accountant. (Greene

p. 17). As the junior accountant, she assisted the senior accountant in the various job

responsibilities of the business office. (Greene pp. 18-19). She testified that the junior

accountant position required a Bachelor's of Science level of education. (Greene p. 23).

She worked under Gene Bridgman who she described as very well versed in accounting

practices of Ingram. She also stated that he was very conscientious and understood how

all of the operations of the accounting at Ingram were carried out. (Greene p. 24). In

September of 1994, the Dean of Fiscal Affairs retired and Greene was appointed as interim Dean by then President Murray Greg. (Greene p. 32). When she was appointed to that position, she had never served as a senior accountant. (Greene p. 33 ll. 10-13). In other words, Greene skipped straight from junior accountant to interim Dean of Fiscal Affairs. Greene said that she was able to obtain the job over Bridgman because he did not have the requisite education. However, she did agree that Bridgman could have done a very good job in the position. (Greene pp. 33-34). Not only had Greene never served as a senior accountant, she had never served as an assistant or associate dean either. (Greene p. 38 ll. 6–8). After serving in the position of interim Dean for approximately one year, she went through the application process and was appointed Dean of Fiscal Affairs. (Greene p. 39 ll. 7-10).

As Dean of Fiscal Affairs, Greene is responsible for managing and administering all of the affairs of the business office at Ingram State Technical College. She supervises employees in the Ingram business office, is responsible for preparing budgets, making timely deposits, accounting for all incoming monies, investing funds where appropriate, and paying all expenses of the College including College payroll and all employee benefits. (Exhibit 1).

### Problems with Greene's Job Performance

Ms. Greene's performance evaluations from President Chambers have been largely favorable over the years. (Exhibits 2 – 6). However, Chambers did not always address the deficiencies in Ms. Greene's performance in her performance evaluations as he was attempting to address her performance by other means. (Affidavit of Chambers). In July of 2005, President Chambers' evaluation of Ms. Greene was not nearly as

favorable.  (Exhibit **7**).  Chambers stated in this evaluation a number of deficiencies in Greene's performance.  He also listed eighteen items that he believed he had instructed Ms. Greene to address but had not been completed.  (Exhibit **7**).  A number of months later Greene submitted a multi-page memorandum disputing each and every criticism and admonishment contained in her evaluation.  (Exhibit 8).  Chambers noted in Greene's evaluation that she did not receive criticism well or admit weaknesses.

Further, in his affidavit, Chambers stated that Greene refuses to take constructive criticism, refuses to admit mistakes or weaknesses, and is generally unteachable regarding the controls, practices and systems of her department.  (Affidavit of Chambers).  Similarly, Dr. James Merk, the Dean of Instruction, testified in his affidavit that Ms. Greene is unwilling to take responsibility for mistakes and timeliness problems associated with the business office. He states that she frequently blames other departments, deans and instructors when problems in the business office arise.  (Affidavit of Merk).  Greene admitted that she did not intend to do anything different after having received the evaluation from Chambers.  (Greene p. 150 ll. 20-23).  Although Greene claims that there is not "one shred of evidence that Dr. Chambers' assessments of her performance is weak, (Greene p. 190 ll. 14-18), there have been numerous complaints from various sources that Greene is not properly performing her job duties as the Fiscal Office Dean.

For example, James Merk testified that he has had numerous problems with the business office functions in acquiring fund balances, processing purchase orders, requisitions, and other business office functions.  Merk further testified that vendors have denied services and goods because of nonpayment on overdue accounts.  (Affidavit of

Merk).  Merk states that he has received complaints from numerous instructors that the

requisitions go unprocessed for months with no word as to status.  In fact, during the

most recent summer semester, several students received an incomplete on their grades

because supplies requisitioned by the instructor were not processed by the business office

in a timely fashion.  (Affidavit of Merk).

Similarly, Dean Wilson testified that he has, on numerous occasions, experienced

difficulty with receiving timely budgets, responses to requisitions, and payment of

invoices from the business office.  Wilson testified that it had been reported to him by

other instructors that requisitions were not being processed in a timely fashion.  He

further testified that vendors had denied services and goods because of nonpayment of

overdue accounts.  (Affidavit of Wilson).  Both Wilson and Merk had reported these

complaints to President Chambers.  (Affidavits of Merk and Wilson).

In January of 2002, President Chambers received a memorandum from the then

Dean of the College, Dr. Huffstetler regarding what he termed as "business office

concerns."   (Defendant's Exhibit 7 to deposition of Greene).  In this memorandum,

Huffstetler set out seven points that he claimed were serious concerns with the business

office, including payment of personal invoices, weakness with institutional purchase

orders, inability to encumber funds as needed, failure to implement modules on the

business office software, failure to distribute budgets and expenditure reports in a timely

fashion, failure to properly eliminate surplus property.  (Defendant's Exhibit 7 to

deposition of Greene).

In February of 2004, the Chancellor sent a peer review team to the business office

to evaluate its performance.  (Defendant's Exhibit 13 to deposition of Greene).  In that

evaluation, weaknesses were noted with various aspects of the business office's functioning including purchasing, payables, receipts, live work, financial reporting/facilities, computer systems, budget reports, restricted funds, payroll, organizational structure, and communication.  Greene admitted that she would have expected the President to take the Chancellor's peer review report seriously.  (Greene p. 316 ll. 19-21).  Greene dismissed the Chancellor's report stating that "she has a problem with it."  (Greene p. 333 ll. 17-19).  She testified that she did not think it was a valid report because she did not know who was behind it.  (Greene p. 332 ll. 18-20).

On February 10, 2006, President Chambers received a letter from the then Chancellor, Roy Johnson, stating that he was aware of the continuing weaknesses that existed in the business office at Ingram.  (Defendant's Exhibit 16 to deposition of Greene).  On June 6, 2006, the former Chancellor wrote another letter to the President stating that he had discussed with both President Chambers and Ms. Greene her failure to pay College bills in a timely manner and her failure to fully automate the functions of the business office.  (Exhibit 17 to deposition of Greene).

In September of 2005, President Chambers received the audit report from the examiners of public accounts regarding Ingram State Technical College's business office function.  (Exhibit 14 to deposition of Greene).  In that audit, the auditors pointed out two specific findings regarding the live work program at Ingram.  First, the examiners pointed out that costs exceeded revenues in the furniture refinishing department by $18,864.98.  Secondly, the auditors noted that a review of the work in progress on June 21, 2005, revealed that deposits had not been collected on four live work projects that were in process in violation of School Board policy.  (Exhibit 14 to deposition of Greene).

Chambers testified in his deposition that he was extremely concerned about the findings in this audit.  (Chambers depo. p. 202 ll. 17-23).

In response to the auditor's report, Chambers filed a detailed response holding certain college officials responsible for not complying with School Board policy. (Exhibit 14 to the deposition of Greene; Chambers pp. 203-204).  Chambers testified that he submitted a letter to the auditors naming the various offenders.  (Chambers p. 205 ll. 1-7).  According to Chambers, the auditor with whom we was working, Larry Willard, indicated that he felt that the response was strong, and that he felt like the problem would not occur again.  (Chambers 205 l. 21 through p. 206 l. 2).  In naming the names of offending parties in the report, Chambers was trying to get the attention of the employees and trying to avoid any further action on the part of investigating officials.  (Chambers pp. 206-207).  According to Chambers, the Chancellor had approved his naming names at the time he submitted a draft to the Chancellor's office.  (Chambers p. 210 l. 22 through p. 211 l. 1).

Notwithstanding Greene's testimony that there is not one shred of evidence that the business office is not performing its functions appropriately, there were numerous outside criticisms of the business office's performance that did not come from President Chambers.

### Communication Problems and Timeliness Weaknesses.

In addition to the various reports of weakness in the functions of the business office, there were numerous instances in which Ms. Greene and her office failed to timely respond to requisitions and where the communication process between Ms. Greene and the other College employees broke down.  In January of 2006, President Chambers

requested that all of his Cabinet Members and Deans write to him their understanding of his instructions regarding a tardiness report.  (Exhibit 18 to deposition of Greene). Greene wrote a memo back to Chambers defending the way she conducts her job and arguing that she does not take time away from the College.  (Defendant's Exhibit 19 to deposition of Greene).  On January 23, 2006, President Chambers wrote back expressing his bewilderment as to why her response detailed things that were not required or expected in his report from the Cabinet Members.  This demonstrates a breakdown in the ability of Ms. Greene to understand instructions from President Chambers and respond appropriately.  (Defendant's Exhibit 20 to deposition of Greene). Because of this constant breakdown in communication, President Chambers submitted a memo to Monica Greene on January 25, 2006, requesting that all future communications between the two of them be in writing. (Exhibit 21 to the deposition of Greene).

With respect to requisitions, there are numerous memos from various College employees requesting the status of requisitions and not understanding why the business office has not or cannot process them in a timely fashion.  (Exhibits 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, and 35 to deposition of Greene).  Exhibits 28 through 35 of Defendant Greene's deposition chronicle a series of communications between Dean Kaye Perryman (a white female) and Ms. Greene regarding her requisition of office supplies. Ultimately, Perryman requested President Chambers' intervention and President Chambers advised Ms. Greene that her understanding of whether to process Ms. Perryman's requisitions was different from the recollection of Chambers and Merk. (Defendant's Exhibits 33 and 34 to deposition of Greene).  He instructed her process Perryman's requisitions immediately.  (Id.)

In addition to problems with requisitions and processing of purchase orders, there were also a number of complaints filed by customers associated with the behavior of Ms. Greene toward customers and College employees.  (Defendant's Exhibits 36 to 42 to deposition of Greene).  In Exhibits 36 to 42 to the deposition of Greene, a number letters and memoranda demonstrate that Ms. Greene acted rudely toward customers and unprofessionally as the Dean of Fiscal Affairs.  Of course, Ms. Greene took absolutely no responsibility for her actions and stated that she had not been unprofessional on any occasion.  (Greene pp. 380-400).

> "Q:  Okay.  And would you agree with me that this memo and the memos associated with your interactions with customers all reflect somebody's opinion that you were being unprofessional, condescending, rude.  That's their opinions about you and your office and your communication?
>
> A:  That's their opinions, uh-huh."

