## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| **JULIE GIVENS and**<br>**MONICA GREENE,** | ) <br> ) <br> ) |
| **Plaintiffs,** | ) <br> ) |
| **v.** | )    **Case No. CV 2:06 CV852-1D** <br> ) |
| **DOUGLAS CHAMBERS,**<br>**Individually and in his capacity**<br>**As President of INGRAM STATE**<br>**TECHNICAL COLLEGE; JAMES**<br>**WILSON, Individually and in his**<br>**Capacity as Dean of Students of**<br>**INGRAM STATE TECHNICAL**<br>**COLLEGE** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| **Defendants.** | ) |

## MOTION FOR SUMMARY JUDGMENT

ATTACHMENTS TO PREVIOUSLY FILED MOTION FOR SUMMARY
JUDGMENT

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 1

1 IN THE UNITED STATES DISTRICT COURT
2 FOR THE MIDDLE DISTRICT OF ALABAMA
3 NORTHERN DIVISION
4
5 CASE NUMBER: 2:06-cv852-ID
6
7 JULIE GIVENS and
8 MONICA GREENE,
9 Plaintiffs,
10 vs.
11 DOUGLAS CHAMBERS, Individually
12 and in his capacity as President
13 of INGRAM STATE TECHNICAL COLLEGE;
14 JAMES WILSON, Individually and in
15 his capacity as Dean of Students
16 of INGRAM STATE TECHNICAL COLLEGE,
17 Defendants.
18
19 BEFORE:
20 Cynthia M. Noakes, Commissioner
21 and Court Reporter
22
23 DEPOSITION TESTIMONY OF JULIE GIVENS

Page 2

1 S T I P U L A T I O N
2
3 IT IS STIPULATED AND AGREED by and
4 between the parties through their respective
5 counsel, that the deposition of JULIE GIVENS may
6 be taken before Cynthia M. Noakes, Court
7 Reporter, at the Law Offices of GIDIERE, HINTON,
8 HERNDON & CHRISTMAN, 60 Commerce Street, 904
9 Regions Tower, Montgomery, Alabama 36104, on the
10 20th day of June, 2007.
11 IT IS FURTHER STIPULATED AND AGREED
12 that the signature to and the reading of the
13 deposition by the witness is waived, the
14 deposition to have the same force and effect as
15 if full compliance had been had with all laws and
16 rules of Court relating to the taking of
17 depositions.
18 IT IS FURTHER STIPULATED AND AGREED
19 that it shall not be necessary for any objections
20 to be made by counsel to any questions except as
21 to the form or leading questions, and that
22 counsel for the parties may make objections and
23 assign grounds at the time of the trial, or at

Page 3

1 the time said deposition is offered in evidence,
2 or prior thereto.
3 IT IS FURTHER STIPULATED AND AGREED
4 that the notice of filing of the deposition by
5 the Court Reporter is waived.
6
7
8
9
10
11
12
13
14
15
16
17 ******************************************
18
19
20
21
22
23

Page 4

1 INDEX
2 EXAMINATION BY: PAGE NUMBER:
3 MR. CHRISTMAN 6-225
4
5 EXHIBITS:
6 Defendants' Exhibit No. 1        11
7 Defendants' Exhibit No. 2        16
8 Defendants' Exhibit No. 3        19
9 Defendants' Exhibit No. 4        31
10 Defendants' Exhibit No. 5        32
11 Defendants' Exhibit No. 6        39
12 Defendants' Exhibit No. 7        42
13 Defendants' Exhibit No. 8        137
14 Defendants' Exhibit No. 9        139
15 Defendants' Exhibit No. 10       140
16 Defendants' Exhibit No. 11       143
17 Defendants' Exhibit No. 11(a)     150
18 Defendants' Exhibit No. 12       178
19 Defendants' Exhibit No. 13       207
20 Reporter's Certificate           226
21
22 ******************************************
23

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 5

1         APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFFS:
4        MR. JIM L. DEBARDELABEN
5        ATTORNEY AT LAW
6        1505 Madison Avenue
7        Montgomery, Alabama 36107
8        (334) 265-9206
9
10   ON BEHALF OF THE DEFENDANTS:
11       MR. ANDREW W. CHRISTMAN
12       GIDIERE, HINTON,
13       HERNDON & CHRISTMAN
14       ATTORNEYS AT LAW
15       60 Commerce Street
16       904 Regions Tower
17       Montgomery, Alabama  36104
18       (334) 834-9950
19
20   ALSO PRESENT:
21       MONICA GREENE, Co-Plaintiff
22
23   ****************************************

Page 6

1        I, CYNTHIA M. NOAKES, a Court Reporter
2    of Eufaula, Alabama, acting as Commissioner,
3    certify that on this date, as provided by the
4    Alabama Rules of Civil Procedure and the
5    foregoing stipulation of counsel, there came
6    before me at the Law Offices of GIDIERE, HINTON,
7    HERNDON & CHRISTMAN, 60 Commerce Street, 904
8    Regions Tower, Montgomery, Alabama 36104,
9    beginning at 9 a.m., JULIE GIVENS, witness in the
10   above cause, for oral examination, whereupon the
11   following proceedings were had:
12
13           JULIE GIVENS,
14   being first duly sworn, was examined and
15       testified as follows:
16
17       THE COURT REPORTER:  Usual
18   stipulations?
19       MR. CHRISTMAN:  Yes, ma'am.
20       MR. DEBARDELABEN:  That's fine.
21
22       EXAMINATION
23   BY MR. CHRISTMAN:

Page 7

1    Q.    Good morning, Ms. Givens.
2    A.    Good morning.
3    Q.    You have been here for the last two days
4    while we were taking the deposition of your
5    supervisor, Monica Greene; is that right?
6    A.    I have.
7    Q.    So you understand the process?
8    A.    I do.
9    Q.    Okay. And I'll ask you the same thing that
10   I asked Ms. Greene. If I ask you a question that
11   you can't understand, let me know, because I want
12   to make sure that we're communicating well. And
13   I'm glad to rephrase the question or kind of clean
14   it up so that you understand it. Okay?
15   A.    Yes, sir.
16   Q.    If you answer my question, I'll assume that
17   you understood the question. Is that fair?
18   A.    Yes, sir.
19   Q.    Thank you. Why don't you first state your
20   name for the record.
21   A.    My name is Julie Givens.
22   Q.    And where do you currently work?
23   A.    J.F. Ingram State Technical College.

Page 8

1    Q.    And tell us a little bit about your
2    background.
3        Where did you go to high school?
4    A.    Jeff Davis in Montgomery, Alabama.
5    Q.    And when did you graduate from high school?
6    A.    1976.
7    Q.    And did you go to college?
8    A.    I did. I received an associate's of
9    science, and graduated with honors, in 1990.
10   Q.    From?
11   A.    Central Alabama Community College.
12   Q.    When you say you graduated with honors, what
13   do you mean by that?
14   A.    I graduated with a 3.95 grade point average
15   magna cum laude.
16   Q.    All right. Now, I believe your transcript
17   from Central Alabama shows that you took two
18   Principles of Accounting courses as part of your
19   studies; is that right?
20   A.    I did.
21   Q.    And then after that, between '97 and 2000,
22   you took two courses in business law, one in
23   economics, one in marketing, and one introductory

2 (Pages 5 to 8)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 9

1  computer course, at Wallace State Community
2  College; is that right?
3  A.  I did.
4  Q.  I understand, in terms of your employment
5  history, that between 1982 and '85, you worked in
6  Montgomery at the Maxwell-Gunter Federal Credit
7  Union as a title clerk; is that right?
8  A.  That's correct.
9  Q.  And after that -- well, let's see.  Tell me
10  about your job with the Army and Air Force
11  Exchange Service as an accounting technician.
12  A.  Okay.  We did accounting work for the whole
13  southeast area of the United States.  We were on
14  what they call a TRW system, and we did all the
15  accounting for the southeast area of the United
16  States for the base exchanges.
17  Q.  When you say -- what were your job duties?
18  A.  We had invoices from those base exchanges
19  that were turned in to us there at the central
20  location, and those were keyed through what was
21  then called the TRW system.
22  It's been a few years back.  But those were
23  actually keyed in.  And before I left there, I was

Page 10

1  named the lead accounting technician.  And I
2  worked there approximately three years.
3  Q.  You don't have a degree in accounting,
4  right?
5  A.  No, sir.
6  Q.  Okay.  And, I guess, before that, you worked
7  at Herff Jones Yearbooks?
8  A.  Yes, I did.
9  Q.  As a press room secretary from 1977 to '78?
10  A.  That's correct.
11  Q.  Is that all of your employment history
12  besides J.F. Ingram?
13  A.  I worked at Troy State University for a
14  three-month period of time as a transcript clerk
15  for them.
16  Q.  Did that involve any accounting?
17  A.  No, it did not.
18  Q.  Any other positions that we haven't
19  discussed?
20  A.  The time period that I worked at Rouse
21  Motors, when I was in high school under a business
22  office education program.
23  Q.  And you were an office clerk there?

Page 11

1  A.  I was.
2  Q.  That didn't involve any accounting though,
3  did it?
4  A.  I kept up with the time for the employees
5  there.  We had a timecard system, and I calculated
6  the time for those, and any other duties that were
7  assigned by the accountant there.  As I remember,
8  I did some calculations for him.  I guess it would
9  be light accounting work, as well as some typing.
10  Just general accounting, perhaps.
11  Q.  You were in high school at this time?
12  A.  Yes, I was.  That was a lot of years ago.
13  Q.  I want to introduce into evidence here --
14  and we'll just start over with Givens 1 -- your
15  personnel file.  This was a file produced to me by
16  the college.
17      (Defendants' Exhibit No. 1 was
18      marked for identification and a
19      copy of the same is attached
20      hereto.)
21  Q.  And I know you haven't memorized what's in
22  your personnel file, but if you'll look at that
23  and make sure that those documents apply to you

Page 12

1  and if that looks familiar to you, in terms of
2  your personnel file.
3      (The witness examines the
4      document.)
5  Q.  Does that look like your personnel file?
6  A.  Yes, sir.
7  Q.  Okay.  And contained in your personnel file
8  are a number of appointment letters from before
9  Chambers' time, when Gregg was still the
10  president, correct?
11  A.  Yes, sir.
12  Q.  And that's basically the history of all of
13  your step increases and your other level increases
14  are contained in here in this personnel file where
15  you've received various increases or
16  recommendations for increases; is that right?
17  A.  Yes, sir.
18  Q.  How did you first hear about the job at
19  Ingram?  How did you come to work at Ingram?
20  A.  Read it in the newspaper.  There was an
21  advertisement.
22  Q.  And you did what?
23  A.  Applied for the job.

3 (Pages 9 to 12)

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

Page 13

1  Q.  And did an interview, I presume?
2  A.  Yes, sir.
3  Q.  Would that have been around January 1985?
4  A.  It would.
5  Q.  And the following day you were appointed --
6  January 4, 1985, you were appointed as a
7  secretary/receptionist; is that right?
8  A.  I'm not sure what day I was appointed.  I
9  know my beginning date was January 21, 1985.
10  Q.  Okay.  And you were appointed as a
11  secretary/receptionist; is that right?
12  A.  That is correct.
13  Q.  You were on the E salary schedule?
14  A.  That is correct.
15  Q.  At level E-7, Step 0?
16  A.  That is what I began at.  I was supposed to
17  be stepped on Step 3.
18  Q.  Why is that?
19  A.  Because of my years of experience.  And
20  found out about 10, 12 years later that I had not
21  been given those steps.  And they went back and
22  gave them to me.
23  Q.  So who was the one that cleaned that up for

Page 14

1  you?
2  A.  The lady that was doing payroll at that
3  time, Janet Lassiter, discovered it.  And she
4  approached Ms. Greene about it.  In fact, she
5  found that myself and Ms. Owensby had not been
6  paid for those years.
7  Q.  And what president approved that?
8  A.  I believe Mr. Chambers was the president at
9  that time.
10  Q.  I didn't understand this yesterday when I
11  was questioning Ms. Greene, but I think I
12  understand it, and I'd like for you to confirm
13  this for me:  The schedule for the different
14  salary levels starts -- well, what's the lowest
15  level?
16  A.  The salary schedule on the E salary is an
17  E-7, Step 0.
18  Q.  All right.  So the steps progress sort of --
19  A.  Each year you're there.
20  Q.  And intuitive, in terms of zero years and
21  then one year and two years, and the steps follow
22  that number?
23  A.  That is correct.

Page 15

1  Q.  But the levels are --
2  A.  At the president's discretion.
3  Q.  And they're upside down though?
4  A.  That is correct.
5  Q.  Like, you start high.  E-7 is the lowest?
6  A.  That is correct.
7  Q.  And E-1 is the highest; is that right?
8  A.  That is correct
9  Q.  I don't know that I understood that
10  yesterday.
11    But you started at E-7?
12  A.  The very bottom.
13  Q.  At Step 0?
14  A.  That is correct.
15  Q.  But later Dr. Chambers approved some steps
16  that were not credited to you for your years of
17  experience?
18  A.  That is correct.
19  Q.  Your initial salary with Ingram was $10,272;
20  isn't that right?
21  A.  I believe that's where I began.  Sounds
22  right.
23  Q.  Okay.  You continued as a

Page 16

1  secretary/receptionist, on the E-7 salary
2  schedule, from '86 to '87; isn't that right?
3  A.  That is correct.
4  Q.  And then in '87 you were raised to the E-6
5  salary schedule; is that right?
6  A.  That is correct.
7  Q.  A couple of years later, in '89, you were
8  appointed to accountant assistant, on the E-5
9  salary schedule; is that right?
10  A.  That is correct.
11  Q.  And this recommendation came from your
12  business manager at that time, Freddie Powell; is
13  that right?
14  A.  That is correct.
15  Q.  And this may be in your personnel file, but
16  I'm not going to dig for it.  I have it, and I'm
17  going to mark it separately.
18    (Defendants' Exhibit No. 2 was
19    marked for identification and a
20    copy of the same is attached
21    hereto.)
22  Q.  This Exhibit 2. August 21, '89, letter from
23  Mr. Powell recommending that you be appointed as

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

Page 17

1   the accountant assistant; is that right?
2   A.   That is correct.
3   Q.   And it looks like President Gregg at that
4   time approved it?
5   A.   He did.
6   Q.   And you'll notice in there that Mr. Powell
7   references that you were currently working on your
8   associate's degree but planned to complete your
9   bachelor of science degree. Do you see that?
10  A.   I do.
11  Q.   You never did complete that bachelor's
12  degree, did you?
13  A.   No, sir, I did not.
14  Q.   All right. Then from '89 to '94 you served
15  as an accountant assistant; is that right?
16  A.   That is correct.
17  Q.   And in '94, you were promoted to secretary
18  and administrative assistant to the Dean of Fiscal
19  Affairs on the E-3 salary schedule; is that right?
20  A.   That is correct.
21  Q.   Now, you had step increases in these years,
22  in between your level increases; is that right?
23  A.   As called for by the scale, I did.

Page 18

1   Q.   And you don't allege in this case that Mr.
2   Gregg or Mr. Chambers ever failed to follow the
3   state board policies regarding salary
4   progressions?
5   A.   No, sir.
6   Q.   You served as the secretary/administrative
7   assistant to Dean of Fiscal Affairs from about '94
8   to '97 on the E-3 salary schedule?
9   A.   That is correct.
10  Q.   President Chambers came to Ingram during
11  that time period; is that right?
12  A.   What year?
13  Q.   In '96. President Chambers came to Ingram
14  in 1996?
15  A.   That is correct.
16  Q.   And then in 1998, President Chambers
17  approved a raise for you to the E-2 salary
18  schedule, in September of 1998?
19  A.   That is correct.
20  Q.   And you worked in that position for another
21  two years on the E-2 salary schedule?
22  A.   That is correct.
23  Q.   And then in the year 2000, President

Page 19

1   Chambers again approached a reclassification of
2   your position as the administrative
3   assistant/payroll/cashier, and moved you up to E-1
4   salary schedule?
5   A.   That is correct.
6   Q.   And that is the highest salary schedule --
7   highest level of the E salary classification?
8   A.   That is correct.
9   Q.   At the time you filed your EEOC Complaint
10  against Dr. Chambers and James Wilson, you were on
11  the E-1 salary schedule making a salary of
12  $50,379?
13  A.   That is correct.
14  Q.   This is in your personnel file. I'm going
15  to mark it separately.
16           (Defendants' Exhibit No. 3 was
17           marked for identification and a
18           copy of the same is attached
19           hereto.)
20  Q.   Exhibit 3 is the job description for the
21  fiscal division secretary and administrative
22  assistant, which is the job that you held at the
23  time you filed your EEOC Complaint; is that right?

Page 20

1   A.   It should not be all of it, because I'm also
2   serving as payroll.
3   Q.   Well, if there's more of it, could you
4   locate it in here? I mean, I think you might know
5   better than I would. If there's more of it, it
6   would be in your personnel file, right?
7   A.   It should be. What were these job
8   descriptions written?
9   Q.   Well, if it's not on the documents, that's a
10  question your lawyer can ask somebody else.
11  A.   Okay.
12  Q.   It's my understanding that that was and may
13  still be your current job description
14           Do you still serve in that role?
15  A.   No, sir.
16  Q.   What position do you serve in today?
17  A.   Today I'm the business office coordinator
18  Q.   And you are on a higher salary schedule now?
19  A.   That's correct.
20  Q.   Tell me, when were you appointed to the
21  higher salary schedule?
22  A.   September of this year.
23  Q.   Of 2006?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

## Page 21

1  A.   That is correct. After the EEOC Complaint
2  was filed.
3  Q.   Okay. And before we go on to that, I do
4  want to talk some more about that.
5  A.   Okay. But I'll finish looking at this
6  first.
7  Q.   Okay, please. Thank you.
8  A.   And actually my appointment letter states
9  payroll/administrative assistant to the Dean of
10  Finance, and that's not what this job description
11  says.
12  Q.   Have you ever brought that to the attention
13  of anyone, when this job description was given to
14  you and put in your personnel file?
15  A.   This job description was not given to me.
16  Q.   It's in your personnel file, isn't it?
17  A.   Yeah.
18  Q.   Do you claim that there's something in that
19  job description that shouldn't be there, or there
20  isn't something in it that should be there?
21  A.   Well, it's obviously outdated.
22  Q.   What's obvious about that?
23  A.   Well, perhaps not obvious to you, but it is

## Page 22

1  obvious to me.
2  Q.   Okay.
3  A.   I do still manage and coordinate
4  correspondence with the dean; I do still work with
5  the accounts payable clerk, as far as travel goes;
6  I do not still help with the prep of budget and
7  financial statements and personnel reports.
8       Excuse me. I do still do quarterly
9  personnel reports.
10      I do still maintain inventories. I do not
11  still assist with writing purchase orders, and I
12  do not still work with the restriction of funds
13  and budgets.
14      Those, we have an assistant accountant that
15  does that.
16  Q.   Okay.
17  A.   I do not still work with the college's phone
18  system. However, I do all other duties
19  assigned by the college dean, which, I guess,
20  could assume all of those other duties.
21  Q.   Okay. Do you know who is responsible for
22  writing the job description?
23  A.   Those, I would assume, fall under the title

## Page 23

1  of the personnel director.
2  Q.   If the job description doesn't accurately
3  reflect all of the duties that you do at a
4  particular point in time, is there some mechanism
5  by which that job description is updated or
6  revised?
7  A.   I would think. That would be my personal
8  thinking. But then our personnel department
9  should be updating their job descriptions.
10  Q.   Well, let's say on one day you're working
11  the phones, and the next day your boss, Ms.
12  Greene. decides that she doesn't want you to do
13  that anymore because she wants someone else to do
14  that; she wants you to focus on some of your other
15  duties.
16      Would you expect that job description to be
17  revised that day by the personnel department?
18  A.   No, sir
19  Q.   How would you expect the flux in job
20  assignments or duties to be reflected in your job
21  description that's in your personnel file?
22  A.   I would expect. when new assignments are
23  made to people in an appointment to new job

## Page 24

1  appointments, I would expect personnel to put out
2  a new job description to reflect that person's new
3  job.
4  Q.   I've gotcha. When President Chambers
5  reclassified you as an administrative
6  assistant/payroll/cashier, you didn't have to
7  compete with anybody for that new job, did you?
8  A.   No, sir.
9  Q.   In fact, no one else was considered for that
10  position when you were reclassified?
11  A.   I would not know if anybody else was
12  considered, because I don't know what he thought.
13  To my knowledge, nobody else was considered; I
14  will say that
15  Q.   Right. And you didn't have to make any
16  special application or demonstration of your
17  competence or qualification to be reclassified?
18  A.   I believe at some point -- and I'm not sure
19  if it was for the position of payroll or for the
20  assistant's job -- at some point, people wrote
21  letters on my behalf. And I did fill out an
22  application. I'm not sure on which position that
23  was

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 25

1   Q.   Would that application be in your personnel
2   file?
3   A.   I would think.
4   Q.   I did not see it in your personnel file
5   That doesn't mean -- I mean. I don't know what I'm
6   looking at as well as you know what I'm looking
7   at, in terms of all the documents in your
8   personnel file.
9        But you've looked through it a couple of
10  times. You didn't see an application like that.
11  did you?
12  A.   I didn't. I do remember vaguely -- I'm just
13  not -- I don't recall.
14  Q.   Yes, ma'am. But you don't recall having
15  been required to compete with males or other
16  females, someone of another race? You didn't have
17  to compete with anybody to be reclassified on the
18  E-1 salary schedule in year 2000?
19  A.   Not that I recall
20  Q    Now, tell me about your most recent -- is it
21  a reclassification? Am I saying the right term?
22       How would you describe your new job duties?
23  Was it at reclassification, a promotion, a raise?

Page 26

1   What was it?
2   A.   Mr. Chambers called myself and some other
3   people down into Mr. Wilson's area this year when
4   they were reclassifying some people.
5        And when I say "some people," I can only say
6   there were other people I know of that were called
7   down there
8        And they were doing some restructuring, they
9   called it. And he called me down and said that
10  after looking over duties in our area, that he had
11  taken my job into consideration and that he felt
12  like it was the time to move me from the E salary
13  schedule to the C salary schedule.
14  Q.   That's a higher schedule, right?
15  A.   It is a higher schedule. I was at the top
16  of E salary schedule, and that he was going to
17  move me to the C salary schedule, and that he was
18  going to place me on that C salary schedule and
19  name me the business office coordinator
20  Q.   Okay. You didn't have to compete with
21  anybody for the business office coordinator
22  position, did you?
23  A.   No, sir, I did not.

Page 27

1   Q.   Where on the C salary schedule did you move?
2   What was your new classification, as of September
3   of last year?
4   A.   What do you mean?
5   Q.   Well. you moved to the C schedule   C what?
6   A.   3  It's the bottom of the schedule.
7   Q.   Starts at 3 goes, down to 1?
8   A.   That's correct  Goes up to 1.
9   Q.   That's correct  Goes up to 1?
10  A.   That is correct. And C-3 does not include
11  any steps  So that means you would not get any
12  years of experience for being where you are.
13  Q.   I see  And that's not unique to your job;
14  that's unique to the salary schedule?
15  A.   That is correct
16  Q.   So anybody that's on the salary schedule.
17  whether it's you or anybody else in the college --
18  A.   On the C-3.
19  Q.   -- on the C-3 salary schedule, they are not
20  going to have steps?
21  A.   That is correct.
22  Q.   And what was your last -- I guess your last
23  salary on the E schedule was $50,379?

Page 28

1   A.   That's what it was the last year I was
2   there. That's not what I would have moved to had
3   I been there this year on E-1. I would have, of
4   course, gotten a step this year.
5   Q.   Yes, ma'am. When the president moved you
6   from E to C, how much of a raise did you get?
7   A.   From one year to the next, that was a
8   $10,000 raise with a cost-of-living increase that
9   I would have gotten had I stayed on the E salary.
10  It was approximately 7,000, because I would have
11  automatically gotten approximately a $3,000 raise
12  anyway.
13  Q.   That was a strong raise for you?
14  A.   Yes, it was.
15  Q.   And that is the position in which you
16  currently serve?
17  A.   That is correct.
18  Q.   What is your current salary?
19  A.   $60,000 a year.
20  Q.   In reviewing your personnel record this
21  morning, you cannot find in that record any
22  reprimands by the president of you?
23  A.   No, sir.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 29

```
1   Q.   Your evaluations were performed by your
2   immediate supervisor, Ms. Greene?
3   A.   That is correct.
4   Q.   And they are generally favorable
5   evaluations?
6   A.   Yes, sir.
7   Q.   You do not have any records in your
8   personnel file that reflect significant criticisms
9   of your performance by your immediate supervisor;
10  is that right?
11  A.   No, sir.
12  Q.   Is that right?
13  A.   That's correct.
14  Q.   Okay. Sometimes the way I ask the question
15  doesn't make sense.
16  A.   Okay.
17  Q.   And, likewise, there are no documents in
18  that file reflecting significant or any --
19  significant or otherwise -- criticisms of you by
20  Dr. Chambers?
21  A.   That's correct.
22  Q.   And in your tenure with -- I'm saying
23  tenure. That's really kind of a term of art,
```

Page 30

```
1   isn't it? Are you tenured? Is that a term that
2   applies to you?
3   A.   I hope so. I've been there a lot of years.
4   Q.   And I'm asking out of honest curiosity. I
5   don't exactly understand the tenure rule.
6   A.   Well, the claim is, if you've been there
7   three years, you're tenured.
8   Q.   So you've been there three years for sure?
9   A.   Oh, yes, sir. I've been there a lot of
10  years.
11  Q.   Okay. And in that time that you've been
12  there and that President Chambers has been there,
13  and that's since 1996, he has moved you up in
14  levels, notwithstanding the yearly step increases,
15  but he's moved you up in levels on three
16  occasions?
17  A.   Yes, sir.
18  Q.   And on none of those occasions have you been
19  required to compete with any other person for that
20  promotion?
21  A.   No, sir. May I "inject" something?
22  Q.   Well, it would be better if you just
23  answered my questions, but I don't want to keep
```

Page 31

```
1   you from testifying truthfully in response to my
2   question. Is your comment in response to a
3   question?
4   A.   (Witness shakes head.)
5   Q.   Not really? Okay. I don't mind if you
6   talk, but I'm not sure if your lawyer wants you to
7   talk.
8   A.   You're not required to apply for these type
9   jobs on the E salary schedule if it's upward
10  mobility.
11  Q.   I'm going to mark as Exhibit 4 the EEOC
12  Complaint that you filed February 23rd of 2006.
13          (Defendants' Exhibit No. 4 was
14          marked for identification and a
15          copy of the same is attached
16          hereto.)
17  Q.   If you'll take a look at that and make sure
18  that that is the totality of your EEOC Complaint.
19          (The witness examines
20          the document.)
21  Q.   Does that appear to be the totality of your
22  EEOC Complaint?
23  A.   It is.
```

Page 32

```
1   Q.   Okay. I'm going to mark as Exhibit 5 the
2   responses to my discovery that were produced by
3   you and sworn under oath.
4           (Defendants' Exhibit No. 5 was
5           marked for identification and a
6           copy of the same is attached
7           hereto.)
8   Q.   Take a look at that and make sure that those
9   are your discovery responses.
10  A.   They are.
11  Q.   Okay. You had ample time to reflect on
12  those questions and requests for production, did
13  you not?
14  A.   We did.
15  Q.   And you provided a complete response to
16  those questions and requests; is that true?
17  A.   To the best of my knowledge.
18  Q.   Okay. If I could direct your attention to
19  No. 8. Are you with me?
20  A.   Identify by name and address of persons?
21  Q.   Yes.
22  A.   Yes.
23  Q.   "Identify by name, address, and telephone
```

8 (Pages 29 to 32)

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

---

Page 33

1  number of any person from whom you or anyone on
2  your behalf have obtained a written, recorded or
3  oral statement concerning or relating to the
4  incident."
5      Your response was that you had written
6  statements from Leo Miller, Patti Graves, Melissa
7  Wallace; and oral statements was the minutes of
8  meetings.
9      You have not produced for me the written
10  statement of Leo Miller; is that right?
11  A.   Written statement? We did.
12  Q.   Okay. Well, where is it?
13  A.   I don't know. It was sent to y'all.
14      MR. DEBARDELABEN: Isn't it attached
15  there?
16      THE WITNESS: It should be.
17      MR. CHRISTMAN: Jim, I just haven't
18  seen that statement.
19      MR. DEBARDELABEN: I thought it was in
20  there.
21      MR. CHRISTMAN: Okay.
22      THE WITNESS: It was furnished. It
23  should be attached.

Page 34

1      MR. DEBARDELABEN: It might be in my
2  office somewhere. If it wasn't, it wasn't out of
3  any --
4  Q.   Okay. Who is Leo Miller?
5  A.   He was an instructor assistant at J.F.
6  Ingram.
7  Q.   When?
8  A.   For the last couple of years.
9  Q.   2005 to now? 2006 to now?
10  A.   Probably 2004.
11  Q.   2004 until now?
12  A.   Uh-huh. Well, actually now he's -- he went
13  away one day and didn't come back.
14  Q.   What does that mean?
15  A.   He was a former inmate; then he was hired as
16  an instructor assistant. And he just didn't come
17  back to work one day.
18  Q.   Who did he work for?
19  A.   He worked for Mr. Keahey in the refinishing
20  shop.
21  Q.   And he was an inmate who was a student at
22  the college?
23  A.   He was. And then when he got out, we hired

Page 35

1  him as part time, and then he come to work as full
2  time.
3  Q.   Who hired him?
4  A.   Mr. Chambers.
5  Q.   And he was hired as an assistant to Keahey?
6  A.   Yes. Mr. Keahey is our refinishing
7  furniture instructor.
8  Q.   Okay.
9      MR. CHRISTMAN: The statement will
10  speak for itself, but I've never seen it. I'd
11  love to talk to you about it.
12      MR. DEBARDELABEN: Did you ask for the
13  statement?
14      MR. CHRISTMAN: Well, I don't know that
15  I asked for it.
16      MR. DEBARDELABEN: You just said
17  identify. But if we've got it, I have no problem
18  getting it for you.
19  Q.   What's in it? What does it say?
20  A.   It says that he was asked by the president
21  and did work, on college time, putting in cabinets
22  at a person, that does really not qualify for live
23  work, at his home.

Page 36

1  Q.   Uh-huh.
2  A.   And turned in hours to my office to be paid
3  for.
4  Q.   Well, how does that create a hostile
5  environment for you?
6  A.   It's asking me to falsify records.
7  Q.   Who is asking you to falsify records?
8  A.   When a person tells me that they are doing
9  something that's illegal, that the president has
10  asked them to do, and I know that that's
11  happening, and he's turning in those hours, I have
12  his word that he's doing that, then what type of
13  position do you think that puts me in? I'm asking
14  you.
15  Q.   Well, I appreciate your response. Actually,
16  I'm the one that's going to be asking the
17  questions today.
18  A.   Yes, sir.
19  Q.   I won't be answering any questions, but I
20  will be asking them.
21      You believe it creates a hostile environment
22  for you because Miller turned in hours that he
23  worked off site?

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 37

1  A.  Yes. sir
2  Q.  Is that right?
3  A.  That's correct.
4  Q.  Okay.  To whom did you report what you claim
5  to be illegal conduct?
6  A.  I reported it to my supervisor.
7  Q.  Monica Greene?
8  A.  And we documented it.
9  Q.  Who else did you report it to?
10  A.  Nobody.
11  Q.  Why not?
12  A.  I didn't find it necessary to report it to
13  anybody else.
14  Q.  Well, you just said that Dr. Chambers asked
15  you to do something illegal.  And the only thing
16  you did was report it to your supervisor?  You
17  didn't report it to anybody else?
18  A.  No, sir
19  Q.  Well, if he was putting you in an impossible
20  position of approving of something that's illegal,
21  why didn't you report it to the authorities?
22  A.  Because if he had the instructor doing it,
23  that was his prerogative.

Page 38

1  Q.  Well, it was either illegal for you to make
2  him pay it, or it was his prerogative.
3  A.  His supervisor signed off on it.
4  Q.  Who's supervisor?
5  A.  Mr. Miller's.  Dr. Merk
6  Q.  So you didn't have a problem paying it?
7  A.  Not if they told me to.  It was my job to do
8  what I was told to do.
9  Q.  And you didn't have a problem with that?
10  A.  Not as long as they were telling me to do
11  it.
12      MR. DEBARDELABEN:  Drew, I have the
13  statement, but it wasn't -- I didn't read that
14  asking for it.  We'd be happy to produce it.
15      MR. CHRISTMAN:  Today?
16      MR. DEBARDELABEN:  I'll produce it
17  right now if you want to get a copy.
18      MR. CHRISTMAN:  I do.  Thanks, Jim.
19      MR. DEBARDELABEN:  And I didn't read
20  that as asking for the statement.
21      MR. CHRISTMAN:  Okay.  For your
22  information, I'm going to be asking exactly the
23  same questions about Patti Graves and Melissa

Page 39

1  Wallace
2      MR. DEBARDELABEN:  I've got their
3  statements here too.  I know I've got Melissa
4  Wallace; I don't know about Patti Graves.  Do you
5  want the statement of Melissa Wallace?
6      MR. CHRISTMAN:  (No response.)
7      MR. DEBARDELABEN:  Do you want to make
8  a copy of Melissa Wallace?
9      MR. CHRISTMAN:  Yes, sir
10      MR. DEBARDELABEN:  I don't have Patti
11  Graves.
12      MR. CHRISTMAN:  Okay.  Thank you.
13  Q.  I'm going to mark as Defendants' Exhibit 6
14  what is entitled Affidavit of Leo Miller.
15      (Defendants' Exhibit No. 6 was
16      marked for identification and a
17      copy of the same is attached
18      hereto.)
19  Q.  How did you get this?
20  A.  Mr. Miller gave it to me.
21  Q.  Why did he give that to you?
22  A.  He volunteered the information.
23  Q.  Why?

Page 40

1  A.  He was just talking about it and he gave it
2  to me.
3  Q.  Why did he sign an affidavit?  Why is it
4  entitled Affidavit?
5  A.  I can't answer that.
6  Q.  Did you ask him to fill out an affidavit for
7  this lawsuit?
8  A.  No, I didn't.  He volunteered the
9  information.
10  Q.  Just out of the blue?
11  A.  Yes, he did.
12  Q.  That appears to have a signature on the
13  bottom, right?
14  A.  Yes, it does.
15  Q.  It doesn't have a notarization, is that
16  right?
17  A.  No, it doesn't.
18  Q.  Who else did he give this to?
19  A.  I don't have any idea.
20  Q.  But he gave it to you?
21  A.  Yes, he did.  Maybe he gave one to Mr.
22  Chambers.
23  Q.  How does that affidavit -- what's labeled as

10 (Pages 37 to 40)

Page 41

1  an affidavit; it's just a signed statement -- but
2  how does that have anything to do with you, other
3  than what you've already told me. that you ended
4  up cutting the check for his hours?
5  A.   Nothing
6  Q.   Okay  I'm going to mark as Defendants'
7  Exhibit 7 what was produced to me today that is
8  the --
9         MR. DEBARDELABEN: Well. you can say
10  produced today. but you didn't ask for these
11  documents on No. 8  We would have been happy to
12  give it to you then  So when you asked for the
13  document. we gave you the document.
14        Kind of like my mistake on the minutes.  I
15  don't think you intended not to produce them; we
16  didn't intend not to produce them  But when you
17  saw we actually were, as you were going to give me
18  copies of the minutes, when you understood what I
19  meant, we're giving you copies of this when we
20  understood that you wanted the statement  We're
21  not trying to hide anything from you
22        MR. CHRISTMAN: I understand. I'm just
23  making a record that I'm just seeing it today.

Page 42

1         MR. DEBARDELABEN: Okay
2         (Defendants' Exhibit No. 7 was
3          marked for identification and a
4          copy of the same is attached
5          hereto.)
6  Q.   You've seen Exhibit 7 before, correct?
7  A.   That is correct.
8  Q.   How did you come in possession of that
9  statement?
10  A.   She gave it to me.
11  Q.   Why did she give that to you?
12  A.   Because she's discussed with me my problems
13  with Mr  Chambers.
14  Q.   When did she give it to you?
15  A.   She gave it to me after this incident.
16  Q.   Well, I understand it was after the
17  incident; she couldn't have given it to you before
18  the incident
19  A.   That's correct.
20  Q.   When did she give it to you though?  Was it
21  this year after you filed this lawsuit?  When was
22  it?
23  A.   I don't really recall.  I think it was

Page 43

1  possibly after.
2         She talked to me about it.  She did not
3  appreciate the way we were being treated, as she
4  didn't appreciate the way she had been treated
5  Q.   Okay  What does that have to do with you?
6  A.   It has to do with me because she's been
7  treated in the same manner I've been treated:
8  hostilely, ugly  Same reason  Because she's a
9  white female  By the same people
10  Q.   What makes you think that anything in that
11  letter is true?
12  A.   Because I don't think she's a liar
13  Q.   The only information you have is what she
14  told you?
15  A.   Except for I saw this meeting take place.
16  Q.   Were you in that meeting?
17  A.   I was not in the meeting, but I did hear the
18  raised voices from that meeting when they degraded
19  her.
20  Q.   You don't know that they degraded her, do
21  you?
22  A.   I know what I heard
23  Q.   Well, what did you hear?

Page 44

1  A.   I heard them raise voices at her  And they
2  were all in there versing her.
3  Q.   How do you know they were versing her, is my
4  question.
5  A.   Because she was sitting at one end of the
6  table and they were all surrounding her.
7  Q.   How do you know that?
8  A.   Because I have eyes and I see that.
9  Q.   You can see through the wall?
10  A.   I didn't have to see through the wall.
11  There's an open door
12  Q.   The door was open while they had this
13  meeting?
14  A.   Yes, it was.
15  Q.   And you saw her sitting at the head of the
16  table?
17  A.   I did.
18  Q.   But you didn't hear the substance of that
19  conversation. did you?
20  A.   I heard some of it.
21  Q.   What did you hear?
22  A.   I heard them raising their voices and
23  saying, "Ms  Wallace."

Page 45

1    Perhaps I can't remember all the exact
2  details of what was being said, but I think I got
3  enough of the gist of it to know that she was
4  being talked ugly to.
5  Q.   Well. you haven't given me any of the gist
6  of it. All you've told me so far is you heard
7  raised voices and you heard them say her name.
8    Anything else that you heard?
9  A.   No, sir.
10  Q.   So anything that she has said in this
11  statement you just heard from her?
12  A.   Yes.
13  Q.   Because you weren't on that phone call?
14  A.   Oh, no, sir, I did not hear her phone call.
15  Q.   And you don't know if any of this transpired
16  the way she said it transpired?
17  A.   No, sir.
18  Q.   You have no personal knowledge of this
19  matter at all?
20  A.   I have personal knowledge that I saw the
21  meeting take place.
22  Q.   You have no personal knowledge of the matter
23  associated with the phone call?

Page 46

1  A.   No, sir.
2  Q.   And you have no personal knowledge of the
3  content of that meeting, other than that they
4  raised their voices and said her name?
5  A.   That's correct.
6  Q.   And this meeting was not about you?
7  A.   No, sir.
8  Q.   You weren't called into the meeting?
9  A.   No, sir.
10  Q.   Nobody raised their voice at you at this
11  meeting?
12  A.   No, sir.
13  Q.   President Chambers never referred to you?
14  A.   No, sir.
15  Q.   Your job performance?
16  A.   No, sir.
17  Q.   This meeting was with -- who did you see in
18  this meeting?
19  A.   I saw Ms. Perryman, I saw Ms. Wallace, I saw
20  Dr. Merk and Mr. Wilson, I believe, and Mr.
21  Chambers, if I recall correctly.
22  Q.   Ms. Perryman is a white female?
23  A.   She is, as we all know.

Page 47

1  Q.   We do all know that, don't we?
2  A.   We do. Because we have expressed that many
3  times.
4  Q.   And that's kind of important?
5  A.   It is, because she is --
6  Q.   You claim Ms. Perryman was berating Ms.
7  Wallace in this meeting where you heard raised
8  voices and somebody say Ms. Wallace's name.
9  because she's a white female?
10  A.   That's all.
11  Q.   Is that what you claim?
12  A.   I don't claim anything.
13  Q.   Okay. Fair enough. How about the statement
14  of Patti Graves? Where is that statement?
15  A.   It was furnished.
16  Q.   It was furnished to your lawyer?
17    MR. DEBARDELABEN: I don't have that
18  statement.
19    THE WITNESS: Okay. We have it.
20    MR. CHRISTMAN: Let's take a quick
21  break. My coffee's catching up with me.
22    (A brief recess was taken.)
23  (BY MR. CHRISTMAN)

Page 48

1  Q.   The last statement that you've listed here
2  is one from Patti Graves. I understand we might
3  be able to get that today.
4    Until we get it. while we're thinking about
5  it and talking about it, what's in it?
6  A.   I believe she talks about the incident where
7  Mr. Chambers berates us and talks ugly to us and
8  hollers at us about wanting to use the programmer,
9  Mr. Englett.
10  Q.   All right. We'll just have to look at that
11  statement and talk about it in a little more
12  detail.
13  A.   Okay.
14  Q.   If you'll look at No. 11 of the
15  interrogatories, which is Exhibit 5.
16  A.   Uh-huh.
17  Q.   It indicates that you have filed for
18  bankruptcy in '97?
19  A.   I did.
20  Q.   Chapter 13 was the type?
21  A.   It was.
22  Q.   And then you were released in 2002?
23  A.   That's correct.

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 49

1  Q.   Why did the bankruptcy trustee keep this
2  thing pending from '97 to '02?
3  A.   Probably because it took us five years to
4  pay it off.
5  Q.   Okay. Look at 14. It says, "Please
6  identify each and every lawsuit in which you have
7  been involved or are currently involved, either as
8  a plaintiff, defendant, or a witness."
9      Your answer was, "There have been several
10 lawsuits involving J.F. Ingram in which I was a
11 potential witness. However, I never testified nor
12 gave any type of deposition in any of the cases."
13     What are we talking about here? What
14 several lawsuits involving Ingram were you a
15 potential witness?
16 A.   They were lawsuits that were settled out of
17 court.
18 Q.   Who filed them?
19 A.   Well, Dr. Gregg and Cynthia Hall and Wendell
20 Bell had a disagreement; and it was a potential
21 lawsuit, and I believe it was settled.
22 Q.   Was a lawsuit ever filed in that
23 disagreement?

Page 50

1  A.   I believe it was. I'm really not sure. I
2  believe they used Shinbaum & McPhillips.
3  Q.   Who sued who?
4  A.   I believe Ms. Hall and Mr. Bell filed suit
5  against Dr. Gregg.
6  Q.   Why?
7  A.   Something to do with Mr. Chisum -- Mr. Gregg
8  having Mr. Chisum -- Woody Chisum that worked with
9  Mr. Bell -- taping some of their conversations.
10 Dr. Gregg, perhaps -- I really don't remember all
11 the details right now. That was several years
12 back.
13 Q.   When was it approximately?
14 A.   When I first came to work up there. It was
15 back when I was still a receptionist, so that was
16 in the late 1980s. So that was several years
17 back.
18 Q.   And it was resolved by, you think,
19 settlement?
20 A.   I think they settled it.
21 Q.   And what were you a witness for?
22 A.   Mostly a character witness for Ms. Hall,
23 because she was a friend of mine.

Page 51

1  Q.   I see.
2  A.   And then before Dr. Gregg retired. he was
3  trying to get several of the ladies up there to --
4  I probably shouldn't have said several lawsuits; I
5  probably should have said a couple of lawsuits.
6  Sometimes you say words that are not --
7  Q.   I understand.
8  A.   Milt Mulder was our Dean of Instruction.
9  And Dr. Gregg was trying to orchestrate another
10 one of the deans, a Dr. Shum at the time. to
11 become the next president of the college. And he
12 was afraid in his mind, or so it seemed, that Milt
13 Mulder would maybe become the next president of
14 the school.
15     So he had some of the instructors -- Johnny
16 Gaither and Bill Griswold, and I think his name
17 was David Jones -- he was another instructor there
18 -- asking some of the women there -- myself and
19 Linda Miller and Becky Mullins and maybe a Kathy
20 Hollman at that time -- I can't remember
21 everybody's name off the top of my head -- but he
22 got it in his mind that if he had those particular
23 instructors to talk to some of us women -- myself

Page 52

1  and Ms. Miller, Ms. Mullins, and Kathy Hollman --
2  that if we would say that Mr. Mulder was making
3  sexual advances at us, that it would knock Mr.
4  Mulder out of the running for president of the
5  college.
6  Q.   Who was asking you to do that?
7  A.   He was asking these instructors.
8  Q.   Who was? Mr. Gregg was asking --
9  A.   Dr. Gregg was asking them to do this. So it
10 turned into a lawsuit.
11     Because after a while, the women got
12 concerned that they were going to be caught up in
13 the middle of this mess.
14     So I know personally one night I called Mr.
15 Mulder and said, Look, the women are being pursued
16 to do this, and we don't want to be caught up in
17 this mess.
18     And from that, Mr. Mulder started talking to
19 the people and found out that this was indeed
20 true, that myself and Ms. Miller and Ms. Hollman
21 and Ms. Mullins had been approached.
22     In fact, I believe Kay Perryman had also
23 been approached to do this same thing, say that he

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 53

1   had been sexually harassing those people.
2       Most of those people were not even under Mr.
3   Mulder's direct supervision, and found out that
4   these were false allegations against Mr. Mulder,
5   and that these guys were just doing what Dr. Gregg
6   had asked them to do.
7       And it turned into a mess and hit the
8   newspapers. And it all became a big thing.
9   Anyway, that lawsuit also was settled out of
10  court.
11  Q.    Who sued who?
12  A.    Milt Mulder ended up suing Dr. Gregg for
13  defaming his name.
14  Q.    But you were approached by someone who asked
15  you to falsely state that you had been sexually
16  harassed?
17  A.    That's correct. Actually, I think I did
18  give a deposition on that. I may have falsely
19  stated that I didn't give a deposition. I didn't
20  testify, but I think I might have given a
21  deposition in that case.
22  Q.    Would you have a copy of that deposition?
23  A.    No, sir, I don't.

Page 54

1   Q.    Okay. Did you appreciate being approached
2   on behalf of Dean Gregg to falsely testify that
3   you had been sexually harassed?
4   A.    No, sir, I did not.
5   Q.    Did you feel like that was putting you in a
6   very difficult position?
7   A.    Yes, I did.
8   Q.    Did you feel like that was a difficult or
9   hostile environment in which to work?
10  A.    Yes, it was.
11  Q.    Why didn't you sue Dr. Gregg?
12  A.    Why didn't I sue him?
13  Q.    Yes, ma'am.
14  A.    Probably because I thought it was being
15  resolved because Mr. Mulder sued him. Probably
16  had he not done it, and probably if I had been
17  older, maybe I would have done it. I was younger
18  at that time, had a smaller child -- had a young
19  child -- maybe was more intimidated at that point
20  in my life.
21  Q.    Well, you weren't intimidated enough to
22  actually give false testimony though, were you?
23  A.    No, sir. A liar I'm not.

Page 55

1   Q.    Any other cases in which you were involved
2   as a witness or a potential witness?
3   A.    Not that I recall.
4   Q.    Look at No. 16, page 5?
5   A.    No. 16?
6   Q.    Yes, ma'am. See it on your page 5?
7   A.    Yes, sir.
8   Q.    "Please identify and describe every item of
9   special, incidental or consequential damages for
10  which you seek recovery in this lawsuit."
11      You indicated that you didn't understand
12  those terms, but that you seek damages for mental
13  and emotional pain and anguish for being yelled
14  at, right?
15  A.    Yes, sir.
16  Q.    For being accused of not performing your
17  duties, right?
18  A.    Correct.
19  Q.    What kind of mental and emotional pain and
20  anguish have you suffered?
21  A.    Every time I'm called in and talked to about
22  things that I have no control over.
23  Q.    It causes you some emotional pain and

Page 56

1   anguish?
2   A.    Yes.
3   Q.    Okay. I know I'm not supposed to ask this,
4   but in a lawsuit I have to: How old are you?
5   A.    49 years old.
6   Q.    And how long have you worked at Ingram?
7   A.    Since January 21, 1985.
8   Q.    22 years?
9   A.    That is correct. 23 in January. So it
10  would be 22 and a half years.
11  Q.    Would you turn to the attachments?
12  A.    Yes, sir.
13  Q.    It says on No. 18 is a listing of some
14  doctors. There are two listed.
15  A.    Uh-huh.
16  Q.    You listed Anne Julianne Jenkins, a medical
17  doctor in Montgomery, right?
18  A.    That's correct.
19  Q.    Who is Dr. Jenkins?
20  A.    She's an internal medicine doctor.
21  Q.    Okay. Is she your regular treating
22  physician?
23  A.    Since 1998 she is.

14 (Pages 53 to 56)

| Page 57 |
|---|

1   Q.   And you see her for everything from a bad
2   cough to a nervous breakdown?
3   A.   That is correct.
4   Q.   All right. And you've been treating with
5   her since '98?
6   A.   That's correct.
7   Q.   The conditions you list here are anxiety,
8   anxiety attacks, and sleep deprivation?
9   A.   That's correct.
10   Q.   What kind of medication have you been taking
11   associated with anxiety, anxiety attacks, or sleep
12   deprivation, from Dr. Jenkins?
13   A.   I take -- daily I take Lexapro, Topamax,
14   Xanax as needed. They've tried me on different
15   medications.
16      Originally I have taken Prozac, Wellbutrin.
17   They've changed me around. I've taken -- for the
18   sleep I've taken several different things from
19   Lunesta to Klonopin to -- gosh, I don't even know
20   if I can even name all the different sleep
21   medications they've put me on.
22   Q.   Who was treating you prior to Dr. Jenkins?
23   A.   Dr. Joe Powell -- Howell, excuse me. Not

| Page 58 |
|---|

1   Powell, Howell. I'm sorry. Dr. Joe Howell in
2   Prattville.
3   Q.   What did he treat you for?
4   A.   He was our regular family physician.
5   Q.   Right.
6   A.   Blood pressure, general medications. He's
7   the first one who tried me on Prozac.
8   Q.   Okay. How did that go for you?
9   A.   It worked for a little while. And that's
10   what I was on when I started with Dr. Jenkins in
11   1998.
12   Q.   When did you start treating with Dr. Howell?
13   A.   I'm not sure.
14   Q.   In 1990? earlier than that?
15   A.   I can't say that I regularly used a doctor
16   until maybe in the late '90s. You went maybe for
17   a cold or something like that. But other than
18   that, I used my female doctor, you know.
19   Q.   Who was your female doctor?
20   A.   Dr. John Ashhurst.
21   Q.   How long has Dr. John Ashhurst been your
22   OB/GYN?
23   A.   Oh, gosh. Since 1976, I guess, when I got

| Page 59 |
|---|

1   married.
2   Q.   Has he ever prescribed for you Prozac or
3   lithium or anything like that?
4   A.   Oh. no, sir. And he retired probably in the
5   early '90s. And that's probably when I started
6   going more frequently to Dr. Howell and then to
7   Dr. Jenkins.
8      Because when Dr. Ashhurst retired, of
9   course, I had to find another doctor. I didn't
10   use anything other than that. I've had some
11   surgeries but that were --
12   Q.   Who is your OB/GYN now?
13   A.   I use Dr. Jenkins for that because she's an
14   internal medicine doctor.
15   Q.   She's not an OB/GYN though?
16   A.   No, she's not. But I just have regular
17   check-ups. I'm at that age where it's not really
18   necessary for all the other. That's called being
19   older too.
20   Q.   Do you know about -- I guess maybe I would
21   have to get the records of Dr. Howell to know when
22   he first tried you on Prozac.
23   A.   Probably.

| Page 60 |
|---|

1      MR. CHRISTMAN: This doesn't need to be
2   on the record.
3      (An off-the-record discussion
4      was held.)
5   (BY MR. CHRISTMAN)
6   A.   Dr. Krher is a surgeon, and he did my
7   surgery caused by acid reflux because I had
8   Barrett's Disease in the esophagus.
9   Q.   Okay. We'll talk about that in just a
10   second.
11      You mentioned Dr. Howell may be at a clinic
12   now in Autaugaville, but he's not practicing where
13   he used to practice?
14   A.   No, sir.
15   Q.   Do you know when he tried you on Prozac? Do
16   you have any idea?
17   A.   I'm going to say it was in the late '90s,
18   but I could be wrong. Mid-'90s.
19   Q.   Well, Dr. Jenkins was in the late '90s?
20   A.   That is correct. It was right before I came
21   to her.
22   Q.   Okay. Gotcha. And do you claim in this
23   lawsuit that this anxiety, anxiety attacks, and

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 61 | |
|---|---|
| 1 | sleep deprivation has anything to do with Dr. |
| 2 | Chambers? |
| 3 | A.   I'm saying that I have a lot of problems |
| 4 | because of the work atmosphere that's caused by |
| 5 | Mr. Chambers; yes, I am. |
| 6 | Q.   Well, I'm not asking about the lot of |
| 7 | problems though; I'm talking about your medical |
| 8 | condition and medication that you're taking. |
| 9 |      Is it your allegation that you are taking |
| 10 | medication because of Dr. Chambers? |
| 11 | A.   Yes, I am. |
| 12 | Q.   Are you married? |
| 13 | A.   Yes, I am. |
| 14 | Q.   How long have you been married? |
| 15 | A.   30 years. |
| 16 | Q.   Do you have any children? |
| 17 | A.   I have one daughter. |
| 18 | Q.   Have you always had only one daughter? |
| 19 | A.   Yes, I have. |
| 20 |      MR. DEBARDELABEN:  Well, not always. |
| 21 | Q.   Well, have you had any more children than |
| 22 | the daughter that you currently have? |
| 23 | A.   No. |

| Page 62 | |
|---|---|
| 1 | Q.   Alex Krher you've listed also. |
| 2 | A.   Uh-huh. |
| 3 | Q.   And he treated you in 2000 to 2001? |
| 4 | A.   That's correct. |
| 5 | Q.   What did he treat you for?  I say "he." |
| 6 | It's a he? |
| 7 | A.   He is. |
| 8 | Q.   What did Dr. Krher treat you for? |
| 9 | A.   I had the beginnings of Barrett's Disease in |
| 10 | my esophagus. |
| 11 | Q.   What is your understanding of that disease? |
| 12 | A.   My understanding is it's caused from acid |
| 13 | reflux.  And it had begun eating away my esophagus |
| 14 | lining.  And they went in and did the surgery, |
| 15 | which is a flap that's inserted which keeps that |
| 16 | reflux from coming up into your esophagus. |
| 17 | Q.   Right.  Are you on any medication for acid |
| 18 | reflux? |
| 19 | A.   Not since I had the surgery I'm not. |
| 20 | Q.   Prior to the surgery were you on medication |
| 21 | for acid reflux? |
| 22 | A.   Yes, I was. |
| 23 | Q.   What were you on? |

| Page 63 | |
|---|---|
| 1 | A.   Prilosec. |
| 2 | Q.   Anything else? |
| 3 | A.   No, sir. |
| 4 | Q.   How long did you take the Prilosec? |
| 5 | A.   Probably about six years. |
| 6 | Q.   Did Dr. Howell ever prescribe you Prilosec? |
| 7 | A.   No, sir. |
| 8 | Q.   Dr. Ashhurst? |
| 9 | A.   No, sir. |
| 10 | Q.   Do you have -- does anyone else in your |
| 11 | family have acid reflux? |
| 12 | A.   Yes, sir. |
| 13 | Q.   Who has it? |
| 14 | A.   My mother and my sister. |
| 15 | Q.   Who is your sister? |
| 16 | A.   Bonnie Best. |
| 17 | Q.   Where does she live? |
| 18 | A.   Millbrook. |
| 19 | Q.   Where does she work? |
| 20 | A.   She's no longer working. |
| 21 | Q.   Where did she work? |
| 22 | A.   Department of Labor. |
| 23 | Q.   She has acid reflux? |

| Page 64 | |
|---|---|
| 1 | A.   Yes, she does. |
| 2 | Q.   Does she take medication? |
| 3 | A.   No longer. |
| 4 | Q.   Why? |
| 5 | A.   Because she had the same surgery. |
| 6 | Q.   Did it work for her? |
| 7 | A.   It did. |
| 8 | Q.   And it worked for you? |
| 9 | A.   It did. |
| 10 | Q.   So you don't have acid reflux anymore? |
| 11 | A.   Well, they say you continue to have it in |
| 12 | your stomach; but once you have the surgery, it no |
| 13 | longer comes up in your throat, until the surgery |
| 14 | quits working. |
| 15 | Q.   I understand.  But you don't struggle from |
| 16 | the symptoms anymore? |
| 17 | A.   That's correct. |
| 18 | Q.   And your mother, does she still struggle |
| 19 | with acid reflux? |
| 20 | A.   Yes. |
| 21 | Q.   Did she have the surgery? |
| 22 | A.   She did. |
| 23 | Q.   Did it work for her? |

16 (Pages 61 to 64)

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

Page 65

| | |
|---|---|
| 1 | A. No, sir. |
| 2 | Q. So she still takes medication? |
| 3 | A. Yes, sir. |
| 4 | Q. And how long has she been taking medication |
| 5 | for acid reflux? |
| 6 | A. I'm not sure. |
| 7 | Q. You're not claiming that your acid reflux is |
| 8 | a result of anything Dr. Chambers did, are you? |
| 9 | A. I can't be sure of that. I'm not a doctor. |
| 10 | Q. Okay. Fair enough. Did Dr. Krher treat you |
| 11 | for anything else? |
| 12 | A. I have had a small surgery since then, but |
| 13 | it was bottom related. It doesn't have anything |
| 14 | to do with that. |
| 15 | Q. And you don't claim that your bottom-related |
| 16 | surgery had anything to do with Dr. Chambers? |
| 17 | A. No, sir. |
| 18 | Q. Okay. I'm going to be requesting the |
| 19 | medical records of your treating physicians |
| 20 | associated with the treatments that we've |
| 21 | discussed today. |
| 22 | A. Yes, sir. |
| 23 | Q. Your attorney and I have talked about that. |

Page 66

| | |
|---|---|
| 1 | And it's my understanding that we'll be joining in |
| 2 | some legal papers to obtain those records. Do you |
| 3 | understand that? |
| 4 | A. Yes, sir. |
| 5 | Q. And do you intend to cooperate with that |
| 6 | effort? |
| 7 | A. Oh, yes, sir. |
| 8 | Q. Very good. I want to cover your attached |
| 9 | documents to your responses to interrogatories. |
| 10 | And it's my understanding that these attached |
| 11 | documents are the documents that you claim support |
| 12 | your allegations in this lawsuit; is that right? |
| 13 | A. Yes, sir. |
| 14 | Q. And you have created, similar to Ms. Greene, |
| 15 | sort of a paragraph form with dates of sort of |
| 16 | anecdotal accounts of things that happened at the |
| 17 | office; is that right? |
| 18 | A. Yes, sir. |
| 19 | Q. And we're going to kind of work through |
| 20 | these. Keep in mind, as we work through these -- |
| 21 | and I'm not sure if this will help or not help, |
| 22 | but I'm going to bring it up just to let you know, |
| 23 | and maybe it will move things along so that when |

Page 67

| | |
|---|---|
| 1 | we get to these wrap-up questions, you'll know |
| 2 | where I'm going. |
| 3 | I will, when we come to the end of this |
| 4 | deposition, begin going through this Complaint |
| 5 | with you, similar to the way I did with Ms. |
| 6 | Greene. |
| 7 | And I'm going to be asking you about your |
| 8 | claim of harassment based upon your race and your |
| 9 | gender. Okay? |
| 10 | A. Okay. |
| 11 | Q. And I'll be asking you about having been |
| 12 | treated differently than similarly situated male |
| 13 | employees, and I'll be asking you about your claim |
| 14 | that blacks are paid more than whites and males |
| 15 | are paid more than females. Okay? Do you |
| 16 | understand? |
| 17 | A. Yes, sir. |
| 18 | Q. So as we're walking through these documents |
| 19 | that you've attached to your responses to my |
| 20 | discovery, you understand that my discovery was |
| 21 | intended to get from you any documents you claim |
| 22 | support these allegations in your Complaint; is |
| 23 | that your understanding? |

Page 68

| | |
|---|---|
| 1 | A. Yes, sir. |
| 2 | Q. And as I said with Ms. Greene, my effort |
| 3 | here is simply to discover and discuss with you |
| 4 | today any documents that you know about that |
| 5 | support your claims. Okay? |
| 6 | A. Yes. |
| 7 | Q. And I want to make sure that I'm fair to you |
| 8 | and that you've had adequate time to assemble |
| 9 | those documents and that we're going to get a |
| 10 | chance to talk about them today. |
| 11 | Have you had that time? |
| 12 | A. Yes, sir. |
| 13 | Q. Let's look at your attachment that has a |
| 14 | written #19 up in the left-hand corner. And it |
| 15 | starts with May 2001 right next to that notation. |
| 16 | Are you with me? |
| 17 | A. Uh-huh. |
| 18 | Q. This May 2001 notation appears to have |
| 19 | something to do with Ms. Greene's mother, who was |
| 20 | very sick; and Ms. Greene was out with her mother, |
| 21 | right? |
| 22 | A. Uh-huh. |
| 23 | Q. Did you know that Dr. Chambers told Ms. |

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

Page 69

1  Greene that she could take as much time as she
2  needed to tend to her mother?
3  A.   I would not know what he told Ms. Greene.
4  Q.   And you don't know that Dr. Chambers -- hold
5  on just a minute.
6      It is your understanding that Ms. Greene's
7  mother died?
8  A.   Yes, sir.
9  Q.   And did you know that Dr. Chambers told Ms.
10  Greene to take off as long as she needed and to
11  let him know if there was anything he could do for
12  her?  Did you know that?
13  A.   No, sir.
14  Q.   Okay.  In this incident that you've listed
15  here at May '01, he apparently called you and Mr.
16  Bridgman into his office.  Is that your
17  contention?
18  A.   Yes.
19  Q.   Isn't it true that there were occasions on
20  which you approached Dr. Chambers to discuss
21  Monica Greene?
22  A.   I may have spoke with Mr. Chambers regarding
23  Ms. Greene.

Page 70

1  Q.   Yes, ma'am.  My question is a little bit
2  more specific than that though.
3      Isn't it true that there were occasions in
4  which you approached Dr. Chambers to discuss Ms.
5  Greene?
6  A.   Yes.
7  Q.   And on some of those occasions you were
8  expressing some frustration with something that
9  was going on in the business office?
10  A.   I don't recall that.
11  Q.   It may have happened, you just don't recall?
12  A.   I don't think so.
13  Q.   If Mr. Bridgman testifies that there were
14  occasions on which he and you approached Dr.
15  Chambers to discuss Ms. Greene's performance in
16  the business office, would you disagree with him?
17  A.   I can't say what Mr. Bridgman discussed with
18  Mr. Chambers.
19  Q.   Well, you could say whether you were present
20  when Mr. Bridgman approached Dr. Chambers with you
21  to discuss Ms. Greene's performance, couldn't you?
22  A.   I could say I've been in Mr. Chambers'
23  office with Mr. Bridgman when Mr. Chambers called

Page 71

1  us in there.  I don't recall me and Mr. Bridgman
2  approaching Mr. Chambers to discuss problems in
3  the business office.
4  Q.   Yes. ma'am.  But if he testifies that that's
5  exactly what happened, would you disagree with
6  him?
7  A.   Yes, I would.
8  Q.   You say in here, "By then Mr. Chambers had a
9  pattern of calling Mr. Bridgman... and I... to
10  Dean of Finance" -- excuse me -- "and I... in to
11  his office whenever she was not at work."
12      All right.  You're talking there about a
13  pattern.  Are you speaking about a specific
14  incident here in this statement, or are you
15  talking about just kind of a general pattern?
16  A.   Can you repeat that?
17  Q.   Yeah.  You said, By then Mr. Chambers had a
18  habit of calling Mr. Bridgman and I.
19      My question is:  Is this about a specific
20  incident or are you just saying that this was
21  happening in time?
22  A.   I'm saying this particular date I'm talking
23  about, May 2001, was not the first occasion that

Page 72

1  this has happened.
2      At this time and place, when I picked up on
3  my notes that I had made of Mr. Chambers calling
4  Mr. Bridgman and myself in, this was not the first
5  time that this had happened.  He had a pattern of
6  doing this.
7  Q.   I understand.  And he had a pattern of doing
8  it with you and Mr. Bridgman?
9  A.   Yes.  And in some cases me alone, and in
10  some cases of Mr. Bridgman alone.
11  Q.   I see.  And you say in your statement that
12  he stated that he wanted you to feel free to come
13  to him about Ms. Greene, and that he knew she was
14  weak and ineffective as a business manager.
15  That's what your statement says.
16  A.   That's correct.
17  Q.   He wasn't saying you were weak, was he?
18  A.   No, sir.
19  Q.   He was talking about your supervisor?
20  A.   That's correct.
21  Q.   Of course. Gene Bridgman is not a white
22  female, right?
23  A.   No, he's not.

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 73

1   Q.   Is it your contention that he was calling
2   you and Mr. Bridgman in to his office to discuss
3   your supervisor's performance because you're a
4   white female?
5   A.   No.
6   Q    Okay. You just didn't like being put in
7   that position; is that my understanding? You tell
8   me. I'm not trying to put words in your mouth
9        What is the problem here? He's not talking
10  about you; he's talking about your supervisor  So
11  why have you listed this?
12  A    I listed that because I feel like he's
13  taking me away from my job, which is causing me
14  undue stress on that job. And I don't feel like
15  that -- if he has a problem with Ms. Greene, he
16  needs to be addressing Ms. Greene. He doesn't
17  need to be calling me in nor Mr. Bridgman in to
18  discuss her with us.
19  Q    I see.
20  A.   And it's a waste of time with people that
21  cannot do anything about it  And he's keeping me
22  away from taking care of my job, which then can be
23  a reflection on me. And then if I'm not doing my

Page 74

1   job, then who gets in trouble, which can affect
2   me.
3   Q.   It's possible. You've never gotten in
4   trouble for not doing your job with Dr. Chambers
5   though, have you?
6   A.   Yet.
7   Q.   You haven't?
8   A.   No.
9   Q.   In fact, Dr. Chambers may think you're a
10  really good worker?
11  A.   Perhaps.
12  Q.   He may think that, right?
13  A.   Perhaps.
14  Q.   He may think that you're very competent in
15  your position, right?
16  A.   I hope so.
17  Q.   And you don't have any evidence that he
18  thinks otherwise, do you?
19  A.   No, I don't.
20  Q.   In fact, he may come in here and testify, in
21  response to your lawyer's questions, that he
22  thinks you're pretty good?
23  A.   I hope so.

Page 75

1   Q.   You don't have any reason to think any
2   different, do you?
3   A.   No, sir.
4   Q.   And his comments that you've listed here
5   were not about you, right?
6   A.   No, sir.
7   Q.   He is the president of the college, isn't
8   he?
9   A.   He is.
10  Q.   And if he wants to take you away from your
11  job to have you hang a picture in his office, he
12  can do that, can't he?
13  A.   He has.
14  Q.   And if he wants to take you away from your
15  job to answer a phone for him, he can do that,
16  can't he?
17  A.   He has.
18  Q.   And he can do that?
19  A.   He can.
20  Q.   And he has the authority to do that?
21  A.   He does.
22  Q.   And if he wants to take you away from your
23  job to discuss the performance of your supervisor,

Page 76

1   he can do that, can't he?
2   A.   He did
3   Q    And he can do it?
4   A.   He did
5   Q.   Well, I understand he did. My question to
6   you is: Your understanding is he can do that?
7   A.   He can.
8   Q.   And he has the authority to do that?
9   A.   He does.
10  Q.   And he has the authority to talk to the
11  senior accountant, at that time Mr. Bridgman,
12  about his supervisor, right?
13  A.   He did, and he does.
14  Q    The next one is November 2001. Ms. Greene
15  was out on annual leave. Mr. Chambers called Mr.
16  Bridgman and you in and stated that he knew that
17  you must have been having problems in your
18  department.
19       Do you recall that?
20  A    I do.
21  Q.   Again, he's talking here about your
22  supervisor?
23  A    Uh-huh

19 (Pages 73 to 76)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 77

1  Q.  And he's talking about your supervisor with
2  Mr. Bridgman and you, right?
3  A.  He is.
4  Q.  And you don't claim that he called you and
5  Mr. Bridgman into his office to discuss your
6  supervisor's performance because you are a white
7  female, do you?
8  A.  I don't know why he did it.
9  Q.  Okay. He stated that you could come to him
10  any time you needed, right?
11  A.  He did.
12  Q.  Do you believe that he wanted you to come to
13  him any time you needed to come to him to talk
14  about problems with the business office?
15  A.  He says he did.
16  Q.  I understand that. But do you believe
17  that's what he wanted you to do?
18  A.  Yeah.
19  Q.  And he says that he knew that accounts
20  payable were probably behind because he knew Ms.
21  Greene held some invoices.
22      He wasn't talking about you there, right?
23  A.  No, sir.

Page 78

1  Q.  He was talking about your supervisor?
2  A.  Yes, sir.
3  Q.  So how does his talking to you and Mr.
4  Bridgman about coming to him any time you need to
5  and about there possibly being invoices behind
6  have anything to do with your environment of
7  working?
8  A.  Other than falling behind on my duties,
9  nothing.
10  Q.  Okay.
11      MR. CHRISTMAN: There's quite a few of
12  these. Let's take a quick break. And we might as
13  well just break this up. And we'll go for another
14  hour after our break and break for lunch. What do
15  you say?
16      MR. DEBARDELABEN: It's about 11:12.
17      MR. CHRISTMAN: Do y'all want to break
18  for lunch?
19      MR. DEBARDELABEN: It's, I guess,
20  whatever Julie wants to do.
21      MR. CHRISTMAN: Well, it's kind of
22  early for lunch. I'd like to go a little bit
23  longer before we break for lunch, if that's okay.

Page 79

1      MR. DEBARDELABEN: Okay.
2      MR. CHRISTMAN: Okay. Let's take about
3  a five-minute break and then come back.
4      (A brief recess was taken.)
5  (BY MR. CHRISTMAN)
6  Q.  Have we talked about March 2002?
7  A.  March 2001.
8  Q.  Let's turn to March 2002. Ms. Greene was
9  out on annual leave and Mr. Chambers called Mr.
10  Bridgman and you in and stated he knew Ms. Greene
11  was ineffective and if you needed to talk to him
12  concerning this, please come and see him.
13      That's very similar to the previous
14  meetings, right?
15  A.  It is.
16  Q.  Okay. June of 2002, basically the same
17  thing?
18  A.  Yes, sir.
19  Q.  October of 2002, it says, Mr. Chambers -- by
20  the way, do you know that the president has an
21  honorary doctorate?
22  A.  I heard he did.
23  Q.  Did you not know that before today or

Page 80

1  yesterday?
2  A.  Yeah, I heard it.
3  Q.  Okay. Is there some reason you call him
4  Mister instead of Doctor?
5  A.  He was Mr. Chambers when he came there, and
6  I've just always addressed him as Mr. Chambers.
7  He doesn't seem to have a problem with it.
8  Q.  Okay. "Mr. Chambers called me in before Ms.
9  Greene arrived at work and reminded me that if I
10  needed to speak with him about her to let him
11  know. He just wanted me to know that he was aware
12  of our situation in the business office."
13  A.  Uh-huh.
14  Q.  Basically the same thing; the difference
15  being that Mr. Bridgman wasn't in on that one; is
16  that right?
17  A.  That's correct.
18  Q.  And is it your understanding that on
19  occasion Mr. Bridgman would get maybe the same
20  meeting when you weren't present?
21  A.  Yes, sir.
22  Q.  And you know that because Mr. Bridgman has
23  told you about that?

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 81

1  A.  Yes.
2  Q.  Next page. January 2003.
3      Ms. Greene was out on annual leave and Mr.
4  Chambers called you and Mr. Bridgman in and stated
5  that he knew the purchase orders and accounts
6  payable were in a mess because of Ms. Greene.
7      Basically the same thing again?
8  A.  Other than to tell us that the vice
9  chancellor, Debbie Dahl, would be calling to talk
10  to us about Ms. Greene. Which the phone call
11  never took place.
12      And, you know, he keeps saying this about
13  Ms. Greene being weak and ineffective and
14  incompetent; and in my opinion, she's not weak and
15  ineffective and incompetent.
16      And that does bother me because those are
17  not my beliefs, and that bothers me a great deal.
18  Because if I thought that, I'm a very verbal
19  person. and I would be the first person to go to
20  Ms. Greene and tell her that.
21  Q.  Well, but you have gone to Dr. Chambers and
22  you've mentioned to him concerns that you have
23  about some of Ms. Greene's methods, haven't you?

Page 82

1  A.  No, sir.
2  Q.  Of course, it's not unusual in the workplace
3  for you to have an opinion that's different from
4  your boss, is it?
5  A.  Probably not. Everybody has an opinion.
6  Q.  And they don't always match?
7  A.  That is correct.
8  Q.  And in this particular instance, Dr.
9  Chambers is expressing to you that he thinks Ms.
10  Greene is not doing a good job, right?
11  A.  Yes, sir. I think that's clear.
12  Q.  And you just don't agree with his opinion,
13  do you?
14  A.  I certainly do not.
15  Q.  How is that causing you a hostile
16  environment?
17  A.  Because when you are called in time after
18  time after time, and you're in, let's say because
19  Mr. Chambers is ultimately the boss, and then Ms.
20  Greene is my direct supervisor, and you're caught
21  between these people, your ultimate boss and
22  then your direct supervisor boss, and you're being
23  strung between these people, and you have these

Page 83

1  people pulling you back and forth, you are caused
2  stress and anxiety, because you have one person
3  telling you one thing, and then you have this
4  ultimate boss up here saying. You need to come
5  talk to me about this.
6      That makes me have a lot of stress. It does
7  indeed cause me stress and anxiety. and it has for
8  several years now. It upsets me tremendously.
9  Q.  Is your understanding that Mr. Bridgman
10  was experiencing the same stress?
11  A.  Yes, it was.
12  Q.  What makes you think that Mr. Chambers was
13  addressing you and Mr. Bridgman about Ms. Greene's
14  performance because you're a white female?
15  A.  Because I am a white female. Why would I
16  not think that?
17  Q.  Well, because he's a white male, that's why.
18  A.  Well, you know, maybe it was because he was
19  her assistant at that time and I was not, you
20  know.
21      What role did I play in it? He was Ms.
22  Greene's direct next in line, and I was this
23  person down here somewhere, you know.

Page 84

1  Q.  I don't understand your response.
2  A.  You don't?
3  Q.  What evidence do you have that he was
4  talking to you and Mr. Bridgman about Ms. Greene's
5  performance based on the fact that you are a white
6  female and not because he just was not pleased
7  with Ms. Greene's performance?
8  A.  Maybe he was talking to both of us because
9  we were white.
10  Q.  Well, it couldn't have been because you were
11  both female, could it?
12  A.  No. Maybe it was because we were both
13  white.
14  Q.  Well, if he also called James Wilson into
15  his office to discuss Ms. Greene's poor
16  performance --
17  A.  I wouldn't know about that.
18  Q.  I understand. But if he were to call James
19  Wilson into his office to discuss Ms. Greene's
20  poor performance -- it is your understanding that
21  he spoke with Mr. Wilson about her performance,
22  isn't it?
23  A.  If that's what he did.

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 85

1   Q.   I mean, that's what you've heard. isn't it?
2   A.   What I've heard where?
3   Q.   Well, at the college. Anywhere  It's your
4   understanding that Chambers and Wilson have
5   discussed Ms. Greene's performance? Is that your
6   understanding?
7   A.   Probably.
8   Q.   Well. do you think that Mr. Chambers was
9   probably having those conferences with Mr. Wilson
10  because he's black?
11       MR. DEBARDELABEN: I object  It's
12  based on speculation. You're asking her to
13  speculate on something that she doesn't really
14  know anything about.
15       MR. CHRISTMAN: You can object, but she
16  can answer.
17       MR. DEBARDELABEN: If she can.
18       MR. CHRISTMAN: She can answer.
19  A.   I really don't know, sir.
20  Q.   Okay  Well, if Mr. Wilson testifies in this
21  case that he and Dr. Chambers have discussed
22  Monica Greene's poor performance, and Dr. Chambers
23  called Mr. Wilson into his office to do that, it's

Page 86

1   obviously not because he's white, right?
2   A.   He's definitely not white.
3   Q.   And it's not because he's female?
4   A.   No, sir, he's not, that I know of.
5   Q.   Okay  Is it your understanding that Dr.
6   Chambers talked to a lot of people about Ms.
7   Greene's performance?
8   A.   I can't answer that question.
9   Q.   Was it your understanding that he talked to
10  the chancellor about her performance?
11  A.   Yes, sir, it is.
12  Q.   Is it your understanding that he talked to
13  the vice chancellor, Debbie Dahl, about her
14  performance?
15  A.   Yes, sir, it is.
16  Q.   And what do you think motivated him to speak
17  with the chancellor and the vice chancellor about
18  Monica Greene's performance?
19  A.   I can't say what motivated him.
20  Q.   You don't know for sure?
21  A.   No, sir, I don't.
22  Q.   You don't have any reason to believe it's
23  because they're both white, do you?

Page 87

1   A.   No, sir.
2   Q.   The next entry here says, "2004-2005-many
3   more of these type meetings took place."
4        And you just didn't spell out the specifics,
5   but it was, again, he asked you, he asked Mr.
6   Bridgman, or he asked both of you to come in and
7   just said I know what you're going through, feel
8   free to come talk to me about Ms. Greene, right?
9   A.   Yes, sir.
10  Q.   None of those meetings were about you?
11  A.   Not that I recall, no, sir.
12  Q.   But you thought he should go talk directly
13  to Ms. Greene and not come to you?
14  A.   Yes, sir, I did.
15  Q.   You think that's a bad management practice,
16  right?
17  A.   I do.
18  Q.   And you think he should have done the same
19  for Mr. Bridgman?
20  A.   Yes, I do.
21  Q.   He should have gone straight to Ms. Greene
22  instead of talking to Mr. Bridgman?
23  A.   I do.

Page 88

1   Q   Is it your understanding that Mr. Bridgman
2   had some sort of stroke episode prior to Dr.
3   Chambers ever arriving at the college? Is that
4   true?
5   A   It is true
6   Q.   So you don't claim that Mr. Bridgman
7   suffered a stroke because of Dr. Chambers, do you?
8   A.   I don't know why he had his last stroke.
9   Q.   Okay  Fair enough. Would you please flip
10  the page  We have here a memo from Sandy Caylor
11  And I discussed this memo with Ms. Greene
12  yesterday, I believe.
13  A.   Yes, sir
14  Q.   Do you recall that discussion?
15  A.   I do.
16  Q.   That memo doesn't have anything to do with
17  you, does it?
18  A.   It does not
19  Q.   It doesn't mention your name, does it?
20  A.   No, sir.
21  Q.   Doesn't criticize your performance, does it?
22  A.   It does not.
23  Q.   Flip to the next page. It says #29 and 22

22 (Pages 85 to 88)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 89

1    handwritten at the top. And it starts with,
2    "During the time that Mr. Chambers ..." Do you see
3    that?
4    A.   Uh-huh.
5    Q.   It indicates that he had several meetings
6    with the ladies at the main Ingram campus
7    regarding their clothing?
8    A.   Uh-huh.
9    Q.   You do understand that Ingram is an all-male
10   inmate student population?
11   A.   Ingram is not.
12   Q.   The main campus is an all-male inmate
13   student population?
14   A.   The main campus is, that is correct.
15   Q.   And you understand that there are certain
16   risks associated with females wearing provocative,
17   tight-fitting, inappropriate clothing?
18   A.   That is correct.
19   Q.   You have never been called down for your
20   dress at Ingram, have you?
21   A.   No, sir.
22   Q.   No one has ever admonished you about your
23   dress?

Page 90

1    A.   No, sir.
2    Q.   No one has ever asked you to admonish
3    anybody else about their dress?
4    A.   No, sir.
5    Q.   How has it created a hostile environment for
6    you for Dr. Chambers to admonish and remind the
7    women that tight-fitting clothing or inappropriate
8    clothing is a safety hazard at the main campus?
9    A.   To be subjected to those meetings.
10   Q.   And what is inappropriate that you are being
11   subjected to at a meeting that requests that you
12   wear appropriate clothing at an all-male,
13   inmate-population campus?
14   A.   I think it's unfair for a select group of
15   people to be called together -- all women at one
16   location -- when there's other women located at
17   the Draper location that are all-male also.
18        And then there's men at the Tutwiler
19   location who, I might add, have been written up
20   and been investigated by I&I -- the men at the
21   Tutwiler location -- for advances on female
22   inmates. But we're not subjecting them to those
23   type meetings.

Page 91

1    So I feel like that we have been singled out
2    because we are directly in the president's
3    eyesight. And so I think that the females at main
4    campus are unfairly being subjected to meetings
5    about our dress, whether it is appropriate or
6    inappropriate according to his opinion. The women
7    at Draper State are not being singled out, and
8    they are in an all-male population.
9        And then the men, who are subjected to the
10   woman at the Tutwiler campus, are not being
11   admonished, and they are the ones who are having
12   charges brought against them.
13   Q.   How do you know they are not being
14   admonished?
15   A.   Well, let's say that I have checked and
16   found that has not happened.
17   Q.   How have you checked?
18   A.   I have called around and checked.
19   Q.   Who have you called?
20   A.   Different people.
21   Q.   Who?
22   A.   Instructors, personnel.
23   Q.   Who?

Page 92

1    A.   Who? I've checked with Leonard Wade at the
2    Tutwiler campus. I checked with Leonard Wade,
3    Tutwiler; I've checked with Beth Wright at
4    Tutwiler, before she retired from there.
5    Q.   Let's talk about Leonard first. What have
6    you checked with Leonard about?
7    A.   He said that there was never any meetings
8    held with the men on their dress attire.
9    Q.   When did that meeting happen?
10   A.   It wasn't a meeting; it was a telephone
11   call.
12   Q.   When did that telephone call happen?
13   A.   Probably -- I would say it happened probably
14   January of 2006.
15   Q.   Why did you talk to him in January 2006
16   about dress?
17   A.   I asked him had they ever had a meeting over
18   there.
19   Q.   Why did you do that?
20   A.   Because we had had meetings, and I wanted to
21   know had this happened with them.
22   Q.   Okay. And it's your testimony that he told
23   you they had not had any meetings about their

23 (Pages 89 to 92)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 93

1  dress?
2  A.    That is correct.
3  Q.    Does he still work at Tutwiler?
4  A.    He does.
5  Q.    So I can go interview him and confirm
6  whether this meeting happened -- this telephone
7  call happened?
8  A.    You can.
9  Q.    And what is Beth's name?
10  A.    Beth Wright.
11  Q.    Where does she work?
12  A.    She's now retired.
13  Q.    Retired from?
14  A.    Tutwiler campus.
15  Q.    And when did you have a meeting with her?
16  A.    I talked to her on the telephone.
17  Q.    When was that telephone call?
18  A.    I talked with her on her telephone at home
19  in Clanton, and I'm not sure of the exact date.
20  But you could check with her and see.
21  Q.    And what did she tell you?
22  A.    She told me that they had never had any such
23  meetings with the females or the males over there

Page 94

1  about their dress.
2  Q.    All right. Who else have you talked to?
3  A.    Talked with Melissa Wallace.
4  Q.    When did you talk with her?
5  A.    I talked with her probably in late 2005. I
6  can't remember the exact date. And she said that
7  they had not had any such meetings at the Draper
8  campus location where she worked. That was before
9  she was terminated from her employment.
10  Q.    Okay. Who else have you talked to?
11  A.    Those would be the names of the people that
12  I remember talking to.
13  Q.    What makes you think there was ever a
14  problem with the dress at Draper?
15  A.    I don't know that there was. I don't know
16  that there was ever a problem at the main campus.
17  Q.    Okay. Well, I'll show you where there was a
18  problem at the main campus.
19      But what makes you think there was a problem
20  with the dress at Tutwiler?
21  A.    Well, I do know of one occasion where Ms.
22  Ross, who was a former employee there, was asked
23  to put on a shirt over her clothing when she

Page 95

1  worked there. But there was never any such
2  meeting held to tell people to dress appropriately
3  there.
4  Q.    Who told Ms. Ross to do that? How do you
5  know that happened?
6  A.    The guard shack.
7  Q.    How do you know that happened?
8  A.    It was hearsay.
9  Q.    Who did you hear it from?
10  A.    I believe it was somebody in student
11  services. I don't remember exactly who told me.
12  Q.    You don't know who told you?
13  A.    No. It was a few years back.
14  Q.    You don't know when they told you?
15  A.    Huh-uh. She's been gone two or three years
16  or longer.
17  Q.    So there's nobody I can talk to to confirm
18  that conversation?
19  A.    You can probably talk to Mr. Wilson. He was
20  her supervisor. He should be aware of it.
21  Q.    Would James Wilson know what Ms. Ross told
22  you?
23  A.    What Ms. Ross told me?

Page 96

1  Q.    Right.
2  A.    Ms. Ross didn't tell me anything.
3  Q.    Oh, okay. You heard about Ms. Ross from
4  somebody else?
5  A.    Uh-huh. You could probably check with some
6  of her coworkers at Tutwiler. They probably
7  remember it.
8  Q.    She was told to put on what?
9  A.    A blouse or a shirt over her attire, by the
10  guards.
11  Q.    Any other instances that you think --
12  A.    Those are just the ones I can remember right
13  offhand.
14  Q.    Okay. And those are ladies and men that
15  work at both Tutwiler and Draper?
16  A.    Uh-huh.
17  Q.    If you'll turn a few pages back in your
18  documents here is a cabinet meeting of September
19  12, 2005. It says page 6 of 6.
20      And you produced this --
21  A.    I did.
22  Q.    -- interestingly enough, in response to my
23  interrogatories and request for production. It

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 97

1  apparently has something that supports your
2  claims?
3  A.  Uh-huh.
4  Q.  Are you with me yet?
5  A.  I am.  Where he states that he held a
6  meeting with the women but then where he also said
7  that applied to the men?
8  Q.  There you go.  We'll read it off and we'll
9  just see exactly what he said.
10     "The President informed the cabinet that he
11  had a meeting with the ladies last Friday, and
12  informed them they will no longer be allowed to
13  wear jeans and tennis shoes to work.  This goes
14  for male office personnel as well."
15     So clearly Dr. Chambers was requiring both
16  the men and the women to dress appropriately;
17  isn't that right?
18  A.  That's what it says in the cabinet meeting,
19  but that's not what he said in the meeting when he
20  was asked about the men.
21  Q.  Are you saying that the cabinet meeting
22  minutes were altered?
23  A.  I'm saying what he said to the cabinet is

Page 98

1  not what he said in the meeting that was held that
2  day on that Friday.
3     I know what the cabinet meeting minutes
4  said, but they did not reflect what was said in
5  the meeting that was held that day.
6  Q.  But ultimately he gave the directive to all
7  the directors of all the departments -- which you
8  are not one of those, right?
9  A.  That is correct.
10  Q.  But he gave the directive to all of the
11  directors that it goes for the men too, right?
12  A.  That's what he said.  But he did not call
13  the men into the meeting, so they were not
14  subjected to the meeting, which is my claim.
15  Q.  Your claim is that you believe you've been
16  discriminated against because you're a woman
17  because he has had more meetings with women than
18  men about dress?
19  A.  No.  My claim is that he's treating men
20  different than women.
21  Q.  Well, would it surprise you to know that
22  Warden DeLoach thinks that the women's dress at
23  the main campus is a problem?  Have you heard

Page 99

1  that?
2  A.  I've heard you say that.
3  Q.  Yes, ma'am.  Have you heard that from
4  anybody but me?
5  A.  No, sir.
6  Q.  Okay.  Well, if Warden DeLoach was telling
7  Dr. Chambers that the dress of the women at the
8  main campus was problematic, you would expect Dr.
9  Chambers to cure that problem, wouldn't you?
10  A.  Yes, sir.
11  Q.  And, of course, you understand the dangers
12  associated with provocative dress of specifically
13  women at an all-male correctional institution, do
14  you not?
15  A.  Why specifically women?  Because we have
16  inmates that maybe do not prefer women.
17  Q.  Do you know how many of the inmate
18  population have homosexual tendencies versus
19  nonhomosexual tendencies?
20  A.  No.  Do you?
21  Q.  Do you know how many incidents of
22  masturbation are involving man on man rather than
23  man on woman?

Page 100

1  A.  No, sir.  Do you?
2  Q.  Do you have any information about security
3  problems and concerns associated with men dressing
4  inappropriately as opposed to women dressing
5  inappropriately?
6  A.  No, sir.
7  Q.  Do you know how many reports Dr. Chambers
8  has received regarding the inappropriate dress of
9  women as opposed to men?
10  A.  No, sir.
11  Q.  So you certainly don't dispute that it's
12  important for women to dress appropriately in an
13  all-male inmate campus, do you?
14  A.  No, sir.
15  Q.  Is it your understanding that Dr. Chambers
16  thinks that professional dress is very important?
17  A.  Yes, sir.
18  Q.  Is it your understanding that he has
19  admonished Dr. Merk about dressing more
20  professionally in the office?
21  A.  No, sir.  I've never heard that.
22  Q.  Did you know that Dr. Chambers has taken Dr.
23  Merk to the men's store to help him understand

25 (Pages 97 to 100)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 101

1  better how to dress appropriately and
2  professionally at the office? Did you know that?
3  A.  No, sir.
4  Q   You didn't know that, did you?
5  A.  No, sir.
6       MR. DEBARDELABEN: Can we take a short
7  break? It's my son calling.
8       MR. CHRISTMAN: Oh, sure. Yeah, yeah.
9       (A brief recess was taken.)
10 (BY MR. CHRISTMAN)
11 Q.  We were going through some examples here.
12 Summer of 2004 he stated that he was fed up with
13 the way people reacted when he told them how to
14 dress, that he did not care how they dressed.
15      That wasn't directed at you, was it?
16 A.  I don't suppose.
17 Q   Okay. February 13, 2005, the next one,
18 says, "Ms. Greene under the direction of Mr.
19 Chambers and Mr. Wilson was told to tell the women
20 at Main Campus that low cut, short, tight clothing
21 and high heel strapless shoes should not be worn."
22      How do you know that Ms. Greene was directed
23 by Dr. Chambers and Mr. Wilson to have that

Page 102

1  meeting?
2  A.  She told us.
3  Q   Well, she didn't tell you that he told her
4  to classify the dress in terms of low cut, short,
5  tight clothing, and high heel, strapless shoes?
6  She didn't tell you that, did she?
7  A.  Best I can recall, she did.
8  Q   Well, but you wouldn't dispute the fact that
9  she actually came up with those categories by
10 herself and wasn't told to talk about low cut,
11 short, tight clothing? You don't know anything
12 about that, do you?
13 A.  I don't really recall.
14 Q   Okay. And you didn't know that Dr. Chambers
15 asked Ms. Greene to have this meeting with the
16 ladies because he thought she was a good example
17 of professional dress in the workplace? You
18 didn't know that, did you?
19 A.  I think she told us that he told her that he
20 thought she was a good example so she needed to
21 have the meeting.
22 Q   Okay.
23 A.  I don't suppose you want me to interject

Page 103

1  anything.
2  Q.  Just answer my questions is all I need.
3  A.  Okay.
4  Q   And you didn't have any disagreement with
5  the idea that Ms. Greene was telling y'all to not
6  wear low cut, short, tight clothes with high heel
7  strapless shoes? You didn't disagree with that,
8  did you?
9  A.  I didn't have on any of those things.
10 Q.  I understand. But my question is: You
11 didn't disagree with her suggestion and directive
12 to the ladies to not wear these things on campus?
13 You didn't disagree that those things shouldn't be
14 worn, did you?
15 A.  I don't think the meetings are necessary.
16 Q.  Well, that's not my question. My question
17 is: Did you disagree that those types of clothing
18 should not be worn?
19 A.  I can't say.
20 Q.  You think it's okay to wear low cut stuff at
21 Ingram's main campus?
22 A.  No.
23 Q.  Do you think it's okay to wear tight stuff?

Page 104

1  A.  I guess if you get too heavy and your
2  clothes are tight. I don't know.
3  Q.  You don't know?
4  A.  I don't think you should go out and buy your
5  clothes too tight to wear to work.
6  Q.  Whether you buy it or not, do you think it's
7  appropriate to wear tight clothing at the all-male
8  inmate campus? It's a simple question.
9  A.  I wouldn't wear it.
10 Q.  Do you think it's okay?
11 A.  No.
12 Q.  Do you think it's okay to wear short shorts
13 or skirts?
14 A.  No. Strapless high heels, I don't see where
15 they hurt anything.
16 Q.  You don't?
17 A.  No, sir.
18 Q.  Well, if somebody says that strapless high
19 heels are too provocative and shouldn't be worn in
20 the workplace, would you disagree with that?
21 A.  Yeah.
22 Q.  You think they're not provocative?
23 A.  No, sir.

26 (Pages 101 to 104)

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

---

Page 105

1   Q.   You think they ought to be allowed?
2   A.   Yes, sir.  That's an opinion.
3   Q.   That's just your opinion?
4   A.   Yes, sir.
5   Q.   If the warden says it's a problem, do you
6   think the warden is wrong about that?
7   A.   I personally think that would be an opinion.
8   But if that is a dress code policy, I would say
9   you need to abide by it.
10  Q.   Well, let's say Ms. Greene says it's not a
11  good idea to wear high heel, strapless shoes, do
12  you disagree with her?
13  A.   She's my boss.  I would have to say don't
14  wear them.
15  Q.   Okay.  September 9, '05.  Chambers called a
16  meeting at 2:45 in the staff lunchroom and he
17  stated that office women can no longer wear blue
18  jeans or capri pants, right?
19  A.   That's correct.
20  Q.   And then you asked him about the men.  And
21  he said he's not talking about the men at that
22  time, only the women.
23  A.   That's correct.

Page 106

1   Q.   Why did you ask him about the men?
2   A.   Because he had not called the men in, as
3   usual.  And that's the point I was making in the
4   minutes.
5        Then when we gets over here in the staff
6   minutes, he talks about that goes for the men too.
7        Well, you know, why are we giving directives
8   to the supervisors about the men, when obviously
9   the men were not called to the meeting.  And
10  that's the point I was making to him: As usual,
11  you've called the women together, but you're not
12  calling the men together to give them the same
13  instructions.  So I just wanted to make it clear,
14  are we still all only talking about the women.
15  Q.   Is there a problem with men wearing capri
16  pants at the institution?
17  A.   I don't know if they are or not.  I don't
18  watch what the men wear.
19  Q.   Do you think you would notice if a man wore
20  capri pants to work?
21  A.   Probably.
22  Q.   Yeah.
23  A.   And, in fact, I think we did have one to

Page 107

1   wear them one time.  L.C. Washington wore them one
2   day to work.  He did, come to think of it.  But we
3   didn't address him.
4   Q.   When was that?
5   A.   L.C.'s been gone a little while.
6   Q.   When was it?
7   A.   It's been since Mr. Chambers has been there,
8   because he hired him.
9   Q.   Tell me about the occasion on which he wore
10  capri pants?
11  A.   He was a Special Ed instructor and he worked
12  on main campus.  He had an office out in the
13  hallway.  I think he's the only man I can recall
14  wearing capri pants to work.
15  Q.   What are capri pants?
16  A.   They hit you mid -- between your knee and
17  your ankles.
18  Q.   And he was wearing capri pants or just pants
19  that were too short for him?
20  A.   No.  I think you would consider those capri
21  pants.
22  Q.   And was Dr. Chambers or anyone else advised
23  by the warden that that was creating a problem

Page 108

1   among the inmates.
2   A.   I don't think so.  Not that I can recall.
3   Q.   And you understand that Dr. Chambers was
4   allowing the men in the shops to wear jeans?
5   A.   Yes, sir.
6   Q.   Do you understand why he was allowing that?
7   A.   He said that he was allowing them to wear
8   them because of the type work they did.
9   Q.   And you agree with that, don't you?
10  A.   In some instances, yes, sir, I do.
11  Q.   The next page is a little memo regarding Ms.
12  Greene's meeting, right?
13  A.   It is.  I believe she had Ms. Graves to take
14  notes for her the day she had the meeting.
15  Q.   And she explained about the tight-fitting
16  clothes and the high heel, strapless shoes, right?
17  A.   She did.
18  Q.   She said, "If in doubt, don't wear it."
19  A.   She did.
20  Q.   And she mentioned a cover up jacket?
21  A.   She did.
22  Q.   Did you know she stated that she thought
23  this meeting went well?

27 (Pages 105 to 108)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 109 |
| --- |

1   A.   She did.
2   Q.   You wouldn't disagree with that, would you?
3   A.   No, sir.
4   Q.   Go to the next page
5   A.   Uh-huh.
6   Q.   1998 memorandum from Douglas Chambers to all
7   employees on appropriate dress. He said that all
8   employees refrain from wearing clothing which can
9   easily be interpreted as inappropriate and
10   unprofessional.
11        Do you see that?
12   A   I do.
13   Q.   That would include the men, wouldn't it?
14   A.   It does, because it says all employees.
15   Q.   So it's not true when you say that he has
16   only required the women to watch their dress
17   That's not true, is it?
18   A.   It's not true that he has only required the
19   women to watch the dress, but it is true he's only
20   held meetings with the women.
21   Q.   That you know of?
22   A.   Right. That I know of.
23   Q.   You don't know if he's had any meetings with

| Page 110 |
| --- |

1   the men, do you?
2   A.   I can only go by what I've been told
3   Q.   You don't know whether he's had any meetings
4   with the men, do you?
5   A.   To my knowledge, he has not.
6   Q.   You don't know if he has or hasn't?
7   A.   To my knowledge, he has not.
8   Q.   You don't have evidence to prove that he's
9   never had a meeting with the men about their
10   dress, do you?
11   A   Other than what I've been told. But you'll
12   notice in this one he says we do not have a dress
13   code.
14   Q.   I'm not sure that I asked a question about
15   that.
16   A.   You didn't.
17   Q.   But since you brought it up, you think that
18   there should be a dress code, don't you?
19   A.   I do
20   Q.   You think that all employees should be
21   required to watch their dress, don't you?
22   A.   Uh-huh.
23   Q.   On the page that starts with "Examples of

| Page 111 |
| --- |

1   Individual Comments," do you see that?
2   A   Uh-huh.
3   Q.   You state here, June 2005: Ms. Beth White
4   was four months pregnant. Mr. Chambers stopped an
5   inmate and asked him did he think she looked four
6   months pregnant
7   A.   Uh-huh
8   Q.   Were you there for that conversation?
9   A.   No. sir.
10   Q.   Somebody told you about that?
11   A.   My daughter did. Beth White
12   Q.   Did she tell you also that when Mr. Chambers
13   walked up, a group of women were already talking
14   about Ms. White's physique? Did you know that?
15   A.   That's not the way I understood it happened
16   Q.   Did she tell you that other women were
17   already commenting on how Ms. White didn't look
18   like she was four months pregnant when he walked
19   up?
20   A.   That's not the way she told me it happened.
21   Q.   You wouldn't know because you weren't there?
22   A.   No.
23   Q.   But Dr. Chambers was there though, wasn't

| Page 112 |
| --- |

1   he?
2   A.   He was there.
3   Q.   That's what you've been told?
4   A.   Yes, sir
5   Q.   You don't contend Dr. Chambers said anything
6   inappropriate?
7   A.   Other than pointing it out to a student.
8   When he's saying keep a low profile, why would you
9   point that out to a student?
10   Q.   When did Dr. Chambers ever say keep a low
11   profile?
12   A.   When he was telling me about dressing
13   Q.   Those are your words, "Keep a low profile"?
14   A.   It is
15   Q.   He never said that?
16   A.   Why would you dress inappropriately if you
17   were not trying to keep a low profile?
18   Q.   He never said that, right?
19   A.   Maybe not in those words
20   Q.   He was admonishing people about
21   inappropriate dress, wasn't he?
22   A.   Yes.
23   Q.   And this conversation here wasn't about Beth

28 (Pages 109 to 112)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

---

Page 113

1  having been dressed inappropriately. was it?
2  A.  No  It was making comments about her body.
3  Q.  About the fact that she didn't look four
4  months pregnant?
5  A.  Correct.
6  Q.  And how is that creating a hostile
7  environment for you?
8  A.  For women.
9  Q.  How is it creating a hostile environment for
10  you?
11  A.  It's not.
12  Q.  September 2005:  Mr. Chambers told Ms. Wood.
13  his secretary, the reason women could not wear
14  jeans anymore is because Ms. Cherry wore hers too
15  tight and too low cut  He could see her belly
16  button.
17      How do you know what he told Ms. Wood?
18  A.  Ms. Wood told me.
19  Q.  You didn't witness that conversation, did
20  you?
21  A.  I did not.
22  Q.  And if Ms. Cherry was wearing her jeans too
23  tight or too low cut, you would agree that's a

---

Page 114

1  problem, isn't it?
2  A.  It is.
3  Q.  So how does that create a hostile
4  environment for you?
5  A.  The fact that he's talking about women's
6  attire.
7  Q.  Well, if her attire was inappropriate, it
8  was inappropriate; isn't that true?
9  A.  True.
10  Q.  So how does it create a hostile environment
11  for you if he's commenting on somebody wearing
12  something that's too tight or too low cut?
13  A.  I have a problem with Mr. Chambers
14  concentrating so much on the women and looking at
15  them in that manner.
16  Q.  Well, if Ms. Cherry was wearing her jeans
17  too tight and too low cut, that's a problem?
18  A.  It is.
19  Q.  How is that a problem for you?
20  A.  Well, it caused a meeting that he called on
21  September 9th.
22  Q.  How do you know that?
23  A.  Because he told Ms. Wood it did.

---

Page 115

1  Q.  You don't know that though?
2  A.  She told me it did.
3  Q.  But you don't have any information
4  personally about that?
5  A.  I know what she told me.
6  Q.  And that's all you know?
7  A.  That's correct.
8  Q.  Next one in 2006:  Mr. Chambers recently
9  made the statement to Julie Wood, his secretary.
10  that Mr. Wilson talks about the women wearing
11  their pants too tight, but that he, Mr. Wilson,
12  does not say anything about LaTonya Trimble's
13  pants going up her butt crack.
14      How do you know what he said to Julie Wood?
15  A.  That's what she told me.
16  Q.  What if she flatly denies that she told you
17  that?
18  A.  I don't believe she will.
19  Q.  You don't know if Mr. Chambers made these
20  remarks though?
21  A.  No, sir.
22  Q.  How does Mr. Chambers' comments about what
23  Mr. Wilson talks about, in terms of people wearing

---

Page 116

1  their pants too tight but not noticing when
2  somebody that works for him is wearing her pants
3  too tight, how does that create a hostile
4  environment for you?
5  A.  I think it creates a hostile environment for
6  all women.
7  Q.  How does that create a hostile environment
8  for you?
9  A.  Because I'm a woman.
10  Q.  For women?
11  A.  Because I'm a woman.
12  Q.  How does it create a hostile environment for
13  women or you?
14  A.  Do you think it's right for men to sit
15  around and talk about women and what they're
16  wearing and concentrating on their butts?
17  Q.  I think it's more than all right; I think
18  it's required if there is a problem with the way
19  women are dressing, for the men and the women to
20  make sure that appropriate dress is put into place
21  at this institution.
22      Do you know that the warden has told Dr.
23  Chambers there's a problem at this institution

---

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

## Page 117

1  with the dress of the women? Do you know that?
2  A.   No, sir.
3  Q.   Don't you think it's appropriate for
4  somebody to get a handle on a problem with women's
5  dress at the institution, if there is a problem?
6  A.   If there is one.
7  Q.   And to get a handle on it, it's got to be
8  talked about, right?
9  A.   If that's the manner in which it's being
10  talked about.
11  Q.   In 2006, the next one: Mr. Chambers
12  recently told Ms. Greene that she had something on
13  her pants. When she went in the bathroom and
14  looked, it was a small piece of lint on her
15  bottom. He sure had to be looking close.
16    Is that your commentary, "He sure had to be
17  looking close"?
18  A.   It is. And hers.
19  Q.   And how does that create a hostile
20  environment for you that he told her that she had
21  something on her pants?
22  A.   Again, I just feel like there's too much
23  concentration on women's bottoms up there.

## Page 118

1  Q.   Okay. And I guess the same thing is true
2  for the next one?
3  A.   Except for I am the one who actually was
4  involved in this one.
5  Q.   Yeah.
6  A.   And he did tell me. And I did hear that
7  with my own ears what he said.
8  Q.   And how is it any different than what we've
9  already talked about? He asked you to get the
10  string off of somebody else's pants on her bottom,
11  right?
12  A.   Uh-huh. And he makes the comment: If those
13  pants were not so tight on her ass you wouldn't
14  have to notice those type things.
15    You think that's necessary?
16  Q.   Well, is it appropriate for a woman to wear
17  pants that are too tight?
18  A.   Is it appropriate for him to just walk
19  around looking at it.
20  Q.   Well, he is the president of the college,
21  and part of his job is to make sure the place is
22  secure and safe, isn't it?
23  A.   (No response.)

## Page 119

1  Q.   Isn't it?
2  A.   Perhaps.
3  Q.   And you believe he has a habit of
4  concentrating on the dress of women and their
5  attire? That's what you said at the bottom there.
6  A.   It is.
7  Q.   Okay.
8    MR. DEBARDELABEN: Are you at a
9  breaking point?
10    MR. CHRISTMAN: We are. Let's stop for
11  lunch.
12    MR. DEBARDELABEN: Yeah.
13    (A lunch recess was taken.)
14    MR. DEBARDELABEN: Drew, here is that
15  statement of Patricia Graves.
16    MR. CHRISTMAN: Very good.
17    MR. DEBARDELABEN: And it was faxed to
18  me, so some of it is not as clear as I would like
19  it. But that is what we have.
20    MR. CHRISTMAN: Okay. I'll take a look
21  at that in a minute.
22  (BY MR. CHRISTMAN)
23  Q.   Is there anything else that we haven't

## Page 120

1  covered associated with Dr. Chambers'
2  admonishments to the main campus folks about their
3  dress? I think we've covered every document that
4  you've produced and every incident that you've
5  listed.
6    Are there any others that we haven't talked
7  about that support your claim of hostile
8  environment or disparate treatment, whatever the
9  claim may be.
10  A.   Just that I think I've made it clear that I
11  think that there should be a dress code policy;
12  then the people would have a guideline to go by
13  and then they will dress appropriately to what he
14  perceives to be appropriate dress.
15  Q.   Okay. Fair enough.
16  A.   Which I probably already stated.
17  Q.   Yes, ma'am. You have stated in response to
18  my question No. 23, which was directed at
19  paragraph 10 of your Complaint to describe any
20  evidence upon which you base your contention that
21  Dr. Chambers raised his voice at you in a loud and
22  threatening manner.
23    Or the plaintiffs, I said. You being one of

30 (Pages 117 to 120)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 121

1  the plaintiffs.
2      And you have attached for me a document that
3  is numbered 23. starts with May 23, 2005, at the
4  top; is that right?
5  A.  October 3, 2005?
6  Q.  May 23, 2005
7  A.  I'm sorry.
8  Q.  Are you with me?
9  A.  Yes, sir, I am.
10  Q.  All right  The first thing listed there
11  under May 23rd was apparently an incident between
12  Barbara McAnaly, from Florida, where she had a
13  closed-door meeting with Dr. Chambers; and it
14  appears they were both talking to each other in a
15  raised tone of voice; is that right?
16  A.  Yes, sir.
17  Q.  You weren't in on that meeting, were you?
18  A.  No, sir.
19  Q.  They weren't talking about you, were they?
20  A.  No, sir
21  Q.  But it appeared that both parties to that
22  conversation were raising their voice?
23  A.  Yes, sir.

Page 122

1  Q.  Did you hear it or did somebody tell you
2  about it?
3  A.  I heard it.
4  Q.  Okay  And there at the bottom of that
5  little section under May 23, 2005, it says that
6  apparently the next day Mr. Chambers' secretary.
7  Julie Wood. told Mr. Chambers that Ms. McAnaly had
8  taken the tape and Mr. Chambers yelled at Ms.
9  Wood.
10      How do you know that that happened?
11  A.  Ms. Wood told me.
12  Q.  So you weren't there for him yelling at Ms.
13  Wood?
14  A.  No, sir.
15  Q.  So you have to take her word for that?
16  A.  Yes, sir
17  Q.  How does this interaction between Mr.
18  Chambers and Ms. McAnaly have anything to do with
19  you?
20  A.  Any time he's yelling and it can be
21  overheard in the other areas, it creates an
22  uncomfortable environment for the people around
23  People have to get up and close their doors.

Page 123

1      We have other people in and out of the
2  college and it's disruptive; it's upsetting; you
3  don't know what to think  Should people
4  intervene; should they not intervene, when you
5  have to get up and close your doors to the other
6  areas
7  Q.  Do you have any evidence that he was --
8  well, apparently she was yelling too, right, Ms.
9  McAnaly?
10  A.  There was raised voices  If I remember
11  correctly, in looking at it I believe it was her
12  and Ms. Perryman in there with him.  I think it
13  was Ms. McAnaly; it could have been Ms. Perryman's
14  voice, the other female voice.
15      I recognized Mr. Chambers' voice because
16  I've heard it so many times  There definitely was
17  a raised female voice
18  Q.  But you're not sure who the female was?
19  A.  No  If I had to guess, I would say it was
20  probably Ms. McAnaly's
21  Q.  But you don't have any reason to believe
22  that that exchange had anything to do with the
23  fact that you're a white female, correct?

Page 124

1  A.  Could be that she's a white female.
2  Q.  Who?  Ms. Perryman or Ms. McAnaly?
3  A.  Both.
4  Q.  Do you have any evidence of that?
5  A.  Other than both of them are white females.
6  Q.  Is that all you've got?
7  A.  Yes, sir
8  Q.  The next one is October 3, 2005, at the
9  bottom of the page.
10  A.  Yes.
11  Q.  And it looks like you and Ms. Graves went to
12  Chambers seeking permission to have Mike Englett,
13  which is a privately contracted programmer, to
14  help you with some work; is that right?
15  A.  Uh-huh.  Along with Ms. Greene, who took us
16  in there with her.
17  Q.  Okay.  Ms. Greene was there too?
18  A.  Yes, sir.  She asked us to go in there with
19  her.
20  Q.  And it says that Mr. Wilson and Dr. Merk
21  were also there, right?
22  A.  They were there when we got there, yes, sir.
23  Q.  And you said Dr. Chambers raised his voice

31 (Pages 121 to 124)

Page 125

1  at Ms. Greene saying that she should not have let
2  you and Patti ask for permission for the
3  programmer and that it was Ms. Greene's fault that
4  you did not have a programmer already on staff?
5  A.    That's what he said.
6  Q.    And what do you contend Dr. Chambers'
7  comments regarding the computer programmer have to
8  do with a hostile environment against you based
9  upon your race and your gender?
10  A.    When Mr. Bridgman was there, Mr. Englett was
11  being a consultant and had been a consultant for
12  us for years. And when he was the accountant, as
13  well as the senior accountant, Mr. Englett had
14  worked with us two to three days a week for the
15  time period that I had been at J.F. Ingram.
16      And it was only after his termination of his
17  position that it became necessary for us, once we
18  became all women -- is the only way I know how to
19  put it -- in that department, to ask for him every
20  time we needed him.
21  Q.    I'm sorry. I did not follow that. It's
22  probably my fault, but I did not understand what
23  you were saying.

Page 126

1  A.    Okay. Before, it was never necessary for a
2  request to be made for Mr. Englett to come.
3  Q.    Before what?
4  A.    Before Mr. Bridgman retired.
5  Q.    I see.
6  A.    It was just always a given that Mr. Englett
7  would be there two to three times a week.
8  Q.    Right.
9  A.    Whenever he was needed.
10  Q.    Right. But it's also true that during all
11  of Mr. Bridgman's tenure, the ACCESS software
12  system was not purchased by the college; is that
13  not true?
14  A.    Not completely.
15  Q.    What part of that is not true?
16  A.    Several of our modules were in place during
17  Mr. Bridgman's time there.
18      Like, for instance, before Mr. Bridgman
19  retired, I already had payroll in place; accounts
20  payable module was already in place; some of the
21  general ledger was in place.
22      We just had -- he was admittedly still doing
23  -- had both the general ledger on ACCESS and on

Page 127

1  what he would call the old program; and he was
2  running both sets of books because he refused to
3  totally go to ACCESS.
4  Q.    Bridgman did?
5  A.    He did.
6  Q.    He didn't like that system?
7  A.    No, he did not.
8  Q.    When did he retire?
9  A.    I believe Mr. Bridgman retired somewhere --
10  it was when Ms. Graves came on staff. I want to
11  say he left in 2002, maybe. 2004?
12  Q.    And isn't it true that the business office
13  purchased the ACCESS system in 1998?
14  A.    '98, '99, somewhere around there.
15  Q.    But Mr. Bridgman was certainly resistant to
16  implementing it?
17  A.    He certainly was.
18  Q.    And everybody kind of knew that?
19  A.    Oh, yes.
20  Q.    He made it well known that he did not want
21  to implement it?
22  A.    He did.
23  Q.    In fact, that was one of the reasons he

Page 128

1  ultimately decided to retire was he was not
2  interested in working with a complete integration
3  of the ACCESS system?
4  A.    I think that and his health. I think that
5  would be a fair statement.
6  Q.    You would agree with me, based upon the
7  documents that we discussed with Ms. Greene
8  yesterday, and we can discuss them again, that
9  President Chambers wanted all of the modules to
10  the ACCESS system integrated into the business
11  office?
12  A.    I think Mr. Chambers had been directed by
13  the chancellor's office to integrate it, yes, sir.
14  Q.    And the chancellor's office, in their peer
15  review in February of 2004, clearly set out the
16  shortcomings of the business office associated
17  with the failure to fully integrate the ACCESS
18  system; is that right?
19  A.    According to the review.
20  Q.    And that happened to be the same year that
21  Bridgman retired?
22  A.    It did.
23  Q.    This computer consultant worked at, what,

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

---

Page 129

1  $65 an hour?
2  A.  I think that would be what -- he was making
3  somewhere between 55 and $65 an hour.
4  Q.  As time wore on, after the college was
5  clearly directed by the chancellor's office to
6  fully integrate the ACCESS system, Dr. Chambers
7  began to grow more impatient with its
8  nonintegration; isn't that true?
9  A.  I think that's true.
10  Q.  And continuing to use Mike was apparently
11  exciting Dr. Chambers?
12  A.  Apparently.
13  Q.  Is it your understanding that Dr. Chambers
14  did not believe it was appropriate for an
15  administrative assistant such as you or an
16  accountant such as Ms. Graves, rather than the
17  Dean of Fiscal Affairs, to make the request for
18  the consultant?
19  A.  I received mixed signals on that.
20  Q.  In what respect?
21  A.  As in previous documents, you'll see he
22  calls me into his office and talks to me; and then
23  on the other hand, when I make a request to him,

---

Page 130

1  it's just according to how it happens to strike
2  him that day.
3  Q.  Okay.  I'm just talking specifically about
4  the request for a consultant.
5      It appeared to frustrate the president that
6  an administrative assistant and an accountant,
7  rather than the dean, was making the request?
8  A.  This particular day it did.
9  Q.  Well, any time that you guys requested a
10  consultant, if it wasn't the dean that was making
11  the request, it frustrated him; isn't that right?
12  A.  According to his documents, it did.
13  Q.  Okay.  And he also expressed that he was
14  frustrated that the business office had not
15  already fully converted to the ACCESS accounting
16  system, right?
17  A.  He did.
18  Q.  And he believed, according to what he was
19  telling you, that full integration would have
20  avoided or diminished the need for Mr. Englett?
21  A.  That's what he believed.
22  Q.  If you'll turn to the next page, that's a
23  memo from you and Ms. Graves to your immediate

---

Page 131

1  supervisor and the president, right?
2  A.  It is.
3  Q.  On October 3, 2005.
4  A.  Uh-huh.
5  Q.  And this was, again, a request to use the
6  programmer, which was Mike?
7  A.  It is.
8  Q.  And you expressed in this memo that, there
9  in the second paragraph, that you are changing
10  from the work order program that Mike wrote to the
11  ACCESS system, right.
12  A.  We finally got the work order program so we
13  could start on it.
14  Q.  And that's what you're talking about here
15  that you're working on changing, right?
16  A.  Uh-huh.
17  Q.  And you said that the less problems
18  encountered will, of course, mean less use of Mike
19  required for the transition?
20  A.  That is correct.
21  Q.  So as the process of integrating ACCESS
22  moves along, the process of using Mike will
23  diminish?

---

Page 132

1  A.  That's correct.
2  Q.  Okay.  And then the next calendar year
3  January 11, 2006, that's your next page, is it
4  not?
5  A.  It is.
6  Q.  You and Ms. Graves again wrote a memo to
7  your immediate supervisor Ms. Greene, and the
8  president requesting the use of Mr. Englett?
9  A.  Uh-huh.
10  Q.  You were in the calendar year closeout?
11  A.  I was.
12  Q.  Running quarterly and yearly reports; is
13  that right?
14  A.  That's correct.
15  Q.  And you mention, there in the third full
16  paragraph, "We are successfully now closing each
17  month without the assistance of Mr. Englett...."?
18  A.  We were.
19  Q.  So y'all were moving along with the ACCESS
20  system; is that right?
21  A.  Right.
22  Q.  And that his services were not necessary at
23  least in terms of closing out the month any

---

33 (Pages 129 to 132)

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

Page 133

1  longer; is that right?
2  A.  Correct.
3  Q.  And you thought you were moving smoothly
4  forward with the ACCESS program; is that right?
5  A.  That is correct.
6  Q.  Turn the page there.  January 11, 2006, is
7  another memo.  This one is not from you but from
8  your supervisor to the president regarding
9  precisely the same matter that you were requesting
10  in your memo; is that right?
11  A.  Correct.
12  Q.  And turn the page.  And you will see there
13  -- these are documents you produced to me.
14      Do you know whose handwriting that is on the
15  bottom there?
16  A.  Mr. Chambers.
17  Q.  And it says okay, right there in the middle
18  of the page, and looks like his initials; is that
19  right?
20  A.  That's correct.
21  Q.  And he had it copied to Dean Greene and
22  wanted to know status ASAP?
23  A.  Uh-huh.

Page 134

1  Q.  So essentially he was saying use Mike?
2  A.  Uh-huh.
3  Q.  And he responded not to your memo but to Ms.
4  Greene's memo?
5  A.  That's correct.  Because we had written to
6  him and to Ms. Greene.
7  Q.  Right.  And he didn't respond to your memo?
8  A.  That's correct.  Because Ms. Greene turned
9  around and wrote to him, and he answered back to
10  Ms. Greene.
11  Q.  Yes.  And he had previously indicated to you
12  that he wanted to deal with Ms. Greene about this
13  matter; is that right?
14  A.  That's correct.
15  Q.  In terms of the documents that you have
16  produced in response to my interrogatories in this
17  lawsuit, that appears to be the balance of any
18  evidence -- documentary evidence -- that you
19  produced to me in support of your claims of a
20  hostile environment.
21      The remainder of these documents appear to
22  be statistical information associated with
23  employees and their hire dates and their salaries;

Page 135

1  is that right?
2  A.  It appears.
3  Q.  There are no other instances documented by
4  you regarding Dr. Chambers creating a hostile
5  environment for you; is that right?
6  A.  Not that I can think of.
7  Q.  If you will, look back at the very front at
8  the actual interrogatory responses on page 8.
9  Look at a question 24.
10      I asked you, in response to the allegations
11  of paragraph 10 of your Complaint, to fully
12  describe any evidence upon which you base your
13  contention that Defendant Chambers raises his
14  voice at meetings involving the Plaintiffs and
15  other female employees but does not raise his
16  voice at meetings with just male employees.
17      Your answer to that question was, "I was
18  aware of male only meetings on various dates and
19  times.  However, I never heard Defendant Chambers
20  raise his voice to the males."  Is that right?
21  A.  Uh-huh.
22  Q.  And you're not stating that Dr. Chambers
23  never raised his voice to a male employee, are

Page 136

1  you?
2  A.  I'm just stating I never heard it.
3  Q.  Were you around when Dr. Huffstutler and Dr.
4  Chambers had a confrontation that ended with Dr.
5  Huffstutler punching the wall?
6  A.  No, sir.
7  Q.  Did you hear about that?
8  A.  Yesterday, when you talked to Ms. Greene
9  about it.
10  Q.  That's the first time you heard about that?
11  A.  That I recall, yes. sir.
12  Q.  You wouldn't have any reason to refute the
13  testimony of Dr. Huffstutler, that he and Dr.
14  Chambers on occasion raised their voices at one
15  another, would you?
16  A.  No, sir, I would not.
17  Q.  And you wouldn't have any reason to dispute
18  the testimony of James Merk that on occasion Dr.
19  Chambers raised his voice at Dr. Merk?
20  A.  No, sir.
21  Q.  And you wouldn't have any reason to dispute
22  the testimony of James Wilson that on occasion Dr.
23  Chambers would raise his voice at James Wilson?

34 (Pages 133 to 136)

## Page 137

1  A   No, sir.
2  Q   And you wouldn't have any reason to dispute
3  if Mr. Montgomery testifies in this case that Dr.
4  Chambers raised his voice on occasion and Mr.
5  Montgomery. you wouldn't have any evidence to
6  dispute that, would you?
7  A   No. sir. I'm not privy to their meetings.
8  Q   Yes, ma'am. You would agree with me that
9  rude behavior contributes to a stressful working
10  environment?
11  A   It does.
12  Q   I'm going to mark this as Exhibit 8.
13      (Defendants' Exhibit No. 8 was
14      marked for identification and a
15      copy of the same is attached
16      hereto.)
17  Q   Take a look at this from Michael Douglas
18  Farris to your supervisor Monica Greene on August
19  of last year.
20      (The witness examines the
21      document.)
22  Q   Have you ever seen that memo before?
23  A   I did.

## Page 138

1  Q   Have you seen it before today?
2  A   I did.
3  Q   When did you first see a copy of that memo?
4  A   Probably the same day it was given to Ms.
5  Greene.
6  Q   And you understand that Mr. Farris was
7  shocked at your treatment of him?
8  A   I do.
9  Q   And you understand that he was very upset
10  about the way you treated his wife?
11  A   It's an untrue account of what happened.
12  Q   Well, it's his account.
13  A   It is.
14  Q   And he believes you were very rude to his
15  wife?
16  A   That's correct.
17  Q   And apparently his wife believes you were
18  very rude to her?
19  A   That's correct.
20  Q   And he was upset enough about it to write a
21  two-page memo to your boss?
22  A   He was.
23  Q   And you would agree with me that being rude

## Page 139

1  to your coworkers does not contribute to a
2  peaceful work environment?
3  A   It does not. But there are witnesses who
4  know that that is not what happened.
5  Q   I want to mark as Defendants' Exhibit 9 a
6  memo Ms. Greene received from the president
7  regarding a memo you sent to him.
8      (Defendants' Exhibit No. 9 was
9      marked for identification and a
10      copy of the same is attached
11      hereto.)
12  Q   Have you ever seen that memo before?
13  A   I did.
14  Q   That happened just recently, didn't it?
15  A   It did.
16  Q   It appears the president is telling Ms.
17  Greene that the two of you had a miscommunication
18  regarding his instructions on live work, right?
19  A   We did.
20  Q   And he asked Ms. Greene to get with you
21  about that miscommunication. didn't he?
22  A   He did.
23  Q   I'll mark as Exhibit 10 your memo to the

## Page 140

1  president.
2      (Defendants' Exhibit No. 10 was
3      marked for identification and a
4      copy of the same is attached
5      hereto.)
6  Q   You've seen that before, haven't you?
7  A   Uh-huh. I wrote it.
8  Q   You would agree with me that mutual respect
9  in the workplace is a good way to facilitate
10  harmony and peace?
11  A   It is.
12  Q   And you wrote to the president, "Perhaps
13  when new terms are to be used, everyone should be
14  informed before blaming employees for perceived
15  infractions when they had no prior knowledge of
16  changes in procedure."
17      You wrote that to the president of the
18  college, didn't you?
19  A   I did
20  Q   Do you think that's a respectful way to
21  address the president of the college?
22  A   I do. When he's appointed me the business
23  office coordinator and that's one of the terms

35 (Pages 137 to 140)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

## Page 141

1  that's been used in the business office.
2  Q.  "Getting on the list," you mean?  The terms?
3  When you say "the terms being used," you're
4  talking about that term, quote, getting on the
5  list?
6  A.  "Getting on the list" is something that's
7  been used.  With all due respect, I've been there
8  22 years, and that is a term that has been used.
9  And I have worked in all phases of the business
10  office.
11     If we're going to change terminology and
12  policy within the business office, and those are
13  terms that are used and we're changing terms, if
14  I'm not going to be the business office
15  coordinator, if I've only been named that in title
16  only, then that should be explained; don't you
17  think?
18  Q.  You agree that any misunderstanding or
19  conflict of understanding can be resolved
20  professionally?
21  A.  It is.
22  Q.  It can be done, can it not?
23  A.  Yes, sir.

## Page 142

1  Q.  And it can be done respectfully?
2  A.  It can.
3  Q.  And my question to you is:  Do you think
4  it's respectful for you to use the terminology to
5  the president of the college that everyone should
6  be informed before blaming employees for perceived
7  infractions when they had no prior knowledge of
8  changes in procedure?
9     Do you think that's respectful.
10  A.  Do you think when I said "Thank you," is
11  there something disrespectful about the way I
12  wrote that?
13  Q.  Well, I'm asking the question.  Do you think
14  it's respectful?
15  A.  I don't see anything wrong with the way I
16  wrote it.  Yes, sir.  I don't see anything
17  disrespectful about it at all.  It was not meant
18  disrespectful in any way.
19  Q.  Well, you can see from Dr. Chambers' memo
20  that he doesn't agree with your understanding of
21  the rule, right?
22  A.  He doesn't really answer my memo.
23  Q.  And he -- his memo, his original memo, to

## Page 143

1  which you responded, I'll label it here as Exhibit
2  11, you've seen that before?
3        (Defendants' Exhibit No. 11 was
4        marked for identification and a
5        copy of the same is attached
6        hereto.)
7  A.  Sure.  It was the original memo to all
8  employees.
9  Q.  It wasn't directed to you, was it?
10  A.  To all employees.  I'm an employee.
11  Q.  Right.  It wasn't directed just at you?
12  A.  No, sir.  But as a member of the business
13  office staff, I have a concern.  If the rules have
14  changed, then we all need to be in coordination of
15  what the rules are.
16  Q.  Direct me to his memo where he blamed
17  employees for perceived infractions.
18        MR. DEBARDELABEN:  Do you have the
19  attachment that went with that letter, because
20  that appears to have something else with it.
21        MR. CHRISTMAN:  That's all I've got.
22        MS. GREENE:  That card.
23        MR. CHRISTMAN:  I have this card.

## Page 144

1  We'll attach this card to that exhibit.
2  A.  The discussion is getting on the list; and
3  that's always been the phrase used by the business
4  office.
5     My concern is this:  If that is not the
6  quote the business office is supposed to be using,
7  then the people in the business office, as the
8  people who answer the phones and the people that
9  are directed -- because I myself receive telephone
10  calls that are directed to me as one of the
11  people.
12     And if that is not the correct terminology
13  -- and I have been there 22 and a half years.  If
14  somebody is directed to me, I need to know, if
15  that is not the correct terminology, what is that
16  terminology I need to be using.
17  Q.  I understand that.
18  A.  Well, then I don't understand.
19  Q.  Let me ask the question again then.
20  A.  Okay.
21  Q.  Where in that memo is he blaming employees
22  for infractions?
23  A.  It says here:  I request that you

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

Page 145

1  familiarize yourself of the information on the
2  enclosed card.
3      And that enclosed card did not tell me what
4  I needed to be telling anybody.
5  Q.   And where is it in the memo that he's
6  blaming anybody for anything?
7  A.   Well, it says please refrain yourself from
8  getting into discussion about "getting on the
9  list."
10      So obviously somebody used the statement
11  "getting on the list," so somebody did something
12  wrong.
13  Q.   Well, he's asking you to refrain from
14  discussions about getting on the list, right?
15  A.   Obviously somebody used that and wasn't
16  supposed to.  So if that's not the terminology we
17  want to use anymore, please tell me what the
18  correct terminology is so we can pass it along.
19  Q.   Fair enough.
20  A.   So I want to know what the correct
21  terminology is.  And I did not see that as being
22  ugly, smart, critical, disrespectful, or anything
23  else.

Page 146

1      The memo came from him.  If we have an
2  open-door policy, if I'm asked to come in there
3  and talk about what's going on in the business
4  office, if I've been given the business office
5  coordinator title, if that's just in title only,
6  if I'm not allowed to ask a question, then please
7  tell me so.
8  Q.   Yes, ma'am.  And I understand what you're
9  saying, ma'am.
10  A.   Okay.  Then I don't understand what the
11  point is.  I'm sorry.
12  Q.   Okay.  Well, let me see if I can help.
13  A.   Okay.  You help me.
14  Q.   Your memo specifically references blaming
15  employees for perceived infractions.
16  A.   Well, maybe the perceived infractions, maybe
17  they never occurred.
18  Q.   Nobody was blamed in this memo of anything;
19  isn't that true?
20  A.   Okay.  I took his statement to refrain from
21  getting into discussions about getting on the
22  list, that someone had said that and that was the
23  wrong term.  And I knew that we had used that term

Page 147

1  in the 22 and a half years I have been there.  And
2  if I personally was not supposed to use that
3  statement anymore, I want to know what the correct
4  statement is to use.
5  Q.   Understood.  If you're supposed to be using
6  particular terminology, you need to know what that
7  terminology is, right?
8  A.   Correct.
9  Q.   And as far as you understand, it's perfectly
10  acceptable to find out what the terminology is,
11  right?
12  A.   Correct.
13  Q.   But is it acceptable to write to the
14  president of the college, to insinuate directly
15  with your words that he's blaming people of
16  infractions when they had no knowledge of a change
17  in procedure, where his memo didn't blame anybody?
18  Is that appropriate?
19  A.   I felt it was.  That's all I can say.
20  Q.   And you can see from his memo to your boss
21  that he thought your understanding of what was
22  said in your correspondence was definitely not
23  what they discussed in cabinet meeting and was not

Page 148

1  the content of his memo?
2  A.   I wasn't in the cabinet meeting, so I wasn't
3  there.
4  Q.   Okay.  But you did see his memo, this memo
5  Exhibit 11?  You saw that?
6  A.   Yes.  I did.
7  Q.   And he writes here that your understanding
8  is not what was in his memo.  He writes that here,
9  doesn't he?
10  A.   I wasn't in the cabinet meeting.  But I did
11  -- Ms. Greene did show me that and she did tell me
12  that he wasn't blaming anybody, but that they're
13  going to call it some kind of pool or some such.
14  Q.   She said he wasn't blaming anybody?
15  A.   That's correct.
16  Q.   But you said he was, didn't you?
17  A.   Yes, I did.
18  Q.   And he's the president of the college?
19  A.   He is.
20  Q.   And you accused him of blaming somebody when
21  he wasn't blaming anybody, didn't you?
22  A.   Well, I won't necessarily say I was blaming
23  him.  I'm going to rephrase that and say if I had

37 (Pages 145 to 148)

## Page 149

1  told somebody to get on the list, that was a term
2  that I had used in the past 22 and a half years.
3  Q.    Understood.
4         MR. CHRISTMAN:  If it's okay with you,
5  Jim, Exhibit 11 is the June 5th memo that says
6  "Attachment," to which you were referring where is
7  the attachment.
8         MR. DEBARDELABEN:  Yeah.
9         MR. CHRISTMAN:  I will paperclip to
10  Exhibit 11 a business card-size attachment that
11  basically just has the requirements for being a
12  live work participant.
13  Q.    Is that what you understand that card to be,
14  ma'am?
15  A.    That's what they sent me.
16         MR. DEBARDELABEN:  Drew, what we might
17  want to do, in case the clip comes off, is put in
18  pencil an 11 up here on the side.
19         MR. CHRISTMAN:  Fair enough.  I will do
20  that.
21         MR. DEBARDELABEN:  I mean, I would hate
22  for it to get lost.
23         MR. CHRISTMAN:  I'm going to write

## Page 150

1  Exhibit 11 in the upper right-hand corner.
2         MR. DEBARDELABEN:  Is that going to
3  cause a problem doing it like that, knowing that
4  that's --
5         THE COURT REPORTER:  You can do 11(a).
6         MR. CHRISTMAN:  For the record, it will
7  be 11(a).
8  Q.    Do you think that former Chancellor Johnson
9  is a reliable source regarding the performance of
10  the business office at Ingram?
11  A.    I wouldn't know what to say about Chancellor
12  Johnson now.
13  Q.    What about Debbie Dahl?  Would you say that
14  she's a reliable source regarding the performance
15  of the business office at Ingram?
16  A.    I suppose.
17  Q.    What about Leigh Grogan?
18  A.    I think Leigh Grogan is a fair and honest
19  person, yes.
20  Q.    You think that she's a good source to
21  evaluate the performance of the business office at
22  Ingram?
23  A.    I do.

## Page 151

1  Q.    You wouldn't have any reason to believe Lee
2  Grogan was not telling the truth if she testified
3  that the business office at Ingram has some
4  timeliness problems?
5  A.    I think she would know, yes.
6  Q.    Did you ever call Dr. Chambers a racist?
7  A.    Yes.
8  Q.    Did you call him a male chauvinist?
9  A.    I have.
10  Q.    You've said that to the vice chancellor,
11  Debbie Dahl, haven't you?
12  A.    I have.
13  Q.    You believe that Dr. Chambers has given
14  preferential treatment to Ms. Perryman, don't you?
15  A.    Yes, I do.
16  Q.    Dr. Chambers appointed to a position at
17  Ingram College your daughter?
18  A.    He did.
19  Q.    What is her name?
20  A.    Beth White.
21  Q.    Beth White.  He had no obligation to appoint
22  your daughter to a position at Ingram, did he?
23  A.    No, he didn't.

## Page 152

1  Q.    He also appointed your sister-in-law to a
2  position in the fiscal division at Ingram, didn't
3  he?
4  A.    She applied for a job and got the job.
5  Q.    He appointed her, didn't he?
6  A.    He was the president when she got the job.
7  Q.    And he appointed her?
8  A.    He did.
9  Q.    He didn't have to do that, did he?
10  A.    No, he didn't.
11  Q.    Your daughter is a white female?
12  A.    She is.
13  Q.    And your sister-in-law is a white female?
14  A.    Yes, she is.
15  Q.    For a time your father was a part-time
16  instructor at Ingram, wasn't he?
17  A.    They asked him was he interested in coming
18  up and working there; he said yes and came up
19  there and worked there for a while.
20  Q.    President Chambers appointed him to that
21  position, right?
22  A.    He did.  He's retired military.  Actually,
23  he's my stepfather.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

---

Page 153

1  Q.  Do you think that Dr. Chambers appointed
2  your daughter, your sister-in-law, and your
3  stepfather to positions at Ingram because you're a
4  white female?
5  A.  No.
6  Q.  I don't either. At the time that you wrote
7  your EEOC Complaint, there was only one
8  African-American dean at the college; isn't that
9  right?
10  A.  I believe that's correct.
11  Q.  In fact, of the four dean-level employees at
12  Ingram when you filed your Complaint, two were
13  white females?
14  A.  I believe that's correct.
15  Q.  And one was a white male?
16  A.  I believe that's correct.
17  Q.  And the other was a black male?
18  A.  I believe that's correct.
19  Q.  That's the highest level, other than the
20  president, at the college; isn't that true?
21  A.  That's true.
22  Q.  Did you know that Bonita Owensby filed a
23  lawsuit against Dr. Chambers and Dean Wilson?

---

Page 154

1  A.  Yes, sir.
2  Q.  Did you know that she's claiming that Dr.
3  Chambers and Dean Wilson discriminated against her
4  because she's black?
5  A.  Yes, sir.
6  Q.  And you claim in this lawsuit that he
7  discriminated against you because you're white; is
8  that right?
9  A.  It appears.
10  Q.  Can both of those be true?
11  A.  I can't say what's true and what's not true.
12  Q.  Well, is it possible for him to discriminate
13  against white and black people?
14  A.  Maybe he discriminates against females,
15  white or black.
16  Q.  Does he discriminate against both white and
17  black people?
18  A.  I don't know. I can only speak for myself.
19  Q.  Did you once state in writing that when Dr.
20  Chambers is not worried about Dean Greene, he's
21  worried about Mr. Keahey and what he's doing for
22  Dr. Johnson and Mr. Clemons?
23  A.  I did.

---

Page 155

1  Q.  Who is Mr. Keahey?
2  A.  He is our furniture and refinishing
3  instructor.
4  Q.  What is his gender and race?
5  A.  He's a white male. He was on Dr. Johnson's
6  appointed evacuation team or some such
7  Q.  And you wrote, If it's not them, then he's
8  worried if Mr. Keahey and Julie Givens are trying
9  to turn the rest of the employees against him.
10  Mr. Chambers thinks it's all one big conspiracy.
11  Lord help us all.
12  A.  That's exactly what I wrote when I was
13  writing my notes what I was going to tell Debbie
14  Dahl.
15  Q.  Of course, we know now that Mr. Chambers was
16  right to be concerned about Mr. Keahey, right?
17  Mr. Keahey had not always been honest with Dr.
18  Merk or the president about where he was going on
19  state business for Dr. Johnson, the chancellor,
20  right?
21  A.  I can't say where Mr. Keahey was and what he
22  was doing.
23  Q.  And you didn't know that Mr. Keahey told

---

Page 156

1  Dean Merk that he was going to South Alabama to
2  see about hurricane damage, and it was later found
3  out that he went to New Orleans?
4  A.  That's according to Mr. George's
5  investigation.
6  Q.  Did you know anything about that?
7  A.  Yeah. It was in my EEOC documents. I read
8  it when it came back.
9  Q.  Well, did you know anything about that at
10  the time you wrote these things about Dr.
11  Chambers?
12  A.  No, I didn't.
13  Q.  If Mr. Keahey had told his dean that he was
14  going to South Alabama to see about hurricane
15  damage but was found in New Orleans, that's a
16  problem, isn't it?
17  A.  Well, at that time my understanding was he
18  was working for Roy Johnson at Postsecondary. I
19  didn't know who he reported to.
20  Q.  Well, if he reported to Dean Merk and the
21  president, that's a problem, isn't it?
22  A.  I would think so, yes.
23  Q.  Okay. If Dr. Chambers received a report

---

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 157

1  from Dr. Huffstutler that there were significant
2  problems with the business office, do you believe
3  Dr. Chambers should take that report seriously?
4  A.  Dr. Huffstutler came with Mr. Chambers from
5  Chattahoochee Valley. And when Dr. Huffstutler
6  first came there, Dr. Huffstutler had his own idea
7  about the way a business office should be run.
8  And we did not do things exactly the way Dr.
9  Huffstutler did things at Chattahoochee Valley.
10     And he had his idea of how a business office
11  should be run and we had our ideas of how a
12  business office should be run. We have integrated
13  some of those ideas.
14     And I will say that Mr. Chambers probably
15  took everything that Dr. Huffstutler said at heart
16  because he worked with Dr. Huffstutler and he
17  would believe anything that Dr. Huffstutler said
18  because he was very comfortable with Dr.
19  Huffstutler.
20     I would not necessarily always agree with
21  everything that Dr. Huffstutler said.
22  Q.  He said some good things though, didn't he?
23  A.  He did say some good things. He did.

Page 158

1  Q.  He was a very experienced guy too, wasn't
2  he?
3  A.  Dr. Huffstutler -- I'm not sure how many
4  years he actually worked as Dean of Finance at
5  Chattahoochee Valley, so how much of his
6  experience was in the finance department, I'm not
7  sure.
8     He did have some ideas that perhaps we used
9  and it helped us out.
10  Q.  Do you know what experience he had in
11  accounting and finance?
12  A.  I don't.
13  Q.  Okay. If it was significant, that would be
14  something Dr. Chambers should take into account if
15  he heard complaints from Dr. Huffstutler, right?
16  A.  Certainly, if they were that extensive.
17  Q.  Sure. And let me get back to my question.
18     If Dr. Huffstutler wrote a two-page,
19  eight-point memorandum about problems he perceived
20  with the business office, you would expect Dr.
21  Chambers to take that memo seriously?
22  A.  I would.
23  Q.  Because Dr. Huffstutler was a dean at that

Page 159

1  time?
2  A.  Oh, yes, sir.
3  Q.  And you would expect Dr. Chambers to take
4  any reports of problems from his deans seriously?
5  A.  Yes, sir.
6  Q.  And certainly you would expect Dr. Chambers
7  to take seriously concerns expressed by the
8  chancellor's office, wouldn't you?
9  A.  Yes, sir.
10  Q.  If Debbie Dahl and the review team had
11  conducted a peer review of the finance office and
12  returned findings of a number of weaknesses, you
13  would expect Dr. Chambers to take those weaknesses
14  seriously, or at least take what they wrote about
15  the weaknesses seriously, wouldn't you?
16  A.  I would feel more comfortable had they spent
17  more than a few minutes with each person and
18  really reviewed each person. I certainly think
19  anything returned from the chancellor's office
20  should be taken seriously.
21     I was there when the review was done. I
22  think sitting with somebody 15 to 20 minutes on
23  each year is not a proper time to review those

Page 160

1  documents.
2  Q.  Are you saying you wouldn't have taken it
3  seriously if you were the president?
4  A.  No, sir, I'm not saying that at all.
5  Q.  Because you would have, wouldn't you?
6  A.  Yes. I would have. But I think you should
7  take into account that 15 minutes sitting beside
8  somebody's desk and asking them questions would
9  not be a fair assessment of what's happening in a
10  business office.
11  Q.  You would agree with me that Dr. Chambers
12  does not believe that the business office is well
13  run?
14  A.  Obviously, from all the times that I was
15  called to his office and put through the many
16  torturous hours of sitting there, over and over
17  and over having to hear the same thing that caused
18  me much stress, no. sir. He obviously does not
19  think we are run efficiently.
20     I do not agree with that, but he obviously
21  thinks not.
22  Q.  He doesn't necessarily think that you're
23  doing a poor job though?

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

---

Page 161

1    A.    No, he didn't say I was doing a poor job.
2    Q.    He does think that Ms. Greene is not
3    performing her job to the level of his
4    expectation. Would you agree with that?
5    A.    I think he's beat that dead horse to death
6    again and again.
7    Q.    Okay. I'm going to change gears and head
8    for the home stretch here.
9    A.    Hallelujah.
10   Q.    I'm going to be referring to -- I'm probably
11   not going to mark it again, but this is Exhibit 45
12   to Ms. Greene's deposition. It is the Complaint
13   that was filed by both you and Ms. Greene.
14        Paragraph 11 of the Complaint -- and by the
15   way, would you please read quickly, or as much
16   time as you need, paragraphs 6, 7, 8, 9, and 10,
17   and confirm for me that we have covered those
18   areas.
19        I've tried to cover all of those areas
20   through your responses to discovery. But take a
21   look and make sure there's nothing that we haven't
22   talked about that you haven't had an opportunity
23   to explain the evidence that you believe supports

Page 162

1    those allegations.
2    A.    No. 8, the only thing I would like to add is
3    I don't have any people under my direct
4    supervision.
5    Q.    I see what you're saying. Let's read it for
6    the record.
7         "Defendant Chambers and Defendant Wilson
8    have indicated in front of other employees that
9    Plaintiff Givens allows personnel in the business
10   office, which is under Givens' direct supervision,
11   to violate school policies when work is being done
12   for employees of the business office or their
13   family members."
14        And your testimony here is you don't really
15   have any direct supervision of anything in the
16   business office?
17   A.    Right. As you'll see from my job
18   description, even though it's not updated, I don't
19   have people under my direct supervision.
20        MR. DEBARDELABEN: That probably should
21   have been Greene. But I didn't catch that typo.
22   I just saw that too.
23        MR. CHRISTMAN: Yes, sir. Let's make

Page 163

1    sure that that's clearly reflected in the record
2    here.
3    Q.    Because what we're doing here is we're
4    changing your Complaint, so we need to make sure
5    that you understand. This is your Complaint. I
6    didn't write this. This is what you filed in
7    federal court.
8    A.    Yeah.
9    Q.    So what you're saying is, where it says,
10   "... which is under Givens' direct supervision..."
11   should read, "... which is under Greene's direct
12   supervision..."?
13        MR. DEBARDELABEN: Yeah. I'll amend
14   that.
15   A.    Yeah, that's fine. But I'm just saying
16   under my -- unless something changed under
17   business office coordinator, which they didn't
18   give me a new job description, as you saw.
19   Q.    Yes, ma'am.
20   A.    In fact, the one for payroll is not even in
21   there. But I will say this: On the Sandy Caylor
22   memo, if I can come back just a moment to that --
23   Q.    Sure. Do you need to look at it?

Page 164

1    A.    No. Mr. Wilson has, if I remember
2    correctly, made a comment in there that perhaps
3    the business office in general has had Ms. Caylor
4    order or go to the mills especially for our
5    business office, I believe is the way he had
6    stated it.
7         And, to my knowledge, I know I certainly
8    have not sent Ms. Caylor -- and I just want to
9    clarify that for the record -- on a special trip
10   to the mill for me personally or for any of my
11   family members, if that's what he was insinuating.
12   Q.    Well, do you think that James Wilson's
13   statement that he believes that maybe the business
14   office is getting some special treatment by Ms
15   Caylor, do you think that's discrimination?
16   A.    Yes. Because I don't think it was
17   necessary, when Ms. Caylor went to him about
18   leaving the campus, that he even throwed the
19   business office in the mix.
20        I think he was -- I think it has become so
21   evident that it's okay with Mr. Chambers to blame
22   things on the business office, that no matter what
23   anybody comes in and asks, for any reason, that

41 (Pages 161 to 164)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

---

Page 165

1  everybody says, Well, blame it on the business
2  office. If you can't get something, blame it on
3  the business office.
4      And that's just my opinion. And I've had
5  other people call me and say, Oh. by the way, the
6  business office got blamed again.
7      So I do believe that that is a comment that
8  circulates; and I do believe that when Mr Wilson
9  throwed the business office in there to Ms.
10 Caylor, when she came back with this memo, it was
11 to say. you know, the business office didn't have
12 anything to do with me not going to the mill
13 today.
14 Q.  And you think based upon his statement,
15 however offhanded it may have been, that you get
16 to file a federal lawsuit and claim money damages
17 against him because he's a racist and a
18 chauvinist? Is that your testimony?
19 A.  I think that's just one of the instances
20 where he's saying that, you know --
21 Q.  That's the other instance, isn't it?
22 There's no other instance like that; isn't that
23 true?

Page 166

1  A.  I don't know if it's the only instance or
2  not.
3  Q.  Okay. The business office didn't file this
4  Complaint, did they?
5  A.  No.
6  Q.  You did?
7  A.  I did.
8  Q.  And Mr. Wilson did not accuse you of doing
9  anything, did he?
10 A.  I think he used Ms. Givens' name.
11 Q.  How do you know that?
12 A.  Because I believe you'll find it in Mr.
13 George's response back on the EEOC, where Mr.
14 Wilson's saying that Ms. Givens blah, blah, blah.
15 Q.  And what Mr. Wilson thinks about you asking
16 for somebody to make a special trip for fabric,
17 that's your evidence that Mr. Wilson has created a
18 hostile environment against you?
19 A.  I think he's talking about me. He's also
20 told his people in his office not to come speak to
21 the people in the business office: me, Ms.
22 Greene.
23 Q.  What do you think the world would be like if

Page 167

1  every time somebody talked about somebody at work
2  they could file a federal lawsuit? What would the
3  world be like if that was the case?
4  A.  I don't know. I can't answer for other
5  people. I can only say that Mr Wilson telling
6  other people not to speak to me, from his
7  department --
8  Q.  How do you know that's not just because he
9  doesn't like your job performance?
10 A.  Then I think he would need to talk to me
11 about my job performance.
12 Q.  Why? He doesn't supervise you, does he?
13 A.  No. But if he has a problem with me, he
14 certainly should talk to me about it. He
15 shouldn't be telling his employees, who may have
16 something that they need to talk to me about on
17 their payroll or their insurance or other things
18 that they might need to talk to me about and that
19 might need to communicate with me.
20 Q.  I understand. But if he doesn't like you
21 for whatever reason, you don't know why he doesn't
22 like you, do you?
23 A.  No.

Page 168

1  Q.  Mr Wilson is not your direct supervisor?
2  A.  No, he is not
3  Q.  Mr. Wilson does not affect your pay?
4  A.  I don't guess.
5  Q.  He can't control whether you're elevated or
6  not. right?
7  A.  To my knowledge he cannot.
8  Q.  And he cannot fire you?
9  A.  Not to my knowledge.
10 Q.  And he can't discipline you?
11 A.  No, sir
12 Q.  He has to go through your supervisor because
13 she controls whether you're recommended for a
14 raise, right?
15 A.  Ultimately the president has that control.
16 Q.  But she recommends it. She controls whether
17 it's recommended?
18 A.  That's correct
19 Q.  And she does your evaluations?
20 A.  That's correct
21 Q.  And you report to her?
22 A.  That's correct.
23 Q.  And she gives you your job assignments?

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 169 | Page 171 |
|---|---|

**Page 169**

1  A.  That's correct.

2  Q.  Mr. Wilson doesn't give you job assignments?

3  A.  He could when Mr. Chambers is not there.

4  Q.  Well, he would have go through your dean

5  though, wouldn't he?

6  A.  I don't know about that.

7  Q.  Let me ask you this: Has he ever given you

8  job assignments?

9  A.  I really don't know in the past if he has or

10  hadn't.

11  Q.  Fair enough. Is there anything else that

12  Mr. Wilson has done, other than this Caylor memo,

13  that you believe supports your lawsuit against him

14  for creating a hostile work environment?

15  A.  That, and him telling his employees not to

16  speak to me.

17  Q.  Okay. What about your allegation that you

18  have been treated differently than similarly

19  situated males? I'm just talking about Wilson

20  now.

21  He doesn't have any control over the terms

22  of your employment, right?

23  A.  No, he doesn't.

**Page 170**

1  Q.  So he really hasn't treated you any

2  differently than anybody else because he can't

3  control that, right?

4  A.  He doesn't; Mr. Chambers does.

5  Q.  So that allegation in your Complaint is

6  really directed at Chambers, not Wilson?

7  A.  That's correct. Do you want to talk about

8  that now?

9  Q.  I'm sorry. Did you say something?

10  A.  About the pay.

11  Q.  Yeah. We'll work our way to the pay issues.

12  A.  Okay.

13  Q.  But were you talking to me or your lawyer?

14  A.  I was just talking to myself.

15  Q.  Okay.

16  MR. CHRISTMAN: Jim, you're not giving

17  her stuff to guide her testimony, are you?

18  MR. DEBARDELABEN: Yeah, sure did,

19  before we came up here.

20  MR. CHRISTMAN: No. I mean, are you --

21  THE WITNESS: He's letting me read this

22  right here. Didn't you say that was okay.

23  MR. DEBARDELABEN: I gave her the

**Page 171**

1  Complaint, which you referred to. So I guess I am

2  giving her stuff to guide her testimony, but not

3  that you didn't know about.

4  MR. CHRISTMAN: Okay. My question is:

5  She made a spontaneous statement. I don't know if

6  you showed her something or --

7  THE WITNESS: No. I just asked did you

8  want to talk about the pay now. And you said not

9  now.

10  MR. CHRISTMAN: Okay. I understand.

11  THE WITNESS: Didn't you say not now?

12  MR. CHRISTMAN: I did.

13  THE WITNESS: That's all I asked.

14  MR. CHRISTMAN: Very good.

15  THE WITNESS: I'm sorry.

16  MR. CHRISTMAN: No, no, don't be sorry.

17  MR. DEBARDELABEN: But, yeah, I did

18  give her something to guide her testimony.

19  A.  I want to talk about No. 13 as it relates to

20  me.

21  Q.  Yes. ma'am, we'll get to No. 13.

22  A.  Do you want to talk about it now?

23  Q.  No, ma'am. I'm thinking about Mr. Wilson

**Page 172**

1  right now.

2  A.  Okay.

3  Q.  And No. 13 is directed at Mr. Chambers?

4  A.  It is.

5  Q.  Is the only claim that you have against Mr.

6  Wilson that he's created a hostile environment

7  against you, is that your only claim against him?

8  A.  It is.

9  Q.  Okay. And we've talked about the evidence

10  supporting that claim, right?

11  A.  To my knowledge.

12  Q.  Very good. Okay. And then how we kind of

13  got on all this was I had asked you to look at 6,

14  7, 8, 9, and 10, and tell me if we hadn't covered

15  everything.

16  And you did bring up 8, which I appreciate,

17  and we covered that. Have we covered 8?

18  A.  We have.

19  Q.  Look at 9 and 10, and make sure we have

20  covered any evidence that supports those

21  allegations. It was my intention to have covered

22  all of that already, but I may have missed

23  something.

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

| Page 173 |
| --- |

1  A.  We have  To my knowledge, everything has
2  been covered.
3  Q.  Very good  Let's look at 11.
4      "Defendant Chambers has consistently refused
5  to raise the salary of white employees that
6  Plaintiff Greene has recommended for a raise  The
7  only employee to receive a raise which was
8  recommended by Plaintiff Greene was a black
9  employee."
10     What employees do you contend are similarly
11 situated with you or have like job duties as you?
12 A.  In my department?
13 Q.  Yes, ma'am, in your department  Because
14 there's not anybody that does your function in
15 another department, is there?
16 A.  No.
17 Q.  So who has like job duties as you in your
18 department?
19 A.  Nobody does exactly the same job I do.
20 Q.  Well, nobody really does anything close,
21 other than people that are superior to you, right?
22 A.  (No response.)
23 Q.  I mean, Patti Graves does some of the things

| Page 174 |
| --- |

1  that you do, but she is on a higher pay scale and
2  has a higher education than you, right?
3  A.  She's been there for two and a half years.
4  Q.  She's been at the college two and a half
5  years?
6  A.  Correct.
7  Q.  She's had other experience apart from the
8  college?
9  A.  Right.
10 Q.  She was with the auditors office for, like,
11 15 years?
12 A.  That's correct.
13 Q.  And the two of you don't occupy the same
14 position?
15 A.  No.
16 Q.  And there's no one else that occupies a
17 position like yours in the business office, right?
18 A.  No.
19 Q.  Do you claim that someone of a different
20 race or gender was given better treatment than
21 you, in promotions, that does what you do?
22 A.  They don't do what I do.
23 Q.  Okay.  You have never been denied a raise,

| Page 175 |
| --- |

1  have you, requested and denied?
2  A.  Yes.
3  Q.  Tell me about that.
4  A.  Between the years 2000 and 2006, I sat on
5  the same salary schedule.  I believe it was like
6  six years I sat on salary E-1, Level 1
7  Q.  You got regular step increases, right?
8  A.  As I was due, yes, sir, and the
9  cost-of-living increases that everybody all over
10 the state got
11 Q.  Okay  And did you request a raise in that
12 time period?
13 A.  Ms. Greene requested, I think on two or
14 three different occasions, for me to get raises.
15 Q.  And what was the decision?
16 A.  No.
17 Q.  And did anyone with similar or less
18 qualifications, who was black or male, receive a
19 raise over you, that does what you do?
20 A.  They don't do what I do.  But that was the
21 -- one of those years was the year that a black
22 employee that was a truck driver was moved to the
23 same level that I was.  He was like a maintenance

| Page 176 |
| --- |

1  person.  He moved to an E-1, Level 1.
2  Q.  He doesn't do what you do though?
3  A.  No, he doesn't.
4  Q.  Who was that black employee?
5  A.  Coleman McKeithen.
6  Q.  But last year you were given a schedule
7  increase by being moved off E to C?
8  A.  After filing an EEOC Complaint.
9  Q.  After you filed an EEOC Complaint?
10 A.  Yes, sir.  Probably hoping I wouldn't file a
11 lawsuit.
12 Q.  That didn't stop you though, did it?
13 A.  No, it didn't.  It didn't change my
14 feelings.
15 Q.  Well, it sure gave you a big raise, didn't
16 it?
17 A.  It did.  Not nearly as big as it gave other
18 people.
19 Q.  What other people, that do what you do and
20 are qualified similarly as you, were treated
21 better than you?
22 A.  Not the same qualifications but....
23 Q.  Okay.  Well, that answered my question.

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

Page 177

1  A.  Okay.
2  Q.  I direct your attention back to 11.
3  Chambers has consistently refused to raise the
4  salary of white employees that she's recommended.
5      Tell me about what evidence you have to
6  support that statement.
7  A.  Well, of course, I know about Beth White
8  because she's my daughter, which we like to point
9  out, so we'll just go ahead and talk about it.
10     She's the secretary/receptionist at main
11 campus, carried a heavy workload, is not being
12 paid equal to secretary/receptionist at Draper and
13 at Tutwiler, both of which are black females.
14 Q.  I talked about that yesterday with Monica.
15 A.  You did.
16 Q.  Did we cover that completely yesterday?
17 A.  We got the chart of it that you asked us to
18 bring today.
19 Q.  Oh, very good.  Let's take a look at it if
20 we have it.
21     MR. CHRISTMAN:  Let's take a short
22 break.
23     (A brief recess was taken.)

Page 178

1      MR. CHRISTMAN:  Let's mark No. 12.
2      (Defendants' Exhibit No. 12 was
3      marked for identification and a
4      copy of the same is attached
5      hereto.)
6  (BY MR. CHRISTMAN)
7  Q.  Let's talk about what I've marked as Exhibit
8  12.  This is a log that was just produced to me.
9      And I guess this refers to some calculations
10 I was talking about with Ms. Greene yesterday
11 regarding the workload distribution between your
12 daughter, Ms. White, and the other two folks that
13 Ms. Greene and you claim have gotten a better
14 deal, right?
15 A.  Uh-huh.
16 Q.  Who are those other two folks?
17 A.  Main campus would be Beth White. and she's a
18 white female; Draper State would be Gloria Knox,
19 she's a black female; Tutwiler campus is Jackie
20 McDuffie, and she is also a black female.
21 Q.  McDuffie and Beth don't have the same job
22 description though, right?
23 A.  That was my understanding yesterday.  Until

Page 179

1  yesterday, I thought they all had basically the
2  same job description.
3  Q.  You don't really know what their job
4  descriptions are though; is that right?  Well, you
5  may know what Beth's is, I'm sure.
6  A.  Well, I have worked all three locations when
7  there would be someone absent, because there would
8  be no coverage at either of the locations.
9      And in sitting in those positions, answering
10 telephones and writing live work orders.  Because
11 for a long period of time at the Tutwiler campus,
12 there was not anybody there.  And I sat at that
13 position.
14     In fact, different people went over and
15 worked at the Tutwiler campus when there was
16 nobody covering that campus, when we had a time
17 frame when there was nobody covering that.
18     And it did entail answering the phone and
19 writing work orders.  Now, unless that's changed
20 since I went over there, there's very little work
21 done there.  And unless that has changed since I
22 was over there, I don't know what her other job
23 duty would be.

Page 180

1      MR. CHRISTMAN:  Could she look at your
2  copy of that, Jim?
3      MR. DEBARDELABEN:  Sure.
4  Q.  Okay.  Do you have any idea why the dates of
5  these calculations is October 2004 to September
6  '05?
7  A.  That was at the time when, I believe, Ms.
8  Greene was going to Mr. Chambers with a – one of
9  the times when Ms. Greene was going to Mr.
10 Chambers to ask for Ms. White a raise, to try to
11 get her in line with the other two people, for
12 their pay.
13 Q.  All right.  Who made this breakout?
14 A.  I believe Patti Graves, who is the
15 accountant, made the chart for Ms. Greene.
16 Q.  And it appears to be calculation of work
17 orders.
18 A.  And bank deposits that are made at those
19 locations.  See where it says "Bank Deposit Log"?
20 Q.  Yes.
21 A.  Detail on Live Work Analysis.
22 Q.  These are bank deposits made based on work
23 orders, right?

45 (Pages 177 to 180)

Page 181

1  A.   That would be correct. That would be the
2  difference in the live work that's done at those
3  locations during the year.
4  Q.   Right. And there are more deposits made --
5  more money is deposited at the main campus than at
6  Draper or Tutwiler campuses regarding live work?
7  A   Obviously.
8  Q   All right. And you don't contend that Ms.
9  McDuffie or Ms Knox, that the only thing they do
10 is live work? That's not your contention, is it?
11 A   No, sir. They do answering the telephones.
12 Q   And other various administrator
13 responsibilities as they arise, correct?
14 A.  I would assume so.
15 Q.  Okay. Very good. And it's your
16 understanding that this raise refusal for Ms.
17 White occurred sometime in the time frame listed
18 here in Exhibit 12, October of '04 to September of
19 '05?
20 A   That's correct.
21 Q   Do you know where in that range it was?
22 A   I would have to say it would be when she
23 went in -- I would say since it was run for that

Page 182

1  time period, I would say it was somewhere along
2  that timeline when she went in and asked him for a
3  raise.
4  Q.  Well, that's a year's timeline, right?
5  A   Right. I would say she ran it -- I'm not
6  sure.
7  Q.  Okay. Any other evidence to support
8  allegation No. 11: Chambers has refused to raise
9  the salary of white employees that Plaintiff
10 Greene has recommended for a raise?
11 A.  I know she's asked for Kerri Conger raises
12 and Jeanna Givens raises and Patti Graves raises
13 as well.
14 Q.  She's asked for everybody in her department
15 to have a raise?
16 A.  Yes, she has.
17 Q.  And at times Dr. Chambers has not agreed to
18 that?
19 A.  That is correct.
20 Q.  But at times he has agreed to that, right?
21 A   Last year he did.
22 Q.  Well, but before that. I mean, you got two
23 raises before that.

Page 183

1  A   Six years prior to that I did.
2  Q.  So at times he's agreed to it and at times
3  he hasn't agreed to it?
4  A.  Correct
5  Q.  What evidence do you have as to anything --
6  any of his refusals to allow a raise requested by
7  Ms. Greene is because of gender?
8  A   Are we talking about gender or race?
9  Q   I asked about gender. I'll ask about race
10 next. I don't want to ask you a compound question
11 and having you answer two questions at once.
12 A.  Okay. Gender. Well, I do know on the
13 gender issue -- of course, we talked about Mr.
14 McKeithen was given a raise when the women were
15 not given a raise. And then I know --
16 Q.  Let's back up and talk about that again.
17 Who was given a raise when who wasn't given a
18 raise?
19 A   Mr. McKeithen.
20 Q   Who is Mr. McKeithen?
21 A   Coleman McKeithen, black male.
22 Q.  This is the maintenance guy?
23 A.  Yes.

Page 184

1  Q   Okay. We've already talked about that one.
2  A   Yeah. That's what I was talking about. I
3  said we had already talked about him.
4  Q   Yes. ma'am
5  A.  And then we know when Josh Bridgman was
6  hired, he was hired after Kerri Conger, for an
7  example.
8       And when he moved on, after he was unable to
9  perform the duties of the accounts payable
10 position, and Ms. Conger was put in that accounts
11 payable position, even though she had been in
12 there longer than Mr. Bridgman, she was put over
13 in the accounts payable position, and I believe
14 she worked in it about three or four months before
15 she was named accounts payable in 2005.
16      And in September of 2005, even though when
17 she was appointed as accounts payable, she was
18 still not put on the same level that Mr. Bridgman
19 was on when he was moved to maintenance.
20      And he was not demoted, even though he
21 couldn't do the job. He kept his money, which is
22 fine. I don't have a problem with him keeping his
23 money; I just feel like she should have certainly

46 (Pages 181 to 184)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 185

1  been moved to the same level that he was on.
2  Q.    And do you know what his qualifications were
3  to that job when he was hired?
4  A.    He didn't have any qualifications.  He had
5  never worked anywhere.
6  Q.    Do you know what his educational background
7  was?
8  A.    He had an associate's degree.
9  Q.    In what?
10  A.    Let me see.  He was going to Central Alabama
11  Community College.  I want to say he was taking
12  landscaping courses, if I remember correctly.
13  Q.    Okay.  What was his degree in, is my
14  question.
15  A.    All I know is he was taking landscaping
16  courses, is what he told me.
17  Q.    And Ms. Conger's education?  Do you know
18  what hers was?
19  A.    She has a four-year degree, and she has a
20  double major, I believe in English.  English and
21  speech maybe.
22  Q.    And what was her work experience at the time
23  she was hired?

Page 186

1  A.    She was working with Kelly Services when she
2  came to work with us.
3  Q.    Okay.  Which is a temporary employment
4  agency?
5  A.    It is.  She was straight out of college.
6  And she had worked with us as receptionist and
7  live work person for a couple of years.
8  Q.    And when was Kerri moved up to Josh's
9  position?
10  A.    I believe she went to work in it maybe in
11  May or March of that year.
12  Q.    What year?
13  A.    2005, I believe that's correct.  And then
14  she went to -- she was still named as a
15  receptionist, live work or whatever.  I mean, they
16  didn't change her job title until that September,
17  when stuff goes into effect and we get our new
18  contracts.  And then they named her live work and
19  didn't give her a raise.
20  Q.    When do you think she should have gotten a
21  raise?  When she was moved to his position?
22  A.    Sure.
23  Q.    Not withstanding when she was actually named

Page 187

1  or whatever?
2  A.    Yeah.
3  Q.    You think she should have gotten the money
4  as soon as she got his job duties?
5  A.    That, or certainly in September when they
6  saw she could do the job.
7      And then when Mr. Bridgman retired, I
8  think --
9  Q.    You're talking about Gene now?
10  A.    Gene.  The father, Gene Bridgman.  Josh's
11  father.
12  Q.    Right.
13  A.    Gene and I had worked together since 1985.
14  Gene began work in Ingram in 1974.  He finished
15  his associate's degree somewhere around the same
16  time I did when I came to work there.
17      And when Gene began at J.F. Ingram, he was
18  like an ABE teacher, I believe, over at the prison
19  part.  And then he came to the main campus working
20  as the account assistant or junior accountant,
21  something like that.  And Sherman Booth was the
22  main accountant or senior accountant.
23  Q.    What year was that?

Page 188

1  A.    When he came over to main campus?
2  Q.    When he became junior accountant.
3  A.    I want to say he worked at the prison, he
4  told me, about maybe a year.
5  Q.    So maybe 1975?
6  A.    So maybe '75, '76, somewhere in that time
7  frame.  I think he started like in November of
8  '74.
9  Q.    What were you doing at that particular time?
10  A.    1975 I was a junior in high school.  And I
11  graduated in 1976.
12  Q.    Okay.  And so he started as a junior
13  accountant in '75, and worked for a senior
14  accountant?
15  A.    Yeah.
16  Q.    For how long?
17  A.    Until 1984, when Sherman Booth was upgraded
18  to an instructor -- an arts instructor for J.F.
19  Ingram.
20      So in 1984, Gene became the accountant at
21  J.F. Ingram; and in 1985, I came there as a
22  secretary/receptionist.
23  Q.    Gotcha.

47 (Pages 185 to 188)

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

Page 189

1  A.  And then I worked on the switchboard a
2  couple of years, I believe.  Or three or four,
3  something like that.  I can't remember exactly.
4      And then I moved to accounting assistant in
5  the back with him. worked across the desk from him
6  all those years.
7      And in the meantime, both of us finished our
8  degrees and got associate's degrees.  And I went
9  on and took a few more accounting courses.
10     And as we progressed along, I was his
11  assistant.  And he worked.  And I did property and
12  I did accounting and he did accounting.
13     And Ms. Lassiter, who had done payroll for
14  30 years, retired, and I moved into the payroll
15  office and still kept some of my duties as
16  property manager as well as doing other duties.
17  Q.  Right.
18  A.  And in 2004. when Mr. Bridgman decided he
19  didn't want to stay any longer, he had, like, 29
20  and a half years or whatever, he was going to
21  retire.
22  Q.  He had been there ten years longer than you
23  at that point?

Page 190

1  A.  He had.  And there was some talk about he
2  was going to leave and whatever.
3  Q.  You were given the opportunity to get his
4  job, right?
5  A.  Ms. Greene approached me about would I be
6  interested in taking Mr. Bridgman's job with no
7  pay increase.
8  Q.  This was April to June of '04?
9  A.  That is correct.
10  Q.  And you were not interested in that?
11  A.  Not with no pay; no, sir, I was not.
12  Q.  You're not contending today that you should
13  have been making what Bridgman was making in April
14  or June of '04, are you?
15  A.  I'm not contending I should have been making
16  as much as him, but I certainly don't think I
17  should have been given his job without a pay
18  increase.
19     I think if I was going to be offered his
20  job, I certainly should have been been moved off
21  the E salary schedule to the C salary schedule and
22  given an opportunity for that job.
23  Q.  But you weren't given that opportunity. were

Page 191

1  you?
2  A.  No, I wasn't.
3  Q.  But Patti Graves was hired?
4  A.  She was
5  Q.  And she's a white female?
6  A.  She is
7  Q.  And she got paid more than you?
8  A.  She did.
9  Q.  And she has more education than you?
10  A.  She did.  And Mr. Bridgman.  But is paid
11  less than him.
12  Q.  But she hasn't been there as long as he had
13  either?
14  A.  No, she hasn't.  But she has more education
15  than him, doesn't she?
16  Q.  All right.  Any other instances in which you
17  believe men were paid more than women for equal or
18  similar positions?
19  A.  Ms. Owensby.  She's not in our department.
20  Q.  And you're talking about the registrar?
21  A.  Yes.
22  Q.  What is your understanding of her education?
23  A.  I believe it's similar to mine.

Page 192

1  Q.  What is your understanding of the outgoing
2  registrar's education?
3  A.  I'm not familiar with it.  I just know she
4  does the same job.
5  Q.  She has been in the same job function; is
6  that what you're saying?
7  A.  Yes, sir.
8  Q.  You don't have any specific knowledge about
9  exactly what the job functions are of Ms. Owensby,
10  do you?
11  A.  No, sir.
12  Q.  Or what the job functions were of who she
13  claims to be her predecessor, the registrar?
14  A.  I was there when he was there, and they
15  appear to be doing the same job.
16  Q.  Based upon what you know?
17  A.  Yes, sir.
18  Q.  But you don't have any specific information
19  about his job responsibilities and the entire
20  scope of his duties?
21  A.  I can only say what I appear to know.
22  Q.  Okay.
23  A.  I'm not an expert on the registrar's

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 193

1  position, no, sir.
2  Q.  Okay. Any other -- in fairness here. you
3  asked me a question earlier and I didn't pick up
4  on where you were going, but I probably should
5  have.
6      We started at question 11, and you asked me,
7  "Are you talking about race or gender?" And I
8  said "Gender, first." Well. really, what I've
9  done here is I've jumped down to No. 13, haven't
10 I?
11 A.  Yes, sir.
12 Q.  Defendant Chambers pays females less than
13 males in equal or similar positions.
14     So that's kind of what we've been talking
15 about.
16 A.  Yes, sir.
17 Q.  So forgive me for misunderstanding what you
18 were driving out.
19     We are now talking about 13. And we've
20 covered Bridgman, Josh; we've covered Bridgman,
21 Gene; and we've covered Coleman and Beth. right?
22 A.  Yes, sir.
23 Q.  Are there any other instances in which you

Page 194

1  claim men were paid more than -- males were paid
2  more than females in equal or similar positions?
3  A.  I don't believe Ms. Greene's been paid
4  equally to her deans in same or similar positions.
5  Q.  Well, you understand that there's only one
6  Dean of Finance?
7  A.  I do.
8  Q.  And nobody else occupies that position?
9  A.  I do.
10 Q.  And nobody's job duties are like hers?
11 A.  That is correct.
12 Q.  And, frankly, their qualifications aren't
13 the same as hers either. are they?
14 A.  No. sir, they are not.
15 Q.  Any others?
16 A.  Outside the business office? inside the
17 business office? anywhere?
18 Q.  Yes, ma'am. Paragraph 13 just says Chambers
19 pays females, including but not limited to you and
20 Monica, less than males in equal or similar
21 positions.
22     So any evidence you have that females are
23 paid less than males in equal or similar

Page 195

1  positions?
2      You've told me several, but I'm just wanting
3  to make sure we've covered them all.
4  A.  I believe Ms. Greene mentioned yesterday
5  that Debra Taylor is not paid the same as Shawn
6  Moore that's hired at the same time. They were
7  both on E salary schedule.
8  Q.  But you don't know anything about their
9  qualifications, do you?
10 A.  I don't.
11 Q.  You don't know anything about their
12 education?
13 A.  No, sir.
14 Q.  You don't know if there's some reason other
15 than the fact that Debra's a female?
16 A.  And he's a male.
17 Q.  And you don't know that there's not another
18 reason, do you?
19 A.  No, sir.
20 Q.  There might be?
21 A.  Could be.
22 Q.  Okay. Any others?
23 A.  I know that in Mr. Wilson's department you

Page 196

1  had people that were hired under the transition
2  program.
3      You had several males hired in at the same
4  time as the females, and the males were all paid
5  higher than the females were.
6  Q.  Okay. When did that happen?
7  A.  That would have been about three years ago.
8  Q.  You have to provide me with some names
9  because I have to check some records.
10 A.  Okay. The females would be like Renee
11 Foshee, Ms. Wainwright, who is no longer with us.
12 Q.  Well, let's talk about Renee. Renee was
13 hired to do what?
14 A.  I think they're all transition clerks or
15 whatever. I just know they were all hired at the
16 same time.
17 Q.  And what is that time? Three years ago,
18 meaning '04?
19 A.  I want to say it was somewhere between 2003,
20 2004.
21 Q.  Okay.
22 A.  Janice Hicks.
23 Q.  Give me one minute make sure I get this

49 (Pages 193 to 196)

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 197 | Page 199 |
|---|---|
| 1  down. Are all of these going to be 2003, 2004? | 1  your deposition responses? |
| 2  A.  I believe so. | 2  A.  Uh-huh. #26. |
| 3  Q.  Janice Hicks? | 3  Q.  Discovery responses, #26 |
| 4  A.  Uh-huh | 4  A.  Maylinda Baynard, B-A-Y-N-A-R-D |
| 5  Q.  Let me back up. Renee Foshee. What was her | 5  Q.  Okay. Same hire date? |
| 6  education? | 6  A.  I believe she was November. I don't see her |
| 7  A.  I'm not sure | 7  on here |
| 8  Q.  What was her experience? | 8  Q.  All right. Who else? Well, let me ask you |
| 9  A.  I'm not sure | 9  these questions about Maylinda? |
| 10  Q.  What were the job duties that she was | 10  A.  I don't know. |
| 11  responsible for? | 11  Q.  You don't know any of the education, |
| 12  A.  I'm not sure. | 12  qualifications, job duties assigned? |
| 13  Q.  What was she hired at, in terms of salary? | 13  A.  I don't know. |
| 14  I don't know how it was, salary or hourly. But | 14  Q.  Who were the men that were hired with these |
| 15  what was her rate of pay? | 15  women? There's more women we've covered. Were |
| 16  A.  Well, I do have the date they were hired was | 16  there more women? |
| 17  November 2004 | 17  A.  No. |
| 18  Q.  I did not understand what you just said | 18  Q.  Who were the men that you claim were hired |
| 19  A.  November 2004 was their hire date. I do not | 19  at higher rates for the same or similar jobs? |
| 20  have their rate of pay on this list. | 20  A.  It looks like some of the men started a |
| 21  Q.  Okay. So that would be true of Ms. Hicks as | 21  month before the women. But we have Shawn Lacey. |
| 22  well? You don't know her rate of pay? | 22  Q.  I'm sorry. Say the last thing you said. |
| 23  A.  I don't. | 23  A.  Shawn Lacey. |

| Page 198 | Page 200 |
|---|---|
| 1  Q.  How do you know they were hired less than | 1  Q.  Right before that. What did you say right |
| 2  men? | 2  before that? |
| 3  A.  I just remembered off the top of my head, | 3  A.  They started a month before the women |
| 4  because I do payroll. | 4  Q.  Okay. Started a month before. Shawn Lacey. |
| 5  Q.  Okay. Janice Hicks was hired as a | 5  All right. He was hired in October? |
| 6  transition clerk? | 6  A.  Uh-huh. They may have just started a month |
| 7  A.  Yes. They were hired with transition money | 7  earlier. |
| 8  under that program. | 8  Q.  Do you know his qualifications? |
| 9  Q.  Okay. And you don't know Ms. Hicks' | 9  A.  I do not. |
| 10  educational background, do you? | 10  Q.  Education? |
| 11  A.  I don't. | 11  A.  No. |
| 12  Q.  Her qualifications? | 12  Q.  Job duties assigned? |
| 13  A.  Maylinda Baynard. | 13  A.  No. |
| 14  Q.  I'm sorry. You didn't hear me. Her | 14  Q.  Rate of pay? |
| 15  qualifications. Do you know -- | 15  A.  No |
| 16  A.  I don't know. | 16  Q.  All right. Next one? |
| 17  Q.  You did not know the job duties she was | 17  A.  Aldolhphos Traywick. A-L-D-O-L-H-P-H-O-S |
| 18  assigned? | 18  Q.  Okay. Same with him. Do you know any of |
| 19  A.  I don't know. | 19  that information about him: his qualifications |
| 20  Q.  All right. And then who was the next one? | 20  education, rate of pay, job duties assigned? |
| 21  M-A-Y -- you're looking at -- | 21  A.  No. |
| 22  A.  New hires. | 22  Q.  Any others? |
| 23  Q.  The New Hires sheet that you attached to | 23  A.  I'm not sure if Mr. Wilson's nephew, Jason |

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 201 |
|---|
| 1  Wright, is paid under that program or not. |
| 2  Q.   Jason? |
| 3  A.   Wright, W-R-I-G-H-T. |
| 4  Q.   What makes you think he's paid more than |
| 5  those ladies? |
| 6  A.   I do payroll. |
| 7  Q.   What is he getting paid? |
| 8  A.   Somewhere in the 30s. |
| 9  Q.   And you mean 30,000? |
| 10  A.   The high 30s, I believe. |
| 11  Q.   And what does he do, Jason Wright? |
| 12  A.   I just know he's on that program.  I'm |
| 13  pretty sure. |
| 14  Q.   What is his experience? |
| 15  A.   I don't know. |
| 16  Q.   What education does he have? |
| 17  A.   I'm not sure about that.  He could have been |
| 18  moved off of that program; I'm not sure. |
| 19  Q.   Any others? |
| 20  A.   That's the ones I can remember. |
| 21  Q.   Okay.  Of those folks that you just listed |
| 22  there, you don't know if there's some reason that |
| 23  some were paid more than others? |

| Page 202 |
|---|
| 1  A.   I don't. |
| 2  Q.   And it may have nothing to do -- if some of |
| 3  the men were paid more than the women, it may be |
| 4  for some reason other than gender, right? |
| 5  A.   Could be. |
| 6  Q.   Okay.  What is Shawn Lacey's race? |
| 7  A.   Black male. |
| 8  Q.   Aldolhphos? |
| 9  A.   Black male. |
| 10  Q.   Jason Wright? |
| 11  A.   Black male. |
| 12  Q.   Maylinda Baynard? |
| 13  A.   Black female. |
| 14  Q.   Janice Hicks? |
| 15  A.   White female. |
| 16  Q.   Renee Foshee? |
| 17  A.   White female |
| 18  Q.   Any other examples of females being paid |
| 19  less than males in equal or similar positions? |
| 20  A.   Not that I can think of. |
| 21  Q.   All right.  Let's move back to 11, that I |
| 22  abandoned for reasons unknown to me. |
| 23    Defendant Chambers has consistently refused |

| Page 203 |
|---|
| 1  to raise the salary of white employees that |
| 2  Plaintiff Greene recommended for a raise. |
| 3    Were there any other white employees that -- |
| 4  well, I believe we finished that one up, didn't |
| 5  we? |
| 6  A.   I believe |
| 7  Q.   Okay.  I'm sorry. |
| 8    12  "Defendant Chambers consistently hires |
| 9  and promotes black employees over white employees |
| 10  and pays black employees more money for doing the |
| 11  same job as white employees." |
| 12    MR. DEBARDELABEN:  Didn't we just cover |
| 13  that one? |
| 14  Q.   Well, we just covered men and women.  Is |
| 15  there any more we need to cover in black and |
| 16  white? |
| 17  A.   I think we've covered it |
| 18    MR. DEBARDELABEN:  I thought she |
| 19  specified who was black and who was white |
| 20    THE WITNESS:  I did |
| 21  Q.   Okay.  Paragraph 14.  "On several occasions |
| 22  Defendant Chambers has informed Plaintiff Greene |
| 23  in the presence of Plaintiff Givens and others |

| Page 204 |
|---|
| 1  that Plaintiff Greene should resign or quit her |
| 2  job." |
| 3    He's never said that you should resign or |
| 4  quit your job, has he? |
| 5  A.   No. |
| 6  Q.   Okay.  And the impact that's had on you is |
| 7  it's made it a more unpleasant place to work to |
| 8  hear those things? |
| 9  A.   Sure it has. |
| 10  Q.   Okay.  Because you don't agree that she |
| 11  should resign or quit job? |
| 12  A.   No. |
| 13  Q.   But apparently Defendant Chambers does |
| 14  believe she should do that? |
| 15  A.   It appears so. |
| 16  Q.   Paragraph 15:  Defendant Chambers yelled at |
| 17  Plaintiff Greene that he 'didn't like her |
| 18  attitude' when she refused to have anything to do |
| 19  with political PAC. |
| 20    Dr. Chambers didn't ask you to have |
| 21  something to do with political PAC, did he? |
| 22  A.   Yes, he did |
| 23  Q.   Tell me about that. |

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

Page 205

1    A.    I'm the secretary of political PAC and the
2    treasurer.
3    Q.    Of this one?
4    A.    Yes, sir.
5    Q.    So you do have something to do with it?
6    A.    I do.  And I wrote the check that day.
7    Q.    And you don't believe that Dr. Chambers
8    asked you to be involved with this political PAC
9    because you're a woman, do you?
10   A.    No.  I just don't think he should have been
11   upset with her about it, because it is in clear
12   violation of her, as the Dean of Finance, because
13   it is in clear violation of her job.  So he
14   doesn't need to be hollering at her because of it.
15   It could have all been handled without all of
16   that.
17   Q.    He didn't holler at you though, did he?
18   A.    No.  But I had to listen to it, so it
19   impacted it.
20   Q.    It impacted you just because it gave you a
21   bad feeling?
22   A.    It did.  It just gets on your nerves.  Makes
23   you wuhhh, crazy.

Page 206

1    Q.    And No. 16:  Chambers yelling at the
2    plaintiffs, talking about women's clothing,
3    threatening the plaintiffs' job security.  Let's
4    stop right there.
5         Threatening Ms. Greene's job security?
6    A.    Correct.
7    Q.    Not yours, right?
8    A.    Not yet.
9    Q.    And you don't have any reason to believe he
10   will, do you?
11   A.    I hope not.
12   Q.    He may like you?
13   A.    I hope so.
14   Q.    This is a recap paragraph.  Have we covered
15   everything in this?
16   A.    We have.
17   Q.    There's no additional evidence to support
18   the allegations of paragraph 16, which appear to
19   be, to me -- and I'm not trying to say something
20   that's in the paragraph that's not -- but it looks
21   to me to refer to yelling, women's clothing, job
22   security comments, females making less than males,
23   whites making less than blacks, intimidation,

Page 207

1    ridicule, and insult, right?
2    A.    That's correct.
3    Q.    And that's basically what we've already
4    talked about?
5    A.    It is.
6    Q.    You don't have any other evidence to support
7    the allegations in paragraph 16 than the evidence
8    we've already covered?
9    A.    Not to my knowledge.
10   Q.    Okay.  I want to mark as 13 this statement
11   of Patti Graves that was produced to me today.
12   And it appears to be a four-page statement.
13         (Defendants' Exhibit No. 13 was
14         marked for identification and a
15         copy of the same is attached
16         hereto.)
17   Q.    How did you come to have this in your
18   possession?
19   A.    Ms. Graves gave it to us.
20   Q.    Why did she give it to you?
21   A.    Because she knew we had filed this.
22   Q.    She gave it to you to support you?
23   A.    She did.

Page 208

1    Q.    Did you ask her for this?
2    A.    No, sir.  She voluntarily gave it to us. to
3    me and Ms. Greene as well.
4    Q.    Okay.
5    A.    I know some of the words were cut off, so
6    you may want a better copy.
7    Q.    Yeah.  I can't read anything on the
8    right-hand side of this paper.
9         MR. DEBARDELABEN:  That was faxed to
10   us.
11         MR. CHRISTMAN:  I understand.
12   Q.    It says here on one occasion she can
13   remember Chambers praising and thanking Monica
14   Greene, Gene Bridgman. and their business staff
15   for the work they were doing for J.F. Ingram State
16   Technical College.
17   A.    When she was an auditor.
18   Q.    So she recalls an occasion where Chambers
19   praised Monica Greene, Gene Bridgman, and their
20   staff, right?
21   A.    That's correct.
22   Q.    You were one of their staff, weren't you?
23   A.    I was.

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 209

1  Q.  So any statements made in this lawsuit or in
2  support of any EEOC Complaints that Chambers never
3  says anything good about the business office is
4  not consistent with what Ms. Graves says here, is
5  it?
6  A.  I can't say that.
7  Q.  Well, Ms. Graves said that he did praise the
8  business office, right?
9  A.  That's her recollection.
10  Q.  Have you ever made the accusation that
11  Chambers never praises the business office?
12  A.  I don't recall.
13  Q.  Okay.  That's not consistent with what Ms.
14  Graves says, is it?
15  A.  It doesn't appear to be.  I think you'll
16  also find she says he wears two faces, doesn't
17  she?
18  Q.  The March 23rd reference --
19        MR. CHRISTMAN:  Do you have a copy of
20  this?  Did I give you an extra copy, Jim?
21        MR. DEBARDELABEN:  I have a copy.
22        MR. CHRISTMAN:  Could you let her look
23  at it?

Page 210

1        MR. DEBARDELABEN:  Sure.
2  Q.  March 23, 2005.  Apparently there was a
3  conference with the cabinet, which would have
4  included Ms. Greene, and they were discussing a
5  termite situation at the Tutwiler campus,
6  according to Ms. Graves.
7        Do you see that?
8  A.  It says it was at main campus concerning the
9  Tutwiler campus.
10  Q.  Yes.  Affairs about the termite situation at
11  Ingram's Tutwiler's campus?
12  A.  That's correct.
13  Q.  That appears to be Ms. Grave's understanding
14  of, at least, part of that meeting, right?
15  A.  Yes, sir.
16  Q.  You don't know anything about that meeting,
17  do you?
18  A.  I don't.
19  Q.  And she said she heard Chambers yelling at
20  Ms. Greene about the termite situation; is that
21  right?
22  A.  That's what it says.
23  Q.  You don't know anything about that, do you?

Page 211

1  A.  I don't recollect that particular meeting,
2  no, sir.
3  Q.  And you weren't in that meeting?
4  A.  No, sir.
5  Q.  And he never yelled at you about the
6  termites, did he?
7  A.  No, he didn't.
8  Q.  Okay.  This is simply her account of a
9  meeting she has knowledge of somehow or overheard?
10  A.  It is.
11  Q.  We would have to ask her about this?
12  A.  You would.
13  Q.  Because you don't know anything about this;
14  is that right?
15  A.  That's correct, sir.
16  Q.  May 23, 2005.  This is the Barbara McAnaly.
17  You and I talked about that today, didn't we?
18  A.  We did.
19  Q.  And this is apparently Ms. Graves' account
20  of that exchange, right?
21  A.  Yes, sir.
22  Q.  You don't have anything else to add about
23  this instance, do you?

Page 212

1  A.  No, sir.
2  Q.  October 3, 2005, appears to be an account of
3  the use of -- the programmer incident that you and
4  I discussed earlier; is that right?
5  A.  Yes, sir.
6  Q.  And we covered how that went down, didn't
7  we?
8  A.  Yes, sir, we did.
9  Q.  And we covered your thoughts about that
10  meeting, right?
11  A.  Yes, sir, we did.
12  Q.  Is there anything you would like to add
13  about that with respect to Ms. Graves' account of
14  this?
15  A.  No, sir.
16  Q.  Okay.  You have Count IV of your Complaint
17  alleges a state cause of action for harassment.
18        Is there any evidence supporting your claim
19  that the consistent and constant yelling at the
20  plaintiffs, being you and Ms. Greene, by Chambers
21  constituted harassment, other than what we've
22  already covered today?
23  A.  Not to my knowledge.

53 (Pages 209 to 212)

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

## Page 213

1  Q.   And I'm directing my question to this
2  particular cause of action, because I just want to
3  make sure there's not any -- the same evidence you
4  have claim support your federal causes of action
5  in the first three counts support your claim under
6  this state action, right?
7  A.   As far as I know.
8  Q.   And this state court action for harassment
9  is based on his yelling at you, right?
10 A.   Correct.
11 Q.   And then the state court action against Dean
12 Wilson is based upon his accusation that the
13 business office employees receive special
14 treatment when work was performed for the business
15 office by Ms. Caylor?
16 A.   That's what it says.
17 Q.   That's what this is about, the Ms. Caylor
18 incident? That's what this is referring to?
19 A.   That's what he accused us of, yes, sir.
20 Q.   And I'm just making sure that's the instance
21 that supports this cause of action against Wilson;
22 is that right?
23 A.   Yes, sir.

## Page 214

1  Q.   And that's the only evidence you have of
2  harassment against Wilson, correct?
3  A.   Correct.
4  Q.   Anything else that we haven't discussed, in
5  terms of the evidence that James Wilson has
6  discriminated against you based upon your race
7  and/or gender that we haven't talked about?
8  A.   Just the things we've talked about.
9  Q.   Okay. Do you know if there is a grievance
10 procedure at Ingram for gender or racial-based
11 harassment?
12 A.   There is.
13 Q.   What is that procedure?
14 A.   All I know is the grievance officer is Dr.
15 Merk.
16 Q.   All right. Did you follow that procedure?
17 A.   I did not.
18 Q.   Why not?
19 A.   I didn't think it would do any good.
20 Q.   So you decided to disregard the procedure in
21 place for complaints of discrimination based upon
22 race and gender?
23 A.   I did.

## Page 215

1  Q.   Why did you not pursue the grievance
2  procedure over Mr. Merk's head or Mr. Chambers'
3  head?
4  A.   I feel like Dr. Merk is in his position
5  because of his closeness with Mr. Chambers, and I
6  do not feel like I would have been given a fair
7  grievance hearing.
8  Q.   I understand that. I'm asking why didn't
9  you go over their head?
10 A.   Go over their head for what?
11 Q.   Why didn't you pursue the same procedure you
12 would have pursued with Mr. Merk -- why didn't you
13 attempt to pursue that procedure over his head
14 with the chancellor's office, for example?
15 A.   I didn't know the chancellor had a grievance
16 policy. I'd say he has a direct line to the
17 chancellor's office. I'd say.
18     I felt like this was my only alternative.
19 Q.   You're not alleging any lost wages in this
20 case, are you?
21 A.   Those I should have been given when Mr.
22 Bridgman retired.
23 Q.   What do you claim you should have gotten

## Page 216

1  when Mr. Bridgman retired?
2  A.   I should have been given the opportunity to
3  do his job and been moved to C level.
4  Q.   Well, what do you claim you were entitled
5  to? Why do you claim you were entitled to go to C
6  level?
7  A.   He was on the C level. I had the same
8  education as he did and had -- let's see. In
9  2004, I had been at the school 19 years.
10 Q.   He had been there ten years longer?
11 A.   He had.
12 Q.   How much do you claim you should have made?
13 A.   Well, with the 19 years' experience there
14 and the other experience I had -- well, let's see.
15 Mr. Bridgman went to work straight out of high
16 school at J.F. Ingram, and I went to work straight
17 out of high school doing similar-type duties.
18     I should have been making somewhere in the
19 -- if he was making 79,000, 73,000, whatever he
20 was making, I should have been making somewhere
21 comparable in the same range.
22 Q.   You should have been making the same thing
23 he was making when he had ten years more

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

Page 217

1 experience than you?
2 A.  He had ten more years at J.F. Ingram than I
3 had
4 Q.  And you claim that you should have been
5 making what he was making?
6 A.  I should have been making comparable to him.
7 I had the same experience that he had; it may not
8 have all been at J.F. Ingram. I had the same
9 education level, some more business courses than
10 him.
11 Q.  Well, to be fair though, ma'am, you were in
12 high school when he started work at J.F. Ingram?
13 A.  Two years.
14 Q.  As a junior accountant, right?
15 A.  No, sir. He came to work there in 1974,
16 '75, as an ABE teacher, did not have his
17 associate's degree. I went to work in 1976
18 straight out of high school.
19 Q.  You understand in the state college system
20 that just because you've been in the work force
21 somewhere doesn't mean you get credit for it in
22 the college system?
23 A.  But it doesn't mean you're not gaining

Page 218

1 experience. You're saying my experience in
2 working in accounting and working in offices are
3 not comparable to that?
4 Q.  Absolutely. Isn't it your understanding
5 that in the state college system there are certain
6 types of experience that will give you credit and
7 reflect on the pay scale, and certain types of
8 experience that do not give credit?
9 A.  But we do remember also when you're on that
10 C level that your steps don't count. Because I
11 have just been placed on that C level and none of
12 my steps counted.
13 Q.  You understand that just because you've been
14 in the work force doesn't mean you get credit for
15 that time in the state college system; you
16 understand that right?
17 A.  It's according to who you are.
18 Q.  What does that mean?
19 A.  It's according to who you are. Some people
20 are brought in and given years experience and some
21 people are not.
22 Q.  What does the state policy say?
23 A.  State policy says that if you've worked for

Page 219

1 a college system, for leave purposes, leave
2 purposes you're given those years. But you are
3 placed on the step according to the president's
4 discretion when you're on anything other than a D
5 salary.
6 Q.  You claim that you had some years of
7 experience that weren't accounted to you?
8 A.  That's correct.
9 Q.  And those years were given to you?
10 A.  Later.
11 Q.  By?
12 A.  Mr. Chambers.
13 Q.  Mr. Chambers. And you were --
14 A.  But I was not back paid for them.
15 Q.  But you're not contending that at the time
16 Gene Bridgman retired --
17 A.  I should have been given all the years that
18 he had worked at the college.
19      But that doesn't mean I should not have been
20 put on the same level, which is a C level, as him.
21 Q.  So you think you should have been placed on
22 the C schedule?
23 A.  Correct.

Page 220

1 Q.  How much would you have been making? The
2 last thing you told me. you think you should have
3 been making the same number that he was making.
4 A.  No. I said approximately the amount of
5 money he was making
6 Q.  Okay. What does that mean to you?
7 A.  I believe he was making somewhere around
8 73,000 when he left. Somewhere around 65,000,
9 say.
10 Q.  And you're just coming up and kind of
11 approximating it out of your own head, basically,
12 right?
13      That's not based on any calculation, state
14 policy; it's just kind of your feel for what you
15 feel like you should have been making. right?
16 A.  Well, I think when you determine he had been
17 there that many more years, and I did have
18 experience, and I did work there, and I had worked
19 directly with Mr. Bridgman...
20 Q.  Listen to my question. You're not basing
21 this number on a calculation, right?
22 A.  I'm basing it on when you're placed on the
23 C-3. Just like they just came up with $60,000

55 (Pages 217 to 220)

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

Page 221

1  when they placed me there this year.
2  Q.    Okay. So you've been placed on the C
3  schedule now?
4  A.    Right.
5  Q.    But they didn't place you at 65- when they
6  put you on the C schedule?
7  A.    No. they didn't
8  Q.    And you think you should have gotten 5,000
9  more three years ago?
10  A    Sure.
11  Q.    Based on what?
12  A.    Based on what?
13  Q.    That's right  Based on what.
14  A.    My years of experience, the hard work and
15  dedication, and the fact that other people have
16  been making it with no more experience and with no
17  more hard work than what I've done
18  Q.    Well, you can't say that about Bridgman. He
19  had more experience than you. didn't he?
20  A.    A couple of years.
21  Q.    All right  You don't claim you've been
22  denied any other job benefits, other than having
23  been placed on this C schedule earlier and at a

Page 222

1  higher rate?
2  A.    That's correct.
3  Q.    You don't claim you've lost any kind of
4  seniority privileges or something?  Is there such
5  a thing at Ingram?
6  A.    No, sir, not to my knowledge.
7  Q.    Okay. What do you want out of this lawsuit?
8  A.    Whatever is fair.
9  Q.    Do you want money?
10  A.    I want the damages I've received.
11  Q.    Okay. Well, do you want money or something
12  else?
13  A.    What do you mean?
14  Q.    Well, when a jury decides this case, what do
15  you want them to give you? money or something
16  else?
17  A    I want to be left alone to do my job; I want
18  to get the money that it's cost me to have to hire
19  an attorney to get what should be a nonhostile
20  working environment; I want to be placed where I
21  should be equally put on the salary schedule I
22  belong on.
23  Q.    Okay. Well, the second two things you said

Page 223

1  sound to me like money  You want money for
2  attorney's fees, which is clearly in your damages
3  here -- damages claimed in your Complaint -- and
4  you want more money in terms of salary?  The money
5  part, that's what you want in terms of money?
6  A.    I want what's fair.
7  Q.    Okay. What did you mean when you said you
8  want to be left alone?
9  A.    I want to work in a place that is free of
10  stress.
11  Q.    How can the Court give you that?
12  A.    Well, I think they can tell Mr. Chambers to
13  behave in a proper manner.
14  Q.    Okay. Well, I don't work in a place that's.
15  free of stress, and I own the business. So how do
16  you work in a place free of stress?
17  A.    Well, perhaps you can't work in a place free
18  of stress, but I think they can tell him to back
19  off and quit being so hostile and yelling  And I
20  think we have that right.
21  Q.    So you want him to stop yelling, and you
22  want the Court to tell him to stop yelling; is
23  that right?

Page 224

1  A.    That's correct
2  Q.    Okay. Do you have any other statistics,
3  other than those that we've covered today, that
4  you claim support your allegations of disparate
5  treatment or hostile environment, or
6  discrimination in general, that we haven't covered
7  and that you haven't attached to your responses to
8  discovery that we've looked at today?
9  A.    Not to my knowledge
10  Q.    Okay. Are you glad Dr. Chambers appointed
11  your daughter to work at Ingram?
12  A.    Am I glad?
13  Q.    Yeah.
14  A.    I don't think he did her any favors
15  Q.    You wish he had turned her down?
16  A.    It really wouldn't have mattered
17  Q.    What about your other relatives?  Are you
18  glad that Dr. Chambers appointed them to work at
19  Ingram?
20  A.    That too was their personal business.  They
21  applied for the job and got it
22       MR. CHRISTMAN: Well, give me a few
23  minutes to make sure I'm all done.  I think I am.

56 (Pages 221 to 224)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 225

1   Let's take a five-minute break and make sure I'm
2   finished. Okay?
3       MR. DEBARDELABEN: Sound good.
4       (A brief recess was taken.)
5   (BY MR. CHRISTMAN)
6   Q.   Have you filed any discrimination claims
7   with any government agency other than the one
8   we're here about today?
9   A.   Huh-uh.
10  Q.   No?
11  A.   No.
12  Q.   You've never filed a previous judicial
13  action for discrimination, right?
14  A.   No, sir.
15      MR. CHRISTMAN: That's all I have.
16
17
18      FURTHER THE DEPONENT SAITH NOT
19
20
21
22
23

Page 226

1       C E R T I F I C A T E
2
3   STATE OF ALABAMA
4   BARBOUR COUNTY
5
6       I hereby certify that the above and
7   foregoing deposition was taken down by me in
8   stenotype and the questions and answers thereto
9   were transcribed by means of computer-aided
10  transcription, and that the foregoing represents
11  a true and correct transcript of the testimony
12  given by said witness upon said hearing.
13      I further certify that I am neither of
14  counsel, nor kin to the parties to the action,
15  nor am I in anywise interested in the result of
16  said cause.
17
18
19
20
21      CYNTHIA M. NOAKES,
22      COURT REPORTER and
23      COMMISSIONER

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

# JULIE GIVENS

# PERSONNEL FILE



DEFENDANT'S
EXHIBIT

1· Givens



**J. F. Ingram
State
Technical
College**
*— Developing Responsible Citizens —*

# PERSONNEL FILE CHECKLIST

**EMPLOYEE NAME:** Givens, Julie K.    **EMPLOYEE #**

**TITLE:** Payroll/Cashier

| | |
|---|---|
| 1st Section | **HIRE DATE:** |
| | **PERSONNEL FILE CHECKLIST** |
| | **APPLICATION OF EMPLOYMENT** |
| | **RESUME** |
| | **TRANSCRIPTS** |
| | **CERTIFICATIONS AND LICENSES** |
| | **PRE EMPLOYMENT REFERENCES** |
| 2nd Section | **EMPLOYMENT / APPOINTMENT / VERIFICATION CONTRACTS LETTERS OF EMPLOYMENT** |
| 3rd Section | **JOB DESCRIPTION** |
| 4th Section | **EVALUATION HISTORY** |
| 5th Section | **VARIOUS EMPLOYEE CORRESPONDENCE** |
| 6th Section | **PROFESSIONAL DEVELOPMENT** |
| 1st Section | **EXIT INTERVIEW – See Checklist** |

**RECORDS REVIEW DATE:**

**NAME AND TITLE:** James T. Merk, Ed.D.   Personnel Director
Erica Portis-Turner   HR Assistant

_____     _____     _____
_____     _____     _____
_____     _____     _____

# FULL-TIME FACULTY CHECK LIST

| EMPLOYEE NAME | Givens, Julie K. | EMP # |
| --- | --- | --- |
| TITLE: | | |

| | |
| --- | --- |
| | **APPLICATION** |
| | **RESUME** |
| | **TRANSCRIPTS** |
| | **JOB DESCRIPTION** |
| | **EVALUATION HISTORY** |
| | **CERTIF. AND LICENCES** |
| | **SALARY HISTORY** |
| | **EMERGENCY CONTACT DATA** |

| RECORDS REVIEW DATE: | 2-7-02 |
| --- | --- |
| NAME AND TITLE: | |

7:30
7:45

## J. F. INGRAM STATE TECHNICAL COLLEGE
### P. O. Box 209
### Deatsville, Alabama 36022
### (205) 285-5177

## APPLICATION FOR EMPLOYMENT

### (Please Print Plainly)

To Applicant: We deeply appreciate your interest in our organization and assure you that we are sincerely interested in your qualifications. A clear understanding of your background and work history will aid us in placing you in the position that best meets your qualifications *and* may assist us in possible future upgrading.

# PERSONAL

Date __Dec. 16, 1984__

Name __Givens      Julie      Kay__     Social Security No __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__
        Last          First          Middle

Present address __Rt1 Box 59   Deatsville AL   36022__     Telephone No. __365-1928__
                  No      Street      City      State      Zip

Position(s) applied for __Receptionist / Secretarial__     Would you work Full-Time __✓__ Part-Time _____

Date of Birth: __January 23, 1958__     Age: __26__

Sex: M _____ F __✓__     Height: __5__ ft __0__ in     Weight: __165__ lbs Race: __White__

Marital Status: Single _____ Engaged _____ Married __✓__ Separated _____ Divorced _____ Widowed _____  _Dwin - Pem emp._
_1 child  20 mo._

Number of dependents including yourself __3__ Are you a Citizen of the USA? __yes__

How long have you lived at present address? __7 years__

Were you previously employed by us? __NO__ If yes, when? _____

If your application is considered favorably, on what date will you be available for work? __2 weeks notice__ 19____

Have you ever been convicted of a crime, excluding misdemeanors and summary offenses, in the past ten years which has not been annulled or expunged or sealed by a court? __NO__ _____ If yes, describe in full

Do you have any physical condition which may limit your ability to perform the particular job for which you are applying? __NO__

If yes. describe such condition and explain how you can perform the job for which you are applying in spite of it __N/A__

Do you have any physical defects which preclude you from performing certain kinds of work? __NO__ If yes. describe such defects and specific work limitations __N/A__

Have you had a major illness in the past 5 years? __NO__ If yes, describe __N/A__

Have you received compensation for injuries? __NO__ If yes, describe __N/A__

List any friends or relatives working for us, other than spouse __N/A__

Name(s)

## RECORD OF EDUCATION

| School | Name and Address of School | Course of Study | Check Last Year Completed | | | | Did You Graduate? | List Diploma or Degree |
|---|---|---|---|---|---|---|---|---|
| Secondary From: To: | Jefferson Davis High School Mont Al Graduated May 1976 | Business Office Education | 9 | 10 | 11 | (12) | ☑Yes ☐No | Diploma |
| College From: To: | | | 1 | 2 | 3 | 4 | ☐Yes ☐No | |
| Other (Specify) From: To: | See attached Resume | | 1 | 2 | 3 | 4 | ☐Yes ☐No | |

## List below all present and past employment, beginning with your most recent
(See attached Resume for complete details)

| I Name and Address of Company and Type of Business | From Mo Yr | To Mo Yr | Describe the work you did | Weekly Starting Salary | Weekly Last Salary | Reason for Leaving | Name of Supervisor |
|---|---|---|---|---|---|---|---|
| Maxwell-Gunter F.C.U. 400 Eastdale Cs 11930 Mont Al 36193 Telephone 279-7550 ext 103 | 2 82 | Present | Submitting title applications for vehicles financed. General office duties | $140.00 | $200.00 | Job offered would be closer to home as well as a new job challenge. | Grace Liggins |

| II Name and Address of Company and Type of Business | From Mo Yr | To Mo Yr | Describe the work you did | Weekly Starting Salary | Weekly Last Salary | Reason for Leaving | Name of Supervisor |
|---|---|---|---|---|---|---|---|
| Southeast Exchange Region 1280 Kershaw St, Mont. Al 36196 Telephone 264-7301 (ext 284) | 7 78 | 12 81 | Accounting - Accounts payable set up on computer system (TRW-FS 21) | $130.00 | $180.00 | Personal | Leah Stephens |

| III Name and Address of Company and Type of Business | From Mo Yr | To Mo Yr | Describe the work you did | Weekly Starting Salary | Weekly Last Salary | Reason for Leaving | Name of Supervisor |
|---|---|---|---|---|---|---|---|
| Herff Jones Yearbooks Selma Hwy Montgomery, Al Telephone 288-5260 | 2 77 | 7 78 | Press Room Secretary - General office Duties | $110.00 | $160.00 | Further job knowledge - Better benefits | Mosie Bates |

| IV Name and Address of Company and Type of Business | From Mo Yr | To Mo Yr | Describe the work you did | Weekly Starting Salary | Weekly Last Salary | Reason for Leaving | Name of Supervisor |
|---|---|---|---|---|---|---|---|
| Rouse Motors/Rouse Motors Eastern Bypass Mont Al Telephone 279-9300 | 8 75 | 7 76 | Office Clerk general office duties | $60.00 | $85.00 | Part-time job while in Highschool | James Kemp |

May we contact the employers listed above ___ yes ___ If not, indicate by No which one(s) you do not wish us to contact _____

Are there any other experiences, skills, or qualifications which you feel would especially fit you for work with our institution? _____

_See attached resume_

Applicants for Secretarial or Clerical positions must complete the following:

Typing:       Yes (✓)       No. w/p/m  _50_

Shorthand:    Yes ( )       No. w/p/m _____  - _Taken in High School. I have not used it since._

## P E R S O N A L   R E F E R E N C E S (Not Former Employers or Relatives)

| Name and Occupation | Address | Phone Number |
|---|---|---|
| Paulette Kindred (Secretary) | Montgomery Al | |
| Odis Best (Computer Prog.) | Montgomery Al | |
| Enoch Horne (Retired - Boy Scouts of America, Camp director) | Deatsville Al |

## MILITARY SERVICE RECORD

Were you in U.S. Armed Forces? Yes _____ No ✓ If yes, what Branch? _N/A_

Dates of duty: From _N/A_ To _____ Rank at discharge _N/A_
        Month Day Year         Month Day Year

List duties in the service including special training that may be applicable to position applied for: _See attached resume._

## PLEASE READ AND SIGN BELOW

The facts set forth in my application for employment are true and complete. I understand that if employed, false statements on this application shall be considered sufficient cause for dismissal. Ingram State Technical College is hereby authorized to make any investigation necessary to verify and support information provided herein

I also understand that if I am employed, I will furnish signed Work Statements from previous employers attesting to experience shown on this application. I agree to provide these Statements prior to completing my first pay period

Signature of Applicant

It is the official policy of the Alabama State Department of Education, including Postsecondary institutions under the control of the State Board of Education, that no person in Alabama shall, on the grounds of race, color, handicap, sex, religion, creed, national origin, or age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program, activity, or employment

# APPLICANT—Do not write on this page

### FOR INTERVIEWER'S USE
#### (if needed)

| INTERVIEWER | DATE | COMMENTS |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

### FOR TEST ADMINISTRATOR'S USE
#### (if needed)

| TESTS ADMINISTERED | DATE | RAW SCORE | RATING | COMMENTS AND INTERPRETATION |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

### REFERENCE CHECK

| *Position Number | RESULTS OF REFERENCE CHECK | *Position Number | RESULTS OF REFERENCE CHECK |
|---|---|---|---|
| I |  | IV |  |
| II |  |  |  |
| III |  |  |  |

*See Page 2

WALLACE STATE COMMUNITY COLLEGE SELMA
P.O. DRAWER 2530
SELMA, AL 36702-2530

08/11/2000
PAGE  1

JULIE JONES GIVENS

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
DATE OF BIRTH: 01/23/1958

| COURSE NO | COURSE NAME | GRADE | CR HRS | QPTS |
|---|---|---|---|---|
| | --- TRANSFER --- | | | |
| | FROM: CENTRAL ALABAMA COMMUNITY | | | |
| ART204 | FINE ARTS ELECTIVE | A | 5.000 | Qtr:Hr |
| BUS215 | BUSINESS COMMUNICATIONS | A | 5.000 | Qtr:Hr |
| BUS241 | PRINC OF ACCOUNTING I | A | 5.000 | Qtr:Hr |
| BUS242 | PRIN OF ACCOUNTING II W/L | A | 5.000 | Qtr:Hr |
| ECO233 | PRINCIPLES OF ECONOMICS I | A | 5.000 | Qtr:Hr |
| ENG101 | ENGLISH COMP I | A | 5.000 | Qtr:Hr |
| ENG102 | ENGLISH COMP II | A | 5.000 | Qtr:Hr |
| ENG262 | ENGLISH LITERATURE II | B | 5.000 | Qtr:Hr |
| HIS121 | WESTERN CIVILIZATION I | A | 5.000 | Qtr:Hr |
| HIS222 | WESTERN CIVILIZATION II | A | 5.000 | Qtr:Hr |
| MTH101 | MATHEMATICAL INSIGHTS | A | 5.000 | Qtr:Hr |
| MTH110 | PRECALCULUS ALGEBRA | A | 5.000 | Qtr:Hr |
| PHS101 | PHYSICAL SCIENCE I | A | 5.000 | Qtr:Hr |
| PHS102 | PHYSICAL SCIENCE II | A | 5.000 | Qtr:Hr |
| SOC200 | INTRODUCTION TO SOCIOLOGY | A | 5.000 | Qtr:Hr |
| SPH106 | FUNDAMENTALS OF SPEECH CO | A | 5.000 | Qtr:Hr |
| SPH107 | FUND OF PUBLIC SPEAKING | A | 5.000 | Qtr:Hr |

--- 1997-1998 WINTER ---                    PRO/OPT: T02 AS
BUS261    BUSINESS LAW I              A    5.000    20.000

|  | AHRS | DHRS | QHRS | EHRS | QPTS | QPA |
|---|---|---|---|---|---|---|
| CUR | | | 5.000 | 5.000 | 20.000 | 4.000 |
| CUM | | | 5.000 | 5.000 | 20.000 | 4.000 |

--- 1997-1998 SPRING ---                    PRO/OPT: T02 AS
BUS262    BUSINESS LAW II             A    5.000    20.000
ECO232    PRINCIPLES OF ECONOMICS II  A    5.000    20.000

|  | AHRS | DHRS | QHRS | EHRS | QPTS | QPA |
|---|---|---|---|---|---|---|
| CUR | | | 10.000 | 10.000 | 40.000 | 4.000 |
| CUM | | | 15.000 | 15.000 | 60.000 | 4.000 |

*** NO FURTHER ENTRIES THIS COLUMN ***

| COURSE NO | COURSE NAME | GRADE | CR HRS | QPTS |
|---|---|---|---|---|
| | CON --- 1997-1998 SPRING --- (CONTINUED) | | | |
| | NOTE: Prior to FA9899 | 10.002 | 40.008 | 4.000 |
| | quarter hours. Course work was recorded in | | | |
| | are in semester hours. Effective with this term, all credits | | | |
| | --- 1999-2000 SUMMER --- | | | |
| | PRO/OPT: BUS AAS | | | |
| BUS285 | PRINCIPLES OF MARKETING | A | 3.000 | 12.000 |
| CIS190 | INTRODUCTION TO COMPUTERS | A | 3.000 | 12.000 |

|  | AHRS | DHRS | EHRS | QHRS | QPTS | QPA |
|---|---|---|---|---|---|---|
| CUR | | | | 6.000 | 24.008 | 4.000 |
| CUM | | | | 16.002 | 64.008 | 4.000 |

*****                     END OF ACADEMIC RECORD                     *****

ACCREDITED
BY THE SOUTHERN ASSOCIATION OF
COLLEGE AND SCHOOLS

AUG 11 2000

DEAN OF STUDENTS

MR. EFFELL WILLIAMS
DEAN OF STUDENTS

ADDRESSEE:    J F INGRAM STATE TECH

ALEXANDER CITY STATE JUNIOR COLLEGE
COOPERATIVE EDUCATION PROGRAM
P. O. Box 699
ALEXANDER CITY, ALABAMA 35010

PLEAS RETURN TO OUR OFFICE BY:
_May 24_

## Supervisor's Evaluation of Cooperative Student

Name _Julie Givens_ _____ Qtr., 19____

Work Period _March - May_ _____

Employer _T. F. Ingram State Tech. College_ Location _Deatsville, AL._

INSTRUCTIONS: The immediate supervisor will evaluate the student objectively, comparing him with other students of comparable academic level, with other personnel assigned the same or similarly classified jobs, or with individual standards.

**RELATIONS WITH OTHERS**
- [X] Exceptionally well accepted
- [ ] Works well with others
- [ ] Gets along satisfactorily
- [ ] Has some difficulty working with others
- [ ] Works very poorly with others

**ATTITUDE—APPLICATION TO WORK**
- [ ] Outstanding in enthusiasm
- [X] Very interested and industrious
- [ ] Average in diligence and interest
- [ ] Somewhat indifferent
- [ ] Definitely not interested

**JUDGMENT**
- [ ] Exceptionally mature
- [X] Above average in making decisions
- [ ] Usually makes the right decision
- [ ] Often uses poor judgment
- [ ] Consistently uses bad judgment

**DEPENDABILITY**
- [X] Completely dependable
- [ ] Above average in dependability
- [ ] Usually dependable
- [ ] Sometimes neglectful or careless
- [ ] Unreliable

**ABILITY TO LEARN**
- [X] Learns very quickly
- [ ] Learns readily
- [ ] Average in learning
- [ ] Rather slow to learn
- [ ] Very slow to learn

**QUALITY OF WORK**
- [X] Excellent
- [ ] Very good
- [ ] Average
- [ ] Below average
- [ ] Very poor

**ATTENDANCE:** [X] Regular  [ ] Irregular

**PUNCTUALITY:** [X] Regular  [ ] Irregular

| OVER-ALL PERFORMANCE: | Outstanding | Very Good | + Average - | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| | | ✓ | | | |

**WHAT ARE THE STUDENT'S STRONGEST ASSETS?**

**WHAT QUALITIES AND CHARACTERISTICS SHOULD THE STUDENT ESPECIALLY STRIVE TO IMPROVE?**

This report has been discussed with student  [ ] Yes  [X] No

(Signed) _Mary C. Gregory_ _President_

(Immediate Supervisor)   (Title)

PLEASE RETURN TO OUR OFFICE BY:

*Aug. 24*

ALEXANDER CITY STATE JUNIOR COLLEGE
COOPERATIVE EDUCATION PROGRAM
P. O. Box 699
ALEXANDER CITY, ALABAMA 35010

## Supervisor's Evaluation of Cooperative Student

Name *Julie Givens*                               *Summer* Qtr., 19 *89*

Work Period *June-August*

Employer *J. F. Ingram State Tech College* Location *Deatsville, AL.*

INSTRUCTIONS: The immediate supervisor will evaluate the student objectively, comparing him with other students of comparable academic level, with other personnel assigned the same or similarly classified jobs, or with individual standards.

**RELATIONS WITH OTHERS**
- [x] Exceptionally well accepted
- [ ] Works well with others
- [ ] Gets along satisfactorily
- [ ] Has some difficulty working with others
- [ ] Works very poorly with others

**ATTITUDE—APPLICATION TO WORK**
- [x] Outstanding in enthusiasm
- [ ] Very interested and industrious
- [ ] Average in diligence and interest
- [ ] Somewhat indifferent
- [ ] Definitely not interested

**JUDGMENT**
- [x] Exceptionally mature
- [ ] Above average in making decisions
- [ ] Usually makes the right decision
- [ ] Often uses poor judgment
- [ ] Consistently uses bad judgment

**DEPENDABILITY**
- [x] Completely dependable
- [ ] Above average in dependability
- [ ] Usually dependable
- [ ] Sometimes neglectful or careless
- [ ] Unreliable

**ABILITY TO LEARN**
- [x] Learns very quickly
- [ ] Learns readily
- [ ] Average in learning
- [ ] Rather slow to learn
- [ ] Very slow to learn

**QUALITY OF WORK**
- [x] Excellent
- [ ] Very good
- [ ] Average
- [ ] Below average
- [ ] Very poor

**ATTENDANCE:** [x] Regular   [ ] Irregular

**PUNCTUALITY:** [x] Regular   [ ] Irregular

**OVER-ALL PERFORMANCE:**

| Outstanding | Very Good | + Average - | Marginal | Unsatisfactory |
|---|---|---|---|---|
| ✓ | | | | |

WHAT ARE THE STUDENT'S STRONGEST ASSETS?

WHAT QUALITIES AND CHARACTERISTICS SHOULD THE STUDENT ESPECIALLY STRIVE TO IMPROVE?

This report has been discussed with student    [x] Yes   [ ] No

(Signed) _____    Dean of Business
              (Immediate Supervisor)        (Title)

*Dec. 6*

CENTRAL ALABAMA COMMUNITY COLLEGE – ALEXANDER CITY CAMPUS

COOPERATIVE EDUCATION PROGRAM
P.O. Box 699
Alexander City, Alabama 35010

Supervisor's Evaluation of Cooperative Student

Name *Julie Givens*                          *Fall*          Qtr., 19*89*

Work Period *Sept.-Dec.*

Employer *J.F. Ingram State Tech. College* Location *Deatsville, AL.*

INSTRUCTIONS: The immediate supervisor will evaluate the student objectively, comparing him with other students of comparable academic level, with other personnel assigned the same or similarly classified jobs, or with individual standards.

---

**RELATIONS WITH OTHERS**
- ☑ Exceptionally well accepted
- ☐ Works well with others
- ☐ Gets along satisfactorily
- ☐ Has some difficulty working with others
- ☐ Works very poorly with others

**ATTITUDE--APPLICATION TO WORK**
- ☑ Outstanding in enthusiam
- ☐ Very interested and industrious
- ☐ Average in diligence and interest
- ☐ Somewhat indifferent
- ☐ Definitely not interested

**JUDGMENT**
- ☐ Exceptionally mature
- ☑ Above average in making decisions
- ☐ Usually makes the right decision
- ☐ Often uses poor judgment
- ☐ Consistently uses bad judgment

**DEPENDABILITY**
- ☑ Completely dependable
- ☐ Above average in dependability
- ☐ Usually dependable
- ☐ Sometimes neglectful or careless
- ☐ Unreliable

**ABILITY TO LEARN**
- ☑ Learns very quickly
- ☐ Learns readily
- ☐ Average in learning
- ☐ Rather slow to learn
- ☐ Very slow to learn

**QUALITY OF WORK**
- ☑ Excellent
- ☐ Very good
- ☐ Average
- ☐ Below average
- ☐ Very poor

ATTENDANCE: ☑ Regular ☐ Irregular          PUNCTUALITY: ☑ Regular ☐ Irregular

---

| OVER-ALL PERFORMANCE: | Outstanding | Very Good | +Average | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| | ✓ | | | | |

WHAT TRAITS MAY HELP OR HINDER THE STUDENT'S ADVANCEMENT?

*Adjusts easily.*

ADDITIONAL REMARKS (OVER IF NECESSARY) *neat*

(In this section please comment on personal appearance, dress, and grooming.)

This report has been discussed with student ☑ Yes ☐ No

(Signed) *[signature]*          *[Dean of Business]*
                    (Immediate Supervisor)    (Title)

EASE RETURN TO OUR OFFICE BY:

*Dec. 2*

ALEXANDER CITY STATE JUNIOR COLLEGE
COOPERATIVE EDUCATION PROGRAM
P. O. Box 699
ALEXANDER CITY, ALABAMA 35010

## Supervisor's Evaluation of Cooperative Student

Name *Julie Givens*  *Fall*  Qtr., 19*88*

Work Period *Sept. - Dec.*

Employer *T. F. Ingram State Tech. College* Location *Deatsville, AL*

INSTRUCTIONS: The immediate supervisor will evaluate the student objectively, comparing him with other students of comparable academic level, with other personnel assigned the same or similarly classified jobs, or with individual standards.

### RELATIONS WITH OTHERS

- [ ] Exceptionally well accepted
- [x] Works well with others
- [ ] Gets along satisfactorily
- [ ] Has some difficulty working with others
- [ ] Works very poorly with others

### ATTITUDE—APPLICATION TO WORK

- [x] Outstanding in enthusiasm
- [ ] Very interested and industrious
- [ ] Average in diligence and interest
- [ ] Somewhat indifferent
- [ ] Definitely not interested

### JUDGMENT

- [ ] Exceptionally mature
- [x] Above average in making decisions
- [ ] Usually makes the right decision
- [ ] Often uses poor judgment
- [ ] Consistently uses bad judgment

### DEPENDABILITY

- [ ] Completely dependable
- [x] Above average in dependability
- [ ] Usually dependable
- [ ] Sometimes neglectful or careless
- [ ] Unreliable

### ABILITY TO LEARN

- [x] Learns very quickly
- [ ] Learns readily
- [ ] Average in learning
- [ ] Rather slow to learn
- [ ] Very slow to learn

### QUALITY OF WORK

- [x] Excellent
- [ ] Very good
- [ ] Average
- [ ] Below average
- [ ] Very poor

ATTENDANCE: [ ] Regular  [ ] Irregular          PUNCTUALITY: [ ] Regular  [ ] Irregular

OVER-ALL PERFORMANCE:

| Outstanding | Very Good | + Average - | Marginal | Unsatisfactory |
|---|---|---|---|---|
| | ✓ | | | |

WHAT ARE THE STUDENT'S STRONGEST ASSETS?

WHAT QUALITIES AND CHARACTERISTICS SHOULD THE STUDENT ESPECIALLY STRIVE TO IMPROVE?

This report has been discussed with student  [ ] Yes  [x] No

(Signed) *Murry C. Gregg*  *President*

(Immediate Supervisor)    (Title)

ALEXANDER CITY STATE JUNIOR COLLL
COOPERATIVE EDUCATION PROGRAM
P. O. Box 699
ALEXANDER CITY, ALABAMA 35010

## Supervisor's Evaluation of Cooperative Student

Name _Julie Givens_ _____ _Winter_ Qtr., 19_89_

Work Period _Jan.- March_

Employer _J. F. Ingram Technical School_ Location _Deatsville, Al._

INSTRUCTIONS: The immediate supervisor will evaluate the student objectively, comparing him with other students of comparable academic level, with other personnel assigned the same or similarly classified jobs, or with individual standards.

| RELATIONS WITH OTHERS | ATTITUDE—APPLICATION TO WORK |
|---|---|
| ☐ Exceptionally well accepted | ☑ Outstanding in enthusiasm |
| ☑ Works well with others | ☐ Very interested and industrious |
| ☐ Gets along satisfactorily | ☐ Average in diligence and interest |
| ☐ Has some difficulty working with others | ☐ Somewhat indifferent |
| ☐ Works very poorly with others | ☐ Definitely not interested |

| JUDGMENT | DEPENDABILITY |
|---|---|
| ☐ Exceptionally mature | ☑ Completely dependable |
| ☑ Above average in making decisions | ☐ Above average in dependability |
| ☐ Usually makes the right decision | ☐ Usually dependable |
| ☐ Often uses poor judgment | ☐ Sometimes neglectful or careless |
| ☐ Consistently uses bad judgment | ☐ Unreliable |

| ABILITY TO LEARN | QUALITY OF WORK |
|---|---|
| ☑ Learns very quickly | ☑ Excellent |
| ☐ Learns readily | ☐ Very good |
| ☐ Average in learning | ☐ Average |
| ☐ Rather slow to learn | ☐ Below average |
| ☐ Very slow to learn | ☐ Very poor |

ATTENDANCE: ☑ Regular ☐ Irregular      PUNCTUALITY: ☑ Regular ☐ Irregular

| OVER-ALL PERFORMANCE: | Outstanding | Very Good | + Average - | Marginal | Unsatisfactory |
|---|---|---|---|---|---|

WHAT ARE THE STUDENT'S STRONGEST ASSETS?

WHAT QUALITIES AND CHARACTERISTICS SHOULD THE STUDENT ESPECIALLY STRIVE TO IMPROVE?

This report has been discussed with student   ☐ Yes   ☑ No

(Signed) _Mary C. Gray_ _____
                    (Immediate Supervisor)    (Title)

RESUME OF JULIE KAY GIVENS

PERSONAL HISTORY

Address - Route 1 Box 59 Deatsville, AL 36022 - 7 years at this residence

Social Security Number - 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

Telephone Number (Home) - 365-1928 - (Business) - 279-7550 Ext 103

Family Status - Married since July 1976, 1 child 18 months old

Age - 26 years old, January 23, 1958

QUALIFICATIONS

Graduated from Jefferson Davis High School, Montgomery, AL in May 1976

While attending Jeff Davis was enrolled in Business-Office Education and held a part-time job in a business office.

Have worked in accounting and business field since 1976.

Employee Development Courses taken while employee at Southeast Exchange Region were Principles of Management, Supervisory Management, Accounting Management, and Techniques of Effective Writing.

Awards - Proficiency Award while employed at Southeast Exchange Region.

WORK EXPERIENCE

Maxwell-Gunter Federal Credit Union
400 Eastdale C.S. 17930
Montgomery, Alabama 36193
                                    Telephone Number - 279-7550 Ext 103

From February 1982 - Present
                                    Supervisor - Grace Coggins

Title Clerk - Submitting title applications to the Motor Vehicle Division of each State when a lien has been taken on a vehicle. General office duties include filing, typing, answering phone calls from members, microfilming, auditing loans, stamping paid accounts, and pulling credit reports from CBI system.

Southeast Exchange Region (Army & Air Force Exchange Service)
1280 Kershaw Street
Montgomery, Alabama   36196
                                    Telephone Number - 264-7301 Ext 284

From July 1978 to December 1981
                                    Supervisor - Ms. Leal Stephens

Accounting Technician - Computerized Accounts Payable, bills were paid on a computer system (TRW-FS-21 System) for the Army & Air Force Exchanges in the Southeast area. Was responsible for finding and correcting errors on computer printouts, processing manually anything computer would reject. Was responsible for the accurate working system of the accounts payable section.

Lead Accounting Technician - Last eighteen months at Southeast was spent in this position which consisted of handling the major vendors' correspondence, training all new employees in this section and supervised the fifteen accounting technicians. Answered all major inquiries on invoices and balanced monthly accounts.

Herff Jones Yearbooks
Selma Highway
Montgomery, Alabama                          Telephone Number - 288-5260

From February 1977 to July 1978           Supervisor - Mosie Bates

---

Press Room Secretary - Responsible for maintaining records for pressroom and bindery departments.

Rouse Motors (Presently Royal Motors)
Eastern Bypass
Montgomery, Alabama                          Telephone Number - 279-9300

From August 1975 to July 1976             Supervisor - Mr. James Kemp
(Part-time job while in high
school, Business-Office Education)

Office Clerk - General office duties included filing, typing, operating various office machines such as calculator, microfilm machines, and type-writer. Served as cashier, answered phone calls, wrote checks,etc.

REFERENCES

Paulette Kindred          Coblentz GMC              Secretary

Odis Best                 Allstate Beverage         Computer Programmer

Enoch Horne               Boy Scouts of America     Camp Director

Attachments:
Certificates (5)
Letters of Recommendation (2)

# ROUSE MOTORS, INC.

833 EASTERN BY-PASS AT I-85
MONTGOMERY, ALABAMA 36109
TELEPHONE 205-279-9300



July 9, 1976

To Whom It May Concern:

Julie Jones Givens worked for Rouse Motors, Inc. for a period of
approximately one year during which time she performed general office
work. Some of her duties were: filing, typing, operating various
office machines, serving as cashier, answering phones, writing checks
for accounts payable and many other varied office duties.

Julie is eager to learn and has the ability to grasp a particular job
with the least amount of instruction. She performed all of her duties
with above average efficiency and accuracy.

Please feel free to contact us if any additional information is
required.

Sincerely,

James M. Kemp
Business Manager

JMK:dls

# Army & Air Force Exchange Service

This certificate is presented to

## JULIE K. GIVENS

*for successful completion of the*

EMPLOYEE DEVELOPMENT PROGRAM STUDY COURSE
1010 – PRINCIPLES OF MANAGEMENT

at

HEADQUARTERS AAFES

THIS 11th DAY OF January 19 80

DAVID W. FRANK
Chief, Training Branch



Army & Air Force Exchange Service

This certificate is presented to

JULIE GIVENS

for successful completion of the

EMPLOYEE DEVELOPMENT PROGRAM STUDY COURSE
3781 — TECHNIQUES OF EFFECTIVE WRITING

at

HEADQUARTERS AAFES

THIS 28th DAY OF November 19 80

DAVID W. FRAME
Chief, Training Branch



Army & Air Force Exchange Service

This certificate is presented to

JULIE GIVENS

for successful completion of the

EMPLOYEE DEVELOPMENT PROGRAM STUDY COURSE
4127 – ACCOUNTING MANAGEMENT

at

HEADQUARTERS AAFES

THIS 30th DAY OF May 19 80

DAVID W. FRAME
Chief, Training Branch



Army & Air Force Exchange Service

This certificate is presented to

JULIE K. GIVENS

for successful completion of the

SUPERVISORY MANAGEMENT COURSE

at

SOUTHEAST EXCHANGE REGION    THIS 14th DAY OF JULY    19 81

DONALD E. PONTIUS
Chief



ARMY AND AIR FORCE EXCHANGE SERVICE

proficiency award
certificate

ARMY & AIR FORCE
EXCHANGE SERVICE

1 April 1981

The Chiefs

JAMES BEACHLER, Chief
Southeast Exchange Region

# AUBURN UNIVERSITY AT MONTGOMERY



OFFICE OF FINANCE
PERSONNEL

MONTGOMERY, ALABAMA 36117

May 24, 1978

TELEPHONE (205) 279-9110
ACTS NUMBER 426-3271

RE: Julie K. Givens
SS# 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

TO WHOM IT MAY CONCERN:

On January 26, 1977, Julie K. Givens took a typing test with us scoring 50 wpm with one error.

If you should need additional information, please let us know.

Sincerely,

Linda B. Moone
Personnel Manager

LBM/ka



# INGRAM STATE TECHNICAL COLLEGE

*Ingram State Technical College*

*" Developing Responsible Citizens "*

August 31, 2006

**MEMORANDUM**

**TO:**     Julie Givens

---

**FROM:**     J. Douglas Chambers, President

*J. Douglas Chambers*

**SUBJECT:**     Appointment

Sections 602 and 603 of the Alabama College System Policy Manual state, "The President is authorized to appoint all faculty and staff at the local level," and further, " may offer twelve, nine, or three month Contracts as appropriate...."

The purpose of this memo is to confirm your appointment as **Coordinator of Business Office Affairs,** beginning effective September 1, 2006, for the period ending August 31, 2007. Pay will be determined from **Salary Schedule C3.** Annual salary for this (12) month appointment is **$60,000.00.**   MJG

This employment will be subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or J.F. Ingram State Technical College.

Please sign below to indicate your acceptance of this appointment.

Signature *Julie Givens*   Date  9/7/06

cc:     Personnel file
        Dean of Fiscal Affairs



*Ingram*
*State*
*Technical*
*College*

**• Developing Responsible Citizens •**

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

# INGRAM STATE TECHNICAL COLLEGE

August 23, 2005

**MEMORANDUM**

**TO:**      Julie Givens

**FROM:**      J. Douglas Chambers, President

*J. Douglas Chambers*

**SUBJECT:**      Appointment

Sections 602 and 603 of the Alabama College System Policy Manual state, "The President is authorized to appoint all faculty and staff at the local level," and further, " may offer twelve, nine, or three month Contracts as appropriate…."

The purpose of this memo is to confirm your appointment as <u>Payroll/Administrative Asst. to the Fiscal Dean</u>, beginning September 1, 2005, for the period ending August 31, 2006. Pay will be determined from <u>Salary Schedule E1 at Grade 1, Step 20 (23)</u>. Annual salary for this twelve (12) month appointment is <u>$50,379.00</u>. MJG  JWW

This employment will be subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or J.F. Ingram State Technical College.

Please sign below to indicate your acceptance of this appointment.

Signature *Julie K Givens*      Date *9/19/05*

cc:      Personnel file
Dean of Fiscal Affairs

P.O. Box 220350  •  Deatsville, Alabama 36022
Phone: 334-285-5177  •  Fax: 334-285-5328



**Ingram**
**State**
**Technical**
**College**
**ISTC**
• *Developing Responsible Citizens* •

**J. Douglas Chambers**
President

---

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

# INGRAM STATE TECHNICAL COLLEGE

August 23, 2004

## MEMORANDUM

**TO:**     Julie K. Givens

**FROM:**     J. Douglas Chambers, President

*J. Douglas Chamb*

**SUBJECT:**     Appointment

Sections 602 and 603 of the Alabama College System Policy Manual state, "The President is authorized to appoint all faculty and staff at the local level," and further, " may offer twelve, nine, or three month Contracts as appropriate…."

The purpose of this memo is to confirm your appointment as <u>Payroll/Cashier, etc. and Administrative Assistant to the Dean of Fiscal Affairs</u>, beginning September 1, 2004, for the period ending August 31, 2005. Pay will be determined from <u>Salary Schedule E1 at Grade 1, Step 20 (22)</u>. Annual salary for this twelve (12) month appointment is <u>$47,527.00</u>. MJG  JYu

This employment will be subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or J.F. Ingram State Technical College.

Please sign below to indicate your acceptance of this appointment.

Signature *Julie K Givens*     Date 9/3/04

cc:     Personnel file
        Dean of Fiscal Affairs

*P.O. Box 220350  •  Deatsville, Alabama 36022*
*Phone: 334-285-5177  •  Fax: 334-285-2521*



**J. Douglas Chambers**
President

---

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

# INGRAM STATE TECHNICAL COLLEGE

August 25, 2003

**MEMORANDUM**

**TO:**      Julie K. Givens

**FROM:**    J. Douglas Chambers

*J. Douglas Chambers*

**SUBJECT:**   Appointment

Sections 602 and 603 of the Alabama College System Policy Manual state, "The President is authorized to appoint all faculty and staff at the local level," and further, " may offer twelve, nine, or three month Contracts as appropriate...."

The purpose of this memo is to confirm your appointment as <u>Administrative Assistant/Payroll/Cashier</u>, beginning effective September 1, 2003, for the period ending August 31, 2004. Pay will be determined from <u>Salary Schedule E1 at Grade 1, Step 20 (21)</u>. Annual salary for this twelve (12) month appointment is <u>$47,527.00</u>.

This employment will be subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or J.F. Ingram State Technical College.

Please sign below to indicate your acceptance of this appointment.

Signature *Julie K Givens* Date *9-16-03*

cc:      Personnel file
Dean of Fiscal Affairs



**Ingram**
**State**
**Technical**
**College**
• *Developing Responsible Citizens* •

J. Douglas Chambers
President

Rickey A. Huffstutler, Ph.D
Dean of the College

Monica J. Greene
Dean of
Fiscal Affairs

James E. Wilson
Dean of Students
and Support Services

# INGRAM STATE TECHNICAL COLLEGE
August 28, 2002

**MEMORANDUM**

**TO:**        **Julie K. Givens**

**FROM:**      J. Douglas Chambers
               *J. Douglas Chambers*

**SUBJECT:**   Appointment

Sections 602 and 603 of the Alabama College System Policy Manual state, "The President is authorized to appoint all faculty and staff at the local level," and further, " may offer twelve, nine, or three month Contracts as appropriate...."

The purpose of this memo is to confirm your appointment as <u>Administrative Assistant/Payroll/Cashier</u>, beginning effective September 1, 2002, for the period ending August 31, 2003. Pay will be determined from <u>Salary Schedule E 1 at Grade 1, Step 20 (20)</u>. Annual salary for this twelve (12) month appointment is <u>$47,527.00</u>. MJG

This employment will be subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or J.F. Ingram State Technical College.

Please sign below to indicate your acceptance of this appointment.

Signature *Julie K. Givens*          Date *9-18-02*

cc:        Personnel file

*P.O. Box 220350 • Deatsville, Alabama 36022*
*Phone: 334-285-5177 • Fax: 334-285-5328*



**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

# INGRAM STATE TECHNICAL COLLEGE

August 17, 2001

**MEMORANDUM**

**TO:** ~~Julie K. Givens~~

**FROM:** J. Douglas Chambers

*J. Douglas Chambers*

**SUBJECT:** Appointment

Sections 602 and 603 of the Alabama College System Policy Manual state, "The President is authorized to appoint all faculty and staff at the local level," and further, " may offer twelve, nine, or three month Contracts as appropriate...."

The purpose of this memo is to confirm your appointment as <u>Administrative Assistant /Payroll/Cashier</u>, beginning effective September 1, 2001, for the period ending August 31, 2002. Pay will be determined from <u>Salary Schedule E1 at Grade 01, Step 15 (19)</u>. Annual salary for this twelve (12) month appointment is <u>$44,685.00.</u> MJG

This employment will be subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or J.F. Ingram State Technical College.

Please sign below to indicate your acceptance of this appointment.

Signature _Julie K. Givens_ Date _10-01-01_

cc:     Personnel file

*P.O. Box 220350 • Deatsville, Alabama 36022*
*Phone: 334-285-5177 • Fax: 334-285-5328*



**INGRAM STATE TECHNICAL COLLEGE**

*Ingram State Technical College*
*Developing Responsible Citizens*

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

October 13, 2000

## <u>**MEMORANDUM OF UNDERSTANDING**</u>

In an effort to improve the efficiency and effectiveness of the J.F. Ingram State Technical College organizational structure, it is agreed that a reorganization and reassignment of job duties are necessary.

In the case of <u>**Julie Givens**</u>, the job duties of <u>**Administrative Assistant to the Dean of Fiscal Affairs and Fiscal Division Secretary**</u> are being integrated into the position of <u>**Administrative Assistant/Payroll/Cashier**</u> for the Fiscal Division.

After meeting with my supervisor and appropriate administrators, wherein we discussed this change, I understand that this position and salary placement is a temporary assignment subject to modifications at the end of the fiscal year and the evaluation of the effectiveness of the reorganization. In the event that it is necessary, I may revert to my previous job title, duties, and salary placement.

_Julie Givens_
Julie Givens

_____
J. Douglas Chambers, President

*P.O. Box 220350 • Deatsville, Alabama 36022*
*Phone: 334-285-5177 • Fax 334-285-5328*



**Ingram
State
Technical
College**

• *Developing Responsible Citizens* •

**J. Douglas Chambers**
President

---

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

# INGRAM STATE TECHNICAL COLLEGE
October 13, 2000

**MEMORANDUM**

**TO:**        **Julie K. Givens**

**FROM:**      J. Douglas Chambers

*J. Douglas Chambers*

**SUBJECT:**   Temporary Appointment

Sections 602 and 603 of the Alabama College System Policy Manual
state, "The President is authorized to appoint all faculty and staff at
the local level," and further, " may offer twelve, nine, or three month
Contracts as appropriate...."

The purpose of this memo is to confirm your temporary appointment
as <u>Administrative Assistant /Payroll/Cashier</u>, beginning effective
November 1, 2000, for the period ending August 31, 2001. Pay will
be determined from <u>Salary Schedule E1 at Grade 01, Step 15 (18)</u>.
Annual salary for twelve (12) month appointments at this level is
<u>$44,685.</u> MJG

This employment will be subject to all employment policies,
conditions, and standards now or hereafter adopted by the Alabama
State Board of Education, The Alabama College System, or J.F.
Ingram State Technical College.

Please sign below to indicate your acceptance of this appointment.

Signature  *Julie K Givens*  Date  *11/27/00*

cc:        Personnel file



*Ingram*
*State*
*Technical*
*College*

⬛ISTC⬛
• *Developing Responsible Citizens* •

J. Douglas Chambers
President

Rickey A. Huffstutler, Ph.D
Dean of the College

Monica J. Greene
Dean of
Fiscal Affairs

James E. Wilson
Dean of Students
and Support Services

# INGRAM STATE TECHNICAL COLLEGE
July 28, 2000

## MEMORANDUM

**TO:**        **Julie K. Givens**

**FROM:**      J. Douglas Chambers

*J. Douglas Chambers*

**SUBJECT:**     Appointment

Sections 602 and 603 of the Alabama College System Policy Manual state, "The President is authorized to appoint all faculty and staff at the local level," and further, " may offer twelve, nine, or three month Contracts as appropriate...."

The purpose of this memo is to confirm your appointment as <u>Administrative Assistant to the Fiscal Dean and Fiscal Division Secretary</u>, beginning effective September 1, 2000, for the period ending August 31, 2001. Pay will be determined from <u>Salary Schedule  E2  at Grade 02,  Step 18</u>.  Annual salary for this twelve (12) month appointment is <u>$41,047.</u>  MJG

This employment will be subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or J.F. Ingram State Technical College.

Please sign below to indicate your acceptance of this appointment.

Signature *Julie K Givens*       Date *8/16/00*

cc:       Personnel file



**J. Douglas Chambers**
President

---

Rickey A. Huffstutler, Ph.D
Dean of the College


Monica J. Greene
Dean of
Fiscal Affairs


James E. Wilson
Dean of Students
and Support Services

# INGRAM STATE TECHNICAL COLLEGE

## MEMORANDUM

**TO:**     **Julie K. Givens**

**FROM:**     J Douglas Chambers

*J. Douglas Chambers*

**SUBJECT:**     Appointment

Sections 602 and 603 of the Alabama College System Policy Manual state, "The President is authorized to appoint all faculty and staff at the local level," and further, " may offer twelve, nine, or three month Contracts as appropriate. "

The purpose of this memo is to confirm your appointment as <u>Administrative Assistant to the Fiscal Dean and Fiscal Division Secretary</u>, beginning effective September 1, 1999, for the period ending August 31, 2000. Pay will be determined from <u>Salary Schedule E at Rank E2, Step 15</u>. Annual salary for this twelve (12) month appointment is <u>$39,468.</u> *MJG*

This employment will be subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or J.F. Ingram State Technical College.

Please sign below to indicate your acceptance of this appointment.

Signature *Julie K Givens*  Date *8/30/99*


cc.     Personnel file



# INGRAM STATE TECHNICAL COLLEGE

**MEMORANDUM**

**TO:**    Ms. Julie K.Givens

**FROM:**   Mr. J. Douglas Chambers

*J. Douglas Chambers*

**SUBJECT:** Appointment

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of Instruction

**Paul Reeder**
Dean of Students

**Monica J. Greene**
Dean of
Fiscal Affairs

Sections 602 and 603 of <u>The Alabama College System Policy Manual</u> state, "The President is authorized to appoint all faculty and staff at the local level," and further, "...may offer twelve, nine, or three months contracts as appropriate..."

Therefore, you are appointed **<u>Secretary and Administrative Assistant to the Dean of Fiscal Affairs</u>**, effective **<u>September 1, 1998</u>**, for the period ending **<u>August 31, 1999</u>**. Pay will be determined from **<u>Salary Schedule E2, Step 15 (16 yrs.) at $39.468</u>**. MJG

This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or by J.F. Ingram State Community College.

Please sign below to indicate your acceptance of this appointment.

*Julie K Givens*                          *9/30/98*

**Signature** _____    **Date** _____

c:        Personnel Director

• P.O. Box 220350 • Deatsville, Alabama 36022-0350
Phone: 334-285-5177 • Fax: 334-285-5328

DATE:        January 3, 1985

SUBJECT:    Interview with Mrs. Julie Kay Givens for Receptionist/
            Secretarial position.

PRESENT:  Dr. Gregg, Mr. Mulder, Mr. Powell, and Mrs. Murphree


      Dr. Gregg explained about the position opening,
stating that some specific duties would be handling of all out-
going and in-coming calls, and handlingWork Orders.  He explained
to her about the students, the school, programs, duty hours,
Teachers Retirement, hospital insurance.

      Dr. Gregg asked her about her shorthand skills.
Mrs. Givens said that she has not used shorthand since high
school.

      Mrs. Givens said that her husband is employed by
Rheem Manufacturing Company in Montgomery and said that
she has one child (age 20 months).  She said that they live
on Holland Road.  She said that she would have no reservations
about working around inmates.

      Dr. Gregg told her that the beginning salary will
be $10,272.

      Mrs. Givens said that she is a hard worker and
is willing to do any type work that she is taught how to do.

      Dr. Gregg told her that he hoped a decision could
be made today and if she was the one selected that she would
be getting a call.  Mrs. Murphree asked if it would be all right
to check with her current employer  if she was seriously considered
for the position.  She replied that it would be all right to check
with her supervisor.

Recorded by: _Sylvia H. Murphree_
            (Mrs.) Sylvia H. Murphree

NOTE: On this date, I called Mrs. Grace Coggins, Mrs. Givens'
supervisor at Maxwell-Gunter Federal Credit Union.  Mrs. Coggins
had no reservations about Mrs. Givens' ability.  She said that
the quantity and quality of her work is very good.  She said
that she works without supervision – that once she is shown
how to do something that she is able to do it without asking
a lot of questions.  She said that she gets along well with other
employees and said that when she (Mrs. Coggins) is out that
Mrs. Givens supervises the other employees and does her work.
She said that she can relax and enjoy taking time away because
she knows that her work will be up-to-date when she returns.
She said that she would hate very much to lose Mrs. Givens
but would certainly not stand in her way.  Mrs. Coggins also
said that Mrs. Givens is dependable, has good attendance, and
is punctual.



**Ingram**
**State**
**Technical**
**College**
ISTC
• *Developing Responsible Citizens* •

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of Instruction

**Paul Reeder**
Dean of Students

**Monica J. Greene**
Dean of
Fiscal Affairs

### INGRAM STATE TECHNICAL COLLEGE

September 1, 1997

## MEMORANDUM

**TO:**    Ms. Julie K. Givens

**FROM:**  Mr. J. Douglas Chambers

*J. Douglas Chambers*

**SUBJECT:** Appointment

Sections 602 and 603 of <u>The Alabama College System Policy Manual</u> state, "The President is authorized to appoint all faculty and staff at the local level," and further, "...may offer twelve, nine, or three months contracts as appropriate..."

Therefore, you are appointed **<u>Secretary and Administrative Assistant to the Dean of Fiscal Affairs</u>**, effective **<u>September 1, 1997</u>**, for the period ending **<u>August 31, 1998</u>**. Pay will be determined from **<u>Salary Schedule E3,   Step 10</u>**.

This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System,  or by J.F. Ingram State Community College.

Please sign below to indicate  your acceptance of this appointment.

**Signature:**    *Julie K Givens*

cc:     Personnel Director



**J. F. Ingram**
**State**
**Technical**
**College**

‹ Developing Responsible Citizens ›

**J. Douglas Chambers**
Interim President

**J. M. Mulder**
Dean of Technical &
Literacy Education

**Paul Reeder**
Dean of Students

**Monica J. Greene**
Dean of Fiscal Affairs

**Ron Shum**
Dean of Educational
Support Services

# J. F. INGRAM STATE TECHNICAL COLLEGE

September 1, 1996

## MEMORANDUM

**TO:**     Ms. Julie K.Givens

**FROM:**   Mr. J. Douglas Chambers, Interim President

**SUBJECT:** Appointment    *J. Douglas Chambers*

Sections 602 and 603 of <u>The Alabama College System Policy Manual</u> state, "The President is authorized to appoint all faculty and staff at the local level," and further, "...may offer twelve, nine, or three months contracts as appropriate..."

Therefore, you are appointed **<u>Secretary and Administrative Assistant to the Dean of Fiscal Affairs</u>**, effective **<u>September 1, 1996</u>**, for the period ending **<u>August 31, 1997</u>**. Pay will be determined from **<u>Salary Schedule E3,   Step 10</u>**.

This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System,   or by J.F. Ingram State Community College.

Please sign below as your acceptance of this appointment.

Signature: *Julie K Givens*

cc:      Personnel Director

5375 Ingram Road  P. O. Box 209  Deatsville, Alabama 36022
Phone: 334-285-5177      Fax: 334-285-5328



**INGRAM STATE COMMUNITY COLLEGE**

September 1, 1995

*Ingram*
*State*
*Community*
*College*

• *Developing Responsible Citizens* •

**Murry C. Gregg, Ed.D.**
President

**J. M. Mulder**
Dean of Technical &
Literacy Education

**Paul Reeder**
Dean of Students

**Ron Shum, Ed.D.**
Dean of Educational &
Educational Support Services

**Monica J. Greene**
Dean (Interim)
Fiscal Affairs

**MEMORANDUM**

**TO:**      Ms. Julie K. Givens

**FROM:**  Dr. Murry C. Gregg, President

**SUBJECT:**          Appointment


Sections 602 and 603 of <u>The Alabama College System Policy Manual</u> state, "The President is authorized to appoint all faculty and staff at the local level," and further, "...may offer twelve, nine, or three months contracts as appropriate..."

Therefore, you are appointed **Secretary and Administrative Assistant to the Dean of Fiscal Affairs**, effective **SEPTEMBER 1, 1995**, for the period ending **August 31, 1996**. Pay will be determined from **Salary Schedule E3, Step 10**.

This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education or Ingram State Community College.

Please sign below as your acceptance of this appointment.


**Signature:** *Julie K Givens*


cc:       Personnel Director

*5375 Ingram Road  •  P.O. Box 209  •  Deatsville, Alabama 36022*
*Phone: 334-285-5177  •  Fax: 334-285-5328*



**INGRAM STATE COMMUNITY COLLEGE**

September 1, 1994

**Murry C. Gregg, Ed. D.**
President

**Freddie Powell**
Vice President

**J. M. Mulder**
Dean of Technical &
Literacy Education

**Paul Reeder**
Dean of Students

**Ron Shum, Ed. D.**
Dean of Academics &
Educational Support Services

**MEMORANDUM**

**TO:**      Ms. Julie K.Givens

**FROM:**  Dr. Murry C. Gregg, President

**SUBJECT:**          Appointment

Sections 602 and 603 of <u>Policies, Procedures, and Regulations Governing Alabama Technical Colleges</u>, states that, "The President is authorized to appoint all faculty and staff at the local level," and further, "...May offer twelve, nine, or three months contracts as appropriate..."

Therefore, you are appointed **Secretary and Administrative Assistant to the Dean of Fiscal Affairs**, effective **September 1, 1994**, for the period ending **August 31, 1995**. Pay will be determined from **Salary Schedule E3, Step 10**.

This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education or Ingram State Community College.

Please sign below as your acceptance of this appointment.

**Signature:**      Julie K Givens

cc:        Personnel Director



*5375 Ingram Road  •  P. O. Box 209  •  Deatsville, Alabama 36022*
*Phone: 205-285-5177  •  Fax: 205-285-5328*



# J. F. INGRAM STATE TECHNICAL COLLEGE
P. O. BOX 209
DEATSVILLE. ALABAMA 36022
Phone. 285-5177



September 1, 1993

Murry C. Gregg, Ed D
PRESIDENT

J M Mulder
DEAN OF INSTRUCTION

Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

---

**MEMORANDUM**

**TO:**       Mrs. Julie Kay Givens

**FROM:**     Dr. Murry C. Gregg, President

**SUBJECT:**  Appointment

Sections 602 and 603 of <u>Policies, Procedures, and Regulations Governing Alabama Technical Colleges</u>, states that, "The President is authorized to appoint all faculty and staff at the local level," and further, " . . . may offer twelve, nine, or three months contract as appropriate . . . "

Therefore, you are appointed **<u>Accountant Assistant</u>** effective **<u>September 1, 1993,</u>** for the year ending **<u>August 31, 1994.</u>** Pay will be determined from Salary Schedule E at **<u>E-5, Step 8</u>**. This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education.

Please sign below as your acceptance of this appointment.

Signature: _____

cc:  Mr. Freddie Powell
     Mr. Greg Wright, Personnel Director





**J. F. INGRAM STATE TECHNICAL COLLEGE**
P O BOX 209
DEATSVILLE, ALABAMA 36022
Phone: 285-5177

September 1, 1992



Murry C. Gregg, Ed D
PRESIDENT

J. M. Mulder
DEAN OF INSTRUCTION

Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

---

**MEMORANDUM**

**TO:**       Mrs. Julie Kay Givens

**FROM:**     Dr. Murry C. Gregg, President

**SUBJECT:**  Appointment

     Sections 602 and 603 of <u>Policies, Procedures, and Regulations Governing Alabama Technical Colleges</u>, states that, "The President is authorized to appoint all faculty and staff at the local level," and further, " . . . may offer twelve, nine, or three months contract as appropriate . . . "

     Therefore, you are appointed <u>**Accountant Assistant**</u> effective <u>**September 1, 1992,**</u> for the year ending <u>**August 31, 1993**</u>. Pay will be determined from Salary Schedule E at <u>**E-5, Step 8**</u>. This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education.

     Please sign below as your acceptance of this appointment.

Signature:  _Julie K Givens_

cc:  Mr. Freddie Powell
     Dean of Business Affairs





# J. F. INGRAM STATE TECHNICAL COLLEGE

P. O. BOX 209
DEATSVILLE, ALABAMA 36022
Phone: 285-5177

September 1, 1991



Murry C. Gregg, Ed D
PRESIDENT

J. M. Mulder
DEAN OF INSTRUCTION

Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

---

**MEMORANDUM**

**TO:**      Mrs. Julie Kay Givens

**FROM:**    Dr. Murry C. Gregg, President

**SUBJECT:**  Appointment

Sections 602 and 603 of <u>Policies, Procedures, and Regulations Governing Alabama Technical Colleges</u>, states that, "The President is authorized to appoint all faculty and staff at the local level," and further, " . . . may offer twelve, nine, or three months contract as appropriate . . . "

Therefore, you are appointed **Accountant Assistant** effective **September 1, 1991,** for the year ending **August 31, 1992.** Pay will be determined from Salary Schedule E at **E-5, Step 6.** This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education.

Please sign below as your acceptance of this appointment.

Signature: _Juliet K Givens_

cc:  Mr. Freddie Powell
     Dean of Business Affairs





Murry C. Gregg, Ed D
PRESIDENT
J. M. Mulder
DEAN OF INSTRUCTION

# J. F. INGRAM STATE TECHNICAL COLLEGE
P. O. BOX 209
DEATSVILLE. ALABAMA 36022
Phone. 285-5177

September 1, 1990



Freddie Powell
DEAN OF BUSINESS AFFAIRS
Paul Reeder
DEAN OF STUDENTS

---

**MEMORANDUM**

**TO:**      Mrs. Julie Kay Givens

**FROM:**    Dr. Murry C. Gregg, President

**SUBJECT:** Appointment


        Sections 602 and 603 of <u>Policies, Procedures, and</u>
<u>Regulations Governing Alabama Technical Colleges</u>, states that,
"The President is authorized to appoint all faculty and staff at
the local level," and further, " . . . may offer twelve, nine, or
three months contract as appropriate . . . "

        Therefore, you are appointed **Accountant Assistant**
effective <u>**September 1, 1990,**</u> for the year ending <u>**August 31, 1991.**</u>
Pay will be determined from Salary Schedule E at <u>**E-5, Step 6**</u>.
This employment is subject to all employment policies,
conditions, and standards now or hereafter adopted by the Alabama
State Board of Education.

        Please sign below as your acceptance of this
appointment.

**Signature:** _Julie K Givens_

cc: Mr. Freddie Powell







# J. F. INGRAM STATE TECHNICAL COLLEGE
P O BOX 209
DEATSVILLE, ALABAMA 36022
Phone. 285-5177

September 1, 1989

Murry C. Gregg, Ed D
PRESIDENT

J M Mulder
DEAN OF INSTRUCTION

Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

---

**MEMORANDUM**

TO:      Mrs. Julie Kay Givens

FROM:    Dr. Murry C. Gregg, President

SUBJECT: Appointment

Sections 602 and 603 of <u>Policies, Procedures, and Regulations Governing Alabama Technical Colleges</u>, states that, "The President is authorized to appoint all faculty and staff at the local level," and further, "...may offer twelve, nine, or three months contract as appropriate..."

Therefore, you are appointed <u>**Accountant Assistant**</u> effective <u>**September 1, 1989,**</u> for the year ending <u>**August 31, 1990.**</u> Pay will be determined from Salary Schedule E at <u>**E-5, Step 5.**</u> This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education.

Please sign below as your acceptance of this appointment.

Signature:   _Julie K Givens_

cc:  Mr. Freddie Powell





Murry C. Gregg, Ed D
PRESIDENT

J. M. Mulder
DEAN OF INSTRUCTION

# J. F. INGRAM STATE TECHNICAL COLLEGE
P O BOX 209
DEATSVILLE, ALABAMA 36022
Phone: 285-5177

September 1, 1988



Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

---

**MEMORANDUM**

**TO:**   Mrs. Julie Kay Givens

**FROM:**   Dr. Murry C. Gregg, President

**SUBJECT:**   Appointment


    Sections 602 and 603 of <u>Policies, Procedures, and</u> <u>Regulations Governing Alabama Technical Colleges</u>, states that, "The President is authorized to appoint all faculty and staff at the local level," and further, "...may offer twelve, nine, or three months contract as appropriate..."

    Therefore, you are appointed <u>**Secretary/Receptionist**</u> effective <u>**September 1, 1988**</u>, for the year ending <u>**August 31, 1989**</u>. Pay will be determined from Salary Schedule E at <u>**E-6, Step 4**</u>. This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education.

    Please sign below as your acceptance of this appointment.

**Signature:**   _Julie K. Givens_





# J. F. INGRAM STATE TECHNICAL COLLEGE
P. O. BOX 209
DEATSVILLE, ALABAMA 36022
Phone: 285-5177

September 1, 1987



Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

Murry C. Gregg, Ed D
PRESIDENT

J M. Mulder
DEAN OF INSTRUCTION

---

## MEMORANDUM

TO:             Mrs. Julie K. Givens

FROM:           Dr. Murry C. Gregg, President

SUBJECT:        Appointment

Sections 602 and 603 of Policies, Procedures, and Regulations Governing Alabama Technical Colleges, states that, "The President is authorized to appoint all faculty and staff at the local level."

Therefore, you are appointed Secretary/Receptionist for the year ending August 31, 1988. Pay will be determined from Salary Schedule E at E-6, Step 3, $13,566 annually. This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education.

Please sign below as your acceptance of this appointment.

Signature: Julie K. Givens





Murry C. Gregg, Ed D
PRESIDENT

J. M. Mulder
DEAN OF INSTRUCTION

# J. F. INGRAM STATE TECHNICAL COLLEGE
P O BOX 209
DEATSVILLE, ALABAMA 36022
Phone: 285-5177

August 28, 1987



Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

MEMORANDUM

TO:        Dr. Murry C. Gregg
           President

FROM:      Freddie Powell
           Dean of Business Affairs

SUBJECT:   Mrs. Julie Givens


        Since coming to work here 1½ years ago,
Mrs. Julie Givens has shown exemplary abilities in
performing her assigned duties.  She has willingly
assumed extra duties as they arise in the accounting
department with thoroughness.

        I recommend that she be moved on the
salary schedule from E-7/2 to E-6/3, be be effective
September 1, 1987.


cc:  Mrs. Julie Givens





# J. F. INGRAM STATE TECHNICAL COLLEGE
P O. BOX 209
DEATSVILLE, ALABAMA 36022
Phone: 285-5177

September 1, 1986



Murry C. Gregg, Ed D
PRESIDENT

J M Mulder
DEAN OF INSTRUCTION

Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

---

MEMORANDUM

TO:        Mrs. Julie Givens

FROM:      Dr. Murry C. Gregg, President

SUBJECT:   Appointment

Sections 602 and 603 of Policies, Procedures, and Regulations Governing Alabama Technical Colleges states that, "The President is authorized to appoint all faculty and staff at the local level."

Therefore, you are appointed Secretary/Receptionist for the year ending August 31, 1987. Pay will be determined from Salary Schedule E at E-7 , Step 2 , $11,718 annually. This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education.

Please sign below as your acceptance of this appointment.

Signature: _Julie K Givens_

cc: Mr. Freddie Powell





## J. F. INGRAM STATE TECHNICAL COLLEGE
P O BOX 209
DEATSVILLE, ALABAMA 36022
Phone: 285-5177

September 1, 1985

Murry C. Gregg, Ed D
PRESIDENT

J M Mulder
DEAN OF INSTRUCTION

Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

---

MEMORANDUM

TO:        Mrs. Julie K. Givens

FROM:      Dr. Murry C. Gregg, President

SUBJECT:   Appointment


Sections 602 and 603 of Policies, Procedures, and Regulations Governing Alabama Technical Colleges states that, "The President is authorized to appoint all faculty and staff at the local level."

Therefore, you are appointed Secretary/Receptionist for the year ending August 31, 1986.  Pay will be determined from Salary Schedule  E-7 , Step  1 ,  $11,256  annually.  This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education.

Please sign below as your acceptance of this appointment.

Signature:  _Julie K. Givens_

cc:  Mr. Freddie Powell





# J. F. INGRAM STATE TECHNICAL COLLEGE
P. O. BOX 209
DEATSVILLE, ALABAMA 36022
Phone: 285-5177

January 4, 1985

Murry C. Gregg, Ed D
PRESIDENT

J. M Mulder
DEAN OF INSTRUCTION

Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

---

## MEMORANDUM

TO:           Mrs. Julie K. Givens

FROM:        Dr. Murry C. Gregg, President

SUBJECT:     Appointment as Secretary/Receptionist

          Sections 602 and 603 of Policies, Procedures, and Regulations Governing Alabama Technical Colleges states that, "The President is authorized to appoint all faculty and staff at the local level."

          Therefore, you are appointed Secretary/Receptionist for the year ending September 30, 1985. Pay will be determined from Salary Schedule E at E-7, Step 0, $10,272 annually. This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education.

          Please sign below as your acceptance of this appointment.

Signature: ___Julie K. Givens___
          Julie K. Givens

cc:  Mr. Freddie Powell

NOTE:  This appointment is effective Monday, January 21, 1985.



## J. F. INGRAM STATE TECHNICAL COLLEGE
P. O. BOX 209
DEATSVILLE, ALABAMA 36022
Phone: 285-5177



Murry C. Gregg, Ed D
PRESIDENT

J. M. Mulder
DEAN OF INSTRUCTION

January 4, 1985

Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

---

MEMORANDUM

TO:         Mrs. Julie K. Givens

FROM:       Dr. Murry C. Gregg, President

SUBJECT:    Appointment as Secretary/Receptionist

Sections 602 and 603 of Policies, Procedures, and Regulations Governing Alabama Technical Colleges states that, "The President is authorized to appoint all faculty and staff at the local level."

Therefore, you are appointed Secretary/Receptionist for the year ending September 30, 1985. Pay will be determined from Salary Schedule E at E-7, Step 0, $10,272 annually. This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education.

Please sign below as your acceptance of this appointment.

Signature:  Julie K. Givens

cc:  Mr. Freddie Powell

NOTE:  This appointment is effective Monday, January 21, 1985.

## Support Personnel Evaluation Form
## J.F. Ingram State Technical College

Employee: Julie Givens                          Date: March 31, 2003

Position/Title: Administrative
Assistant/Payroll/Cashier

*The following items should be rated "as is" or "with comment" by the evaluator. Comments may be either positive or negative as needed. Employees may also request a "with comment" rating in order to make their own comments about specific items on this evaluation.*

| Meets standard As is | With comment | | |
|---|---|---|---|
| () | () | 1. | Adheres to institutional policies, practices, and procedures. |
| () | () | 2. | Utilizes good housekeeping or maintenance practices in the workplace. |
| () | () | 3. | Works required days. Does not create problems by using excessive amounts of leave. |
| () | () | 4. | Works required hours. Not habitually tardy. Does not leave early. |
| () | () | 5. | Stays on task. Does not waste time on socializing or personal phone calls. |
| () | () | 6. | Work performed is of acceptable quality. |
| () | () | 7. | Communicates effectively oral and written form. |
| () | () | 8. | Develops and maintains appropriate and efficient working relationships with coworkers. |
| () | () | 9. | Cooperates with dean/supervisor, accepts directions and receives assignments willingly. |
| () | () | 10. | Participates in appropriate professional development activities. |

4

Employee's Signature _Julie K Givens_   Date _8/15/03_

Supervisor's Signature _Monica J. Greene_   Date _8/15/03_

## Ingram State Technical College
## Job Description

**JOB TITLE:  Fiscal Division Secretary and Administrative Assistant**

Salary Level:       Schedule E               Division:     Fiscal
Location:           Office at Main Campus     Department: Fiscal

Employee Name:   Julie Givens
Supervisor:         Ms. Monica Greene, Dean of Fiscal Affairs

SUMMARY:  All duties performed under the supervision of the Dean of Fiscal Affairs. Provides general secretarial services to the Fiscal Division and serves as Administrative Assistant to the Dean of Fiscal Affairs.

ESSENTIAL DUTIES AND RESPONSIBILITIES:

1.  Manages and coordinates correspondence for the Dean and maintains correspondence files.

2.  Monitors completion of travel forms and coordinates reimbursement for travel expenses.

3.  Assists with preparation of budgets, financial statements, quarterly personnel reports, and monthly general ledger reports.

4.  Assists in maintaining inventories.

5.  Assists in preparation of all accounts payable for the college.

7.  Assists in writing purchase orders as needed.

8.  Assists in accounting for restricted funds, budgets, monthly reports and final reports.

9.  Monitors maintenance of the college's phone equipment and processes order for phone equipment and installation.

10.  Assumes any other duties assigned by the Dean

SUPERVISORY RESPONSIBILITIES:  May be assigned by the Dean to supervise

clerical personnel within the division.    Carries out any such supervisory responsibilities in accordance with policies of the college and the Alabama Department of Postsecondary Education.

QUALIFICATION REQUIREMENTS:    To perform this job successfully, an individual must be able to perform each essential function satisfactorily.  The requirements listed below are representative of the knowledge, skills, and/or ability required.  Reasonable accomodations may be made to enable individuals with disabilities to perform the essential functions.

EDUCATION/EXPERIENCE:
Associate degree or equivalent from a two-year college or technical school; or six months to one year related experience and/or training; or equivalent combination of training or experience.

LANGUAGE SKILLS:
Ability to read, analyze, and interpret documents.  Ability to respond effectively to sensitive inquiries or complaints.  Ability to communicate effectively in writing.

MATHEMATICAL SKILLS:
Ability to comprehend and apply principles of accounting and calculate discounts, interest, commissions, proportions and percentages.

REASONING ABILITY:
Ability to apply commonsense understanding to carry out instructions furnished in written, oral, or diagram form.  Ability to deal with problems involving several concrete variables in standardized situations.

OTHER SKILLS AND ABILITIES:
Ability to coordinate activities and cooperate with other employees.

# JOB DESCRIPTION

**NAME:**      Mrs. Julie Givens

**JOB TITLE:**  Accountant Assistant

**DATE:**      January 24, 1990

## SPECIFIC DUTIES AND RESPONSIBILITIES:

(1)  Assist with all financial data on computer;

(2)  Assist with the preparation of budgets, financial
     statements, EBO budget, two-year facility report,
     quarterly personnel report, and monthly general ledger
     reports;

(3)  Assist in maintaining equipment inventory;

(4)  Assist in preparation of all accounts payable for
     institution, including checking, coding, posting, balancing
     statements, and preparing monthly remittance and mailing
     same;

(5)  Assist in writing purchase orders and preparing purchase
     order reports;

(6)  Assist in accounting for restricted funds, budgets, monthly
     reports, and final reports;

(7)  Responsible for maintaining Mrs. Lassiter's desk in her
     absence;

(8)  Responsible for typing financial reports for accounting
     department, as needed;

(9)  Assist in keeping log on invoices signed out to shops;

(10) Assist in balancing bank statements;

(11) Responsible for making daily deposits;

(12) Assist in collecting for live-work and receipting same;

(13) Responsible for ordering and maintaining phone equipment
     for all three campuses;

(14) Assist in removal of monies from vending machines and
     counting same;

(15) Responsible for completion of travel forms and the
     reimbursement of travel expenses;

(16) Assist others in work overload as needed; and

(17) Other duties as assigned by Dr. Gregg or Mr. Powell.

APPROVED: _Murry C. Gregg_____    DATE: _____1-24-90_____
              (President)

cc:    Personnel File
       Central File
       Mr. Freddie Powell

REVISED

October 17, 1985

JULIE GIVENS, SECRETARY

WORK DUTIES:

Main switch board operator.

Answer all incoming calls, place outgoing calls for instructors, log all long distance calls, and audit same monthly. Prepare invoices for employees long distance calls.

Write work orders, total invoices, call customers when live work project is completed.

Log all paid invoices and work orders to ledger books.

Type financial reports for accounting department as needed.

Assist in keeping log on invoices signed out to shop.

Assist in balancing all bank statements.

Make daily bank deposits.

Assist in collecting for live work and receipting of same.

Assist in work overload as needed.

Other duties as assigned by Dr. Gregg and Mr. Powell.

NOTE:  It is important that Mrs. Givens, Mrs. Lassiter, Mr. Bridgman, and Mr. Heard  work closely in their duties.

APPROVED: _Murry C Gregg_____     DATE:____10/17/85_____

cc:  Personnel File
     Central File
     Mr. Powell

**Support Personnel Evaluation Form**
**J.F. Ingram State Technical College**

Employee: _____Givens, Julie_____          Date: ___July 15, 1998___

Position/Title: __Fiscal Division Secretary and Administrative Assistant__

*The following items should be rated "as is" or "with comment" by the evaluator. Comments may be either positive or negative as needed. Employees may also request a "with comment" rating in order to make their own comments about specific items on this evaluation.*

| Meets standard as is | With comment | | |
|---|---|---|---|
| (✓) | ( ) | 1. | Adheres to institutional policies, practices, and procedures. |
| (✓) | ( ) | 2. | Utilizes good housekeeping or maintenance practices in the workplace. |
| (✓) | ( ) | 3. | Works required days. Does not create problems by using excessive amounts of leave. |
| (✓) | ( ) | 4. | Works required hours. Not habitually tardy. Does not leave early. |
| (✓) | ( ) | 5. | Stays on task. Does not waste time on socializing or personal phone calls. |
| ( ) | (✓) | 6. | Work performed is of acceptable quality. |
| (✓) | ( ) | 7. | Communicates effectively, orally and in written form. |
| ( ) | (✓) | 8. | Develops and maintains appropriate and efficient working relationships with coworkers. |
| ( ) | (✓) | 9. | Cooperates with dean/supervisor, accepts directions and receives assignments willingly. |
| (✓) | ( ) | 10. | Participates in appropriate professional development activities. |

1

# EMPLOYMENT INTERVIEW ANALYSIS

_'s address

'elephone #

me of interviewer
_Fanklie Powell_

'tes of any previous interviews | Date of this interview

The purpose of this analysis is to organize the recording of information collected during the interview and to assist in evaluating and comparing different applicants when interviews are completed.

It will be most effective if prepared immediately after the interview when memory is fresh. The analysis may also be referred to during the interview as a reminder of basic areas to discuss with the applicant.

Name of applicant _Julia Gwin_    Position applied for _Sec Res_

| TRAITS | UNSATISFACTORY | SOME DEFICIENCIES EVIDENT | SATISFACTORY | EXCEPTIONAL | CLEARLY OUTSTANDING | INSERT RATING (0 through 4) |
|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 4 | |
| KNOWLEDGE OF SPECIFIC JOB AND JOB-RELATED TOPICS | No knowledge evident. | Less than we would prefer. | Meets our requirements for hiring. | Exceeds our expectations of average candidate. | Thoroughly versed in job and very strong in associated areas. | 1 |
| EXPERIENCE | None for this job nor any related experience. | Would prefer more for this job. | Adequate for job applied for. | More than adequate. Has some experience in related areas. | Totally experienced in job. Has strong experience in related areas. | 2 |
| COMMUNICATION ABILITY | Could not communicate. Will be severely impaired in most jobs. | Some difficulties. Will detract from job performance. | Sufficient for adequate job performance. | More than sufficient for job. | Outstanding ability to communicate. | 2 |
| INTEREST IN POSITION AND OUR ORGANIZATION | Showed no interest. | Some lack of interest. | Appeared genuinely interested. | Very interested. Seems to prefer type of work applied for. | Totally absorbed with job content. Conveys feeling only this job will do. | 2 |
| OVERALL MOTIVATION TO SUCCEED | None exhibited. No concern for personal future. | Not up to average level. Shows little desire to succeed. | Average desire to succeed. | Highly motivated. Wants to succeed and advance. | Extremely motivated. Has very strong compulsion to succeed. | 2 |
| APPEARANCE AND HABITS In evaluating, consider the position applied for | Very sloppy in appearance or unacceptably dressed; or unacceptable personal habits. | Dress or grooming less than satisfactory; or some offensive personal habits. | Properly dressed and groomed. Few poor personal habits. | Very well dressed and groomed. No offensive habits. | Presented excellent appearance, maintained high level of behavior throughout interview. | 3 |
| POISE | Appeared extremely distracted and confused; or unreasonably uneven temper. | Sufficient display of confusion or loss of temper to interfere with job performance. | Sufficient poise to perform job applied for. | No loss of poise during interview. Inspires confidence in ability to handle pressure. | Displayed impressive poise under stress. Appears unusually confident and secure. | 2 |
| INSIGHT AND ALERTNESS | Did not understand many points or concepts. | Missed some concepts or ideas. | Understood most new ideas and shifts in discussion points | Grasped all new points and concepts quickly. | Extremely sharp. Understood subtle points and underlying motives. Quick grasp of ideas. Strong insight. | 2 |
| PERSONALITY valuate in relation to ɪ ɪ position applied for | Not acceptable for job. | Some deficiencies. | Within satisfactory range for job. | Good personality for job. Some traits considered especially desirable. | Perfect for job. Generally outstanding personality as well. | 2 |

# EMPLOYMENT INTERVIEW ANALYSIS

Applicant's address

Telephone #

*Mulder*

Name of interviewer

Date of any previous interviews | Date of this interview

The purpose of this analysis is to organize the recording of information collected during the interview and to assist in evaluating and comparing different applicants when interviews are completed.

It will be most effective if prepared immediately after the interview when memory is fresh. The analysis may also be referred to during the interview as a reminder of basic areas to discuss with the applicant.

*Givens*

Name of applicant

*Rec./Recp.*

Position applied for

| TRAITS | UNSATISFACTORY | SOME DEFICIENCIES EVIDENT | SATISFACTORY | EXCEPTIONAL | CLEARLY OUTSTANDING | INSERT RATING (0 through 4) |
|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 4 | |
| KNOWLEDGE OF SPECIFIC JOB AND JOB-RELATED TOPICS | No knowledge evident. | Less than we would prefer. | Meets our requirements for hiring. | Exceeds our expectations of average candidate. | Thoroughly versed in job and very strong in associated areas. | 2 |
| EXPERIENCE | None for this job nor any related experience. | Would prefer more for this job. | Adequate for job applied for. | More than adequate. Has some experience in related areas. | Totally experienced in job. Has strong experience in related areas. | 2 |
| COMMUNICATION ABILITY | Could not communicate. Will be severely impaired in most jobs. | Some difficulties. Will detract from job performance. | Sufficient for adequate job performance. | More than sufficient for job. | Outstanding ability to communicate. | 2 |
| INTEREST IN POSITION AND OUR ORGANIZATION | Showed no interest. | Some lack of interest. | Appeared genuinely interested. | Very interested. Seems to prefer type of work applied for. | Totally absorbed with job content. Conveys feeling only this job will do. | 2 |
| OVERALL MOTIVATION TO SUCCEED | None exhibited. No concern for personal future. | Not up to average level. Shows little desire to succeed. | Average desire to succeed. | Highly motivated. Wants to succeed and advance. | Extremely motivated. Has very strong compulsion to succeed. | 2 |
| APPEARANCE AND HABITS In evaluating, consider the position applied for | Very sloppy in appearance or unacceptably dressed; or unacceptable personal habits. | Dress or grooming less than satisfactory; or some offensive personal habits. | Properly dressed and groomed. Few poor personal habits. | Very well dressed and groomed. No offensive habits. | Presented excellent appearance, maintained high level of behavior throughout interview. | 2 |
| POISE | Appeared extremely distracted and confused; or unreasonably uneven temper. | Sufficient display of confusion or loss of temper to interfere with job performance. | Sufficient poise to perform job applied for. | No loss of poise during interview. Inspires confidence in ability to handle pressure. | Displayed impressive poise under stress. Appears unusually confident and secure. | 2 |
| INSIGHT AND ALERTNESS | Did not understand many points or concepts. | Missed some concepts or ideas. | Understood most new ideas and shifts in discussion points. | Grasped all new points and concepts quickly. | Extremely sharp. Understood subtle points and underlying motives. Quick grasp of ideas. Strong insight. | 2 |
| PERSONALITY Evaluate in relation to the position applied for | Not acceptable for job. | Some deficiencies. | Within satisfactory range for job. | Good personality for job. Some traits considered especially desirable. | Perfect for job. Generally outstanding personality as well. | 2 |

# EMPLOYMENT INTERVIEW ANALYSIS

Applicant's address

Telephone #

_m̃  v̄_

Name of interviewer

Date of any previous interviews | Date of this interview

The purpose of this analysis is to organize the recording of information collected during the interview and to assist in evaluating and comparing different applicants when interviews are completed.

It will be most effective if prepared immediately after the interview when memory is fresh. The analysis may also be referred to during the interview as a reminder of basic areas to discuss with the applicant.

_Mrs. Owens_

Name of applicant | Position applied for

| TRAITS | UNSATISFACTORY | SOME DEFICIENCIES EVIDENT | SATISFACTORY | EXCEPTIONAL | CLEARLY OUTSTANDING | INSERT RATING (0 through 4) |
|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 4 | |
| KNOWLEDGE OF SPECIFIC JOB AND JOB-RELATED TOPICS | No knowledge evident. | Less than we would prefer. | Meets our requirements for hiring. ✓ | Exceeds our expectations of average candidate. | Thoroughly versed in job and very strong in associated areas. | |
| EXPERIENCE | None for this job nor any related experience. | Would prefer more for this job. | Adequate for job applied for. | More than adequate. Has some experience in related areas. | Totally experienced in job. Has strong experience in related areas. | |
| COMMUNICATION ABILITY | Could not communicate. Will be severely impaired in most jobs. | Some difficulties. Will detract from job performance. | Sufficient for adequate job performance. | More than sufficient for job. ✓ | Outstanding ability to communicate. | |
| INTEREST IN POSITION AND OUR ORGANIZATION | Showed no interest. | Some lack of interest. | Appeared genuinely interested. | Very interested. Seems to prefer type of work applied for. | Totally absorbed with job content. Conveys feeling only this job will do. | |
| OVERALL MOTIVATION TO SUCCEED | None exhibited. No concern for personal future. | Not up to average level. Shows little desire to succeed. | Average desire to succeed. | Highly motivated. Wants to succeed and advance. ✓ | Extremely motivated. Has very strong compulsion to succeed. | |
| APPEARANCE AND HABITS In evaluating, consider the position applied for | Very sloppy in appearance or unacceptably dressed; or unacceptable personal habits. | Dress or grooming less than satisfactory; or some offensive personal habits. | Properly dressed and groomed. Few poor personal habits. | Very well dressed and groomed. No offensive habits. | Presented excellent appearance, maintained high level of behavior throughout interview. | |
| POISE | Appeared extremely distracted and confused; or unreasonably uneven temper. | Sufficient display of confusion or loss of temper to interfere with job performance. | Sufficient poise to perform job applied for. | No loss of poise during interview. Inspires confidence in ability to handle pressure. ✓ | Displayed impressive poise under stress. Appears unusually confident and secure. | |
| INSIGHT AND ALERTNESS | Did not understand many points or concepts. | Missed some concepts or ideas. | Understood most new ideas and shifts in discussion points. | Grasped all new points and concepts quickly. ✓ | Extremely sharp. Understood subtle points and underlying motives. Quick grasp of ideas. Strong insight. | |
| PERSONALITY Evaluate in relation to the position applied for | Not acceptable for job. | Some deficiencies. | Within satisfactory range for job. | Good personality for job. Some traits considered especially desirable. | Perfect for job. Generally outstanding personality as well. | |





# J. F. INGRAM STATE TECHNICAL COLLEGE
P O. BOX 209
DEATSVILLE. ALABAMA 36022
Phone. 285-5177

September 16, 1985

Murry C. Gregg, Ed D
PRESIDENT

J. M Mulder
DEAN OF INSTRUCTION

Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

---

MEMORANDUM

TO:        Mrs. Julie Givens

FROM:      Dr. Murry C. Gregg, President

SUBJECT:   Evaluation Form JFI-H-10B REVISED 4/84

Attached is annual Evaluation Form which you should complete and return to your immediate supervisor by Wednesday, September 25, 1985.

Thank you for your attention to this matter.

MCG:shm

Attachment - 1

cc: Mr. Freddie Powell

DATE:        January 3, 1985

SUBJECT:    Interview with Mrs. Julie Kay Givens for Receptionist/
            Secretarial position.

PRESENT:    Dr. Gregg, Mr. Mulder, Mr. Powell, and Mrs. Murphree


        Dr. Gregg explained about the position opening,
stating that some specific duties would be handling of all out-
going and in-coming calls, and handlingWork Orders.  He explained
to her about the students, the school, programs, duty hours,
Teachers Retirement, hospital insurance.

        Dr. Gregg asked her about her shorthand skills.
Mrs. Givens said that she has not used shorthand since high
school.

        Mrs. Givens said that her husband is employed by
Rheem Manufacturing Company in Montgomery and said that
she has one child (age 20 months).  She said that they live
on Holland Road.  She said that she would have no reservations
about working around inmates.

        Dr. Gregg told her that the beginning salary will
be $10,272.

        Mrs. Givens said that she is a hard worker and
is willing to do any type work that she is taught how to do.

        Dr. Gregg told her that he hoped a decision could
be made today and if she was the one selected that she would
be getting a call.  Mrs. Murphree asked if it would be all right
to check with her current employer  if she was seriously considered
for the position.  She replied that it would be all right to check
with her supervisor.

                    Recorded by: _Sylvia H. Murphree_
                                 (Mrs.) Sylvia H. Murphree

NOTE:  On this date, I called Mrs. Grace Coggins, Mrs. Givens'
supervisor at Maxwell-Gunter Federal Credit Union.  Mrs. Coggins
had no reservations about Mrs. Givens' ability.  She said that
the quantity and quality of her work is very good.  She said
that she works without supervision - that once she is shown
how to do something that she is able to do it without asking
a lot of questions.  She said that she gets along well with other
employees and said that when she (Mrs. Coggins) is out that
Mrs. Givens supervises the other employees and does her work.
She said that she can relax and enjoy taking time away because
she knows that her work will be up-to-date when she returns.
She said that she would hate very much to lose Mrs. Givens
but would certainly not stand in her way.  Mrs. Coggins also
said that Mrs. Givens is dependable, has good attendance, and
is punctual.

FORM JFI-H-10B, REVISED April, 1984

## SUPPORT PERSONNEL EVALUATION FORM

### J. F. INGRAM STATE TECHNICAL COLLEGE

EMPLOYEE NAME: **Julie K. Givens**            DATE: **July, 1995**

RATING FACTOR:    1 through 5

(a) = 1 Point  (Unsatisfactory)
(b) = 2 Points (Improvement Needed)
(c) = 3 Points (Average)
(d) = 4 Points (Strong)
(e) = 5 Points (Superior)

|  | RATING | |
|---|---|---|
|  | Employee | Supervisor |

I.  QUALITY OF WORK - The extent to which the employee accurately completes job assignments.    **e** | **e**

(a) Almost always makes errors; has very low accuracy.
(b) Quite often makes errors.
(c) Makes errors but equals job standards.
(d) Once in a while makes errors; has high accuracy.
(e) Almost never makes errors; has very high accuracy.
COMMENTS: _____

II. QUANTITY OF WORK - The extent to which the employee produces a volume of work consistent with established standards for the job.    **e** | **e**

(a) Almost never meets performance expectations.
(b) Quite often does not meet performance expectations.
(c) Volume of work is satisfactory; equals job expectations.
(d) Quite often produces more than expected.
(e) Almost always exceeds standards; exceptionally productive.
COMMENTS: _____

III. USE OF WORK TIME - How efficiently the employee uses time to accomplish job tasks (for example, does not wait until the last minute to work on a project.)    **e** | **e**

(a) Quite often wastes time, at nearly every opportunity; neglects assignments.
(b) Occasionally wastes time; procrastinates; or leaves early.
(c) Makes adequate use of time; infrequently idle; and seldom leaves early.
(d) Utilizes time wisely and almost never leaves early.
(e) Exceptionally prudent in use of time; hard worker; team worker.
COMMENTS: _____

FORM JFI-H-10B, REVISED   ril, 1984
Page #2

RATING
Employee    Supervisor

IV.  PUNCTUALITY    -  The extent to which the employee is
     AT WORK            on time for work (except for excused
                        reasons).

                                                            d         d

     (a)  Seldom, if ever on time; habitually late.
     (b)  Occasionally on time.
     (c)  Seldom late.
     (d)  Late on rare occasions.
     (e)  Always on time, never late.
          COMMENTS: _____.

V.   COMMUNICATION   -  The degree of effectiveness with which
     EFFECTIVENESS      the employee communicates orally and/or
                        in writing.                         e         e

     (a)  Unable to express thoughts clearly; lacks
          organization.
     (b)  Expresses thoughts satisfactorily on routine matters.
     (c)  Usually organizes and expresses thoughts clearly and
          concisely.
     (d)  Consistently able to express ideas clearly.
     (e)  Excellent ability to communicate ideas to others.
          COMMENTS: _____.

VI.  RELATIONSHIPS   -  The extent to which the employee
     WITH CO-WORKERS     establishes good relations with co-
                         workers (for example, being a good
                         team worker, being tactful and
                         courteous with co-workers.          d         d

     (a)  Does not get along well with people; shows a
          pronounced tendency to be inflexible, intolerant,
          or opinionated.
     (b)  Has difficulty in getting along with co-workers;
          is unduly blunt and direct with co-workers.
     (c)  Gets along with people adequately; has average
          skill in maintaining good human relations.
     (d)  Above average skills in human relations; has the
          degree of tact and sensitivity necessary for the
          establishment and maintenance of good interpersonal
          relations with other members of staff.

VII. DEMONSTRATES    -  Demonstrates responsibility and
     RESPONSIBILITY     initiative in assigned area of
                        responsibility and initiates
                        positive activity without being
                        reminded by supervisor and/or
                        administration.                      e         e

     (a)  Quite often must be reminded to initiate activity.
     (b)  Occasionally has to be reminded.
     (c)  Infrequently fails to initiate needed activity.
     (d)  Almost never has to be reminded to initiate activity.
     (e)  Exceptionally responsible in seeing that needs of the
          institution are completed on a timely basis.
          COMMENTS: _____.

FORM JFI-H-10B, REVISED A 1, 1984
Page #3

RATING
Employee Supervisor

VIII.  CONTRIBUTES TO  - How effectively the employee assists
       TEAM EFFORT          others in completing projects and
                            activities for benefit of institu-
                            tion without being asked and/or
                            reminded.

*e*        *e*

(a) Quite often must be asked, shows lack of cooperation.
(b) Occasionally has to be reminded.
(c) Rarely has to be asked or reminded.
(d) Almost never has to be reminded.
(e) Exceptionally responsible to needs of co-workers and
    never has to be asked or reminded to assist with
    projects and activities.
COMMENTS: _____.

TOTAL POINTS:                      BY EMPLOYEE      *38*

                                   BY SUPERVISOR    *38*

RATINGS (for eight factors)

Superior          33 - 39
Strong            25 - 32
Average           17 - 24
Improvement Needed 9 - 16
Unsatisfactory     1 -  8

SUGGESTIONS FOR IMPROVEMENT: *Mrs. Givens is a valuable
part of our department!*

Signed: *Monica J. Greene*
        Supervisor

EMPLOYEE'S STATEMENT (Optional): *Good leadership makes the
difference.*

Signed: *Julie K Givens*
        Employee

FORM JFI-H-10B, REVISED A, 11, 1984                           Page 1 of 3

## SUPPORT PERSONNEL EVALUATION FORM

### J. F. INGRAM STATE TECHNICAL COLLEGE

EMPLOYEE NAME: _Julie K. Givens_          DATE: _4/20/94_

RATING FACTOR:   1 through 5

```
(a) = 1 Point  (Unsatisfactory)
(b) = 2 Points (Improvement Needed)
(c) = 3 Points (Average)
(d) = 4 Points (Strong)
(e) = 5 Points (Superior)
```

|  | RATING | |
|---|---|---|
|  | Employee | Supervisor |

I.  **QUALITY OF WORK** - The extent to which the employee accurately completes job assignments.    _e_  |  _e_

```
(a) Almost always makes errors; has very low accuracy.
(b) Quite often makes errors.
(c) Makes errors but equals job standards.
(d) Once in a while makes errors; has high accuracy.
(e) Almost never makes errors; has very high accuracy.
    COMMENTS: _____
```

II.  **QUANTITY OF WORK** - The extent to which the employee produces a volume of work consistent with established standards for the job.    _e_  |  _e_

```
(a) Almost never meets performance expectations.
(b) Quite often does not meet performance expectations.
(c) Volume of work is satisfactory; equals job
    expectations.
(d) Quite often produces more than expected.
(e) Almost always exceeds standards; exceptionally
    productive.
    COMMENTS: _____
```

III. **USE OF WORK TIME** - How efficiently the employee uses time to accomplish job tasks (for example, does not wait until the last minute to work on a project.)    _e_  |  _e_

```
(a) Quite often wastes time, at nearly every opportunity;
    neglects assignments.
(b) Occasionally wastes time; procrastinates; or leaves
    early.
(c) Makes adequate use of time; infrequently idle; and
    seldom leaves early.
(d) Utilizes time wisely and almost never leaves early.
(e) Exceptionally prudent in use of time; hard worker;
    team worker.
    COMMENTS: _____
```

FORM JFI-H-10B, <u>REVISED</u>    -il, 1984
Page #2

RATING
Employee   Supervisor

IV.  <u>PUNCTUALITY</u>       -  The extent to which the employee is
     <u>AT WORK</u>             on time for work (except for excused
                          reasons).

     (a)  Seldom, if ever on time; habitually late.
     (b)  Occasionally on time.
     (c)  Seldom late.
     (d)  Late on rare occasions.
     (e)  Always on time, never late.
          COMMENTS: _____.

V.   <u>COMMUNICATION</u>      -  The degree of effectiveness with which
     <u>EFFECTIVENESS</u>         the employee communicates orally and/or
                          in writing.

     (a)  Unable to express thoughts clearly; lacks
          organization.
     (b)  Expresses thoughts satisfactorily on routine matters.
     (c)  Usually organizes and expresses thoughts clearly and
          concisely.
     (d)  Consistently able to express ideas clearly.
     (e)  Excellent ability to communicate ideas to others.
          COMMENTS: _____.

VI.  <u>RELATIONSHIPS</u>      -  The extent to which the employee
     <u>WITH CO-WORKERS</u>       establishes good relations with co-
                          workers (for example, being a good
                          team worker, being tactful and
                          courteous with co-workers.

     (a)  Does not get along well with people; shows a
          pronounced tendency to be inflexible, intolerant,
          or opinionated.
     (b)  Has difficulty in getting along with co-workers;
          is unduly blunt and direct with co-workers.
     (c)  Gets along with people adequately; has average
          skill in maintaining good human relations.
     (d)  Above average skills in human relations; has the
          degree of tact and sensitivity necessary for the
          establishment and maintenance of good interpersonal
          relations with other members of staff.

VII. <u>DEMONSTRATES</u>       -  Demonstrates responsibility and
     <u>RESPONSIBILITY</u>        initiative in assigned area of
                          responsibility and initiates
                          positive activity without being
                          reminded by supervisor and/or
                          administration.

     (a) Quite often must be reminded to initiate activity.
     (b) Occasionally has to be reminded.
     (c) Infrequently fails to initiate needed activity.
     (d) Almost never has to be reminded to initiate activity.
     (e) Exceptionally responsible in seeing that needs of the
         institution are completed on a timely basis.
         COMMENTS: _____.

FORM JFI-H-10B, REVISED Ap 1, 1984
Page #3

RATING
Employee Supervisor

VIII.  CONTRIBUTES TO    - How effectively the employee assists
       TEAM EFFORT          others in completing projects and
                            activities for benefit of institu-
                            tion without being asked and/or
                            reminded.

(a) Quite often must be asked, shows lack of cooperation.
(b) Occasionally has to be reminded.
(c) Rarely has to be asked or reminded.
(d) Almost never has to be reminded.
(e) Exceptionally responsible to needs of co-workers and
    never has to be asked or reminded to assist with
    projects and activities.
    COMMENTS: _____.

TOTAL POINTS:                          BY EMPLOYEE      38

                                       BY SUPERVISOR    38

                    RATINGS (for eight factors)

                    Superior          33 - 39
                    Strong            25 - 32
                    Average           17 - 24
                    Improvement Needed  9 - 16
                    Unsatisfactory      1 - 8

SUGGESTIONS FOR IMPROVEMENT: _____

_____

_____

_____

                    Signed: _____
                            Supervisor

EMPLOYEE'S STATEMENT (Optional): _____

_____

_____

_____

                    Signed: _____
                            Employee

FORM JFI-H-10B, REVISED / il, 1984                                    Page 1 of 3

## SUPPORT PERSONNEL EVALUATION FORM

J. F. INGRAM STATE TECHNICAL COLLEGE

EMPLOYEE NAME: __Mrs. Julie Kay Givens__          DATE: __June, 1993__

RATING FACTOR:   1 through 5

(a) = 1 Point  (Unsatisfactory)
(b) = 2 Points (Improvement Needed)
(c) = 3 Points (Average)
(d) = 4 Points (Strong)
(e) = 5 Points (Superior)

|  | RATING | |
|---|---|---|
|  | Employee | Supervisor |

I.  QUALITY OF WORK - The extent to which the employee
                     accurately completes job assignments.          *e*

(a) Almost always makes errors; has very low accuracy.
(b) Quite often makes errors.
(c) Makes errors but equals job standards.
(d) Once in a while makes errors; has high accuracy.
(e) Almost never makes errors; has very high accuracy.
COMMENTS: _____

II. QUANTITY OF WORK - The extent to which the employee
                      produces a volume of work consistent
                      with established standards for the
                      job.                                          *e*

(a) Almost never meets performance expectations.
(b) Quite often does not meet performance expectations.
(c) Volume of work is satisfactory; equals job
    expectations.
(d) Quite often produces more than expected.
(e) Almost always exceeds standards; exceptionally
    productive.
COMMENTS: _____

III. USE OF WORK TIME - How efficiently the employee uses
                       time to accomplish job tasks (for
                       example, does not wait until the
                       last minute to work on a project.)           *e*

(a) Quite often wastes time, at nearly every opportunity;
    neglects assignments.
(b) Occasionally wastes time; procrastinates; or leaves
    early.
(c) Makes adequate use of time; infrequently idle; and
    seldom leaves early.
(d) Utilizes time wisely and almost never leaves early.
(e) Exceptionally prudent in use of time; hard worker;
    team worker.
COMMENTS: _____

FORM JFI-H-10B, <u>REVISED</u>  ' ril, 1984                    Page 2 of 3
Page #2

RATING
Employee  Supervisor

IV.  <u>PUNCTUALITY</u>     - The extent to which the employee is
     <u>AT WORK</u>          on time for work (except for excused
                          reasons).                                      d

     (a)  Seldom, if ever on time; habitually late.
     (b)  Occasionally on time.
     (c)  Seldom late.
     (d)  Late on rare occasions.
     (e)  Always on time, never late.
          COMMENTS: _____.

V.   <u>COMMUNICATION</u>   - The degree of effectiveness with which
     <u>EFFECTIVENESS</u>     the employee communicates orally and/or
                          in writing.                                    e

     (a)  Unable to express thoughts clearly; lacks
          organization.
     (b)  Expresses thoughts satisfactorily on routine matters.
     (c)  Usually organizes and expresses thoughts clearly and
          concisely.
     (d)  Consistently able to express ideas clearly.
     (e)  Excellent ability to communicate ideas to others.
          COMMENTS: _____.

VI.  <u>RELATIONSHIPS</u>   - The extent to which the employee
     <u>WITH CO-WORKERS</u>   establishes good relations with co-
                          workers (for example, being a good
                          team worker, being tactful and                 d
                          courteous with co-workers.

     (a)  Does not get along well with people; shows a
          pronounced tendency to be inflexible, intolerant,
          or opinionated.
     (b)  Has difficulty in getting along with co-workers;
          is unduly blunt and direct with co-workers.
     (c)  Gets along with people adequately; has average
          skill in maintaining good human relations.
     (d)  Above average skills in human relations; has the
          degree of tact and sensitivity necessary for the
          establishment and maintenance of good interpersonal
          relations with other members of staff.

VII. <u>DEMONSTRATES</u>    - Demonstrates responsibility and
     <u>RESPONSIBILITY</u>    initiative in assigned area of
                          responsibility and initiates
                          positive activity without being
                          reminded by supervisor and/or                  e
                          administration.

     (a) Quite often must be reminded to initiate activity.
     (b) Occasionally has to be reminded.
     (c) Infrequently fails to initiate needed activity.
     (d) Almost never has to be reminded to initiate activity.
     (e) Exceptionally responsible in seeing that needs of the
         institution are completed on a timely basis.
         COMMENTS: _____.

Case 2:06-cv-00852-ID-SRW    Document 11-3    Filed 09/19/2007    Page 71 of 133
Page 3 of 3

```
                                                    RATING
                                            Employee Supervisor
```

VIII.   <u>CONTRIBUTES TO</u>  - How effectively the employee assists
        <u>TEAM EFFORT</u>       others in completing projects and
                               activities for benefit of institu-
                               tion without being asked and/or
                               reminded.                                    _e_ |

(a) Quite often must be asked, shows lack of cooperation.
(b) Occasionally has to be reminded.
(c) Rarely has to be asked or reminded.
(d) Almost never has to be reminded.
(e) Exceptionally responsible to needs of co-workers and
    never has to be asked or reminded to assist with
    projects and activities.
    COMMENTS: _____.

        TOTAL POINTS:                          BY EMPLOYEE    _38_

                                               BY SUPERVISOR  _____

                    RATINGS (for eight factors)

                    Superior            33 - 39
                    Strong              25 - 32
                    Average             17 - 24
                    Improvement Needed   9 - 16
                    Unsatisfactory       1 -  8

SUGGESTIONS FOR IMPROVEMENT: _____

_____

_____

_____

                    Signed: _____
                            Supervisor

EMPLOYEE'S STATEMENT (Optional): _____

_____

_____

_____

                    Signed: _____
                            Employee

FORM JFI-H-10B, REVISED A, 1, 1984                          Page 1 of 3

## SUPPORT PERSONNEL EVALUATION FORM

### J. F. INGRAM STATE TECHNICAL COLLEGE

EMPLOYEE NAME:    **Julie K. Givens**                DATE:  **May, 1992**

RATING FACTOR:    1 through 5

(a) = 1 Point  (Unsatisfactory)
(b) = 2 Points (Improvement Needed)
(c) = 3 Points (Average)
(d) = 4 Points (Strong)
(e) = 5 Points (Superior)

RATING
Employee  Supervisor

I.   QUALITY OF WORK - The extent to which the employee
                        accurately completes job assignments.          e        ✓

(a) Almost always makes errors; has very low accuracy.
(b) Quite often makes errors.
(c) Makes errors but equals job standards.
(d) Once in a while makes errors; has high accuracy.
(e) Almost never makes errors; has very high accuracy.
    COMMENTS: _____

II.  QUANTITY OF WORK - The extent to which the employee
                        produces a volume of work consistent
                        with established standards for the
                        job.                                           e        ✓

(a) Almost never meets performance expectations.
(b) Quite often does not meet performance expectations.
(c) Volume of work is satisfactory; equals job
    expectations.
(d) Quite often produces more than expected.
(e) Almost always exceeds standards; exceptionally
    productive.
    COMMENTS: _____

III. USE OF WORK TIME - How efficiently the employee uses
                        time to accomplish job tasks (for
                        example, does not wait until the
                        last minute to work on a project.)             d        ✓

(a) Quite often wastes time, at nearly every opportunity;
    neglects assignments.
(b) Occasionally wastes time; procrastinates; or leaves
    early.
(c) Makes adequate use of time; infrequently idle; and
    seldom leaves early.
(d) Utilizes time wisely and almost never leaves early.
(e) Exceptionally prudent in use of time; hard worker;
    team worker.
    COMMENTS: _____

RATING
Employee  Supervisor

IV.  PUNCTUALITY     - The extent to which the employee is
     AT WORK           on time for work (except for excused
                       reasons).

     (a)  Seldom, if ever on time; habitually late.
     (b)  Occasionally on time.
     (c)  Seldom late.
     (d)  Late on rare occasions.
     (e)  Always on time, never late.
          COMMENTS: _____.

V.   COMMUNICATION   - The degree of effectiveness with which
     EFFECTIVENESS     the employee communicates orally and/or
                       in writing.

     (a)  Unable to express thoughts clearly; lacks
          organization.
     (b)  Expresses thoughts satisfactorily on routine matters.
     (c)  Usually organizes and expresses thoughts clearly and
          concisely.
     (d)  Consistently able to express ideas clearly.
     (e)  Excellent ability to communicate ideas to others.
          COMMENTS: _____.

VI.  RELATIONSHIPS   - The extent to which the employee
     WITH CO-WORKERS   establishes good relations with co-
                       workers (for example, being a good
                       team worker, being tactful and
                       courteous with co-workers.

     (a)  Does not get along well with people; shows a
          pronounced tendency to be inflexible, intolerant,
          or opinionated.
     (b)  Has difficulty in getting along with co-workers;
          is unduly blunt and direct with co-workers.
     (c)  Gets along with people adequately; has average
          skill in maintaining good human relations.
     (d)  Above average skills in human relations; has the
          degree of tact and sensitivity necessary for the
          establishment and maintenance of good interpersonal
          relations with other members of staff.

VII. DEMONSTRATES    - Demonstrates responsibility and
     RESPONSIBILITY    initiative in assigned area of
                       responsibility and initiates
                       positive activity without being
                       reminded by supervisor and/or
                       administration.

     (a) Quite often must be reminded to initiate activity.
     (b) Occasionally has to be reminded.
     (c) Infrequently fails to initiate needed activity.
     (d) Almost never has to be reminded to initiate activity.
     (e) Exceptionally responsible in seeing that needs of the
         institution are completed on a timely basis.
         COMMENTS: _____.

FORM JFI-H-10B, REVISED Apr 1, 1984
Page #3

```
                                                  RATING
                                         Employee Supervisor
```

VIII.   <u>CONTRIBUTES TO</u>   - How effectively the employee assists
        <u>TEAM EFFORT</u>        others in completing projects and
                               activities for benefit of institu-
                               tion without being asked and/or
                               reminded.                          e    |    ✓

(a) Quite often must be asked, shows lack of cooperation.
(b) Occasionally has to be reminded.
(c) Rarely has to be asked or reminded.
(d) Almost never has to be reminded.
(e) Exceptionally responsible to needs of co-workers and
    never has to be asked or reminded to assist with
    projects and activities.
    COMMENTS: _____.

TOTAL POINTS:                              BY EMPLOYEE        37

                                           BY SUPERVISOR      ____

<u>RATINGS (for eight factors)</u>

Superior            33 - 39
Strong              25 - 32
Average             17 - 24
Improvement Needed   9 - 16
Unsatisfactory       1 -  8

SUGGESTIONS FOR IMPROVEMENT: _____

_____

_____

_____

                        Signed: _____
                                Supervisor

EMPLOYEE'S STATEMENT (Optional): _____

_____

_____

_____

                        Signed: ___Julie K Rivera_____
                                Employee

FORM JFI-H-10B, REVISED    il, 1984                                    Page 1 of 3

## SUPPORT PERSONNEL EVALUATION FORM

### J. F. INGRAM STATE TECHNICAL COLLEGE

EMPLOYEE NAME: _Julie Givens_                    DATE: _5/29/91_

RATING FACTOR:   1 through 5

```
(a) = 1 Point  (Unsatisfactory)
(b) = 2 Points (Improvement Needed)
(c) = 3 Points (Average)
(d) = 4 Points (Strong)
(e) = 5 Points (Superior)
```

|  | RATING Employee | Supervisor |
|---|---|---|
| I.  QUALITY OF WORK - The extent to which the employee accurately completes job assignments. | E | ✓ |

```
(a) Almost always makes errors; has very low accuracy.
(b) Quite often makes errors.
(c) Makes errors but equals job standards.
(d) Once in a while makes errors; has high accuracy.
(e) Almost never makes errors; has very high accuracy.
    COMMENTS: _____
```

| II.  QUANTITY OF WORK - The extent to which the employee produces a volume of work consistent with established standards for the job. | E | ✓ |
|---|---|---|

```
(a) Almost never meets performance expectations.
(b) Quite often does not meet performance expectations.
(c) Volume of work is satisfactory; equals job
    expectations.
(d) Quite often produces more than expected.
(e) Almost always exceeds standards; exceptionally
    productive.
    COMMENTS: _____
```

| III.  USE OF WORK TIME - How efficiently the employee uses time to accomplish job tasks (for example, does not wait until the last minute to work on a project.) | E | ✓ |
|---|---|---|

```
(a) Quite often wastes time, at nearly every opportunity;
    neglects assignments.
(b) Occasionally wastes time; procrastinates; or leaves
    early.
(c) Makes adequate use of time; infrequently idle; and
    seldom leaves early.
(d) Utilizes time wisely and almost never leaves early.
(e) Exceptionally prudent in use of time; hard worker;
    team worker.
    COMMENTS: _____
```

FORM JFT-H-10B, REVISED April, 1984
Page #2

RATING
Employee   Supervisor

IV.  PUNCTUALITY      - The extent to which the employee is
     AT WORK            on time for work (except for excused
                        reasons).

     (a)  Seldom, if ever on time; habitually late.
     (b)  Occasionally on time.
     (c)  Seldom late.
     (d)  Late on rare occasions.
     (e)  Always on time, never late.
          COMMENTS: _____.

V.   COMMUNICATION    - The degree of effectiveness with which
     EFFECTIVENESS       the employee communicates orally and/or
                         in writing.

     (a)  Unable to express thoughts clearly; lacks
          organization.
     (b)  Expresses thoughts satisfactorily on routine matters.
     (c)  Usually organizes and expresses thoughts clearly and
          concisely.
     (d)  Consistently able to express ideas clearly.
     (e)  Excellent ability to communicate ideas to others.
          COMMENTS: _____.

VI.  RELATIONSHIPS    - The extent to which the employee
     WITH CO-WORKERS     establishes good relations with co-
                         workers (for example, being a good
                         team worker, being tactful and
                         courteous with co-workers.

     (a)  Does not get along well with people; shows a
          pronounced tendency to be inflexible, intolerant,
          or opinionated.
     (b)  Has difficulty in getting along with co-workers;
          is unduly blunt and direct with co-workers.
     (c)  Gets along with people adequately; has average
          skill in maintaining good human relations.
     (d)  Above average skills in human relations; has the
          degree of tact and sensitivity necessary for the
          establishment and maintenance of good interpersonal
          relations with other members of staff.

VII. DEMONSTRATES     - Demonstrates responsibility and
     RESPONSIBILITY     initiative in assigned area of
                        responsibility and initiates
                        positive activity without being
                        reminded by supervisor and/or
                        administration.

     (a) Quite often must be reminded to initiate activity.
     (b) Occasionally has to be reminded.
     (c) Infrequently fails to initiate needed activity.
     (d) Almost never has to be reminded to initiate activity.
     (e) Exceptionally responsible in seeing that needs of the
         institution are completed on a timely basis.
         COMMENTS: _____.

Ratings handwritten in margin:
- IV: Employee = D, Supervisor = ✓
- V: Employee = E, Supervisor = ✓
- VI: Employee = D, Supervisor = ✓
- VII: Employee = E, Supervisor = ✓

RATING
Employee Supervisor

VIII. <u>CONTRIBUTES TO</u>  - How effectively the employee assists
      <u>TEAM EFFORT</u>       others in completing projects and
                             activities for benefit of institu-
                             tion without being asked and/or
                             reminded.

E   ✓

(a) Quite often must be asked, shows lack of cooperation.
(b) Occasionally has to be reminded.
(c) Rarely has to be asked or reminded.
(d) Almost never has to be reminded.
(e) Exceptionally responsible to needs of co-workers and
    never has to be asked or reminded to assist with
    projects and activities.
    COMMENTS: _____.

TOTAL POINTS:                    BY EMPLOYEE    38

                                 BY SUPERVISOR  _____

             RATINGS (for eight factors)

             Superior            33 - 39
             Strong              25 - 32
             Average             17 - 24
             Improvement Needed   9 - 16
             Unsatisfactory       1 -  8

SUGGESTIONS FOR IMPROVEMENT: _____

_____

_____

                    Signed: _____
                                      Supervisor

EMPLOYEE'S STATEMENT (Optional): _____

_____

_____

                    Signed: ___Julie K Givens_____
                                      Employee

FORM JFI-H-10B, REVISED April, 1984                                  Page 1 of 3

## SUPPORT PERSONNEL EVALUATION FORM

### J. F. INGRAM STATE TECHNICAL COLLEGE

EMPLOYEE NAME: __Julie K. Givens__                DATE: __July 5, 1990__

RATING FACTOR:   1 through 5

(a) = 1 Point  (Unsatisfactory)
(b) = 2 Points (Improvement Needed)
(c) = 3 Points (Average)
(d) = 4 Points (Strong)
(e) = 5 Points (Superior)

|  | RATING | |
| --- | --- | --- |
|  | Employee | Supervisor |

I.   QUALITY OF WORK - The extent to which the employee accurately completes job assignments.     | d | ✓ |

(a) Almost always makes errors; has very low accuracy.
(b) Quite often makes errors.
(c) Makes errors but equals job standards.
(d) Once in a while makes errors; has high accuracy.
(e) Almost never makes errors; has very high accuracy.
    COMMENTS: _____

II.  QUANTITY OF WORK - The extent to which the employee produces a volume of work consistent with established standards for the job.     | d | ✓ |

(a) Almost never meets performance expectations.
(b) Quite often does not meet performance expectations.
(c) Volume of work is satisfactory; equals job expectations.
(d) Quite often produces more than expected.
(e) Almost always exceeds standards; exceptionally productive.
    COMMENTS: _____

III. USE OF WORK TIME - How efficiently the employee uses time to accomplish job tasks (for example, does not wait until the last minute to work on a project.)     | d | ✓ |

(a) Quite often wastes time, at nearly every opportunity; neglects assignments.
(b) Occasionally wastes time; procrastinates; or leaves early.
(c) Makes adequate use of time; infrequently idle; and seldom leaves early.
(d) Utilizes time wisely and almost never leaves early.
(e) Exceptionally prudent in use of time; hard worker; team worker.
    COMMENTS: _____

RATING
Employee   Supervisor

IV.   PUNCTUALITY       -  The extent to which the employee is
      AT WORK              on time for work (except for excused
                           reasons).

      (a)  Seldom, if ever on time; habitually late.
      (b)  Occasionally on time.
      (c)  Seldom late.
      (d)  Late on rare occasions.
      (e)  Always on time, never late.
           COMMENTS: _____.

V.    COMMUNICATION     -  The degree of effectiveness with which
      EFFECTIVENESS        the employee communicates orally and/or
                           in writing.

      (a)  Unable to express thoughts clearly; lacks
           organization.
      (b)  Expresses thoughts satisfactorily on routine matters.
      (c)  Usually organizes and expresses thoughts clearly and
           concisely.
      (d)  Consistently able to express ideas clearly.
      (e)  Excellent ability to communicate ideas to others.
           COMMENTS: _____.

VI.   RELATIONSHIPS     -  The extent to which the employee
      WITH CO-WORKERS      establishes good relations with co-
                           workers (for example, being a good
                           team worker, being tactful and
                           courteous with co-workers.

      (a)  Does not get along well with people; shows a
           pronounced tendency to be inflexible, intolerant,
           or opinionated.
      (b)  Has difficulty in getting along with co-workers;
           is unduly blunt and direct with co-workers.
      (c)  Gets along with people adequately; has average
           skill in maintaining good human relations.
      (d)  Above average skills in human relations; has the
           degree of tact and sensitivity necessary for the
           establishment and maintenance of good interpersonal
           relations with other members of staff.

II.   DEMONSTRATES      -  Demonstrates responsibility and
      RESPONSIBILITY       initiative in assigned area of
                           responsibility and initiates
                           positive activity without being
                           reminded by supervisor and/or
                           administration.

      (a)  Quite often must be reminded to initiate activity.
      (b)  Occasionally has to be reminded.
      (c)  Infrequently fails to initiate needed activity.
      (d)  Almost never has to be reminded to initiate activity.
      (e)  Exceptionally responsible in seeing that needs of the
           institution are completed on a timely basis.
           COMMENTS: _____.

RATING
Employee Supervisor

VIII. CONTRIBUTES TO
TEAM EFFORT

- How effectively the employee assists
others in completing projects and
activities for benefit of institu-
tion without being asked and/or
reminded.

*e*          $\checkmark$

(a) Quite often must be asked, shows lack of cooperation.
(b) Occasionally has to be reminded.
(c) Rarely has to be asked or reminded.
(d) Almost never has to be reminded.
(e) Exceptionally responsible to needs of co-workers and
    never has to be asked or reminded to assist with
    projects and activities.
    COMMENTS: _____.

TOTAL POINTS:                      BY EMPLOYEE      35

                                   BY SUPERVISOR    35

RATINGS (for eight factors)

Superior              33 - 39
Strong                25 - 32
Average               17 - 24
Improvement Needed     9 - 16
Unsatisfactory         1 -  8

SUGGESTIONS FOR IMPROVEMENT: _____

_____

_____

_____

Signed: _____
        Supervisor

EMPLOYEE'S STATEMENT (Optional): _____

_____

_____

_____

Signed: _____
        Employee

## SUPPORT PERSONNEL EVALUATION FORM

### J. F. INGRAM STATE TECHNICAL COLLEGE

EMPLOYEE NAME: _Julie K. Givens_          DATE: _July 13, 1989_

RATING FACTOR:   1 through 5

(a) = 1 Point   (Unsatisfactory)
(b) = 2 Points  (Improvement Needed)
(c) = 3 Points  (Average)
(d) = 4 Points  (Strong)
(e) = 5 Points  (Superior)

RATING
Employee   Supervisor

I.   QUALITY OF WORK - The extent to which the employee accurately completes job assignments.   _D_ | _✓_

(a) Almost always makes errors; has very low accuracy.
(b) Quite often makes errors.
(c) Makes errors but equals job standards.
(d) Once in a while makes errors; has high accuracy.
(e) Almost never makes errors; has very high accuracy.
COMMENTS: _____

II.  QUANTITY OF WORK - The extent to which the employee produces a volume of work consistent with established standards for the job.   _D_ | _✓_

(a) Almost never meets performance expectations.
(b) Quite often does not meet performance expectations.
(c) Volume of work is satisfactory; equals job expectations.
(d) Quite often produces more than expected.
(e) Almost always exceeds standards; exceptionally productive.
COMMENTS: _____

III. USE OF WORK TIME - How efficiently the employee uses time to accomplish job tasks (for example, does not wait until the last minute to work on a project.)   _E_ | _✓_

(a) Quite often wastes time, at nearly every opportunity; neglects assignments.
(b) Occasionally wastes time; procrastinates; or leaves early.
(c) Makes adequate use of time; infrequently idle; and seldom leaves early.
(d) Utilizes time wisely and almost never leaves early.
(e) Exceptionally prudent in use of time; hard worker; team worker.
COMMENTS: _____

FORM JF1-H-10B, REVISED April, 1984
Page #2

RATING

| | Employee | Supervisor |
|---|---|---|

IV.  **PUNCTUALITY AT WORK**  — The extent to which the employee is on time for work (except for excused reasons).

(a)  Seldom, if ever on time; habitually late.
(b)  Occasionally on time.
(c)  Seldom late.
(d)  Late on rare occasions.
(e)  Always on time, never late.
     COMMENTS: _____.

Employee rating: D    Supervisor rating: ✓

V.  **COMMUNICATION EFFECTIVENESS**  — The degree of effectiveness with which the employee communicates orally and/or in writing.

Employee rating: E    Supervisor rating: ✓

(a)  Unable to express thoughts clearly; lacks organization.
(b)  Expresses thoughts satisfactorily on routine matters.
(c)  Usually organizes and expresses thoughts clearly and concisely.
(d)  Consistently able to express ideas clearly.
(e)  Excellent ability to communicate ideas to others.
     COMMENTS: _____.

VI.  **RELATIONSHIPS WITH CO-WORKERS**  — The extent to which the employee establishes good relations with co-workers (for example, being a good team worker, being tactful and courteous with co-workers.

(a)  Does not get along well with people; shows a pronounced tendency to be inflexible, intolerant, or opinionated.
(b)  Has difficulty in getting along with co-workers; is unduly blunt and direct with co-workers.
(c)  Gets along with people adequately; has average skill in maintaining good human relations.
(d)  Above average skills in human relations; has the degree of tact and sensitivity necessary for the establishment and maintenance of good interpersonal relations with other members of staff.

Employee rating: D    Supervisor rating: ✓

VII.  **DEMONSTRATES RESPONSIBILITY**  — Demonstrates responsibility and initiative in assigned area of responsibility and initiates positive activity without being reminded by supervisor and/or administration.

(a)  Quite often must be reminded to initiate activity.
(b)  Occasionally has to be reminded.
(c)  Infrequently fails to initiate needed activity.
(d)  Almost never has to be reminded to initiate activity.
(e)  Exceptionally responsible in seeing that needs of the institution are completed on a timely basis.
     COMMENTS: _____.

Employee rating: E    Supervisor rating: ✓

|  | | RATING |
|---|---|---|
|  | | Employee  Supervisor |

VIII. <u>CONTRIBUTES TO</u>   - How effectively the employee assists
      <u>TEAM EFFORT</u>       others in completing projects and
                          activities for benefit of institu-
                          tion without being asked and/or
                          reminded.

RATING — Employee: E   Supervisor: ✓

(a) Quite often must be asked, shows lack of cooperation.
(b) Occasionally has to be reminded.
(c) Rarely has to be asked or reminded.
(d) Almost never has to be reminded.
(e) Exceptionally responsible to needs of co-workers and
    never has to be asked or reminded to assist with
    projects and activities.
    COMMENTS: _____.

---

TOTAL POINTS:                          BY EMPLOYEE    36

                                       BY SUPERVISOR   36

RATINGS (for eight factors)

Superior          33 - 39
Strong            25 - 32
Average           17 - 24
Improvement Needed  9 - 16
Unsatisfactory     1 -  8

SUGGESTIONS FOR IMPROVEMENT: _____

_____

_____

_____

Signed: _____
        Supervisor

EMPLOYEE'S STATEMENT (Optional): _____

_____

_____

_____

Signed: _____
        Employee

FORM JFI-H-10B, REVISED Apr , 1984

## SUPPORT PERSONNEL EVALUATION FORM

### J. F. INGRAM STATE TECHNICAL COLLEGE

EMPLOYEE NAME: _Julie K. Givens_     DATE: _6/6/88_

RATING FACTOR:   1 through 5

(a) = 1 Point  (Unsatisfactory)
(b) = 2 Points (Improvement Needed)
(c) = 3 Points (Average)
(d) = 4 Points (Strong)
(e) = 5 Points (Superior)

RATING
Employee   Supervisor

I.   QUALITY OF WORK – The extent to which the employee accurately completes job assignments.

Employee: D   Supervisor: D

(a) Almost always makes errors; has very low accuracy.
(b) Quite often makes errors.
(c) Makes errors but equals job standards.
(d) Once in a while makes errors; has high accuracy.
(e) Almost never makes errors; has very high accuracy.
    COMMENTS: _____

II.  QUANTITY OF WORK – The extent to which the employee produces a volume of work consistent with established standards for the job.

Employee: E   Supervisor: E

(a) Almost never meets performance expectations.
(b) Quite often does not meet performance expectations.
(c) Volume of work is satisfactory; equals job expectations.
(d) Quite often produces more than expected.
(e) Almost always exceeds standards; exceptionally productive.
    COMMENTS: _____

III. USE OF WORK TIME – How efficiently the employee uses time to accomplish job tasks (for example, does not wait until the last minute to work on a project.)

Employee: E   Supervisor: E

(a) Quite often wastes time, at nearly every opportunity; neglects assignments.
(b) Occasionally wastes time; procrastinates; or leaves early.
(c) Makes adequate use of time; infrequently idle; and seldom leaves early.
(d) Utilizes time wisely and almost never leaves early.
(e) Exceptionally prudent in use of time; hard worker; team worker.
    COMMENTS: _____

                                                      RATING
                                              Employee   Supervisor

IV.   PUNCTUALITY      - The extent to which the employee is
      AT WORK            on time for work (except for excused
                        reasons).                              *D*        *D*

      (a)  Seldom, if ever on time; habitually late.
      (b)  Occasionally on time.
      (c)  Seldom late.
      (d)  Late on rare occasions.
      (e)  Always on time, never late.
           COMMENTS: _____.

V.    COMMUNICATION    - The degree of effectiveness with which
      EFFECTIVENESS       the employee communicates orally and/or
                          in writing.                          *E*        *E*

      (a)  Unable to express thoughts clearly; lacks
           organization.
      (b)  Expresses thoughts satisfactorily on routine matters.
      (c)  Usually organizes and expresses thoughts clearly and
           concisely.
      (d)  Consistently able to express ideas clearly.
      (e)  Excellent ability to communicate ideas to others.
           COMMENTS: _____.

VI.   RELATIONSHIPS    - The extent to which the employee
      WITH CO-WORKERS     establishes good relations with co-
                          workers (for example, being a good
                          team worker, being tactful and
                          courteous with co-workers.           *B*        *D*

      (a)  Does not get along well with people; shows a
           pronounced tendency to be inflexible, intolerant,
           or opinionated.
      (b)  Has difficulty in getting along with co-workers;
           is unduly blunt and direct with co-workers.
      (c)  Gets along with people adequately; has average
           skill in maintaining good human relations.
      (d)  Above average skills in human relations; has the
           degree of tact and sensitivity necessary for the
           establishment and maintenance of good interpersonal
           relations with other members of staff.

II.   DEMONSTRATES     - Demonstrates responsibility and
      RESPONSIBILITY      initiative in assigned area of
                          responsibility and initiates
                          positive activity without being
                          reminded by supervisor and/or
                          administration.                      *E*        *E*

      (a)  Quite often must be reminded to initiate activity.
      (b)  Occasionally has to be reminded.
      (c)  Infrequently fails to initiate needed activity.
      (d)  Almost never has to be reminded to initiate activity.
      (e)  Exceptionally responsible in seeing that needs of the
           institution are completed on a timely basis.
           COMMENTS: _____.

RATING
Employee Supervisor

VIII.   <u>CONTRIBUTES TO</u>    - How effectively the employee assists
        <u>TEAM EFFORT</u>          others in completing projects and
                                activities for benefit of institu-
                                tion without being asked and/or
                                reminded.

E        E

(a) Quite often must be asked, shows lack of cooperation.
(b) Occasionally has to be reminded.
(c) Rarely has to be asked or reminded.
(d) Almost never has to be reminded.
(e) Exceptionally responsible to needs of co-workers and
    never has to be asked or reminded to assist with
    projects and activities.
    COMMENTS: _____.

TOTAL POINTS:                          BY EMPLOYEE      3̶8̶ 37

                                       BY SUPERVISOR    37

                    RATINGS (for eight factors)

                    Superior           33 - 39
                    Strong             25 - 32
                    Average            17 - 24
                    Improvement Needed  9 - 16
                    Unsatisfactory      1 -  8

SUGGESTIONS FOR IMPROVEMENT: _____

_____

_____

_____

                    Signed: _____
                            Supervisor

EMPLOYEE'S STATEMENT (Optional): _____

_____

_____

_____

                    Signed: _____
                            Employee

FORM JFI-H-10B, REVISED April, 1984

## SUPPORT PERSONNEL EVALUATION FORM

### J. F. INGRAM STATE TECHNICAL COLLEGE

EMPLOYEE NAME: _Julie K. Givens_     DATE: _6/2/87_

RATING FACTOR:    1 through 5

```
(a) = 1 Point  (Unsatisfactory)
(b) = 2 Points (Improvement Needed)
(c) = 3 Points (Average)
(d) = 4 Points (Strong)
(e) = 5 Points (Superior)
```

RATING
Employee   Supervisor

I.  QUALITY OF WORK - The extent to which the employee
                      accurately completes job assignments.        D     D

```
(a) Almost always makes errors; has very low accuracy.
(b) Quite often makes errors.
(c) Makes errors but equals job standards.
(d) Once in a while makes errors; has high accuracy.
(e) Almost never makes errors; has very high accuracy.
    COMMENTS: _____
```

II.  QUANTITY OF WORK - The extent to which the employee
                        produces a volume of work consistent
                        with established standards for the
                        job.                                        D     D

```
(a) Almost never meets performance expectations.
(b) Quite often does not meet performance expectations.
(c) Volume of work is satisfactory; equals job
    expectations.
(d) Quite often produces more than expected.
(e) Almost always exceeds standards; exceptionally
    productive.
    COMMENTS: _____
```

III.  USE OF WORK TIME - How efficiently the employee uses
                         time to accomplish job tasks (for
                         example, does not wait until the
                         last minute to work on a project.)        D     D

```
(a) Quite often wastes time, at nearly every opportunity;
    neglects assignments.
(b) Occasionally wastes time; procrastinates; or leaves
    early.
(c) Makes adequate use of time; infrequently idle; and
    seldom leaves early.
(d) Utilizes time wisely and almost never leaves early.
(e) Exceptionally prudent in use of time; hard worker;
    team worker.
    COMMENTS: _____
```

RATING
Employee   Supervisor

**IV.  PUNCTUALITY
AT WORK**   — The extent to which the employee is
on time for work (except for excused
reasons).

D    D

(a)  Seldom, if ever on time; habitually late.
(b)  Occasionally on time.
(c)  Seldom late.
(d)  Late on rare occasions.
(e)  Always on time, never late.
     COMMENTS: _____

**V.  COMMUNICATION
EFFECTIVENESS**   — The degree of effectiveness with which
the employee communicates orally and/or
in writing.

D    D

(a)  Unable to express thoughts clearly; lacks
     organization.
(b)  Expresses thoughts satisfactorily on routine matters.
(c)  Usually organizes and expresses thoughts clearly and
     concisely.
(d)  Consistently able to express ideas clearly.
(e)  Excellent ability to communicate ideas to others.
     COMMENTS: _____

**VI.  RELATIONSHIPS
WITH CO-WORKERS**   — The extent to which the employee
establishes good relations with co-
workers (for example, being a good
team worker, being tactful and
courteous with co-workers.

D    D

(a)  Does not get along well with people; shows a
     pronounced tendency to be inflexible, intolerant,
     or opinionated.
(b)  Has difficulty in getting along with co-workers;
     is unduly blunt and direct with co-workers.
(c)  Gets along with people adequately; has average
     skill in maintaining good human relations.
(d)  Above average skills in human relations; has the
     degree of tact and sensitivity necessary for the
     establishment and maintenance of good interpersonal
     relations with other members of staff.

**VII.  DEMONSTRATES
RESPONSIBILITY**   — Demonstrates responsibility and
initiative in assigned area of
responsibility and initiates
positive activity without being
reminded by supervisor and/or
administration.

E    E

(a)  Quite often must be reminded to initiate activity.
(b)  Occasionally has to be reminded.
(c)  Infrequently fails to initiate needed activity.
(d)  Almost never has to be reminded to initiate activity.
(e)  Exceptionally responsible in seeing that needs of the
     institution are completed on a timely basis.
     COMMENTS: _____

RATING
Employee Supervisor

VIII.  <u>CONTRIBUTES TO</u>   - How effectively the employee assists
       <u>TEAM EFFORT</u>        others in completing projects and
                             activities for benefit of institu-
                             tion without being asked and/or
                             reminded.

$E$      $E$

(a) Quite often must be asked, shows lack of cooperation.
(b) Occasionally has to be reminded.
(c) Rarely has to be asked or reminded.
(d) Almost never has to be reminded.
(e) Exceptionally responsible to needs of co-workers and
    never has to be asked or reminded to assist with
    projects and activities.
    COMMENTS: _____.

TOTAL POINTS:                          BY EMPLOYEE      34

                                       BY SUPERVISOR    34

RATINGS (for eight factors)

Superior           33 - 39
Strong             25 - 32
Average            17 - 24
Improvement Needed  9 - 16
Unsatisfactory      1 -  8

SUGGESTIONS FOR IMPROVEMENT: _____

_____

_____

Signed: _____
              Supervisor

EMPLOYEE'S STATEMENT (Optional): _____

_____

_____

Signed: _____
              Employee

FORM JFI-H-10B, REVISED Ar 1, 1984

## SUPPORT PERSONNEL EVALUATION FORM

### J. F. INGRAM STATE TECHNICAL COLLEGE

EMPLOYEE NAME: _Julie K Huns_     DATE: _6/27/86_

RATING FACTOR: 1 through 5

```
(a) = 1 Point  (Unsatisfactory)
(b) = 2 Points (Improvement Needed)
(c) = 3 Points (Average)
(d) = 4 Points (Strong)
(e) = 5 Points (Superior)
```

RATING
Employee  Supervisor

I.  QUALITY OF WORK - The extent to which the employee
accurately completes job assignments.          D

```
(a)  Almost always makes errors; has very low accuracy.
(b)  Quite often makes errors.
(c)  Makes errors but equals job standards.
(d)  Once in a while makes errors; has high accuracy.
(e)  Almost never makes errors; has very high accuracy.
     COMMENTS: _____
```

II.  QUANTITY OF WORK - The extent to which the employee
produces a volume of work consistent
with established standards for the
job.                                            D

```
(a)  Almost never meets performance expectations.
(b)  Quite often does not meet performance expectations.
(c)  Volume of work is satisfactory; equals job
     expectations.
(d)  Quite often produces more than expected.
(e)  Almost always exceeds standards; exceptionally
     productive.
     COMMENTS: _____
```

III.  USE OF WORK TIME - How efficiently the employee uses
time to accomplish job tasks (for
example, does not wait until the
last minute to work on a project.)             C

```
(a)  Quite often wastes time, at nearly every opportunity;
     neglects assignments.
(b)  Occasionally wastes time; procrastinates; or leaves
     early.
(c)  Makes adequate use of time; infrequently idle; and
     seldom leaves early.
(d)  Utilizes time wisely and almost never leaves early.
(e)  Exceptionally prudent in use of time; hard worker;
     team worker.
     COMMENTS: _____
```

FORM JFI-H-10B, REVISED  April, 1984
Page #2

RATING
Employee  Supervisor

IV.  PUNCTUALITY      - The extent to which the employee is
     AT WORK            on time for work (except for excused
                        reasons).                                          *C*

     (a)  Seldom, if ever on time; habitually late.
     (b)  Occasionally on time.
     (c)  Seldom late.
     (d)  Late on rare occasions.
     (e)  Always on time, never late.
          COMMENTS: _____.

V.   COMMUNICATION    - The degree of effectiveness with which
     EFFECTIVENESS       the employee communicates orally and/or
                         in writing.                                       *C*

     (a)  Unable to express thoughts clearly; lacks
          organization.
     (b)  Expresses thoughts satisfactorily on routine matters.
     (c)  Usually organizes and expresses thoughts clearly and
          concisely.
     (d)  Consistently able to express ideas clearly.
     (e)  Excellent ability to communicate ideas to others.
          COMMENTS: _____.

VI.  RELATIONSHIPS    - The extent to which the employee
     WITH CO-WORKERS     establishes good relations with co-
                         workers (for example, being a good
                         team worker, being tactful and
                         courteous with co-workers.                        *C*

     (a)  Does not get along well with people; shows a
          pronounced tendency to be inflexible, intolerant,
          or opinionated.
     (b)  Has difficulty in getting along with co-workers;
          is unduly blunt and direct with co-workers.
     (c)  Gets along with people adequately; has average
          skill in maintaining good human relations.
     (d)  Above average skills in human relations; has the
          degree of tact and sensitivity necessary for the
          establishment and maintenance of good interpersonal
          relations with other members of staff.

VII. DEMONSTRATES     - Demonstrates responsibility and
     RESPONSIBILITY      initiative in assigned area of
                         responsibility and initiates
                         positive activity without being
                         reminded by supervisor and/or
                         administration.                                   *D*

     (a) Quite often must be reminded to initiate activity.
     (b) Occasionally has to be reminded.
     (c) Infrequently fails to initiate needed activity.
     (d) Almost never has to be reminded to initiate activity.
     (e) Exceptionally responsible in seeing that needs of the
         institution are completed on a timely basis.
         COMMENTS: _____.

RATING
Employee  Supervisor

VIII.  CONTRIBUTES TO    - How effectively the employee assists
       TEAM EFFORT          others in completing projects and
                            activities for benefit of institu-
                            tion without being asked and/or
                            reminded.

*D*

(a) Quite often must be asked, shows lack of cooperation.
(b) Occasionally has to be reminded.
(c) Rarely has to be asked or reminded.
(d) Almost never has to be reminded.
(e) Exceptionally responsible to needs of co-workers and
    never has to be asked or reminded to assist with
    projects and activities.
    COMMENTS: _____.

TOTAL POINTS:                    BY EMPLOYEE      28

                                 BY SUPERVISOR    28

RATINGS (for eight factors)

Superior          33 - 39
Strong            25 - 32
Average           17 - 24
Improvement Needed  9 - 16
Unsatisfactory     1 -  8

SUGGESTIONS FOR IMPROVEMENT: _____

_____

_____

_____.

                    Signed: _____
                            Supervisor

EMPLOYEE'S STATEMENT (Optional): _____

_____

_____

_____.

                    Signed: _____
                            Employee

FORM JFI-H-10B, REVISED Apri', 1984                                    Page 1 of 3

## SUPPORT PERSONNEL EVALUATION FORM

### J. F. INGRAM STATE TECHNICAL COLLEGE

EMPLOYEE NAME: _Julie Sivens_                    DATE: _9-19-85_

RATING FACTOR:    1 through 5

```
(a) = 1 Point  (Unsatisfactory)
(b) = 2 Points (Improvement Needed)
(c) = 3 Points (Average)
(d) = 4 Points (Strong)
(e) = 5 Points (Superior)
```

|  | RATING | |
|---|---|---|
|  | Employee | Supervisor |

---

**I.  QUALITY OF WORK** - The extent to which the employee accurately completes job assignments.     D    4    D

```
(a) Almost always makes errors; has very low accuracy.
(b) Quite often makes errors.
(c) Makes errors but equals job standards.
(d) Once in a while makes errors; has high accuracy.
(e) Almost never makes errors; has very high accuracy.
    COMMENTS: _____
```

**II.  QUANTITY OF WORK** - The extent to which the employee produces a volume of work consistent with established standards for the job.     D    4    D

```
(a) Almost never meets performance expectations.
(b) Quite often does not meet performance expectations.
(c) Volume of work is satisfactory; equals job
    expectations.
(d) Quite often produces more than expected.
(e) Almost always exceeds standards; exceptionally
    productive.
    COMMENTS: _____
```

**III.  USE OF WORK TIME** - How efficiently the employee uses time to accomplish job tasks (for example, does not wait until the last minute to work on a project.)     D    4    D

```
(a) Quite often wastes time, at nearly every opportunity;
    neglects assignments.
(b) Occasionally wastes time; procrastinates; or leaves
    early.
(c) Makes adequate use of time; infrequently idle; and
    seldom leaves early.
(d) Utilizes time wisely and almost never leaves early.
(e) Exceptionally prudent in use of time; hard worker;
    team worker.
    COMMENTS: _____
```

RATING
Employee   Supervisor

IV.  <u>PUNCTUALITY</u>      - The extent to which the employee is
     <u>AT WORK</u>           on time for work (except for excused
                            reasons.)                                    b    4      D

     (a)  Seldom, if ever on time; habitually late.
     (b)  Occasionally on time.
     (c)  Seldom late.
     (d)  Late on rare occasions.
     (e)  Always on time, never late.
          COMMENTS: _____.

V.   <u>COMMUNICATION</u>     - The degree of effectiveness with which
     <u>EFFECTIVENESS</u>       the employee communicates orally and/or
                            in writing.                                  C    3      C

     (a)  Unable to express thoughts clearly; lacks
          organization.
     (b)  Expresses thoughts satisfactorily on routine matters.
     (c)  Usually organizes and expresses thoughts clearly and
          concisely.
     (d)  Consistently able to express ideas clearly.
     (e)  Excellent ability to communicate ideas to others.
          COMMENTS: _____.

VI.  <u>RELATIONSHIPS</u>     - The extent to which the employee
     <u>WITH CO-WORKERS</u>     establishes good relations with co-
                            workers (for example, being a good
                            team worker, being tactful and
                            courteous with co-workers.                   C    3      C

     (a)  Does not get along well with people; shows a
          pronounced tendency to be inflexible, intolerant,
          or opinionated.
     (b)  Has difficulty in getting along with co-workers;
          is unduly blunt and direct with co-workers.
     (c)  Gets along with people adequately; has average
          skill in maintaining good human relations.
     (d)  Above average skills in human relations; has the
          degree of tact and sensitivity necessary for the
          establishment and maintenance of good interpersonal
          relations with other members of staff.

VII. <u>DEMONSTRATES</u>      - Demonstrates responsibility and
     <u>RESPONSIBILITY</u>      initiative in assigned area of
                            responsibility and initiates
                            positive activity without being
                            reminded by supervisor and/or
                            administration.                              D    4      D

     (a) Quite often must be reminded to initiate activity.
     (b) Occasionally has to be reminded.
     (c) Infrequently fails to initiate needed activity.
     (d) Almost never has to be reminded to initiate activity.
     (e) Exceptionally responsible in seeing that needs of the
         institution are completed on a timely basis.
         COMMENTS: _____.

RATING
Employee  Supervisor

VIII.  CONTRIBUTES TO    - How effectively the employee assists
       TEAM EFFORT          others in completing projects and
                            activities for benefit of institu-
                            tion without being asked and/or
                            reminded.                                    D    4    D

(a) Quite often must be asked, shows lack of cooperation.
(b) Occasionally has to be reminded.
(c) Rarely has to be asked or reminded.
(d) Almost never has to be reminded.
(e) Exceptionally responsible to needs of co-workers and
    never has to be asked or reminded to assist with
    projects and activities.
    COMMENTS: _____.

---

TOTAL POINTS:                              BY EMPLOYEE    _____ 30

                                           BY SUPERVISOR  _____ 30

RATINGS (for eight factors)

Superior             33 - 39
Strong               25 - 32
Average              17 - 24
Improvement Needed    9 - 16
Unsatisfactory        1 -  8

SUGGESTIONS FOR IMPROVEMENT: _____

_____

_____

_____.

                          Signed: _____
                                   Supervisor

EMPLOYEE'S STATEMENT (Optional): _____

_____

_____

_____.

                          Signed: _____
                                   Employee

Transaction Report

Send
Transaction(s) completed

| No. | TX Date/Time | Destination | Duration P. # | Result | Mode |
|-----|--------------|-------------|---------------|--------|------|
| 387 | JUN-30   09:28 | 2708625 | 0' 00' 22"  002 | OK | N  ECM |

Rx Date/Time      JUN-29-2004(TUE) 13:42                                    P. 002
28-Jun-2004 13:38  From-Countrywide Home Loans          T-890  P 002/003  F-781

Prepared by: GINA KLEINSCHMIDT                    COUNTRYWIDE HOME LOANS, INC.

DATE:        06/29/2004                    Branch #: 0000230
BORROWER: JULIE K. GIVENS    -42482-7443     2542 EASTERN BLVD
CASE #:                                     MONTGOMRY, AL 36117
LOAN #:      63311436                        Phone: (334)213-9997
PROPERTY ADDRESS:  3751 BROWNS ROAD           Br Fax No.: (334)270-8625
                   MILLBROOK, AL 36054

## TELEPHONE CONTACT CERTIFICATION
(To be completed when alternate documents
are accepted as evidence of employment)

EMPLOYER NAME  J F INGRAM TECH

EMPLOYER ADDRESS
DEATSVILLE, AL 36022

EMPLOYER PHONE NO.    285 5177

I CERTIFY THE FOLLOWING:

1. I have confirmed the employer's phone number through:

   ☒ Directory Assistance
   ☐ The Telephone Book

2. I contacted the employer directly and spoke to:

   James T. Merk    Personnel Director      June 30, 2004
   Name             Title                   Date of Contact

3. The above person stated the following:

   (A) The applicant ☒ is ☐ is not currently employed as Administrative Assistant/ Payroll/Cashier
                                                                    Job Title

   (B) The probability to continued employment is:  Excellent

   (C) The borrower's date(s) of employment: From: Jan 21 1985  To:  Present

   D. The borrower's current earnings are $ _____ per _____
                                                                    (wk, mo, yr)

   (E) Does the applicant have any ownership interest in the business? No . If so, what percentage is
       owned? _____

4. Conventional Loans Only - If the employer will not answer questions regarding earnings, probability of employment
   etc., document the unwillingness to provide the information for the following reasons:

   _____

   _____

5. FHA Loans Only - If the employer will not answer item 3A, standard employment documentation must be
   used.

SIGNED:
   James T. Merk                    Personnel Director
                                    TITLE

Rx Date/Time     JUN-29-2004(TUE) 13:42                                      P. 001
28-Jun-2004 13:38   From-Countrywide ome Loans                    T-890  P 001/003  F-791

285-2521



# Countrywide Home Loans®

2542 Eastern Blvd Suite 38
Montgomery AL 36117

# FAX

| To: | From: | |
|---|---|---|
| Personnel Director | **Gina Kleinschmidt**<br>**Loan Specialist II** | Date:<br>Number of pages:<br>Phone: (334)270-7121<br>Fax: (334)270-8625 |

**Remarks:**

Please Fax back
to 270-8625

Chris,
Gina

Prepared by: GINA KLEINSCHMIDT

**COUNTRYWIDE HOME LOANS, INC.**

DATE:      06/29/2004
BORROWER: JULIE K. GIVENS
CASE #:
LOAN #:    63311436
PROPERTY ADDRESS:  3751 BROWNS ROAD
                   MILLBROOK, AL 36054

~ 424 827463

Branch #: 0000230
2542 EASTERN BLVD
MONTGOMERY, AL 36117
Phone: (334)213-0997
Br Fax No.: (334)270-8625

## TELEPHONE CONTACT CERTIFICATION
(To be completed when alternate documents
are accepted as evidence of employment)

EMPLOYER NAME  J F INGRAM TECH

EMPLOYER ADDRESS
DEATSVILLE, AL 36022

EMPLOYER PHONE NO.    _285-5177_

I CERTIFY THE FOLLOWING:

1. I have confirmed the employer's phone number through:

   ☑ Directory Assistance
   ☑ The Telephone Book

2. I contacted the employer directly and spoke to:

   _James I. Merk_   _Personnel Director_   _June 30, 2004_
   Name               Title                  Date of Contact

3. The above person stated the following:

   A. The applicant  ☑ is  ☐ is not currently employed as _Administrative Assistant/ Payroll/Cashier_
                                                            (Job Title)

   B. The probability to continued employment is: _Excellent_

   C. The borrower's date(s) of employment: From: _Jan 21 1985_  To: _Present_

   D. The borrower's current earnings are $ _____ per _____
                                                          (wk, mo, yr.)

   E. Does the applicant have any ownership interest in the business? _No_ . If so, what percentage is
      owned? _____

4. **Conventional Loans Only** - If the employer will not answer questions regarding earnings, probability of employment etc., document the unwillingness to provide the information for the following reasons:

   _____

   _____

5. **FHA Loans Only** - If the employer will not answer Item 3A, standard employment documentation must be used.

SIGNED:
_James I. Merk_                           _Personnel Director_
                                          TITLE

FHA/CONV
● Telephone Contact Certification
2C38B-US (10/01)(d)




Rx Date/Time    JUN-2. `904(TUE) 13:42    P. 003

28-Jun-2004 13:38    From-Cou...ywide Home Loans    T-890   P 003/003   F-791

LOAN #:

## Borrower's Certification & Authorization

### Certification

The undersigned certify the following:

1. I/We have applied for a mortgage loan from COUNTRYWIDE HOME LOANS, INC.

   *(Lender)*. In applying for the loan, I/we completed a loan application containing various information on the purpose of the loan, the amount and source of the down payment, employment and income information, and assets and liabilities. I/We certify that all of the information is true and complete. I/We made no misrepresentations in the loan application or other documents, nor did I/we omit any pertinent information.

2. I/We understand and agree that Lender reserves the right to change the mortgage loan review process to a full documentation program. This may include verifying the information provided on the application with the employer and/or the financial institution.

3. I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements when applying for this mortgage, as applicable under the provisions of Title 18, United States Code, Section 1014.

### Authorization to Release Information

To Whom it May Concern:

1. I/We have applied for a mortgage loan from Lender. As part of the application process, Lender may verify information contained in my/our loan application and in other documents required in connection with the loan, either before the loan is closed or as part of its quality control program.

2. I/We authorize you to provide to Lender, and to any investor to whom Lender may sell my/our mortgage, any and all information and documentation that they request. Such information includes, but is not limited to, employment history and income; bank, money market, and similar account balances; credit history; and copies of income tax returns.

3. Lender, or any investor that purchases the mortgage may address this authorization to any party named in the loan application or disclosed by any consumer credit reporting agency or similar source.

4. A copy of this authorization may be accepted as an original.

5. Your prompt reply to Lender or the investor that purchased the mortgage is appreciated.

6. To make products and services available, often at a lower cost or with greater convenience, Lender may prudently share some customer and former customer nonpublic personal financial information within our family of companies and with well respected business partners. To obtain a copy of our privacy notice with information on our policies and practices, please call us at (866) 605-3467. If you do not want us to share nonpublic personal information with these companies, other than sharing transactions and experience within our family of companies, please call us at (866) 605-3467. By signing below, you authorize us to share this information unless you call to exercise your right to opt-out. Please be aware that even if you decide to opt-out, Lender will continue to share nonpublic personal information with companies that perform services on our behalf and with third parties as otherwise permitted by law.

**NOTICE TO BORROWERS:** This is notice to you as required by the Right to Financial Privacy Act of 1978 that HUD/FHA has a right of access to financial records held by financial institutions in connection with the consideration or administration of assistance to you. Financial records involving your transaction will be available to HUD/FHA without further notice or authorization but will not be disclosed or released by this institution to another Government Agency or Department without your consent except as required or permitted by law.

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

| | | | |
|---|---|---|---|
| WOODROW B. GIVENS JR | (Borrower's Signature) | Date | (Social Security Number) |
| | | | 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 |
| JULIE K. GIVENS | (Borrower's Signature) | Date 6/9/04 | (Social Security Number) |
| | (Borrower's Signature) | Date | (Social Security Number) |
| | (Borrower's Signature) | Date | (Social Security Number) |

-5DA.plbl.01    CHL (10/01)(d)    VMP MORTGAGE FORMS - (800)521-7291    9/01





**DATE:**    August 10, 1989

**SUBJECT:**  Conference with Mrs. Julie Givens relative to Junior
           Accountant position for which she had applied.

**PRESENT:**  Dr. Murry C. Gregg and Mrs. Sylvia Murphree


Dr. Gregg told Mrs. Givens that he wanted to talk with
her about the Junior Accountant position for which she had
applied. He told her that he did not know of anyone on the
staff who did not want her to have that position. He told her
that because the institution had advertised for someone with a
Bachelors Degree and there were several who met those
requirements, it would be setting itself up for a lawsuit if she
were selected over those who possessed the advertised
credentials.

Dr. Gregg told her that he did want her to know that it
appears that another person is probably needed in the accounting
department and that he and Mr. Powell have discussed the
possibility of adding an Account Clerk. He asked that she not
hold him to this because it is still in the discussion stage and
no definite decision has been made. If such a position is
created, the salary would be a step above where Mrs. Givens is
now on the E Salary Schedule.

Dr. Gregg said there are some who would like to raise
her to that salary and leave her in the same position. He told
her that such a move, however, could not be justified. Dr. Gregg
told Mrs. Givens that before she could be moved into that
position; however, a replacement would have to be found. He
asked if she was familiar with the cashiers and clerks at the
Grandview Winn-Dixie. He said that he had observed one young
lady who seemed to have much ability and is quite impressive in
handling customers. He said the young lady just recently had a
baby and suggested to Mrs. Givens that she might want to talk to
her about completing an application.

Mrs. Givens said that she thought she knew the lady
that Dr. Gregg was referring to and she would talk with her.

Dr. Gregg expressed his regrets again to Mrs. Givens
relative to the Junior Accountant position. Mrs. Givens said
that she understood the position the institution had to take but
she would have to say that she was disappointed and that she
appreciated very much Dr. Gregg talking to her.

Recorded by:  _Sylvia H. Murphree_
                 Sylvia H. Murphree

# Central Alabama Community College

Alexander City    Childersburg

The State Board of Education
and the faculty of the Central Alabama Community College
have conferred upon

## Julie B. Givens

the degree of

## Associate in Science—Magna Cum Laude

with all the rights and
privileges appertaining thereto

In Witness Whereof the signatures of the duly authorized officers
and the corporated seal of the college are hereunto affixed.

August 30, 1990

_James H. Carlee_
President

_Charles C. Turner_

_Guy Hunt_
Governor

_Fred Reinours_
Chancellor



# Alexander City
# State Junior College

P. O. Box 699 ○ Alexander City, Alabama 35010 ○ (205) 234-6346

**DEAN OF
INSTRUCTION**

May 11, 1989

Ms. Julie Givens
Route 1, Box 185
Deatsville, AL  36022

Dear Ms. Givens:

I am pleased to notify you that your grade point ratio qualifies you for the dean's list for winter quarter, 1989 at Alexander City State Junior College.  Please accept our sincere congratulations on your receiving this high honor.

Please be assured that I am very much interested in your educational progress and will continue to observe your record during your enrollment in our college.

On behalf of myself and the faculty of Alexander City State Junior College, I extend best wishes for your continued success.

Sincerely,

Charles A. Farrow, Ed. D.
Dean of Instruction

mlr



# Alexander City
# State Junior College

P. O. Box 699 ○ Alexander City, Alabama 35010 ○ (205) 234-6346

**DEAN OF
INSTRUCTION**

*June 20, 1989*

*Ms. Julie K. Givens
Route 1, Box 185
Deatsville, AL  36022*

*Dear Ms. Givens:*

*In recognition of your academic achievement during the Spring quarter of 1989 your name has been included on the Dean's List.*

*The faculty joins me in extending to you our congratulations and best wishes. We know that your family shares our pride in your having earned this honor.*

*Sincerely yours,*

*Charles A. Farrow, Ed. D.
Dean of Instruction*

*mlr*

Date:    September 12, 1988

**MEMORANDUM**

**TO:**    Dr. Murry C. Gregg, President

**FROM:**    Mrs. Julie K. Givens
                    (Employee)

**RE:**    Permission to enroll in College Classes

Dr. Gregg, I will appreciate your permission to enroll in the following class(es) at    ACJC
                                                                                    (college)
for the    Fall    Quarter, 19  88 .

| COURSE NO. | TITLE | CREDIT HOURS | SCHEDULED DAYS/TIME |
|---|---|---|---|
| SOC 247 | Marriage and the Family | 5 | Mon/Wed 3:30-5:35 |
| HIS 121 | World History | 5 | Mon/Wed 5:35-7:40 |
| MTH 101 | Mathematical Insights | 5 | Mon/Wed 7:40-9:45 |
| Co-op | | 2 | |

Thank you for your consideration to this request.

----------------------------------------------------------------

( ✓ )  Approved
(  )  Disapproved

Murry C. Gregg, Ed. D.

# INGRAM STATE COMMUNITY COLLEGE

*Ingram
State
Community
College*

**ISCC**
• Developing Responsible Citizent •

**Murry C. Gregg, Ed. D.**
President

**J. M. Mulder**
Dean of Technical &
Literacy Education

**Paul Reeder**
Dean of Students

**Ron Shum, Ed. D.**
Dean of Academics &
Educational Support Service

December 1, 1994

MEMORANDUM

TO:        Mrs. Julie Givens

FROM:    Dr. Murry C. Gregg, President

SUBJECT:    Committee Appointment

As a part of our updating and revision of various standing committee assignments, I am appointing you to serve as a member of the Ingram State Community College Sick Leave Bank Committee.    Your appointment will be for the remainder of this academic year, and may be renewed in August, 1995.

I am confidant that you will serve our college well in this very important position, and look forward to working with you.  If you have any questions regarding  this appointment, please contact me or the ISCC personnel director.



*5375 Ingram Road   •   P. O. Box 209   •   Deatsville, Alabama 36022*

January 30, 1995

Mrs. Julie Givins

NOTE OF APPRECIATION

I wanted to express my appreciation to you for everything you did toward making the word processing efforts for the visiting team a success. From the first time I spoke with you on the telephone, you expressed the desire to do anything you could to assist and you did. I don't know what I would have done without your extra help.

During the entire process, you helped me organize my thoughts about what equipment might be used and what supplies were needed and then went out of your way to help get these things together and set up at the Holiday Inn. Once in action, you went beyond normal expectations and supported all efforts including working until 12:30 a.m. After three hours of sleep, you went back to the Holiday Inn to insure that everything was moved back to its proper place. You definitely went beyond your normal duties or even what was expected of you.

Thank you. I really appreciate you and your efforts.

*Arleen Thomas*

Arleen Thomas, Coordinator
Word Processing for COC Visiting Committee

# INTEROFFICE MEMO

To:      Mr. Greg Wright
From:    Paul Reeder
Subject: Cook Out For Students
Date:    August 22, 1995
CC:

I wish to place this letter of commendation in the personnel jackets of the following employees for their hard work and planning for the students cook out which was a success. The people I wish to cite are Mrs. Julie Givens,Dean Monica Greene,Mrs. Gladys Laster and Mr. David Jones.Everyone at Ingram played a role in the cook out but it is my understanding that the above mentioned people went beyond expectations.
ccMrs. Givens
   Dean Greene
  Mrs. Laster
  Mr. Jones



# J. F. INGRAM STATE TECHNICAL COLLEGE
P. O. BOX 209
DEATSVILLE, ALABAMA 36022
Phone: 285-5177



Murry C. Gregg, Ed D
PRESIDENT

J. M. Mulder
DEAN OF INSTRUCTION

Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

August 21, 1989

---

MEMORANDUM

TO:        Dr. Murry C. Gregg

FROM:      Mr. Freddie Powell

I would like to recommend Mrs. Julie Givens be appointed as assistant accountant and be placed at E5, Step 5 on the salary schedule.

Mrs. Givens is currently working on her Associate Degree and plans to complete her BS degree. She has been assisting in the accounting department for several months and desires to be in accounting.

Due to the increased volume of work in our accounting department and the need for our accounting to be timely, I recommend she be placed in this department effective September 1, 1989.

*8-21-89*
*Approved*
*Murry C Gregg*





*Capitol City Chapter*
National Property Management Association
Post Office Box 2463
Montgomery, Alabama 36101-2463

( G. Vens )

*October 11, 2000*

*Enclosed you will find your certificate for attending the Property Manager's Conference, August 8 - 9, 2000. We hope you enjoyed the conference and plan to attend next years events.*

*If you have any questions or comments, please contact me at (334) 242-2132.*

*Sincerely,*

*Tam Lowery*
*Secretary*
*Capitol City Chapter*
*NPMA*

*Ed Minter, President, Department of Veterans Affairs* ◆
*Michael Sumrall, Vice President, National Guard Bureau* ◆ *Jan Holden, Treasurer, ABC Board* ◆
*Tam Lowery, Secretary, Alabama Commission on Higher Education*



**The National Property Management Association, Inc.**

Presents this Certificate and
1.5 Continuing Education Units to

*Julie Giving*

For the Successful Completion of the
*Annual Property Managers Conference*
August 9, 2000
Prattville, Alabama

Marlene A. Millemaci, CPPM, CF
Vice President Professional Development

© 1998 GOES 34425
All Rights Reserved

LITHO IN USA



**INGRAM STATE COMMUNITY COLLEGE**

November 2, 1993

Murry C. Gregg, Ed. D.
President

Freddie Powell
Vice President

J. M. Mulder
Dean of Technical &
Literacy Education

Paul Reeder
Dean of Students

Ron Shum, Ed. D.
Dean of Academics &
Educational Support Services

**MEMORANDUM**

**TO:**      Mr. Ron Sutton, Associate Commissioner
Mr. Roy Hightower, Regional Coordinator

**FROM:**    Dr. Murry C. Gregg, President

**SUBJECT:** FLYC Population's Use of Foul Language

        The attached memorandum from one of our employees reflects a problem that has been occurring for two or three months. I have met with Captain Henry on one occasion and Mr. Powell has met with him and the officers at the front gate several times concerning the problem.

        I do not accept the idea that people who are incarcerated can use freely, without control, the kind of language as reflected in Mrs. Givens' letter. I am, therefore, requesting that you look into this matter and see if you can provide us some assistance.

        I trust that you will give this matter your early attention and that I may receive a prompt response.

MCG:shm

_Judy's memo to Ron_

TO: Dr. Gregg,
We are dealing with this situation — if it is not corrected please let me know.
Ron Sutton





# INGRAM STATE COMMUNITY COLLEGE

*Ingram State Community College*
**ISCC**
• *Developing Responsible Citizens* •

**November 2, 1993**

Murry C. Gregg, Ed. D.
President

Freddie Powell
Vice President

J. M. Mulder
Dean of Technical &
Literacy Education

Paul Reeder
Dean of Students

Ron Shum, Ed. D.
Dean of Academics &
Educational Support Services

**TO:**    Dr. Murry C. Gregg, President

**FROM:**    *Julia Givens*
Mrs. Julie Givens, Assistant Accountant

**SUBJECT:**    Student/Inmate Harassment

　　　　This memo is for official documentation of harassment by students from Frank Lee Youth Center suffered by myself and the other women at Ingram State Community College.

　　　　In the past 9 years that I have worked here, there have been an occasional remarks made by students that, yes, I think the women were able to ignore. However, in the past few months, the boys from FLYC have become bolder. I do not know if it is because they do not have a warden or if they really just don't care. Listed below are various dates that I personally have experienced this type of harassment:

　　　　On June 17th, 1993, a skeleton staff was working here on Main Campus. Mr. Bridgman, Mrs. Miller, and I stepped out the back door of the administrative building and the inmates at FLYC started chanting the word "pussy" at us. We immediately stepped back in the door. I called over to FLYC and spoke with Captain Henry concerning their behavior. He stated that he had them locked down, "What more did I want him to do?" I told him that he should make them keep their mouths shut.

　　　　Mr. Bill Griswold was working this day, and he stepped out the back door to see if he could tell what the problem was. They chanted the same "P" word at him. He then called downtown to his father, William Griswold, and reported this matter. His father told him to walk next door and talk to Captain Henry. However, when he got there the Captain had left to go to Kilby and had left Lt. LaHue in charge. It did appear that she brought them under control in a short period of time.



*5375 Ingram Road • P. O. Box 209 • Deatsville, Alabama 36022*
*Phone: 205-285-5177 • Fax: 205-285-5328*

On July 7, 1993, Mr. Freddie Powell had a meeting with the women on Main Campus concerning bringing the FLYC students in the front gate. He stated that if the women arrived at this time, they should wait in the parking lot for FLYC students to check in. He stated that the women should "close their eyes, cover their ears, and remember where they were." He then added that if they walked between students, or got too close, they "had the right to talk ugly to them." I was not here that day, however, the next day, he came to my office and told me to "hear no evil and see no evil," at which time I responded they had better not say evil to me.

On July 9, 1993, Mrs. Bonita Lewis and I were in the parking lot when FLYC started checking out. We stayed in the parking lot behind the trees. The students started hollering at us to "get out from behind the tree, Bitch." They continued to holler this during the entire time it took the front gate to check them out. Not once did the officers at the front gate reprimand them, not even to the point of telling them to shut up.

After the students were out the gate and I returned to the building, I reported the incident to Mr. Powell who stated that this did not have anything to do with his meeting of July 7. I then came to your office very upset about these encounters and you asked that I calm myself and not be hasty about calling the Commissioner's office reporting the DOC and their lack of response to these cases of harassment. You asked that I give you an opportunity to handle the situation and I agreed.

On July 12, the following Monday, you called a meeting of all the women concerning the harassment and stated that from now on, the FLYC students would be checked in through the side gate to help solve this type problem. You also had a meeting with Captain Henry concerning this matter. I felt that at this time you were doing your best to solve these problems. However, checking the students through the side gate lasted about three weeks. Note, they are now often being checked in and out the front gate for lunches, etc.

Time and again I, as well as the other females on our staff, are being subjected to students' calling us names and making vulgar comments in our direction. This type harassment has not only been directed at me but at most of the other women at one time or another.

On October 19, Mr. Bridgman and I went out back
to Mr. Benton's shop to take my car for repairs.  At the
time we took the car, no students were on campus.  It was
one of the mornings that the fog was heavy and the buses
were being delayed.  However, as we came out of Mr.
Benton's shop, FLYC was being checked in.  As we walked
down the sidewalk, a group of inmates started making cat
calls.  After attempting to ignore them, Mr. Bridgman
finally told them that it was enough.  As we turned to
walk off again, they called Mr. Bridgman an S.O.B.  He
asked the student who said this to step forward, and of
course they didn't.  We again started walking away and
they called both of us S.O.B.'s.  Mr. Bridgman then asked
me to come in and call Mr. Clark at the front gate.  When
Mr. Clark arrived, he informed Mr. Bridgman that he did
not have the authority to kick a student out or give them
a disciplinary for this type behavior.  He stated that he
had a letter from Warden Morrison to this effect.
However, Mr. Johnny B. Leonard witnessed the incident and
could identify the student doing most of the smart talk.
The next day, Mr. Reeder removed the student from school.

On November, 1 as I walked through the front
gate of Main Campus, I noticed the FLYC students lined up
at the side gate.  Therefore, I walked with my head down,
not looking at the students due to being paranoid,
because they were standing there, and knowing that they
would take this opportunity to talk ugly.  The front gate
officers were in the guard shack, and I did not see any
officers with the students at the side gate.  Sure
enough, one of the students started hollering "Hey big
titties."  I walked as fast as I could to get on the
sidewalk, out of sight, and he continued hollering the
remark even as I was coming through the front door.

When I reached my office, I called FLYC at 6:45
am, and talked to Officer Peppers and asked him to report
the incident to Captain Henry.  Officer Peppers stated
that he would, however, he would rather I speak with
Captain Henry myself.  I asked him to have Captain Henry
call me back.

I then came in search of you and found that you
were out and not expected to return until Wednesday due
to meetings.  I then went to Mr. Powell in his office and
told him about the incident, and he agreed that this type
of comment was certainly out of line and that I had his
permission to contact the DOC concerning this matter.  I
want you to know that general insults are one thing but
when the boys start making reference to my personal

body parts, it means they are looking at me in a manner
which is not acceptable, and to think they think they can
make reference to it infuriates me.

At 9:55 am, on November 1, Officer Clark called
my office and stated that Captain Henry asked him to find
out what my complaint was.  I informed Officer Clark of
what had happened and told him that Captain Henry should
have placed this call.  Mr. Clarke made the smart remark
that "well maybe we just didn't need any students so our
feelings would not be getting hurt."

At 9:58 am, on November 1, Captain Henry called
me, and once again, I explained what had happened, and he
seemed to think this type problem could be solved by not
bringing the FLYC students over until around 7:30 am
since some shops were unsupervised until the bus drivers
arrive.  He stated he would be over later to talk with
Mr. Powell.

He did come over, and Mr. Powell informed him
that the students were being supervised and that this was
not the problem.

I do not know how to solve the problem.  I can
only say that I am willing to take whatever action is
necessary to put a stop to this type harassment.

I once again appeal to you to try to handle
this from your position.  I do not want to embarrass
myself or you or the DOC, but I will do whatever it takes
to let those little fools know that they can not get away
with this type behavior.

I have been told by legal council that the
women here have a clear class action sexual-harassment
suit.

Thank you for your help and consideration in
the matter.


cc:  Mr. Powell
     Mr. Mulder
     Mr. Reeder
     Dr. Shum



**STATE OF ALABAMA**

**DEPARTMENT OF CORRECTIONS**

**MONTGOMERY, ALABAMA 36130**

TOMMY HERRING
COMMISSIONER

JIM FOLSOM
GOVERNOR

November 9, 1993

M E M O R A N D U M:

TO:        Dr. Murry C. Gregg, President
           Ingram State Community College

FROM:      Ron Sutton, Associate Commissioner
           for Institutions

RE:        FLYC Population's Use of Foul Language


     In response to your memorandum dated November 2,
1993.  We are dealing with the situation of use of
foul language at Frank Lee Youth Center.  If it is not
corrected please let me know.

     Thank you for your concerns.

RSjb

Date: 3/23/90

MEMORANDUM

TO:      Dr. Murry C. Gregg, President

FROM:    Julie K. Givens
                    (Employee)

RE:      Permission to enroll in College Classes

Dr. Gregg, I will appreciate your permission to enroll in the following class(es) at __Athens State__
                                    (college)
for the __Spring__ Quarter, 19 90 .

| COURSE NO. | TITLE | CREDIT HOURS | SCHEDULED DAYS/TIME |
|---|---|---|---|
| SE301 | Intro. to the Exceptional Child | 5. | Friday 6:00pm - 10:00pm Saturday 8:00AM - 5:00p.m |
| | | | |
| | | | |

Thank you for your consideration to this request.

-------------------------------------------------------------------

(✓) Approved
( ) Disapproved

Murry C. Gregg, Ed. D.

Date: _1/24/90_

MEMORANDUM

TO:      Dr. Murry C. Gregg, President

FROM:    _Julie K. Givens_
                (Employee)

RE:      Permission to enroll in College Classes

Dr. Gregg, I will appreciate your permission to enroll
in the following class(es) at _C A C C_
                                        (college)
for the _Winter_ Quarter, 19 _90_ .

| COURSE NO. | TITLE | CREDIT HOURS | SCHEDULED DAYS/TIME |
|---|---|---|---|
| Sph 107 | Public Speaking | 5 | 4:00-6:00 |
| Eng Lit 261 | Eng. Lit I | 5 | 6:00-8:00 |
| Soc 200 | Sociology | 5 | independent Study |

Thank you for your consideration to this request.

--------------------------------------------------------

(✓)  Approved
( )  Disapproved

_Murry C. Gregg_
Murry C. Gregg, Ed. D.

Date: _9|14|89_

MEMORANDUM

TO:        Dr. Murry C. Gregg, President

FROM:    _Julie K. Givens_
                    **(Employee)**

RE:        Permission to enroll in College Classes

Dr. Gregg, I will appreciate your permission to enroll in the following class(es) at _C A C C_
                                                                                          **(college)**
for the _Fall_ Quarter, 19 _89_ .

| COURSE NO. | TITLE | CREDIT HOURS | SCHEDULED DAYS/TIME |
|---|---|---|---|
| _Eng 102_ | _English Comp I_ | _5_ | _M+W 5:30-7:35_ |
| _Bus 215_ | _Business Communication_ | _5_ | _T+TH 7:35-9:40_ |
| | _Co-op_ | _2_ | |

Thank you for your consideration to this request.

------------------------------------------------------

( ✓ ) Approved
( )  Disapproved

_Murry C. Gregg_
Murry C. Gregg, Ed. D.

Date: _3/27/89_

MEMORANDUM

TO:      Dr. Murry C. Gregg, President

FROM:    _Julie K. Givens_
                    (Employee)

RE:      Permission to enroll in College Classes

        Dr. Gregg, I will appreciate your permission to enroll
in the following class(es) at _All Bible Central Al Comm. College_
                                        (college)
for the _Spring_ Quarter, 19 _89_.

| COURSE NO. | TITLE | CREDIT HOURS | SCHEDULED DAYS/TIME |
|---|---|---|---|
| Sph 106 | Fund. of Communication | 5 | m/w 3:30-5:35 |
| PS 101 | Phys. Science | 5 | m/w 7:30 9:40 |
| | Co-op | 2 | |

        Thank you for your consideration to this request.

------------------------------------------------------------

                (✓) Approved
                ( ) Disapproved

                        _Murry C. Gregg_
                        Murry C. Gregg, Ed. D.

Date: _1 - 12 - 89_

MEMORANDUM

TO:    Dr. Murry C. Gregg, President

FROM:  _Julie K. Givens_
       (Employee)

RE:    Permission to enroll in College Classes

Dr. Gregg, I will appreciate your permission to enroll in the following class(es) at _A. C. J. C._
(college)
for the _Winter_ Quarter, 19 _89_ .

| COURSE NO. | TITLE | CREDIT HOURS | SCHEDULED DAYS/TIME |
|---|---|---|---|
| 110 | College Algebra | 5 | Tues - Thurs. 4:00-5:? |
| 122 | World History II | 5 | " 5:30-7:0 |
| 231 | Prin. of Economics I | 5 | " 7:30-9:45 |
| | Co - o p | 2 | |

Thank you for your consideration to this request.

------------------------------------------------------------

(✓) Approved
( ) Disapproved

_Murry C. Gregg_
Murry C. Gregg, Ed. D.

Date: _9/26/86_

MEMORANDUM

TO:        Dr. Murry C. Gregg, President

FROM:      _Julie K Hura_ (handwritten)
                (Employee)

RE:        Permission to enroll in College Classes

Dr. Gregg, I will appreciate your permission to enroll
in the following class(es) at _Alex City Jr. College_
                                    (college)
for the _Fall_ Quarter, 19 _86_.

| COURSE NO. | TITLE | CREDIT HOURS | SCHEDULED DAYS/TIME |
|------------|-------|--------------|---------------------|
| OAD 114 | Elementary Shorthand | 5 | Mon/Wed 5:30-7:30 |
| | | | |
| | | | |

Thank you for your consideration to this request.

----------------------------------------------------------------

( ✓ ) Approved
(   ) Disapproved

_Murry C. Gregg_
Murry C. Gregg, Ed. D.

Date: _8/23/91_

MEMORANDUM

TO:        Dr. Murry C. Gregg, President

FROM:      _Julie Givens_
           (Employee)

RE:        Permission to enroll in College Classes

        Dr. Gregg, I will appreciate your permission to enroll
in the following class(es) at _Athens_
                                    (college)
for the _Fall_ Quarter, 19_91_.

| COURSE NO. | TITLE | CREDIT HOURS | SCHEDULED DAYS/TIME |
|---|---|---|---|
| G BA 305 | Statistical Methods of Bus | 5 | Friday 6:00-9:00 Saturday 8:00-4:00 |
| _____ | _____ | ___ | _____ |
| _____ | _____ | ___ | _____ |

_Sept. 20, Sept. 11, Oct. 25, Oct. Nov 15_

        Thank you for your consideration to this request.

----------------------------------------------------------------

        ( ✓ ) Approved
        (   ) Disapproved

                    _Murry C. Gregg_
                Murry C. Gregg, Ed. D.

# INGRAM STATE COMMUNITY COLLEGE

**Murry C. Gregg, Ed D**
President

**J. M. Mulder**
Dean of Technical &
Literacy Education

**Paul Reeder**
Dean of Students

**Ron Shum, Ed.D.**
Dean of Academics &
Educational Support Services

**Monica J. Greene**
Dean (Interim)
Fiscal Affairs

April 4, 1996

MEMORANDUM

TO:          File

FROM:       Dr. James Selman

SUBJECT:    Meeting of April 4, 1996, to discuss an argument of April 3,
            1996, involving Ms. Julie Givens and Ms. Barbara Acreman

At approximately 8:00 a.m. this morning a meeting was held in the office of Dr. James Selman.  In attendance were Dr. Selman, Mrs. Monica Greene, Mr. Gene Bridgman, Mr. Greg Wright, Mrs. Julie Givens, and Ms. Barbara Acreman.

Discussion centered on an argument and altercation which occurred on April 3, 1996, and involved Ms. Acreman and Ms. Givens.  At that time, both were placed on administrative leave for the remainder of the day, and for one hour this morning, 7:00 to 8:00.  Dr. Selman opened the discussion by stressing the need for all employees to get along as coworkers, and pointing out that both women were valued employees. When asked to comment, both expressed regret that the incident had occurred and had progressed as far as it had.  Mrs. Greene and Mr. Bridgman made positive remarks about both employees.  Mr. Wright suggested a  verbal "no discussion" agreement among all parties to head off some of the inevitable office gossip.  All agreed.

A consensus was reached that there would be no repeat of the incident. Any future friction should be discussed with Mrs. Greene, Mr. Bridgman, Mr. Wright, or Dr. Selman, in order to avoid similar situations in the workplace.  The meeting adjourned shortly before 9:00 a.m..

NOTE:  Both employees will be given an opportunity to attach a written statement to this memo, to be placed in their personnel files.



*Ingram State Community College*

*ISCC*

*• Developing Responsible Citizens •*

**Murry C. Gregg, Ed.D.**
President

**J. M. Mulder**
Dean of Technical &
Literacy Education

**Paul Reeder**
Dean of Students

**Ron Shum, Ed.D.**
Dean of Academics &
Educational Support Services

**Monica J. Greene**
Dean (Interim)
Fiscal Affairs

## INGRAM STATE COMMUNITY COLLEGE

May 13, 1996

MEMORANDUM

TO:          File

FROM:      Greg Wright, Personnel Director

SUBJECT:   Conference with Bobby Luster and Julie Givens

A meeting was held on May 13, 1996, at approximately 12:30 pm, in the small conference room adjacent to the president's office. In attendance were Mr. Douglas Chambers, Interim President; Mr. Bruce Thomas, Assistant Technical Dean; Mrs. Monica Greene, Fiscal Dean; Mrs. Julie Givens, Administrative Assistant to the Fiscal Dean; and Mr. Bobby Luster, Barbering Instructor.

The purpose of the meeting was to discuss a complaint Mrs. Givens had submitted to the president. In it she stated that Mr. Luster, just earlier in the day, had intruded into a conversation she was having with another instructor about lunch periods and had spoken to her in a degrading and personally insulting manner. This occurred in the front office, in front of coworkers and livework patrons. (See attached complaint)

During discussion of the incident, all agreed that this type of unprofessional behavior cannot be tolerated. Mr. Luster admitted that his language had been as Mrs. Givens described and was inappropriate and wrong. He apologized for his behavior and told Mrs. Givens that it wouldn't happen again. Mr. Chambers urged both employees to try to return to a normal professional working relationship, but emphasized that <u>any such future incidents must not occur</u>. He recommended professionalism and more attention to protocol as approaches to avoid conflicts. Following this discussion the complaint was considered resolved.

c:      Mr. Douglas Chambers
        File

5375 Ingram Road • P.O. Box 209 • Deatsville, Alabama 36022

Phone: 334-285-5177 • Fax: 334-285-5328

LEAVE LOST ACKNOWLEDGEMENT FORM

TO:                Personnel Files

FROM:              *Julie Bivens*

SUBJECT:           Acknowledgement of Lost Leave Time Accumulated at August
                   31st Cut-Off Period *1997*

      I hereby acknowledge that I have lost the following hours, as
indicated, for the category of leave described below.  Because of failure to take such
leave, I understand that my balance is not permitted to exceed the maximum accrued
allowable for carry-forward at September 1st of any given year.

| Leave Description | Hours Lost |
|---|---|
| Annual Leave | _____ |
| Sick Leave | _____ |
| Personal Leave | _____ |
| Emergency Leave | *1.75* |

      I hereby authorize my accrued balance to be deducted for the
above amounts.

*Julie K Bivens*

Employee Signature

08/13/97  WED 07:45 FAX 334 285 5328    JSTC MAIN    ☐001

# J. F. INGRAM STATE TECHNICAL COLLEGE

J. F. Ingram
State
Technical
College

JSTC

• Developing Responsible Citizens •

**J. Douglas Chambers**
President

**Paul Reeder**
Dean of Students

**Monica J. Greene**
Dean of Fiscal Affairs

**Jickey A. Huffsutler, Ph.D.**
Dean of Instruction

MEMORANDUM

DATE:     August 11, 1997

TO:       All Employees

FROM:     Greg Wright

SUBJECT:  Conversion of unused personal leave to sick leave

Policy #610.01, <u>Leaves With Pay</u>, from *The Alabama College System Policy Manual*, has been revised to allow for the conversion of unused personal leave to sick leave at the end of the leave year.  Section 6.13 of this policy states:

> *Personal leave not taken may, at the discretion of the employee, be converted at the end of the leave year to sick leave.  Such election requires affirmative action and timely written notice by the employee to the institution.*

If you have personal leave you want to convert, please sign the statement below and return to me by Monday, August 18, 1997.  This will satisfy the affirmative action and timely written notice requirements of the policy.   Thank you.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**I am requesting that any personal leave I have remaining on the books at this time be converted to sick leave.**

Name _____ Date _8/18/97_
                    16.00 hours

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

5375 Ingram Road  P. O. Box 220350  Deatsville, Alabama 36022-0350
Phone: 334-285-5177          Fax: 334-285-5328

THE ALABAMA COLLEGE SYSTEM
EMPLOYEES' TUITION WAIVER APPLICATION

EMPLOYEE

Name: _Julie Givens_    SSAN: _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_

Employing Institution: _Ingram State Community College_

Date of Full-time Employment: _1-21-85_

Position/Title: _Assistant Accountant_

Institution to Attend: _CACC_

Course No./Title: _BUS 242 Principles of Acct. II_ Credit hrs. _5_ Qtr. _Spg 94_

Course No./Title: _____ Credit hrs._____ Qtr._____

Course No./Title: _____ Credit hrs._____ Qtr._____

Course No./Title: _____

EMPLOYING INSTITUTION

Initial Date of Full-time Employment _January 21, 1985_

_Authorized Signature_

I certify that _Julie K. Givens_ is an eligible employee
at _Ingram State Community College_, and is entitled to
receive an employee tuition waiver.

_4/4/94_
President's Signature    Date

INSTITUTION TO ATTEND

_____ has been approved to receive an employee tuition
waiver for _____ hours at _____.

_____    _____
President's Signature    Date

cc:  Employee
     Employing Institution
     Institution to Attend

THE ALABAMA COLLEGE SYSTEM
EMPLOYEES' TUITION WAIVER APPLICATION

<u>EMPLOYEE</u>

Name: _Julie Givens_    SSAN: _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_

Employing Institution: _Ingram State Comm. College_

Date of Full-time Employment: _1-21-85_

Position/Title: _Asst. Accountant_

Institution to Attend: _C.A.C.C._

Course No./Title: _Bus 241 Prin. of Acct. I_ Credit hrs. _5_ Qtr. _Winter_

Course No./Title: _____ Credit hrs._____ Qtr._____

Course No./Title: _____ Credit hrs._____ Qtr._____

<u>EMPLOYING INSTITUTION</u>

Initial Date of Full-time Employment _January 21, 1985_

Authorized Signature

I certify that _Julie Givens_ is an eligible employee
at _Ingram State Community College_, and is entitled to
receive an employee tuition waiver.

_____ _1/5/94_
President's Signature          Date

<u>INSTITUTION TO ATTEND</u>

_____ has been approved to receive an employee tuition
waiver for _____ hours at _____.

_____        _____
President's Signature          Date

cc: Employee
    Employing Institution
    Institution to Attend

# ALEXANDER CITY STATE JUNIOR COLLEGE

## ALEXANDER CITY, ALA.

### STUDENT'S GRADE REPORT

| GIVENS, JULIE K. | | | | 0008 2 | | | PAGE | 06/07/80 |
|---|---|---|---|---|---|---|---|---|
| STUDENT'S NAME | ADV. CODE | SCHOOL OR DIV. | DEPT. | MAJOR | CLASS | SEX | H.S. | DAY MO. YR. PERIOD ENDING |

GIVENS, JULIE K.
RT 1, BOX 185
DEATSVILLE, AL        36022

**GRADING SYSTEM:**

A-EXCELLENT         4
B-GOOD              3
C-FAIR              2
D-POOR              1
F-FAILURE
P-PASSING
  (NOT COMPUTED IN AVG.)
I  -INCOMPLETE
W -WITHDRAWN
W -(A, B, C OR D) WITHDRAWN
   PASSING
WF-WITHDRAWN FAILURE

| COURSE | NUMBER | TITLE | GRADE | HOURS CARRIED | HOURS EARNED | QUALITY POINTS |
|---|---|---|---|---|---|---|
| PHS | 101 | PHYSICAL SCI I | A | 05 | 05 | 20 |
| SPH | 106 | FUND SPEECH | A | 05 | 05 | 20 |
| BUS | 195 | BUS CO-OP III | A | 02 | 02 | 08 |
| | | ** DEANS LIST ** | | | | |

| | GRADE | HOURS CARRIED | HOURS EARNED | QUALITY POINTS |
|---|---|---|---|---|
| QUARTER AVERAGE AND TOTALS | 4.00 | 012 | 012 | 048 |
| OVERALL AVERAGE AND TOTALS | 4.00 | 051 | 051 | 204 |

A STUDENT MUST EARN A TOTAL QUALITY
POINT AVERAGE OF 2.0 TO BE ELIGIBLE
FOR GRADUATION. SATISFACTORY GRADES
ARE A, B, AND C. MOST COLLEGES AND
UNIVERSITIES   WILL   NOT   ACCEPT   A
TRANSFER OF "D".

REPORT ERRORS TO DEAN OF STUDENTS

**STUDENT**

_____
DEAN OF STUDENTS

# ALEXANDER CITY STATE JUNIOR COLLEGE
## ALEXANDER CITY, ALA.
### STUDENT'S GRADE REPORT

| GIVENS, JULIE K. | | 0000 | 2 | | 8888 | 03/21/59 |
|---|---|---|---|---|---|---|
| **STUDENT'S NAME** | ADV. CODE / SCHOOL OR DIV. / DEPT. | MAJOR | CLASS | SEX | H.S. | DAY MO. YR. PERIOD ENDING |

GIVENS, JULIE K.
RT 1, BOX 185
DEATSVILLE, AL    36022

**GRADING SYSTEM:**

A-EXCELLENT    4
B-GOOD         3
C-FAIR         2
D-POOR         1
F-FAILURE
P-PASSING
   (NOT COMPUTED IN AVG.)
I  -INCOMPLETE
W  -WITHDRAWN
W  -(A, B, C or D) WITHDRAWN
       PASSING
WF-WITHDRAWN FAILURE

| COURSE | NUMBER | TITLE | GRADE | HOURS CARRIED | HOURS EARNED | QUALITY POINTS |
|---|---|---|---|---|---|---|
| MTH | 110 | COLLEGE ALGEBRA | A | 05 | 05 | 20 |
| ECO | 231 | PRIN ECONOMIC I | A | 05 | 05 | 20 |
| HIS | 122 | WORLD HISTORY II | A | 05 | 05 | 20 |
| BUS | 194 | BUS CO-OP II | A | 02 | 02 | 08 |
| | | | | | | |
| **QUARTER AVERAGE AND TOTALS** | | | 4.00 | 017 | 017 | 068 |
| **OVERALL AVERAGE AND TOTALS** | | | 4.00 | 039 | 039 | 156 |

A STUDENT MUST EARN A TOTAL QUALITY
POINT AVERAGE OF 2.0 TO BE ELIGIBLE
FOR GRADUATION. SATISFACTORY GRADES
ARE A, B, AND C. MOST COLLEGES AND
UNIVERSITIES  WILL  NOT  ACCEPT  A
TRANSFER OF "D".

REPORT ERRORS TO DEAN OF STUDENTS

**STUDENT**

_____
DEAN OF STUDENTS

## ALEXANDER CITY STATE JUNIOR COLLEGE
ALEXANDER CITY, ALA.
### STUDENT'S GRADE REPORT

| GIVENS, JULIE K. | | ADV. CODE | SCHOOL OR DIV. | DEPT. | MAJOR | CLASS | SEX | H.S. | DAY MO. YR. PERIOD ENDING |
|---|---|---|---|---|---|---|---|---|---|
| STUDENT'S NAME | | | | | 0006 | 2 | | 8P08 | 12/13/ |

GIVENS, JULIE K.
RT 1, BOX 185
DEATSVILLE, AL          36022

**GRADING SYSTEM:**

A-EXCELLENT 4
B-GOOD 3
C-FAIR 2
D-POOR 1
F-FAILURE
P-PASSING
  (NOT COMPUTED IN AVG.)
I -INCOMPLETE
W -WITHDRAWN
W -(A, B, C OR D) WITHDRAWN
  PASSING
WF-WITHDRAWN FAILURE

| COURSE | NUMBER | TITLE | GRADE | HOURS CARRIED | HOURS EARNED | QUALITY POINTS |
|---|---|---|---|---|---|---|
| MTH | 101 | MATH INSIGHTS | A | 05 | 05 | 20 |
| SOC | 247 | MARRIAGE/FAMILY | A | 05 | 05 | 20 |
| HIS | 121 | WORLD HISTORY I | A | 05 | 05 | 20 |
| BUS | 193 | BUS CO-OP 1 | A | 02 | 02 | 08 |
| | | | | | | |
| | | ** DEANS LIST ** | | | | |
| QUARTER AVERAGE AND TOTALS | | | 4.00 | 017 | 017 | 068 |
| OVERALL AVERAGE AND TOTALS | | | 4.00 | 022 | 022 | 084 |

A STUDENT MUST EARN A TOTAL QUALITY POINT AVERAGE OF 2.0 TO BE ELIGIBLE FOR GRADUATION. SATISFACTORY GRADES ARE A, B, AND C. MOST COLLEGES AND UNIVERSITIES WILL NOT ACCEPT A TRANSFER OF "D".

REPORT ERRORS TO DEAN OF STUDENTS

_____
DEAN OF STUDENTS

**STUDENT**

# ALEXANDER CITY STATE JUNIOR COLLEGE
## ALEXANDER CITY, ALA.
### STUDENT'S GRADE REPORT

| GIVENS, JULIE K. | | | | 0000 1 | | | 8888 | 12/18/86 |
|---|---|---|---|---|---|---|---|---|
| STUDENT'S NAME | ADV. CODE | SCHOOL OR DIV. | DEPT. | MAJOR | CLASS | SEX | H.S.- | DAY MO. YR. PERIOD ENDING |

GIVENS, JULIE K.
RT 1, BOX 185
DEATSVILLE, AL        36022

**GRADING SYSTEM:**

A-EXCELLENT        4
B-GOOD             3
C-FAIR             2
D-POOR             1
F-FAILURE
P-PASSING
   (NOT COMPUTED IN AVG.)

I  - INCOMPLETE
W  - WITHDRAWN
W  - (A, B, C OR D) WITHDRAWN
     PASSING
WF- WITHDRAWN FAILURE

| COURSE | NUMBER | TITLE | GRADE | HOURS CARRIED | HOURS EARNED | QUALITY POINTS |
|---|---|---|---|---|---|---|
| OAD | 114 | SHORTHAND, ELEM | A | 05 | 05 | 20 |
| | | QUARTER AVERAGE AND TOTALS | 4.00 | 005 | 005 | 020 |
| | | OVERALL AVERAGE AND TOTALS | 4.00 | 005 | 005 | 020 |

A STUDENT MUST EARN A TOTAL QUALITY
POINT AVERAGE OF 2.0 TO BE ELIGIBLE
FOR GRADUATION. SATISFACTORY GRADES
ARE A, B, AND C. MOST COLLEGES AND
UNIVERSITIES WILL NOT ACCEPT A
TRANSFER OF "D".

REPORT ERRORS TO DEAN OF STUDENTS

STUDENT                                    DEAN OF STUDENTS





# J. F. INGRAM STATE TECHNICAL COLLEGE
P. O. BOX 209
DEATSVILLE, ALABAMA 36022
Phone: 285-5177

Murry C. Gregg, Ed D
PRESIDENT
J. M. Mulder
DEAN OF INSTRUCTION

Freddie Powell
DEAN OF BUSINESS AFFAIRS
Paul Reeder
DEAN OF STUDENTS

August 21, 1989

---

MEMORANDUM

TO:        Dr. Murry C. Gregg

FROM:      Mr. Freddie Powell

    I would like to recommend Mrs. Julie Givens be appointed as assistant accountant and be placed at E5, Step 5 on the salary schedule.

    Mrs. Givens is currently working on her Associate Degree and plans to complete her BS degree. She has been assisting in the accounting department for several months and desires to be in accounting.

    Due to the increased volume of work in our accounting department and the need for our accounting to be timely, I recommend she be placed in this department effective September 1, 1989.

8-21-89
Approved
Murry C Gregg





DEFENDANT'S EXHIBIT
2-Givens