# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| JULIE GIVENS and | ) | |
| MONICA GREENE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. CV 2:06 CV852-1D |
| | ) | |
| DOUGLAS CHAMBERS, | ) | |
| Individually and in his capacity | ) | |
| As President of INGRAM STATE | ) | |
| TECHNICAL COLLEGE; JAMES | ) | |
| WILSON, Individually and in his | ) | |
| Capacity as Dean of Students of | ) | |
| INGRAM STATE TECHNICAL | ) | |
| COLLEGE | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION FOR SUMMARY JUDGMENT

ATTACHMENTS TO PREVIOUSLY FILED MOTION FOR SUMMARY
JUDGMENT

Ex. 4

## Ingram State Technical College
## Job Description

**JOB TITLE:** Fiscal Division Secretary and Administrative Assistant

Salary Level:   Schedule E        Division:    Fiscal
Location:        Office at Main Campus    Department: Fiscal

Employee Name:   Julie Givens
Supervisor:        Ms. Monica Greene, Dean of Fiscal Affairs

SUMMARY: All duties performed under the supervision of the Dean of Fiscal Affairs. Provides general secretarial services to the Fiscal Division and serves as Administrative Assistant to the Dean of Fiscal Affairs.

ESSENTIAL DUTIES AND RESPONSIBILITIES:

1. Manages and coordinates correspondence for the Dean and maintains correspondence files.

2. Monitors completion of travel forms and coordinates reimbursement for travel expenses.

3. Assists with preparation of budgets, financial statements, quarterly personnel reports, and monthly general ledger reports.

4. Assists in maintaining inventories.

5. Assists in preparation of all accounts payable for the college.

7. Assists in writing purchase orders as needed.

8. Assists in accounting for restricted funds, budgets, monthly reports and final reports.

9. Monitors maintenance of the college's phone equipment and processes order for phone equipment and installation.

10. Assumes any other duties assigned by the Dean

SUPERVISORY RESPONSIBILITIES: May be assigned by the Dean to supervise



DEFENDANT'S EXHIBIT

3- Givens

clerical personnel within the division. Carries out any such supervisory responsibilities in accordance with policies of the college and the Alabama Department of Postsecondary Education.

QUALIFICATION REQUIREMENTS: To perform this job successfully, an individual must be able to perform each essential function satisfactorily. The requirements listed below are representative of the knowledge, skills, and/or ability required. Reasonable accomodations may be made to enable individuals with disabilities to perform the essential functions.

EDUCATION/EXPERIENCE:
Associate degree or equivalent from a two-year college or technical school; or six months to one year related experience and/or training; or equivalent combination of training or experience.

LANGUAGE SKILLS:
Ability to read, analyze, and interpret documents. Ability to respond effectively to sensitive inquiries or complaints. Ability to communicate effectively in writing.

MATHEMATICAL SKILLS:
Ability to comprehend and apply principles of accounting and calculate discounts, interest, commissions, proportions and percentages.

REASONING ABILITY:
Ability to apply commonsense understanding to carry out instructions furnished in written, oral, or diagram form. Ability to deal with problems involving several concrete variables in standardized situations.

OTHER SKILLS AND ABILITIES:
Ability to coordinate activities and cooperate with other employees.

EEOC FORM 131 (5/01)

# U. S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| J. Douglas Chambers, President<br>J. F. INGRAM ST TECHNICAL COLLEGE<br>Post Office Box 220350<br>Deatsville, AL 36022 | **Julie Givens** |

THIS PERSON (check one or both)

[X] Claims To Be Aggrieved

[ ] Is Filing on Behalf of Other(s)

EEOC CHARGE NO.

**420-2006-01109**

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act

[ ] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act

[ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **10-APR-06** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [ ] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by _____
to _____
If you <u>DO NOT</u> wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

**Kay Lindsey,**
**Investigator Support Assistant**

*EEOC Representative*

*Telephone:* **(205) 212-2110**

Enclosure(s): [X] Copy of Charge

**Birmingham District Office - 420**
**Ridge Park Place**
**1130 22nd Street, South**
**Birmingham, AL 35205**

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[X] RACE  [ ] COLOR  [X] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN  [ ] AGE  [ ] DISABILITY  [X] RETALIATION  [ ] OTHER

## See enclosed copy of charge of discrimination.

**DEFENDANT'S EXHIBIT**

4- Givens

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| Mar 08, 2006 | **Bernice Williams-Kimbrough,**<br>**District Director** | *Bernice Williams Kimbrough* |

*Enclosure with EEOC*
*Form 131 (5/01)*

## INFORMATION ON CHARGES OF DISCRIMINATION

### EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charged with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA. These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge. (For ADEA charges, this notice is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge – the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below). Parts 1602, 1620 and 1627 also prescribe record retention periods – generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

**Section 1602.14  Preservation of records made or kept.** . . . . Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action. The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes. The Equal Pay Act contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, of rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

### NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA<br>☒ EEOC | 420-2006-01109 |

and EEOC

_____
State or local Agency, if any

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Julie Givens | (334) 285-7736 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 3751 Browns Road | Millbrook, Al. 36054 | 1/23/58 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| J. F. Ingram State Technical College | 139 | (334) 285-5177 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 5375 Ingram Road | Deatsville, Al. 36022 | Elmore |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| J. Douglas Chambers | (334) 285-5177 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 5375 Ingram Road, | Deatsville, Al. 36022 | Elmore |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

☒ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ AGE
☐ RETALIATION   ☐ NATIONAL ORIGIN   ☐ DISABILITY   ☒ OTHER *(Specify)* Hostile Work Environment

DATE DISCRIMINATION TOOK PLACE
EARLIEST *(ADEA/EPA)* October 1999
LATEST *(ALL)* January 2006

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

SEE ATTACHED

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
|  | Jimmy Lee DeBardelaben<br>I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT<br>Julie R. Givens |
| <br>Date                    Charging Party *(Signature)* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day, month, and year)<br>23 February 2006 |

EEOC FORM 5 (Test 10/94)

May 2001

Mrs. Greene's Mother was very sick and she was out with her. By then Mr. Chambers had a pattern of calling Mr. Bridgman, Asst. to Dean of Finance and I, Adm. Asst. to Dean of Finance, in to his office whenever she was not at work. He stated that he knew that we had problems in the business office. He stated that we could feel free to come to him about Mrs. Greene, that he knew that she was weak and ineffective as a business manager.

When Mrs. Greene returned to work, Mr. Chambers called in to my office, and had me to gather all the other members of the business office into my office, he then had me to put him on speaker phone with Mrs. Greene and proceeded to tell her what a poor job she was doing, and how ineffective she was as the business manager.

Mrs. Greene's Mother passed away the next week, and instead of showing support as an administrator he continued to belittle her to the other staff members and her office staff.

November 2001

Mrs. Greene was out on annual leave. Mr. Chambers called Mr. Bridgman and I in and stated that he knew that we must have been having problems in our department. Mr. Chambers stated that we could come to him anytime we needed to. He mentioned that he knew that accounts payable was probably behind because he knew that Mrs. Greene always held invoices.

March 2002

Mrs. Greene was out on annual leave. Mr. Chambers called Mr. Bridgman and I in and stated that he knew that Mrs. Greene was weak and ineffective. If we needed to talk to him concerning this please feel free to come in and see him.

June 2002

Mrs. Greene was out on professional leave. Mr. Chambers called me and told me that I could feel free to discuss Mrs. Greene with him. He stated that the people at Postsecondary knew that she was weak, incompetent and ineffective as a business manager.

October 2002

Mr. Chambers called me in before Mrs. Greene arrived at work and reminded me that if I needed to speak with him about her to let him know. He just wanted me to know that he was aware of our situation in the business office.

January 2003

Mrs. Greene was out on annual leave. Mr. Chambers called Mr. Bridgman and I in and stated that he knew that the purchase orders and accounts payable were in a mess because of Mrs. Greene. He stated that if we needed him to take care of anything to let him know. Mr. Chambers also kept mentioning that the vice-chancellor, Debbie Dahl, would be calling us to talk with us concerning Mrs. Greene.

2004-2005-many more of these type meetings took place.

Note: On all the above dates he talked in general and tried to get us to say something negative about Mrs. Greene. Sometimes we would be in his office as long as three hours.

You will note that these are just some of the instances where I know that I felt like I was being put in the middle of a battle between Mr. Chambers as President and Mrs. Monica Greene, my direct supervisor. I felt that *IF* there had been a real problem with Mrs. Greene he should have been talking directly with her, not with me a member of her staff. He never was clear on what he wanted me or Mr. Bridgman to say about her or do about her. He was always just kept insinuating that he knew that we knew something.

Putting me through this caused me to fall behind on my job duties, as I'm sure it did Mr. Bridgman. Being behind on my duties caused me stress and caused me anxiety. I have had to start taking medication for work stress anxiety back in 1999. At that time they put me on Prozac for a while, when it no longer was strong enough I was moved to Lexapro, Topamax and Zanex. These are medications I need just to come to work. This type work environment is not healthy.

On occasssion Mr. Chambers will still catch me and call me in to talk about Mrs. Greene, however, about three years ago I learned to ask her to let me know if she is going to be out and so I could take leave to avoid him.

Lucky Mr. Bridgman has retired. But not before suffering a *stroke* over Ingram stress.

October 13, 2003

MEMO

TO:           Mr. J. Douglas Chambers, President

FROM:         Mrs. Julie K. Givens, Payroll Office

Cc:           Mrs. Monica J. Greene, Dean of Fiscal Affairs

This memo is to notify you of several problems encountered by the payroll office while
beginning the new fiscal year. There are of course the normal changes that everyone
expects and there are always people who refuse to turn their paperwork in on time.
These type problems are to be expected and are handled.

*[handwritten margin note: Normal refuse? expected How handl]*

As you know, personnel and the accounting office, attended training sessions held by
the Access Group on contracts. Mrs. Greene also asked me to set in on a telephone
conference with the personnel department to key in information on contracts.
However, instead of having Erica set up at the workstation to key the information, Dr.
Merk set me up at the workstation. I told Mrs. Greene at that point that I had a feeling
that they thought I was going to key all the information for them and that I did not feel
that the personnel side of this was my responsibility.

*[handwritten margin note: Why you? who knew]*
*[handwritten note: what did she do to change this? Action taken?]*

Personnel had at least six months to key their side of the contracts in and had led
everyone as far as I know to believe that they had done so. But when I approached
Erica 2 weeks prior to keying the new pay changes she informed me that the contracts
had not been run from Access because of problems they had encountered with the
program. *[handwritten: what did Dean Greene/Dr. Merk (who knows) Concludi... After all it was his project]*

*[handwritten margin notes: Led 2 out po! ; No mention of it not being don to my Kno until deadline time.]*

Therefore, with two weeks left, I had to key all information, not only for payroll, but
also the information that would have automatically been created by the contracts, in
that short time frame. This created a very stressful situation for me and I feel that this
was very unfair and uncalled for. *[handwritten: what type of reasoning was given to you for doing this by yoursl it had to be done I did it]*

This very same group of people came to me not 10 days after payroll to help them with
the pers report for downtown. They needed information keyed to the personnel side of
payroll in order for the pers report to be right. Postsecondary does not recognize 12-
month contract instructors they have to be broken down for the report as 9 and 3-month
contracts. Mr. Griffin seemed to be pleased with the help I gave him with this report.

*[handwritten margin note: hy did they come to you?]*

In the last week Dr. Merk and I have discussed payroll issues such as employees
moving steps with 9 months services verses 12 months. All persons affected by these

*[handwritten bottom note: Because I have always made these corrections no matter who ran the pers. I guess it came from when Gene use to run it.]*

*[handwritten top margin notes: Mr. Wilson told them I had to train them in. Mrs. Perr... very helpf... ; Dr. Merk was 50-50 ; Dr Huffstutler could have cared less if his people turn theirs in etc]*

step increases will require adjusted pay records. We have been updating employee degrees for the pers report, etc. My point, I am not letting my personal feelings interfere with my job.

> what does this mean

(I stayed professional which is what you pay me to do.)

My hope is that next year will be a better year, with more organization, and that just maybe some of these other people will help out and make my job and the rest of business' office job easier. Just because we will pick up the slack, doesn't mean we should always have to.

Again, why are you and not (Merk & Greene) seeking resolution to this very important issue?

(Good Question)



**Ingram**
**State**
**Technical**
**College**

**ISTC**
*Developing Responsible Citizens •*

**J. Douglas Chambers**
President

**ickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

# INGRAM STATE TECHNICAL COLLEGE

December 10, 2003

## M E M O R A N D U M

**TO:**        J. Douglas Chambers
              President

**FROM:**      James T. Merk, Ed.D.
              Personnel Director

**RE:**        Progress on the Winter IPEDS Surveys

This correspondence is being sent to identify some of problems I have
encountered while filling out Ingram's Winter IPEDS survey and ask for your
help in solving them. For the last two and one half days, Mr. Griffin and I have
attempted to fill out the IPEDS surveys, Employees by Assigned Position, Fall
Staff, and Salaries. Since Ingram has not activated the Contract Module in its
ACCESS400 software, we were forced to use data from the PERS Fall Census
file, ACSPER. ACSPER is the file which reports Ingram's personnel data to the
Department of Postsecondary Education. Our AS400 computer generates the
ACSPER file using the personnel and payroll records in ACCESS400's payroll
module.

We analyzed the data by writing twenty-one separate queries and used the
queries' results to fill out the IPEDS survey, *Employees by Assigned Position.*
The IPEDS program performed an automatic edit to detect errors in the
completed survey. The survey contained so many errors that it was not accepted.
I have attached a copy of the error report that the IPEDS program generated and a
list of problems we noticed in the ACSPER file while running the queries.

These attachments represent serious problems. The ACSPER file is laden with
errors which misrepresent Ingram to anyone who sees the file. They also cost the
college hundreds of wasted man hours each time we complete a federal report on
personnel or try to print contracts. The reason for this is that before we can
complete work, we must clean up the ACSPER file. This is really wasteful
because the personnel office can not change the ACCESS400 payroll records that
generate the file

Since last January, I have attempted to help the Business Office activate the ACCESS400 Contract Module. The Contract Module is the ACCESS400 program that uses data from payroll and personnel records to generate contracts and IPEDS surveys. Ingram personnel have attended training sessions with the ACCESS400 group, user group training sessions and teleconferencing training to get ready to implement the module. Mr. Griffin, Mrs. Turner, and I hand entered all the pay scales into the ACCESS400 software. I have arranged numerous dates for the personnel office and the business office to work together to implement the module. I have set-up computers and projection equipment to make sure that work could be done jointly. However, the meetings have either been postponed or cancelled. It is essential that this be a joint effort to eliminate data entry errors and the inevitable finger pointing that would result from them.

I have exhausted all the means at my disposal to use software and equipment Ingram has paid for to prevent weeks of wasted manpower. I have not been successful. I need your help. Although there are many other pressing matters and deadlines, my team is ready to do whatever it takes to accomplish this vital task.

I recommend that you direct both departments immediately implement the Contract Module and use it as designed to generate contracts and external, especially the Winter 2003-2004 IPEDS survey.


