# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **JULIE GIVENS and** | ) | |
| **MONICA GREENE,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CV 2:06 CV852-1D** |
| | ) | |
| **DOUGLAS CHAMBERS,** | ) | |
| **Individually and in his capacity** | ) | |
| **As President of INGRAM STATE** | ) | |
| **TECHNICAL COLLEGE; JAMES** | ) | |
| **WILSON, Individually and in his** | ) | |
| **Capacity as Dean of Students of** | ) | |
| **INGRAM STATE TECHNICAL** | ) | |
| **COLLEGE** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MOTION FOR SUMMARY JUDGMENT

ATTACHMENTS TO PREVIOUSLY FILED MOTION FOR SUMMARY
JUDGMENT

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3        NORTHERN DIVISION
4
5    CASE NUMBER:  2:06-cv852-ID
6
7    JULIE GIVENS and
8    MONICA GREENE,
9        Plaintiffs,
10   vs.
11   DOUGLAS CHAMBERS, Individually
12   and in his capacity as President
13   of INGRAM STATE TECHNICAL COLLEGE;
14   JAMES WILSON, Individually and in
15   his capacity as Dean of Students
16   of INGRAM STATE TECHNICAL COLLEGE,
17       Defendants
18
19   BEFORE:
20       Cynthia M. Noakes, Commissioner
21       and Court Reporter
22
23   DEPOSITION TESTIMONY OF MONICA GREENE

Page 2

1        S T I P U L A T I O N
2
3        IT IS STIPULATED AND AGREED by and
4    between the parties through their respective
5    counsel, that the deposition of MONICA GREENE may
6    be taken before Cynthia M. Noakes, Court
7    Reporter, at the Law Offices of GIDIERE, HINTON,
8    HERNDON & CHRISTMAN, 60 Commerce Street, 904
9    Regions Tower, Montgomery, Alabama 36104, on the
10   18th day of June, 2007.
11       IT IS FURTHER STIPULATED AND AGREED
12   that the signature to and the reading of the
13   deposition by the witness is waived, the
14   deposition to have the same force and effect as
15   if full compliance had been had with all laws and
16   rules of Court relating to the taking of
17   depositions.
18       IT IS FURTHER STIPULATED AND AGREED
19   that it shall not be necessary for any objections
20   to be made by counsel to any questions except as
21   to the form or leading questions, and that
22   counsel for the parties may make objections and
23   assign grounds at the time of the trial, or at

Page 3

1    the time said deposition is offered in evidence,
2    or prior thereto.
3        IT IS FURTHER STIPULATED AND AGREED
4    that the notice of filing of the deposition by
5    the Court Reporter is waived.
6
7
8
9
10
11
12
13
14
15
16
17   ****************************************
18
19
20
21
22
23

Page 4

1                INDEX
2    EXAMINATION BY:              PAGE NUMBER:
3    MR. CHRISTMAN                 9-543
4
5    EXHIBITS:
6    Defendants' Exhibit No. 1          11
7    Defendants' Exhibit No. 2          76
8    Defendants' Exhibit No. 3          77
9    Defendants' Exhibit No. 4          78
10   Defendants' Exhibit No. 5          164
11   Defendants' Exhibit No. 6          164
12   Defendants' Exhibit No. 7          190
13   Defendants' Exhibit No. 8
14   (Duplicate of Exhibit 7)
15   Defendants' Exhibit No. 9          219
16   Defendants' Exhibit No. 10         220
17   Defendants' Exhibit No. 11         245
18   Defendants' Exhibit No. 12         252
19   Defendants' Exhibit No. 13         253
20   Defendants' Exhibit No. 14         320
21   Defendants' Exhibit No. 15         349
22   Defendants' Exhibit No. 16         350
23   Defendants' Exhibit No. 17         353

1 (Pages 1 to 4)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 5

1           INDEX (continued)
2
3    Defendants' Exhibit No. 18        355
4    Defendants' Exhibit No. 19        356
5    Defendants' Exhibit No. 20        357
6    Defendants' Exhibit No. 21        358
7    Defendants' Exhibit No. 22        359
8    Defendants' Exhibit No. 23        362
9    Defendants' Exhibit No. 24        362
10   Defendants' Exhibit No. 25        363
11   Defendants' Exhibit No. 26        363
12   Defendants' Exhibit No. 27        364
13   Defendants' Exhibit No. 28        365
14   Defendants' Exhibit No. 29        366
15   Defendants' Exhibit No. 30        368
16   Defendants' Exhibit No. 31        370
17   Defendants' Exhibit No. 32        372
18   Defendants' Exhibit No. 33        373
19   Defendants' Exhibit No. 34        375
20   Defendants' Exhibit No. 35        376
21   Defendants' Exhibit No. 36        379
22   Defendants' Exhibit No. 37        382
23   Defendants' Exhibit No. 38        386

Page 6

1           INDEX (continued)
2
3    Defendants' Exhibit No. 39        387
4    Defendants' Exhibit No. 40        389
5    Defendants' Exhibit No. 41        395
6    Defendants' Exhibit No. 42        397
7    Defendants' Exhibit No. 43        401
8    Defendants' Exhibit No. 44        409
9    Defendants' Exhibit No. 45        518
10   Reporter's Certificate           544
11
12
13
14
15   ****************************************
16
17
18
19
20
21
22
23

Page 7

1                    APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFFS:
4        MR. JIM L. DEBARDELABEN
5        ATTORNEY AT LAW
6        1505 Madison Avenue
7        Montgomery, Alabama 36107
8        (334) 265-9206
9
10   ON BEHALF OF THE DEFENDANTS:
11       MR. ANDREW W. CHRISTMAN
12       GIDIERE, HINTON,
13       HERNDON & CHRISTMAN
14       ATTORNEYS AT LAW
15       60 Commerce Street
16       904 Regions Tower
17       Montgomery, Alabama 36104
18       (334) 834-9950
19
20   ALSO PRESENT:
21       JULIE GIVENS, Co-Plaintiff
22
23   ****************************************

Page 8

1        I, CYNTHIA M. NOAKES, a Court Reporter
2    of Eufaula, Alabama, acting as Commissioner,
3    certify that on this date, as provided by the
4    Alabama Rules of Civil Procedure and the
5    foregoing stipulation of counsel, there came
6    before me at the Law Offices of GIDIERE, HINTON,
7    HERNDON & CHRISTMAN, 60 Commerce Street, 904
8    Regions Tower, Montgomery, Alabama 36104,
9    beginning at 9 a.m., MONICA GREENE. witness in
10   the above cause, for oral examination, whereupon
11   the following proceedings were had:
12
13       MONICA GREENE,
14   being first duly sworn, was examined and
15       testified as follows:
16
17       THE COURT REPORTER:  Usual
18   stipulations?
19       MR. CHRISTMAN:  Yes, ma'am, that's
20   fine.
21       MR. DEBARDELABEN:  Yeah

22
23

2 (Pages 5 to 8)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

---

Page 9

1        EXAMINATION
2    BY MR. CHRISTMAN:
3    Q.    Good morning. Ms. Greene.
4    A.    Good morning.
5    Q.    I'm Drew Christman. It's nice to meet you.
6    A.    Nice to meet you.
7    Q.    I'm going to be taking your deposition
8    today. You're a plaintiff in a lawsuit against
9    President Chambers and the college. We're here to
10   take your deposition.
11       Have you ever given a deposition before?
12   A    No, I haven't.
13   Q.    All right. Let me tell you a little bit
14   about how this is going to work. You do
15   understand that you're under oath. You know what
16   that means?
17   A.    Yes.
18   Q.    You intend to tell the truth?
19   A.    I do.
20   Q.    Okay. I'm going to ask you questions today
21   about your lawsuit. I'll try to be as clear as I
22   can and not ask you sorry questions that are
23   confusing. I don't always succeed at that, and

---

Page 10

1    occasionally we'll have to try again. So you let
2    me know if I ask a sorry question that you really
3    can't understand or that doesn't make sense, so
4    that we can make sure that we're communicating.
5    Is that okay?
6    A.    Okay.
7    Q.    I'll need you to speak up. Any time I ask
8    you a question, you'll need to respond orally with
9    your voice and not with a head nod or a head
10   shake, because she can't take that down on the
11   transcript. Okay?
12   A.    All right.
13   Q.    All right. Let's start with the easy stuff.
14   Tell me your name for the record.
15   A.    Monica Greene.
16   Q.    And what is your current place of
17   employment, Monica?
18   A.    J.F. Ingram State Technical College.
19   Q.    And what position are you currently working
20   in?
21   A.    Dean of Fiscal Affairs.
22   Q.    Let's talk a little bit about your
23   background.

---

Page 11

1        I do have your personnel file here with me
2    today, and we're probably going to attach for the
3    record your whole personnel file.
4        If you'll thumb through this very quickly.
5    That was produced to me by the college. Just look
6    through that and make sure that that looks like
7    your personnel file.
8    A.    Yes.
9    Q.    All right. I'll attach that as Defendants'
10   Exhibit 1 to your deposition.
11       (Defendants' Exhibit No. 1 was
12       marked for identification and a
13       copy of the same is attached
14       hereto.)
15   Q.    And we'll talk about some of the contents of
16   this file.
17       MR. DEBARDELABEN: Drew, we'll say that
18   appears to be her personnel file. But then she's
19   not the personnel director, you know. We don't
20   know if it's a complete file or an incomplete,
21   because she's not the director; but it does appear
22   to be her file.
23       MR. CHRISTMAN: Okay. Well, it was

---

Page 12

1    produced to me by the college as her file, so I --
2        MR. DEBARDELABEN: Yeah, right. You
3    don't know either. The only one that would know
4    would be the personnel director, wouldn't it?
5        MR. CHRISTMAN: Well, whoever handles
6    that. I assume the president of the college would
7    know, and he produced it to me.
8        MR. DEBARDELABEN: All right.
9    Q.    Let's talk a little bit about your
10   background, Monica -- Ms. Green. I'll call you
11   Ms. Greene. I apologize. I probably shouldn't
12   call you Monica.
13   A.    Monica is fine.
14   Q.    Okay. Where did you go to high school?
15   A.    Baldwin County High School in Bay Minette,
16   Alabama.
17   Q.    Have you lived in Alabama all your life?
18   A.    Yes. I was actually born in Bay Minette.
19   Q.    Okay. And you graduated in what year?
20   A.    1981
21   Q.    Did you receive any honors or anything like
22   that in high school?
23   A.    No.

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 13

1  Q.   All right. Where did you go to college?
2  A.   I went two years to, at the time it was
3  Alabama Christian which is now Faulkner
4  University, and I got an associate's degree there;
5  and then I went my final two years at Auburn in
6  Montgomery and got a B.S. in business
7  administration.
8  Q.   When did you receive that degree?
9  A.   1985.
10 Q.   You said your B.S. was in business
11 administration?
12 A.   Uh-huh.
13 Q.   Did you have any other focuses in your
14 education at AUM?
15 A.   It was in finance.
16 Q.   And how was it focused in finance?
17 A.   I took several finance classes. I was going
18 to get my degree in finance, but my counselor said
19 business administration, and just taking those
20 classes would be fine.
21     At the time, you know, I thought I was going
22 to pursue a career in, like, stock market or
23 something.

Page 14

1  Q.   Okay. Did you receive any honors in
2  college.
3  A.   Some. I won an essay award, things like
4  that.
5  Q.   Anything else?
6  A.   Not that I recall.
7  Q.   Were you ever disciplined by any college or
8  university or asked to leave?
9  A.   No.
10 Q.   Have you attended any post graduate or
11 professional schools?
12 A.   Yes. I got my MBA from Troy State in
13 Montgomery in 1993.
14 Q.   And that was in what?
15 A.   Business administration.
16 Q.   Any other education?
17 A.   No.
18 Q.   Any awards received while training for your
19 MBA?
20 A.   No.
21 Q.   Never disciplined?
22 A.   No.
23 Q.   All right. Let's talk a little bit about

Page 15

1  your work history. Start me off out of -- were
2  you working when you were in college?
3  A.   I worked at -- I didn't work until after I
4  got out of high school. I worked two summers at a
5  hotel in Bay Minette, just a desk clerk job for
6  two summers.
7      Then, when I started at AUM, I lived in
8  Montgomery and I worked at Gayfer's at the time,
9  which is Dillard's. And I worked there until '85.
10     And then I moved back home, and I was in the
11 banking industry until then. I was engaged at the
12 time to be married. My fiance at the time had a
13 job down close to Bay Minette, so we moved that
14 way. And I was in banking until I started at, at
15 the time it was Atmore State Technical College.
16 And that was in April of 1987.
17 Q.   Before you go on with Atmore, tell me, when
18 you say you were in banking, what do you mean by
19 that?
20 A.   I mean it was the first job out of college,
21 basically. I just did teller work.
22 Q.   Okay. And then you went to work at Atmore
23 State?

Page 16

1  A.   Yeah. I was hired in April of 1987 as an
2  accountant there.
3  Q.   You were an accounts payable clerk there; is
4  that right?
5  A.   Yeah. I'd have to look on my resume. I was
6  thinking my title was accountant or junior
7  accountant.
8      No, I was not an accounts payable clerk. I
9  did payroll and accounting, general ledger.
10 Q.   Is your resume' in your personnel file? Did
11 you see it in there? I don't think I saw it.
12 A.   You can look on my application. Everything
13 is -- there was things in it when I applied for
14 the jobs that aren't in here, that there was a
15 previous personnel section, because I had a
16 complete packet. But you can see in there what my
17 title was.
18     MR. CHRISTMAN: We're, for the record,
19 looking at the Application for Employment that's
20 contained in the personnel file, which is
21 Defendants' Exhibit 1.
22 A.   Yeah. In Atmore I did accounting, payroll,
23 general ledger, and financial statements. I did

4 (Pages 13 to 16)

Page 17

1 not do accounts payable there
2 Q.  Okay  And you did that for two years, '87
3 until --
4 A   I started -- yeah  I started at Ingram
5 September of 1989.
6 Q.  Okay
7 A   And I was hired there as a junior
8 accountant.
9 Q.  At Ingram?
10 A.  Uh-huh
11 Q.  Okay  Is it true that your master's program
12 included only one course in accounting?
13 A.  I'd have to look at my -- a master's in
14 business administration, most of it was one course
15 over the time  I mean, in the curriculum there's,
16 like, two economics  There wasn't much room to
17 take any extra courses, so that probably is
18 correct  I'd have to look at my transcript to
19 remember.
20 Q.  Okay  And as far as you recall, President
21 Murry Gregg is the one who appointed you at Ingram
22 when you first came to Ingram; is that right?
23 A.  He did.

Page 18

1 Q.  And he appointed you in September of 1989?
2 A.  Yes.
3 Q.  And the appointment was for junior
4 accountant of the business office at Ingram; is
5 that right?
6 A   Uh-huh.
7 Q.  You have to say yes.
8 A   Yes.
9 Q.  All right  What does a junior accountant
10 do?
11 A   I did various things  Now, when I first
12 started there. and I don't remember if it was
13 first thing, but I did do accounts payable there
14     But a junior accountant assists the senior
15 accountant with just about any accounting
16 function.
17 Q.  What is the senior accountant versus the
18 junior accountant?  How do they differ?
19 A.  At Ingram, the senior accountant just had.
20 you know, been there longer and just handled more
21 -- he did more of the general ledger work and
22 actual -- I guess I did prep work for him.
23 Q.  Now, I understand your answer to kind of be

Page 19

1 specific in terms of people, because you referred
2 to the senior accountant as a he  I'm really
3 speaking more in general, in terms of what the
4 position requires.
5     And if you understand that, as opposed to
6 maybe what an individual senior accountant may
7 have done or may not have done, that's really what
8 I'm driving at
9     In terms of the position of senior
10 accountant. how does the position of senior
11 accountant differ from the position of a junior
12 accountant?
13 A   I can only answer for J.F  Ingram. and at
14 J.F. Ingram, it was assisting the senior
15 accountant with any duty as assigned  I mean,
16 that's the way I worked  I was the junior
17 accountant and I was there to do whatever I could
18 help, whatever part of the accounting department,
19 and that's what I did.
20 Q.  Did the senior accountant handle accounts
21 payable?
22 A.  I mean, there were questions sometimes  If
23 there was a question, you know, I would ask the

Page 20

1 senior accountant if I didn't know
2 Q.  Was that part of his responsibilities
3 though, accounts payable?
4 A.  No.
5 Q.  Whose responsibility was accounts payable?
6 A.  It was mine.
7 Q.  The junior accountant?
8 A.  I mean, the way we worked at Ingram, I mean,
9 we were all involved with each other  I mean, I
10 guess you would say that it was mine  But, I
11 mean, like I said, if he needed to do something,
12 he would.  If there was an account that I needed
13 him to code, that maybe I wasn't familiar with, I
14 would ask him.
15 Q.  And I guess my question is kind of focused
16 on ultimate responsibility, who was ultimately
17 going to be responsible for whether the job was
18 going to be done correctly or incorrectly.  And so
19 I guess that's kind of the focus of my question.
20     Was the senior accountant ultimately
21 responsible for accounts payable being managed
22 properly, or was that ultimately your
23 responsibility?  You answered to the president or

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 21

1 the senior accountant, and you were the primary
2 person responsible for that and had to answer for
3 its effective administration?
4 A.   (No response.)
5        MR. DEBARDELABEN:  I don't understand
6 the question either.
7 A.   I mean, ultimately it's always the
8 president.  You know, I had communication with the
9 president also.  So I don't really know where
10 you're going with that.
11 Q.   Okay.  Well, I'm not trying to be tricky.
12 A.   I mean, it's been a while since I've been --
13 I haven't been a junior accountant since 1994, so,
14 you know, I am starting to get older, so it's
15 going to take me a while to go back.
16 Q.   Everything the junior accountant does, the
17 junior accountant must report to the senior
18 accountant in all of the junior accountant's
19 functions; is that right?
20 A.   Probably.
21 Q.   The senior accountant is responsible to
22 supervise the junior accountant; is that true?
23 A.   I guess it's true.

Page 22

1 Q.   Well, you are now the Dean of Fiscal Affairs
2 at Ingram; is that right?
3 A.   Yes.
4 Q.   So you would know, if you had a senior
5 accountant and a junior accountant, you would know
6 whether the junior accountant reports to the
7 senior accountant, wouldn't you?
8 A.   Well, we have different levels now.  We're
9 kind of set up differently than we were then.
10 Q.   Okay.  Well, from your understanding now of
11 all the --
12 A.   The way it is now, we didn't have a dean --
13 we did at one point, and we're leaving him out of
14 this loop.
15     But, you know, it would have been junior
16 accountant, senior accountant, the dean, and the
17 president.
18 Q.   Okay.
19 A.   Now we don't have a junior accountant and a
20 senior accountant, but we've got a business office
21 coordinator.
22     But ultimately the president is responsible
23 of the business office and ultimately the dean.

Page 23

1 Q.   All right.  What level of education or
2 experience is required to be a junior accountant?
3 A.   Junior accountant, I believe, was a B.S.
4 Q.   Okay.  And you possessed that level of
5 education?
6 A.   Yes.
7 Q.   How many junior accountants were there?
8 A.   One.
9 Q.   Just you?
10 A.   (Witness nods head.)
11 Q.   How many senior accountants were there?
12 A.   One.
13 Q.   Who was that senior accountant at the time
14 you worked there?
15 A.   Gene Bridgman.
16 Q.   Are you familiar with Mr. Bridgman's
17 experience and educational history?
18 A.   I am.
19 Q.   Tell me what your understanding of Mr.
20 Bridgman's experience was.
21 A.   He had many years at the college.
22 Q.   At Ingram?
23 A.   Right, at Ingram.  His educational

Page 24

1 background was. I think he had a -- I'm not sure
2 that he had a two-year degree, but he at least had
3 a two-year degree.  I think he did have that.
4 Q.   He had some 20 years, 25 years of
5 experience?
6 A.   When he retired, I think he had 29.  And
7 he's been gone for -- I think he worked maybe 27,
8 and he's been gone two or three years.
9 Q.   And do you remember, when you were a junior
10 accountant all the way up through his retirement,
11 that he was very well versed in the accounting
12 practices of Ingram?
13 A.   He was.  Very conscientious.
14 Q.   And very well experienced in how all of the
15 operations of the accounting of Ingram were
16 carried out?
17 A.   He was.
18 Q.   And was he helpful to you when you reported
19 to him as the junior accountant?
20 A.   Very.
21 Q.   But he did not have -- are you familiar with
22 his educational history?
23 A.   I am.

6 (Pages 21 to 24)

Page 25

1  Q.  Tell me again what you understand his
2  educational history to be. Did he have a
3  four-year college degree?
4  A.  No.
5  Q.  He had a two-year college degree, or
6  associate's degree?
7  A.  Yeah. I think he graduated; I don't know.
8  Q.  Did he have a master's in anything?
9  A.  No.
10  Q.  Okay. And September of 1990 through '94,
11  you continued to serve as a junior accountant at
12  Ingram; is that right?
13  A.  I did.
14  Q.  What salary schedule were you on?
15  A.  E.
16  Q.  Tell me how the salary schedules are set up
17  at Ingram. Well, I guess I'm saying Ingram. I
18  guess they're set up this way throughout the --
19  A.  We are a two-year college. Yes, sir. We
20  have A for president; B for dean; C for various
21  administrators, different positions; D is
22  instructional; and E are support personnel.
23  Q.  Okay. Help me again with that. A is

Page 26

1  president; B is what?
2  A.  Dean.
3  Q.  Dean. So you would be currently on the B?
4  A.  I am.
5  Q.  Who else would be on the B right now? James
6  Wilson?
7  A.  James Wilson, Jim Merk. That's it.
8  Q.  There are no other deans of the college?
9  A.  No.
10  Q.  Huffstutler. when he was with the college,
11  what salary schedule would he have been on?
12  A.  B.
13  Q.  He would have been on B. All right. And
14  then C is administrative personnel; is that what
15  you said?
16  A.  It is.
17  Q.  Explain to me what that means. What is
18  administrative personnel?
19  A.  C is -- they're not instructional. It would
20  be, say, Mr. Wilson has people in his department
21  that are, I guess you'd call them mid-level
22  administrators.
23     The C scale is somewhat flexible. So, you

Page 27

1  know, they -- the instructors have certain
2  credentials they have to meet. And the E tops off
3  at a certain level.
4     C is kind of a scale that if you wanted to,
5  you know, maybe pay someone a little more, but,
6  you know, they're not at the B position. So it's
7  just very limited people that are on it.
8  Q.  It's not necessarily higher than D, which is
9  instructional; is that correct or is that not
10  correct?
11  A.  It's not higher. I mean, there would be
12  probably some levels on it that are higher; but
13  the instructional -- of course, the top instructor
14  is going to be way above that.
15  Q.  The fact that C comes before D doesn't
16  necessarily mean that the salary schedule is
17  higher than the instructional staff?
18  A.  No. It's just kind of another.
19  Q.  It's another. Okay. That helps. And then
20  E is support personnel?
21  A.  Uh-huh.
22  Q.  And, in that category, we're talking about
23  secretaries and -- what are we talking about?

Page 28

1  A.  General maintenance. There are people that
2  are like teacher's aide, if they don't have the
3  qualifications to be an instructor. It kind of
4  varies. But it would range from secretaries to
5  accounting. accounts payable.
6  Q.  Junior accountant?
7  A.  Junior accountant.
8  Q.  Okay. And when you get on the E schedule --
9  help me understand how all the numbers work.
10     For example. you started, I think, as a
11  junior accountant on Schedule E-3, Step 6.
12     Explain to me and to the jury what that
13  means, E-3, Step 6.
14  A.  Okay. It has changed since I first started.
15  They put some more levels in there now for people
16  that are on it. They have to, say, jump through a
17  few more hoops to move up.
18     But when I started on E-3, I was -- you can
19  come in wherever the president so desires. And so
20  I came in at where I left when I left Atmore.
21     But, I mean, you could come in and, if it
22  was your -- if had no prior experience, you could
23  start on zero.

Page 29

1  Q.   Which is E-0?
2  A    E-0, yeah  Now they've made, like E --
3  there's another little level in there  But that
4  just means E is the schedule.  Say E-1 is a level,
5  and then 3, 6 are your years as they go.
6       So I started at 6  And after that. I would
7  just have a step, if there was a step  Like.
8  there's not a step from 6 until 8  So it's just a
9  step process.
10  Q.   Okay  So the step means years?
11  A    Step means years.
12  Q.   Okay.  So E-3, what's the difference between
13  an E-3 and an E-2?
14  A.   Just a level.  There's a money difference.
15  If you go up. it's 4,000, say, versus say going --
16  I forgot  But, of course, if you went up a level,
17  it would be more money.
18  Q.   And how do you ascend levels from E-1 to E-2
19  to E-3 to E-4?
20  A.   Normally, you would have -- your supervisor
21  would write a letter stating that your job duties
22  are increased or something.
23       Now, at the time that I was there, it was

Page 30

1  probably simpler than it is now.  They put
2  personnel downtown as putting steps, and there's
3  supposed to be certain criteria you meet to jump.
4       But at the time I was there, say my
5  supervisor might write a letter that my duties had
6  increased and he would like to recommend.  Of
7  course, it still has to be approved by the
8  president.
9  Q.   When you rise from E-3 to E-4, do you go
10  back to Step 1 or are you still at Step 6?
11  A.   No.  You keep your steps.
12  Q.   Okay.  So you ascend the steps just by years
13  of service?
14  A.   Right.
15  Q.   But you ascend the E schedule or the E
16  levels --
17  A.   You should never go back on your steps.  I'm
18  not saying it may not have been done, but you
19  should not.
20  Q.   Okay.  And whether you're going up to E-3 or
21  E-4, that's kind of a function of -- is it a
22  function of job performance, or is it a function
23  of the number and types of duties that are

Page 31

1  assigned to you?
2  A.   It could be both.
3  Q.   Could be both.  Very good.  And you started
4  in September of '89 and continued as a junior
5  accountant until you reached Step 10 in August of
6  '94, on the E-3 salary schedule; is that right?
7  A.   Right.
8  Q.   And apparently your duties, in terms of your
9  level, E-3, had not changed dramatically, or at
10  all, in that time, at least sufficient to elevate
11  you from an E-3 to an E-something else; is that
12  right?
13  A.   Uh-huh.
14  Q.   Yes?
15  A.   Yes.
16  Q.   But you did change in steps, because the
17  years of service increased; is that right?
18  A.   Right.
19  Q.   All right  In September of '94, tell me
20  what happened.
21  A.   I was --
22  Q.   It's an appointment.  I'm not trying to be
23  coy.

Page 32

1  A    Yeah  I was appointed Interim Dean of
2  Fiscal Affairs.  Because the dean that was there
3  really surprised us all.  I mean, we thought he
4  would -- I hate to say it, but we thought he would
5  die in the position.  We really thought he would
6  never leave.  I mean. he just enjoyed his job.
7  Q.   Who was it?
8  A.   Freddie Powell  And he came up in May of
9  that year and said, "I'm going to retire."  And
10  so, you know, we were shocked.
11       And then I was, you know, approached and
12  appointed to be the interim, on an interim basis,
13  so that I could see what the position entailed.
14  Q.   Who approached you?
15  A.   The president
16  Q.   Mr. Gregg. at that time?
17  A.   Yes
18  Q    And why were you approached, as opposed to
19  anyone else?
20  A.   Because I had the qualifications and the
21  education, he said.
22  Q.   At the time you were appointed Interim Dean
23  of Fiscal Affairs, you were essentially performing

8 (Pages 29 to 32)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 33 |
|---|
| 1 all of the job functions of the Dean of Fiscal |
| 2 Affairs; is that true? |
| 3 A. Yes. |
| 4 Q. The interim really refers to the fact that |
| 5 it wasn't yet a permanent appointment; is that |
| 6 right? |
| 7 A. Right. And I would have to go through the |
| 8 appointment process, the full job interview and |
| 9 all. |
| 10 Q. I've gotcha. At that time you were |
| 11 appointed interim dean, you had never served as a |
| 12 senior accountant; is that true? |
| 13 A. True. |
| 14 Q. Mr. Bridgman was not approached for that |
| 15 position because he did not have the appropriate |
| 16 educational requirements; is that your |
| 17 understanding? |
| 18 A. Yes. |
| 19 Q. He certainly had the right experience, |
| 20 however; is that true? |
| 21 A. He did. |
| 22 Q. Do you believe Mr. Bridgman could have |
| 23 effectively performed the job of the interim dean? |

| Page 34 |
|---|
| 1     MR. DEBARDELABEN: I object to the |
| 2 form. She's not qualified to answer; she's not a |
| 3 personnel specialist. |
| 4 Q. You can answer the question. |
| 5     MR. DEBARDELABEN: If she can answer |
| 6 it. |
| 7 A. I don't care to answer. |
| 8     MR. DEBARDELABEN: Well, if you can |
| 9 answer, you can answer. I just said you're not |
| 10 qualified to answer. |
| 11 A. Yes. |
| 12 Q. You think he could have done a good job? |
| 13 A. Yes, he could have done a good job. |
| 14 Q. Do you know whether Mr. Bridgman -- how he |
| 15 felt about your having been appointed as the |
| 16 interim dean? |
| 17     MR. DEBARDELABEN: Object. You're |
| 18 asking how Mr. Bridgman felt. There's no way she |
| 19 would know how he felt. |
| 20     MR. CHRISTMAN: That's not true at all. |
| 21 If he told her how he felt, she would know. |
| 22     MR. DEBARDELABEN: She can tell you |
| 23 what he told her, but how he felt is his own inner |

| Page 35 |
|---|
| 1 feelings. |
| 2 Q. Well, you can just testify as to what you |
| 3 know, ma'am. I'm not trying to make you guess |
| 4 about anything. |
| 5 A. He did not tell me how he felt about it. |
| 6 Q. And you had no other reason to know how he |
| 7 felt about your having been appointed? |
| 8 A. Right. |
| 9 Q. Did he ever express displeasure about that |
| 10 to you? |
| 11 A. Not to me. |
| 12 Q. Did you hear from anyone else that he had |
| 13 expressed displeasure about your having been |
| 14 appointed? |
| 15 A. Hearsay. |
| 16 Q. What did you hear? |
| 17 A. I mean, I'm sure it was a problem, but I |
| 18 can't say how he felt. But I can tell you what I |
| 19 did. |
| 20 Q. Okay. |
| 21 A. When Dr. Gregg approached me -- I mean, |
| 22 normal people would think that if someone had been |
| 23 there and the junior accountant's promoted, there |

| Page 36 |
|---|
| 1 might be a problem. |
| 2     He could not have the job because there were |
| 3 definite education problems. So I went to the -- |
| 4 Dr. Gregg and I discussed it; and I said, you |
| 5 know, I don't want to -- I'm not the kind of |
| 6 person that comes in to do this. I am qualified |
| 7 and I want to do the job, but I don't want to |
| 8 cause a problem for him. And we need to work |
| 9 together; he's a good worker. |
| 10     So he was given a substantial raise from me |
| 11 doing that. And that should have ended |
| 12 everything. |
| 13     As far as I know, several times I tried to |
| 14 talk to him and see if there were any problems, |
| 15 and he never said there was. He said everything |
| 16 was fine. And that's all I know. |
| 17     I mean, there's always hearsay that, you |
| 18 know, people -- and, you know, it's normal to |
| 19 think that there might have been. But we didn't |
| 20 have problems. I don't know what he said to other |
| 21 people, but when I asked him -- and I did do that, |
| 22 to get that. |
| 23     And you can check his records and see that |

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 37

1  it was substantial for someone with that
2  educational background. It was a very nice
3  salary.
4  Q.  Yes, ma'am.
5  A.  And I felt that that was the right thing to
6  do. I'm not trying to say that I'm some wonderful
7  person, but it would be the right thing to do.
8  Q.  Why would you have been concerned that there
9  might be, you know, problems?
10  A.  Because I don't like to work in conflict.
11  This is not my area here, but sometimes -- so, you
12  know, to not have any conflict -- I mean, when you
13  bring someone in, they're new, they haven't been
14  there, you've been there for, I don't know at the
15  time how many years he had, I mean; and then I
16  moved along, I mean, normal, standard things,
17  there could be a problem for someone that has all
18  the confidence in the world.
19      So why -- we needed to work together. I'm
20  for working in harmony, so that would have been
21  the right thing to do.
22  Q.  Okay. And you never had any -- is there
23  such thing as a chief accountant?

Page 38

1  A.  No. I mean, there might be, but ours was
2  called senior accountant.
3  Q.  Okay. And you testified earlier that you
4  had never served in that position?
5  A.  No.
6  Q.  And you had never served as the assistant or
7  associate dean; is that true?
8  A.  That's true.
9  Q.  And what happened after you were appointed
10  interim dean? What was your next appointment?
11  A.  I went through the application process. It
12  was a long and thorough process: interview, the
13  whole nine yards.
14      And I was appointed to the job permanently
15  in, I think it was June of -- I think it was July
16  of 1995. We can check the records for sure.
17  Q.  Did you have any competitors for that job?
18  A.  I did. I really can't remember the details
19  of it. I'm sure I did.
20  Q.  Do you recall that there were four other
21  male applicants?
22  A.  I do not.
23  Q.  Do you recall that one of the applicants had

Page 39

1  22 years of experience as a CPA?
2  A.  No. I wasn't privy to that information.
3  Q.  So you probably wouldn't have known that
4  another of the applicants was a Ph.D. candidate in
5  economics. Did you know that?
6  A.  No.
7  Q.  But you were the one that was selected, and
8  those other applicants were not selected; is that
9  right?
10  A.  Right. I know I met state board
11  requirements for the job or I wouldn't have gotten
12  it.
13  Q.  Do you know whether these other male
14  applicants also met state board requirements?
15  A.  No. I don't know anything about that.
16  Q.  Okay. And your appointment to permanent
17  dean was effective June of '95; is that right?
18  A.  I think that's correct. I don't remember
19  whether it was June or July.
20  Q.  And your salary schedule immediately moved
21  from E all the way up to B; is that right?
22  A.  Right.
23  Q.  And you never were paid under the

Page 40

1  instructors' schedule?
2  A.  No.
3  Q.  And you were never paid under the
4  administrators' schedule?
5  A.  No.
6  Q.  You went from E -- E is the lowest schedule;
7  is that right?
8  A.  Well, H is an hourly schedule. That would
9  be the lowest. But we normally don't use the
10  hourly schedule.
11  Q.  I see. So you normally use --
12  A.  E.
13  Q.  E schedule. So normally E would be the
14  lowest schedule?
15  A.  It would be.
16  Q.  So you moved from the lowest schedule to the
17  second highest schedule; is that right?
18  A.  I did.
19  Q.  And you began the Schedule B at Step 10,
20  which was your years of service?
21  A.  Yes.
22  Q.  Do you know what your pay increase was for
23  that move?

10 (Pages 37 to 40)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 41

1  A.  I did at the time. It was significant. I
2  don't recall the exact numbers now.
3  Q.  Okay. And that contract is for one year; is
4  that right?
5  A.  It is.
6  Q.  Is it always for one year?
7  A.  Yes.
8  Q.  Do you have to be reappointed to the
9  position every year?
10  A.  Yes.
11  Q.  And those reappointments are reflected in
12  these appointment letters in your personnel file;
13  is that right?
14  A.  Right.
15  Q.  And that's why you have one for consecutive
16  years?
17  A.  Uh-huh.
18  Q.  And how does that process work, the
19  reappointment to the same position? You don't
20  have to interview and all that again, do you?
21  A.  No.
22  Q.  How does that process work?
23  A.  Well, instructors are under tenure; we're

Page 42

1  not under the tenure law. But, basically. if you
2  have three years, you are tenured at the college.
3  So if you were not renewed yearly, it would have
4  to be a -- there's a process.
5      You know, it would start with reprimands or
6  something like that. But there is a process. I
7  mean, you're going to be reappointed unless
8  there's some process against you.
9  Q.  You mentioned that you are not under
10  Alabama's tenure law; is that what you said?
11  A.  Fair dismissal.
12  Q.  Class instructors?
13  A.  Uh-huh.
14  Q.  Is that right?
15  A.  Yes. I don't know all of the legalities of
16  that. I'm not a personnel manager.
17  Q.  Okay. The personnel manager would know all
18  the legalities of that?
19  A.  Should.
20  Q.  Is it your understanding that you do have
21  tenure in your current position?
22  A.  Yes
23  Q.  Is that an Ingram-specific tenure, or is

Page 43

1  that two-year college systemwide?
2  A.  Two-year college systemwide.
3  Q.  So all of the deans of fiscal affairs, for
4  example, at the various colleges, if they've been
5  there more than three years are considered
6  tenured; is that right?
7  A.  Yes
8  Q.  What is the process, if you know, for
9  dismissing an employee or administrator or dean
10  who has attained tenure? Let's just focus in on
11  dean. Just dean.
12  A.  I don't really know the full process. I
13  know there would have to be some notice given to
14  me, and then there's, you know, a time process.
15  But I don't know all the ins and outs of that.
16  Q.  One of the reasons you don't know is because
17  that process has never been initiated against you;
18  is that right?
19  A.  Right. Or I would know it
20  Q.  Or you certainly would know it, right?
21  A.  Uh-huh.
22  Q.  You currently serve as the Dean of Fiscal
23  Affairs for Ingram; is that right?

Page 44

1  A.  I do
2  Q.  And you serve at Salary Schedule B; is that
3  right?
4  A.  Yes
5  Q.  And you are at Step 20 or 21?
6  A.  I think I'm at 23. Because I have 20 years
7  at Ingram, but when I came to Ingram, my previous
8  boss gave us -- there was a time when the
9  chancellor allowed you to go back and if you had
10  all your previous employers document that you had
11  worked there, they took the time. And I was
12  given, like, a little over three years. So that's
13  why I'm at 23, I think it is.
14      You can check the records to be sure, but I
15  think that's what it is.
16  Q.  All right. Let me see if I can check the
17  records real quickly
18  A.  I'm at 20 years. so it should be 23.
19  Q.  When was your last appointment letter?
20  A.  Last September of '06.
21  Q.  All right. February of '06?
22  A.  No. That's not an appointment letter.
23  Q.  Excuse me. I'm sorry. August of '04 is the

11 (Pages 41 to 44)

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

Page 45

1   last one I think I have.
2   A.   '04 was 21 there. so I would be at 23 now.
3   Q.   I've gotcha.
4   A.   '06 would be 23.
5   Q.   Okay. And I have, for some reason not here,
6   but it was attached to an EEOC response filed by
7   the previous lawyer for the college. but he
8   attached to the EEOC response an August 23, 2005,
9   appointment letter that has your Step 22 and an
10  annual salary at $95,182.
11      Does that sound about right as of '05?
12  A.   It does.
13  Q.   And do you know what your current annual
14  salary is?
15  A.   99,945.
16  Q.   Just under a hundred thousand a year?
17  A.   Yes.
18  Q.   Have you worked in any other positions at
19  Ingram?
20  A.   No.
21  Q.   You have been periodically reviewed by
22  President Chambers in your position as dean. have
23  you not?

Page 46

1   A.   I have.
2   Q.   Okay. And do you recall some of those
3   evaluations having been favorable, earlier in your
4   employment?
5   A.   Yes.
6   Q.   I'm going to try to show you some of these
7   out of your personnel file. You also received
8   some reviews from Powell. Those are in here.
9   Now, that was when you were a junior accountant;
10  is that right?
11  A.   Yes.
12  Q.   And then you received a review from Gregg in
13  '95.
14  A.   Mr. Powell wasn't there. He had retired.
15  Q.   So the first one I see in the file that I
16  have is a 1997 review performed by the current
17  president, Doug Chambers.
18  A.   Yes.
19  Q.   And would you look at that overall
20  performance appraisal for me and tell me if you
21  recall seeing that evaluation of your performance?
22  A.   Yes.
23  Q.   And how did he score you there at the top of

Page 47

1   that page?
2   A.   Outstanding, excellent.
3   Q.   Is that the highest level of achievement on
4   that evaluation form?
5   A.   Appears to me it is.
6   Q.   At the bottom here, would you read for the
7   record what it says there in the comments section
8   of his performance appraisal? And this is, by the
9   way, on September 2, 1997.
10  A.   "Employee is very friendly and works well
11  with others. She could improve on her
12  self-confidence when dealing with her workers.
13  Tend to allow others to attack her when she is in
14  charge. Her knowledge is most valuable to the
15  college. She is an outstanding worker."
16  Q.   That sounds like a pretty good review to me.
17  Would you agree?
18  A.   Yes.
19  Q.   Is there anything about those comments that
20  you don't agree with?
21  A.   The ones with the self-confidence. I mean,
22  that's his opinion. But overall it's a good
23  response.

Page 48

1   Q.   Well, I understand it's his opinion, but he
2   is your supervisor, right?
3   A.   Yes.
4   Q.   And his opinion about your performance is
5   important, isn't it?
6   A.   Yes.
7   Q.   In fact, his opinion about your performance
8   in many ways dictates what he expects of you as a
9   performer; isn't that right?
10  A.   Yes.
11  Q.   So the fact that it's his opinion doesn't
12  somehow diminish its importance in your
13  evaluation, does it?
14  A.   If it's accurate.
15  Q.   Well, do you think that it's inaccurate that
16  he says here that you need to work on your
17  self-confidence? Do you think that's inaccurate?
18  A.   I do.
19  Q.   You disagree with that?
20  A.   I disagree.
21  Q.   And you disagreed with that at the time?
22  A.   Yes.
23  Q.   And it says you tend to allow others to

12 (Pages 45 to 48)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 49

1   attack you when you are in charge. Did you agree
2   with that?
3   A.   I told him that, that I disagreed with it.
4   But, I mean, he wasn't going to change it; and it
5   was, as you said, overall a good evaluation.
6   Q.   But you don't find any merit in those
7   comments right there?
8   A.   No.
9   Q.   You were still a white female at the time he
10  made that evaluation, weren't you?
11  A.   Yes.
12  Q.   How was your working relationship with Doug
13  Chambers in September of '97?
14  A.   I don't really recall. I mean, I think it
15  was fair.
16  Q.   Fair?
17  A.   (Witness nods head.)
18  Q.   Just fair? Or would it have been a
19  productive working relationship?
20         MR. DEBARDELABEN: Object to the form.
21  Q.   He's objecting because I'm characterizing it
22  as productive.
23         MR. DEBARDELABEN: She's already

Page 50

1   answered the question. Now you're asking for
2   something else. That's why I'm objecting.
3   Q.   Do you think it was a better working
4   relationship than you are currently in with Dr.
5   Chambers?
6   A.   Yes.
7   Q.   Would you characterize your current working
8   relationship with Dr. Chambers as fair?
9   A.   No.
10  Q.   How would you characterize it now?
11         MR. DEBARDELABEN: Tell him how you
12  would characterize it.
13  A.   It's not fair. I'm working on a
14  professional level with him and I have never
15  caused any problem. I've done my job. I feel
16  that anything that's said is not supported. If
17  there is something said that needs to be changed,
18  and there's proof that it needs to be changed, but
19  I feel that it's opinion.
20      And I'm not really sure what caused the
21  feelings that he has, but they are unfair. I
22  mean, you can call 50 character witnesses and see
23  if I'm a problem person.

Page 51

1   Q.   I intend to call lots of witnesses.
2   A.   Okay. I'll be glad for you. I am not --
3   I am not a problem. And when you read this, you
4   think I am.
5   Q.   Well --
6   A.   There are some people that you can do
7   everything and there's some people that never are
8   pleased, and that's what Mr. Chambers is. And if
9   people are not telling you that, they are not
10  telling you the truth.
11      He has a certain way. You can show him the
12  facts. If he makes a statement that's not true,
13  you can show him the facts and he will not change
14  his mind.
15      I mean, I have gone above and beyond to work
16  with him. And it's not fair. He has called in
17  people to work under me and not discussed problems
18  with me. It's not fair. And, you know, these
19  type things he just says.
20      He says he has some background in some other
21  area, and he thinks he can analyze me. He doesn't
22  know me. He hasn't tried to know me. But I have
23  tried to be a worker. We haven't appeared in the

Page 52

1   newspaper. We've had audits that are no different
2   than other places. You know, we're certainly not
3   perfect. I've never said I'm perfect, but I'm not
4   doing anything wrong. I'm not doing anything
5   legally, morally wrong, and I think I'm treated
6   unfairly. It's just a bias, and I don't know what
7   caused it.
8   Q.   You don't know what caused it?
9   A.   I just think my personality bothers him.
10  That I'm cautious, that I'm careful, that I'm
11  going to question. He is my boss. I've always
12  acknowledged that; I've always been respectful.
13  But I am going to say, "Do you really think we
14  need to do this?"
15      And that may be one of the reasons we're not
16  in the newspaper. And I'm going to do that. But
17  I've always treated him with respect. I'm very
18  much a when you are my boss I give you my respect.
19      When Gene Bridgman was the senior
20  accountant, I didn't overstep my boundaries at
21  that time. It's probably why we worked well
22  later, you know.
23  Q.   Yeah. And you don't think that these

13 (Pages 49 to 52)

Page 53

1  comments here about self-confidence and allows
2  others to attack you --
3  A.  That's his opinion.
4  Q.  And I was going to ask you:  You don't think
5  that there's any basis for that statement?
6  A.  I don't.  It's a different personality type.
7  He thinks if you're mild-mannered that you're
8  weak.  I've been told I'm weak.
9     You know, to me. consistency and things like
10  that shows strength.  But I guess I'm weak because
11  maybe I don't scream and yell and raise my voice
12  and curse.  I mean, I don't think you have to do
13  that to be a manager.  I think you can be
14  consistent and fair is what a good manager is.
15     I mean, you have make some tough calls, and
16  I can do that when I have to, but you don't have
17  to do that every day.
18     But on these, you'll see I have about three
19  -- there was, like, seven years I was not
20  evaluated.  And he kept threatening me and other
21  members in the cabinet that we would get them. and
22  we didn't.
23     And the reason they were put in the file

Page 54

1  later -- I didn't even see them -- is we had an
2  accreditation coming up.  And about seven of them
3  were put in there.  And then I got the one last
4  year that is negative.
5     So I haven't been -- I think there were
6  maybe three or four that we sat and discussed; and
7  the other, I think, six or seven, they were put in
8  my file later.
9  Q.  Have you ever worked with anybody that you
10  perceived struggled with self-confidence?
11  A.  I probably have someone now that works for
12  me.
13  Q.  How do you know that that person struggles
14  with self-confidence?
15  A.  They're just a quiet person.  But I don't
16  know that.  I don't know that person.  I don't
17  tell them things like this.
18  Q.  Well, you just told me that you think
19  there's someone that you perceive struggles with
20  self-confidence in your office.
21  A.  But I don't give them advice.
22  Q.  Well, if you thought that their struggle
23  with self-confidence was affecting their ability

Page 55

1  to adequately perform their job, would you counsel
2  them about what you believe to be the source of
3  their struggle?
4  A.  Probably not.
5  Q   Don't you think that would be a good
6  practice, for a supervisor to encourage one of
7  their employees who is struggling with something
8  you believe to be affecting their work?
9  A.  I encourage all mine.
10  Q.  I understand that, and that's great.  I'm
11  really asking more specifically about someone who
12  you believe struggles with self-confidence.  If
13  it's affecting their work, don't you think it
14  would be a good supervisory practice to encourage
15  them associated with that struggle?
16  A.  If it was affecting their work.  That would
17  be the key factor.  If it's not, I don't think I
18  would go there or should go there.
19  Q.  But if you thought it was affecting their
20  work. you think it would be a good practice to go
21  there?
22  A   If you thought, I guess.  I don't know
23  Q.  You don't know?

Page 56

1  A.  I don't know.
2  Q.  Well, what if you perceived that one of your
3  workers was allowing their subordinates to
4  overstep their boundaries and to attack your
5  worker?  Have you ever known any workers like
6  that?
7  A.  Say your question again.
8  Q.  Has anybody ever worked for you that you
9  thought was kind of getting run over by
10  subordinates?
11  A.  By their subordinates?
12  Q.  Yeah.
13  A.  I would step in.  But I would talk to the
14  people who were bothering them.
15  Q.  Okay.  That wasn't exactly my question.  I
16  appreciate that response.
17     My question was:  Do you know of anybody
18  that has worked for you that has struggled with
19  their subordinates running over them?
20  A.  No.
21  Q.  Never had that happen?
22  A.  They can hold their own, my employees can.
23  Q.  Okay.  Well, can you conceive, or would you

14 (Pages 53 to 56)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 57

1  agree with me that there are instances in which an
2  employee might be run over by their subordinates
3  and their subordinates overstep their boundaries?
4      MR. DEBARDELABEN:  Object to the form
5  A.  I can't perceive on that
6  Q.  You don't think that could happen?
7  A.  I don't know.
8  Q.  You don't?
9  A.  No
10  Q.  Okay. Well, if one of your subordinates was
11  being run over by their subordinate, and it was
12  affecting their job, do you think it would be a
13  good employment practice to address that?
14      MR. DEBARDELABEN:  Asked and answered
15  about ten questions ago.
16      MR. CHRISTMAN:  Actually, Jim, before I
17  was referring to self-confidence; I wasn't
18  referring to this particular situation.
19  A.  Can you repeat the question?
20  Q.  Yes, ma'am. If someone that worked for you
21  was being run over by one of their subordinates,
22  or more, and it was affecting your employee's
23  ability to do their job, don't you think it would

Page 58

1  be a good employment practice for you to address
2  that matter with your employee?
3  A.  Yes.
4  Q.  Because you want your employee to be able to
5  do a good job, right?
6  A.  Yes.
7  Q.  And if they are being undermined by their
8  employees, that's a problem, isn't it?
9  A.  Yes, if they had employees. I mean, certain
10  positions don't have people that are their
11  employees.
12  Q.  Okay. If you hired a senior accountant —
13  you don't have one; is that right?
14  A.  I do have a senior accountant.
15  Q.  Okay. Who is your senior accountant?
16  A.  Patti Graves.
17  Q.  Patti Graves. You don't have a junior
18  accountant though; is that right?
19  A.  Right.
20  Q.  Okay. Well, let's say you thought it would
21  be a good idea to hire another Monica Greene as a
22  junior accountant, just like you were hired, and
23  this junior accountant was running over Patti

Page 59

1  Graves.
2      Do you think you would need to address with
3  Patti Graves the fact that her junior accountant
4  was running over her?
5      MR. DEBARDELABEN:  Object to the form
6  Q.  You can answer the question if you
7  understand it.
8  A.  I would think that I would intervene as the
9  supervisor
10  Q.  How would you intervene?
11  A.  I would talk to the junior accountant and
12  the senior accountant. And, you know, if the
13  junior accountant was out of line, I would tell
14  them.
15  Q.  Would you address with the senior accountant
16  the fact that she was having trouble keeping her
17  junior accountant from running over her?
18  A.  Yes. I would talk to both of them.
19  Q.  Okay. But you don't perceive any of that to
20  be happening to you in 1997?
21  A.  Not the negative part.
22      MR. DEBARDELABEN:  Drew, we'd like to
23  point out that that 1997 evaluation is not signed

Page 60

1  by the employee, so we don't know if she saw it or
2  not at that point in time.
3  A.  Yeah. And I may not have signed it for that
4  reason.
5  Q.  Well, earlier you told me that you had seen
6  it
7  A.  I've seen it in my file.
8  Q.  In response to your lawyer making statements
9  here on the record, now you tell me maybe you
10  haven't seen it.
11  A.  I mean, it's in my file, and I've seen my
12  file. But I can't remember. I mean, I think I've
13  signed the other one, and it probably says
14  something similar. I mean, he's been saying this
15  same statement for ten years. so, I mean, I've
16  heard the statement plenty.
17  Q.  All right. Let's look at this one in August
18  of '98. And this overall performance appraisal,
19  tell me how it was rated there at the top.
20  A.  Very good. above average.
21  Q.  Okay. That's not the highest mark that
22  could be achieved, right?
23  A.  Right.

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 61

1  Q.   There's one higher, outstanding and
2  excellent, right?
3  A.   Right.
4  Q.   And that's the one you received in '97?
5  A.   Uh-huh.
6  Q.   And this appraisal was performed by Doug
7  Chambers?
8  A.   Right.
9  Q.   Would you read the comments section for me?
10  A.   "Employee continues to develop good
11  leadership skills. Tends to get down when
12  confronted by other workers. She continues to
13  agree stronger each day. Very knowledgeable in
14  business area."
15  Q.   That sounds like a pretty good performance
16  appraisal, wouldn't you say?
17  A.   Except for the opinion part of it.
18  Q.   Well, it's all opinion, right?
19  A.   Well, I mean, there could be facts. I mean,
20  you could list specific things that I'm
21  knowledgeable about.
22  Q.   It's certainly his opinion that you continue
23  to develop good leadership skills. That's his

Page 62

1  opinion, isn't it? It's just a good opinion,
2  right?
3  A.   (No response.)
4  Q.   Is that right?
5  A.   Right.
6  Q.   But that's his opinion, isn't it?
7  A.   Right.
8  Q.   And it's his opinion that you are very
9  knowledgeable in the business area. That's his
10  opinion, isn't it?
11  A.   But it can be proven.
12  Q.   You continue to grow stronger each day.
13  That's his opinion, isn't it?
14  A.   But that's saying I'm weak.
15  Q.   So you disagree that you continue to grow
16  stronger each day?
17  A.   I don't think that's necessary.
18  Q.   You think that's a negative comment?
19  A.   I do. Because I know what he's really
20  saying.
21  Q.   Well, what is he really saying?
22  A.   That I'm weak. He's told me on numerous
23  occasions.

Page 63

1  Q.   Well, let's keep in mind that this is 1998.
2  So you guys have had lots of conversations since
3  he took the job, right?
4  A.   Right.
5  Q.   You were already the Dean of Fiscal Affairs
6  when he became the president; is that right?
7  A.   Yes.
8  Q.   So he didn't appoint you to that position?
9  A.   Right.
10  Q.   You were already serving there?
11  A.   Yes.
12  Q.   And you have had lots of conversations,
13  since he arrived at the college, about your
14  performance, have you not?
15  A.   Yes.
16  Q.   Okay. So I guess -- and maybe this is not a
17  fair question to ask you, but I'm trying to ask
18  you to move your mind back to '98.
19  A.   I signed it, so apparently I was okay with
20  it.
21  Q.   Is signing it saying that you are okay with
22  it, in your mind?
23  A.   Not necessarily.

Page 64

1  Q.   What does it mean when you sign it?
2  A.   Well, it says there I agree wholly with it,
3  so I guess I am. I mean, you know, it needed to
4  be done.
5  Q.   You're referring to this little bold
6  statement here right above your signature?
7  A.   Yes.
8  Q.   And it says, "My signature does not
9  necessarily indicate that I agree wholly with the
10  content of this appraisal."
11      That's what it says, right?
12  A.   Yeah.
13  Q.   So the fact that you sign it doesn't
14  necessarily mean you agree with it?
15  A.   Right.
16  Q.   Is that what you understood when you signed
17  it?
18  A.   Yes. I mean, I'm reading that.
19  Q.   Yes, ma'am. And I'm just trying to
20  understand. Your statement to me just before I
21  read that section indicated to me that you thought
22  your signature meant I agree with everything that
23  was said. And I guess my question is, in '98 --

16 (Pages 61 to 64)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 65

1   A.   I didn't remember that with that statement
2   But I signed it.
3   Q.   Okay. When you sign one of these, what does
4   it mean to you?
5   A.   That I'm acknowledging that I received it.
6   Q.   That's all?
7   A.   I'm not going to sign it if it was a totally
8   negative. Because I don't -- you know, I just
9   don't -- I don't know about this. But..
10  Q.   Okay. Let me focus in here a little bit.
11  When you signed it, did you understand your
12  signature to mean that you have knowledge of it
13  and you received it?
14  A.   Correct.
15  Q.   That was the testimony you just gave; is
16  that right?
17  A.   (Witness nods head.)
18  Q.   Does it mean anything more than that you
19  have knowledge of this evaluation and that you
20  received this evaluation?
21  A.   That's all that I know that it does. But
22  who knows what it could be? Maybe it could have
23  been used for something else.

Page 66

1   But all I know is that I have knowledge of
2   it and that I signed it. It says that I don't
3   agree wholly with it.
4   Q.   Yes, it does. And so you signed this one?
5   A.   I did.
6   Q.   Okay. Where it says, "Tends to get down
7   when confronted by other workers," do you agree
8   with that statement?
9   A.   No.
10  Q.   You don't agree with that?
11  A.   I don't know what he's talking about.
12  Q.   You don't think there's any merit at all in
13  that statement?
14  A.   No.
15  Q.   And you took it as a criticism the statement
16  that "She continues to grow stronger each day"?
17  A.   That's not a -- that's a personal -- that's
18  a subjective opinion. I don't think it's
19  necessary in a job evaluation.
20  Q.   Well, I've seen some of your responses, and
21  I've seen you write the "This is a subjective
22  opinion" thing before. I want to explore that
23  with you and try to understand what you mean.

Page 67

1   When you say it's his subjective opinion.
2   isn't everything in this evaluation his subjective
3   opinion, whether it's good or bad?
4   A.   There are facts that can be put in an
5   evaluation. There are facts, there are
6   accomplishments, there's things that you have done
7   that can be put in the there.
8   When I do mine, I talk about things that
9   people have done. I mean, I guess it can be
10  whatever the person writing it wants it to be, but
11  it can be factual.
12  Q.   There can be facts to back up whatever the
13  opinion is that's expressed; is that what you
14  mean?
15  A.   Right.
16  Q.   I'm not trying to put words in your mouth;
17  I'm trying to understand what you mean by
18  "subjective opinion." Is that what you mean?
19  A.   I just think that personality traits and
20  things like that should not be in that, if it's
21  not affecting job performance.
22  Q.   Do you think that your getting down when
23  others confront you -- when other workers confront

Page 68

1   you -- do you think that's a criticism of your
2   personality?
3   A.   I do. I don't know why it's in the job
4   performance.
5   Q.   You don't?
6   A.   (Witness shakes head.)
7   Q.   And you don't agree that it's true?
8   A.   No.
9   Q.   Okay.
10  A.   Those are probably the ones that were just
11  put in there.
12  Q.   Okay. This one was '98. The next one here
13  I have in my hand is 2002. And there's no
14  comments on this one.
15  A.   I never saw it.
16  Q.   You never saw that one?
17  A.   Until it was in here.
18  Q.   Okay. Without regard to whether you had
19  ever seen it -- because there is no place on this
20  one for you to have signed it; is that right?
21  A.   Right.
22  Q.   It's just dated April 3, '02, and it's
23  signed by Doug Chambers on April 3, '02; is that

17 (Pages 65 to 68)

Page 69

1 right?
2 A.  Correct.
3 Q.  And there are no comments in the comments
4 section; is that correct?
5 A.  Correct.
6 Q.  But on the reverse side, where the
7 evaluation performance schedule is located,
8 there's numbers 1 through 11.  Do you see those
9 numbers?
10 A.  I do.
11 Q.  And there's a place where you can check, on
12 the left side of those numbers, "Meets standard as
13 is," and then there's a section that you can check
14 that says, "With comment."  Do you see that?
15 A.  I do.
16 Q.  All of your performance categories there
17 were checked "Meets standard as is"; is that
18 right?
19 A.  That's what it says.
20 Q.  Well, do you have any disagreement or
21 complaint about this evaluation as it reads?
22 A.  No.  But I had not seen it.
23 Q.  You had not seen it at the time?

Page 70

1 A.  Right.
2 Q.  Okay.  But you've seen it since then?
3 A.  Just in my file.  When I looked. it was in
4 there.
5 Q.  You've seen it before today?
6 A.  Yes.
7 Q.  But you don't disagree with anything here.
8 do you?
9 A.  No.
10 Q.  Is there anything negative that you can see
11 contained in this evaluation?
12 A.  No.
13 Q.  This was performed by Doug Chambers, wasn't
14 it?
15 A.  Yes.
16 Q.  And you were still a white female when this
17 was performed, weren't you?
18 A.  (Witness nods head.)
19 Q.  Yes?
20 A.  Yes.
21 Q.  And then here's one from March 31st of 2003,
22 the following year.  Same story.  Signed by Doug
23 Chambers, March 31, '03; correct?

Page 71

1 A.  Correct.
2 Q.  And there's no comments on the back written
3 in; is that right?
4 A.  Right.
5 Q.  And then all 11 characteristics of
6 performance are checked "Meets standards as is,"
7 true?
8 A.  True.
9 Q.  Do you see anything negative in this
10 evaluation?
11 A.  No.  It was not in my file in 2003, and this
12 one wasn't either.
13 Q.  Well, how do you know that?
14 A.  Because I had checked my file earlier for my
15 evaluation.
16 Q.  When did you check your file for your
17 evaluation?
18 A.  I would have to go back.  There's probably a
19 record of it.
20 Q.  A record of you having checked your file?
21 A.  We have to sign when we look at our
22 personnel file.
23 Q.  So the personnel -- is it the personnel

Page 72

1 director?  What's the name of the person that
2 works there?
3 A.  We did have one, and that was Jim Merk.  I'm
4 not sure if that person is called the personnel
5 director now.  There's someone that's in
6 personnel, but I don't know if they're the
7 director.
8 Q.  Okay.  But do you believe that you checked your
9 personnel file --
10 A.  I checked it periodically, yes.
11 Q.  Let me finish my question.  Do you believe
12 that you checked your personnel file after March
13 31st of 2003, and this was not in there?
14 A.  Yes.
15 Q.  When did you first discover it in there?
16 A.  We would have to see when the accreditation
17 came about.  I don't remember the date of that.
18 That's when they were put in there.
19 Q.  How do you know that?
20 A.  Because it wasn't in there.
21 Q.  Well, and that's what I'm trying to --
22 A.  He told us in a meeting.  He threatened us
23 many times that he was going to give us bad

18 (Pages 69 to 72)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 73

1    evaluations. We were all poor administrators and
2    we were going to get bad evaluations. And he
3    never did it.
4        And then he told us. And we would have to
5    recall the minutes of that meeting. It would be
6    around the accreditation time, and I don't recall
7    what date that was. Probably '03 or '04. And he
8    said: I'm just going to give y'all a break and
9    I'm going put these in your file because we need
10   them for the record, but beware.
11       And that's how it was put. And that should
12   be in the minutes.
13   Q.   Beware of future evaluations?
14   A.   Right.
15   Q.   But these aren't -- if he was threatening to
16   put in bad evaluations, this isn't bad.
17   A.   No. But he put them in there to get the
18   accreditation through. And he told us he did
19   that.
20   Q.   Okay. But he could have given you a bad
21   evaluation and still gotten the accreditation
22   through, couldn't he have?
23   A.   It would have been a problem if he gave us

Page 74

1    bad evaluations because none of us would have
2    signed them, so they would not have been in there.
3    Q.   But you didn't sign your last evaluation
4    either, did you?
5    A.   I did the one in '98, the last one I had.
6    Q.   Well. no. The most recent one you had was a
7    very negative evaluation, wasn't it?
8    A.   Yes.
9    Q.   And you didn't sign that one, did you?
10   A.   No.
11   Q.   That wouldn't create a problem in
12   accreditation, would it?
13   A.   They could ask about it. They could
14   interview me and ask about it, and they could say
15   there was disharmony among administrators, and
16   that could be a problem.
17   Q.   Is there disharmony among administrators?
18   A.   Yes.
19   Q.   So he could have made this a bad evaluation,
20   just like he did your most recent one that you
21   didn't sign, and it would have wound up in your
22   file unsigned as well. right?
23   A.   I can't say.

Page 75

1    Q.   Okay. 2004. And I'm not going to go
2    through all the rigamarole with you. But that
3    looks like it's April of '04, signed by Doug
4    Chambers, right?
5    A.   Right.
6    Q.   This one is signed by you though, right?
7    A.   Yes.
8    Q.   And this one is just like the last two that
9    we've looked at. You met standards as is all the
10   way down the board?
11   A.   We need to check the date of the
12   accreditation. That was probably still within
13   that time.
14   Q.   Okay. But this one you signed?
15   A.   I did
16   Q.   So this one you saw?
17   A.   Yes.
18   Q.   Accreditation notwithstanding?
19   A.   Right.
20   Q.   Okay. And this one he gave you favorable
21   marks all the way down, right?
22   A.   Right.
23   Q.   And he added no negative comments to the

Page 76

1    evaluation; isn't that true?
2    A.   True.
3    Q.   We're going to cover this one in just a
4    minute. This is the July 14, 2005, evaluation.
5    And that one doesn't have a back page to it. But
6    you can see from the checkmarks on that one that
7    there are a number that says "With comment." And
8    that's checked down the line there; do you see
9    that?
10   A.   I do.
11   Q.   Let me pull that out for you, and we'll
12   examine this one.
13       MR. CHRISTMAN: The full version of
14   this I'm going to mark as Defendants' 2.
15       (Defendants' Exhibit No. 2 was
16       marked for identification and a
17       copy of the same is attached
18       hereto.)
19   Q.   If you will, look at this and tell me if
20   that's what you recall to be the evaluation that
21   was given to you in the year 2005?
22   A.   Yes.
23   Q.   And it's my understanding, from your

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 77

1  comments here today, that you did not agree to
2  sign that document; is that right?
3  A.  Right.
4  Q.  And why did you refuse to sign that
5  document?
6  A.  You should have a response from me in that.
7  Q.  Yes, ma'am.
8  A.  It was not valid, and I didn't want to sign
9  in any way that it might be construed that I
10  agreed to it.  I just wrote a response, which I
11  have a right to do.
12  Q.  I have here what I'll mark as Exhibit 3,
13  which is what appears to be your February 6, 2006,
14  response to this evaluation.
15       (Defendants' Exhibit No. 3 was
16       marked for identification and a
17       copy of the same is attached
18       hereto.)
19  Q.  If you will, take a quick look at that and
20  tell me if that is your response?
21  A.  It is.
22  Q.  All right.
23       MR. CHRISTMAN:  We can take a break at

Page 78

1  any time, Jim.
2       MR. DEBARDELABEN:  This is a good time.
3       (A brief recess was taken.)
4  (BY MR. CHRISTMAN)
5  Q.  Before we go on to that evaluation that is
6  in front of you, I wanted to show you another
7  evaluation that I'll mark as the next exhibit.
8  This is actually one that predates the first one
9  we discussed.  The first one we discussed was '97.
10  This is '96.  I'll mark it as Exhibit 4.
11       (Defendants' Exhibit No. 4 was
12       marked for identification and a
13       copy of the same is attached
14       hereto.)
15  Q.  Would you take a quick peek at that and tell
16  me if you remember seeing that one?
17  A.  Yes.
18  Q.  Now, that one was just before the '97
19  evaluation which included the admonishments that
20  "She needs to improve on her self-confidence when
21  dealing with her workers.  Tends to allow others
22  to attack her when she's in charge."  Those
23  comments appeared in '97.

Page 79

1       This evaluation is one year before those
2  comments appeared in your '97 evaluation, which
3  was, by the way, outstanding or excellent.
4       Would you tell us, in that '96 evaluation,
5  how did Dr. Chambers evaluate your performance?
6  A.  Talking about this?
7  Q.  Well, here on the first page, we see that he
8  checked all of the characteristics of performance,
9  1 through 12 in this one, as "Meets standards as
10  is," right?
11  A.  Right.
12  Q.  Nothing with comment; is that right?
13  A.  Right.
14  Q.  And then on the second page, we see he wrote
15  in the comments section, in very large writing --
16  what did he write?
17  A.  "Excellent!  A very caring person."
18  Q.  "Excellent," with an exclamation point,
19  right?
20  A.  Right.
21  Q.  "A very caring person."  Any other comments?
22  A.  No.
23  Q.  Would you agree with me that that is his

Page 80

1  opinion about your performance?
2  A.  True.
3  Q.  And it's a very good opinion, isn't it, in
4  terms of your performance?
5  A.  Yes.
6  Q.  And you signed that one; is that right?
7  A.  I did.
8  Q.  All right.  So now back to your performance
9  evaluation that we have marked as Exhibit 2.
10       This one was not as favorable as the other
11  ones we have seen; is that true?
12  A.  True.
13  Q.  Prior to this evaluation, had you ever
14  received an evaluation with as many admonishments
15  or instructions as you received in Exhibit 2?
16  A.  No.
17  Q.  In fact, that's the first evaluation you've
18  ever received since you've worked at Ingram that
19  included as many points of discussion regarding
20  improvements that Dr. Chambers thought you should
21  make; is that right?
22  A.  Right.
23  Q.  I'm going to put that the one in front of

20 (Pages 77 to 80)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 81 | Page 83 |
|---|---|
| 1  you and I'm going to see if I can find this one on | 1  Let's stop right there. |
| 2  my -- here we go. | 2  Q.  Do you agree it's his opinion that you |
| 3  If you'll look at the top, we're going to go | 3  present yourself in a positive and professional |
| 4  to the second page of Exhibit 2.  At the top of | 4  manner? |
| 5  this, it says, Employee, Position/Title, and Date. | 5  A.  Yes. |
| 6  And that's all blank, right? | 6  Q.  All right.  And do you agree with his |
| 7  A.  Right. | 7  opinion in that regard? |
| 8  Q.  And we know that you definitely did not sign | 8  A.  Yes. |
| 9  this particular evaluation; is that right? | 9  Q.  The next part says "...the majority of her |
| 10  A.  Right. | 10  work tends to show a weakness in her specific |
| 11  Q.  But you do recall reading all of the items | 11  leadership roles as they relate to overseeing and |
| 12  listed in Exhibit 2? | 12  administrating the affairs of the Business |
| 13  A.  Yes. | 13  Office." |
| 14  Q.  So the fact that you didn't sign it doesn't | 14  That's Dr. Chambers' opinion, isn't it? |
| 15  reflect that you didn't get it; is that right? | 15  A.  Yes. |
| 16  A.  Right. | 16  Q.  Do you agree with it? |
| 17  Q.  Because you did get it? | 17  A.  No. |
| 18  A.  I got it. | 18  Q.  All right.  Why don't you agree with the |
| 19  Q.  And you did read it? | 19  statement that you tend to show weakness in your |
| 20  A.  Yes. | 20  specific leadership roles as they relate to |
| 21  Q.  And you did understand what it said? | 21  overseeing and administrating the affairs of your |
| 22  A.  Yes. | 22  office? |
| 23  Q.  The reason you didn't sign it is because you | 23  A.  I've already answered all of this in here, |

| Page 82 | Page 84 |
|---|---|
| 1  didn't agree with it? | 1  and I give facts. |
| 2  A.  Correct. | 2  Q.  Is there anything, other than what's in |
| 3  Q.  Okay.  And that's the only reason? | 3  here, that would support the reason you don't |
| 4  A.  Yes. | 4  believe that you show weakness? |
| 5  Q.  Okay.  Let's look at the top there.  It | 5  MR. DEBARDELABEN:  Let me make a |
| 6  says, "Employee displays good morale while on the | 6  statement.  "In here," you're talking about |
| 7  job." | 7  Defendants' Exhibit 3. |
| 8  That's Dr. Chambers' opinion, isn't it? | 8  MR. CHRISTMAN:  Yes. |
| 9  A.  Yes. | 9  MR. DEBARDELABEN:  Because y'all both |
| 10  Q.  Do you agree with that? | 10  referred to it and didn't... |
| 11  A.  Yeah.  It can be proven. | 11  MR. CHRISTMAN:  Thank you. |
| 12  Q.  It can?  How can you prove that you have | 12  A.  I'm sorry.  Could you repeat the question? |
| 13  good morale on the job? | 13  Q.  Is there anything, other than what you wrote |
| 14  A.  I don't know. | 14  in your response which is marked as Exhibit 3, |
| 15  Q.  Okay.  It says, "She displays an honest and | 15  that demonstrates why you do not believe that you |
| 16  respectful attitude when working with other | 16  have shown weakness in your specific leadership |
| 17  employees." | 17  roles as they relate to overseeing and |
| 18  That's Dr. Chambers' opinion, isn't it? | 18  administrating the affairs of the Business Office? |
| 19  A.  Yes. | 19  A.  I've put it all in here. |
| 20  Q.  And do you agree with it? | 20  Q.  Nothing other than what's in here; is that |
| 21  A.  Yes. | 21  right? |
| 22  Q.  It says, "Although the employee presents | 22  A.  Right. |
| 23  herself in a positive and professional manner..." | 23  Q.  Okay.  I'll just ask you a broader question. |

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

### Page 85

1  If you need to. I want you to go ahead and read
2  the full paragraph there, because I want to ask
3  you a broad question about the full paragraph
4  before the bullets, before the directives.
5  A    Okay.
6        (The witness examines the
7        document.)
8  Q.   Is it fair to say that you don't agree with
9  anything else in that paragraph?
10 A.   Yes, that I don't agree.
11 Q.   You do not agree with anything else in the
12 paragraph, right?
13 A.   (No response.)
14 Q.   And we can go one at a time if it's more
15 fair.
16       MR. CHRISTMAN:  Jim, I want to be fair
17 about the question.
18       MR. DEBARDELABEN:  No.  I'm just making
19 sure she read it.
20       MR. CHRISTMAN:  Okay.
21       MR. DEBARDELABEN:  We are talking about
22 stopping after the word "are" semicolon?
23       MR. CHRISTMAN:  "Are," colon, yes.

### Page 86

1  A-R-E, colon.
2        MR. DEBARDELABEN:  Just to be sure
3  we're on the same page.
4        MR. CHRISTMAN:  Yes, sir.
5  A.   I disagree with all of that.
6  Q.   Okay.  Do you perceive all of the remainder
7  of that paragraph, other than what we've already
8  discussed, to be negative evaluations of your
9  performance?
10 A.   Yes.
11 Q.   So you disagree with all of the negative
12 aspects of this evaluation; is that true?
13 A.   Yes.
14 Q.   And you agree with all the good aspects of
15 this evaluation; is that true?
16 A.   Yes.
17 Q.   Okay.  Below that are some examples, what
18 Dr. Chambers refers to as other examples or areas
19 of the college where leadership is needed, but is
20 either missing or ineffective.  And these are
21 numbered examples 1 through 18, right?
22 A.   Yes.
23 Q.   All right.  The first one -- and you can

### Page 87

1  refer to your response if you wish, but we're
2  going to walk through these.
3        The first one is, "Develop a 'How to use the
4  Business Office manual or brochure.'"  Says, "She
5  didn't do it."
6        Do you agree with that?
7  A.   No.
8  Q.   Have you developed a "How to use the
9  Business Office manual"?
10 A.   Yes.
11 Q.   Where is it?
12 A.   I presented it in a cabinet meeting, and he
13 never approved it.
14 Q.   Where is it now?
15 A.   He has a copy and I have a copy.
16 Q.   And it is a "How to use the Business Office
17 manual or brochure"?
18 A.   Yes.
19 Q.   And is it complete?
20 A.   Yes.
21 Q.   Is there anything you would liked to add to
22 it or take from it?
23 A.   No.

### Page 88

1  Q.   The next one is, "Provide the President with
2  a monthly expense on all regular expenses of the
3  college."  Says you didn't do that.
4        Do you agree with that?
5  A    No.
6  Q.   All right.  Why don't you agree?
7  A.   I have provided them to him.  And I've told
8  him that I have the monthly reports, and he's
9  never shown the desire to have these.
10 Q    Well, he's showing a desire right there in
11 No. 2, isn't he?
12       MR. DEBARDELABEN:  Object to the form.
13 Q.   Isn't he?
14 A.   Yes.  But he has them.
15 Q.   And you gave them to him?
16 A.   Uh-huh.
17 Q.   Well, your response says, "I have provided
18 these expenses to you on various occasions when
19 you asked for them.  I have also informed you that
20 I have monthly reports that I can give you.  You
21 have never shown a desire to have these."
22       Did you produce any of these monthly reports
23 that you say he never showed a desire to have?

22 (Pages 85 to 88)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

| Page 89 | Page 91 |
|---|---|

**Page 89**

1  A.  We have monthly reports every month
2  maintained in our office.
3  Q.  Did you give them to Dr. Chambers?
4  A.  I have.
5  Q.  Did you give them to him in response to this
6  evaluation?
7  A.  Yes.  Since then, he gets them.  We've had
8  meetings; he gets reports.
9  Q.  Is he satisfied with those reports?
10  A.  I don't know.
11  Q.  Does he indicate to you that he's pleased
12  with the fact that you gave him --
13  A.  He has.
14  Q.  Does he indicate to you that he no longer
15  feels like you haven't been providing the reports?
16  Has he made any expressions to you in that regard?
17  A.  Yes.
18  Q.  Is it your opinion that he actually wanted
19  these reports?  I'm asking for your opinion now.
20  Do you feel like he really wants these reports?
21  A.  No.
22  Q.  Why don't you feel like that?
23      MR. DEBARDELABEN: Object to the form.

**Page 90**

1  Q.  Why do you say that?
2  A.  I've said in here that he's never shown a
3  desire to have these things.
4  Q.  Well, but since then you have been giving
5  them to him?
6  A.  Yes.
7  Q.  And he seems pleased about that?
8  A.  Yes.
9  Q.  And my question to you is: Do you believe
10  he wants these reports, in light of this
11  evaluation, the fact that you are giving them to
12  him now and he seems pleased?
13  A.  I don't know.
14  Q.  Okay.  No. 3 says, "To identify all vehicles
15  and the conditions of each."  You didn't do it.
16      Your No. 3 response says, "All vehicles are
17  identified for our insurance records.  I informed
18  you of this on several occasions."
19      When did you ever inform Dr. Chambers about
20  the identity and condition of all the vehicles on
21  the property?
22  A.  Many times.
23  Q.  In what way?

**Page 91**

1  A.  Verbally, and I've shown him in cabinet
2  meetings.
3  Q.  You've shown him in cabinet meetings?
4  A.  Yes.
5  Q.  What have you shown him?
6  A.  All of the vehicles.  We have a listing with
7  all of the vehicles, VIN numbers, what's all on
8  the insurance, drivers.  And then we have a file
9  on that that's always open for view.
10  Q.  And you have provided that to him?
11  A.  I have.
12  Q.  Is there any record of that, that you are
13  aware of?
14  A.  I mean, there would be a printout of it.
15  There's printouts of the insurance.  But it would
16  be his word against mine.
17  Q.  Oh, is that right?  There's not a document
18  demonstrating that?
19  A.  I didn't do it in a letter, no, but I've
20  shown him.  It's probably in some minutes.
21  Q.  None of those printouts, however,
22  particularly those with reference to the insurance
23  records, none of those printouts are going to

**Page 92**

1  describe the condition of vehicles; isn't that
2  true?
3  A.  Yes.
4  Q.  So you've never provided him with any
5  documentation as to the condition of the vehicles;
6  isn't that true?
7  A.  I don't agree with that.
8  Q.  Okay.  When have you provided him with the
9  condition of the vehicles?
10  A.  I have a sign out sheet in my office, and
11  they sign out.  I mean, if there's a problem, it's
12  on there.  There haven't been any problems.  I
13  don't really know what he's talking about.
14  Q.  Well --
15  A.  I don't know what he means by "condition."
16  Q.  You don't know what he means by the
17  condition of the vehicles?
18  A.  (Witness shakes head.)
19  Q.  Have you ever asked him what he meant by the
20  condition of the vehicles?
21  A.  Yes.
22  Q.  When did you ask him?
23  A.  I don't recall.

23 (Pages 89 to 92)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 93

1   Q.   Did you ask him verbally or in writing?
2   A.   Verbally.
3   Q.   What was his response?
4   A.   Time for an oil change. And we keep the
5   record of that. I mean, that's what he wanted to
6   know. I don't know why he wanted to know that,
7   but, I mean. that's handled by someone else
8   Q.   He wanted to know when it was time for an
9   oil change? I don't understand your response.
10  A.   I mean, I guess that's what -- I don't
11  really know what he wants on that. But I've given
12  him plenty of things. I don't know what he wants
13  Q.   I understand what you're saying. What I'm
14  asking you though is a little bit more specific
15  I understand that he wants to know the identity
16  and the condition of all the vehicles. I
17  understand that you don't know what he means by
18  condition.
19      What I want to know today is whether you
20  have ever attempted to clarify to your
21  satisfaction with Dr. Chambers what he means when
22  he says he wants to know the condition of the
23  vehicle.

Page 94

1   A.   I have.
2   Q.   Okay. And has he ever clarified what he
3   means by that, to your satisfaction?
4   A.   No.
5   Q.   Well, what did you do in an effort to get
6   that clarification?
7   A.   We continue to do what we do in our
8   department. I have someone that's assigned to
9   that. And we make sure that all the things are
10  handled. There is a form, if there is a problem,
11  that it's noted. It will be given to me in a
12  memorandum and that would just come to me.
13  Q.   Yes, ma'am. Thank you for that answer.
14  It's really not responsive to my question though.
15      My question is: What have you done to get
16  clarification from Dr. Chambers about what he
17  means about the condition of the vehicles, to your
18  satisfaction, so that you could do what he wants?
19  A.   I don't recall.
20  Q.   It's difficult to give him the information
21  that he wants unless you understand what he wants;
22  would you agree with me on that?
23  A.   Right.

Page 95

1   Q.   The next one says, "To compare insurance
2   companies for the best rates." Says, "She didn't
3   do it."
4       You have here, No. 4 of your response, which
5   is contained in Exhibit 3, "I did have Ms. Givens
6   begin soliciting quotes from different insurance
7   carriers, but in the process you informed Ms.
8   Givens that you were wanting to go with someone
9   that you knew, so there was not any reason to get
10  quotes. It would not be fair to the other
11  carriers to have them spend the time on putting
12  together a proposal and not be chosen."
13      So is your response -- I just want to make
14  sure I understand what No. 4 means.
15      Did you request or did you get a comparison
16  of rates from insurance companies?
17  A.   Yes. I had Ms. Givens do that.
18  Q.   Did she get the comparison?
19  A.   She did.
20  Q.   Did you present it to Dr. Chambers?
21  A.   She went in to present it to him, and that's
22  what she was told. I mean that's part of her
23  duties that she would handle for me.

Page 96

1   Q.   Yes, ma'am. But did you follow up to make
2   sure he got what he asked for?
3   A.   Yes.
4   Q.   And what did you discover on your follow-up?
5   A.   We just -- we stayed with who we were with.
6   It never went anywhere.
7   Q.   In terms of who you were going with for the
8   insurance?
9   A.   Right.
10  Q.   Did Dr. Chambers get the comparison of
11  rates, is what I'm asking you.
12  A.   I don't know. You would have to ask Ms.
13  Givens.
14  Q.   Yes, ma'am. You don't know if --
15  A.   She was -- I asked her to handle it as part
16  of her job, and she was to give it to him. And so
17  when she -- to my knowledge, when she went in
18  there, that's what happened. You can ask her
19  later.
20  Q.   I intend to do that. My focus though is
21  really more on how you were involved. And I think
22  I understand your response. Your response is you
23  don't know if she did or did not do that?

24 (Pages 93 to 96)

Page 97

1   A.   She did do it.
2   Q.   How do you know?
3   A.   Because she informed me of what she had.
4   But I let her present it because that's her job.
5   Q.   Okay. And did you follow up with Dr.
6   Chambers to assure that he was satisfied with the
7   presentation of comparable rates?
8   A.   He said it was fine to stay where we were.
9   Q.   So you did follow up with him?
10  A.   Yes.
11  Q.   When did you follow up with him?
12  A.   I don't remember.
13  Q.   Was it in a cabinet meeting or recorded
14  anywhere, or was it informal?
15  A.   Probably both. Probably could have been in
16  a cabinet meeting. I'm pretty sure I probably
17  would have handled it in that manner.
18  Q.   All right. So I should be able to go to the
19  minutes of a cabinet meeting and find somewhere
20  that Dr. Chambers got the comparison of vehicle
21  insurance?
22  A.   It should be.
23  Q.   Well, if you did it in a cabinet meeting, it

Page 98

1   would be reflected?
2   A.   Yes, right. It should be in cabinet meeting
3   minutes.
4        MR. DEBARDELABEN: That was a "should
5   be." Whether it is reflected or not, we don't
6   know.
7        MR. CHRISTMAN: Okay.
8   A.   If I said it in a cabinet meeting, yes, it
9   should be in the minutes.
10  Q.   Very good. Is there any reason it wouldn't
11  be reflected in the minutes, that you know of, if
12  you said it?
13  A.   No.
14  Q.   Okay. There hasn't been a problem, that
15  you're aware of, where things were not properly
16  recorded in the minutes of meetings, has there?
17  A.   Yes.
18  Q.   There has been a problem with that?
19  A.   Yes.
20  Q.   Okay. Tell me about that.
21  A.   I mean, the only thing I know is that the
22  recorder has been cut off in meetings. I'm not
23  specifically saying for me, but the recorder is

Page 99

1   cut off and on in the cabinet meetings.
2   Q.   Okay. Well, are you aware of there ever
3   having been an instance in which something was
4   discussed in a cabinet meeting but not reflected
5   in the minutes? That's what I'm driving at.
6   A.   I feel quite sure.
7   Q.   Well, have you had opportunity to examine
8   the minutes of meetings?
9   A.   I have read them, but they are numerous. I
10  don't have time to sit there and go over them. I
11  mean, I've already been in a two-hour meeting.
12  Q.   Yes, ma'am. I understand.
13  A.   But I do look at them.
14  Q.   Have you ever made note to anyone that the
15  minutes of the meetings were not properly recorded
16  and that there were things that were left out?
17  A.   No. I could have them in my notes, but I
18  would have to look back.
19  Q.   What do you mean your notes?
20  A.   I mean, I keep notes in a meeting, just like
21  this.
22  Q.   Okay.
23       MR. CHRISTMAN: Jim, I can handle this

Page 100

1   however you want me to handle this. I'm gonna
2   want those notes. Do you want me to just tell you
3   I want them or do you want me to send you a
4   request for production?
5        MR. DEBARDELABEN: Send me a request.
6   Oh, let me tell you something about that.
7        MR. CHRISTMAN: Yes.
8        MR. DEBARDELABEN: You sent me a disk
9   of the meetings.
10       MR. CHRISTMAN: Yes.
11       MR. DEBARDELABEN: There's only one
12  meeting on that. November 28th.
13       MR. CHRISTMAN: Yes.
14       MR. DEBARDELABEN: And there's more
15  meetings than that.
16       MR. CHRISTMAN: Yes, sir.
17       MR. DEBARDELABEN: I only have one
18  meeting. I don't know if it was a mistake with
19  y'all.
20       MR. CHRISTMAN: No. That's what you
21  asked for. You asked for the meeting of 2006 -- a
22  recording of the meeting of 2006.
23       MR. DEBARDELABEN: No, I asked for the

25 (Pages 97 to 100)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

## Page 101

1   meeting from all -- any and all audiotapes of all
2   meetings of J.F. Ingram Technical College from
3   January 1, "1006," until present.
4       MR. CHRISTMAN: Yes, sir.
5       MR. DEBARDELABEN: And that should have
6   been 1996 until present. But I asked for it from
7   1006. So if we -- that was --
8       MR. CHRISTMAN: I'm sorry. I thought
9   it said 2006.
10      MR. DEBARDELABEN: No. It says 1006,
11  but it should have been 1996. But it goes all the
12  way back before we had it. And, of course, I know
13  you don't know if there is --
14      MR. CHRISTMAN: I'll be glad to give
15  them to you.
16      MR. DEBARDELABEN: Okay. But we only
17  got one meeting.
18      MR. CHRISTMAN: And I thought I was
19  being responsive. I thought your request was
20  everything from January '06 until now.
21      MR. DEBARDELABEN: No, no. Because the
22  one right below it says 1996.
23      MR. CHRISTMAN: I'm just trying to do

## Page 102

1   what you asked me to do.
2       MR. DEBARDELABEN: I understand. I
3   don't know how they thought 2006 when everything
4   else says 1996. But I'll agree there is a typo.
5   But the typo went back way before this.
6       MR. CHRISTMAN: Yeah. Way before you
7   and I existed.
8       MR. DEBARDELABEN: Yeah, yeah. But I
9   do understand it. But it is --
10      MR. CHRISTMAN: I'm glad to give them
11  to you, Jim.
12      MR. DEBARDELABEN: Okay.
13      MR. CHRISTMAN: I'm going to send you a
14  request for production for the notes of Monica
15  Greene associated with cabinet meetings.
16      MR. DEBARDELABEN: Okay.
17  (BY MR. CHRISTMAN)
18  Q.  Do you have any other notes that reflect
19  discussions between you and Dr. Chambers, besides
20  these notes that you've told me about here?
21  A.  I mean, I always have a pad when I go in
22  there.
23  Q.  Well, I don't want notes --

## Page 103

1   A.  I mean, he's given me things to do, so I'm
2   going to write them down. And that's what that's
3   for. That would be a note.
4   Q.  Yes. Any notes that you have associated
5   with your thoughts, your expectations, your
6   understanding of his intentions, any of those, I'm
7   going to send you a request for production on
8   that; and your lawyer will get it, and if you
9   could begin to assimilate that.
10  A.  Fine.
11      MR. CHRISTMAN: Is there a time frame
12  that you find acceptable or unacceptable?
13      MR. DEBARDELABEN: Well, you know, he
14  came in '96, didn't he?
15      MR. CHRISTMAN: Yes, he did.
16      MR. DEBARDELABEN: January 1, 1996, I
17  guess. I mean, she could have notes before then.
18      MR. CHRISTMAN: Not unless they talked
19  before he came. I don't know why she would.
20      MR. DEBARDELABEN: Now, we're talking
21  about all notes she had concerning contacts with
22  Mr. Chambers, right?
23      MR. CHRISTMAN: That's correct.

## Page 104

1   Meetings, interviews, instructions. I'll make
2   sure that my request is broad. I mean, I'm not
3   trying to be -- I don't want you to produce a
4   bunch of stuff I'm not looking for.
5   Q.  What I'm looking for is any time you and he
6   had a conference about something, whether it was a
7   cabinet meeting or otherwise, and you wrote a note
8   about it, that's what I want.
9   A.  I would have the title and the date.
10  Q.  Very good.
11      MR. DEBARDELABEN: What he's looking
12  for is what you have that we haven't already
13  produced.
14      MR. CHRISTMAN: True.
15      MR. DEBARDELABEN: Because you've got a
16  lot of it.
17  A.  You've got dates and times. A lot of that
18  is in response to that.
19  Q.  That you filed in response to my request for
20  production?
21      MR. CHRISTMAN: Is that what she's
22  talking about, Jim?
23      MR. DEBARDELABEN: Yeah.

26 (Pages 101 to 104)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

## Page 105

1  Q.  If you've already given it to me, I don't
2  want it again.
3  A  Okay  I'll verify that it's something
4  different.
5  Q.  Okay  We're back on the directions that he
6  says maybe were not completed  No. 5.  "To design
7  a key board for all buildings and vehicles  She
8  didn't do it."
9      You said, "I turned the keys and the key
10 board over to Mr  Marty Martin and assigned him
11 the task  I assigned this quite some time ago but
12 there are a tremendous amount of keys at the
13 college and it will take some time to have this
14 completed."
15     So is there a -- what is a key board?  What
16 is he talking about?  Do you know?
17 A   What he wanted is a board with keys on it
18 and identified where they are  We have several
19 surveys that went out that had all that listed.
20 We had it to date  But when he asked me to do
21 this, it has been done by Marty Martin. and he's
22 in charge of it  But he took it and. I mean.
23 there was just a huge amount of work to do. But

## Page 106

1  it has been done
2  Q.  What is the huge amount of work to do
3  associated with compiling all the keys and putting
4  them on a key board?
5  A.  I mean. he wanted each key identified, which
6  is a tremendous task.  That's what he said.
7  Q.  In other words, you've got to know what the
8  key does, what it's for?
9  A.  Right.
10 Q.  A vehicle, a door, a closet, right?
11 A.  Right.
12 Q.  And why do you believe that's a tremendous
13 task?
14 A.  Do you want to see how many keys there are
15 on campus.  And we had a survey went out that had
16 them listed on there that --
17 Q.  What does that mean, a survey went out?  I
18 don't understand.
19 A.  It was just a key listing survey that would
20 go out periodically, so that each person would --
21 I mean, we had identified who had them.  And they
22 did.  So it really wasn't necessary, in my
23 opinion. but that's what he wanted

## Page 107

1  Q.  Well, he wanted a key board  What is that?
2  What was he talking about?
3  A  I don't know.
4  Q.  You said you turned the keys and the key
5  board --
6  A.  There was a board in my office, and I assume
7  maybe -- an old, outdated one  I believe you
8  would have to ask him what he wanted.
9      But Mr Martin has identified the keys at
10 the college.
11 Q.  What is the board?  What is it?  Has it got
12 a bunch of hooks on it for keys to hang on?
13 A.  Yes.
14 Q.  Okay  So it's a board with a bunch of screw
15 hooks or something on it where you hang keys on
16 it?
17 A.  Right.
18 Q.  And he wanted a copy, I guess, of all the
19 keys to hang on the board, and identify what they
20 are, right?
21 A.  Right.
22 Q.  Okay  When did he give you that assignment?
23 Do you know?

## Page 108

1  A.  No.
2  Q.  It was sometime before this evaluation;
3  would you agree with that?
4  A.  Right.
5  Q.  And you turned that job over to Marty
6  Martin?
7  A.  Uh-huh.
8  Q.  Who is Marty Martin?
9  A.  He does many things at the college.  I don't
10 remember what his exact title is right now, but he
11 helps in shipping, several things like that.
12 Q.  He would be the right guy to do this task?
13 A.  Right.
14 Q.  And how long before you wrote -- excuse me.
15 How long before you received this evaluation had
16 you assigned that task to Marty Martin?
17 A.  I don't recall.
18 Q.  Was it weeks? months? days?
19 A.  I don't recall.
20 Q.  Okay  Did you assign him the task after you
21 got the evaluation?
22 A.  No.
23 Q.  So you are confident that it was sometime

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 109

1  before the evaluation that you assigned the task;
2  is that right?
3  A.  Yes.
4  Q.  Did you ever follow up with Martin about the
5  board for the keys?
6  A.  Yes.
7  Q.  What did you discover on your follow-up?
8  A.  He had them identified.
9  Q.  What does that mean, he had them identified?
10  A.  He had the board and he had all the keys
11  identified.  He gave me a printout also.
12  Q.  So you had all the keys and all the
13  identifications for all the keys?
14  A.  (Witness nods head.)
15  Q.  All right.  But you didn't have it on the
16  day of this evaluation?
17  A.  I don't recall.
18  Q.  Well, your response to No. 5 indicates to me
19  that you assigned the task quite some time ago,
20  but there was a lot of work to do and it would
21  take some time.  So is it safe to say that --
22  A.  It was probably not done -- completed.
23  Q.  It wasn't completed at the time of your

Page 110

1  evaluation, right?
2  A.  Probably.
3  Q.  And it was not completed at the time of your
4  response; is that right?
5  A.  It appears.
6  Q.  The evaluation is dated July 14, 2005; your
7  response is dated February 6, 2006.  Does it
8  take --
9  A.  Did you note that I didn't receive the
10  evaluation until October 10th?
11  Q.  All right.  Well, let's use that date
12  October 10th to February 6th.
13    And we don't know how much time lapsed
14  between the time he asked you to get the board and
15  the time you got the evaluation.  We don't know
16  that, right?
17  A.  Say that again.
18  Q.  We don't know how much time lapsed between
19  the time he requested you to do this key board and
20  the time you received the evaluation, right?
21  A.  Right.
22  Q.  But we do know that it was at least October
23  to February that lapsed between the time you knew

Page 111

1  about his request, and it still wasn't done
2  between October to February.
3    Why does it take that many months to
4  assemble a key board?
5  A.  It's a big job.  I mean, he has other
6  duties.
7  Q.  Would you say that it is true -- would you
8  agree with me that it is true that, at the time
9  Dr Chambers wrote this evaluation, that you had
10  not yet designed and provided him with a key board
11  for all the buildings and vehicles; isn't that
12  true?
13  A.  It was in process.  It was not completed
14  Q.  He didn't have one?
15  A.  Right, yes.  He didn't have one
16  Q.  No. 6.  "To evaluate the pest contract and
17  identify product and usages."  Says you didn't do
18  it.
19    I'm not going to read your whole response.
20  It's a longer paragraph.  Your position on that is
21  that you did do that?
22  A.  (Witness nods head.)
23  Q.  And that a purchase order was issued by the

Page 112

1  college to Cook's in April 19, '05.  Is that what
2  your response says?
3  A.  Uh-huh.
4  Q.  Did you ever inform Dr. Chambers that you
5  had contacted these three companies, Cook's,
6  Orkin, and Terminix?
7  A.  Yes.
8  Q.  How did you inform him of that?  It says, "I
9  informed you verbally on the quotes from each
10  company."
11    Tell me about the context of that.
12  A.  I informed him verbally in his office of the
13  three quotes.  We had much discussion about it.
14  Q.  What do you mean you had much discussion
15  about it?
16  A.  I mean we talked about the -- I showed him
17  each plan.  I had a -- I had a -- I have that.  I
18  have a quote from each company.  He saw it.  I
19  also presented it in a cabinet meeting and
20  informed all in attendance.  So you can request
21  that.
22  Q.  It doesn't say which cabinet meeting, right?
23  A.  Right.

28 (Pages 109 to 112)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

## Page 113

1  Q.   But I should be able to find it?
2  A.   I would say from January through there, you
3  should be able to find it.
4  Q.   Okay.  From January '06?
5  A.   '05.  The purchase order was on April 19th
6  of '05, long before this.
7  Q.   And you informed the folks in the cabinet
8  meeting about the various pest control providers
9  in January?
10 A.   I don't recall when it was.
11 Q.   Okay.  I'll have to go find it?
12 A.   Yes.
13 Q.   But that's in the time frame?
14 A.   Yes.
15 Q.   Okay.  No. 7.  "Provide a report on all
16 college employees who are classified as high risk
17 drivers by the insurance company."  Says you
18 didn't do it.
19     Your response was, "The college only had one
20 driver at the time that was considered high risk.
21 I verbally informed you of this in a cabinet
22 meeting and in your office on more than one
23 occasion."

## Page 114

1      So I should be able to find in a cabinet
2  meeting where you reported there was only one high
3  risk driver?
4  A.   Yes.
5  Q.   Did you provide any written report?
6  A.   No.  It's in the insurance file.
7  Q.   There is an insurance file that demonstrates
8  that you have one high risk driver?
9  A.   Yes.
10 Q.   Have you ever produced that for Dr.
11 Chambers?
12 A.   I don't recall if I have or not.
13 Q.   "Implement new purchasing procedures."
14 Status is unclear, he said.
15     You wrote, "A new purchasing procedure was
16 implemented on May 3, 2004."  You went over that
17 procedure step by step in the meeting.
18     April 26, 2004, is two years prior to this
19 evaluation, isn't it?  Is that true?
20 A.   True.
21 Q.   Is it your understanding that Dr. Chambers
22 didn't want a new purchasing procedure other than
23 the one that was issued two years before he

## Page 115

1  criticized you for not having provided it?
2  A.   This is the same as that.
3  Q.   I don't understand that response.  What do
4  you mean, this is the same as that?
5      MR. DEBARDELABEN:  I think what she's
6  saying. yeah, it was two years before she did it.
7  That's what she means to say to that.  It was
8  already implemented.
9  Q.   And it's your understanding that the new
10 purchase procedure that he wanted implemented had
11 been implemented two years before?
12 A.   Yes.
13 Q.   Did Dr. Chambers have a copy of that
14 purchase order procedure?
15 A.   Yes.  There should be a copy in the file.
16 It was attached to this.
17 Q.   I see.  And that's the one you think he's
18 talking about when he says new purchasing
19 procedures?
20 A.   Yes. it is.
21 Q.   Okay.  No. 9.  "Review procedures to use
22 receipts for small work projects, instead of using
23 large amounts of paperwork.  She didn't do it."

## Page 116

1      And you wrote, "The procedure of receipting
2  of small work projects only applies to the
3  Barbering, Cosmetology. and Horticulture programs.
4  A memorandum was sent out regarding the receipting
5  of the barbering program on March 11, 2004.  The
6  Cosmetology program was already receipting theirs
7  this way.  The Horticulture program had been doing
8  their receipting this way for quite some time.
9  These are the only shops where this is feasible.
10 This project was completed."
11     How did you inform Dr. Chambers regarding
12 receipting for small work projects prior to this
13 response?
14 A.   There's a memorandum that went out.  It
15 should be in the file when this was done.
16 Q.   In March of '04?
17 A.   Uh-huh.
18 Q.   Again, two years before this date?
19 A.   Uh-huh.
20 Q.   Did you supply Dr. Chambers with that
21 memorandum, after he asked you to review the
22 procedures?  Did you supply him with that
23 memorandum and discuss that with him?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

---

Page 117

1       MR. DEBARDELABEN: I'm going to object
2  to the question. And let me tell you why.
3       MR. CHRISTMAN: Okay.
4       MR. DEBARDELABEN: You're --
5       MR. CHRISTMAN: I just want you to
6  object now; I don't want you to lead your witness.
7       MR. DEBARDELABEN: No, I'm not leading
8  the witness. It's where I'm confused.
9       MR. CHRISTMAN: Okay
10      MR. DEBARDELABEN: We're talking about
11 an evaluation, and you're referring to numbers on
12 the evaluation and saying Dr. Chambers requested.
13 But we haven't seen either when he requested
14 either a verbal request or how he requested. So
15 that's where I'm a little confused.
16      He says. "Review procedures ..." But you're
17 asking, in the way you phrase the question, it's
18 assuming that he made the request and when he did
19 But what we haven't seen -- and it's difficult to
20 answer your question. We can respond like she
21 responded here, but we don't have the question
22 when he asked it or how he asked it.
23 Q.     Well, let me ask you about that. Do you

---

Page 118

1  recall Dr. Chambers asking you to review
2  procedures to use receipts for small work
3  projects?
4  A.   If I did, it was at this time. I mean, it's
5  been done, yes.
6  Q.   Well, do you understand what I'm driving at?
7  A.   I don't have it in writing.
8  Q.   Do you recall when it was that he asked you
9  to use receipts for small work projects?
10 A.   No.
11 Q.   Was it sometime before this evaluation?
12 A.   Yes.
13 Q.   Do you know if it was a matter of months or
14 weeks?
15 A.   And it was done.
16 Q.   You think he asked you for it two years
17 before that?
18 A.   And it was done, yes.
19 Q.   That was the first time he asked you was two
20 years before, and you did it?
21 A.   Yes.
22 Q.   I understand. No. 10. "Stop allowing her
23 staff to carry Business Office documents home.

---

Page 119

1  She didn't do it "
2       No. 10 says, "My staff does not take any
3  information home that cannot be replaced. On
4  occasion I have allowed them to take reports home
5  to check on their own personal time. I see it as
6  dedication; you see it as something wrong with me
7  I did stop them from doing this though since you
8  had a problem with it "
9       All right. Do you know when he asked you to
10 stop allowing your staff to carry home business
11 office documents?
12 A.   No.
13 Q.   You don't remember when that was?
14 A.   Verbal.
15 Q.   When did you inform him that you had done
16 exactly what he asked?
17 A.   I don't recall.
18 Q.   Did you inform him that you had done what he
19 asked?
20 A.   Yes.
21 Q.   Before this response?
22 A.   I don't remember when it was.
23 Q.   Would you agree with me that if he asked you

---

Page 120

1  to do it, but you never indicated to him that you
2  had done what he asked, he wouldn't know that you
3  did what he asked you to do? Would you agree with
4  me about that?
5  A.   Say that again. please
6  Q.   If he had asked you to do it and you did it,
7  but you didn't tell him that you did it, he
8  wouldn't have any way to know that you complied
9  with his request; isn't that true?
10 A.   True. But I did tell him
11 Q.   You did tell him. When did you tell him?
12 A.   He asked me verbally, and I told him
13 verbally. That's all I can tell you.
14 Q.   Was it a day later or two days later or the
15 same day?
16 A.   I don't recall.
17 Q.   Were your office staff still taking
18 documents home after he requested that they stop?
19 A.   No.
20 Q.   No. 11. "Compare JFI Business Office forms
21 and guidelines to other ACS " Alabama College
22 System, I guess, is what that means, right?
23 A.   Uh-huh.

---

30 (Pages 117 to 120)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 121

1  Q.  "She didn't do it."
2      Your response: "My office and I are
3  constantly talking to other colleges regarding all
4  types of forms and procedures if we have
5  questions. I can supply the phone logs if
6  necessary."
7      Well, did you at any time obtain standard
8  forms or guidelines from other colleges and
9  compare them to J.F. Ingram's?
10 A.  Yes.
11 Q.  And do you have any documented --
12 documentary proof that you have done that?
13 A.  Yes.
14 Q.  What is that proof?
15 A.  We have records in our office. And like I
16 said, you can look at the phone records. And we
17 have forms from other colleges.
18 Q.  Well, I don't know what the phone records
19 would show me, other than that you called
20 somebody.
21 A.  It would show that we called.
22 Q.  It wouldn't tell me whether you were
23 comparing forms for guidelines or whether you were

Page 122

1  ordering a sandwich, would it?
2  A.  That's all I can tell you is that we did it.
3  Q.  Okay. Well, I need to know if there's proof
4  that you did it or if it's just your testimony.
5  A.  I have forms, some forms.
6  Q.  Okay. What kind of forms do you have?
7  A.  Various. We called about different things:
8  payroll, live work, bids large items. I've called
9  for numerous different things.
10 Q.  Do you know what forms he was looking for,
11 for you to compare?
12 A.  I don't know what he was looking for.
13 Q.  Did you ever try to clarify what he was
14 looking for?
15     (Witness and Mr. DEBARDELABEN
16 conversing.)
17     MR. DEBARDELABEN:  Just tell him.
18 Q.  You can just tell me what you're telling
19 your lawyer.
20 A.  I mean, I've told him that we did it. I've
21 shown him proof. And I don't know what else I can
22 do. I mean, he did not believe it, but it was
23 true. He doesn't -- didn't listen to me. That's

Page 123

1  all I can say.
2      But I can go get you some documents right
3  now, if you want to see them, and show you that
4  I've communicated with other colleges. I mean,
5  you know. they're my colleagues. I talk to people
6  every day over something I need to know how to do.
7  Q.  I will want that documentation. I don't
8  want you to get it right now, but --
9  A.  Okay. I will get it for you.
10 Q.  And these are documents reflecting what?
11 A.  Various things from other colleges. I don't
12 have a problem with people
13 Q.  Well, is there anything demonstrating that
14 you did what he asked here: Compare forms and
15 guidelines to other college systems?
16 A.  Yes.
17 Q.  And you think those documents are what? You
18 can produce them, whatever they are?
19 A.  Yes.
20 Q.  When did he request that you do this?
21 A.  You can probably see the minutes. It's one
22 of those things he brought up a lot. But he
23 wouldn't listen, is all I can say.

Page 124

1  Q.  Well, did you ever report to him in writing
2  specifically addressing his comparison request and
3  say, Dr. Chambers. I've compared forms and
4  guidelines from other college systems, including
5  the following?
6  A.  No, I didn't.
7  Q.  You never did that?
8  A.  No.
9  Q.  You said you weren't sure what he meant when
10 he was talking about comparing forms and
11 guidelines. You didn't know what he wanted; is
12 that right?
13 A.  I didn't know why it was necessary. I mean,
14 if it was, we did it; if it wasn't, we -- I mean,
15 he just randomly brought this up on numerous
16 occasions when there would be no reason for it.
17 Q.  Well, if he thinks a particular function is
18 not being carrying out with as much efficiency as
19 maybe is done at another college, that would be a
20 good reason for us to review the way they do it.
21 wouldn't it?
22 A.  That's his opinion.
23 Q.  No, ma'am; I'm asking for yours. I'm asking

31 (Pages 121 to 124)

Page 125

1  you; not his opinion but your opinion
2      If there's another college that is doing
3  something more efficiently or better than J F.
4  Ingram --
5  A    Who says that it's more efficient?  But if
6  they did, we would look at it
7  Q.    Okay.  Well, you could say what's more
8  efficient, couldn't you?
9  A.    If I did. I called them and got a copy of
10  it.
11  Q.    That's what I'm referring to  If there was
12  another system --
13  A    When we changed our purchase orders, I have
14  it. I can show you that.
15  Q.    Good.  Well, did you show Dr. Chambers those
16  things?
17  A.    I have showed him  I don't have a record of
18  it  I did not write it down and say, This is what
19  I'm giving you.
20  Q.    Do you think that would have been beneficial
21  to Dr. Chambers, in terms of satisfying him that
22  you had done what he requested?
23  A.    No. But I should have done it for my

Page 126

1  benefit.
2  Q.    Okay.  And the same thing with work orders,
3  No. 12  And would your response be the same that
4  we just --
5  A.    Yes  We have a lot of documentation on
6  that  I'll be glad to give it to you.
7  Q.    Very good.  No. 13 is, "Reactivate or change
8  the reimbursement time period for travel payment."
9      Do you know when he requested you to
10  reactivate or change the reimbursement time period
11  for travel payment?
12  A.    No. It would probably be in some minutes
13  You can probably find it.
14  Q.    Why would he ask you to do that?  What is
15  the purpose for that?
16  A.    I don't know.
17  Q.    Is there ever a purpose for reactivating or
18  changing the reimbursement time period for travel
19  payment?
20  A.    (No response.)
21  Q.    Let me ask it to you this way: You wrote in
22  No. 13, "The time period for travel checks has
23  been changed on more than one occasion."

Page 127

1      Why?  Why did you change the time period?
2  A    So that employees wouldn't be in our -- you
3  know, the state takes. like, six weeks, and we do
4  it very quickly  But we did set a limit of three
5  to ten days. seven to ten, something.  There's a
6  memorandum  If I didn't attach it, I can produce
7  it
8      Just so that we wouldn't have instructors or
9  employees going one day and calling us the next,
10  so that we could get the work done.  So it was for
11  our benefit as well as theirs.
12  Q.    The purpose was so that your office wouldn't
13  be tied up by constant requests for reimbursement?
14  A.    Right.
15  Q.    And that there would be a regular schedule
16  upon which reimbursements would be paid?
17  A    Right
18  Q.    And he wanted those reimbursement schedules
19  to be either reactivated or changed so that your
20  office would not be burdened with constant
21  requests; is that right?
22  A    I don't know why he wanted it.
23  Q.    He didn't tell you why he wanted it?

Page 128

1  A.    No.
2  Q.    Did you think it was a good idea to have a
3  good reimbursement time period for travel checks?
4  A    Yes.
5  Q.    Did you ever inform Dr. Chambers that you
6  had reactivated or changed the reimbursement time
7  period for travel checks?
8  A.    Yes.
9  Q.    When did you inform him of that?
10  A.    I don't remember.  But there were
11  memorandums that went out to everyone.  Each time
12  that happened, there were memorandums that went
13  out to all.
14  Q.    Okay.  Have you produced those in this
15  lawsuit?
16  A.    I don't remember if they -- I would think I
17  had put one in here.  If I didn't, I can provide
18  it.
19  Q.    Where are those memorandums kept?
20  A.    In our files in my office.
21  Q.    Some of this stuff I may be able to just get
22  from my client, since my client is president.
23  A    I don't remember if it's in there, but it's

32 (Pages 125 to 128)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

|  | Page 129 |
|---|---|
| 1 | not a problem. |
| 2 | Q.   You can put your hands on it and get it to |
| 3 | your lawyer? |
| 4 | A.   (Witness nods head.) |
| 5 | Q.   The funny thing about this kind of a lawsuit |
| 6 | is a lot of these documents are in our possession. |
| 7 | MR. DEBARDELABEN:  Is this a good time |
| 8 | for a break?  She needs one. |
| 9 | MR. CHRISTMAN:  Yes, sir. |
| 10 | A.   It's break time. |
| 11 | Q.   Yes, ma'am.  I understand. |
| 12 | MR. CHRISTMAN:  Let's take a break. |
| 13 | MR. DEBARDELABEN:  What time do you |
| 14 | want to break for lunch? |
| 15 | MR. CHRISTMAN:  Well, we might as well |
| 16 | go now.  It's twelve o'clock.  So how about come |
| 17 | back at one o'clock? |
| 18 | MR. DEBARDELABEN:  That's a good time. |
| 19 | MR. CHRISTMAN:  Let's get back on the |
| 20 | record and finish up with this line of inquiry, |
| 21 | and then we'll take a lunch break. |
| 22 | THE WITNESS:  Okay.  I just need a |
| 23 | restroom break. |

|  | Page 130 |
|---|---|
| 1 | (A brief recess was taken.) |
| 2 | (BY MR. CHRISTMAN) |
| 3 | Q.   Okay.  No. 14.  "Design a better procedure |
| 4 | for purchasing and receiving."  Says, "She didn't |
| 5 | do it." |
| 6 | No. 14 says, "The new purchasing procedure |
| 7 | implemented on May 3, 2004, covered this." |
| 8 | When did he request that you design a better |
| 9 | purchasing and receiving procedure? |
| 10 | A.   I don't remember. |
| 11 | Q.   Well, do you think that he could -- is it |
| 12 | your understanding that his directive to you was |
| 13 | to implement something that was revising this |
| 14 | May 3, 2004, procedure? |
| 15 | A.   I did not understand it that way.  I |
| 16 | understood it as this was already done and he was |
| 17 | still asking for it. |
| 18 | Q.   What did this May 2004 revision change? |
| 19 | A.   We would have to look at it.  I'm pretty |
| 20 | sure that it's when we changed purchase order |
| 21 | procedures and several things like that, who |
| 22 | processed them and how we did it.  But we can pull |
| 23 | it and view it. |

|  | Page 131 |
|---|---|
| 1 | Q.   Did you -- but you don't know when Dr. |
| 2 | Chambers requested that you design a better |
| 3 | procedure for purchasing and receiving? |
| 4 | A.   No.  You can probably find it in the |
| 5 | minutes. |
| 6 | Q.   You think he did that in a cabinet meeting? |
| 7 | A.   Probably there and in his office. |
| 8 | Q.   Did you do anything after May 3, 2004, to |
| 9 | discuss with Dr. Chambers a better procedure for |
| 10 | purchasing and receiving? |
| 11 | A.   I still say this he was only talking about |
| 12 | one.  I mean, I don't know of another procedure he |
| 13 | wanted, because this covered everything that we |
| 14 | needed to do. |
| 15 | Q.   Well, if he wanted this changed, did you do |
| 16 | anything to change this May 3, '04? |
| 17 | A.   No. |
| 18 | Q.   Did you know what Dr. Chambers wanted when |
| 19 | he asked you to design a better purchasing and |
| 20 | receiving procedure? |
| 21 | A.   No. |
| 22 | Q.   Did you do anything to clarify what he |
| 23 | wanted from you? |

|  | Page 132 |
|---|---|
| 1 | A.   I didn't know it until I got this from this |
| 2 | date.  I mean, this was done; I thought it was |
| 3 | handled.  And then I get an evaluation that says |
| 4 | this.  And I don't know what he's talking about |
| 5 | besides this.  There were many changes made here, |
| 6 | and that's all I know that he wanted. |
| 7 | Q.   So when you said "this," you're saying you |
| 8 | didn't know that he wanted anything improved until |
| 9 | you got your evaluation that said you didn't do |
| 10 | it, right? |
| 11 | A.   And I still say he's talking about this.  He |
| 12 | had never, before that, when I'm talking about in |
| 13 | the cabinet is when he would have been asking for |
| 14 | this. |
| 15 | I didn't know of this until I get this, that |
| 16 | there was something wrong with this.  I still |
| 17 | don't know that. |
| 18 | Q.   So you didn't know there was anything wrong |
| 19 | with the May 3, '04, procedure? |
| 20 | A.   No. |
| 21 | Q.   And you thought the May 3, '04, change |
| 22 | covered any of his expectations regarding |
| 23 | improving? |

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

Page 133

1   A.   Yes.
2   Q    That's what you thought?
3   A.   Yes.
4   Q    All right.  Did you ever attempt to clarify
5   what he wanted?
6   A.   Yes.
7   Q.   How did you attempt to clarify his
8   expectations or desires regarding a better
9   procedure?
10  A    I've asked him.  That's all I can recall.  I
11  mean, there's probably been much discussion on
12  this.  I mean, I don't know what he wanted.
13  Q.   Yes, ma'am.  I understand that you don't
14  know what he wanted.  My question is:  What did
15  you do to clarify it, when and how?
16  A    I don't recall.
17  Q.   Okay.  15.  "Regularly monitor live work
18  projects.  She didn't do it."
19       15 says, "I do regularly monitor live work
20  projects.  Some items I look at daily and some
21  items I monitor on a monthly basis.  This includes
22  all three campuses.  I can supply documentation on
23  this."

Page 134

1        How do you monitor the live work projects on
2   a daily basis?  What do you do daily?
3   A.   I can look it up on my computer, I have
4   reports, I run outstanding invoice logs.  I spend
5   a lot of time on it.  That's a large part of our
6   college operation.  I can give you pages of checks
7   on this.  I talk to instructors.   It's just part
8   of my daily routine.  I have plenty of
9   documentation that I could give you.
10  Q.   Would errors in the live work function of
11  the college demonstrate that maybe some components
12  of that function should be reviewed more
13  regularly?
14  A    What do you mean by errors?  We're not
15  talking about errors.
16  Q.   Well, if Dr. Chambers wanted you to
17  regularly monitor these projects because he
18  perceived there were errors associated with
19  managing live work -- for example, showing a
20  deficit or charging the customer only for the
21  materials used rather than the total materials
22  purchased and the college eating the scrap, those
23  type of errors -- if Dr. Chambers thought those

Page 135

1   types of errors were going on, wouldn't that
2   require the dean of business affairs to more
3   closely monitor the process?
4   A.   Yes. and I did.
5   Q.   Okay.  No. 16.  "Implement a timeline for
6   all personal items without proper paperwork, to be
7   removed from campus."
8        You said, "I implemented this by memorandum
9   with the Dean of the College back in July 23,
10  2002.  Any items on campus have an approved work
11  order."
12       When did he ask you to implement that
13  timeline?
14  A    I don't recall.  Probably back at this time.
15  Q.   You don't think he asked you to do that --
16  A    It's just not a true statement.  It was done
17  then.  And there's probably more memorandums to
18  that.  But that's not a true statement.  It was
19  done.
20  Q.   Is this July 23rd timeline for removing
21  personal items, is it reflected in the documents
22  you produced to me?
23  A.   Yes.

Page 136

1   Q.   I'll look for it.  I'm not sure that I've
2   seen it.
3        And is it your position that any items on
4   campus right this very minute have an approved
5   work order?
6   A.   They better.  There's numerous memorandums
7   that have gone out.  There's no excuse for it.
8   And I'll be glad to give you memorandums.
9   Q.   What controls are in place for you to know
10  if somebody is not telling you the truth about
11  what's all --
12  A.   I go out there and check it, when I do the
13  checks.  I mean, they could tell me.  But then I
14  go out there and check what's in the shops.
15  Q.   Okay.  And is it your position that
16  everything out there has a live work order?
17  A    Right now?
18  Q.   Right this very second.
19  A.   It should.  That's all I can say.
20  Q    And your control on that is that you
21  personally look at it?
22  A.   True.
23  Q.   How often do you go out there and look?

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 137

1   A.   The last time I was out there was about a
2   month ago.
3   Q.   Okay. And how often do you go out there and
4   look? That was the last time you went. But how
5   often do you go? Do you go on a regular basis?
6   A.   Out to the shops, not as regular as checking
7   the paperwork. The Dean of Instruction is also
8   responsible for that too.
9   Q.   Okay. We'll talk about that in just a
10  moment. But how often do you go physically check?
11  A.   It varies. I don't know.
12  Q.   Do you have a protocol?
13  A.   I don't do it monthly. It's not really
14  necessary monthly.
15  Q.   How do you know when to do it? Do you just
16  think of it one day and go?
17  A.   When I do my checks on it, whether I do it
18  daily or if I -- if I see that maybe there's a lot
19  in the shop or something. I mean, I've done the
20  job for 20 years. I know when I should do it, is
21  all I can say. But it is monitored.
22  Q.   Okay.
23  A.   Sometimes I send my employees out. But it

Page 138

1   is monitored.
2   Q.   How often do you send out your employees?
3   A.   It's not a set time.
4   Q.   Okay.
5   A.   We do it as necessary.
6   Q.   How do you know if it's necessary, unless
7   you --
8   A.   I make that decision.
9   Q.   Okay. If today I was to go out there and
10  there's a boat out there that doesn't have a live
11  purchase order on it, and you don't know anything
12  about it because you haven't checked, what --
13  A.   Then that shop should be reprimanded.
14  Q.   And my question to you is: What control do
15  you have in place, other than whenever it comes to
16  you, that you go check or you send somebody from
17  your office to check? Is there a control in place
18  where this is regularly monitored? That's what
19  I'm driving at, I guess.
20  A.   Yes.
21  Q.   What is the control?
22  A.   I mean, they have to come in the front
23  office. They have to use -- there's memorandums

Page 139

1   that you cannot have that. I don't know what
2   you're asking for.
3        THE WITNESS: I don't know what he's
4   asking for. I mean. I have controls. You put out
5   memorandums.
6   Q.   You can just tell me, ma'am.
7   A.   I mean, they would have to be reprimanded if
8   they were found with that. I cannot reprimand. I
9   can only recommend. I have recommended many times
10  when that did happen for them to be reprimanded.
11  Q.   You understand that in a college. or a
12  business of any kind, people sometimes break the
13  rules. You understand that, don't you?
14  A.   Yes, I do.
15  Q.   And you understand that you can't make
16  everybody follow the rules every minute of the
17  day. right?
18  A.   I do.
19  Q.   But you also understand that as a supervisor
20  you can and are responsible to have in place
21  certain controls to catch mistakes. errors, or
22  intentional misconduct? That's the job of the
23  supervisor, to have something in place to where we

Page 140

1   check these things, to make sure that people don't
2   mess up and break the rules. You understand that?
3   A.   Yes.
4   Q.   What you continue to tell me is that there
5   are controls in place and that you do check. And
6   what I'm driving at here is: What controls are in
7   place? So far all I've heard from you is that you
8   occasionally check or you send somebody to check
9   on an undetermined timetable.
10       Is there any other control that you can
11  point me to, to assure that live work is being
12  properly processed?
13  A.   We have guards at the gate. Everyone that
14  comes in has to come to the front office. They
15  can't just go back to the shop.
16       I don't know what you're asking and I don't
17  have any more to say about that. I know it's
18  being done. I don't know what else to say.
19  Q.   How long have there been guards at the gate?
20  A.   Forever. 1965.
21  Q.   Well, since the guards came, which is
22  probably when it opened, there have on occasions
23  been vehicles. boats, personal items that were

35 (Pages 137 to 140)

Page 141

1  live work that weren't properly processed on the
2  campus. That's happened, hasn't it?
3  A.  Yes.
4  Q.    It's happened more than once, hasn't it?
5  A.  Yes.
6  Q.    So the fact that the guards are at the gate
7  doesn't keep it from happening, isn't that true,
8  because the guards have always been at the gate?
9  A.  I guess.
10  Q.    Okay. So just a wrap-up question: Are
11  there any other controls that you can point me to
12  that --
13  A.    There are controls. I would just have to
14  pull them. I cannot tell you what you want right
15  now, but I have controls.
16  Q.    Okay. Well, this is my chance to depose you
17  is why I'm kind of pressing you on it.
18  A.    All I'm saying is if it's done, they would
19  have to be reprimanded by the president. I would
20  have to recommend it, which I've done before; it's
21  never happened.
22  Q.    Yes, ma'am.
23  A.    And unless that's done, it's probably never

Page 142

1  going to be stopped. But I have memorandum after
2  memorandum after memorandum. We check, we find
3  them, we report them. That's all I can do.
4  Q.    Just to make sure I understand. When you
5  say "we check," the way you check is you
6  intermittently or you send someone intermittently
7  to check, but not on a timetable? You don't know
8  how often; is that right?
9  A.    Periodically through the year.
10  Q.    Periodically through the year. Very good.
11  No. 17. "Report on the payment status of all
12  accounts with vendors. She didn't do it."
13      17. "I have provided this on more than one
14  occasion. I can supply documentation on this."
15      You have provided reports on the payment
16  status on all accounts with vendors to Dr.
17  Chambers?
18        THE WITNESS: Can I talk to you?
19        MR. DEBARDELABEN: Yeah, go ahead.
20        (An off-the-record discussion
21        was held.)
22  A.  I mean, we have just an unreal amount of
23  vendors because we do a lot of labor. I've given

Page 143

1  him reports; I've given him vendor files. I don't
2  know what he wants. It's unnecessary. It's a
3  ridiculous thing to ask me to provide. It's not
4  necessary. I've given it to him, but I think it's
5  unnecessary. That's my job; it's not -- I mean,
6  I've given it to him and he said, This isn't what
7  I want. Because it's this big. It's a status.
8  He didn't want it. I don't know what he wants.
9  Q.    What did you give to him that was this big?
10  A.    It's a report, a vendor report. It would
11  show what he wants to see. I don't know what he
12  wants to see.
13  Q.    Okay. What have you done to clarify what he
14  wants to see?
15  A.    He can't see what he wants to see. It's an
16  unreal amount of vendors we pay in a month. If I
17  gave him a statement on all that, he wouldn't have
18  time to do his daily duties. He's got to count on
19  us to do that.
20      But I have given him those reports, but he
21  said that wasn't what he wanted. But it was the
22  report that he asked for.
23  Q.    It was a payment status on all of your

Page 144

1  vendors?
2  A.    Yes. It would show.
3  Q.    Well, just suppose, for the sake of this
4  question, that what he wants to know is what
5  accounts with vendors are late and which are paid
6  up.
7      Let's just assume for this question he wants
8  to know what accounts that we have with vendors
9  that are late versus those that are paid up.
10  Because he's concerned, for the sake of this
11  question, that we've got late accounts out there,
12  and it's illegal to pay a late fee as the State of
13  Alabama. Let's say that's what he wants.
14      Have you ever provided to him any report
15  indicating the payment status on all of our vendor
16  accounts? Have you ever provided that kind of
17  report, with those qualifications in my question?
18  A.    I'm sure I have. I don't recall it. But
19  I've given him these things he's asked for. I
20  don't have a record of it.
21  Q.    Well, he says you didn't.
22  A.    I know he said I didn't. That's fine. I
23  said I did.

36 (Pages 141 to 144)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 145

1  Q.  Well, it's not really fine if he thinks you
2  didn't do it.
3  A.  He doesn't know what he's looking at, is all
4  I can say.
5  Q.  Okay.  Well, what have you done --
6  A.  I mean, I've shown him the whole run for the month.  That would
7  show him the whole run for the month.  That would
8  show it.  It's got a statement attached.  We've
9  given him that.
10 Q.  Would you agree with me that it's important
11 for you to comply with the president's directives?
12 A.  Yes.
13 Q.  Would you agree with me that it's part of
14 your job description to comply with the
15 president's directives?
16 A.  Yes.
17 Q.  Would you agree with me that it's impossible
18 for you to do that if you don't know what he
19 wants?
20 A.  Yes.
21 Q.  Here's my concern here, and I just want to
22 understand your position on this:  If he wants to
23 know what the payment status is for our vendor,

Page 146

1  Home Depot, and all the others. and you don't know
2  what he wants, would you agree with me that it's
3  incumbent upon you to get clarification so that
4  you can abide by his directive?
5  A.  Yes.  I've tried many times.
6  Q.  How have you tried to get clarification?
7  A.  I've asked him what he wanted.  He doesn't
8  make himself clear as what he wants.  I've asked
9  him exactly what.  I've taken him things, and it
10 wasn't what he wants.  I don't know what he wants.
11    There's only a certain amount of reports
12 that can give him that.  If he turns down what I
13 give him, that's all I can do.
14 Q.  Well, did you ever create a report -- just
15 create one for him?
16 A.  I don't recall.  I probably have, but I
17 don't recall right now.  I would have to look in
18 my files.
19 Q.  If you have such a report, could you produce
20 it to your lawyer?
21 A.  If I have it, I will.
22 Q.  I'm going to ask for it.  No. 18.  "Provide
23 cross training for her staff.  Status pending."

Page 147

1     So he doesn't say that you didn't do this
2  one; he says, I guess, it's pending.
3     What is your understanding of his request
4  that you provide cross training?
5  A.  I don't know.  Because I have told him and
6  they are and we have staff minutes.  He just
7  doesn't hear it, is all I can say.  We are very
8  cross trained and can demonstrate it and give you
9  minutes.
10 Q.  Do you have any document where you have
11 written Dr. Chambers advising him that your staff
12 is fully cross trained, before this?
13 A.  I don't recall.  It probably could have been
14 discussed in a cabinet meeting.
15 Q.  All right.  Almost finished here.  We're
16 going to go to the bottom of this page, this last
17 paragraph.
18    It says, "In order for the Business Office
19 to function as it should, the Dean must make an
20 effort to improve her leadership and management
21 style."
22    Do you agree that there are some areas of
23 improvement for your leadership and management

Page 148

1  style?
2  A.  No.
3  Q.  You don't agree with that?
4  A.  No.
5  Q.  Do you think that's just Dr. Chambers'
6  opinion?
7  A.  Yes.
8  Q.  Specifically with respect to leadership?
9  A.  Ask the question again.
10 Q.  It was just the same question; I'm just
11 breaking it down.  Instead of it being a compound
12 question, we're going to address them one at a
13 time.
14 A.  I disagree with both of them.
15 Q.  You don't think you need any improvement in
16 leadership; is that right?
17 A.  Right.
18 Q.  And you don't need any improvement on
19 management style?
20 A.  Right.
21 Q.  It says, "She must refrain from worrying
22 about whether she will be liked or accepted by the
23 people who continues to violate policies..."

37 (Pages 145 to 148)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 149

1    Do you agree with that?
2  A.  How does he know what I worry about?
3  Q.  Do you agree that you should refrain from
4  worrying about those things?
5  A   I never said I worried about it.
6  Q.  Do you worry about it?
7  A.  No.
8  Q    So you don't agree with his assessment that
9  you are worried about being accepted by people who
10 continue to violate policies; is that right?
11 A.   That I don't agree that I'm --
12 Q.  Let's try it again.
13 A.  Yeah. I don't agree that I'm worried about
14 that.
15 Q.  Okay. And it says, ". and spend more time
16 on making sure the College policies are followed
17 by customers and employees at all times."
18    Do you agree that you should spend more time
19 on making sure the College policies are followed
20 by customers and employees at all times?
21 A.  I do, and I do that. I don't agree that I'm
22 not doing that.
23 Q.  Well, do you think you should spend more

Page 150

1  time doing it?
2  A   That can always -- yeah.
3  Q.  Okay. Well, there we go. We have one where
4  you agree. You should spend more time. But your
5  contention is you're already doing that?
6  A.  Yes. I mean, it's something that could
7  always, you know -- I guess you could never spend
8  too much time. I'm not saying that I'm not
9  spending time, but I will continue spending time.
10 Q.  Do you intend to do anything different than
11 what you're doing right now, based upon that?
12    MR. CHRISTMAN: Let me withdraw that
13 question.
14 Q.  Did you intend to do anything different at
15 the time you received this evaluation regarding
16 spending more time to make sure the college
17 policies are followed?
18 A.  I mean, that's just something that I do
19 always. I mean, I will continue to do that.
20 Q.  Did you intend to do anything differently
21 than you had already been doing it when you
22 received this?
23 A  No.

Page 151

1  Q.  All right. "She must seek ways to improve
2  in her oral communication."
3    Do you agree that you need to improve on
4  your oral communication?
5  A.  No.
6  Q.  "She must acknowledge that she has
7  weaknesses. and that recognizing them is the first
8  step toward improvement."
9    Do you acknowledge that you have weaknesses?
10 A   If I do, I don't agree with what he's
11 saying.
12 Q.  Well, you haven't acknowledged one yet
13 A.  Yeah, not from him. If I have a good
14 source. I would.
15 Q   Okay. Well, who is a good source?
16 A.  Someone that, you know --
17 Q.  How about the examiner of public accounts?
18 Is that a good source?
19 A   Yes.
20 Q.  How about the president's or the
21 chancellor's review team? Is that a good source?
22 A.  No.
23 Q.  Debbie Dahl is not a good source?

Page 152

1  A.  Could have been. But it depends what -- I
2  don't think we want to go there.
3  Q.  Oh, we're going there. We're going to talk
4  all about that report.
5  A.  Okay.
6  Q.  But my question to you is: Do you think
7  Debbie Dahl is a good source?
8  A.  Yes.
9  Q.  Do you think that the review team that she
10 headed up, at the chancellor's direction to review
11 the business office, was a good source?
12 A.  I don't know.
13 Q.  Why?
14 A.  I think they were handpicked.
15 Q.  By whom?
16 A.  I don't know. Maybe a combination of the
17 chancellor and the president. I don't know.
18 Q.  Why do you think that? Are you just
19 speculating, or do you have any reason --
20 A.  I don't know.
21 Q.  Who on the chancellor's review team, which
22 was headed up by Debbie Dahl, do you believe is
23 not a good source?

38 (Pages 149 to 152)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

## Page 153

1   A.   I don't have any comment.
2   Q.   I understand, ma'am, this can be
3   uncomfortable and this can be a frustrating
4   process.  I do understand that.
5       But you have filed a lawsuit against the
6   president of this college and you've called him a
7   racist and you've called him a gender bigot.  And
8   you have to prove that those things are true and
9   you have to prove that his claims against you that
10  you are not doing your job well in places are pure
11  pretext, and that real reason he says what he says
12  is because he's a racist and a gender bigot.  You
13  have to prove that.
14      And what I want to understand from you today
15  is:  Why do you believe that the chancellor's
16  review team is not a good source?
17  A.   It wasn't necessary.  He went to the
18  chancellor.  And why was that necessary for them
19  to come out there?  It wasn't necessary.  There
20  was no reason for him to go down there.
21  Q.   Well, ma'am --
22  A.   And Dr. Johnson told me it would help me.
23  He said he was doing that to help us.  It did not.

## Page 154

1   Q.   Well, maybe the reason it didn't is because
2   it was not a terribly favorable review, and many
3   of the same weaknesses that were described by Dr.
4   Chambers was described by the review team; isn't
5   that right?
6   A.   And he met behind doors with them.  So I
7   wonder why that was.  I mean, I can't say that
8   it's a valid -- there was too many things I didn't
9   know about that I can say it's valid.  I disagree
10  with it.
11  Q.   Okay.  I understand you disagree with it.
12  Now I want to come back to my question.  And if
13  the answer is, "I don't know," that's okay.
14  That's fair.
15      But you made a statement.  You said they are
16  not a good source.  The chancellor's review team
17  is not a good source.  Well, what about the
18  chancellor's review team makes them a bad source?
19  A.   They were handpicked by him.
20  Q.   By who?
21  A.   By the chancellor, I guess.  I don't know
22  who picked them.  But I don't know if they're good
23  sources or not.

## Page 155

1   Q.   Well, you said they weren't.
2   A.   I know.  That's what I'm saying.
3   Q.   But you don't know now?
4   A.   I don't know who picked them.
5   Q.   Okay.  Well, what if the chancellor picked
6   them.  I don't know who picked them either.  But
7   let's say the chancellor did.
8       Are they a good source if the chancellor
9   picked them?
10  A.   I don't feel real good about the
11  chancellor's judgment right now.  I don't know if
12  you know what's going on.
13  Q.   I know all about what's going on.
14  A.   And I think all that proves some of that.  I
15  mean, I don't really know about his judgment on
16  that.
17  Q.   Well, do you think the chancellor was after
18  you because you're a woman?
19  A.   No.
20  Q.   Do you think he was after you because you're
21  white?
22  A.   I don't know what the chancellor's after.  I
23  don't know what he thinks.  How would I know?

## Page 156

1   Q.   I'm just exploring.  If you think his review
2   team is a bad source, I just want to know why.
3   That's why I'm asking these questions.
4   A.   I don't know why.
5   Q.   Okay.  Because we're going to talk about
6   their report; and their report is not favorable
7   for you, is it?
8   A.   No, I guess it isn't.
9   Q.   Okay.  So back to the question that kind of
10  spawned that little rabbit trail:  "She must
11  acknowledge that she has weaknesses and that
12  recognizing them is the first step toward
13  improvement."
14      Do you agree with that statement that you
15  must acknowledge that you have weaknesses?
16  A.   If I have them, I must acknowledge them.
17  Q.   But you just don't agree that you have them?
18  A.   I don't agree with this document.
19  Q.   Yes, ma'am.  I think that's the remainder of
20  all the admonishments or assessments.  The rest of
21  it is what he expects and what, if it is
22  determined by the dean and/or the president that
23  corrective measures cannot be identified or

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

| Page 157 | |
|---|---|
| 1 | developed, the president will take appropriate |
| 2 | action. |
| 3 | So the rest of it doesn't really assess your |
| 4 | performance. So I think we're done with this |
| 5 | document for now, and it would be a good time to |
| 6 | break for lunch. |
| 7 | MR. CHRISTMAN: Do you agree with that, |
| 8 | Jim? |
| 9 | MR. DEBARDELABEN: I think it would be |
| 10 | an excellent time to break for lunch. |
| 11 | MR. CHRISTMAN: Very good. Let's |
| 12 | break. |
| 13 | MR. DEBARDELABEN: I've got 12:31. |
| 14 | About 1:30 or so? |
| 15 | MR. CHRISTMAN: Yes, sir. |
| 16 | (A lunch recess was taken.) |
| 17 | (BY MR. CHRISTMAN) |
| 18 | Q. What I'd like to get into now, Ms. Greene, |
| 19 | is some of the specifics about your lawsuit. And |
| 20 | we'll also cover some other items such as the |
| 21 | chancellor's team review and report, that kind of |
| 22 | thing. |
| 23 | Before we move on to your EEOC Complaint, I |

| Page 158 | |
|---|---|
| 1 | do want to make as part of the record the job |
| 2 | description of your office, the Dean of Fiscal |
| 3 | Affairs. And there are a few versions of it in |
| 4 | the file. And if you'll just look at these |
| 5 | descriptions of your job as they kind of developed |
| 6 | through time, and tell me if you've seen that |
| 7 | before or if it rings a bell. |
| 8 | (The witness examines the |
| 9 | document.) |
| 10 | A. I know I've seen this one and this old one. |
| 11 | I just don't know about that one. |
| 12 | Q. Okay. Well, let's talk about it on the |
| 13 | record here so we can figure out what you're |
| 14 | saying here. |
| 15 | You're saying you think you've seen this |
| 16 | January 1990 job description that was apparently |
| 17 | promulgated or prepared by the former president of |
| 18 | the college, Mr. Gregg, true? |
| 19 | A. True. |
| 20 | Q. And then you have one in your hand there |
| 21 | that was also signed by Mr. Gregg that you are not |
| 22 | sure if you have seen that one? |
| 23 | A. This is Greg Wright. He was the personnel |

| Page 159 | |
|---|---|
| 1 | director. But this was the president and this was |
| 2 | the personnel. But I don't know if I've seen |
| 3 | that. Sometimes they just put things in there to |
| 4 | meet the paperwork. I'm just not sure if I've |
| 5 | seen it. |
| 6 | Q. That wasn't in place when Dr. Chambers was |
| 7 | the president, was it? He didn't prepare it? |
| 8 | A. I don't know. Well, it says -- well, let's |
| 9 | see. No, apparently not. But they were there at |
| 10 | the same time, Greg Wright and Mr. Chambers. |
| 11 | But that says that Gregg was there at the |
| 12 | time -- Murry Gregg. |
| 13 | Q. Right, Murry Gregg. So the former president |
| 14 | was the president that noted this job description |
| 15 | that you're not sure if you've seen or not? |
| 16 | A. Yeah, yeah. |
| 17 | Q. But you may have seen it, you just don't |
| 18 | recall? |
| 19 | A. I don't recall. |
| 20 | Q. And then this more recent job description, |
| 21 | you have seen these? |
| 22 | A. Yeah. Well, this is one similar to that. |
| 23 | These two I don't know if I've seen them, but I've |

| Page 160 | |
|---|---|
| 1 | seen this one and the recent one. |
| 2 | Q. Okay. Let's just start with the more recent |
| 3 | one. |
| 4 | Do you believe this accurately describes the |
| 5 | job that you currently have at Ingram? |
| 6 | A. Yes. |
| 7 | Q. Where did these come from? |
| 8 | A. Personnel department. |
| 9 | Q. And they, I guess, update them, revise them |
| 10 | from time to time? |
| 11 | A. I guess. |
| 12 | Q. You are the highest ranking school official |
| 13 | with respect to fiscal affairs; isn't that true? |
| 14 | A. Yes. |
| 15 | Q. And in terms of the business office, there's |
| 16 | really nobody higher than you, right? |
| 17 | A. Right. |
| 18 | Q. And there's really not anybody like you, in |
| 19 | terms of somebody that has your same rank in the |
| 20 | business office, right? |
| 21 | A. Right. |
| 22 | Q. You're the boss? |
| 23 | A. Yes. |

40 (Pages 157 to 160)

## Page 161

1  Q.  And there's no one else at the college that
2  performs the same functions that you perform as
3  the Dean of Fiscal Affairs?
4  A.  No.  There may be some that are similar,
5  overlap, but no they wouldn't do the strictly
6  financial ones.
7  Q.  Yes.  Anybody that does similar functions
8  mostly works for you, right?
9  A.  Yes.  Or, you know, like the Dean of
10  Instruction and I could have a few of the same --
11  I don't really negotiate with industry.  But, you
12  know, some of those things could overlap between
13  maybe me and one of the other deans.
14  Q.  Right.  Maybe an item or two?
15  A.  Right.
16  Q.  But in terms of primary job function, really
17  not comparable, are they?
18  A.  Right.
19  Q.  Is that true?
20  A.  That's true.
21  Q.  Ingram is a school that is unique, at least
22  in one respect, in that it is comprised completely
23  of an inmate student body; isn't that true?

## Page 162

1  A.  True.
2  Q.  The other two-year colleges are not
3  comprised of totally inmates; is that right?
4  A.  Right.
5  Q.  Is that right?
6  A.  Yes.
7  MR. DEBARDELABEN:  Atmore?
8  THE WITNESS:  Not totally.  There's
9  probably five other colleges that have both, but
10  we're the only 100 percent.
11  Q.  Other colleges deal with -- their business
12  office deals with a number of issues that Ingram
13  does not have to deal with because of its inmate
14  population; is that not true?
15  A.  True.
16  Q.  Describe some of those other items.  What
17  are some of the things that other institutions
18  have to deal with through the business office that
19  are not part of your responsibilities because of
20  the inmate population?
21  MR. DEBARDELABEN:  We would object.  I
22  mean, if she knows.  I mean, she's never worked
23  there.

## Page 163

1  MR. CHRISTMAN:  Well, she just said she
2  knew, so I'm just following up.
3  A.  Student tuition payments.  Even though we do
4  have very few that have to pay their way if they
5  take a second course of study.  But I don't have
6  to deal with student problems anyway, especially
7  with inmates.  Say student tuition payments.
8  Q.  Student tuition you don't have to deal with.
9  You don't have to deal with student housing,
10  right?
11  A.  Right.
12  Q.  There's no housing requirements.  What about
13  on the campus, cafeterias and food service and all
14  that?
15  A.  No.
16  Q.  You don't have to deal with any of that, do
17  you?
18  A.  No.
19  Q.  Books and all of that, do you have to
20  process any of that?
21  A.  No.
22  Q.  Don't have to process any of that.  So there
23  are number of items that Ingram's student

## Page 164

1  population just sort of eliminate from
2  consideration for the business office; isn't that
3  right?
4  A.  Yes.
5  Q.  And in many of the other two-year colleges,
6  the business office has to manage these other
7  functionalities in addition to all of the things
8  that you have to manage; isn't that true?
9  A.  Yes.
10  Q.  Okay.  I'm going to make your job
11  descriptions Exhibit 5.
12  (Defendants' Exhibit No. 5 was
13  marked for identification and a
14  copy of the same is attached
15  hereto.)
16  Q.  All right.  Exhibit 6 will be the EEOC
17  Charge of Discrimination that you filed.
18  (Defendants' Exhibit No. 6 was
19  marked for identification and a
20  copy of the same is attached
21  hereto.)
22  Q.  Take a quick look at that and make sure that
23  that is your EEOC Charge.

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 165

1    THE WITNESS: I don't think that's
2  mine.
3    MR. DEBARDELABEN: No, that's not
4  yours.
5    MR. CHRISTMAN: Which part are we
6  talking about?
7    MR. DEBARDELABEN: The March 8, 2006.
8  fax to Doug Chambers from Joan Davis
9    MR. CHRISTMAN: Okay. Anything else in
10  there that you didn't attach?
11    MR. DEBARDELABEN: I think just that
12  last page.
13  Q.   All right. Other than that, does this look
14  like your Charge of Discrimination?
15  A.   Yes.
16    MR. CHRISTMAN: And for the record,
17  Jim, this is not a copy you produced to me. I
18  have requested a copy from you, to kind of avoid
19  any Is this the whole thing or not the whole
20  thing.
21    MR. DEBARDELABEN: That appears to be
22  the whole thing. And I thought we got that to
23  you. I know you called me. And I've been going

Page 166

1  back and forth, and I just --
2    MR. CHRISTMAN: I'm happy to substitute
3  this for whatever you give me.
4    MR. DEBARDELABEN: That looks like the
5  same thing I have.
6    MR. CHRISTMAN: Okay.
7  Q.   This Charge of Discrimination appears to
8  have been filed by you on February 23, 2006; is
9  that correct?
10  A.   Yes.
11  Q.   All right. And you claimed to the EEOC at
12  that time that you were being discriminated based
13  upon your race and your sex; is that correct?
14  A.   Yes.
15  Q.   Okay. Your race being Caucasian?
16  A.   Yes.
17  Q.   And your gender being female?
18  A.   Yes.
19  Q.   The second page here --
20    THE WITNESS: This is checked too.
21    MR. DEBARDELABEN: Yeah, right.
22    MR. CHRISTMAN: I'm sorry?
23    MR. DEBARDELABEN: She just noted

Page 167

1  hostile environment was checked.
2  Q.   So your specific allegation is hostile
3  environment; is that right?
4  A.   (No response.)
5  Q.   Is that what you were saying, ma'am?
6    MR. DEBARDELABEN: What she just
7  whispered to me was that "Other," the hostile work
8  environment.
9  Q.   Okay. Well what was the importance of your
10  putting that there and pointing it out to your
11  lawyer just now?
12  A.   There's three things there. I would think
13  they would all need to be listed.
14  Q.   Okay. And they are retaliation?
15  A.   No. Race, sex, and hostile environment
16  That was the charge.
17  Q.   Okay. I see what you're saying. kind of.
18  You're claiming that Dr. Chambers and James Wilson
19  discriminated against you, right?
20  A.   Yes.
21  Q.   Based upon?
22  A.   Those three factors.
23  Q.   How did they discriminate against you based

Page 168

1  upon a hostile environment?
2  A.   The legal --
3  Q.   I understand what you're saying. You're
4  saying it's because you're white and because
5  you're a female; is that right?
6  A.   Yes.
7  Q.   Not because of your religion?
8  A.   No.
9  Q.   Not because of your national origin?
10  A.   No.
11  Q.   Not because you have a disability?
12  A.   No.
13  Q.   And not because of your age?
14  A.   No.
15  Q.   Not because of the color of your skin?
16  A.   It's not checked.
17  Q.   Okay. Race and gender is what --
18  A.   Yes.
19  Q.   All right. On the second page here, you
20  said to the EEOC that by all accounts of
21  measurements used to determine your effectiveness,
22  you have done very well in your job; is that
23  right?

42 (Pages 165 to 168)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 169

1  A   Yes.
2  Q   What were you referring to when you said by
3  all accounts of measurements used to determine
4  your effectiveness?
5  A   I'm referring to audit reports. And we've
6  had -- you know, we haven't had bad audit reports
7  that's been stated.
8     I'm referring to operating funds. We've
9  always had very good fund balances. It's improved
10 every year that I've been there. So I've made
11 sure that the school operates as it should on that
12 factor.
13    And my other thing. I've based it on my
14 evaluations. And I've had one negative evaluation
15 in 20 years. At that time it may have been 18.
16 So I was basing it on overall, the big picture.
17 Q   Okay. And we'll look at some of those
18 things.
19 A   That's what I'm talking about there.
20 Q   You would agree with me that there have been
21 findings by the auditors associated with the
22 business office, right?
23 A   Well, with the college.

Page 170

1  Q   For which you are directly responsible?
2  A   There's none of those that I am totally
3  responsible for, is my point. There are other
4  people that can affect that.
5     If I was totally responsible for something,
6  I would -- I may be 80 percent, but there is
7  interference that's caused those audit findings.
8  There's not one that I'm --
9  Q   We'll talk more concrete in a minute when we
10 go through the audits.
11 A   Okay.
12 Q   You said that the attacks, under the guise
13 of professional problems, are simply a personal
14 attack on you and other women at Ingram.
15    What other women at Ingram are you talking
16 about?
17 A   We'll get into it. Mainly, a lot in my
18 department.
19 Q   Do you know Ms. Perryman?
20 A   Yes.
21 Q   What is her race and gender?
22 A   White female.
23 Q   Do you believe that Dr. Chambers has

Page 171

1  attacked Ms. Perryman?
2  A   No.
3  Q   Do you know Julie Wood?
4  A   I do.
5  Q   What is her function at the college?
6  A   She's the president's secretary.
7  Q   Okay. What is her race and gender?
8  A   White female.
9  Q   What is Ms. Perryman's job?
10 A   Ms. Perryman no longer works for us.
11 Q   I'm sorry. You're right. What was her job
12 at the time that she worked for the college?
13 A   She was over the special education
14 department. And then she lost that job, and then
15 a position was established for her until she
16 retired. Created. A dean's position that we've
17 never had was created for Ms. Perryman.
18 Q   At your college, right?
19 A   And, you know, I'm not Ms. Perryman, so I
20 don't know exactly what she did to her. So I can
21 only really answer for myself.
22 Q   Well, but you say here -- you're talking for
23 somebody other than yourself here. You're

Page 172

1  saying attacks on me and other women. So, I --
2  A   I don't know about Ms. Perryman.
3  Q   What other women?
4  A   In my department, I know. They're not
5  treated fairly and haven't been given promotions.
6  We have a saying that everything is blamed on the
7  business office. If there's any problem, it's
8  blamed on the business office. I mean, there just
9  always seems to be problems.
10 Q   What other women?
11 A   The women in my office.
12 Q   I'm asking you the names.
13 A   Julie Givens, Beth White, Kerri Conger,
14 Patti Graves, Jeanna Givens. That's all in my
15 office.
16 Q   Julie Givens is with us today?
17 A   Uh-huh.
18 Q   She is also a plaintiff in this lawsuit, is
19 she not?
20 A   Uh-huh.
21 Q   Who is Beth White?
22 A   Her daughter.
23 Q   Her daughter. Who is Jeanna Givens?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 173

1  A.  Her sister-in-law.
2  Q.  Sister-in-law.  And Ms. Conger, who is she?
3  A.  Kerri Conger.
4  Q.  What position does she hold?
5  A.  She's accounts payable clerk.
6  Q.  Patti Graves is the senior account?
7  A.  Yes.  I think her title actually is
8  accountant.
9  Q.  Okay.  Who else?  I'm trying to remember who
10  else you said.
11  A.  Jeanna Givens is business office assistant.
12  Q.  Okay.  And Beth?
13  A.  Beth is receptionist/clerk.
14  Q.  And you believe that Dr. Chambers has
15  attacked these people that you just named?
16  A.  I think through attacking me, I mean, there
17  have been problems for them.
18  Q.  I see.  Then you said, I dare say a man
19  would not have been subjected to these kinds of
20  attacks, for they would have surely taken matters
21  into their own hands if they had.
22      Is it your testimony here today that Dr.
23  Chambers has never confronted men in a very vocal

Page 174

1  and aggressive manner for their performance?  Is
2  that your testimony?
3  A.  I don't know what he's done to the men.
4  Q.  Well, has he ever gotten into a shouting
5  match with Mr. Huffstutler?
6  A.  Yes.
7  Q.  And didn't Mr. Huffstutler come out of that
8  meeting, one particular meeting, very, very angry?
9  A.  I don't know what meeting you're talking
10  about.
11  Q.  Well, didn't Mr. Huffstutler break his hand
12  punching a wall?
13  A.  I don't think that was a meeting.  I don't
14  -- I don't think that was a meeting.  I have heard
15  that, but I wasn't in attendance when that
16  happened.
17  Q.  Okay.  But you have heard that there was a
18  confrontation with Mr. Huffstutler?
19  A.  Yes.
20  Q.  And Dr. Chambers?
21  A.  I've heard that.
22  Q.  And it was an elevated one?
23  A.  I've heard that.

Page 175

1  Q.  And Mr. Huffstutler punched the wall and
2  broke his hand?  You were aware that his hand was
3  broken?
4  A.  I heard that.  I don't know that it was
5  broken.  I never saw a bandage.
6  Q.  Okay.  But you heard that?
7  A.  I heard it.
8  Q.  So you are not contending here today that
9  Dr. Chambers does not address aggressively the men
10  at Ingram, are you?
11  A.  I don't know what that was about.  I don't
12  know about the men.  I know how he addresses me
13  and other women.
14  Q.  Okay.  But you don't know whether he treats
15  the men differently?
16  A.  No, I don't.
17  Q.  Okay.  Fair enough.  You are aware that Dr.
18  Chambers and James Wilson have had heated
19  conversations.  You are aware of that, aren't you?
20  A.  I don't know.
21  Q.  Well, haven't you been in the room before
22  when James Wilson and Dr. Chambers --
23  A.  What I saw it was just -- I wouldn't say

Page 176

1  that was really heated.  I don't think I've ever
2  heard him holler at Mr. Wilson.
3  Q.  Have you ever heard Mr. Wilson bang his
4  first on the table at Dr. Chambers?
5  A.  No.
6  Q.  You've never heard that?
7  A.  No.
8  Q.  Have you ever heard anybody tell you that?
9  A.  No.
10  Q.  Do you know whether that's happened?
11  A.  I don't know.
12  Q.  Do you have any evidence that that's never
13  happened?
14  A.  No.
15  Q.  And there are white females at Ingram that
16  have not received any aggressive treatment, to
17  your knowledge, such as Ms. Perryman, by Dr.
18  Chambers; isn't that true?
19  A.  I don't know.  I mean, I can really just
20  speak for myself; and I know what happens to women
21  in my office.  I can't speak for everyone.
22      I have been in meetings where it was a lot
23  of women that were being talked to about clothing

44 (Pages 173 to 176)

Page 177

1  and things like that, but that's as far as I can
2  go on that.
3  Q.  Well, let's talk about clothing. Do you
4  believe that Dr. Chambers' admonishments to you
5  and memos to female employees at the college about
6  clothing. do you agree that those are necessary?
7  A.  No. Because there's not a dress code
8  policy. So, in my opinion, he shouldn't address
9  it.
10  Q.  It's your opinion that Dr. Chambers should
11  not address the dress of women at an all-male
12  inmate college?
13  A.  He needs to address it in a policy. Have
14  that policy and you are to abide by it. But
15  unless you have a policy. I don't know how you can
16  be held to it.
17  Q.  You don't know how Dr. Chambers can require
18  the employees, without writing an official policy.
19  to closely watch their dress to make sure that
20  they are not wearing any provocative clothing?
21  A.  The second part to be with that is it should
22  be for all employees and all women. And it has
23  not been dressed that way.

Page 178

1  Q.  How has it not been addressed that way?
2  A.  The meetings that I've been involved in were
3  the women directly in his sight on main campus.
4  And we have to other sites that have women on
5  them. And we've called in only women.
6  Q.  Okay. Well, the women on the other sites
7  are white and black, right?
8  A.  Right.
9  Q.  You agree with me that there is a concern at
10  an all-male inmate-populated campus for the dress
11  of females? You agree with me there's a concern
12  there?
13  A.  I would agree if I had a concern. I don't
14  know what his concern is, what it's about.
15  Q.  Is it your testimony that you have no idea
16  why Dr. Chambers is concerned about the dress of
17  the women at campus at Ingram? Is that your
18  testimony?
19  A.  I mean, I don't know what his concern is
20  for, if it's not across the board.
21  Q.  Well, you do have inmates at Ingram?
22  A.  Yes.
23  Q.  All of your students are inmates?

Page 179

1  A.  Yes.
2  Q.  They're all male?
3  A.  Yes.
4  Q.  They're all felons?
5  A.  Yes.
6  Q.  You understand that a prison comprised of
7  male felons, there is the danger of wrong
8  behavior?
9  A.  Yes.
10  Q.  You understand that there is a danger of
11  inappropriate conduct by the inmates?
12  A.  Yes.
13  Q.  You understand that the inmates are prone to
14  certain inappropriate conduct, such as
15  masturbation?
16  A.  Yes.
17  Q.  You understand that that is an ongoing
18  problem at every prison including Ingram?
19  A.  Yes.
20  Q.  That's a problem that all of the staff at
21  Ingram are advised about prior to their
22  employment, isn't it?
23  A.  I don't recall that. I was never advised of

Page 180

1  that. I would know it. And my point is, they're
2  all adults and they know it.
3    And, you know, you can't force someone,
4  without a dress code, to dress a certain way. You
5  can warn them and you can tell them for security
6  reasons, but you cannot make them. And I think if
7  we had a policy, you could.
8    But I was not — none of that was discussed
9  with me, that I remember, when I was hired. Of
10  course, it's been a long time.
11  Q.  Yes, ma'am. Well, let me ask you this: If
12  the president says, in a memo, for all the
13  employees to start doing something, isn't that a
14  rule that all employees begin to do that thing?
15  A.  It hasn't been consistent. Sometimes memos
16  are just put out; sometimes they're considered as
17  policy.
18  Q.  Let me ask the question again. Isn't it
19  true that if Dr. Chambers sends out a memo
20  directing all the employees to do something, that
21  they are all expected to do that thing?
22  A.  Yes.
23  Q.  And if he directed the employees to be

45 (Pages 177 to 180)

## Page 181

1  careful about not wearing tight-fitting clothes.
2  jeans. other provocative clothing, that every
3  employee should abide by that directive?
4  A.   If there is one
5  Q.   Well, if he puts it in a memo. there is one,
6  right?
7  A.   Yes  And if it's a directive
8  Q.   And if he asked you to have a meeting with
9  the women. and you have one and tell them to watch
10  their dress. you're going to expect them to watch
11  their dress, aren't you?
12  A.   But if I did it, it was because he directed
13  me to.
14  Q.   But you're not saying that that's not a
15  necessary element, are you?
16  A.   I think I should have met with all women.  I
17  only met with the main campus women.
18  Q.   What women do you think you should have met
19  with?
20  A.   All of them  If I'm going meet with the
21  women at J F. Ingram. I'm would meet with all of
22  them, and not just the ones in eyesight of the
23  prisoners.

## Page 182

1  Q.   Okay. Well --
2  A.   And I met with main campus because he
3  directed me to.  If there was a policy, it would
4  be appropriate
5  Q.   Do you know if Dr. Chambers had information
6  from a warden that it was the main campus that was
7  offending the problem?
8  A.   No, I do not know that.
9  Q.   You don't know, do you?
10  A.   No
11  Q.   So Dr. Chambers could have had you meet only
12  with Ingram because Ingram was the problem, the
13  main campus?
14  A.   He could have.  It could have been a lot of
15  things. He didn't tell me.
16  Q.   And he doesn't have to, does he?
17  A.   No, he doesn't  And I did what he directed
18  me to do. I had the meeting
19  Q.   Yes, you did. And you reported that the
20  meeting went well?
21  A.   Uh-huh
22  Q.   And the women were receptive to your
23  instruction?

## Page 183

1  A.   Yes
2  Q.   And you understand the purpose of that
3  instruction?
4  A.   Yes
5  Q.   It's not frivolous, is it?
6  A.   No.
7  Q.   It's a problem to dress provocatively in a
8  prison?
9  A.   Yes. But an individual makes that decision,
10  you know.
11  Q.   No, ma'am, I don't know.
12  A.   Yeah.  I mean, it's up to the individual, I
13  would say.
14  Q.   What do you mean?
15  A.   I mean, they can be told.  But there's not a
16  policy.  And if they choose to do it, there's
17  nothing...
18  Q.   So you just think there should be a policy?
19  A.   Yes.
20  Q.   You don't think that his --
21  A.   And then it can be enforced.
22  Q.   Okay.  But you don't contend that his
23  directing women to watch their dress in a prison

## Page 184

1  campus, that that's a bad idea, do you?
2  A.   No.  But it should be all women.
3  Q.   It should be stronger?
4  A.   It should be stronger and it should be in a
5  policy.  It should be for everybody though.  Why
6  would it just be for women?
7      I mean, you know, there's other things that
8  happen in a prison.  They might find the men more
9  attractive, the more we're talking about these bad
10  things that go on.  You know, a man wearing blue
11  jeans could attract guys at our campus.  I mean,
12  they could be more in danger than a woman.
13  Q.   Isn't it true that Dr. Chambers did issue a
14  memorandum to all employees, including men,
15  addressing dress?
16  A.   I don't recall.
17  Q.   Okay.  Well, I'll show you in just a moment.
18  Your thought about the dress thing is that his
19  directive should have been stronger, in the form
20  of a policy, and it should have been broader?
21  A.   Number one, I think we should have a policy
22  with specific guidelines, very specific.  And then
23  you can reprimand people or whatever.

46 (Pages 181 to 184)

## Page 185

1    If you have a policy established, say this
2    is a policy and this is what you're violating,
3    people have to -- but it has to be fair and
4    equitable to everybody.
5    Q.    You don't think it's discriminatory against
6    women, or you, because Dr. Chambers has issued
7    memoranda or asked you to have meetings directing
8    the main campus to watch their dress?
9    A.    I do.
10   Q.    How is that discriminatory?
11   A.    Because, I mean, why wouldn't you talk to
12   the men also. Like I say, it could be a problem
13   for the men. One thing, I think. first of all
14   it's women, and then it's a select group of women.
15   Q.    How is it a select group of women?
16   A.    It's main campus. I mean, it's dangerous at
17   Tutwiler. There are women there. Women versus
18   women. That can be something in prison. Draper.
19   Q.    So how is it discriminatory if two campuses
20   that have women, white and black, aren't given
21   this directive, but the main campus women are? I
22   mean, there's women at both.
23   A.    Because it's -- but it's a select group.

## Page 186

1    How can it be fair? How can it not be
2    discriminatory?
3    Q.    Against women?
4    A.    Yeah.
5    Q.    All of those women are getting off, so how
6    are they being discriminated against?
7    A.    The ones that are being discriminated
8    against are the ones that are constantly having to
9    have meetings, because he looks at them. It's
10   everything that's in his eyesight.
11       And how is that fair, just because you work
12   at one campus, that you should be told every other
13   week or notice or comments made about your
14   clothing, and there's people at another campus
15   that are doing it?
16       I don't see how it can be right. It's
17   discrimination against someone.
18   Q.    It is? Well, the women at the other campus
19   are women, aren't they?
20   A.    I guess so, as far as I know.
21   Q.    And they're not receiving that treatment,
22   are they? They're not getting directives like the
23   main campus is?

## Page 187

1    A.    Yeah.
2    Q.    But they're women?
3    A.    Uh-huh.
4    Q.    And you understand that there's a good
5    reason for Dr. Chambers to make sure that women
6    are dressing appropriately?
7    A.    Women and men.
8    Q.    Well, if I take the deposition of Warden
9    DeLoach, and he says that the Ingram campus is the
10   problem, you wouldn't dispute that, would you?
11       MR. DEBARDELABEN: Object. Calls for a
12   hypothetical.
13   Q.    You can understand a hypothetical if you
14   understand the question.
15   A.    I mean, Ingram campus could be -- we have
16   three.
17   Q.    The main campus. I'm talking about the one
18   you're talking about. The main campus, where you
19   work.
20   A.    I don't think it matters. I mean, I think
21   he should go ahead and include all of them.
22   Because next week it could be Draper; the next
23   week it could be Tutwiler. Why not just make an

## Page 188

1    across-the-board decision.
2    Q.    And you think that that's based upon the
3    fact that you're a female that he doesn't direct
4    the other females the same way he directed you,
5    because you're a female? That's your contention?
6    A.    That's not what I said. What you are
7    talking about directing?
8    Q.    Well, he's directing you to watch your dress
9    because you're at main campus, but he's not
10   directing the other females at the other campuses
11   to watch their dress. But the reason he's
12   directing you is because you're female; is that
13   your testimony?
14   A.    Well, it hasn't -- specific things haven't
15   been said to the males. Why do they call in just
16   a group of females at the main campus? So I guess
17   that is my contention.
18   Q.    Well. you're changing subjects now. You're
19   talking about males now.
20   A.    I'm just saying all we've ever addressed is
21   a select group of females. That cannot be fair.
22   That can not be equitable. So I would say it's
23   discrimination in some form. You can pick which

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 189

1  form.
2  Q.   I can just pick whatever I want?
3  A.   Yeah.
4  Q.   Okay.  There's white and black females at
5  the other campuses that aren't given this same
6  directive, right?
7  A.   Yeah.  I think we've covered that.
8  Q.   Yeah.  I just wanted to make sure we covered
9  that.
10     You said here, in the second page of your
11  charge, which is Exhibit 6, "Mr. Chambers
12  constantly uses generic words like 'weak' and
13  'soft' and makes general accusations without one
14  shred of evidence to back it up."
15     Dr. Chambers has referred to your work as
16  weak in the past, hasn't he?
17  A.   Yes.  He's used that word with me a lot.
18  Q.   That's not an unusual word though, is it, in
19  terms of evaluating performance?
20  A.   I think it is.  It's not supported; it's
21  perceptions.
22  Q.   Well, doesn't every audit that you get
23  describing findings or problems with certain

Page 190

1  controls, don't they describe them as weak?
2  A.   Are you saying that we've gotten audits
3  every time that said that?
4  Q.   No, ma'am.  I'm talking about the word
5  "weak."
6  A.   I don't know.  We would have to look at an
7  audit report to see.
8  Q.   Is it your contention that there is not one
9  shred of evidence that Dr. Chambers' assessments
10  of your performance as weak, that there's not one
11  shred of evidence?
12  A.   I agree with what I said.  That's his
13  opinion.
14  Q.   Yes, ma'am.  Is it your contention that
15  there is not one shred of evidence that your
16  performance as the business office dean is weak?
17  Is that your testimony?
18  A.   That's my testimony.
19  Q.   Okay.  I'm going to mark as Exhibit 7 a memo
20  from Rickey Huffstutler to Dr. Chambers.
21     (Defendants' Exhibit No. 7 was
22     marked for identification and a
23     copy of the same is attached

Page 191

1     hereto.)
2  Q.   Do you know who Rickey Huffstutler is?
3  A.   I do.
4  Q.   What is your understanding as to his
5  position at the college at the time he was there
6  when he was dean?
7  A.   He was appointed the Dean of the College,
8  which is similar to a vice president.
9  Q.   This is the same Huffstutler that was not
10  chosen as the dean when you were chosen?  Is this
11  the same?
12  A.   No.
13  Q.   That's Gene Bridgman?
14  A.   Yes.  He's never applied for my job.
15  Q.   No.  Dean Huffstutler was a contemporary,
16  basically, of yours, and he was the Dean of the
17  College?
18  A.   Uh-huh.
19  Q.   But he had interaction with your office on a
20  regular basis?
21  A.   He did.
22  Q.   What is his race and gender?
23  A.   He's a white male.

Page 192

1  Q.   Okay.  He's a white male.  I'm going to show
2  you Defendants' Exhibit 7.  Take a minute to look
3  at that and read over it, if you would like.
4     (The witness examines the
5     document.)
6  Q.   Have you seen that document before, ma'am?
7  A.   I have not seen this.
8  Q.   Okay.  This is the first time you've seen
9  that document?
10  A.   As I recall.
11  Q.   Do you recall discussing the items contained
12  in that document in a cabinet meeting near
13  February the 26th of 2002?
14  A.   I don't remember.
15  Q.   Okay.  Let's look at this letter.  It's a
16  memorandum from Rickey Huffstutler to Doug
17  Chambers, right?
18  A.   Yes.
19  Q.   Mr. Huffstutler was your contemporary at the
20  college, right?
21  A.   I guess.  I've never used that term.  I
22  guess you mean like a colleague.
23  Q.   He was a colleague?

48 (Pages 189 to 192)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 193

1   A.   Yes.
2   Q    Of similar stature in the system?
3   A.   Yes.
4   Q.   And he reported to Dr. Chambers a number
5   of --
6   A.   Dr. Huffstutler --
7   Q.   Let me finish my question. He communicated
8   to Dr. Chambers a number of concerns that he had
9   with the business office operations, according to
10  this memo, didn't he?
11  A.   His opinion, yes.
12  Q.   He communicated those to the president,
13  didn't he?
14  A.   He did.
15  Q.   And the president was receiving these
16  criticisms from someone who was ranked, basically,
17  as high as you, right?
18  A.   It appears.
19  Q.   The president did not author this, as far
20  as you know, did he?
21  A.   I have no idea to know that. I've never
22  seen that, that I remember. It's been several
23  years ago and I don't remember it.

Page 194

1   Q.   Have you ever seen Rickey Huffstutler's
2   signature?
3   A.   I have.
4   Q.   Is that it?
5   A.   It appears to be. But, I mean, I can't tell
6   you that; I didn't see him sign it.
7   Q.   I understand. And we can get his deposition
8   and he can tell us whether he wrote it.
9        You don't have any reason to believe he
10  didn't write it, do you?
11  A.   I don't know that. You know, neither name
12  is mine on that letter, so I can't answer.
13  Q.   Okay. But it's talking about your office?
14  A.   It is.
15  Q.   And --
16       (Witness confers with counsel.)
17       MR. DEBARDELABEN: Just answer his
18  questions.
19  Q.   I want you to refer to the letter. And
20  we're going to walk through these and try to
21  understand what Mr. Huffstutler's concerns were
22  and see if you agree.
23       First, he says, "This memorandum is written

Page 195

1   to express certain concerns I have regarding
2   processes and activities associated with the
3   Business Office. I'm writing this in a positive
4   manner and this is not as a reaction to the recent
5   problem with my personal invoices but to express
6   some observations from my experience as a chief
7   financial officer."
8        MR. DEBARDELABEN: Excuse me for a
9   minute.
10       (Witness confers with counsel.)
11       MR. DEBARDELABEN: Just answer his
12  questions.
13  Q.   Was it your understanding that Dean
14  Huffstutler was, in a previous position, a chief
15  financial officer?
16  A.   He was.
17  Q.   So you would agree with me that he had
18  extensive experience in managing the exact type of
19  affairs that you are responsible for managing?
20  A.   He liked to say he did. I mean, I didn't
21  work with him. But he did hold that position at
22  another college. I don't know what kind of job he
23  did, just like somebody that doesn't work with me

Page 196

1   every day doesn't know what kind of job I do.
2        You know, there are people that hold
3   positions...
4   Q.   Yes, ma'am.
5   A.   So all I can say is I know he had the job at
6   another college.
7   Q.   Do you have any reason to believe he wasn't
8   as qualified --
9   A.   I just know that he was written up in some
10  of our audits. I don't do some of the things the
11  same way he does. And, you know, I'm sure there
12  are things he does better than me and I think
13  there are some I do better than him.
14  Q.   He was called out in some of those audits,
15  wasn't he?
16  A.   He was.
17  Q.   He was actually threatened with discipline
18  in some of those audits.
19  A.   Right. He caused some of the problems. So
20  a lot of the problems that I had were -- and he
21  was the Dean of Instruction.
22  Q.   A lot of the problems you had were what?
23  A.   Were the result of things that, you know,

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 197

1  didn't go through me, that went through the
2  president and him as the Dean of Instruction,
3  people that got in that shouldn't be in. We'll
4  get to some of those audits.
5  Q.  You're saying that Dean Huffstutler was the
6  cause of some of your problems with your office?
7  A.  Yes.
8  Q.  Okay. But you do understand --
9  A.  You know, there's -- go ahead.
10 Q.  You do understand that Dean Huffstutler was
11 aggressively reprimanded by Dr. Chambers in
12 response to one of the audits? You realize that?
13 A.  It's probably the one where he put both of
14 our names. I don't know what he did to Dr.
15 Huffstutler. I'm not Dr. Huffstutler.
16 Q.  All right. Well, we'll look at that in just
17 a minute.
18     You are aware though that Dr. Chambers has
19 had --
20     MR. DEBARDELABEN: Excuse me. Dr.
21 Chambers? He's not a doctor.
22     MR. CHRISTMAN: Yes, sir, he is. He is
23 a -- I believe he has an honorary doctorate.

Page 198

1     MR. DEBARDELABEN: Oh, okay. He's not
2  an earned doctorate. Okay. I've never heard of
3  anybody called "Doctor" that didn't have an earned
4  doctorate.
5     MR. CHRISTMAN: You haven't?
6     MR. DEBARDELABEN: No.
7     MR. CHRISTMAN: You've never heard of
8  anybody with an honorary doctorate called
9  "Doctor"?
10    MR. DEBARDELABEN: No.
11    MR. CHRISTMAN: I can call him Mr.
12 Chambers, if it suits you.
13    MR. DEBARDELABEN: It doesn't matter.
14 I was just confused. I didn't know if we were
15 talking about the same man or not.
16    MR. CHRISTMAN: We are. Doug Chambers.
17    MR. DEBARDELABEN: Okay
18 (BY MR. CHRISTMAN)
19 Q.  You understand that the president of the
20 college, Doug Chambers, aggressively disciplined
21 or pursued Huffstutler in response to that audit?
22 Just like he called your name, he called
23 Huffstutler's?

Page 199

1  A.  I guess so. I can't answer for Huffstutler.
2  I know his name was called in the audit, and I
3  think he was threatened reprimand. I don't know
4  what happened.
5  Q.  Okay. But you think he was threatened and
6  reprimanded in the audit response?
7  A.  It appears he was.
8  Q.  And he's a white man?
9  A.  He is.
10 Q.  No. 1. He says, "The payment of my personal
11 invoices again proves the inadequacy of the
12 account payable function of JFI."
13    Do you know what he's talking about?
14 A.  I don't really remember what he's talking
15 about.
16 Q.  Do you agree --
17 A.  That was a long time ago.
18 Q.  I'm sorry. Go ahead.
19 A.  I don't really remember what he's talking
20 about.
21 Q.  Do you agree that there is an inadequacy in
22 the account payable function of JFI?
23 A.  No.

Page 200

1  Q.  All right. "If the institutional billing
2  statement had been correctly checked against the
3  shipping invoices the Business Office would not
4  have mistakenly included these amounts in the JFI
5  payment."
6     Are you aware of what he's talking about
7  there?
8  A.  No. I don't remember. It seems like there
9  was some personal business of his, but it was
10 something that he had signed. I don't remember
11 the details of it. But it was not a lack on our
12 part; it was something that he had done that was
13 wrong.
14 Q.  Oh. It wasn't anything that you did that
15 was wrong; he was wrong?
16 A.  And it was not me personally; it was in my
17 department, which I'm responsible for.
18 Q.  Okay. He says, "Major weaknesses in the
19 accounts payable process have been identified and
20 discussed previously."
21    Do you agree that there are major weaknesses
22 in the accounts payable process?
23 A.  No. That's his opinion.

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

Page 201

1  Q.   His opinion.  Just like it was Dr. Chambers'
2  opinion?
3  A.   Yes.
4  Q.   "This has occurred when the Business Office
5  allowed the payment of bills to become backlogged
6  and processed once monthly."
7     Do you agree that the business office
8  allowed payments of bills to become backlogged and
9  processed once monthly?
10  A.   The only thing I agree is that we used to
11  pay bills once a month.  We've changed that.  But
12  that didn't mean they were backlogged.  A lot of
13  places pay bills once a month.
14  Q.   You think that there is no evidence that the
15  bills were backlogged?
16  A.   There's never been an audit finding on that.
17  Q.   Yes. ma'am.
18  A.   The only one I've known that said that is
19  Mr. Chambers.
20  Q.   Well, is it your contention that there are
21  no late payments?
22  A.   If there is, there was a reason.  There was
23  some mistake.  I've tried to explain this to Mr.

Page 202

1  Chambers.  I mean, you don't just pay every bill
2  that comes in; there are things to be checked out.
3  If we pay 50, there may be 49 that needs something
4  checked out.  There could be a wrong amount on
5  there.  If it's not paid, there's some problem:
6  It hasn't been signed.  There is a problem if it
7  hasn't been paid.  There's no other reason not to
8  pay it.
9     Now they're run once a week probably.  I
10  mean, there's not a...
11  Q.   And it's your contention that if I produce a
12  stack this tall of late payments, there's a reason
13  for every one of those?
14  A.   I can discuss them with you.
15  Q.   All right.  Well, that will make it a longer
16  deposition, but we may have to do that.
17     You agree with me that bills ought to be
18  paid on time?
19  A.   Yes.
20  Q.   You agree with me that every college in the
21  two-year college system does not have a problem
22  with backlogged payments or late payments?  Do you
23  agree with me on that?

Page 203

1  A.   Say that again.
2  Q.   Every college in the two-year college system
3  does not have trouble with late payments to
4  vendors?
5  A.   No, I don't agree with that.
6  Q.   You think every one of them does?
7  A.   I would say at times, yes.  I mean, I'm sure
8  they've had some that's, just like me, there's
9  something that hasn't been paid.
10     There's been some in the newspapers that we
11  know that have been written up.  There has never
12  been dilatory payment in an audit finding.  And
13  that's what I think I'm judged on.
14  Q.   Well, if Dr. Chambers thinks that we're
15  paying a lot of late fees and that we're not
16  paying them on time, isn't that adequate --
17  A.   If he had proof.
18  Q.   I'm sorry, ma'am.  Let me finish my question
19  before you answer.
20     Isn't that adequate for you to take action
21  to make sure that those late payments no longer
22  occur?
23  A.   I would check it if he asked me to.

Page 204

1  Q.   And he's asked you to check on late payments
2  in the past?
3  A.   And I've checked.
4  Q.   Do you perceive there to be a timeliness
5  problem with the business office under your
6  control?
7  A.   No.
8  Q.   Would you disagree if Debbie Dahl took the
9  stand and said that J.F. Ingram, under the watch
10  of Monica Greene, has a timeliness problem in
11  their business office with processing invoices?
12  A.   That's her opinion.
13  Q.   That's her opinion?
14  A.   Yes.
15  Q.   Okay.
16  A.   I don't see -- Debbie Dahl doesn't work
17  there every day.
18  Q.   Debbie Dahl is the vice chancellor of the
19  two-year college system, isn't she?
20  A.   Yes.
21  Q.   Do you agree with Huffstutler's statement
22  here that says, "As chief financial office of the
23  institution, Dean Greene has the responsibility to

Page 205

1   allocate personnel resources so that the bills are
2   paid on time even if the accounts payable staff
3   member assigned to this responsibility is not at
4   work"?
5   A.   Yes.
6   Q.   Do you agree with his statement where he
7   says. "She also has the responsibility to review
8   her staff member's work to ensure its accuracy"?
9   A.   Yes.
10  Q.   No. 2.  He says, "Dean Greene continues to
11  verbally issue purchase order numbers to employees
12  and expects them to call the vendor."  Is that
13  true?  Were you doing that?
14  A.   That's not true.
15  Q.   I'm sorry?
16  A.   It's not true.  We don't do that.  This is
17  an old memorandum.
18  Q.   Yes, ma'am, it is.  It's in 2002.
19  A.   Yeah.
20  Q.   But was it true then?
21  A.   Sometimes it was.  We allowed the
22  instructors to call the vendor, before we made
23  that process that I changed in 2004.  We changed

Page 206

1   that.  Also, I think we might look at my job
2   evaluation for 2002.  I don't think anything was
3   mentioned there then.
4   Q.   And who performed your job evaluation?
5   A.   Mr. Chambers.  So I didn't know of this
6   problem.
7   Q.   And in spite of this letter that he got, he
8   still gave you a good evaluation, didn't he?
9   A.   Dr. Huffstutler is not my supervisor.
10  Q.   No, he's not.  But Dr. Chambers received
11  these criticisms of your office.
12  A.   Uh-huh.
13  Q.   And he still gave you good evaluation,
14  didn't he?
15  A.   He didn't discuss this with me, that I
16  remember.
17  Q.   That's not my question, ma'am.
18  A.   He did, yes.  Yes, he did.
19  Q.   Do you agree with this statement in section
20  2 -- in paragraph 2 -- on page 2: "The Business
21  Office should print three part purchase orders and
22  mail the original to vendor, one copy to the
23  requestor, and the third to be placed in a

Page 207

1   Business Office file so that shipping invoices and
2   statements can be matched to the purchase order
3   verify complete orders"?
4   A.   We do that now.  It was not done in the
5   past.  We've made a lot of changes.
6   Q.   Well, that was a weakness that was remedied.
7   right?
8   A.   It was a change in procedure.
9   Q.   You are unwilling to admit that that was a
10  weakness that was remedied?
11       MR. DEBARDELABEN:  We object to the
12  form.  That's your characterization.  She's
13  answered it.
14       MR. CHRISTMAN:  It is my
15  characterization, and I'm asking the witness.
16  Q.   Do you admit that that was a weakness that
17  was remedied?
18  A.   I didn't do this because Huffstutler said to
19  do it, if I chose to do it.
20  Q.   I'm not suggesting that.
21  A.   I mean, we made a lot of changes.  You know,
22  with time, changes.  This was five years ago.  I
23  mean, if we had not changed -- I don't object to

Page 208

1   changes that need to be made.  But my department
2   and I will decide, or if there is someone that is
3   valid.  So far I haven't had anybody that's valid
4   to tell me that I needed to do things.
5   Q.   I've gotcha.  Well, if the chancellor and a
6   review team he sent told you to do some things,
7   would you consider that valid?
8   A.   Not the review team that came.  I have
9   problems with that review team.
10  Q.   You don't think the chancellor's review team
11  is valid?  That's your testimony today?
12  A.   No, I don't.
13  Q.   The chancellor is the highest ranking
14  official in the two-year college; is that right?
15  A.   He was the one at that time.
16  Q.   Whoever the chancellor is at any given time?
17  A.   Yes.
18  Q.   And if the chancellor sends a team to your
19  college to review your progress and your
20  performance, you are required to abide by any
21  directives given, are you not?
22  A.   I am.
23  Q.   No. 3 in this memo.  "In late November with

52 (Pages 205 to 208)

Page 209

1  the assistance of the Welding instructors, bid
2  specifications were given to Dean Greene. These
3  were Carl Perkins budgeted expenditures. This
4  would have allowed us to encumber the funds and to
5  comply with your directive to spend these funds in
6  a timely manner. It was after she was questioned
7  at least three times by Durrance" -- I don't know
8  who that is -- "before she finally" --
9       MR. CHRISTMAN: "I don't know who that
10  is," is not in here. I'm sorry.
11      THE COURT REPORTER: Well, it's in
12  here.
13      MR. CHRISTMAN: Okay.
14  Q.   "... before she finally advertised the bids
15  in January."
16      Do you agree that you had to be questioned
17  three times before you finally advertised the bids
18  on this particular --
19  A.   I don't remember. But usually when I'm
20  given -- Durrance was a former instructor.
21      Normally, when I've given bid specs they are
22  lacking in what I need to put out a bid. So I
23  have to go back to the instructor and get things.

Page 210

1  There's usually a reason.
2       Or sometimes we wait and do several bids at
3  one time. That's not a closeout time of year, so
4  it was not hurting us.
5       I don't remember this incident. But I know
6  that many times I'm not given what I need to do
7  the bids by the instructors or the supervisors.
8  Q.   And that's somebody else's fault; that's not
9  your fault?
10  A.   No. Before I do the bid I have to get it.
11  But I can't -- you know, they're supposed to give
12  me the specs for what they need.
13  Q.   And if they don't give them to you, you
14  don't follow up?
15  A.   If they don't give them to me after a
16  certain amount of time, I would just have to get
17  it myself, which I would do.
18      But if they are requesting equipment, I
19  would think they would need to get the specs, or I
20  would go to their supervisor.
21  Q.   How much is a certain amount of time?
22  A.   Well, there's other -- I don't know. You
23  know, there's other things that I have to do. We

Page 211

1  don't have -- late November and January, we don't
2  know when, that's not a very long time.
3       We're out for two weeks in December, so it's
4  not very many weeks you're talking about there.
5  So that's probably not a lot of time.
6  Q.   In your estimation, that's not a lot of
7  time?
8  A.   Right, in my estimation. You know, I've got
9  -- bids is just one of the things that I do.
10  Q.   Let's go down to No. 5 there. "When we
11  brought the Business Office on line with the
12  ACCESS software we identified that the Live Work
13  module did not meet our needs. Winston Hayes
14  committed to building a live work module for free
15  with our identifying the specifications. Mr. Hill
16  was unsuccessful in obtaining the necessary
17  definition or specifications from the Business
18  Office."
19      Do you recall this need to put together a
20  more productive live work module?
21  A.   That was Mr. Chambers' and Dr. Huffstutler's
22  opinion. We had an excellent program.
23  Q.   What was their opinion?

Page 212

1  A.   They wanted us to go to this ACCESS system.
2  And I think all of these people -- I think we know
3  why now.
4  Q.   We do?
5  A.   Yes. Have you read the newspapers? There
6  was no -- we had a great system. We have the
7  largest live work program in the state. We had
8  every check and balance you could have.
9       We eventually went to this system. But we
10  were having -- Mr. Englett was going to help us
11  write that program, since we were going to be
12  forced to go to this system that wasn't necessary.
13  It was an inferior system and it's been proven
14  that.
15      But this is -- we use it now, and it can't
16  give us half the reports we had before. But we
17  went to it. You know, there's just some battles
18  you can't keep fighting. But no, it was a big
19  mistake.
20      I called many business managers before we
21  had to do this, and I had ten of them tell me it
22  was a bad decision.
23  Q.   You think the chancellor's office now thinks

53 (Pages 209 to 212)

## Page 213

1  the ACCESS system is a worse system than Ingram
2  had in place?
3  A.  I hope they do now.
4  Q.  Do you know?
5  A.  I don't know.  I don't know what the
6  chancellor's office thinks
7  Q.  Okay.
8  A.  But I can see why they were pushing it.
9  Q.  You can?
10  A.  Yeah.
11  Q.  Why were they pushing it?
12  A.  I think you read the newspapers.
13  Q.  Why were they pushing it, ma'am?
14       MR. DEBARDELABEN:  She has an opinion.
15  A.  I have an opinion of things.  I mean, it's
16  an expensive system; it's an inferior system.  And
17  they wanted all the colleges to go to it?  It
18  makes you wonder if somebody's not getting a
19  kickback.  And it appears they were.
20  Q.  Okay.  Well, you believe that moving the
21  business office to the ACCESS system was --
22  A.  A mistake.  But we have moved it.
23  Q.  And you were requested to do that by people

## Page 214

1  superior to you?
2  A.  Yes.
3  Q.  And when someone superior to you --
4  A.  I was directed to do it.
5  Q.  I see.  And when someone directs you to do
6  something, even if you don't agree, you do it, if
7  they are superior to you, don't you?
8  A.  If it's moral and ethical and legal.  But
9  no, I will not do other things.
10  Q.  Okay.  Well, let's talk about the ACCESS
11  software.  If someone directs you to implement all
12  of the modules of the ACCESS system, and they are
13  higher ranking than you, you are required to
14  comply with that directive, are you not?
15  A.  We've done that.
16  Q.  There's nothing immoral or illegal about
17  that, is there?
18  A.  With this it could be, but we couldn't prove
19  it at the time.
20  Q.  Well, you're not saying that your using the
21  ACCESS system is immoral or illegal for you to do?
22  A.  No.  But I do think there are people that
23  are receiving something for using it.  And it --

## Page 215

1  Q.  Well, if the president asks you to implement
2  ACCESS, you're required to implement it?
3  A.  I am.
4  Q.  Okay.  But as we sit here today, there are
5  still modules of the ACCESS system that are not in
6  place; isn't that true?
7  A.  In 2002.  It's not true today.
8  Q.  Sitting right here today, there are still
9  modules of the system that are not activated;
10  isn't that true?
11  A.  The only thing they could have said to me
12  is the --
13       MR. DEBARDELABEN:  No.  Just answer his
14  question.
15  A.  I mean, to my knowledge, there are not.
16  Q.  Okay.  Well, you should have knowledge,
17  right?
18  A.  I should.
19  Q.  The contract module, if it's fully
20  implemented, you would know?
21  A.  Yes.
22  Q.  And if it's not fully implemented, you would
23  know?

## Page 216

1  A.  Yes.
2  Q.  And it's your contention that it is
3  implemented?
4  A.  It's no problem in my office if it's not.
5  We've done everything we could do for it.  It
6  works with two offices there.  We have implemented
7  everything that we can at that college, that I
8  know of, for ACCESS software.
9       The last two to go on were the contract
10  module and the live work module.  So, to my
11  knowledge, I have implemented everything.  If
12  there's something else, I don't know about it
13  Q.  But you should, right, if there's a module
14  that's not activated?
15  A.  Maybe I should.  I mean, I know of
16  everything that we use.  There's nothing I know of
17  that we don't have and are using for that system.
18  Q.  But it's your job to make sure that all of
19  the modules of ACCESS are implemented?
20  A.  I have implemented every module I've been
21  told to implement.
22  Q.  It's your job to implement all the modules
23  of --

54 (Pages 213 to 216)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

## Page 217

1  A.  The contract? I don't know if it's working
2  perfectly, but I have done everything I can to do
3  it.
4  Q.  I understand. My question is very specific.
5  It's your job to implement all the modules of the
6  ACCESS system?
7  A.  That apply to me. I would not implement the
8  student services. All business office functions.
9  It is my job to implement all business office
10 functions.
11 Q.  Yes, ma'am.
12 A.  The contract module would not be strictly
13 business office; it would be business office and
14 personnel. So there would be a part that I've
15 implemented that is my part. I cannot answer for
16 the personnel side.
17 Q.  And the live work module?
18 A.  The live work module is implemented.
19 Q.  And that's your responsibility?
20 A.  Yes, it is.
21 Q.  Do you think that Dr. Chambers should
22 consider seriously memos he receives from his
23 deans associated with concerns of other

## Page 218

1  departments?
2  A.  I don't know if he should. I think he
3  should talk to the dean of that department and
4  see.
5  Q.  Let me ask it this way: If you wrote a memo
6  to Dr. Chambers and you had a serious concern
7  about the personnel department -- are you in
8  control of that department? --
9  A.  No.
10 Q.  -- would you expect Dr. Chambers to take
11 seriously your memo? If you highlighted a number
12 of concerns about that department, would you want
13 him to take them seriously?
14 A.  I would if they were valid.
15 Q.  Well, if you thought they were valid, would
16 you want him to take them seriously?
17 A.  I think he should talk to both of us.
18 Q.  Would you want him to take you seriously?
19 A.  Yes.
20 Q.  And if you were the president of Ingram and
21 you got a memo like this from Huffstutler, would
22 you take it seriously?
23 A.  I don't know. I'd have to investigate it.

## Page 219

1  I think it should be investigated. I mean, you
2  know, anybody can say these things.
3  Q.  So you don't know if you would take it
4  seriously; is that your testimony?
5  A.  Right. Yes.
6  Q.  Everybody doing okay? Do you need to take a
7  break?
8  A.  Yes.
9        MR. CHRISTMAN: Let's take a break.
10       (A brief recess was taken.)
11       (Defendants' Exhibit No. 9 was
12       marked for identification and a
13       copy of the same is attached
14       hereto.)
15 (BY MR. CHRISTMAN)
16 Q.  Let me show you a memo that I presume you
17 received as you were Dean of Fiscal Affairs at
18 this time. This was May of 1998. Doug Chambers
19 had sent this memorandum to all employees, as you
20 can see.
21     Do you recall receiving that memo?
22 A.  I don't. But I'm sure I did if it went to
23 all employees.

## Page 220

1  Q.  Okay. And you see there that it references
2  that all employees are to be mindful of their
3  dress, doesn't it?
4  A.  Uh-huh.
5  Q.  It's not directed just at the women, is it?
6  A.  This particular one is not.
7  Q.  Do you recall when the chancellor sent the
8  review team? Wasn't it around the beginning of
9  '04?
10 A.  That sounds correct.
11 Q.  And what is your understanding as to why the
12 chancellor sent a peer review team to review the
13 functioning of the business office at Ingram?
14 A.  I don't really know why.
15 Q.  Well, is it your understanding that he did
16 that based upon concerns expressed by you?
17 A.  That's the way he put that.
18 Q.  Well, let's take a look here and mark this
19 as Defendants' 10 to your deposition.
20       (Defendants' Exhibit No. 10 was
21       marked for identification and a
22       copy of the same is attached
23       hereto.)

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

## Page 221

1  Q.   Did you ever see a copy of that letter?
2  A.   I don't know if I saw this particular one.
3  I may have; I don't recall.
4       In a meeting with the chancellor -- I went
5  down there to express concerns that I had about
6  myself with Mr. Chambers.
7       And the chancellor said that he wanted to do
8  this and would I be okay with it. I never told
9  him I would be okay with it, but the chancellor is
10  the chancellor and he said that this is what he
11  was going to do.
12       I don't think I would go and request that
13  people come and check out my department. But it
14  was the chancellor's idea, and he said it would be
15  a good thing. And, you know, the chancellor can
16  do what he wants to do.
17  Q.   The chancellor at this time was a white
18  male?
19  A.   Yes.
20  Q.   Tell me about the meeting that you had.
21  When did you go see the chancellor?
22  A.   I would have to look at the paperwork to see
23  the exact time.

## Page 222

1  Q.   I'd love to show you any paperwork that
2  would help you. What would help you?
3  A.   Have you got where I have the dates and
4  times? I would say it was late fall 2002, but I'm
5  guessing. I can probably find it in there.
6  Q.   I have your responses to my interrogatories
7  and request for production, if that's helpful.
8  A.   Okay. I think it was probably summer of
9  2002.
10       MR. DEBARDELABEN: 2002 or 2004?
11       THE WITNESS: '-2. They came, I think,
12  January of '04.
13  Q.   But the summer of --
14  A.   Let me -- okay. What did you ask me to tell
15  you about?
16  Q.   When did you have the meeting with the
17  chancellor?
18  A.   It was sometime after this meeting that I
19  had with Chambers on July 3, '03. I don't know
20  what day that was, but it was within a week of
21  that, I would say. Probably right after the 4th
22  of '03.
23  Q.   Okay.

## Page 223

1  A.   And there may have been one more before
2  this. I think he called me down there. Well, I
3  went down there once. I think he called me back
4  before December. Maybe September. I don't know
5  if I have that in that paperwork or not.
6  Q.   And you were looking at your responses to my
7  request. No. 19, and referencing the notes that
8  you had for July 3, 2003?
9  A.   Yes.
10  Q.   And apparently you had a bad interaction
11  with Dr. Chambers on that day?
12  A.   Yes.
13  Q.   It was about an audit; is that right?
14  A.   I think that's what it says.
15  Q.   It says, "Hal Bradsher (auditor) had talked
16  to him about an audit matter concerning Dr. Fred
17  Gainous."
18  A.   Yes. There were some questionable things on
19  there.
20  Q.   Questionable things in the audit. And he
21  believed that there were problems with your
22  office?
23  A.   No. This was about Dr. Gainous.

## Page 224

1  Q.   Okay. And what was he trying to get you to
2  tell the truth about?
3  A.   I have no idea. I told the truth, so I
4  don't know what he was talking about. And that
5  was part of the argument.
6  Q.   What was the problem with the audit?
7  A.   There was a problem with a work order for
8  Dr. Gainous, that I can recall.
9  Q.   Live work?
10  A.   Live work on a bed. And we would have to
11  look at that audit. But I don't know if it was in
12  there or not.
13  Q.   Very quickly, because we're going to be
14  talking about live work some more, but just for
15  the record and for -- I know what you mean when
16  you say "live work," and you know what you mean,
17  but we really need to get in the record what that
18  means.
19       What is a live work project? What does that
20  mean?
21  A.   It is a job done in our college. All of our
22  shops -- a live work project, in this instance,
23  would be repairing or making a bed. It could be

56 (Pages 221 to 224)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 225

1  re-upholstering a couch; it could be making a
2  barbecue grill. Any work done in one of our
3  technical shops is considered live work.
4  Q.   The college has different classes where they
5  teach inmates these trades?
6  A.   Yes.
7  Q.   Auto mechanics, upholstery?
8  A.   Yes.
9  Q.   Cabinet making?
10  A.   Yes.
11  Q.   Woodworking of all kinds?
12  A.   Yes.
13  Q.   And the students learn to do these trades on
14  equipment that's owned by the college?
15  A.   Yes.
16  Q.   The college has purchased a number of very
17  expensive and state-of-the-art woodworking tools?
18  A.   Yes.
19  Q.   Including paint rooms?
20  A.   Booths.
21  Q.   State-of-the-art paint booths?
22  A.   Yes.
23  Q.   With heating function and all?

Page 226

1  A   Yes.
2  Q.   And the students are allowed to use these
3  tools and equipment to make things for customers?
4  A   Yes.
5  Q.   Who are allowed to be customers. under the
6  live work rules?
7  A   It is any state, city, county, or
8  government, current or retired, employees; any
9  current students in the two-year college system; a
10  tax-supported entity; and a charitable
11  organization.
12     And those are the only four. basically, for
13  guidelines to get in.
14  Q.   So any time we're talking about live work,
15  we're talking about one of these projects where
16  the inmate students, under the leadership of their
17  instructor, are building, repairing, doing some
18  kind of work in one of the different instructional
19  divisions?
20  A.   Yes.
21  Q.   And this one, you think, may have been a bed
22  being made?
23  A   I know it was in the refinishing shop. And

Page 227

1  they refinished and built, so I don't remember
2  which it was. And repaired.
3  Q.   By the way, the live work functionality of
4  the school is intended to be a profitable one, is
5  it not?
6  A.   Not really profitable. We just should --
7  the way the auditors want it is really break even
8  or retain the money that -- we don't really make a
9  profit off of it, it's just getting our cost back.
10  But it is the only funds that we have come into
11  the college.
12     Whereas other schools -- you said I didn't
13  handle tuition -- we handle that. And it is funds
14  coming in.
15     But all we should make is the -- there's a
16  20 percent, 25 percent, basically, through the
17  state board, that we're authorized to charge to
18  cover our expenses. So what the auditors look at
19  is cost plus.
20     Employees, it's 10 -- say, 15 percent,
21  because they get a break; and outside people, it's
22  25. So they want us to make cost plus 15 to 20
23  percent. If we do that, we're okay. It's not

Page 228

1  really a --
2  Q   It's not a big money-making venture?
3  A.   Yeah, yeah.
4  Q.   But you are intended to never operate in a
5  deficit?
6  A   Right, right.
7  Q.   You are intended to recover all the cost,
8  plus some percentage over that amount?
9  A   Yes.
10  Q   And that would cover, like, electricity and
11  personnel and --
12  A.   Yeah. That percentage over, yeah.
13  Miscellaneous costs
14  Q   You do expect the customer to pay for all
15  materials used in whatever project is underway; is
16  that right?
17  A   Yes.
18  Q.   For example, a bed, you would expect the
19  customer to pay for the materials used to make the
20  bed, if it's a wooden bed?
21  A   Yes.
22  Q   All right. Now, with that understanding, do
23  you recall what the deal was on this live work

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

Page 229

1   project that caused this little confrontation?
2   A.   I don't recall why. I don't think I knew
3   what he was talking about telling the truth about.
4   I really don't think I ever knew. I mean, he
5   insinuated that a lot, and for no reason.
6   Q.   It was his impression that for some reason
7   you weren't telling the truth?
8   A.   May I see that, the front part of it?
9   Q.   Yes, ma'am.
10  A.   I just can remember that this didn't really
11  -- I didn't know what he meant by "tell the
12  truth." And, you know, I had talked to this
13  auditor about -- there was some problem with the
14  bed. And it may have been -- we've had trouble
15  with our instructors and auditors agreeing on what
16  they would call a redo.
17       If they -- say our paint shop paints a car
18  and they find a nick in it, the auditors say if
19  you paint it again -- where they're trying to be
20  perfectionists -- you charge the customer twice
21  for it.
22       We've had problems with them not reporting
23  to us if they've done that.

Page 230

1   Q.   Who not reporting that?
2   A.   Instructors. If there was a problem or if
3   there was a concern about this -- something. I
4   really can't remember the details. There was
5   something about this bed. I had talked to the
6   auditor about it because I was concerned.
7        One thing I was concerned about was our
8   instructors were going to Dr. Gainous' house,
9   which is against the rules. We don't go over
10  there.
11       We even had the realtor call one day and
12  said she had the garage door opener to Dr.
13  Gainous' house.
14       So I had expressed concerns to the auditor
15  about this, that I didn't know what was going on.
16  I don't remember. We can look at that audit. I
17  don't remember if something was written up on
18  this.
19       And all I can assume is that he may have
20  said I wasn't telling the truth about this. But I
21  was. I mean I have the date documented, when the
22  realtor called me. I felt like that was something
23  I needed to tell the auditor about that, because

Page 231

1   they were looking at it. And there was a
2   question, in there, whether there was one invoice
3   for the bed or two.
4        And there was some disagreement between Mr.
5   Chambers -- and I on what it was. But, I mean, I
6   think that's what this has to do with it. I don't
7   think he was clear that day on what he was talking
8   about. And I'm saying -- I'm assuming he's saying
9   I was not maybe telling the truth about that. I
10  don't know what he was talking about in that
11  meeting.
12  Q.   And what you're using to refresh your
13  recollection is a note that you created? What
14  you're reading from here?
15  A.   Yes. I wrote this down that day when I came
16  out, because it was a problem.
17  Q.   Okay. And I guess that's what all of these
18  are in here in response to the interrogatories,
19  that you have produced sort of an anecdotal
20  account?
21  A.   If there was a problem, yeah.
22  Q.   These are notes that you made
23  contemporaneously with the events?

Page 232

1   A.   Yes.
2   Q.   For example, you wrote this 7/3/03 note
3   about the Fred Gainous issue, you wrote that note
4   the same day it happened?
5   A.   Yes.
6   Q.   And that's what you're reading from here?
7   A.   Yes.
8   Q.   And it appears that Dr. Chambers apparently
9   thought there was some kind of foul play going on,
10  and he was wondering if you were telling the
11  truth; is that right?
12  A.   I don't know. I think he thinks I said
13  something against Dr. Gainous that wasn't true.
14  That's what I think that was about.
15       Dr. Gainous was a chancellor and a personal
16  friend of Mr. Chambers.
17  Q.   I see. Very good. And so you went to see
18  the chancellor?
19  A.   I did. Because if you'll note here -- of
20  course, this is my response here -- "His worst
21  comment though at the height of his yelling at me
22  was, 'you need to resign.' I responded that I
23  would not give up my career for him, especially

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 233

1   when nothing he has accused me of is remotely
2   true. He then replied, 'when I get back from my
3   trip, I will take you to the Chancellor.' He was
4   going out of town that day. I said, 'no, sir, Mr.
5   Chambers, I will go before you get back.'"
6       I considered him threatening my job by
7   asking me to resign, so I would go to the top man,
8   who is the chancellor, to just say I was concerned
9   about my job and I really didn't know why.
10  Q.   Who was Gainous?
11  A.   No. Dr. Gainous was gone at that time. And
12  that was another question I had during this audit,
13  and that's one thing I talked to Hal Bradsher
14  about.
15      I would say Dr. Gainous was not qualified
16  anymore to have work done at my college. And I
17  called the supervisor to Mr. Bradsher, and she
18  said it was up to the president.
19      And so there was a letter that he had
20  written that he gave them that Dr. Gainous wrote
21  that said Mr. Chambers could approve jobs on live
22  work if he wanted to. So they said nothing about
23  that.

Page 234

1       So he was no longer the chancellor and we
2   were doing work for him. He was in another state
3   and he was not retired. But the chancellor at the
4   time was Dr. Johnson.
5   Q.   Right. So when you said you were going to
6   the chancellor, you weren't referring to going to
7   Gainous, you were referring to going to Dr.
8   Johnson?
9   A.   Yes.
10  Q.   And that's what you did, you went to see
11  Johnson?
12  A.   Yes.
13  Q.   And the purpose of that meeting, you say,
14  was to express concern for your job?
15  A.   Yes.
16  Q.   Well, help me understand what it was that
17  transpired at that meeting? How many meetings
18  were there, first of all? I think you referred to
19  more than one.
20  A.   I think there was July and then there was
21  one more before this.
22  Q.   Okay. Let's talk about July. Tell me about
23  what happened in July. Did you go to his office?

Page 235

1   A.   I did.
2   Q.   And who was in the conference with you?
3   A.   My husband and the chancellor.
4   Q.   Who is your husband?
5   A.   Jerry Greene.
6   Q.   What does your husband do?
7   A.   He's a teacher at Macon East Montgomery
8   Academy.
9   Q.   And why did you take your husband?
10  A.   Because it was a family history. I mean, I
11  was afraid I was losing my job. He went in
12  support of me. He just went to support me.
13  Q.   Okay. And what did you discuss with the
14  chancellor at that meeting?
15  A.   Concerns about my job, and I told him what
16  happened. I also asked him at that meeting -- I
17  told him one thing that Mr. Chambers had said to
18  me was that he was always getting calls about late
19  bills from the chancellor's office. And I said,
20  Have you ever received a call and called Mr.
21  Chambers? He said, I've never had a call about
22  J.F. Ingram's late payment of bills. That was one
23  of the things.

Page 236

1       It was mainly just I was looking for some
2   type of relief or assurance that my job -- I just
3   wanted to make sure that I was okay with the
4   chancellor. I didn't know what may have been -- I
5   didn't know what he had been told about me, but I
6   thought he needed to -- I really didn't know him
7   until then.
8   Q.   Well, but you thought it was important to go
9   see him personally?
10  A.   Yes, at this point.
11  Q.   Did you express to the chancellor at that
12  time that you believed Dr. Chambers was subjecting
13  you to racial discrimination?
14  A.   I think I talked more about hostile work
15  environment at that point. And I'm sure it came
16  up about that some of these things were done
17  because I was a woman.
18  Q.   Well, let me back up. Did you express to
19  Dr. Johnson in this meeting that you believed Dr.
20  Chambers was subjecting you to racial
21  discrimination?
22  A.   I don't recall.
23  Q.   Did you tell Dr. Johnson in this meeting

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

---

Page 237

1  that you believed Dr. Chambers was subjecting you
2  to gender-based discrimination?
3      MR. DEBARDELABEN: Do you know what
4  that means?
5  A.  I just don't remember what all we discussed.
6  That was emotions and --
7  Q.  If you don't remember, that's okay.
8      MR. DEBARDELABEN: If you don't
9  remember, you don't remember. I mean, it was a
10  while back. You can't remember everything. But
11  if Drew doesn't ask it, he doesn't know what
12  you're going to remember.
13  A.  And, of course, I was upset and things, and
14  it's been a while-I mean, I can't really
15  remember everything; and I did not, like, write
16  down everything that I discussed.
17  Q.  Sure. Well, I guess my question is: Were
18  you there just kind of talking about. Am I going
19  to lose my job? or were you there talking about
20  discrimination?
21  A.  Really, yeah, I was more concerned about
22  losing my job, because that may be some kind of
23  relief from the hostility and yelling and things.

---

Page 238

1  Q.  Understood. With respect to the yelling,
2  since you brought it up, it is your contention
3  that Dr. Chambers raises his voice in the
4  workplace?
5  A.  Yes.
6  Q.  He raises it at you?
7  A.  Yes.
8  Q.  He raises it at some of your colleagues that
9  are females?
10  A.  I don't know that I've said that.
11  Q.  Okay. Fair enough. He raises his voice at
12  other men?
13  A.  I mean, I really am talking about myself
14  here.
15  Q.  Okay. Well, I'm just asking you. You can
16  say, I don't know, and that's fine. That's a
17  perfectly acceptable answer.
18      Do you know whether he's raised his voice at
19  Dr. Merk?
20  A.  No, I don't know. I would say not as I've
21  been subjected to; I don't think he ever has.
22  Q.  You've never heard him yell at Dr. Merk?
23  A.  I don't think so.

---

Page 239

1  Q.  Okay. Have you heard him yell at James
2  Wilson?
3  A.  I don't think so.
4  Q.  Have you ever heard him yelling at any other
5  male employees or deans?
6  A.  He probably has yelled at Huffstutler at
7  times. It seemed to be when Huffstutler became
8  more supportive of me, in the later time that he
9  was there, it seemed that he seemed to focus on
10  both of us, as he did in the audit and other
11  things.
12  Q.  And you contend that's because he was
13  supportive of you and not just because Huffstutler
14  was independently deserving of some instruction?
15  A.  They had been together a long time, so I
16  think they had gotten along.
17  Q.  Is it fair to say that Dr. Chambers'
18  management style is a little bit loud?
19  A.  Yes.
20  Q.  He yells kind of at everybody; isn't that
21  right?
22  A.  No. I wouldn't say at everybody.
23  Q.  Well, if I paraded Dr. Merk in here and he

---

Page 240

1  said he's been yelled at by Dr. Chambers, do you
2  have any evidence that that's not true?
3  A.  No.
4  Q.  If James Wilson testifies in this case that
5  Dr. Chambers has yelled at him and has yelled at
6  him and that Wilson has pounded his fist on the
7  desk at Dr. Chambers, would you have any evidence
8  to demonstrate that that's not true?
9  A.  No.
10  Q.  What if Malcolm Montgomery testifies in this
11  case that Dr. Chambers has yelled at him? Would
12  you have any evidence that that's not true?
13  A.  No.
14  Q.  What about Rickey Huffstutler? If he
15  testifies in this case that Dr. Chambers has
16  yelled at him, would you have any evidence that
17  that's not true?
18  A.  No.
19  Q.  Are you going -- you're talking to Dr.
20  Johnson about Chambers going to the chancellor
21  against you or whatever. And your recollection of
22  that conversation was mainly focused on, Am I
23  going to lose my job or whatever, right?

60 (Pages 237 to 240)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 241

1  A.  Right
2  Q.  It wasn't so much focused on reports of
3  discrimination, racial or gender-based; is that
4  right?
5  A.  Right
6  Q.  And we were discussing whether Dr. Chambers
7  has a management style of yelling at his
8  employees, and you agreed he has a loud management
9  style; is that true?
10  A.  Loud and negative.
11  Q.  Loud and negative. And you don't approve of
12  that management style; is that true?
13  A  True.
14  Q.  You think there's a better way to manage a
15  college as a president than yelling at your
16  employees?
17  A.  I do. That's my opinion.
18  Q.  And you think he could be more positive as a
19  president?
20  A.  Yes.
21  Q  And if his management style was better in
22  that regard. do you believe you would have a
23  better working relationship with Dr. Chambers?

Page 242

1  A.  Yes.
2  Q.  Tell me about this second meeting that you
3  had with the chancellor, I guess, just before this
4  letter was issued. Is that what you said?
5  A.  I really -- I really can't -- I'm having
6  trouble remembering.
7  Q.  Yes, ma'am.
8  A.  I don't remember if it was to -- I guess it
9  was when he told me that he was going to suggest
10  this. I think he called me back, and I'm not
11  really sure if it was September, November. I
12  might have it documented somewhere, but I don't
13  know that I do. And I think he kind of wanted to
14  know how things were going.
15  Q.  He called you back or did you call him back?
16  A.  He called me back. I think I only went down
17  there the one time on my own.
18  Q.  So the second time, did you go to see him in
19  person or did you speak with him on the phone?
20  A.  I went in person and I went alone. But he
21  had Debbie Dahl in there. So it was Debbie Dahl,
22  Dr. Johnson, and myself.
23  Q.  Okay. Tell me about that meeting and what

Page 243

1  was discussed
2  A.  I really can't remember. I think is when --
3  I really don't remember. Except I feel sure that
4  this is when he said he would like to do that, to
5  bring this team out there.
6  Q.  Okay.
7  A.  I really can't remember. But I think we
8  maybe talked about some of the same things that
9  had happened, and maybe some more things, I'm sure, are
10  documented that happened in there.
11  Q.  Where are they documented?
12  A.  And I might have it in some of my notes. I
13  just really can't remember.
14  Q.  Well, I invite you to look at anything that
15  you think would help, if there's something you
16  could read that will help you remember what you
17  said
18  A.  I don't think I had much written about that.
19  Okay. On August 13. '03, I said, "The Chancellor
20  called me back to his office to discuss further
21  the complaints I had filed with him concerning Mr
22  Chambers. I met with Chancellor Roy Johnson and
23  Vice Chancellor Debbie Dahl."

Page 244

1  Q.  Did you discuss what was talked about?
2  A.  I said, "I never wanted any action at all as
3  far as disciplining him. I only made the same
4  request at both meetings. I wanted him to stop
5  yelling at me in meetings, stop berating me at
6  cabinet meetings. and stop undermining my ability
7  to do my job with his personal attacks, especially
8  those in front of the subordinates from my
9  department. One of the things I discussed with
10  the Chancellor at both meetings was a claim he
11  made that 'vendors had contacted the Chancellor's
12  office about unpaid bills.' I asked the
13  Chancellor if that were true. They replied that
14  they had never received any call about J.F.
15  Ingram."
16  So that was August 13th. And I don't think
17  -- let me make sure there wasn't another one.
18  That's all I have on that. Apparently that was
19  the last until this, maybe.
20  THE COURT REPORTER: Is that part of an
21  exhibit that has already been marked?
22  MR. CHRISTMAN: I'm going to make that
23  an exhibit right now. These are Ms. Greene's

61 (Pages 241 to 244)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 245

1    responses to my interrogatories and request for
2    production. I'll make them Exhibit 11
3    collectively. It's a multipage exhibit.
4         (Defendants' Exhibit No. 11 was
5         marked for identification and a
6         copy of the same is attached
7         hereto.)
8         MR. CHRISTMAN:  And she was referring
9    to a response to No. 23 -- and there's a "23" at
10   the top of the page -- and she was looking at
11   August 13th of '03, the note that she was reading
12   from.
13   Q.   Did you specifically reference in your
14   meeting -- it's not noted here in your notes --
15   but do you have an independent recollection, that
16   you didn't record, that you complained to the
17   chancellor that Mr. Chambers was treating you
18   poorly because of your race?
19   A.   I don't remember.
20   Q.   Your gender?
21   A.   I don't remember.
22   Q.   Okay. You would expect --
23   A.   It's very possible, but I don't remember.

Page 246

1    Q.   Well, you would expect, if you had a
2    complaint of racial or gender-based
3    discrimination, for the chancellor to take some
4    action, would you not?
5    A.   I would.
6    Q.   No action was forthcoming in that regard; is
7    that true?
8    A.   That's true.
9    Q.   So it's your understanding that Defendants'
10   Exhibit 10, this December 18, 2003, letter from
11   Dr. Johnson, the chancellor, was a result of these
12   two meeting; is that your understanding?
13   A.   Yes.
14   Q.   He says at the top of the letter, "Based on
15   concerns expressed to me by Ms. Monica Greene,
16   Dean of Fiscal Affairs, I have determined it
17   appropriate to conduct a peer review of the
18   business operations at the college."
19        And this letter was written to the president
20   of the college; is that right?
21   A.   Yes.
22   Q.   Okay. And you don't dispute Dr. Chambers --
23   excuse me -- Dr. Johnson's assessment -- excuse

Page 247

1    me
2         You don't dispute Dr. Johnson's contention
3    here that he sent this peer review team as a
4    result of concerns expressed by you?
5    A.   I disagree with that statement. Not only
6    from this. The chancellor did say that Mr.
7    Chambers had come to him and, you know, said
8    things about me. He didn't tell me anything
9    specific, but he had gone to him. I think it's a
10   combination and my going
11        But I never agreed with the way this was --
12   I did not ask for this team and it was the
13   chancellor's idea. But it was worded that way and
14   there was nothing I felt like I could do about it.
15   Q.   There's no reference in there to it being
16   based on anything but concerns expressed by you,
17   is there?
18   A.   I mean, all we can go by is what it says.
19   Q.   Right. And you don't have any evidence that
20   his decision was based on anything but what he
21   says, concerns expressed by you, Monica Greene,
22   right?
23   A.   There were two other witnesses too, you

Page 248

1    know. that you could ask later
2    Q.   Who's that?
3    A.   Debbie Dahl in the second meeting and my
4    husband. the first
5    Q.   And what do you believe Debbie Dahl or your
6    husband would say concerning whether the
7    chancellor based his intention to send a review
8    team on anything other than your concerns?
9    A.   Say that again, please.
10   Q.   What do you expect your husband or Debbie
11   Dahl to testify was the basis of the chancellor's
12   decision to send a review team, other than what he
13   says in this letter, concerns expressed by you?
14   A.   My husband will agree with what I'm saying,
15   that that's not why that team came, that's not
16   what was said
17   Q.   What would he say? What would he say was
18   the reason for the review team. if it wasn't
19   concerns expressed by you?
20   A.   I don't know. I did not ask for a review
21   team to come; it was Dr. Johnson's idea. I don't
22   know what Debbie Dahl would say
23   Q.   And he didn't say that you asked for it,

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

Page 249

1  does he?
2  A.  Concerns expressed.  He's acting like -- I,
3  mean, you know. we're reading between the lines,
4  so I don't know.
5  Q.  Well, I'm not intending to read between the
6  lines; I'm intending to read the face of the
7  letter.
8      He doesn't say in here that you asked for a
9  review team, does he?
10  A.  No.
11  Q.  He says that based on concerns expressed by
12  you, he thought it appropriate and decided to do
13  this; is that right?
14  A.  He did.
15  Q.  So the review team was assembled; and it was
16  headed, according to this letter. by Debbie Dahl;
17  is that right?
18  A.  Yes.
19  Q.  And she is an individual who you said would
20  be a good source as to your performance and to any
21  assessments of possible weaknesses in the business
22  office or your performance; isn't that true?
23      (Witness confers with counsel.)

Page 250

1      MR. DEBARDELABEN: Well. just --
2  Q.  Let me say something just for the record and
3  for your benefit.  When we're in the deposition,
4  I'm basically just asking you questions, and you
5  can answer them as best you can.  Your lawyer is
6  really not allowed to help you answer the
7  questions or to guide you or coach you through
8  this process.
9      He's here to support you and to object to
10  anything that I'm doing that's squirrelly and I
11  need to fix.  And I'm glad to fix it if I'm messed
12  up.  But he really can't provide you with any
13  guidance on that, other than if he has an
14  objection to my question, or if you and I just
15  aren't connecting and he can help us connect; I
16  want to connect.  But I really don't want you to
17  be conferencing in the middle of my question.
18      MR. DEBARDELABEN: She's got concerns.
19  And when we get there, I'll let you know.  It
20  hasn't gotten there yet.  But I understand her
21  concerns and I think you will too.
22      MR. CHRISTMAN: Okay.  I just want to
23  make sure that when I ask my question that she's

Page 251

1  not consulting you for the right response.
2      MR. DEBARDELABEN: No, no.  It's not
3  about that.  And when you ask the right question,
4  she will tell you.  But until that time. she's
5  probably going to lean over here and say. Can I
6  answer?  And I think you'll understand why.
7      MR. CHRISTMAN: Okay.  Well, can we
8  just get to it right now?
9      MR. DEBARDELABEN: No.  No, we can't
10  get to it now.  You might not get there, so . .
11  A.  You know, we had earlier, we had the Debbie
12  Dahl thing.
13      MR. DEBARDELABEN: She's got something
14  she's very concerned about.  She doesn't just want
15  to --
16  Q.  Well. Debbie Dahl --
17  A.  I did say she is qualified, but I did say
18  that I was not pleased with the team that came
19  because I felt like they were handpicked and there
20  were some other problems.
21      MR. DEBARDELABEN: Just let him ask the
22  questions.
23  Q.  Okay.

Page 252

1  A.  So, yes, Debbie Dahl was a good leader.
2  Q.  And she was a good source to determine your
3  performance?
4  A.  I suppose.
5  Q.  And if she is to give testimony in this case
6  that many of the weaknesses pointed out by Dr.
7  Chambers are in fact weaknesses of this business
8  office, you would agree that her criticisms are
9  valid, would you not?
10  A.  I don't know.
11  Q.  You don't know?
12  A.  I don't know.
13  Q.  Okay.  Let's look now at the results of this
14  peer review assessment.  I'm going to label these
15  separately.  One is Defendants' 12.  It's the
16  letter to the president from the chancellor dated
17  February 10, 2004.
18      (Defendants' Exhibit No. 12 was
19      marked for identification and a
20      copy of the same is attached
21      hereto.)
22  Q.  Tell me if you've seen that letter before.
23  There's some underlining and markings on there.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 253

1   that probably are not original. I don't know
2   where they came from. I don't know if those are
3   your marks or if those are --
4   A.   I'm not sure that I saw this. I can't say
5   for sure. I probably did, but I can't say for
6   sure. I may have just gotten a letter from Mr.
7   Chambers; I can't remember.
8   Q.   All right.
9   A.   But these are not my marks.
10  Q.   Okay. And then Exhibit 13 is the actual
11  report.
12          (Defendants' Exhibit No. 13 was
13          marked for identification and a
14          copy of the same is attached
15          hereto.)
16  A.   I have seen that.
17  Q.   Would you take a look just to make sure?
18  A.   I don't think I got this, but let me look.
19  Yes, I have seen this.
20  Q.   Very good. I'm going to let you look at
21  that copy, and I'm going to look at one here.
22  Let's look first at the letter.
23      At the end of the second full paragraph, you

Page 254

1   will note that Dr. Chambers was directed by the
2   chancellor to take all necessary action to cause a
3   complete conversion to the ACCESS software system
4   to occur within a four month time frame. Is that
5   your understanding of that letter?
6   A.   Yes.
7   Q.   Yes?
8   A.   Yes.
9   Q.   And it's your understanding that Dr.
10  Chambers did direct you at this time to make a
11  complete conversion to the ACCESS system; isn't
12  that true?
13  A.   I'm sure he did. I don't remember getting
14  anything in writing. I would assume, but I don't
15  know that I had anything in writing
16  Q.   And if the chancellor directed Chambers to
17  implement this ACCESS system, that was his
18  responsibility, wasn't it, to make sure he obeyed
19  the chancellor's directive?
20  A.   Yes.
21  Q.   And it would be your responsibility to make
22  sure you obeyed his directive at the same time;
23  isn't that right?

Page 255

1   A.   Yes.
2   Q.   Even if we don't think it's a great system,
3   it's still your responsibility and his
4   responsibility to comply; is that right?
5   A.   Yes.
6   Q.   The system was not converted -- completely
7   converted -- within four months of that letter;
8   isn't that true?
9   A.   I don't remember. I would have to go back
10  and see those dates.
11  Q.   Well, you can't say with some level of
12  assurance that you did not have a complete
13  conversion by the middle of 2004, June?
14  A.   I don't remember when we --
15  Q.   Haven't you only recently completed your
16  conversion on the live work and contract modules?
17  A.   We've been on the live work since -- it's
18  probably been two years. We should have started
19  in October of '05, the live work
20      But the live work program was not where we
21  could get it all -- it was not ready by then. I
22  would think we had everything except live work and
23  payroll contracts, which we would have to check on

Page 256

1   payroll contracts. I'm not sure that they were
2   where we could put them on. But everything else
3   should have been on by that time period. I would
4   have to go back and check dates. But we did
5   everything humanly possible to get that done.
6   Q.   You did everything humanly possible to get
7   your contract module implemented?
8   A.   To get everything on. I'm not sure that
9   four months -- I mean, we -- we couldn't get the
10  -- the live work, I don't think, was ready.
11      But anyway, we did all the others. And they
12  -- I don't remember what happened. I think we
13  explained to him that the other was not ready. I
14  don't recall what happened there. But we have all
15  the contracts on that, on that system -- all
16  programs on that system.
17  Q.   You're saying you have all the modules
18  activated now?
19  A.   Yes.
20  Q.   That's your --
21  A.   I would say the contracts on our side, and
22  that's been a year ago. That was the last thing,
23  payroll contracts.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

|  | Page 257 |
|---|---|

1  Q.  Wouldn't Jim Merk know if that module was
2  activated?
3  A.  I don't know what he knows.
4  Q.  Well. isn't he the IT guy at Ingram?
5  A.  He's the Dean of Instruction. The IT guy is
6  Hubert Griffin.
7  Q.  And Hubert Griffin reports to Dean Merk?
8  A.  Yes.
9  Q.  And Dean Merk gives Hubert Griffin any
10  instructions that he gets about the system; isn't
11  that right?
12  A.  Yes.
13  Q.  Wouldn't Dean Merk know whether the ACCESS
14  modules are all completely activated on the
15  system?
16  A.  I don't know what Dean Merk would know. You
17  would have to ask him.
18  Q.  I have. If he testifies that not all of the
19  modules are activated as we sit here today, do you
20  have any reason to believe that that is not true?
21  A.  As far as my side, my understanding,
22  everything on my end of it is done. If there's
23  something not done on payroll contracts, it's

|  | Page 258 |
|---|---|

1  something they didn't do. And the personnel
2  department -- which Dr. Merk is involved in all
3  sorts of things. I don't know what he does with
4  personnel.
5      But as far as the business office side, all
6  ACCESS programs are on, no matter what Dr. Merk
7  says.
8  Q.  As far as you know?
9  A.  As far as I know.
10  Q.  And if there's information out there that
11  demonstrates that the business office side of the
12  contract module has not been fully implemented,
13  somebody has messed up that works for you; isn't
14  that true?
15  A.  I was not aware of it.
16  Q.  And someone has messed up that works for
17  you; isn't that true?
18  A.  I wouldn't say that. I'd say I'm not aware
19  of it.
20  Q.  Well, if it's not done -- you think it's
21  done. If it hasn't been done -- do you expect
22  that it has already been done already?
23  A.  I do.

|  | Page 259 |
|---|---|

1  Q.  And if it hasn't been done, has someone
2  failed to comply with your directive to get it
3  done?
4  A.  Possibly.
5  Q.  All right. Let's look at this report.
6  You'll note the first page is "Purchasing." Do
7  you see that?
8  A.  I do.
9  Q.  And you see a section that's labeled
10  "Strengths" and a section that's labeled
11  "Weaknesses"?
12  A.  Yes.
13  Q.  And you will agree with me that this review
14  team refers to items that need attention as
15  weaknesses? Would you agree with that?
16  A.  I agree with that.
17  Q.  Okay. Before we get started going through
18  these -- we won't address them all line by line,
19  but we will address a number of them -- do you
20  generally agree with the outcome of this review or
21  do you generally disagree with it?
22  A.  Generally disagree.
23  Q.  Very good. The review team noted certain

|  | Page 260 |
|---|---|

1  strengths in purchasing. Do you see that?
2  A.  I do.
3  Q.  Three of them. "Requisitions are submitted
4  to immediate supervisor for approval."
5      That was a strength. Do you agree with
6  that?
7  A.  Yes.
8  Q.  No. 2. "Requisitions are checked against
9  budgets by Dean of Finance" -- which is you -- "to
10  ensure adequate funding."
11      Do you agree with that?
12  A.  I agree.
13  Q.  And, "Purchase orders are processed in the
14  ACCESS system."
15  A.  Yes.
16  Q.  Do you agree with that?
17  A.  Yes.
18  Q.  Those are all the strengths. And you agree
19  with all of those?
20  A.  Yes.
21  Q.  Weaknesses. "Requisitions must be approved
22  by both the Vice President and the Dean of Finance
23  before a purchase order number is assigned."

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 261

1    Do you agree that's a weakness, or was a
2  weakness at that time?
3  A.   I don't really know.  They didn't say why
4  they said that was a weakness.  I don't know why
5  that's a weakness.  I would think we would -- I
6  don't see what's wrong with the vice president and
7  the -- I don't agree with that.
8  Q.   All right.  You don't agree with that.  No.
9  2.  "Purchase order numbers are assigned by the
10  Dean of Finance."
11    Do you agree that that is a weakness, or was
12  at that time?
13  A.   We have changed it since then.  I didn't
14  really agree with it, but it's one of the changes
15  I made in the 2004.  So right after this, we did
16  make that change, and I assigned it to someone
17  else.
18  Q.   Okay.  This might go a little faster -- and
19  I invite you to add what you think is necessary;
20  I'm not trying to limit your testimony -- but we
21  may be able to move through this a little faster.
22    I'm interested in whether you agree that
23  it's a weakness or don't agree that it's a

Page 262

1  weakness.  And you can just tell me whether you
2  agree or not.
3  A.   Okay.
4  Q.   Do you think the fact that you assigned
5  purchase orders was a weakness at that time?
6  A.   No.
7  Q.   "Dean of Finance enters and prints purchase
8  orders."
9    Do you agree that it was a weakness for you
10  to enter and print purchase orders at that time?
11  A.   No.
12  Q.   Next one.  "Purchase orders are not
13  processed daily."
14    Do you agree that that was a weakness at
15  that time?
16  A.   No.
17  Q.   No. 5.  "Purchase orders are not partially
18  unencumbered when order is not complete."
19    Do you agree that that was a weakness at
20  that time?
21  A.   That was -- that's not a correct statement.
22  Q.   My reading of it or the way it is written?
23  A.   Well, they were partially unencumbered.  I

Page 263

1  mean. maybe they found one or two, but we were --
2  I don't know if everybody is familiar with that
3  term.  But anyway, I disagree with that.
4  Q.   You think it's just a false statement?
5  A.   Yes.
6  Q.   Not only do you disagree that it's a
7  weakness, you think it's false?
8  A.   Yes.
9  Q.   No. 6.  "Items received are not processed
10  and distributed in a timely manner."
11    Do you agree that the items received were
12  not processed and distributed in a timely manner?
13  A.   I disagree.
14  Q.   Disagree.  "Budgets are not issued to
15  departments in a timely manner."
16    Do you agree with that statement?
17  A.   No.
18  Q.   You disagree?
19  A.   Disagree.
20  Q.   Okay.  So to wrap up, you have agreed with
21  all of the strengths and none of the weaknesses;
22  is that correct?
23  A.   Correct.

Page 264

1  Q.   And you disagree with Dr. Chambers'
2  assessment that you have difficulty accepting or
3  assessing your own weaknesses?
4  A.   Say that again.
5  Q.   You disagree with Dr. Chambers' comment to
6  you that you have difficulty accessing and
7  admitting your own weaknesses?  You disagree with
8  that statement, don't you?
9  A.   I do.
10  Q.   How about the recommendations?  Do you agree
11  with any of those?
12  A.   I disagree with the recommendations.
13  Q.   And I won't go through them.  Payables.
14  Number of strengths listed here.  Six.  "All mail
15  is opened in a single location."  That's a
16  strength.
17    Do you agree that that's a strength?
18  A.   Yes.
19  Q.   "Invoices are routed to Accounts Payable
20  clerk daily."
21    Do you agree with that?
22  A.   Yes.
23  Q.   Just go ahead and read the rest of them

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 265 | Page 267 |
|---|---|
| 1  there  We won't belabor the point | 1  A.  No. |
| 2  Do you agree with the remaining strengths? | 2  Q.  No. 2  "Instructors and staff should be |
| 3  A.  I do. | 3  educated as to the flow of paperwork and held |
| 4  Q.  Do you think that they are all strengths? | 4  accountable for turning in invoices and packing |
| 5  A.  Yes | 5  slips to the Business Office." |
| 6  Q.  Let's look at the weaknesses  There are | 6  Do you agree with that? |
| 7  three  Again, we are on the second page. which is | 7  A.  I do |
| 8  payables. | 8  Q.  Well, how do you hold them accountable? |
| 9  Weakness are: "Complaints were made that | 9  A.  Memorandums  I'm sure I have a memorandum |
| 10  college invoices are routinely paid late." | 10  that went out  All I can do is that, and hope |
| 11  A.  I disagree. | 11  that it's enforced  If it's not. I will write a |
| 12  Q.  No. 2  "Many times purchase orders have not | 12  letter to the president saying that I'm having a |
| 13  been processed in ACCESS so invoices cannot be | 13  problem with that. |
| 14  paid as received in a timely manner." | 14  Q.  How did you go about holding them |
| 15  A.  Disagree. | 15  accountable?  Do you have a specific response to |
| 16  Q.  No. 3  "Instructors and staff picking up | 16  that recommendation? |
| 17  orders do not turn in paperwork to the Business | 17  A.  I probably do  I would have to look it up. |
| 18  Office in a timely manner." | 18  Q.  You don't know as we sit here today? |
| 19  A.  I agree with that | 19  A.  I don't remember |
| 20  Q.  How about that  Let's talk about that one | 20  Q.  Receipts  Look there through the strengths |
| 21  some more. | 21  Ms. Givens name is mentioned there a couple of |
| 22  You agree that there are some of your | 22  times |
| 23  instructors and staff that are not picking up | 23  No. 6  "Julie Givens (Payroll/Cashier) |

| Page 266 | Page 268 |
|---|---|
| 1  their paperwork and turning it in to you in a | 1  makes deposits timely " |
| 2  timely manner? | 2  Do you agree with all the strengths, |
| 3  A.  I agree | 3  including No. 6? |
| 4  Q.  That's really a criticism of the instructors | 4  A.  I agree with all the strengths. |
| 5  and the staff who are failing to pick up and turn | 5  Q.  There are four weaknesses  Why don't you |
| 6  in their papers, isn't it? | 6  read through them real quickly and tell me if you |
| 7  A.  (Witness nods head.) | 7  agree with any of them. |
| 8  Q.  It's really not a criticism of your office, | 8  A.  I disagree with all of the weaknesses. |
| 9  so to speak, because there's not much you can do | 9  Q.  Okay  Read through the recommendations |
| 10  about that, is there? | 10  there and see if you agree with the four |
| 11  A.  Right. | 11  recommendations that were made by the review team. |
| 12  Q.  So the one weakness that you do agree with | 12  And they go on to the next page, by the way. |
| 13  associated with payables is the reference to what | 13  Pages 3 and 4 |
| 14  the instructors and staff are failing to do? | 14  A.  I don't agree with those recommendations. |
| 15  A.  Correct. | 15  Q.  The next section, I believe, is live work. |
| 16  Q.  The remaining weaknesses you disagree with? | 16  16 strengths listed there  Take a moment to look |
| 17  A.  I do. | 17  through those and let me know when you are ready. |
| 18  Q.  And you agree with all the strengths? | 18  (The witness examines the |
| 19  A.  Yes. | 19  document.) |
| 20  Q.  Recommendations  "Purchase orders should be | 20  A.  I agree |
| 21  processed daily so paperwork will be in order for | 21  Q.  With all of those strengths? |
| 22  payment." | 22  A.  I do. |
| 23  Do you agree with that recommendation? | 23  Q.  There are two weaknesses  "College does not |

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 269

1    use receipt book for live work performed in the
2    Barbering Department."
3        Do you agree with that?
4    A.   I would need to look back to see. That's
5    one of the changes we made. I don't remember if
6    we made it before this or after, so I would need
7    to look at that before I would answer. It may
8    have come about before this. If we weren't, I
9    agree that that would be fine to change.
10   Q.   Well, would you agree that's a weakness?
11   A.   In their opinion. It's not necessarily a
12   weakness, it's just a suggestion that I agree
13   with.
14   Q.   Well, I'm talking about in your opinion.
15   A.   In my opinion it's not a weakness; it's
16   something they suggested that I -- it's fine to
17   do.
18        The second one, I don't agree that that's a
19   weakness because we didn't use ACCESS.
20   Q.   Okay. And the recommendations there are
21   basically reflective of those two listed
22   weaknesses.
23        Would you agree or disagree with those

Page 270

1    recommendations?
2    A.   I made the No. 1 change. so I would say I
3    agree with it. No. 2 I don't agree with.
4    Q.   And you agree with the No. 1 recommendation
5    inasmuch as it's okay to do it that way, but you
6    do not think it was a necessary implement; is that
7    true?
8    A.   Right. But we did implement it.
9    Q.   All right. Financial Reporting/Facilities.
10   Four strengths listed there.
11        What do you see in there regarding your
12   agreement or disagreement? That's a terrible
13   question. Do you agree with those four?
14   A.   I agree.
15   Q.   Weaknesses. "Externally developed software
16   programs (primarily for report generation) are
17   written and maintained by an outside consultant.
18   As a result. few management reports are printed
19   and used. This deficiency would place
20   administrators at a management disadvantage."
21        Do you agree with that?
22   A.   I disagree.
23   Q.   No. 2. "Purchase orders and payables are

Page 271

1    not processed in a timely fashion."
2        Do you agree or disagree?
3    A.   I disagree.
4    Q.   No. 3. "The organizational charts do not
5    reflect clearly the actual chain of command. The
6    President indicated that the Vice President was
7    next in command, however the Dean of Fiscal
8    Affairs apparently does not report to the Vice
9    President. The Dean must provide more leadership"
10   -- meaning the Dean of Fiscal Affairs. "The Dean
11   must provide more leadership to both Business
12   Office staff and to other college managers."
13        Do you agree with No. 3?
14   A.   No.
15   Q.   Let's clear something up real quick. Dr.
16   Chambers didn't write any of this, did he?
17   A.   I don't know.
18   Q.   You don't have any reason to believe that
19   Dr. Chambers wrote the assessment --
20        (Witness confers with counsel.)
21   Q.   I'm sorry, ma'am.
22   A.   I'm sorry. I thought it might be the time
23   to --

Page 272

1        MR DEBARDELABEN: No, no. Just answer
2    the question.
3    Q.   You don't have any reason to believe that
4    Dr. Chambers wrote the assessment of the
5    chancellor's review team, do you?
6    A.   I don't know.
7    Q.   If Debbie Dahl testifies that she wrote
8    many, if not most. of these items. would you
9    disagree with that?
10       MR. DEBARDELABEN: That she wrote them?
11       MR. CHRISTMAN: She wrote them.
12   Q.   Would you disagree with that?
13   A.   No. If she says she did in her testimony, I
14   would say she did.
15   Q.   Is it surprising to you that many of her
16   criticisms are very similar to those of Dr.
17   Chambers, particularly with regard to purchase
18   orders and payables not being processed in a
19   timely fashion? Does that surprise you?
20   A.   No.
21   Q.   Okay. No. 4. "All administrative personnel
22   appeared to be overly contentious with little
23   cooperation and trust existing among them."

68 (Pages 269 to 272)

Page 273

1    Would you agree with that weakness?
2  A.   No. And that's not really -- administrative
3  personnel would not be the business office
4  function. I mean, one. I would be considered an
5  administrator.
6  Q.   Well, isn't everybody that works for you
7  administrative personnel?
8  A.   I would say this is the administrators at
9  the college. I don't really know what they're
10 talking about here. That's not my office they're
11 talking about.
12 Q.   You don't think so?
13 A.   No. We work very well together.
14 Q.   Well, what if they're talking about your
15 office and its interaction with other offices?
16 A.   Maybe they are. I don't know what they're
17 talking about. I disagree with it.
18 Q.   Very good. Recommendations 1 through 3.
19 Take a peek at those and tell me if you agree or
20 disagree with the recommendations listed there.
21 A.   I disagree with No. 1, but I did it because
22 the chancellor said I -- this was the chancellor's
23 report, so we did it. But I don't agree that we

Page 274

1  needed to.
2  Q.   Yes, ma'am.
3  A.   I disagree with No. 2. And I don't remember
4  if we made those changes though.
5      You know, a lot of things that I disagreed
6  with we did because the chancellor said to.
7  Q.   Yes, ma'am.
8  A.   And I disagree with No. 3.
9  Q.   Okay. And we're nearing the end, I think.
10 Computer System. There's one strength listed
11 there regarding the "old Ingram system" has many
12 good features.
13     Read the remainder of that paragraph and
14 tell me if you agree with that strength.
15 A.   I agree.
16 Q.   And the weakness listed there is only one,
17 and it's associated with the ACCESS system and
18 your use of a consultant is what they claim is a
19 dual process that causes timeliness problems and
20 creates unnecessary errors.
21     Do you agree with that weakness?
22 A.   I disagree.
23 Q.   Recommendations. The only one is to fully

Page 275

1  administrate one software system. Says that
2  duplicative efforts are unnecessary in terms of
3  staff work. late processing, inadequate management
4  reports. and a waste of college resources.
5      Do you agree with that recommendation?
6  A.   No.
7  Q.   Do not agree with that. Okay.
8  A.   But we did change to the system.
9  Q.   But you disagree?
10 A.   I disagree.
11 Q.   Budget Reports. There are three strengths
12 listed. Tell me what you think about those three
13 strengths. Do you agree with those?
14 A.   Yes.
15 Q.   And the weaknesses are two: Duplication of
16 the reports from both systems.
17     You've reflected that you don't agree with
18 that.
19 A.   I disagree with both of those.
20 Q.   Okay. And you don't agree that reports are
21 not provided in a timely manner? You disagree
22 with that?
23 A.   Yes, I disagree.

Page 276

1  Q.   And the recommendation is, of course,
2  associated with the ACCESS system. And you've
3  testified already that you've implemented the
4  ACCESS system but you don't agree with the
5  recommendation?
6  A.   Correct.
7  Q.   Restricted Funds. Page 11. What is
8  restricted funds. by the way?
9  A.   Restricted funds are funds that come to the
10 college and have a purpose that we must abide by.
11 They are restricted to a certain program.
12 Q.   Like a federal program?
13 A.   Yeah.
14 Q.   If the federal government sends you money,
15 you can't spend it on anything you want?
16 A.   Right. And they have guidelines that we
17 have to go by.
18 Q.   You've got to spend the money according to
19 what they tell you to, right?
20 A.   Right, right.
21 Q.   And those are restricted funds?
22 A.   Yes.
23 Q.   And those have to be closely guarded?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

---

Page 277

1  A   Yes.
2  Q   By you and your office?
3  A   Yes, and my office.
4  Q   And you are ultimately responsible for
5  ensuring that restricted funds are appropriately
6  processed and managed?
7  A   Yes.
8  Q   Strengths. "Currently, seven restricted
9  funds are processed in the Business Office."
10     What's that AE there?
11  A   Adult Ed.
12  Q   "Adult Ed was examined as an example... and
13  a good job is being done of keeping up with
14  expenditures and asking for reimbursement from the
15  state."
16     Do you agree with that?
17  A   I do.
18  Q   Would you agree with Debbie Dahl if she
19  testifies that there are often funds available to
20  you and to your college that you fail to timely
21  request and they simply sit at the chancellor's
22  office waiting to be sent to your college?
23  A   I disagree.

---

Page 278

1  Q   And if she testifies that that's happened on
2  more than one occasion, that all you have to do is
3  ask for the money and it comes to you, but you
4  fail to do it, do you disagree?
5  A   I do.
6  Q   Weakness listed here.
7  A   I disagree.
8  Q   Disagree with the weakness. Okay.
9  A   And I disagree with the recommendation. But
10  she was -- we did change since then.
11  Q   Very good. Payroll. Strengths. "Julie
12  Givens processes payroll for 133 employees. She
13  also serves as the college cashier, handles petty
14  cash, accounts for capital assets, and serves as
15  Ms. Greene's secretary. Julie's been with the
16  college many years and has performed the payroll
17  duties for the last two years. She is familiar
18  and comfortable with the ACCESS system and said
19  that she learned payroll on this system and never
20  used the old Ingram system."
21     That's a strength. Do you agree with that?
22  A   Yes.
23     MR. CHRISTMAN: Well done.

---

Page 279

1     MS. GIVENS: Thank you.
2  Q   Weaknesses. Five are listed.
3     "Julie prints and files all reports from the
4  payroll and leave modules and only a limited
5  number are necessary."
6     Do you agree with that?
7  A   I disagree.
8  Q   Disagree. No. 2. "...contracts module is
9  not used..."
10     Do you agree with that, that that's a
11  weakness?
12  A   I agree that we were not using it at the
13  time. I don't agree that it was a weakness. But
14  I agree that we were not using it at that point.
15  Q   Very good. No. 3: Optional deductions
16  seemed excessive.
17     Do you agree with that?
18  A   No.
19  Q   No. 4. "The college does not offer direct
20  deposit..."
21     Do you agree that that was a weakness?
22  A   No.
23  Q   No. 5. "There appears to be disharmony

---

Page 280

1  between payroll and personnel functions."
2     Do you agree with that?
3  A   I agree.
4  Q   All right. You agree that there was at that
5  time disharmony between payroll and personnel?
6  A   Yes.
7  Q   Why was there disharmony?
8  A   I think that's a better question for Ms.
9  Givens at her time. That's her area.
10     MR. DEBARDELABEN: Well, you can answer
11  what you know.
12  Q   She reports to you, right?
13  A   Yeah. She -- in my opinion, Julie was doing
14  the payroll portion of it. But personnel, all
15  they wanted to do was blame the business office.
16  And there were things -- I mean, ACCESS came and
17  told us that it was personnel's job to do -- you
18  know, it's one of those things Julie has a part of
19  it, but there's also a personnel part.
20     They actually print the contracts and
21  everything. They have not printed those off.
22  That is not our area. So there was -- I would say
23  there was disharmony because Julie doesn't

---

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 281

1   appreciate doing her part and them not doing
2   theirs
3       And then, of course, they're blaming us for
4   something, I'm sure. But you can check it and see
5   whose part is in there. They have not run a
6   contract off of there that I know of. But that's
7   their end of it. But our side is there. and I'll
8   be glad to show someone.
9   Q.  Very good. So the disharmony is essentially
10  because the payroll side has not really
11  implemented what they need to implement; but your
12  office is not responsible for this disharmony?
13  A.  No. The payroll has done their part;
14  personnel has not.
15  Q.  Very good. Payroll being you?
16  A.  My office.
17  Q.  Personnel being them?
18  A.  Yes.
19  Q.  Recommendations. There are four. Do you
20  disagree or agree with those recommendations? I
21  am mistaken when I said there were four. There
22  are five. There's another one on page 13.
23  A.  I'm okay with No. 1. We were never really

Page 282

1   told/trained to know what we didn't need to run.
2   I mean, I don't have a problem. And probably
3   since then we're not running as many. I don't
4   have a problem with No. 1.
5   Q.  Hold on. Before we go on, let's talk about
6   it.
7   A.  They're essentially saying she's running too
8   many reports.
9       I don't remember anybody ever telling her
10  what reports she should or shouldn't run. I'm
11  sure, since this time, she has called and we've
12  straightened that out. But that might be
13  something you want to ask her about at her time.
14  Q.  Well, she reports to you and you're
15  responsible ultimately for her?
16  A.  I am. But, you know, I do agree in letting
17  people perform their jobs. I don't micromanage.
18  And so this would -- I would have told her to
19  check into this.
20  Q.  Yes, ma'am. And she should have reported
21  back to you?
22  A.  And she should have done it. That's three
23  years ago. I don't remember the ins and outs of

Page 283

1   it. But I feel quite sure that it has been done.
2   Q.  And you agree that it was important for you
3   to determine what reports were necessary? You
4   didn't do that before and you needed to do it?
5   A.  No, I don't think it's -- I think that's
6   something that ACCESS, when they are training us,
7   should tell us what is needed by most colleges
8   Q.  So you disagree that the business office
9   should determine the essential reports necessary?
10  A.  I do. I do disagree with that.
11  Q.  All right. And the payroll department at
12  another ACCESS college could be helpful.
13      Do you think that's --
14  A.  I agree with that.
15  Q.  And did you instruct anyone to follow --
16  A.  I don't remember.
17  Q.  Okay. Do you agree that determining what
18  reports would be necessary and printing out the
19  right reports would save resources and storage
20  space?
21  A.  I do.
22  Q.  Do you agree that that was a weakness of
23  your office, that you guys were not printing out

Page 284

1   reports that you should be printing out?
2   A.  The way I took it, we were printing too many
3   reports.
4   Q.  Yes, ma'am. Do you agree with that?
5   A.  So sure. You know, I'm for saving trees. I
6   mean, you know, if we don't have to print it and
7   we don't need it, I agree with that.
8   Q.  Did you think you were printing too many
9   reports?
10  A.  No.
11  Q.  So you don't agree that you were printing
12  nonessential reports?
13  A.  Right.
14  Q.  Very good. All right. 2. "Begin using the
15  payroll contracts module..."
16      We talked about that. You did it, you just
17  don't think it was necessary?
18  A.  We did it.
19  Q.  Is that right?
20  A.  We did it. We were not able to do our part
21  until, I think it was fall, maybe, 2005 or '-6.
22  But we have done it.
23  Q.  So it was one or two years after the

71 (Pages 281 to 284)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 285

1   deadline indicated in this report; is that true?
2   A.   Yes.
3   Q.   So let me make sure I understand your
4   testimony.
5        You implemented the contracts module. You
6   did not implement it according to this timetable,
7   but you did implement it, right?
8   A.   Correct.
9   Q.   But you don't agree that it was a weakness
10  that needed to be rectified by the implementation
11  of this module?
12  A.   No.
13  Q.   Is that correct?
14  A.   Correct.
15  Q.   No. 3. "Do not begin any new payroll
16  deductions unless a certain number of employees
17  sign up for the deduction. Eliminate deductions
18  which do not have a significant number of
19  employees."
20       Did you agree with that?
21  A.   Yes. And we would love to do that. But we
22  are not allowed to do that. When we try, the
23  president and other people don't support us on

Page 286

1   that.
2        That's a great thing, but it's not feasible.
3   When we try not to do it, we're told do it by the
4   president.
5   Q.   By the president? He tells you to do what?
6   A.   That we need -- if we tell someone no, we're
7   not going to do another deduction for them, they
8   go to him; and he tells us we need to do it.
9   Q.   Do you have any evidence of that having
10  happened?
11  A.   Yes.
12  Q.   Where is the evidence that you have?
13  A.   You can get it from Ms. Givens. Ms. Givens
14  can testify. She has instances, yes. I'm sure
15  she has it documented.
16  Q.   Do you have any evidence?
17  A.   No. It would be in her payroll records. I
18  mean, they're ours, but she is responsible for
19  those.
20  Q.   Well, now, let me clear this up, because
21  we're a little bit -- I believe there to be a
22  small contradiction here.
23       It's my understanding, based upon your

Page 287

1   earlier comment. that you disagreed with weakness
2   listed as No. 3. but you do agree with
3   recommendation No 3. So help me reconcile that
4   A.   We didn't say that 20 was excessive. That
5   was their assessment. We didn't say we had too
6   many
7        But we do agree that it should be, say, 10
8   people before we -- rather than doing a deduction
9   for one
10       The president has several that he's the only
11  one that has it. So, of course, we have to do it
12  for other people
13       But I would agree that it should be probably
14  ten people. Maybe five. I agree that one person
15  should not have a deduction of 133 people. and one
16  person have one deduction. I agree with that, but
17  it's not happening. And that's no fault of my
18  office.
19  Q    Why is that no fault of your office?
20  A.   Because the president is the ultimate
21  authority. He only has one, so how could we tell
22  other people no? And we have tried to tell them
23  no, and he's told us that we have to do it.

Page 288

1   Q.   And you have evidence of that?
2   A.   I'm sure Ms. Givens has that noted.
3   Q.   Ms. Givens has evidence of that; you don't
4   have any evidence?
5   A.   No, I don't do payroll.
6   Q.   Okay. No. 4. Do you agree with that
7   recommendation?
8   A.   No.
9   Q.   Okay. No. 5. Payroll and personnel
10  functions must work closely together so that any
11  problems can be resolved.
12       Do you agree with that?
13  A.   I agree with that.
14  Q.   Do you agree or do you believe that that
15  working together requires more of you or does it
16  require more of personnel, or both?
17  A.   It would be my payroll person and the
18  personnel. I think it requires more of them. I
19  think we've done our part.
20  Q.   Okay. Done your part. Organizational
21  Structure.
22       There are no strengths listed here. There
23  are three weaknesses.

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

Page 289

1    Do you agree that there are too many staff
2    members at that time reporting directly to you?
3    A.   No.  I mean, I disagree.  I don't know what
4    I --
5    Q.   You said no.
6    A.   Okay.
7    Q.   Do you agree with No. 2?  It was not evident
8    that the Dean provides adequate supervision of
9    your staff.
10    Do you think that you were providing
11    inadequate supervision?
12    A.   I disagree.
13    Q.   Well, let me --
14    A.   Did I -- I don't know if I'm saying that
15    right.
16    Q.   Let me ask a better question, because I
17    actually didn't characterize this question as
18    precisely as it's written.
19    What they said was, "It was not evident that
20    the Dean provides adequate supervision of staff
21    members."
22    Do you agree that it was not evident when
23    they were there that you provided adequate

Page 290

1    supervision?
2    A.   I disagree with that statement.
3    Q.   You believe that you do provide adequate
4    supervision?
5    A.   Yes.
6    Q.   And that it was evident to them?
7    A.   Yes.
8    Q.   And No. 3.  "The Dean should not act as the
9    purchasing clerk."
10    Do you agree with that?
11    A.   I agree to an extent.  At the time -- I'm
12    not doing that anymore.  There was a shortage of
13    people.  I was not really the purchasing clerk,
14    but I was monitoring expenses.  So I would agree
15    to 50 percent of that.
16    Q.   Okay.  Why would you agree to 50 percent and
17    not 100 percent?
18    A.   Because I wouldn't say I was acting as the
19    purchasing clerk.  It was just a process at the
20    time where people were located.  And I didn't --
21    due to the separation of duties, I didn't have
22    anybody at the time that could monitor the
23    purchase order process, so I was doing it.  I have

Page 291

1    changed that.  That was probably at the 2004 memo
2    that went out.
3    Q.   Okay.
4    MR. CHRISTMAN:  Let's take a short
5    break.
6    (A brief recess was taken.)
7    (BY MR. CHRISTMAN)
8    Q.   Let's just finish this up and then we'll be
9    done for the day and come back tomorrow.
10    A.   And we were to the recommendation section.
11    Q.   On Communication?
12    A.   On Organizational Structure.
13    Q.   Very Good.  And have you looked at those?
14    A.   Yes.  And I disagree with all those.
15    Q.   All right.  Let's look at Communication
16    Weaknesses.
17    Do you agree that there are numerous
18    personality clashes between and among college
19    staff?
20    A.   I mean, this isn't the business office, is
21    it?
22    Q.   Well, that's not what it says though; it
23    just says --

Page 292

1    A.   Yeah.  I mean.  I don't really know what that
2    has to do with us.
3    Q.   Well, I mean, you have a personality clash
4    with Dr. Chambers. don't you?
5    A.   Apparently.
6    Q.   I think that's what you said earlier, that
7    he didn't like your personality.
8    A.   Yeah.  I don't know what they're meaning
9    "team members."
10    MR. DEBARDELABEN:  I think all he's
11    asking you about is there appears to be numerous
12    personality clashes between and among college
13    staff.  And that's not talking about just the
14    business office.
15    A.   Yeah.  I would agree with that.  I don't
16    really know what that "team members" means.  We
17    don't have team members that I know.
18    Oh, these are referencing their team.  Okay.
19    I couldn't think.
20    Q.   Yeah, their team.  "These were referenced to
21    team members freely..." meaning the review team.
22    A.   Yeah.  I agree with that.
23    Q.   "...although team members for the most part

73 (Pages 289 to 292)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 293

1  did not know the Ingram staff "
2      You know. folks telling on other folks
3  A.  Yeah
4  Q.  Do you agree with that?
5  A.  Yes.
6  Q.  Of course, that's their assessment about
7  sort of the personality climate at Ingram
8      Would you agree that there's sort of a
9  clashing personality climate there?
10  A.  I would.  And. you know, when you have teams
11  come in like this, some people, that's when they
12  voice their --
13  Q.  You've got a chance to unload?
14  A.  Yeah, yeah  Let me unload while you're
15  here.  I agree with that
16  Q.  And you agree that's a weakness, in terms of
17  communication?
18  A.  Yes  Because you should go to the person
19  you clash with, the only way you're going to fix
20  it.
21  Q.  That has not so far worked for you and Dr.
22  Chambers?
23  A.  I've tried.  I've tried numerous times, way

Page 294

1  before this happened.  This was the last resort.
2  Q.  Okay.  No. 2.  "Complaints from a
3  cross-section of college personnel indicate a
4  dissatisfaction with the timeliness of some
5  business office activities, primarily purchasing
6  and budget reports.  Staff who work outside the
7  Business Office are keeping their own program or
8  budget records because timely information is not
9  provided from the Business Office."
10      Are you aware of that going on?
11  A.  I disagree with the first part.  I mean,
12  they can complain, but I disagree with what
13  they're saying.
14      You know, I think they should keep up with
15  their -- I mean, we give it to them, but I wish
16  they would read them.  I mean, more of them do
17  need to keep up with it.  I'm glad to know they
18  are.  I don't see evidence that they are, because
19  they keep asking for things that they don't have.
20  And they do have their budgets.
21  Q.  What I understand this to be saying is that
22  staff who work outside the business office are
23  keeping their own because timely information is

Page 295

1  not provided by you.
2      Is that true?
3  A.  I disagree
4  Q.  No. 3.  "Complaints were made that college
5  invoices are routinely paid late "
6  A.  Disagree.
7  Q.  4  "Observations by Ingram staff who work
8  outside the Business Office are that too much work
9  is done manually by Business Office staff "
10  A.  I disagree
11  Q.  5  "Complaints were made that
12  reimbursements for sponsored programs are
13  processed several months in arrears."
14  A.  Disagree
15  Q.  6  "Staff feel that the absence of ACCESS
16  software management reports hinders their ability
17  to manage well "
18      Do you agree with that?
19  A.  Disagree.
20  Q.  7  "The duplication of administrative
21  software providers wastes money and time and
22  causes additional staff work "
23  A.  Disagree.

Page 296

1  Q.  8: The Business Office was said to work
2  reactively rather than proactively and is
3  described as not customer friendly.
4  A.  Disagree.
5  Q.  Do you agree that there have been customers
6  that have complained about you and your approach
7  to some conflict?
8  A.  No
9  Q.  You are not aware of any complaints?
10  A.  No
11  Q.  We'll cover those tomorrow.
12  A.  Okay
13  Q.  And you do not agree that your office works
14  reactively rather than proactively?
15  A.  I do not agree with that.
16  Q.  Look at the Recommendations there
17      "The Dean should seek to improve her
18  communication styles. both written and oral."
19      Do you agree with that?
20  A.  No.
21  Q.  Would you agree with Debbie Dahl if she said
22  under oath that she believes you could improve
23  your communication style, both written and oral?

74 (Pages 293 to 296)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

---

Page 297

1    A.    I disagree. It's her opinion. I disagree
2    with her if she said that.
3    Q.    Well, just because it's some of these
4    people's opinion, does that mean it's not worth
5    your consideration?
6    A.    I would consider it. But, I mean, Debbie
7    Dahl doesn't work with me every day. I don't
8    think you can come in for even a week and make a
9    judgment like that.
10    Q.    Well, Dr. Chambers says the same thing. He
11    works with you every day.
12    A.    Yeah.
13    Q.    Do you agree with him?
14    A.    I don't agree with that.
15    Q.    What if Jim Merk says that you could improve
16    your communication, both written and oral? Would
17    you agree with him.
18    A.    I don't agree with that, no.
19    Q.    Is he a bad source?
20    A.    I'm not going to say that about him and he
21    doesn't have to say that about me. I don't care
22    for his opinion.
23    Q.    Okay. Well, he's going to take the stand in

Page 298

1    this case because he's a defendant.
2    A.    That's fine.
3            MR. DEBARDELABEN: Not in this case.
4    A.    He's not a defendant in this case.
5    Q.    Not in this case, in another case.
6    A.    Yeah.
7    Q.    But if he gives testimony in this case, via
8    affidavit or via deposition, and says that you
9    should improve, that you need improvement in your
10    communication style, both oral and written, would
11    you agree with him about that?
12    A.    No.
13    Q.    How about James Wilson? Would you agree
14    with his assessment in that regard?
15    A.    No.
16    Q.    How about Huffstutler? Would you agree if
17    he said you could stand some improvement?
18    A.    No.
19    Q.    No?
20    A.    No.
21    Q.    How about Larry Williard? Would you agree
22    with him?
23    A.    No.

Page 299

1    Q.    Do you know who Larry Williard is?
2    A.    Yes.
3    Q.    He's an auditor, isn't he?
4    A.    He is. But communication style. I don't
5    think that's his area of expertise.
6    Q.    Well, whose area of expertise is that?
7    A.    I think it's a personal -- I mean, I don't
8    think any of those people can judge my
9    communication style.
10    Q.    Okay. Who in the world can judge your
11    communication style besides you?
12    A.    Maybe some great orator or some
13    communication guru.
14    Q.    You don't think the people that are around
15    you or are assessing your performance are
16    qualified to know whether you are effectively
17    communicating?
18    A.    No. I do not.
19    Q.    What if they don't understand what you need
20    or what you want? If they don't think that you're
21    making clear what you have done or what you should
22    do, do you think that's irrelevant?
23    A.    Yes.

Page 300

1    Q.    How about Carolyn Nichols? What if she has
2    the assessment that you should improve your
3    communication style, both written and oral? Would
4    you disagree with Carolyn?
5    A.    I disagree with Carolyn.
6    Q.    How about Warden DeLoach? Would you agree
7    if he said that you could improve your ability to
8    communicate?
9    A.    No. I have no interaction with Warden
10    DeLoach. I've never communicated with him in any
11    way.
12    Q.    Would you disagree?
13    A.    I would disagree with what he said, yes.
14    Q.    No. 2. "A response should be provided to
15    the requesting party for each purchase requisition
16    submitted to the Business Office. The response
17    would indicate the requisition is approved or
18    disapproved."
19            Do you agree that that should be something
20    provided by your office?
21    A.    I don't agree that that wasn't being done.
22    Q.    Is it currently being done?
23    A.    Yes.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

---

Page 301

1  Q.  Well, if Jim Merk testified that he
2  currently has requisitions. and has had
3  requisitions. that he has no idea what their
4  status is. whether they are approved, disapproved,
5  whether there's money in the budget to cover it,
6  whether you intend to allow it or not allow it.
7  he's totally in the dark about any of those
8  matters, would you disagree with that?
9  A.   I've given Jim Merk -- I've got them dated
10 when I've given him budget reports. I've given
11 him one. two. or three times and he said he didn't
12 have it. I'll go against whatever Jim Merk said
13 is wrong.
14     If they are not processed, there's a
15 problem. He gets an update from my purchase order
16 clerk on what -- he has information. I don't know
17 what he's doing with it. but he is privy to the
18 information.
19 Q.   What about the other folks that are making
20 requisitions to Dr. Merk? Do they have the
21 information that you're referring to?
22 A.   They get a copy of the purchase order when
23 it is approved. If they don't get it, it's not

Page 302

1  approved.
2  Q.   Well, now, wait a minute. Sometimes
3  requisitions are made and they are ultimately
4  approved, but it's several months after the
5  requisition is made; isn't that true?
6  A.   There is a decision that may have to be
7  made. There may not be money. That could be
8  true. They don't have it at the time.
9  Q.   And so there's no way for them to know
10 during that several month period, between the time
11 they made the requisition and the time you decided
12 to cut the order, they have no way of knowing
13 whether their requisition is approved or
14 disapproved; isn't that right?
15 A.   I disagree.
16 Q.   Well, how do they have a way of knowing?
17 A.   They can come to my office. We give status
18 reports all the time.
19 Q.   Other than them coming to your office to ask
20 you about it, is there any way they would know the
21 status of their requisition, if there is several
22 months' delay between the time they make it and
23 the time you approve it?

Page 303

1  A.   I have sent them back to them saying why it
2  is not approved.
3  Q.   That's not my question, ma'am. My question
4  is: Is there any way for them to know, between
5  the time they make the requisition and the time
6  that you approve the purchase order, when there is
7  a several-month delay, there is no way for them to
8  know what the status of that requisition. is
9  there?
10 A.   I disagree with that.
11 Q.   Okay. Then you tell me what way there is
12 for them to know, other than them coming to your
13 office and saying, "Where is my requisition?"
14 A.   I don't know.
15 Q.   And haven't you received requests from Dr
16 Merk on a number of occasions that certain
17 requisitions are outstanding and he doesn't know
18 the status?
19 A.   Dr. Merk does not use the information that I
20 give him. He keeps submitting requests that there
21 are no funds for. I have given him the
22 information; he's denied it; I've shown it to him.
23 He is not using the information I've given him.

Page 304

1  Q.   Isn't it true that there are a number of
2  documents --
3  A.   I have answered him when he sends those
4  letters acting like he doesn't know what's going
5  on when he does. But I have answered him.
6  Q.   Okay. That's the next thing. But let me
7  get the answer to my first question.
8      Aren't there a number of documents
9  reflecting that Jim Merk has asked about the
10 status of requisitions of folks that are reporting
11 to him?
12 A.   Yes. Because he sends the same letter three
13 times. But yes, that would be numerous.
14 Q.   Well. we'll go through those and I'll give
15 you a chance to talk about that. But there a
16 number of occasions when Jim Merk has not known
17 the status of his requisitions, at least --
18 A.   There's been a number of things with Jim
19 Merk that I don't know that he does too. But
20 anyway.
21 Q.   Okay. No. 3. "Budget communications should
22 be made" -- let me back up. I don't think we
23 ultimately answered No. 2.

76 (Pages 301 to 304)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 305

1    Do you agree that a response should be
2  provided to the requesting party for a purchase
3  requisition, either approved or disapproved?
4  A.  I disagree.
5  Q.  Okay.  No. 3.  "Budget communications should
6  be made to appropriate college personnel in a
7  timely manner."
8    Do you agree with that?
9  A.  I agree.
10  Q.  Do you agree that that is not happening?
11  A.  No.
12  Q.  Well, that's what this recommendation is
13  designed to address, isn't it?  Isn't this
14  recommendation designed to address --
15  A.  This was written three years ago.  It is
16  happening.  That was their opinion that it wasn't
17  happening then; it is happening now.
18  Q.  Was it a fact that it wasn't happening?
19  A.  It was their opinion.
20  Q.  Well, either you were distributing budgets
21  in a timely manner or you weren't.  Were you?
22  A.  I say I was.  So I disagree with that.
23  Q.  When does the fiscal year start for the

Page 306

1  college system?
2  A.  October 1.
3  Q.  When do you think that budgets should be
4  submitted to department heads?
5  A.  As soon as the budget is entered, which
6  would probably be -- it just depends.  I mean,
7  timely could be, you know, my decision.
8    I mean, the budget has to go in.  Which it
9  doesn't go in with the ACCESS software.  Isn't
10  that wonderful?  So it takes longer.  And
11  sometimes it could take months.
12    January.  I know some of them said January.
13  That's not really a bad thing.  If you know
14  anything about accounting, that's not really a
15  long period of time.
16    I don't know what they're saying.  But
17  November might not be feasible, or maybe December.
18  It just depends. especially when your computer
19  system doesn't work.
20  Q.  What about January, February, and March?  Is
21  that timely?
22  A.  It was not.
23  Q.  Is that timely, January, February, or March?

Page 307

1  A.  No, not in March.  January would still be
2  timely.
3  Q.  What if Debbie Dahl says January is not
4  timely?
5  A.  That's her opinion.
6  Q.  Well, but she knows something about
7  accounting, doesn't she?
8  A.  She doesn't work there with me every day.
9  But that's fine.
10  Q.  In fact, she supervises all of the business
11  managers of all of the colleges, doesn't she?
12  A.  She does.
13  Q.  And she understands the practices of every
14  college in the two-year system with respect to
15  budgets, does she not?
16  A.  She does.
17  Q.  And if she says that the practice at Ingram,
18  as opposed to every other college in the system,
19  of submitting budgets at the first of the year,
20  meaning January, is an inappropriate method of
21  accounting on the part of your business office, do
22  you disagree with that statement?
23  A.  I disagree.

Page 308

1  Q.  The Overall Followup.  "DPE will monitor
2  accounts..."  What does DPE stand for?
3  A.  Department of Postsecondary Education.
4  Q.  "DPE will monitor accounts payable for an
5  unspecified period in order to satisfy that
6  invoices..."
7    That's not a criticism or anything else.
8  It's just saying what they're going to do.  So we
9  won't address that.
10    "DPE will monitor for an unspecified period
11  to ensure duplicative software is phased out..."
12    So they either did or didn't monitor
13  it, but it's not an assessment of your performance
14  or your office's performance, so we won't address
15  that.
16    MR. CHRISTMAN:  I think we're done for
17  today.  We'll pick up tomorrow.
18    (The proceedings were adjourned
19    at 5:15 p.m., to the following
20    day, June 19, 2007, at 9 a.m.)
21  (BY MR. CHRISTMAN)
22  Q.  Good morning again, Ms. Greene.
23  A.  Good morning.

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 309

1   Q.   You understand you're still under oath?
2   A.   I do.
3   Q.   Okay   We'll try to finish up today, and I'm
4   sure that we will.  We have several other matters
5   to cover today.  One of the first things I want to
6   go through with you -- yesterday we went through
7   the chancellor's review team's report, and we went
8   through it page by page.  Do you recall that?
9   A.   I do.
10  Q.   You understand that the chancellor's review
11  team, all of the members of that team were not
12  employees of Ingram College; do you understand
13  that?
14  A.   I do.
15  Q.   And is it your understanding, or do you have
16  evidence that the members of the chancellor's
17  review team were appointed by anyone other than
18  the chancellor?
19  A.   I don't know.
20  Q.   Okay   And do you have any reason to believe
21  that anybody on that review team was unfairly
22  biased against you?
23  A.   Possibly.

Page 310

1   Q.   All right.  What are those reasons?
2   A.   I don't know what occurred before they came.
3   I know there were meetings with them before they
4   came out there.  I don't know what happened.  But
5   I'm not saying they -- they could have been and
6   they couldn't have been.  I'm not saying they were
7   totally unbiased.  I don't know.
8   Q.   Well, do you know who the members of the
9   team were?
10  A.   I do.
11  Q.   Name them for me.
12  A.   Roger Chandler, Ben Jordan, Leigh Grogan,
13  Debbie Dahl, and I cannot recall the other -- I
14  know his first name is Jeff.  He's the business
15  manager at Reid State in Evergreen.  I think that
16  was it.
17  Q.   And you don't have any evidence or knowledge
18  of any collaboration by any of those members with
19  Dr. Chambers, do you?
20  A.   Mr. Chambers met with Leigh Grogan and Roger
21  Chandler before they left, for a long time.  He
22  met with the whole team before they started.  And
23  we know there's a problem there, so I don't know

Page 311

1   what happened.
2   Q.   What do you mean, we know there's a problem
3   there?
4   A.   We know there's a problem with Mr. Chambers
5   and myself.  That's apparent.  And so we know that
6   Mr. Chambers had gone to the chancellor about me,
7   and then --
8   Q.   How do you know that?
9   A.   Because the chancellor admitted it when I
10  went down there.
11  Q.   He said that he had talked with Chambers
12  about you?
13  A.   Mr. Chambers had talked to him about me.
14  Q.   And you had gone to the chancellor and
15  talked to the chancellor about him?
16  A.   I went to the chancellor about relief.  I
17  didn't go to criticize Mr. Chambers.  There's a
18  difference there.
19  Q.   Well, you don't know what Mr. Chambers went
20  to the chancellor to do, do you?
21  A.   Not really.  I wasn't there.
22  Q.   Okay   It's not uncommon for the president
23  to meet with the Examiners Review Team of Public

Page 312

1   Accounts, is it?
2   A.   From what I hear, it is.  I heard that they
3   don't meet with presidents.  They rarely see
4   presidents.  Some auditors have told me that.  But
5   I don't know that.  But normally they would meet
6   with -- it is unusual for an auditor to come in --
7   an audit manager -- and not speak to the business
8   manager, which has happened the last two years.
9   So I don't know what's happened there, but that is
10  unusual.
11  Q.   How do you know it's unusual?
12  A.   I have an auditor on my staff, and she said
13  that it's unusual.  They don't meet with
14  presidents, spend a lot of time with presidents
15  like ours do.
16  Q.   What auditor is on your staff?
17  A.   Patricia Graves -- Patti Graves.
18  Q.   And she's an accountant for you?
19  A.   She was an auditor for 15 years?
20  Q.   For the Examiners of Public Accounts?
21  A.   Yes.
22  Q.   And she told you that it was uncommon for
23  the auditors to not meet with the business

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 313

1 manager?
2 A   Yes
3 Q   And did she tell you it was uncommon for
4 them to meet with the president?
5 A   Yes  She said the ones she knows, that they
6 see the president normally in the exit conference.
7 Q   And what is so unusual about meeting with
8 him intermittently during --
9 A   Well, it's just unusual.  The auditors, for
10 the last two years they come -- the audit manager
11 comes and, you know, doesn't even acknowledge to
12 me that she's there.  I mean, I would be really
13 who they're working with.
14    You know, they meet with the president
15 behind closed doors.  They've gone to lunch.  And
16 she has come and gone and not even spoken to me.
17 The auditors that she's had there the last couple
18 of years have been very disrespectful of me.  I
19 don't care if they like me, but they have been
20 disrespectful.  Not so much that I care, but other
21 people have noticed how the auditors, you know,
22 have treated me, for no reason that I know of.
23 Q   Who has been disrespectful of you from the

Page 314

1 auditor's office?
2 A   Melissa.  I'm trying to think of her last
3 name.  She was the one just there.  Her first name
4 is Melissa.  I can't remember her last name.
5 Q   How about Mr. Williard?  Has he been
6 disrespectful to you?
7 A   No.
8 Q   Do you have any complaints about the audit
9 responses that you have received?
10    MR. DEBARDELABEN:  The audit responses?
11 I don't understand the question.
12    MR. CHRISTMAN:  The audits.  That was a
13 bad question.  The audits.
14 Q   The reports that you've received from the
15 Department of Examiners of Public Accounts, do you
16 have any problem with the reports that you've
17 received?
18 A   I have a problem with the report where my
19 name was put in there and said I was weak and
20 ineffective.  And I called Mr. Williard and I
21 expressed that to him.
22    I've never seen an audit report, unless
23 someone had taken money or done some kind of

Page 315

1 crime, where their name had been in there.  I
2 think you could go back through and look.
3    They put your position.  I understand that
4 they would put my position in there if they had to
5 mention something that, you know, there was
6 something that could be improved upon.  But I've
7 never seen people's individual names.
8    Mine wasn't the only name there.  But I say
9 it's wrong when anyone's name is in there when
10 they have not committed some type of crime or
11 deception.  And that was my problem.
12    But Mr. Williard did not do anything about
13 it.  But I did express my concern to him about it.
14 Q   How did your name get in the audit report?
15 Do you know?
16 A   Mr. Chambers -- it's in the response letter.
17 Mr. Chambers wrote it.
18    And I've always been a part of the response.
19 Through my position, I've always helped Mr.
20 Chambers.
21    On that one I was told he didn't need my
22 help.  And I asked if I could see a copy of it
23 before it went away, which is, I would say normal

Page 316

1 procedure.  He said no.  And then, when it came
2 out, I knew why, because it had negative comments
3 in there.
4 Q   Not just about you?
5 A   No.
6 Q   There were negative comments about many
7 people, right?
8 A   Three people, I think, were negative.
9 Q   Okay  And we'll look at that in just a
10 moment.
11    With respect to the chancellor's review
12 team, you understand that their report was
13 ultimately forwarded to the college?
14 A   Yes.
15 Q   And you got a copy of it, didn't you?
16 A   Yes.
17 Q   And the president got a copy?
18 A   Yes.
19 Q   And you would expect the president to take
20 the chancellor's review seriously, wouldn't you?
21 A   I suppose.
22 Q   And you would expect him to take to heart
23 the weaknesses and recommendations that were noted

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 317

1  in the report. wouldn't you?
2  A.   If they were true.
3  Q.   If he believes they are true -- do you have
4  any reason to believe he thought that they were
5  made up?
6  A.   I don't know what he thinks. I can't tell
7  what he thinks.
8  Q.   Okay. So you don't have any reason to
9  believe that he thought it was all made up, do
10  you?
11  A.   I can't answer that.
12  Q.   Well, you can. You can tell me yes, you
13  have no reason, or no, you do have a reason to
14  believe that he thought otherwise.
15        MR. DEBARDELABEN: I'm going to object.
16  You're asking her for his mental conclusion.
17        MR. CHRISTMAN: I want her to tell me
18  does she have any reason, any evidence, that he
19  thought the report was made up.
20        MR. DEBARDELABEN: She can't tell you
21  what he thought.
22        MR. CHRISTMAN: She can tell me if she
23  has any evidence that he thought it was made up.

Page 318

1        MR. DEBARDELABEN: She can tell you
2  what evidence she has, but she can't tell you his
3  mental thinking.
4        MR. CHRISTMAN: You understand my
5  question?
6        MR. DEBARDELABEN: I understand your
7  question, and she can't answer it.
8        MR. CHRISTMAN: It's a fair question.
9        MR. DEBARDELABEN: No, it's not.
10        MR. CHRISTMAN: Yes, it is.
11        MR. DEBARDELABEN: You're asking her to
12  address his mental conclusion, and she can't do
13  that.
14        MR. CHRISTMAN: Yes, she can. She can
15  tell me if she -- listen, if the answer is, I
16  don't have any evidence that he believed it was
17  false -- there could be evidence that she has,
18  such as his statement to her: I never believed a
19  word of that thing. Then she would have evidence.
20  Q.   My question is: Do you have any evidence
21  that he thought the conclusions in the
22  chancellor's report were false?
23  A.   No.

Page 319

1  Q.   Okay. Did you expect the president to do
2  everything in his power to comply with the
3  recommendations and directives contained in the
4  chancellor's report?
5  A.   Yes.
6  Q.   And did you expect that you would probably
7  receive some directives from the president
8  regarding the items listed in the chancellor's
9  report?
10  A.   Yes.
11  Q.   And did you comply with those directives?
12  A.   I did. I don't remember getting -- I'm sure
13  we talked about it. I don't remember getting
14  something. I'm not saying I didn't, but I don't
15  remember getting it.
16        But I told you yesterday that we made many
17  changes. I mean, I'm not saying that --
18  improvements can always be made. We're certainly
19  not perfect. But I did disagree with a lot of
20  them. I didn't necessarily think it was fair. I
21  did not think it was fair that they came out.
22        But we made several changes from that
23  report, because the chancellor said we were to

Page 320

1  follow those; and he was my boss and my boss's
2  boss, so we did follow it.
3  Q.   Very good. Let's look for a minute -- and
4  I'm going to mark this as 14 to your deposition.
5        (Defendants' Exhibit No. 14 was
6         marked for identification and a
7         copy of the same is attached
8         hereto.)
9  Q.   This is the Examiner's report, October 1,
10  2003, to September 30, 2004. And this was the
11  report that sort of spawned a response from the
12  president. And this is the one you're referring
13  to where he called out names and you thought that
14  was inappropriate. You know what I'm talking
15  about?
16  A.   Yes.
17  Q.   Okay. I see you're already on the page
18  there where he submits his response. And this is
19  at the back of the report. And it's dated
20  September 9, 2005. Do you see that?
21  A.   Yes.
22  Q.   And with respect to the first finding -- to
23  the finding, excuse me -- it's listed here by

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

Page 321

1 President Chambers that "A comparison of live work
2 revenue and costs was done for the instructional
3 departments. The comparison indicated that costs
4 exceeded revenues in the Furniture Refinishing
5 Department by $18,864.98."
6     Do you remember the audit finding associated
7 with there being a cost exceeding revenues in the
8 Furniture Refinishing?
9 A  I do.
10 Q.  And do you recall it being about the amount
11 listed here, $18,864.98?
12 A.  Yes.
13 Q.  "Also, a review of work in process on
14 June 21, 2005, revealed that deposits had not been
15 collected on four live work projects that were in
16 process."
17     Do you recall that finding of the auditors?
18 A  I do.
19 Q.  And then finally the audit noted that the
20 Dean of the College delivered a tractor to the
21 diesel shop.
22     Who was the Dean of the College?
23 A.  Rickey Huffstutler.

Page 322

1 Q.  That wasn't you?
2 A.  No.
3 Q.  That was a white male?
4 A.  Yes.
5 Q.  And then the dean went on vacation on May
6 31st and returned to work on July 12th; and the
7 order for the tractor was dated June 21, 2005.
8     What does that indicate to you, that there
9 was a tractor delivered and then the dean went on
10 vacation and came back?
11 A.  The dean violated college policy. The
12 auditor put that to show that he was gone when it
13 was found and the work order was done while he was
14 gone.
15 Q.  So Dean Huffstutler did not follow college
16 policy?
17 A.  He did not.
18 Q.  And then President Chambers submitted --
19 A.  Now, I did -- he did allow me to write this
20 response on the 18,000, because he knew I knew the
21 answer to it. But he did not let me see the part
22 where he said I was weak and ineffective.
23     So I actually wrote -- well, he might have

Page 323

1 changed it some, but I wrote this. what caused it.
2 Q.  Response No. 1 was all your work?
3 A.  Well, he made some changes, which he always
4 does, but the money figures are mine.
5 Q.  Very good. That's great, because that means
6 I don't have to read all of this because you
7 understand what happened and why this amount of
8 cost exceeded revenues?
9 A  Yes. And from that, the auditors allowed us
10 to add some costs that the college should have
11 been getting. That way it was -- it was something
12 they had not allowed for in the past, so, you
13 know, we were helped in that manner.
14 Q.  It worked out in a good way in that regard;
15 is that right?
16 A  Yes.
17 Q.  But there were some things that were
18 creating this negative cost -- this deficit
19 situation with the live work. right?
20 A  Yes.
21 Q.  Quickly, what was causing the 18,389.91
22 deficit in live work?
23 A.  Well, one they had repaired, they had a --

Page 324

1 they had several items damaged due to a leaking
2 roof, and the instructor did not properly account
3 for those items that he used for that.
4 Q.  And how much was that?
5 A.  I don't think --
6 Q.  Is that listed?
7 A.  Let me look down and I'll see. And then the
8 instructor also revealed that he didn't adjust his
9 shop inventory for that. It was a financial loss
10 from the damaged materials, and he did not adjust
11 his inventory for that; so that way his inventory
12 was off, which would figure into the final figure
13 for the year.
14     I don't know if we have that breakdown.
15 Q.  That's okay.
16 A.  Well, this is it. The total of damaged
17 items was $7,947.
18 Q.  That was damaged in the leaking roof?
19 A.  And he didn't account for that on his
20 inventory.
21 Q.  Okay.
22 A.  And then the instructor reported that he had
23 not been charging the customers for unused wood

Page 325

1  and other supplies.
2      So what he wasn't doing is, say he had a
3  whole piece of lumber and he used this much, and
4  the other got thrown away. Well, the auditors say
5  you charge for the whole amount.
6      And, I mean, I guess he thought he was being
7  fair to the customer, because you would probably
8  just want to be charged for that, and me too. But
9  they say it's state money; you've got to charge
10  them for the whole piece. So there was -- that
11  would be waste.
12      So that's where we decided that we needed,
13  like, an additional 20 percent to be built into
14  that, and the auditors did allow for that.
15  Q.   You're talking about 20 percent on top of
16  the cost?
17  A.   Right. The way we do it now is cost -- just
18  regular Board policy if you have something done,
19  it would be cost of the materials plus 20 percent
20  and a 5 percent miscellaneous. So it would be
21  cost plus 25.
22      They're saying in that initial cost, if you
23  know that you've used this much lumber, that you

Page 326

1  can allow for 20 percent in the initial, if
2  there's stuff that's thrown away.
3  Q.   Okay.
4  A.   So we determined from that, that the amount
5  of that would have totaled 18,389.91. And you see
6  the deficit was 18,864. So when you put both of
7  those together, that's where our money was. And
8  we actually would have been to the good.
9  Q.   You would have been in the black a little
10  bit?
11  A.   Right.
12  Q.   And what was this shrinkage down here, this
13  10 percent?
14  A.   We found that one of the vendors that we
15  were using, when we ordered lumber -- say we
16  ordered $2500 worth, we were getting maybe $2,000
17  worth. Whatever the shrinkage would be.
18      When we unloaded it by the weight or
19  whatever, they were not allowing for that. So we
20  were having to pay that, and then we weren't
21  getting what we paid for. So we dropped the
22  vendor from the vendor's list.
23      We didn't adjust for that shrinkage because

Page 327

1  we just said that's one of those life lessons we
2  learned; we won't use that vendor anymore.
3      But we figured that would have been about 10
4  percent loss, which would have been $4,597.48. So
5  we would have been -- you see where we lost it.
6  So we learned several things from that, and we
7  have corrected all of those.
8  Q.   Okay. And then No. 2, the Response II
9  listed here. "A review of the work in process on
10  June 21, 2005, revealed that deposits had not been
11  collected on four live work projects that were in
12  process."
13      So this is the issue of customers bringing
14  in stuff to be worked on, or asking for something
15  to be made, and no deposit having been collected,
16  at least on four work orders. And they are listed
17  here.
18  A.   Yeah. I'm trying to remember who they were.
19  I know one was a Postsecondary employee that was
20  late sending their deposit. And what we've had
21  instructors get in trouble for, they have, in the
22  past, started working on something, before they --
23  I mean, all the rules and everything that's sent

Page 328

1  out is, when you get your paper from the front
2  office signed off, ready to go, deposit paid, you
3  start.
4      Well, we have some instructors that have
5  been there 25 years that, years ago things weren't
6  done that way, way before my time and our time.
7  And they have started on projects. And I think
8  all of this was -- it wasn't even one shop; it may
9  have been two shops. But they're some of those
10  old time employees. And they started on it before
11  the deposit was paid.
12      The deposit was paid on the particular one
13  I'm talking about, but then they had started on it
14  before. I know that was in the refinishing shop.
15  Seems like there might have been two in
16  refinishing and two in auto mechanics; I can't
17  remember.
18      But it was a violation of the policy by the
19  instructor that there's no reason they can say
20  they didn't know what to do.
21  Q.   Right. And then the response here says --
22  this is at the bottom of the page here, under
23  Response II -- "It was also revealed that internal

82 (Pages 325 to 328)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 329

1  controls administered by the Dean of the College,
2  Dr. Rickey Huffstutler" -- he's a white male
3  right? --
4  A.  He is.
5  Q.  -- who is responsible for supervising live
6  work instructors. and the Dean of Fiscal Affairs.
7  Monica Greene, who is responsible for
8  administering and handling the financial affairs
9  of the College were weak and ineffective."
10     Now, you do understand there that he's not
11 just saying that your methods were weak and
12 ineffective. but he also said that Rickey
13 Huffstutler's methods were weak and ineffective.
14 Is that your understanding?
15 A.  It is.  The problem is the name. for one
16 thing.  I don't think it should have been said,
17 but I don't think my name should have been there.
18 But this other part I have a problem with too.
19 Q.  Before we move on. you don't think your name
20 should have been called out?
21 A.  Not my name.  If you wanted to put my title
22 -- like I said, I disagree with the statement. of
23 course.  But if he wanted to put my position --

Page 330

1  I've look at lots of audit reports for a lot of
2  entities.  But I don't see names, unless there's
3  money taken, big deception, crimes
4  Q.  Well, and maybe -- do you know if
5  Huffstutler appreciated his name appearing?
6  A.  I can't speak for him.
7  Q.  And he hasn't said to you one way or the
8  other how he feels about that?
9  A.  He has.  He didn't appreciate it.  But I'm
10 not him.  But he did not appreciate it.
11 Q.  That's what he told you?
12 A.  Yes.
13 Q.  Well, you're not saying that your name
14 appeared in this audit because you're a woman, are
15 you?
16 A.  Yes.
17 Q.  Then why did his name appear in the audit?
18 He's not a woman
19 A.  I don't know.  Maybe because he supported
20 the woman.  I don't know why.  I think that's one
21 of the reasons.  I think this whole thing is
22 because I'm an honest, white woman
23 Q.  I understand.  But what I need to find out

Page 331

1  is:  Do you have any evidence upon which to base
2  your belief?
3     I understand that's what you believe  But
4  to prevail in this lawsuit. you can't just believe
5  something; you've got to be able to prove it.
6     And what I'm asking you is:  Wouldn't
7  Huffstutler have the same complaint that you have
8  about his name appearing in this audit?
9  A.  I can't speak for Dr. Huffstutler.
10    But it just seems like everything with me,
11 the word "weak" is used  I don't have a problem
12 with improving things.  But "weak "
13    In this instance you may say it applies to
14 more than me, but in every other instance "weak"
15 is to me  Weak is because maybe I don't have a
16 strong boisterous voice  Does that mean I'm weak?
17    If I'm consistent on policies, consistency
18 is a strong characteristic.  But weak?  I just
19 don't see a lot of men being called weak
20 Q.  Dr. Huffstutler was, wasn't he?
21 A.  One time.
22 Q.  Okay.  One time  Well, Dr Chambers is not
23 the only one who has described the affairs of the

Page 332

1  business office as weak.
2  A.  Well, and he's probably not the only male
3  that had such feelings.
4  Q.  Well, did Debbie Dahl have those feelings?
5  Because she wrote a lot of that chancellor's
6  report, and it describes weaknesses.
7     MR. DEBARDELABEN:  Object to what
8  feeling Ms. Dahl had.  That's something that she
9  is not qualified to give on Ms. Dahl's feelings.
10 Q.  Well, you're not likewise qualified to give
11 that information on Dr. Chambers' feelings either,
12 are you?
13 A.  No.
14 Q.  But what is a fact is that the chancellor's
15 report describes many of the functions of the
16 business office as weaknesses; isn't that right?
17 A.  Yes.  The chancellor's report, I told you, I
18 have a problem with.  I don't think it's a valid
19 report.  And there's many reasons for that.  I
20 don't know what all was behind that.  But that's
21 fine if you want to keep referencing it.
22    This, I have to go by this; and I went by
23 the chancellor's report  But I have a problem

83 (Pages 329 to 332)

Page 333

1   with the chancellor's report.
2   Q.   Well, you have a problem with any report
3   that describes anything you do as a weakness,
4   right?
5   A.   No, I don't.
6   Q.   Well, have you agreed with any weaknesses?
7   A.   This audit report, we have to make changes.
8   I told you I don't have problems making changes.
9   You just want to use that term "weakness."
10  Q.   Well, I'm finding the term in documents to
11  describe either your conduct or the conduct of Dr.
12  Huffstutler or the business office in general.
13  The word appears in documents. I'm not making it
14  up, right? I mean, it appears in the documents.
15  A.   It appears.
16  Q.   And you seem to think, based upon your
17  testimony, that these criticisms -- for example,
18  this one right here that Dr. Huffstutler shared in
19  in, in terms of the criticism -- you seem to
20  think, based on your testimony, that the
21  description of Dr. Huffstutler's work and your
22  work as weak is based on the fact that you're a
23  woman.

Page 334

1   A.   You know what, Mr. Chambers -- I just think
2   it's uncalled for. Mr. Chambers, no matter what
3   he thinks, is ultimately responsible for the
4   audit. Both of our names are the only names that
5   appear in it. I take my responsibility of it.
6   Mr. Chambers is writing this. Ultimately he's
7   responsible, and he's responsible even for me.
8   I just think that it's not necessary to put
9   that statement in there. Answer what the problem
10  is.
11  I told Larry Williard I didn't think those
12  type things should be allowed. There was
13  something wrong; we were going to say what
14  happened to fix it. It wasn't necessary, is what
15  I'm saying, to put that in there.
16  So I guess you're saying that if he thinks
17  I'm weak, then it's all right for him to yell at
18  me. And because I'm a white woman and I'm weak,
19  in his opinion, he can yell at me; is that what
20  we're saying? That gives him a right to yell?
21  Q.   Well, what I'm saying -- what I'm trying to
22  understand is, what in the world makes you think
23  that the description of Huffstutler's work and

Page 335

1   your work as weak is based on the fact that you
2   are a woman? Why in the world do you think that,
3   in light of the fact that Dr. Huffstutler is not a
4   woman and his name appears right alongside yours?
5   A.   That's not the only time.
6   Q.   Okay.
7   A.   That's not the only comment.
8   Q.   Okay. And the only other reason I'm
9   bringing up the chancellor's report is because I'm
10  trying to understand if it's your understanding
11  that somebody other than Dr. Chambers has
12  described the business office, which is your
13  responsibility, as weak. You understand that.
14  don't you?
15  A.   So the other stuff doesn't matter that was
16  in the report? You're only focus is on what they
17  said was weak? I don't think the report was all
18  about that.
19  Q.   Listen to my question and just answer my
20  question.
21  You understand that someone other than Dr.
22  Chambers has assessed the performance of the
23  business office, in certain aspects, as weak? You

Page 336

1   understand that?
2   MR. DEBARDELABEN: Object to the form.
3   A.   Yes.
4   Q.   And if Debbie Dahl testifies in this case
5   that she believes that certain aspects of the
6   business office's functions are weak, do you think
7   that her testimony is going to be based on the
8   fact that you are a woman?
9   A.   I can't say what Ms. Dahl's testimony will
10  be based on.
11  Q.   It says, on the next page, "Although both
12  Deans had reported to the President's
13  Administrative Cabinet that all live work
14  activities were up to par, and checks and balances
15  were in place to identify possible violations, the
16  findings of the auditors confirmed that they were
17  not."
18  A.   That statement was -- that didn't even apply
19  to this. What he's talking about here was way
20  before that, and it was at that particular time.
21  It's not like we had told him Thursday that these
22  were up to par, and this happened Friday. They
23  were not related.

84 (Pages 333 to 336)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 337

1  Q.  Well, I guess his statement is that you and
2  Huffstutler had reported to him that there were
3  checks and balances in place to make sure that
4  violations of the live work process would not
5  occur.  And the fact that on four occasions
6  deposits were not collected proves that there
7  weren't checks and balances.
8      That criticism didn't just apply to you,
9  right?
10 A.  Right.
11 Q.  It also applies to Huffstutler, right?
12 A.  The reason it applied to Huffstutler is
13 those were violations by instructors that knew the
14 procedures.  The instructors should have been
15 reprimanded.  The reprimand has to come from the
16 president.  It has to be recommended by the dean.
17 Those instructors should have been.
18     I have numerous letters, if you'd like to
19 see them, where I recommended reprimands and they
20 were never done.
21     Until that's done, instructors are going to
22 -- we have all the procedures in place, and this
23 happens.  This is going to happen until somebody

Page 338

1  is reprimanded and have to pay the price for
2  violating the policy.
3      The procedures are there.  But there are
4  people there that, people in the world everywhere,
5  that break rules.  We know that.  It's obvious in
6  the two-year college system.  But the procedures
7  are.  But something has got to be done.
8      I can't reprimand them.  I can only
9  recommend, which I've done numerous times.
10 Q.  So you don't think any more checks and
11 balance are necessary?
12 A.  I think you can always -- we're always
13 looking for ways.  But we have plenty there.  But
14 I don't -- I never think something can't be made
15 better.  And live work is a big procedure.
16 Q.  If you go on down in the paragraph, it says,
17 "Changes were made where needed to improve the
18 entire live work process."
19     You agree with that, don't you?
20 A.  Yes.
21 Q.  And it says, "The review also afforded the
22 College an opportunity to implement and improve
23 ways to better monitor and account for all live

Page 339

1  work activities as required by generally accepted
2  government compliance standards."
3      Do you agree with that?
4  A.  Yes.
5  Q.  So what you just said is reflected in Dr.
6  Chambers' comments here.  He says we did a review
7  and we have improved some things, made some
8  changes.
9  A.  And that would have been enough said without
10 the front part.
11 Q.  I understand you don't believe that your
12 name should have appeared in here.  I understand
13 that.
14     Next paragraph.  "The Dean of the College,
15 who is primarily responsible for supervising all
16 live work instructors," has been replaced by a new
17 Dean of Instruction, Dr. Jim Merk."
18     This was another change that he thought was
19 going to help the live work process; is that
20 right?
21 A.  Well, the problem with that -- and it's
22 really not my problem, but it's just something
23 that is kind of deceptive -- the Dean of the

Page 340

1  College, Dr. Huffstutler, got a job with
2  Postsecondary.
3      He wasn't replaced because of the result of
4  this audit, which it sounds like, that he was
5  replaced by Jim Merk because he messed up in the
6  audit.  That wasn't why.  He started a new job.
7  Q.  Well, I'm not asking a question about that.
8  A.  I know.  But it just shows that there's some
9  deception there in this write-up.
10 Q.  Well.  "The Dean of Fiscal Affairs" --
11 that's you -- "reaffirmed her positions as they
12 relate to live work and the Business Office.  She
13 informed all employees that she and the Dean of
14 Instruction" -- that's Dr. Merk -- "will be
15 implementing changes where needed, and closely
16 monitoring all live work activities on a regular
17 schedule."
18     Is that right?
19 A.  Yes.
20 Q.  All right.  Now, let's look at the last
21 paragraph.
22     "As a result of the findings by the auditors
23 and an acknowledgment of agreement by the

Page 341

1  President of policy violations, I have initiated a
2  formal disciplinary procedure for the Dean of the
3  College, Dr. Rickey Huffstutler, Cabinet and
4  Refinishing Instructor, Mr. Terry Keahey, and
5  Cabinet Instructor, Mr. Roger Haines."
6      Rickey Huffstutler is a white male, right?
7  A.  He is.
8  Q.  And what is the race and gender of Terry
9  Keahey?
10 A.  White male.
11 Q.  And what is the race and gender of Roger
12 Haines?
13 A.  White male.
14 Q.  So all three of their names appeared in
15 here, and they are all men, right?
16 A.  Yes.
17 Q.  Do you think their names appeared in here
18 because they're men?
19 A.  I don't know why they appeared in there.
20 Q.  Well, you're saying Dr. Chambers put yours
21 in here because you're a woman, so --
22 A.  That's my opinion. I don't know theirs.
23 Q.  Well, do you think he put theirs in there

Page 342

1  because they are men?
2  A.  I can't answer that.
3  Q.  Okay. "They all received a 'Letter of
4  Intent to Take Action' reprimand."
5      You didn't receive a Letter of Intent to
6  Take Action reprimand, did you?
7  A.  No.
8  Q.  Those three men did though.
9  A.  They violated. I didn't. They violated my
10 policies.
11 Q.  They violated your policies and their names
12 were called out in here, weren't they?
13 A.  My name is in there, so it didn't look too
14 favorable on me, even though I didn't get a
15 reprimand. It reflects on me no matter what.
16 Q.  And if there's a problem in your business
17 office it should reflect on you, shouldn't it?
18 A.  It should, yes. The audit should reflect on
19 me and the president. We both need to take
20 responsibility. I take mine.
21 Q.  You think he didn't take responsibility in
22 this audit report?
23 A.  I don't. I think he blamed others.

Page 343

1  Q.  "The Dean of Fiscal Affairs was directed to
2  review the live work process. step by step, to
3  ascertain that the process is workable and clearly
4  understood by all employees and customers."
5      Later on down there, "She was warned that if
6  an effective monitoring process is not enforced
7  immediately. disciplinary actions could be
8  forthcoming. She was directed to regularly
9  monitor all live work projects to make sure that
10 the College adheres to all business procedures and
11 guidelines controlled and governed by her office,
12 the College, Postsecondary, and the State of
13 Alabama."
14 It's a good thing to adhere to business
15 procedures, isn't it?
16 A.  Yes
17 Q.  It's a good thing to adhere to guidelines,
18 isn't it?
19 A.  Sure is. I wish everyone would.
20 Q.  I'm sorry?
21 A.  I wish everyone would.
22 Q.  I do too. It's a good thing to adhere to
23 policies that are governed -- guidelines

Page 344

1  controlled and governed by the business office,
2  the College, Postsecondary. and the State of
3  Alabama. That's a good thing?
4  A.  That is a good thing.
5  Q.  And the fact that you were directed to make
6  sure that happens, that's a good thing, isn't it?
7  A.  Yes. I was already doing that, but that's
8  fine.
9  Q.  Sure. But he's saying we had four
10 violations here.
11 A.  Right.
12 Q.  And he's saying let's make sure we don't
13 have any more violations, right?
14 A.  Right.
15 Q.  And that's a good thing to not have
16 violations, isn't it?
17 A.  Yes.
18 Q.  That's not a bad thing?
19 A.  No. But he and I both should make sure that
20 they are.
21 Q.  And he's trying to make sure that this
22 happens by making sure that his number one dean in
23 the business office is on board and running with

86 (Pages 341 to 344)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 345

1  the ball, right?
2  A.  Apparently.
3  Q.  And there's nothing wrong that?
4  A.  No.
5  Q.  Because that's exactly what you do with your
6  subordinates. They are assigned tasks, and you
7  expect them to run with the ball; right?
8  A.  Uh-huh.
9  Q.  Isn't that right?
10 A.  Right.
11 Q.  There's not anywhere in this response that
12 you are given any formal discipline or threatened
13 with formal discipline; isn't that true?
14 A.  I am threatened with it.
15 Q.  Where are you threatened with it?
16 A.  "She was warned that if an effective
17 monitoring process is not enforced immediately
18 disciplinary actions could be forthcoming."
19     I have a problem with that being in there.
20 That is a warning that if I don't do what I had
21 already done -- I didn't violate. I'm responsible
22 for it; these people violated it. But I was
23 warned.

Page 346

1  Q.  And you think that's a threat of discipline
2  action?
3  A.  My three problems with that is my name,
4  saying I'm weak and ineffective, and warning me
5  with disciplinary action in this report. This is
6  not the place to put that.
7  Q.  Well, these three men might have the same
8  feelings you have, right?
9  A.  They might. I can't say.
10 Q.  And it wouldn't have anything to do with the
11 fact that they are a female, would it?
12 A.  I don't think so.
13 Q.  Because they're not.
14 A.  I don't think so.
15 Q.  All right. Do you know why Dr. Chambers
16 called out names in this report?
17 A.  No.
18 Q.  You don't have any idea that there was a
19 specific reason he was naming names? You've never
20 heard that specific reason?
21 A.  No.
22 Q.  Were you aware that, at the time these
23 findings were made, that there were some District

Page 347

1  Attorney investigations into live work issues
2  associated with the two-year college system? Did
3  you know that?
4  A.  No.
5  Q.  Did you know that there was a threat that
6  certain instructors and/or administrators, may be
7  brought up on ethics charges based upon these
8  findings? Did you know that?
9  A.  No.
10 Q.  So you have no idea why Dr. Chambers thought
11 it important to name names in this report, do you?
12 A.  Are you saying that about me?
13 Q.  You have no idea why --
14 A.  I'm talking about my name. So you're saying
15 there was an investigation into me?
16 Q.  That's not what I'm saying. ma'am.
17 A.  I think I would know that, wouldn't I?
18 Q.  You might not. But I'm not asking you about
19 that.
20 A.  I would say there's not an investigation
21 into me. because I -- and I'm talking about my
22 name. I'm not concerned about the men. They
23 should be concerned about it. I'm concerned about

Page 348

1  my name. I don't think my name should have been
2  in there.
3  Q.  Do you think theirs should have been?
4  A.  No. I think no names. I told you that. I
5  don't think -- that's handled in another area.
6  Even if he has this ethics thing, he needs to
7  handle that somewhere else. You don't put this
8  Q.  My question to you is: You have no idea as
9  to why he actually named names?
10 A.  No. But I'm talking about mine. And if I
11 was in an ethics investigation -- which I was not;
12 I know nothing about it.
13     I'm talking about my name. There was no
14 reason for my name to have been in there. I told
15 you my title -- I know my title has to be in there
16 if there's perceived problems in the business
17 office.
18     But my name. My name. When you put a name
19 in there, that's very personal. And I haven't
20 done anything for my name to be in there is all
21 I'm saying. I had a very big problem with that,
22 and I still do.
23 Q.  I understand that, ma'am. I think you've

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 349

1  made that quite clear. And forgive me for going
2  over this numerous times.
3      But. Ms. Greene, my question is much
4  simpler. You don't have any idea why Dr. Chambers
5  named names in his report response, do you?
6  A.   No. Is that the only audit report you're
7  going to talk about.
8  Q.   Yes, ma'am.
9  A.   Okay. You know. there's years of no
10  findings. But that's fine.
11      (Defendants' Exhibit No. 15 was
12      marked for identification and a
13      copy of the same is attached
14      hereto.)
15  Q.   This is a memo dated January -- or a letter
16  dated January 25. 2006. from Dr. Chambers to the
17  chancellor
18      Have you ever seen that letter before?
19  A.   I have.
20  Q.   You're cc'd on that letter, aren't you?
21  A.   I am.
22  Q.   And that's a letter where he's requested an
23  audience with the chancellor to discuss what he

Page 350

1  believes to be a very serious problem between you
2  and him, right?
3  A.   Uh-huh.
4  Q.   And you would agree that there was a
5  problem?
6  A.   I think that was a result of a memorandum I
7  wrote him. I don't remember at the time.
8  Q.   I didn't ask you what it was the result of.
9  A.   Well, I'm just saying. Yeah, I would say
10  he's saying --
11  Q.   You agree that there was a serious problem
12  between the two of you?
13  A.   Yes.
14      MR. CHRISTMAN: I'll mark this as 16.
15      (Defendants' Exhibit No. 16 was
16      marked for identification and a
17      copy of the same is attached
18      hereto.)
19  Q.   And this is a letter from the chancellor to
20  the president dated February 10, 2006.
21      Have you ever seen that letter before?
22  A.   I don't think I've seen that. I'm sure I
23  didn't because it went to Mr. Chambers.

Page 351

1  Q.   Okay. You see that letter is apparently
2  addressed to Dr. Chambers, right?
3  A.   Uh-huh
4  Q.   And you do see where it says that his title
5  is Dr. J. Douglas Chambers, President. You see
6  that, don't you?
7  A.   I do. So I would not have seen it unless
8  Mr. Chambers gave it to me. And I didn't see
9  that.
10  Q.   Okay. You see there at the first sentence
11  the chancellor states, "I am aware of continuing
12  weaknesses that exist in the business office."
13      Do you see that?
14  A.   I do.
15  Q.   But do you agree with the chancellor's
16  assessment of weaknesses in the business office?
17  A.   I don't. I don't know how he really knows
18  about them, unless Mr. Chambers is telling him
19  Q.   Or the chancellor's review team?
20  A.   That was two years before that. And we had
21  made those corrections. So I'm not sure what
22  continued weaknesses are. But I disagree with
23  that. That's fine.

Page 352

1  Q.   Okay. Well, you would expect Dr. Chambers
2  to take seriously a letter from the chancellor
3  regarding continuing weaknesses in the business
4  office in his college, wouldn't you?
5  A.   Mr. Chambers is orchestrating this whole
6  thing with the chancellor, and apparently the
7  chancellor was going along with him
8      So, you know, you can say he's concerned
9  about it. He's causing it. He doesn't like me
10  I told you why, apparently. I've done nothing
11  else to the man. The only thing I know is I'm a
12  white woman. And I know I'm honest, no matter
13  what he says. And that's the only thing I know.
14      I've gone over this for ten years. I have
15  done nothing to the man but keep him out of the
16  newspaper. Do you see our name in there? We've
17  operated in the black always, very much in the
18  black. I have done nothing but do a good job for
19  him. He's never appreciated it. There's no
20  reason for this. There's no reason for it. But
21  he's orchestrating this with the chancellor, in my
22  opinion. That's my opinion.
23      MR. DEBARDELABEN: Just answer his

88 (Pages 349 to 352)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 353

1  questions
2  Q.  Okay.  Thank you for that answer.  My
3  question was much more simple
4       MR. DEBARDELABEN:  Just answer his
5  questions.
6  Q.  You would expect the president of a college
7  to take seriously any assessment by the chancellor
8  of continuing weaknesses that existed in the
9  business office of that president's college?
10  A.  Yes.
11  Q.  Here's a letter that I'll mark as
12  Defendants' 17 dated June 6, 2006, from the
13  chancellor to the president
14       (Defendants' Exhibit No. 17 was
15            marked for identification and a
16            copy of the same is attached
17            hereto.)
18  Q.  And it shows at the bottom there that you
19  were copied on this letter
20       Have you seen this letter before?
21  A.  Apparently I have.  I don't remember getting
22  it, but I'm copied on it.
23  Q.  Okay.  And you see where it says, "I have

Page 354

1  discussed with you and Ms. Greene" -- do you see
2  there on the second paragraph?  First sentence of
3  the second paragraph?
4  A.  I do.
5  Q.  All right.  "I have discussed with you and
6  Ms. Greene her failure to pay college bills in a
7  timely manner..."
8  A.  I don't remember the chancellor ever
9  discussing that with me.
10  Q.  Well, are you saying the chancellor is
11  lying?
12  A.  I don't know.  I don't remember him talking
13  to me about paying college bills.  I do remember
14  we did talk about the functions of the business
15  office on ACCESS, of course.  But that's come out
16  in the paper why he wanted that.  But I don't
17  remember him talking about college bills.  But
18  maybe I've forgotten.  I don't remember it though.
19  Q.  Okay.
20  A.  That's just Mr. Chambers -- that's what his
21  focus is.  So I'm sure that's why the chancellor's
22  focus was on that.
23  Q.  Are you saying the chancellor addressed this

Page 355

1  with you?
2  A.  I don't remember him addressing failure to
3  pay college bills.  I don't remember that
4  Q.  You're not saying he didn't though; you're
5  saying you just don't remember?
6  A.  I don't remember.
7  Q.  But you don't contend that he addressed with
8  you the failure to pay college bills in a timely
9  manner because you're a woman, do you?
10  A.  I can't answer that
11  Q.  Well, do you contend that or not?
12  A.  What is your question?
13  Q.  That the chancellor spoke with you about
14  college bills being paid in a timely manner
15  because you are a woman?
16  A.  I don't know why the chancellor did that.
17  Q.  Okay.  I'm going to mark this as a
18  collective exhibit, because it all kind of
19  addresses the same thing.  And it will cut down on
20  the number of exhibits here that we are examining.
21       (Defendants' Exhibit No. 18 was
22            marked for identification and a
23            copy of the same is attached

Page 356

1       hereto.)
2  Q.  Do you recall the president addressing with
3  the cabinet, in the beginning of '06, his wanting
4  a tardiness report from all of the different heads
5  of departments?  Do you recall that?
6  A.  Yes.
7  Q.  And this first page of this exhibit is a
8  January 9, '06, memo to the cabinet stating that
9  the little report he asked for on tardiness was
10  past due.
11       Do you see that?
12  A.  Uh-huh.
13  Q.  He didn't just send that to you, did he?
14  A.  No.
15  Q.  And then you responded to that January 9th
16  memo ten days later on the 19th?
17  A.  Uh-huh.
18       MR. CHRISTMAN:  I'm just going to go
19  ahead and mark these separately.  I think they
20  will probably get confusing if I don't.  So I'll
21  mark this 19.
22       (Defendants' Exhibit No. 19 was
23            marked for identification and a

89 (Pages 353 to 356)

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

| Page 357 | Page 359 |
|---|---|
| 1    copy of the same is attached | 1    Do you see that? |
| 2    hereto ) | 2  A.   Yes |
| 3  Q.   This is your response; is that right? | 3  Q.   And he expresses that it had become clear to |
| 4  A.   Yes. | 4  him that his meetings and discussions with you |
| 5  Q.   All right. | 5  have been interpreted, unclear, confusing, or |
| 6    (Defendants' Exhibit No. 20 was | 6  intentionally translated for reasons unknown to |
| 7    marked for identification and a | 7  him. |
| 8    copy of the same is attached | 8    Do you agree that you guys were having |
| 9    hereto.) | 9  difficulty communicating whenever y'all were |
| 10  Q.   And then on the 20th -- excuse me -- on the | 10  having meetings? |
| 11  23rd, the president sent you a memo expressing | 11  A.   We were  That resulted because, if you |
| 12  that he was puzzled that your response was not | 12  disagree with Mr. Chambers, you have difficulty |
| 13  addressing, necessarily, the issues that he was | 13  communicating, apparently. We had a disagreement |
| 14  interested in, that included a number of things | 14  about something, and then I got that letter. So I |
| 15  that he never asked you about. | 15  guess you can't express disagreement. |
| 16  A.   He did. But we did not know this at the | 16  Q.   This is a memo from Dr. Chambers to both you |
| 17  time. He just started this. So now he's answered | 17  and Dr. Huffstutler -- Exhibit 22 -- |
| 18  the way he wanted it. But we didn't know at the | 18    (Defendants' Exhibit No. 22 was |
| 19  time how he wanted it. I think three deans gave | 19    marked for identification and a |
| 20  him three different answers. But I don't know if | 20    copy of the same is attached |
| 21  they got a memo or not. Probably not. | 21    hereto.) |
| 22  Q.   Well, does this demonstrate to you that you | 22  Q.   -- regarding your completion of work |
| 23  and Dr. Chambers are having difficulty | 23  responsibilities. |

| Page 358 | Page 360 |
|---|---|
| 1  communicating? | 1    Do you recall getting that memorandum? |
| 2  A.   It's hard to understand what Mr. Chambers | 2  A.   I do. Now, I had a response to this. Would |
| 3  wants a lot of times. He won't exactly tell you | 3  it not be part of the exhibit? |
| 4  what he wants. When you give it to him, that's | 4  Q.   Not if I don't make it part of the exhibit. |
| 5  not what he wants  Sometimes you have to try two | 5  A.   It's in our paperwork. Seems like it would |
| 6  or three times. | 6  have to be there. |
| 7    I don't think I would be the only person to | 7  Q.   Well, if your lawyer would like to attach it |
| 8  say that, but I can only speak for myself. | 8  as an exhibit to your deposition, he is entitled |
| 9  Q.   Well, you would agree with me that, | 9  to do that. I'm asking you about the memo. |
| 10  certainly in this instance, Dr. Chambers didn't | 10    You understand that the memo was addressed |
| 11  understand why your response addressed a number of | 11  to you and Dr. Huffstutler? |
| 12  issues that he didn't ask you about? | 12  A.   Yes  In 2002. |
| 13    Isn't that what you understand this memo to | 13  Q.   And at that time -- |
| 14  be about? | 14  A.   And I responded to it. |
| 15  A.   Yes. | 15  Q.   And you responded. But I'm not talking |
| 16  Q.   Okay. And this was a memo directed to you | 16  about your response right now; I'm talking about |
| 17  by the president. | 17  this memo. |
| 18    (Defendants' Exhibit No. 21 was | 18    This memo is -- Dr. Chambers is expressing |
| 19    marked for identification and a | 19  his frustration with you and Huffstutler; is that |
| 20    copy of the same is attached | 20  true? |
| 21    hereto.) | 21  A.   True. |
| 22  Q.   He informs you that the remainder of your | 22  Q.   And he says, When both of you tell me you |
| 23  communications will be in writing. | 23  can't do anything with problem employees, but you |

90 (Pages 357 to 360)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

## Page 361

1  refuse to recommend discipline, I have a serious
2  -- we have a serious problem
3  So he's saying there that you were reporting
4  to him that you are having problem employees that
5  won't comply with rules, but you won't recommend
6  discipline.
7  A.  I have recommended discipline.  I have it in
8  writing.
9  Q.  So you disagree with his assessment here?
10  A.  I responded, it's just not attached.
11  Q.  No, it's not attached.
12  A.  I'm sure I addressed that in my response.
13  MR. DEBARDELABEN:  Just answer his
14  question.
15  Q.  He says, "I strongly request that you take a
16  serious look at your job responsibilities and
17  decide whether or not you are applying appropriate
18  leadership to your subordinates, as well as the
19  college."
20  You were not the only one who got that
21  strong suggestion, were you?
22  A.  No.
23  Q.  There was also a white male that received

## Page 362

1  this exact same strong suggestion?
2  A.  Uh-huh.
3  Q.  We talked yesterday some about requisitions.
4  And I asked you whether you were aware that Dr.
5  Merk had, on a number of occasions, asked you for
6  the status of requisitions.
7  (Defendants' Exhibit No. 23 was
8  marked for identification and a
9  copy of the same is attached
10  hereto.)
11  Q.  Exhibit 23 is a January 19, '06. is Dr. Merk
12  asking you about the status of a requisition, is
13  it not?
14  A.  It is.  And I told you he asked for them
15  several times.  Same letter.
16  (Defendants' Exhibit No. 24 was
17  marked for identification and a
18  copy of the same is attached
19  hereto.)
20  Q.  These are out of order here.  But this is
21  the day before, January 18th, marked Exhibit 24.
22  Again, he's requesting the status of a
23  requisition -- different requisition, right?

## Page 363

1  A.  Yes.  I'm very careful with state funds,
2  unlike some people.
3  Q.  And then --
4  A.  We would be in the red if I wasn't, but that
5  will never be said.
6  (Defendants' Exhibit No. 25 was
7  marked for identification and a
8  copy of the same is attached
9  hereto.)
10  Q.  Again, on November 17, '05, which was a
11  couple of months before Exhibit 24.
12  Again, James Merk requesting the status of
13  requisitions, true?
14  A.  True.
15  (Defendants' Exhibit No. 26 was
16  marked for identification and a
17  copy of the same is attached
18  hereto.)
19  Q.  And then fast forward a year later, December
20  14, '06, he says here that he's attaching
21  requisitions dating back to September 11th, which
22  would have been almost three months.
23  A.  Before the fiscal year closed.  So they

## Page 364

1  didn't have any money at that time is why they
2  weren't processed, until the new year began.  But
3  he did have a status report.  But that's fine.
4  Q.  Again, he's asking for requisitions?
5  A.  That's true.
6  (Defendants' Exhibit No. 27 was
7  marked for identification and a
8  copy of the same is attached
9  hereto.)
10  Q.  27 is a memo from Dr. Huffstutler to you.
11  Please take a look at that and tell me if you've
12  seen that before.
13  A.  From 2004 (sic).  I'm sure I have, but I --
14  that's seven years ago.
15  Q.  Well, 2004 was not seven years ago.
16  A.  It's January 4, 2000.  I'm sure I've seen
17  it, but I don't recall it right at this moment.
18  But I'm sure I've seen it.
19  Q.  You see here he's complaining about the
20  delay in implementing the testing center process
21  and delay in student access to instructional tools
22  caused by you and your office?
23  A.  I wonder if I had all the specs.  But we

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

| Page 365 | Page 367 |
|---|---|
| 1  don't know all that right now. | 1      hereto ) |
| 2  Q.   I'm just saying he's complaining about that. | 2  Q.   Now, you may not have seen this, Exhibit 29. |
| 3  A.   That's fine.  That's fine. | 3  Why don't you take a quick peek at that? |
| 4  Q.   Is that right? | 4      (The witness examines the |
| 5  A.   He is. | 5      document.) |
| 6  Q.   And he's complaining about your lack of | 6  Q.   Do you see in that memo to the file, which |
| 7  communication with him to inform him of the status | 7  is dated May 12, '06, that she apparently |
| 8  of the process; is that right? | 8  attempted to contact a vendor for the status of |
| 9  A.   That's what he's saying.  I don't agree with | 9  her order; is that right? |
| 10  it. | 10  A.   Sounds like they called her on something |
| 11  Q.   Okay.  Do you recall last year, in May, an | 11  that had been ordered. |
| 12  exchange associated with some office furniture and | 12  Q.   Have you seen that before? |
| 13  supplies that were requested by Kay Perryman? | 13  A.   No. |
| 14  A.   I do. | 14  Q.   And she was inquiring, it says, on May 15th, |
| 15      (Defendants' Exhibit No. 28 was | 15  '06, "I." meaning Ms. Perryman? |
| 16      marked for identification and a | 16  A.   Yeah.  All of that goes together. |
| 17      copy of the same is attached | 17  Q.   "I contacted Tracey to inquire if this was |
| 18      hereto.) | 18  the first time she had received an order from J.F. |
| 19  Q.   Exhibit 28, you'll see, is a memo to you | 19  Ingram for me. and she stated yes. she received |
| 20  from her regarding the status of her supplies. | 20  the order for the first time on the morning of |
| 21      Do you see that? | 21  May 12, '06.  The order was prepared and approved |
| 22  A.   I do. | 22  in Dr. Merk's office on 3/21/06.  I sent Dean |
| 23  Q.   She's saying she hasn't got the supplies | 23  Greene a memo on May 10 ... requesting a status |

| Page 366 | Page 368 |
|---|---|
| 1  she's requisitioned, and needs them; right? | 1  report..." |
| 2  A.   Uh-huh.  I had a good reason.  Want to hear | 2      She writes here, "It should be noted that |
| 3  it? | 3  she did not process this order until I sent the |
| 4  Q.   Is that right? | 4  status request." |
| 5  A.   Right.  And guess what, I was ordered to get | 5      I understand her statement in this memo to |
| 6  them; she got them; and she no longer works for | 6  the file to be that you did not process her order, |
| 7  them.  And it was a waste of state money sitting | 7  which was approved by Merk on the 21st, until |
| 8  in the office not being used.  But the president | 8  after she asked about the status. |
| 9  said to get her whatever she needed.  I thought it | 9      Is that true? |
| 10  was excessive. | 10  A.   Yeah.  That wasn't why I did it.  But there |
| 11      MR. DEBARDELABEN: Just answer his | 11  was a reason why that order was held, yes. |
| 12  questions.  Let's take a break. | 12      (Defendants' Exhibit No. 30 was |
| 13      MR. CHRISTMAN:  Yes, sir. | 13      marked for identification and a |
| 14      (A brief recess was taken.) | 14      copy of the same is attached |
| 15  (BY MR. CHRISTMAN) | 15      hereto.) |
| 16  Q.   We were talking about the Kay Perryman | 16  Q.   Exhibit 30 is a memo from Ms. Perryman to |
| 17  requisitions for office furniture and supplies. | 17  you where she's thanking you for your attention in |
| 18      And you recall having seen the memo asking | 18  assuring the delivery of some of the office |
| 19  about the status, that was Exhibit 28? | 19  supplies and asking for your help in ascertaining |
| 20  A.   Yes. | 20  the status of the supplies that have not been |
| 21      (Defendants' Exhibit No. 29 was | 21  delivered. |
| 22      marked for identification and a | 22      Do you recall seeing that memo? |
| 23      copy of the same is attached | 23  A.   I do. |

Page 369

1  Q.  And she lists a few items there. Were you
2  irritated with Ms. Perryman?
3  A.  Pardon?
4  Q.  Were you irritated with Ms. Perryman during
5  this exchange?
6  A.  No. I had reasons that that had not been
7  ordered. I had to find funds.
8      That position was made for her, and I didn't
9  have money for -- this was like thousands of
10  dollars, like probably 20- or $30,000 or more that
11  I was going to have to find to set up her office.
12      And she had been in another area. She was
13  -- and all of her funds were federal funds. So
14  she had all this in another area; and then she
15  didn't have that job anymore, and we took her up.
16  So I can't just find 30,000. And this was getting
17  close to year-end. So I was trying to find money
18  and see what we could do. But I can't just pull
19  that money out of the air. So that was the reason
20  for the delay.
21  Q.  And you weren't irritated with her?
22      MR. DEBARDELABEN: Object to the form.
23  A.  I don't remember whether I was or not.

Page 370

1      (Defendants' Exhibit No. 31 was
2      marked for identification and a
3      copy of the same is attached
4      hereto.)
5  Q.  Let me show you your memo to Ms. Perryman,
6  dated May 30, 2006, where you say "You're
7  welcome!" at the beginning.
8      You said something like we do our best to --
9  read it for us. What does it say?
10  A.  "My department does try hard to meet all
11  necessary requests."
12  Q.  Were you just being sarcastic there?
13  A.  She said thank you, so I said you're
14  welcome.
15  Q.  Were you being sarcastic there?
16  A.  I don't recall.
17  Q.  You do recall writing that memo, do you not?
18  A.  I do.
19  Q.  In the second page there you state, "You
20  also stated 'that you felt compelled to take your
21  concerns to a higher level.' Please be informed
22  that I have had more than one conversation with
23  Mr. Chambers concerning your purchase requisitions

Page 371

1  for the current year. I explained to Mr. Chambers
2  that only your salary and benefits are currently
3  covered by the budget and that there are no budget
4  operating line items for any of the additional
5  items you have requested."
6      The next paragraph says, "As far as your
7  other requests, Mr. Chambers told me to scrutinize
8  each requisition and ensure that funds are
9  available to cover the anticipated expenditure
10  amounts and that the items are not excessive."
11      So you had, according to this memo, some
12  conversations with Dr. Chambers about her
13  requisitions?
14  A.  I did. I showed them to him because it was
15  a lot of money.
16  Q.  And he told you to scrutinize the
17  requisitions, right?
18  A.  He did. One particular I showed him was a
19  large printer. And, you know, we didn't normally
20  order those for our employees, so I wanted to make
21  sure that he was okay with it.
22  Q.  And then you were careful to point out at
23  the end of your memo that she should note that

Page 372

1  your position with the college is that of Dean of
2  Fiscal F-I-S-C-A-L Affairs, not Dean of Physical
3  Affairs.
4  A.  Yeah. We had been working together a while.
5  You think she would have known that.
6  Q.  Why did you find it important to straighten
7  her out on that?
8  A.  Because that wasn't the correct title.
9  Believe me, she would straighten me out if I
10  didn't get her title right.
11      Physical sounds like a gym teacher.
12      (Defendants' Exhibit No. 32 was
13      marked for identification and a
14      copy of the same is attached
15      hereto.)
16  Q.  And then here we have Exhibit 32, and this
17  is Ms. Perryman's response to your memo.
18      Do you recall receiving that?
19  A.  Yes, I'm sure I've seen this.
20  Q.  You see at the beginning of this response
21  she is expressing her belief that there's some
22  communication problems between you and she; is
23  that right?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 373

1  A.   It appears she is. yes
2  Q.   She wasn't aware that there were problems
3  with the requisitions and thinks that you should
4  have contacted her about those problems. right?
5  A.   Right
6  Q.   She writes. "This could have easily been
7  resolved if you had communicated with me
8  concerning items I wished to purchase for the
9  current year."
10     So your understanding is that she thought
11  y'all should have been in communication about
12  these requisitions. rather than you contacting
13  President Chambers directly, right?
14  A.   Right

15  Q.   And then she goes item by item and expresses
16  what she believes to be the explanations for why
17  there was no requisition; she didn't know there
18  was a requisition required, right?
19  A.   It appears. yes
20  Q.   Ms. Perryman is a white female?
21  A.   She is.
22       (Defendants' Exhibit No. 33 was
23       marked for identification and a

Page 374

1       copy of the same is attached
2       hereto.)
3  Q.   Exhibit 33 is a memo to you from the
4  president dated the same day as Ms. Perryman's
5  memo to you. And in this memo the president
6  expresses to you that he doesn't remember your
7  conversations with him the way you do, right?
8  A.   Yeah, that's what he's saying.
9  Q.   And he says that Dr. Merk doesn't remember
10  the conversations the way you remembered them.
11  right?
12  A.   That's what he's saying.
13  Q.   And he tells you to approve her
14  requisitions, despite your memo to Ms. Perryman,
15  right?
16  A.   Right.
17  Q.   So apparently there was some lapse in
18  communication between you, Dr. Merk, and Dr.
19  Chambers?
20  A.   Apparently.
21  Q.   So maybe there could be some improvement in
22  communication skills, particularly associated with
23  this transaction, true?

Page 375

1  A.   Between both of us. I mean. two of us
2  didn't communicate, so we could have both
3  improved.
4  Q.   Well, if both Dr. Merk and Dr. Chambers had
5  the same recollection of the conversation, then
6  you -- do you still stand by that statement?
7  A.   I do
8       (Defendants' Exhibit No. 34 was
9       marked for identification and a
10      copy of the same is attached
11      hereto.)
12  Q.   And here is the memo to the president from
13  Dr. Merk. which is Exhibit 34, where he expresses
14  that he had a different understanding of your
15  communications than you do; isn't that true?
16  A.   What was your question?
17  Q.   This is the memo where Dr. Merk tells Dr.
18  Chambers that your recollection and his
19  recollection are not the same.
20  A.   That's his opinion. But that is a memo of
21  him saying it.
22  Q.   So according to this memo and according to
23  Dr. Chambers' memo, neither of them remember the

Page 376

1  same things you remember about your conversations;
2  is that right?
3  A.   That's right
4  Q.   And Dr. Merk is white, isn't he?
5  A.   He is.
6  Q.   And Ms. Perryman is white and a female,
7  right?
8  A.   Right.
9       (Defendants' Exhibit No. 35 was
10      marked for identification and a
11      copy of the same is attached
12      hereto.)
13  Q.   And then this is your memo to Dr. Chambers
14  associated with these interactions. And you
15  expressed, in about the fourth sentence down, that
16  you regret that you cannot agree regarding what
17  transpired in your communication; is that right?
18  A.   Yes. that's what I said
19  Q.   Okay. Do you recall yesterday you and I
20  discussed briefly your knowledge of any customer
21  complaints against you, and you said that you
22  don't recall any customer complaints or don't
23  recall any bad interactions with customers; is

94 (Pages 373 to 376)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 377

1   that true?
2   A.   Customer complaints. I don't know of one
3   Q.   Okay. If the president receives a complaint
4   from a customer that one of his deans is being
5   rude or unprofessional, do you think it's
6   important for the president to take that complaint
7   seriously?
8   A.   Yes.
9   Q.   Do you think that would shape a president's
10  perception of a dean, in terms of their ability to
11  adequately perform their job?
12  A.   Ask that again.
13  Q.   Do you believe that complaints by customers
14  of a dean being rude and unprofessional would
15  shape the president's perceptions about that dean
16  and their ability to adequately perform their job?
17  A.   No. That's an outside person coming in.
18  The president works with me every day. He should
19  go to his dean, tell them he's had a complaint,
20  say, 'Let's talk about it,' and see what that is.
21      But I don't even know what that is, so I
22  don't think he talked to me about it.
23  Q.   I'm not talking about this right now; I'm

Page 378

1   talking about in general.
2       If one of your employees --
3   A.   I mean, people could come in off the street
4   and make a complaint. I mean, everybody has a
5   right to make a complaint.
6       But what I do if there were a complaint made
7   against one of my employees, I would call the
8   employee in and say, "Now, you tell me what
9   happened." And then I've heard what the other
10  person said. And then we work out a solution.
11  But I would definitely talk to the person that the
12  complaint had been made about.
13  Q.   Is it a good thing for the president to get
14  complaints from customers that his deans have
15  treated them rude or unprofessional? Is that a
16  good thing?
17  A.   I don't know.
18  Q.   You don't know?
19  A.   Huh-uh.
20  Q.   Well, if one of your subordinates had an
21  interaction with a customer, and the customer
22  called you and said, "Your subordinate was
23  extremely rude and unprofessional to me" --

Page 379

1   A.   That's happened. But you know what, they
2   don't say what they did. I've been there and
3   witnessed what the customer did. And so the
4   customer, you know, can cause that. and then they
5   turn around and write a complaint.
6       You know, people are people. That's their
7   opinion. They think they've been violated, and I
8   could think I have been violated. But a lot of
9   times the customers have an attitude.
10      Any customer can come in and try to have
11  someone's job. I don't think that's fair to base
12  one or two or three incidents on that, when you
13  don't know all the details of it. I think you
14  should look at all sides of it.
15  Q.   Is it a good thing when a customer complains
16  about one of your staff being rude or
17  unprofessional? Is that a good thing?
18  A.   Probably not. But it may not be true.
19  People make up things.
20  Q.   It may not be true. It might be true
21  though?
22  A.   It could be.
23          (Defendants' Exhibit No. 36 was

Page 380

1           marked for identification and a
2           copy of the same is attached
3           hereto.)
4   Q.   Let me show you Exhibit 36 and ask you if
5   you recall hearing about a complaint from a J.
6   Robert Camp in the fall of 2006.
7           (The witness examines the
8           document.)
9   A.   I was not rude to Mr. Camp. I know he's
10  saying I was.
11      There's a long history with Mr. Camp. But
12  we have witnesses that I was not rude to him. I
13  just talked to him like we're talking now.
14      But he has come and caused problems at the
15  school for years. But that's fine. That's his
16  opinion. Mr. Chambers didn't do anything.
17  Q.   No, he didn't, did he?
18  A.   He didn't do anything because he knew that
19  we had had problems with Mr. Camp.
20  Q.   He didn't do anything against you because of
21  this complaint, did he?
22  A.   No.
23  Q.   But this customer did complain that you had

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

Page 381

1  been rude to him?
2  A.  I know.  But that is not the fact.
3  Q.  Well, but he complained about it, didn't he?
4  A.  He did.
5  Q.  He thought you were being rude to him?
6  A.  But Mr. Chambers knew that I had not been,
7  because he was aware of it.  And he didn't lift
8  the ban or anything.
9  Q.  This person thought you were being rude to
10  him, didn't he?
11  A.  He thought so.
12  Q.  And he sent that to President Chambers, it
13  appears, right?
14  A.  Uh-huh.  But I never had seen that letter.
15  Q.  Well, it didn't go to you; it went to Dr.
16  Chambers, right?
17  A.  I know.  But you had asked me if I knew
18  about it, and I didn't.
19  Q.  You knew about the interaction.
20  A.  Yeah.  But, I mean, that happens a lot.
21  Q.  It happens a lot?
22  A.  I mean, interaction with customers.  Not
23  that kind of interaction, but I interact with

Page 382

1  customers almost daily.
2  Q.  Okay.
3       (Defendants' Exhibit No. 37 was
4       marked for identification and a
5       copy of the same is attached
6       hereto.)
7  Q.  Well, tell me if you have ever seen this
8  letter, Exhibit 37, from a Cyrenthia Crawford.
9  A.  I have not.  That's not a truthful letter.
10  And I have reasons.  The lady caused audit
11  problems for us.  She didn't pay for work she had
12  on our campus.  And that's not the first thing I
13  said to her.  But that's fine if you want to keep
14  that.
15      Ms. Crawford made a complaint against me.  I
16  acknowledge that, if that's what you want.
17  Q.  She complained that you were being rude to
18  her?
19  A.  Yes.  But that's not accurate.  But that's
20  fine.
21  Q.  Well, would you agree with me that --
22  A.  She was the one that started with an
23  attitude.  But as you said...

Page 383

1  Q.  Would you agree with me that an
2  administrator or an employee, generally speaking,
3  who has bouts of rudeness or confrontations with
4  customers, that they could use some improvement in
5  their communication skills?  Would you agree with
6  that?
7  A.  No.
8  Q.  You don't agree that an employee who has
9  bouts of rudeness and confrontations with
10  customers could use some work on their
11  communication skills?  You don't agree with that?
12  A.  Huh-uh.  What I'm puzzled about:  Am I weak
13  and ineffective or rude and confrontational?
14  Those are not two like items.  Which one am I?
15  Q.  Well, let's back up for a second.  I'm
16  talking about generally.  Generally speaking.  I'm
17  not saying assume that you were rude in this
18  situation.  I'm not saying that.
19      I'm saying assume that somebody that works
20  for you was, in fact, rude, and you heard it with
21  your own ears, and your employee was rude and
22  confrontational.  Would you agree with me on their
23  that employee could use some work on their

Page 384

1  communication skills?  That's the question.
2  A.  I would talk to them if I heard them.  Mr.
3  Chambers did not hear that.  I would agree that I
4  would talk to them.  I don't know that --
5  Q.  That's not my question.
6  A.  I don't know if I can answer your question.
7  Q.  Sure you can.  It's not difficult.
8      MR. DEBARDELABEN:  She just answered
9  it.  She's not giving you the answer you want.
10  She said she can't answer it.
11      MR. CHRISTMAN:  I'll try it one more
12  time.  If I don't get it, that's fine, I'll leave
13  it alone.  Okay?  Let me try it one more time.
14  Q.  I'm not asking you if you'd talk to them.
15  My question is more specific.
16      Do you agree with me that an employee, who
17  you witnessed being rude and confrontational,
18  could use some work on their communication skills?
19  That's my question.
20      I'm not asking whether you'd go talk to them
21  or what you would do as the manager of that
22  employee.  I'm asking you:  Could that employee
23  use work on their communication skills?  That's my

96 (Pages 381 to 384)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

---

Page 385

1 question. Could they use work?
2 A.   Why are you saying if I heard them? What
3 does that have to do with it?
4 Q.   Because there's no question in your mind --
5 A.   Because Mr. Chambers didn't hear me, if
6 that's what you're getting to over here. I don't
7 know if I'm going to answer your question.
8     He didn't hear it, so if that -- I don't
9 know why you're making that statement, if I heard
10 them.
11 Q.   Well, let's take that part out. Let's just
12 say you know this person and you know for a fact
13 in your own mind that this employee was rude and
14 confrontational. You know it.
15     I don't care how you know it -- you heard
16 it; you saw it on TV; somebody told you and you
17 believed them. It doesn't matter to me how you
18 found out. Take all that off the table.
19     You know that your employee was rude and
20 confrontational. You're convinced of it. However
21 you got convinced, you're convinced.
22     Could that employee use work on their
23 communication skills? It's not a complicated

Page 386

1 question, I don't think.
2 A.   Yes.
3     (Defendants' Exhibit No. 38 was
4     marked for identification and a
5     copy of the same is attached
6     hereto.)
7 Q.   Defendants' 38. Have you ever seen that
8 memo?
9 A.   It's to the record, so I have not seen it
10 Q.   Take a minute to look at it
11     (The witness examines the
12     document.)
13 A.   I don't know what this is. I really don't.
14 I don't remember that. I don't know what they are
15 talking about.
16 Q.   It's from James Merk. It's dated June 22,
17 2006.
18 A.   If it relates to that. But I don't know
19 what that is, no. I mean, I don't remember that.
20 Q.   Okay.
21 A.   Mr. Wilson was involved here. But I don't
22 know if Dr. Merk just got his dates wrong when he
23 wrote that. I don't know. I don't know what

Page 387

1 that's about. It may be that. but I don't know
2 about that
3 Q.   Well, if this is talking about Ms
4 Crawford's complaint. would you agree with me that
5 Dr. Merk's account demonstrates something very
6 similar to what Ms. Crawford said?
7 A.   No
8 Q.   You wouldn't agree with that?
9 A.   No
10     (Defendants' Exhibit No. 39 was
11     marked for identification and a
12     copy of the same is attached
13     hereto.)
14 Q.   Exhibit 39 is a memo dated June 22, 2006,
15 from Loryn R. Wainwright
16     Who is Ms. Wainwright?
17 A.   She's, I think, a clerk in Mr. Wilson's
18 area
19 Q.   What is her race and gender?
20 A.   She's a white female.
21 Q.   She's a white female?
22 A.   She's a clerk that was answering the phone,
23 so I'm sure she's written up something. She was

Page 388

1 there with Ms. Crawford. I'm sure she's written
2 something; I haven't seen it.
3 Q.   Okay. Well. you're about to see it. This
4 is a memo that Ms. Wainwright wrote to Mr. Wilson.
5 See if you have seen it and read its contents,
6 please.
7 A.   I have not seen it.
8     (The witness examines the
9     document.)
10     THE WITNESS: It already discredits
11 what Ms. Crawford said
12     MR. DEBARDELABEN: No, no.
13 A.   That's fine.
14 Q.   You understand that this white female's
15 account of what transpired is that you were
16 becoming very red in the face and talking loudly
17 and pointing your finger at Ms. Crawford? That's
18 what the memo says, isn't it?
19 A.   That's what it says.
20 Q.   And in this person's opinion, she said you
21 were unprofessional, didn't she?
22 A.   She did
23 Q.   And she said she was embarrassed because of

97 (Pages 385 to 388)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 389

1    what happened. didn't she?
2    A.   She did.
3    Q.   She said she was very shocked at the way you
4    and Ms. Graves handled yourselves in this
5    situation. That's what it says, doesn't it?
6    A.   That's what it says.
7    Q.   You don't agree with a word of that, do you?
8    A.   No.
9    Q.   Let me show you another one.
10        (Defendants' Exhibit No. 40 was
11        marked for identification and a
12        copy of the same is attached
13        hereto.)
14   Q.   Exhibit 40 is a memo dated June 22nd to Dr.
15   Chambers from James Wilson. This is his account
16   of what he saw. Take a look at that.
17        (The witness examines the
18        document.)
19   A.   That's fine.
20   Q.   Mr. Wilson's account indicates that you
21   ignored his question and talked in a very hostile
22   manner, doesn't it?
23   A.   That's what he says.

Page 390

1    Q.   He says you continued to shout and shake
2    your finger at Ms. Crawford. That's what he says,
3    isn't it?
4    A.   That's what he says.
5    Q.   And that you turned to both Dr. Merk and
6    him, in a very rude tone, and said that you didn't
7    need their assistance. That's what it says,
8    doesn't it?
9    A.   That was true, yes.
10   Q.   And you did say that, didn't you?
11   A.   Yeah. I didn't need them. She was trying
12   to get Mr. Wilson to bypass the rules because
13   they're friends.
14        There was no need for either of them to be
15   involved. That wasn't their...
16   Q.   So you thought it was appropriate at that
17   point to point your finger and say to them --
18   A.   That's what they said I did.
19   Q.   -- in a very rude tone, you don't need their
20   assistance? That was an appropriate response on
21   your part?
22   A.   That's what I said.
23   Q.   My question was: That was appropriate, in

Page 391

1    your estimation?
2    A.   If you had been there. it would have been
3    appropriate.
4    Q.   Well, Mr. Wilson says that in his opinion it
5    was very unprofessional.
6    A.   That's his opinion.
7    Q.   Do you think Dr. Chambers should take
8    seriously -- if he received every one of these
9    memos associated with this account, and Ms.
10   Crawford's letter, do you think that he should
11   take seriously those complaints about your conduct
12   toward that customer?
13   A.   He should listen to the facts from me, which
14   he knew about them.
15   Q.   Did he discipline you for that?
16   A.   No.
17   Q.   No?
18   A.   Because I had facts to show that the woman
19   should not have work done at the college.
20   Q.   Even if the woman shouldn't have been at the
21   college, did that give anybody license to be rude?
22   A.   What happened is the woman got the attitude
23   first. No one put that down, and nobody is going

Page 392

1    to put that down. But the lady has an attitude.
2    She's been to the school many times. And you
3    could get other people to verify that. But that's
4    fine. Nobody's going to put that in there.
5         She started with the attitude. I was trying
6    to just take the information. I was going to show
7    them later to not let her have the work done.
8    Because she really caused us a problem, like I
9    said, about two years earlier, with an audit. She
10   left furniture and never paid for it. We never
11   could get in touch her. It was very frustrating.
12   She never returned our calls.
13        And then she just shows up out of the blue.
14   I was just going to take her name, show it to Mr.
15   Chambers and tell him we can't do it. She started
16   with an attitude.
17        But that's fine. So that's why Mr. Chambers
18   -- I explained it to him. And I don't know why he
19   didn't do something. But it's probably because I
20   had gave him the facts. I don't know.
21   Q.   Well, do you think he did the right thing in
22   taking no action against you?
23   A.   Yes.

98 (Pages 389 to 392)

Page 393

1   Q.    Do you think all these people wrote these
2   ugly things about your conduct because you're a
3   white female?
4   A.    Yes
5   Q.    You think James Merk wrote it because you're
6   a white female?
7   A.    Yes.
8   Q.    How about that white female clerk?  Do you
9   think she wrote it against you because you're a
10  white female?
11  A.    I don't know why she did it.  Maybe so.
12  Q.    Her too?
13  A.    Uh-huh.  She works for Mr. Wilson, so -- I
14  know that's why he did it
15  Q.    So she's a racist and a gender bigot too?
16  A.    She could be; I don't know.
17  Q.    Against her own gender and her own race?
18  A.    Maybe
19  Q.    And the same is true for Mr. Wilson.  He
20  wrote those things against you because you are a
21  white female?
22  A.    Yes.
23  Q.    Well, how does that explain why Mr. Chambers

Page 394

1   didn't take any action?  If all this was because
2   you are a white female, and you claim Mr. Chambers
3   is discriminating against you because you're a
4   white female, how do you explain that he didn't
5   take any action?
6   A.    Because I presented facts to him probably.
7   Q.    Well, maybe because it's not because you're
8   a white female.
9   A.    I don't know.  You would have to ask him.
10  Q.    Maybe not.  Is it your testimony that all of
11  these accounts of this interaction are false?
12  A.    There was interaction, but that is not all
13  true.
14  Q.    Each one of them contains false assessments
15  of the way you acted?
16  A.    Right.
17  Q.    And all of their opinions that you were rude
18  and unprofessional should be disregarded and
19  discounted?
20  A.    Right
21  Q.    And what the president should do is
22  disregard their statements and accept yours?
23  A.    Yes.  I have facts.

Page 395

1   Q.    Okay
2         (Defendants' Exhibit No  41 was
3         marked for identification and a
4         copy of the same is attached
5         hereto.)
6   Q.    Exhibit 41 is a January 16, 2007 -- this
7   year -- memo from Rosie Edwards.  Who is Rosie
8   Edwards?
9   A.    She's the director of special services
10  Q.    Is she a white or black lady?
11  A.    Black
12  Q.    And she wrote this memo to the president
13  associated with advertising some positions, but
14  says that they couldn't run due to the college's
15  account status
16        Have you ever seen that before?
17  A.    I have not.  We have continuous problems
18  with the Advertiser and the Birmingham News.  We
19  have written them letters; I've had my accountant
20  call them and tell them we must have tear sheets
21  We can't just pay the bills that come from the --
22  if you've ever seen a bill from the newspaper, if
23  you don't have a tear sheet, it's pretty vague.

Page 396

1   We have to have tear sheets.
2         My accounts payable clerk is one of the most
3   detailed persons I've ever seen.  She knows she's
4   supposed to have those; she's requested those.
5   Like I said, the accountant has called and told
6   them we have to have them.  We don't pay them
7   without the tear sheets.  And that's why they had
8   not received payment.
9         As I told you, if we have not paid one,
10  there is a reason.  We have to have the tear
11  sheet.  So they do that about every other week.
12  And I'm sure J.F. Ingram is not the only other
13  person.  But that was the reason:  We don't have
14  tear sheets.  So there was a reason.
15  Q.    So it doesn't surprise you though that the
16  college's account with the Advertiser was
17  delinquent?
18  A.    We have had numerous problems with the paper
19  over the years is all I'm going say.
20  Q.    Well, I appreciate that answer, but I really
21  want you to answer the question I asked you.
22        You don't disagree with me then that the
23  Montgomery Advertiser account with the college was

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

---

Page 397

1  delinquent?
2  A.  I would have to see the statement to know.
3  Q.  Do you recall this happening?
4  A.  Yes.
5  Q.  And based upon your recollection --
6  A.  We called again and asked for the tear
7  sheet. And I'd have to check with her. I mean,
8  it was probably three or four phone calls before
9  we got it. I'm sure when we got it, it was paid.
10  But she's going to make sure she has the proper
11  paperwork before she pays a bill.
12  Q.  So you do remember that the college's
13  account with the Montgomery Advertiser was
14  delinquent on this occasion?
15  A.  That's what they said. I remember her
16  checking on it. She checked on it to see. I know
17  that they didn't allow the ad, for whatever
18  reason.
19        (Defendants' Exhibit No. 42 was
20        marked for identification and a
21        copy of the same is attached
22        hereto.)
23  Q.  42. Do you know a Frank Clem?

---

Page 398

1  A.  I do.
2  Q.  What is this person's race and gender?
3  A.  White male.
4  Q.  Do you recall this complaint that he sent to
5  you on payroll changes?
6  A.  Yes.
7  Q.  Do you recall him stating to you that he
8  thought that you were being condescending in your
9  tone?
10  A.  Let me read it and see what he's saying.
11        (The witness examines the
12        document.)
13  A.  I don't remember if I talked to him or if
14  someone in my office talked to him. So I don't
15  know if it was a condescending tone or not. It
16  says communications from your office. I'm not
17  sure who that was.
18  Q.  Okay.
19  A.  But that's his opinion. whether it was
20  condescending or not. I mean. I don't recall.
21  Q.  Well, do you think he had an opinion that
22  your office was being condescending because you're
23  a white female?

---

Page 399

1  A.  I don't know. I don't know what he thinks.
2  Q.  Well. he thinks you were being condescending
3  in that transaction, or your office was. doesn't
4  he?
5  A  He does.
6  Q.  Do you think that condescending
7  communications are effective ways to communicate
8  to other departments?
9  A.  No.
10  Q.  Do you think if there is --
11  A.  But, you know, when you put out several
12  memos all through the year telling people when
13  their deductions are going to be made, you know,
14  there could be -- I don't remember what all
15  happened.
16        There could be frustration in a department
17  when you've told them. We've announced it in
18  staff meetings, and then they come up with these.
19  like, every month. So there could be frustration
20  there. There could be condescending in the -- I
21  don't remember what all happened there. But I do
22  remember getting a memo from him
23  Q.  Okay. And you would agree with me that this

---

Page 400

1  memo and the memos associated with your
2  interactions with customers all reflect somebody's
3  opinion that you were being unprofessional,
4  condescending, rude. That's their opinions about
5  you or your office and your communication?
6  A.  That's their opinions, uh-huh.
7  Q.  And do you know whether the president
8  received every one of those complaints?
9  A.  I don't know. I don't know what he
10  received.
11  Q.  You don't know whether he had that or didn't
12  have it, do you?
13  A.  No.
14  Q.  If he did receive every one of those memos,
15  do you think he should take those complaints
16  seriously?
17  A.  I told you before I think he should go to
18  the person it was made about. You know, people
19  write complaints about people in positions of
20  authority all the time.
21  Q.  Yes. Just like you've written complaints
22  about Dr. Chambers, right?
23  A.  I have.

---

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

Page 401

1  Q.  Those are all your opinions too, aren't
2  they?
3  A.  I've written them to him.  I think I've
4  answered him back if I had a problem with him.
5        (Defendants' Exhibit No. 43 was
6        marked for identification and a
7        copy of the same is attached
8        hereto.)
9  Q.  43 is a memo that you wrote to James Merk
10 regarding a pay increase request for a person
11 called Gloria Knox.
12      Do you recall that memo?
13 A.  I do.
14 Q.  You opposed Ms. Knox's pay increase, didn't
15 you?
16 A.  I did.
17 Q.  What is her race and gender?
18 A.  Black female.
19 Q.  Did you oppose her fee increase because
20 she's black?
21 A.  No.  I think if you read this letter you'll
22 see why I opposed it.  Her work product is not
23 good.

Page 402

1  Q.  Well. I think I've also read all of the
2  documents associated with the performance of your
3  office, and none of them referred to the fact that
4  you're white or that you're female.  But that's
5  what you believe the cause was for all of those
6  complaints, isn't it?
7  A.  Yes.
8  Q.  But you want me to believe, or the reader of
9  this thing to believe that your opposition of Ms
10 Knox is not because she's black?
11 A.  No.  That's not the reason.
12 Q.  It's not?
13 A.  No.
14 Q.  You said in that memo that you had problems
15 with her work, right?
16 A.  Proof of it, yes.  There's proof in there.
17 That's a big difference when you can prove.
18 Q.  What's the proof?  Your opinion that she
19 wasn't doing a good job?
20 A.  No.  We have documented evidence of work she
21 took in.
22 Q.  Documented mistakes, right?  Is that true?
23 You documented her mistakes?

Page 403

1  A.  Yes, we did.
2  Q.  And you think there's never been a
3  documentation of your mistakes?
4  A.  I don't know.  Looks like there has been.
5  Q.  Yes, it does.  But you didn't appreciate the
6  idea of her getting a raise because her work was
7  poor for you, wasn't it?
8  A.  It was.
9  Q.  You were not pleased with her performance,
10 were you?
11 A.  No.
12 Q.  You had specific complaints?
13 A.  I was not going to recommend it.
14 Q.  Yes, ma'am.  You had specific complaints
15 about her performance, didn't you?
16 A.  I did.  Specific complaints.  I would think
17 that would be the key.
18 Q.  And there have been specific complaints
19 about your performance by the chancellor's office,
20 right?
21 A.  Supposedly.
22 Q.  Yes, ma'am.  You stated in this memo that
23 you thought Ms. Knox should be grateful rather

Page 404

1  than complaining
2      What did you perceive her complaint to be?
3  The fact that she wanted some more money for her
4  job?
5  A.  Uh-huh.
6  Q.  Is it, in your opinion, a complaint when an
7  employee wants more money?
8  A.  No.
9  Q.  But it was for her?
10 A.  Uh-huh.
11 Q.  Why?  Because she's black?
12 A.  No.  Did you see the letter that she wrote
13 asking for it.  Maybe that would help you
14 understand
15 Q.  Well, you tell me what did you think about
16 her letter that demonstrated she was complaining?
17 A.  I would have to see her letter.  There was
18 apparently something that made me think that.  I
19 don't think I would just write that.
20 Q.  Apparently there was some comparison between
21 Ms. Knox and some other employees at the college
22 to substantiate her pay increase; is that right?
23 A.  Right.

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

Page 405

1  Q.  And you did not think that many of these
2  comparators were appropriately comparable; is that
3  right?
4  A.  Right.
5  Q.  They performed different job functions; is
6  that right?
7  A.  Is that what I said? I'd have to see the --
8  Q.  Well, it says here -- I'm happy for you to
9  look.
10  "I noticed that you have listed some
11  employees in comparison to Ms. Knox and the only
12  other two that make more than Ms. Knox are Ms.
13  Bankston, and she works for Special Education who
14  has separate funding, and Ms. Turner."
15  So there were two employees that you picked
16  up on that made more than her that you thought
17  were not the same, right?
18  A.  Apparently. Dr. Merk must have put that in
19  his letter. We would have to see the letters that
20  came before that. I was answering a letter.
21  apparently, from Dr. Merk, so we would probably
22  need to look at that.
23  Q.  Why would that --

Page 406

1  A.  Well. I mean. you're looking at my response
2  to something. And apparently -- is that my
3  response to -- did he list Ms. Bankston. "I
4  noticed that you have listed some of the employees
5  in comparison..." I think Dr. Merk's letter did
6  have that.
7  So what I'm saying is I'm answering a letter
8  from him. You think we would have his letter too.
9  But that's fine. I said I noticed it and they
10  don't compare, looks like what I'm saying.
11  Q.  Well. just listen to my questions. If you
12  can't answer one of my questions because you need
13  another document, I'm glad to provide you the
14  document if I have it. But for the purposes of my
15  question, I'm not interested in Dr. Merk's letter.
16  A.  Well, I had to see what you were saying. I
17  was not understanding what you were saying.
18  Q.  Yes, ma'am. I'm referring to your
19  opposition that you wrote to Ms. Knox's request
20  for a pay increase. So I'll show you any document
21  that I have in my possession.
22  A.  I'm sure I have it too, but I don't have it
23  today.

Page 407

1  Q.  But I don't want you to be thinking that you
2  need to read a litany of documents just to answer
3  my question. If you'll just listen to my
4  questions, you might need a document; and if you
5  do, I'll give it to you if I have it.
6  You said here that Ms. Turner has a
7  completely different job description than Ms.
8  Knox.
9  In other words, because Ms. Turner's job
10  description is totally different, she's not really
11  fairly comparable?
12  A.  Right. Ms. Turner is at a much higher level
13  than Ms. Knox.
14  Q.  And their job qualifications and
15  descriptions are different?
16  A.  Right.
17  Q.  And you shouldn't compare them?
18  A.  Right. Education is way different, which is
19  a qualifier for Ms. Turner's job. There's a lot
20  more education there that is not a qualifier for
21  Ms. Knox's job.
22  Q.  And Ms. Bankston works under a separate
23  funding?

Page 408

1  A.  Right.
2  Q.  And you don't think she's comparable at all?
3  A.  No, because it's a totally different area.
4  Q.  Different are, different job requirements,
5  different funding, right?
6  A.  Right.
7  Q.  So none of those folks are comparable with
8  Ms. Knox?
9  A.  Right.
10  Q.  You said that Ms. Knox does not -- you found
11  that she does not take instruction well, mainly
12  because she will not listen to what you're telling
13  her, right?
14  A.  (Witness nods head.)
15  Q.  That creates a problem, especially for you,
16  in working with Ms. Knox, right?
17  A.  Uh-huh.
18  Q.  Because she doesn't take instruction well?
19  A.  Yes.
20  Q.  Isn't that true?
21  A.  Yes.
22  Q.  And she won't listen to what you tell her,
23  will she?

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 409

1  A.  No.
2  Q.  And that creates a problem for you, doesn't
3  it?
4  A.  Uh-huh.
5  Q.  And it creates such a problem for you that
6  you thought it was important to put it in this
7  memo opposing her pay increase, right?
8  A.  Uh-huh.
9  Q.  And that would be true of not just Ms. Knox
10  but any employee that works for you, that if they
11  have trouble taking instruction and won't listen
12  to what you tell them, that's a problem, isn't it?
13  A.  The problem with Ms. Knox is her mistakes
14  are the result of not writing down and doing what
15  we say.  I don't have problems with other
16  employees like that.
17    And I'm not even sure Ms. Knox is under me,
18  so I don't really know why they asked that.
19  Q.  If Dr. Chambers perceives that you do not
20  take instruction well and you won't listen to what
21  he's saying, that's a problem for him, isn't it?
22  A.  He thinks that it is.
23    (Defendants' Exhibit No. 44 was

Page 410

1    marked for identification and a
2    copy of the same is attached
3    hereto.)
4  Q.  44 is a memo that you wrote to Josh Bridgman
5  saying that he was neglecting his duty.
6    Do you recall that memo?
7  A.  I do.
8  Q.  You had given Josh some checks that you
9  wanted him to process before he went out of town?
10  A.  At the time, he was the accounts payable
11  clerk at that time.
12  Q.  And he was supposed to process some stuff
13  before he left?
14  A.  Right.
15  Q.  And you said to him, "You do not take time
16  off and leave your job undone," right?
17  A.  Right.
18  Q.  Because getting the job done is important?
19  A.  Yes.
20  Q.  And neglect of duties is cause for
21  reprimand, isn't it?
22  A.  Uh-huh.
23  Q.  And if the evidence for Dr. Chambers shows

Page 411

1  that you are neglecting your duty, that would be
2  cause for reprimand, wouldn't it?
3  A.  If it shows that.
4  Q.  Uh-huh.
5    MR. CHRISTMAN:  I'm ready to take a
6  break for lunch before we get into the specific
7  allegations.  We'll be there for a while, so we
8  might as well break now.
9    MR. DEBARDELABEN:  Want to come back a
10  little after one?
11    MR. CHRISTMAN:  Yes, sir, that's fine.
12    (A lunch recess was taken.)
13  (BY MR. CHRISTMAN)
14  Q.  I'm going to give you Defendants' 11 for
15  your reference, and I'm going to use this
16  electronic copy.
17    Those are your responses to my
18  interrogatories; is that true?
19  A.  Yes.
20  Q.  And those responses were given under oath;
21  do you understand that?
22  A.  Yes.
23  Q.  And you made complete responses to those

Page 412

1  interrogatories, did you not?
2  A.  Yes.
3  Q.  You wouldn't have left anything out that was
4  important, would you?
5  A.  No.
6    MR. DEBARDELABEN:  Not if she
7  remembered it.
8    THE WITNESS:  That's right.  I am
9  getting kind of old, senile.
10    MR. DEBARDELABEN:  He's young.  He
11  don't understand that.
12    THE WITNESS:  I know.  I never thought
13  I would.  Everything goes.  My eyes.
14  Q.  Well, you had plenty of opportunity to
15  reflect and think about those questions before you
16  answered them, right?
17  A.  Yes.
18  Q.  I guess what I'm getting at is, if there was
19  a correct response to that question, there wasn't
20  anything, in terms of time or opportunity, that
21  prevented you from making your responses complete
22  as possible?
23  A.  Correct.

103 (Pages 409 to 412)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

---

Page 413

1   Q    No. 16 on page 5, the question was to
2   identify and describe every item of special,
3   incidental or consequential damages for which you
4   seek recovery in this lawsuit.
5       And you indicated that you didn't quite
6   understand the terms "special, incidental or
7   consequential damages," but that you sought
8   damages for mental and emotional pain and anguish
9   for being yelled at by Mr. Chambers, for being
10  denied the opportunity to apply for promotions
11  because you are a female, and for your staff being
12  denied promotions because they work for you.
13      I want to explore that. By the way, how do
14  you refer to the president? Do you refer to him
15  as Mr. Chambers or Dr. Chambers?
16  A    Mr. Chambers.
17  Q    And tell me again why you don't refer to him
18  as Dr. Chambers.
19  A    He's never formally announced -- I mean,
20  when I started he was Mr. Chambers. He's never
21  formally announced that about getting a doctorate,
22  that I remember. I mean, he's never seemed to
23  have a problem with it. And I guess I'm routine.

Page 414

1   I've always called him Mister. And I don't think
2   about the Doctor.
3   Q    But you have seen documents where the
4   chancellor referred to him as Dr. Chambers?
5   A    Yes.
6   Q    You said here that you were seeking damages
7   for being denied the opportunity to apply for
8   promotions.
9       What promotions have you ever applied for
10  and been denied?
11  A    There's two things that have happened. I've
12  been the long-standing dean at the college. I've
13  been there the longest. Mr. Chambers and Dr.
14  Huffstutler worked together at Chattahoochee
15  Valley before Mr. Chambers came in, I think it was
16  '97. Mr. Chambers brought Dr. Huffstutler to J.F.
17  Ingram to be the Dean of Instruction. When the
18  former Dean of Instruction retired, he brought him
19  in. And he -- I don't know how it worked. I
20  mean, I know he didn't apply for the job. I don't
21  know how that worked. That was for the Dean of
22  Instruction. But he brought him in. And either
23  then or a couple months later he was going to name

Page 415

1   him the Dean of the College, which is similar to a
2   vice president.
3       The Dean of the College position, they
4   receive 110 percent of their salary and they, at
5   that time, got $1,000 a month for being the second
6   in command, in the president's absence.
7       I went to Mr. Chambers about that because,
8   you know, I said, you know, I have been here, and
9   you're bringing someone in. And he said, Well, we
10  make -- you know, the Dean of Instruction are the
11  ones that most colleges use for that; they don't
12  use the business managers.
13      But they don't all do that. But that's what
14  he said. And he said, you know, You are a woman;
15  you wouldn't want to do that.
16      Even though there are women wardens and
17  women correctional officers. But that was his
18  statement. And he said, He won't in any way be
19  your boss. I just need him to handle that when
20  I'm gone.
21      So that would have been the -- that's a
22  money difference there that he received. That's
23  the only really promotion that I could get. But I

Page 416

1   was not even given the opportunity to turn that
2   down. And I did express to him my concern for it.
3   So I was not even given the opportunity to have
4   that job, and I think that was wrong.
5   Q    You wanted that job?
6   A    I would have -- I think I should have been
7   offered that job and, yes, I would have taken it.
8   I was not even considered.
9       But then not too much later -- and I have it
10  in my paperwork -- there was a memo that went out
11  that shows him, as the Dean of the College, he
12  would be the supervisor.
13      When I asked him, he marked on the chart
14  that he wouldn't be over me, but he was. You can
15  see letters that went out where he was kind of
16  over all of us. And then the second time it
17  happened -- that was the first time.
18  Q    If you're going to go on to another
19  instance, we need to finish talking about this one
20  first.
21  A    Okay. That's the first one.
22  Q    Okay. Do you have any idea what
23  Huffstutler's experience or qualifications were?

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 417

1   A.   I do.
2   Q.   Okay. What were they at the time that he
3   was selected to be the Dean of the College?
4   A.   He had I don't know how many years at
5   another college, but he didn't have it at J.F.
6   Ingram. He had probably at that time -- I don't
7   know the exact number of years. But he had years,
8   but he did not have years at J.F. Ingram is my
9   point.
10       J.F. Ingram is a whole different environment
11  from another college.
12       He has a doctorate but it's not -- I mean,
13  it is an earned doctorate.
14       But I still think I should have had the
15  opportunity to apply. None of that gave him -- I
16  don't see where he had any more experience to run
17  J.F. Ingram than I did if the president wasn't
18  there.
19  Q.   Yes, ma'am. Thank you for that answer.
20  Please listen to my question.
21       What were Huffstutler's qualifications?
22  A.   I don't know them enough to make that
23  statement.

Page 418

1   Q.   What was his Ph.D. in?
2   A.   I don't know.
3   Q.   But you do know he had a Ph.D.?
4   A.   Yes.
5   Q.   Did you have a Ph.D.?
6   A.   No. Mr. Chambers doesn't either.
7   Q.   Mr. Chambers wasn't applying to be the Dean
8   of the College, was he?
9   A.   No. He's the president. I didn't apply and
10  neither did Huffstutler apply. He was given it by
11  the president.
12  Q.   Did you see an application for Huffstutler?
13  A.   For the Dean of the College?
14  Q.   That's right.
15  A.   No.
16  Q.   Do you know whether he filled out an
17  application?
18  A.   No. I think there's a letter that said he
19  was appointed. We can check it. I have it in our
20  stuff.
21  Q.   Do you know if other qualified applicants
22  were considered?
23  A.   No.

Page 419

1   Q.   Do you know what criteria are required to be
2   the Dean of the College?
3   A.   No.
4   Q.   Do you know how many years of experience
5   Huffstutler had as an educator or supervisor in
6   the college system?
7   A.   No.
8   Q.   Do you know about any other qualifications
9   that Huffstutler may have had to perform that job?
10  A.   No.
11  Q.   Isn't it very possible that Huffstutler was
12  chosen to be the Dean of the College because he
13  was better qualified for the position than you
14  were?
15  A.   I don't know that.
16  Q.   You don't know?
17  A.   Huh-uh.
18  Q.   It's possible though?
19  A.   I don't know.
20  Q.   Okay. Fair enough.
21  A.   Who determines who's more qualified?
22  Q.   What evidence do you have that he was put in
23  that position above you because you're a woman?

Page 420

1   A.   I know I am a woman and I was never even
2   considered for it.
3   Q.   Yes, ma'am. What evidence --
4   A.   And I was there before him. I was the only
5   dean at the time.
6   Q.   Yes, ma'am. What evidence do you have that
7   he was selected and you were denied because you
8   are a woman and not any other reason?
9   A.   I don't see the reason I wasn't given an
10  opportunity to apply.
11  Q.   So you just think because you don't know why
12  you weren't given the opportunity, it must have
13  been because you're a woman?
14  A.   Mr. Chambers made the statement that, You
15  know, a woman doesn't need to be over a prison.
16  Q.   Tell me precisely what he said.
17  A.   That's what he said. He said, You know, a
18  woman doesn't need to be over a prison.
19  Q.   When did he tell you that?
20  A.   I don't remember. It was a long time ago.
21  Q.   Who was present?
22  A.   He and I.
23  Q.   Anybody else?

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 421

1  A.  No.
2  Q.  And he said a woman does not need to be --
3  A.  Can't be over a prison environment. It's
4  dangerous.
5  Q.  You have no witnesses to that statement?
6  A.  I don't.
7  Q.  It was made just between the two of you?
8  A.  Yes.
9  Q.  Do you have any other evidence that
10  demonstrates you were denied the opportunity to be
11  the Dean of the College because you're a woman?
12  A.  No.
13  Q.  Do you have any evidence that you were
14  denied that opportunity because you're white?
15  A.  No.
16  Q.  And when was that? When did that transpire?
17  A.  We'd have to check the records. I think it
18  was 1997. When Dr. Huffstutler got that position?
19  Q.  Yes, and you did not get it.
20  A.  I think it was '97. His appointment could
21  have been beginning of '98.
22  Q.  Yes, ma'am. Let's move on to the next.
23  A.  Here's the memo. I forgot that I had it.

---

Page 422

1  It says, "This correspondence is being provided to
2  inform you that Dr. Rickey Huffstutler was
3  appointed Dean of the College December 1997."
4  Q.  Okay. December 1997. Do you know if the
5  Dean of the College is an advertised position?
6  A.  I don't know.
7  Q.  Do you know if the Dean of the College
8  position is --
9  A.  It was not advertised.
10  Q.  Is it a position that's normally advertised,
11  is my question.
12  A.  I don't think so.
13  Q.  You said there was another promotion or
14  opportunity that you weren't given. And I stopped
15  you when we were talking about the Dean of the
16  College one. Let's go on to the second one.
17  A.  Okay. When Dr. Huffstutler took the
18  position with the Department of Postsecondary,
19  that Dean of the College position came open again,
20  and Mr. James Wilson was given that position. So
21  he received 110 percent of his salary.
22  Now, the chancellor's department had
23  increased the being second in command to $2,000.

---

Page 423

1  So that was an additional amount. So he received
2  that.
3  Mr. Wilson has been at J.F. Ingram longer
4  than me, but Mr. Wilson has not been a dean as
5  long as I have.
6  So there was nothing ever -- we were just
7  told Mr. Wilson was going to be given that
8  position. And, again, nothing was ever said to
9  me.
10  Q.  Did you express interest in the job at that
11  time?
12  A.  I didn't, because it was already -- we were
13  just told that happened and it was done. I should
14  have been considered.
15  Q.  And you think you should have been
16  considered based upon what?
17  A.  More years of experience at the college as a
18  dean. And a lot of colleges use their -- their
19  business manager, you know, would be their --
20  their business dean would be their right hand and
21  knows a lot about the whole workings of the
22  college.
23  So when he made the statement with Dr.

---

Page 424

1  Huffstutler that it was because he was the Dean of
2  Instruction, now we've appointed the Dean of
3  Students. So I guess that rule went away when he
4  decided to do it to Mr. Wilson.
5  Because that was the first thing he told me
6  was why he gave it to Huffstutler instead of me.
7  His position, Deans of Instruction are supposed to
8  have those positions, not Deans of Business.
9  But know we've given it to Mr. Wilson, who
10  didn't have as many years as me. But it's okay
11  now; I guess the rules changed.
12  Q.  Wilson had more years than you?
13  A.  At the college, but not as a dean. I think
14  the dean experience really -- you're exposed to a
15  lot more as a dean than not a dean.
16  Q.  Anything else about your educational
17  background that you believe qualified you for that
18  job?
19  A.  I have a master's in business
20  administration; I think he has a master's; so we
21  would be the same. I would think I have more
22  general experience. As much as he does anyway.
23  And I have more as a dean.

---

106 (Pages 421 to 424)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 425

1  Q.  Well, what is Mr. --
2  A.  I mean, you know, a lot of business courses
3  are facilities and things like that. So I have
4  the ability to run that college if Mr. Chambers is
5  not there, in all aspects of it.
6     And being over the money is a big factor
7  that exposes you to a lot of things. And under
8  that are the facilities and different things like
9  that. We mentioned yesterday keys. All kinds of
10  things that I've been exposed to that would make
11  it good to be able to handle a problem in an
12  institution or whatever if that happened.
13  Q.  What education does Mr. Wilson have?
14  A.  I don't know. I think that he has a
15  master's, but I don't know what it's in.
16  Q.  What experience did Wilson have?
17  A.  At the college?
18  Q.  In his career.
19  A.  I don't know. He's been at J.F. Ingram most
20  of his career.
21  Q.  You don't know Wilson's experience history?
22  A.  No. I wouldn't want to answer it because
23  that's -- I mean, I wouldn't give a good answer as

Page 426

1  well as he would.
2  Q.  I understand. And what evidence do you have
3  that Wilson was chosen for that position instead
4  of you because you're a woman?
5  A.  I don't know why else I wouldn't be given an
6  opportunity to at least turn it down if I didn't
7  want it.
8  Q.  Well, isn't it possible that he was more
9  qualified in terms of the overall experience that
10  he had than you?
11  A.  I don't know the answer to that.
12  Q.  Okay. Fair enough. And is it possible that
13  his education may have been better suited to be
14  the Dean of the College than you, or do you not
15  know?
16  A.  On that I would say it's not better suited,
17  but I can't say for sure.
18  Q.  But you don't know what his education was?
19  A.  No.
20  Q.  So how can you tell me that it was or wasn't
21  better suited? You can't, can you?
22  A.  I can't.
23  Q.  Any other evidence that he was chosen over

Page 427

1  you because you are a woman?
2  A  No.
3  Q.  Any other evidence that he was chosen over
4  you because you're white?
5  A.  No. But he is a black male, and a black
6  male selected him.
7  Q.  Anything else?
8  A.  No.
9  Q.  Any other -- let me read through your
10  discovery responses to make sure I ask this
11  question correctly.
12     Any other opportunities to apply for
13  promotions that you did not receive because you
14  are a female?
15  A.  Those would be the only two.
16  Q.  The next thing you say is, "I seek damages
17  for the creation of a hostile work environment and
18  for having members of my staff brought into Mr
19  Chambers' office each time I am out and being
20  questioned about my duties and inferences being
21  made that I am doing something wrong."
22     We will discuss in greater detail these
23  specific logs that you made. Is that a fair

Page 428

1  assessment? Logs? Is that what they were?
2  A  Yes.
3  Q.  Notes that you made?
4  A  Yes.
5  Q.  So let's skip that for now and go on to the
6  next part here.
7     "I also seek damages for having been treated
8  differently from my male counterpart and
9  coworkers."
10     Who is your male counterpart that you refer
11  to there?
12  A.  I would be talking about Mr. Wilson. Dr.
13  Huffstutler at the time.
14  Q.  And how have you been treated differently
15  than them?
16  A.  And Dr. Merk. I told you they did not -- I
17  don't know of Dr. Merk and Mr. Wilson being yelled
18  at; the promotions.
19  Q.  Well, we've already talked about the
20  promotions. Let's make sure that I'm not missing
21  something here.
22     Other than the promotions that we just
23  discussed with Dean Wilson and Dr. Huffstutler --

107 (Pages 425 to 428)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 429

1   we need to look at these one at a time -- who do
2   you say is your contemporary, your coworker -- let
3   me see how it's stated.
4   A.   I'm speaking at times of all three of those.
5   Huffstutler is not there anymore. The other, if
6   you listen to cabinet meeting minutes, if you'll
7   notice in a cabinet meeting, I'm probably given
8   ten things to do two for them, or 50 things to
9   do to for 30 of them.
10      If you'll listen to cabinet meetings, see
11  how many different things I'm told to check on
12  that almost make it so much that, you know, I've
13  got to go out of that meeting and forget that I've
14  got a budget due or a financial statement. I've
15  got to check the key board, check the -- things
16  like that are differences that are made, and it
17  puts me -- I mean, there are so many things --
18  there are things that are going to get backed up.
19      Now, I've expressed this in those cabinet
20  meetings to Mr. Chambers. Now, you know, I've
21  already got these job things that I must perform
22  daily. You know, the business office is a little
23  different from some of the other offices.

Page 430

1   Q.   Yes, it is.
2   A.   It's constant things that happen daily.
3   Q.   Yes.
4   A.   And I'm given a lot more tasks or
5   assignments. And then, you see, I get in trouble
6   that I haven't done them or it looks like I'm not
7   doing my job. Which a lot of these are little
8   side jobs rather than my other. Something's going
9   to -- might get lax.
10      But I've always said that it's not fair that
11  I'm getting ten to their two or 20 to their 10.
12  That's some of the things I'm talking about.
13  Q.   Well, like you said earlier, the business
14  office is not run like any other office in the
15  college, right?
16  A.   Right.
17  Q.   Your job duties as the business dean are
18  very specific and quite different than Jim Merk's
19  job duties, right?
20  A.   Well, one thing I've tried to explain to Mr.
21  Chambers is I have a lot of deadlines, say,
22  downtown: facility reports, budgets, financial
23  statements, budget amendments.

Page 431

1       I have a lot of deadlines that I have to get
2   to the chancellor's office that he doesn't need to
3   know about; and it isn't necessary because it just
4   goes with my job. So that's got to be number one,
5   along with any straight directive he gives me.
6   But sometimes I have to -- you know, I'll tell
7   him: Now, I've got this budget due; can what you
8   need, can you give me a day or two?
9       I mean, there's a lot of deadlines that I
10  have that are preset that some of the other
11  departments, especially student services.
12  Dr. Merk would have some deadlines that he
13  has to meet to the chancellor.
14  Q.   But not like your deadlines?
15  A.   I would say I have the most.
16  Q.   I don't think I would disagree with that.
17  And as you testified earlier, there's only one
18  Dean of Fiscal Affairs at Ingram?
19  A.   Yes.
20  Q.   It's you?
21  A.   Yes.
22  Q.   And nobody else performs functions that you
23  perform as the Dean of Fiscal Affairs, right?

Page 432

1   A.   Right.
2   Q.   Your job qualifications and requirements are
3   wholly distinctive, except for small overlaps here
4   and there; isn't that true?
5   A.   True.
6   Q.   The assignment of tasks. Any other ways
7   that you believe you have been treated
8   differently? And let me make sure I understand
9   who you are referring to when you say your male
10  counterparts. Jim Merk, James Wilson --
11  A.   And Huffstutler when he was there.
12  Q.   Huffstutler when he was there.
13  A.   Yes.
14  Q.   Any other ways that you believe they were
15  treated differently than you?
16  A.   I don't think the yelling was the same and
17  the treatment was the same to them as it was to
18  me.
19  Q.   You think you got yelled at more?
20  A.   Yes.
21  Q.   Anything else?
22  A.   No.
23  Q.   In your judgment, is James Wilson your

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

| Page 433 |
|---|

1  superior?
2  A    It appears he is when he's Dean of the
3  College. I mean, he wasn't until he was named
4  that. And then the way that works, if the
5  president is out, I would say he's in charge; so I
6  would say he is.
7  Q    Do you contend that James Wilson has treated
8  you differently than others?
9  A    Yes.
10  Q    In what ways -- well, what other
11  counterparts -- you've identified three.
12      How has Wilson treated you differently? Of
13  course, he was one of your counterparts among the
14  three that you identified. How has he treated you
15  differently?
16  A    He writes a lot of memos and brings up lots
17  of things in meetings trying to cause problems
18  saying he doesn't have budgets when he does.
19      He has some federal programs that he's over.
20  We process those and give him printouts on that.
21  And he continuously brings things out that he
22  doesn't have, and I have given it to him.
23  Q    Well, he can't get that from anybody but

| Page 434 |
|---|

1  you. I mean, assuming what he's saying is true,
2  or not true, there's only one place to get the
3  budget?
4  A    Yes.
5  Q    From you?
6  A    Yes.
7  Q    I mean, he wouldn't ask for the budget from
8  Merk?
9  A    No. But he's saying he's not getting it
10  when he is.
11  Q    Okay. But how has he treated you
12  differently, other than -- okay. You've given
13  that example.
14      There's only one place he can get the budget
15  though. If he says he's not getting budgets, he
16  can only get them from you.
17      Are there any other instances in which you
18  say you see him treating you differently from the
19  counterparts you identified?
20  A    No.
21  Q    Okay. No. 21 says, "With respect to the
22  allegations of paragraph 9 in your Complaint,
23  please fully describe any evidence upon which you

| Page 435 |
|---|

1  base your contention that Defendant Chambers
2  consistently comments on the attire and dress of
3  females while not commenting on the dress of male
4  employees. Identify the time, place, and
5  substance of any such comments. Identify any
6  witnesses present when such comments were made."
7  And then you have. "See memos. . ."
8  A    Uh-huh.
9  Q    This is what we talked about earlier. isn't
10  it, about Dr. Chambers admonishing the ladies to
11  watch their dress, right?
12  A    Yes.
13  Q    And when I say watch their dress. he's
14  really talking about the provocative clothing or
15  inappropriate attire; isn't that right?
16  A    Yes.
17  Q    And you participated, on occasion, in
18  admonishing the ladies in your office to watch
19  their attire; isn't that right?
20  A    When directed by him.
21  Q    And you thought it was a good idea at the
22  time. didn't you?
23  A    I did it because I was directed

| Page 436 |
|---|

1  Q    Yes, ma'am. You thought it was a good idea
2  at the time, didn't you?
3  A    I think we need to have a dress code.
4  Q    Yes, ma'am. And you see the merit of ladies
5  being careful with how they dress around male
6  inmates?
7  A    All employees. I don't know, maybe we need
8  to have a uniform. I mean, really.
9  Q    Well, do you not appreciate the fact that
10  ladies' dress might be more of a problem at a
11  prison than men's dress?
12  A    In a prison, maybe not.
13  Q    Well, I'm not asking you --
14  A    At a prison, I'd say no. No, not just
15  women.
16  Q    You don't agree with that?
17  A    No. And I told you before, it's not all
18  ladies. That's my problem. It's ladies at one
19  campus. And we have three. And other sites.
20  Q    That's right. And you stated earlier that
21  there's ladies at those other campuses too?
22  A    Yes.
23  A    But you believe that you're being

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 437

1  discriminated against because you're a woman when
2  those ladies are getting the more favorable
3  treatment than you; is that right?
4  A.   Discrimination is when it's not fair and
5  all. I'm not talking about discrimination here
6  for the same way you're talking about it. There's
7  different areas of discrimination.
8       Discrimination. I told you yesterday. is
9  when if there is 30 women and five are getting in
10  trouble for something, that's discrimination. The
11  only way it's not discrimination is if you've got
12  30 women -- just 30 women; no men; no other
13  variables -- and the 30 women are all getting in
14  trouble. Maybe you could say -- probably you
15  could say there was no discrimination.
16      But when you pick a select group of anything
17  and do it, maybe good or bad, if could be
18  discrimination. You could discriminate to the
19  good by only picking five people for something.
20  But it's not right because it's only a select
21  group that are being ..
22  Q.   Yes, ma'am. And I appreciate your answer.
23  You have filed a federal lawsuit alleging

Page 438

1  discrimination that is adjudged by the United
2  States Supreme Court and the courts under that
3  high court. And there is litany case law and
4  statutory precedent that guide the courts in
5  deciding what is and what is not discrimination.
6  Your lawyer will help frame your arguments about
7  what is and what isn't discrimination.
8       I appreciate your answer. But just because
9  somebody is treated differently doesn't mean you
10  can file a lawsuit about it. Your lawyer can help
11  you on that part.
12      But what I'm referring to specifically here
13  is the dress code, or at least his memos regarding
14  the dress?
15  A.   There is no dress code.
16  Q.   And you think there should be?
17  A.   Yes. That's the only way you can, to me,
18  reprimand people. If you have a policy and it's
19  violated, then you have a clear --
20  Q.   Yes, ma'am, I understand. But you do
21  believe that the women and the men should watch
22  their dress?
23  A.   Yes.

Page 439

1  Q.   And you have seen the 1998 memo that I
2  showed you yesterday where Dr. Chambers admonished
3  all employees to watch their dress?
4  A.   Yes
5  Q.   Has James Wilson ever admonished or in any
6  way mistreated you about dress?
7  A.   No.
8  Q.   Okay. Would you turn to what is numbered
9  19, handwritten, in the back, which is your
10  attachments to your responses.
11      And we'll start with the page that has a big
12  #19 handwritten on there, and then there is a
13  typed 19 just below that.
14  A.   Okay. "You will note..."?
15  Q.   Yes, "You will note .. " And under 19
16  there, there is some discussion about prepared
17  statements from Julie Givens that were apparently
18  attached to her discovery response, and that's
19  what you're referring to here. That Mr. Chambers
20  called Julie and/or Gene Bridgman into his office
21  and inferred that you, Monica Greene, were not
22  being truthful.
23      My understanding of this response, No. 19 --

Page 440

1  and correct me if I'm wrong, because I don't want
2  to misstate what you're trying to say here -- my
3  understanding of what you're trying to say here is
4  that on occasions Julie Givens and/or Gene
5  Bridgman would be brought into Dr. Chambers'
6  office and that he would try to -- you're saying
7  he would try to get them to say you were being
8  untruthful; is that right?
9  A.   That's what they were asked.
10  Q.   Okay. It says, "In the notes that I
11  prepared, you will note that there are instances
12  when he infers about bills not being paid ...
13  so-called problems in the business office that he
14  is never specific about."
15      So he was questioning them about --
16  A.   Apparently. I wasn't there.
17  Q.   Okay. You were told that that was
18  happening?
19  A.   Yes.
20  Q.   And you were told that by whom?
21  A.   I've been told by Julie and Gene; I've been
22  told by another employee that worked for me, that
23  when I was out on leave, that he would have them

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

Page 441

1  in his office for long periods of time
2      And I've even had some instructors tell me,
3  just like. you know. you need to know this, I
4  guess in case if Julie or Gene didn't tell me.
5  But they did. They were concerned
6  Q    But they don't know what happened in the
7  meeting, right?
8  A    No. But they just noticed that they were in
9  there for long periods of time if I was out, which
10  seemed unusual to them
11  Q    Julie and Gene would know what happened in
12  that meeting, right?
13  A    Yes
14  Q    And they're the only ones that would know
15  firsthand what happened, right?
16  A    Right. And I was referencing Julie's
17  statement
18  Q    Okay. And what evidence do you have that
19  Dr. Chambers called in Julie or Gene to discuss
20  your performance or your truthfulness because you
21  are a woman?
22  A    I don't know why else he would do it. It's
23  very important for me -- I think he did the truth

Page 442

1  thing because he knows that honesty is just very
2  important to me. And, I mean, it should be to
3  everybody, but we know that it isn't. But it
4  really bothers me, and I think he knows that
5  that's what taps my...
6  Q    Pushes your button?
7  A    Yeah, yeah. It makes me upset. So I think
8  that's why he always stresses that, so that it
9  would push my button.
10      I don't know why he would do that except
11  there's, apparently -- I don't know what the
12  problem he has with me.
13      There's a lot of positive things I've done
14  for the college and for him, and I don't know of
15  any reason --
16  Q    Well, there could be other reasons, such as
17  you have a personality conflict. You've already
18  talked about that. You believe that he doesn't
19  like your personality, right?
20  A    Apparently so.
21  Q    I mean, that's your belief?
22  A    Yes.
23  Q    So it could be because he doesn't like your

Page 443

1  personality  And it could be because he thinks
2  you're not doing a good job  He thinks you're
3  doing a poor job, right?  It could be because of
4  that?
5  A    It could be  It doesn't give him the right
6  to treat me that way
7  Q    Well, that might be a bad managerial move,
8  right?
9  A    You know. I have never been considered a
10  confrontational person  Granted Mr. Chambers and
11  I seem to have a problem. I told you. you can
12  even call a lot of witnesses that know me  I'm
13  not a confrontational-type person.
14  Q    Yes, ma'am.
15  A    But there is a problem there. And that's
16  why I don't understand what I have done to Mr.
17  Chambers, except he has some kind of bias
18  Because I haven't done anything but do my job.
19      He doesn't have proof to show that I haven't
20  done my job; he has opinions. There's a lot of
21  proof that hasn't been looked at.
22      So I'm saying he has some type of bias
23  against me, and I think it's because I'm a white

Page 444

1  woman.
2  Q    Yes, ma'am. It's not exactly accurate to
3  say there is no proof that you haven't done the
4  job, is it? That's not accurate, is it?
5  A    I'm saying there's a lot of proof of
6  positive things that we've not looked at. I don't
7  know that a lot of his things aren't opinion.
8  Q    Yes, ma'am. I understand. There's plenty
9  of proof, however, from people other than Chambers
10  that you have done something that someone else
11  thought was poor or weak, right?
12  A    And there's a lot of those people.
13      MR. DEBARDELABEN: We're going to
14  object to that  There's memorandum stating
15  there's proof  But you have given us memorandum,
16  not proof  So I understand what you're asking.
17  but I'm objecting to the word "proof "
18      MR. CHRISTMAN: Well. if you're talking
19  about the evidentiary question as to whether it's
20  admissible or not admissible, we'll deal with that
21  later.
22      MR. DEBARDELABEN: Yeah. But whether
23  it's proof or not is not up for you and I to

111 (Pages 441 to 444)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 445

1  decide. And you're asking her a legal term, and I
2  think we're getting into legal terminology.
3      MR. CHRISTMAN: I don't agree that it's
4  a legal term. If she doesn't understand the
5  question, I invite her to just tell me she doesn't
6  understand what I'm talking about.
7      MR. DEBARDELABEN: Well, that's what
8  I'm here for.
9  A.  I don't agree that there's proof.
10 Q.  Okay. You said in response to the EEOC,
11 there's not one shred of evidence -- that was your
12 words -- not one shred of evidence that Dr
13 Chambers' characterizations of you as weak exist.
14 Not a shred. That's what you said.
15 A.  That's what I said.
16 Q.  After yesterday, you realized there's much
17 more than a shred of evidence that you performed
18 weakly, right?
19 A.  I disagree.
20 Q.  Well, there's the chancellor's report,
21 right? That's evidence.
22 A.  I told you I don't think that's a valid
23 report.

Page 446

1  Q.  Well, you don't agree with it, but it's
2  evidence, isn't it?
3  A.  (No response.)
4  Q.  That's your words. You said there wasn't
5  one shred of evidence. That's evidence, isn't it?
6  You don't agree with it, but it's evidence, right?
7  A.  I'm not going to agree to that.
8  Q.  Okay. Well, Dr. Huffstutler's letter, where
9  he noted eight items that he thought you were
10 messing up on -- Dr. Chambers didn't write that
11 now, Huffstutler did -- that's evidence that you
12 weren't doing your job, isn't it?
13 A.  No.
14 Q.  Okay. What is it?
15 A.  It's their opinion. You know, I could write
16 a letter every day on Dr. Merk, James Wilson, Dr.
17 Huffstutler. Do you know how many things that
18 they haven't done? I mean, if we're going to be
19 like that.
20     I'm talking about factual evidence. I'm
21 talking about audit reports; I'm talking about
22 evaluations in my file. What's in my personnel
23 file.

Page 447

1  Q.  What do you think the chancellor's report
2  is?
3  A.  What's in my personnel file?
4  Q.  The chancellor's report is in there.
5  A.  No, the chancellor's report is not in my
6  personnel file. It better not be in there.
7  Q.  What do you think the chancellor's report
8  is?
9  A.  The chancellor's report, I've told you,
10 there's problems in the chancellor's office; and
11 I'm not going to say all of those -- I don't know
12 what went on with that. I have problems with
13 that.
14 Q.  Maybe it's possible that you are weak in
15 some areas and that you don't admit it. Is that
16 possible?
17 A.  I'm not going to agree to that
18 Q.  Do you have any other evidence -- do you
19 have any evidence -- that Dr. Chambers met with
20 Julie and Gene to discuss your performance because
21 you're a female. other than that you can't think
22 of any other reason?
23 A.  I've got lots of notes in here, times he met

Page 448

1  with them.
2  Q.  We'll go through them. I'm asking you:
3  What evidence do you have that his meetings were
4  because you're a female?
5  A.  I don't know why they were.
6  Q.  Okay.
7  A.  I just know he met with my subordinates when
8  I'm out. And how can I be -- he says I'm
9  ineffective. It's going to be hard for me to be
10 effective when he's telling people that work under
11 me that I'm weak, I'm terrible, I'm dishonest
12 Now, how am I suppose to have credibility when the
13 president, their ultimate boss, is telling my
14 employees what a terrible person I am, if they
15 can't use their own head and say that's not right
16 But how am I supposed to be effective when he's
17 doing that?
18 Q.  I understand your concern
19 A.  I mean, I'm very concerned about that. And
20 I don't know how that is fair treatment. If he
21 needs to have me in there, when I'm there, face to
22 face. every minute telling me how terrible I am,
23 but he doesn't need to be telling my subordinates.

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 449

1 And he has
2 Q.   Well, he has told you how terrible you are
3 face to face with you and your subordinates; and
4 you have, on occasion, asked them to leave, right?
5 A.   He should never tell me with my
6 subordinates  It made them uncomfortable  That's
7 why I asked them -- if you and I have a problem,
8 you and I need to talk about it  We don't need
9 all of them there
10 Q.   Well, I thought you just said he should do
11 it with you and them present?
12 A.   No.  I'm saying if he has a problem with me,
13 he should do it with me; no one else should have
14 been in there.
15 Q.   I understand  And you believe that's
16 probably a bad way to manage a college, right?
17 A.   To meet with your subordinates?
18 Q.   Yes.
19 A.   Yes
20 Q.   That's bad management?
21 A.   Yes
22 Q.   There's a better way to do it, in your
23 opinion?

Page 450

1 A.   Yes.
2 Q.   On April 5th, same page: In front of your
3 subordinate, Gene Bridgman, he said, "These are
4 things you need to do, but you won't do them."  He
5 was insinuating that --
6 A.   I didn't know what "things" were.
7 Q.   And he was insinuating you weren't be being
8 honest.
9     What proof do you have that he was doing
10 that because you're a female?
11 A.   I see here, again, he was not specific.  He
12 said there are things you're not doing.
13     Now, how could I correct something that I
14 don't know what it is.  I said, "I have complied
15 with his directives."
16 Q.   Yes, ma'am.
17 A.   He said again I wasn't being honest, and I
18 don't know why he's doing that
19 Q.   Yes, ma'am.  We'll be here for a long time
20 if we can't connect on my question.  And I want to
21 go through this as quickly as possible.
22     What evidence do you have that he said these
23 things because you are a female?

Page 451

1 A.   Because he did that.  I say he did that
2 because I'm a female
3 Q.   Okay.  What evidence do you have that he
4 said those things because you're white?
5 A.   We don't know why he said them.
6 Q.   Yes, ma'am.  September 6th: In the presence
7 of your department, he yelled at you about the
8 Home Depot bill.  And then there were some other
9 items in there.
10 A.   Yeah.  And that he called me into a room
11 like this, and brought every one of my workers in
12 there, and yelled at me about something that had
13 been handled.  And I'm sorry. that's just not
14 right.
15 Q.   I understand.
16 A.   He should have taken me in his office again
17 and talked to me about it.
18 Q.   I understand that you believe that it's not
19 right.  I do understand that.
20     What evidence do you have that he was doing
21 that because you're a female?
22 A.   I've never seen him do it to a male
23 employee.

Page 452

1 Q.   Any other evidence?
2 A.   No.  He wouldn't do it to Merk and Wilson.
3 Q.   How do you know?
4 A.   I know he wouldn't.  It's never been done.
5 Q.   How do you know?
6 A.   I think I would have heard.
7 Q.   What if they testified that he has yelled at
8 them in front of other people?
9 A.   In front of their employees?
10 Q.   Yeah.
11 A.   In front of their subordinates.  Make sure.
12 That's a difference.
13     I mean, if they believe Mr. Chambers, he
14 calls all my workers in to say that, how do I
15 get respect from those workers?  If they see him
16 call in, say stuff that's not true in front of all
17 of them, what if they believe that?  How am I
18 supposed to gain their respect?  I've got to work
19 harder for their respect if they believe him.
20 Q.   That may all be true, ma'am.  I'm not here
21 to debate that with you; I'm here to find out what
22 evidence you have that he said these things about
23 you because you're a female.  That's what I want

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

Page 453

1  to know.
2  A.   Because he did it.  I say he did it because
3  I am a female.
4  Q.   Okay.  And what evidence do you have that he
5  did it because you're white?
6  A.   Same reason.
7  Q.   Okay.  You wrote all of these responses
8  yourself, right?
9  A.   I did.
10  Q.   Why don't you just read down through the
11  next page, read what you have and down through the
12  next page.  I'm just trying to be more expeditious
13  in terms of time, because I suspect that most of
14  your responses will be the same as what we've
15  covered, and I just don't want to belabor the
16  point.
17        MR. DEBARDELABEN:  I think we can
18  stipulate her proof is she's a white female, he's
19  a black male; and, you know, she's going to answer
20  the same thing she's been answering to you to all
21  of these.
22        MR. CHRISTMAN:  Okay.
23        MR. DEBARDELABEN:  I'm just trying

Page 454

1  to --
2        MR. CHRISTMAN:  I understand.  I don't
3  want you to characterize what the stipulation is
4  or what the proof is.  If she's going to tell me
5  that the only --
6  Q.   Are you telling me, Ms. Greene, that the
7  only evidence you have that he was saying these
8  things to you and about you because you're a
9  female is the fact that he said them?  I just need
10  to understand that that's your testimony.  If
11  there is any other evidence, I would like to have
12  the evidence.
13  A.   I believe it's because I'm a white female is
14  why he's doing that.  Because there is no other
15  reason that I know of that he would do it.
16  Q.   Well, maybe because you're not good at your
17  job.  Maybe he believes --
18  A.   That's his opinion.
19  Q.   Yes, ma'am.  I'm not disputing --
20  A.   I'm telling you what is judged.  If Mr.
21  Chambers were to try to get rid of me, it's what's
22  in my personnel file.  And I've looked at my
23  personnel file, and this is not there.

Page 455

1  Q.   I understand what you're saying.  And I
2  didn't say --
3  A.   So I'm tired of all of this being said.
4  It's not in my file.
5  Q.   I didn't ask that last question well.  Let
6  me say it better.
7        Don't you think that maybe one of the
8  reasons he's doing all of this -- let me correct
9  what I said a minute ago -- not because you're not
10  good at your job, but because he honestly thinks
11  you're not good at your job?  Isn't that a reason
12  that he might be doing all of this?  Because he
13  thinks -- he may be flat wrong; he may be as
14  mistaken as he can be; he may be off in left field
15  -- but he believes you're a rotten business
16  manager?  Isn't that a reason he might be doing
17  this?
18  A.   I think he's doing it because I'm a white
19  female.  I think he knows the truth.
20  Q.   Okay.  And there is -- other than what we've
21  talked about so far, there's no other evidence
22  that you have that it's because you're a white
23  female?  We've covered everything that you know

Page 456

1  of.
2  A.   Can I look through this and make sure I'm
3  not forgetting something.  I mean, it would be
4  here.  I just want to make sure that I'm not
5  forgetting something.  We've said a lot in two
6  days.
7  Q.   Yes, ma'am, we have.  More than we should,
8  I'm sure.
9        And I will be going through some of these
10  other numbers.  This is No. 19.  I'll be covering
11  some of these others.
12  A.   But I don't think he would tell a man,
13  October 7th of '99 --
14  Q.   What are you looking at?
15  A.   23.
16  Q.   Okay.  We're looking at 23, 10/7/99, top of
17  the page.  Okay.
18  A.   He had me in his office as usual telling me
19  that I was weak because he thinks that I always
20  want everyone to like me.  I do not think that.
21  I do think that you do not have to scream and
22  holler all the time to make people do what you
23  need them to do.  He doesn't like my leadership

114 (Pages 453 to 456)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

---

Page 457

1   style, which is totally different from his. This
2   does not mean that I'm weak because I don't rule
3   like him. This particular day he made the comment
4   "I know that you are soft and all but..." he
5   continued on about me not doing what I need to do
6   because I was weak. I am consistent which he is
7   not and that would make me strong.
8       I don't think that he would tell a man that
9   he was soft. And he's saying I'm soft and weak
10  because I'm a woman. I don't believe he's ever
11  told a man that they're soft. And there's no
12  reason to tell me I'm soft. There was nothing to
13  back that up.
14  Q.   Okay.
15  A.   He also, on that page. on 1/10 -- I think
16  that's January 10th of 2000 -- "Mr. Chambers asked
17  me the question. do you curse? I told him that
18  that was not my style. He said, 'I want you to
19  get real mad and curse.' He also told me that I
20  needed to be a b-i-t-c-h. I have been successful
21  in doing my job by not behaving in this manner. I
22  certainly am not perfect, but I just don't cuss at
23  employees to get my job done. This does not mean

Page 458

1   that I am soft and weak."
2       That term that he wanted me to say, I would
3   say, is definitely gender-based.
4   Q.   What term that he wanted you to say?
5   A.   Bitch.
6   Q.   He didn't want you to say that. Where does
7   it say he wanted you to say that?
8   A.   I mean, he wanted me to be one. Is that not
9   a female --
10  Q.   Okay. So you understand that what he said
11  to you --
12  A.   A bitch is not a female --
13  Q.   Term?
14  A.   Term?
15  Q.   Sure it is. I mean, I guess it is.
16  A.   I think it is. And I don't like to say that
17  word. I'm saying it in context here, because I
18  don't care to say that word.
19  Q.   I understand. And it's your contention that
20  he told you that sometimes you need to be a bitch.
21  And the reason he told you that is because you're
22  a woman?
23  A.   I don't think he would say that to a man.

Page 459

1   Q.   Well, no. It wouldn't make any sense if he
2   said it to a man. But if he said to a man,
3   Sometimes you've got to be a jackass, would he
4   have said that because he was a man?
5   A.   I don't think it was appropriate. I don't
6   think he would have said it to a man. I'm just
7   saying he said that to me because I'm a woman.
8   Q.   Well, let's explore this.
9   A.   And he thinks because I don't get mad and
10  curse, that I'm soft and weak. That doesn't mean
11  anything. Consistency is a lot stronger than
12  being all those things.
13  Q.   Yes, ma'am, I understand. But couldn't he
14  think that any man who did not curse and was not
15  as boisterous as him, couldn't he also think that
16  that man was soft and weak?
17  A.   I don't know what he could think. I'm just
18  saying this is what he said and I think he did
19  that because I'm a woman.
20  Q.   Well, isn't it also possible, however, that
21  it wasn't because you're a woman but it's because
22  he believes you're not aggressive enough?
23      Isn't that what he's driving at here when

Page 460

1   he's saying "Sometimes you have to be a bitch"?
2   Isn't he saying I want you to get mad and curse; I
3   want you to get intense; and sometimes you've got
4   to be mean to get the job done?
5       Isn't that what's he's talking about? Isn't
6   he talking about intensity?
7   A.   Has that made him successful?
8   Q.   That's not my question. It may be a
9   terrible strategy. I'm not advocating the
10  strategy.
11      I'm just saying, isn't what he's driving at
12  here intensity?
13  A.   I don't know what he's driving at; I just
14  know what he said.
15  Q.   Don't you think he's driving at intensity?
16  Doesn't that make sense?
17  A.   I was very offended by that.
18  Q.   I'm not surprised. I'm not saying I
19  wouldn't be
20  A.   It occurred seven years ago. I don't
21  understand why not acting in that manner. not even
22  being aggressive as a business manager means I'm
23  not doing my job as a business manager.

115 (Pages 457 to 460)

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

Page 461

1    The business manager is a figure person.
2    They're usually not in the limelight. They sit
3    there punching in a calculator. So, you know
4    what, I can be very effective.
5    As a dean, I have to handle things at the
6    college. But I don't have to be -- I'm not the
7    leader of the institution.
8    Q.    I understand. My question is more focused.
9    I'm not suggesting to you that I wouldn't have
10   been offended if he had said that to me. I'm not
11   saying I wouldn't be offended at the use of that
12   language or asking me to curse.
13   A.    I don't know why he did it; I'm just telling
14   you that happened.
15   Q.    Okay.
16   A.    And I feel that it's because I'm a woman.
17   Q.    You think it's because you're a woman
18   because he used the word bitch, right?
19   A.    Yes.
20   Q.    And in the other instance, he used the word
21   soft?
22   A.    Yes.
23   Q.    And those two things indicate to you that

Page 462

1    he's saying those things to you because you're a
2    woman?
3    A.    Yes.
4    Q.    But you do acknowledge that he could be
5    saying those things, using those terms, because
6    he's trying to get intensity out of you?
7    A.    I don't acknowledge that.
8    Q.    You don't acknowledge that. You think
9    that's not a possibility, that he's driving at
10   intensity here? You don't acknowledge that?
11   A.    No.
12   Q.    Okay. Anything else?
13   A.    I think I have one more. I was called into
14   a meeting -- I don't have the date by that. It's
15   right before the January 25th of '02. It's 23 at
16   the top of the page.
17   Q.    Okay. At Example B?
18   A.    Right before that.
19   Q.    Okay.
20   A.    "I was called to a meeting with Mr. Chambers
21   and James Wilson. Mr. Chambers said I could make
22   many improvements in my department. He then said
23   he wished James and I could swap some qualities.

Page 463

1    He said he wished I could be more 'irratic' like
2    James" -- Mr. Wilson goes off and cusses and does
3    stuff like that -- and that James could be like me
4    in..." -- and he went (demonstrating).
5    And I said, Come on, Mr. Chambers, surely
6    you can... And he said, Well, you just need to
7    be more like James. And I said, There's not one
8    thing you can say?
9    So in that little -- that may go back to the
10   other question, when my male counterparts are
11   treated different from me. There you go.
12   Q.    And, where do you --
13   A.    I mean, it's hard to believe that there's
14   not one thing that James might could pick up from
15   me. I mean, my gosh, I've worked there 20 years;
16   there's nothing in my personnel file. I think I
17   have something to offer.
18   One thing? There's nothing he could say.
19   But I needed to act like Mr. Wilson. And I don't
20   agree with that. But, you know, they would have
21   maybe a similar management style. But there was
22   nothing he could say that I did good.
23   Q.    And it's your perception that he likes

Page 464

1    Wilson's management style better than yours?
2    A.    Yes.
3    Q.    Anything else?
4    A.    I think there might be one more. On
5    September 12th of '02, it's 23 at the top, "A
6    two-hour meeting resulted in the threatening
7    comment by Mr. Chambers, 'I am putting you on
8    notice concerning your job.' There were no
9    circumstances or problems in the business office
10   that warranted anything but positive comments,
11   much less threatening my livelihood."
12   I don't know of him doing that to anybody
13   else.
14   Q.    What makes you think that was because you're
15   a woman and not because he thinks you're doing a
16   sorry job?
17   A.    He didn't do it to the men. Just out of the
18   blue, he tells me he's putting me on notice
19   concerning my job.
20   First of all, again, that's just a
21   statement, because there wasn't anything in my
22   personnel file. But he'd make statements like
23   that randomly.

116 (Pages 461 to 464)

Page 465

1  Q.   He didn't do it to any other women either,
2  did he?
3  A.   I don't know.
4  Q.   Do you know of any other women that he's
5  made that statement, "I'm putting you on notice
6  concerning your job"?
7  A.   I don't know.
8  Q.   And you don't know if he's done it to any
9  other men, do you?
10 A.   I guess I don't. But I know I've been in
11 lots of meetings with me and those other men --
12 the other deans -- and they haven't been told
13 that.
14 Q.   Well, all of the deans are men except you.
15 A.   Yes. That doesn't mean I have to be treated
16 differently.
17 Q.   Well, if he thinks you're doing a bad job
18 and they're doing a good job, doesn't it make
19 sense that you would get a lot of heat from him?
20 A.   Since, apparently, he says every minute that
21 I'm -- he can't say one good thing about me.
22 Q.   That may not be fair. That may not be a
23 nice thing to do as a manager.

Page 466

1     But what I want to know is: Where's the
2  evidence that it's because you're a woman and not
3  because he just thinks you're doing poorly?
4  A.   Well, he's a man, and there's three men in
5  the room. and he picks on the woman.
6  Q.   All right.
7  A.   8/1 of '03. 23 at the top. "On July 31, my
8  office received an unqualified audit report.
9  Instead of being supportive and positive" --
10 apparently we had no audit findings -- "he called
11 Julie Givens and me in and gave us a stern lecture
12 about how bad things really were."
13    We've had an audit; we had no findings. and
14 we were told how bad things really were. It was a
15 common practice after each good audit -- and we
16 did have a lot of good audits that we didn't look
17 at.
18    "These meetings were full of comments like
19 these: 'You are just fortunate that you have a
20 good relationship with the auditors,' and, 'You
21 got lucky they didn't pull certain records.' He
22 never once commended us."
23    And so we get -- you saw what we got when we

Page 467

1  got a bad audit; and we got that when we got a
2  good audit. And that happens a lot.
3     I don't reprimand, I do; I don't do
4  something, I'm bad. You know, I feel that I'm put
5  in a no-win situation. And I think that's because
6  I'm a woman. If I do it --
7  Q.   I know what you think, ma'am?
8  A.   "D" if you do and "d" if you don't.
9  Q.   I'm completely willing to go through all of
10 these one-by-one and --
11 A.   Well, that's the last one.
12 Q.   That's no different than any of the other
13 bad things he's said about you though, is it? I
14 mean, he's said bad things -- he's said you
15 haven't done your job in ten different ways. And
16 this is another way he said, even if you got a
17 good audit, he said you're just lucky they didn't
18 catch you.
19 Q.   But he's said you're not doing a good job in
20 lots of different ways, hasn't he?
21 A.   Apparently so, yes. I'm just showing some.
22 Q.   And you've documented lots of them, right?
23 A.   Yes.

Page 468

1  Q.   But you don't have any more evidence than
2  what we've already talked about that his
3  criticisms here that you're fortunate that you
4  didn't get caught by the auditors, and that you're
5  lucky they didn't pull records, you don't have any
6  more evidence than what we've already talked about
7  that that's because you're white or that's because
8  you're female, other than the fact that he said
9  it?
10 A.   I think all of those criticisms and all of
11 those things that he's doing is because I'm a
12 white female.
13 Q.   Yes. And I'm asking for the evidence to
14 prove that that's why?
15 A.   This is evidence to me.
16 Q.   Well, it's evidence that he's clearly not
17 pleased and he says harsh things to you, right?
18 You perceive these criticisms to be harsh. don't
19 you?
20 A.   Yes.
21 Q.   So there's evidence that he has, by your own
22 testimony, said harsh things to you.
23    I'm just asking you: Is there any more

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

Page 469

1  evidence that you've got that the reason he says
2  harsh things -- the reason he says harsh things --
3  is because you're a white female, not because he
4  thinks you're a bad business manager?
5  A    There's nothing in my file that said I'm a
6  bad business manager. So I'm saying the file is
7  what I'm judged on. The file is what's going to
8  hire or fire me. So it must be because I'm a
9  white female. And I think that stands for itself
10 Q    Okay. Understood. We've touched on the
11 various meetings that you've had, and that he's
12 had with you and others, associated with your
13 performance and what he believes to be the
14 shortcomings with your performance, none of which
15 you agree with; is that right?
16 A    Right
17 Q    We've discussed his approach to you about
18 female dress and why you believe he should
19 implement a policy about dress and not just
20 address it the way he's doing, right?
21 A    Yes
22 Q    You said in your Complaint at paragraph 11,
23 "Defendant Chambers has consistently refused to

Page 470

1  raise the salary of any white employees that
2  Plaintiff Greene has recommended for a raise. The
3  only employee to receive a raise which was
4  recommended by Plaintiff Greene was a black
5  employee."
6     Tell me about that.
7  A    Okay. I have one black employee under my
8  supervision. And the main reason of that is
9  because I have not had any apply that met the
10 qualifications. I have no problem with having a
11 black employee. But I have a black employee that
12 works for me. It's a male. And he's more of a
13 grounds maintenance-type person?
14 Q    What is his name?
15 A    His name is Coleman McKeithen. I don't
16 remember the exact year; it's going to be between
17 2003 and 2004, probably more like 2004.
18 Q    Okay.
19 A    I prepared several recommendations for
20 upward mobility for my staff. At least three of
21 them, at that time.
22 Q    You're going to need to name them.
23 A    It would have been Beth White and Kerri

Page 471

1  Conger
2  Q    What did you propose? Let's start with each
3  one. You proposed for Beth White what?
4  A    Yeah. I would have to look -- it would have
5  been upward mobility. It probably would have been
6  up one level, and then they would get their --
7  normally, all they would get is a level and a
8  step. I'm sure that's what it was.
9  Q    They would have gotten the step either way,
10 right?
11 A    Yeah. So it would have been one level or
12 two, but it was probably one level. One or two
13 levels
14 Q    And what happened?
15 A    And Coleman was the only one that got it.
16 And he made the comment that that would give you
17 some brownie points. And that insulted me for
18 myself and Coleman
19 Coleman is -- a lot of people think he's my
20 favorite employee. Because he's one of those
21 people that comes to work, works hard, and does
22 everything -- I haven't -- we -- I don't think
23 that should have been said. I don't like that

Page 472

1  statement.
2  Q    I want to talk more about that statement,
3  but I want to back up and make sure I get all the
4  facts associated with what you're saying happened
5  here
6     You proposed a level up and a step for Beth
7  White. Who else did you propose this for?
8  A    Kerri Conger
9  Q    Kerri Conger. She is a white female?
10 A    Uh-huh.
11 Q    Who else?
12 A    I think that was it.
13 Q    And Coleman?
14 A    Yes.
15 Q    And Coleman?
16 A    Received it.
17 Q    Coleman is the only one?
18 A    It could have been, at that time, Julie
19 also. And Coleman got it.
20 Q    Julie Givens?
21 A    Uh-huh
22 Q    She's shaking her head no. We'll talk to
23 her later

118 (Pages 469 to 472)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 473

1      Coleman was the only one who received the
2   raise. And tell me again, how did you find out
3   that Coleman was the only one that received the
4   raise?
5   A.   Mr. Chambers said that was the one he was
6   going to give. And he said that will make some
7   brownie points for you.
8   Q.   What was going to make brownie points for
9   you?
10   A.   Giving Coleman a raise. I don't really know
11   what he meant by that but, you know, we have some
12   assumptions.
13   Q.   I understand.
14   A.   And I told you Coleman was a black man,
15   which doesn't make any difference to me. but you
16   need it.
17   Q.   Do you know why Beth and Kerri and maybe
18   Julie did not receive a raise?
19   A.   I don't recall it. I would have to go back
20   and look at that.
21   Q.   Well, what would you look at?
22   A.   I would look at the letter I wrote. There's
23   probably a note on there.

Page 474

1   Q.   The letter that you wrote would say --
2   A.   To get an increase for someone, we are
3   required to write a letter stating, you know. what
4   they have to deserve that. And I would be
5   recommending it. And then I would recommend the
6   position on the salary scale.
7   Q.   I'm sorry. I was not inquiring as to why
8   they should get a raise; I was inquiring as to why
9   they did not get a raise.
10      Do you know why they did not get a raise?
11   A.   I don't remember what he said. It should be
12   noted on that letter. I would have to pull that.
13   Q.   Where would you pull it from?
14   A.   In my files. I mean, I keep all the memos
15   that I write.
16      MR. CHRISTMAN: I'm not going to make
17   another request for that; I believe that's covered
18   in the request that I made associated with that
19   claim. I asked for any evidence you have in
20   support of that claim. So I need you to produce
21   that as basically a supplement to your other --
22      MR. DEBARDELABEN: Yeah. But, you
23   know, that's in the possession of the school too.

Page 475

1      MR. CHRISTMAN: I understand. It is.
2      MR. DEBARDELABEN: We both have access
3   to it.
4      THE WITNESS: It may be in here.
5      MR. CHRISTMAN: It is.
6      MR. DEBARDELABEN: You know, I don't --
7      MR. CHRISTMAN: I understand what
8   you're saying.
9      MR. DEBARDELABEN: But I think we both
10   need a copy of it.
11      MR. CHRISTMAN: Yes. I'm saying for me
12   to be sitting here asking her a question about one
13   of her claims, and she's got to refer to a
14   document that hasn't been produced, we shouldn't
15   be doing that. If she has a document that
16   supports her claim, that I've asked for, we should
17   have it.
18      MR. DEBARDELABEN: Yeah. I'm sure you
19   know --
20      THE WITNESS: It may be in here. I
21   just can't remember from my memory. is what I'm
22   saying.
23      MR. CHRISTMAN: I understand.

Page 476

1   (BY MR. CHRISTMAN)
2   Q.   You don't know, from your memory, why they
3   did not receive a raise and Coleman did receive a
4   raise?
5   A.   I just can't -- I remember what he said
6   about Coleman; and I don't remember if he just
7   said we can't do it at this time for the other
8   ones or what.
9   Q.   Okay. And this happened in '03, '04?
10   A.   I would say somewhere between '-2, '-3, or
11   '-4.
12   Q.   '02, '03, or '04?
13   A.   Yeah, one of those.
14   Q.   Probably '04 at the latest?
15   A.   Yeah.
16   Q.   All right. You said, in paragraph 11 of
17   your Complaint, that he consistently refuses to
18   raise the salary of any white employees that you
19   have recommended.
20      Are there any other occasions on which you
21   believe this has happened, other than what we have
22   just discussed?
23   A.   Yes.

119 (Pages 473 to 476)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

---

Page 477

1  Q.   Okay. When was that?
2  A.   I had asked for Julie for -- this past year
3  is the first time Julie's gotten one in several
4  years. And I know over the time I've asked for
5  it.
6  Q.   I need a date.
7  A.   She got it in '06, so -- I would have to
8  look it up.
9  Q.   Okay.
10  A.   But I have asked for raises for Julie and
11  not gotten them. This past year I asked for a
12  raise for Patti Graves, and she did not get it.
13  Q.   All right. Did a black person get a raise?
14  A.   Malcolm Montgomery did. And they would be
15  on the same level. He's a black male.
16      And we were in a meeting -- all the deans
17  were in a meeting -- and this year we had to
18  present all of them. And this year we were to
19  present all of them. And Patti and Malcolm, they
20  were like in the same category. And they said we
21  weren't going to do this. It would have been --
22  Malcolm ended up being put on the C scale that we
23  talked about. And I was trying to get Patti moved

Page 478

1  to that, because her position -- that's where Mr.
2  Bridgman was, and she took his place.
3  Q.   Right.
4  A.   She's on the C, but it was on the same --
5  she and Malcolm were -- it was like being in the
6  same position. You know, different departments,
7  but they would be equal positions.
8      And they said in the meeting that we weren't
9  going to do that. And so that was fine. We
10  weren't going to do that. And some other things
11  were removed. Later though, Mr. Montgomery did
12  get the raise and Patti did not.
13  Q.   Okay.
14  A.   And I think it was significant too. It was
15  like over a combined positions or something.
16  Q.   When was this?
17  A.   That was this past year. So it was August
18  or September of '06.
19  Q.   That's not somebody you recommended for a
20  raise though, right?
21  A.   Who? I recommended Patti Graves for it.
22  Q.   Malcolm Montgomery.
23  A.   No. Mr. Wilson recommended him. But I

Page 479

1  recommended Patti, and didn't get it. Also -- are
2  you ready for another one?
3  Q.   Well, we need to back up to Julie. We
4  haven't covered Julie.
5      When did she ask for a raise?
6  A.   I would have to go back and look. It may be
7  here. I've asked several times for her. In '06
8  was the first time she got it.
9  Q.   What are you looking at? Are you looking at
10  something that's helping you?
11  A.   Yeah. I mean, this is something you have.
12  No. 26.
13  Q.   Does it say "Stanley Carter" at the top?
14  A.   Yeah.
15  Q.   Okay. Tell me what you're looking at.
16  A.   I'm just looking. I don't know if what I'm
17  looking for is right here.
18      We're talking about when I've gone for
19  raises and been turned down for my people is what
20  we're talking about right now, right?
21  Q.   Yes, ma'am. Let's understand something
22  before we move on. Montgomery and Graves are not
23  in the same position?

Page 480

1  A.   No.
2  Q.   They don't perform the same job functions?
3  A.   But they were on the same salary scale. C C
4  is that flexible one I told you about. They were
5  basically in the same place.
6  Q.   I understand. On the salary scale?
7  A.   Yeah.
8  Q.   The salary scale is very broad, in terms of
9  it covers a lot of people that do a lot of
10  different things, right?
11  A.   It is.
12  Q.   And Montgomery and Graves were not doing the
13  same jobs, right?
14  A.   No. But we were both asking -- it was like
15  something special that had to be written to the
16  chancellor.
17      I left the meeting understanding we weren't
18  going to do it. Later, it was done for Mr.
19  Montgomery and it was not done for Ms. Graves.
20  Q.   I understand that part. I'm trying to ask
21  you specific questions here.
22      Montgomery and Graves don't work in the same
23  department?

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

---

Page 481

1  A.   No.
2  Q.   They don't perform the same job function?
3  A.   No.
4  Q.   They don't have the same qualifications?
5  A.   No.
6  Q.   They don't have the same educational
7  background?
8  A.   No.
9  Q.   Julie Givens asked for a raise, but we don't
10  know exactly -- or you asked for one on her
11  behalf.
12  A.   Well, it's more than one. We can -- I don't
13  think we have her record here. But if we pulled
14  her file, there was a long time that she just got
15  her step raises.
16      And I can look it up and get it for you, but
17  there was probably three times, three different
18  years maybe, that it was asked for her.
19      And you saw in this other writing when she
20  got it a good while back, before we could do it,
21  we had to combine about -- she had about six
22  titles. And then she got a raise.
23  Q.   Okay. I need you to pull those documents.

---

Page 482

1  If you claim they support your claims, I'm
2  entitled to see what you claim supports your
3  claims.
4  A.   Okay.
5  Q.   I could go have my clients rifle through the
6  documents, but what I need to understand is what
7  you claim supports your claim.
8  A.   Okay.
9  Q.   Who was given a raise, instead of her,
10  that's male or black?
11  A.   It would be several. We would have to look
12  at the time period. We've got several examples
13  here, but I would have to look at the time period
14  and I could show you. There were several.
15  Q.   This is my chance to depose you today, Ms.
16  Greene, so I need to fully understand. If you
17  claim that whites were not given raises and blacks
18  were --
19  A.   Well, right now we're talking about people
20  that I -- I know there's different variations of
21  this. Right now I thought we were talking about
22  when I asked for people in my department raises
23  and they were turned down, so I was still covering

---

Page 483

1  that
2  Q.   Let's cover that then. But I need you to
3  cover it for me, because I'm not going to be able
4  to -- your lawyer's not going to let me come back
5  and ask you more questions. This is my chance.
6  A.   Uh-huh. All right. Jeanna Givens. It was
7  probably 2004 or '-5 I asked for an increase for
8  her for
9  Q.   Is it 2004 or 2005? Do you know?
10  A.   I would have to look it up to know exactly.
11  Q.   I'll need you to do that for me, please.
12  A.   Because she had increased job duties. And
13  it was turned down.
14  Q.   And was a black person or a male given a
15  raise?
16  A.   Yes. And when I get that date -- I know
17  there were.
18  Q.   Are you just going to pick out somebody in
19  the college that was black that got a raise that
20  year, and not her, and that's going to be your
21  proof? Is that what you're talking about?
22  A.   No. I mean, they were done at the same
23  time. I mean, like, we had a meeting. I mean, I

---

Page 484

1  would just have to pull my records.
2  Q.   Okay.
3  A.   But those are the ones that I asked for that
4  didn't get them
5  Q.   Are the records that you need to look at
6  anywhere where we can put our hands on them right
7  now, so I can question you about it right now?
8  Otherwise, I'm going to have to reserve the right
9  to come back and question you about the documents
10  that I've already asked to be produced that we
11  don't have here today
12  A.   I'm still looking.
13  Q.   Yes, ma'am
14  A.   I don't see what I'm looking for right here
15      MR DEBARDELABEN: Maybe we can get it
16  here. And I understand the problem. I didn't
17  know it existed At the end of Julie's
18  deposition, you can finish up with Monica on that,
19  if she has the chance to pull the document. Drew,
20  we're not going to fuss about that There's so
21  many documents, sometimes you don't get them all.
22      MR CHRISTMAN: I understand.
23  Q.   Anybody else that you claim was not given a

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

Page 485

1  raise when --
2  A.  That worked under me?
3  Q.  -- when you recommended it, and somebody
4  else --
5  A.  That should cover it.
6  Q.  Okay.  No. 12 says, "Defendant Chambers
7  consistently hires and promotes black employees
8  over white employees and pays black employees more
9  money for doing the same job as white employees."
10     Give me any instances that you have in
11  support of that allegation.
12  A.  Okay.  You've got me and James Wilson.  And
13  I told you earlier.
14  Q.  We've already discussed that one.
15  A.  That's black and white.
16  Q.  Anything else?
17  A.  Yes.  You've got Patti Graves and Malcolm
18  Montgomery.  That's black and white.
19  Q.  All right.  We talked about Patti and
20  Malcolm a little bit.  Anybody else?
21  A.  You've got Gloria Knox and Jackie McDuffie.
22  They're black females.  And they were both raised
23  over Beth White who is a white female.

Page 486

1  Q.  What is Gloria Knox's position?
2  A.  Clerk.  They're all three -- they have the
3  same positions.
4  Q.  We're going to talk about that.  Where does
5  Gloria Knox work at the Draper campus?  What does
6  she do?
7  A.  At the front desk.
8  Q.  And she works at Draper?
9  A.  Yes.
10  Q.  Do you know what her education is?
11  A.  She doesn't have any, I don't think.  We'd
12  have to check her file.  I don't know; I'm not the
13  personnel director.
14  Q.  So you don't know her education?
15  A.  No.
16  Q.  Do you know her experience?
17  A.  No.
18  Q.  Do you know the scope of her job duties at
19  Draper?
20  A.  Yes.
21  Q.  What are they?
22  A.  Answering the phone, handling the money
23  there, and doing little various things for

Page 487

1  instructors.  Same things that's done at main
2  campus and at Tutwiler.
3  Q.  Does she have a particular job title?
4  A.  She does.  I don't know what her -- it
5  should be -- Beth's is receptionist/clerk.  They
6  should all be around that level.
7     And I don't have someone that does payroll
8  for me in this room, so I'm not the -- I don't
9  micromanage, so I don't know all the titles.
10  Q.  What about Jackie?  What does she do?
11  A.  She does the same thing at Tutwiler.  She
12  answers the phone, takes the money for work
13  orders, and does, you know, typing and copies and
14  things for instructors.
15  Q.  Do you know if their job functions are
16  exactly the same as Beth White's?
17  A.  They should be.
18  Q.  Do you know if they are exactly the same, is
19  what I'm asking.
20  A.  Yes.  In fact, Beth does more; and Beth has
21  more live work at our campus.  That's the
22  comparison we made on the workloads.
23  Q.  And do you know Jackie's educational

Page 488

1  history?
2  A.  No.
3  Q.  Do you know her experience?
4  A.  She's not been at J.F. Ingram very long, not
5  as long as Gloria and probably Beth.  I don't know
6  what she did before she came.
7  Q.  Do you know how long she's been at Ingram?
8  A.  She's been at Ingram maybe three years.
9  Q.  And when was Gloria raised over Beth?
10  A.  She's always been over Beth.  She's got a
11  few more years than Beth.  And that's fine.  I'm
12  not discussing the years.
13     But the level, they should be on the same
14  level.  She should just have more years because
15  she's been at the college longer.  And that's been
16  my belief.
17     Now, this year, I tried to get everyone --
18  we've tried to keep all that equitable throughout
19  the years.  You know, we look at them and try to
20  keep those the same.
21     Like I said, longer years, but on the same
22  level, not steps.  Longer steps, but same level.
23     So when I -- this year, when I asked to

122 (Pages 485 to 488)

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

| Page 489 | Page 491 |
|---|---|

Page 489

1  raise Beth, and she did get it, that would have
2  put all of them on the same level.
3      Mr. Chambers said, Well, we're going to go
4  ahead and raise Gloria too. And I said, Well,
5  that's defeating the purpose. We need to get
6  everybody the same; they do the same job.
7      But Gloria was given a raise this year,
8  really without anybody even asking for her.
9      And Ms. McDuffie came in at a higher level.
10  Beth has been there longer than Ms. McDuffie.
11  Q.   Who makes more money?
12  A.   Ms. McDuffie makes the most, then Ms. Knox,
13  and then Beth.
14  Q.   Do you know why they came in at a higher
15  level?
16  A.   Yes.
17  Q.   Why?
18  A.   I don't know why.
19  Q.   That's what I was asking you: Do you know
20  why she came in at a higher level?
21  A.   No.
22  Q.   Okay. When did she come in at a higher
23  level? When did she come?

Page 490

1  A.   I'm not sure she's been there quite three
2  years. I would say she came in in '04. Must have
3  come maybe in '04. I think she's been there maybe
4  about three years.
5  Q.   Okay. McDuffie came in '04. And --
6  A.   She was moved from E-2 to 3, and added five
7  years experience September '05. Now, I'm not sure
8  if that's when she started. I'd have to look.
9  That may be when she came in. She's been there
10  two or three years. But she was given five years'
11  experience.
12  Q.   When did that happen? When was given that?
13  A.   She was given five years -- she was already
14  here, so she was here some point before September
15  '05. Because her salary was 37,033.
16      In September of '05, which is when we make
17  the payroll changes, she was moved from E-2 to an
18  E-3, which is a level, and she was added five
19  years of experience, which is unusual.
20      If you're going to give credit for
21  experience, it should be when you start, not after
22  you come. You know, I told you, when I came, I
23  had, what, three years added. You can come in and

Page 491

1  it can be added when you come. It's normally not
2  added after you come, but it has been done.
3      So she got five years of experience, and it
4  raised her to 40,845.
5  Q.   Okay. I need to know when --
6      MR. DEBARDELABEN: You need to know
7  when she came in. She has that information, if
8  you want me to show it to her on the paper.
9      MR. CHRISTMAN: Where is it?
10      MR. DEBARDELABEN: It's on this paper
11  right here. I think it's where it says
12  "Receptionist" up at the top. Does that help you?
13      THE WITNESS: Okay, yeah.
14  A.   Jackie McDuffie was hired in 11 of 2004.
15  Q.   Where do you see that? Show me what you're
16  looking at.
17  A.   (Witness complies.)
18  Q.   Okay. You're on, where it's handwritten #26
19  at the top; and first thing at the top says,
20  "Receptionist"?
21  A.   Right. So Gloria has been here the longest,
22  and then Beth, and then Ms. McDuffie. You see the
23  workloads and you see the salaries. Granted,

Page 492

1  Gloria has more years, but they are not on the
2  same levels.
3  Q.   And these are your calculations, in terms of
4  your percentages. This 77 percent of the
5  workload, you came up with that, right?
6  A.   This was done on the live work that they
7  take in and handle, which is a big part of the
8  job. We took actual deposits that were made and
9  figured these percentages. I mean, we didn't pull
10  it out of the air; it's based on facts. Deposits.
11  And then a percentage was taken on the workload.
12  Q.   Tell me what was taken into account on the
13  workload. Deposits?
14  A.   We have the -- that letter on that job thing
15  for Gloria, I think I have it in there. May I
16  look at that?
17  Q.   Yeah, sure.
18  A.   That's supposed to be an attachment to this,
19  and that's where that listing was. I have a copy
20  of it I can get for you by tomorrow.
21  Q.   Get it to your lawyer and we'll --
22  A.   Okay. It's the actual worksheet that we
23  used

123 (Pages 489 to 492)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

---

Page 493

1  Q.  All right.  But that percentage is really
2  something that's associated with live work?
3  A.  Yes.  Because that is the main thing,
4  besides answering the phone.  And I think that
5  will -- when you look at that worksheet, you'll
6  see what went into it.
7  Q.  But when it says 77 percent of workload,
8  that's live workload.  It doesn't take into
9  account any other tasks?
10  A.  I don't remember what the worksheet has, but
11  it would be -- there's more phone calls on the
12  main campus.
13  Q.  How do you know that?
14  A.  It's just -- you're going to have more at
15  the main campus.  But the way the phone system's
16  set up, it rings to the main line first, and then
17  it would go to Draper and then to Tutwiler.
18      It hasn't always been like that; but at the
19  time being, it was more phone calls.  There's just
20  more volume of work at the main campus.  And
21  that's true just about anywhere at the main
22  building.  But now, the way the phone system's set
23  up, it does that.

Page 494

1  Q.  But you don't know if Gloria Knox, at the
2  Draper campus, has other duties that Beth and
3  Jackie don't do, because there's not as much live
4  work to do or the phones don't ring as often?  She
5  may do other things that Beth and Jackie don't do.
6  You have no information about that, right?
7  A.  I addressed it in here that she doesn't --
8  Q.  So what is the response.  Do you have
9  information about that or do you not have
10  information about that?
11  A.  When I prepared this response --
12      MR. DEBARDELABEN:  So he'll know and
13  I'll know what you're talking about, it's
14  Defendants' Exhibit 43.
15  A.  When I did this, I compared Ms. McDuffie had
16  a different job description than the other two,
17  but Ms. Knox did not have a different job
18  description than Beth White.
19  Q.  Okay.  You're telling me about the job
20  description; I'm talking about --
21  A.  Well, that would be their job duties.  It
22  should be what they do, according to their job
23  descriptions.

Page 495

1  Q.  Well, not if there's something that's going
2  on at Draper that Beth is picking up and doing
3  because somebody else can't do it or isn't doing
4  it?
5  A.  You mean, Gloria?
6  Q.  No, I'm talking about Beth.
7  A.  She's at main campus.
8  Q.  No, I'm talking about Gloria.  Excuse me.
9      If Gloria's doing something at Draper that
10  Beth isn't doing, you don't know anything about
11  that, do you?  You're not at Draper?
12  A.  No.  I have a lot of dealings from what
13  Gloria does because she does live work.
14  Q.  So she reports to you on the live work?
15  A.  On the live work.
16  Q.  But she doesn't report to you on all the
17  other work?
18  A.  No.
19  Q.  Same with Jackie.  She reports to you on the
20  live work, doesn't she?
21  A.  Yes.
22  Q.  But not the other work?
23  A.  No.  But I do check with their supervisors

Page 496

1  and verify things that they did.  And then they
2  reported.
3      Like I said, Ms. McDuffie's job description
4  was different, but they said she did the same
5  thing the others did.
6      I think it was Mr. Wilson that I talked to,
7  but I would have to verify that.
8  Q.  Well, we'll all verify that with their sworn
9  testimony, and we'll see what they say about
10  Jackie's job duties.
11  A.  Okay.
12  Q.  Any other instances in which you believe
13  that Chambers consistently hires and promotes
14  black employees over white employees and pays
15  black employees more money for doing the same job?
16  A.  This document, #26, if you'll notice, most
17  of those are black on the new hires.
18  Q.  Where did this document come from?
19  A.  You have it.
20  Q.  Right.  But I got it from you.  These are
21  your responses.
22  A.  Those came from the payroll department.
23  Those are actually records of the new hires from,

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

| Page 497 | Page 499 |
|---|---|
| 1  I think, '04 to '06. | 1  paid the same to do the same job." |
| 2  Q.   And you believe that these new hire records | 2     So before Gene left, it was Gene and Julie. |
| 3  demonstrate -- | 3  They worked together. They had the same education |
| 4  A.   I'm just showing that's a lot. If you see, | 4  background. She worked with him all these years. |
| 5  the majority of those are black. | 5  He left making 73,786. At that time. she was |
| 6  Q.   I understand. It doesn't indicate on here | 6  making 40s, in the 40s range. |
| 7  what position they are hired to, right? | 7     So before I hired Ms Graves, we discussed |
| 8  A.   Right. | 8  about Julie having the position; but I was told |
| 9  Q.   It doesn't indicate what their | 9  Julie could not have that position. I mean, she |
| 10  qualifications are, does it? | 10  could. but she had to keep the same pay. And the |
| 11  A.   Right. | 11  job entails a lot of duties so. of course, she |
| 12  Q.   It doesn't indicate what their educational | 12  didn't want to do that. |
| 13  requirement is, does it? | 13     So then we advertised for the job  We hired |
| 14  A.   No. | 14  Patti Graves, who is a white female, and she came |
| 15  It doesn't indicate what the educational | 15  in making 54.5- |
| 16  requirement is for the position they're going | 16  Q.   And that's more than Julie? |
| 17  into, does it? | 17  A.   That's more than Julie. Her educational |
| 18  A.   No | 18  background was more, the reason for that. More |
| 19  Q.   Or the education that they have; is that | 19  than Julie but less than the white male, Gene |
| 20  right? | 20  Bridgman. And she has two four-year degrees. So |
| 21  A.   No. | 21  she had more than Mr. Bridgman had educationwise. |
| 22  Q.   Doesn't indicate any of their work | 22  And she had 15 years experience as an auditor. |
| 23  experience, right? | 23  Q.   But Bridgman had far more experience than |

| Page 498 | Page 500 |
|---|---|
| 1  A.   Right. That's just a listing of new hires | 1  she had. didn't he? |
| 2  Q.   Just a listing of new hires. Gotcha. | 2  A.   At J.F. Ingram. He had experience, not |
| 3  A.   I'm still looking on the other  That's all | 3  education. |
| 4  I have regarding white/black | 4  Q.   More than ten years more experience. right? |
| 5  Q.   Okay. Allegation 13 of the Complaint says, | 5  A.   Yeah  So that's one example. |
| 6  "Defendant Chambers pays female employees, | 6  Q.   Okay. So Bridgman made more than Givens, |
| 7  including but not limited to Plaintiffs Greene and | 7  and Bridgman made more than Graves; is that |
| 8  Givens, less money than paid to male employees in | 8  your -- |
| 9  equal or similar positions." | 9  A.   Right. |
| 10     What evidence do you have to support that | 10  Q.   Okay. |
| 11  contention? | 11  A.   Josh Bridgman, you remember him, that was |
| 12  A.   Evidence No. 1: Gene Bridgman, who retired, | 12  doing accounts payable. |
| 13  when he left he made 73,786. He's a white male. | 13  Q.   Right. |
| 14  Patti Graves, who took his place -- first of all. | 14  A.   He started in April of 2002. |
| 15  Mr. Chambers told me that I could offer Julie | 15  Q.   Let me back up before we keep going, because |
| 16  Givens the accountant position; however, if she | 16  I didn't ask you these questions. Bridgman -- |
| 17  took the position, she would remain on the same | 17  A.   And you can see this is on this document. |
| 18  pay scale she currently on. Ms. Givens was | 18  That's what I'm discussing. Now, that was Gene |
| 19  and still is at the top of the E salary schedule | 19  Bridgman. That's his father. |
| 20  -- at that time. She's at C now. | 20  Q.   Yeah, Gene Bridgman. Gene Bridgman -- |
| 21     "Ms. Givens turned the offer down because | 21  A.   Was the first one. Now this is Josh |
| 22  she had just as much experience and education as | 22  Bridgman. |
| 23  Mr. Bridgman and felt that she should have been | 23  Q.   Okay. Let's back up to Gene |

125 (Pages 497 to 500)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 501

1  A.  Okay.
2  Q.  When did -- when was Julie started on her
3  schedule -- when was Julie not given the
4  opportunity to take over for Gene and get paid on
5  the higher schedule?
6  A.  Let me see if I have their hire dates.  I
7  don't have those hire dates, but I can have them
8  for you before we're done.
9  Q.  Can you give me a ballpark?
10  A.  Gene has been gone maybe three years.
11  Q.  And that's when Julie was --
12  A.  Patti has not -- July.  July, Patti will be
13  there three years.  So that would have been --
14  Gene left April of '04, I'd say.
15  Q.  Okay.  So this --
16  A.  So between that time period.  Patti was
17  hired July of '04.  I'm pretty close on that, I
18  think.  But I will verify that.  Because she will
19  just make three years this year.
20  So between April -- I would say that offer
21  to Julie was probably May or June.  Sometime in
22  the month of May or very early June.
23  Q.  Would it be fair for me to say that between

Page 502

1  April or June, that was when she was given the
2  opportunity to move to Bridgman's old job but not
3  at a higher pay scale?
4  A.  Yes.
5  Q.  And then Patti was brought in --
6  A.  Yeah.  Sometime in July.
7  Q.  Okay.  Sometime in July of '04?
8  A.  Uh-huh.
9  Q.  Okay.  Now, back to Josh Bridgman.
10  A.  Okay.  Josh Bridgman was accounts payable
11  clerk at the time, and he was hired in April of
12  2002.
13  Q.  Okay.
14  A.  And he was making 32,897.
15  Q.  What are you looking at?
16  A.  Right in the middle of this.
17  Q.  Okay.  Got it.
18  A.  And then he was moved to a maintenance job
19  with no pay cut.
20  Kerri Conger then -- Kerri Conger was
21  employed at the college.  She was in the front
22  office.  Like, she was doing the receptionist-type
23  work.  But she was employed at the college, you

Page 503

1  see, August of 2001.  So Kerri Conger took the
2  accounts payable job.
3  And all of this went through the process.
4  I'm not discussing all that.  But, I mean, she got
5  the accounts payable job.  And Kerri Conger was
6  paid 28,130.
7  Josh Bridgman is a white male and Kerri
8  Conger is a white female.
9  Q.  Wait a minute.
10  A.  She had been at the college longer, and she
11  took the position that Josh was moved from.
12  Q.  Was her pay increased?
13  A.  No.  This is what they were making at the
14  time.
15  Q.  She was employed in 8/2001.  What job was
16  she hired to?
17  A.  8/2001 she was hired in the
18  receptionist/clerk position.
19  Q.  And Josh Bridgman was hired in April of '02,
20  right?
21  A.  And I think his title was business office
22  assistant, but he did accounts payable.
23  Q.  A higher position than she was at?

Page 504

1  A.  Yes.  But we're talking about when she --
2  Q.  Well, I want to talk about this first.  and
3  then we're going to move to that.
4  A.  This is where they were. yeah.  When he left
5  the accounts payable position, he was making that.
6  When she got it. she got it at that.  And that was
7  one of the times I'm sure that I asked --
8  Q.  But she was already working for that, for
9  28,130?
10  A.  Yes.
11  Q.  Was her pay increased or not increased when
12  she took over?
13  A.  No.  And it was more job duties.
14  Q.  Okay.
15  A.  And since then, there's still -- you know,
16  of course, he -- any time she gets one, he's still
17  higher than her, even though they're in different
18  areas.
19  Q.  And when did that happen?
20  A.  She's been doing that probably close to two
21  years, so I'd say '05.  I'd have to check the date
22  exactly
23  Q.  Well. was it the fall, spring, winter?

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

## Page 505

1  A.  I don't remember when Josh was moved. Can I
2  look at this memo? It might give me an idea.
3  Q.  Yeah. sure.
4  A.  It's definitely '05. I would say.
5          MR. DEBARDELABEN: If you'll look at
6  the other page, on 10/3 he got a raise. I don't
7  know if that helps you or not.
8  A.  Are we talking about when he moved? Is that
9  what we were looking at probably? When Kerri took
10 over?
11 Q.  I'm looking at when Kerri took over.
12 A.  I would say it was, like, August or
13 September of '05. Late summer in that year.
14 Q.  Do you have any documents that demonstrate
15 exactly when it was?
16 A.  Yes.
17 Q.  Okay. I need you to produce those for me,
18 please.
19 A.  Okay.
20 Q.  And somebody needs to be writing that down,
21 so that we can make sure we --
22          THE WITNESS: Julie. are you keeping a
23 list of that?

## Page 506

1          MS. GIVENS: (Nods head.)
2  A.  Okay. I'm doing male/female, right?
3  Q.  That's right.
4  A.  Male/female. Shawn Lacey is a black male.
5  He was hired in 10 of '04.
6  Q.  Where are you looking at?
7  A.  Well, all I've got here is I've got the new
8  hires. I'll have to bring you the --
9  Q.  Shawn Lacey?
10 A.  Uh-huh.
11 Q.  Right?
12 A.  Yes.
13 Q.  What about him?
14 A.  And Debra Taylor is a black female. She was
15 hired January '06. They are both on the E scale
16 as instructor assistants at the Tutwiler campus.
17 And Mr. Lacey makes more than -- Oh, I'm sorry.
18 Not Shawn. I'm sorry. I've given you the wrong
19 name. I'm sorry. Not Shawn.
20        It is Shawn, but it's -- let me find him.
21 Shawn Moore. They're right by each other. That's
22 what's confusing me.
23        Shawn Moore is a black male, and he was

## Page 507

1  hired January of '06. Debra Taylor is a black
2  female, and she was hired January of '06. Both as
3  instructor aides at the Tutwiler campus.
4  Q.  Who is the second one?
5  A.  Debra Taylor. They were both hired at the
6  Tutwiler campus as instructor aides, and Mr. Moore
7  makes more than Ms. Taylor. I am doing
8  male/female right now, right?
9  Q.  Right. Do you know what Shawn Moore's
10 educational background is?
11 A.  I don't.
12 Q.  Do you know his qualifications?
13 A.  I don't.
14 Q.  How about Debra's?
15 A.  I don't. I just know it's the same position
16 and they were hired at the same time.
17 Q.  Do you know if there was some reason that he
18 was paid more than her, other than that he's black
19 or that he's a male and she's female?
20 A.  I don't know.
21 Q.  There could be another reason though?
22 A.  There could be; I don't know.
23 Q.  All right.

## Page 508

1  A.  I think that's all I have right now.
2  Q.  Okay. You want to take a quick break?
3  A.  Yeah.
4          (A brief recess was taken.)
5  (BY MR. CHRISTMAN)
6  Q.  I think we finished all the female/male; is
7  that right? Was there any more female/male
8  discrepancies in pay?
9  A.  There is one more I thought I should
10 mention, and it's on No. 27, the last one.
11 Q.  Okay.
12 A.  Bonita Owensby. Tim Robinson was the
13 registrar, and he quit working for Ingram, I
14 guess, 98/99. And he was paid 67,654.
15        And Ms. Owensby is doing that job, and she
16 was paid -- now she's paid 60,000.
17 Q.  Well, Ms. Owensby has filed a lawsuit. I
18 don't know if you know that. Do you know that?
19 A.  Yes.
20 Q.  And we will be addressing that in her
21 lawsuit.
22 A.  Okay. That's the only other one I have. I
23 just realized I didn't mention that.

127 (Pages 505 to 508)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 509 | Page 511 |
|---|---|

Page 509

1  Q.   Do you know what Tim Robinson's education
2  is?
3  A.   I don't remember.
4  Q.   Do you know what his qualifications are for
5  the job?
6  A.   I don't.
7  Q.   Do you know what Ms. Owensby's education is?
8  A.   I don't know to say.
9  Q.   Do you know that there are reasons that have
10  nothing to do with gender as to why Robinson was
11  paid more than Owensby?
12  A.   I don't.
13  Q.   Okay.  Owensby is a black female, isn't she?
14  A.   She is.
15  Q.   And Robinson, what is his --
16  A.   Black male.
17  Q.   Okay.  Any other allegations or proof that
18  -- not allegations.
19      Any other proof that Chambers pays females
20  less than males in equal or similar positions?
21  A.   That's all I had.
22  Q.   All right.  We've looked at a number of
23  instances in which Chambers has said to you, and

Page 511

1  these requests for production, sort of a log of
2  your notes describing different occasions on which
3  he has raised his voice at you or gone behind your
4  back and spoken to your staff about your
5  performance, right?
6  A.   Right.
7  Q.   Are these instances that are listed in your
8  response the basis for your allegation of a
9  racially hostile working environment?
10  A.   Yes.
11  Q.   Are there any other -- or is there any other
12  evidence, upon which you rely, in alleging that
13  you are working in a racially hostile environment,
14  other than what we have already covered today?
15  A.   It is all in here.
16  Q.   Very good.  And would the same be true of a
17  gender-based hostile working environment?
18  A.   Yes.
19  Q.   All of your evidence has been produced in
20  support of your responses to my interrogatories;
21  is that right?
22  A.   Yes.
23  Q.   And we've covered all of that evidence today

Page 510

1  to others about you, that your job performance is
2  unsatisfactory; and he's used various words to say
3  basically that; isn't that true?
4  A.   Yes.  In his opinion.
5  Q.   In his opinion.  But the primary thrust of
6  all of his sentiment is that he is not pleased
7  with your job performance; isn't that right?
8  A.   It appears to be.
9  Q.   And he's not pleased with your managerial
10  style; isn't that right?
11  A.   I don't know.  I don't know if he's not
12  pleased with that.
13  Q.   He wants you to be -- he wants you to stand
14  up for yourself more, right?
15  A.   I don't know.  Seems like when I take a
16  stand, I get in trouble for that too; so I'm not
17  sure what he's saying.
18  Q.   Okay.  Fair enough.  And you have alleged,
19  and we've covered in your deposition, numerous
20  occasions where he has raised his voice at you; is
21  that right?
22  A.   Right.
23  Q.   And you have produced for us, in response to

Page 512

1  and yesterday, right?
2  A.   Yes.
3  Q.   Is there anything in addition to what we've
4  covered that you believe supports your allegation
5  that you are working -- or that Chambers has
6  created a gender-based hostile environment for
7  you?
8      (Witness confers with counsel.)
9      MR. CHRISTMAN:  The question is for the
10  witness.
11  A.   Yes, I believe it is.
12  Q.   Okay.  Have we discussed every instance in
13  which you claim you have been treated differently
14  than similarly situated male employees, as alleged
15  in paragraph 24 of your Complaint?
16  A.   We've either discussed it or it will be in
17  here.  We didn't go over each of those little
18  notes, but it's in there.
19  Q.   Well, I want to do that if we need to do
20  that.  I don't want to leave here without having
21  explored every bit of evidence that you have.
22      MR. DEBARDELABEN:  Drew, I think what
23  she's saying, you brought it up; she discussed it.

128 (Pages 509 to 512)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 513

1  But if y'all didn't discuss it, it was in the
2  notes  I mean, she can't remember  I think
3  that's the gist of her answer  And I don't think
4  she could answer it any other way
5  Q.   Okay  Well, let's zero in a little bit
6  tighter here so I make sure that we don't leave
7  anything uncovered
8      You've alleged, in paragraphs 23 and 24 of
9  your Complaint, that Dr  Chambers has violated the
10 Equal Protection Clause of the United States
11 Constitution and has treated you differently than
12 similarly situated male employees
13    We have discussed today who you believe to
14 be similarly situated to you  And you've
15 described three individuals; and we discussed ways
16 that you think those men have been treated
17 differently
18    I want to make sure that we've covered it
19 all, that there's nothing else that we need to
20 discuss?
21 A    Right now you're just talking about the
22 similarly situated male employees, or are you
23 talking about the whole deal?

Page 514

1  Q.   I'm talking about paragraph 24 of your
2  Complaint  "...has treated them differently than
3  similarly situated male employees, denying them
4  equal protection of the law..."
5  A.   Well, 24 here says --
6      MR. DEBARDELABEN:  No, no, no, no
7  He's talking about this 24.
8  Q.   This is your Complaint  This is not an
9  exhibit to the deposition; this is the Complaint
10 that was filed in court.
11     MR. DEBARDELABEN:  Drew, I want to
12 object to that on this ground, then she can answer
13 if she understands:  You're asking her for an
14 interpretation of law using "similarly situated."
15 Those are legal terms of art.
16    With that noted, she can answer it  But I
17 don't think she's qualified to give you a response
18 to the legal definition or the legal part of it.
19 But with that noted, I think she can answer it
20 best she can.
21     MR. CHRISTMAN:  All right.
22 Q.   Well, in light of your counsel's objection,
23 let me ask it this way:  When you go to court and

Page 515

1  you're talking to a jury on the stand, are you
2  going to tell the jury about being treated
3  differently than men, are you going to bring up
4  facts that we haven't talked about today?
5      Because we talked about you being treated
6  differently than three specific people that you
7  believe are similar to you
8      I've tried to cover the waterfront, and if I
9  haven't, I want to at this time
10 A.   Even if it's here; if we didn't discuss a
11 particular note, you want to talk about it?  I'm
12 saying as long as anything I talk about is in this
13 document; is that what you want to know?  Or do we
14 need to talk about, if there's a little note here
15 we haven't discussed, do I need to discuss it?
16 Q.   Let me back up here  We've talked about --
17 A.   I mean, there could be a note that I need to
18 discuss  if I need to discuss --
19 Q.   Okay  Well, then I'm going to have to
20 invite you to read them  Because we've talked
21 about Huffstutler, Wilson  and Merk?
22 A.   Yeah  And I'm talking about them  But I
23 mean instances  Do you need every instance listed

Page 516

1  here?  I don't know that I've said every instance
2  that I've got documented
3      MR. DEBARDELABEN:  Drew, I think what
4  she's saying is she's not sure if -- you've asked
5  a question and she responded best she could, but
6  she might have missed something that's in those
7  documents.
8  A.   Yeah  I know that I can't bring in
9  something that's not in this document  But we
10 might not have talked about everything in this
11 document.
12 Q.   Okay  Then we need to walk through the
13 document and make sure  I mean, I've got one
14 opportunity to sit down with you and talk about
15 every time you claim that you've been treated
16 differently than Merk, than Wilson, than
17 Huffstutler.
18    We're here today to talk about that  Because
19 if you get in front of a jury and tell them about
20 it, I don't want to hear about it for the first
21 time when you're on the stand.
22 A.   Okay  I mean, I can look through this
23 quicker than us going line by line.

129 (Pages 513 to 516)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 517

1   Q.   I'll let you do it whatever way is the
2 fastest and most efficient to do it.
3   A.   I think I've covered them, but I do need to
4 look at it to make sure.
5   Q.   Okay. Please look at it. I want to close
6 the door on this issue. I don't want to be
7 revisiting things that I've never heard about at
8 trial.
9       MR. DEBARDELABEN: Well, if you've got
10 the responses to interrogatories, you've heard
11 about it.
12       MR. CHRISTMAN: I'll invite her to read
13 them. She has them in front of her.
14       MR. DEBARDELABEN: We invite you to ask
15 the questions you want to about the documents.
16       MR. CHRISTMAN: I'm doing that, Jim.
17 I'm doing my best to do that. I can go through it
18 line by line, if you want me to. That's one way
19 to do it. That's not the fastest way, but that's
20 one way.
21       MR. DEBARDELABEN: Drew, all I'm saying
22 is, if she hasn't discussed it, it's in the
23 documents.

Page 518

1   You know, we might discover something
2 talking to Merk and Wilson and Chambers that she
3 doesn't even know about today.
4       (The witness examines the
5       document.)
6       MR. CHRISTMAN: I'm going to mark the
7 Complaint, Jim.
8       MR. DEBARDELABEN: Okay.
9       MR. CHRISTMAN: 45.
10       (Defendants' Exhibit No. 45 was
11       marked for identification and a
12       copy of the same is attached
13       hereto.)
14   A.   It appears I've covered it.
15   Q.   Very good. You don't allege that Dr.
16 Chambers has ever used any racial epithets about
17 you or to you in the workplace, do you?
18   A.   To me?
19   Q.   If you've ever heard him use racial epithets
20 at all, I'd be interested in your testimony.
21   A.   Well, just in the majority of his
22 conversations, when he's telling you a story or
23 describing an incident, he references whether a

Page 519

1 person is white or black.
2      And, in my opinion, that shouldn't matter.
3 I mean, you can have a general conversation about
4 going to Wal-Mart or having a child and, in a lot
5 of his conversations, when he's telling you a
6 story, in a large majority of them he always makes
7 a comment whether people are white or black. And
8 in my opinion, that's not necessary.
9   Q.   I may not be using a word that --
10   A.   That may not be what you want, but that's
11 the only racial remarks that I've heard.
12   Q.   Okay. You know what an epithet is?
13   A.   Yes.
14   Q.   Have you ever heard him use one of those?
15   A.   (No response.)
16   Q.   A derogatory race-based term?
17   A.   I'm thinking. Not that I can recall.
18   Q.   Would you describe the nature of most of
19 his, what you consider to be harassing conduct by
20 Dr. Chambers, to have been verbal?
21   A.   Is that the end of your question?
22   Q.   Yes, it is.
23   A.   I just wanted to make sure. Of his

Page 520

1 conversations to me? Say that one more time.
2   Q.   All right. I'll ask the question again.
3      The bulk of what we discussed today, that
4 you have already testified supports your claim of
5 a hostile environment based upon race and gender,
6 were these meetings that he had with you, or with
7 others about you, right?
8   A.   Right.
9   Q.   Where he made derogatory comments about your
10 job performance either to you or about you, in
11 meetings, right?
12   A.   Right.
13   Q.   Where he raised his voice at you in the
14 workplace, right?
15   A.   Yes.
16   Q.   And written memoranda where he criticized
17 your job performance, true?
18   A.   Yes.
19   Q.   And those written memoranda could have been
20 in the form of reports or responses or letters or
21 memoranda; isn't that correct?
22   A.   Yes.
23   Q.   And we've covered a number of documents in

130 (Pages 517 to 520)

Page 521

1   that regard today; isn't that right?
2   A.   Yes.
3   Q.   And there aren't any other written documents
4   that have not, at least, been produced to me by
5   you that support your claim of hostile
6   environment; is that right?
7   A.   (No response.)
8   Q.   I'm talking about documents that aren't in
9   the room with us today.
10      MR. DEBARDELABEN:  Only what you asked
11  her to bring.  And I don't know if that would be
12  used to support a hostile environment or not.  We
13  haven't looked at it.
14      MR. CHRISTMAN:  I didn't hear the
15  beginning of your comment.  I'm sorry.
16      MR. DEBARDELABEN:  I said, only what
17  you asked her to get up and bring.  And I don't
18  know if that's going to support hostile
19  environment.  I don't think she's qualified to
20  answer it.  But those are the only documents we
21  know about at this point in time.
22      MR. CHRISTMAN:  Okay.
23      MR. DEBARDELABEN:  And I'm not trying

Page 522

1   to answer for her, but I don't think she can
2   answer that.
3   Q.   Well, you know, what documents there are
4   that you say support your claim that you've been
5   mistreated?
6   A.   Yes.  It's all been supplied to Mr.
7   DEBARDELABEN.
8   Q.   Okay.  If there's a document at your house
9   that I have not seen, that's what my question is
10  about.  I don't want to find out about a document
11  later that I've not had an opportunity to view and
12  talk to you about, that you're going to rely on.
13  You know what I mean?
14  A.   Right.
15  Q.   And as far as you know, we've got them all?
16  A.   Yes.
17  Q.   We have not really spent any time talking
18  about James Wilson, but he is a defendant in your
19  lawsuit.  We've not spent any time talking about
20  how maybe he's created a hostile environment
21  against you.
22      Is your hostile environment claim directed
23  at Chambers or does it also include Wilson?

Page 523

1   A.   It's both of them.
2   Q.   Okay.  And what instances support your
3   allegation that Wilson has created a hostile
4   environment against you?  We'll need to cover
5   those instances.
6   A.   I'm looking it up.
7   Q.   Yeah.  Take as much time as you need.  We
8   need to talk about any instances that you claim
9   support the allegation that Wilson has created a
10  hostile environment for you.
11  A.   I believe you have the minutes to the
12  cabinet meetings.
13  Q.   Right.
14  A.   And you'll find in there that Mr. Wilson
15  makes a lot of negative remarks and negative
16  innuendo towards my department.
17      This one letter on the practice fabric --
18  Q.   Describe the letter for me, for the record.
19  A.   Okay.  It is a letter to Mr. Chambers from
20  Sandy Caylor, who is the upholstery instructor.
21  Q.   Dated?
22  A.   February 16th of '06.  It says, "On
23  Wednesday, Dean Wilson, you, and myself were

Page 524

1   having a conversation about the fabric that I
2   purchase for practice in my shop.  There were some
3   comments made that are not true.  Dean Wilson said
4   that the Business Office wouldn't let me go.  They
5   have nothing to do regarding when I go.  Dean
6   Wilson also stated that if the Business Office
7   wanted something done for their family or kids
8   they would send me.  You stated that you knew it
9   and was keeping an eye on it.  Let me just say,
10  Nobody from the Business Office has ever sent me
11  to get fabric.  Merk is the one to o.k. my
12  trips now.  Dean Wilson did ask me awhile back if
13  I had any of the practice fabric and I told him
14  that I had very limit.  I told him that I hadn't
15  been in awhile to get any.  I told him that I
16  hadn't been able to go.  That I had to get Dr.
17  Merk to let me go.  The mill I purchase this
18  fabric from is only open on 'Wednesday's.'  When I
19  would ask Erica" -- who works for Dr. Merk --
20  "what the schedule looked like, there was usually
21  a lot of Instructors already going to be off.  So
22  I would just wait.  Finally, I told her I had to
23  go.  Dr. Merk was not here so, Erica stopped my

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

| Page 525 |
|---|

1  shop up. I set it up with Monica for payment of
2  the fabric. If I do any work for Dean Greene or
3  anyone else in the Business Office, I have a work
4  order. I treat everyone the same. In fact, Dean
5  Greene needed a piece of scrap material last week.
6  I told her I had a piece we were going to throw
7  away and I'd give it to her. She said that she
8  would do a work order on it. I just sold Dean
9  Wilson a class project sofa covered in some of the
10  practice fabric. He also had a work order for
11  his. Everyone is treated the same. Also, any
12  Embroidery work we do over here, whether it be for
13  me or someone else also has paperwork. I get
14  permission from Dean Greene."
15        Mr. Wilson makes a lot of comments like
16  this. He makes a lot of digs about the business
17  office with nothing to back it up. There was no
18  reason for him to say this in this letter. But
19  you'll find in those cabinet meetings that he
20  makes a lot of comments to that effect.
21  Q.  Do you have any one of those cabinet
22  meetings in mind, because I've got a stack this
23  tall, 4 or 5 inches tall, of cabinet meeting

| Page 526 |
|---|

1  minutes. So without more specificity, I wouldn't
2  know where to look for that.
3  A.  I would have to go through them, because
4  that's where that is going to be.
5  Q.  Can you remember for me today any instances
6  in which Mr. Wilson -- by the way, Mr. Wilson does
7  not control the terms of your employment; is that
8  right?
9  A.  He does not.
10  Q.  He cannot fire you?
11  A.  Apparently he's in charge sometimes if Mr.
12  Chambers is gone, so at times he is, I guess. my
13  supervisor.
14  Q.  Well, has he ever given you a directive that
15  you were required to follow?
16  A.  Not that I recall.
17  Q.  And he doesn't set your salary?
18  A.  No.
19  Q.  And he doesn't approve any salary issues
20  associated with your position?
21  A.  No.
22  Q.  He doesn't have any control over your staff?
23  A.  No.

| Page 527 |
|---|

1  Q.  Okay. But President Chambers does have that
2  type of control?
3  A.  Yes.
4  Q.  So James Wilson, while he may. I guess under
5  some circumstances be the one in charge when
6  President Chambers is gone, he can't really affect
7  the terms of your employment by himself?
8        MR. DEBARDELABEN: Object to the form.
9  Q.  Is that right?
10        MR. DEBARDELABEN: You can answer.
11  A.  As far as I know, he cannot.
12  Q.  So when you say that he's creating a hostile
13  environment for you. he's just saying negative
14  things about your office; is that right?
15  A.  He is.
16  Q.  And this Caylor memo here that you've
17  directed us to and that has been produced is what
18  you claim to be one example of where he says the
19  business office does something inappropriate or
20  whatever, right?
21  A.  Yes.
22  Q.  And you claim there are other examples in
23  the cabinet meeting minutes?

| Page 528 |
|---|

1  A.  Yes.
2  Q.  But you haven't brought any of that evidence
3  with you today, have you?
4  A.  Those meetings have been subpoenaed. Mr.
5  DEBARDELABEN has them.
6  Q.  Right. I produced them to him.
7        MR. DEBARDELABEN: I don't think we had
8  them when we produced this to you.
9        THE WITNESS: No, we didn't.
10        MR. CHRISTMAN: I believe you would
11  have because I believe I produced mine before I
12  got yours.
13  A.  When I answered these interrogatories, the
14  only thing I know is Mr. Chambers had to request
15  some records from us when all that was subpoenaed,
16  our office, and that was after we had answered
17  those interrogatories.
18  Q.  But you have and had access to the cabinet
19  meeting minutes, right?
20  A.  No.
21  Q.  You had access to the cabinet meeting
22  minutes before your deposition today, right?
23  A.  Yes.

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

---

Page 529

1   Q.   All right. But you can't describe for me
2   today any specific instance in which he --
3   A.   I just know if you listen to those -- do you
4   have them on tape; you've got them in writing, I
5   guess -- that you will find many instances where
6   he makes derogatory remarks about the business
7   office.
8   Q.   How has that affected your ability to do
9   your job? Just somebody said something bad?
10  A.   I mean, he's a dean at the college and he's
11  making remarks like that. I mean, you don't know
12  where he's making them. He's writing memos saying
13  he hadn't gotten his budgets, when he had.
14  Q.   Well, Huffstutler wrote an ugly letter about
15  you. Was he creating a hostile environment for
16  you?
17  A.   I didn't name him.
18  Q.   I know that. But that's not my question.
19  A.   I said no for Huffstutler.
20  Q.   Well, but he said ugly things about you,
21  right, and he was a dean; is that right?
22  A.   It appears to be, yes.
23  Q.   Okay. So we've seen this memo from Caylor,

---

Page 530

1   and we discussed maybe the existence in the
2   minutes of the cabinet meetings that there are
3   derogatory comments by James Wilson.
4        And these two things you've identified as
5   supporting your claim that Wilson creates for you
6   a hostile work environment.
7        Any other evidence that Wilson has created
8   for you a hostile environment?
9   A.   Not that I know of at this time.
10  Q.   Wilson is not your employer; is that true?
11  A.   That's true.
12  Q.   Would the same evidence that we just
13  discussed regarding the Caylor memo and the
14  cabinet meeting minutes be the evidence that you
15  have to support an allegation of harassment under
16  state law against Wilson?
17  A.   Is that term used in the lawsuit?
18  Q.   Harassment? It's a state law cause of
19  action.
20  A.   And that's what I named in there? Do you
21  want to ask the question one more time?
22  Q.   Yeah. In paragraph 26 of your Complaint --
23  and it appears to be specific -- it says, The

---

Page 531

1   consistent and constant yelling at the plaintiffs
2   by President Chambers and the accusations of
3   Defendant Wilson that the Business Office
4   employees who work under the supervision of
5   Plaintiff Greene received special treatment when
6   work was performed for Business Office employees
7   by Ingram, amounted to harassment.
8        So is there any other allegation or proof of
9   harassment, other than what you've described in
10  paragraph 26?
11  A.   That and then those minutes is what I would
12  use.
13  Q.   And the minutes contain just derogatory
14  things he said about the business office and its
15  functioning?
16  A.   Yes.
17  Q.   Okay. Does the college have any
18  anti-harassment policies in place?
19  A.   I don't know.
20  Q.   Okay.
21  A.   I'm sure we should have, but I don't know if
22  we have them.
23  Q.   Do you know of any training programs for

---

Page 532

1   supervisors regarding harassment?
2   A.   No.
3   Q.   Do you know of any procedure for reporting
4   problems of harassment?
5   A.   There is a grievance procedure. I would
6   assume that it's in there.
7   Q.   Did you follow it?
8   A.   I did not.
9   Q.   Why not?
10  A.   Because Dr. Merk would have been the person
11  that I would have had to go to; and because of his
12  relationship with Mr. Chambers, I did not feel
13  comfortable going through the school.
14  Q.   Why didn't you go over their heads and go to
15  the chancellor's office?
16  A.   I did go to the chancellor's office.
17  Q.   Why didn't you use the grievance procedure?
18  A.   I went to the chancellor's office; they did
19  not offer the grievance procedure to me.
20  Q.   Well, your testimony yesterday was that you
21  didn't really go to the chancellor to discuss
22  harassment or hostile environment based on gender
23  and race, you went more because you were afraid

---

133 (Pages 529 to 532)

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

Page 533

1  you were about to lose your job.
2  A.    For relief.
3  Q.    Because you were afraid you were about to
4  lose your job, right?
5  A.    Right. I did not feel comfortable with the
6  process at J.F. Ingram or at the Postsecondary
7  office, so I went to Mr. DEBARDELABEN.
8  Q.    Okay. Why have you come to work, for the
9  last three or four months, late nearly every day?
10  A.    Because one is I have a young daughter that
11  I get off to school. I was married 13 years
12  before I had her. And I use my leave for that.
13  There's a leave form. I had never taken an ounce
14  of leave from that school. And that's the way I
15  use my leave, rather than vacation.
16      And I have not enjoyed coming to work lately
17  because of the position that I'm in.
18      But I mainly do it to be with my child and
19  help her get off in the morning. But I do dread
20  coming to work. But I do take leave to cover
21  that. You can check. There's no time not covered
22  by leave.
23  Q.    Hasn't the president instructed you and all

Page 534

1  of your staff, as well as the staff of every other
2  administrator at the college, to come to work on
3  time?
4  A.    He has. He knows that I use my leave for
5  that.
6  Q.    Has he ever given you permission to come to
7  work late every day?
8  A.    He has given me permission before. It
9  should be in my file. When I had my child, he
10  did.
11  Q.    Sure. When the baby was new, you mean?
12  A.    Yes. But he knows that I use my leave for
13  that. We've discussed it before.
14  Q.    Well, he knows that you come to work late
15  every day.
16  A.    Yes. And my leave is used.
17  Q.    Has he ever approved or given you permission
18  to come to work late every day for the last three
19  or four months -- nearly every day?
20  A.    I don't know.
21  Q.    If he testifies that he has not given you
22  permission to do that and that he views your
23  coming to work every day late for the last four

Page 535

1  months as disrespect, would you have a reason to
2  disagree with that?
3  A.    That's his opinion.
4  Q.    And if he testifies that you are not abiding
5  by his directive to come to work on time, would
6  you disagree with that?
7  A.    I would.
8  Q.    Why is the college several thousand dollars
9  in deficit right now?
10  A.    We're not in deficit right now.
11  Q.    That was a bad question.
12  A.    I don't know what you're talking about.
13  Q.    There has recently come up an issue
14  associated with federal government funds.
15  A.    Oh, gosh.
16  Q.    Why don't you tell me about that?
17  A.    That's very recent. We are not in a
18  deficit. Those federal funds are -- boy, that was
19  last week. They're working fast.
20      I don't think Mr. DEBARDELABEN has a copy of
21  that. Can you do that? We're discussing things
22  that we don't know about. That just happened last
23  week.

Page 536

1      THE WITNESS: Do you not need to know
2  that?
3      MR. DEBARDELABEN: What you know, you
4  can tell him.
5  A.    Mr. Wilson is over some federal programs --
6  and, first of all, we're not in deficit. This
7  money is requested from Washington, and it's
8  requested after it's used and everything has been
9  approved by Mr. Wilson.
10      We have our budgets. Mr. Wilson's budget
11  for that program is $335,000 for the current year.
12  Mr. Wilson supplies to our office the carryover
13  amount, which was another 60-some thousand. So
14  the budget for that department was showing as
15  397,000.
16      My business office assistant draws that
17  money down as a business office function. And she
18  was drawing it down based on the 397-, because
19  that is from Mr. Wilson as the program director.
20  He gave her that.
21      And the last request -- the current request
22  would be for 25,000. And they show the balance as
23  being 17,000.

134 (Pages 533 to 536)

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trial Services

Page 537

1  Q.    Who is they?
2  A.    Washington. So my business office assistant
3  came to me and showed me that. And we have
4  researched it. And also when the auditors were
5  there, they had questioned Mr. Wilson on his
6  program. Because what Washington shows is
7  335,000, and they wanted to know where he got his
8  carryover figure. Which his response for that
9  program on that, the director of that program
10  supplies us that type of information.
11      So Mr. Wilson comes up with a memo or a
12  letter from, I suppose, the lady in Washington to
13  show the auditors the carryover amount.
14      The carryover amount does not show -- what
15  we've discovered in my office is the carryover
16  amount is not showing for two years. And we also
17  found an error in Washington where we requested
18  27,000. And they said they -- they made an error
19  and put in a figure of 85,000, which is a $55,000
20  difference. So when you take the 55- -- and Mr.
21  Wilson, as soon as I get back to work after these
22  depositions, because he was out all last week and
23  this just came out last week. He was out last

Page 538

1  week when this came out. He wasn't out maybe two
2  days, but when this just came up last week.
3      The lady in Washington is who he talks to.
4  So we're going to have a conference call, the
5  three of us, because he's the director of the
6  program, I'm over the finance area, and I was
7  going to have the business office assistant in
8  there because she draws down the fund.
9      So I have not -- since Mr. Wilson came back
10  to work, I've been here. I called him Friday at
11  home and left him a message that we needed to get
12  together to handle this. Because it's an error in
13  Washington. And I have written him a memo to tell
14  him that. It's an error in Washington that we
15  need to all three talk about.
16      One, they put in their figure wrong; and the
17  other thing is apparently someone's new come,
18  because we've not had this ever come up before.
19  There must be a new employee in Washington that is
20  not putting in this carryover. They're going to
21  have to put that carryover in.
22      And that figure and the two carryover
23  figures balance to what we have. But I have to

Page 539

1  get with Mr. Wilson.
2      We're not in deficit. Because even if that
3  was so, there are other funds that Mr. Wilson has
4  that those could come out of. So you have not
5  been given correct information. There is a
6  problem that we're working --
7  Q.    Why do you say I haven't been given correct
8  information?
9  A.    Because the college is not in a deficit.
10  Q.    Well, that was my fault. I used the wrong
11  term.
12  A.    Yeah. There is a problem in the special
13  services program that we've just discovered. We
14  are in the middle of working out the problem. It
15  appears to be with Washington; it's nothing the
16  college has done. And as soon as I get back to
17  work, we will have it straight.
18  Q.    Has the federal government yet confirmed
19  that they made the mistake?
20  A.    I didn't want to call with that. Mr. Wilson
21  normally deals with them, so I thought it would be
22  best that the three of us --
23  Q.    Very good.

Page 540

1  A.    We probably will do it Thursday. But it was
2  my business office assistant that found it, and I
3  am the one that alerted Mr. Wilson to it. It's
4  not like they found it. We were letting them know
5  that we had discovered a problem, which can happen
6  when you're dealing with an outside agency.
7  Everybody makes mistakes.
8  Q.    Like Washington, you mean?
9  A.    Right.
10  Q.    Have you ever filed a lawsuit before?
11  A.    No.
12  Q.    Have you ever been arrested?
13  A.    No.
14  Q.    Accused of a crime?
15  A.    No.
16  Q.    Are there any other statistics that you
17  claim support your claims in this case, other than
18  the statistics that you provided in your response
19  associated with new hires and the other
20  statistics?
21  A.    Not that I know of.
22  Q.    I want to make sure I've covered all of your
23  alleged damages, ma'am.

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 541

1    You don't claim to have lost any wages,
2    other than not having been placed in the Dean of
3    the College position, right?
4    A.   Right.
5    Q.   You haven't been denied any job benefits
6    other than that position?
7    A.   Right.
8    Q.   You haven't lost any seniority?
9    A.   Well, I mean, the Dean of the College
10   position would be a higher level, so I guess you
11   could say I have.
12   Q.   Other than that?
13   A.   Not other than that, no.
14   Q.   Do you have any history of mental or
15   emotional illness?
16   A.   No.
17   Q.   Do you allege that you have any illnesses
18   from which you suffer today as a result of
19   anything that's gone on at the college?
20   A.   I don't sleep. But I have not gone -- I
21   don't go to the doctor. I have not gone and been
22   diagnosed, but I have lost a lot of sleep.
23   Q.   Okay.

Page 542

1    A.   And I know I have been under stress, but I
2    have not been diagnosed with it.
3    Q.   And you haven't sought treatment for it?
4    A.   No.
5    Q.   You don't have any other physical injuries?
6    A.   No.
7    Q.   You don't have any other losses that we
8    haven't discussed?
9    A.   No.
10   Q.   You've never received any other disciplinary
11   action -- you've never received any disciplinary
12   action as the Dean of Fiscal Affairs, have you?
13   A.   No. Just that negative evaluation.
14   Q.   Have you ever made any complaints to other
15   previous employers about discrimination?
16   A.   No.
17   Q.   Have you ever made any prior discrimination
18   claims to any government agency?
19   A.   No.
20       MR. CHRISTMAN: Give me five minutes.
21   I'll make sure I'm done. I feel like I'm done;
22   how about that?
23       MR. DEBARDELABEN: Okay.

Page 543

1    (A brief recess was taken.)
2        MR. CHRISTMAN: I'm finished.
3
4
5    FURTHER THE DEPONENT SAITH NOT
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 544

1        C E R T I F I C A T E
2
3    STATE OF ALABAMA
4    BARBOUR COUNTY
5
6        I hereby certify that the above and
7    foregoing deposition was taken down by me in
8    stenotype and the questions and answers thereto
9    were transcribed by means of computer-aided
10   transcription, and that the foregoing represents
11   a true and correct transcript of the testimony
12   given by said witness upon said hearing.
13       I further certify that I am neither of
14   counsel, nor kin to the parties to the action,
15   nor am I in anywise interested in the result of
16   said cause.
17
18
19
20
21       CYNTHIA M. NOAKES,
22       COURT REPORTER and
23       COMMISSIONER

136 (Pages 541 to 544)