**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **JULIE GIVENS and** | ) | |
| **MONICA GREENE,** | ) | |
| | ) | |
|    **Plaintiffs,** | ) | |
| | ) | |
|       **v.** | ) | **Case No. CV 2:06 CV852-1D** |
| | ) | |
| **DOUGLAS CHAMBERS,** | ) | |
| **Individually and in his capacity** | ) | |
| **As President of INGRAM STATE** | ) | |
| **TECHNICAL COLLEGE; JAMES** | ) | |
| **WILSON, Individually and in his** | ) | |
| **Capacity as Dean of Students of** | ) | |
| **INGRAM STATE TECHNICAL** | ) | |
| **COLLEGE** | ) | |
| | ) | |
|    **Defendants.** | ) | |

**MOTION FOR SUMMARY JUDGMENT**

ATTACHMENTS TO PREVIOUSLY FILED MOTION FOR SUMMARY
JUDGMENT

*2/26/02*

*Dr. Huff*
*Prepare to discuss*
*his Cabinet*
*Jac*
*2-26-02*

MEMORANDUM

TO:        J. Douglas Chambers, President

FROM:      Rickey A. Huffstutler
           Dean of the College

SUBJECT:   Business Office Concerns

DATE:      January 15, 2002

This memorandum is written to express certain concerns I have regarding processes and activities associated with the Business Office. I am writing this in a positive manner and this is not as a reaction to the recent problem with my personal invoices but to express some observations from my experience as a chief financial officer. All functions of the institution are interconnected. When one institutional process is not in harmony with another then we are faced with disharmony. The following is presented in no priority order or order of significance;

1.    The payment of my personal invoices again proves the inadequacy of the account payable function of JFI. If the institutional billing statement had been correctly checked against shipping invoices the Business Office would not have mistakenly included these amounts in the JFI payment. Additionally, no institutional purchase order number appeared on my invoice, which is the first data item to be checked when processing invoices. Major weaknesses in the accounts payable process have been identified and discussed previously. This has occurred when the Business Office allowed the payment of bills to become backlogged and processed once monthly. When Dean Greene and Mr. Bridgeman sign checks they are in effect saying that they have reviewed and certify the accuracy of the payment and thus they could face charge backs when errors occur.

      As chief financial officer of the institution, Dean Greene has the responsibility to allocate personnel resources so that the bills are paid on time even if the accounts payable staff member assigned this responsibility is not at work. She also has the responsibility to review her staff member's work to ensure its accuracy

2.    Purchase orders are key to accounts payable process. Dean Greene continues to verbally issue purchase order numbers to employees and expects them to call the vendor. I have talked with her about giving the employee a "signed blank check" by not issuing a "hard copy" purchase order to the vendor. This week I have been informed by Bud Harris and Terry Keahey that vendors have refused to accept phone orders and they have been unable to obtain a paper copy to provide the vendor. Mr. Harris' request was made in early

DEFENDANT'S EXHIBIT

7- Greene

December and Keahey's is two months old. The Business Office should print three part purchase orders and mail original to vendor, one copy to the requestor, and the third should be placed in a Business Office file so that shipping invoices and statements can be matched to the purchase order to verify complete orders. Mr. Harris has stated to me that he was informed by Business Office staff that they could not issue him a paper copy because "they were working on W2s".

3.  In late November with the assistance of the Welding instructors, bid specification were given to Dean Greene. These were Carl Perkins budgeted expenditures. This would have allowed us to encumber the funds and to comply with your directive to spend these funds in a timely manner. It was after she was questioned at least three times by Durrance before she finally advertised the bids in January.

4.  Last September I asked Dean Greene to inform me when and why Ms. Lassiter and Mr. Englet would be needed. I assume that Ms. Lassiter is now working to issue W2s. I have observed her apparently doing accounts payable and answering the switchboard in the last two days. On Thursday she and Englet were discussing who should and should not receive W2s. I wonder where Dean Greene and Julie Givens are in assuming responsibility for this process.

5.  When we brought the Business Office on line with the ACCESS software we identified that the Live Work module did not meet our needs. Winston Hayes committed to building a live work module for free with our identifying the specifications. Mr. Hill was unsuccessful in obtaining the necessary definition of specifications from the Business Office. They chose to continue utilizing the old system supported by Mr. Englet. I learned this week that Englet has developed changes and additional functions to the old system. Ms Knox was brought to the main campus on Monday for training on the changes. This is another demonstration of the Business Office's dependency on Mr. Englet to solve problems.

6.  When Ms. Leigh Wenslet was hired one of the justifications provided by Dean Greene was that she would be able to distribute budgets and expenditure reports to all persons responsible for budgets. To date the only reporting has been to cabinet members. We are in the fourth month of the fiscal year.

7.  In early September, Dean Greene was provided all necessary information to conduct a surplus property sale to eliminate the cars, buses and trucks from the scrap pile on the Draper Campus. We need to remove these items in order to clean the area and make appropriate use of the space. The equipment listing was limited so that it could be done without major interruptions to the Business Office. To date, nothing has been done and we have a large amount of additional items that need to be removed from the campus.

*Dr. Huff
Prepare to discuss
his Cabinet
Joe
2-26-02*

# MEMORANDUM

**TO:**        J. Douglas Chambers, President

**FROM:**   Rickey A. Huffstutler
Dean of the College

**SUBJECT:**   Business Office Concerns

**DATE:**    January 15, 2002

This memorandum is written to express certain concerns I have regarding processes and activities associated with the Business Office. I am writing this in a positive manner and this is not as a reaction to the recent problem with my personal invoices but to express some observations from my experience as a chief financial officer. All functions of the institution are interconnected. When one institutional process is not in harmony with another then we are faced with disharmony. The following is presented in no priority order or order of significance;

1.  The payment of my personal invoices again proves the inadequacy of the account payable function of JFI. If the institutional billing statement had been correctly checked against shipping invoices the Business Office would not have mistakenly included these amounts in the JFI payment. Additionally, no institutional purchase order number appeared on my invoice, which is the first data item to be checked when processing invoices. Major weaknesses in the accounts payable process have been identified and discussed previously. This has occurred when the Business Office allowed the payment of bills to become backlogged and processed once monthly. When Dean Greene and Mr. Bridgeman sign checks they are in effect saying that they have reviewed and certify the accuracy of the payment and thus they could face charge backs when errors occur.

    As chief financial officer of the institution, Dean Greene has the responsibility to allocate personnel resources so that the bills are paid on time even if the accounts payable staff member assigned this responsibility is not at work. She also has the responsibility to review her staff member's work to ensure its accuracy

2.  Purchase orders are key to accounts payable process. Dean Greene continues to verbally issue purchase order numbers to employees and expects them to call the vendor. I have talked with her about giving the employee a "signed blank check" by not issuing a "hard copy" purchase order to the vendor. This week I have been informed by Bud Harris and Terry Keahey that vendors have refused to accept phone orders and they have been unable to obtain a paper copy to provide the vendor. Mr. Harris' request was made in early

**DEFENDANT'S EXHIBIT**

*8 - Greene*

December and Keahey's is two months old. The Business Office should print three part purchase orders and mail original to vendor, one copy to the requestor, and the third should be placed in a Business Office file so that shipping invoices and statements can be matched to the purchase order to verify complete orders. Mr. Harris has stated to me that he was informed by Business Office staff that they could not issue him a paper copy because "they were working on W2s".

3.    In late November with the assistance of the Welding instructors, bid specification were given to Dean Greene. These were Carl Perkins budgeted expenditures. This would have allowed us to encumber the funds and to comply with your directive to spend these funds in a timely manner. It was after she was questioned at least three times by Durrance before she finally advertised the bids in January.

4.    Last September I asked Dean Greene to inform me when and why Ms. Lassiter and Mr. Englet would be needed. I assume that Ms. Lassiter is now working to issue W2s. I have observed her apparently doing accounts payable and answering the switchboard in the last two days. On Thursday she and Englet were discussing who should and should not receive W2s. I wonder where Dean Greene and Julie Givens are in assuming responsibility for this process.

5.    When we brought the Business Office on line with the ACCESS software we identified that the Live Work module did not meet our needs. Winston Hayes committed to building a live work module for free with our identifying the specifications. Mr. Hill was unsuccessful in obtaining the necessary definition of specifications from the Business Office. They chose to continue utilizing the old system supported by Mr. Englet. I learned this week that Englet has developed changes and additional functions to the old system. Ms Knox was brought to the main campus on Monday for training on the changes. This is another demonstration of the Business Office's dependency on Mr. Englet to solve problems.

6.    When Ms. Leigh Wenslet was hired one of the justifications provided by Dean Greene was that she would be able to distribute budgets and expenditure reports to all persons responsible for budgets. To date the only reporting has been to cabinet members. We are in the fourth month of the fiscal year.

7.    In early September, Dean Greene was provided all necessary information to conduct a surplus property sale to eliminate the cars, buses and trucks from the scrap pile on the Draper Campus. We need to remove these items in order to clean the area and make appropriate use of the space. The equipment listing was limited so that it could be done without major interruptions to the Business Office. To date, nothing has been done and we have a large amount of additional items that need to be removed from the campus.



# INGRAM STATE TECHNICAL COLLEGE

*Ingram*
*State*
*Technical*
*College*

**ISTC.**
• *Developing Responsible Citizens* •

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of Instruction

**Paul Reeder**
Dean of Students

**Monica J. Greene**
Dean of
Fiscal Affairs

## MEMORANDUM

**TO:**              All Employees

**FROM:**         J. Douglas Chambers, President

*J. Douglas Chambers*

**REFERENCE:**   Appropriate Dress

**DATE:**         May 20, 1998

This memorandum is being provided to request that all employees refrain from wearing clothing which could easily be interpreted as inappropriate and unprofessional for the work environment. Although the college does not have a dress code, I am requesting that all employees refrain from wearing t-shirts, caps, and shorts while in a classroom setting.

I realize that some work areas are not conducive for dress clothes and casual attire is appropriate. However, in those cases where casual clothing is in the workers' best interest, I ask that you use good judgment and make every attempt to look your best. In case you are curious, several individuals, employees, and outsiders have suggested that we improve our image with the public by doing a better job with our appearance.

Thank you for your cooperation and support in this matter.

JDC:shm

• *P.O. Box 220350* • *Deatsville, Alabama 36022-0350* •
*Phone: 334-285-5177* • *Fax: 334-285-5328*



**DEFENDANT'S EXHIBIT**
9 - Greene



# ALABAMA
# DEPARTMENT OF
# POSTSECONDARY EDUCATION

Ex. 30

## *Representing Alabama's Public Two-Year College System*

| STATE BOARD OF EDUCATION | Governor Bob Riley President | Randy McKinney District 1 | Betty Peters District 2 | Stephanie Bell District 3 | Ethel Hall Vice President District 4 | Ella B. Bell District 5 | David F. Byers, Jr. District 6 | Sandra Ray District 7 | Mary Jane Caylor District 8 |
|---|---|---|---|---|---|---|---|---|---|

December 18, 2003

Dr. J. Douglas Chambers, President
J. F. Ingram State Technical College
Post Office Box 220350
Deatsville, Alabama 36022

Dear President Chambers:

Based on concerns expressed to me by Mrs. Monica Greene, Dean of Fiscal Affairs, I have determined it appropriate to conduct a peer review of the business operations at the college. Ms. Dahl will lead a team comprised of Mrs. Leigh Grogan, the Department's Fiscal Director, and three college chief financial officers. Ms. Dahl will contact you regarding the logistics of this visit. Please ensure that pertinent college staff and records are available. You may contact Ms. Dahl or me with any questions.

Sincerely,

Roy W. Johnson
Chancellor

RWJ/DD/ph

DEFENDANT'S EXHIBIT
10- Greene

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| **JULIE GIVENS and** | ) |
| **MONICA GREENE,** | ) |
| | ) |
| **Plaintiffs,** | ) **CASE NO.: 2:06 CV 852-1D** |
| | ) |
| **v.** | ) |
| | ) |
| **DOUGLAS CHAMBERS, et al.** | ) |
| | ) |
| **Defendants.** | ) |

## PLAINTIFF'S ANSWER TO DEFENDANTS' INTERROGATORIES

1. State your name, present address, age, date of birth, social security number, and all names by which you have been known in the past. Additionally, state the name and address of each and every person who assisted in preparing responses to these interrogatories.

> **ANSWER:** **Monica J. Greene**
> **757 Towne Lake Drive, Montgomery, AL 36117**
> **Age:44**
> **DOB: 10/20/62**
> **SS#: 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**
> **Monica Jane Langham**

2. Name each person, firm or corporation for whom you have worked from 1990 to the date you answer these interrogatories, stating the kind of work you did for each such employer, the date on which you began working for each such employer, the amount of



DEFENDANT'S
EXHIBIT

11-Greene

compensation you received from each employer for your services, on what date you stopped working for each such employer, the reason you stopped working for each such employer, and your immediate supervisor at each such place of employment.

**ANSWER: See attachment #2**

3. Identify every person whom you know or have reason to believe has knowledge of the facts regarding any of your claims, regardless of whether you intend to call that person as a witness, specifying with particularity the basis for said knowledge.

**ANSWER: See attachment #3**

4. Identify every person, employee, former employee, or agent of Defendants, other than your lawyers, with whom you or someone on your behalf has mentioned, discussed, or communicated in any way concerning this lawsuit or the claims made in this lawsuit, including any person associated with any Defendants, and identify the substance of said communication including every document evidencing said communication.