**(Greene p. 399 l. 23 to p. 400 l. 6).**

### Greene's Allegations of Hostile Work Environment.

In Greene's Complaint, she claims that Chambers continuously raises his voice in a loud and threatening manner.  (Complaint paras. 10, 15 and 16).  In her response to Interrogatories, Greene claims that Chambers raised his voice in a loud at threatening manner at her on numerous occasions.  It is undisputed, however, that on every occasion on which Chambers allegedly raised his voice at Ms. Greene, it was directly associated with his concern about the proper completion of her work or his efforts at making his point abundantly clear.  (Affidavit of Chambers).  Moreover, Greene does not dispute that Chamber's management style is a little bit loud.  (Greene p. 239 ll. 7-19).  Likewise, she does not dispute the testimony of other individuals in the office who have either been

yelled at by Chambers or who have witnessed Chambers yelling at other men.  (Greene p. 239 l. 23 – p. 240 l. 18).  Both Wilson and Merk testified by affidavit that Chambers on occasion raises his voice in the office as part of his management style.  (Affidavits of Wilson and Merk).  Wilson even testified that President Chambers has on occasion yelled at him in front of his employees.  (Wilson depo. p. 120 ll. 19-22).

As another part of her claim for hostile environment, Greene alleges that Wilson undermines her authority and implies that she is not telling the truth to other employees in the office.  In response to Interrogatory Number 19, Greene submits multiple anecdotal examples of when her subordinates were called in with Mr. Chambers to discuss Greene's job performance.  It is undisputed, however, that in every one of these alleged meetings, Chambers was addressing something he believed to be a concern or a problem in the business office.  (Exhibit 11 to deposition of Greene; Response Number 19).

While Greene may not appreciate having her performance as business office manager challenged, Chambers states that when he met with Greene's subordinates regarding her job performance, it was always in an effort to rectify problems and get uncompleted work finished.   (Affidavit of Chambers).   Not one of Ms. Greene's anecdotal examples where Chambers has criticized her performance to subordinates either in her presence or in her absence contains any referenced to Ms. Greene's gender or race.  (Exhibit 11 to deposition of Greene; Response Number 19).  When asked what evidence she has in support of her contention that Chambers calling in Greene's subordinates to discuss her performance was based upon her race and gender, Greene testified "I don't know why else he would do it."  (Greene p. 441 l. 22).  Further, Greene admitted that there could be other reasons for Chambers' behavior in criticizing her

performance, including a personality conflict.  (Green p. 442 ll. 16-22).  She likewise admitted that Chambers may have been addressing her subordinates concerning her performance because he thinks she is not doing a good job.  (Green p. 443 ll. 1-5).  Early in Ms. Greene's deposition, she explained what she believed to be Chambers' bias against her, "I just think my personality bothers him."  (Greene p. 52 l. 9).

Greene also cites numerous examples in which Chambers has admonished female employees concerning their inappropriate dress at the College.  (Defendant's Exhibit 11 to deposition of Greene; Response to Interrogatory Number 21 and 22).  Greene claims that Chambers constantly warns them not to wear jeans, tight clothes, show cleavage, wear Capri pants, or strapless heels.  (Defendant's Exhibit 11 to deposition of Greene; Responses 21 and 22).  Givens peppers the allegations concerning Chambers' instructions regarding dress with certain stories that Chambers stated that someone's pants were too tight and going up their "butt crack," that he noticed lint on someone's bottom and asked Ms. Greene to get it off, and that he stated that an employee who had a string on her bottom would not have been noticed if "those pants weren't so tight on her ass." (Defendant's Exhibit 11 to deposition of Greene; Responses 21 and 22).

It is undisputed that on every occasion in which Chambers was alleged to be addressing someone's clothes, it was in reference to the fact that they were inappropriately tight for their work environment.  Chambers testified by affidavit that

> Ms. Givens and Ms. Greene claim that I am discriminating against them for enforcing a rigorous dress code policy regarding proper attire of females at the Ingram campus. The reason I have instituted a dress code at Ingram is institutional security.  Because Ingram is an all male inmate institution, the risks associated with provocative, revealing, and inappropriate attire by females are self-evident.  There have been numerous instances of masturbation by inmates

13

in the presence of females in the prison setting as a whole and at Ingram. The correctional officers and wardens alike have warned and instructed me on numerous occasions to require the female employees under my charge to dress appropriately at the institution. I have never been admonished or instructed by the Department of Corrections regarding the dress of male employees. I am aware of no instance in which an inmate inappropriately exposed himself or masturbated because of inappropriate male attire. It is incumbent on me to rigorously enforce the appropriate dress of females in the prison setting as it is my duty to make every effort in providing for the safety and security of my employees and the institution.

(Affidavit of Chambers).

Likewise, James Wilson referenced in his affidavit

In the prison setting, the provocative dress of females constitutes a security risk. This risk is particularly acute with respect to females as opposed to males. In my experience, I have never known there to be a security risk or disciplinary infraction by an inmate involving sexually inappropriate conduct because of the inappropriate attire of a male employee. I am, however, aware of numerous instances, both by personal experience and by report from the Department of Corrections, that the provocative dress of female employees has created disciplinary infractions involving sexual misconduct by inmates. These disciplinary infractions obviously constitute a significant security risk. As a result, I am committed to assuring to the best of my ability and within the scope of my own authority that employees under my charge are appropriately dressed when they arrive on campus. President Chambers has admonished all employees (both men and women) that professional attire is mandatory.

(Affidavit of Wilson) (See also Defendant's Exhibit 9 Memorandum from Captain Robbie Barnett of the Alabama Department of Corrections to Warden Willie Rowel regarding a J. F. Ingram employee who was not dressed appropriately while on campus).

Ms. Greene's final allegation regarding hostile environment involves her contention that on one occasion President Chambers told her that he wanted her to be a

"bitch" sometimes.  (Greene p. 457 ll. 16-20).  Greene states that she believes the comment was discriminatory and created a hostile environment because she does not believe Chambers would have made such a statement to a man.  (Greene p. 449 ll. 5-7).  However, Greene later testified that Chambers also told her that he wished he could "swap some qualities" with James Wilson.  (Greene p. 462 l. 23 – p. 463 l. 4).  According to Greene, Chambers stated that he wishes Greene could be more erratic like Wilson.  (Greene p. 463 ll. 1-2).  Greene then stated that Wilson "goes off and curses and does stuff like that."  Id.  Greene testimony appears to indicate that Chambers was telling Greene that he wants her to be more aggressive and sometimes "erratic" like Dean James Wilson.  Chambers denies having made the "bitch" statement.

As to Defendant Wilson, Greene claims that he created a hostile environment by saying things at meetings about not getting what he needed from the business office, such as budgets.  (Greene, p. 433, ln 12-23).  She admits however that the only place Wilson can get the budgets is from Greene.  (Greene, p. 434, ln. 1-6).  She further claims that Wilson made negative remarks and innuendo toward her department.  (Greene, 523, ln 7-16).  Greene has no evidence that any of Wilson's innuendo has affected any term of her employment.  Greene admits that Wilson has never admonished or mistreated her with respect to dress or attire.  (Greene, p. 439, ln 5-7).

Greene admits that Wilson does not control the terms of her employment and cannot fire her.  (Greene, p. 526, ln. 5-10)  Wilson does not set Greene's salary, does not give her directives, and does not control her staff.  (Greene, p. 526, ln 14-23)

**Givens' claims of hostile environment**

Ms. Givens and Ms. Green share the same complaint regarding the allegedly hostile environment created by Chambers and Wilson. However, Givens's claims are unique in that she was never the target of any of the yelling or comments concerning poor performance. Further, no curse words were ever used toward her. Givens admitted that Chambers was not accusing her of being weak. (Givens depo., p. 72). Givens further admitted that it was both she and Mr. Bridgman that were called in to Chambers's office to discuss the performance of Greene, not Givens. (Givens depo., p. 73, lines 1-4).

Givens claims that Chambers was "taking me away from my job." (Givens depo., p. 73, lines 12-14). She also claims that he was causing her undue stress. Id. However, she admits that she has never been in trouble with Dr. Chambers about her own job performance. (Givens depo., p. 74, lines 3-8). She also admits that, since he is the president, Chambers can call her away from whatever task she is performing to discuss her supervisor's performance if he so chooses. (Givens depo., p. 75, line 1 – p. 76, line 23). In fact, Givens admitted that, other than falling in behind in her duties, her discussions with Dr. Chambers about Green's performance had no impact on her working environment.

Concerning defendant Wilson, Givens admits that Wilson had no control over her job duties, her salary, or any other terms of her employment. Her only claim of hostile environment against Wilson is that he made a comment that the business office receives favorable treatment from Sandy Caylor (a fabric instructor), and that Wilson allegedly told his employees not to talk to Givens. (Givens, p. 169, l. 15-16; 213, l. 17-23)

**Greene's claims of disparate treatment in promotions.**

16

There are two instances in which Greene claims she was denied promotion.  First was when she claims to have been passed over for the opportunity to become the Dean of the College in December of 1997.  (Greene p. 422 ll. 1-5).  She claims she was not given the opportunity to have this job despite the fact that she was qualified.  (Greene pp. 415-416).  Greene did not, however, offer any testimony regarding her qualifications to be the Dean of the College, other than that she had been a Dean longer than Huffstetler.  Greene acknowledged that she does not know how many years of experience Dr. Huffstetler had at another institution, but does understand that he was at another college for a number of years.  (Greene p. 414 ll. 2-9).  She also acknowledged that Huffstetler had a Doctorate Degree.  (Greene p. 417 ll. 12-13).

Greene further claims that Chambers told her that the position of Dean of the College is usually filled by the Dean of Instruction.  (Greene p. 415 ll. 9-12).  She also claims that Chambers told her that she did not want to be the Dean of the College because a woman should not be over a prison environment as it is too dangerous. (Greene p. 421 ll 3-4).

Dr. Chambers confirms in his affidavit that he would generally choose the Dean of Instruction or a similar position in light of the more overreaching school wide responsibilities of the Dean of Instruction.

> In my judgment, the Dean of the College position requires extensive experience in the overall operations of the institution.  It requires the person occupying the position to be available and on call twenty-four hours a day and have the knowledge and experience necessary to address a myriad of issues that may arise concerning the College and any one of its departments.  Traditionally, it has been my experience that the Dean of Instruction has always been the best suited college employee for the position of Dean of the College.  The Dean of Instruction generally has the most

> overall exposure and experience in dealing with the various
> aspects of the College and its departments. Dr. Huffstetler
> occupied the position of Dean of Instruction at the time I
> appointed him to be the Dean of the College. Ms. Greene
> did not request an opportunity to be considered for that
> position at that time. After the position was filled, she
> indicated that she had been a Dean longer than Dr.
> Huffstetler. However, I informed her that the position is
> generally filled by the Dean of Instruction because of the
> broad experience and more far reaching institutional
> qualifications required. I do not think that a business office
> dean would be appropriate for the position in light of the
> business office's more focused job responsibilities.