JTM/ept

Attachments

cc:    Monica J. Greene

**NCES** National Center for Education Statistics

*Integrated Postsecondary Education Data System 2003 - 04*

Institution: J F INGRAM STATE TECHNICAL COLLEGE (101471)(4)

| Surveys | Reports | Tools | Help | User L |
|---------|---------|-------|------|--------|

## Edit Report                                                                                         ?

## Fall Staff

Return to Surveys Page

Institution: J F INGRAM STATE TECHNICAL COLLEGE (101471)

| Source | Description | Severity | Resolved | |
|--------|-------------|----------|----------|---|
| **Global Edits** | | | | |
| Perform Edits | There is more than a 10% difference between total part-time Other professional staff on EAP and total part-time Other professional staff (men plus women) in Part D of Fall Staff. Please explain this difference. | Explanation | No | Back |
| Perform Edits | There is more than a 10% difference between total part-time Technical and paraprofessional staff on EAP and total part-time Technical and paraprofessional staff (men plus women) in Part D of Fall Staff. Please explain this difference. | Explanation | No | Back |
| Perform Edits | Total number of faculty (8) by gender and race/ethnicity in Part F must match the total number of faculty (6) by gender and race/ethnicity in Part A. | Fatal | No | Back |
| Perform Edits | Total number of faculty (6) by gender and race/ethnicity in Part F must match the total number of faculty (5) by gender and race/ethnicity in Part A. | Fatal | No | Back |
| Perform Edits | Total number of faculty (28) by gender and race/ethnicity in Part F must match the total number of faculty (23) by gender and race/ethnicity in Part A. | Fatal | No | Back |
| Perform Edits | Total number of faculty (6) by gender and race/ethnicity in Part F must match the total number of faculty (7) by gender and race/ethnicity in Part A. | Fatal | No | Back |
| Perform Edits | Total number of faculty (36) by gender and race/ethnicity in Part F must match the total number of faculty (29) by gender and race/ethnicity in Part A. | Fatal | No | Back |
| **Screen: 11/12 mo - M** | | | | |
| Screen Entry | The number entered, 22, has an expected range of between 25 and 41. Please explain this difference. | Explanation | No | Go to |

Return to Surveys Page

December 12, 2003

MEMO

TO:           Mr. J. Douglas Chambers, President

FROM:         Mrs. Julie K. Givens, Payroll Office

Cc:           Mrs. Monica J. Greene, Dean of Fiscal Affairs

---

This memo is in direct response to the memo received by Mrs. Greene from Dr. Merk concerning contracts. I have no doubt this memo is a direct attack on me personally.

First, I can only say that the memo is full of un-truths. I believe that if you are going to discuss a problem you should include all of the information, not just the side that makes you look like a victim. Dr. Merk failed to mention that I sat in on a teleconference with his office, Mrs. Greene and Vicky from Access. However, instead of Dr. Merk or Mrs. Turner taking the driver's seat at the computer to learn the process, they sat me there. Perhaps they should have sat there?

On another occasion, I sat with Mrs. Turner at her desk one on one while she keyed in information on a test screen that Mr. Griffin had set up for her to practice on. I have given Mrs. Turner spreadsheets with employee information, codes being used in the payroll office that were originally set up by Vicky and Mrs. Lassiter, and other information they have asked for.

Just recently, Mrs. Greene and I spent a full day with Dr. Merk, Mrs. Turner and Mr. Griffin discussing contracts. This time, Mrs. Turner did sit at the computer. However, after sitting there for a full day, they still had not keyed one contract in. They kept referring to errors that they had detected on the IPEDS side coming from PERS and payroll. I asked for a copy of these errors and never received a copy.

Dr. Merk, however, did not have a problem coming up with the list of errors to attach to the memo to you. I guess this was his little weapon to pull out in case everyone did not do as he wanted.

Errors are a sign that a person is working, and they can be corrected. I am not perfect, and I do make errors. However, I feel Dr. Merk was remiss in his duties not giving Mrs. Greene or myself a list of these errors. The errors made on the PERS side perhaps are due to the fact that I had one day to key the PERS screen for MR. Griffin to correct 84

critical errors caused by flaw in the PERS report due to the 9 and 12 month contract issue downtown.

Granted, there have been other occasions when Dr. Merk has asked for my help sitting in on contract training. Unfortunately, these times have interfered with my job of payroll or other reports. For example, he asked me Wednesday at quitting time, and I responded that if I did not receive the information needed on Taxable Benefits that I would work with them until it came in on Thursday morning. However, I got the information and began working on Taxable Benefits. This, as you know, has to be done in December and keyed to each person's individual record as two separate entries. It took all day Thursday and most of the day Friday.

Monday, December 15, 2003, I will have to begin finalizing leave and gathering hours to complete payroll. This week will be booked with payroll preparations, reports, running checks, calling in taxes, and finalizing reports for year-end.

Finally, instead of being so critical of my not jumping in there and putting their contract project before my job. He should be saying thank you for all the help I have given them up to this point. After all, the PERS report got done, they used my spread sheet with their WORD document to create contracts last year and this year, he now knows that people with 9 months service move up instead of having to wait a year, etc.

Last, but not least, I would hope a directive from you would be that they decide just exactly what information they really need from me before I am called back in to a meeting. Perhaps Mrs. Turner and I working together instead of a conference would be more conducive to entering contracts. Just a suggestion!



*Ingram*
*State*
*Technical*
*College*

*Developing Responsible Citizens*

# INGRAM STATE TECHNICAL COLLEGE

# MEMORANDUM

**Date :**     2/16/2006

**To :**     **J. Douglas Chambers**
             President

**From :**     **Sandy Caylor**
               Tᴇ I Instructor

**Re :**     Comments on practice fabric

J. Douglas Chambers
Presiden t

Rickey A. Huffstutler,Ph.
Dean of the College

Monica J. Greene
Dean of
Fiscal Affairs

James E. Wilson
Dean Of Students
And
Support Services

On Wednesday,  Dean Wilson,You and myself  were having a conversation about the fabric that I purchase for practice in my shop. There were some comments  made that are not true. Dean Wilson said that the Business Office wouldn't let me go. They have nothing  to do regarding when I go. Dean Wilson also stated that if the Business Office wanted something done for their family or kids they would send me. You stated that you knew it and was keeping an eye on it. Let me just say, Nobody from the Business Office has ever sent me to get fabric. Dr. Merk is the one to o.k. my trips now. Dean Wilson did ask me awhile back if I had any of the practice frabic and I told him that I had very little. I told him that I hadn't been in awhile to get any.I told him that I hadn't been able to go. That I had to get Dr. Merk to let me go. The mill I purchase this fabric from is only open on Wednesday's. When I would ask Erica what the schedule looked like,  there was usually a lot  of Instructors already going to be off. So I would just wait. Finally, I told her I had to go. Dr. Merk was not here so, Erica stopped my shop up. I set it up with Monica for payment  of the fabric.   If I do any work for Dean Greene or anyone else in the Business Office, I have a workorder. I treat everyone the same.  In fact,Dean Greene needed a piece of scrap material last week. I told her I had a piece we were going to throw away and I'd give it to her. She said that she would do  a worKorder on it. I just sold Dean Wilson a class project sofa covered in some of the practice fabric. He also had a workorder for this. Everyone is treated the same. Also, any Embroidery work we do over here ,.whether it be for me or someone else also has paperwork. I get permission from Dean Greene.

Sandy Caylor
Tᴇ I Instructor

*P O  Box 220350 ·  Deatsville. Alabama 36022-0350*

*Phone. 334-285-5177    Fax  334-285-5328*

During the time that Mr. Chambers has been at Ingram as the President he has had several meetings with the ladies at Main Campus regarding their clothing. He will warn them that they should not wear jeans, tight clothing, show cleavage, wear capri pants, strapless heels, etc. In his opinion, this type clothing is not appropriate for the office.

Ingram does not have a dress code policy for women or men. He only meets with the office staff women at Main campus. We have a campus next to Draper Prison and one next to Tutwiler Prison. To my knowledge no such meetings have taken place at these locations.

Examples:

Summer of 2004

During a regular Faculty meeting downstairs Mr. Chambers stated that he was fed up with the way people reacted when they were told how to dress (I guess Main campus women) so "he did not care how they dressed." Other campus' employees were asking after the meeting "what was he was referring too?". This type question only reinforces that he had held no such meetings with the other ladies or men.

February 13, 2005

Mrs. Greene under the direction of Mr. Chambers and Mr. Wilson was told to tell the women at Main Campus that low cut, short, tight clothing and high heel strapless shoes should not be worn. The College would even provide cover up jackets to be worn.

September 9, 2005

Mr. Chambers called a meeting at 2:45 pm in the staff lunchroom of all the women on main campus with Mr. Wilson and Mrs. Greene. He stated that "office women can no longer wear blue jeans or capri pants", I asked him about the men and he told me he was not talking about the men only the women. He stated that men in the shops could wear jeans and when I asked about the office men he told me not to worry about it he was talking to the women.

J. F. Ingram State Technical College
Deatsville, Alabama


On Wednesday February 16, 2005 a meeting of the ladies working at our main campus was held to address and discuss the proper attire that should be worn at Ingram State.  Dean Greene conducted the meeting and told the ladies that proper business attire should be worn by all.  Mrs. Greene stated that low cut, short, tight clothes and high heel strapless shoes should not be worn.  The overall message delivered by Dean Greene was "if in doubt don't wear it".

Dean Greene also stated that "cover up jackets" can be purchased by the College for the ladies to wear during their workday.  Discussion followed about the type of jackets needed during the winter and summer.  Several stores in the Montgomery area were mentioned as possible sources of supplying the "cover up jackets".  Catalogs of the styles available will be obtained by the College and after input from the ladies the "cover jackets" will be purchased.  The meeting was then adjourned.



J. F. Ingram

State

Technical

College

• Developing Responsible Citizens •

**J. Douglas Chambers**
President

**Paul Reeder**
Dean of Students

**Monica J. Greene**
Dean of Fiscal Affairs

**Bruce Thomas**
Acting Dean of Technical
and Adult Literacy Education

# J. F. INGRAM STATE TECHNICAL COLLEGE

February 4, 1997

*Why are Men & women treated differ*

To:          All Employees

From:        J. Douglas Chambers

Re:          Employee Haircutting and Styling

Questions have arisen concerning the school's policy on haircutting and styling for employees. There are two major issues: first, that it takes employees away from their duty stations, and equally important is whether or not it contributes or interferes with the instructional process in the barbering or cosmetology program.

I have talked with the instructors involved, as well as the administrative council about these concerns. I am aware that for many years male employees often had their hair cut during the working day at a nominal fee, and often it was the program instructor who did the work. I am also aware that recently, more female employees have had their hair cut or styled even in the barbering programs as those have evolved more towards cosmetology. It is my judgment that the instructors believe that the employees provide a modeling function which enhances the programs. However, we will need to put more structure into the process.

In consideration of the value of providing demonstration models for the programs, I am asking that the following procedures be implemented. First, the instructor must always integrate the demonstration into the curriculum. Second, those employees wishing to volunteer as models should place their names on the appropriate instructor's waiting list, and he or she will call them as needed. Anyone, moreover, needing more than one hour in any one month for these purposes must request and receive from his or her supervisor before agreeing to participate. Permission to be allowed to serve as a model must be obtained from the immediate supervisor. An employee's regular job cannot be allowed to suffer as a result of these demonstrations or student work. All work should be done by students, unless the instructor is giving a demonstration.

Effective immediately, the minimum charge for a man's haircut will be increased to two dollars. Other services will be charged according to the materials involved, etc. The barbering and cosmetology programs will now operate in the same manner as any other; that is, a waiting list will be held by the instructor, or the technical dean's secretary; approved by the dean, and a work order issued when the services can be integrated into the curriculum needs. Mrs. Lassitter, as the cashier, will handle the finances.

Thank you.

5375 Ingram Road  P. O. Box 209  Deatsville, Alabama 36022
Phone: 334-285-5177          Fax: 334-285-5328

**CABINET MEETING**
JF Ingram State Technical College
September 12, 2005

Present:    J. Douglas Chambers          Dr. James T. Merk
            Monica J. Greene             James E. Wilson
            Kay D. Perryman
Recorder:   Julie Wood

President Chambers noted this is the first cabinet meeting since the reorganization and/or restructuring. He stated he wanted the cabinet to keep focused. He knows some of the members have been very concerned about his response to the audit, and he has completed and submitted his response to the audit report to Mr. Ron Jones and has had a discussion with Larry Williard, and is now waiting to hear back from him. What he is telling the cabinet is for information purposes only, not for them to quote him or to say anything to any other employees. He has not shared his response with anyone in detail, but has talked to some individuals about certain responses as it might relate to them individually, and he did that to get some feedback. He does appreciate the feedback that he received, because he wrote some things up based on his interpretation after talking to everyone at the table, as it relates to them, mostly Dr. Merk and Monica Greene. He has changed a few things and made the wording fit the specific response. The auditors, in his opinion, have been very fair and responsive to helping the school. He even stated in his response that he felt like the audit was fair and supportive. However, when the auditors make their final decision which will be going in their report at the end of this month, we will be notified as to how we fit in the situation. Dr. Johnson and Stephanie Bell will receive a copy as well. The President put some things in the response which will clearly show that he did not disagree with their findings. He also assured them that he has and would be taking steps to make sure that this does not occur again. He informed them that he would be warning and reprimanding certain people and copies of those were available for submission and will be included in the President's final report to the Chancellor. The President stated that he would need the cabinet's help on a problem area. He will be calling certain employees in and telling them up front, while handing them a reprimand. He stated he has no time for foolishness, and has told a few of them to expect a discipline due to the findings. The President does not think anyone was dealt with to a point that they cannot move on from this. No one will miss a check or be suspended, but we are not going to just warn over and over. We are taking steps to discipline, and a reprimand is a form of discipline. He expects the cabinet to help him carry out the tasks we have before us. It will be important that we review the problems we have had, look at our internal controls, see that we have a check and balance so that the type things that were in our findings do not show up again. There were four findings, and he will be working with the cabinet to go forward, realizing that we are going to grow from those things that caused us to be under the microscope. As the chief person in charge of running this institution, the President has gotten over his embarrassment, hurt, disappointment. Yes, he was embarrassed that an auditor had to tell us that we did not have the proper documents, that we were working on a tractor, and he stated in his response summary that

Cabinet Meeting
September 12, 2005
Page 2 of 6

the Dean of the College, the person employed to supervise live work, violated college ·
policy. He also said that the Dean of Fiscal Affairs had no knowledge that the tractor was
being worked on, and therefore there was no way possible that she could have had the
proper paperwork or deposit. He put the responsibility of that just where it was. He tried
to be fair about his response, but also had to be realistic. We have been weak and we are
going to become stronger.

The President suggested one of the ways we are going to become stronger is that he
wants the cabinet to have a vision of what their roles are and what they expect to do in
their areas. First, he needs know if the cabinet is getting the most and best of those they
supervise. He wants each cabinet member to ask themselves that question. He thinks
they would say no, if they are honest. When they review the job descriptions in each
area, he wants them to put that imaginary question — is this person doing what this person
is hired to do? In order for them to answer that question, they must first understand what
they want that person to do. Sometimes we find ourselves becoming upset because
something did not go right, and then they know the set of questions the President is going
to ask. He wants them to come to him with the answers before he asks the questions.
The questions will be: what did we have in place that could have prevented this? What
steps did you take to make sure this could have been avoided? When was the last time
you checked this to see if it was working? For the last few months, the President has
been talking about controls. As we go forward into the fall term, he wants to concentrate
on "how could this have been avoided?" Hank Sanders always says "turning our
struggles into opportunities, turning our negatives into positives," and that is what he
wants to do. He wants to make sure we are doing what is expected of us, and what we
understood it to be before we start. He wants us to be treated fairly and for us to
understand what is expected. He wants the employees to have clear expectations of what
they are expected to do, and he wants the feedback, let them state it back to you. Have
your employees to write back to you a memo of understanding.

The President wants the cabinet to have proof of a check and balance all through their
workday and when checking their programs. He wants them to be able to look at the
results of the check and balance. Evaluating the results is going to important, because if
it does not work one way, try another way.

Dr. Merk stated he could pass around a document that would "nail down" what the
President has been talking about, which is the Institutional Management Plan. It contains
the requirements to do those things the President suggested and then turn them in to the
Chancellor's office. The President asked him to break it down, call a meeting of the
cabinet, and talk about which roles will be assigned to each cabinet member and put it
back together. He stated that although you might be identified as the contact person, you
don't just go to your computer, pull up something and send it downtown. Dr. Merk
agreed. The President asked the cabinet to get with other members and the President,
analyze and verify the information they have before it is sent downtown.
The President stated all contracts should be completed. If anyone has any questions or
anything that flares up as a result of the contracts, the President needs to know. Dr. Merk

Cabinet Meeting
September 12, 2005
Page 3 of 6

stated they did have a question from one part-time, ABE employee, and the issue was cleared up with the President's approval. There was a time limit in which the employee is to return the contract, and the President stated if we do not have it back within that time frame, we will notify her that she has not signed the contact and is therefore not employed. It is imperative that every person follows up on everything they start. When someone has something on their checklist that still pending, notify the person who is holding up the progress and get it completed.