**ANSWER: Julie Givens, Patty Graves, Emma White, Julie Wood, Melissa Wallace, Barbara Hendrix, Bonita Owensby, Gene Bridgman, Janet Lassiter, Barbara Acreman, Sylvia Murphee. Grace Wright, Greg Wright, Rickey Huffstutler, Terry Keahey, Frank Benton, Coleman McKeithan, Willie McKeithan, Sandy Caylor, LaTonya Trimble, Elaine Toxey, Leo Miller, Roger Haines. I cannot identify the substance of each conversation, other than to state it was discussing issues raised in this law suit.**

5. Identify each person you expect to call as an expert witness at the trial of this action. State in your answer the subject matter and substance of each expert's expected

testimony, identify the grounds for each opinion, identify all documents used by each expert to support his testimony, identify all reports or opinions issued or written by each expert, and list the qualifications of each expert.

**ANSWER: None identified at this time, other than possible testimony from treating physicians.**

6. State whether you, your attorney, or anyone acting on their or your behalf have in their possession or have knowledge of any photographs, motion pictures, drawings, diagrams, videotapes, or other visual or audio descriptions concerning or relating to the events referred to in the Complaint.

**ANSWER: N/A- Object, to any evidence that my attorney might have, as such would be his work product.**

7. If an investigation was made by you or on your behalf concerning any matter relating to the charges complained of in this action, please describe fully and in detail all persons who participated in the investigation, the matters investigated, and the results of the investigation.

**ANSWER: The only investigation I am aware of is the EEOC investigation.**

8. Identify by name, address and telephone number any person from whom you or anyone on your behalf have obtained a written, recorded or oral statement concerning or relating to the incident.

**ANSWER: Written Statements: Leo Miller Patty Graves, Melissa Wallace**
**Oral Statements: Minutes of Meetings**

9. If you have made a statement, in any form, regarding the incident, your injuries or

3

your damages, identify all persons present when you made the statement, identify the

custodian of any record of such statement, state the date, time, and location of the

statement, and the words used. If any document reflecting such statement has been lost or

destroyed, describe the document and the circumstances of its loss or destruction.

**ANSWER: The only statement I have made is to my attorney, which is privileged.**

10.  If you have ever been arrested or convicted of a crime other than a traffic

violation, identify the crime, date of arrest, the court hearing the case, case number,

jurisdiction and outcome of the proceeding.

**ANSWER: None**

11. Have you ever filed a bankruptcy petition, voluntary or involuntary? If so, please

identify the court in which such petition was filed, the case number and the date you

received a discharge.

**ANSWER: No**

12. Please list the name and address of all your relatives by blood or marriage who

reside in the Middle District of Alabama.

**ANSWER: Gerald Thomas Greene (spouse), Peri LeeAnn Greene (daughter), Tamara Annett Langham Solomon (sister), Michael Solomon (brother-in-law), Jeffery Earle Langham (brother), and Ginny Weldon Langham (sister-in-law).**

13. Please list all schools, colleges, universities, trade schools, vocational schools and

other educational institutions which you have attended above and including high school

4

level, and provide the dates of graduation or date last attended, degrees or certificates received, and course of study in each institution.

**ANSWER: see attachment #13**

14. Please identify each and every lawsuit in which you have been involved or are currently involved, either as a plaintiff, defendant, or witness. For each lawsuit, tell whether you were a plaintiff, defendant, or witness, and identify the court, jurisdiction, case number, final disposition (if the case has concluded,) and nature of the case.

**ANSWER: This is the only law suit that I have ever been involved in.**

15. Identify your current sources of income and state the amount of income received monthly from each source.

**ANSWER: J.F. Ingram State Technical College: Monthly Gross ($8,328.75) Net Pay ($5,346.92).**

16. Please identify and describe every item of special, incidental or consequential damages for which you seek recovery in this lawsuit.

**ANSWER: I do not understand the terms "special, incidental or consequential damages. However, I seek damages for mental and emotional pain and anguish, for being yelled at by Mr. Chambers, for being denied the opportunity to apply for promotions because I am a female and for my staff being denied promotions because they work for me. I seek damages for the creation of a hostile work environment and for having members of my staff brought into Mr. Chambers' office each time I am out and being questioned about my duties and inferences being made that I am doing something wrong. I also seek damages for having being treated different from my male counter part and co-workers.**

17. Please identify by name, address and place of employment your current spouse, if married, and any other person to whom you have been married previously, and your

children.

> **ANSWER:   Gerald Thomas Green (spouse)**
> **757 Towne Lake Drive**
> **Montgomery, Alabama 36117**
> **Place of employment: Macon East Montgomery Academy**
> **Peri LeeAnn Greene(daughter)**

18. Please provide the name and address of all medical care providers who treated,

saw, counseled, advised or examined Plaintiff in the last ten years, and list all relevant

dates on which you received treatment or were examined, and the medical condition or

the symptoms for which you were treated or examined.

> **ANSWER:**

19. With respect to paragraph 7 of your Complaint, please fully describe any

evidence upon which you base your contention that numerous meetings have taken place

between Defendant Chambers and Plaintiffs Greene and Givens wherein Chambers has

insinuated that Plaintiff Greene had not told him the truth about an issue and admonished

Plaintiff Givens to tell him the truth.  Describe when such communications occurred and

further, describe where such communications occurred and who was present.  Describe

what issues you are referring to in paragraph 7 regarding Greene not telling the truth.

> **ANSWER: See attached #19**

20. With respect to the allegations of paragraph 8 in your Complaint, please fully

describe any evidence upon which you base your contention that Defendants Chambers

and Wilson have indicated in front of other employees that Givens allows personnel in

the business office to violate school policy. Identify any of these other employees in front of whom Defendants Chambers and Wilson have indicated that Givens allows employees to violate school policy. Additionally, identify what school policies Chambers and Wilson indicated Givens had violated and exactly how that policy was violated.

**ANSWER: See Sandie Caylor's memo to Mr. Chambers dated 2/16/05. See attachment # 20**

21. With respect to the allegations of paragraph 9 in your Complaint, please fully describe any evidence upon which you base your contention that Defendant Chambers consistently comments on the attire and dress of females while not commenting on the dress of male employees. Identify, the time, place, and substance of any such comments. Identify any witnesses present when such comments were made.

**ANSWER: See memos dated 05-20-98 re: appropriate dress; 05-10-99 re: dress code and meeting minutes dated 2-16-05 of meeting held by Mrs. Greene with business office employees per Mr. Chambers' request. See attachment #21.**

22. With respect to paragraph 9 of your Complaint, please fully describe any evidence upon which you base your contention that Chambers has established a dress policy for women and not for men.

**ANSWER: same as #21**

23. With respect to paragraph 10 in your Complaint, please fully describe any evidence upon which you base your contention that Defendant Chambers has raised his voice at the Plaintiffs in a loud and threatening manner. Identify specific dates, locations, and purposes for the meetings at which you claim Defendant Chambers raised his voice.

7

Further, identify who was present at such meetings.

   **ANSWER: See attached #23**

   24. With respect to the allegations in paragraph 10 of your Complaint, please fully describe any evidence upon which you base your contention that Defendant Chambers raises his voice at meetings involving the Plaintiffs and other female employees but does not raise his voice at meetings with just male employees.  Identify any meetings of which you are aware when Defendant Chambers met with male employees, who was present, and how you know whether Chambers did or did not raise his voice.

   **ANSWER: I was aware of male only meetings on various dates and times. However, I never heard Defendant Chambers raise his voice to the males.**

   25. With respect to the allegations of paragraph 11 in your Complaint, please fully describe any evidence upon which you base your contention that Chambers consistently refused to raise the salary of any white employee recommended by Plaintiff Greene. Identify any occasions on which raises were requested and/or recommended by any white employee and refused by Defendant Chambers.  Further, identify any similarly situated employee who was given a raise, identifying that employee's job title, job responsibilities, previous pay, amount of raise, gender of the employee, and race of the employee.

   **ANSWER: See attachment #26.**

   26. With respect to your allegations of paragraph 11 in your Complaint, please fully describe any evidence upon which you base your contentions that Defendant Chambers

8

consistently hires and promotes black employees over white employees and pays black

employees more money for doing the same job as white employees. Specifically identify

any black employees who are treated more favorable than whites by providing their name,

job title, job responsibilities, how they were treated more favorably, and on what specific

occasions. Further, identify what white employees were treated less favorably by

providing those employees' names, job title, job responsibilities, and the specific

occasions on which they were treated less favorably.

**ANSWER: See listing of new hires since his tenure in office which indicates blacks vs non-blacks. Also see attached salary scales noting which employees are black vs non black and salary amounts and some employees holding exact same jobs. See attachment #26**

27. With respect to the allegations of paragraph 11 in your Complaint, please fully

describe any evidence upon which you base your contention that Defendant Chambers

pays female employees, including Plaintiff Greene, less money than male employees in

equal or similar positions. Identify which male employees were treated more favorably

by providing the names of those employees, their job title, job responsibilities, and in

what respect they were paid more money than the female employees, including the

Plaintiffs.

**ANSWER: See attachment #27**

28. Fully describe any evidence upon which you base your contention that you were

discriminated against in violation of Title 7 of the Civil Rights Act of 1964. Further, detail

in itemized form any damages you claim to have suffered as a result of this alleged

9

discrimination.

**ANSWER: Previously discussed in above numbered items all related to wither race or gender. See interrogatory answers # 19, 20, 21, 22, 23, 24, 25, 26 & 27.**

29. Fully describe any evidence upon which you base your contention that you were discriminated against based on race/gender in violation of 42 U.S.C. §1981. Further, detail any damages in itemized form you claim to have suffered as a result of the alleged discrimination.

**ANSWER: All evidence, statements, etc. discussed in above numbered items. Do not understand question. However, please refer back to interrogatory # 19,20,21,22,23,24,25,26 & 27.**

30. Fully describe any evidence upon which you base your contention that you were treated differently than similarly situated male employees in violation of the Equal Protection Clause of the Constitution of the United States. Dully describe any evidence upon which you base your contentions that you were harassed in violation of state law.

**ANSWER: Do not understand question. However, please refer back to interrogatory # 19,20,21,22,23,24,25,26 & 27.**

Respectfully submitted this the _14th_ day of February, 2007.

_Monica Greene_
Monica Greene
Plaintiff

**STATE OF ALABAMA        )**
**COUNTY OF MONTGOMERY)**

On this the _14th_ day of _February_, 2007, before me, a Notary Public for the State of Alabama, duly commissioned and sworn, personally appeared Monica Greene, known to me to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same.

**IN WITNESS WHEREOF,** I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

Notary Public
My Comm. Expires _06-01-08_

BY: _____
Jim L. DeBardelaben (DEB003)
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing by U. S. Mail, postage prepaid and properly addressed, upon the following counsel of record on this the _14th_ day of February, 2007:

Andrew W. Christman, Esq.
Gidiere, Hinton, Herndon & Christman
P.O. Box 4190
Montgomery, Alabama 36103

OF COUNSEL

11

## 2. Employment History

### 1989- Present     J.F. Ingram State Technical College

| Date | Job Title | Salary | Supervisor |
|------|-----------|--------|------------|
| 9/1/89 | Junior Accountant | 23,533.00 | Freddie Powell |
| 9/1/90 | Junior Accountant | 25,424.00 | Freddie Powell |
| 9/1/91 | Junior Accountant | 25,960.00 | Freddie Powell |
| 9/1/92 | Junior Accountant | 25,960.00 | Freddie Powell |
| 9/1/93 | Junior Accountant | 28,222.00 | Freddie Powell |
| 9/1/94 | Interim Dean of Fiscal Affairs | 66,994.00 | Dr. Murry C. Gregg |
| 9/1/95 | Dean of Fiscal Affairs | 66,994.00 | Dr. Murry C. Gregg |
| 9/1/96 | Dean of Fiscal Affairs | 69,679.00 | J. Douglas Chambers |
| 9/1/97 | Dean of Fiscal Affairs | 69,679.00 | J. Douglas Chambers |
| 9/1/98 | Dean of Fiscal Affairs | 79,702.00 | J. Douglas Chambers |
| 9/1/99 | Dean of Fiscal Affairs | 79,702.00 | J. Douglas Chambers |
| 9/1/00 | Dean of Fiscal Affairs | 82,905.00 | J. Douglas Chambers |
| 9/1/01 | Dean of Fiscal Affairs | 82,905.00 | J. Douglas Chambers |
| 9/1/02 | Dean of Fiscal Affairs | 85,396.00 | J. Douglas Chambers |

| 9/1/03 | Dean of Fiscal Affairs | 89,794.00 | J. Douglas Chambers |
| 9/1/04 | Dean of Fiscal Affairs | 89,794.00 | J. Douglas Chambers |
| 9/1/05 | Dean of Fiscal Affairs | 95,182.00 | J. Douglas Chambers |
| 9/1/06 | Dean of Fiscal Affairs | 99,945.00 | J. Douglas Chambers |



**3.**   Gerald(Jerry)  Greene – Spouse

Patricia Graves
Jeanna Givens
Kerri Conger                    **Fiscal Department Employees**
Beth White
Coleman McKeithen


Gene Bridgman                   **Retired Fiscal Dept.**
Janet Lassiter                        **Employees**


Jerrel Durrance
Cynthia Hall
Willie McKeithen
Johnny Gaither                  **Retired Instructors**
James Rogers
Grace E. Wright
Wayne Butler


Nancy Fuller
Elaine Toxey
Barbara A. Wood
David Bowen
Elaine Lee                      **Former J.F. Ingram Employees**
Cynthia Lester
Marilyn Nipper
Leigh Walker
Rodger Haines
Leigh Winslett
Michael Abbott


Paul Reeder                     **Retired Dean of Students**

Rebecca Mullins                 **Retired JFI Center Director**

Greg Wright                     **Retired  JFI Personnel Director**

Sylvia Murphree                 **Retired JFI  President's Secretary**

Melissa Wallace                 **Retired JFI Placement Officer**



Travis Arnette
Rod Benton
Sandra Caylor
Barbara Hendrix          **Current JFI Instructors**
Fletcher Hyde
Terry Keahey
Phillip Till
LaTonya Trimble


Rickey Huffstutler        **Former JFI Dean of College**


Bonita Owensby           **Current JFI Employees**
Julie Wood


Barbara McAnnally        **Consultant- Florida Dept. of Edcuation**

Roy Johnson              **Former Chancellor of Postsecondary Ed**

Debra F. Dahl            **Vice Chancellor of Postsecondary Ed**

Robert Higgins    Former Asst. of Roy Johnson

**\*\*\*\*\*\*\* WE  RESERVE THE RIGHT TO CALL  ANY OR ALL CURRENT OR FORMER  J.F. INGRAM EMPLOYEES IF NEEDED  \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***



13.  **Baldwin County High School**
     Dates Attended:  1977-1981
     Date of Graduation:  May 1981


     **Alabama Christian College (Faulkner University)**
     Dates Attended:  September 1981- May 1983
     Course of Study: Business
     Date of Graduation:  May 1983
     Degree Earned:  A.A.