(Affidavit of Chambers). Chambers did not believe that Greene had the requisite all

around qualifications to be the Dean of the College as would the Dean of Instruction.

Ultimately, the then Dean of Instruction, Dr. Huffstetler was chosen to be Dean of the

College. (Affidavit of Chambers).

Greene's other allegation that she was passed over for a promotion was when

James Wilson was named Dean of the College in 2006. (Greene p. 422 l. 19). Greene

does not dispute that she did not express an interest in that job. (Greene p. 423 l. 12).

However, she claims she should have been given the job because she had more years of

experience than did Dean Wilson as a Dean. (Greene p. 423 ll. 3-4). She acknowledged

that Wilson had more years of experience at Ingram. (Greene p. 423 ll. 3-4). She

admitted that she does not know whether Wilson was given the job simply because he

was more qualified in terms of his overall experience. (Greene p. 426 ll. 8-12).

Chambers stated in his affidavit:

> When Dr. Huffstetler vacated the position of Dean of the
> College, I appointed James Wilson to that position. The
> Dean of Students was the most comparable position to the
> Dean of Instruction in terms of institutional exposure and
> wide range of responsibility. Mr. Wilson had been at the
> institution for some thirty years and had a broad base of

knowledge concerning its operations. In my judgment his personal experience at Ingram and the fact that he was the Dean of Students positioned him most closely to a position such as the Dean of Instruction. Therefore, I determined he would be the best candidate for position of Dean of the College.

Ms. Greene further claims that she should have been made the Dean of the College when James Wilson was promoted to that position after it was vacated by Huffstetler. However, Ms. Greene did not express an interest to me in that position at the time Mr. Wilson was selected. Further, Ms. Greene's qualifications in no way exceed those of Mr. Wilson. In fact, Mr. Wilson's supervisory experience was more extensive than Ms. Greene's, notwithstanding the fact that she had been a dean longer than he. Further, Ms. Greene's poor performance as the business office manager would have made Ms. Greene a poor candidate for the position of Dean of the College. In my judgment, Ms. Greene deserved no added responsibility to her duties as business office manager. Since she appears incapable of performing her duties as business manager, I would not have considered her for a promotion to the Dean of the College.

(Affidavit of Chambers).

### Givens' claims of disparate treatment

In her deposition, Givens claims that she was passed over for a promotion when Gene Bridgman retired in April or June of 2004. (Givens depo., p. 190, lines 1-14). She claims she was given the chance to take over for Bridgman, but with no pay increase. (Givens depo., p. 190, lines 5-7). Later, she claims that Patty Graves was hired in that slot on the C salary schedule. However, Ms. Graves is a white female. (Givens depo., p. 191, lines 3-8).

Chambers testified in his deposition that Graves's position was reorganized by Ms. Green. He states that he appointed Ms. Graves to that position because Ms. Green reorganized her department after Gene Bridgman left. Clearly, there is absolutely no

evidence of intentional discrimination based upon Ms. Givens's race or sex where a white female was put into a position to which Givens claims entitlement.

**Greene and Givens' alleged statistical data**

Greene includes along with her responses to Interrogatories, a number of pages of statistics that she claims demonstrates that white employees are paid less than blacks, that more black employees have been hired by Defendant Chambers, and that females are paid and promoted less than males. (Exhibit 11 to deposition of Greene; Response to Interrogatory Number 26). However, those several pages of her Interrogatory Responses list only new hires noting the name, race and gender and date of hire. The document contains no information regarding the education, qualification, job responsibilities, department or other relevant employment information regarding the new hires. Further, it contains no information regarding the demographic of the applicant. Other pages of these statistics claim to indicate "promotions." (Exhibit 11 to deposition of Greene; Response to Interrogatory Number 26).

Again, this document does not demonstrate any of the defining characteristics of any of the individuals listed. There is no information regarding education, experience, job qualifications, duties, department, responsibilities, or other relevant employment information related to salary and placement on the schedule. All of these statistics are difficult to understand and have little meaning. On the last page, Plaintiffs list receptionists, accountants payable, accounting assistants, and accountants with their respective salaries. Again, there is no information concerning these statistics demonstrating the qualifications of these individuals, their educational background, their

responsibilities, their scope of work, or any other relevant and crucial employment factors.

## SUMMARY JUDGMENT PROCEDURE AND STANDARD

Defendants in this case bear the initial burden of demonstrating the basis for their motion for summary judgment, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions that they believe show an absence of any genuine issue of material fact. Hairston v. Gainesville Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993). In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the United States Supreme Court held that if a party opposing summary judgment "fails to make a showing sufficient to establish the existence of an element essential to their party's case, and on which their party will bear the burden of proof at trial," summary judgment is due to be granted.

> [W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial . . . . We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment . . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56 except the mere pleadings themselves . . . ."

Id. at 324.

For summary judgment purposes, an issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The Court must review the evidence, and all factual inferences properly drawn from the evidence, in the light most favorable to the nonmoving party. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987). But, "[I]f the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." Anderson, 477 U.S. at 240-50 (citations omitted). When responding to a motion for summary judgment, the non-movant "may not rely on bare allegations of wrongdoing, but must come forward with some evidence of specific facts." Pennington v. City of Huntsville, 93 F. Supp.2d 1201, 1206 (N.D. Ala. 2000).

## LEGAL ARGUMENT

I.    **Plaintiffs' Title VII Claims Against the Defendants in Their Individual Capacities are Barred as the Individuals are not Plaintiffs' Employer.**

The Plaintiffs have sued Defendants Wilson and Chambers in their individual capacities and official capacities. The Plaintiffs do not delineate which causes of action are directed at which Defendants or in what capacity. As a result, it can only be assumed that the Plaintiffs intended to sue Defendants Wilson and Chambers individually under Title VII. This Eleventh Circuit has long held, "individual capacity suits under Title VII are inappropriate because 'the relief granted under Title VII is against the *employer*[1], not individual employees who actions would constitute a violation of the act.'" James V. Montgomery Regional Airport Authority, 181 Fed. Appx. 930, 931 (11th Cir. 2006) (quoting Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991)). Since Defendants Wilson and Chambers clearly cannot be sued in their individual capacities

---

[1] Defendants Wilson and Chambers are state actors in their official capacity as J.F. Ingram is a state educational institution. (Aff. of Chambers).

under Title VII as they are not considered the "employer," Plaintiffs' Title VII claims

against the Defendants in their individual capacities should be dismissed.

> II.     **The Plaintiffs' Section 1981 Claims Against Defendants Chambers and Wilson in their Official Capacities are Barred by the Eleventh Amendment.**

The Eleventh Amendment bars the Plaintiffs' claims for monetary damages

against Defendants Wilson and Chambers in their official capacities as they are acting

within the line and scope of their employment as state educational officials.  Under most

circumstances, the Eleventh Amendment bars suit against states and state entities by their

citizens.  Williams v. Board of Regents of the University System of Georgia, 477 F.3d

1282, 1301 (11th Cir. 2007) (citing Hans v. Louisiana, 34 U.S. 1, 20-21 (1890)).

Congress has not abrogated states immunity from Section 1981 or Section 1983 suits.  Id.

(citing Miller v. King, 384 F.3d 1248, 1259-60 (11th Cir. 2004)).  See also Youngblood

v. Florida Department of Health, 224 Fed. Appx. 909, 912 n. 4 (11th Cir. 2007) (holding

that the Eleventh Amendment bars plaintiffs' monetary damage claims against state

inspectors in their official capacities).  The State of Alabama has not waived its Eleventh

Amendment immunity with respect to the Plaintiffs' claims for monetary damages.

Therefore, the Eleventh Amendment bars the Plaintiffs' Section 1981 claims against

Wilson and Chambers in their official capacities.

> III.    **Defendants Wilson and Chambers are Entitled to Summary Judgment Where Neither Plaintiff Givens nor Plaintiff Greene can make a Prima Facia Case of Hostile Environment.**

The Plaintiffs' allegations that they were unlawfully subjected to a hostile work

environment based upon their race and gender are without merit.  To establish a hostile

environment under Eleventh Circuit precedent, the employee must show: "1) that he or

she belongs to a protected group; 2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; 3) that the harassment must have been based on the sex of the employee; 4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create the discriminatorily abusive working environment; and 5) a basis for holding the employer liable." Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999). The analysis is the same for a hostile environment claim whether it be based on race discrimination or sexual harassment. See Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275-76 (11th Cir. 2002) (citing sexual harassment cases in discussing the elements of the Plaintiffs' hostile environment racial harassment claim). To establish the fourth element listed above, the harassing conduct must have been sufficiently severe or pervasive to alter the employee's terms or conditions of employment. This analysis includes both a subjective and an objective component. Mendoza, 195 F.3d at 1246. First, the employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. Id. "The environment must be one that a reasonable person would find hostile or abusive and that the victim … subjectively perceive[s] … to be abusive." Id. (internal quotation marks omitted). The objective severity should be judged from the perspective of a reasonable person in the Plaintiff's position considering all the circumstances. Id.

In determining whether the harassment was objectively hostile and abusive, the Court examines 1) the frequency of the conduct, 2) the severity of the conduct, 3) whether the conduct is physically threatening or humiliating, or a mere offensive

utterance, and 4) whether the conduct unreasonably interferes with the employee's job performance.  Id. (citing Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997)).

It is important to note here that "Title VII is not a federal 'civility code.'"  Id. (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 118 S. Ct. 998, 1000-02 (1998) ("we have never held that workplace harassment, even harassment between men and women, is automatic discrimination because of sex merely because the words used have sexual content or connotations." ); Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 2283 (1998) ("a recurring point in these opinions is that 'simple teasing,' off hand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'")).

The Eleventh Circuit has examined a number of cases in other circuits involving allegations of hostile environment much more severe than the present case but, nevertheless, concluding that the Plaintiffs' failed to establish sufficient evidence to support hostile environment claims.