The President asked Dr. Merk to tell him what type of understanding the employees were given as to when they were to return the contracts. Dr. Merk stated the contracts were to be returned within a week. The President instructed Mrs. Perryman to have her off-site employees sign and fax the contract, then mail the original.

The President also instructed that within the next three to four weeks, he needs to have the evaluations in to Dr. Merk. Dean Greene stated she has not received evaluation forms as of yet, but Dr. Merk said he would get them to her. The President stated that evaluations are meant to identify areas of weakness, as well as areas an employee is doing well. The President will remind the cabinet that they are due, but he does need them by mid-October. Dr. Merk's part will be to identify areas where he knows there are weaknesses, and it will be more of a counseling opportunity to improve. The President stated this is a priority. If an individual refuses to sign his evaluation, make sure there is a witness to the fact the evaluation was shared with the employee. The signature does not necessarily indicate the employee agrees with the evaluation, but merely that they received it.

President Chambers reminded the cabinet it is time to submit the three month tardy report, and he will need it before the end of the week, following the same system as before. He stated that he will be looking at the flex-time proposals, but will not just jump into any situation. He will have to talk to the Vice-Chancellor to make sure there is even a possibility. He will have to talk to the DOC as well. In the meantime, he expects the cabinet to adhere as closely as possible to the guidelines already in place. The President asked Dr. Merk to look at each employee's tardiness in the past, as well as just the past three months. The President stated, for the record, you cannot change a person's schedule. You can recommend that they be allowed to change their schedule temporarily, or for a week, etc., but be very careful not to tell an employee they can have a permanent schedule change. We have to be consistent across the board. The President is very considerate of employees' needs, is conscious that emergencies occur, but has to say "what if" one employee needs a change, then a few others decide to follow suit as well. He asked the cabinet to remember that lawsuits come as a result of people being unfairly treated as compared to others. He wants the cabinet to try to be flexible with their employees, but at the same time realize they cannot make a whole lot of decisions like that. The President does appreciate the way the cabinet has dealt with some of the problem employees, some are gone but some are not. He wants us working together as a team to deal with this. We are still sharing too much administrative business with people we are supervising, and the President has proof, because employees tell the President

Cabinet Meeting
September 12, 2005
Page 4 of 6

things that he only talks to administrators about. He expects the cabinet to have
professional courtesy to know what to talk about and when to talk about it.

President Chambers wants the cabinet to have written proof of their meetings. Mrs.
Perryman has a monthly meeting, and we have proof of that. He advised Dr. Merk to
meet at least monthly until he gets comfortable with what he is doing. He advised Deans
Wilson and Greene to look over Dr. Merk's agenda to see how they might contribute to
his faculty meetings with updates, etc. He encouraged Deans Wilson and Greene to hold
monthly meetings, even if it is only to ask their departments if they are having any
problems, etc. Send a copy of the meeting announcement to the President, as Mrs.
Perryman does. If something comes up in the meeting that the President needs to know
about, he expects you to bring it to his attention immediately. <u>All meetings are to be
documented.</u>

There is a Diversity Conference on Sept. 14-15 in Birmingham, and a Workforce
Development meeting on Sept. 28-30 in Birmingham.

At the beginning of each month, if you have a meeting scheduled, Julie Wood needs to
know about it. At the first of each month, she prepares a calendar for the President, and
he would like for those meetings to be on there, so he can know where the cabinet
members are. The President asked Dr. Merk to personally survey each faculty member to
see whether they have plans to attend any professional development activities, have them
tell you why they feel it important for them to attend, and then Dr. Merk is to make his
decision whether they can attend (but be consistent). The President wants meetings
attended to be for program enhancement, not for personal gain.

The IRS is increasing travel reimbursement due to higher gasoline prices, and the
Chancellor will probably be sending something out on it. The President asked the cabinet
to think smarter, to try and make sure trips are being combined in order to conserve and
be efficient. Mrs. Perryman stated the State Dept. got an email that their travel was going
up on October 1st, to 48.5 cents/mile. The President is concerned that we are not taking
any precautions for energy savings. He asked the cabinet to begin turning off lights when
not in use, etc., and ask employees to help in monthly meetings. Be conscious of comp
time being accrued. He wants to have a meeting to analyze the steps we take to get our
reports in on time, and the cabinet members are to keep a log of when things are asked
for so that they will know what is keeping them from getting reports completed.

The President stated that we have to collectively deal with our live work activity. He
talked with Dr. Merk about passes, and we are going to have to revamp that process
because the passes were developed for one thing, but are being used to get around the
process. It is not fair for Monica and her staff to be held responsible for all the tricks that
are played at this institution, but it is fair that if she does not say "this is the way it is
going to be" that she be held liable. If an auditor can go out and check on something and
ask the status of it, then we can too. He has asked Dr. Merk and Dean Greene to
regularly and randomly spot check paperwork on live work projects. If they do not, then

Cabinet Meeting
September 12, 2005
Page 5 of 6

write them up, just as if we were having an audit. The President has committed himself in writing to the auditors that we will be tough, and will get on the right track, and he expects for each of the cabinet members to roll up their sleeves, and remember what is negative now does not have to be negative tomorrow. He has talked to all the members individually.

Dr. Merk stated that the Alabama Accountability Performance Profile is something we are going to be using next year and the year thereafter. He quoted a paragraph from the Institutional Management Plan regarding evaluating the college performance standards, handed a copy to each cabinet member, and discussed the way in which it is to be filled out, used and what we can expect to gain from using the plan. The President concluded this discussion by stating that everything follows a pattern and the information needed to complete the profile should be readily available because it is information compiled on a daily basis. He also stated he wanted to have a meeting to specifically discuss completing the profile.

Dean Greene stated that the business office would be busy for the next few weeks due to closing out the fiscal year. A representative from ACCESS will be coming to assist with putting contracts on the new system and changing live work over to the new system. The President directed that HR personnel be included in the training. Dean Greene stated that it will be necessary for some business office personnel to work late a few days in order to affect that training. She will send out memos on new procedures as they are necessary. The Facilities Master Plan has been emailed downtown. The equipment and supply and resale inventory will be taking place by the end of the month. The President asked Dean Greene to try sending out an inventory list of what is supposed to be there (a self-inventory) for each department to check what equipment is "displaced" or "additional pieces" and Dean Greene stated that she already has a similar procedure in place. Dr. Merk asked what instructions he should give instructors with regard to supply and resale inventory. Dean Greene stated she will be sending out a memo with instructions and will go over it with Dr. Merk.

The President stated he wants the four cabinet members to begin meeting once every two weeks as sort of a "brainstorm" session to work out any issues that may come up.

Dean Greene stated that the transition car will be delivered on Wednesday. Dr. Merk asked if the policy on use of private vehicles, state-owned vehicles, etc. was ever completed. The President stated it needed to be completed as soon as possible. Dr. Merk will send out an email update on where the policy is in the completion stage. The President directed that, on employees who cannot be insured to drive state vehicles, some type of policy is created setting guidelines that those employees will be responsible for their own transportation without being paid mileage, or pay a fee for the college to insure them.

Dean Greene stated that purchasing has been cut off, and spending looks good. The President stated there will be no major purchases after January. He also directed that Dr.

Cabinet Meeting
September 12, 2005
Page 6 of 6

Merk, Mrs. Perryman and Dean Wilson check to see if there is anything they need in the way of major purchases, and if so, get it ordered before January. The President noted that Dr. Merk's role has changed and with that comes the responsibility of saying no to certain purchases. The President asked Dean Greene to create a chart comparing how much money we have this year as opposed to last year, and suggested that each of the cabinet members do the same for their department budgets.

A discuss was held regarding the sewage problem, and Dr. Merk stated that Phillip Till is completing an estimate on what it will cost to excavate the field lines and have a perk test done. The President directed that this be done in the very near future. He also mentioned having some students complete training while placing tile downstairs.

The President informed the cabinet that he had a meeting with the ladies last Friday, and informed them they will no longer be allowed to wear jeans or tennis shoes to work. This goes for male office personnel as well. Shop instructors will be allowed to continue wearing jeans. He stated the rule of thumb to use is whether or not you would be appropriately dressed to go to the Chancellor's office when you come to work.

Dean Greene stated they have gone back and added 20% on all internal jobs, due to Mr. Bradsher giving them permission to do so. The new program will automatically calculate in the 20%. The President asked Dean Greene to send him a memo saying 'based on her evaluation and consultation with the examiner, and being in line with board policies, she is recommending that we add the 20% to projects,' and he will sign it.

The President gave a word of caution regarding external contracts to Dean Wilson and Mrs. Perryman. He also requested a memo from Dr. Merk telling him he has evaluated the teaching load of all instructors and has found that all instructors have a full load based on the formula we use, therefore there will be no need for requesting equivalency for any instructor during the fall semester of 2005. The President needs this in the records and a copy needs to go to Dean Greene and the cabinet.

The President requested that the cabinet reach out to the new employees and spend a little time with them. Dr. Merk stated that the search for the welding position closed as of last Friday. Both Mr. Wade and Ms. Turner have looked at the applications, and there are several who meet the basic qualifications.

With no further business before the cabinet, the meeting adjourned.


Recorder: _____     Approved: _____
          Julie Wood                              J. Douglas Chambers
          Administrative Assistant                President

Examples of Individual Comments:

June 2005

Mrs. Beth White was 4 months pregnant and Mr. Chambers stopped and inmate (student) and asked him did he think she looked 4 months pregnant. In discussing work attire Mr. Chambers has stated on numerous occasions that the women at Main Campus should not dress in any manner that draws attention from the inmate students. By making this comment about Mrs. White and her pregnancy status Mr. Chambers was contradicting his own comments about women keeping a low profile around students.

September 2005

Mr. Chambers told Mrs. Wood, (his secretary) that the reason the women could not wear jeans anymore was because Mrs. Cherry wore hers too tight and too low cut. He could see her belly button. Mr. Chambers told Mrs. Wood that this was the reason he called the meeting of September 9, 2005.

2006

Mr. Chambers recently made the statement to Julie Wood (his secretary) that Mr. Wilson talks about the women wearing their pants too tight, but, that he (Mr. Wilson) does not say anything about LaTonya Trimble's pants going up her butt crack.

2006

Mr. Chambers recently told Mrs. Greene that she had something on her pants. When she went to the bathroom and looked it was a small piece of lint on her bottom. He sure had to be looking close.

2006

Mr. Chambers recently asked me (Julie Givens) to get a string off Shannon Cherry's butt, and I told her that it was there, she removed it herself. As she was walking off, he said, "If those pants weren't so tight on her ass you wouldn't notice those type things."

As you can see from the dates provided that Mr. Chambers has a habit of concentrating on women and their attire. These are just a few examples of comments that have been made by him.

May 23, 2005

Mrs. Barbara McAnaly, from Florida, was sent to Ingram to audit the Director of Special Education (Mrs. Perryman) and the Special Education program. In setting up the date and time of this meeting Mr. Chambers told Ms. McAnaly that she would not be allowed to bring anyone with her to the meeting. It was noted by numerous employees of the front office and business office that within minutes of closing the conference room door where the meeting with Ms. McAnaly was held that Mr. Chambers could be heard yelling at Ms. McAnaly and pounding on the table and that this behavior continued for several minutes. After Mr. Chambers's outburst Ms. McAnaly could be heard speaking in a raised tone of voice herself.

Everyone at this meeting was aware that the meeting was being tape recorded. At the conclusion of the meeting, Mrs. McAnly asked Mr. Chambers secretary for the tape, and Mrs. Wood gave it to her.

The next morning May 24, 2005, Mr. Chambers's secretary, Mrs. Julie Wood, told Mr. Chambers that Mrs. McAnly had taken the tape. Mr. Chambers yelled at Mrs. Wood and told her that he could fire her for giving Mrs. McAnaly the tape and slung the papers in his hand across his office.

October 3, 2005

Patti Graves and I went to Mr. Chambers seeking permission for Mike Englett, a programmer, to come and do some work for us. Mrs. Greene, Mr. Wilson and Dr. Merk were also there. He raised his voice at Mrs. Greene and told her that she should not have let me and Patti come in to ask for permission and that it was her fault that we did not have a programmer on staff. Ms. Graves asked for permission to speak and Mr. Chambers granted it. However, when she started explaining to him that all of the two year colleges that she audited during her time with Examiners of Public Accounts had a programmer or programmers on staff and that the accounting software program that Ingram uses is not a problem free software program, he started yelling at her and I asked him to stop, that she was a new employee. He told me that she would just have to get use to it.

He then started telling me that Dr. Merk said that we did not need a full time programmer and I told him that since Dr. Merk did not work in the business office, perhaps he was not the best judge. He then began yelling at me telling me that if Mrs. Greene had wanted a programmer she damn sure should have hired one and then turned his back to us.

A memo is attached, showing where we did a written request after that meeting and for future requests. Note: No need to get yelled at every time you need the programmer!

October 3, 2005

MEMORANDUM

TO:              Mrs. Monica J. Greene, Dean of Fiscal Affairs
                 Mr. J. Douglas Chambers, President


From:            Mrs. Julie Givens, Asst. to Dean of Fiscal Affairs
                 Mrs. Patti Graves, Accountant

RE:              Programmer

This memo is to inform you that the fiscal office will need Mike Englett during the month of October to close out the fiscal year. We will limit his time as much as possible.

As you know, we are changing from the work order program that Mike wrote to the work order program that Access has provided. The less problems encountered will of course mean the less use of Mike required for the transition. We estimate the hours needed for Mike will be 18. We hope to have the work order program for Access up and running by Wednesday of this week and the old program closed out. The 18 hour calculation is having Mike work three 6 hour days.

At the point we start closing our books for the year, we will need Mike. Hopefully, this process will again only be a three day process involving Mike. This would again be 18 hours with Mike working three 6 hour days.

When Patti does the financial statement she may need Mike. We are not sure if this is the case or not. However, we feel you should be aware of the possibility.

We have checked our records and we have only used Mike 160 hours total this year which is a major decrease from the prior years. We paid him at a rate of $65.00 an hour totaling $10,445 from October 1, 2004 until September 30, 2005. Thank you for your consideration in this matter.



Ingram
State
Technical
College
• Developing Responsible Citizens •

J. Douglas Chambers
President


Rickey A. Huffstutler, Ph.D
Dean of the College


Monica J. Greene
Dean of
Fiscal Affairs


James E. Wilson
Dean of Students
and Support Services

# INGRAM STATE TECHNICAL COLLEGE

January 11, 2006

MEMORANDUM

TO:       Mrs. Monica J. Greene, Dean of Fiscal Affairs
          Mr. J. Douglas Chambers, President

FROM:     Mrs. Julie Givens, Payroll/Adm. Asst. to Dean of
          Fiscal Affairs
          Ms. Patti Graves, Accountant

RE:       Request for Consultation of Mike Englett

As you know we are in process of the calendar year closeout. Quarterly and yearly reports are due, before W-2's and 1099's can be run.

You are also aware of the problems with the taxable benefit in the payroll department last January. We feel that we will need Mr. Englett on hand during the process of running the W-2's and 1099's. Mrs. Givens has quarterly and yearly figures ready to verify against the W-2's and 1099's, however they need to be verified before mailing.

We are successfully now closing each month without the assistance of Mr. Englett and moving smoothly forward with the Access program. With the exception of problems in the live work module that you are already aware of, we feel that we have made great strides.

But, there will be occasions when we will still need the assistance of Mr. Englett. This time it is for a last year carryover problem, however, in the future we may still need to make a special request upon occasion to consult with him in his programming expertise.

I need him ASAP. Thanks for your consideration in this matter.