     **Auburn University at Montgomery**
     Dates Attended:  September 1983 – June 1985
     Course of Study:  Business (Finance)
     Date of Graduation:  June 1985
     Degree Earned:  B.S.B.A


     **Troy State University at Montgomery**
     Dates Attended:  1990 – 1993
     Course of Study: Business Administration
     Date of Graduation: December 1993
     Degree Earned:  M.B.A.

19.  You will note from the prepared statements from Julie Givens the
     numerous times that Mr. Chambers called Julie and /or Gene Bridgman
     in his office and inferred that I (Monica Greene) was not being truthful
     with him. You will also note that he did it when I was not at work. As
     Julie states in her documents, he was never specific, he just wanted to infer
     that I was not being honest with him. Please reference the attached
     document prepared by Julie Givens.  (Example A)

     In the notes that I prepared, you will note that there are instances when he
     infers about bills not being paid on time and he also references other so-
     called problems in the business office that he is never specific about. I will
     list some of these, but these are certainly not all the times that he has
     inferred that I was not telling him the truth. He has no basis for these
     accusations. I believe this is why he never states specific items because he
     doesn't want me to be able to refute them.

## 4-5-02
In front of my subordinate, Gene Bridgman (white male), he said " these
are things you need to do, but you won't do them." No such " things" exist,
as I have complied with all his directives. I have always complied with
directives given by him. So what is he insinuating here except that I am not
being honest with him. This is again a false statement made by President
Chambers.

## 9-6-02
In the presence of my department, Mr. Chambers yelled at me about the
Home Depot bill. The matter that he was yelling about had already been
handled, yet he wouldn't listen to my response and he berated me in front
of my subordinates again. I was never given an opportunity to give a
response in this meeting. In other words, he did not want to hear the truth
from me he just wanted to complain about me.

## 9-20-02
Mr. Chambers, Dr. Huffstutler, Gene Bridgman and I were in a meeting.
Mr. Chambers mentioned several times a memo I had written him
disputing his untrue claims about bills not being paid on time. He said, I'm
not going to get into a memo war." This is an obvious attempt to avoid a
paper trail that would explain the truth about his harassing me with unfair
and untrue statements. You will note that he never allows me to respond
verbally if we are in a meeting if I am trying to give the facts on a matter
that he has embellished and if I write a memo to show the facts of the
matter he says that he will not get into a memo war. He references that
statement about a memo war every time that I respond in writing. Yet he
will certainly put his erroneous facts in writing to me but he gets offended
if I respond. How can this be fair? In this instance he again infers that I
am not telling him the truth about the college bill payments. The college

has never been written up or even asked about any late bill payments in any of our audits yet he continues to make these untrue statements, but he acts like I am the one not telling the truth.

### 9-24-02

Mr. Chambers announced that he would have his secretary check all the bills before sending them to my office. This action was demeaning to me, since his secretary had no idea about our accounts payable process. This was just another inference that the bills needed to be monitored because he didn't think that I was telling him the truth. He has no basis for these inferences.

### 7-3-03

Mr. Chambers called me into his office along with Julie Givens and Gene Bridgman. Hal Bradsher (auditor) had talked to him about an audit matter concerning Dr. Fred Gainous. He was very mad during this meeting and he, once again, made several negative remarks about me, including alluding to my not being honest. He knows that I am an honest person and that I get very upset if that integrity is questioned. Knowing this he makes almost constant requests that I " tell the truth". I have never told him anything but the truth. On this day he looked at Gene and Julie and said for them to tell the truth. In other words he was implying that I was not telling the truth. Please note that he was not talking about any particular incident, he was just acting like I never told him the truth. He does unsubstantiated things like this quite often. I became upset and I asked him if my employees could leave because this matter was between he and I. I also knew that this encounter was making them feel uncomfortable. He refused this request. The meeting escalated. His worst comment though at the height of his yelling at me was, " you need to resign". I responded that I would not give my career for him, especially when nothing he has accused me of is remotely true. He then replied, "when I get back from my trip, I will take you to the Chancellor". He was going out of town that day. I said, "no sir, Mr. Chambers, I will go before you get back. He had been threatening me with going to the Chancellor for quite some time. I did make the appointment and met with the Chancellor. Then things got worse. What he never will understand is that he forced me to go to the Chancellor in defense of my job. It was a natural reaction but he constantly brings it up in conversation like I should not have gone but it was okay for him to take me himself to berate me.

### 8-22-03

I got a memo from Mr. Chambers concerning "old bills". He continued to insist that "bills weren't being paid". Regardless of any explanation, he wrote these inaccurate memos to "make his case". Again, he is inferring that I am not telling the truth about the bills.

**All of 2003**
Mr. Chambers had his secretary keep a record of any bill in which there was a problem.  He kept these in a file, regardless of the fact that all of them could be explained.  For the volume of bills we pay, these represented a miniscule number of them in which any questions arose.  I am later told that he shared these with the Chancellor's office as so called "evidence".


As you can see, Mr.Chambers wants to believe that I am not telling him the truth even though there is no basis for this thinking.  The truth is he will not listen to the truth if it comes out of my mouth!  As I mentioned previously, I think he does this on purpose because he knows how I feel about him questioning my integrity and he is hoping that I will be disrespectful to him so that he would have reason to terminate me.
This listing is just a sampling of the times that he has made these inferences/accusations.  There are many more.

# Example A

May 2001

Mrs. Greene's Mother was very sick and she was out with her. By then Mr. Chambers had a pattern of calling Mr. Bridgman, Asst. to Dean of Finance and I, Adm. Asst. to Dean of Finance, in to his office whenever she was not at work. He stated that he knew that we had problems in the business office. He stated that we could feel free to come to him about Mrs. Greene, that he knew that she was weak and ineffective as a business manager.

When Mrs. Greene returned to work, Mr. Chambers called in to my office, and had me to gather all the other members of the business office into my office, he then had me to put him on speaker phone with Mrs. Greene and proceeded to tell her what a poor job she was doing, and how ineffective she was as the business manager.

Mrs. Greene's Mother passed away the next week, and instead of showing support as an administrator he continued to belittle her to the other staff members and her office staff.

November 2001

Mrs. Greene was out on annual leave. Mr. Chambers called Mr. Bridgman and I in and stated that he knew that we must have been having problems in our department. Mr. Chambers stated that we could come to him anytime we needed to. He mentioned that he knew that accounts payable was probably behind because he knew that Mrs. Greene always held invoices.

March 2002

Mrs. Greene was out on annual leave. Mr. Chambers called Mr. Bridgman and I in and stated that he knew that Mrs. Greene was weak and ineffective. If we needed to talk to him concerning this please feel free to come in and see him.

June 2002

Mrs. Greene was out on professional leave. Mr. Chambers called me and told me that I could feel free to discuss Mrs. Greene with him. He stated that the people at Postsecondary knew that she was weak, incompetent and ineffective as a business manager.

October 2002

Mr. Chambers called me in before Mrs. Greene arrived at work and reminded me that if I needed to speak with him about her to let him know. He just wanted me to know that he was aware of our situation in the business office.



January 2003

Mrs. Greene was out on annual leave. Mr. Chambers called Mr. Bridgman and I in and stated that he knew that the purchase orders and accounts payable were in a mess because of Mrs. Greene. He stated that if we needed him to take care of anything to let him know. Mr. Chambers also kept mentioning that the vice-chancellor, Debbie Dahl, would be calling us to talk with us concerning Mrs. Greene.

2004-2005-many more of these type meetings took place.

Note: On all the above dates he talked in general and tried to get us to say something negative about Mrs. Greene. Sometimes we would be in his office as long as three hours.

You will note that these are just some of the instances where I know that I felt like I was being put in the middle of a battle between Mr. Chambers as President and Mrs. Monica Greene, my direct supervisor. I felt that *IF* there had been a real problem with Mrs. Greene he should have been talking directly with her, not with me a member of her staff. He never was clear on what he wanted me or Mr. Bridgman to say about her or do about her. He was always just kept insinuating that he knew that we knew something.

Putting me through this caused me to fall behind on my job duties, as I'm sure it did Mr. Bridgman. Being behind on my duties caused me stress and caused me anxiety. I have had to start taking medication for work stress anxiety back in 1999. At that time they put me on Prozac for a while, when it no longer was strong enough I was moved to Lexapro, Topamax and Zanex. These are medications I need just to come to work. This type work environment is not healthy.

On occassion Mr. Chambers will still catch me and call me in to talk about Mrs. Greene, however, about three years ago I learned to ask her to let me know if she is going to be out and so I could take leave to avoid him.

Lucky Mr. Bridgman has retired. But not before suffering a *stroke* over Ingram stress.



**Ingram**
**State**
**Technical**
**College**

**iSTC**

*Developing Responsible Citizens*

J. Douglas Chambers
Presiden t

Rickey A. Huffstutler, Ph.
Dean of the College

Monica J. Greene
Dean of
Fiscal Affairs

James E. Wilson
Dean Of Students
And
Support Services

# INGRAM STATE TECHNICAL COLLEGE

## MEMORANDUM

Date :      2/16/2006

To :      **J. Douglas Chambers**
President

From :      **Sandy Caylor**
Ta I Instructor

Re :      Comments on practice fabric

On Wednesday,   Dean Wilson,You and myself  were having a conversation about the fabric that I purchase for practice in my shop. There were some comments  made that are not true. Dean Wilson said that the Business Office wouldn't let me go. They have nothing  to do regarding when I go. Dean Wilson also stated that if the Business Office wanted something done for their family or kids they would send me. You stated that you knew it and was keeping an eye on it. Let me just say, Nobody from the Business Office has ever sent me to get fabric. Dr. Merk is the one to o.k. my trips now. Dean Wilson did ask me awhile back if I had any of the practice frabic and I told him that I had very little. I told him that I hadn't been in awhile to get any.I told him that I hadn't been able to go. That I had to get Dr. Merk to let me go. The mill I purchase this fabric from is only open on Wednesday's. When I would ask Erica what the schedule looked like,  there was usually a lot  of Instructors already going to be off. So I would just wait. Finally, I told her I had to go. Dr. Merk was not here so, Erica stopped my shop up. I set it up with Monica for payment  of the fabric.   If I do any work for Dean Greene or anyone else in the Business Office, I have a workorder. I treat everyone the same.  In fact,Dean Greene needed a piece of scrap material last week. I told her I had a piece we were going to throw away and I'd give it to her. She said that she would do  a worKorder on It. I just sold Dean Wilson a class project sofa covered in some of the practice fabric. He also had a workorder for this. Everyone is treated the same. Also, any Embroidery work we do over here ,.whether it be for me or someone else also has paperwork. I get permission from Dean Greene.

Sandy Caylor
Ta I Instructor

*P O  Box 220350  ·  Deatsville  Alabama 36022-0350*

*Phone  334-285-5177    Fax  334-285-5328*

4-6-04
Mr. Chambers met with the main campus ladies about their dress attire.

4-7-04
Approximately 2:30 p.m., Mr. Chambers met with the main campus ladies
and said that he wasn't going to say anything else about their dress. He was
mad because he said that someone had told him that the ladies were
offended from his talking to them the day before.

There are two important items to note from this one incident:

(1) You will notice from Mrs. Givens documents and mine that he only
    meets with the main campus ladies about their dress attire. He does not
    address the ladies at other campuses as a group.
(2) You will notice that Mr. Chambers states that he wasn't going to say
    anything else about their dress. You will also notice in all the documents
    provided that this incident was not the last time that he talked about
    ladies dress attire.