> Other circuits have applied these factors to delineate a minimum level of severity or pervasiveness necessary for harassing conduct to constitute discrimination in violation of Title VII.  Many decisions throughout the circuits have rejected sexual-harassment claims based on conduct that is as serious or more serious than the conduct at issue in this appeal.  Shepherd v. Comptroller of Public Accounts of Texas, 168 F.3d 871, 872-75 (5th Cir. 1999) (holding that several incidents over a two-year period, including comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, touching plaintiff's arm, and attempts to look down the plaintiff's dress, were insufficient to support hostile-environment claim); Indest v. Freeman Decorating, Inc., 164 F.3d 258, 264-67 (5th Cir. 1999) (noting it was "dubious" whether several sexually oriented comments and gestures and an implied threat of retaliation for refusing a sexual advance would be sufficient to establish a hostile environment); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998) (holding

that statement that plaintiff had the "sleekest ass" in office plus single incident of "deliberatelly" touching plaintiff's "breasts with some papers that he was holding in his hand" were insufficient to alter the terms or conditions of the plaintiff's employment); <u>Adusumilli v. City of Chicago</u>, 164 F.3d 353, 357 (7th Cir. 1998) (Holding actions insufficient to support hostile environment claim where co-employees teased plaintiff, made sexual jokes aimed at her, asked her what "putting one rubber band on top and another on the bottom means," commented about her low neck tops, repeatedly staring at her breasts with attempts to make eye contact, and four incidents of touching her arm, fingers or buttocks); <u>Sprague v. Thorn Americas, Inc.</u>, 129 F.3d 1355, 1365-66 (10th Cir. 1997) (holding five "sexually oriented, offensive" hostile environment, even though one of the harasser's statements occurred while he put his arm around plaintiff, looked down her dress and said, "well, you got to get it when you can"); <u>Galloway v. General Motors Serv. Parts Operations</u>, 78 F.3d 1164, 1167-68 (7th Cir. 1996) (holding offensive comments including repeatedly calling the plaintiff a "sick bitch" insufficient under <u>Harris</u> because not necessarily gender-related); <u>Hopkins v. Baltimore Gas & Elec. Co.</u>, 77 F.3d 745, 753-54 (4th Cir. 1996) (holding evidence that the harasser "bumped into [the plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding, and stared at him in the bathroom" insufficient to establish violation of Title VII); <u>Black v. Zaring Homes, Inc.</u>, 104 F.3d 822, 823-24 (6th Cir. 1997) (reversing jury verdict and finding conduct was "sex-based" but insufficiently severe or pervasive to state actionable claim, where conduct over a four-month period involved repeated sexual jokes; one occasion of looking plaintiff up and down, smiling and stating, there's "Nothing I like more in the morning than sticky buns"; suggesting land area be named as "Titsville" or "Twin Peaks"; asking plaintiff, "Say, weren't you there [at a biker bar] Saturday night dancing on the tables?"; stating, "Just get the broad to sign it"; telling plaintiff she was "paid great money for a woman"; laughing when plaintiff mentioned the name of Dr. Paul Basam, apparently pronounced as "bosom"); <u>Baskerville v. Culligan Int'l Co.</u>, 50 F.3d 428, 430 (7th Cir. 1995) (holding insufficiently severe or pervasive to support a hostile-environment claim nine instances of offensive behavior over seven months including repeated references to plaintiff as a "tilly" and a "pretty girl" and one instance of simulated masturbation); <u>Kidwai v. McDonald's Corp.</u>, No. 93-1720, 1994 W.L. 136971 (4th Cir. 1994) (holding insufficient under <u>Harris</u> seven incidents, including one instance in which harasser asked plaintiff whether "she was in bed with someone"); <u>Weiss v. Coca-Cola Bottling Co. of Chicago</u>, 990 F.2d 333, 337 (7th Cir. 1993) (holding plaintiff's claims-supervisor repeatedly asked about her personal life, told her how beautiful she was, asked her

26

on dates, called her a dumb blonde, put his hand on her shoulder at least six times, placed "I love you" signs in her work area, and tried to kiss her once at a bar and twice at work-were not sufficient for actionable sexual harassment); see also DeAngelis v. El Paso Num. Police Officers Ass'n, 51 F.3d 591, 593 (5th Cir. 1995) ("A hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the workplace."); Indest v. Freeman Decorating, Inc., 164 F.3d 258, 263 (5th Cir. 1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment.").

Mendoza, 195 F.3d at 1246-47.

It is instructive to see that the Eleventh Circuit has rejected claims of hostile work environment based upon many of the same or similar allegations as the Plaintiffs have leveled in this case. For example, in Howard v. United Pruitt Corporation, 196 Fed. Appx. 780 (11th Cir. 2006), the Court determined that the Plaintiff's claims did not amount to a hostile work environment where she alleged that she was "screamed at at least twice, was excluded occasionally from meetings, and her supervisor once asked her a question in an inappropriate tone of voice." The Court noted that the Plaintiff failed to offer any evidence that any of these incidents was related to her race. In Arnold v. Tuskegee University, 212 Fed. Appx. 803 (11th Cir. 2006), the Plaintiff claimed that she was subjected to a sexually hostile work environment involving tangible employment actions where her boss was "yelling at her, telling her to find another job, requesting sexual favors, and denying her requests for course work, supplies, and office furniture." Id. at 808. The Eleventh Circuit held that no reasonable person would conclude that these actions constituted a significant change in the Plaintiff's employment status. Id. Further, the Court determined that, even assuming that these actions were taken because

of the Plaintiff's sex, these actions, independently or collectively, did not constitute a tangible employment action within the meaning of Title VII.  Id.

In Njie v. Regions Bank, 198 Fed. Appx. 878 (11th Cir. 2006), the Court rejected the Plaintiff's claim of hostile environment based on her allegation that she was "stripped of her authority as a branch manager."  The Plaintiff claimed that she "lost control of her branch when [her employer] instructed her not to discipline subordinates … until after the human resources investigation was complete."  Id.  The Court held that the Plaintiff did not cite any authority to support her position that this action by the employer constituted an adverse employment action.  This is true even in light of the fact that the Plaintiff in this case alleged that her employer made racial slurs on several occasions calling her a "token" and "quota" employee (in reference to her race).  Id.  Again rejecting Plaintiff's hostile environment claim, the Court held that the Plaintiff failed to demonstrate that any unwelcome harassment was objectively so pervasive as to alter the terms and conditions of her employment.  "While [plaintiff] alleged that [her employer] made racial comments that she found offensive, these remarks were not frequent or severe enough to constitute a hostile work environment."  Id. at 884.

The Eleventh Circuit has even noted that profanity used in the workplace is not by itself actionable as a hostile environment claim.  In Baldwin v. Blue Cross/Blue Shield of Alabama, 480 F.3d 1287 (11 th Cir. 2007), the Plaintiff claimed that, as part of the harassment she suffered, she was subjected to the widespread use of profanity.  The Court acknowledged that "there was a lot of profanity" in the Plaintiff's work place, but the Court determined that very little of it was aimed specifically at females.  The Court noted that the curse words used in that office frequently were "fuck," "fucking," "bullshit,"

"cocksucker," and "peckerwood" are relatively gender neutral.  The Eleventh Circuit

noted that "Title VII does not prohibit profanity alone, however profane.  It does not

prohibit harassment alone, however severe and pervasive.  Instead, Title VII prohibits

discrimination, including harassment that discriminates based upon a protected category

such as sex.  Because '[a] claim of sexual harassment [under Title VII] is a claim of

disparate treatment,'  in order to prevail a Plaintiff must show 'that similarly situated

persons not of [her] sex were treated differently and better.'" Id. at 1302 (citing

Mendoza, 195 F.3d at 1254 n.3.  "An equal opportunity cursor does not violate a statute

whose concern is, as the Supreme Court has phrased it 'whether members of one sex are

exposed to disadvantageous terms or conditions of employment to which members of the

other sex are not exposed.'" Id. (quoting Oncale v. Sundowner Offshore Services, Inc.,

523 U. S. 75, 80 (1998) (citations omitted)).

Based upon this extensive legal precedent, the Plaintiffs' hostile work based on

office yelling, undermining comments about poor performance, directions and comments

about inappropriate dress, and the use of the term "bitch" clearly fail as neither based on

the plaintiffs' race or gender, and are not severe and pervasive enough to be actionable.

### A.    Defendant Monica Greene cannot make a Prima Facia case of hostile environment.

Greene claims that Wilson has created a hostile work environment for her.  She

claims that he created a hostile environment by saying things at meetings about not

getting things from the business office that he needs, such as budgets.  (Greene, p. 433, ln

12-23).  She admits however that the only place Wilson can get the budgets is from

Greene.  (Greene, p. 434, ln. 1-6).  She further claims that Wilson makes negative

remarks and innuendo toward her department.  (Greene, 523, ln 7-16).  Greene has no

evidence that any of Wilson's innuendo has affected any term of her employment. Greene admits that Wilson has never admonished or mistreated her with respect to dress or attire.  (Greene, p. 439, ln 5-7).

Greene admits that Wilson does not control the terms of her employment and cannot fire her.  (Greene, p. 526, ln. 5-10)  Wilson does not set Greene's salary, does not give her directives, and does not control her staff.  (Greene, p. 526, ln 14-23).  Clearly, Greene's claims of hostile environment against Wilson are spurious at best.  Negative comments, or less, innuendo, does to constitute actionable harassment under Title VII. Greene offered no evidence that Wilson did, or could, alter any of the terms or conditions of her employment, or that his negative comments were sufficiently severe or pervasive to constitute actionable harassment under federal law.  Wilson is entitled to summary judgment.

Ms. Greene's allegation of hostile work environment against Chambers is based upon essentially four categories of circumstances that she claims created a hostile or an unpleasant working environment:  1) she alleges that Chambers is constantly yelling at her regarding her job performance; 2) Chambers undermines her authority by yelling at her in front of her subordinates and discussing her poor performance with her subordinates in her absence; 3) Chambers subjects her to meetings where he admonishes the females regarding proper attire in the prison setting; and 4) Chambers, on one occasion, told her that she needed to be a "bitch" sometimes.  Taking the Plaintiff's claims in light of all of the surrounding circumstances, Greene cannot show that she suffered work place harassment based upon the fact that she is white or female.

In order to demonstrate a prima facie case of hostile environment, a plaintiff must prove that she suffered harassment based upon a protected characteristic such as her race or gender. However, the record is replete with evidence that Chambers' dissatisfaction with Greene's performance, his admonishments regarding female dress, and his belief that Greene should be a better manager had nothing to do with her race or gender.

### 1. Chambers yelling in the work place does not constitute a hostile environment based upon the Plaintiffs' race or sex.