*P.O. Box 220350  •  Deatsville, Alabama 36022*
*Phone: 334-285-5177  •  Fax: 334-285-5328*



*Ingram*
*State*
*Technical*
*College*

• *Developing Responsible Citizens* •

# INGRAM STATE TECHNICAL COLLEGE
January 11, 2006

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

MEMORANDUM

TO:        J. Douglas Chambers
            President

FROM:   Monica J. Greene            *Monica*
            Dean of Fiscal Affairs

RE:        Consultant

I am writing this memorandum as a follow-up to the request from
Julie Givens and Patti Graves regarding the services of Mike
Englett for consultation purposes. I have discussed this matter
with Julie and Patti, along with Mr. Hubert Griffin of the MIS
Department. Mr. Griffin said that he was not familiar enough with
the payroll program which runs the W-2's to assist Mrs. Givens. I
have made the determination that Mr. Englett's services are
necessary. I am expecting to need him for approximately 3-4 days.
If additional time is needed, I will inform you at a later date.
Thank you for your consideration of this matter.



# INGRAM STATE TECHNICAL COLLEGE
January 11, 2006

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

## MEMORANDUM

**TO:**      J. Douglas Chambers
             President

**FROM:**    Monica J. Greene      *Monica*
             Dean of Fiscal Affairs

**RE:**      Consultant

I am writing this memorandum as a follow-up to the request from Julie Givens and Patti Graves regarding the services of Mike Englett for consultation purposes. I have discussed this matter with Julie and Patti, along with Mr. Hubert Griffin of the MIS Department. Mr. Griffin said that he was not familiar enough with the payroll program which runs the W-2's to assist Mrs. Givens. I have made the determination that Mr. Englett's services are necessary. I am expecting to need him for approximately 3-4 days. If additional time is needed, I will inform you at a later date. Thank you for your consideration of this matter.

*Copy to*      *OIC*          *1-12-06*
               *Joe*          *Please let*
*To: Dean                     me know —*
*Greene*                      *status A SAP*

*P.O. Box 220350   •   Deatsville, Alabama 36022*
*Phone: 334-285-5177   •   Fax: 334-285-5328*

Points discussed with Ms. Debbie Dahl at Postsecondary on 1/26/06 concerning Mr. Chambers and his behavior toward the business office. In attendance were Ms. Dahl, Monica Greene, Patti Graves and Julie Givens.

CHAMBERS

Unstable-
- Consistently acts out
- Yells at people when upset, can not remain calm
- Starts rumors to see where they go and then gets mad because he forgets he started the rumor
- Under-minds supervisors to their employees
- Plays people against each other
- Never sees the good in a situation, always beating people down
- Spends more time worrying about Mrs. Perryman and the way SPED is run than JFI

Racists-
- Consistently hires and promotes blacks
- Even makes statements like you will earn brownie points by giving this person a raise (it did happen in the business office)
- White people sitting in like jobs making less money while blacks sitting in exact job, some with less work making a lot more money (this is happening in the business office)

Note: Any raises asked for by Dean Greene are refused in hopes of turning her employees against her, with the exception of the one black, who he approved for a raise. Example: When we took over the ABE consortium Jeanna Givens was promised a raise. The next year Mr. Chambers refused to honor Dean Greene's request.

Male Chauvinist-
- Women placed in same jobs as men paid less money
- Lady dean called a candy stripper
- Women talked down to as if they are ignorant

Mr. Chambers devotes so much time trying to get rid of Dean Greene that he cannot be about the business of J.F. Ingram. It has become a joke, at the expense of the business office, about how much he dislikes Dean Greene. It is a shame that a postsecondary college is being run by a president that spends all his time plotting with other deans and employees to get rid of one Dean.

He says she's incompetent, however, audit after audit, time after time he is proven wrong. She may not be perfect, but she is honest and accountable. Maybe that's what bothers him most.

When he's not worried about Dean Greene, he's worried about Mr. Keahey and what he's doing for Dr. Johnson or Mr. Clemons. If it's not them, then he's worried if Terry Keahey and Julie Givens are trying to turn the rest of the employees against him. Mr. Chambers thanks its all one big conspiracy. Lord please help us all!!!

**Ms. Dahl**

At the conclusion our meeting at Postsecondary Ms. Dahl stated that she would hate to work in a place where you were yelled at on a regular basis and that she felt fortunate not to work in such an environment. Ms. Dahl stated that what we had discussed with her was confidential and that she would discuss it with the Chancellor, Dr. Roy Johnson, so that he would be aware of the almost daily atmosphere that business office staff must work within.

The major point we wanted to make with Ms. Dahl was to let her hear from business office staff just what it is like to work at Ingram. We told Ms. Dahl that we wanted Mr. Chambers to leave us alone. We have not let the work environment that we are forced to work in affect the way we do our individual jobs we just asking for some relief. No one is perfect, if an individual is actually working at a job mistakes or errors in judgment can and will be made.

Prior to this meeting with Ms. Dahl no one except Mrs. Greene had let anyone at Postsecondary know what it is like to work for Mr. Chambers. The members of Mrs. Greene staff that went to this meeting felt it was imperative that we let Postsecondary hear the business office's side.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JULIE GIVENS and          )
MONICA GREENE,            )
                          )
    Plaintiffs,          ) CASE NO.: 2:06 CV 852-1D
                          )
v.                        )
                          )
DOUGLAS CHAMBERS, et al.  )
                          )
    Defendants.          )


## PLAINTIFF'S ANSWER TO DEFENDANTS' INTERROGATORIES

1. State your name, present address, age, date of birth, social security number, and all names by which you have been known in the past. Additionally, state the name and address of each and every person who assisted in preparing responses to these interrogatories.

    ANSWER:    **Julie K. Givens**
                    **3751 Browns Road East**
                    **Millbrook, Alabama 36054**
                    **Age: 49**
                    **DOB: 1-23-58**
                    **SS#: 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**

2. Name each person, firm or corporation for whom you have worked from 1990 to the date you answer these interrogatories, stating the kind of work you did for each such employer, the date on which you began working for each such employer, the amount of

1


DEFENDANT'S EXHIBIT
5 - Givens

compensation you received from each employer for your services, on what date you stopped working for each such employer, the reason you stopped working for each such employer, and your immediate supervisor at each such place of employment.

> **ANSWER:**
> **Place of Employment: 1990 to date-JF Ingram Technical College, Deatsville, AL**
> **Type of Work:  Business/Administrative**
> **Amount of Compensation for this period:**
> **Supervisors during this period: 1990 to 1994-Mr. Freddie Powell; 1994 to date: Mrs. Monica Greene.**

3. Identify every person whom you know or have reason to believe has knowledge of the facts regarding any of your claims, regardless of whether you intend to call that person as a witness, specifying with particularity the basis for said knowledge.

**ANSWER: Any current and former employee could have knowledge and should be considered as a potential witness.**

4. Identify every person, employee, former employee, or agent of Defendants, other than your lawyers, with whom you or someone on your behalf has mentioned, discussed, or communicated in any way concerning this lawsuit or the claims made in this lawsuit, including any person associated with any Defendants, and identify the substance of said communication including every document evidencing said communication.

**ANSWER: Monica Greene, Patty Graves, Emma White, Julie Wood, Melissa Wallace, Barbara Hendrix, Bonita Owensby, Gene Bridgman, Janet Lassiter, Barbara Acreman, Sylvia Murphee. Grace Wright, Greg Wright, Rickey Huffstutler, Terry Keahey, Frank Benton, Coleman McKeithan, Willie McKeithan, Sandy Caylor, LaTonya Trimble, Elaine Toxey, Leo Miller, Roger Haines.  I cannot identify the substance of each conversation, other than to state it was discussing**

2

i sues raised in this law suit.

5. Identify each person you expect to call as an expert witness at the trial of this

a tion. State in your answer the subject matter and substance of each expert's expected

t stimony, identify the grounds for each opinion, identify all documents used by each

e pert to support his testimony, identify all reports or opinions issued or written by each

e pert, and list the qualifications of each expert.

**ANSWER: None identified at this time, other than possible testimony from
t eating physicians.**

5. State whether you, your attorney, or anyone acting on their or your behalf have in

t eir possession or have knowledge of any photographs, motion pictures, drawings,

d agrams, videotapes, or other visual or audio descriptions concerning or relating to the

e ents referred to in the Complaint.

**ANSWER:N/A- Object, to any evidence that my attorney might have, as such
w uld be his work product.**

7. If an investigation was made by you or on your behalf concerning any matter

r ating to the charges complained of in this action, please describe fully and in detail all

p rsons who participated in the investigation, the matters investigated, and the results of

t e investigation.

**ANSWER: EEOC reviewed the documents sent to them and found no
v lations under title VII of the Civil Rights Act.  No professional private
i vestigation has been conducted on my behalf.**

3

8. Identify by name, address and telephone number any person from whom you or anyone on your behalf have obtained a written, recorded or oral statement concerning or relating to the incident.

**ANSWER: Written Statements: Leo Miller Patty Graves, Melissa Wallace**
**Oral Statements: Minutes of Meetings**

9. If you have made a statement, in any form, regarding the incident, your injuries or your damages, identify all persons present when you made the statement, identify the custodian of any record of such statement, state the date, time, and location of the statement, and the words used. If any document reflecting such statement has been lost or destroyed, describe the document and the circumstances of its loss or destruction.

**ANSWER: Only to my attorney**

10.    If you have ever been arrested or convicted of a crime other than a traffic violation, identify the crime, date of arrest, the court hearing the case, case number, jurisdiction and outcome of the proceeding.

**ANSWER: I have not been arrested or convicted of any crime other than traffic violation.**

11. Have you ever filed a bankruptcy petition, voluntary or involuntary? If so, please identify the court in which such petition was filed, the case number and the date you received a discharge.

**ANSWER: Voluntary Chapter 13 Bankruptcy filed in the Middle District of Alabama, Case No. 97-5133-RRS, November 9, 1997.  Release date: January 30, 2002.**

4

12. Please list the name and address of all your relatives by blood or marriage who reside in the Middle District of Alabama.

**ANSWER: See attached #12**

13. Please list all schools, colleges, universities, trade schools, vocational schools and other educational institutions which you have attended above and including high school level, and provide the dates of graduation or date last attended, degrees or certificates received, and course of study in each institution.

**ANSWER: see attached #13**

14. Please identify each and every lawsuit in which you have been involved or are currently involved, either as a plaintiff, defendant, or witness. For each lawsuit, tell whether you were a plaintiff, defendant, or witness, and identify the court, jurisdiction, case number, final disposition (if the case has concluded,) and nature of the case.

**ANSWER: There have been several law suits involving J. F. Ingram in which I was a potential witness.   However, I never testified nor gave any type of deposition in any of the cases.**

15. Identify your current sources of income and state the amount of income received monthly from each source.

**ANSWER: J. F. Ingram State Community College, $5,000.00 monthly**

16. Please identify and describe every item of special, incidental or consequential damages for which you seek recovery in this lawsuit.

**ANSWER: I do not understand the terms special, incidental or consequential damages.  However, I seek damages for mental and emotional pain and anguish, for**

5

being yelled at, for being accused for not performing my duties and being accused of not performing tasks which are not my duty. I seek damages for not being given promotions and raises that I have been in line to receive, which were probably denied because I was female. I seek damages for being forced to work in a hostile work environment and for being treated differently from my male counter parts and co-workers.

17. Please identify by name, address and place of employment your current spouse, if married, and any other person to whom you have been married previously, and your children.

       **ANSWER: Woodrow B. Givens, Jr. (spouse)**
               **3751 Browns Road east**
               **Millbrook, AL 36054**
               **Place of employment: Rheem Manufacturing, Montgomery, Alabama**
               **Emma Elizabeth Givens White (daughter)**
               **60 Boswell Street**
               **Elmore, Alabama 36025**

18. Please provide the name and address of all medical care providers who treated, saw, counseled, advised or examined Plaintiff in the last ten years, and list all relevant dates on which you received treatment or were examined, and the medical condition or the symptoms for which you were treated or examined.

       **ANSWER: See attachment #18**

19. With respect to paragraph 7 of your Complaint, please fully describe any evidence upon which you base your contention that numerous meetings have taken place between Defendant Chambers and Plaintiffs Givens wherein Chambers has insinuated that Plaintiff Greene had not told him the truth about an issue and admonished Plaintiff

Givens to tell him the truth. Describe when such communications occurred and further, describe where such communications occurred and who was present. Describe what issues you are referring to in paragraph 7 regarding Greene not telling the truth.

**ANSWER: refer to dated "Occurrence" outline where on numerous occasions myself and Mr. Bridgman were called to Mr. Chambers' office keeping us 2-3 hours at a time talking about Mrs. Greene and trying to get us to say she was not performing her job, etc. See attachment #19.**

20. With respect to the allegations of paragraph 8 in your Complaint, please fully describe any evidence upon which you base your contention that Defendants Chambers and Wilson have indicated in front of other employees that Givens allows personnel in the business office to violate school policy. Identify any of these other employees in front of whom Defendants Chambers and Wilson have indicated that Givens allows employees to violate school policy. Additionally, identify what school policies Chambers and Wilson indicated Givens had violated and exactly how that policy was violated.

**ANSWER: See Sandie Caylor's memo to Mr. Chambers dated 2/16/05.**

21. With respect to the allegations of paragraph 9 in your Complaint, please fully describe any evidence upon which you base your contention that Defendant Chambers consistently comments on the attire and dress of females while not commenting on the dress of male employees. Identify, the time, place, and substance of any such comments. Identify any witnesses present when such comments were made.

**ANSWER: See memos dated 05-20-98 re: appropriate dress; 05-10-99 re: dress code and meeting minutes dated 2-16-05 of meeting held by Mrs. Greene with**

**business office employees per Mr. Chambers' request.**

22. With respect to paragraph 9 of your Complaint, please fully describe any evidence upon which you base your contention that Chambers has established a dress policy for women and not for men.

**ANSWER: same as # 21**

23. With respect to paragraph 10 in your Complaint, please fully describe any evidence upon which you base your contention that Defendant Chambers has raised his voice at the Plaintiffs in a loud and threatening manner. Identify specific dates, locations, and purposes for the meetings at which you claim Defendant Chambers raised his voice. Further, identify who was present at such meetings.

**ANSWER: President Chambers' secretary, Julie Wood has taped cabinet meetings that will reflect temperament of Mr. Chambers. See attached #23 statements of recalled events of Mr. Chambers raising his voice in a threatening manner to female employees.**

24. With respect to the allegations in paragraph 10 of your Complaint, please fully describe any evidence upon which you base your contention that Defendant Chambers raises his voice at meetings involving the Plaintiffs and other female employees but does not raise his voice at meetings with just male employees. Identify any meetings of which you are aware when Defendant Chambers met with male employees, who was present, and how you know whether Chambers did or did not raise his voice.

**ANSWER: I was aware of male only meetings on various dates and times. However, I never heard Defendant Chambers raise his voice to the males.**

25. With respect to the allegations of paragraph 11 in your Complaint, please fully

8

describe any evidence upon which you base your contention that Chambers consistently refused to raise the salary of any white employee recommended by Plaintiff Greene. Identify any occasions on which raises were requested and/or recommended by any white employee and refused by Defendant Chambers. Further, identify any similarly situated employee who was given a raise, identifying that employee's job title, job responsibilities, previous pay, amount of raise, gender of the employee, and race of the employee.

**ANSWER: See attachment #26**

26. With respect to your allegations of paragraph 12 in your Complaint, please fully describe any evidence upon which you base your contentions that Defendant Chambers consistently hires and promotes black employees over white employees and pays black employees more money for doing the same job as white employees. Specifically identify any black employees who are treated more favorable than whites by providing their name, job title, job responsibilities, how they were treated more favorably, and on what specific occasions. Further, identify what white employees were treated less favorably by providing those employees' names, job title, job responsibilities, and the specific occasions on which they were treated less favorably.