2-16-05
Mr. Chambers directed me to have a meeting with the main campus ladies
regarding their dress attire. The main reason that he made me conduct the
meeting is because I had told him that I thought that he should stop
commenting on individual ladies attire. I told him that I felt like he was
going to get in trouble doing this. I was trying to help him but he continued
as you will see in further documentation. I have enclosed the minutes of the
meeting that I had with the ladies. (EXAMPLE C )



J. F. Ingram State Technical College
Deatsville, Alabama


On Wednesday February 16, 2005 a meeting of the ladies working at our main campus was held to address and discuss the proper attire that should be worn at Ingram State.  Dean Greene conducted the meeting and told the ladies that proper business attire should be worn by all.  Mrs. Greene stated that low cut, short, tight clothes and high heel strapless shoes should not be worn.  The overall message delivered by Dean Greene was "if in doubt don't wear it".

Dean Greene also stated that "cover up jackets" can be purchased by the College for the ladies to wear during their workday.  Discussion followed about the type of jackets needed during the winter and summer.  Several stores in the Montgomery area were mentioned as possible sources of supplying the "cover up jackets".  Catalogs of the styles available will be obtained by the College and after input from the ladies the "cover jackets" will be purchased.  The meeting was then adjourned.

During the time that Mr. Chambers has been at Ingram as the President he has had several meetings with the ladies at Main Campus regarding their clothing. He will warn them that they should not wear jeans, tight clothing, show cleavage, wear capri pants, strapless heels, etc. In his opinion, this type clothing is not appropriate for the office.

Ingram does not have a dress code policy for women or men. He only meets with the office staff women at Main campus. We have a campus next to Draper Prison and one next to Tutwiler Prison. To my knowledge no such meetings have taken place at these locations.

Examples:

Summer of 2004

During a regular Faculty meeting downstairs Mr. Chambers stated that he was fed up with the way people reacted when they were told how to dress (I guess Main campus women) so "he did not care how they dressed." Other campus' employees were asking after the meeting "what was he was referring too?". This type question only reinforces that he had held no such meetings with the other ladies or men.

February 13, 2005

Mrs. Greene under the direction of Mr. Chambers and Mr. Wilson was told to tell the women at Main Campus that low cut, short, tight clothing and high heel strapless shoes should not be worn. The College would even provide cover up jackets to be worn.

September 9, 2005

Mr. Chambers called a meeting at 2:45 pm in the staff lunchroom of all the women on main campus with Mr. Wilson and Mrs. Greene. He stated that "office women can no longer wear blue jeans or capri pants", I asked him about the men and he told me he was not talking about the men only the women. He stated that men in the shops could wear jeans and when I asked about the office men he told me not to worry about it he was talking to the women.

J. F. Ingram State Technical College
Deatsville, Alabama

On Wednesday February 16, 2005 a meeting of the ladies working at our main campus was held to address and discuss the proper attire that should be worn at Ingram State. Dean Greene conducted the meeting and told the ladies that proper business attire should be worn by all. Mrs. Greene stated that low cut, short, tight clothes and high heel strapless shoes should not be worn. The overall message delivered by Dean Greene was "if in doubt don't wear it".

Dean Greene also stated that "cover up jackets" can be purchased by the College for the ladies to wear during their workday. Discussion followed about the type of jackets needed during the winter and summer. Several stores in the Montgomery area were mentioned as possible sources of supplying the "cover up jackets". Catalogs of the styles available will be obtained by the College and after input from the ladies the "cover jackets" will be purchased. The meeting was then adjourned.

This meeting was held after Mrs. Greene was instructed by Mr. Chambers to hold this meeting.

2 1-4-__

Examples of Individual Comments:

June 2005

Mrs. Beth White was 4 months pregnant and Mr. Chambers stopped and inmate (student) and asked him did he think she looked 4 months pregnant. In discussing work attire Mr. Chambers has stated on numerous occasions that the women at Main Campus should not dress in any manner that draws attention from the inmate students. By making this comment about Mrs. White and her pregnancy status Mr. Chambers was contradicting his own comments about women keeping a low profile around students.

September 2005

Mr. Chambers told Mrs. Wood, (his secretary) that the reason the women could not wear jeans anymore was because Mrs. Cherry wore hers too tight and too low cut. He could see her belly button. Mr. Chambers told Mrs. Wood that this was the reason he called the meeting of September 9, 2005.

2006

Mr. Chambers recently made the statement to Julie Wood (his secretary) that Mr. Wilson talks about the women wearing their pants too tight, but, that he (Mr. Wilson) does not say anything about LaTonya Trimble's pants going up her butt crack.

2006

Mr. Chambers recently told Mrs. Greene that she had something on her pants. When she went to the bathroom and looked it was a small piece of lint on her bottom. He sure had to be looking close.

2006

Mr. Chambers recently asked me (Julie Givens) to get a string off Shannon Cherry's butt, and I told her that it was there, she removed it herself. As she was walking off, he said, "If those pants weren't so tight on her ass you wouldn't notice those type things."

As you can see from the dates provided that Mr. Chambers has a habit of concentrating on women and their attire. These are just a few examples of comments that have been made by him.



**CABINET MEETING**
JF Ingram State Technical College
September 12, 2005

Present:     J. Douglas Chambers          Dr. James T. Merk
             Monica J. Greene             James E. Wilson
             Kay D. Perryman
Recorder:    Julie Wood

President Chambers noted this is the first cabinet meeting since the reorganization and/or restructuring. He stated he wanted the cabinet to keep focused. He knows some of the members have been very concerned about his response to the audit, and he has completed and submitted his response to the audit report to Mr. Ron Jones and has had a discussion with Larry Williard, and is now waiting to hear back from him. What he is telling the cabinet is for information purposes only, not for them to quote him or to say anything to any other employees. He has not shared his response with anyone in detail, but has talked to some individually about certain responses as it might relate to them individually, and he did that to get some feedback. He does appreciate the feedback that he received, because he wrote some things up based on his interpretation after talking to everyone at the table, as it relates to them, mostly Dr. Merk and Monica Greene. He has changed a few things and made the wording fit the specific response. The auditors, in his opinion, have been very fair and responsive to helping the school. He even stated in his response that he felt like the audit was fair and supportive. However, when the auditors make their final decision which will be going in their report at the end of this month, we will be notified as to how we fit in the situation. Dr. Johnson and Stephanie Bell will receive a copy as well. The President put some things in the response which will clearly show that he did not disagree with their findings. He also assured them that he has and would be taking steps to make sure that this does not occur again. He informed them that he would be warning and reprimanding certain people and copies of those were available for submission and will be included in the President's final report to the Chancellor. The President stated that he would need the cabinet's help on a problem area. He will be calling certain employees in and telling them up front, while handing them a reprimand. He stated he has no time for foolishness, and has told a few of them to expect a discipline due to the findings. The President does not think anyone was dealt with to a point that they cannot move on from this. No one will miss a check or be suspended, but we are not going to just warn over and over. We are taking steps to discipline, and a reprimand is a form of discipline. He expects the cabinet to help him carry out the tasks we have before us. It will be important that we review the problems we have had, look at our internal controls, see that we have a check and balance so that the type things that were in our findings do not show up again. There were four findings, and he will be working with the cabinet to go forward, realizing that we are going to grow from those things that caused us to be under the microscope. As the chief person in charge of running this institution, the President has gotten over his embarrassment, hurt, disappointment. Yes, he was embarrassed that an auditor had to tell us that we did not have the proper documents, that we were working on a tractor, and he stated in his response summary that



the Dean of the College, the person employed to supervise live work, violated college
policy. He also said that the Dean of Fiscal Affairs had no knowledge that the tractor was
being worked on, and therefore there was no way possible that she could have had the
proper paperwork or deposit. He put the responsibility of that just where it was. He tried
to be fair about his response, but also had to be realistic. We have been weak and we are
going to become stronger.

The President suggested one of the ways we are going to become stronger is that he
wants the cabinet to have a vision of what their roles are and what they expect to do in
their areas. First, he needs know if the cabinet is getting the most and best of those they
supervise. He wants each cabinet member to ask themselves that question. He thinks
they would say no, if they are honest. When they review the job descriptions in each
area, he wants them to put that imaginary question – is this person doing what this person
is hired to do? In order for them to answer that question, they must first understand what
they want that person to do. Sometimes we find ourselves becoming upset because
something did not go right, and then they know the set of questions the President is going
to ask. He wants them to come to him with the answers before he asks the questions.
The questions will be: what did we have in place that could have prevented this? What
steps did you take to make sure this could have been avoided? When was the last time
you checked this to see if it was working? For the last few months, the President has
been talking about controls. As we go forward into the fall term, he wants to concentrate
on "how could this have been avoided?" Hank Sanders always says "turning our
struggles into opportunities, turning our negatives into positives," and that is what he
wants to do. He wants to make sure we are doing what is expected of us, and what we
understood it to be before we start. He wants us to be treated fairly and for us to
understand what is expected. He wants the employees to have clear expectations of what
they are expected to do, and he wants the feedback, let them state it back to you. Have
your employees to write back to you a memo of understanding.

The President wants the cabinet to have proof of a check and balance all through their
workday and when checking their programs. He wants them to be able to look at the
results of the check and balance. Evaluating the results is going to important, because if
it does not work one way, try another way.

Dr. Merk stated he could pass around a document that would "nail down" what the
President has been talking about, which is the Institutional Management Plan. It contains
the requirements to do those things the President suggested and then turn them in to the
Chancellor's office. The President asked him to break it down, call a meeting of the
cabinet, and talk about which roles will be assigned to each cabinet member and put it
back together. He stated that although you might be identified as the contact person, you
don't just go to your computer, pull up something and send it downtown. Dr. Merk
agreed. The President asked the cabinet to get with other members and the President,
analyze and verify the information they have before it is sent downtown.
The President stated all contracts should be completed. If anyone has any questions or
anything that flares up as a result of the contracts, the President needs to know. Dr. Merk

stated they did have a question from one part-time, ABE employee, and the issue was cleared up with the President's approval. There was a time limit in which the employee is to return the contract, and the President stated if we do not have it back within that time frame, we will notify her that she has not signed the contact and is therefore not employed. It is imperative that every person follows up on everything they start. When someone has something on their checklist that still pending, notify the person who is holding up the progress and get it completed.

The President asked Dr. Merk to tell him what type of understanding the employees were given as to when they were to return the contracts. Dr. Merk stated the contracts were to be returned within a week. The President instructed Mrs. Perryman to have her off-site employees sign and fax the contract, then mail the original.

The President also instructed that within the next three to four weeks, he needs to have the evaluations in to Dr. Merk. Dean Greene stated she has not received evaluation forms as of yet, but Dr. Merk said he would get them to her. The President stated that evaluations are meant to identify areas of weakness, as well as areas an employee is doing well. The President will remind the cabinet that they are due, but he does need them by mid-October. Dr. Merk's part will be to identify areas where he knows there are weaknesses, and it will be more of a counseling opportunity to improve. The President stated this is a priority. If an individual refuses to sign his evaluation, make sure there is a witness to the fact the evaluation was shared with the employee. The signature does not necessarily indicate the employee agrees with the evaluation, but merely that they received it.

President Chambers reminded the cabinet it is time to submit the three month tardy report, and he will need it before the end of the week, following the same system as before. He stated that he will be looking at the flex-time proposals, but will not just jump into any situation. He will have to talk to the Vice-Chancellor to make sure there is even a possibility. He will have to talk to the DOC as well. In the meantime, he expects the cabinet to adhere as closely as possible to the guidelines already in place. The President asked Dr. Merk to look at each employee's tardiness in the past, as well as just the past three months. The President stated, for the record, you cannot change a person's schedule. You can recommend that they be allowed to change their schedule temporarily, or for a week, etc.; but be very careful not to tell an employee they can have a permanent schedule change. We have to be consistent across the board. The President is very considerate of employees' needs, is conscious that emergencies occur, but has to say "what if" one employee needs a change, then a few others decide to follow suit as well. He asked the cabinet to remember that lawsuits come as a result of people being unfairly treated as compared to others. He wants the cabinet to try to be flexible with their employees, but at the same time realize they cannot make a whole lot of decisions like that. The President does appreciate the way the cabinet has dealt with some of the problem employees, some are gone but some are not. He wants us working together as a team to deal with this. We are still sharing too much administrative business with people we are supervising, and the President has proof, because employees tell the President

Cabinet Meeting
September 12, 2005
Page 4 of 6

things that he only talks to administrators about. He expects the cabinet to have
professional courtesy to know what to talk about and when to talk about it.

President Chambers wants the cabinet to have written proof of their meetings. Mrs.
Perryman has a monthly meeting, and we have proof of that. He advised Dr. Merk to
meet at least monthly until he gets comfortable with what he is doing. He advised Deans
Wilson and Greene to look over Dr. Merk's agenda to see how they might contribute to
his faculty meetings with updates, etc. He encouraged Deans Wilson and Greene to hold
monthly meetings, even if it is only to ask their departments if they are having any
problems, etc. Send a copy of the meeting announcement to the President, as Mrs.
Perryman does. If something comes up in the meeting that the President needs to know
about, he expects you to bring it to his attention immediately. All meetings are to be
documented.

There is a Diversity Conference on Sept. 14-15 in Birmingham, and a Workforce
Development meeting on Sept. 28-30 in Birmingham.

At the beginning of each month, if you have a meeting scheduled, Julie Wood needs to
know about it. At the first of each month, she prepares a calendar for the President, and
he would like for those meetings to be on there, so he can know where the cabinet
members are. The President asked Dr. Merk to personally survey each faculty member to
see whether they have plans to attend any professional development activities, have them
tell you why they feel it important for them to attend, and then Dr. Merk is to make his
decision whether they can attend (but be consistent). The President wants meetings
attended to be for program enhancement, not for personal gain.