In paragraphs 10, 15, and 16, Greene claims that Chambers continuously raises his voice in a loud and threatening manner. Similarly in her deposition, she claims that Chambers yells at her as part of her claim of hostile environment. (Greene depo. p. 238 l. 1 through p. 242 l. 17; p. 432, l. 14-22; p. 451 l. 6 through p. 452 l. 6). Greene admits, however, that Chambers' management style is simply a little bit loud. (Greene p. 239 l. 17-19). Greene further admits that she would not be able to dispute the testimony of other men in the office who have either been yelled at by Chambers or have witnessed him yelling at other men. (Greene p. 239 l. 23 through p. 240 l. 18). Both Wilson and Merk testified by affidavit that Chambers on occasion raises his voice in the office as part of his management style. (Affidavits of Wilson and Merk). Moreover, Wilson testified in his deposition that President Chambers has yelled at him in front of the employees that he supervises. (Wilson depo. p. 120 l. 19-22).

The Eleventh Circuit has held that "an equal opportunity cursor does not violate a statute whose concern is, as the Supreme Court has phrased it 'where the members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" Baldwin, 480 F.3d at 1302. Likewise, in

the present case, Chambers being an equal opportunity yeller does not constitute a hostile environment under Title VII.

### 2. There is no evidence that Chambers undermines Greene's authority based on the fact she is a white female.

Plaintiff Greene contends in her Complaint that Chambers has on numerous occasions had meetings with Plaintiffs Greene and Givens where he has insinuated that Greene was not told the truth about an issue.  (Complaint para. 7).  Greene has also alleged that both Chambers and Wilson have indicated in front of other employees that Greene allows business office personnel to violate school policies when work is being done for the employees in the business office or their family members.  (Complaint para. 8).  Plaintiff Greene alleges that Chambers has informed Greene in the presence of Givens and others that Greene should resign or quit her job.  (Complaint para. 14). Finally, Greene alleges that Chambers has yelled at Greene that he "didn't like her attitude" when she refused to have anything to do with a political pact.  (Complaint para. 15).

In addition to the allegations in the Complaint, Greene submitted in response to Interrogatory Number 19, numerous instances in which she states that Chambers undermined her authority by meeting with her subordinates to discuss her allegedly poor performance.  (Defendant's Exhibit 11 to Greene's deposition).  As part of her response to Interrogatory Number 19, she cites as examples occurrences dated April 5, 2002, September 6, 2002, September 20, 2002, September 24, 2002, July 3, 2003, August 22, 2003, and "all of 03."  She also attaches a document labeled "Example A in response to Number 19" where she lists several instances in which Chambers called in Gene

Bridgeman or Givens to discuss Greene's performance.  (Defendant's Exhibit 11 to the deposition of Greene).

When asked what evidence Greene has in support of her allegation that Chambers called in Givens and Bridgman to discuss Greene's performance based on the fact that she was a white woman, Greene testified "I don't know why else he would do it." (Greene p. 441 l. 22).  Greene admitted that there could be other reasons for Chambers' behavior including a personality conflict.  (Greene p. 442 l. 16-22).  She further admitted that Chambers may have been addressing her subordinates with her performance because he thinks that she is not doing a good job.  (Greene p. 443 l. 1-5).

Similarly, when questioned about why Chambers stated to her in front of her subordinate "these are things you need to do but you won't do them," Greene's only explanation for his motive was "because he did that.  I say he did that because I'm a female."  (Greene p. 450 l. 2 through p. 451 l. 5).
Interestingly, early on in Ms. Greene's deposition, she stated that she believed Chambers' bias against her was because "I just think my personality bothers him."  (Greene p. 52 l. 9).  Greene's own testimony establishes that she has no evidence of discriminatory intent on the part of Chambers regarding his meetings with her subordinates or other efforts to "undermine her authority."  Chambers testified,  "I have made no secret of my displeasure with her inability to operate the business office in a way that creates inner-department harmony and fiscal prudence.  On occasions when I have met with the staff of Ms. Greene, I have done so only with the intent of evaluating why a task had not been completed by Ms. Green.  The purpose of these meetings was to determine what problems existed and to motivate the workers under her charge to complete tasks that she

did not complete." (Affidavit of Chambers). There is absolutely no evidence demonstrating that Chambers' conduct was in any way related to the race or gender of Greene. There is abundant evidence that he was continually frustrated by her poor performance.

### 3. Chambers' enforcement of the dress code policy with respect to females in the prison institution context is not motivated out of discrimination against Plaintiffs based upon their race or gender.

In the Plaintiff's Complaint, Greene and Givens allege that Chambers consistently commented on the attire and dress of females while not commenting on the dress of male employees. (Complaint para. 9). In that same paragraph, the Plaintiffs alleged that Chambers has established a dress code policy for women but not for men. (Complaint para. 9). It is difficult to understand how the enforcement of a dress code policy with respect to provocative attire in the prison setting constitutes a hostile work environment for the plaintiffs. What's more, Greene's deposition testimony reveals that she believes that the dress code policy should apply to both men and women, or that there should be no addressing of dress at all since there is no specific dress code policy in place. (Greene p. 177 ll. 3-23). She then admits that women at other campuses are not admonished about their dress as are the women on the main campus. (Greene p. 178 ll. 2-5).

She appears to be arguing that Chambers is guilty of discrimination because women at another campus are not required to attend meetings regarding dress while women at the main campus are. However, there is no suspect classification known under federal law for main campus women as opposed to satellite campus women in the Alabama Correctional or Education System. In other words, Greene's own argument that other women are treated more favorably than the women at the main campus undermines

her allegation of harassment based upon her race and gender.  If women at other campuses are not required to undergo the same rigors of the dress code policy as the main campus, obviously, the requirements as to the women on the main campus is not based purely on the fact that they are women.  Otherwise, the satellite campuses would receive the same treatment.  Further, the affidavits of Chambers and Wilson demonstrate that there is a paramount institutional concern in the appropriate dress of women at an all male inmate institution.  Chambers has testified that he has been admonished and instructed by Department of Corrections officers and wardens that the dress attire of the females at the main campus must be monitored to prevent security risks.

Even Greene acknowledges that she understands the purposes of this instruction to not dress provocatively on campus. (Greene p. 183 ll. 2-9).  Since the dress code is obviously motivated out of security concerns, it is not employment conduct on the part of Chambers that constitutes a hostile environment based purely on the race or gender of Ms. Greene.  There is no evidence that Chambers' comments about dress are based on upon discriminatory intent against Greene or Givens.

### 4. Chambers' alleged hostile comment to Greene that she "needs to be a bitch sometimes" was not necessarily directed at her as a gender based discrimination comment.

Greene alleges that Chambers asked her whether she cursed.  When she said it was not her style, she alleges Chambers said that he wanted her to get real mad and curse. He also told her that he wanted her to be a bitch.  (Greene p. 457 ll. 16-20).  Greene believes that this comment was discriminatory and created a hostile working environment because she does not believe that Chambers would have made such a statement to a man. (Greene p. 459 ll. 5-7).  However, as the Eleventh Circuit has noted, the term "sick bitch"

is not necessarily a sexual or gender related term.  Mendoza, 195 F.3d at 1248 (citing

Galloway v. General Motors Service Parts Operations, 78 F.3d 1164. 1167-68 (7th Cir.

1996)).  Taking Dr. Chambers' alleged statement in its context clearly demonstrates that

he was not making a sexual or gender related slur.

Although Dr. Chambers denies having made any such statement, even if it had

been made, it appears to have been made in the context of Ms. Greene's ability to control

her office.  Greene testified that the fact that she does not curse does not make her soft or

weak.  (Greene p. 458 l. 1).  At another point in Greene's deposition, she stated that

Chambers told her that he wished she could "swap some qualities" with James Wilson.

(Greene p. 462 l. 23 through p. 463 l. 4).  According to Greene, Chambers stated that he

wishes Greene could be more " irratic" like Wilson.  (Greene p. 463 ll. 1-2).  Greene then

stated that Wilson "goes off and curses and does stuff like that."  Clearly, based on

Greene's own testimony, any statement that may have been made by Chambers regarding

Greene acting like a bitch was not necessarily pointed at her gender, but in her having a

management style more like Wilson's.  Based on the full context of these statements as

proven by Greene's own testimony, it is clear that Chambers wanted Greene to be more

aggressive and less timid in her management style.  This could easily have been the

motive behind his alleged comment that he wished Greene would sometimes be a bitch.

The alleged "bitch" comment by Chambers was not based upon discriminatory animus

against Greene's race or gender.

### 5.  Greene's claims of hostile environment are not sufficiently severe or pervasive to be objectively offensive under federal law.

As described above, far more extreme conduct on the part of employers has been

held insufficient to constitute a cause of action for hostile work environment in the

Eleventh Circuit.  No reasonable jury could find that occasional yelling in the work place, derogatory comments of an employee to others, a dress code for females at a prison institution, and a single incident in which Chambers allegedly used the word bitch, rises to the level of actionable harassment.  The Eleventh Circuit has rejected similar cases where the Plaintiff alleged that she had been screamed at, excluded from meeting, and subjected to an inappropriate tone.  In another case, yelling, telling the Plaintiff to get another job, requesting sexual favors, and denying her request for course work supplies and office furniture was not sufficient to constitute harassment.  And even where an employer was using severe profanity in the office on a regular basis, that was not sufficient to create a hostile environment.  See Howard, 196 Fed. Appx. at 781; Arnold, 212 Fed. Appx. at 808; Baldwin, 480 F.3d at 1301; Mendoza, 195 F.3d at 1246-47.  If these other more significant and serious incidents were not sufficient to be actionable under Title VII, Ms. Greene's innocuous claims of yelling and performance criticism are certainly not sufficient.  Therefore, Plaintiff Greene's claim of hostile environment is without merit and Defendants Chambers and Wilson are entitled to summary judgment.

### B.    Plaintiff Givens cannot make out a prima facie case of hostile working environment.

Ms. Givens and Ms. Green share the same complaint regarding the allegedly hostile environment created by Chambers and Wilson.  However, Givens's claims are unique in that she was never the target of any of the yelling or comments concerning poor performance.  Further, no curse words were ever used toward her.  Givens admitted that Chambers was not accusing her of being weak.  (Givens depo., p. 72).  Givens further admitted that it was both she and Mr. Bridgman that were called in to Chambers's office to discuss the performance of Greene, not Givens.  (Givens depo., p. 73, lines 1-4).