**ANSWER: see listing of new hires since his tenure in office which indicates blacks vs non-blacks. Also see attached salary scales noting which employees are black vs non black and salary amounts and some employees holding exact same jobs. See attachment #26**

27. With respect to the allegations of paragraph 13 in your Complaint, please fully

9

describe any evidence upon which you base your contention that Defendant Chambers

pays female employees, including Plaintiff Givens, less money than male employees in

equal or similar positions. Identify which male employees were treated more favorably

by providing the names of those employees, their job title, job responsibilities, and in

what respect they were paid more money than the female employees, including the

Plaintiffs.

ANSWER: see attachment #27

28. Fully describe any evidence upon which you base your contention that you were

discriminated against in violation of Title 7 of the Civil Rights Act of 1964. Further, detail

in itemized form any damages you claim to have suffered as a result of this alleged

discrimination.

**ANSWER: Previously discussed in above numbered items all related to wither
race or gender. See interrogatory answers # 19, 20, 21, 22, 23, 24, 25, 26 & 27.**

29. Fully describe any evidence upon which you base your contention that you were

discriminated against based on race/gender in violation of 42 U.S.C. §1981. Further,

detail any damages in itemized form you claim to have suffered as a result of the alleged

discrimination.

**ANSWER: All evidence, statements, etc. discussed in above numbered items.
Do not understand question. However, please refer back to interrogatory #
19,20,21,22,23,24,25,26 & 27.**

30. Fully describe any evidence upon which you base your contention that you

were treated differently than similarly situated male employees in violation of the Equal

Protection Clause of the Constitution of the United States. Dully describe any evidence

upon which you base your contentions that you were harassed in violation of state law.

**ANSWER: Do not understand question. However, please refer back to interrogatory # 19,20,21,22,23,24,25,26 & 27.**

Respectfully submitted this the *14th* day of February, 2007.

_____
Julie Givens
Plaintiff

**STATE OF ALABAMA** )
**COUNTY OF MONTGOMERY)**

On this the *14th* day of *February*, 2007, before me, a Notary Public for the State of Alabama, duly commissioned and sworn, personally appeared Julie Givens, known to me to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same.

**IN WITNESS WHEREOF,** I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public
My Comm. Expires *06-01-08*

BY: _____
Jim L. DeBardelaben (DEB003)
Counsel for Plaintiff

11

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing by U. S. Mail, postage prepaid and properly addressed, upon the following counsel of record on this the _14th_ day of February, 2007:

Andrew W. Christman, Esq.
Gidiere, Hinton, Herndon & Christman
P.O. Box 4190
Montgomery, Alabama 36103

OF COUNSEL

12

#12

| Family Name | Last Name | Address | City, State Zip | Relationship |
|---|---|---|---|---|
| Bonnie Best | Best | 100 Duck Cove | Elmore, AL 36025 | Sister |
| Brad & Rachael Bulger | Bulger | 763 Hillman Road | Montgomery, AL 36109 | Husband Nephew |
| Teresa Bulger | Bulger | 3231 Fairfax Road | Montgomery, AL 36109 | Husband Sister |
| J.T. & Carolyn Chambers | Chambers | 8 Grass Farm Road | Titus, AL 36080 | Parents |
| Rita Dennis | Dennis | 2083 County Road 66 | Deatsville, AL 36022 | Husband Aunt |
| Alton Dennis | Dennis | 271 County Road 525 | Verbena, AL 36091 | Husband Uncle |
| Billy & Cindy Dennis | Dennis | 85 Co. Rd. 482 | Verbena, AL 36091 | Husband Cousin |
| Bennie & Julie Givens | Givens | 3751 Browns Road | Millbrook, AL 36054 | |
| Leon & Jeanna Givens & Family | Givens | 1935 Cedar Ridge Loop | Prattville, AL 36067 | Husband Brother |
| Traci Givens & Austin | Givens | 111 Wallahatchee Drive | Tallassee, AL 36078 | Husband Niece |
| Glenn & Cathy Givens & Family | Givens | 2 Cherry Street | Wetumpka, AL 36092 | Husband Brother |
| Fred & Fay Hanna | Hanna | 3661 Jackson Rd | Millbrook, AL 36054 | Husband Cousin |
| Mark A Jones | Jones | 3751 Browns Road | Millbrook, AL 36054 | Brother |
| Dale & Lori Lawrence | Lawrence | 2225 Lizmar Lane | Montgomery, AL 36106-3452 | Husband Cousin |
| Randy & Estelle Newman & Family | Newman | 6700 Woodglen Court | Montgomery, AL 36117 | Husband Cousin |
| Billy & Alesha Rogers & Family | Rogers | 1719 Hamlet Court | Montgomery, AL 36117 | Husband Niece |
| Jason & Beth White & Layton | White | 60 Boswell St | Elmore, AL 36025 | Daughter |
| Roby Flowers Wiggins | Wiggins | 216 Flowers Lane | Deatsville, AL 36022 | Husband Aunt |

13. Listing of all schools attended and degrees earned, date received and course of study.

| | |
|---|---|
| Jefferson Davis High School Graduated: May 1976 | High School Diploma |
| Central Alabama Community College Graduated: August 1990 | Associates In Science Degree |
| Athens State University 10 quarter hours completed | Bachelor's Degree (incomplete) |
| Wallace State Community College Job-Related Accounting II Economics II Business Law I and II Introduction to Computers | Business Courses 1998 – 2000 15 semester hours completed |

18.  Anne Julianne Jenkins, M. D.
     Morrow Medical Building
     Montgomery, AL

     Dates of Treatment:  1998 to present
     Conditions:  Anxiety, anxiety attacks, sleep deprivation,

            Depression, stress, shingles (nerve related),
            Ulcers/stomach acid/upset, chronically sick

     Alex Krher, M. D.
     Morrow Medical Building
     Montgomery, AL

     Dates of Treatment:  2000 to 2001

     Condition:  Stomach Problems resulting in surgery(Nissen
            Fundaplication)



May 2001

Mrs. Greene's Mother was very sick and she was out with her. By then Mr. Chambers had a pattern of calling Mr. Bridgman, Asst. to Dean of Finance and I, Adm. Asst. to Dean of Finance, in to his office whenever she was not at work. He stated that he knew that we had problems in the business office. He stated that we could feel free to come to him about Mrs. Greene, that he knew that she was weak and ineffective as a business manager.

When Mrs. Greene returned to work, Mr. Chambers called in to my office, and had me to gather all the other members of the business office into my office, he then had me to put him on speaker phone with Mrs. Greene and proceeded to tell her what a poor job she was doing, and how ineffective she was as the business manager.

Mrs. Greene's Mother passed away the next week, and instead of showing support as an administrator he continued to belittle her to the other staff members and her office staff.

November 2001

Mrs. Greene was out on annual leave. Mr. Chambers called Mr. Bridgman and I in and stated that he knew that we must have been having problems in our department. Mr. Chambers stated that we could come to him anytime we needed to. He mentioned that he knew that accounts payable was probably behind because he knew that Mrs. Greene always held invoices.

March 2002

Mrs. Greene was out on annual leave. Mr. Chambers called Mr. Bridgman and I in and stated that he knew that Mrs. Greene was weak and ineffective. If we needed to talk to him concerning this please feel free to come in and see him.

June 2002

Mrs. Greene was out on professional leave. Mr. Chambers called me and told me that I could feel free to discuss Mrs. Greene with him. He stated that the people at Postsecondary knew that she was weak, incompetent and ineffective as a business manager.

October 2002

Mr. Chambers called me in before Mrs. Greene arrived at work and reminded me that if I needed to speak with him about her to let him know. He just wanted me to know that he was aware of our situation in the business office.



January 2003

Mrs. Greene was out on annual leave. Mr. Chambers called Mr. Bridgman and I in and stated that he knew that the purchase orders and accounts payable were in a mess because of Mrs. Greene. He stated that if we needed him to take care of anything to let him know. Mr. Chambers also kept mentioning that the vice-chancellor, Debbie Dahl, would be calling us to talk with us concerning Mrs. Greene.

2004-2005-many more of these type meetings took place.

Note: On all the above dates he talked in general and tried to get us to say something negative about Mrs. Greene. Sometimes we would be in his office as long as three hours.

You will note that these are just some of the instances where I know that I felt like I was being put in the middle of a battle between Mr. Chambers as President and Mrs. Monica Greene, my direct supervisor. I felt that *IF* there had been a real problem with Mrs. Greene he should have been talking directly with her, not with me a member of her staff. He never was clear on what he wanted me or Mr. Bridgman to say about her or do about her. He was always just kept insinuating that he knew that we knew something.

Putting me through this caused me to fall behind on my job duties, as I'm sure it did Mr. Bridgman. Being behind on my duties caused me stress and caused me anxiety. I have had to start taking medication for work stress anxiety back in 1999. At that time they put me on Prozac for a while, when it no longer was strong enough I was moved to Lexapro, Topamax and Zanex. These are medications I need just to come to work. This type work environment is not healthy.

On occasssion Mr. Chambers will still catch me and call me in to talk about Mrs. Greene, however, about three years ago I learned to ask her to let me know if she is going to be out and so I could take leave to avoid him.

Lucky Mr. Bridgman has retired. But not before suffering a *stroke* over Ingram stress.





*Ingram*
*State*
*Technical*
*College*

*Developing Responsible Citizens*

**J. Douglas Chambers**
Presiden t

**Rickey A. Huffstutler,Ph.**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean Of Students
And
Support Services

# INGRAM STATE TECHNICAL COLLEGE

## MEMORANDUM

**Date :**      **2/16/2006**

**To :**        **J. Douglas Chambers**
President

**From :**      **Sandy Caylor**
Ta l Instructor

**Re :**        Comments on practice fabric

On Wednesday,   Dean Wilson,You and myself  were having a conversation about the fabric that I purchase for practice in my shop. There were some comments  made that are not true. Dean Wilson said that the Business Office wouldn't let me go. They have nothing  to do regarding when I go. Dean Wilson also stated that if the Business Office wanted something done for their family or kids they would send me. You stated that you knew it and was keeping an eye on it. Let me just say, Nobody from the Business Office has ever sent me to get fabric. Dr. Merk is the one to o.k. my trips now. Dean Wilson did ask me awhile back if I had any of the practice frabic and I told him that I had very little. I told him that I hadn't been in awhile to get any.I told him that I hadn't been able to go. That I had to get Dr. Merk to let me go. The mill I purchase this fabric from is only open on Wednesday's. When I would ask Erica what the schedule looked like,  there was usually a lot  of Instructors already going to be off. So I would just wait. Finally, I told her I had to go. Dr. Merk was not here so, Erica stopped my shop up. I set it up with Monica for payment  of the fabric.   If I do any work for Dean Greene or anyone else in the Business Office, I have a workorder. I treat everyone the same.  In fact,Dean Greene needed a piece of scrap material last week. I told her I had a piece we were going to throw away and I'd give it to her. She said that she would do  a worKorder on it. I just sold Dean Wilson a class project sofa covered in some of the practice fabric. He also had a workorder for this. Everyone is treated the same. Also, any Embroidery work we do over here ,.whether it be for me or someone else also has paperwork. I get permission from Dean Greene.

Sandy Caylor
Ta l Instructor

*P O  Box 220350   Deatsville. Alabama 36022-0350*

*Phone  334-285-5177   Fax  334-285-5328*



During the time that Mr. Chambers has been at Ingram as the President he has had several meetings with the ladies at Main Campus regarding their clothing. He will warn them that they should not wear jeans, tight clothing, show cleavage, wear capri pants, strapless heels, etc. In his opinion, this type clothing is not appropriate for the office.

Ingram does not have a dress code policy for women or men. He only meets with the office staff women at Main campus. We have a campus next to Draper Prison and one next to Tutwiler Prison. To my knowledge no such meetings have taken place at these locations.

Examples:

Summer of 2004

During a regular Faculty meeting downstairs Mr. Chambers stated that he was fed up with the way people reacted when they were told how to dress (I guess Main campus women) so "he did not care how they dressed." Other campus' employees were asking after the meeting "what was he was referring too?". This type question only reinforces that he had held no such meetings with the other ladies or men.

February 13, 2005

Mrs. Greene under the direction of Mr. Chambers and Mr. Wilson was told to tell the women at Main Campus that low cut, short, tight clothing and high heel strapless shoes should not be worn. The College would even provide cover up jackets to be worn.

September 9, 2005

Mr. Chambers called a meeting at 2:45 pm in the staff lunchroom of all the women on main campus with Mr. Wilson and Mrs. Greene. He stated that "office women can no longer wear blue jeans or capri pants", I asked him about the men and he told me he was not talking about the men only the women. He stated that men in the shops could wear jeans and when I asked about the office men he told me not to worry about it he was talking to the women.

219 22.

J. F. Ingram State Technical College
Deatsville, Alabama

On Wednesday February 16, 2005 a meeting of the ladies working at our main campus was held to address and discuss the proper attire that should be worn at Ingram State. Dean Greene conducted the meeting and told the ladies that proper business attire should be worn by all. Mrs. Greene stated that low cut, short, tight clothes and high heel strapless shoes should not be worn. The overall message delivered by Dean Greene was "if in doubt don't wear it".

Dean Greene also stated that "cover up jackets" can be purchased by the College for the ladies to wear during their workday. Discussion followed about the type of jackets needed during the winter and summer. Several stores in the Montgomery area were mentioned as possible sources of supplying the "cover up jackets". Catalogs of the styles available will be obtained by the College and after input from the ladies the "cover jackets" will be purchased. The meeting was then adjourned.

This meeting was held after Mrs. Greene was instructed by Mr. Chambers to hold this meeting.

21 + 22.



Ingram
State
Technical
College
• ISTC •
• Developing Responsible Citizens •

# INGRAM STATE TECHNICAL COLLEGE

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of Instruction

**Paul Reeder**
Dean of Students

**Monica J. Greene**
Dean of
Fiscal Affairs

## MEMORANDUM

**TO:**            All Employees

**FROM:**         J. Douglas Chambers, President

                  *J. Douglas Chambers*

**REFERENCE:**    Appropriate Dress

**DATE:**         May 20, 1998

        This memorandum is being provided to request that all employees refrain from wearing clothing which could easily be interpreted as inappropriate and unprofessional for the work environment. Although the college does not have a dress code, I am requesting that all employees refrain from wearing t-shirts, caps, and shorts while in a classroom setting.

        I realize that some work areas are not conducive for dress clothes and casual attire is appropriate. However, in those cases where casual clothing is in the workers' best interest, I ask that you use good judgment and make every attempt to look your best. In case you are curious, several individuals, employees, and outsiders have suggested that we improve our image with the public by doing a better job with our appearance.

        Thank you for your cooperation and support in this matter.

JDC:shm

• P.O. Box 220350 • Deatsville, Alabama 36022-0350 •
Phone: 334-285-5177 • Fax: 334-285-5328

Examples of Individual Comments:

June 2005

Mrs. Beth White was 4 months pregnant and Mr. Chambers stopped and inmate (student) and asked him did he think she looked 4 months pregnant. In discussing work attire Mr. Chambers has stated on numerous occasions that the women at Main Campus should not dress in any manner that draws attention from the inmate students. By making this comment about Mrs. White and her pregnancy status Mr. Chambers was contradicting his own comments about women keeping a low profile around students.

September 2005

Mr. Chambers told Mrs. Wood, (his secretary) that the reason the women could not wear jeans anymore was because Mrs. Cherry wore hers too tight and too low cut. He could see her belly button. Mr. Chambers told Mrs. Wood that this was the reason he called the meeting of September 9, 2005.

2006

Mr. Chambers recently made the statement to Julie Wood (his secretary) that Mr. Wilson talks about the women wearing their pants too tight, but, that he (Mr. Wilson) does not say anything about LaTonya Trimble's pants going up her butt crack.

2006

Mr. Chambers recently told Mrs. Greene that she had something on her pants. When she went to the bathroom and looked it was a small piece of lint on her bottom. He sure had to be looking close.

2006

Mr. Chambers recently asked me (Julie Givens) to get a string off Shannon Cherry's butt, and I told her that it was there, she removed it herself. As she was walking off, he said, "If those pants weren't so tight on her ass you wouldn't notice those type things."