The IRS is increasing travel reimbursement due to higher gasoline prices, and the
Chancellor will probably be sending something out on it. The President asked the cabinet
to think smarter, to try and make sure trips are being combined in order to conserve and
be efficient. Mrs. Perryman stated the State Dept. got an email that their travel was going
up on October 1st, to 48.5 cents/mile. The President is concerned that we are not taking
any precautions for energy savings. He asked the cabinet to begin turning off lights when
not in use, etc., and ask employees to help in monthly meetings. Be conscious of comp
time being accrued. He wants to have a meeting to analyze the steps we take to get our
reports in on time, and the cabinet members are to keep a log of when things are asked
for so that they will know what is keeping them from getting reports completed.

The President stated that we have to collectively deal with our live work activity. He
talked with Dr. Merk about passes, and we are going to have to revamp that process
because the passes were developed for one thing, but are being used to get around the
process. It is not fair for Monica and her staff to be held responsible for all the tricks that
are played at this institution, but it is fair that if she does not say "this is the way it is
going to be" that she be held liable. If an auditor can go out and check on something and
ask the status of it, then we can too. He has asked Dr. Merk and Dean Greene to
regularly and randomly spot check paperwork on live work projects. If they do not, then


write them up, just as if we were having an audit. The President has committed himself
in writing to the auditors that we will be tough, and will get on the right track, and he
expects for each of the cabinet members to roll up their sleeves, and remember what is
negative now does not have to be negative tomorrow. He has talked to all the members
individually.

Dr. Merk stated that the Alabama Accountability Performance Profile is something we
are going to be using next year and the year thereafter. He quoted a paragraph from the
Institutional Management Plan regarding evaluating the college performance standards,
handed a copy to each cabinet member, and discussed the way in which it is to be filled
out, used and what we can expect to gain from using the plan. The President concluded
this discussion by stating that everything follows a pattern and the information needed to
complete the profile should be readily available because it is information compiled on a
daily basis. He also stated he wanted to have a meeting to specifically discuss
completing the profile.

Dean Greene stated that the business office would be busy for the next few weeks due to
closing out the fiscal year. A representative from ACCESS will be coming to assist with
putting contracts on the new system and changing live work over to the new system. The
President directed that HR personnel be included in the training. Dean Greene stated that
it will be necessary for some business office personnel to work late a few days in order to
affect that training. She will send out memos on new procedures as they are necessary.
The Facilities Master Plan has been emailed downtown. The equipment and supply and
resale inventory will be taking place by the end of the month. The President asked Dean
Greene to try sending out an inventory list of what is supposed to be there (a self-
inventory) for each department to check what equipment is "displaced" or "additional
pieces" and Dean Greene stated that she already has a similar procedure in place. Dr.
Merk asked what instructions he should give instructors with regard to supply and resale
inventory. Dean Greene stated she will be sending out a memo with instructions and will
go over it with Dr. Merk.

The President stated he wants the four cabinet members to begin meeting once every two
weeks as sort of a "brainstorm" session to work out any issues that may come up.

Dean Greene stated that the transition car will be delivered on Wednesday. Dr. Merk
asked if the policy on use of private vehicles, state-owned vehicles, etc. was ever
completed. The President stated it needed to be completed as soon as possible. Dr. Merk
will send out an email update on where the policy is in the completion stage. The
President directed that, on employees who cannot be insured to drive state vehicles, some
type of policy is created setting guidelines that those employees will be responsible for
their own transportation without being paid mileage, or pay a fee for the college to insure
them.

Dean Greene stated that purchasing has been cut off, and spending looks good. The
President stated there will be no major purchases after January. He also directed that Dr.

Cabinet Meeting
September 12, 2005
Page 6 of 6

Merk, Mrs. Perryman and Dean Wilson check to see if there is anything they need in the way of major purchases, and if so, get it ordered before January. The President noted that Dr. Merk's role has changed and with that comes the responsibility of saying no to certain purchases. The President asked Dean Greene to create a chart comparing how much money we have this year as opposed to last year, and suggested that each of the cabinet members do the same for their department budgets.

A discuss was held regarding the sewage problem, and Dr. Merk stated that Phillip Till is completing an estimate on what it will cost to excavate the field lines and have a perk test done. The President directed that this be done in the very near future. He also mentioned having some students complete training while placing tile downstairs.

The President informed the cabinet that he had a meeting with the ladies last Friday, and informed them they will no longer be allowed to wear jeans or tennis shoes to work. This goes for male office personnel as well. Shop instructors will be allowed to continue wearing jeans. He stated the rule of thumb to use is whether or not you would be appropriately dressed to go to the Chancellor's office when you come to work.

Dean Greene stated they have gone back and added 20% on all internal jobs, due to Mr. Bradsher giving them permission to do so. The new program will automatically calculate in the 20%. The President asked Dean Greene to send him a memo saying 'based on her evaluation and consultation with the examiner, and being in line with board policies, she is recommending that we add the 20% to projects,' and he will sign it.

The President gave a word of caution regarding external contracts to Dean Wilson and Mrs. Perryman. He also requested a memo from Dr. Merk telling him he has evaluated the teaching load of all instructors and has found that all instructors have a full load based on the formula we use, therefore there will be no need for requesting equivalency for any instructor during the fall semester of 2005. The President needs this in the records and a copy needs to go to Dean Greene and the cabinet.

The President requested that the cabinet reach out to the new employees and spend a little time with them. Dr. Merk stated that the search for the welding position closed as of last Friday. Both Mr. Wade and Ms. Turner have looked at the applications, and there are several who meet the basic qualifications.

With no further business before the cabinet, the meeting adjourned.


Recorder: _____        Approved: _____
      Julie Wood                                        J. Douglas Chambers
      Administrative Assistant                          President



**23.** There have been numerous times that Mr. Chambers has raised his voice in a loud and threatening manner. I have previously documented these so I will reference the instances that were documented as ( EXAMPLE  B ) for the purposes listed here. I will attach copies of Example B.



10-7-99  Mr. Chambers had me in his office as usual telling me that I was weak because he thinks that I always want everyone to like me. I do not think that. I do think that you do not have to scream and holler all the time to make people do what you need them to do. He doesn't like my leadership style, which is totally different from his. This does not mean that I am weak because I don't rule like him. This particular day he made the statement that " I know that you are soft and all but..." he continued on about me not doing what I need to do because I was weak. This is not true. I am consistent which he is not and that makes me very strong.

11-10-99  Mr. Chambers told me that Debbie Dahl said that I was weak. I know that this statement is not true.

1-10-0  Mr. Chambers asked me the question, do you curse? I told him that was not my style. He said , " I want you to get real mad and curse." He also told me that I needed to be a "bitch"! I have been successful in doing my job by not behaving in this manner. I certainly am not perfect but I just don't cuss at employees to get my job done. This does not mean that I am soft and weak.

9-11-0  Mr. Chambers decided to move his secretary up on the salary scale. I asked Him why we couldn't do this with Mrs. Julie Givens and he said that it was because we weren't combining positions for her. He said that was the difference. Later I would have to give Mrs. Givens a ridiculous amount of combined jobs to get her any kind of increase. My department always has to jump through hoops for anything that we get!

10-27-0  Mr. Chambers called me in this day and asked me what was wrong with me? There was nothing wrong with me. He liked to do this a lot. By doing this he could shift the attention off him. He said on this day that there were people that thought I should not have my job but that was water under the bridge. This was just another one of his put-downs.

11-30-0  I was called into Mr. Chambers office. In attendance were Mr. Chambers, Dr. Huffstutler, Gene Bridgman (my assistant), and myself. Mr. Chambers said that I slowed everything down. He said that he wanted to apologize to Gene and Julie Givens because of them having to pick up the pace for me basically. He said that it would take me 4 days to do something that would take them 2. I got up to leave and said that I was not going to sit through this again. I told him that I was so tired of being subjected to this. He raised his voice at me and told me to sit down. He then mentioned the word insubordination. He talked on for a while. He said that I was reactive not proactive. In the meeting though, he would agree with anything Gene said, but he continually put me down.

Example B



# 2001

2-13-01    My trip to Oxford- Mr. Chambers said he would approve if I paid my own way because of proration but if later he could pay some he would. I was never reimbursed for any of the expenses. All other participants colleges paid their way. He just made a joke of the whole trip.

2-28-01    I received a letter from Mr. Chambers telling me to pay one of our instructors for some equipment that he was giving to the college. I had approximately 3 questions. When I told him about it not being bid, he got real mad. He raised his voice and began yelling, closed door, called Dr. Huffstutler in. He went on to say that things with my department had been building up with him. He said that he had made a bet that something would be said about this. He went on to tell me about my weaknesses. He said that he did not like the team concept that I had. I know you don't cuss but ... H e went on to talk about how I had been criticized by the instructors. He fussed for a while. I told him that I was just a cautious person and that was why I asked the questions.

*Example B*

3-21-01    Mr. Chambers called me, Gene , and Julie in and said it was not going to be a chewing out. I asked him before we went in if he just needed to talk to me because I knew that he had called them in while I was out with my sick child. He said no, that this was just about things we needed to do, etc. I have the notes from what he said.

3-21-01    I tried to get a job at one of the other technical colleges so that I could get Closer to my aging parents. I did not discuss this with him because I knew that he would not help me. Today, he called me in and said that he knew about it because the President of that college had called him. He said that he wished I would have told him so that he could have helped me. I got denial letter on 3-23-01. He could have helped me when the President called and he didn't. It appears that he doesn't want me around but he doesn't want me to be able to go anywhere else.

3-22-01    Cabinet meeting with Dr. Huff, Mrs. Perryman, Dr. Merk, Mr. Wilson, and Mr. Chambers. He berated me in front of the cabinet. He said that he had given me an ultimatum. He said that I didn't pay the bills, etc. He said lots of negative things I have the notes on this.

*Example B*

5-7-01    My mom had a very serious surgery and I had been out a week with her. She died on 5-20-01. The day that I came back Mr. Chambers was not at

*Example B*



work but he called me in Julie Givens office and put me on speaker phone. He told me to get my whole staff in there for the call. He proceeded to tell me all the things that were wrong with my department.

6-18-01   Mr. Chambers called me in his office and made some general comments about the live work program. He then said that I was being accused of being a weak business manager. He gave me no reasons for this. He just made the statement.

6-28-01   General meeting with Mr. Chambers and Dr. Huff. He keeps telling me about business manager getting fired at Trenholm. The Business Manager at Trenholm had a known alcohol problem, missed a lot of work, and had many other problems. There should not have been any comparison.

7-2-01   Mr. Chambers said that I didn't need to do an out-of-state travel request for Oxford because I couldn't be reimbursed for it.

8-27-01   Cabinet meeting about teamwork, many negative tones thrown to business office, reference to people keeping journals, etc., said this is not helping us with teamwork. After meeting, he questioned me about cutting off live work, like I shouldn't be doing this at year end.

*Example B*

9-13-01   I questioned Mr. Chambers about Mrs. Perryman's travel since everyone else's was being monitored during proration. He got really mad and said that I should get me a job somewhere else. He went on to mention jobs that Julie did, some I did, but he said that Gene Bridgman does everything.

*Example B*



I was called to a meeting with Mr. Chambers and James Wilson, (black male administrator).  Mr. Chambers said I could make many improvements in my department.  He then said he wished James and I could swap some qualities.  He said he wished I could be more irratic like James and that James could be like me in....well, you just need to be more "like" James.

**Example B** | Mr. Chambers called me and my subordinates (Gene Bridgman and Julie Givens) in and once again told me how lousy my department was right in front of them.

1-25-02 | I had been out  with my sick child the day before.  I came in to do a bid.  Rickey Huffstutler (white male administrator) and I were called into his office.  He was mad about several things and made the statement  "damn near everything is bad."  He was yelling this day about our college cell phones.  He was mad at me because I had been paying any personal calls that I had on my college phone.  He said that I was only looking out for myself.  This was not true.  I gave copies of the bills to the other administrators and him to be marked business or personal.  This is just another case where he is blaming me for something that I did not do.

**Example B** (annotation on left margin)

1-29-02 | I asked for a live work coordinator and was denied.  This position was one recommended by auditors and others, yet he still refused, trying to undermine my department.

**Example B** | 1-30-02 | Mr. Chambers made the statement, "I'm going to stay on you, so you better get used to it."

3-14-02 | There was a position open in our department and I saw several resumes on Mr. Chambers' desk for the position.  Mr. Chambers gave them to Gene Bridgman(white male assistant of mine) as if he were to decide the position.  When I questioned him about it, he said "he is just reviewing them; you can make the decision."   There was no reason for Gene to see them over me.

4-5-02 | In front of my subordinate Gene Bridgman (white male), he said "these are things you need to do, but you won't do them." (no such "things" exist, as I have complied with all his directives.

5-14-02 | Once again, a meeting with me and Gene Bridgman.  Mr. Chambers said he was "disappointed with the business office" although there is not one shred of evidence as to why he should have been disappointed.  He went on to say, "if better things don't happen, Monica will be ineffective (an obvious legal term)and if she is ineffective, she will be of no use to Gene or my department."  He continued, "Gene is doing your job, but that should free you up."  He made other degrading remarks in this meeting as well.  Of course he said I was weak and that I wanted everyone to like me.  This was not true.