Clearly, since Mr. Bridgman was also called into these meetings, Givens cannot prove that she was asked to discuss Ms. Green's performance simply because Givens is a woman.  If Mr. Bridgman was called into the same meeting, he obviously was not called because he is a woman.  Moreover, it is unclear how Givens being called in to discuss Greene's poor performance creates an actionable hostile environment for Givens.

Givens claims that Chambers was "taking me away from my job."  (Givens depo., p. 73, lines 12-14).  She also claims that he was causing her undue stress.  Id.  However, she admits that she has never been in trouble with Dr. Chambers about her own job performance.  (Givens depo., p. 74, lines 3-8).  She also admits that, since he is the president, Chambers can call her away from whatever task she is performing to discuss her supervisor's performance if he so chooses.  (Givens depo., p. 75, line 1 – p. 76, line 23).  In fact, Givens admitted that, other than falling in behind in her duties, her discussions with Dr. Chambers about Green's performance had no impact on her working environment.  Clearly, Givens' overly developed sensitivities and stress over discussing someone else's job performance does not constitute evidence of Title VII sexual or racial harassment.

> **Q:     So how does this talking to you and Mr. Bridgman about coming to him anytime you need to about there possibly being invoices behind have anything to do with your environment of working?**

> **A:     Other than falling behind on my duties, nothing.**

(Givens depo., p. 78, lines 3-9).

Givens alleges that the stress and anxiety of being caught between her two bosses constitutes actionable Title VII harassment.  (Givens depo., p. 82, lines 20-21; p. 83, lines 1-2).  There is absolutely no evidence in the record to prove that Givens was approached

by Dr. Chambers about her supervisor's performance because Givens is a white woman. Chambers testified in his affidavit that he spoke with Green's subordinates, on occasion, to try to accomplish tasks that Green had not performed.  There is no evidence in the record to rebut this testimony, and it is undisputed.  Therefore, Givens's generalized anxiety over one boss being upset with her other boss for nonperformance does not create actionable Title VII hostile work environment.  If it did, there would be no end to the federal litigation that could ensue by opportunistic and malcontented plaintiffs who just feel general stress at work.  Title VII would be transformed into a general civility code.

Givens also alleges, similar to Greene, that being subjected to meetings about female dress constituted gender based hostile work environment.  Like Ms. Green, Givens acknowledges that she does not think it is appropriate to wear low cut clothing at Ingram's main campus.  (Givens depo., p. 103, lines 20-22).  She further acknowledges that she does not think it is appropriate to wear tight fitting clothing at an all male inmate campus.  (Givens depo., p. 104, lines 6-14).  Since Givens acknowledges the very purposes stated by Chambers for having enforced a dress code as to the women at Ingram's main campus, she undermines her own claims of hostile work environment based upon gender.

As stated above, there are obvious security risks associated with women wearing provocative clothing in an all male prison institution.  (See Affidavits of Chambers and Wilson.)  Givens does not deny this.  Therefore, her claim that she should not be subjected to meetings about the dress code policy is frivolous.

Ms. Givens' last reference in her deposition to a hostile environment is that, before the business office became predominantly female, they were allowed to use a

computer programmer without prior approval from the president. (Givens depo., p. 126, lines 1-2). Later in her deposition, however, she admitted that, upon Bridgman's retirement, the ACCESS software was more fully integrated into the business office. (Givens depo., pp. 126-127). She admitted that Bridgman did not want to integrate the ACCESS software and was resistant to doing so. (Givens depo., p. 127, lines 15-17). When Chambers was directed by the chancellor's office to integrate the software on a short timeframe, he grew more and more impatient with its non-implementation. (Givens depo., p. 129, lines 6-12). As the access software was fully converted, its integration avoided and diminished the need for the private computer programmer. (Ingram depo., p. 130, lines 13-21; Givens depo., p. 131, line 21 –p. 132, line 1).

Clearly, Givens's testimony, by itself, demonstrates why Chambers was reluctant and impatient with allowing the business office to continue to use a private software programmer. By Givens's own admission, Chambers had been directed by the chancellor to implement the software, and he was growing impatient with the continued use of a private programmer rather than using the software. This testimony from Givens completely undermines any assertion that Chambers's frustration with allowing the private programmer to work with the business office was based on the fact that the business office was largely comprised of females.

As stated above, a hostile environment claim is by its nature a disparate treatment claim. There is no reason to believe, in light of Givens's testimony, that the women in the business office were not allowed to use the private computer programmer simply because they were ladies rather than the president's obligations to follow the chancellor's

directive.  Therefore, this final allegation of hostile environment by Givens is without merit.

**IV.     Neither Givens nor Greene can make a Prima Facia case of disparate treatment in violation of Title VII or the Equal Protection Clause through Section 1981.**

To establish an equal protection claim under Section 1981, the Plaintiff must establish 1) she is similarly situated with other persons who are treated differently than she, and 2) that the reason for the treatment is based on race, religion, national origin, poverty, or some other constitutionally protected interest.  Grider v. Alabama Department of Corrections, 2007 W.L. 2254405, *9 (N.D. Ala., August 3, 2007).  Title VII and Section 1981 claims have the same requirements of proof and use the same intellectual framework.  Keith v. MGA, Inc., Standard v. Abel Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).  Therefore, we will address the Section 1981 claim with the understanding that, to the extent Plaintiff has alleged Title VII disparate treatment, the analysis applies to both.

Intentional discrimination is required under both Title VII and § 1983.  Vessels v. Atlanta Ind. Sch. Sys., 408 F.3d 763, 767 (11th Cir.2005).  42 U.S.C. 2000e *et seq*., Title VII of the Civil Rights Act of 1964 as amended makes it unlawful for an employer: 1) "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals race, color, religion, sex, or national origin; or 2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or

otherwise adversely effect his status as an employee, because of such individuals race, color, religion, sex, or national origin."  42 U.S.C. Section 2000e-2.

Under Title VII, there are three theories under which an employer may be held liable: disparate treatment, pattern and practice, or disparate impact. <u>EEOC v. Joe's Stone Crab</u>, 220 F.3d 1263, 1273 (11th Cir. 2000).  The first two theories require proof of discriminatory intent. <u>Id</u> at 1273. If a plaintiff alleges that he or she has been treated differently than other employees, as Owensby has in the present case, courts have construed this claim as a disparate treatment claim.  <u>Ricky Grider v. Alabama Department of Corrections</u>, 2007 WL 2254405 (M.D.Ala. 2007).  When alleging discrimination under the disparate treatment or pattern and practice theories, the plaintiff has the burden of proving discriminatory intent. <u>EEOC</u> at 1273.  See also <u>Holifield v. Reno</u>, 115 F.3d 1555, 1565 (11th Cir. 1997). ("In a disparate treatment case, the plaintiff bears the burden of proving that the employer intentionally discriminated against him because of his race.")  The plaintiff in the instant case is bringing her complaint under the disparate treatment theory and must prove discriminatory intent.

Discriminatory intent can be established through either direct or circumstantial evidence.  To allege intentional discrimination, a plaintiff must show that a defendant acted in a way that: "…implies more than intent as volition or intent as awareness of consequences.  It implies that the decision maker…selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects…"  <u>Personnel Adm'r v. Feeney</u>, 442 U.S. 256, 279 (1979).  The applicable standard for direct evidence of discriminatory intent is "when it is sufficient to prove discrimination without inference or presumption.  Only the most blatant remarks whose

intent could be nothing other then to discriminate constitute direct evidence." Clarks v. Coats and Clark, Inc., 990 F.2d 1217, 1223 (11th Cir. 1993). Direct evidence has also been characterized as evidence "composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor." Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir.1999).

There is also no circumstantial evidence of discriminatory intent on the part of Chambers or Wilson. Circumstantial, or indirect, evidence is evidence "of a quality that leads to an inference that a provable event did or did not occur." Commentary to Weissenberger's Federal Evidence, 2003 Courtroom Edition. The framework for establishing discriminatory intent through indirect or circumstantial evidence is described by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, (1973). Under this framework, Plaintiffs must first establish a prima facie case of discrimination. Crawford v. City of Fairburn, Ga., 482 F.3d 1305, 1309 (11th Cir. 2007).

In McDonnell Douglas, the United States Supreme Court set out the requirements a plaintiff must fulfill in order to establish a prima facie case of discrimination in promotion: (1) he or she belongs to a racial minority; (2) he or she was qualified for and applied for a position the employer was trying to fill; (3) he or she was denied the position despite his or her qualifications; and (4) other equally or less qualified employees who are not members of the protected minority were promoted. 411 U.S. 792, 802 (1973) (See also Lee v. GTE Florida, Inc., 226 F.3d 1249 (11th Cir. 2000)).

The Eleventh Circuit has further refined the above referenced requirements to state a prima facie case of intentional discrimination specifically in the context of discriminatory pay. A plaintiff must establish that (1) she belongs to a racial minority;

(2) she received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) she was qualified to receive the higher wage. Cornelius Cooper, Michael Edwards, et al. v. Southern Company, Georgia Power Company, et al., 390 F.3d 695 (11th Cir. 2004). See Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1528 (11th Cir. 1992).

In Miranda, the Court held that a named comparator employee must "share[] the same type of tasks." Miranda at 1529. If the plaintiff is able to meet these requirements, a presumption of discrimination is created. "Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reasons for the employee's rejection … . If the employer meets this burden of production, the plaintiff must then establish that the defendant's proffered reasons for the employee's rejection were pretextual." Lee at 1253. The defendants must produc[e] evidence that the plaintiff "was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason" in order to rebut the presumption. U.S. Postal Serv. Bd. Of Governors v. Aikens, 460 U.S. 711, 714, 103 S. Ct. 1478, 1481, 75 L.Ed.2d 403 (1983) (citation and internal quotation marks omitted). The United States Supreme Court has made it clear that the burden of proof at all times remains with the plaintiff. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981).

At this point in the legal analysis, the obligation placed on the defendants to provide evidence of legitimate, non-discriminatory reasons for the employment actions taken is easily established. "It is important to bear in mind … that *the defendant's burden of rebuttal is exceedingly light*…. At this state of the inquiry, the defendant need not persuade the court that its proffered reasons are legitimate; the defendant's burden is

merely one of production, not proof." <u>Perryman v. Johnson Prods. Co.</u>, 698 F.2d 1138, 1142 (11th Cir. 1983) (citation and internal quotation marks omitted) (emphasis added). If the offered reason by the defendant employer is one that might motivate a reasonable employer, a plaintiff must confront and address it directly. <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1030 (11th Cir. 2000).   If the plaintiff only quarrels with that reason, a pretext has not been established. <u>Id</u>.