As you can see from the dates provided that Mr. Chambers has a habit of concentrating on women and their attire. These are just a few examples of comments that have been made by him.

Cabinet Meeting
September 12, 2005
Page 6 of 6

Merk, Mrs. Perryman and Dean Wilson check to see if there is anything they need in the way of major purchases, and if so, get it ordered before January. The President noted that Dr. Merk's role has changed and with that comes the responsibility of saying no to certain purchases. The President asked Dean Greene to create a chart comparing how much money we have this year as opposed to last year, and suggested that each of the cabinet members do the same for their department budgets.

A discuss was held regarding the sewage problem, and Dr. Merk stated that Phillip Till is completing an estimate on what it will cost to excavate the field lines and have a perk test done. The President directed that this be done in the very near future. He also mentioned having some students complete training while placing tile downstairs.

The President informed the cabinet that he had a meeting with the ladies last Friday, and informed them they will no longer be allowed to wear jeans or tennis shoes to work. This goes for male office personnel as well. Shop instructors will be allowed to continue wearing jeans. He stated the rule of thumb to use is whether or not you would be appropriately dressed to go to the Chancellor's office when you come to work.

Dean Greene stated they have gone back and added 20% on all internal jobs, due to Mr. Bradsher giving them permission to do so. The new program will automatically calculate in the 20%. The President asked Dean Greene to send him a memo saying 'based on her evaluation and consultation with the examiner, and being in line with board policies, she is recommending that we add the 20% to projects,' and he will sign it.

The President gave a word of caution regarding external contracts to Dean Wilson and Mrs. Perryman. He also requested a memo from Dr. Merk telling him he has evaluated the teaching load of all instructors and has found that all instructors have a full load based on the formula we use, therefore there will be no need for requesting equivalency for any instructor during the fall semester of 2005. The President needs this in the records and a copy needs to go to Dean Greene and the cabinet.

The President requested that the cabinet reach out to the new employees and spend a little time with them. Dr. Merk stated that the search for the welding position closed as of last Friday. Both Mr. Wade and Ms. Turner have looked at the applications, and there are several who meet the basic qualifications.

With no further business before the cabinet, the meeting adjourned.

Recorder: _____     Approved: _____
　　　　　Julie Wood　　　　　　　　　　　　　J. Douglas Chambers
　　　　　Administrative Assistant　　　　　　　President





CABINET MEETING
JF Ingram State Technical College
September 12, 2005

Present:      J. Douglas Chambers          Dr. James T. Merk
              Monica J. Greene             James E. Wilson
              Kay D. Perryman
Recorder:     Julie Wood

President Chambers noted this is the first cabinet meeting since the reorganization and/or restructuring. He stated he wanted the cabinet to keep focused. He knows some of the members have been very concerned about his response to the audit, and he has completed and submitted his response to the audit report to Mr. Ron Jones and has had a discussion with Larry Williard, and is now waiting to hear back from him. What he is telling the cabinet is for information purposes only, not for them to quote him or to say anything to any other employees. He has not shared his response with anyone in detail, but has talked to some individually about certain responses as it might relate to them individually, and he did that to get some feedback. He does appreciate the feedback that he received, because he wrote some things up based on his interpretation after talking to everyone at the table, as it relates to them, mostly Dr. Merk and Monica Greene. He has changed a few things and made the wording fit the specific response. The auditors, in his opinion, have been very fair and responsive to helping the school. He even stated in his response that he felt like the audit was fair and supportive. However, when the auditors make their final decision which will be going in their report at the end of this month, we will be notified as to how we fit in the situation. Dr. Johnson and Stephanie Bell will receive a copy as well. The President put some things in the response which will clearly show that he did not disagree with their findings. He also assured them that he has and would be taking steps to make sure that this does not occur again. He informed them that he would be warning and reprimanding certain people and copies of those were available for submission and will be included in the President's final report to the Chancellor. The President stated that he would need the cabinet's help on a problem area. He will be calling certain employees in and telling them up front, while handing them a reprimand. He stated he has no time for foolishness, and has told a few of them to expect a discipline due to the findings. The President does not think anyone was dealt with to a point that they cannot move on from this. No one will miss a check or be suspended, but we are not going to just warn over and over. We are taking steps to discipline, and a reprimand is a form of discipline. He expects the cabinet to help him carry out the tasks we have before us. It will be important that we review the problems we have had, look at our internal controls, see that we have a check and balance so that the type things that were in our findings do not show up again. There were four findings, and he will be working with the cabinet to go forward, realizing that we are going to grow from those things that caused us to be under the microscope. As the chief person in charge of running this institution, the President has gotten over his embarrassment, hurt, disappointment. Yes, he was embarrassed that an auditor had to tell us that we did not have the proper documents, that we were working on a tractor, and he stated in his response summary that



Cabinet Meeting
September 12, 2005
Page 2 of 6

the Dean of the College, the person employed to supervise live work, violated college
policy. He also said that the Dean of Fiscal Affairs had no knowledge that the tractor was
being worked on, and therefore there was no way possible that she could have had the
proper paperwork or deposit. He put the responsibility of that just where it was. He tried
to be fair about his response, but also had to be realistic. We have been weak and we are
going to become stronger.

The President suggested one of the ways we are going to become stronger is that he
wants the cabinet to have a vision of what their roles are and what they expect to do in
their areas. First, he needs know if the cabinet is getting the most and best of those they
supervise. He wants each cabinet member to ask themselves that question. He thinks
they would say no, if they are honest. When they review the job descriptions in each
area, he wants them to put that imaginary question – is this person doing what this person
is hired to do? In order for them to answer that question, they must first understand what
they want that person to do. Sometimes we find ourselves becoming upset because
something did not go right, and then they know the set of questions the President is going
to ask. He wants them to come to him with the answers before he asks the questions.
The questions will be: what did we have in place that could have prevented this? What
steps did you take to make sure this could have been avoided? When was the last time
you checked this to see if it was working? For the last few months, the President has
been talking about controls. As we go forward into the fall term, he wants to concentrate
on "how could this have been avoided?" Hank Sanders always says "turning our
struggles into opportunities, turning our negatives into positives," and that is what he
wants to do. He wants to make sure we are doing what is expected of us, and what we
understood it to be before we start. He wants us to be treated fairly and for us to
understand what is expected. He wants the employees to have clear expectations of what
they are expected to do, and he wants the feedback, let them state it back to you. Have
your employees to write back to you a memo of understanding.

The President wants the cabinet to have proof of a check and balance all through their
workday and when checking their programs. He wants them to be able to look at the
results of the check and balance. Evaluating the results is going to important, because if
it does not work one way, try another way.

Dr. Merk stated he could pass around a document that would "nail down" what the
President has been talking about, which is the Institutional Management Plan. It contains
the requirements to do those things the President suggested and then turn them in to the
Chancellor's office. The President asked him to break it down, call a meeting of the
cabinet, and talk about which roles will be assigned to each cabinet member and put it
back together. He stated that although you might be identified as the contact person, you
don't just go to your computer, pull up something and send it downtown. Dr. Merk
agreed. The President asked the cabinet to get with other members and the President,
analyze and verify the information they have before it is sent downtown.
The President stated all contracts should be completed. If anyone has any questions or
anything that flares up as a result of the contracts, the President needs to know. Dr. Merk





2\4\22

stated they did have a question from one part-time, ABE employee, and the issue was cleared up with the President's approval. There was a time limit in which the employee is to return the contract, and the President stated if we do not have it back within that time frame, we will notify her that she has not signed the contact and is therefore not employed. It is imperative that every person follows up on everything they start. When someone has something on their checklist that still pending, notify the person who is holding up the progress and get it completed.

The President asked Dr. Merk to tell him what type of understanding the employees were given as to when they were to return the contracts. Dr. Merk stated the contracts were to be returned within a week. The President instructed Mrs. Perryman to have her off-site employees sign and fax the contract, then mail the original.

The President also instructed that within the next three to four weeks, he needs to have the evaluations in to Dr. Merk. Dean Greene stated she has not received evaluation forms as of yet, but Dr. Merk said he would get them to her. The President stated that evaluations are meant to identify areas of weakness, as well as areas an employee is doing well. The President will remind the cabinet that they are due, but he does need them by mid-October. Dr. Merk's part will be to identify areas where he knows there are weaknesses, and it will be more of a counseling opportunity to improve. The President stated this is a priority. If an individual refuses to sign his evaluation, make sure there is a witness to the fact the evaluation was shared with the employee. The signature does not necessarily indicate the employee agrees with the evaluation, but merely that they received it.

President Chambers reminded the cabinet it is time to submit the three month tardy report, and he will need it before the end of the week, following the same system as before. He stated that he will be looking at the flex-time proposals, but will not just jump into any situation. He will have to talk to the Vice-Chancellor to make sure there is even a possibility. He will have to talk to the DOC as well. In the meantime, he expects the cabinet to adhere as closely as possible to the guidelines already in place. The President asked Dr. Merk to look at each employee's tardiness in the past, as well as just the past three months. The President stated, for the record, you cannot change a person's schedule. You can recommend that they be allowed to change their schedule temporarily, or for a week, etc.; but be very careful not to tell an employee they can have a permanent schedule change. We have to be consistent across the board. The President is very considerate of employees' needs, is conscious that emergencies occur, but has to say "what if" one employee needs a change, then a few others decide to follow suit as well. He asked the cabinet to remember that lawsuits come as a result of people being unfairly treated as compared to others. He wants the cabinet to try to be flexible with their employees, but at the same time realize they cannot make a whole lot of decisions like that. The President does appreciate the way the cabinet has dealt with some of the problem employees, some are gone but some are not. He wants us working together as a team to deal with this. We are still sharing too much administrative business with people we are supervising, and the President has proof, because employees tell the President

Cabinet Meeting
September 12, 2005
Page 4 of 6

things that he only talks to administrators about. He expects the cabinet to have
professional courtesy to know what to talk about and when to talk about it.

President Chambers wants the cabinet to have written proof of their meetings. Mrs.
Perryman has a monthly meeting, and we have proof of that. He advised Dr. Merk to
meet at least monthly until he gets comfortable with what he is doing. He advised Deans
Wilson and Greene to look over Dr. Merk's agenda to see how they might contribute to
his faculty meetings with updates, etc. He encouraged Deans Wilson and Greene to hold
monthly meetings, even if it is only to ask their departments if they are having any
problems, etc. Send a copy of the meeting announcement to the President, as Mrs.
Perryman does. If something comes up in the meeting that the President needs to know
about, he expects you to bring it to his attention immediately. <u>All meetings are to be
documented.</u>

There is a Diversity Conference on Sept. 14-15 in Birmingham, and a Workforce
Development meeting on Sept. 28-30 in Birmingham.

At the beginning of each month, if you have a meeting scheduled, Julie Wood needs to
know about it. At the first of each month, she prepares a calendar for the President, and
he would like for those meetings to be on there, so he can know where the cabinet
members are. The President asked Dr. Merk to personally survey each faculty member to
see whether they have plans to attend any professional development activities, have them
tell you why they feel it important for them to attend, and then Dr. Merk is to make his
decision whether they can attend (but be consistent). The President wants meetings
attended to be for program enhancement, not for personal gain.

The IRS is increasing travel reimbursement due to higher gasoline prices, and the
Chancellor will probably be sending something out on it. The President asked the cabinet
to think smarter, to try and make sure trips are being combined in order to conserve and
be efficient. Mrs. Perryman stated the State Dept. got an email that their travel was going
up on October 1st, to 48.5 cents/mile. The President is concerned that we are not taking
any precautions for energy savings. He asked the cabinet to begin turning off lights when
not in use, etc., and ask employees to help in monthly meetings. Be conscious of comp
time being accrued. He wants to have a meeting to analyze the steps we take to get our
reports in on time, and the cabinet members are to keep a log of when things are asked
for so that they will know what is keeping them from getting reports completed.

The President stated that we have to collectively deal with our live work activity. He
talked with Dr. Merk about passes, and we are going to have to revamp that process
because the passes were developed for one thing, but are being used to get around the
process. It is not fair for Monica and her staff to be held responsible for all the tricks that
are played at this institution, but it is fair that if she does not say "this is the way it is
going to be" that she be held liable. If an auditor can go out and check on something and
ask the status of it, then we can too. He has asked Dr. Merk and Dean Greene to
regularly and randomly spot check paperwork on live work projects. If they do not, then



write them up, just as if we were having an audit. The President has committed himself in writing to the auditors that we will be tough, and will get on the right track, and he expects for each of the cabinet members to roll up their sleeves, and remember what is negative now does not have to be negative tomorrow. He has talked to all the members individually.

Dr. Merk stated that the Alabama Accountability Performance Profile is something we are going to be using next year and the year thereafter. He quoted a paragraph from the Institutional Management Plan regarding evaluating the college performance standards, handed a copy to each cabinet member, and discussed the way in which it is to be filled out, used and what we can expect to gain from using the plan. The President concluded this discussion by stating that everything follows a pattern and the information needed to complete the profile should be readily available because it is information compiled on a daily basis. He also stated he wanted to have a meeting to specifically discuss completing the profile.

Dean Greene stated that the business office would be busy for the next few weeks due to closing out the fiscal year. A representative from ACCESS will be coming to assist with putting contracts on the new system and changing live work over to the new system. The President directed that HR personnel be included in the training. Dean Greene stated that it will be necessary for some business office personnel to work late a few days in order to affect that training. She will send out memos on new procedures as they are necessary. The Facilities Master Plan has been emailed downtown. The equipment and supply and resale inventory will be taking place by the end of the month. The President asked Dean Greene to try sending out an inventory list of what is supposed to be there (a self-inventory) for each department to check what equipment is "displaced" or "additional pieces" and Dean Greene stated that she already has a similar procedure in place. Dr. Merk asked what instructions he should give instructors with regard to supply and resale inventory. Dean Greene stated she will be sending out a memo with instructions and will go over it with Dr. Merk.

The President stated he wants the four cabinet members to begin meeting once every two weeks as sort of a "brainstorm" session to work out any issues that may come up.

Dean Greene stated that the transition car will be delivered on Wednesday. Dr. Merk asked if the policy on use of private vehicles, state-owned vehicles, etc. was ever completed. The President stated it needed to be completed as soon as possible. Dr. Merk will send out an email update on where the policy is in the completion stage. The President directed that, on employees who cannot be insured to drive state vehicles, some type of policy is created setting guidelines that those employees will be responsible for their own transportation without being paid mileage, or pay a fee for the college to insure them.

Dean Greene stated that purchasing has been cut off, and spending looks good. The President stated there will be no major purchases after January. He also directed that Dr.

May 23, 2005

Mrs. Barbara McAnaly, from Florida, was sent to Ingram to audit the Director of Special Education (Mrs. Perryman) and the Special Education program. In setting up the date and time of this meeting Mr. Chambers told Ms. McAnaly that she would not be allowed to bring anyone with her to the meeting. It was noted by numerous employees of the front office and business office that within minutes of closing the conference room door where the meeting with Ms. McAnaly was held that Mr. Chambers could be heard yelling at Ms. McAnaly and pounding on the table and that this behavior continued for several minutes. After Mr. Chambers's outburst Ms. McAnaly could be heard speaking in a raised tone of voice herself.

Everyone at this meeting was aware that the meeting was being tape recorded. At the conclusion of the meeting, Mrs. McAnly asked Mr. Chambers secretary for the tape, and Mrs. Wood gave it to her.

The next morning May 24, 2005, Mr. Chambers's secretary, Mrs. Julie Wood, told Mr. Chambers that Mrs. McAnly had taken the tape. Mr. Chambers yelled at Mrs. Wood and told her that he could fire her for giving Mrs. McAnaly the tape and slung the papers in his hand across his office.