**Example B** (annotation on left margin)

7-3-02 | I rebuked an employee (Jeff Prosser, white male) for a clear violation of policy and, in the presence of the instructor, took his side though I was clearly in the right.

9-6-02 | In the presence of my department, Mr. Chambers yelled at me about the Home

**Example B** (annotation on left margin)



Depot bill. The matter had already been handled, yet he wouldn't listen and berated me in front of my subordinates again. This meeting included a remark by his then supporter and white male dean of instruction, Rickey Huffstutler, that "business managers had been fired."

9-9-02    Mr. Chambers arbitrarily gave the majority of James Wilson's staff raises.

9-11-02    In an administrative cabinet meeting he once again brought up the Home Depot bill and asked others for their imput. They had actually been part of the problem which had, by the way, already been resolved. This was just another obvious attempt to undermine me.

9-12-02    A two-hour meeting resulted in the threatening comment by Mr. Chambers, "I

**Example B**

am putting you on notice concerning your job" There were no circumstances or problems in the business office that warranted anything but positive comments, much less threatening my livelihood.

9-19-02    Mr. Chambers sent Dr. Huffstutler and I a very negative and inaccurate memorandum. He sent copies to the other cabinet members which included a subordinate of mine. I have enclosed a copy of his letter and a copy of my response.

9-20-02    Mr. Chambers, Dr. Huff, Gene Bridgman and I were in a meeting. He mentioned several times a memo I had written him disputing his untrue claims about bills not being paid on time. He said, "I'm not going to get into a memo war". This is an obvious attempt to avoid a paper trail that would explain the truth about his harassing me with unfair and untrue statements.

9-22-02    I have enclosed a copy of my response to his letter on 11-19-02  In this letter I asked him to stop the personal attacks.

9-24-02    Mr. Chambers announced that he would have his secretary check all the bills before sending them to my office. This action was demeaning to me, since his secretary had no idea about our accounts payable process.

10-10-02    Larry Williard and Hal Bradsher (white male auditors) came to a meeting concerning our audit. The audit was an unqualified one. There were some ethics questions concerning he and Dr. Huffstutler. I was told there was no need for me to be there. Imagine, the business dean, the person solely in charge of the results of an audit being told she was not needed in a meeting about an audit. The issue was obviously resolved, as no ethics problem was noted. I had said that I wanted nothing said about me or my office without me being there. Mr. Chambers said nothing would be. I find it unusual that the auditors would allow this. I later would find out why they did.

10-21-02    Mr. Chambers once again called me in to berate me about accounts payable. I cannot remember exact quotes, but the tone of the meeting was extremely

**Example B**

hostile and threatening.



3-14-03   Mr. Chambers and I were meeting with Mr. Ed George, a white male lawyer. During that meeting, both men said I was going to "have to be tougher." The meeting was concerning the steps that I would need to follow to terminate a problem employee. Mr. Chambers brought up some of our disagreements in this meeting. This was not the place. Mr. George told Mr. Chambers he did need my support on this termination matter. Mr. Chambers relayed several messages in this meeting that were completely inaccurate concerning the firing of the employee. He was clearly looking for a reason how I had handled this incorrectly. Among other things, he said that I gave Carrie Hand (the employee) a raise for no reason. This is simply a false statement which was an attempt to undermine me. There were no problems which arose concerning this matter. The employee was terminated and there were no repercussions. I obviously handled it correctly. The problem is, there is great irony in two men telling me I am weak that are also telling me they aren't sure I should take the action I was taking. You can't have it both ways. I believe the "weak" comments were definitely related to my gender.

7-3-03    Mr. Chambers called me into his office along with Julie Givens and Gene Bridgman. Hal Bradsher (auditor) had talked to him about an audit matter concerning Dr. Fred Gainous. He was very mad at this meeting and he, once again, made several negative remarks about me, including alluding to my not being honest. He knows that I am an honest person and that I get very upset if that integrity is questioned. Knowing this he makes almost constant requests that I "tell the truth". I have never told him anything but the truth. On this day he looked at Gene and Julie and said for them to tell the truth. In other words he was implying that I was not telling the truth. Please note that he was not talking about any particular incident, he was just acting like I never told him the truth. He does unsubstantiated things like this quite often. I became upset and I asked him if my employees could leave because this matter was between he and I. I also knew that this encounter was making them feel uncomfortable. He refused this request. The meeting escalated. His worst comment though at the height of his yelling at me was, "you need to resign". I responded that I would not give up my career for him, especially when nothing he has accused me of is remotely true. He then replied, "when I get back from my trip, I will take you to the Chancellor." I said, "no, sir, Mr. Chambers, I will go before you get back. I did make the appointment and met with the Chancellor Then, things got worse.

Example B

23

| | |
|---|---|
| 8-1-03 | On July 31, my office received an unqualified audit report. Instead of being supportive and positive, he called Julie Givens (my administrative assistant) and me in and gave us a stern lecture about how bad things really were. This was a common practice after each good audit. These meetings were full of comments like these: " you are just fortunate that you have a 'good relationship' with the auditors"  and "you got lucky they didn't pull certain records". He never once commended us. |

Example B

| | |
|---|---|
| 8-13-03 | The Chancellor called me back to his office to discuss further the complaints I had filed with him concerning Mr. Chambers. I met with Chancellor Roy Johnson and Vice-Chancellor Debbie Dahl. I never wanted any action at all as far as disciplining him, I only made the same request at both meetings. I wanted him to stop yelling at me in meetings, stop berating me at cabinet meetings, and stop undermining my ability to do my job with his personal attacks, especially those in front of the subordinates from my department. One of the things I discussed with the Chancellor at both meetings was a claim he made that, "vendors had contacted the Chancellor's office about unpaid bills." I ask the Chancellor if that were true. They replied that they had never received any call about J.F. Ingram. It doesn't take a genius to figure out that this lie is an obvious attempt to make a case against me regardless of truth. |
| 8-22-03 | I got a memo from Mr. Chambers concerning "old bills." He continued to insist that "bills weren't being paid". Regardless of any explanation, he wrote these inaccurate memos to "make his case". |
| 8-25-03 | Terrible administrative meeting with more yelling, though I do not have record of exact quotes. After the meeting, I gave him another memo asking for him to stop attacking me. Dr. Huffstutler and Mr. Chambers had a physical confrontation out behind main building on that same day regarding a betrayal that he had commited against Dr. Huffstutler. There were witnesses to the altercation. After this date, Dr. Huffstutler seemed not to be on his "team" any more. He became the target of vicious attacks and criticism more often. I believe some of this was Dr. Huff's unwillingness to assist him in trying to get rid of me. Dr. Huffstutler and I worked very well together despite Mr. Chambers trying to make it appear to the contrary. |

Example B

| | |
|---|---|
| 8-26-03 | I was out of town on school business (ACCESS workshop). He called an Instructor (Terry Keahey) in and told him I was out to get him. This was certainly not true, but Mr. Chambers needed Keahey to not like me because of some questionable work Chambers had made Keahey do for Chancellor Fred Gainous. Mr. Keahey is a witness for me in this complaint if needed. |
| 9-9-03 | Jim Merk and I were working very hard to get some board approvals done. In the middle of this project, he pulled Merk away to go to breakfast, leaving me to complete the task, though there was much pressure from him to get this done  that day.  I still completed the task. |
| 9-10-03 | I finished the board approvals and needed his signature to complete the task in time. Without signing them, he left for a doctor's appointment. |
| 10-13-03 | Gene Bridgman met with Mr. Chambers behind closed doors. James Wilson and personnel director Jim Merk called me in for a meeting after this, instructing me to offer Josh Bridgman (Gene's son) the job as accounts |



problems were as a result of Mr. Chambers interference and especially inconsistency. I felt then and I still feel that there was no reason for this visit. It came about as a result of Mr. Chambers constant complaining about me to them. I feel this was totally unwarranted.

| | |
|---|---|
| 4-7-04 | Approximately 2:30 pm, Mr. Chambers met with the main campus ladies and said that he wasn't going to say anything else about their dress. He was mad because he said that someone had told him that the ladies were offended from his talking to them the day before. |
| 5-27-04 | Mr. Chambers yelled at me in front of Jeanna Givens and told me he "didn't like my attitude" because I told him I could not have anything to do with the political PAC because of my position with the college. He fussed very loudly at me about this for a while, as Jeanna can verify. He had wanted to give money to our state board representative Stephanie Bell and wanted me to handle the transaction and I couldn't. I t would be a job violation for me. |
| 6-30-04 | Kay Perryman went to the Chancellor, I believe at the urging of Mr. Chambers. I believe she went there to criticize me as you will see in the next article. |
| 7-26-04 | Roy Johnson (Chancellor) and Debbie Dahl (Vice-Chancellor) came to talk to Mr. Chambers and me. We talked about the Lifetech program, Special Ed, and the business office. The meeting lasted about an hour. Dr. Johnson had ideas mainly about special ed. After we finished, Mr. Chambers told them he needed to see them for about 15 minutes, but kept them for about 35 minutes. |
| 9-1-04 | I was waiting on (Jesse Perry) , a live work customer (black male who works at Alabama State University), to send his total deposit on a live work project he was having done. He had not given us the full amount. Though it is a clear policy of our institution to have the total deposit before beginning work on a project, Mr. Chambers told me to let Jeff Prosser go ahead and start the project. I have contested all along that any weaknesses in any procedures were a direct result of his not being supportive of policy. This incident verifies my claim. |
| 5-23-05 | Barbara McAnally (a consultant from Florida for the State Dept. of Education) came for a meeting regarding the monitoring of the Special Education program. I was in my office with the door closed. I heard this loud noise so I opened the door to see what it was. It was Mr. Chambers yelling at this woman. He was yelling and pounding hid fist on the table. This was around |

*Example B* (handwritten annotation pointing to 5-27-04 entry)



| | |
|---|---|
| | was very professional and I thought, sympathetic. Mr. Chambers had once again been there complaining about me. |
| 3-4-05 | On his first day back after my meeting with the Chancellor, Mr. Chambers called a meeting with me and Dr. Huffstutler. He had already waited in the parking lot that morning on my assistant Julie Givens so he could get the details of my meeting. He immediately, in the meeting, let me know that he knew "I went to the Chancellor". I told him the truth, that the Chancellor had called me down there. He always knew when I had a meeting there, and I know how. He spent the rest of the day with his henchmen (James Wilson and Jim Merk) going around like spies to get the gist of my meeting. |
| 3-23-05 | He called me in his office about the pest control contract. I began to tell him that I had already handled this, when he got mad and yelled at me that "you didn't keep me informed" and other angry words. Leigh Grogan, from the chancellor's office happened to be on campus and heard him yelling. |
| 5-24-05 | The auditors came back after a break. Mr. Chambers had them in his office early. |
| 9-23-05 | The 2003-04 audit report was released. Mr. Chambers had the worst negative response I have ever witnessed for one audit finding. He personally attacked me in this response. He put my name in this report, a report so negative that the Chancellor later sent him a memo calling it "unprofessional" and "unnecessary". |
| 9-19-05 | As if the response was not enough, I received a memo (enclosed) from him on this day referencing "weak internal controls" again. He directed me to review the live work process step by step and give him a report. He described this as "a warning to me". |
| 9-20-05 | Mr. Chambers allowed his friend (a black male) to get a work order with a $9600 deposit only 10 days before the end of the fiscal year. There was no way to complete the work before the end of the month, so the money had to sit on our books. |
| 10-06-05 | I responded to the attached letter of 9-19-05. |
| 10-10-05 | I received my first poor evaluation in 18 years in the system. I responded to this and showed very clearly that his accusations were groundless and unfounded. This response is enclosed. |
| 12-07 –05 | Carolyn (the audit manager) was in with Mr. Chambers for a long time. The door was open at first, but then he closed it. You can bet he had something he didn't want heard. |
| 1-24-06 | Mr. Chambers called an administrative meeting. In this meeting, he only discussed perceived problems in the business office. I took it for a while, then I said, "I get your point; I think you've said enough." He yelled at me and said, "don't you tell me when I've said enough." I then said, "I find it hard to believe that I'm the only person in this room that we need to discuss." No one else said a word and the focus stayed on me. He dismissed the meeting because he was still angry. |
| 1-25-06 | He sent me a memo saying "all further communication between us will be in |

Example B

Example B

25. I will list the notes that I have on the matter:

9-11-00

Mr. Chambers decided to move his secretary up on the salary scale and informed my office of this. I asked him why we couldn't do this with Mrs. Julie Givens because I had tried to recommend an increase for her. He told me that Julie couldn't get an increase because we weren't combining positions for her. He said that was the difference. Later I would have to give Mrs. Givens a ridiculous amount of combined jobs to get her any kind of increase. My department always has to jump through hoops for anything we get!

1-29-02

I asked for a live work coordinator to fill a needed position and was denied. This position was one recommended by auditors and others, yet he still refused, trying to undermine my department.

9-9-02

Mr. Chambers arbitrarily gave the majority of James Wilson's staff raises. (Example: Malcolm Montgomery, black male, previous pay of $50,587.00 raised to $57,022.00, changed salary scale also.