   In a recent Eleventh Circuit case, the Court analyzed whether the plaintiff had established a prima facie case of discrimination regarding pay where the plaintiff could not identify a similarly situated employee who received higher wages than she. <u>Sumerlin v. Amsouth Bank</u>, 2007 WL 2209457 (11th Cir., August 2, 2007).  The plaintiff claimed that another employee with her same job title (payroll representative) was similarly situated, was outside of her protected class, and was paid at a higher rate.  The Eleventh Circuit disagreed that the comparator was similarly situated.  The Court noted "an employee is similarly situated if she performs 'the same type of tasks' as the plaintiff." <u>Id</u>. at *3 (internal citations omitted). "The plaintiff must establish that the employee is 'similarly situated in all relevant respects.'"  <u>Id</u>. (quoting <u>Wilson v. B-E Aerospace, Inc.</u>, 376 F.3d 1079, 1091 (11th Cir. 2004)).  "The comparator employee 'must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer.'"  <u>Id</u>.  The <u>Sumerlin</u> Court concluded that the plaintiff's comparator was not similarly situated because she performed different tasks than the plaintiff.  "Sumerlin handled overtime and advanced pay and entered data, such as name and address changes, but Hilton balanced payroll accounts and verified employment.  Sumerlin even admitted that all of the payroll representatives 'had different duties.'"  <u>Id</u>.  Because the Court

concluded that the plaintiff was not similarly situated with her alleged comparator, the plaintiff's lower wage was determined to not be circumstantial evidence of discrimination.

Where Givens and Greene assert a disparate treatment claim concerning her pay, the central element of which is discriminatory intent. Chardon v. Fernandez, 454 U.S. 6, 8 (1981); Watson v. Fort Worth Bank and Trust, 487 U.S. 997, 1002 (1998) ([a] "disparate treatment challenge focuses exclusively on the intent of the employer"). The United States Supreme Court in Ledbetter v. Goodyear Tire and Rubber Company, Inc., has recently addressed the issue of timeliness concerning pay decisions made outside the 180 day charge period. The Court held that each decision with regard to pay constitutes a discrete act. 2007 Westlaw 1528298 (May 29, 2007).

In Ledbetter, the plaintiff alleged that past discriminatory pay decisions outside the charge period had continuing effects during the charge period rendering the previous decisions actionable. Id. The Court rejected this argument, and looked to prior precedent including United Airlines, Inc. v. Evans, 431 U.S. 553 (1977). As the Court stated in United Airlines, "a discriminatory act which is not made the basis for a timely charge … is merely an unfortunate event in history which has no present legal consequences." United Airlines 431 U.S. at 558.

The Court also noted, in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002), the statutory term "employment practice" generally refers to "a discrete act or a single 'occurrence'" that takes place at a particular point in time. Id. at 110-111. Examples of discrete acts are termination, failure to promote, denial of transfer, and

refusal to hire.  Id.  Under Title VII, a plaintiff can only file a charge to cover discrete

acts that occurred within the appropriate time period (i.e. 180 days).  Id. at 114.

        The Court in Ledbetter summarized its holding as follows:  "The EEOC charging

period is triggered when a discrete unlawful practice takes place.  A new violation does

not occur, and a new charging period does not commence, upon the occurrence of

subsequent nondiscriminatory acts that entail adverse effects resulting from the past

discrimination.  Of course, if an employer engages in a series of acts each of which is

intentionally discriminatory, then a fresh violation takes place when each act is

committed."  Id. at 2169.

        The Court in Ledbetter also recognized and emphasized the need for adherence to

filing deadlines and statutes of limitation.  The Supreme Court has noted that the EEOC

filing deadline protects employers from "the burden of defending claims arising from

employment decisions that are long past."  Delaware State College v. Ricks, 449 U.S.

250, 256-257 (1980).  The short deadlines contained in the EEOC statute (180 days)

reflects Congress' strong preference for "the prompt resolution of employment

discrimination allegations through voluntary conciliation and cooperation."  Id. at 2164.

The Court explained the policy considerations for the deadlines:

                A disparate treatment claim comprises two elements:  an
                employment practice, and discriminatory intent.  Nothing
                in Title VII supports treating the intent element of [the
                plaintiff's claim] any differently from the employment
                practice element.  If anything, concerns regarding stale
                claims weigh more heavily with respect to proof of the
                intent associated with employment practices than with the
                practices themselves.  For example, in a case such as this in
                which the plaintiff's claim concerns the denial of raises, the
                employer's challenged acts (the decisions not to increase
                the employee's pay at the times in question) will almost
                always be documented and will typically not even be in

> dispute. By contrast, the employers intent is almost always disputed, and evidence related to intent may fade quickly with time. In most disparate treatment cases, much if not all of the evidence of intent is circumstantial. Thus, the critical issue in a case involving a long past performance evaluation will often be whether the valuation was so far off the mark that a sufficient inference of discriminatory intent can be drawn. This can be a settled termination and the passage of time may seriously diminish the ability of the parties and the fact finder to reconstruct what actually happened.

Id. at 2171.

Ledbetter further stands for the proposition that a single, free standing violation can be charged within its own charging period regardless of its connection to other violations. In Morgan, the Court had reached a similar conclusion and held:  "[t]he existence of past acts and the employee's prior knowledge of their occurrence … does not bar employees from filing charges about related discrete acts so long as the acts are not independently discriminatory and charges addressing those acts are themselves timely filed." Morgan, 536 U.S. at 113. When an employee alleges serial violations, i.e., a series of actionable wrongs, a timely EEOC charge must be filed with respect to each discrete alleged violation.  Ledbetter, 127 S. Ct. at 2175 (quoting Morgan, 536 U.S. at 113).  Plaintiff in Ledbetter failed to allege discriminatory conduct and intent regarding pay decisions within the charge period, but instead argued that each paycheck she received based on the discriminatory decision outside the charging period shifted the intent to paychecks inside the period.  The Court rejected that argument and dismissed all of her claims as untimely.

**A.    Greene cannot make a prima facia case of disparate treatment or discriminatory failure to promote, and, even if she could, there were legitimate nondiscriminatory reasons for Chambers' decision.**

There were two instances in which Greene claims that she was denied a promotion.  In her deposition, she claims that she was passed over for the opportunity to become the Dean of the College in December of 1997.  (Greene p. 422 ll. 1-5).  She claims she was not given an opportunity to have the job despite the fact that she believes she was qualified.  (Greene pp. 415-416).  Greene claims that since she had been the longest standing Dean at the College, she should have received the job.  She did not demonstrate, however, any other capabilities or qualifications that entitled her for that position.  Dr. Huffstetler was ultimately chosen for that position.

To the extent Greene is making a Title VII claim of disparate pay in that she did not receive the pay and promotion commensurate with the position of Dean of the College in December of 1997, her claim is time barred.  As referenced above, pay decisions are discrete employment practices that must be alleged within the 180 day EEOC charge period.  That period expired for Givens and Green on August 27, 2005 since they filed their EEOC complaints on February 23, 2006.  (See Exh. 6 to Depo. of Greene and Exh. 4 to Depo. of Givens).  Therefore, any claims of disparate or discriminatory pay by Greene regarding the 1997 appointment of the Dean of College is time barred and due to be dismissed.  Ledbetter, 127 S. Ct. at 2175.

Concerning the section 1981 complaint of disparate pay or promotion, Greene acknowledges that she does not know how many years of experience Dr. Huffstetler had at another institution.  She does understand that he was at another college for a number of years but did not have as many years at J.F. Ingram as she did.  (Greene p. 415 ll. 2-9).  She acknowledged, that Huffstetler had a doctorate degree.  (Greene p. 417 ll. 12-13).  Greene does not have a doctorate.  Greene was not aware of any of Huffstetler's other

qualifications.  Greene alleges that Chambers said to her that a woman could not be "over

a prison environment" because it was dangerous.  (Greene p. 421 ll. 3-4).  She admits that

she has no evidence that she was denied the opportunity to be Dean of the College

because she is white.  (Greene p. 421 ll. 13-15).

Greene acknowledged in her deposition that Chambers had stated that the Dean of

Instruction was usually the one who would become the Dean of the College rather than

business managers.  (Greene p. 415 ll. 9-12).  Dr. Chambers confirms in his affidavit that

he would generally choose the Dean of Instruction or a similar position in light of the

more overarching school wide responsibilities of those positions.  In Dr. Chambers'

mind, the Dean of the College bears with it responsibility of being on call twenty-four

hours and having vast experience in all facets of the operations of the institution.

(Affidavit of Chambers).  In the judgment of Dr. Chambers, the positions of Dean of

Instruction and Dean of Students are far more compatible to being the Dean of the

College than the position of Dean of Fiscal Affairs.  (Affidavit of Chambers).

Further, Chambers testified in his affidavit that Greene had not performed well or

demonstrated a level of expertise or experience on an institution wide basis necessary to

become the Dean of the College.  As a result, Dr. Huffstetler was the natural choice.

(Affidavit of Chambers).

Greene also contends that she should have received the position as Dean of the

College when that position was later given to Wilson in 2006.  (Greene p. 422 l. 19).

Here, she does not dispute that she did not express an interest in that job.  (Greene p. 423

l. 12).  She claims that she should have been given this job because she had more years of

experience as a Dean than did Wilson.  However, she acknowledges that Wilson had

more years of experience at the College itself.  (Greene p. 423 ll. 3-4).  She admits that she does not know what Wilson's experience history was at the time he was appointed Dean of the College.  (Greene p. 425 ll. 19-22).  She states that she does not know whether Wilson was given the job simply because he was more qualified in terms of his overall experience.  (Greene p. 426 ll. 8-12).

As stated by Dr. Chambers in his affidavit, Mr. Wilson had more extensive experience during his thirty years at J.F. Ingram on an institution-wide basis than did Ms. Greene.  He was familiar with the various functionings of other departments in light of his years as the Dean of Students.  In Chambers' mind, the Dean of Students was more closely likened to the Dean of Instruction in terms of overall institutional-wide experience.  (Affidavit of Chambers)  At the time Huffstetler left the College and created a vacancy for the Dean of the College, there was no Dean of Instruction.  Therefore, Chambers did not have the opportunity to appoint the Dean of Instruction to Dean of the College.  (Affidavit of Chambers).  The closest position to Dean of Instruction in terms of institution-wide responsibility and job duties was the Dean of Instruction.  Therefore, Mr. Wilson was made Dean of the College.  Further, as stated above, Greene had demonstrated by that time that she was totally incapable of even performing the job functions assigned to her as the Dean of Fiscal Affairs.  These considerations demonstrate legitimate nondiscriminatory reasons by Dr. Chambers for having made the employment decisions regarding Dean of the College position.