October 3, 2005

Patti Graves and I went to Mr. Chambers seeking permission for Mike Englett, a programmer, to come and do some work for us. Mrs. Greene, Mr. Wilson and Dr. Merk were also there. He raised his voice at Mrs. Greene and told her that she should not have let me and Patti come in to ask for permission and that it was her fault that we did not have a programmer on staff. Ms. Graves asked for permission to speak and Mr. Chambers granted it. However, when she started explaining to him that all of the two year colleges that she audited during her time with Examiners of Public Accounts had a programmer or programmers on staff and that the accounting software program that Ingram uses is not a problem free software program, he started yelling at her and I asked him to stop, that she was a new employee. He told me that she would just have to get use to it.

He then started telling me that Dr. Merk said that we did not need a full time programmer and I told him that since Dr. Merk did not work in the business office, perhaps he was not the best judge. He then began yelling at me telling me that if Mrs. Greene had wanted a programmer she damn sure should have hired one and then turned his back to us.

A memo is attached, showing where we did a written request after that meeting and for future requests. Note: No need to get yelled at every time you need the programmer!



October 3, 2005

MEMORANDUM

TO:            Mrs. Monica J. Greene, Dean of Fiscal Affairs
               Mr. J. Douglas Chambers, President

From:          Mrs. Julie Givens, Asst. to Dean of Fiscal Affairs
               Mrs. Patti Graves, Accountant

RE:                     Programmer

        This memo is to inform you that the fiscal office will need Mike Englett during the month of October to close out the fiscal year. We will limit his time as much as possible.

        As you know, we are changing from the work order program that Mike wrote to the work order program that Access has provided. The less problems encountered will of course mean the less use of Mike required for the transition. We estimate the hours needed for Mike will be 18. We hope to have the work order program for Access up and running by Wednesday of this week and the old program closed out. The 18 hour calculation is having Mike work three 6 hour days.

        At the point we start closing our books for the year, we will need Mike. Hopefully, this process will again only be a three day process involving Mike. This would again be 18 hours with Mike working three 6 hour days.

        When Patti does the financial statement she may need Mike. We are not sure if this is the case or not. However, we feel you should be aware of the possibility.

        We have checked our records and we have only used Mike 160 hours total this year which is a major decrease from the prior years. We paid him at a rate of $65.00 an hour totaling $10,445 from October 1, 2004 until September 30, 2005. Thank you for your consideration in this matter.



**Ingram
State
Technical
College**

• Developing Responsible Citizens •

**J. Douglas Chambers**
President

---

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

# INGRAM STATE TECHNICAL COLLEGE

January 11, 2006

MEMORANDUM

TO:         Mrs. Monica J. Greene, Dean of Fiscal Affairs
            Mr. J. Douglas Chambers, President

FROM:       Mrs. Julie Givens, Payroll/Adm. Asst. to Dean of
            Fiscal Affairs
            Ms. Patti Graves, Accountant

RE:         Request for Consultation of Mike Englett

        As you know we are in process of the calendar year closeout. Quarterly and yearly reports are due, before W-2's and 1099's can be run.

        You are also aware of the problems with the taxable benefit in the payroll department last January. We feel that we will need Mr. Englett on hand during the process of running the W-2's and 1099's. Mrs. Givens has quarterly and yearly figures ready to verify against the W-2's and 1099's, however they need to be verified before mailing.

        We are successfully now closing each month without the assistance of Mr. Englett and moving smoothly forward with the Access program. With the exception of problems in the live work module that you are already aware of, we feel that we have made great strides.

        But, there will be occasions when we will still need the assistance of Mr. Englett. This time it is for a last year carryover problem, however, in the future we may still need to make a special request upon occasion to consult with him in his programming expertise.

        I need him ASAP. Thanks for your consideration in this matter.

*P.O. Box 220350  •  Deatsville, Alabama 36022*
*Phone: 334-285-5177  •  Fax: 334-285-5328*



*Ingram*
*State*
*Technical*
*College*

• *Developing Responsible Citizens* •

# INGRAM STATE TECHNICAL COLLEGE
January 11, 2006

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

## MEMORANDUM

TO:        J. Douglas Chambers
           President

FROM:      Monica J. Greene      *Monica*
           Dean of Fiscal Affairs

RE:        Consultant

I am writing this memorandum as a follow-up to the request from Julie Givens and Patti Graves regarding the services of Mike Englett for consultation purposes. I have discussed this matter with Julie and Patti, along with Mr. Hubert Griffin of the MIS Department. Mr. Griffin said that he was not familiar enough with the payroll program which runs the W-2's to assist Mrs. Givens. I have made the determination that Mr. Englett's services are necessary. I am expecting to need him for approximately 3-4 days. If additional time is needed, I will inform you at a later date. Thank you for your consideration of this matter.



Ingram
State
Technical
College

• Developing Responsible Citizens •

**INGRAM STATE TECHNICAL COLLEGE**
January 11, 2006

**J. Douglas Chambers**
President

---

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

MEMORANDUM

TO:        J. Douglas Chambers
           President

FROM:      Monica J. Greene          *Monica*
           Dean of Fiscal Affairs

RE:        Consultant

I am writing this memorandum as a follow-up to the request from
Julie Givens and Patti Graves regarding the services of Mike
Englett for consultation purposes. I have discussed this matter
with Julie and Patti, along with Mr. Hubert Griffin of the MIS
Department. Mr. Griffin said that he was not familiar enough with
the payroll program which runs the W-2's to assist Mrs. Givens. I
have made the determination that Mr. Englett's services are
necessary. I am expecting to need him for approximately 3-4 days.
If additional time is needed, I will inform you at a later date.
Thank you for your consideration of this matter.

*1-12-06*

*To: Dean Greene    Copy to    OIC    Please let*
*Joe    me know —*
*status ASAP*
*Jan*

P.O. Box 220350 • Deatsville, Alabama 36022
Phone: 334-285-5177 • Fax: 334-285-5328

#26

NEW HIRES

Tonya Allen
Black Female
9/05

Debra Taylor
Black Female
1/06

Fate Bryant
White Female
1/06

Chris Thomas
Black Male
9/06

Gloria Cotton
Black Female
1/05

Aldolhphos Traywick
Black Male
10/04

Cherea Crayton
Black Female
9/05

Felix Tyre
Black Male
1/06

Lakerri Gill
Black Female
11/04

Loran Wainwright
White Female
11/04

Renee Glenn
White Female
11/04

Mary King
Black Female
12/05

Charles Henderson
Black Male
9/05

Kevin Towns
White Male
6/06

Richard Jordan
Black Male
9/05

Eric Baker
Black Male
6/06

Shawn Lacey
Black Male
10/04

Michael Farris
White Male
7/06

Shawn Moore
Black Male
1/06

LaShauna Hulett-Jones
Black Female
7/06

Jackie McDuffie
Black Female
11/04

Barbara Harvest
Black Female
7/06



Dorothy Petty
Black Female
7/06

Carol Banks
Black Female
7/06

Robert Conway
Black Male
8/06

Leo Miller
White Male
11/06

Corey Johnson
Black Male
9/06

Tawanna Thornton
Black Female

# 26

Promotions

Stanley Carter
| | | |
|---|---|---|
| 9/04 | Rank 1A Instructor | $56,505 |
| | Acting Facility Dir. Tutwiler $16,000 raise | $72,485 |
| 9/05 | Appt. Facility Dir. Tutwiler $25,000 raise | $81,496 |
| | *Black Male* | |

*85574  Cost of Living*

Woody Chisum
| | | |
|---|---|---|
| 9/02 | Moved from Rank 2 to Rank III | $3,900 | $61,622 |
| 9/03 | Moved from Rank III Instructor | $5,500 | $67,153 |
| | to Rank IV without Credentials | | $75,856 |
| | (Not Grand fathered in) | | |
| | *White Male* | | |

*79651  Cost of Living*

Josh Bridgman
| | | |
|---|---|---|
| 10/03 | Made retroactive to 9/03 moved | | $29,535 |
| | from E/3 level 5 to level 4 | $ 4,000 raise | $32,897 |
| | *White Male* | | |

*Moved + came back*

Willie Goldsmith
| | | |
|---|---|---|
| | | $29,538 |
| 9/04 | Moved from E3/5 to E1/2 | $11,200 raise | $44,817 *03/04* |
| | *Black Male* | *p 414* | *51231 05/06* |

*E/12 to E/1 Grade increase*

David Milledge
| | | |
|---|---|---|
| 9/04 | Moved from Rank IB Instructor | | $56,505 |
| | to Rank IA Instructor? | $13,000 raise | $69,371 |
| | *Black Male* | | |

*72852*

Malcolm Montgomery
| | | |
|---|---|---|
| 9/03 | Moved from Rank IA Instructor to | | $50,587 |
| | C3 Adm. | $6,500 raise | $57,022 |
| 9/05 | Moved to C2 | $6,000 raise | $63,600 |
| | *Black Male* | | |

*72337*

Colman McKeithen
| | | |
|---|---|---|
| | | $42,280 |
| 9/04 | Moved from E2/2 E1/1 | $3,800 raise | $46,027 |
| | *Black Male* | | |

*48780  52901*

Stan Humphries
| | | |
|---|---|---|
| | | $44,527 |
| 9/04 | Moved from E2/2 to E1/1 | $3,600 raise | $47,199 |
| | *White Male* | | |

*49561*

Gloria Knox
| | | |
|---|---|---|
| | | $28,788 |
| 9/04 | Moved from E4/05 to E3/4 | $6,494 raise | $33,285 |
| | *Black Female* | | $35,282 |

*41220*



Rick Bonnano                                                  $35,530
9/04   Moved from E1 level 2  E1 level 1   $5,200   $40,770
      *White male*   *44019*
                                               *47056*

Jim Merk
7/04   Moved from C2 to C1   $26,000   $65,990
                                               $73,485
9/05   Moved to B- Dean's Level   $91,520
      *White male*   *97049*

Erica Turner   $34,783
9/05   Moved from E2 to E1   $6,854   $41,637
      *Black female*   *55802*

Jackie McDuffie   $37,033
9/05 Moved from E2/3 added 5 yrs exp.   $3,812   $40,845
      *Black Female*   *42890*

*Leo M. Iler*
*11/06 Part time Bishe   Jan '07 Give full time Contract #44,220*
*L paid for Mo of Dec Jan '07*

IN THE AREA OF SPED MRS. PERRYMAN WAS FIRED BY DEPT OF EDUCATION
AS THE DIRECTOR OF SPED. THIS WAS EFFECTIVE OCT 1.

*However, before leaving, she gave to each of her office tech's raises. One just happened
to be Jim Merk's daughter, Amelia Fox, the other girl was Ashley Bankston, a friend of
Mrs. Perryman's daughter. Both of these two girls are white females.*

*After Mrs. Perryman was fired by SPED Mr. Chambers has created a position for her as
Dean of ????, whatever, we have no appointment letter to what this title is. However, she
does make $104,700, more than any other dean on our staff.*

*Hired 6/94 $42,069- Kay Perryman*

Mrs. Perryman is now Dean of Strategic Planning
NO work product. Never a position before.

Funding was to be for 1 year thru SPED.

NO longer pd thru SPED Retired JAN 1 2007

Health Related problems (Stress) (Health issues)

#26

## RECEPTIONIST

Beth White          Main Campus     $26,540              Date of Empl.     6/2003
*white female*
*77% OF WORK LOAD*

Gloria Knox         Draper Campus    $35,282             Date of Empl.     9/1994
*black female*
*21% OF WORK LOAD*

Jackie McDuffie  Tutwiler Campus $40,845                 Date of Empl.     11/2004
*black female*
*2% OF WORK LOAD*

## ACCOUNTS PAYABLE

Kerri Conger        Main Campus  A/P        $28,130      Date of Empl.     8/2001
*white female*
Josh Bridgman      Prior A/P                $32,897      Date of Empl.     4/2002
*white male*        *moved to maintenance no pay cut*

## ACCOUNTING ASST.

Jeanna Givens      Main Campus           Grade E 3/4    beginning salary $31,586
*took on duties for ABE consortium for postsecondary and promised a raise and never received it.*

Leigh Winslett  Prior Acct. Asst.         Grade E1/2    beginning salary $41,047
*did not have the duties of the ABE consortium*

## ACCOUNTANT

Patti Graves        Main Campus           C-1           salary    $54,500
*white female*

Gene Bridgman   Main Campus           C-2           salary    $73,786
*white male*

*Note: Mr. Chambers told Mrs. Greene she could offer Mrs. Julie Givens the accountant position, however,*
*if she took the position she would remain on the same pay scale she was currently on. Mrs. Givens was and*
*still is at the top of the E salary schedule. Mrs. Givens turned the offer down because she had just as much*
*experience and education as Mr. Bridgman and felt that should have been paid the same to do the same*
*job*

27. Females holding previously male-held jobs at lesser pay:

Bonita Owensby      Registrar           Paid:   $60,000
Tim Robinson        Registrar           Paid:   $67,654 98/99
                                        06/07        $90,470 C/1

Patti Graves        Senior Accountant   Paid:   $63,087
Gene Bridgeman      Senior Accountant   Paid:   $73,786
                                                (2003)
Malcolm Montgomery  Director of Student Services
                                        Paid    $72,337

Ms. Graves and Mr. Montgomery are told they are considered professional contemporaries for promotional, supervisory and educational purposes and opportunities.

However, before Ms. Graves was hired; Mrs. Greene offered Mrs. Givens or was told she could offer Mrs. Givens Mr. Bridgman's job to Mrs. Givens but with no increase in pay.
  Please note: that Mrs. Julie Givens had as much education and experience as Mr. Bridgman and with the background experience at Ingram would certainly have been the next in line for the position.

AFFIDAVIT

I Leo Miller was asked by J. Douglas Chambers to deliver and install cabinets for Mr.
Tim Leonard, a customer of J. F. Ingram and friend of Mr. Chambers, on J. F. Ingram
time and on my own time. He instructed me to do this and told me that even though Mr.
Leonard would not be expected to pay out of his own pocket that I would be compensated
through the hours that I claimed on my hours turned in for working at J. F. Ingram during
the day and for the night program. Dr. Jim Merk, the Dean of Instruction, was also aware
of this taking place. Dr. Merk later called me aside and told me that I should remember
that Mr. Chambers asked that I do this for Mr. Leonard not him. However, he did not
want me to quit taking care of Mr. Leonard.

Some dates are as follows:

Memorial Day all day
June 1st Night
June 5th Night
June 7th Night

These are only some of the days, because the job is not yet finished.

Leo Miller    _Leo Mill_____



On June 24th, 2005 I went to Bibb County Correctional Facility to interview some special education inmates. While interviewing these inmates it became evident that the instructor did not know the inmates. I found out that the instructor had only been in the class four times in several months. Since we are currently in litigation over special education services I contacted Barry Blackwell at the State Department of Education and laughingly said, "Well you did a great job monitoring", and I explained what I had found out.

On Saturday night, June 25, 2005, President Chambers called me at home and in a very hostile manner asked me if I had called Barry Blackwell and told him of the situation at Bibb County Correctional Center. I said, "Yes", and President Chambers proceeded to verbally denounce my actions, telling me never to call Barry Blackwell again and telling me I was not a team player, etc. I tried to explain that I was in the middle of a dinner party and now was not the time and that I meant no harm. He hollered that I was to be in his office at 8:00 am Monday morning.

Monday morning when I went to President Chambers's office, President Chambers, Mrs. Kay Perryman, Dr. Jim Merk and Mr. James Wilson were in there and they made me sit at the head of the table. They went around the table and took turns berating me about how I could not be trusted.

President Chambers said he knew of 22 staff at Ingram that hated him because he had hired me. He also stated that if I ever talked to Barry Blackwell again he would not be giving me another Christmas present like he gave me this time (a reference to my not being fired).


*Melissa Wallace*

Melissa P. Wallace
Placement Coordinator
J.F. Ingram State Technical College



DEFENDANT'S EXHIBIT

# MEMORANDUM

**TO: Mrs. Monica Greene**
    **Dean of Fiscal Affairs**

**FROM: Michael Douglas Farris**
    **Transition Specialist**

**RE: Insurance Inquiry**

**DATE: 08/02/06**

---

This correspondence is to inform you of events that took place at JFI on 08/02/06.