#26

## NEW HIRES

Tonya Allen
Black Female
9/05

Fate Bryant
White Female
1/06

Gloria Cotton
Black Female
1/05

Cherea Crayton
Black Female
9/05

Lakerri Gill
Black Female
11/04

Renee Glenn
White Female
11/04

Charles Henderson
Black Male
9/05

Richard Jordan
Black Male
9/05

Shawn Lacey
Black Male
10/04

Shawn Moore
Black Male
1/06

Jackie McDuffie
Black Female
11/04

Debra Taylor
Black Female
1/06

Chris Thomas
Black Male
9/06

Aldolhphos Traywick
Black Male
10/04

Felix Tyre
Black Male
1/06

Loran Wainwright
White Female
11/04

Mary King
Black Female
12/05

Kevin Towns
White Male
6/06

Eric Baker
Black Male
6/06

Michael Farris
White Male
7/06

LaShauna Hulett-Jones
Black Female
7/06

Barbara Harvest
Black Female
7/06

Dorothy Petty
Black Female
7/06

Carol Banks
Black Female
7/06

Robert Conway
Black Male
8/06

Leo Miller
White Male
11/06

Corey Johnson
Black Male
9/06

Tawanna Thornton
Black Female

Promotions

Stanley Carter
9/04    Rank 1A Instructor
        Acting Facility Dir. Tutwiler    $16,000 raise    $72,485
9/05    Appt. Facility Dir. Tutwiler    $25,000 raise    $81,496    *cost of*
        *Black Male*                                     85574    *Living*

Woody Chisum
9/02    Moved from Rank 2 to Rank III    $3,900    $61,622
9/03    Moved from Rank III Instructor    $5,500    $67,153
        to Rank IV without Credentials            $75,856    *cost of*
        (Not Grand fathered in)                   79651    *Living*
        *White Male*

Josh Bridgman                                    *moved*
10/03   Made retroactive to 9/03 moved            $29,535    *& came back*
        from E/3 level 5 to level 4    $ 4,000 raise    $32,897
        *White Male*

Willie Goldsmith                                 $29,538
9/04    Moved from E3/5 to E1/2    $11,200 raise    $44,817  03/04    E/12 to
        *Black Male*               b414             51231  05/06    E/11
                                                                   Grade incrse

David Milledge
9/04    Moved from Rank IB Instructor             $56,505
        to Rank IA Instructor?    $13,000 raise    $69,371
        *Black Male*                              72842

Malcolm Montgomery
9/03    Moved from Rank IA Instructor to          $50,587
        C3 Adm.                   $6,500 raise    $57,022
9/05    Moved to C2               $6,000 raise    $63,600
        *Black Male*                              72337

Colman McKeithen                                  $42,280
9/04    Moved from E2/2 E1/1    $3,800 raise      $46,027
        *Black Male*                              48789
                                                  52901

Stan Humphries                                    $44,527
9/04    Moved from E2/2 to E1/1    $3,600 raise   $47,199
        *White Male*                              49561

Gloria Knox                                       $28,788
9/04    Moved from E4/05 to E3/4    $6,494 raise  $33,285
        *Black Female*                            $35,282
                                                  41220

Rick Bonnano                                            $35,530
9/04    Moved from E1 level 2  E1 level 1    $5,200     $40,770
        *White male*                                   44019
                                                       47056

Jim Merk
7/04    Moved from C2 to C1                  $26,000    $65,990
                                                       $73,485
9/05    Moved to B- Dean's Level                       $91,520
        *White male*                                   97049
                                                       ~

Erica Turner                                            $34,783
9/05    Moved from E2 to E1                  $6,854     $41,637
        *Black female*                                 55802

Jackie McDuffie                                         $37,033
9/05 Moved from E2/3 added 5 yrs exp.        $3,812     $40,845
        *Black Female*                                 42890

Leo miller
11/06 Part time $15hr          '07  give full time ContRact #41,220
     paid for Mo of Dec  Jan '07

*IN THE AREA OF SPED MRS. PERRYMAN WAS FIRED BY DEPT OF EDUCATION
AS THE DIRECTOR OF SPED. THIS WAS EFFECTIVE OCT 1.*

*However, before leaving, she gave to each of her office tech's raises. One just happened
to be Jim Merk's daughter, Amelia Fox, the other girl was Ashley Bankston, a friend of
Mrs. Perryman's daughter.   Both of these two girls are white females.*

*After Mrs. Perryman was fired by SPED Mr. Chambers has created a position for her as
Dean of ????, whatever, we have no appointment letter to what this title is. However, she
does make $104,700, more than any other dean on our staff.*

*Hired 6/94 $42,069- Kay Perryman*

Mrs. Perryman is now Dean of Strategic Planning
NO work product. Never a position before.

Funding was to be for 1 year thru SPED.

NO longer pd thru SPED Retired JAN 1 2007

Health Related problems (Stress) (Health issues)

# 26

## RECEPTIONIST

Beth White          Main Campus    $26,540                  Date of Empl.    6/2003
*white female*
*77% OF WORK LOAD*

Gloria Knox         Draper Campus   $35,282                  Date of Empl    9/1994
*black female*
*21% OF WORK LOAD*

Jackie McDuffie  Tutwiler Campus $40,845                   Date of Empl.    11/2004
*black female*
*2% OF WORK LOAD*

## ACCOUNTS PAYABLE

Kerri Conger      Main Campus  A/P       $28,130          Date of Empl.    8/2001
*white female*
Josh Bridgman    Prior A/P                    $32,897          Date of Empl    4/2002
*white male*        *moved to maintenance no pay cut*

## ACCOUNTING ASST.

Jeanna Givens     Main Campus           Grade E 3/4     beginning salary $31,586
*took on duties for ABE consortium for postsecondary and promised a raise and never received it.*

Leigh Winslett  Prior Acct. Asst.          Grade E1/2      beginning salary $41,047
*did not have the duties of the ABE consortium*

## ACCOUNTANT

Patti Graves       Main Campus           C-1             salary    $54,500
*white female*

Gene Bridgman   Main Campus           C-2             salary    $73,786
*white male*

*Note: Mr. Chambers told Mrs. Greene she could offer Mrs.Julie Givens the accountant position, however, if she took the position she would remain on the same pay scale she was currently on. Mrs. Givens was and still is at the top of the E salary schedule. Mrs. Givens turned the offer down because she had just as much experience and education as Mr. Bridgman and felt that should have been paid the same to do the same job.*

27. I became the Dean of Fiscal Affairs in July 1995. I served one year before
that as the Interim Dean of Fiscal Affairs so I actually began doing the job
in June 1994. In July 1997, Mr. Chambers had Rickey Huffstutler (white
male) moved or transferred to J.F. Ingram from Chattahoochee Valley
Community College. He came to J.F. Ingram to assume the position of
Dean of Instruction. In past years, he had been a business manager so Mr.
Chambers was constantly having him give me advice on being a business
manager even though it was not necessary. Mr. Chambers immediately
made him 2nd in charge which pays an additional $1000.00 per year per
contract period. He never gave me the consideration for this even though I
had more years at J.F. Ingram than Dr. Huffstutler. Then in December of
that same year he named Dr. Huffstutler the Dean of the College. This
status change increased his salary approximately $5345.00 per year. By
being named the Dean of the College he was eligible to receive 110% of the
salary step that he was currently on. This resulted in the above salary
increase. I questioned Mr. Chambers about him bringing someone new in
and putting him over me and he assured me that he was not my supervisor.
He also stated that the system did not give the business deans the position
of Dean of the College but that this position was given to the Dean of
Instruction. This is not true. Any dean can be the Dean of the College, you
can check other colleges and see. As the story goes, Dr. Huffstutler was
given authority over the deans which included myself and he was paid
more money than me without going through any type of process to get the
position. (See example D)

Dr. Huffstutler took a position with the Department of Postsecondary
Education. The Dean of the College position was open again. Mr. James
Wilson became the Dean of Students in September of 1998. You will note
that I (Monica Greene-white female) was a dean before Mr. Wilson (black
male) was named a dean. Mr. Wilson was named the Dean of the College
in September 2006. I guess the excuse this time will be that Mr. Wilson
had more years at the college than me but he did not have more years as a
dean than I did. The way that he received it was done secretly too. Mr.
Chambers, Dr. Merk, Mr. Wilson and myself had very thorough budget
meetings for all the salary positions. We went over each employee in our
distinct areas. This raise for Mr. Wilson was never brought up before this
group. He was just given a contract for the 110% of his salary increase
which resulted in approximately a $10,647.00 increase. I questioned Mr.
Chambers about this not being brought out in the meeting and he said that
Mr. Wilson assured him that Dr. Merk and I were okay with it. I can't
speak for Dr. Merk, who did not have the dean experience to get the job,
but I can speak for myself and I was not okay with it. Mr. Chambers really
did not give me an answer except that he said that it was a lot of
responsibility and so I guess he was saying that he didn't think I could do
the job. Mr. Wilson also an increase of 2000.00
a year for being the 2nd in charge.



On both of these occasions, I was paid less than male employees in similar positions. On both occasions, these two men were just placed in these positions without any type of real justification.

EXAMPLE D

## INGRAM STATE TECHNICAL COLLEGE

*Ingram*
*State*
*Technical*
*College*
**ISTC**
• *Developing Responsible Citizens* •

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of Instruction

**Paul Reeder**
Dean of Students

**Monica J. Greene**
Dean of
Fiscal Affairs

## MEMORANDUM

**TO:**            All Employees

**FROM:**      J. Douglas Chambers, President

*J. Douglas Chambers*

**SUBJECT:**    Temporary Appointment

**DATE:**       December 3, 1997

     This correspondence is being provided to inform you that Dr. Rickey A. Huffstutler, Dean of Instruction, was appointed Dean of the College effective December 1, 1997. This is a temporary appointment and remains as such until further notice.

     I have complete confidence that Dr. Huffstutler will do a good job in his new expanded role and ask that each of you give him your full support. Please let me know if you have questions and/or concerns about this or any other matters of importance.

     Attached is your copy of our new organizational chart.

cc:    Dr. Rickey Huffstutler
       Mrs. Monica Greene
       Mr. Greg Wright





Shaded area indicates where administrators hold dual responsibility

Placement Officer

Counselors

Registrar

Dean of Students
REEDER

Institutional Research
& Effectiveness

Draper Center

Nature Center
REEDER

Nursing Center
WALSH

Assistant Dean

Special Education

Student Support
Services

Dean of Fiscal
Affairs

MIS
Coordinator

Cashier
Payroll

Accounting

Assistant to President
Personnel Officer
WALSH

Dean of College

President

Secretary

27.  Females holding previously male-held jobs at lesser pay:

| | | | |
|---|---|---|---|
| Bonita Owensby | Registrar | Paid: | $60,000 |
| Tim Robinson | Registrar | Paid: | $67,654 98/99 |
| | | 06/07 | $90,470 C/1 |

| | | | |
|---|---|---|---|
| Patti Graves | Senior Accountant | Paid: | $63,087 |
| Gene Bridgeman | Senior Accountant | Paid: | $73,786 |
| | | | (2003) |

Malcolm Montgomery   Director of Student Services
Paid   $72,337

Ms. Graves and Mr. Montgomery are told they are considered professional contemporaries for promotional, supervisory and educational purposes and opportunities.

However, before Ms. Graves was hired; Mrs. Greene offered Mrs. Givens or was told she could offer Mrs. Givens Mr. Bridgman's job to Mrs. Givens but with no increase in pay.
 Please note: that Mrs. Julie Givens had as much education and experience as Mr. Bridgman and with the background experience at Ingram would certainly have been the next in line for the position.



# ALABAMA
# DEPARTMENT OF
# POSTSECONDARY EDUCATION

## *Representing Alabama's Public Two-Year College System*

| STATE BOARD OF EDUCATION | Governor Bob Riley President | Randy McKinney District 1 | Betty Peters District 2 | Stephanie Bell District 3 | Ethel Hall Vice President District 4 | Ella B. Bell District 5 | David F. Byers, Jr. District 6 | Sandra Ray District 7 | Mary Jane Caylor District 8 |
|---|---|---|---|---|---|---|---|---|---|

February 10, 2004

Dr. J. Douglas Chambers, President
J. F. Ingram State Technical College
Post Office Box 220350
Deatsville, Alabama 36022

Dear President Chambers:

A peer review of the business office functions at Ingram State Technical College has been completed and the report is attached for your use. There are several recommendations made by functional area which should serve to improve operations. It appears there are an adequate number of staff in the Business Office and that these persons are desirous of a good operation. However, two issues emerged which must be addressed and corrected at your level.

First, the use of two accounting software systems causes unnecessary problems and errors and results in unnecessary staff work, late processing, and inadequate management reports. The duplicative systems waste not only staff time but college funds. It is the recommendation of the review team that ACCESS software is the better system and that complete conversion can occur within four months. Therefore, you are directed to take all necessary actions to cause this conversion to occur within this timeframe.

Second, the working relationships necessary for effective administration do not appear to be in place among personnel across the college. There appears to be a high level of mistrust throughout the organization. This impairs communication and the completion of tasks. Various administrative units and their personnel appear to have developed a silo mentality which hinders efficient operation. There appears to be no clear vision or consensus which guides decision making. It is your responsibility to foster a collegial atmosphere that encourages cooperation and communication throughout the organization. It is also your responsibility to provide the vision and consensus around the vision for the direction of the institution and for the goals which must be accomplished. You must create an atmosphere of trust and openness in order for this to occur.

DEFENDANT'S
EXHIBIT

12-Greene

Dr. J. Douglas Chambers, President
Page 2
February 10, 2004


I am available to discuss these issues further and would be willing to provide assistance should you determine it is needed. I have made my position very clear in regard to the business affairs at all colleges that adequate professional and support staffing be in place, that business operations be solid, and that the institution maintain a contingency balance.