The Eleventh Circuit has noted that a plaintiff cannot prove pretext by baldly asserting that she was better qualified than the person who received the promotion at issue.  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1090 (11th Cir. 2004).  Instead, the

Plaintiff must adduce evidence that the disparity in qualifications was "so apparent as virtually to jump off the page and slap you in the face.'" Id. (quoting Cofield v. Goldkist, Inc., 267 F.3d 1264, 1268 (11th Cir. 2001)).  Clearly, Ms. Greene cannot demonstrate qualifications over Wilson and Huffstetler sufficient to virtually jump off the page and slap you in the face.  Therefore, she cannot prove that she was passed over for the Dean of College position with evidence sufficiently significant that no reasonable person could have chosen Huffstetler and Wilson over her.  Id.  Therefore, Greene's claims for failure to promote have no merit, and Defendant Chambers is entitled to summary judgment.

**B.      Greene's generalized claims of disparate treatment fail as she can show no comparitors.**

Greene makes no other specific complaints regarding disparate treatment in terms of the conditions of her employment.  However, she makes generalized allegations that men were treated better than women and blacks were treated better than whites.  However, she can point to no similarly situated employee who was in any respect treated better than she.  Greene admits that no one else performs functions that are performed by the Dean of Fiscal Affairs.  (Greene p. 431 l. 22 through p. 432 l.1).  She agreed that her "job qualifications and requirements are wholly distinctive, except for small overlaps here and there."  ( Greene p. 432 ll. 2-5).  Based on her own admission, any disparate treatment that she claims with respect to the assignment of tasks or other such generalized allegations would fail to make out a prima facia case.  Since her job qualifications and requirements are wholly distinctive, any assignment of duties by Chambers would be specifically related to the performance of her job and not be comparable to others performing other jobs in different departments.

**C.      Givens cannot make a *prima facie* case of disparate treatment, and, even if she could, there are legitimate nondiscriminatory reasons for Chambers' employment decisions**

In her deposition, Givens claims that she was passed over for a promotion when Gene Bridgman retired in April or June of 2004. (Givens depo., p. 190, lines 1-14). She claims she was given the chance to take over for Bridgman, but with no pay increase. (Givens depo., p. 190, lines 5-7). Later, she claims that Patty Graves was hired in that slot on the C salary schedule. However, Ms. Graves is a white female. (Givens depo., p. 191, lines 3-8). Since an individual within the same protected class was given the job to which she claims entitlement, she cannot make out a *prima facie* case of disparate treatment. McDonnell Douglas, 511 U.S. at 802.

Even if she were able to make out a *prima facie* case in failure to promote, Chambers testified in his deposition that Graves's position was reorganized by Ms. Green. He states that he appointed Ms. Graves to that position because Ms. Green reorganized her department after Gene Bridgman left. Clearly, there is absolutely no evidence of intentional discrimination based upon Ms. Givens's race or sex where a white female was put into a position to which Givens claims entitlement. Therefore, defendant Chambers is entitled to summary judgment as to this claim.

**D.      Plaintiffs' claims of disparate treatment based upon statistical evidence is without merit, as those statistics contain no meaningful information regarding qualifications, education, experience, or other relevant factors bearing on employment decisions.**

In their complaint, the plaintiffs make the broad and conclusory assertion that Chambers consistently hires and promotes white employees over black employees and pays black employees more for doing the same job as white employees. (Complaint, ¶ 12). Plaintiffs further claim that Chambers pays female employees, including but not

limited to the plaintiffs Givens and Greene, less money than paid the male employees in an equal or similar positions.  (Complaint, ¶ 13).  Finally, plaintiffs claim that Chambers has consistently refused to raise the salaries of White employees that Green has recommended for raises except for one black employee.  (Complaint, ¶ 11).  In support of the assertion that Chambers consistently hires and promotes black employees over white employees and consistently refuses to raise the salaries of white employees while raising the salary of one black employee, Givens and Green point to the responses to defendant's interrogatories number 26.  (Exh. 11 to Depo. of Greene, response to interrogatory # 26).  In this response, the plaintiffs list new hires noting a name, race and gender, and the date of hire.  This document contains no information regarding the education, qualification, job responsibilities, department, or other relevant employment information regarding these new hires.  Further, it contains no information regarding the demographic of the applicant.

Another page of these statistics indicates "promotions."  (Id.).  Again, this document does not demonstrate any of the defining characteristics of any of the individuals listed.  There is no information regarding education, experience, job qualifications, duties, department, responsibilities, or other relevant employment information related to salary and placement on the schedule.  All of the statistics are difficult to understand and have little meaning.  On the last page, the plaintiffs list receptionists, accounts payable, accounting assistants, and accountants with their respective salaries.  Again, there is no information concerning these statistics demonstrating the qualifications of these individuals, their educational background, their responsibilities, the scope of their work, or any other relevant and crucial employment

factors.  As a result, the statistics provide no information meaningful in ascertaining whether a pattern and practice of discrimination can be established.  As noted by this Court in <u>King v. Kirkland Stores, Inc.</u>, 2006 WL 2239208 (M.D. Ala. Aug. 4, 2006), the plaintiff must provide "meaningful information about the full factual context to allow [the court] to make any significance of the statistics they proffer."  <u>Id</u>. at *14 (internal quotation marks omitted).  "[W]ithout information about the racial makeup of the pool of qualified applicants from which replacement employees were hired, it is impossible to find inferences created by the changing racial composition of the workforce."  <u>Id.</u>

Likewise, in the present case, it is impossible to draw any inferences from the statistics listed by the plaintiffs in Exh. 11 to Depo. of Greene, response to interrogatory # 26.  A collection of names, races, and salaries in no respect explains why the individuals were hired, to what positions they were hired, what their education levels were, what their experience levels were, or any other factor that may have impacted the rate of pay and the position to which they were hired.  Both Givens and Green admit that they do not know most of the qualification information, educational information, or other important employment information of the individuals listed in statistical information.  (Givens depo., pp. 196-202; Green depo., pp. 481-509).  Moreover, with respect to many of the alleged comparable individuals, both Givens and Greene admitted that the comparators were not working the same positions and did not share the same responsibilities.  (Id.)  Without meaningful information about the statistics, no inferences of discrimination can be drawn.  Therefore, defendants are entitled to summary judgment as to the plaintiffs' claims of disparate treatment.

**V.    Plaintiff's claims of harassment under state law are barred by sovereign immunity and state agent immunity**

55

Under Alabama law, an arm of the state, such as a state college or university, cannot be sued for money damages.  As we made clear in Ex parte Butts, 775 So.2d 173, 177 (Ala.2000), "[a] complaint seeking money damages against a State employee in his or her official capacity is considered a complaint against the State, and such a complaint is barred by Art. I, § 14, Alabama Constitution of 1901. Ex parte Alabama Dep't of Forensic Sciences, 709 So.2d [455,] 457 [ (Ala.1997) ]." Ex parte Trawick,  959 So.2d 51, 55 (Ala. 2006).  Therefore, the state law claims of harassment against Wilson and Chambers in their official capacities are barred.

The state law claims of harassment against Wilson and Chambers is likewise barred under the doctrine of state agent immunity.  In *Ex parte Cranman,* 792 So.2d 392 (Ala. 2000) (plurality opinion), the following restatement of the law as it pertains to State-agent immunity was offered:

> A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
>
> (1) formulating plans, policies, or designs; or
>
> (2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
>
> (a) making administrative adjudications;
>
> (b) allocating resources;
>
> (c) negotiating contracts;
>
> (d) hiring, firing, transferring, assigning, or supervising personnel; or
>
> (3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties

in that manner; or

\*\*\*

(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

[5] Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent *shall not* be immune from civil liability in his or her personal capacity

(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or

(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

In the present case, Chambers and Wilson, as the President, Dean of the College, and Dean of Students, were at all times acting with the line and scope of their authority (Affidavits of Chambers and Wilson).  Chambers testified that his responsibilities as President are dictated by Department of Education policy.  (Affidavit of Chambers).  Further, Chambers' conduct in determining appointments to positions, exercising his judgment in allocating school resources, enforcing security, managing and supervising his employees, and making decisions about how best to approach problems with the business office constitute official conducted deemed immune under sections 1, 2, and 3 of the Cranman criteria.  Chambers and Wilson were formulating plans and policies on female dress at Ingram, allocating resources by determining how to best approach problems with the business office, and generally supervising the personnel under their charge.  (Affidavits of Chambers and Wilson).  Accordingly, Chambers and Wilson are

entitled to state agent immunity as to plaintiffs' claims against defendants in their individual capacities.

Finally, counsel is unaware of any private right of action recognized under Alabama law for "harassment." Although there is a criminal law with such a title, plaintiff in no way alleges violation of the criminal law in the complaint and offers no evidence in support of a claim of negligence per se. Since there is no such claim as "harassment" under Alabama law, and plaintiff offers nothing the Complaint to provide defendants with notice as to what claim they are defending under Alabama law, defendants are entitled to summary judgment as to plaintiffs' claim.

## CONCLUSION

For the foregoing reasons, Ingram State Technical College, President Douglas Chambers, and Dean James Wilson respectfully request this Honorable Court to enter summary judgment in their favor and against the plaintiff on all claims and dismiss this case with prejudice, costs taxed against the plaintiff.

Respectfully Submitted,

/s/ Andrew W. Christman_____
Andrew W. Christman (CHR024)
J. Douglas Chambers, individually
and in his capacity as President of J.
F. Ingram State Technical College
and James Wilson, individually and
in his capacity as Dean of Students
and Support Services at J.F. Ingram

State Technical College

OF COUNSEL:
Gidiere, Hinton, Herndon
  & Christman
P. O. Box 4190
Montgomery, AL 36103
Telephone: (334) 834-9950
Facsimile:  (334) 834-1054

<u>CERTIFICATE OF SERVICE</u>

       I hereby certify that the above and foregoing was served on the following by placing a copy of same in the United States mail, postage prepaid and properly addressed this 18th day of September, 2007:

Jim L. DeBardelaben
Attorney at Law
1505 Madison Avenue
Montgomery, AL  36107

/s/ Andrew W. Christman_____
Of Counsel

59