On August 2, 2006 at approximately 6:55 A.M., I entered Mrs. Julie Givens office to inquire about my health insurance contract number and group number. The reason for this inquiry was to provide this information to my daughter who had a medical appointment today at 8:30 A.M. I explained to Mrs. Givens about my daughter's appointment and my need for the previously mentioned information. Mrs. Givens stated that she did not have the information and I would have to contact the health insurance provider to get the information. She also said I should give the doctor my social security number and they could access my information. Mrs. Givens said that I probably had not been with JFI long enough (just over three weeks) for the paperwork to be completely processed. I thanked her for her time and left the office. I returned to my workstation and phoned my wife who was to pass along the needed information to my daughter. Mr. Trawick, my supervisor, provided the insurance group number and I gave this to my wife along with the information I had received from Mrs. Givens.

At approximately 9:10 A.M. a co-worker told me that Mrs. Givens wanted to see me. I entered her office and Mrs. Givens began by telling me that I needed to take care of my own business and not have my wife taking care of it for me. She said she was trying not to have an attitude with me about the situation but she didn't like anyone telling her how to do her job. This was when I first became aware that my wife had spoken with anyone here. I was away from the phone at the time but had told my wife that Mrs. Givens was the person I had spoken to about the situation. This was also the time my daughter was at the doctor's office. I informed Mrs. Givens that I was not aware that my spouse had been in contact with her. Before I could ask for further clarification of the situation Mrs. Givens said she wanted me to know that she had sent my insurance paperwork to the appropriate agency prior to today but she was not responsible for what happened to it after that. She then held up some papers in front of me and said she was sending my paperwork again and wanted me to see it so I could tell my wife that it was being done. She then told me that if I had any further problems that I should handle them myself and



that she did not want my wife to call again. I apologized to Mrs. Givens for any misunderstanding and left her office.

I returned to my workstation and called my spouse in attempt to gain some clarity of the situation. When I spoke with her she relayed that she had in fact contacted Mrs. Givens as well as the health insurance provider in an attempt to acquire the needed information. She stated that her experience with Mrs. Givens had been similar to mine. She described the treatment she had received from Mrs. Givens as "very rude". She was instructed to contact the health insurance provider by Mrs. Givens. She stated the two ladies she spoke with there were both cordial and polite but informed her that they had never received any paperwork regarding my insurance from JFI.

At this time I reported this incident to my supervisor, Mr. Trawick, who in turn instructed me to schedule an appointment with Dean Wilson.

I was shocked by the way I was treated in Mrs. Givens office and later became very upset when I learned of her treatment of my spouse. Her behavior was rude, unprofessional, and unnecessary. No member of my family has done anything wrong and should not be treated in such a manner. If I am not available my family should feel free to contact the appropriate staff members at JFI for any questions they have concerning issues related to my work here that impact our family. Mrs. Givens treatment of my family reflects poorly on JFI. I hope this was an isolated incident though my education in human behavior and years of experience as a professional counselor would suggest otherwise.

Due to the fact that there was no record of my application for insurance the medical facility in Birmingham refused to treat my daughter. Although the cancelled appointment created some hardship, it pales in comparison to the rude and discourteous behavior displayed toward my family and me. I believe that Mrs. Givens owes us an apology. I would also like to take this opportunity to request a copy of the original insurance correspondence that I completed July 10, 2006. It is my desire to always treat my co-workers with courtesy and tact. I plan to become a valuable member of the JFI team and never represent the school in the negative manner that I experienced today.


cc: President Chambers
    Dr. Merk
    Dean Wilson


MDF



# INGRAM STATE TECHNICAL COLLEGE

*Ingram*
*State*
*Technical*
*College*

*Developing Responsible Citizens*

June 11, 2007

**MEMORANDUM**

**TO:**     Dean Monica Greene

**FROM:**   *J. Douglas Chambers*
J. Douglas Chambers, President

**RE:**     Memo from Mrs. Julie Givens

Attached is a copy of a memorandum I received from Mrs. Julie Givens referencing a memorandum I sent to all employees on June 5, 2007. As you will see from her comments, her understanding of what was sent in my correspondence was definitely not what we discussed in our cabinet meeting, nor what was in the content of my memo. I strongly suggest that you meet with her to clarify and address her questions and/or concerns. Please feel free to review the minutes and/or the tape of the cabinet meeting when this subject was discussed.

Please contact me if you have questions or concerns.

Thanks.

JDC:jw

cc:    Mrs. Julie Givens
       Dr. James Merk
       Dean James Wilson
       Mrs. Rosie Edwards

**DEFENDANT'S EXHIBIT**
*9 - Givens*



# INGRAM STATE TECHNICAL COLLEGE

June 7, 2007

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

MEMORANDUM

TO:        Mr. J. Douglas Chambers, President

FROM:     Mrs. Julie Givens, Business Office Coordinator

RE:        Live Work Information

This memorandum is to ask for clarification on your memorandum dated June 5, 2007 concerning **"getting on the list"** for live work. To my knowledge this is the term that has always been used the past with customers and if this has changed, the business office should have been notified.

Perhaps when new terms are to be used, everyone should be informed before blaming employees for perceived infractions when they had no prior knowledge of changes in procedure. And if there is no longer a list when did this procedure stop? I do know that several of our Instructors are now keeping their own "lists" of live work and calling people in themselves.

Thank you for your clarification on this matter.

Cc:        Dean Greene
           Dean Merk
           Dean Wilson
           Director Edwards

*P.O. Box 220350  •  Deatsville, Alabama 36022*

*Phone: 334-285-5177  •  Fax: 334-285-5328*

**DEFENDANT'S EXHIBIT**

*10-Givens*



**INGRAM STATE TECHNICAL COLLEGE**

*Ingram*
*State*
*Technical*
*College*

*· Developing Responsible Citizens ·*

**DATE:**  June 5, 2007

**TO:**  All Ingram Employees

**FROM:**  J. Douglas Chambers
President

**RE:**  Live Work Information

As we continue to our efforts to provide professional services to our students and qualified customers, it will be to our advantage to provide accurate and correct information about the College. I request that each of you familiarize yourselves with the information on the enclosed card, and use it when potential customers inquire about our live work qualifications and/or procedures.

Please refrain from getting into discussions about **"getting on the list."**   Refer this and related discussions to Dean Merk for his actions.

Thank you for your cooperation.

JDC/ept

attachment

cc:  Dr. Merk
Dean Greene
Dean Wilson
Director Edwards

*J. Douglas Chambers, President*
*P.O. Box 220350 • Deatsville, Alabama  36022*
*Phone:  334-285-5177    Fax: 334-285-2521*



DEFENDANT'S
EXHIBIT

*11 - Given*



Ex. 11 (a)

**Proof of one of the following qualifications must accompany this form in order to participate in live work.**

- An Alabama tax supported program
- An Alabama State or Federal public employee (proof of employment: insurance card, paycheck stub, employee I.D. card, letter from supervisor on employer letterhead etc.)
- A current student in the Alabama two-year college system
- A charitable organization supported by donations (not the individual working for the organization but the organization itself)

**The person qualified will be required to sign applicable paperwork and make a 75% deposit of the total estimate. When items are dropped off payment must be made before any work is accomplished.
Any exception to the above must be approved by the President or his designee.**

J. F. Ingram State
Technical College
Deatsville, Alabama

Bank Deposit Log
Bank Deposit Detail - Live Work Analysis
October 1, 2004 through September 30, 2005

| Month | Main Campus Work Orders | Draper Campus Work Orders | Tutwiler Campus Work Orders | Total Work Order Activity |
|---|---|---|---|---|
| October-04 | 18,899.50 | 6,130.03 | 214.28 | 25,243.81 |
| November-04 | 13,599.29 | 2,609.92 | 645.01 | 16,854.22 |
| December-04 | 12,190.90 | 5,620.98 | 293.61 | 18,105.49 |
| January-05 | 15,400.01 | 9,164.29 | 132.76 | 24,697.06 |
| February-05 | 13,203.03 | 3,688.56 | 741.16 | 17,632.75 |
| March-05 | 10,815.37 | 6,393.52 | 454.16 | 17,663.05 |
| April-05 | 15,195.93 | 3,078.22 | 1,841.83 | 20,115.98 |
| May-05 | 13,432.13 | 5,393.23 | 746.93 | 19,572.29 |
| June-05 | 15,571.36 | 5,804.01 | 536.22 | 21,911.59 |
| July-05 | 32,626.51 | 3,693.88 | 261.55 | 36,581.94 |
| August-05 | 11,458.53 | 1,288.91 | 363.70 | 13,111.14 |
| September-05 | 23,463.10 | 3,152.85 | 347.35 | 26,963.30 |
| | 195,855.66 | 56,018.40 | 6,578.56 | 258,452.62 |
| | 195,855.66 | 56,018.40 | 6,578.56 | 258,452.62 |
| | 258,452.62 | 258,452.62 | | 258,452.62 |
| **Percentage of Live Work Total By Campus** | **75.78%** | **21.67%** | **2.55%** | **100.00%** |

DEFENDANT'S EXHIBIT
12-Draper

1

February 25, 2006

To Whom It May Concern:

Prior to joining the staff of J. F. Ingram State Technical College in July 2004 I was a
employee of the State of Alabama Department of Examiners of Public Accounts for
thirteen years. During my time with Examiners I was often assigned the audit of J.
Ingram State Technical College and when given this audit assignment I never felt an
degree of apprehensive about having to work at J. F. Ingram State Technical College
During these audit assignments at J. F. Ingram State Technical College I found the s
members that I had contact with to be courteous, helpful, and knowledgeable about t
job duties and responsibilities. During these audit assignments my contact with J. D
Chambers was somewhat limited but I remember Mr. Chambers as being a very pers
individual who supported his entire staff. On more than one occasion I can rememb
Chambers praising and thanking Monica Greene, Gene Bridgman and their business
staff for the work they were doing for J. F. Ingram State Technical College.

Since joining the staff of J. F. Ingram State Technical College, I have come to see a s
J. Douglas Chambers's personality that I never saw while working with Examiners o
Public Accounts. Mr. Chambers has a volatile temper and has subjected numerous
employees including me to his wrath.

The instances of this behavior that I can pinpoint to the actual date are described belo

<u>March 23, 2005</u>

A morning meeting of Ingram's "Cabinet" (J. Douglas Chambers and the College De
Main Campus) was held behind closed doors in Mr. Chambers's office. This was the
day that week that Mr. Chambers was on campus, the earlier part of this week he was
of town at a conference. Within minutes after closing his door, Mr. Chambers was he
by the front office staff and business office staff yelling at Monica Greene, Dean of F
Affairs about the "termite situation" at Ingram's Tutwiler campus. The yelling conti
and we could hear that Mr. Chambers was also pounding on his desk as he yelled at M
Greene. From what we could hear evidentially Mrs. Greene tried to interrupt Mr.
Chambers and she was trying to explain her position. At this point Mr. Chambers
continued yelling and he could be heard saying "you don't know what he told me"
(reference to Stanley Carter – Center Director at Ingram's Tutwiler Campus) and Mr.
Chambers could be heard telling Mrs. Greene to be quiet.



DEFENDANT'S
EXHIBIT
13- <em>Divers</em>

1

Page 2 of 4

## March 23, 2005 - Continued

The point Mrs. Greene was trying to tell Mr. Chambers was that she had handled he
and responsibility concerning the "termite situation" days earlier, if there was any fi
problem concerning the "termite situation" at Tutwiler the shortcomings were those
Tutwiler Center Director.

## May 23, 2005

A meeting with Barbara McAnnaly, a compliance and audit advisor for J. F. Ingram
Technical College's Special Education Program was held in Mr. Chambers's confere
room. I cannot tell you the names of everyone at this meeting but I do know that thi
meeting was attended by Mr. Chambers, Kay Perryman, Ingram's Special Education
Director, Julie Wood, President Chambers's Secretary and Ms. McAnnaly.

This meeting was set up weeks prior by Mr. Chambers and Mr. Chambers made a po
telling Ms. McAnnaly that she would not be allowed to bring anyone with her to this
meeting. It should be noted that Ms. McAnnaly is not an employee of J. F. Ingram S
Technical College.

Mr. Chambers 's conference room is within earshot of the business office. Within m
of closing the conference room door business office staff could hear Mr. Chambers y
at Ms. McAnnaly. Mr. Chambers's yelling continued for several minutes and then th
business office staff heard Ms. McAnnaly speaking in a raised tone of voice in the
direction of Mr. Chambers. After awhile conditions in this room calmed down.

Everyone at this meeting was aware that Julie Wood, Mr. Chambers's Secretary was
recording this meeting. After the meeting concluded Ms. McAnnaly asked Ms. Woo
the tape and in fact told Mrs. Wood that she was not leaving our campus without the t
Mrs. Wood gave Ms. McAnnaly the tape. Mr. Chambers was not present when Ms.
McAnnaly asked for and received the tape.

## October 3, 2005

This is a day I will never forget because I got to witness Mr. Chambers's temper and t
personally. After arriving for work this day Julie Givens and I went into Mrs. Greene
office to tell her that we needed to request the services of Mike Englett a computer
programmer that the College uses on a consultant basis. J. F. Ingram State Technical
College does not have a computer programmer on staff and J. F. Ingram State Technic
College has used Mr. Englett's services for several years now. Mrs. Greene then aske
Mrs. Givens and me if we would go with her to Mr. Chambers's office so we could ex
to Mr. Chambers why we needed Mr. Englett's services.

October 3, 2005 - Continued

When entering Mr. Chambers's office we noticed that James Wilson, Dean of Stuc
Dr. Jim Merk, Dean of Instruction/MIS Director were already there. Mrs. Greene ;
Mr. Chambers if he wanted Mr. Wilson and Dr. Merk to leave and Mr. Chambers t
Greene that it was okay if they stayed. Mrs. Greene and Mrs. Givens starting expla
Mr. Chambers that we needed Mike Englett to come and help us with some accoun
ledger postings and generating some fiscal year end reports. Upon hearing this Mr.
Chambers started on a tirade about Mr. Englett and why we continued to need his s
This behavior continued for several minutes and after Mr. Chambers calmed down I
Mr. Chambers if I could say something. Mr. Chambers told me it was okay for me
speak. I told Mr. Chambers that as an Examiner all the Postsecondary sites that I au
had at least one programmer or more on staff to help other college personnel with re
reports and accounting ledger posting analysis.

I also told Mr. Chambers that the accounting software module that the business offic
was not an error free software package and that the business office staff sometimes n
help in tracking these errors. Right after I made these statements, Mr.Chambers start
yelling at me and saying "why don't you ask your supervisor (meaning Mrs. Greene)
J. F. Ingram State Technical College does not have a programmer on staff." Mr. Cha
continued yelling and Mrs. Greene made the comment that Mr. Chambers thinks the
problems are always caused by her. I cannot tell you all the comments that Mr. Chan
sent in my direction because at that point in time I could not believe what was happer
I do remember that after lashing out at me Julie Givens came to my defense and then
Givens became Mr. Chambers's rage target. Several more minutes passed and then N
Chambers calmed down and said he did not have a problem with Mike Englett comin;
campus but that the business office staff was to report when and what he would be wo
on to Dr. Merk and his MIS staff. I think it should be noted that during this encounter
Mr. Chambers that neither James Wilson or Dr. Jim Merk said anything, they just stoo
there.

In the eighteen months that I have been employed by J. F. Ingram State Technical Coll
I have overheard Mr. Chambers yelling at College employees on numerous occasions.
above mentioned instances are only the ones I can put a date of occurrence to. The usu
target of Mr. Chambers's yelling is Mrs. Monica Greene, Dean of Fiscal Affairs. I sho
also mention that Mr. Chambers never apologizes for the verbal attacks; in fact he acts
though the attacks never occurred.

Page 4 of 4

I assure you that the instances that I have documented in this letter are truthful acco

Sincerely,

*Patricia R. Graves*

Patricia R. Graves
Accountant