                                        Sincerely,


                                        Roy W. Johnson
                                        Chancellor


RWJ/DD/ph

Attachment

Ingram State Technical College
Review of Business Office Functions

## PURCHASING

Strengths:

1. Requisitions are submitted to immediate supervisor for approval.

2. Requisitions are checked against budgets by Dean of Finance to ensure adequate funding.

3. Purchase orders are processed in the ACCESS system.

Weaknesses:

1. Requisitions must be approved by both the Vice President and the Dean of Finance before a purchase order number is assigned.

2. Purchase order numbers are assigned by the Dean of Finance.

3. Dean of Finance enters and prints purchase orders.

4. Purchase orders are not processed daily.

5. Purchase orders are not partially unencumbered when order is not complete.

6. Items received are not processed and distributed in a timely manner.

7. Budgets are not issued to departments in a timely manner. Fiscal year 2003-2004 budgets were not distributed until January 2004.

Recommendations:

1. The purchasing function should be reassigned to the Senior Accountant with the associated responsibility of resolving payable issues. The Senior Accountant could delegate some of these duties to a clerk.

2. Purchase orders should be processed daily.

3. Backorders should be left encumbered.

4. The distribution of deliveries should be assigned to individual on a daily basis.



DEFENDANT'S
EXHIBIT

13-Greene

2/10/2004

# PAYABLES

### Strengths:

1. All mail is opened in a single location.

2. Invoices are routed to Accounts Payable clerk daily.

3. Invoices are matched with appropriate purchase order and packing slip (which has been signed by receiving party).

4. Statements are reconciled as received.

5. Checks are processed weekly.

6. Payables are processed in the ACCESS system.

### Weaknesses:

1. Complaints were made that college invoices are routinely paid late.

2. Many times purchase orders have not been processed in ACCESS so invoices cannot be paid as received in a timely manner.

3. Instructors and staff picking up orders do not turn in paperwork to the Business office in a timely manner.

### Recommendations:

1. Purchase orders should be processed daily so paperwork will be in order for payment.

2. Instructors and staff should be educated as to the flow of paperwork and held accountable for turning in invoices and packing slips to the Business Office.

2/10/2004

# RECEIPTS

Strengths:

1. Employees responsible for cash receipts (Julie Givens and Keri Conger) appear to be knowledgeable of their duties and responsibilities.

2. Mail is opened at central location and all checks received are listed.

3. Checks are given to Ms. Green for review and safe keeping through out the day.

4. Kerri Conger (who is independent of the approval of live work projects and bank deposits) accepts payment and processes cash receipts for deposits on and payment of live work performed at the main campus.

5. Daily deposits are made if cash received exceeds $100 or checks received are over $500.

6. Julie Givens (Payroll/Cashier) makes deposits timely.

Weaknesses:

1. Julie Givens receives checks from Ms. Green, receipts checks on the Work Order Software Program, prepares deposit and makes deposit (No Separation of Duties).

2. Cash received at the Tutwiler Campus and Draper Staton Campus is receipted and deposited by same employee (No Separation of Duties however, may not be possible due to number of employees at other locations).

3. Deposit information is printed off the Work Order Program Software and given to Mr. Gene Bridgeman to be updated to the general ledger system.

4. The College has not converted this function to ACCESS software but is using a duplicative alternate software to accomplish this function.

Recommendations:

1. Checks received in mail should be given to Kerri Conger (who is currently receipting live work revenue) for cash receipting, and monies should be turned over to Julie Givens at end of day for deposit preparation and actual bank deposit.

2. Cash receipting at the Tutwiler Campus and Draper Staton Campus should be performed by someone other than the person making the deposits (if possible due to number of employees).

3

2/10/2004

3. Cash receipting should be processed on the ACCESS system which updates timely to the general ledger through a normal accounting process, therefore eliminating the increased possibility of general ledger accounting errors.

4. The College must convert all business functions to the ACCESS system, eliminating the need for the duplicative software system and any expenses involved (such as maintenance and/or consulting fees).

2/10/2004

# LIVE WORK

### Strengths:

1. All campus visitors are initially routed to the administrative office by security

2. Employees and/or visitors requesting live work must pick up estimate form and live work contact form from Business Office.

3. Live work customer must provide documentation of eligibility to have live work performed (such as student, public employee, state agency etc......).

4. Estimate form and contact form must be completed and approved by instructor.

5. Business Office makes calculations and receipts deposit (if applicable) and initializes the work order process.

6. The College uses pre-numbered work order forms, assigns other locations work orders by batch and accounts for them on a register.

7. All voided work orders are kept on file.

8. Live work estimates that exceed $50 require a 75% deposit prior to work order authorization.

9. Business Office stamps the estimate form Deposit Paid (if applicable).

10. Any parts or supplies provided by customer must be accompanied by the original invoice in order to properly calculate customer charges.

11. At project completion, the instructor completes an invoice form which is sent to the Business Office for verification and processing.

12. Business Office notifies Customer of the 30-day payment and pick up policy for completed work.

13. Ms. Green monitors the shop areas periodically to insure that live work projects are not being performed without proper approval.

14. Paid receipts are required by security in order to move any work performed through the security gate.

15. A Work Order Software Program (other than ACCESS) is used to account for all live work and live work receipting.

2/10/2004

16. The Horticulture Department uses a printed form (Horticulture Invoice) to account for items sold in the Department. Customer takes the invoice to the business office to pay and at payment a copy of the form is given to the customer to enable to pass through security with items.

**Weaknesses:**

1. College does not use receipt book for live work performed in the Barbering Department.

2. College does not use the Live Work Management Module provided by ACCESS.

**Recommendations:**

1. The Barbering Department should use a duplicating receipt book to process customer receipts for live work performed in the department. Cash receipts should be taken to the Business Office along with the receipt book at the end of each day if live work has been performed.

2. Although the Work Order Software Program currently being used by the College appears to be a good program with exceptional audit trail, there is a cost savings to the College to convert this function to ACCESS Software. The College has purchased the Live Work Module but has never used it.

2/10/2004

## FINANCIAL REPORTING/FACILITIES

**Strengths:**

1. ACCESS data files are used for all business office functions. Therefore all information is accessible in the correct file format even though the staff is not using the software for generating reports. The ACCESS payroll and accounts payable modules have been fully implemented.

2. The business office appears to have an adequate number of staff to operate efficiently according to State and Federal standards.

3. The general ledger chart of accounts is adequately detailed for total implementation with ACCESS software.

4. Budgets and financial statements have been completed and submitted as required.

**Weaknesses:**

1. Externally developed software programs (primarily for report generation) are written and maintained by an outside consultant. As a result, few management reports are printed and used. This deficiency would place administrators at a management disadvantage.

2. Purchase orders and payables are not processed in a timely fashion.

3. The organizational charts do not reflect clearly the actual chain of command. The President indicated that the Vice President was next in command, however the Dean of Fiscal Affairs apparently does not report to the Vice President. The Dean must provide more leadership to both Business Office staff and to other college managers.

4. All administrative personnel appeared to be overly contentious with little cooperation and trust existing among them.

**Recommendations:**

1. Implement all ACCESS programs immediately. Provide training on site and off site if necessary to familiarize all personnel with the capabilities of the system. Discontinue use of the externally developed software programs for report generation and use ACCESS exclusively for all processing and reporting. Work with the ACCESS Group to modify programs if necessary.

2/10/2004

2. Realign the organizational chart to reflect actual and desired duties and responsibilities. Purchasing should be reassigned to the Senior Accountant with the associated responsibility for resolving payable issues.

3. Develop a professional development strategy to ensure adequate knowledge of the operating processes and enhance cooperation among individuals in the business office.

2/10/2004

# COMPUTER SYSTEM

Strengths:

1. The "old Ingram system" has many good features. Monthly journal entries post after changing only the amounts. One program makes reconciling bank statements much easier. It was mentioned that the software consultant has met with ACCESS to incorporate some of the functions of the Ingram program into ACCESS, but ACCESS representatives stated they were too busy with other projects to incorporate these features into their program.

Weaknesses:

1. For Business Office functions, the college utilizes only the Payroll and Accounts Payable modules of the ACCESS system. Other work such as journal entries and bank reconciliation is performed in the "old Ingram system" and the results transferred to ACCESS. Mike, a consultant with Ingram, is responsible for the old system and keeps it functioning. All work done in the ACCESS system is bridged back to the old system, so that at the end of each month the totals in both systems can be matched. This dual process causes timeliness problems and can create unnecessary errors.

Recommendations:

1. The college must use one administrative software system. The duplicative efforts result in unnecessary staff work, late processing, inadequate management reports, and a waste of college resources.

2/10/2004

# BUDGET REPORTS

Strengths:

1. The "old Ingram monthly" report formats include the instructor name before each of their expenses and is a nice looking report.

2. Business Office personnel are familiar with these reports and know which ones are helpful to them.

3. Monthly reports are also being run from the ACCESS system which produce the same totals.

Weaknesses:

1. There is duplication in the reports from both systems and many reports that are not needed or used are printed and filed.

2. Ingram personnel are not familiar with the ACCESS reports. Budget managers throughout the college are disadvantaged because reports are not provided in a timely manner. ✗

Recommendations:

1. Determine the ACCESS reports that are helpful for the college and only run a limited number. For example, run the chart of accounts listing to determine if the general ledger is in balance and the budget to actual comparison to determine monthly funds remaining to be spent.

10

2/10/2004

# RESTRICTED FUNDS

Strengths:

    1.  Currently, seven restricted funds are processed in the Business Office.  AE was examined as an example of restricted accounts and a good job is being done of keeping up with the expenditures and asking for reimbursement from the state.

Weaknesses:

    1.  Jeanna Givens' time does not appear to be fully utilized.  Her primary duty is to maintain the restricted accounts and she assists in other areas of the business office as needed, such as processing leave, balancing bank statements, and helping with accounts payable.

Recommendations:

    1.  Reorganize so that Ms. Givens' position is a fully assigned position.

2/10/2004

# PAYROLL

Strengths:

1. Julie Givens processes payroll for 133 employees. She also serves as the college cashier, handles petty cash, accounts for capital assets, and serves as Mrs. Green's secretary. Julie has been with the college many years and has performed the payroll duties for the last two years. She is familiar and comfortable with the ACCESS system and said that she learned payroll on this system and never used the old Ingram system.

Weaknesses:

1. Julie prints and files all reports from the payroll and leave modules and only a limited number are necessary.

2. The ACCESS payroll contracts module is not used to create contracts for college employees. If used, this information would automatically transfer into the payroll files and eliminate the data entry in the Business Office for each employee for the following year.

3. The optional deductions number around twenty which seems excessive and causes much work to be performed by payroll in keeping up with these deductions and submitting them to the proper vendors.

4. The college does not offer direct deposit for its employees.

5. There appears to be disharmony between payroll and personnel functions.

Recommendations:

1. The Business Office should determine the essential reports necessary. The payroll department at another ACCESS college could be very helpful. This would save resources and storage space.

2. Begin using the payroll contracts module as of Fall 2004.

3. Do not begin any new payroll deductions unless a certain number of employees sign up for the deduction. Eliminate deductions which do not have a significant number of employees.

4. Implement direct deposit which is relatively easy to do and is a great employee benefit. It would result in less paperwork in the payroll function.

2/10/2004

5. Payroll and personnel functions must work closely together, so any problems between applicable employees must be resolved.

2/10/2004

# ORGANIZATIONAL STRUCTURE

Weaknesses:

1. Too many staff members report to the Dean.

2. It was not evident that the Dean provides adequate supervision of staff members.

3. The Dean should not act as the purchasing clerk.

Recommendations:

1. The positions of payroll, payables, live work, and accounting should report to the Senior Accountant.

2. A better title for Senior Accountant might be Director of Accounting.

3. Purchasing functions should be assigned to a clerk-level position.

4. the Dean must provide supervision to the Business Office and leadership college-wide.

2/10/2004

# COMMUNICATION

**Weaknesses:**

1. There appears to be numerous personality clashes between and among college staff. These were referenced to team members freely, although team members for the most part did not know Ingram staff.

2. Complaints from a cross-section of college personnel indicate a dissatisfaction with the timeliness of some business office activities, primarily purchasing and budget reports. Staff who work outside the Business Office are keeping their own program or budget records because timely information is not provided from the Business Office.

3. Complaints were made that college invoices are routinely paid late.

4. Observations by Ingram staff who work outside the Business Office are that too much work is done manually by Business Office staff.

5. Complaints were made that reimbursements for sponsored programs are processed several months in arrears.

6. Staff feel that the absence of ACCESS software management reports hinders their ability to manage well.

7. The duplication of administrative software providers wastes money and time and causes additional staff work.

8. The Business Office was said to work reactively rather than proactively. The Business Office is described as not customer friendly.

**Recommendations:**

1. The Dean should seek to improve her communication styles, both written and oral.

2. A response should be provided to the requesting party for each purchase requisition submitted to the Business Office. The response would indicate the requisition is approved or disapproved.

3. Budget communications should be made to appropriate college personnel in a timely manner. That is, the approved operating budget should be provided to all budget coordinators prior to October and monthly budget/actual reports should be provided by the 15th of the month for the preceding month.

15

2/10/2004

## OVERALL FOLLOWUP

1. DPE will monitor accounts payable for an unspecified period in order to satisfy that invoices are being processed timely.

2. DPE will monitor for an unspecified period to ensure duplicative software is phased out of use and that ACCESS is used effectively.