# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **JULIE GIVENS and** | ) | |
| **MONICA GREENE,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CV 2:06 CV852-1D** |
| | ) | |
| **DOUGLAS CHAMBERS,** | ) | |
| **Individually and in his capacity** | ) | |
| **As President of INGRAM STATE** | ) | |
| **TECHNICAL COLLEGE; JAMES** | ) | |
| **WILSON, Individually and in his** | ) | |
| **Capacity as Dean of Students of** | ) | |
| **INGRAM STATE TECHNICAL** | ) | |
| **COLLEGE** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MOTION FOR SUMMARY JUDGMENT

ATTACHMENTS TO PREVIOUSLY FILED MOTION FOR SUMMARY
JUDGMENT

# FREEDOM COURT REPORTING

Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3           NORTHERN DIVISION
 4
 5   JULIE GIVENS and MONICA )
 6   GREENE,              )
 7       Plaintiffs,   )
 8   vs.             ) CASE NUMBER:
 9   DOUGLAS CHAMBERS,      ) CV:2:06-CV-852-ID
10   Individually, and in his )
11   capacity as President of )
12   INGRAM STATE TECHNICAL  )
13   COLLEGE; JAMES WILSON,  )
14   Individually, and in his )
15   capacity as Dean of    )
16   Students of INGRAM STATE )
17   TECHNICAL COLLEGE,     )
18       Defendants.   )
19
20
21
22
23
```

Page 3

```
 1   JAMES T. MERK,       )
 2   Individually, and in his )
 3   capacity as Dean of   )
 4   Institution of Ingram  )
 5   State Technical College, )
 6       Defendants.   )
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 2

```
 1      IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3           NORTHERN DIVISION
 4
 5   BARBARA HENDRIX,       )
 6       Plaintiff,   )
 7   vs            ) CASE NUMBER:
 8   DOUGLAS CHAMBERS,      ) 2:07-CV-21-MHT
 9   Individually, and in his )
10   capacity as President of )
11   Ingram State Technical  )
12   College; JAMES WILSON,  )
13   Individually, and in his )
14   capacity as Dean of    )
15   Student and Support    )
16   Services of Ingram State )
17   Technical College;    )
18   MALCOLM MONTGOMERY,    )
19   Individually, and in his )
20   capacity as Coordinator )
21   of Student Support    )
22   Services of Ingram State )
23   Technical College; and  )
```

Page 4

```
 1      IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3           NORTHERN DIVISION
 4
 5   BONITA J. OWENSBY,    )
 6       Plaintiff,   )
 7   vs            ) CASE NUMBER:
 8   J.F. INGRAM STATE     ) 2:06-CV-796-WKW
 9   TECHNICAL COLLEGE; J.  )
10   DOUGLAS CHAMBERS,     )
11   Individually, and in his )
12   official capacity as   )
13   President of J.F. Ingram )
14   State Technical College; )
15   and JAMES WILSON,      )
16   Individually, and in his )
17   official capacity as Dean )
18   of Student and Support  )
19   Services at J.F. Ingram )
20   State Technical College, )
21       Defendants.   )
22
23      DEPOSITION OF JOHN DOUGLAS CHAMBERS
```

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

Page 5

1  In accordance with Rule 5(d) of
2  The Alabama Rules of Civil Procedure, as
3  Amended, effective May 15, 1988, I, Cindy
4  Weldon, am hereby delivering to Jim
5  Debardelaben, the original transcript of the
6  oral testimony taken on the 27th day of
7  June, 2007, along with exhibits.
8  Please be advised that this is the
9  same and not retained by the Court Reporter,
10 nor filed with the Court.
11
12  STIPULATIONS
13  IT IS STIPULATED AND AGREED, by
14 and between the parties through their
15 respective counsel, that the deposition of
16 JOHN DOUGLAS CHAMBERS, may be taken before
17 Cindy Weldon, Certified Shorthand Reporter,
18 Commissioner and Notary Public, at the
19 office of Jim Debardelaben, 1505 Madison
20 Avenue, Montgomery, Alabama, on June the
21 27th, 2007 at 9:30 a.m.
22  IT IS FURTHER STIPULATED AND
23 AGREED that it shall not be necessary for

Page 6

1  any objections to be made by counsel to any
2  questions, except as to form or leading
3  questions, and that counsel for the parties
4  may make objections and assign grounds at
5  the time of trial, or at the time said
6  deposition is offered in evidence, or prior
7  thereto.
8  IT IS FURTHER STIPULATED AND
9  AGREED that notice of filing of the
10 deposition by the Commissioner is waived.
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 7

1  APPEARANCES
2
3  FOR THE PLAINTIFF:
4  MR. JIM DEBARDELABEN
5  1505 MADISON AVENUE
6  MONTGOMERY, ALABAMA 36107
7
8  FOR THE DEFENDANT:
9  MR. ANDREW W. CHRISTMAN
10  GIDIERE, HINTON, HERNDON & CHRISTMAN
11  60 COMMERCE STREET, SUITE 904
12  MONTGOMERY, ALABAMA 36104
13
14  ALSO PRESENT:
15  MS. JULIE GIVENS
16  MS. MONICA GREENE
17  MS. BARBARA HENDRIX
18
19
20
21
22
23

Page 8

1  INDEX
2
3  EXAMINATION BY:    PAGE
4  MR. DEBARDELABEN    10, 231
5  MR. CHAMBERS    196
6
7  EXHIBITS
8  PAGE
9  PLAINTIFF'S EXHIBIT NO. 1    35
10  PLAINTIFF'S EXHIBIT NO. 2    36
11  PLAINTIFF'S EXHIBIT NO. 3    39
12  PLAINTIFF'S EXHIBIT NO. 4    43
13  PLAINTIFF'S EXHIBIT NO. 5    51
14  PLAINTIFF'S EXHIBIT NO. 6    52
15  PLAINTIFF'S EXHIBIT NO. 7    56
16  PLAINTIFF'S EXHIBIT NO. 8    71
17  PLAINTIFF'S EXHIBIT NO. 9    78
18  PLAINTIFF'S EXHIBIT NO. 10 - 16    93
19  PLAINTIFF'S EXHIBIT NO. 17    97
20  PLAINTIFF'S EXHIBIT NO. 18    106
21  PLAINTIFF'S EXHIBIT NO. 19    113
22  PLAINTIFF'S EXHIBIT NO. 20    116
23  PLAINTIFF'S EXHIBIT NO. 21    129

2  (Pages 5 to 8)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 9

1    PLAINTIFF'S EXHIBIT NO. 22        137
2    PLAINTIFF'S EXHIBIT NO. 23        145
3    PLAINTIFF'S EXHIBIT NO. 24        145
4    PLAINTIFF'S EXHIBIT NO. 25        233
5    PLAINTIFF'S EXHIBIT NO. 26        234
6    PLAINTIFF'S EXHIBIT NO. 27        236
7    PLAINTIFF'S EXHIBIT NO. 28        236
8    PLAINTIFF'S EXHIBIT NO. 29        237
9    PLAINTIFF'S EXHIBIT NO. 30        238
10   PLAINTIFF'S EXHIBIT NO. 31        239
11   PLAINTIFF'S EXHIBIT NO. 32        239
12   PLAINTIFF'S EXHIBIT NO. 33        239
13   PLAINTIFF'S EXHIBIT NO. 34        242
14   PLAINTIFF'S EXHIBIT NO. 35        243
15   PLAINTIFF'S EXHIBIT NO. 36        243
16   PLAINTIFF'S EXHIBIT NO. 37 - 38   261
17   PLAINTIFF'S EXHIBIT NO. 39        262
18   PLAINTIFF'S EXHIBIT NO. 40        269
19
20
21
22
23

Page 10

1           JOHN DOUGLAS CHAMBERS,
2       after first being duly sworn, testified
3               as follows:
4    EXAMINATION BY MR. DEBARDELABEN:
5           THE COURT REPORTER:  Usual
6    stipulations?
7           MR. CHRISTMAN:  That's fine.
8           MR. DEBARDELABEN:  Yes.
9       Q.  Mr. Chambers, I'm Jim
10   Debardelaben.  I represent Ms. Monica
11   Greene, Ms. Julie Givens, Ms. Barbara
12   Hendrix and Ms. Bonita Owensby.
13          Now, what we've done here, your
14   lawyer and I have agreed to take one
15   deposition for all three suits.  That saves
16   you time, saves the State money, saves the
17   clients money and saves the lawyers' time.
18          This is a Federal deposition.  You
19   have the right to read and sign to see if
20   the court reporter took down what you said
21   correctly or you can waive reading and
22   signing.
23          You can't change your answer.  You

Page 11

1    can just correct something that you thought
2    she took down incorrectly and she goes back
3    to the transcript and the tape to check it.
4           So you might want to talk to your
5    lawyer to see if you want to read or sign or
6    waive reading and signing.
7           MR. CHRISTMAN:  That's up to you.
8       A.  I would like to read and sign.
9       Q.  Okay.  And she needs to hear you
10   more than me or Mr. Christman because she's
11   taking it down.  One thing we all do, I do,
12   Drew does, everybody does uh-huh and
13   huh-uh.
14          We don't want her -- If you can
15   remember, try to do yes or no.  But we all
16   do the others.  But we try to remind you.
17   Would you state your name, please, sir.
18      A.  John Douglas Chambers.
19      Q.  And what is your address?
20      A.  1743 Pebble Creek Drive,
21   Prattville, Alabama 36066.
22      Q.  How are you employed?
23      A.  I'm employed by the Alabama

Page 12

1    College System as president of J.F. Ingram
2    State Technical College.
3       Q.  Okay.  And when did you become
4    president of J.F. Ingram State Technical
5    College?
6       A.  About ten years ago.
7       Q.  1996?
8       A.  I've been there about ten years,
9    yes.  It may be going on eleven.
10      Q.  Let's go through your -- Let me
11   ask you this question.  Are you married?
12      A.  No.
13      Q.  Do you have any children?
14      A.  Yes.
15      Q.  Do you have any children in the
16   Middle District of Alabama which is
17   basically Autauga and Elmore County,
18   Montgomery south and basically to the east
19   of I-85?
20          MR. CHRISTMAN:  65.
21      Q.  65.  Do you have any relatives in
22   that area?  And it goes over to Lee County.
23      A.  Yes, I have some in Lee County.

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 13

1    Q.  Please give me their names,
2  please, sir.
3    A.  It's a lot of them.  It's the
4  Sparks family, the Johnson families in
5  Smith, Alabama.  I mean, it's quite a few.
6  My mother's --
7    Q.  Just give me the last names of
8  your kin people.
9    A.  Chambers.  And my daughter's name
10  is Contraman.
11    Q.  And you're kin to the Sparks'
12  family?
13    A.  Yes.
14    Q.  The Jackson family?
15    A.  Johnson.
16    Q.  Johnson.  Of course, the
17  Chambers.  And your daughter's married -- is
18  it Contraman or Countryman?
19    A.  Contraman.  But it's Contraman.
20  It's one word.
21    Q.  Any other family names?
22    A.  No.
23    Q.  And that's mostly in Lee County?

Page 14

1    A.  Yes.
2    Q.  Okay.  Where does your ex-wife
3  live?
4    A.  Columbus, Georgia.
5    Q.  She's not in Alabama.  Give me
6  your educational background starting with
7  graduating from high school.
8    A.  I graduated from South Girard High
9  School in Phenix City.  I attended Tuskegee
10  then Institute, now University.  I received
11  a B.S. degree in sociology with a minor in
12  psychology.
13    Q.  When did you receive that degree?
14    A.  '71.
15    Q.  When did you graduate from high
16  school?
17    A.  In '67.  And I did further study
18  at Auburn University toward a doctorate
19  degree.  I received a master's degree from
20  Tuskegee in 1972.
21    Q.  What did you get your master's in?
22    A.  Student personnel services.
23    Q.  And you said you did some study at

Page 15

1  Auburn University?
2    A.  Yes, sir.
3    Q.  What study did you do at Auburn?
4  Is that Auburn University in Auburn or AUM
5  in Montgomery?
6    A.  Auburn University in Auburn.
7    Q.  What did you study over there?
8    A.  I was following a doctorate degree
9  in counseling education.
10    Q.  When did you do that?
11    A.  In the time period around '74,
12  '75.
13    Q.  How many courses did you take?
14    A.  Four.
15    Q.  You haven't taken any courses
16  since 1975?
17    A.  That's right.
18    Q.  And isn't it usually approximately
19  a ten year period you have to finish the
20  course of study in?
21    A.  I'm not sure.
22    Q.  Do you have any other educational
23  degrees?

Page 16

1    A.  No.
2    Q.  Do you have any other degrees?
3    A.  Yes.
4    Q.  What are they?
5    A.  I have an honorary doctorate from
6  West Alabama, a doctorate of laws.
7    Q.  How did you get an honorary
8  doctorate from West Alabama, a doctorate of
9  laws?
10    A.  They said an honorary.  And it was
11  bestowed upon you for your services or
12  outstanding services that you do and --
13  whether it's community, political or
14  whatever.  That's the typical way you get an
15  honorary doctorate.  I've been offered
16  several honorary doctorates.
17    Q.  Where is West Alabama located?
18    A.  In Livingston.
19    Q.  Livingston.  What did you do for
20  West Alabama for them to confer an honorary
21  doctorate to you?
22    A.  They didn't do anything.
23    Q.  What does it mean when you get

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 17

1  something that says an honorary doctorate?
2      A.  It means several things. But it
3  was told -- It was told to me in my career
4  that it means that someone is recognizing
5  you for your contribution that you have
6  contributed, and whether it's in education
7  or community or otherwise.
8      Q.  When was that bestowed upon you?
9      A.  About two years ago.
10      Q.  Two years ago?
11      A.  Yes.
12      Q.  It doesn't affect your educational
13  level, does it?
14      A.  No.
15      Q.  It doesn't affect your pay grade,
16  does it?
17      A.  No.
18      Q.  It has no monetary benefit, does
19  it?
20      A.  No.
21      Q.  Let's go through your employment
22  history. What was your first job you
23  remember having?

Page 18

1      A.  After college?
2      Q.  Yes, sir.
3      A.  I was employed in Columbus,
4  Georgia as a case worker with the Muskogee
5  County Family Children Services.
6      Q.  And when was that?
7      A.  In 1972.
8      Q.  How long did you work as a case
9  worker for Muskogee?
10      A.  For four months.
11      Q.  Why did you leave that job?
12      A.  To enroll in graduate school.
13      Q.  Okay. Did you have a job while
14  you were in graduate school?
15      A.  Yes.
16      Q.  What was that?
17      A.  As a counselor.
18      Q.  For who?
19      A.  For the University.
20      Q.  Tuskegee University?
21      A.  Yes.
22      Q.  And how long were you a counselor
23  for Tuskegee University?

Page 19

1      A.  A year.
2      Q.  When you say counselor, what do
3  you mean because there's various --
4      A.  I was serving as a graduate intern
5  and I served as a counselor. And I was an
6  overseer of one of the dormitories, men
7  dormitories.
8      Q.  What did you do as the counselor
9  or as a counselor?
10      A.  Well, I was a supervisor over a
11  dormitory and I served as a counselor and I
12  dealt with student problems.
13      Q.  So you did this at the dormitory?
14      A.  Yes.
15      Q.  After you got your master's degree
16  from Tuskegee in 1972, what was your next
17  employment?
18      A.  I was employed by Tuskegee.
19      Q.  In what position?
20      A.  As a recruiter in the admission's
21  office.
22      Q.  How long were you employed by
23  Tuskegee as a recruiter in the admission's

Page 20

1  office?
2      A.  For about eighteen months.
3      Q.  That was '72, '73?
4      A.  Yes.
5      Q.  What was your next position?
6      A.  I left Tuskegee to accept a
7  position at Columbus College, now Columbus
8  State University in Columbus, Georgia.
9      Q.  What was that position?
10      A.  I was a program director for
11  continuing education.
12      Q.  How long did you hold that
13  position?
14      A.  For about a year and a half.
15      Q.  So from '73 to '75?
16      A.  Up to '75. Because in '75, I took
17  a new position.
18      Q.  What position did you take in '75?
19      A.  July of '75, I started working at
20  Chattahoochee Valley Community College.
21      Q.  Tell me about going to work at the
22  Chattahoochee Valley Community College. How
23  did you find out about that position?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1    A.   By an announcement that they -- it
2   was a start-up institution. They were
3   announcing new positions that would be
4   available.
5    Q.   Where is Chattahoochee Valley
6   located?
7    A.   Phenix City.
8    Q.   Did you apply for that job?
9    A.   Yes, I did.
10   Q.   Go through an application process?
11   A.   Yes.
12   Q.   Who did you interview?
13   A.   Who did I interview?
14   Q.   Yes, sir. Do you remember?
15   A.   A Dr. John, Dr. Ralph Savage and
16  the dean then, Mr. Noem Shubert.
17   Q.   And what position did you get for
18  Chattahoochee Valley?
19   A.   I was hired as a counselor.
20   Q.   What were your duties?
21   A.   I worked in student personnel.
22  And my duties were to serve as a counselor
23  for the students.

Page 22

1    Q.   Help the students with problems?
2    A.   Yes.
3    Q.   How long did you hold that
4   position?
5    A.   I was there for eighteen years.
6   But I held that position for about three or
7   four years.
8    Q.   What was your next position at
9   Chattahoochee Valley?
10   A.   I was assistant Dean of Students.
11   Q.   How did you get the assistant Dean
12  of Students?
13   A.   They created a position and I
14  applied for it and I was selected.
15   Q.   So you made application, you
16  competed for it?
17   A.   No. I made an application. At
18  that time, they did not have positions and
19  they were creating positions as they went
20  along in building the college. It was --
21  The college started in 1974. And so we did
22  a lot of multi -- while I was a counselor, I
23  was also a part-time instructor.

Page 23

1    Q.   But to become assistant Dean of
2   Students, you filled out an application?
3    A.   I can't recall filling out an
4   application.
5    Q.   Okay. Who appointed you as
6   assistant Dean of Students?
7    A.   The Dean of Students.
8    Q.   The Dean of Students. I thought
9   the president was the one that made those
10  selections?
11   A.   Well, he did eventually. But I
12  was recommended by the Dean of Students.
13   Q.   Who was that?
14   A.   Who was the Dean of Students?
15   Q.   Yes, sir.
16   A.   Noem Shubert.
17   Q.   How long were you assistant Dean
18  of Students?
19   A.   Probably about three or four
20  years.
21   Q.   Is that 1982, '83, until then?
22   A.   I can't be exact. But it was
23  about three or four years.

Page 24

1    Q.   After you were assistant Dean of
2   Students, what was your next position?
3    A.   I became the Dean of Students.
4    Q.   How did you get that position?
5    A.   I was appointed by the president
6   at the retirement of the Dean of Students.
7    Q.   Did you fill out an application or
8   was it just appointed?
9    A.   Appointed.
10   Q.   And when was that, if you
11  remember?
12   A.   I can't recall the exact date.
13   Q.   Let's see. If you went there in
14  '75 as a counselor and you had that three
15  or four years, that was '78, '79. Then you
16  were assistant Dean of Students three or
17  four years. That would be '81, '82. And
18  how long -- So was this in the early '80's,
19  mid '80's?
20   A.   I would think it was around that
21  time. I cannot be exact. I have it in my
22  records. But I cannot be exact.
23   Q.   What was your next position?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 25

1    A.  From Dean of Students?
2    **Q.  Yes, sir.**
3    A.  Interim president at J.F. Ingram.
4    **Q.  How did you get to interim**
5    **president at J.F. Ingram?**
6    A.  I was asked by the Chancellor to
7    go to that institution and serve as interim
8    president.
9    **Q.  And when was that?**
10   A.  I want to say 1996.
11   **Q.  Dr. Gainus was the Chancellor**
12   **then?**
13   A.  Yes.
14   **Q.  Now, interim president, you were**
15   **just appointed by -- as an interim basis**
16   **until they filled the slot; correct?**
17   A.  Right.
18   **Q.  Did you make application to be**
19   **president?**
20   A.  Not the first time, no.
21   **Q.  How long were you interim**
22   **president?**
23   A.  I think about six months.

Page 26

1    **Q.  I find it interesting.  You said**
2    **you didn't make application the first time.**
3    **What do you mean the first time?**
4    A.  When they advertised for the
5    position, I did not make an application for
6    the position.
7    **Q.  Okay.  And when was that, when you**
8    **were interim president?**
9    A.  When I was interim president, yes.
10   **Q.  Did they subsequently not fill the**
11   **position?**
12   A.  That's right.
13   **Q.  They re-advertised?**
14   A.  Yes.
15   **Q.  Did you make an application when**
16   **it was re-advertised?**
17   A.  Yes.
18   **Q.  Were you still serving as interim**
19   **president?**
20   A.  No.
21   **Q.  Okay.  After you were interim**
22   **president, where did you go?**
23   A.  Back to Chattahoochee Valley.

Page 27

1    **Q.  As what position?**
2    A.  As the Dean of Students.
3    **Q.  How long did you stay there as the**
4    **Dean of Students when you went back?**
5    A.  For about a a month and a half.
6    **Q.  When did you make application to**
7    **become president of J.F. Ingram?**
8    A.  I can't give you the exact date.
9    But it was during the few months before '96,
10   before I was appointed and recommended to
11   the Board.  I came in '96.  So it was a few
12   months before that when the application
13   process had started.
14   **Q.  What caused you to make the**
15   **application for president the second time**
16   **and not the first time?**
17   A.  Well, the first time, I was not
18   sure I wanted to stay there.  The second
19   time, I decided I wanted to stay there.  So
20   I made an application.
21   **Q.  Okay.  The State Board of**
22   **Education appoints you or the Chancellor?**
23   A.  The Chancellor makes the

Page 28

1    recommendation after you complete the
2    process.  Then he makes a recommendation to
3    the Board for Board approval.
4    **Q.  When you were appointed as**
5    **president, was Ms. Monica Greene the Dean of**
6    **Fiscal?**
7    A.  Yes.
8    **Q.  Looking at some of the letterhead,**
9    **it appears to show at the present time y'all**
10   **have Mr. -- excuse me -- Dr. Merk as a**
11   **dean.  I think he's -- what's he dean of?**
12   A.  Dean of Instruction.
13   **Q.  Okay.  You have Mr. Bill Wilson as**
14   **the Dean of Students and Support Services, I**
15   **guess.  And he's also college -- Dean of the**
16   **College now, isn't he?**
17   A.  Yes.
18   **Q.  So he holds two positions?**
19   A.  Yes.
20   **Q.  And you have Ms. Monica J. Greene**
21   **as Dean of Fiscal affairs.  Is that all your**
22   **deans?**
23   A.  Yes.

7  (Pages 25 to 28)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 29

1    Q.  And the only person that's the
2  dean now that was a dean when you came on
3  board is Ms. Greene; is that correct?
4    A.  That's correct.
5    Q.  And all the other deans, you have
6  appointed?
7    A.  That's right.
8    Q.  Okay.  But she's a hold over from
9  Dr. Gregg's presidency?
10   A.  Yes.
11   Q.  And at the present time, Ms.
12 Greene is the only female dean?
13   A.  Yes.
14   Q.  In your position as president, are
15 you her supervising official?
16   A.  Yes.
17   Q.  Nobody else supervises her except
18 you?
19   A.  The Dean of the College has the
20 authority as Dean of the College to act as
21 second in command.  So there are times that
22 the Dean of the College is in charge of the
23 institution.

Page 30

1    Q.  And that's when you're gone?
2    A.  That's when he's playing the role
3  of second in command.  But as Dean of the
4  College, he's equivalent to a
5  vice-president.
6    Q.  But under the structure of the
7  college, he has no direct authority over the
8  other deans if you're on campus, does he?
9    A.  Yes, he does.
10   Q.  Okay.  So would the structure be
11 you up top as president, it comes down to
12 the Dean of the College, and then under the
13 Dean of the College, would it be the other
14 deans?
15   A.  Well, that's not the way we have
16 it structured.  But theoretically, yes.
17   Q.  How do you have it structured?
18   A.  With all the deans being on an
19 equal level.
20   Q.  Oh, okay.
21   A.  And in some cases, we have two
22 blocks with the dean filling two blocks.
23   Q.  I want to show you what has been

Page 31

1  presented to me to be the J.F. Ingram State
2  Technical College manual.  I'll let you look
3  at it.
4    And this has been introduced
5  before as a Plaintiff's exhibit.  I think we
6  introduced it as Plaintiff's Exhibit 1 to
7  Mr. Merk's deposition.  Is that the present
8  policies and procedures manual for Ingram?
9    A.  I can't tell you whether that's
10 the present one or not.  But I can tell you
11 from the cover that it is one.
12   Q.  Okay.  Has Ingram updated its
13 policies and procedures manual since 2002?
14   A.  We have been -- We've received
15 policies that has been passed on to the
16 appropriate people who work on the policy.
17 Now, whether they've been implemented or
18 not, I can't say.  Whether they've been
19 included in the manual, I cannot say.
20   Q.  Mr. Chambers, whose responsibility
21 is it to see that policies and procedures
22 are included in the manual?
23   A.  It's mine.

Page 32

1    Q.  It's yours.  What procedure do you
2  follow to see that updated policies and
3  procedures are included in the manual?
4    A.  When we come up with a new policy
5  or I receive a policy mandate from the
6  Chancellor's office, I send a copy to all
7  deans and I ask one -- and for the official
8  files and ask them to update policies and to
9  remove the old policies.  That's a standard
10 procedure.
11   Q.  Okay.  So all deans should get a
12 copy?
13   A.  Yes.
14   Q.  And there is -- Could we use the
15 word a master policies and procedures
16 manual?
17   A.  That's usually kept in the office
18 of the Dean of Instruction.
19   Q.  And that would be at this time Dr.
20 Merk?
21   A.  Yes.
22   Q.  Okay.  Should something that's
23 been adopted in 1998 be reflected if it's a

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 33

1  policy and procedure in the 2002 manual?
2       MR. CHRISTMAN: Object to the
3  form. The question is vague. Answer if you
4  know what he's talking about.
5       A. Well, I don't know what you're
6  talking about.
7       Q. If there was a rule or regulation
8  or a policy adopted in 1998 at Ingram, that
9  should be reflected in the 2002 policies and
10  procedure manual, shouldn't it?
11       A. I would think so.
12       Q. Thank you. Now, what is the
13  purpose of annual evaluations?
14       A. To serve as a tool to examine the
15  work of an employee.
16       Q. Now, are they supposed to be
17  accurate?
18       A. To the best of your ability.
19       Q. And are they supposed to be able
20  to be relied on by the employee?
21       A. I'm not sure I understand your
22  question.
23       Q. Well, if you evaluate an employee,

Page 34

1  should the employee be able to look at their
2  annual evaluation to see how they are doing?
3       A. Yes.
4       Q. What training is an employee given
5  to be able to fill out an annual evaluation?
6       A. We have a policy manual that we're
7  governed to follow by.
8       Q. Who adopted that policy manual?
9  Is this the policy manual we're talking
10  about, Plaintiff's Exhibit 1?
11       A. No. The Alabama State Board of
12  Education policy manual.
13       Q. So y'all have to follow the
14  Alabama State Board of Education policy
15  manual. It's not something that J.F. Ingram
16  makes to follow; is that correct?
17       A. That's right.
18       Q. And that means that -- Is that in
19  an effort to make all the -- maybe you don't
20  know the answer to this question -- to make
21  all the evaluations in the entire system to
22  be alike?
23       A. I can't -- I don't know.

Page 35

1       Q. You don't know. I want to show
2  you what I have marked as Plaintiff's No. 1
3  to your deposition.
4       (Whereupon, Plaintiff's Exhibit
5  No. 1 was marked for identification and
6  attached to the original transcript.)
7       Q. I'll ask if you recognize that
8  document?
9       MR. CHRISTMAN: Before you
10  continue, Jim, when you gave him the
11  policies and procedure manual, this was
12  Exhibit 1 to somebody elses deposition.
13       MR. DEBARDELABEN: To Dr. Merk's
14  deposition.
15       MR. CHRISTMAN: You did not intend
16  that to be Exhibit 1 to this deposition?
17       MR. DEBARDELABEN: No. I referred
18  to it as Exhibit 1 to Dr. Merk's deposition.
19       Q. Can you identify Plaintiff's
20  Exhibit 1?
21       A. Can I identify the plaintiff?
22       Q. Can you identify that exhibit?
23  What is this?

Page 36

1       A. Yes. This is an evaluation on Ms.
2  Monica Greene.
3       Q. And what year is it?
4       A. 1996.
5       Q. And who signed that evaluation as
6  the evaluator?
7       A. I did.
8       Q. What did you put in the comments?
9       A. Excellent. Very caring person.
10       Q. Okay. Did she completely meet
11  standards?
12       A. At that particular time, yes.
13       Q. Okay. And that's 1996?
14       A. Yes.
15       Q. Okay.
16       (Whereupon, Plaintiff's Exhibit
17  No. 2 was marked for identification and
18  attached to the original transcript.)
19       Q. Show you what I have marked as
20  Plaintiff's Exhibit 2. Can you identify
21  that document for me?
22       A. Yes.
23       Q. What is that document?

9 (Pages 33 to 36)

# FREEDOM COURT REPORTING

Page 37

1  A.  An evaluation for Ms. Monica
2  Greene.
3  **Q.  What is the date of that document?**
4  A.  August 28th, 1997.
5  MR. CHRISTMAN:  Talking about the
6  date on the front?  It's dated on the front
7  and the back.
8  MR. DEBARDELABEN:  Right.  I'm
9  going to ask him both dates.
10  **Q.  And who signed that document?**
11  A.  I did.
12  **Q.  What date did you sign that**
13  **document?**
14  A.  On September the 2nd, '97.
15  **Q.  And what was your title at that**
16  **time?**
17  A.  President or -- interim or
18  president. I'm not really sure.
19  **Q.  How did you sign that document?**
20  A.  President.
21  **Q.  Okay.  Now, what was her overall**
22  **performance appraisal?**
23  A.  Outstanding, excellent

Page 38

1  performance.
2  **Q.  And what were the comments?**
3  A.  You mean you want me to read
4  them?
5  **Q.  Yes, sir.**
6  A.  Employee is very friendly and
7  works well with others.  She could improve
8  on her self-confidence when dealing with her
9  workers.  Tends to allow others to attach
10  her when she is in charge.
11  That's supposed to be attack her.
12  Her knowledge is most valuable to the
13  college.  She is an outstanding review.
14  **Q.  Did you go over this appraisal**
15  **with Ms. Greene?**
16  A.  I can't recall.  But I normally
17  do.
18  **Q.  I noticed she signed the 1996**
19  **appraisal on 9-20 of '96.  And I noticed**
20  **there is no signature on the 1997**
21  **appraisal.  Do you know why?**
22  A.  No, I don't.
23  **Q.  Have you ever made an appraisal**

Page 39

1  **and not gone over them with your deans?**
2  A.  I can't recall.
3  (Whereupon, Plaintiff's Exhibit
4  No. 3 was marked for identification and
5  attached to the original transcript.)
6  **Q.  Show you what I have marked as**
7  **Exhibit No. 3 and ask you if you can**
8  **identify that?**
9  A.  Yes.  This is an evaluation for
10  Ms. Monica Greene.
11  **Q.  And for what year is that?**
12  A.  The date is July 15, 1998.
13  MR. CHRISTMAN:  The date on the
14  front again is what we're talking about;
15  right?
16  MR. DEBARDELABEN:  Yes.
17  **Q.  And what was her overall rating**
18  **there?**
19  A.  Two, which is very good.  Above
20  average.
21  **Q.  What did you say about Ms. Greene**
22  **in the comments?**
23  A.  I said employee continues to

Page 40

1  develop good leadership skills.  Tends to
2  get down when confronted by other workers.
3  She continues to grow stronger each day.
4  Very knowledgeable on the business area --
5  in the business area.
6  **Q.  And she signed that document on --**
7  **apparently on August the 5th, '98, didn't**
8  **she?**
9  A.  That's right.
10  **Q.  And you signed it on 7-27-98?**
11  A.  Yes.
12  **Q.  And on the front, you checked her**
13  **-- What's this with comment, provides**
14  **effective leadership in areas of primary**
15  **responsibility?  What is meant by this**
16  **comment?**
17  A.  This is -- This supports the
18  comments that we have on the back.
19  **Q.  Is that -- When you have with**
20  **comment, what does that mean?**
21  A.  That means that number one, if
22  it's checked with comment, it's included in
23  the comment statement that I would make on

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 41

1    the back.
2        Q.  Oh, okay.  So with comment is not
3    necessarily negative?
4        A.  No.
5        Q.  Okay.  Mr. Chambers, is there a
6    requirement in the Alabama College System
7    for a yearly evaluation?
8        A.  Yes.
9        Q.  Where do you put somebody's
10   evaluation when it's done?  Where is it
11   kept?
12       A.  Where do I keep my copies?  I keep
13   a copy in my office and a copy is turned
14   over to personnel.
15       Q.  Is it required for a copy to be
16   turned over to personnel?
17       A.  No.
18       Q.  It's not required for the -- I'm
19   calling it the annual evaluation.
20   Administrative personnel evaluation.  It's
21   not required to be kept by personnel?
22       A.  From my understanding, it's only
23   to be -- I'm required to keep a copy.

Page 42

1        Q.  Okay.  So do you have a file on
2    every one that works for Ingram State
3    Technical College in your office?
4        A.  No.
5        Q.  Is there a separate file
6    maintained in your office for everyone's
7    evaluation, yearly evaluation?
8        A.  No.
9        Q.  Where would the file be
10   maintained?
11       A.  That would be in personnel and the
12   Dean of Instruction and Dr. Merk's office.
13       Q.  Now, you said in the personnel.
14   Does Dean Merk keep a separate file or is
15   that because he's also the director of
16   personnel?
17       A.  It's also because he's director of
18   personnel.
19       Q.  Okay.  So when you say Dean Merk's
20   office, you mean under his hat as director
21   of personnel?
22       A.  Yes.
23       Q.  Do you keep a copy of the yearly

Page 43

1    evaluations in your office in any way of
2    employees?
3        A.  For the deans.
4        Q.  For the deans?
5        A.  Yes.
6        Q.  Is it in a file marked for the
7    deans?
8        A.  Yes.
9        Q.  Okay.  And it's your understanding
10   it does not have to be placed in the
11   personnel file?
12       A.  It needs to be placed with the
13   personnel director.
14       Q.  Okay.  Well, the reason I asked
15   you those series of questions is I was
16   provided this by your attorney as the
17   personnel file of Ms. Monica Greene.
18       And going through it, I found '96,
19   '97 and '98 evaluations.  The next
20   evaluation I found, it is dated 2002.
21       (Whereupon, Plaintiff's Exhibit
22   No. 4 was marked for identification and
23   attached to the original transcript.)

Page 44

1        Q.  I'll mark this as Plaintiff's
2    Exhibit No. 4.  I'll ask you if you
3    recognize that document?
4        A.  Yes.
5        Q.  What is that?
6        A.  It's an evaluation of Ms. Monica
7    Greene.
8        Q.  When is it dated?
9        A.  April the 3rd, 2002.
10       Q.  And is her -- Did Ms. Greene sign
11   that document?
12       A.  No, she did not.
13       Q.  Do you know why she didn't sign
14   it?
15       A.  No, I do not.
16       Q.  You had no comments, did you?
17       A.  That's right.
18       Q.  And you found on April the 3rd,
19   2002, she met standard as is in all areas?
20       A.  That's right.
21       Q.  And that's your signature on the
22   back?
23       A.  That's right.

11  (Pages 41 to 44)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 45

1    Q.  Will you look through Ms. --
2  what's been presented to me as Ms. Monica
3  Greene's personnel file and see if you can
4  find a '99, 2000 and 2001 evaluation?
5        MR. CHRISTMAN:  For the record, I
6  will double-check our production, my
7  production of this file to you and make sure
8  -- For some reason if we have not made a
9  complete production, we will make sure you
10  get a complete copy.
11        MR. DEBARDELABEN:  Drew, it was
12  not in the file you produced either.
13        MR. CHRISTMAN:  I'm sorry?
14        MR. DEBARDELABEN:  The personnel
15  file, it was not in that personnel file
16  either.
17        MR. CHRISTMAN:  I'll take a look.
18        MR. DEBARDELABEN:  That I could
19  find.
20        MR. CHRISTMAN:  We'll find out
21  what the college has in terms of evaluations
22  and make sure -- if there are evaluations
23  that have not been produced, they will be

Page 46

1  produced immediately.
2    A.  Okay.
3    Q.  Mr. Chambers, did you see any
4  annual evaluations for '99, 2000 and 2001 in
5  the personnel file of Ms. Monica Greene?
6    A.  I was not looking -- I was looking
7  at the evaluation form.  I was not looking
8  at the date.  But I did not recall seeing
9  any.
10    Q.  Okay.  If there's any in there,
11  would you please pull them out and we'll
12  mark them.
13    A.  Go back to where I first saw
14  them.  No, I do not.
15    Q.  Okay.  Whose job is it to see that
16  the personnel files are maintained?
17    A.  Mine.
18    Q.  Would the personnel evaluations be
19  any place else besides the personnel file?
20    A.  Yes.
21    Q.  And where would that be?
22    A.  It could very well be in the
23  minutes of the cabinet meeting where I gave

Page 47

1  -- made the statement that they would not
2  be receiving an evaluation and the minutes
3  would reflect on what we needed to improve
4  on.
5    Q.  Mr. Chambers, when I started this,
6  you told me that the Alabama College System
7  required evaluations every year?
8    A.  That's true.
9    Q.  Is there -- Did you get any
10  exception from the counselor not to do the
11  evaluations?
12        MR. CHRISTMAN:  You mean the
13  Chancellor.
14    Q.  Excuse me.  The Chancellor.
15    A.  I did do evaluations.
16    Q.  You said the minutes might reflect
17  that they did not -- wasn't going to receive
18  evaluations?
19    A.  A written evaluation.
20    Q.  Does the Alabama College System
21  require a written evaluation each year?
22    A.  I'm not sure.
23    Q.  Are there rules and regulations of

Page 48

1  the Alabama College System on evaluations?
2    A.  Yes.
3    Q.  And that would be in the
4  Chancellor's office?
5    A.  I'm not clear what --
6    Q.  The rules and regulations of the
7  Alabama College System, do you maintain a
8  copy of that at Ingram State Technical
9  College?
10    A.  And the State Board policy manual,
11  yes.
12    Q.  And it's there at the school?
13    A.  Yes.
14    Q.  Any deviation from that manual --
15  strike that.  Are there provisions for the
16  deviation from the State Board of Education
17  manual?
18    A.  Yes.
19    Q.  Okay.  And any deviation you made
20  from that manual, do you have permission
21  from the Chancellor to make it?
22    A.  By the authority that's granted me
23  as president, yes.

12  (Pages 45 to 48)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 49

1     Q.  Okay.  And there is something --
2   Well, we'll just have to get those manuals.
3   But if you deviated, there's a specific
4   section in that manual that allows you to
5   deviate?
6     A.  I'm not sure I understand your
7   question.
8     Q.  If you deviate from the State
9   Board of Education manual, is there a
10  specific section in that manual that allows
11  a president to deviate?
12    A.  Well, that's included in my job
13  description.  But the word deviate is not
14  used.  It's overseeing the operation of the
15  college.
16    Q.  Yes, sir.  And the State Board of
17  Education sets up certain rules to follow?
18    A.  Right.
19    Q.  Okay.
20    MR. CHRISTMAN:  In fairness,
21  before you go into your next line of
22  questioning, I do need to state for the
23  record that Mr. Debardelaben pointed out in

Page 50

1   a prior deposition that the personnel files
2   I produced for him in this litigation were
3   not certified personnel files by the
4   Department of Personnel at the college.
5     And I'm saying that for the
6   record.  To the extent there are evaluations
7   which could exist that are not part of the
8   personnel file that I produced, that's my
9   responsibility to make sure that I produce
10  complete documents to you, Jim.
11    So if there are more evaluations
12  that aren't in here -- because this is what
13  I produced to you -- you'll get them.
14    MR. DEBARDELABEN:  Yes, sir.  And
15  if you produce different material, we'll
16  probably have to redo some depositions.  I
17  mean, you know, I depended on them to be
18  complete.  And I don't know if they are
19  complete until I ask the questions.
20    And we're finding out that
21  unfortunately what appears to -- what might
22  have been produced to you --
23    MR. CHRISTMAN:  Right.

Page 51

1     MR. DEBARDELABEN:  I have no doubt
2   that their attorney produced me everything
3   that was produced to him.  And he has to
4   rely on that.  But unfortunately, we
5   apparently are finding out that what was
6   produced to you for you to produce to me was
7   not complete.
8     MR. CHRISTMAN:  I will agree for
9   you to reserve the right to question that
10  witness on any documents that were not
11  produced by my office.  They should have
12  been produced.
13    MR. CHRISTMAN:  Off the record
14  just a second.
15    (Whereupon, there was a brief
16  off-the-record discussion.)
17    (Whereupon, Plaintiff's Exhibit
18  No. 5 was marked for identification and
19  attached to the original transcript.)
20    Q.  I want to show you what I have
21  marked as Plaintiff's Exhibit No. 5 and ask
22  you to identify that document for me,
23  please, sir.

Page 52

1     A.  It's an evaluation of Ms. Monica
2   Greene.
3     Q.  And what is that overall
4   evaluation?
5     A.  Meets standards as is.
6     Q.  And what year is that?
7     A.  2003.
8     Q.  And did Ms. Greene sign that
9   evaluation?
10    A.  No, she didn't.
11    Q.  And did you sign that evaluation?
12    A.  Yes, I did.
13    Q.  And what's the date that you
14  signed it?
15    A.  March 31st '03.
16    (Whereupon, Plaintiff's Exhibit
17  No. 6 was marked for identification and
18  attached to the original transcript.)
19    Q.  I want to show you what's been
20  marked as Plaintiff's Exhibit No. 6 and ask
21  you if you can identify that?
22    A.  It's an evaluation for Ms. Monica
23  Greene.

13  (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 53

1  Q.  And what year is that?
2  A.  2004.
3  Q.  And what's the evaluation?
4  A.  Meets standard as is.
5  Q.  And what date did you sign that?
6  A.  April 1st, '04.
7  Q.  April 1st, '04?
8  A.  Yes.
9  Q.  And what's the date of the
10 evaluation?
11 A.  April 1st, '04.
12 Q.  You signed it on the same date
13 that you gave it.  And did you give it to
14 Ms. Greene?
15 A.  Yes, I did.
16 Q.  What date did she sign it?
17 A.  She didn't.  She signed it on the
18 26th.
19 Q.  How do you go about giving these
20 evaluations to your employees?
21       MR. CHRISTMAN:  Object to the
22 form.  That's vague.  You talking about in
23 this instant?

Page 54

1       MR. DEBARDELABEN:  Yes.
2  Q.  Well, generally, how do you go
3  about giving evaluations to the deans?
4  A.  I would complete the evaluation
5  and give them a copy of it and ask them to
6  read it.  And in cases where we need to talk
7  about things, we will talk about it.
8       And I will ask them to sign it,
9  informing them that their signature is
10 certifying that they received it, not that
11 they agree with it.
12 Q.  I notice -- and I don't know why
13 -- but the form on No. 5, which is the
14 2003, is different from the form on the 2004
15 evaluation.  Do you know why?
16 A.  Well, it could be because the
17 State Board was changing -- they were trying
18 to get a unified evaluation system going
19 across the State.  So we were having to
20 change our evaluation forms to include
21 several items.
22 Q.  And the 2002, it's the same form
23 as the 2003, isn't it?

Page 55

1       MR. CHRISTMAN:  Take a look at
2  them before you answer, Dr. Chambers.
3  A.  When you're saying the same form,
4  you mean the same information?
5  Q.  Yes, sir.  The form itself, not
6  what's written on it.  But the form itself
7  is the same.  And when I say written, I mean
8  by you.  But basically what's written by you
9  is the same, isn't it, on 2003 and 2002?
10      MR. CHRISTMAN:  You talking about
11 Exhibits 4 and 5.
12      MR. DEBARDELABEN:  Yes, sir.
13 Q.  But Exhibit 4 and 5 have no place
14 for the employee to sign; correct?
15 A.  That's right, sir.
16 Q.  Okay.
17      MR. CHRISTMAN:  Do you withdraw
18 your question about whether they are the
19 same or not?
20 Q.  Are they the same?  Are 4 and 5
21 the same form?
22 A.  No, they are not.
23 Q.  What's different about them?

Page 56

1  A.  Different print.
2  Q.  Okay.
3  A.  Different format.
4  Q.  Different format.  But the wording
5  on them are the same?
6  A.  Yes.
7       (Whereupon, Plaintiff's Exhibit
8  No. 7 was marked for identification and
9  attached to the original transcript.)
10 Q.  I want to show you what I have
11 marked as Plaintiff's Exhibit No. 7 and ask
12 you --
13      MR. DEBARDELABEN:  And I don't
14 have a copy of that, Drew.
15      MR. CHRISTMAN:  That's fine.
16      MR. DEBARDELABEN:  I had a copy.
17      MR. CHRISTMAN:  I've seen it.
18 Q.  I'll ask you if you know what that
19 form is?
20 A.  Yes.
21 Q.  What is that form?
22 A.  It's an evaluation for Ms. Monica
23 Greene.

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 57

1    Q. Okay. Now, let's look at this.
2  Number one, you put she meets standards as
3  is. What's the date of Plaintiff's Exhibit
4  7?
5    A. July the 14th, 2005.
6    Q. Okay.
7       MR. CHRISTMAN: You're on the
8  front page?
9       MR. DEBARDELABEN: Yes, sir.
10   Q. I want you to look at her
11 personnel file. Is that the same evaluation
12 that is in Ms. Greene's personnel file for
13 2005 dated July the 14th?
14   A. Yes.
15   Q. Okay. And I want you to look at
16 what was Defendant's Exhibit 2 to the Greene
17 deposition and see if it is the same
18 evaluation as Defendant's Exhibit 2 to
19 Greene's deposition?
20   A. Yes.
21   Q. Okay. Does the front page of
22 Defendant's Exhibit 7 appear to be the same
23 form as the front page of Defendant's

Page 58

1  Exhibit 6? On that I mean, the form page
2  and the writings on it? Are the wording the
3  same?
4    A. Yes.
5    Q. Is it, from what you can tell, the
6  same form?
7    A. Yes.
8    Q. Can you explain to me why the back
9  page is not there on Defendant's Exhibit 7
10 as it is on Defendant's Exhibit 6?
11   A. No, I cannot. Other than we put a
12 -- I attached the comments on the back.
13   Q. Does your signature appear any
14 place on Defendant's Exhibit 7?
15   A. No.
16   Q. To be an official evaluation,
17 isn't it necessary for your signature to
18 appear?
19   A. It normally appears on the second
20 page which is not here.
21   Q. Yes, sir. And you've looked at
22 the personnel file. And the second page is
23 not in her personnel file, is it?

Page 59

1    A. That's right.
2    Q. And you looked at Defendant's
3  Exhibit 2 to Ms. Greene's deposition and the
4  second page wasn't on that. Here, sir. I
5  think I took that back.
6    A. That's right.
7    Q. And your signature is not on
8  Defendant's Exhibit 2 to Ms. Greene's
9  deposition, is it?
10   A. That's right.
11   Q. Okay. Where would the complete
12 document be if there is one?
13   A. With Dr. Merk or with personnel.
14   Q. It wouldn't be in your possession
15 any place?
16   A. I can't recall. I do have a copy
17 of this.
18   Q. Did you go over this with Ms.
19 Greene?
20   A. Yes.
21   Q. Let's look at this. Number two,
22 you checked with comment, provides effective
23 leadership in areas of primary

Page 60

1  responsibility. And reading up here it
2  said, comments may either be positive or
3  negative as needed. What's your comment in
4  number two?
5    A. It's included in the attachment
6  that I have.
7    Q. Yes, sir. Will you read number
8  two comment that goes with it. Is there a
9  specific comment for number two?
10   A. There is not a specific comment.
11 The comment page is in the narrative form
12 that we put here. And it could apply to
13 more than one. It could apply to more than
14 one when you check it off.
15   Q. Now, is this comment positive or
16 negative?
17   A. Negative.
18   Q. Okay. Now, let's go to number
19 three. It says does not create problems by
20 using excessive amount of leave. Does not
21 habitually arrive late or leave early. And
22 that's meets standards; correct?
23   A. Right.

15 (Pages 57 to 60)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 61

1    Q.  Number four, works effectively
2  with employees at all levels to achieve
3  common goal.  And that's with comment.  Is
4  that a positive or a negative comment?
5    A.  It's a negative.
6    Q.  And you don't have a specific
7  comment at that.  It's just included in what
8  you attached?
9    A.  In my comments, yes.
10    Q.  Number five, maintains appropriate
11  balance between professional role and
12  personal relationships with employees.  And
13  that's a --
14    A.  A positive and a negative.
15    Q.  That's a positive and a negative?
16    A.  Yes.
17    Q.  Okay.  How is it positive?
18    A.  Because she's a very professional
19  person.
20    Q.  How is it negative?
21    A.  Well, it's stated in here about
22  that she -- I want to make sure I'm looking
23  at this.  When I said -- Some of the

Page 62

1  statements I entered, that she would never
2  refuse to do an assignment, but she rarely
3  completes them.  So that's a positive and a
4  negative.
5    Q.  Okay.  Number six, communicates
6  effectively in oral and written form.  You
7  have with comment.  Is that a positive or a
8  negative comment?
9    A.  That's a negative comment.
10    Q.  Okay.  Tell me what's negative.
11    A.  I'm having to read the entire
12  document so I can pull out -- This way, I
13  have to go back and look at it.
14      In the evaluation on the last page
15  it's stated that she must seek ways to
16  improve in her oral communication.  She must
17  also acknowledge that she has weaknesses and
18  that recognizing them is the first step
19  toward improving them.
20    Q.  Number seven, develops and
21  maintains appropriate and efficient working
22  relationships with administrators and it's
23  with comment.  Is that a negative or a

Page 63

1  positive?
2    A.  That's a negative.
3    Q.  Which administrator that she
4  doesn't have an appropriate working
5  relationship with?
6    A.  Both deans.
7    Q.  And that would be Dean Wilson and
8  Dean Merk?
9    A.  Yes.
10    Q.  What's inappropriate about her
11  relationship with Dean Wilson and Dean Merk?
12    A.  They have a problem working with
13  her office as far as financing.  And they
14  both need finances in order to carry out
15  their program.
16    Q.  If they have testified they work
17  well with Ms. Greene, you would say they
18  were -- that's wrong?
19    A.  I would say one of us is telling a
20  lie.  And I don't think it would be me.
21    Q.  We can only go by what they say,
22  can't we?
23    A.  I guess so.

Page 64

1    Q.  How has she failed to develop and
2  maintain an efficient working relationship
3  with other administrators?
4    A.  Well, it's included in my
5  comments.  But if you're asking me for
6  examples of what I have in the comments --
7    Q.  I'm asking you how she's done
8  that.  Why did you put that comment?
9    A.  Because we continue to have
10  problems with other administrators getting
11  what they want from the business office.
12    Q.  You've been the president for
13  approximately ten years or eleven years?
14    A.  Yes.
15    Q.  During this entire period of time,
16  has Ingram State Technical College as an
17  entity ever been cited by the examiner's of
18  public account for the illegal or wrongful
19  expenditure of public funds?
20    A.  Not that I know of.
21    Q.  No one has -- Anybody, the
22  Chancellor's office or any other
23  organization has never questioned how the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 65

1  funds at Ingram were spent by being either
2  inappropriate or illegal, have they?
3      A.  Yes.  But not illegal.
4      Q.  Okay.  What inappropriate spending
5  has there been?
6      A.  Well, for example, we've been
7  questioned about whether we should have paid
8  a vendor an amount or a past due amount.
9  We've been -- We've had some questions about
10 whether we were paying late charges, things
11 like that.  But not anything of an illegal
12 nature.
13     Q.  Not inappropriate.  But where you
14 were paying late charges.  Wouldn't you
15 agree with me, since you're the president,
16 that it's better to wait and get all your
17 documents and have everything in line and be
18 sure it meets the requirements of the State
19 before you pay a bill, even though if the
20 bill might be paid late?
21     A.  From a personal standpoint, yes.
22 But I'm not sure whether that is allowed by
23 State Board policy.

Page 66

1      Q.  Well, State Board policy don't
2  want you paying a bill that's not properly
3  documented, does it?
4      A.  No.
5      Q.  Mr. Chambers, do you have any
6  accounting background?
7      A.  No.
8      Q.  I don't either.  Are you
9  knowledgeable enough to read the financial
10 statement and really know what it means?
11     A.  Not to the fullest extent, no.
12     Q.  Who at your school today besides
13 Ms. Greene is knowledgeable enough to read a
14 financial statement and has training in that
15 area?
16     A.  Ms. Greene and probably a couple
17 of her staff members.
18     Q.  So it's all in the fiscal office?
19     A.  Right.
20     MR. CHRISTMAN:  Talking about
21 today.
22     MR. DEBARDELABEN:  Today.
23     Q.  Number eight, is that a positive

Page 67

1  or a negative comment on Defendant's Exhibit
2  7?
3      A.  That's a positive.
4      Q.  Okay.  So she cooperates with the
5  supervisor, accepts direction and receives
6  assignments willingly?
7      A.  That's right.
8      Q.  And that's you; you're the
9  supervisor?
10     A.  Right.
11     Q.  So she accepts direction from you?
12     A.  Yes.
13     Q.  Okay.  Is sensitive to problems or
14 changes within the work place and responds
15 appropriately is number nine.  You have that
16 checked.  Is that a positive or a negative?
17     A.  A negative.
18     Q.  So she's not sensitive to problems
19 in the work place?
20     A.  Repeat your question, please.
21     Q.  Number nine says that she is
22 sensitive to problems or changes within the
23 work place and responds appropriately and

Page 68

1  you said that's a negative comment?
2      A.  That's right.
3      Q.  How is it negative?
4      A.  Because of what it says.  That
5  she's -- I feel that she's sensitive and she
6  responds appropriately.
7      Q.  And that's a negative?
8      A.  Is sensitive to problems or
9  changes within -- she responds
10 appropriately.
11     Q.  Well, you said that was a negative
12 comment.
13     A.  After I read it, that's a
14 negative.
15     Q.  So it's negative to be -- she is
16 not sensitive to problems or changes in the
17 work place and does not respond
18 appropriately?  Is that what you're --
19     A.  That's right.
20     Q.  Okay.  How is she insensitive to
21 problems or changes?
22     A.  Well, if you go back and look in
23 the comments that I made, there are several

17  (Pages 65 to 68)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 69

1  cases where I said she tends to blame other
2  employees for problems related to her area
3  and never addresses whether she, being the
4  dean, should have had controls in place to
5  avoid possible breakdowns, confusion or
6  conflicts related to financial matters.
7       If you go a little higher, you'll
8  see where I say when she is asked about the
9  status of an assignment or a directive, she
10 always is -- she's always in the, quote, I
11 was fixing to stage. And there are other
12 examples of -- to support this as a
13 negative.
14     **Q. I noticed, as you were reading**
15 **that, I saw the word internal controls of**
16 **the business office are vague and**
17 **ineffective. How did you come to that**
18 **conclusion if you're not trained in**
19 **accounting?**
20     A. Because of the confusion and the
21 mishaps that continue to happen in the
22 business office.
23     **Q. Now, let's look at number ten. It**

Page 70

1  **says makes an effort to be a team player and**
2  **works effectively as a member of the**
3  **administrative team. And you've got that**
4  **checked with comment. Is that a positive or**
5  **a negative comment?**
6      A. That's a negative.
7      **Q. Okay. Now, let's turn to your --**
8  **It says the president directed employee.**
9  **You see that?**
10     A. Yes.
11     **Q. To develop a how to use the**
12 **business office manual or brochure. And you**
13 **put she didn't do it?**
14     A. That's right.
15     **Q. Have you ever seen this document?**
16     A. I haven't seen this document in
17 this form.
18     **Q. But you have seen the document?**
19     A. I saw a draft of the document
20 about a year ago, first time and last time.
21     **Q. And this is your 2005. When did**
22 **you direct her to use -- to develop a how to**
23 **use a business office manual or brochure?**

Page 71

1      A. About a year after I was employed
2  at J.F. Ingram.
3      **Q. So in 1997?**
4      A. Somewhere around that time, yes.
5         MR. CHRISTMAN: I don't think I
6  have ever seen this, Jim.
7      **Q. Now --**
8         MR. CHRISTMAN: Would you attach
9  this as an exhibit, please.
10        MR. CHRISTMAN: Okay.
11     **Q. What happened between -- We can**
12 **make that the next exhibit. It will be**
13 **Plaintiff's Exhibit No. 8.**
14        (Whereupon, Plaintiff's Exhibit
15 No. 8 was marked for identification and
16 attached to the original transcript.)
17     **Q. Mr. Chambers, did you direct her**
18 **in writing to do that, how to document how**
19 **to use the business office?**
20     A. In writing and several cabinet
21 meetings.
22     **Q. So there should be written**
23 **documentation?**

Page 72

1      A. There could be, yes.
2      **Q. Can you provide that to your**
3  **lawyer?**
4      A. I'm not sure I can provide it.
5  But I do have it documented in cabinet
6  notes.
7      **Q. Okay. Now, let me ask you about**
8  **those cabinet notes. Who types those?**
9      A. My administrative assistant.
10     **Q. Who is that?**
11     A. I've had three. Ms. Sylvia
12 Murphrey, Donna Wisman and now Ms. Julie
13 Wood.
14     **Q. These minutes -- Is there a taping**
15 **of the cabinet meetings?**
16     A. Sometimes, yes.
17     **Q. And you have -- Do you still have**
18 **those recordings?**
19     A. I'm not for sure. I know we have
20 some. We used to keep them for a while. We
21 would only use them so that we could
22 document accurately. The copies would be
23 distributed to the cabinet for the file.

18 (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 73

1    And I do know that on a few
2  occasions, once we had signed off on them,
3  they used tapes over and over again
4    Q.  When you say sign off, does that
5  mean all the members of the cabinet reads
6  the minutes of the meeting and signs like
7  counsel members do a document that's true
8  and correct?
9    MR CHRISTMAN: Object to the
10 form.
11   A  No
12   Q.  What do you mean by sign off on
13 them?
14   A  When they are typed up, I sign off
15 that this was the meeting that I held  And
16 then I distribute it to the cabinet
17   Q.  Okay.  So only you sign off on it?
18   A  Right. Sometimes they are given a
19 sheet on the top.
20   Q.  Have you ever looked at the
21 cabinet meetings minutes and gone to either
22 Ms. Murphrey, Ms. Wisman or Ms. Wood and say
23 you need to make a change here, that's not

Page 74

1  what I meant?
2    A  No. There have been cases where I
3  have asked her to review her tape or to
4  review her notes.
5    Q.  So whatever is in the cabinet
6  meetings is what's on the tapes or the
7  notes?
8    A  Yes.
9    Q.  And you haven't changed any of
10 that?
11   A  No. There are cases where we
12 would read the minutes and I will see how I
13 said something and I would follow-up with a
14 memo making sure that they did not
15 misinterpret what I had just read or what I
16 said.
17   Q.  Now, would the memo be attached to
18 the cabinet minutes?
19   A  No. No. Sometimes we would put a
20 form letter on the top saying these were the
21 things you were assigned to do and dead
22 lines.
23   Q.  Okay.

Page 75

1    MR. CHRISTMAN: Let's take a
2  break.
3    MR. DEBARDELABEN: Okay.
4    (Whereupon, a short recess was
5  taken.)
6    Q.  Mr. Chambers, would you please
7  look at Plaintiff's Exhibit No. 8.  Take it
8  out of the package.  You stated you had
9  never seen that document before?
10   A  That's right.
11   Q.  Okay.  There's a note there to you
12 from Ms. Greene; right?
13   A  Right.
14   MR. CHRISTMAN: You're talking
15 about on the first page?
16   MR. DEBARDELABEN: Yes.
17   Q.  I'm just flipping through here.
18 Do you recognize whose handwriting that is?
19   A  Yes.
20   Q.  Whose is it?
21   A  It looks like mine.
22   Q.  Okay.  And that's on the purpose?
23   A  Right.

Page 76

1    Q.  Do you recognize whose handwriting
2  that is on fiscal division staff?
3    A  That's mine.
4    Q.  You sure?
5    A  Yes.
6    Q.  So apparently you've reviewed some
7  of this document, haven't you?
8    A  In a draft form, yes.
9    Q.  Did you ever get your draft form
10 back to -- I noticed it said for your
11 review. Thank you Monica. Did you ever get
12 the form back to her or do you remember?
13   A  Those few pages that you just
14 showed me, yes.
15   Q.  Okay. You got the entire book,
16 didn't you?
17   A  No, I did not.
18   Q.  So you didn't get the entire book?
19   A  No, I did not.
20   Q.  And if Ms. Greene said you did,
21 you'd say she's not telling the truth?
22   A  Yes.
23   Q.  Okay. And if the cabinet meeting

19 (Pages 73 to 76)

# FREEDOM COURT REPORTING

Page 77

1  showed that was represented in the cabinet
2  meeting, you'd still say she wasn't telling
3  the truth?
4      A.  She presented a draft and she
5  stated -- and the minutes will reflect --
6  that she said this is a draft.  When I get
7  the completed copy, I will present it to the
8  cabinet for discussion.
9      Q.  And you have to approve the
10  completed copy, don't you, before it's
11  presented to the cabinet?
12      A.  Yes.
13      Q.  Okay.
14      A.  Let me clear up something.  I do
15  not have to approve it before it's presented
16  to the cabinet.  I have to approve it before
17  it becomes an accepted publication of the
18  college.
19      Q.  Now, was that a college
20  publication or just a publication for your
21  people at J.F. Ingram or -- I'm sorry.  I
22  called it -- I've seen both, J.F. Ingram
23  State Technical College and Ingram State

Page 78

1  Technical College.  I don't know which one
2  it is.
3      A.  It's both of them.
4      Q.  It's both of them.  Was that a
5  manual to be put out by the college or just
6  for your people at the college to use?
7      A.  Just for the people at the college
8  to use.
9      Q.  Okay.
10      (Whereupon, Plaintiff's Exhibit
11  No. 9 was marked for identification and
12  attached to the original transcript.)
13      Q.  Did you go over the evaluation
14  with Ms. Greene?
15      MR. CHRISTMAN:  Object to the
16  form.  What evaluation?
17      Q.  The evaluation -- I'm sorry.  No.
18  7.
19      A.  I gave it to her and told her to
20  read it and asked her if she had any
21  questions or concerns, to come discuss them
22  with me.  And I also indicated to her that
23  her signature was to acknowledge that she

Page 79

1  received it, but not that she -- it does not
2  indicate that she agreed with it.
3      Q.  I want you to look at No. 6.  What
4  happened in that year between 6 and 7 to
5  make her evaluations go down so low?
6      A.  Say that again.  Between No. 6.
7      Q.  Between No. 6 and 7.  It's the
8  very next year for 2004 where she got
9  everything checked acceptable and signed
10  it.
11      And I think No. 6 is dated -- by
12  you, it's signed April 1st, '04 and by her,
13  it's signed April 26th, '04.  And the 2005
14  evaluation -- what's the date on that?
15      A.  2005, July 14th.
16      Q.  What happened in that period of
17  time?
18      A.  Well, if you look at the comments
19  on the previous -- a couple of the previous
20  evaluations, I did a narrative.  I made
21  comments.  And this time I decided to get
22  positive results, I would try to identify
23  these things as opposed to just making

Page 80

1  general statements.
2      Q.  Well, let me show you all the
3  previous evaluations we've been provided and
4  ask -- which is Exhibit No. -- it starts
5  with Exhibit No. 1, Plaintiff's Exhibit 1
6  through 6 there.
7      MR. CHRISTMAN:  We'll look at
8  these, Jim, just to make sure we're looking
9  at the right exhibits.
10      Q.  Now, which evaluation are you
11  talking about?
12      A.  What was your question, please?
13      Q.  Your answer to my question was if
14  I look at the previous evaluations.  And I
15  asked you where you check things.  And I'm
16  looking at the previous evaluations, sir.
17      Let's kind of go through them in
18  order.  And the only evaluation I see where
19  anything is checked besides as is, is
20  evaluation 1998 where it says provides
21  effective leadership in areas of primary
22  responsibility and you told me that was a
23  positive.  Now, which evaluations do you

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 81

1  want me to look at?
2      A.  You asked me when did the change
3  take place?
4      Q.  Yes, sir.  Then you made a comment
5  that if I looked at the previous evaluation
6  where you would check, you decided to --
7      A.  No, I didn't say check.  I said if
8  you look where I made the comments.  I made
9  statements indicating negative activity.
10      And this -- And what I started
11  doing then is not just making general
12  statements.  I started identifying them as
13  on the evaluation.
14      Q.  So I can take the -- where you
15  said the president directed the employee to
16  and you've got eighteen items there?
17      A.  Yes.
18      MR. CHRISTMAN:  Now we're talking
19  about Exhibit 7?
20      MR. DEBARDELABEN:  7.
21      Q.  All that happened within the 2005
22  evaluation period?
23      A.  No.

Page 82

1      Q.  It didn't happen from 2004 of
2  April?
3      A.  It started happening when we --
4  when I started making the comments.  When I
5  put employee tends to develop good
6  leadership, tends to get down when
7  confronted, all of this is including -- it
8  was building up to this.
9      Q.  Well, that is -- The comment
10  you're referring to is Plaintiff's Exhibit
11  No. 3 for '98, isn't it?
12      A.  Right.
13      Q.  Well, if we look at Plaintiff's
14  Exhibit No. 4 for 2002, which is the next
15  one we have been provided, everything is
16  meets standards as is, isn't it?
17      A.  Yes.
18      Q.  And when we look at Plaintiff's
19  Exhibit No. 5, which is 2003, it's meets
20  standards as is.  All that's checked.  So if
21  an employee is reading this, everything is
22  fine, isn't it?
23      A.  Yes.

Page 83

1      Q.  And even 2004 is meets standards
2  as is.  So what happened between the 2004
3  evaluation and the 2005 evaluation?
4      A.  Well, I tried to resolve issues in
5  the cabinet meetings and have meetings with
6  the administrative staff as opposed to
7  trying to put everything in writing.
8      We've met and we've discussed
9  weaknesses.  We discussed things that we
10  needed to improve in.  So I was trying a new
11  technique.
12      Q.  Do you have any memos that you put
13  in Ms. Greene's file, personnel file that
14  showed she wasn't doing her job?
15      A.  Not that I recall.
16      Q.  You have memorandums you sent her
17  between 2004 of -- April the 1st, 2004, July
18  of 2005 that pointed out she wasn't doing
19  her job?
20      A.  I would think so, yes.
21      Q.  Okay.  Can you provide all those
22  to your attorney so he can provide them to
23  me?  All your memorandums you sent Ms.

Page 84

1  Greene from 2000 -- April 1st, 2004 through
2  -- what's the date on No. 7, July 15th?
3      A.  July 14th.
4      Q.  July 14th.
5      A.  2005.
6      Q.  2005.  And you have -- Are you
7  telling me you have memorandums to support
8  all these eighteen items?
9      A.  Yes.  But not necessarily during
10  that period of time.  Some of them goes
11  before that and some goes after that.
12      Q.  Well, certainly if they are after
13  this, it could be written up on the July
14  '05, couldn't it?
15      A.  Well, today, yes.  But not then.
16      Q.  But not then?
17      A.  I know what you're saying.
18      Q.  Okay.  And if it was prior to
19  April of '04, then she wouldn't know to
20  change.  You told her in April of '04 that
21  everything was fine, wasn't it?
22      A.  On the evaluation, yes.
23      Q.  Yes, sir.  An employee is supposed

21 (Pages 81 to 84)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 85

1  to be able to rely on an evaluation, isn't
2  she, any employee?
3  　　A.  Yes.
4  　　　　MR. CHRISTMAN:  Object to the
5  form.
6  　　Q.  Any employee?
7  　　A.  Yes.
8  　　Q.  Examiners of public accounts are
9  -- they come in every year and evaluate
10  J.F. Ingram, don't they?
11  　　A.  Yes, sir.
12  　　Q.  Or every two years?
13  　　A.  Some every two years.  But mostly
14  every year.
15  　　Q.  And they give you an audit report;
16  correct?
17  　　A.  Right.
18  　　Q.  And Mr. Ronald L. Jones, he's the
19  chief examiner, isn't he?
20  　　A.  Right.
21  　　Q.  Been the chief examiner since the
22  '70's, hasn't he?
23  　　A.  I'm not sure of that.

Page 86

1  　　Q.  And they audit everything the
2  business office does, don't they?
3  　　A.  To the best of my knowledge, yes.
4  　　Q.  They're the experts?
5  　　A.  Right.
6  　　Q.  And they -- If Ms. Greene is not
7  doing something by the acceptable accounting
8  standards, they certainly point that out,
9  don't they?
10  　　A.  Usually, yes.
11  　　Q.  Or somebody else at the college is
12  not doing something right and it impacts on
13  the finances, they point that out, don't
14  they?
15  　　A.  Yes.  Usually.
16  　　Q.  They're pretty strict, aren't
17  they?
18  　　A.  Most times.
19  　　Q.  Mr. Jones is a pretty tough task
20  master, isn't he?
21  　　　　MR. CHRISTMAN:  Form.
22  　　Q.  Do you know Ronald Jones?
23  　　A.  Yes, I know him.  But I've never

Page 87

1  worked with him individually.
2  　　Q.  I have.  And I believe you came in
3  1996, didn't you?
4  　　A.  I think so.
5  　　Q.  So this October of '95 through
6  September 30th of '96, would that involve
7  you any?
8  　　A.  It might have involved me in
9  transition.  I'm not sure.
10  　　Q.  But it definitely involved Ms.
11  Greene, didn't it?
12  　　A.  It should have, yes.
13  　　Q.  Now, when you get an audit, aren't
14  you basically looking for your audit to get
15  something called an unqualified audit?
16  　　A.  Yes.
17  　　Q.  Now, do you know where to look in
18  here and see if they are unqualified?  And
19  so far as audits go, unqualified is the best
20  that can be hoped for, isn't it?
21  　　A.  Yes.
22  　　Q.  Let's start at 2004.  We'll go
23  backward from 2004.  Do you recognize this

Page 88

1  as being the audit from the J.F. Ingram
2  State Technical College from October 1st,
3  2003 to September 30th, 2004?  I'm opening
4  to that page.
5  　　A.  Yes, I do.
6  　　Q.  And who was the president then?
7  　　A.  I was president.
8  　　Q.  Who was the fiscal officer?
9  　　A.  Ms. Monica Greene.
10  　　Q.  Was that -- Did they have a
11  finding that that was an unqualified audit?
12  　　A.  No, they did not according to
13  this.
14  　　Q.  What did they find?
15  　　A.  What did they find?
16  　　Q.  Yes, sir.
17  　　A.  On page twenty-eight, they showed
18  that there was -- the audit did not disclose
19  any findings or questioned costs required to
20  be reported.
21  　　Q.  So there was nothing --
22  　　　　MR. CHRISTMAN:  For the record,
23  where are you reading from, Dr. Chambers?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 89

1    MR. CHRISTMAN: Page twenty-eight.
2    MR. CHRISTMAN: Under what
3  section? There's more than one section.
4    THE WITNESS: Section two.
5    **Q. I'm looking at the summary of the**
6  **examiners results.**
7    MR. CHRISTMAN: All right.
8  Section two says financial statement
9  findings. Let's see where we can find where
10 he's looking at.
11    MR. DEBARDELABEN: It should be on
12 page twenty-eight. It should be the summary
13 of examiners results.
14    MR. CHRISTMAN: All right. Make
15 sure we're talking about the same thing.
16 What's your question?
17    MR. DEBARDELABEN: Was it an
18 unqualified audit.
19    MR. CHRISTMAN: Okay.
20    **Q. Did they find anything wrong?**
21    A. On page twenty-eight of the
22 financial statement, it's no.
23    **Q. Okay. So there was no problem**

Page 90

1  **with finances? Is that --**
2    MR. CHRISTMAN: Well, read the
3  document, President Chambers.
4    A. It says financial statement
5  findings. And it say the audit did not
6  disclose any findings or questioned costs
7  required to be reported. And that was under
8  financial statement findings, section two.
9    Section three, which is Federal
10 awards findings, it say that the audit did
11 not disclose any findings or questioned
12 costs required to be reported.
13    **Q. And that was your 2004 audit,**
14 **2003, 2004; correct?**
15    A. 2003, 2004, yes.
16    **Q. Okay. And you were the president**
17 **and Ms. Greene was the fiscal officer that**
18 **year?**
19    A. That's right.
20    **Q. Now, let's look at -- and this**
21 **might help us.**
22    MR. CHRISTMAN: We're going to
23 attach this as an exhibit?

Page 91

1    MR. DEBARDELABEN: We can. No, I
2  wasn't going to attach them as an exhibit.
3    MR. CHRISTMAN: If we're going to
4  talk about it in the deposition, I would ask
5  that you attach that.
6    MR. DEBARDELABEN: I will be happy
7  to. He's got a copy. These are just copies
8  I got from the examiners.
9    MR. CHRISTMAN: Yes, sir.
10    **Q. I'm going to ask you about the**
11 **2002 and 2003 audit. And I think I got it**
12 **over to the page that will help you. The**
13 **summary of the examiners results.**
14    **Did the examiners find anything**
15 **the matter with the fiscal part of it?**
16    A. No, they didn't.
17    **Q. And you were the president?**
18    A. Yes.
19    **Q. And Ms. Greene was the fiscal**
20 **officer?**
21    A. Right.
22    **Q. Is that a good audit? They didn't**
23 **identify any material weaknesses, did they?**

Page 92

1    A. We need to clear up something.
2  There are parts in an audit where questions
3  are asked that you would have a yes or no.
4  And then there are findings which requires a
5  response and a corrective action.
6    So that's the reason I'm looking
7  through the entire booklet because you're
8  looking at part of it where it say no. I
9  wanted to make sure that this has -- this is
10 in line with the findings or if there were
11 any findings. So according to your
12 question, I didn't see any findings.
13    **Q. Okay.**
14    MR. CHRISTMAN: I'm going to --
15 Jim, if you don't mind -- if you don't want
16 to mark these -- I am going to ask these to
17 be marked. I will mark '03, '04 as
18 Defendant's Exhibit 1 if you don't want to
19 mark those as Plaintiff's exhibits.
20    MR. DEBARDELABEN: We'll mark them
21 as Plaintiff's exhibits. I have no problem
22 with that.
23    **Q. Okay. I'm going to show you '01**

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 93

1  and '02. What we'll do is, we'll just start
2  and mark them from backwards. Let's do it
3  this way. The '03, '04 we've marked that as
4  Plaintiff's Exhibit No. 9.
5     That's examiners of public
6  accounts audit. The '02, '03, we'll mark as
7  No. 10. The '01, '02, we'll mark as No.
8  11. 2000 to '01, we'll mark this as 12.
9  The '99 to 2000, we'll mark as No. 13. The
10  '98 to '99, we'll mark as No. 14.
11     The '97 to '98, we'll mark as No.
12  15. And the '96 to '97, we'll mark as 16.
13  And I don't think since you came in at the
14  last, you weren't there all of '95, this
15  September of '96. We'll just leave that one
16  out. That doesn't cover your entire term,
17  did it?
18     A.  No, I don't think so.
19     (Whereupon, Plaintiff's Exhibits
20  No. 10 through 16 were marked for
21  identification and attached to the original
22  transcript.)
23     Q.  On all these audits, '97 through

Page 94

1  2004, do you know of any places that they
2  found -- had an opinion that there were --
3  material weaknesses were identified,
4  reportable conditions that are not
5  considered to be material weaknesses are
6  identified or there was noncompliance with
7  financial statements?
8     MR. CHRISTMAN: Compound question.
9  Object to the form. Answer it if you can.
10     Q.  I'll put it this way. On any of
11  these audits, do you know whether the
12  examiners found that the -- identified
13  internal control over financial reporting
14  contained material weaknesses?
15     A.  Yes. But I cannot specifically
16  say which ones until I have examined them.
17     Q.  Well, sir, take all the time you
18  need and examine them.
19     MR. DEBARDELABEN: Drew, we can do
20  this two ways. We can take a break for
21  lunch and let y'all both go over them
22  because I want to ask you three questions.
23     MR. CHRISTMAN: Okay.

Page 95

1     MR. DEBARDELABEN: And the three
2  questions will be, show me each and every
3  place in these audits where the examiners
4  found internal control over financial
5  reporting contained material weaknesses
6  identified, reportable conditions identified
7  that were not considered to be material
8  weaknesses, and noncompliance material to
9  financial statements was noted.
10     MR. DEBARDELABEN: Okay. You're
11  looking at the financial statements. There
12  are also Federal awards that have those same
13  categories.
14     MR. DEBARDELABEN: Either
15  financial statements or Federal awards.
16     MR. CHRISTMAN: Okay.
17     MR. DEBARDELABEN: And if y'all
18  want to go over these and review them for it
19  might take a little while, I'll be happy for
20  you to do it. And we'll even agree on the
21  record for you to take these along with you
22  if you prefer doing it at your office.
23     MR. CHRISTMAN: Okay.

Page 96

1     MR. DEBARDELABEN: We'll let you
2  have custody of the exhibits. Is that
3  agreeable?
4     MR. CHRISTMAN: Sure. We'll take
5  a break and come back.
6     MR. DEBARDELABEN: Okay. But I
7  have exhibits on that from '94 through '95
8  and '95 through '96. But Mr. Chambers
9  wasn't the president during that period of
10  time.
11     MR. CHRISTMAN: Do you have '05,
12  '06?
13     MR. DEBARDELABEN: I don't have
14  '05, '06 yet. I couldn't get them. If you
15  have it, I'd like to have it.
16     MR. CHRISTMAN: I think I do.
17     MR. DEBARDELABEN: And if you have
18  it, we'd like to mark it, also.
19     MR. CHRISTMAN: I'll see if I can
20  get my hands on it before we come back.
21     MR. DEBARDELABEN: Let's make a
22  note on the record that you're taking
23  exhibits --

24 (Pages 93 to 96)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 97

1      MR. CHRISTMAN: No. 9, 10, 11, 12,
2  13, 14, 15, and 16.
3      MR. DEBARDELABEN: Okay.
4      (Whereupon, a lunch recess was
5  taken.)
6      Q. We're going to mark '04, '05 as
7  Plaintiff's Exhibit 17. That's the '04,
8  '05, Department of Public Accounts report.
9      (Whereupon, Plaintiff's Exhibit
10  No. 17 was marked for identification and
11  attached to the original transcript.)
12      Q. Mr. Chambers, during lunchtime,
13  did you have a chance to review all the
14  reports of examiners of public accounts from
15  I think '97 through '04, '05?
16      A. Yes, sir.
17      Q. Okay. How many reports did you
18  find on the summary of examiners results
19  where it said type of opinion issued in
20  section one where it said internal control
21  over financing reporting a material weakness
22  identified?
23      A. I think we found one.

Page 98

1      Q. And which one was that?
2      A. Let me go back and find which one.
3      MR. CHRISTMAN: He was referring
4  to this one right here. Material weakness
5  identified.
6      A. Yes. A report --
7      MR. CHRISTMAN: One of these.
8      A. It might have been in the wrong
9  place that said yes. But the majority of
10  them said no. Nearly all of them said no.
11      Q. Said no. And you say there's one
12  that might have said yes. Let's look at
13  those real quick.
14      MR. CHRISTMAN: Look at the most
15  recent one, Jim.
16      Q. '04, '05?
17      MR. CHRISTMAN: You just marked
18  it.
19      Q. It's 17. Let's look at '04, '05.
20  And I think it says -- here's '04, '05.
21  What does '04, '05 say? Let's go through
22  that one real quick. What does it say under
23  summary of examiner's results, type of

Page 99

1  opinion issued, internal over financial
2  reporting, material weakness identified, the
3  first one?
4      A. No.
5      Q. Reportable condition identified
6  that are not considered to be a material
7  weakness?
8      A. Yes.
9      Q. And noncompliance material to
10  financial statement noted?
11      A. No.
12      Q. Do you know what it meant by
13  reportable weakness -- excuse me -- a
14  reportable condition identified that are not
15  considered to be a material weakness?
16      A. Yes.
17      Q. What was that?
18      A. Do I know what it was?
19      Q. Yes, sir.
20      A. I'll have to go through the report
21  to see that.
22      Q. Okay. But it's whatever is in the
23  report. Let's go down -- Is there anything

Page 100

1  under Federal award that was checked yes
2  that you found?
3      A. No.
4      Q. Okay. So that's the only one that
5  you know of that was checked yes?
6      A. Yes.
7      Q. Okay. Didn't that have something
8  to do with a car or a tractor being found on
9  campus that didn't have a work order?
10      A. It was one of the findings. If
11  I'm not mistaken, that was related to one of
12  the findings about a tractor.
13      MR. CHRISTMAN: Are you talking
14  about the most recent?
15      MR. DEBARDELABEN: Yes, sir. '04,
16  '05.
17      Q. And wasn't the person -- Who's in
18  charge of live work at that point in time?
19      A. Let me make sure for clarification
20  now which one we're -- Are we talking about
21  --
22      Q. '04, '05.
23      A. '04, '05. I'm not sure if that

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 101

1    was related to the tractor.
2        **Q.   Okay.**
3        A.   That was related to something
4    else.
5        **Q.   Do you know what it was related**
6    **to?**
7        A.   Yes.  That was a finding about
8    five checks.
9        **Q.   Five checks?**
10       A.   That was not properly deposited.
11       **Q.   And where did those checks come**
12   **from?**
13       A.   I'm not sure where they came
14   from.  I know some of them came from the
15   State Department.
16       **Q.   Okay.  Now, it also has something**
17   **to do on one of them with the -- a vehicle**
18   **being found, didn't it, on campus?**
19       A.   I don't think it was in that one.
20       **Q.   Okay.  But it wasn't considered --**
21   **It was not considered to be a material**
22   **weakness, was it?**
23       A.   According to that, yes.

Page 102

1        **Q.   Yes, sir.  And these are the**
2    **examiners of public accounts doing it?**
3        A.   Right.
4        **Q.   Okay.  When the examiners come in**
5    **and make an examination of the records of**
6    **Ingram, they examine inventory and the bank**
7    **accounts and work orders and all that, don't**
8    **they?**
9        A.   They do a test to that, yes.
10       **Q.   They examine everything that's**
11   **related to the fiscal office of receiving**
12   **money and spending money and keeping**
13   **inventory of the J.F. Ingram College?**
14       A.   They do not examine everything.
15   They do a test, a cross section of a test on
16   everything.
17       **Q.   Right.  And they usually have an**
18   **auditor that comes and stays on campus any**
19   **place from four weeks to four months, don't**
20   **they?**
21       A.   Sometimes longer, yes, sir.
22       **Q.   So those auditors have access to**
23   **every file on campus, don't they?**

Page 103

1        A.   Yes.
2        **Q.   And they are allowed -- If they've**
3    **got questions, they can have anything**
4    **pulled?**
5        A.   Yes.
6        **Q.   And then they file this report and**
7    **make it available to the public?**
8        A.   Yes.
9        **Q.   And they report back to their**
10   **legislative committee that they are a branch**
11   **of, don't they?**
12       A.   I'm not familiar with that step.
13       **Q.   Did you know that the examiners of**
14   **public accounts is not a cabinet agency,**
15   **it's a legislative agency of the State of**
16   **Alabama?**
17       A.   No.  I'm not familiar with that.
18       **Q.   Okay.  And the chief examiner of**
19   **public accounts is appointed by the**
20   **legislature instead of the governor?  Did**
21   **you know that?**
22       A.   No, I did not.
23       **Q.   Do you know a Mr. Leo Miller?**

Page 104

1        A.   Yes, I do.
2        **Q.   How do you know Mr. Miller?**
3        A.   From being an inmate and then
4    became an employee at the college.
5        **Q.   Do you know a Mr. -- Tell me**
6    **this.  I might have asked you this.  I don't**
7    **think so.  Who can get work done by J.F.**
8    **Ingram?  Is it a special group of people?**
9        A.   Yes.
10       **Q.   Who are they?**
11       A.   State employees, retired or
12   present.  Two year -- Alabama two-year
13   college students, employees at Ingram.  I
14   think I'm missing somebody.
15       **Q.   Charitable organizations?**
16       A.   Charitable.  Non-profit charitable
17   organizations.
18       **Q.   State agencies?**
19       A.   Non-profit charitable
20   organizations.  It doesn't necessarily have
21   to be a state agency.
22       **Q.   But can a state agency have work**
23   **done?**

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 105

1    A. Yes. An Alabama state agency,
2  yes.
3    Q. Right. What about a county
4  agency?
5    A. Yes.
6    Q. Any governmental -- Can we say any
7  governmental agency?
8    A. Yes.
9    Q. Mr. Tim Leonard, do you know who
10  he works for?
11   A. No, I do not. I know he works for
12  a beverage company.
13   Q. A beverage company?
14   A. Uh-huh.
15   Q. Is he in any way connected with a
16  state agency?
17   A. I'm not sure. I would have no
18  knowledge of that.
19   Q. Do you know how he qualifies to
20  get work done by J.F. Ingram?
21   A. No.
22   Q. Do you know Mr. -- Did you ever
23  ask Mr. Leo Miller to do work for Mr. Tim

Page 106

1  Leonard?
2    A. No.
3    Q. And if Mr. Miller said you asked
4  him to deliver his file cabinets for Mr. Tim
5  Leonard, that would be wrong?
6    A. That's right.
7    Q. And if he said that you told him
8  to do this and told him that even though Mr.
9  Leonard would not be expected to pay out of
10  his own pocket, that I would be compensated
11  for the hours I claim on my hours turned in
12  for working at J.F. Ingram?
13   A. What's your question?
14   Q. Did you know he said that the work
15  -- in essence, the work he was doing for
16  Mr. Leonard would be paid by J.F. Ingram?
17   A. No, I did not know he said that.
18   Q. And if Mr. Miller said that, he
19  would be lying?
20   A. That's correct.
21   (Whereupon, Plaintiff's Exhibit
22  No. 18 was marked for identification and
23  attached to the original transcript.)

Page 107

1    Q. Mr. Chambers, on leave requests,
2  are leave requests supposed to be done for
3  annual leave in advance?
4    A. Yes.
5    Q. And I forgot to ask you this. Are
6  you a member of any organizations?
7    A. Several.
8    Q. What are you a member of?
9    A. I'm a member of the Correction
10  Education Association. I'm a member of the
11  SACS, the Southern Association of Colleges
12  and Schools. I'm a member of the
13  Association of American Community College.
14      I'm a member of the Presidential
15  Round Table and some others, quite a few
16  others that I'm a member of as part of my
17  job.
18   Q. Are you a member of any social
19  organizations?
20   A. Yes.
21   Q. What social organizations are you
22  a member of?
23   A. I'm a member of the Montgomery

Page 108

1  Chapter of the One Hundred Black Men
2  Association. I'm a member of the local
3  graduate college fraternity, Omega Phi Si
4  Fraternity. And that's it.
5    Q. Are you on any board of directors
6  of any organization?
7    A. Yes, I am.
8    Q. Which organization is that?
9    A. I'm on the Phenix City local board
10  of Colonial Bank in Phenix City.
11   Q. Colonial Bank in Phenix City?
12   A. Yes.
13   Q. Is that in any way connected with
14  your duties at the college?
15   A. No.
16   Q. Are you paid for that?
17   A. Yes, I am.
18   Q. And how often do you meet with the
19  Board of directors of Colonial Bank over in
20  Phenix City?
21   A. Four times per year.
22   Q. And are you paid for each of those
23  four times you meet?

27 (Pages 105 to 108)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 109

1  A. Yes, I am.
2  Q. Is that scheduled in advance?
3  A. Is what scheduled in advanced?
4  Q. The meetings?
5  A. Yes.
6  Q. Is it during the week?
7  A. Yes.
8  Q. I want to show you what's marked
9  as Plaintiff's Exhibit 18. Is that a leave
10  form for you?
11  A. Yes.
12  Q. For November 13th, 14th, 15th,
13  16th?
14  A. Yes.
15  Q. Of 2006?
16  A. Yes.
17  Q. And when did you file that?
18  A. It's showing that was -- it was
19  signed by him on the 29th.
20  Q. Okay. When did you submit it?
21  A. I don't see it showing. November
22  the 20th is when it was sent down.
23  Q. Sent down?

Page 110

1  A. Uh-huh.
2  Q. For you to get leave approved, the
3  Chancellor has to approve it?
4  A. The Chancellor has to have not
5  approve, but a record of it.
6  Q. A record of it?
7  A. Like we keep records of the
8  employees. I keep records of employees and
9  the Chancellor keeps records of mine.
10  Q. And what time were you off on
11  November the 13th?
12  A. The entire day.
13  Q. Okay. What about the 14th?
14  A. Two hours.
15  Q. Two hours. Wasn't there an
16  instance on the 14th where there was a
17  report made to the Governor's office and to
18  the Chancellor's office that you were seen
19  at a gambling casino, a Creek gambling
20  casino here in Montgomery?
21  MR. CHRISTMAN: Object to the form
22  of the question and the relevance of that
23  question.

Page 111

1  Q. During that time period --
2  MR. CHRISTMAN: Wait just a
3  minute. We're not going to talk about
4  that. That has nothing to do with this
5  lawsuit. And we're not going to ask
6  questions about that unless it has some
7  relevance to your client's claim. We're not
8  going to talk about --
9  MR. DEBARDELABEN: It does.
10  MR. CHRISTMAN: -- whether he was
11  at a gambling casino.
12  MR. DEBARDELABEN: It does. Are
13  you going to direct him not to answer? You
14  can direct him not to answer, but I'll get
15  the answer to the question.
16  MR. CHRISTMAN: I'm going to give
17  you some latitude to go into some of this.
18  When I feel like we're out of bounds, we're
19  stopping.
20  Q. I just asked was a report made to
21  the Department of Postsecondary Education
22  and/or the Governor's office about that?
23  A. Not to my knowledge.

Page 112

1  Q. You have no knowledge of that?
2  A. No, sir.
3  Q. And if somebody reported that,
4  they would be wrong?
5  A. Yes. I go there. But to say it
6  was on this particular day when I was on
7  leave or not on leave, I could not say.
8  Q. Okay. That's fine. You said
9  before we asked that, that those annual
10  leaves should be filed in advance?
11  A. Yes.
12  Q. And it appears that you filed that
13  annual leave after you took it; is that
14  correct?
15  A. It was -- yes. But it was with an
16  understanding of the Chancellor's office.
17  Q. Okay. I think I asked you about
18  the 17th. And I'm just going to -- And you
19  answered, I believe, you were off on the
20  17th. And that only goes through the 16th.
21  But here's -- I think this one is
22  the same answer. I don't want to get
23  confused. 19 takes you through the 17th,

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 113

1  doesn't it?
2      (Whereupon, Plaintiff's Exhibit
3  No. 19 was marked for identification and
4  attached to the original transcript.)
5      MR. CHRISTMAN:  Your question was,
6  was he off on the 17th?
7      MR. DEBARDELABEN:  Yes.
8      A.  Yes.
9      Q.  And the only reason I put that one
10 in is -- and I think we asked you questions
11 about the 17th and it was my understanding
12 that you responded that you were off on the
13 17th?
14     A.  I'm not -- You mean a few minutes
15 ago?
16     Q.  Yes, sir.
17     A.  I'm not sure what you're asking
18 me, sir.
19     Q.  Just if you were off on the 17th.
20     A.  Yes, I was off on the 17th.
21     Q.  Do you know who Mr. J.L. Griswold
22 is?
23     A.  Yes.

Page 114

1      Q.  Who is he?
2      A.  He's an employee at J.F. Ingram.
3      Q.  What was his position?
4      A.  He's had several.  But he's an
5  assistant to the Dean of Instruction.
6      Q.  J.L. Griswold?
7      A.  Oh, that's -- this is his uncle.
8  I'm not sure which Griswold.  We've had
9  three associated with the Department of
10 Corrections.
11     Q.  I'm talking about Captain
12 Griswold.
13     A.  Oh, okay.  He used to be a
14 part-time employee at the college.
15     Q.  Okay.  And I used the words
16 Captain Griswold.  Was he a retired captain
17 to your knowledge from the Department of
18 Corrections?
19     A.  Yes.
20     Q.  And did he work at one time at
21 Franklin Youth Center and have supervision
22 of security for J.F. Ingram trade school?
23     A.  Yes.

Page 115

1      Q.  And I said trade school.  It's
2  really a technical college, isn't it?
3      A.  That's all right.
4      Q.  People refer to J.F. Ingram as a
5  trade school because it used to be one,
6  didn't it?
7      A.  Yes.
8      Q.  And I think it's been a trade
9  school, a community college or a technical
10 college?
11     A.  All of the above.
12     Q.  All of the above at one time or
13 another.  Now, were you aware that Mr. J.L.
14 Griswold was concerned about Ms. Hendrix's
15 safety?
16     A.  Was I aware?
17     Q.  Yes, sir.
18     A.  In what way?
19     Q.  Well, let me show you this.  We'll
20 mark this as 20.
21     (Whereupon, Plaintiff's Exhibit
22 No. 20 was marked for identification and
23 attached to the original transcript.)

Page 116

1      Q.  Have you ever seen that letter by
2  Mr. Griswold?
3      A.  Not that I recall.
4      Q.  Are you familiar with the incident
5  that happened with Ms. Hendrix that she
6  reported to Mr. Malcolm Montgomery
7  concerning an inmate?
8      A.  Yes.
9      Q.  Are you familiar that Ms. Hendrix
10 filed a complaint and then a grievance
11 concerning that matter?
12     A.  Yes.
13     MR. CHRISTMAN:  We're talking
14 about Inmate Pruitt.
15     MR. DEBARDELABEN:  Inmate Pruitt,
16 yes
17     A.  Yes.
18     Q.  Okay.  And you appointed Dean Merk
19 to conduct an investigation?
20     A.  Yes.
21     Q.  Okay.  Did you know prior to your
22 appointment of Dean Merk to conduct that
23 investigation, that he had already been in

29 (Pages 113 to 116)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 117

1  meetings with Ms. Hendrix, Mr. Montgomery,
2  Mr. Wilson and Ms. Bonita Owensby concerning
3  the very issue he was to investigate?
4      A. No.
5      Q. Did he not inform you of that?
6      A. Only after he had completed his
7  investigation.
8      Q. If you had known that he had
9  personal knowledge of what went on, would
10  you have still appointed him to investigate?
11      MR. CHRISTMAN: Object to the
12  form. The personal knowledge component has
13  not been proven. It's not in evidence.
14      Q. If you had known he had
15  participated in meetings where this matter
16  was discussed and could be a potential
17  witness to it, would you have appointed him
18  to do the investigation?
19      A. Yes.
20      Q. So you don't think it was improper
21  to appoint him to do the investigation even
22  though he had some knowledge of the matter
23  prior to that?

Page 118

1      A. No.
2      Q. Okay. Were you aware that what
3  Ms. Hendrix complained about was that Mr.
4  Montgomery asked her to show him what the
5  inmate did?
6      A. Well, I was not aware of it. I
7  was told that that was what she had said
8  happened to her.
9      Q. To her?
10      A. Yes.
11      Q. And were you aware that Mr.
12  Montgomery was only asked if he requested
13  Ms. Hendrix to demonstrate how the inmate
14  was masturbating?
15      MR. CHRISMAN: Object to the
16  form. Vague.
17      A. Repeat your question one more
18  time.
19      Q. Were you aware that Mr. Montgomery
20  was not asked if he requested Ms. Hendrix to
21  show him what she saw?
22      A. Asked by whom?
23      MR. CHRISTMAN: Form.

Page 119

1      Q. Mr. Merk.
2      A. No, I was not.
3      Q. Dean Merk.
4      A. No.
5      Q. Were you aware that Mr. Montgomery
6  denied asking Ms. Hendrix to show him how
7  the inmate was masturbating?
8      A. At the end -- Well, at the end of
9  Dr. Merk's report.
10      Q. Were you also aware that Ms.
11  Hendrix stated that he said and kept on
12  stating he asked me to show him what I saw
13  him doing?
14      A. Only at the end of his report when
15  he was giving me the information of what she
16  alleged happened.
17      Q. Did you not see those two
18  statements as being in conflict with each
19  other?
20      A. Yes.
21      Q. You saw them being conflicting?
22      MR. CHRISTMAN: You talking about
23  the statements of Hendrix and Montgomery?

Page 120

1      MR. DEBARDELABEN: Correct.
2      A. Yes.
3      Q. So were you aware that the
4  grievance procedure requires if there is
5  conflicting material facts, that a hearing
6  be conducted?
7      A. Yes.
8      Q. Did you consider the two
9  statements that Ms. Hendrix said he asked me
10  to show him what I saw the inmate doing and
11  Mr. Montgomery saying I didn't ask her to
12  show me how he was masturbating, that those
13  two statements showed a difference in
14  material fact?
15      MR. CHRISTMAN: Form.
16      A. Yes. I'd use the same answer.
17  Yes.
18      Q. So you realized there was a
19  difference in -- they couldn't agree on the
20  facts?
21      A. Right.
22      Q. And if you can't agree on the
23  facts, doesn't the procedure call for a

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 121

1  hearing?
2      A.  If a hearing -- If a grievance
3  procedure has been filed, yes.  At the time
4  that it was brought to my attention, a
5  complaint had been levied against Mr.
6  Montgomery.
7      Q.  So you don't think a grievance was
8  ever filed in this by Ms. Hendrix?
9      A.  Yes.  Eventually.  Once I assigned
10  Dr. Merk to investigate it and then put it
11  on the right steps.
12      Q.  Okay.  Now, did you ever get a
13  report from Dr. Merk on the grievance?
14      A.  Yes.
15      Q.  Did you find that his report had
16  conflicting -- excuse me -- had material
17  differences in the facts by what Ms. Hendrix
18  saw -- said happened and Mr. Malcolm
19  Montgomery said happened?
20      A.  Yes.  That never changed.
21      Q.  Well, sir, you're in charge of
22  seeing that the regulations are followed,
23  aren't you?

Page 122

1      A.  Yes.
2      Q.  And, I mean, you're kind of like
3  President Truman, the buck stops with you up
4  there?  I mean, if it's -- When it gets down
5  to it, you're the one that has to be sure
6  the rules are followed, aren't you?
7      A.  Right.
8      Q.  Okay.  Are you familiar with the
9  grievance procedure?
10      A.  Yes, I am.
11      Q.  And it's employee grievance
12  procedure number 620.02, isn't it?
13      A.  I'm not sure which number it is
14      Q.  Right.  Do you recognize that as
15  the grievance procedure, sir?
16      A.  Yes.
17      MR. CHRISTMAN:  We're looking at
18  Exhibit 2 to another deposition.
19      Q.  We're looking at Exhibit 2 to Dean
20  Merk's deposition.  Will you look at part
21  three of that.  It says investigative
22  procedures.
23      A.  Okay.

Page 123

1      Q.  The second paragraph.  You see
2  where it says if there is any dispute
3  between the parties as to factual
4  allegations?
5      A.  Uh-huh.
6      Q.  The coordinator shall schedule a
7  hearing which will be.  You see that part?
8      A.  Yes.
9      Q.  And as you read the report that
10  Dean Merk did for you, did you find there
11  was dispute between the parties as to the
12  factual allegations?
13      A.  That never changed throughout the
14  entire process.
15      Q.  Yes, sir.  There was a dispute of
16  those factual allegations, wasn't there?
17      A.  There was a difference of what Ms
18  -- There was a difference between what both
19  parties said.  And it started that way and
20  that never changed.
21      Q.  Yes, sir.  And this procedure
22  that's been adopted by the college said the
23  coordinator shall schedule a hearing,

Page 124

1  doesn't it?
2      A.  Yes.
3      Q.  Now, however, it goes on down,
4  that if both or all of the parties, if more
5  than two, agree to waive a hearing, the
6  hearing will be waived.
7      Have you seen any indication or
8  any information that either Ms. Hendrix or
9  Mr. Malcolm Montgomery agreed to waive the
10  hearing?
11      A.  I haven't seen anything to that
12  effect
13      Q.  Did anybody ever inform you they
14  had agreed to waive the hearing?
15      A.  No.
16      Q.  So in this case, shouldn't there
17  have been a hearing?
18      A.  It was not -- It was not at a
19  level to be presented to me at that point.
20      Q.  But --
21      A.  If you go back to the third part
22  on there, it tells you.  It says that -- the
23  grievance said -- it says should the

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 125

1 president, the grievance coordinator or
2 other designated official which to assist in
3 submitting a report. And it goes on to talk
4 about steps to be taken to get to that
5 point.
6    **Q. Yes, sir. I understand.**
7    A. So --
8    **Q. But I asked you earlier if it was**
9 **your job to make sure the process is**
10 **followed and I thought you told me yes?**
11    A. Yes. And it's also my job to make
12 sure that they have properly followed the
13 appropriate steps. And at this particular
14 level, it was not at the step where I was
15 supposed to be involved.
16    **Q. So you're telling me that it's not**
17 **your job to look and see if your coordinator**
18 **followed the appropriate steps?**
19    A. Only at the end of the report when
20 he's presenting it to me as being -- as his
21 work is being complete.
22    **Q. Okay. And at the end of the**
23 **report, it never changed, that there was**

Page 126

1 dispute of material fact?
2    A. Right. That's right.
3    **Q. Mr. Chambers, do you have a habit**
4 **of yelling at your employees?**
5    A. No.
6    **Q. Do you ever raise your voice at**
7 **your employees?**
8    A. Yes.
9    **Q. Under what circumstances do you**
10 **raise your voice at your employees?**
11    A. Usually when I'm disappointed or
12 we have a problem
13    **Q. Aren't you a trained counselor?**
14    A. Yes.
15    **Q. Have you been trained when to**
16 **discuss a problem with people that you**
17 **shouldn't be raising your voice?**
18    A. Yes.
19    **Q. So you know that when you raise**
20 **your voice, based on your training, that it**
21 **can cause more problems, don't you?**
22    A. Sometimes.
23    **Q. Okay. And you can take a**

Page 127

1 **situation that could be diffused or**
2 **resolved, but when you raise your voice, it**
3 **creates more animosity in another person?**
4 **You knew that, didn't you?**
5    A. Sometimes.
6    **Q. Based on your training?**
7    A. Sometimes.
8    **Q. Okay. Have you ever raised your**
9 **voice at Ms. Greene?**
10    A. I'm sure I have.
11    **Q. Have you ever raised your voice at**
12 **Ms. Greene in front of her employees?**
13    A. I'm sure I have.
14    **Q. Why doesn't Ingram State Technical**
15 **College have a dress code?**
16    A. Say why?
17    **Q. Why don't you have a dress code?**
18    A. Because there seems to be conflict
19 as to whether you can actually have one or
20 not statewide.
21    **Q. Conflict of what?**
22    A. Some agencies say you can and some
23 say you can't.

Page 128

1    **Q. As I understand, your student**
2 **population is one of the most unique in the**
3 **State of Alabama because they are all**
4 **felons, aren't they?**
5    A. That's right.
6    **Q. Each and every student you have at**
7 **that college is a felon?**
8    A. Right.
9    **Q. Now, over at the main campus, they**
10 **are all male felons; correct?**
11    A. That's right.
12    **Q. At the Tutwiler campus, they are**
13 **all female felons?**
14    A. That's right.
15    **Q. And at the other campus -- is it**
16 **Draper?**
17    MR. CHRISTMAN: Staton, Draper.
18    **Q. At the Staton, Draper campus, they**
19 **are all male felons, aren't they?**
20    A. That's right.
21    **Q. And in both areas, you have men**
22 **and women working, don't you?**
23    A. Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 129

1    MR. CHRISTMAN: You talking about
2  non-inmate.
3    MR. DEBARDELABEN: Yes.
4    **Q. Working employees?**
5    A. That's right.
6    **Q. Your employees in both areas are**
7  **men and women?**
8    A. Right.
9    **Q. Would you agree or disagree that**
10  **over the years there has been some confusion**
11  **over what is appropriate attire for either**
12  **the men or women to wear at your campuses?**
13    A. I know you said that's a agree or
14  disagree. No, I don't think there's been
15  any confusion.
16    **Q. Okay. Now, have you put out**
17  **memorandums concerning what people should**
18  **wear?**
19    A. Yes.
20    (Whereupon, Plaintiff's Exhibit
21  No. 21 was marked for identification and
22  attached to the original transcript.)
23    **Q. Now, you put this memorandum out**

Page 130

1  **in 1998 for all people to wear proper dress**
2  **code, didn't you?**
3    A. Yes.
4    **Q. And that was directed at males as**
5  **well as females, wasn't it?**
6    A. Yes.
7    **Q. There have been situations from**
8  **time to time at your main campus and at the**
9  **Staton, Draper campus of male inmates having**
10  **relations with each other, haven't there?**
11    A. There have been some alleged.
12    **Q. Homosexual --**
13    A. Oh, well, there's been some
14  alleged. I haven't witnessed any.
15    **Q. Right.**
16    A. But there's been some reports,
17  yes.
18    **Q. Been some reports. So what you**
19  **have, at least at the Draper Staton and the**
20  **main campus, you have apparently men that**
21  **are attracted to men in some instances?**
22    MR. CHRISTMAN: Object to the
23  form. Not established.

Page 131

1    **Q. Or reports of that?**
2    A. There's been reports of that, yes.
3    **Q. At the Draper Staton or at the**
4  **main campus, has there ever to your**
5  **knowledge been an attack by a male inmate**
6  **upon a female?**
7    A. Not that I know of. Not that I
8  recall.
9    **Q. Has there ever been any complaints**
10  **about a male attacking a female inmate -- I**
11  **mean a female that worked there or visited?**
12    A. Not physical attack, no.
13    MR. CHRISTMAN: You talking about
14  ever in the history of --
15    MR. DEBARDELABEN: To his
16  knowledge.
17    MR. CHRISTMAN: Answer what you
18  know.
19    A. Well, since I've been there, no.
20    **Q. You can only state about when**
21  **you've been there. And the person out of**
22  **all your deans, present deans, who has been**
23  **there the longest is Ms. Greene, isn't she?**

Page 132

1    A. Yes. No. Mr. Wilson has been
2  there the longest.
3    **Q. He hasn't been the dean as long,**
4  **has he?**
5    A. No.
6    **Q. Have you ever called Ms. Greene**
7  **into your office and told her she was weak?**
8    A. Yes.
9    **Q. Because she wants everybody to**
10  **like her?**
11    A. Not in the sense that you just
12  said it. But, yes.
13    **Q. In January of 2000, have you ever**
14  **called Ms. Greene -- did you call Ms. Greene**
15  **into your office, said I want you to get**
16  **real mad and curse?**
17    A. No. Not in that sense. I've
18  heard that. But, no.
19    **Q. Have you ever told her that she**
20  **needed to be and I, quote, a bitch?**
21    A. No.
22    **Q. You've never used those words?**
23    A. No.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 133

1    Q.  And if she says you did, you would
2  deny that?
3    A.  Yes, I would.
4    Q.  Have you ever, when Ms. Green was
5  not present on campus, have you ever called
6  Ms. Givens into your office along with Mr.
7  Bridgeman and discussed Ms. Greene?
8    A.  Yes.
9    Q.  Have you ever told them she was
10 weak?
11   A.  Yes.
12   Q.  And ineffective?
13   A.  Yes.
14   Q.  And not a good manager?
15   A.  I don't know about all the other
16 things you're addressing.  But I have had a
17 conversation to the first things that you
18 asked.
19   Q.  And did you do this in 2001?
20   A.  I can't recall the exact date.
21 But it did occur.
22   Q.  Have you done it more than once?
23   A.  Yes.

Page 134

1    Q.  And you're a trained counselor?
2    A.  Yes.
3    Q.  And you know that when you
4  criticize, don't you, a person's superior to
5  their subordinates, that you weaken that
6  person?
7    A.  Sometimes.
8    Q.  And you were aware of that
9  situation when you were doing it?
10   A.  That was not my focus at that
11 time.
12   Q.  That wasn't your focus?
13   A.  No.
14   Q.  But you were aware that when a
15 person's superior criticizes that person to
16 that person's subordinate, that it can
17 create a very adverse situation for both the
18 subordinates and their immediate superior?
19   A.  Like I said, that was not my focus
20 at that time.
21   Q.  Yes, sir.
22   A.  And our meetings were to do -- to
23 reach another end.  It was not designed to

Page 135

1  criticize her.  It was designed to --
2    Q.  But you did do --
3      MR. CHRISTMAN:  Hold on just a
4  second.
5    A.  It was designed to get the work
6  completed.  And they were two people who
7  were capable of doing that work.  And that's
8  why they were called in.
9    Q.  But you did criticize Ms. Greene
10 to them?
11   A.  I did not call it criticism at
12 that time.  I was trying to get to an end.
13   Q.  Why did you pick times when Ms.
14 Greene wasn't on campus?
15   A.  So that I could get the work
16 completed.
17   Q.  But as I look at the examiners
18 reports of about approximately a ten-year
19 period that we've gone through, you've only
20 given me one example where the Department of
21 Examiners of Public Accounts found a
22 criticism that wasn't considered a major
23 weakness?

Page 136

1    A.  But I could give you several
2  examples in these where they've had
3  findings.  If you were to read my responses,
4  my -- not one of my responses addressed what
5  they found other than in the findings.
6    Q.  Now, in March of 2002, did you
7  tell Mr. Bridgeman and Ms. Givens that he
8  knew Ms. Greene was weak and ineffective,
9  and that if they needed to talk with you
10 concerning this, to please feel free to come
11 forward and come in and see him?
12   A.  Not in those terms.  But it's in
13 the same content of the question you asked
14 me previous.
15   Q.  And, in fact, you have told Ms.
16 Givens, didn't you, if she's ever asked
17 about these conversations, just to tell the
18 truth?
19   A.  I don't recall.  But -- I don't
20 recall.  I will say that I've even informed
21 Ms. Greene after she would return to work
22 that I had met with her employees.
23     (Whereupon, Plaintiff's Exhibit

34  (Pages 133 to 136)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 137

1  No. 22 was marked for identification and
2  attached to the original transcript.)
3      Q.  Let me show you what I have marked
4  as Plaintiff's Exhibit 22. And this appears
5  to be a memorandum from Sandy Caylor to you
6  dated February 16th, 2006. Do you recall
7  getting that memorandum from Ms. Caylor?
8      A.  Yes, I do.
9      Q.  Do you recall the conversations
10  she refers to?
11      A.  Yes, I do.
12      Q.  Do you recall Dean Wilson making
13  comments as that letter states?
14      A.  No.
15      Q.  Did Ms. Caylor misunderstand?
16      A.  Yes.
17      Q.  But how many times have you gotten
18  a memorandum written like that?
19      MR. CHRISTMAN: Object to the form
20  of the question.
21      Q.  If you can remember.
22      MR. CHRISTMAN: I don't know what
23  like that means.

Page 138

1      Q.  Concerning a conversation with you
2  and another dean.
3      A.  Very seldom. I don't get a lot of
4  memorandums from instructors or employees.
5      Q.  That's highly unusual. Let's just
6  say that's unusual for you to get a
7  memorandum such as Ms. Caylor sent you,
8  isn't it?
9      A.  Well, it's in a small number. I
10  don't get -- I wouldn't say highly unusual,
11  because I do get notes from people.
12      Q.  I corrected that and said
13  unusual.
14      A.  Well, no, I get them. But not in
15  large quantities.
16      Q.  What did you do after you got that
17  memorandum?
18      A.  I read it. The next morning she
19  came and I asked her, I said, I read your
20  memorandum, but did we have a
21  misunderstanding. I told her what I thought
22  I heard and she told me what she thought she
23  was hearing. When she left my office, I

Page 139

1  thought everything was cleared up.
2      Q.  But she felt uncomfortable enough
3  about the -- for whatever reason to write
4  that memorandum to you, to make sure you
5  would understand what --
6      MR. CHRISTMAN: I object to the
7  form as to whether he knows how she felt.
8  Answer if you know how she felt.
9      A.  I don't know how she felt.
10      Q.  Okay. Now, I've heard claims
11  about Ms. Greene not paying bills on time.
12  And I've read that in your complaints -- I
13  mean your write-up. Can you give me an
14  example of one bill she hasn't paid on time?
15      A.  I can't recall any one in
16  particular. But there are a lot of them.
17  We have those on file. I can get whatever
18  you need.
19      Q.  Does the examiners of public
20  accounts audit that?
21      A.  They do a test of that, yes.
22      Q.  Yes, sir. And if it's -- Aren't
23  there tests designed to find problems with

Page 140

1  colleges or any institution they audit?
2      MR. CHRISTMAN: Form.
3      A.  I'm sure there are. But I
4  wouldn't have any knowledge of that.
5      Q.  Right. They are the professionals
6  and they're charged with auditing it to make
7  sure that the money is handled right, isn't
8  it?
9      A.  From my understanding, yes.
10      Q.  And I think in the front of their
11  book, I think they certify, don't they -- if
12  you want to read it -- the audit was
13  conducted in accordance with the generally
14  accepted governmental auditing standards for
15  financial audits?
16      MR. CHRISTMAN: What are you
17  reading from there, Mr. Debardelaben?
18      MR. DEBARDELABEN: The scope and
19  objective of the audit. And it's usually on
20  the index page A.
21      MR. CHRISTMAN: Are you looking at
22  an exhibit?
23      MR. DEBARDELABEN: I'm reading

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 141

1   from particularly Plaintiff's Exhibit 10.
2   But I believe it will say the same thing on
3   all examiners exhibits. When I say
4   examiners, I'm talking about the State
5   Department -- I mean the Department of
6   Examiners of Public Accounts of the State of
7   Alabama.
8       Q. And it says the objectives of the
9   audits were to determine whether the
10  financial statements presented fairly the
11  financial position and results of financial
12  operation and whether the college has
13  complied with the applicable laws and
14  regulations. That's their purpose, isn't
15  it?
16      A. According to that, yes, sir.
17      Q. Yes. And, Mr. Chambers, would you
18  defer to the examiners of public accounts'
19  expertise in the auditing of the financial
20  records of Ingram State Technical College?
21          MR. CHRISTMAN: Form.
22      A. I'm not sure I understand your
23  question. Would I defer?

Page 142

1       Q. Would you think the examiners of
2   public accounts has more expertise in the
3   auditing of financial records in determining
4   if anything was wrong of Ingram than you
5   would?
6       A. Yes.
7       Q. And you would expect them to defer
8   to your ability in education, wouldn't you?
9           MR. CHRISTMAN: Form.
10      A. Sometimes.
11          MR. DEBARDELABEN: Could y'all
12  excuse me for a minute.
13          (Whereupon, a short recess was
14  taken.)
15      Q. Mr. Chambers, do you remember when
16  Mr. Bridgeman retired?
17      A. Yes.
18      Q. He was a, what, senior accountant?
19      A. I don't know whether they called
20  him a senior accountant. But he was a --
21      Q. He was an accountant?
22      A. He was the top accountant.
23      Q. And was he the assistant to the

Page 143

1   fiscal dean?
2       A. I don't know whether his title was
3   assistant to her. But he was next in line.
4       Q. Okay. When he retired, do you
5   remember telling Dean Greene that Ms. Givens
6   could have Mr. Bridgeman's job?
7       A. No.
8       Q. You never told her she could have
9   the job, but couldn't get paid for it?
10      A. No.
11      Q. No raise in pay?
12      A. No.
13      Q. If Mr. Greene says that, it's
14  wrong?
15      A. That's right.
16      Q. Okay. So it's your testimony
17  today that that job was never offered by you
18  to Ms. Givens through Dean Greene?
19          MR. CHRISTMAN: Talking about
20  Bridgeman's job.
21          MR. DEBARDELABEN: Right.
22      A. That's right.
23      Q. And a person was subsequently

Page 144

1   hired to replace Mr. Bridgeman, wasn't
2   there?
3       A. Not to my knowledge.
4       Q. Nobody has been hired to replace
5   Mr. Bridgeman?
6       A. Not to replace Mr. Bridgeman, no.
7       Q. What about Mr. Bridgeman's
8   position?
9       A. Ms. Greene reorganized that.
10      Q. Okay. Now, do you know a Ms.
11  Bonita Owensby?
12      A. Yes.
13      Q. How do you know Ms. Owensby?
14      A. From meeting her when I started
15  working at Ingram.
16      Q. Okay. And what was Ms. Owensby's
17  position?
18      A. When I came to Ingram?
19      Q. Yes.
20      A. I'm not sure.
21      Q. Who does Ms. Owensby work under,
22  which dean?
23      A. Dean Wilson.

36 (Pages 141 to 144)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 145

1    Q.  And do you know what job she has
2   now?
3       A.  No.  Not by title I don't.
4       (Whereupon, Plaintiff's Exhibits
5   No. 23 - 24 were marked for identification
6   and attached to the original transcript.)
7       Q.  Show you what we've marked as
8   Plaintiff's Exhibit 23 and ask if you
9   recognize that document?
10      A.  Yes.
11      Q.  What's that document?
12      A.  This is a memorandum of contracts
13  agreement for Ms. Bonita Owensby from me.
14      Q.  And what position did you appoint
15  her to?
16      A.  Registrar, assistant to the Dean
17  of Students and Student Support Services.
18      Q.  Okay.  So she is the registrar?
19      A.  Yes.
20      Q.  What are the duties of the
21  registrar?
22      A.  Well, they vary.  She's in charge
23  of records and maintenance of the admissions

Page 146

1   office.
2       Q.  Who was registrar before her?
3       A.  Mr. Tim Robinson.
4       Q.  And Ms. Owensby is a black female,
5   isn't she?
6       A.  Yes.  To the best of my knowledge,
7   yes.
8       Q.  Appears to be, doesn't she?
9       A.  Yes.
10      Q.  And Mr. Tim Robinson was a black
11  male?
12      A.  Yes.
13      Q.  And do you recognize this as a job
14  description for Mr. Robinson?
15      MR. CHRISTMAN:  Form.
16      A.  No, I do not.
17      Q.  Okay.  Who would be the best one
18  to ask about that?
19      A.  He's retired.  But it would be the
20  past Dean of Students.  What was his name?
21  I can't answer your -- Reeder.
22      Q.  Dean Reeder?
23      A.  Dean Reeder.

Page 147

1       Q.  And what about -- When did -- Who
2   was the personnel director before Dean Merk
3   became personnel director?  Was it Mr. Greg
4   Wright?
5       A.  Yes.
6       Q.  Would he have knowledge of that,
7   too, being a personnel director?
8       A.  He should.
9       Q.  Does Ms. Owensby perform
10  approximately the same job as Mr. Robinson
11  as registrar?
12      A.  She does some of the work.  But to
13  say that they did the exact same thing --
14  because Mr. Robinson also taught classes.
15  He had other duties I know she's not doing.
16      Q.  And Ms. Owensby is the assistant
17  to the Dean of Students that Mr. --
18      A.  Wilson.
19      Q.  Mr. Robinson wasn't?
20      A.  Pardon me?
21      Q.  Mr. Robinson was not the assistant
22  to the Dean of Students, was she?
23      A.  Was he.

Page 148

1       Q.  Was he.
2       A.  Not to my knowledge, no.
3       Q.  So they were both registrars and
4   they have other jobs?
5       A.  He was registrar and had other
6   jobs.
7       Q.  And she's registrar and has other
8   jobs?
9       A.  As assistant to the dean, yes.
10      Q.  All right.  Are you aware that Ms.
11  Owensby is paid substantially less now than
12  Mr. Robinson was when he left the job?
13      A.  Yes.
14      Q.  And he left the job in 1999,
15  didn't he?
16      A.  Around that time, yes.
17      Q.  And at that time, he was paid
18  approximately sixty-seven thousand dollars,
19  wasn't he?
20      A.  I could not tell you.  I don't
21  know.
22      Q.  And are you aware that Ms. Owensby
23  is only paid sixty thousand dollars today?

37  (Pages 145 to 148)

# FREEDOM COURT REPORTING

Page 149

1    A. Yes.
2    Q. And since '99, which has been
3    about seven years, there's been several pay
4    increases by the State, hasn't there?
5    A. Yes.
6    Q. But she still is not as high as
7    where Mr. Robinson was when he left the job,
8    is she?
9    A. That's right.
10   Q. What's the reason for that?
11   A. I can't answer why she's not where
12   he was. I can answer why where she is now.
13   Q. Who would be able to answer the
14   question as to why she's not on the same pay
15   scale as Mr. Robinson?
16   A. I don't know.
17   Q. You're the president, aren't you?
18   A. Yes, I am.
19   Q. And if you send Ms. Greene a
20   memorandum to put somebody on a certain pay
21   scale, she has to do that, doesn't she?
22   A. Yes. But I wouldn't be saying it
23   because of Mr. Robinson. I would be saying

Page 150

1    it because this is where the person is
2    placed and this is the salary that goes with
3    that placement.
4    Q. Now, you would agree with me that
5    if Ms. Greene saw you doing something that
6    is improper or illegal, she should say no,
7    President Chambers, I'm not going to do
8    that, it could get us both in trouble?
9    A. I would certainly hope so.
10   Q. That's her job?
11   A. Yes. That's all employees job.
12   Q. One of her main jobs, one of her
13   main jobs is to make sure that the money
14   expended by J.F. Ingram is properly
15   expended, isn't it?
16   A. Yes.
17   Q. And that's probably number one,
18   isn't it?
19   A. Yes.
20   Q. You can get in all kinds of
21   trouble if that money is improperly spent,
22   isn't it?
23   A. Yes.

Page 151

1    Q. And she has all the deans all the
2    time wanting her to spend money for things,
3    doesn't she?
4    A. Yes.
5    Q. And it's -- When I say her, it's
6    her and her staff's job to make sure that
7    all the i's are dotted and all the t's are
8    crossed, so to speak, and all legal
9    requirements are met before that money is
10   spent?
11   A. Yes.
12   Q. And if it's not spent correctly,
13   it's her fault, isn't it?
14   A. And mine.
15   Q. Right. But you depend on her to
16   make sure it's spent legally, don't you?
17   A. Yes.
18   Q. Because quite frankly, you're not
19   trained in that area, are you?
20   A. No.
21   Q. And you have to depend on her?
22   A. Yes.
23   Q. Okay. And in the entire time

Page 152

1    you've been there, nobody has questioned how
2    your money was spent in the sense that it's
3    been spent improperly or illegally?
4    A. Yes.
5    Q. When did they say it's been spent
6    improperly or illegally?
7    A. I can't give you an exact date or
8    time. But there's been some question as to
9    whether a purchase was appropriate and
10   whether travel was -- should have been
11   billed under one budget. But not anything
12   of a major issue.
13        MR. CHRISTMAN: You talking about
14   up to today?
15        MR. DEBARDELABEN: Yes. Up to
16   today.
17   A. Well, we have one in our audit now
18   about -- we're talking about not in
19   appropriate spending. But we have some
20   question about spending related to the
21   checks.
22        We also have a situation now
23   that's -- where we've allowed some charges

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 153

1  that were over and beyond that should have
2  been closed out in last year's budget.
3      Q.  Did they find a major -- what's
4  that word?
5      A.  Finding?
6      Q.  Yes.
7      A.  Yes.
8      Q.  What do they call that thing?
9      A.  Material weakness.
10     Q.  A material weakness identified
11 that was -- yes.  That would make it a
12 qualified audit.
13     A.  You have training as an auditor.
14 You've already said that.  But you keep
15 referring to that part.  My responses are
16 only to the findings.
17     Q.  Okay.  No, sir.  I do not have
18 training as an auditor.  I was their legal
19 counsel.
20     A.  Oh, okay.  Well, you hear enough
21 of it then.
22     Q.  Are you aware that Ms. Owensby
23 filed a grievance concerning her pay?

Page 154

1      A.  A grievance to me or to the
2  college?
3      Q.  To the college.  I assume all
4  grievances go to you?
5      A.  But she also filed some other
6  issues, too.
7      Q.  Yes, sir.  But she filed an issue
8  on her pay.  Were you aware of that?
9      A.  Yes.
10     Q.  Tell me about this pay schedule.
11 I'm fairly confused about it.  You have an A
12 to E?
13     A.  Right.
14     Q.  And the E is the lowest and A is
15 the highest?
16     A.  Yes.
17     Q.  Okay.
18     A.  Full-time.
19     Q.  Okay.  Mr. Griswold, Bill
20 Griswold, what's his title?
21     A.  Assistant to the Dean of
22 Instruction.
23     Q.  Okay.  And that's Dean Merk;

Page 155

1  correct?
2      A.  Right.
3      Q.  And is his title assistant to the
4  dean or assistant to the college, college
5  dean?  Is he assistant to the dean of
6  instruction or assistant to the Dean of the
7  College?
8      A.  He's Dr. Merk's assistant.  He
9  could have been assistant to the Dean of the
10 College at one time because that was the
11 Dean of Instruction, also
12     Q.  Because at one time, until it was
13 rearranged, Dr. Huffstutler was Dean of the
14 College?
15     A.  Right.
16     Q.  And if memory serves me correct,
17 Dr. Huffstutler came to Ingram when you came
18 to Ingram?
19     A.  Right.
20     Q.  You brought him with you from
21 Chattahoochee Valley?
22     A.  No.  He didn't come with me.  He
23 came later.

Page 156

1      Q.  Later.  But he talked with you and
2  worked with you at Chattahoochee Valley?
3      A.  Right.
4      Q.  Now, did Dr. Huffstutler have to
5  apply for that and go through an application
6  process or did you appoint him?
7      A.  No.  He went through an
8  application process.
9      Q.  And he came over as Dean of the
10 College?
11     A.  Dean of Instruction.
12     Q.  Dean of Instruction.  When did he
13 become Dean of the College?
14     A.  I can't give you an exact time.
15 But it was after he had been there for a
16 while.
17     Q.  Who was Dean of the College when
18 you got there?
19     A.  I think Mr. Bruce Thomas.  I don't
20 know whether he was titled the Dean of the
21 College, but he was academic dean in charge.
22     Q.  And Mr. Thomas, he retired shortly
23 thereafter, didn't he?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 157

1    A.  Yes.
2    Q.  Medical reasons?
3    A.  Yes.
4    Q.  And you knew he has since
5    deceased?
6    A.  Right.
7    Q.  Who is Dean Wilson's assistant?
8    Does he have an assistant?
9    A.  No, he does not.  You mean as
10   assistant dean?
11   Q.  Yes.
12   A.  No.
13   Q.  But Ms. Owensby is assistant to
14   the Dean of Students, isn't she?
15   A.  Yes.  Assistant to the Dean of
16   Students, not assistant Dean of Students.
17   There's a difference.
18   Q.  Okay.  So what is the difference
19   between assistant to the dean and like Mr.
20   Griswold is?  Is he a dean's assistant or
21   assistant to the dean?
22   A.  Assistant to the dean.
23   Q.  So there's no difference?

Page 158

1    MR. CHRISTMAN:  Between the two of
2    them.
3    Q.  Between the two of them in the
4    position they hold?
5    A.  As far as titles, no.  But the
6    role in duties -- job duties and
7    responsibilities, they are different.
8    Q.  That's what I'm getting at.  On
9    salary scale, do you have a salary scale for
10   the assistant to the dean that all
11   assistants to the dean are on?
12   A.  No.
13   Q.  Is the salary scale of the person
14   for the position or for the person occupying
15   the position?
16   MR. CHRISTMAN:  I object to the
17   form of that question.  I don't understand
18   it.
19   Q.  Is the salary set by position or
20   is it set by the person occupying the
21   position?
22   A.  For the position.
23   Q.  Okay.  So do you have a salary

Page 159

1    scale for assistants to the deans?
2    A.  No.
3    Q.  Do you have a particular salary
4    scale for assistants to Dean of Students and
5    Support Services?
6    A.  No.
7    Q.  And you have no salary scale for
8    assistants to the Dean of Instruction?
9    A.  No.
10   Q.  So how is it determined what the
11   salary of Ms. Owensby and/or Mr. Griswold is
12   that occupies those two positions?
13   A.  Well, they are usually looked upon
14   as years at the college.  That involves
15   steps that they are placed on.  And in
16   particular cases, if it's on a C scale,
17   there's one scale that will allow for a
18   negotiable salary based on duties, jobs,
19   roles, responsibilities.
20   Q.  What about an E scale?
21   A.  E scale has three levels.  And
22   it's left up to the supervisor to determine
23   and evaluate the employees and recommend

Page 160

1    that they go up on the scale or whether they
2    go to another step once they complete the
3    three that's available for them.
4    Q.  Have you ever had a budget meeting
5    with Ms. Greene?
6    A.  Yes.
7    Q.  And one of the things she has to
8    do besides pay the bills and keep up with
9    the money is to figure out what the budget
10   will be for the next year; correct?
11   A.  Yes.
12   Q.  Now, does J.F. Ingram have a
13   surplus budget?
14   A.  I don't know.
15   Q.  Would that be a good thing to
16   have?
17   A.  Yes.
18   Q.  Is that something that Ms. Greene
19   should strive to create for J.F. Ingram?
20   A.  Yes.
21   Q.  Have you ever asked her to strive
22   to keep a surplus budget for J.F. Ingram?
23   A.  Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 161

1    Q.  And you don't know if she has one
2  or not?
3    A.  That's right.
4    Q.  What would be a good size surplus
5  budget for your school?  Would a million
6  dollars?
7    A.  Two would be good.
8    Q.  Two.  And if there's anything over
9  two million dollars, it's exceptional, isn't
10  it?
11    A.  In our particular case, yes.
12    Q.  Do you recall in September of '02
13  yelling at Ms. Greene about a Home Depot
14  bill?
15    A.  I don't recall that date or
16  particular setting.
17    Q.  Are you denying you did that?
18    A.  No, I am not denying that I did
19  it.  I'm saying I do not recall that
20  particular date or setting.
21    Q.  Have you ever asked Ms. Greene to
22  resign her job?
23    A.  Not in the sense that you just

Page 162

1  stated, no.
2    Q.  Have you asked her in any sense to
3  resign her job?
4    A.  Yes.
5    Q.  What sense have you asked her to
6  resign?
7    A.  If she did not want to do her job,
8  then she should resign.
9    Q.  What part of her job is she not
10  doing?
11    MR. CHRISTMAN:  You talking about
12  in any sense or just one that let it all go?
13    A.  I'm sorry.  I thought I was
14  waiting.  Running the business office in an
15  effective way.
16    Q.  Now, didn't you just tell me that
17  if she had a surplus at the end of the year
18  of two million dollars, that would be
19  excellent?
20    A.  Yes.  As a surplus, yes.
21    MR. CHRISTMAN:  You said surplus
22  budget.
23    Q.  And if it's anything over two

Page 163

1  million, it would be extremely good?
2    A.  Yes.  That two million you're
3  looking at is only for in case we have a
4  crisis.  That would carry us for two to
5  three six months.
6    Q.  Do you realize in 2003 it was two
7  point nine million and 2004 it was two point
8  one million surplus?
9    A.  Yes.
10    Q.  At the end of the year?
11    A.  Yes.
12    Q.  That's extremely good, isn't it?
13    A.  No, it's not.  It's only -- That
14  would only carry the college -- if we have a
15  crisis, that would only carry the college
16  anywhere from three to six months.
17    Q.  So when you told me earlier that
18  if you had two million --
19    A.  You said surplus budget.  I do not
20  consider that as a surplus.  That is a --
21  I'm trying to bring that even higher.  The
22  State requires us to have a three year plan
23  for emergencies.

Page 164

1    I think that would carry us until
2  about six months.  And I'm trying to get it
3  up to a year.  So that does not leave us any
4  funds for buildings or any type of major
5  projects.
6    Q.  Let me understand how you get your
7  money.  Your money is appropriated by the
8  legislature, isn't it?
9    A.  Right.
10    Q.  And to get the money appropriated
11  by the legislature, you have to submit a
12  budget to the Chancellor's office; is that
13  correct?
14    A.  Not exactly.
15    Q.  Okay.  Do you submit a budget
16  directly to the State legislature?
17    A.  No.  We only submit a budget once
18  so they can get a picture as to what we're
19  requesting.  But our appropriation is based
20  on -- it comes out of the Chancellor's
21  office.
22    Q.  Comes out of your Chancellor's
23  office?

41  (Pages 161 to 164)

# FREEDOM COURT REPORTING

Page 165

1    A.  They give us a figure as to how
2  much money we're going to get.  And then we
3  base the budget on that.
4    Q.  And you don't give the
5  Chancellor's office input into the amount of
6  money you need every year to run your
7  operation?
8    A.  No.
9    Q.  They just give you a figure and
10  say you have to run your operation on this?
11    A.  That's right.
12    Q.  And they've always done it that
13  way?
14    A.  Ever since I've been there.
15    Q.  And you have no input into
16  determining how much money -- when I say
17  you, the college -- has no input in
18  determining how much money its going to get?
19    A.  That's right.
20    Q.  Okay.  But you get it once a year?
21    A.  Right.  We get it appropriated
22  once a year.
23    Q.  How often is money sent in to the

Page 166

1  college?
2    A.  Some of it is sent in monthly and
3  some of it is sent in quarterly.  I can't
4  tell you exactly when or where.  But it
5  comes through the year during the year.
6    Q.  And in some, you get Federal funds
7  and some you get State funds?
8    A.  Right.
9    Q.  And does Ms. Greene -- is she
10  responsible for keeping up with all the
11  budgets including the Federal funds?
12    A.  Yes.
13    Q.  Is she responsible for getting the
14  Federal grants?
15    A.  No.
16    Q.  Are different people at the
17  college responsible for getting Federal
18  grants?
19    A.  Yes.
20    Q.  On those grants, the Federal
21  grants you get, is it designated who the
22  funds will go through?
23    A.  Yes.

Page 167

1    Q.  Now, is Ms. Greene the designee
2  for those funds?
3    A.  She's the receiver of those funds.
4    Q.  She's the receiver?
5    A.  Yes.
6    Q.  And she's the one responsible for
7  those funds and grants?
8    A.  Yes.
9    Q.  And how many grants do y'all have
10  getting Federal funds?
11    A.  We have several.  But the major
12  ones are the Student Support Services and
13  the Transitional Youth Offender grant.
14    Q.  And Ms. Greene has complete
15  control of all that paperwork getting those
16  -- dealing with those grants?
17    A.  No.
18    Q.  Who does?
19    A.  The director along with Ms.
20  Greene.  You said the complete paperwork?
21    Q.  Yes.
22    A.  The director and Ms. Greene.
23    Q.  Where does Ms. Greene get her

Page 168

1  information about the grants from the
2  director?
3    A.  No.  She gets it from Washington
4  D.C., or she gets it from the State
5  Department where the grant is coming from.
6    Q.  Okay.  Are you telling me today
7  that all the information should go directly
8  to Ms. Greene?
9    A.  We receive a notification about
10  whether we've received an award or not and
11  it will tell us how much the award will be
12  and how we can expect to get it.  That
13  information goes directly to Ms. Greene and
14  the director.
15    Q.  And the director?
16    A.  Yes.
17    Q.  And if it's not going to Ms.
18  Greene, then something is wrong?
19    A.  It should be, yes.
20    Q.  And whose responsibility is it to
21  see that it goes to Ms. Greene?
22    A.  Well, those that are sent directly
23  to me, it's my responsibility.  If it's sent

42 (Pages 165 to 168)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 169

1  through notification, it's sent directly to
2  a director, it's their responsibility to get
3  that information to her.
4      Q.  And you would agree with me,
5  wouldn't you, that Ms. Greene's office can
6  be only as effective as the information she
7  receives?
8      A.  Yes.
9      Q.  Do you recall requesting Ms.
10  Givens to get a string off of Shannon
11  Cherry's behind?
12      A.  No.
13      Q.  Do you recall making a remark to
14  Ms. Givens about Ms. Cherry, that if those
15  pants weren't so tight on her ass, you
16  wouldn't notice those type things?
17      A.  No.
18      Q.  Are you saying you didn't make
19  that remark?
20      A.  That's right.
21      Q.  If Ms. Givens says you did, then
22  that's an incorrect comment?
23      A.  That's right.

Page 170

1      Q.  And Ms. Givens is lying?
2      A.  That's right.
3      Q.  Okay.  Did you ever make the
4  comment to Ms. Julie Wood that Mr. Wilson
5  talks about women wearing their pants too
6  tight, but that Mr. Wilson doesn't say
7  anything about Tonya Trimble's pants going
8  up her butt crack?
9      A.  No.
10      Q.  You never made that statement?
11      A.  No, I did not.
12      Q.  If such statements like that were
13  made, that would be improper, wouldn't it?
14  That wouldn't be proper statements to make
15  in the work place by a male to a female
16  employee, would it?
17      A.  The way you stated it, I would
18  agree.
19      Q.  Did you ever ask an inmate student
20  words or words to the effect that Ms. Beth
21  White does not look four months pregnant?
22      A.  No.
23      Q.  Did you ever comment to an inmate

Page 171

1  about Ms. White's looks when she was
2  pregnant?
3      A.  Yes.
4      Q.  What did you say?
5      A.  That she was talking about her
6  size and I simply said you don't even look
7  like you're pregnant.  And she went on to
8  discuss how small she is and knowing she is
9  not showing the sign until she's about to
10  give birth.
11      Q.  Did you discuss that with an
12  inmate?
13      A.  No, I did not.
14      Q.  Okay.  That would be improper,
15  wouldn't it?
16      A.  It depends.
17      Q.  You think discussing a female
18  employee's body with an inmate would be
19  proper?
20      A.  I didn't say I discussed a female
21  body with an inmate.
22      Q.  Well, you said depends.
23      A.  Well, that does depend.  We

Page 172

1  discuss a lot with inmates.  We have inmates
2  as aides and everything else.  But the way
3  you stated it, that would be improper if it
4  occurred.
5      Q.  Mr. Chambers, have you ever called
6  a meeting of the ladies at the main campus
7  and discussed with them that they could no
8  longer wear jeans or tennis shoes to work?
9      A.  Yes.
10      Q.  Did you call a meeting with the
11  men and tell them the same thing?
12      A.  Not by themselves, no.
13      Q.  Why did you call a separate
14  meeting with the ladies?
15      A.  Because the ladies are the ones
16  that I was concerned about.
17      Q.  Okay.  Again, there's never been
18  any attack on the ladies while you've been
19  there, have there?
20      A.  No, there haven't.
21      Q.  Did you have a meeting with the
22  ladies over at the Staton Draper campus?
23      A.  We've had some individually, yes.

43 (Pages 169 to 172)

# FREEDOM COURT REPORTING

Page 173

1  Q.  Okay.  Did you have a meeting with
2  the men over at the Staton Draper campus?
3  A.  Yes.  On an individual, yes.
4  Q.  What about at the Tutwiler campus?
5  A.  We've never had a problem with
6  dressing over at the Tutwiler campus.  The
7  answer is no.
8  Q.  Have you ever had any male inmates
9  at the main campus filing any complaints
10  against the female employees at the main
11  campus for harassment or anything?
12      MR. CHRISTMAN:  Form.
13  A.  No.  Not that I recall.
14  Q.  Now, over at the Tutwiler campus,
15  haven't you had some complaints filed by
16  female inmates concerning sexual harassment
17  by male instructors?
18  A.  Yes.
19  Q.  In fact, you've even had to call
20  ABI in to investigate, haven't you?
21  A.  No.
22  Q.  Who investigated it?
23  A.  The Department of Corrections.

Page 174

1  Q.  The Department of Corrections.
2  But you never had such an investigation of
3  that over at J.F. Ingram campus concerning
4  females, have you?
5  A.  Not an investigation.  But
6  interviews by the Department of Corrections.
7  Q.  Okay.  Do you have any idea what
8  percentage of male employees you've hired as
9  opposed to the percent of female employees
10  since you've been there?
11  A.  No, I don't.
12  Q.  Do you have any idea of the
13  percentage of black employees you've hired
14  as opposed to white employees since you've
15  been at J.F. Ingram?  I said there a while
16  ago.  You understood J.F. Ingram, didn't
17  you?
18  A.  No, I don't.
19  Q.  Who would be the best source to
20  get that information from?
21  A.  Dr. Merk or employee personnel
22  staff.
23  Q.  Okay.  Now, what about the

Page 175

1  salaries that are paid to people who are
2  hired?  Who would be the proper source to
3  get that from?
4  A.  From Dr. Merk and from the
5  business office.
6  Q.  The business office would be the
7  best source for the salaries, wouldn't it?
8  A.  Yes.
9  Q.  And as I understand, the salary
10  clerk for -- if that's what you call it --
11  the clerk that does the salary is Ms. Julie
12  Givens, isn't it?
13  A.  I don't know whether she is a
14  clerk.
15  Q.  Well, she's --
16  A.  When you say does the salary --
17  Q.  Ms. Givens does the payroll,
18  doesn't she?
19  A.  Right.
20  Q.  She's in charge of the payroll.
21  And I think at most businesses -- and I
22  don't know if this is the proper title.
23  They refer to it as payroll clerk.  Is that

Page 176

1  true?
2  A.  Well, we don't call it that.  But
3  those are some of the duties that falls
4  under that.
5  Q.  Okay.  But actually Ms. Givens'
6  title is assistant to the fiscal dean, isn't
7  it?
8  A.  I think so, yes.
9  Q.  Okay.  And under that, she has
10  various duties?
11  A.  Right.
12  Q.  Okay.
13      MR. DEBARDELABEN:  Let's take a
14  small break.
15      MR. CHRISTMAN:  Sure.
16      (Whereupon, a short recess was
17  taken.)
18  Q.  Mr. Chambers, what's the purpose
19  of an employee's personnel file?
20  A.  To keep their files so they would
21  have a record.
22  Q.  A record of what?
23  A.  Of various things that's required

44  (Pages 173 to 176)

# FREEDOM COURT REPORTING

Page 177

1  by the State Board and to know who they are.
2      **Q. Okay. And it should be -- Should**
3  **it be a record of their employment?**
4      A. Should be, yes.
5      **Q. And what they're doing right and**
6  **what they're doing wrong?**
7          MR. CHRISTMAN: Form.
8      A. Other than the evaluation form?
9      **Q. Uh-huh.**
10     A. No. It's --
11     **Q. Let me put it this way and ask you**
12 **this way. Maybe I can get a document and**
13 **find out. Is there a policy and procedure**
14 **of J.F. Ingram State Technical College or**
15 **the State Board of Education that requires**
16 **certain things to be in the personnel file?**
17     A. Yes.
18     **Q. Now, is it a policy and procedure**
19 **of the State Board?**
20     A. Yes.
21     **Q. Is there a policy and procedure of**
22 **J.F. Ingram on personnel files?**
23     A. No.

Page 178

1      **Q. So if I want to find out what's**
2  **required in the personnel file, I can get**
3  **the policy and procedure book produced by**
4  **the State Board of Education?**
5      A. No.
6      **Q. What do I get?**
7      A. You will get what we have in the
8  personnel file that's put in by personnel.
9  They get their -- most of their guidance and
10 direction from the human resources, from the
11 Chancellor's office.
12     **Q. From the Chancellor's office. So**
13 **do I need to look at the Department of**
14 **Postsecondary Education for the requirements**
15 **of what's to be in a personnel file?**
16     A. Those mandated things, yes.
17     **Q. Okay. And whose responsibility is**
18 **it to see that the mandated items are in the**
19 **personnel file at the various colleges?**
20     A. Personnel.
21     **Q. Personnel?**
22     A. Yes.
23     **Q. Okay. So if it's not in there,**

Page 179

1  **the personnel director is held responsible?**
2      A. Right.
3      **Q. By whom?**
4      A. By me.
5      **Q. Who holds you responsible?**
6          MR. CHRISTMAN: You talking by him
7  at -- who at his college?
8          MR. DEBARDELABEN: Yes.
9          MR. CHRISTMAN: You talking about
10 --
11     **Q. Who holds you responsible?**
12     A. The Chancellor.
13     **Q. Okay. Is it a fair statement, Mr.**
14 **Chambers, to say that you are responsible**
15 **for everything that goes on at J.F. Ingram?**
16     A. Yes.
17     **Q. Excuse me. I don't think that's a**
18 **fair statement. I think it's a better or**
19 **fair statement to say that you are held**
20 **responsible for everything that goes on at**
21 **J.F. Ingram?**
22     A. Yes.
23         MR. CHRISTMAN: Form.

Page 180

1      **Q. And you allocate responsibilities**
2  **to your various deans, don't you?**
3      A. Yes.
4          MR. CHRISTMAN: Form.
5      **Q. And are you -- Do you expect your**
6  **various deans to allocate responsibilities**
7  **to people within their department?**
8      A. Yes.
9      **Q. And when something in the**
10 **department goes wrong, your contact -- you**
11 **look to the dean, don't you?**
12     A. Yes.
13     **Q. Do you ever look to the people**
14 **within the department?**
15     A. Only when it's with involvement of
16 the dean.
17     **Q. Okay.**
18         MR. CHRISTMAN: I presume your
19 question is not addressing in there security
20 and DOC policy and all those things.
21         MR. DEBARDELABEN: That's not part
22 of J.F.I.
23     **Q. Now, inmate security. Let's talk**

45  (Pages 177 to 180)

# FREEDOM COURT REPORTING

Page 181

1  about that since Mr. Christman brought it
2  up. What is Dean Wilson's responsibility
3  for security?
4      A.  As Dean of Students, he's -- one
5  of his major responsibilities deal with
6  student behavior. So by virtue of his
7  position, he is involved in security to the
8  point that it becomes a security control
9  situation.
10     Q.  And once it becomes a security
11  control situation, it goes to the Department
12  of Corrections?
13     A.  That's right.
14     Q.  Is basically Dean Wilson's
15  responsibility to determine through you, I
16  guess, or you to determine through Dean
17  Wilson's recommendation whether a student
18  stays on campus or has to leave?
19     A.  Unless it's an issue that involves
20  a security breach with DOC.
21     Q.  And when there's a security
22  breach, that's no tolerance, isn't it?
23     A.  That's a --

Page 182

1      Q.  Automatic gone?
2      A.  Not an automatic. But it becomes
3  -- it becomes -- now it becomes a
4  Department of Corrections. So they would be
5  in control at that point.
6      Q.  Right. And all -- J.F. Ingram has
7  no punishment imposes on students; that's
8  all done by the Department of Corrections,
9  isn't it?
10     A.  No.
11     Q.  Y'all have punishment?
12     A.  Yes.
13     Q.  What kind of punishment does J.F.
14  Ingram have?
15     A.  We place students on probation,
16  suspension, expulsion just like any other
17  two-year college.
18     Q.  How often do you get back to the
19  horticulture area of J.F. Ingram's main
20  campus?
21     A.  Not very often.
22     Q.  Okay. Is it in the back part of
23  the campus?

Page 183

1      A.  Yes, it is.
2      Q.  Is it a rather large area?
3      A.  Yes.
4      Q.  Is it -- So far as work area,
5  space covered, is it about the largest one
6  at J.F. Ingram?
7      A.  I would think so, yes.
8      Q.  Is the horticulture department on
9  its location -- due to its location in kind
10  of an isolated part of the campus?
11     MR. CHRISTMAN: Form. Isolated
12  from what?
13     Q.  The rest of the campus?
14     A.  I wouldn't say isolated. It's
15  just located in the rear.
16     Q.  Located in the rear?
17     A.  Yes.
18     Q.  And the other shops, they are
19  located between the horticulture department
20  and the main administrative buildings,
21  aren't they?
22     A.  That's right.
23     Q.  Insofar as employees being close

Page 184

1  by -- when I say employees, I'm not talking
2  about students -- the other instructors have
3  more free world people close by than it
4  would in horticulture, wouldn't they?
5      A.  As far as space, yes.
6      Q.  Yes, sir. And if something God
7  forbid happened, an attack or something by a
8  student in the other shops, there would be
9  people closer by than it would be in
10  horticulture, wouldn't there?
11     A.  No.
12     Q.  What you have in horticulture, you
13  have a couple of guards on towers down at
14  the back, don't you?
15     A.  Directly a few feet from the
16  building.
17     Q.  Yes, sir. And then you have your
18  three greenhouses and a classroom area?
19     A.  Right.
20     Q.  And a storage area. And I know
21  you have three or four buses that park down
22  in that area, don't you?
23     A.  They are not in the area where

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 185

1  horticulture is. They are on the other side
2  of the campus.
3  **Q. Is there a fence between**
4  **horticulture and the buses?**
5  A. No.
6  **Q. Do the buses park on the inside of**
7  **a fence?**
8  A. Yes.
9  **Q. Is that -- The area where they**
10 **park is right next to horticulture?**
11 A. No. It's the -- There's some
12 buildings between the buses and
13 horticulture, temporary buildings.
14 **Q. Is there any fence between those**
15 **buildings and --**
16 A. No.
17 **Q. -- horticulture?**
18 A. No.
19 **Q. Would you agree that the**
20 **horticulture area probably covers a little**
21 **over an acre approximately of property?**
22 MR. CHRISTMAN: If you know.
23 A. I don't have any -- I really don't

Page 186

1  know that.
2  **Q. If Ms. Hendrix has written Dr.**
3  **Huffstutler a memorandum pointing out that**
4  **it covers a little over an acre, you**
5  **wouldn't disagree with that, would you?**
6  A. I wouldn't think she would make it
7  up.
8  **Q. And you know she has two**
9  **greenhouses back there that are**
10 **approximately three thousand square feet a**
11 **piece, don't you?**
12 A. I'm not familiar with the size.
13 **Q. They are pretty big, aren't they?**
14 A. Yes.
15 **Q. Dr. Chambers, who recommended the**
16 **Access system?**
17 A. Who recommended?
18 **Q. Yes, sir. That y'all purchase it?**
19 A. Yes.
20 **Q. Who recommended that?**
21 A. The recommendation came from the
22 Chancellor's office.
23 **Q. From the Chancellor's office?**

Page 187

1  A. Yes.
2  **Q. Is it a required system for all**
3  **two-year colleges to have?**
4  A. Yes and no. Yes, we were told
5  that we were all going that way as soon as
6  we could get the finances and get it on
7  board. I think all the colleges with the
8  exception of maybe three or four have gotten
9  on board. The others are having financial
10 problems.
11 **Q. In fact, Ms. Renae Colinhouse**
12 **(spelled phonetically) -- one of the -- she**
13 **doesn't have it, does she?**
14 A. I'm not familiar with the ones
15 that don't. But I know there are three or
16 four that don't have it.
17 **Q. And was the -- Would you say it**
18 **was a recommendation from the Chancellor's**
19 **office to go on Access or a directive from**
20 **the Chancellor's office to go on Access?**
21 A. A directive.
22 **Q. So you basically as president of**
23 **J.F. Ingram had no choice but to go to**

Page 188

1  **Access?**
2  A. I was led to believe that, yes.
3  **Q. Are you aware that there's certain**
4  **allegations now concerning the former**
5  **Chancellor's connection with Access?**
6  MR. CHRISTMAN: Before you answer
7  that question, off the record.
8  (Whereupon, there was a brief
9  off-the-record discussion.)
10 MR. CHRISTMAN: Go ahead and ask
11 your question.
12 **Q. Mr. Chambers, are you aware that**
13 **there are some allegations concerning the**
14 **former Chancellor Mr. Johnson's connection**
15 **with the company or the people that run the**
16 **Access system?**
17 MR. CHRISTMAN: I'm going to
18 object to that question on two grounds. One
19 is it's not material to the allegations of
20 this complaint and second, Mr. Chambers has
21 been a witness to the Grand Jury and I'm
22 instructing him not to answer any questions
23 associated with matters regarding former

47 (Pages 185 to 188)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 189

1  Chancellor Johnson or the Access system or
2  the propriety of that system.
3     Q.  Now, Mr. Chambers, one of your
4  complaints concerning Ms. Greene was that
5  she was resisting going to the Access system
6  for J.F. Ingram; is that correct?
7     A.  Yes.
8     Q.  And Mr. Bridgeman who has since
9  retired, he just wouldn't -- he really
10 resisted it, didn't he?
11    A.  Yes.
12    Q.  And they -- Was there a basic
13 complaint that the Access system did not do
14 the job that their system they had did?
15    A.  No.
16    Q.  What were basically their
17 complaints?
18    A.  That they had a system set up in
19 place that was producing what they felt was
20 comfortable for what we needed at J.F.
21 Ingram.
22    Q.  But you felt you had no choice but
23 to go where you were directed to go, didn't

Page 190

1  you?
2     A.  That's right.
3     Q.  And so what they were concerned
4  about, although it might have concerned you
5  -- I'm not saying it did or didn't -- for
6  you to go in the direction you were directed
7  to go?
8     A.  That's right.
9     Q.  Okay.  And that was whether it was
10 a better system or a worse system, you still
11 felt you had to go, didn't you?
12    A.  That's right.
13    Q.  Okay.  That in and of itself
14 created some friction between you and Ms.
15 Greene, didn't it?
16    A.  It didn't create friction.  It
17 just -- It was delaying us going there.
18    Q.  She just kind of fought you on
19 that, didn't she?
20    A.  Yes.
21    Q.  And Mr. Bridgeman also fought you
22 on that, didn't he?
23    A.  We didn't fight.

Page 191

1     Q.  I'm talking about resisted you.
2  I'm using fight in the word of resisting.
3     A.  Yes.  But we didn't make an issue
4  out of that.  We just felt like at the right
5  time everybody would be there and we would
6  have to be there, too.
7     Q.  And it was when Mr. Bridgeman
8  left, the system -- they got the Access
9  system up and running, didn't they?
10    A.  Yes.
11    Q.  And there has been some problems
12 between payroll and personnel on the Access
13 system, hasn't there?
14    A.  Yes.
15    Q.  And there's been some problem with
16 Ms. Givens filling the payroll as being
17 called upon to key in contract information
18 that personnel is supposed to have, isn't
19 it?
20    A.  Yes.
21    Q.  And Ms. Givens has written you
22 memorandums or notes to the effect that
23 she's been asked to do personnel work, in

Page 192

1  essence, hasn't she?
2     A.  Yes.
3     Q.  That the personnel system has not
4  gotten their end of the -- their end of the
5  duties for Access up and running?
6     A.  I don't know about up and
7  running.  But she has indicated to me that
8  there's been problems, that she's been doing
9  their work, yes.
10    Q.  Okay.  Have you gotten involved in
11 that?
12    A.  Yes.
13    Q.  And what have you found out?
14    A.  Very little.  I've gotten the
15 deans involved and asked them to sit down
16 with the employees on more than three
17 occasions.  They've come back and told me it
18 was worked out until Ms. Givens would let me
19 know again that it was not working.
20    Q.  But the deans are trying to work
21 with each other?
22    A.  Yes.
23    Q.  And they are having no problem

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 193

1 working with each other?
2     MR. CHRISTMAN: Form.
3     Q.  Apparently?
4     MR. CHRISTMAN: Form.
5     A.  Well, for three times, they didn't
6 have any problems working with each other.
7 But they didn't resolve the issue.
8     Q.  President Chambers, would you
9 think that maybe if what I call the worker
10 bees doing the work got together, they might
11 could resolve the issues a little bit
12 quicker than the deans?
13     MR. CHRISTMAN: Form.
14     A.  In some cases.
15     Q.  You know what I'm saying when I
16 say worker bees?
17     A.  Yes.
18     Q.  Do you think it might be a good
19 idea to put the people who are actually
20 doing the crunching together and say y'all
21 work it out?
22     A.  We've tried that.
23     Q.  Okay.  Has Ms. Givens refused to

Page 194

1 try to work with anybody?
2     A.  No.
3     Q.  As a matter of fact, she goes and
4 tries to get everything done, doesn't she?
5     A.  Most of the time.
6     Q.  Do you have a complaint about Ms.
7 Givens' work?
8     A.  No.
9     Q.  Is she a good employee?
10     A.  Yes.
11     Q.  But you have a complaint about Ms.
12 Greene's work?
13     A.  Yes.
14     Q.  And you do admit, don't you, that
15 you have no training in accounting?
16     A.  Yes. I admitted that.
17     Q.  And if Ms. Greene said come in and
18 do my job, you wouldn't know really where to
19 start, would you?
20     A.  I would know first not to go in
21 there to do her job.
22     Q.  Okay.  And would you agree that
23 probably her job is the most technical on

Page 195

1 campus?  When I say Ms. Greene, I'm talking
2 about any fiscal dean's job is probably the
3 most technical job on campus?
4     A.  Probably.  I mean, she has a very
5 technical job.  One of the most serious jobs
6 on the college campus.
7     Q.  And it's the one job on any
8 college campus that can get the college and
9 the administrators in the most trouble with
10 the public and the legislatures and --
11     MR. CHRISTMAN:  Object to the
12 form.  You can give your opinion if you
13 know.
14     A.  It's a high priority job that
15 would cause problems for the college.  But
16 so is my job and other deans.
17     Q.  Right.  And in her job, she has to
18 not only know accounting procedures, she has
19 to know State bid law?
20     A.  Yes.
21     Q.  And State purchasing procedures?
22     A.  Yes.
23     Q.  And ensure that all the deans and

Page 196

1 instructors follow them?
2     A.  Yes.
3     MR. DEBARDELABEN:  I have no more
4 questions.
5 EXAMINATION BY MR. CHRISTMAN:
6     Q.  I have a few.  Dr. Chambers, I
7 want to show you Exhibit 9, the 2003, 2004
8 audit report that was covered with you by
9 Mr. Debardelaben.
10     He directed your attention to page
11 twenty-seven and asked you a series of
12 questions regarding summary of the examiners
13 results, particularly regarding the internal
14 control or financial reporting.  Do you
15 remember that line of questions?
16     A.  Yes.
17     Q.  And he asked you whether there was
18 a marking on here as to whether material
19 weakness was identified.  Do you recall
20 that?
21     A.  Yes.
22     Q.  And whether there was a reportable
23 condition identified that are not considered

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 197

1  to be material weaknesses.  Do you recall
2  that?
3      A.  Yes.
4      Q.  And whether there was a
5  noncompliance material to financial
6  statements noted.
7      A.  Right.
8      Q.  Do you recall that?
9      A.  Yes, sir.
10     Q.  What he wanted to know was
11 basically whether any of these boxes were
12 checked yes or any of these boxes were
13 checked no.  That's what his question was
14 about; right?
15     A.  Right.
16     Q.  Is there anything in this 2003,
17 2004 audit record that caused you concern
18 other than those check marked boxes that the
19 plaintiff's lawyer referred you to in his
20 line of questioning?
21     A.  Yes, there is.
22     Q.  What were you concerned about in
23 this audit other than the summary?

Page 198

1      A.  I was mostly concerned, like I am
2  with most audits, of the findings.
3      Q.  Okay.  Well, let's turn to the
4  findings and discuss your concerns.  On page
5  C, subtitle audit finding, I'll direct your
6  attention to the last paragraph.  If you'd
7  read that for the record, please.
8      A.  The last paragraph?
9      Q.  The last paragraph under the
10 section that is labeled audit finding on
11 page C.
12     A.  The last paragraph says, a
13 comparison of live work revenue and costs
14 was done for the instructional departments.
15 The comparison indicated that costs exceeded
16 revenues in the furniture refinishing
17 department by eighteen thousand eight
18 hundred and sixty-four dollars and
19 ninety-eight cents.
20     Also, a review of work in process
21 on June 21st, 2005, revealed that deposits
22 had not been collected on four live work
23 projects that were in process.

Page 199

1      In another instance, the Dean of
2  the College delivered a tractor to the
3  diesel shop.  The dean went on vacation on
4  May 31st and returned to work on July 12th.
5  The work order for the tractor was dated
6  June 21st, 2005.
7      Q.  What section again were those
8  comments noted under in this audit report?
9      A.  Under audit findings.
10     Q.  Does the audit finding mean
11 anything to you as president of the college?
12     A.  Yes.
13     Q.  What does it mean to you?
14     A.  That means that they have
15 discovered a irregularity and the college
16 must give a response on how to -- the
17 college must give a response of corrective
18 action that's going to be taken to correct
19 the problem and ensure -- keep it from
20 happening again.
21     Q.  So there is something required of
22 the president of the college if there's a
23 finding?

Page 200

1      A.  Yes.
2      Q.  Okay.  And what was your
3  responsibility associated with this finding
4  in this report that Mr. Debardelaben didn't
5  cover with you?
6      A.  In my discussion with the
7  auditors, the auditors indicated to me that
8  there was a possibility there could be some
9  legal action.
10     Q.  What kind of legal action?
11     A.  They referenced that a dean in
12 North Alabama has had a similar situation
13 and they had turned it over to the District
14 Attorney's Office.
15     They also referenced that the Dean
16 of the College had violated -- had again
17 violated a policy of having live work on
18 campus without the appropriate paperwork and
19 they were thinking about turning it over to
20 the Commission and some of the other files.
21     Q.  Who told that to you?
22     A.  Ms. Carol Nichols and Harold -- I
23 can't remember Harold's last name.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 201

1    Q.    Who does Caroline work for?
2    A.    She works for the State Department
3    -- a supervisor auditor for the State
4    Department.
5    Q.    And Hal?
6    A.    He's an auditor with the State
7    Department.
8    Q.    Okay.  You don't prepare --
9    A.    Hal Brasswell  I think it's
10   Brasswell.
11   Q.    You don't prepare these audit
12   reports, do you, Dr. Chambers?
13   A.    No, I do not.
14   Q.    You don't categorize the summary
15   of examiners results, do you?
16   A.    No, I do not.
17   Q.    Do you come up with the verbiage
18   used to characterize these results?
19   A.    No, I do not
20   Q.    When it refers to an internal
21   control over financial reporting, do you
22   know what they're talking about when they
23   say financial reporting?

Page 202

1    A.    Yes.
2    Q.    What are they talking about there?
3    A.    They are talking about the fact
4    that -- the forms and reports that we have
5    to submit.
6    Q.    Do you know if they are talking
7    about live work or whether there are
8    problems with live work would appear as a
9    weakness in financial reporting?  Do you
10   know one way or the other about that?
11   A.    No, I do not.
12   Q.    Okay.  What is live work?
13   A.    Live work is a description of a
14   process that we use at the school to
15   practice some of the technical programs that
16   we have in place.
17   Q.    Do you know why the auditors would
18   be concerned about problems in the live work
19   process at Ingram?
20   A.    Yes.
21   Q.    Why?
22   A.    Well, because we are required by
23   State Board policy to do things as far as --

Page 203

1    and make a certain percentage off it.  We
2    also can use it as a lab or a practical
3    experience and we're not supposed to make a
4    profit off of it.
5    Q.    Did any of that DA stuff you were
6    talking about have anything to do with live
7    work in those other contexts in terms of
8    your understanding of what the auditors were
9    saying to you?
10   A.    Yes.
11   Q.    Were you at all concerned when the
12   auditor brought to your attention
13   discrepancies in the live work process at
14   Ingram?
15   A.    Yes.
16   Q.    What did you do in response to the
17   auditor's findings on the live work
18   discrepancies noted in the auditor's report
19   under audit findings?
20   A.    First, I investigated it to see
21   what they were telling me -- whether it was
22   accurate or not.  And I validated what they
23   told me.  And I discussed it with all of the

Page 204

1    parties involved, instructors, the Dean of
2    the College and the Dean of Fiscal Affair.
3         Afterwards, I met with the
4    auditors and I asked them if they would
5    allow me an opportunity to take appropriate
6    penalties or steps to correct this problem.
7    And they, in essence, they said they would
8    give me an opportunity to do so.
9    Q.    So after doing your investigation
10   and discussing with the auditors whether
11   they would allow you an opportunity to fix
12   this, what was your next course of action?
13   A.    I made an attempt to try to show
14   the auditors that I could correct the
15   measures by taking strong actions against
16   all of the parties involved with the
17   process.
18   Q.    Did you ultimately submit anything
19   to the examiners of public accounts
20   associated with your effort in response to
21   their findings?
22   A.    Yes, I did.
23   Q.    What did you submit?

51 (Pages 201 to 204)

# FREEDOM COURT REPORTING

Page 205

1    A.  I submitted a letter to the
2  auditors telling them these were the steps
3  that I was going to take.  They reviewed it
4  and sent it back to me and told me anything
5  like that would be appropriate and get the
6  attention of the employees to correct the
7  problem.
8    Q.  Let's back up just a minute.  You
9  submitted a draft response to the auditors?
10    A.  Yes.
11    Q.  Who specifically did you send that
12  response to?
13    A.  To Mr. Larry Willard.
14    Q.  And did he review that response
15  that you proposed to him?
16    A.  Yes, I did.
17    Q.  What was his -- What were his
18  comments regarding the propriety or
19  effectiveness of the comments that you had
20  provided to him?
21    A.  He indicated to me he felt that
22  was strong.  If I could take those actions
23  and make sure that all the employees took it

Page 206

1  as a serious step, he felt like that would
2  not occur again.
3    Q.  Was it your opinion that the fact
4  that all of these three areas were checked
5  no on page twenty-seven meant that you could
6  disregard or ignore the findings associated
7  with the live work discrepancies at the
8  college?
9    A.  No.
10    Q.  After you submitted your draft and
11  received word back from the examiners
12  concerning your response to findings, what
13  did you do next?
14    A.  Well, I submitted a copy to the
15  Chancellor's office.  I met with the
16  Chancellor and the vice-chancellor and told
17  them why I was doing it this way, what I was
18  attempting to do.  And he told me he felt
19  like that would serve the purpose.
20    Q.  What were you attempting to do?
21    A.  I was trying to do two things.  I
22  was trying to get the attention of the
23  employees, that we were about to have a

Page 207

1  major finding, and we were also trying to
2  correct a procedure that I was trying to get
3  in the right perspective as it related to
4  live work.
5    Q.  How did the Chancellor respond to
6  your suggested response?
7    A.  He told me he thought that would
8  be strong enough.
9    Q.  Did you ever ultimately submit
10  your response in an official form to the
11  examiners of public accounts?
12    A.  Yes, I did.
13    Q.  Does that appear in Exhibit 9?
14    A.  Yes.
15    Q.  Mr. Debardelaben didn't cover this
16  part with you, did he?
17    A.  No.
18    Q.  But on the last five pages appears
19  your response, is that true?
20    A.  That's true.
21    Q.  Did you prepare this response all
22  by yourself?
23    A.  No.  Most of it was prepared by

Page 208

1  the Dean of Fiscal Affair.
2    Q.  Did she do that at your request or
3  just on her own?
4    A.  At my request.
5    Q.  What part did she prepare in this
6  response?
7    A.  Well, she responded to all of it.
8  But most of it -- the first couple of pages
9  is just about exactly like she presented it
10  to me.
11    Q.  Okay.  The accounting provisions
12  of particularly response one?
13    A.  Yes.
14    Q.  Okay.  Response one is associated
15  with the eighteen thousand eight hundred and
16  sixty-four dollar and ninety-eight cent cost
17  overage in the furniture refinishing
18  department for live work; is that right?
19    A.  That's right.
20    Q.  There appears to be an accounting
21  here that was done as to why that -- those
22  overages appear to the auditors; is that
23  right?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 209

1    A.  Right.
2    Q.  And Ms. Greene -- Is it my
3  understanding that Ms. Greene is the one who
4  explained how all that happened?
5    A.  Yes.
6    Q.  Did she explain it to your
7  satisfaction?
8    A.  I mistook what she was saying.  So
9  I presented it like she said.  I took what
10  she said.
11    Q.  Did you name any people's names in
12  this audit report?
13    A.  Yes, I did.
14    Q.  Why did you do that?
15    A.  Well, at that particular time, I
16  thought I was trying to get their attention
17  and I was also trying to impress upon the
18  auditors that they did not have to take
19  major steps, that I was going to impress
20  upon them that we could correct the
21  problem.
22         Also in the past -- This is
23  nothing new.  This had occurred before.  And

Page 210

1  what I was trying to do is stop just getting
2  -- sending out the same warnings and I was
3  trying to impress upon the auditors that we
4  had corrected without them having to go
5  forward with what they were intending to do.
6    Q.  Are you aware of any other audit
7  responses that called names?
8    A.  Yes.  There's several.  I looked
9  at one recently from John C. Calhoun and
10  there was a name mentioned.
11        MR. DEBARDELABEN:  Object to
12  anything unless it has to do with J.F.
13  Ingram.
14        MR. CHRISTMAN:  You can object.
15  But your client testified that this was
16  never done.
17    Q.  My question to you, Dr. Chambers,
18  is, do you know whether this -- whether what
19  you did in naming peoples names has ever
20  been done other than this case?
21    A.  Oh, yes.
22    Q.  Do you know if the Chancellor
23  approved of your naming names?

Page 211

1    A.  He did at that time.
2    Q.  At what time?
3    A.  When I presented him the draft of
4  my response to Mr. Ron Jones.
5    Q.  Do you know if his opinion
6  changed?
7    A.  Something changed because
8  afterwards, I received a letter from -- a
9  letter with his signature on it, that I did
10  not have to use the employees to some --
11  what degree to make my point like it was a
12  personal thing that I did.
13    Q.  And what, if anything, was your
14  response to that letter from the Chancellor?
15    A.  Well, I had a meeting with him and
16  took his letter and my letter.  And when I
17  approached him, he denied even having
18  written that letter or didn't even know the
19  content of that letter.
20    Q.  Do you believe there are any
21  problems with the business office anymore?
22    A.  Yes.
23    Q.  Do you get -- Do you base your

Page 212

1  opinion regarding the problems at the
2  business office solely on the examiner's
3  report that you received from the Department
4  of Examiners of Public Accounts?
5    A.  No.  The audit reports really just
6  put a stamp on what was occurring.  I get
7  complaints from instructors of purchase
8  requisitions, payments, orders, all types of
9  stuff.
10        And I have -- So that audit just
11  really kind of came in and told me that they
12  saw some of the things, too.  So the audit
13  was not the ultimate reason I made my
14  decision to respond that way.
15        The audit was just really
16  identifying what I already knew.
17    Q.  Well, some of the audits were
18  good, isn't that true?
19    A.  Yes.
20    Q.  Did the fact that those audits
21  were good mean that there weren't any
22  problems at Ingram in the business office?
23    A.  No.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 213

1    Q. Were there any other sources other
2 than the audit reports outside of Ingram
3 that indicated to you that there might be
4 serious problems in the business office?
5    A. Vendors saying that they were not
6 being paid on time.
7    Q. Any other official reports from
8 anybody elses office associated with the
9 functioning of the business office?
10    A. Well, we have one that's -- one
11 that's ongoing at this present time from
12 Washington D.C. as it relates to Federal
13 monies. And I received an e-mail last week
14 about a problem that we're having with
15 student support services. And I expect a
16 big letter to be coming pretty soon.
17    Q. Has the Chancellor's office ever
18 addressed problems with --
19    MR. DEBARDELABEN: Objection to
20 leading.
21    Q. You can answer. Has the
22 Chancellor's office ever addressed problems
23 with the business office at Ingram?

Page 214

1    A. Yes. They've sent two review
2 teams in twice that I recall.
3    Q. Did you get a report from those
4 review teams?
5    A. Yes.
6    Q. Was that report favorable
7 regarding the business office's functioning
8 efficiency?
9    A. No.
10    Q. What did you think about those
11 reports? How did it affect your perception
12 of the business office?
13    A. That we had a -- we were having
14 some problems in the business office and
15 they needed to be corrected. And they were
16 just not identifying one or two things.
17 They were identifying from mistakes to
18 employment morale, relationships, co-workers
19 and what have you.
20    Q. Is the fact that you don't have an
21 education sufficient to run the business
22 office disqualify you from understanding
23 whether there is or is not a problem in that

Page 215

1 office?
2    A. No. Because we've had -- you just
3 mentioned a review team. Dr. Huffstutler
4 who worked with us had over seventeen years
5 of experience as a Dean of Finance. We've
6 had other people in the fields to indicate
7 that we had problems.
8    Q. Did you ever have any discussions
9 with Mr. Willard about the business office?
10    A. Yes, I have.
11    Q. Were those favorable or
12 unfavorable in terms of disfunctioning?
13    A. Most of them were unfavorable.
14    Q. Why do you care how the women
15 dress at Ingram State Technical College?
16    A. It's my responsibility at the
17 college to be concerned about the safety of
18 the employees. I never forget that we work
19 in a prison environment.
20    When I got there, one of the major
21 problems that they had in the prison system
22 were men masturbating. And they would put
23 them on the field in orange suits. Tried to

Page 216

1 use embarrassment as a technique.
2    One of the major problems that
3 exist today where we're taking students out
4 of their classes, masturbation is at the
5 top. Those young men being incarcerated and
6 masturbating -- if they see a baby or if
7 they see a lady eighty years old.
8    And the wardens have reminded me
9 and reminded employees that their presence
10 and how they look on campus can easily cause
11 a riot or can cause inmates to be out of
12 control and subject them to discipline
13 problems and things that we have to deal
14 with.
15    Q. Well, as you pointed out to Mr.
16 Debardelaben in response to his questions,
17 there's never been a lady attacked to your
18 knowledge on the Ingram campus. So why does
19 it matter?
20    A. Well, I think it's my
21 responsibility to try to keep it from
22 happening. I listen to the students
23 talking. They can tell me what people have

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 217

1  on when they get there. They can tell me
2  exactly how people are sitting.
3        They can tell me everything about
4  a female. And so I'll try to be -- take
5  steps in advance to prevent any type of
6  things from happening. I don't think that
7  just because it hasn't happened, it won't
8  happen.
9        So I try to make every effort to
10 make people conscious of their attire and
11 try to keep them in a safer environment.
12    **Q.  Have you only addressed your**
13 **comments regarding dress to females?**
14    A.  No. I have addressed them to both
15 males and females.
16    **Q.  Have there ever been any**
17 **complaints associated with female dress at**
18 **the Ingram State Technical College main**
19 **campus?**
20    A.  Yes.
21    **Q.  By who?**
22    A.  By some employees and by some
23 correctional officers.

Page 218

1    **Q.  How about anybody higher than**
2  **correctional officers such as wardens or**
3  **anything else?**
4    A.  I wouldn't say correctional
5  officers. I was putting them all in one.
6  The wardens have threatened to terminate and
7  ban a couple of people as a result of their
8  dressing.
9    **Q.  Were they males or females?**
10    A.  Females.
11    **Q.  Does anything besides campus**
12 **security motivate your position regarding**
13 **the way females dress?**
14    A.  No.
15    **Q.  At the Ingram campus?**
16    A.  No. Can I add something to that
17 answer I just gave you?
18    **Q.  Sure.**
19    A.  When I came to Ingram ten years
20 ago -- and I think you alluded to something
21 a few minutes ago -- we were firing
22 weapons. I would hear things inappropriate
23 like employee student relationships, phone

Page 219

1  calls being made.
2        A lot of things that -- We have a
3  policy at -- in the system where an employee
4  is banned from contact with students. That
5  constitutes termination. And all the
6  Department of Corrections has to do is bring
7  about charges.
8        They don't have to prove any of
9  their charges. They can just ban an
10 employee. I recently had a meeting with the
11 director of special education with a young
12 lady who was about to be banned from Kilby
13 for the same reason, that she came in and
14 said that I know that my dressing causes
15 problems, but you don't have to worry about
16 it anymore.
17        It's been a continuous problem.
18 But my ultimate goal is to try to get people
19 to dress appropriately so that they will not
20 encourage or entice or do all those things
21 that DOC describes as a hinderance to their
22 ability to keep people safe.
23    **Q.  Are you aware of any inmates**

Page 220

1  shootings on campus?
2    A.  Not on campus, no.
3    **Q.  Do you have a policy regarding the**
4  **employees bringing firearms on campus?**
5    A.  It's prohibited.
6    **Q.  Well, why have a policy regarding**
7  **prohibiting firearms and no one has ever**
8  **been shot?**
9    A.  Well, because of the potential of
10 someone getting shot.
11    **Q.  Do you recall Mr. Debardelaben's**
12 **questions associated with Ms. Hendrix's**
13 **grievance procedure? Do you recall some of**
14 **that?**
15    A.  Yes.
16    **Q.  I want to direct you back to some**
17 **of his questions associated with the hearing**
18 **procedure. Do you remember those questions?**
19    A.  Yes.
20    **Q.  And didn't he ask you a question**
21 **about whether disputed facts result in the**
22 **necessity of a hearing? Do you recall that?**
23    A.  Yes.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 221

1    Q.  Do you know whether Ms. Hendrix
2  got a hearing?
3    A.  According to my understanding, she
4  did.
5    Q.  Do you know if there is a process
6  in place for her to do something about it if
7  she doesn't get a hearing?
8    A.  Yes.
9    Q.  What is the process?
10   A.  If she doesn't get a hearing, she
11 can appeal it to the Chancellor.  She can
12 appeal to me first.  And then if she's not
13 satisfied there, I do not take action.  She
14 can appeal it to the Chancellor.
15   Q.  Well, did she appeal it?
16   A.  To me?
17   Q.  To anybody.
18   A.  Yes.
19   Q.  What did she say?
20   A.  She wrote to some degree that she
21 wanted to appeal and asked me to review it.
22   Q.  Well, how did you respond?
23   A.  I reviewed it and told her that I

Page 222

1  had looked at the evidence and I didn't have
2  any reason to change what had been decided.
3    Q.  Was there some correspondence
4  associated with the timeliness of her
5  appeal?
6    A.  Yes.  She had -- The time for her
7  appeal had expired.  But we did try to look
8  at it and make sure everything was in order.
9    Q.  Do you know if the policies and
10 procedures have any provision for what
11 happens to a complainant's grievance if she
12 does not file a timely appeal?
13   A.  Yes.  It's clearly stated in the
14 policy that it must be appealed within an
15 allotted time.  And if not --
16   Q.  Let me show you the policy here.
17 If you'll look under section four of
18 available appeals.  I'm referring to Exhibit
19 2 to James Merk's deposition.
20        Section four, the paragraph
21 directly below the number two paragraph
22 starting with if the appeal.  Would you read
23 that for the record, please.

Page 223

1    A.  If the appeal is not filed by the
2  close of business day on the fifteenth day
3  following the grievant's receipt of the
4  report, the grievant's right to appeal shall
5  be forfeited.
6    Q.  So what is your understanding of
7  the results of a complainant failing to
8  file her appeal in a timely manner?
9    A.  Well, it means that no action will
10 be taken.
11   Q.  And is it her appeal will be
12 forfeited according to this; right?
13   A.  Right.
14   Q.  Is there any provision in here
15 alleviating the forfeiture of that appeal if
16 it is filed untimely?
17   A.  No.
18   Q.  Do you know whether Ms. Hendrix's
19 appeal effort was timely filed?
20   A.  Yes.
21   Q.  Was it timely?
22   A.  No.
23   Q.  Did you inform her of that?

Page 224

1    A.  Yes.
2    Q.  Did she go over your head
3  regarding the untimely appeal that she
4  filed?
5    A.  Yes.
6    Q.  What did she do, to your
7  knowledge?
8    A.  She appealed it to the
9  Chancellor's office.
10   Q.  How did he respond?
11   A.  They responded that she did not
12 appeal within a time that were allowed, and
13 therefore, they were not going to take any
14 action on it.
15   Q.  What was Mr. Tim Robinson's
16 education level; do you know?
17   A.  To the best of my knowledge, he
18 had a master's degree.
19   Q.  Did Ms. Owensby have a master's
20 degree?
21   A.  No, she did not.
22   Q.  Does she have a bachelor's degree?
23   A.  I don't think so.

# FREEDOM COURT REPORTING

Page 225

1    Q. Do you know whether her job duties
2  as they currently are described are the same
3  job duties occupied by Tim Robinson when he
4  was registrar?
5    A. To the best of my knowledge, some
6  of them are not. But not all of the duties
7  that Tim Robinson had.
8    Q. So it's your understanding that
9  they are different in some respect?
10    A. Yes.
11    Q. Do you know whether they had the
12  same level of education?
13    A. They did not have the same level
14  of education.
15    Q. How about the same level of
16  experience?
17    A. I'm not familiar -- I'm not sure
18  of that.
19    Q. Who would know that?
20    A. Well, we can find it in their
21  personnel file.
22    Q. Would James Merk be a good witness
23  to testify regarding the similarity between

Page 226

1  Owensby and Robinson in terms of their
2  education, experience and qualifications for
3  their respective jobs?
4    A. Yes.
5    Q. If he testified that they were not
6  similarly situated or associated with their
7  experience, would you disagree with that?
8    A. No.
9    Q. How about education? Would you
10  disagree with me if he said they did not
11  have a similar education?
12    A. No.
13    Q. If he said they did not have the
14  same job duties, would you disagree with
15  that?
16    A. No.
17    Q. Have you ever discriminated
18  against Ms. Greene based upon her race?
19    A. No.
20    Q. How about her gender?
21    A. No.
22    Q. Have you ever created a difficult
23  place for her to work in because she's a

Page 227

1  female?
2    A. No.
3    Q. Have you ever created hostility
4  for her because she's white?
5    A. No.
6    Q. Have you ever treated her any
7  differently than anybody else because she's
8  white?
9    A. No.
10    Q. How about because she's a female?
11    A. No.
12    Q. Have you ever treated Ms. Givens
13  differently than anybody else because she's
14  white?
15    A. No.
16    Q. How about because she's female?
17    A. No.
18    Q. Have you ever created a hostile
19  place for her to work in because she's
20  white?
21    A. No.
22    Q. How about because she's female?
23    A. No.

Page 228

1    Q. Did you have anything to do with
2  whether -- Did you have anything to do with
3  Mr. Montgomery's exchange between he and
4  Hendrix associated with an inmate's behavior
5  in the horticulture department on February
6  14th, 2006?
7    A. No.
8    Q. Did you know what Mr. Montgomery
9  was telling or asking Ms. Hendrix in any of
10  their meetings?
11    A. No.
12    Q. Did he come to you and counsel
13  with you about how to address Ms. Hendrix's
14  concerns regarding an inmate that she
15  believed to be masturbating?
16    A. No.
17    Q. Were you aware of any misconduct
18  on his part?
19    A. No.
20    Q. Let me rephrase that question.
21  Were you aware of any misconduct on Mr.
22  Montgomery's part?
23    A. No.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 229

1    Q.  Were you aware of any misconduct
2  on the part of James Wilson in addressing
3  Inmate Pruitt's misbehavior?
4    A.  No.
5    Q.  Did you have anything to do with
6  the initial process involving interviews
7  between Wilson, Montgomery, Merk, Owensby
8  and a student named Paul Edwards and Ms.
9  Hendrix?
10   A.  No.
11   Q.  Were you advised at all about that
12 incident on the day in question which would
13 be February 14th, 2006?
14   A.  You mean on that particular day?
15   Q.  Yes, sir.
16   A.  No.
17   Q.  Are you aware of James Wilson
18 refusing to respond to complaints about
19 students submitted by Ms. Hendrix?
20   A.  No, I'm not.
21   Q.  Has it ever been reported to you
22 that she has a pattern of not backing her up
23 when she complains about a student's

Page 230

1  behavior?
2    A.  After this process had started.
3    Q.  Only after the complaints and the
4  EEOC charges were filed; is that right?
5    A.  Right.
6    Q.  Before that time, had you ever
7  been made aware that Ms. Hendrix believed
8  that Wilson was not backing her up?
9    A.  No.
10   Q.  Do you know whether Mr. Merk
11 followed the grievance procedure in dealing
12 with Ms. Hendrix's complaint against
13 Montgomery and Wilson associated with her
14 reports of misconduct by Inmate Pruitt?
15   A.  Yes.
16   Q.  Did he follow the guidelines?
17   A.  According to my understanding,
18 yes.
19   Q.  Do you have any reason to believe
20 that he didn't?
21   A.  No.
22   Q.  Do you have any reason to believe
23 that his adherence or non-adherence to those

Page 231

1  guidelines had anything to do with Ms.
2  Hendrix's race?
3    A.  No.
4    Q.  How about her gender?
5    A.  No.
6        MR. CHRISTMAN:  That's all I have.
7  EXAMINATION BY MR. DEBARDELABEN:
8    Q.  Mr. Chambers, have you ever called
9  any of Dean Wilson's people that he
10 supervised in your office and told them Dean
11 Wilson was weak?
12   A.  No.
13   Q.  That he's ineffective?
14   A.  No.
15   Q.  Have you ever called them in his
16 office, his people in your office and
17 criticized Dean Wilson?
18   A.  No.
19   Q.  But you did call Ms. Greene's two
20 top people and criticized Ms. Greene, didn't
21 you?
22   A.  You're using the term criticized.
23 I came in to discuss getting to the end of a

Page 232

1  problem we were having.
2    Q.  Did you ever call Dean Merk's
3  people -- Dr. Merk's people working under
4  him into your office when Dr. Merk was out
5  of town and discussed problems you were
6  having with Dr. Merk?
7    A.  No.
8    Q.  But you did do it with Dean
9  Greene's people she supervised, didn't you?
10   A.  Yes.
11   Q.  Now, you referred to Exhibit 9,
12 page C -- I guess it's page C -- on the
13 findings; correct?  Who was -- Who's in
14 charge of live work on the campus?
15   A.  The Dean of Instruction in
16 conjunction with the Dean of Fiscal
17 Affairs.  But the activities are approved by
18 -- they kind of work hand in hand.  But the
19 projects itself is an instructional part.
20   Q.  That was Dr. --
21   A.  Huffstutler.
22   Q.  -- Huffstutler, wasn't it?
23   A.  Right.

58 (Pages 229 to 232)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 233

1    Q.  He was in charge of it.  And Ms.
2  Greene has been concerned about live work on
3  that campus for some time, hasn't she?
4        MR. CHRISTMAN:  Object to the
5  form.  If you know what she's concerned
6  about.  Answer what you know.
7        (Whereupon, Plaintiff's Exhibit
8  No. 25 was marked for identification and
9  attached to the original transcript.)
10    Q.  Show you Plaintiff's Exhibit No.
11  25, a letter -- a memo to Rickey Huffstutler
12  from Monica Greene, June 19, 2001.  I
13  believe you put a handwritten note on that
14  one, didn't you?
15    A.  Yes.
16    Q.  Concerned about -- We won't go
17  into details unless you want to.  That's
18  concerned about live work, isn't it?
19    A  Yes, it is.
20    Q.  And that is Ms. Greene writing
21  Dean Huffstutler a letter seeking his help,
22  isn't it?
23    A.  Yes.

Page 234

1    Q.  Show you Plaintiff's Exhibit No.
2  26.
3        (Whereupon, Plaintiff's Exhibit
4  No. 26 was marked for identification and
5  attached to the original transcript.)
6    Q.  It's July 18th, 2001.  That's Dean
7  Greene writing Dr. Huffstutler.  Did you get
8  a copy of that?  Well, you wrote a note on
9  the 25, didn't you?  Exhibit 25, what did
10  your note say?
11    A.  You said did I get a copy of it.
12    Q.  Yes, sir.  You got a copy of
13  Exhibit 25, didn't you?
14    A.  Not that -- You just handed it to
15  me.
16    Q.  Excuse me.  I mean when she wrote
17  it.
18    A.  Oh.  Yes.
19    Q.  As a matter of fact, you wrote a
20  note on it, didn't you?
21    A.  Yes, I did.
22    Q.  And what does that note say?
23    A.  It says thank you informing Dr.

Page 235

1  Huffstutler about this.  Very good.  I will
2  follow this to see what happens.
3    Q.  Did you?
4    A.  Yes, I did.
5    Q.  Okay.  So Dean Greene has been
6  concerned about live work we know since
7  2001, hasn't she?
8    A.  Yes.
9    Q.  And what's the -- The July 18th,
10  2001 is another letter to Dr. Huffstutler
11  with a copy going to you, isn't it?
12    A.  Right.
13    Q.  And that's again concerned about
14  live work, isn't it?
15    A.  Yes.
16    Q.  Okay.  I'm going to show you a
17  letter dated April 22nd, 2002.  That's
18  another memo to Dr. Huffstutler.  Isn't that
19  a copy to you concerned about live work and
20  live work deposits?
21    A.  That's right.
22        (Whereupon, Plaintiff's Exhibit
23  No. 27 was marked for identification and

Page 236

1  attached to the original transcript.)
2    Q.  So Dean Greene is concerned in
3  2002, isn't it?
4    A.  Yes.
5    Q.  And she brought it to your
6  attention?
7    A.  That's true.
8        (Whereupon, Plaintiff's Exhibit
9  No. 28 was marked for identification and
10  attached to the original transcript.)
11    Q.  Okay.  Show you Plaintiff's
12  Exhibit No. 28.  There's another example of
13  Dean Greene being concerned about live work
14  and sent it to Dr. Huffstutler requesting
15  his help, isn't it?
16    A.  That's right.
17    Q.  Pointing out the problem that the
18  fiscal office is catching; correct?
19    A.  Yes.
20    Q.  Okay.  That's all she can do,
21  isn't it?
22    A.  No.
23    Q.  She's telling Dr. Huffstutler and

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 237

1  she's telling you, isn't she?
2      A.  Yes.
3      Q.  And asking for guidance?
4      A.  Are you asking me a question?
5      Q.  Wasn't she asking for guidance
6  from Dr. Huffstutler?
7      A.  Yes.
8          MR. CHRISTMAN:  Which memo?
9          MR. DEBARDELABEN:  All of them.
10         MR. CHRISTMAN:  Read them all if
11 he's going to ask you a broad question about
12 what they all say, whether they all say the
13 same thing.  Make sure you know what they
14 all say.
15     A.  Yes.  They basically are asking
16 for help.
17         (Whereupon, Plaintiff's Exhibit
18 No. 29 was marked for identification and
19 attached to the original transcript.)
20     Q.  Show you another one, Plaintiff's
21 Exhibit No. 29.  It's a letter from Monica
22 Greene or a memorandum to Rickey Huffstutler
23 dated December the 18th, 2002 pointing out

Page 238

1  that Mr. Keahey is violating some policies;
2  is that correct?  And it has the information
3  attached to it to back up the memo, doesn't
4  it?
5      A.  Right.
6      Q.  Didn't you get a copy of that one,
7  too, sir?
8      A.  Yes.
9      Q.  Okay.  And again, she's asking Dr.
10 Huffstutler to look into the problem for one
11 of his instructors, isn't she?
12     A.  Yes.
13     Q.  And Dr. Huffstutler is the one
14 over Mr. Keahey, isn't he?
15     A.  Yes.
16         (Whereupon, Plaintiff's Exhibit
17 No. 30 was marked for identification and
18 attached to the original transcript.)
19     Q.  Okay.  Here's another one to Dr.
20 Huffstutler dated February 27th, 2004.  It's
21 to Dr. Huffstutler concerning invoices in
22 auto mechanics, Plaintiff's Exhibit No. 30.
23 Again, she's concerned about live work,

Page 239

1  isn't she?
2      A.  That's right.
3          (Whereupon, Plaintiff's Exhibit
4  No. 31 was marked for identification and
5  attached to the original transcript.)
6      Q.  Show you Plaintiff's Exhibit No.
7  31.  I think this is concerning Mr. Benton
8  on a live work project he's not doing right.
9  She said this must stop.  And it's Dr.
10 Huffstutler again, isn't it?
11     A.  That's right.
12     Q.  And that's pointing out about the
13 same thing that was pointed out in the
14 examiner's report, isn't it?  A lot of that
15 is similar?
16     A.  Yes.
17         (Whereupon, Plaintiff's Exhibit
18 No. 32 was marked for identification and
19 attached to the original transcript.)
20     Q.  Okay.  Here's a memorandum to Ms.
21 Gloria Knox on live work with a copy to Dr.
22 Huffstutler concerning problems with a live
23 work project dated -- when is that dated--

Page 240

1  June 24th, 2004.
2          Just another little problem with
3  live work, isn't it?  And she's writing one
4  of Dr. Huffstutler's instructors to resolve
5  the problem; is that correct?
6      A.  That's not correct.
7      Q.  What does it do?  Don't let me put
8  words in your mouth.
9      A.  It clearly emphasizes that she's
10 asking him to help look into the problems
11 that she's having.
12     Q.  Right.  And they're creating
13 problems for the fiscal office, not doing it
14 right; is that correct?
15     A.  No, that's not correct.
16     Q.  Okay.  What does that say?  Let's
17 look at that one.  It's telling them the
18 customers, to pay in cash because it had to
19 -- they took a check and it obviously
20 bounced and they had to decrease their
21 deposit by three hundred dollars.
22         That was -- Don't you have a rule
23 and regulation that y'all only take cash or

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 241

1  money orders?
2      A.  We take up to seventy-five percent
3  in cash -- I mean in check or money order or
4  whatever. But you must pay the last
5  twenty-five percent in cash.
6      Q.  And she's trying to get them to
7  follow that policy, isn't she?
8          MR. CHRISTMAN:  He hasn't
9  responded to the question.
10     Q.  She's trying to get Ms. Gloria
11 Knox to follow the policy of the college?
12     A.  Right.
13     Q.  Okay.  And when it wasn't
14 followed, it had to collect three hundred
15 dollars, take it off, because somebody paid
16 three hundred dollars in cash and it appears
17 the check bounced, didn't it?
18     A.  Yes.
19         (Whereupon, Plaintiff's Exhibit
20 No. 33 was marked for identification and
21 attached to the original transcript.)
22     Q.  Okay.  I want you to look at
23 Plaintiff's Exhibit No. 33, September 22nd,

Page 242

1  2005.  Talking about to Ms. Gloria Knox
2  again on live work deposits.  That she's not
3  apparently timely -- making timely
4  deposits.
5          (Whereupon, Plaintiff's Exhibit
6  No. 34 was marked for identification and
7  attached to the original transcript.)
8      Q.  Here's another memorandum that you
9  got a copy of to Mr. Huffstutler dated
10 November the 16th, 2001 about automobiles
11 being taken out of the auto mechanic shop
12 and the invoice has not been billed out and
13 paid; is that correct?
14     A.  Is what correct?
15     Q.  That automobiles have been taken
16 out of the automobile mechanic shop and the
17 invoices haven't been paid?
18     A.  That's what she's saying in this
19 document.
20     Q.  And she sent it to Dr.
21 Huffstutler?
22     A.  Right.
23     Q.  And who has the control over the

Page 243

1  automobile mechanic shop?
2      A.  The Dean of Instruction and the
3  Dean of Fiscal Affairs.
4      Q.  And who is that?
5      A.  At this particular time, it was
6  Dr. Huffstutler and Dean Greene.
7      Q.  Now, Dean Greene, she didn't have
8  physical control over the people running the
9  shop, did she, that was Dr. Huffstutler?
10     A.  Physical control?
11     Q.  Yes, sir.  They reported to Dr.
12 Huffstutler?
13     A.  That's right.
14     Q.  And he's the one that grades them
15 and annual reports and supervises them,
16 isn't he?
17     A.  Right.
18     Q.  Okay.
19         (Whereupon, Plaintiff's Exhibits
20 No. 35 - 36 were marked for identification
21 and attached to the original transcript.)
22     Q.  Here's another one to Dr.
23 Huffstutler dated July 25th, 2005.  It's

Page 244

1  concerning Mr. Benton again not collecting
2  money on auto mechanics.  And it's Dr.
3  Huffstutler with a copy to you, isn't it?
4      A.  That's right.
5      Q.  Who is Ms. Jacquelyn McDuffie?
6      A.  She's the receptionist, clerk over
7  at the Tutwiler campus.
8      Q.  Okay.  And is she under Mr. Wilson
9  and Dr. Huffstutler?
10     A.  She has a dual role.  She's under
11 the Dean of Fiscal Affairs and the Center
12 Director.
13     Q.  Well, were you aware that Ms.
14 Greene has sent her a memorandum concerning
15 problems with accounts receivable and
16 deposits?
17     A.  No, sir.
18     Q.  Now, Mr. Christman didn't ask you
19 about any of that, did he?
20     A.  No, he did not.
21     Q.  Okay.  Let me see that Exhibit 9
22 again.  It says instructors prepare a
23 contact form and estimate for all proposed

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 245

1  live work projects. Ms. Greene had been
2  complaining some of them weren't doing that,
3  hadn't she? And this is before this time?
4      A.  Right.
5      Q.  Okay. And if you look through
6  there, she's complaining about some of those
7  work orders being written up for less than
8  fifty dollars where they didn't get their
9  seventy-five percent deposit, wasn't she?
10     A.  I think I saw that, yes, sir.
11     Q.  So some of the very same things
12  the audit found, Ms. Greene was complaining
13  about prior to that time to Dr. Huffstutler
14  and sending you memorandums about; correct?
15     A.  That's right.
16     Q.  Some of the very same practices
17  that you felt necessary to address when you
18  got the audit; correct?
19     A.  Right.
20     Q.  President Chambers, what more can
21  this lady do than inform you and inform the
22  Dean of the College and the Dean of
23  Instruction that we've got a problem,

Page 246

1  fellows, we need to correct it? What else
2  can she do?
3      A.  She can stop the money.
4      Q.  Stop the money how, sir?
5      A.  She can stop the money from the
6  beginning. She can stop purchasing. She
7  can stop ordering stuff for people until she
8  gets the appropriate paperwork.
9      Q.  But, sir, one of your complaints
10  about Dean Greene is she wouldn't purchase
11  and order?
12     A.  That's right.
13     Q.  And now you're telling me she
14  should stop purchasing and ordering until
15  they do right?
16     A.  Yes.
17     Q.  And if she does that, then you'd
18  complain --
19     A.  You're not hollering, are you?
20     Q.  -- then you'd raise -- I'm just
21  talking like Mr. Christman. Then you'd
22  raise another issue?
23     A.  No. The issue is, if you would go

Page 247

1  back and look at this, with the exception of
2  maybe one or two, there were some materials
3  ordered. There were some purchase
4  requisitions approved.
5      And we have in our documents --
6  and the minutes will reflect -- that she has
7  been directed by me that if she does not
8  have the paperwork, do not allow the process
9  to continue. That has been said over and
10  over and over.
11     And all she had to do was stop
12  purchasing. Stop allowing people to come in
13  and bring stuff in because that was her
14  responsibility.
15     Q.  And when people don't pay for the
16  materials when they pick it up, y'all ban
17  her from campus, don't you?
18     A.  We try as much as we can to
19  penalize them so they can't come back.
20     Q.  Yes, sir.
21     A.  But they cannot start a process or
22  end a process without our approval. They
23  cannot bring a car in there to be worked on.

Page 248

1  Yes, they've slipped a few in. But when
2  we found them, we dealt with them.
3      But we do not have to order a
4  spark plug for a car if the paperwork is not
5  right. We do not have to pay a bill for a
6  -- to a vendor if the paperwork is not
7  right.
8      Q.  Correct.
9      A.  So they could have stopped the
10  process.
11     Q.  And when you talk about late
12  payments, you agree with me that the
13  paperwork has to be right before that bill
14  is paid?
15     A.  But the paperwork had an
16  opportunity to be right before the bill was
17  allowed to happen.
18     Q.  Well, sometimes it's billed to you
19  incorrectly?
20     A.  You're right. Sometimes.
21     Q.  Now, let's go to another issue
22  here. Now, I wrote this down. And you said
23  in response to Mr. Christman's questions

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

**FREEDOM COURT REPORTING**

Page 249

1 about Ms. Hendrix, according to my
2 understanding, Ms. Hendrix got a hearing.
3    A.  At that time, yes, I thought she
4 had. I thought the process had gone through
5 according to the policy. When I got the
6 report from Dr. Merk when he said he had
7 gone through the steps according to State
8 Board policy and according to his
9 recommendation or resolution, he had gone
10 through the procedures he had gone through
11 and he was making a recommendation that the
12 problem had been resolved and no further
13 action was needed.
14    Q.  So you were under the impression
15 she had her public hearing?
16    A.  I was under the impression that
17 she had been provided all of those steps
18 that were provided as outlined, which could
19 --
20    Q.  But you know --
21       MR. CHRISTMAN:  Hold on. Which
22 could.
23    A.  Which could have included a

Page 250

1 hearing. It could have been used as
2 investigative information. They could have
3 used a lot of things in that.
4    Q.  You know now she didn't have a
5 hearing, don't you?
6    A.  I still don't know that she did
7 not have a hearing. I'm hearing this in
8 these type of meetings and discussions.
9    Q.  If Dr. Merk admitted she didn't
10 have a hearing --
11    A.  I would believe him.
12    Q.  Right. If he admitted that under
13 oath especially?
14    A.  Whether he admitted it under oath
15 or not, I would believe him.
16    Q.  Okay. Did you say you got a
17 letter signed by the Chancellor that
18 criticized your response?
19    A.  Yes.
20       MR. CHRISTMAN:  Talking about his
21 response to the audit report?
22       MR. DEBARDELABEN:  Report number
23 -- Plaintiff's Exhibit No. 9.

Page 251

1    A.  Yes.
2    Q.  Okay. When did you get that
3 letter?
4    A.  I can't give you the exact time.
5 But it was after we had received our report
6 back from the audit.
7    Q.  Okay. Now, did Dr. Huffstutler
8 leaving J.F. Ingram have anything to do with
9 that audit report?
10    A.  No. But it was good timing
11 because I also indicated to the auditors
12 that he probably would be no longer at the
13 institution, which would help us to resolve
14 some of the problems we've had with him.
15    Q.  And some of those problems, it
16 appears from reading Dean Greene's
17 memorandum to him and from what's in the
18 audit report, is that he was pretty loose
19 about letting people bring equipment in to
20 get repaired, not getting work orders, or
21 not having his people prepare their work
22 orders correctly. Would that be a bad
23 statement?

Page 252

1    A.  No. That's a pretty accurate
2 statement.
3    Q.  And Ms. Greene kept on sending him
4 memorandums to tighten up apparently, didn't
5 she?
6    A.  Yes. According to what I'm
7 reading here.
8    Q.  And she sent you a lot of those
9 memorandums, didn't she?
10    A.  That's right.
11    Q.  And she's kind of caught between a
12 devil and the deep blue see if she cuts off
13 the funds and shops can't get any of their
14 work done?
15    A.  So. If they're doing it
16 incorrectly why would --
17    Q.  But if she doesn't cut off the
18 funds --
19    A  Then she's going to get in
20 trouble.
21    Q.  -- they'd disagree with it
22 indirectly. So either way she goes --
23    A.  No. I disagree with you.

63 (Pages 249 to 252)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 253

1      Q.  -- she can get in trouble?
2      A.  I disagree with you.
3      Q.  But you are complaining about Ms.
4   Greene getting purchase orders out, aren't
5   you?
6      A.  Yes.
7      Q.  And Dean Wilson is complaining
8   about purchase orders, isn't he?
9      A.  Yes.
10     Q.  And Dean Merk is complaining about
11  purchase orders?
12     A.  That's right.
13     Q.  And Dean Huffstutler has
14  complained about purchase orders?
15     A.  That's right.
16     Q.  But on the other hand, if it's
17  done wrong, according to you, she's supposed
18  to cut it off?
19     A.  Ms. Greene will never be able to
20  tell you or anyone else that I have told her
21  to disregard policies, don't worry about
22  whether we have the money.  Go in and buy,
23  purchase it, order it.

Page 254

1      She will never tell you or anyone
2   else that I have told her to circumvent
3   policies to make sure that someone was
4   happy.
5      Q.  Right.  But she's got to work with
6   those people to be a team player, doesn't
7   she?  You want her to be a team player?
8      A.  It's not important as to whether
9   she's a team player or she's doing things
10  right.  I want to be a team player, too.
11  And look where I'm at today.
12     Q.  And if she is a team player, she
13  should try to -- and you wrote her up about
14  not getting along with people, didn't you?
15     A.  That has nothing to do with the
16  paperwork and stuff we're talking about.
17     Q.  Let's see.  You said she was not
18  sensitive to the problems or changes within
19  the work place.  I think that was No. 10.
20  You said, in essence, I asked you -- I'm
21  paraphrasing -- and it was a negative.  She
22  makes an effort to be a team player and
23  works effectively as a member of the college

Page 255

1   administrative team.
2      So what -- If she gets along with
3   them, she violates policy.  If she's a team
4   player, she's a team player.  But if she
5   cuts it out and cuts off the money and don't
6   buy stuff, she gets criticized because she's
7   not a team player.
8      A.  That's a good paraphrase if we
9   were doing it that way.  But that has
10  nothing to do with what we're talking about.
11     Q.  Yes, sir.
12     A.  No, sir, it doesn't.
13     Q.  We disagree on that.
14     A.  Well, you have a right to disagree
15  and so do I because what we're talking about
16  here is a money trail.
17     Q.  Yes, sir, we're talking about a
18  money trail.
19     A.  She's asking Dr. Huffstutler here
20  to stop the teachers from violating policy.
21     Q.  Yes, sir.
22     A.  I'm saying that the teachers
23  cannot violate policy to this degree if they

Page 256

1   can't purchase and they can't have the
2   equipment to work with.  And I have said
3   that over a hundred times.
4      That if you do not order it, they
5   will get in line with what you're trying to
6   do.  I'm not disagreeing with what she is
7   saying here.  She's asking the dean to tell
8   the people that he supervises to stop
9   violating policy.
10     But she holds the money.  You said
11  earlier in this interview that I expect for
12  Dean Greene to spend the money, to save the
13  money, all those money questions you asked
14  me.  And they were leading to one thing,
15  that Dean Greene was the money person.
16     You also asked me about her
17  priority.  And I said she has the number one
18  priority on this campus including my job.
19     Q.  Now, let me ask you --
20     MR. CHRISTMAN:  Wait a minute
21  He's not finished.
22     A.  No, I'm not through.
23     MR. DEBARDELABEN:  I haven't asked

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 257

1  him a question. He started that comment. I
2  asked a question.
3      MR. CHRISTMAN: You're not going
4  to cut him off then.
5      MR. DEBARDELABEN: Okay. You ask
6  the question. We'll be here until ten
7  o'clock tonight. I'm going to stay here.
8  And I'm fixing to get some more stuff.
9      MR. CHRISTMAN: Just hold on.
10  Let's go off the record for a second.
11      (Whereupon, there was a brief
12  off-the-record discussion.)
13      Q. If you'd just answer the question
14  and don't editorialize, I'll be fine.
15      MR. CHRISTMAN: You answer it
16  fully, Dr. Chambers. Answer it fully.
17      Q. Let me ask you this. You
18  mentioned the report from the Chancellor's
19  office concerning Ms. -- well, the review of
20  the business office function of Ingram State
21  Technical College; correct?
22      A. Correct.
23      Q. Now, I want to show you what was

Page 258

1  introduced in Dean Greene's deposition as
2  Exhibit No. 13 and ask you if this is the
3  report?
4      A. Yes.
5      Q. Now, flip that page, please, sir.
6  Up in the upper right-hand corner, what's
7  the date on it?
8      A. February 10, 2004.
9      Q. Is that when you got it?
10      A. I don't know when I got it. But I
11  know I received it.
12      Q. And that's the date of the report,
13  isn't it? You got it pretty quickly after
14  that, didn't you?
15      A. I don't know when I got it because
16  they had been over twice. But I got -- I
17  received this report.
18      Q. How did you receive that report?
19      A. Well, I believe it was mailed to
20  me. But I'm not sure.
21      Q. Mailed to you. Did you get a
22  cover letter with it?
23      A. I'm not sure.

Page 259

1      Q. Okay.
2      A. Normally I do. But I'm not sure
3  whether I did or not.
4      Q. Okay. Did you put a copy of that
5  in Dean Greene's personnel file?
6      A. No.
7      Q. Do you think you got it before the
8  month of March was out?
9      A. I would only be speculating. I'm
10  not sure when I received it.
11      Q. So you don't know. But you got a
12  cover letter going with it?
13      A. No, I didn't say that. I said
14  normally I do.
15      Q. But what's the date of that
16  report?
17      A. February 10, 2004.
18      Q. And that was something that was
19  requested of -- that the Chancellor did,
20  didn't it?
21      A. Yes.
22      Q. But you do agree on -- look at
23  Plaintiff's Exhibit No. 6.

Page 260

1      A. Okay.
2      Q. You do have to agree, even after
3  that report was written on February the
4  10th, '04, you gave her an evaluation on
5  April 1st, 2004 that says she met standards,
6  didn't you?
7      A. Yes.
8      Q. Even after that report was
9  written?
10      A. Yes.
11      Q. So it didn't affect your
12  evaluation of her in 2004, did it?
13      A. Not on paper it didn't.
14      Q. And this is what she has to rely
15  on, isn't it?
16      A. Yes.
17      Q. What the State Department has to
18  rely on; is that correct?
19      A. Not necessarily.
20      Q. Is there a -- You mentioned
21  purchases. Is there a phenomenon at the end
22  of the year that people try to purchase and
23  use up their budget?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

1     A.  Yes.

2     **Q.  And that creates problems with the**

3  **finance office, doesn't it?**

4     A.  Yes.

5     **Q.  You're aware of that?**

6     A.  Yes.

7     **Q.  And you're aware that when people**

8  **send in a lot of purchases at one time, that**

9  **they are not going to be processed**

10  **immediately, are they?**

11     A.  I would expected that.  I wouldn't

12  think so.

13     **Q.  And from time to time, Ms. Greene**

14  **has to send a memorandum out to the**

15  **employees reminding them of that?**

16     A.  That's right.

17        (Whereupon, Plaintiff's Exhibits

18  No. 37 and 38 were marked for identification

19  and attached to the original transcript.)

20     **Q.  And she does that every year as**

21  **shown by Plaintiff's Exhibit 37 and 38 for**

22  **the years of 2004 and 2005, basically by the**

23  **end of the year, it's going to be slow**

1  **processing.  I'm paraphrasing.  But that's**

2  **what they say, isn't it?**

3     A.  Right.

4        (Whereupon, Plaintiff's Exhibit

5  No. 39 was marked for identification and

6  attached to the original transcript.)

7     **Q.  And she even tries -- It's not**

8  **unusual as shown by Plaintiff's Exhibit 39**

9  **that she tries to tell employees we have a**

10  **close out on purchasing, to get your**

11  **purchase dates -- purchasing by this date?**

12     A.  Right.

13     **Q.  I think one of the criticisms in**

14  **that Chancellor's report is concerning**

15  **direct deposits of the check into a bank.**

16  **Were you familiar with that?**

17        MR. CHRISTMAN:  Criticism or the

18  practice?

19     **Q.  They criticized J.F. Ingram for**

20  **not having direct deposits?**

21     A.  Yes.  What's your --

22     **Q.  Have any of your employees**

23  **requested direct deposit?**

1     A.  From time to time, yes.

2     **Q.  What percentage of them?**

3     A.  I wouldn't have any idea.  I

4  wouldn't have any idea.

5     **Q.  And this is also during the time**

6  **period y'all are going through that Access,**

7  **getting that up and running and correct?**

8     A.  It's been requested from time to

9  time ever since I've been there.

10     **Q.  Have you ordered it done?**

11     A.  No.

12     **Q.  Do you consider that a priority?**

13     A.  No.

14     **Q.  I mean, that's just kind of a it**

15  **would be nice if we had it, but we're just**

16  **not ready to function like that; right?**

17     A.  Well, according to the information

18  I received from the business office, that's

19  right.  But I didn't disagree with it.

20     **Q.  Now, another thing I think they've**

21  **showed to criticizing in that report is the**

22  **deduction from employees' checks.**

23        **You might have one or two**

1  **employees that money is deducted and sent to**

2  **one company or maybe only one employee.  And**

3  **that report is criticizing that J.F. Ingram**

4  **goes to the effort of deducting only one or**

5  **two employees and sending it to a company.**

6        **And they said it should be a**

7  **minimum amount.  That was a criticism in**

8  **that report, too, wasn't it?**

9     A.  I'm not for sure if it was in the

10  report.  I would have to look at it.  But

11  I'm not sure.

12     **Q.  Let me see.  I think I can find**

13  **that thing.  Do y'all have a vice-president?**

14     A.  The college?

15     **Q.  Yes.**

16     A.  No.

17     **Q.  So y'all don't have anything**

18  **that's a vice-president?**

19     A.  No.

20     **Q.  Do other colleges?**

21     A.  Technical colleges are only

22  allowed to have a Dean of the College.  A

23  community college can have a vice-president.

**367 VALLEY AVENUE**

**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 265

1    Q.  These people who are doing this
2  review, were they junior college people or
3  technical college people?
4    A.  I don't know how they were
5  selected.  They were selected from the
6  Chancellor's office.  I have think they were
7  a cross section of people.  I'm not sure.
8    Q.  Would you agree with me or
9  disagree with me -- I think you'll agree
10  with me - that there's no other school in
11  the system that operates like J.F. Ingram?
12    MR. CHRISTMAN:  Form.
13    A.  You mean as related to --
14    Q.  As related to almost anything.
15  Y'all have a captive student body of
16  inmates?
17    A.  But there are some similarities
18  that we have with other schools that we are
19  to conform to.
20    Q.  Yes, sir.  You have a good many
21  similarities.  But even those similarities,
22  you have differences within, don't you?
23    A.  Well, yes.

Page 266

1    Q.  So what might be good for John
2  Patterson here in Montgomery certainly
3  wouldn't work for J.F.I, would it?
4    A.  Well, it's depending on what we're
5  looking at.  The live work procedure is
6  similar.  The reporting procedure is
7  similar.  The purchasing is similar.  We're
8  dealing with a different clientele.  But the
9  procedures are not all that different.
10    Q.  Right here.  The college does not
11  offer direct deposits to employees.  That's
12  the weakness.  You don't consider that a
13  weakness, do you?
14    A.  No.
15    Q.  Okay.  And it says do not begin
16  any new payroll deduction unless a certain
17  number of employees sign up for the
18  deduction.  That's a recommendation.
19    I guess they're saying optional
20  deduction number around twenty which seems
21  excessive and causing much work to be
22  performed by payroll in keeping up with
23  these deductions and submitting them to the

Page 267

1  proper vendors.  Do you consider that a
2  weakness?
3    A.  No.
4    MR. CHRISTMAN:  What are you
5  reading from there?
6    MR. DEBARDELABEN:  I'm reading
7  from the payroll section of this report
8  where they point out weaknesses that --
9    MR. CHRISTMAN:  Just for the
10  record --
11    MR. DEBARDELABEN:  -- that Mr.
12  Chambers don't agree with.
13    Q.  And at the time -- Now, it says
14  the Access payroll contract module is not
15  used -- y'all still having some problems
16  getting the payroll module for contracts on
17  Access, aren't you, but it's being worked
18  on?
19    A.  I think we're just about there, if
20  we're not there already.
21    Q.  Is that a weakness or just a
22  situation y'all are working on?
23    A.  A situation we're working on.

Page 268

1    Q.  But you wouldn't consider that a
2  weakness, would you?
3    A.  No.  And I didn't consider it as a
4  weakness.
5    Q.  Right.  So is it fair to say that
6  everything that this -- I'm going to call it
7  the Chancellor's office report pointed out
8  as a weakness, you didn't necessarily agree
9  it was a weakness?
10    A.  Not necessarily.
11    Q.  And you and Ms. Greene got
12  together and basically implemented anything
13  that y'all thought was a weakness within
14  J.F. Ingram, didn't you?  Y'all changed it?
15    MR. DEBARDELABEN:  Form.
16    Q.  Let's put it this way.  Y'all
17  started a process to make changes?
18    A.  Yes.
19    Q.  And sometimes a process to make
20  changes can take months to years?
21    A.  That's right.
22    Q.  Okay.  Did you know on September
23  the 30th, 2006 -- and that's just about the

67 (Pages 265 to 268)

# FREEDOM COURT REPORTING

Page 269

1   last of the fiscal year, isn't it?
2       A.   Right.
3       Q.   -- y'all had a cash -- J.F. Ingram
4   State Technical had a cash balance at
5   Alliant Bank in Alex City of two million
6   five hundred and eighty-four thousand six
7   hundred and seventy-six dollars and
8   eighty-seven cents?
9       A.   I don't know the exact figure.
10       (Whereupon, Plaintiff's Exhibit
11   No. 40 was marked for identification and
12   attached to the original transcript.)
13       Q.   I'll show you Plaintiff's Exhibit
14   40. Would you disagree with that?
15       A.   No, I would not disagree with it.
16       Q.   Now, from the other figures we
17   saw, that's an increase over 2004, isn't
18   it? I think it was two point --
19   approximately two point one million?
20       A.   Something like that, yes.
21       Q.   And J.F. Ingram has to get that
22   cash budget by being very shrewd with its
23   funds.

Page 270

1       A.   You could say that, yes.
2       Q.   It shows basically y'all not
3   having any wasted spending, doesn't it?
4       A.   Well, it shows that we're not
5   spending as much as we had been spending.
6       Q.   Right. That might be why some of
7   the -- let me ask the question this way. Do
8   you know any program at J.F. Ingram that's
9   not getting enough material to do what they
10   are supposed to be doing?
11       A.   No.
12       Q.   And every instructor at J.F.
13   Ingram and every dean wants more money and
14   more material, don't they?
15       A.   Most of them, yes.
16       Q.   And if each instructor had a
17   million dollars to spend and each dean had
18   ten million, they would still want more
19   money, wouldn't they?
20       A.   Not necessarily. They don't ask
21   for a lot of money.
22       Q.   But they always want more than
23   they've got, don't they?

Page 271

1       A.   You'd be surprised, but they
2   don't.
3       MR. DEBARDELABEN: I have no
4   further questions at this time.
5       MR. CHRISTMAN: We're good.

Page 272

1              C E R T I F I C A T E
2
3   STATE OF ALABAMA )
4   MONTGOMERY COUNTY)
5
6       I hereby certify that the above
7   and foregoing deposition was taken down by
8   me in stenotype, and the questions and
9   answers thereto were transcribed by means of
10   computer-aided transcription, and that the
11   foregoing represents a true and correct
12   transcript of the testimony given by said
13   witness upon said hearing.
14       I further certify that I am
15   neither of counsel, nor of kin to the
16   parties to the action, nor am I in any wise
17   interested in the result of said cause.
18
19
20   ----------------
21       CINDY WELDON
22
23

68 (Pages 269 to 272)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

**A**

**ABI** 173:20
**ability** 33:18
142:8 219:22
**able** 33:19 34:1
34:5 85:1
149:13 253:19
**academic**
156:21
**accept** 20:6
**acceptable** 79:9
86:7
**accepted** 77:17
140:14
**accepts** 67:5,11
**access** 102:22
186:16 187:19
187:20 188:1,5
188:16 189:1,5
189:13 191:8
191:12 192:5
263:6 267:14
267:17
**account** 64:18
**accountant**
142:18,20,21
142:22
**accounting** 66:6
69:19 86:7
194:15 195:18
208:11,20
**accounts** 85:8
93:6 97:8,14
102:2,7 103:14
103:19 135:21
139:20 141:6
141:18 142:2
204:19 207:11
212:4 244:15
**accurate** 33:17
203:22 252:1
**accurately** 72:22
**achieve** 61:2
**acknowledge**

62:17 78:23
**acre** 185:21
186:4
**act** 29:20
**action** 92:5
199:18 200:9
200:10 204:12
221:13 223:9
224:14 249:13
272:16
**actions** 204:15
205:22
**activities** 232:17
**activity** 81:9
**add** 218:16
**address** 11:19
228:13 245:17
**addressed** 136:4
213:18,22
217:12,14
**addresses** 69:3
**addressing**
133:16 180:19
229:2
**adherence**
230:23
**administrative**
41:20 70:3
72:9 83:6
183:20 255:1
**administrator**
63:3
**administrators**
62:22 64:3,10
195:9
**admissions**
145:23
**admission's**
19:20,23
**admit** 194:14
**admitted** 194:16
250:9,12,14
**adopted** 32:23
33:8 34:8

123:22
**advance** 107:3
109:2 112:10
217:5
**advanced** 109:3
**adverse** 134:17
**advertised** 26:4
**advised** 5:8
229:11
**Affair** 204:2
208:1
**affairs** 28:21
232:17 243:3
244:11
**affect** 17:12,15
214:11 260:11
**agencies** 104:18
127:22
**agency** 103:14
103:15 104:21
104:22 105:1,4
105:7,16
**ago** 12:6 17:9,10
70:20 113:15
174:16 218:20
218:21
**agree** 51:8 54:11
65:15 95:20
120:19,22
124:5 129:9,13
150:4 169:4
170:18 185:19
194:22 248:12
259:22 260:2
265:8,9 267:12
268:8
**agreeable** 96:3
**agreed** 5:13,23
6:9 10:14 79:2
124:9,14
**agreement**
145:13
**ahead** 188:10
**aides** 172:2

**Alabama** 1:2 2:2
4:2 5:2,20 7:6
7:12 11:21,23
12:16 13:5
14:5 16:6,8,17
16:20 34:11,14
41:6 47:6,20
48:1,7 103:16
104:12 105:1
128:3 141:7
200:12 272:3
**Alex** 269:5
**alike** 34:22
**allegations**
123:4,12,16
188:4,13,19
**alleged** 119:16
130:11,14
**alleviating**
223:15
**Alliant** 269:5
**allocate** 180:1,6
**allotted** 222:15
**allow** 38:9
159:17 204:5
204:11 247:8
**allowed** 65:22
103:2 152:23
224:12 248:17
264:22
**allowing** 247:12
**allows** 49:4,10
**alluded** 218:20
**Amended** 5:3
**American**
107:13
**amount** 60:20
65:8,8 165:5
264:7
**ANDREW** 7:9
**and/or** 111:22
159:11
**animosity** 127:3
**announcement**

21:1
**announcing**
21:3
**annual** 33:13
34:2,5 41:19
46:4 107:3
112:9,13
243:15
**answer** 10:23
33:3 34:20
55:2 80:13
94:9 111:13,14
111:15 112:22
120:16 131:17
139:8 146:21
149:11,12,13
173:7 188:6,22
213:21 218:17
233:6 257:13
257:15,16
**answered**
112:19
**answers** 272:9
**anybody** 64:21
124:13 194:1
213:8 218:1
221:17 227:7
227:13
**anymore** 211:21
219:16
**apparently** 40:7
51:5 76:6
130:20 193:3
242:3 252:4
**appeal** 221:11
221:12,14,15
221:21 222:5,7
222:12,22
223:1,4,8,11
223:15,19
224:3,12
**appealed** 222:14
224:8
**appeals** 222:18

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| appear 57:22 58:13,18 202:8 207:13 208:22 | appropriated 164:7,10 165:21 | 106:3 111:20 112:9,17 113:10 118:4 | 158:11 159:1,4 159:8 | attended 14:9 attention 121:4 196:10 198:6 |
| appears 28:9 50:21 58:19 112:12 137:4 146:8 207:18 208:20 241:16 251:16 | appropriately 67:15,23 68:6 68:10,18 219:19 | 118:12,20,22 119:12 120:9 125:8 133:18 136:13,16 138:19 160:21 | associated 114:9 188:23 200:3 204:20 206:6 208:14 213:8 217:17 220:12 | 203:12 205:6 206:22 209:16 236:6 attire 129:11 217:10 |
| applicable 141:13 | appropriation 164:19 approval 28:3 247:22 | 161:21 162:2,5 191:23 192:15 196:11,17 | 220:17 222:4 226:6 228:4 230:13 | attorney 43:16 51:2 83:22 Attorney's |
| application 21:10 22:15,17 23:2,4 24:7 25:18 26:2,5 26:15 27:6,12 27:15,20 156:5 156:8 | approve 77:9,15 77:16 110:3,5 approved 110:2 210:23 232:17 247:4 | 204:4 221:21 254:20 256:13 256:16,23 257:2 asking 64:5,7 113:17 119:6 | Association 107:10,11,13 108:2 assume 154:3 attach 38:9 71:8 90:23 91:2,5 | 200:14 attracted 130:21 Auburn 14:18 15:1,3,4,4,6,6 audit 85:15 86:1 87:13,14,15 |
| applied 22:14 apply 21:8 60:12 60:13 156:5 | approximately 15:18 64:13 135:18 147:10 148:18 185:21 | 228:9 237:3,4 237:5,15 238:9 240:10 255:19 256:7 | attached 35:6 36:18 39:5 43:23 51:19 52:18 56:9 | 88:1,11,18 89:18 90:5,10 90:13 91:11,22 92:2 93:6 |
| appoint 117:21 145:14 156:6 | 186:10 269:19 April 44:9,18 | ass 169:15 assign 6:4 | 58:12 61:8 71:16 74:17 | 139:20 140:1 140:12,19 |
| appointed 23:5 24:5,8,9 25:15 27:10 28:4 29:6 103:19 116:18 117:10 117:17 | 53:6,7,11 79:12,13 82:2 83:17 84:1,19 84:20 235:17 260:5 area 12:22 40:4 | assigned 74:21 121:9 assignment 62:2 69:9 assignments 67:6 | 78:12 93:21 97:11 106:23 113:4 115:23 129:22 137:2 145:6 233:9 234:5 236:1,10 | 152:17 153:12 196:8 197:17 197:23 198:5 198:10 199:8,9 199:10 201:11 203:19 209:12 |
| appointment 116:22 | 40:5 66:15 69:2 151:19 | assist 125:2 assistant 22:10 | 237:19 238:3 238:18 239:5 | 210:6 212:5,10 212:12,15 |
| appoints 27:22 appraisal 37:22 38:14,19,21,23 | 182:19 183:2,4 184:18,20,22 184:23 185:9 185:20 | 22:11 23:1,6 23:17 24:1,16 72:9 114:5 | 239:19 241:21 242:7 243:21 261:19 262:6 269:12 | 213:2 245:12 245:18 250:21 251:6,9,18 |
| approached 211:17 | areas 40:14 44:19 59:23 | 142:23 143:3 145:16 147:16 | attachment 60:5 | auditing 140:6 140:14 141:19 |
| appropriate 31:16 61:10 62:21 63:4 125:13,18 129:11 152:9 152:19 200:18 204:5 205:5 246:8 | 80:21 128:21 129:6 206:4 arrive 60:21 asked 25:6 43:14 69:8 74:3 78:20 80:15 81:2 92:3 104:6 | 147:21 148:9 154:21 155:3,4 155:5,6,8,9 157:7,8,10,13 157:15,16,19 157:20,21,22 158:10 176:6 assistants | attack 38:11 131:5,12 172:18 184:7 attacked 216:17 attacking 131:10 attempt 204:13 attempting 206:18,20 | 142:3 auditor 102:18 153:13,18 201:3,6 203:12 auditors 102:22 200:7,7 202:17 203:8 204:4,10 204:14 205:2,9 |

208:22 209:18
210:3 251:11
**auditor's** 203:17
203:18
**audits** 87:19
93:23 94:11
95:3 140:15
141:9 198:2
212:17,20
**August** 37:4
40:7
**AUM** 15:4
**Autauga** 12:17
**authority** 29:20
30:7 48:22
**auto** 238:22
242:11 244:2
**automatic** 182:1
182:2
**automobile**
242:16 243:1
**automobiles**
242:10,15
**available** 21:4
103:7 160:3
222:18
**Avenue** 5:20 7:5
**average** 39:20
**avoid** 69:5
**award** 100:1
168:10,11
**awards** 90:10
95:12,15
**aware** 115:13,16
118:2,6,11,19
119:5,10 120:3
134:8,14
148:10,22
153:22 154:8
188:3,12 210:6
219:23 228:17
228:21 229:1
229:17 230:7
244:13 261:5,7

**a.m** 5:21

━━━ **B** ━━━

**B** 8:7
**baby** 216:6
**bachelor's**
224:22
**back** 11:2 26:23
27:4 37:7
40:18 41:1
44:22 46:13
58:8,12 59:5
62:13 68:22
76:10,12 96:5
96:20 98:2
103:9 124:21
182:18,22
184:14 186:9
192:17 205:4,8
206:11 220:16
238:3 247:1,19
251:6
**background**
14:6 66:6
**backing** 229:22
230:8
**backward** 87:23
**backwards** 93:2
**bad** 251:22
**balance** 61:11
269:4
**ban** 218:7 219:9
247:16
**bank** 102:6
108:10,11,19
262:15 269:5
**banned** 219:4,12
**Barbara** 2:5
7:17 10:11
**base** 165:3
211:23
**based** 126:20
127:6 159:18
164:19 226:18

**basic** 189:12
**basically** 12:17
12:18 55:8
87:14 181:14
187:22 189:16
197:11 237:15
261:22 268:12
270:2
**basis** 25:15
**bees** 193:10,16
**beginning** 246:6
**behavior** 181:6
228:4 230:1
**believe** 87:2
112:19 141:2
188:2 211:20
230:19,22
233:13 250:11
250:15 258:19
**believed** 228:15
230:7
**benefit** 17:18
**Benton** 239:7
244:1
**best** 33:18 86:3
87:19 146:6,17
174:19 175:7
224:17 225:5
**bestowed** 16:11
17:8
**Beth** 170:20
**better** 65:16
179:18 190:10
**beverage** 105:12
105:13
**beyond** 153:1
**bid** 195:19
**big** 186:13
213:16
**bill** 28:13 65:19
65:20 66:2
139:14 154:19
161:14 248:5
248:13,16

**billed** 152:11
242:12 248:18
**bills** 139:11
160:8
**birth** 171:10
**bit** 193:11
**bitch** 132:20
**black** 108:1
146:4,10
174:13
**blame** 69:1
**blocks** 30:22,22
**blue** 252:12
**board** 27:11,21
28:3,3 29:3
34:11,14 48:10
48:16 49:9,16
54:17 65:23
66:1 108:5,9
108:19 177:1
177:15,19
178:4 187:7,9
202:23 249:8
**body** 171:18,21
265:15
**Bonita** 4:5 10:12
117:2 144:11
145:13
**book** 76:15,18
140:11 178:3
**booklet** 92:7
**bounced** 240:20
241:17
**bounds** 111:18
**boxes** 197:11,12
197:18
**branch** 103:10
**Brasswell** 201:9
201:10
**breach** 181:20
181:22
**break** 75:2
94:20 96:5
176:14

**breakdowns**
69:5
**Bridgeman**
133:7 136:7
142:16 144:1,5
144:6 189:8
190:21 191:7
**Bridgeman's**
143:6,20 144:7
**brief** 51:15
188:8 257:11
**bring** 163:21
219:6 247:13
247:23 251:19
**bringing** 220:4
**broad** 237:11
**brochure** 70:12
70:23
**brought** 121:4
155:20 181:1
203:12 236:5
**Bruce** 156:19
**buck** 122:3
**budget** 152:11
153:2 160:4,9
160:13,22
161:5 162:22
163:19 164:12
164:15,17
165:3 260:23
269:22
**budgets** 166:11
**building** 22:20
82:8 184:16
**buildings** 164:4
183:20 185:12
185:13,15
**buses** 184:21
185:4,6,12
**business** 40:4,5
64:11 69:16,22
70:12,23 71:19
86:2 162:14
175:5,6 211:21

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 212:2,22 213:4 | 128:9,12,15,18 | 241:3,5,16 | 97:12 107:1 | 67:22 68:9,16 |
| 213:9,23 214:7 | 130:8,9,20 | 269:3,4,22 | 126:3 141:17 | 68:21 254:18 |
| 214:12,14,21 | 131:4 133:5 | casino 110:19,20 | 142:15 157:7 | 268:17,20 |
| 215:9 223:2 | 135:14 172:6 | 111:11 | 172:5 176:18 | changing 54:17 |
| 257:20 263:18 | 172:22 173:2,4 | catching 236:18 | 179:14 186:15 | Chapter 108:1 |
| businesses | 173:6,9,11,14 | categories 95:13 | 188:12,20 | characterize |
| 175:21 | 174:3 181:18 | categorize | 189:3 193:8 | 201:18 |
| butt 170:8 | 182:20,23 | 201:14 | 196:6 201:12 | charge 29:22 |
| buy 253:22 | 183:10,13 | caught 252:11 | 210:17 231:8 | 38:10 100:18 |
| 255:6 | 185:2 195:1,3 | cause 126:21 | 245:20 257:16 | 121:21 145:22 |
| B.S 14:11 | 195:6,8 200:18 | 195:15 216:10 | 267:12 | 156:21 175:20 |
| | 216:10,18 | 216:11 272:17 | chance 97:13 | 232:14 233:1 |
| **C** | 217:19 218:11 | caused 27:14 | **Chancellor** 25:6 | charged 140:6 |
| C 7:1 159:16 | 218:15 220:1,2 | 197:17 | 25:11 27:22,23 | charges 65:10 |
| 198:5,11 210:9 | 220:4 232:14 | causes 219:14 | 47:13,14 48:21 | 65:14 152:23 |
| 232:12,12 | 233:3 244:7 | causing 266:21 | 110:3,4,9 | 231:7,9 230:4 |
| 272:1,1 | 247:17 256:18 | Caylor 137:5,7 | 179:12 188:14 | charitable |
| cabinet 46:23 | campuses | 137:15 138:7 | 189:1 206:16 | 104:15,16,16 |
| 71:20 72:5,8 | 129:12 | cent 208:16 | 207:5 210:22 | 104:19 |
| 72:15,23 73:5 | capable 135:7 | **Center** 114:21 | 211:14 221:11 | **Chattahoochee** |
| 73:16,21 74:5 | capacity 1:11,15 | 244:11 | 221:14 250:17 | 20:20,22 21:5 |
| 74:18 76:23 | 2:10,14,20 3:3 | cents 198:19 | 259:19 | 21:18 22:9 |
| 77:1,8,11,16 | 4:12,17 | 269:8 | **Chancellor's** | 26:23 155:21 |
| 83:5 103:14 | captain 114:11 | certain 49:17 | 32:6 48:4 | 156:2 |
| cabinets 106:4 | 114:16,16 | 149:20 177:16 | 64:22 110:18 | check 11:3 |
| Calhoun 210:9 | captive 265:15 | 188:3 203:1 | 112:16 164:12 | 60:14 80:15 |
| call 120:23 | car 100:8 247:23 | 266:16 | 164:20,22 | 81:6,7 197:18 |
| 132:14 135:11 | 248:4 | certainly 84:12 | 165:5 178:11 | 240:19 241:3 |
| 153:8 172:10 | care 215:14 | 86:8 150:9 | 178:12 186:22 | 241:17 262:15 |
| 172:13 173:19 | career 17:3 | 266:2 | 186:23 187:18 | checked 40:12 |
| 175:10 176:2 | caring 36:9 | certified 5:17 | 187:20 188:5 | 40:22 59:22 |
| 193:9 231:19 | Carol 200:22 | 50:3 | 206:15 213:17 | 67:16 70:4 |
| 232:2 268:6 | Caroline 201:1 | certify 140:11 | 213:22 224:9 | 79:9 80:19 |
| called 77:22 | carry 63:14 | 272:6,14 | 257:18 262:14 | 82:20 100:1,5 |
| 87:15 132:6,14 | 163:4,14,15 | certifying 54:10 | 265:6 268:7 | 197:12,13 |
| 133:5 135:8 | 164:1 | **Chambers** 1:9 | change 10:23 | 206:4 |
| 142:19 172:5 | case 1:8 2:7 4:7 | 2:8 4:10,23 | 54:20 73:23 | checks 101:8,9 |
| 191:17 210:7 | 18:4,8 124:16 | 5:16 8:5 10:1,9 | 81:2 84:20 | 101:11 152:21 |
| 231:8,15 | 161:11 163:3 | 11:18 13:9,17 | 222:2 | 263:22 |
| calling 41:19 | 210:20 | 31:20 41:5 | changed 74:9 | **Cherry** 169:14 |
| calls 219:1 | cases 30:21 54:6 | 46:3 47:5 55:2 | 121:20 123:13 | **Cherry's** 169:11 |
| campus 30:8 | 69:1 74:2,11 | 66:5 71:17 | 123:20 125:23 | chief 85:19,21 |
| 100:9 101:18 | 159:16 193:14 | 75:6 88:23 | 211:6,7 268:14 | 103:18 |
| 102:18,23 | cash 240:18,23 | 90:3 96:8 | changes 67:14 | children 12:13 |

| | | | | |
|---|---|---|---|---|
| 12:15 18:5 | 176:15 177:7 | 244:6 | 156:21 159:14 | 60:15 61:3,4,7 |
| **choice** 187:23 | 179:6,9,23 | **client** 210:15 | 163:14,15 | 62:7,8,9,23 |
| 189:22 | 180:4,18 181:1 | **clientele** 266:8 | 165:17 166:1 | 64:8 67:1 68:1 |
| **CHRISMAN** | 183:11 185:22 | **clients** 10:17 | 166:17 177:14 | 68:12 70:4,5 |
| 118:15 | 188:6,10,17 | **client's** 111:7 | 179:7 182:17 | 81:4 82:9 |
| **Christman** 7:9 | 193:2,4,13 | **close** 183:23 | 195:6,8,8,15 | 169:22 170:4 |
| 7:10 10:7 11:7 | 195:11 196:5 | 184:3 223:2 | 199:2,11,15,17 | 170:23 257:1 |
| 11:10 12:20 | 210:14 231:6 | 262:10 | 199:22 200:16 | **comments** 36:8 |
| 33:2 35:9,15 | 233:4 237:8,10 | **closed** 153:2 | 204:2 206:8 | 38:2 39:22 |
| 37:5 39:13 | 241:8 244:18 | **closer** 184:9 | 215:15,17 | 40:18 44:16 |
| 45:5,13,17,20 | 246:21 249:21 | **code** 127:15,17 | 217:18 241:11 | 58:12 60:2 |
| 47:12 49:20 | 250:20 256:20 | 130:2 | 245:22 254:23 | 61:9 64:5,6 |
| 50:23 51:8,13 | 257:3,9,15 | **Colinhouse** | 257:21 264:14 | 68:23 79:18,21 |
| 53:21 55:1,10 | 262:17 265:12 | 187:11 | 264:22,23 | 81:8 82:4 |
| 55:17 56:15,17 | 267:4,9 271:5 | **collect** 241:14 | 265:2,3 266:10 | 137:13 199:8 |
| 57:7 66:20 | **Christman's** | **collected** 198:22 | **colleges** 107:11 | 205:18,19 |
| 71:5,8,10 73:9 | 248:23 | **collecting** 244:1 | 140:1 178:19 | 217:13 |
| 75:1,14 78:15 | **Cindy** 5:3,17 | **college** 1:13,17 | 187:3,7 264:20 | **COMMERCE** |
| 80:7 81:18 | 272:21 | 2:12,17,23 3:5 | 264:21 | 7:11 |
| 85:4 86:21 | **circumstances** | 4:9,14,20 12:1 | **Colonial** 108:10 | **Commission** |
| 88:22 89:1,2,7 | 126:9 | 12:2,5 18:1 | 108:11,19 | 200:20 |
| 89:14,19 90:2 | **circumvent** | 20:7,20,22 | **Columbus** 14:4 | **Commissioner** |
| 90:22 91:3,9 | 254:2 | 22:20,21 28:15 | 18:3 20:7,7,8 | 5:18 6:10 |
| 92:14 94:8,23 | **cited** 64:17 | 28:16 29:19,20 | **come** 32:4 69:17 | **committee** |
| 95:16,23 96:4 | **City** 14:9 21:7 | 29:22 30:4,7 | 78:21 85:9 | 103:10 |
| 96:11,16,19 | 108:9,10,11,20 | 30:12,13 31:2 | 96:5,20 101:11 | **common** 61:3 |
| 97:1 98:3,7,14 | 269:5 | 38:13 41:6 | 102:4 136:10 | **communicates** |
| 98:17 100:13 | **Civil** 5:2 | 42:3 45:21 | 136:11 155:22 | 62:5 |
| 110:21 111:2 | **claim** 106:11 | 47:6,20 48:1,7 | 192:17 194:17 | **communication** |
| 111:10,16 | 111:7 | 48:9 49:15 | 201:17 228:12 | 62:16 |
| 113:5 116:13 | **claims** 139:10 | 50:4 64:16 | 247:12,19 | **community** |
| 117:11 118:23 | **clarification** | 77:18,19,23 | **comes** 30:11 | 16:13 17:7 |
| 119:22 120:15 | 100:19 | 78:1,5,6,7 | 102:18 164:20 | 20:20,22 |
| 122:17 128:17 | **classes** 147:14 | 86:11 88:2 | 164:22 166:5 | 107:13 115:9 |
| 129:1 130:22 | 216:4 | 102:13 104:4 | **comfortable** | 264:23 |
| 131:13,17 | **classroom** | 104:13 107:13 | 189:20 | **company** 105:12 |
| 135:3 137:19 | 184:18 | 108:3,14 | **coming** 168:5 | 105:13 188:15 |
| 137:22 139:6 | **clear** 48:5 77:14 | 114:14 115:2,9 | 213:16 | 264:2,5 |
| 140:2,16,21 | 92:1 | 115:10 123:22 | **command** 29:21 | **comparison** |
| 141:21 142:9 | **cleared** 139:1 | 127:15 128:7 | 30:3 | 198:13,15 |
| 143:19 146:15 | **clearly** 222:13 | 141:12,20 | **comment** 40:13 | **compensated** |
| 152:13 158:1 | 240:9 | 154:2,3 155:4 | 40:16,20,22,23 | 106:10 |
| 158:16 162:11 | **clerk** 175:10,11 | 155:4,7,10,14 | 41:2 59:22 | **competed** 22:16 |
| 162:21 173:12 | 175:14,23 | 156:10,13,17 | 60:3,8,9,10,11 | **complain** 246:18 |

# FREEDOM COURT REPORTING

complained
118:3 253:14
complaining
245:2,6,12
253:3,7,10
complains
229:23
complaint
116:10 121:5
188:20 189:13
194:6,11
230:12
complaintant
223:7
complaintant's
222:11
complaints
131:9 139:12
173:9,15 189:4
189:17 212:7
217:17 229:18
230:3 246:9
complete 28:1
45:9,10 50:10
50:18,19 51:7
54:4 59:11
125:21 160:2
167:14,20
completed 77:7
77:10 117:6
135:6,16
completely
36:10
completes 62:3
complied 141:13
component
117:12
Compound 94:8
computer-aided
272:10
concern 197:17
concerned
115:14 172:16
190:3,4 197:22

198:1 202:18
203:11 215:17
233:2,5,16,18
235:6,13,19
236:2,13
238:23
concerning
116:7,11 117:2
129:17 136:10
138:1 153:23
173:16 174:3
188:4,13 189:4
206:12 238:21
239:7,22 244:1
244:14 257:19
262:14
concerns 78:21
198:4 228:14
conclusion
69:18
condition 99:5
99:14 196:23
conditions 94:4
95:6
conduct 116:19
116:22
conducted 120:6
140:13
confer 16:20
conflict 119:18
127:18,21
conflicting
119:21 120:5
121:16
conflicts 69:6
conform 265:19
confronted 40:2
82:7
confused 112:23
154:11
confusion 69:5
69:20 129:10
129:15
conjunction

232:16
connected
105:15 108:13
connection
188:5,14
conscious
217:10
consider 120:8
163:20 263:12
266:12 267:1
268:1,3
considered 94:5
95:7 99:6,15
101:20,21
135:22 196:23
constitutes
219:5
contact 180:10
219:4 244:23
contained 94:14
95:5
content 136:13
211:19
contexts 203:7
continue 35:10
64:9 69:21
247:9
continues 39:23
40:3
continuing
20:11
continuous
219:17
contract 191:17
267:14
contracts 145:12
267:16
Contraman
13:10,18,19,19
contributed
17:6
contribution
17:5
control 94:13

95:4 97:20
167:15 181:8
181:11 182:5
196:14 201:21
216:12 242:23
243:8,10
controls 69:4,15
conversation
133:17 138:1
conversations
136:17 137:9
cooperates 67:4
coordinator
2:20 123:6,23
125:1,17
copies 41:12
72:22 91:7
copy 32:6,12
41:13,13,15,23
42:23 45:10
48:8 54:5
56:14,16 59:16
77:7,10 91:7
206:14 234:8
234:11,12
235:11,19
238:6 239:21
242:9 244:3
259:4
corner 258:6
correct 11:1
25:16 29:3,4
34:16 55:14
60:22 73:8
85:16 90:14
106:20 112:14
120:1 128:10
155:1,16
160:10 164:13
189:6 199:18
204:6,14 205:6
207:2 209:20
232:13 236:18
238:2 240:5,6

240:14,15
242:13,14
245:14,18
246:1 248:8
257:21,22
260:18 263:7
272:11
corrected
138:12 210:4
214:15
Correction
107:9
correctional
217:23 218:2,4
Corrections
114:10,18
173:23 174:1,6
181:12 182:4,8
219:6
corrective 92:5
199:17
correctly 10:21
151:12 251:22
correspondence
222:3
cost 208:16
costs 88:19 90:6
90:12 198:13
198:15
counsel 5:15 6:1
6:3 73:7
153:19 228:12
272:15
counseling 15:9
counselor 18:17
18:22 19:2,5,8
19:9,11 21:19
21:22 22:22
24:14 47:10
126:13 134:1
Countryman
13:18
county 12:17,22
12:23 13:23

# FREEDOM COURT REPORTING

18:5 105:3
272:4
**couple** 66:16
79:19 184:13
208:8 218:7
**course** 13:16
15:20 204:12
**courses** 15:13,15
**court** 1:1 2:1 4:1
5:9,10 10:5,20
**cover** 31:11
93:16 200:5
207:15 258:22
259:12
**covered** 183:5
196:8
**covers** 185:20
186:4
**co-workers**
214:18
**crack** 170:8
**create** 60:19
134:17 160:19
190:16
**created** 22:13
190:14 226:22
227:3,18
**creates** 127:3
261:2
**creating** 22:19
240:12
**Creek** 11:20
110:19
**crisis** 163:4,15
**criticism** 135:11
135:22 262:17
264:7
**criticisms**
262:13
**criticize** 134:4
135:1,9
**criticized** 231:17
231:20,22
250:18 255:6

262:19
**criticizes** 134:15
**criticizing**
263:21 264:3
**cross** 102:15
265:7
**crossed** 151:8
**crunching**
193:20
**currently** 225:2
**curse** 132:16
**custody** 96:2
**customers**
240:18
**cut** 252:17
253:18 257:4
**cuts** 252:12
255:5,5
**CV:2:06-CV-...**
1:9
_____

**D**

**D** 8:1
**DA** 203:5
**date** 24:12 27:8
37:3,6,12
39:12,13 46:8
52:13 53:5,9
53:12,16 57:3
79:14 84:2
133:20 152:7
161:15,20
258:7,12
259:15 262:11
**dated** 37:6 43:20
44:8 57:13
79:11 137:6
199:5 235:17
237:23 238:20
239:23,23
242:9 243:23
**dates** 37:9
262:11
**daughter's** 13:9

13:17
**day** 5:6 40:3
110:12 112:6
223:2,2 229:12
229:14
**dead** 74:21
**deal** 181:5
216:13
**dealing** 38:8
167:16 230:11
266:8
**dealt** 19:12
248:2
**dean** 1:15 2:14
3:3 4:17 21:16
22:10,11 23:1
23:6,7,8,12,14
23:17 24:1,3,6
24:16 25:1
27:2,4 28:5,11
28:11,12,14,15
28:21 29:2,2
29:12,19,20,22
30:3,12,13,22
32:18 42:12,14
42:19 63:7,8
63:11,11 69:4
114:5 116:18
116:22 119:3
122:19 123:10
132:3 137:12
138:2 143:1,5
143:18 144:22
144:23 145:16
146:20,22,23
147:2,17,22
148:9 154:21
154:23 155:4,5
155:5,6,9,11
155:13 156:9
156:11,12,13
156:17,20,21
157:7,10,14,15
157:16,19,21

157:22 158:10
158:11 159:4,8
176:6 180:11
180:16 181:2,4
181:14,16
199:1,3 200:11
200:15 204:1,2
208:1 215:5
231:9,10,17
232:2,8,15,16
233:21 234:6
235:5 236:2,13
243:2,3,6,7
244:11 245:22
245:22 246:10
251:16 253:7
253:10,13
256:7,12,15
258:1 259:5
264:22 270:13
270:17
**deans** 28:22
29:5 30:8,14
30:18 32:7,11
39:1 43:3,4,7
54:3 63:6
131:22,22
151:1 159:1
180:2,6 192:15
192:20 193:12
195:16,23
**dean's** 157:20
195:2
**Debardelaben**
5:5,19 7:4 8:4
10:4,8,10
35:13,17 37:8
39:16 45:11,14
45:18 49:23
50:14 51:1
54:1 55:12
56:13,16 57:9
66:22 75:3,16
81:20 89:11,17

91:1,6 92:20
94:19 95:1,10
95:14,17 96:1
96:6,13,17,21
97:3 100:15
111:9,12 113:7
116:15 120:1
129:3 131:15
140:17,18,23
142:11 143:21
152:15 176:13
179:8 180:21
196:3,9 200:4
207:15 210:11
213:19 216:16
231:7 237:9
250:22 256:23
257:5 267:6,11
268:15 271:3
**Debardelaben's**
220:11
**deceased** 157:5
**December**
237:23
**decided** 27:19
79:21 81:6
222:2
**decision** 212:14
**decrease** 240:20
**deducted** 264:1
**deducting** 264:4
**deduction**
263:22 266:16
266:18,20
**deductions**
266:23
**deep** 252:12
**DEFENDANT**
7:8
**Defendants** 1:18
3:6 4:21
**Defendant's**
57:16,18,22,23
58:9,10,14

# FREEDOM COURT REPORTING

59:2,8 67:1
92:18
defer 141:18,23
142:7
definitely 87:10
degree 14:11,13
14:19,19 15:8
19:15 211:11
221:20 224:18
224:20,22
255:23
degrees 15:23
16:2
delaying 190:17
deliver 106:4
delivered 199:2
delivering 5:4
demonstrate
118:13
denied 119:6
211:17
deny 133:2
denying 161:17
161:18
department
50:4 97:8
101:15 111:21
114:9,17
135:20 141:5,5
168:5 173:23
174:1,6 178:13
180:7,10,14
181:11 182:4,8
183:8,19
198:17 201:2,4
201:7 208:18
212:3 219:6
228:5 260:17
departments
198:14
depend 151:15
151:21 171:23
depended 50:17
depending

266:4
depends 171:16
171:22
deposit 240:21
245:9 262:23
deposited
101:10
deposition 4:23
5:15 6:6,10
10:15,18 31:7
35:3,12,14,16
35:18 50:1
57:17,19 59:3
59:9 91:4
122:18,20
222:19 258:1
272:7
depositions
50:16
deposits 198:21
235:20 242:2,4
244:16 262:15
262:20 266:11
Depot 161:13
described 225:2
describes 219:21
description
49:12 146:14
202:13
designated
125:2 166:21
designed 134:23
135:1,5 139:23
designee 167:1
details 233:17
determine 141:9
159:22 181:15
181:16
determined
159:10
determining
142:3 165:16
165:18
develop 40:1

64:1 70:11,22
82:5
develops 62:20
deviate 49:5,8
49:11,13
deviated 49:3
deviation 48:14
48:16,19
devil 252:12
diesel 199:3
difference
120:13,19
123:17,18
157:17,18,23
differences
121:17 265:22
different 50:15
54:14 55:23
56:1,3,4 158:7
166:16 225:9
266:8,9
differently
227:7,13
difficult 226:22
diffused 127:1
direct 30:7
70:22 71:17
111:13,14
198:5 220:16
262:15,20,23
266:11
directed 70:8
81:15 130:4
189:23 190:6
196:10 247:7
direction 67:5
67:11 178:10
190:6
directive 69:9
187:19,21
directly 164:16
168:7,13,22
169:1 184:15
222:21

director 20:10
42:15,17,20
43:13 147:2,3
147:7 167:19
167:22 168:2
168:14,15
169:2 179:1
219:11 244:12
directors 108:5
108:19
disagree 129:9
129:14 186:5
226:7,10,14
252:21,23
253:2 255:13
255:14 263:19
265:9 269:14
269:15
disagreeing
256:6
disappointed
126:11
discipline
216:12
disclose 88:18
90:6,11
discovered
199:15
discrepancies
203:13,18
206:7
discriminated
226:17
discuss 78:21
126:16 171:8
171:11 172:1
198:4 231:23
discussed 83:8,9
117:16 133:7
171:20 172:7
203:23 232:5
discussing
171:17 204:10
discussion 51:16

77:8 188:9
200:6 257:12
discussions
215:8 250:8
disfunctioning
215:12
dispute 123:2,11
123:15 126:1
disputed 220:21
disqualify
214:22
disregard 206:6
253:21
distribute 73:16
distributed
72:23
District 1:1,2
2:1,2 4:1,2
12:16 200:13
division 1:3 2:3
4:3 76:2
DOC 180:20
181:20 219:21
doctorate 14:18
15:8 16:5,6,8,8
16:15,21 17:1
doctorates 16:16
document 35:8
36:21,23 37:3
37:10,13,19
40:6 44:3,11
51:22 59:12
62:12 70:15,16
70:18,19 71:18
72:22 73:7
75:9 76:7 90:3
145:9,11
177:12 242:19
documentation
71:23
documented
66:3 72:5
documents
50:10 51:10

# FREEDOM COURT REPORTING

65:17 247:5
**doing** 34:2 81:11
83:14,18 86:7
86:12 95:22
102:2 106:15
119:13 120:10
134:9 135:7
147:15 150:5
162:10 177:5,6
192:8 193:10
193:20 204:9
206:17 239:8
240:13 245:2
252:15 254:9
255:9 265:1
270:10
**dollar** 208:16
**dollars** 148:18
148:23 161:6,9
162:18 198:18
240:21 241:15
241:16 245:8
269:7 270:17
**Donna** 72:12
**dormitories**
19:6,7
**dormitory** 19:11
19:13
**dotted** 151:7
**double-check**
45:6
**doubt** 51:1
**Douglas** 1:9 2:8
4:10,23 5:16
10:1 11:18
**Dr** 21:15,15
25:11 28:10
29:9 32:19
35:13,18 42:12
55:2 59:13
88:23 119:9
121:10,13
155:8,13,17
156:4 174:21

175:4 186:2,15
196:6 201:12
210:17 215:3
232:3,4,6,20
234:7,23
235:10,18
236:14,23
237:6 238:9,13
238:19,21
239:9,21 240:4
242:20 243:6,9
243:11,22
244:2,9 245:13
249:6 250:9
251:7 255:19
257:16
**draft** 70:19 76:8
76:9 77:4,6
205:9 206:10
211:3
**Draper** 128:16
128:17,18
130:9,19 131:3
172:22 173:2
**dress** 127:15,17
130:1 215:15
217:13,17
218:13 219:19
**dressing** 173:6
218:8 219:14
**Drew** 11:12
45:11 56:14
94:19
**Drive** 11:20
**dual** 244:10
**due** 65:8 183:9
**duly** 10:2
**duties** 21:20,22
108:14 145:20
147:15 158:6,6
159:18 176:3
176:10 192:5
225:1,3,6
226:14

**D.C** 168:4
213:12

_____
**E**
_____
**E** 7:1,1 8:1,7
154:12,14
159:20,21
272:1,1
**earlier** 125:8
163:17 256:11
**early** 24:18
60:21
**easily** 216:10
**east** 12:18
**editorialize**
257:14
**education** 15:9
17:6 20:11
27:22 34:12,14
48:16 49:9,17
107:10 111:21
142:8 177:15
178:4,14
214:21 219:11
224:16 225:12
225:14 226:2,9
226:11
**educational** 14:6
15:22 17:12
**Edwards** 229:8
**EEOC** 230:4
**effect** 124:12
170:20 191:22
**effective** 5:3
40:14 59:22
80:21 162:15
169:6
**effectively** 61:1
62:6 70:2
254:23
**effectiveness**
205:19
**efficiency** 214:8
**efficient** 62:21

64:2
**effort** 34:19 70:1
204:20 217:9
223:19 254:22
264:4
**eight** 66:23
198:17 208:15
**eighteen** 20:2
22:5 81:16
84:8 198:17
208:15
**eighty** 216:7
**eighty-four**
269:6
**eighty-seven**
269:8
**either** 45:12,16
60:2 65:1 66:8
73:21 95:14
124:8 129:11
252:22
**eleven** 12:9
64:13
**Elmore** 12:17
**elses** 35:12
213:8
**embarrassment**
216:1
**emergencies**
163:23
**emphasizes**
240:9
**employed** 11:22
11:23 18:3
19:18,22 71:1
**employee** 33:15
33:20,23 34:1
34:4 38:6
39:23 55:14
70:8 81:15
82:5,21 84:23
85:2,6 104:4
114:2,14
122:11 170:16

174:21 194:9
218:23 219:3
219:10 264:2
**employees** 43:2
53:20 61:2,12
69:2 104:11,13
110:8 126:4
126:7,10
127:12 129:4,6
136:22 138:4
150:11 159:23
173:10 174:8,9
174:13,14
183:23 184:1
192:16 205:6
205:23 206:23
211:10 215:18
216:9 217:22
220:4 261:15
262:9,22
263:22 264:1,5
266:11,17
**employee's**
171:18 176:19
**employment**
17:21 19:17
177:3 214:18
**encourage**
219:20
**enroll** 18:12
**ensure** 195:23
199:19
**entered** 62:1
**entice** 219:20
**entire** 34:21
62:11 64:15
76:15,18 92:7
93:16 110:12
123:14 151:23
**entity** 64:17
**environment**
215:19 217:11
**equal** 30:19
**equipment**

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 251:19 256:2 | everyone's 42:6 | exception 47:10 | 233:10 234:1,3 | ex-wife 14:2 |
| equivalent 30:4 | evidence 6:6 | 187:8 247:1 | 234:9,13 | e-mail 213:13 |
| especially | 117:13 222:1 | exceptional | 235:22 236:8 | |
| 250:13 | exact 23:22 | 161:9 | 236:12 237:17 | **F** |
| essence 106:15 | 24:12,21,22 | excessive 60:20 | 237:21 238:16 | F 272:1 |
| 192:1 204:7 | 27:8 133:20 | 266:21 | 238:22 239:3,6 | fact 120:14 |
| 254:20 | 147:13 152:7 | exchange 228:3 | 239:17 241:19 | 126:1 136:15 |
| established | 156:14 251:4 | excuse 28:10 | 241:23 242:5 | 173:19 187:11 |
| 130:23 | 269:9 | 47:14 99:13 | 244:21 250:23 | 194:3 202:3 |
| estimate 244:23 | exactly 164:14 | 121:16 142:12 | 258:2 259:23 | 206:3 212:20 |
| evaluate 33:23 | 166:4 208:9 | 179:17 234:16 | 261:21 262:4,8 | 214:20 234:19 |
| 85:9 159:23 | 217:2 | exhibit 8:9,10,11 | 269:10,13 | facts 120:5,20 |
| evaluation 34:2 | examination 8:3 | 8:12,13,14,15 | exhibits 5:7 | 120:23 121:17 |
| 34:5 36:1,5 | 10:4 102:5 | 8:16,17,18,19 | 55:11 80:9 | 220:21 |
| 37:1 39:9 41:7 | 196:5 231:7 | 8:20,21,22,23 | 92:19,21 93:19 | factual 123:3,12 |
| 41:10,19,20 | examine 33:14 | 9:1,2,3,4,5,6,7 | 96:2,7,23 | 123:16 |
| 42:7,7 43:20 | 94:18 102:6,10 | 9:8,9,10,11,12 | 141:3 145:4 | failed 64:1 |
| 44:6 45:4 46:7 | 102:14 | 9:13,14,15,16 | 243:19 261:17 | failing 223:7 |
| 47:2,19,21 | examined 94:16 | 9:17,18 31:5,6 | exist 50:7 216:3 | fair 179:13,18 |
| 52:1,4,9,11,22 | examiner 85:19 | 34:10 35:4,12 | expect 142:7 | 179:19 268:5 |
| 53:3,10 54:4 | 85:21 103:18 | 35:16,18,20,22 | 168:12 180:5 | fairly 141:10 |
| 54:15,18,20 | examiners 85:8 | 36:16,20 39:3 | 213:15 256:11 | 154:11 |
| 56:22 57:11,18 | 89:6,13 91:8 | 39:7 43:21 | expected 106:9 | fairness 49:20 |
| 58:16 62:14 | 91:13,14 93:5 | 44:2 51:17,21 | 261:11 | falls 176:3 |
| 78:13,16,17 | 94:12 95:3 | 52:16,20 55:13 | expended | familiar 103:12 |
| 79:14 80:10,18 | 97:14,18 102:2 | 56:7,11 57:3 | 150:14,15 | 103:17 116:4,9 |
| 80:20 81:5,13 | 102:4 103:13 | 57:16,18,22 | expenditure | 122:8 186:12 |
| 81:22 83:3,14 | 135:17,21 | 58:1,9,10,14 | 64:19 | 187:14 225:17 |
| 84:22 85:1 | 139:19 141:3,4 | 59:3,8 67:1 | experience | 262:16 |
| 177:8 260:4,12 | 141:6,18 142:1 | 71:9,12,13,14 | 203:3 215:5 | families 13:4 |
| evaluations | 196:12 201:15 | 75:7 78:10 | 225:16 226:2,7 | family 13:4,12 |
| 33:13 34:21 | 204:19 206:11 | 80:4,5,5 81:19 | expertise 141:19 | 13:14,21 18:5 |
| 43:1,19 45:21 | 207:11 212:4 | 82:10,14,19 | 142:2 | far 63:13 87:19 |
| 45:22 46:4,18 | examiner's | 90:23 91:2 | experts 86:4 | 158:5 183:4 |
| 47:7,11,15,18 | 64:17 98:23 | 92:18 93:4 | expired 222:7 | 184:5 202:23 |
| 48:1 50:6,11 | 212:2 239:14 | 97:7,9 106:21 | explain 58:8 | fault 151:13 |
| 53:20 54:3 | example 65:6 | 109:9 113:2 | 209:6 | favorable 214:6 |
| 79:5,20 80:3 | 135:20 139:14 | 115:21 122:18 | explained 209:4 | 215:11 |
| 80:14,16,23 | 236:12 | 122:19 129:20 | expulsion | February 137:6 |
| evaluator 36:6 | examples 64:6 | 136:23 137:4 | 182:16 | 228:5 229:13 |
| eventually 23:11 | 69:12 136:2 | 140:22 141:1 | extent 50:6 | 238:20 258:8 |
| 121:9 | exceeded 198:15 | 145:8 196:7 | 66:11 | 259:17 260:3 |
| everybody 11:12 | excellent 36:9 | 207:13 222:18 | extremely 163:1 | Federal 10:18 |
| 132:9 191:5 | 37:23 162:19 | 232:11 233:7 | 163:12 | 90:9 95:12,15 |

# FREEDOM COURT REPORTING

100:1 166:6,11
166:14,17,20
167:10 213:12
**feel** 68:5 111:18
136:10
**feet** 184:15
186:10
**fellows** 246:1
**felon** 128:7
**felons** 128:4,10
128:13,19
**felt** 139:2,7,8,9
189:19,22
190:11 191:4
205:21 206:1
206:18 245:17
**female** 29:12
128:13 131:6
131:10,11
146:4 170:15
171:17,20
173:10,16
174:9 217:4,17
227:1,10,16,22
**females** 130:5
174:4 217:13
217:15 218:9
218:10,13
**fence** 185:3,7,14
**field** 215:23
**fields** 215:6
**fifteenth** 223:2
**fifty** 245:8
**fight** 190:23
191:2
**figure** 160:9
165:1,9 269:9
**figures** 269:16
**file** 42:1,5,9,14
43:6,11,17
45:3,7,12,15
45:15 46:5,19
50:8 57:11,12
58:22,23 72:23

83:13,13
102:23 103:6
106:4 109:17
139:17 176:19
177:16 178:2,8
178:15,19
222:12 223:8
225:21 259:5
**filed** 5:10 112:10
112:12 116:10
121:3,8 153:23
154:5,7 173:15
223:1,16,19
224:4 230:4
**files** 32:8 46:16
50:1,3 176:20
177:22 200:20
**filing** 6:9 173:9
**fill** 24:7 26:10
34:5
**filled** 23:2 25:16
**filling** 23:3
30:22 191:16
**finance** 215:5
261:3
**finances** 63:14
86:13 90:1
187:6
**financial** 66:9
66:14 69:6
89:8,22 90:4,8
94:7,13 95:4,9
95:11,15 99:1
99:10 140:15
141:10,11,11
141:19 142:3
187:9 196:14
197:5 201:21
201:23 202:9
**financing** 63:13
97:21
**find** 20:23 26:1
45:4,19,20
88:14,15 89:9

89:20 91:14
97:18 98:2
121:15 123:10
139:23 153:3
177:13 178:1
225:20 264:12
**finding** 50:20
51:5 88:11
101:7 153:5
198:5,10
199:10,23
200:3 207:1
**findings** 88:19
89:9 90:5,6,8
90:10,11 92:4
92:10,11,12
100:10,12
136:3,5 153:16
198:2,4 199:9
203:17,19
204:21 206:6
206:12 232:13
**fine** 10:7 56:15
82:22 84:21
112:8 257:14
**finish** 15:19
**finished** 256:21
**firearms** 220:4,7
**firing** 218:21
**first** 10:2 17:22
25:20 26:2,3
27:16,17 46:13
62:18 70:20
75:15 99:3
133:17 194:20
203:20 208:8
221:12
**fiscal** 28:6,21
66:18 76:2
88:8 90:17
91:15,19
102:11 143:1
176:6 195:2
204:2 208:1

232:16 236:18
240:13 243:3
244:11 269:1
**five** 61:10 101:8
101:9 207:18
269:6
**fix** 204:11
**fixing** 69:11
257:8
**flip** 258:5
**flipping** 75:17
**focus** 134:10,12
134:19
**follow** 32:2 34:7
34:13,16 49:17
196:1 230:16
235:2 241:7,11
**followed** 121:22
122:6 125:10
125:12,18
230:11 241:14
**following** 15:8
223:3
**follows** 10:3
**follow-up** 74:13
**forbid** 184:7
**foregoing** 272:7
272:11
**forfeited** 223:5
223:12
**forfeiture**
223:15
**forget** 215:18
**forgot** 107:5
**form** 6:2 33:3
46:7 53:22
54:13,14,22
55:3,5,6,21
56:19,21 57:23
58:1,6 60:11
62:6 70:17
73:10 74:20
76:8,9,12
78:16 85:5

86:21 94:9
109:10 110:21
117:12 118:16
118:23 120:15
130:23 137:19
139:7 140:2
141:21 142:9
146:15 158:17
173:12 177:7,8
179:23 180:4
183:11 193:2,4
193:13 195:12
207:10 233:5
244:23 265:12
268:15
**format** 56:3,4
**former** 188:4,14
188:23
**forms** 54:20
202:4
**forward** 136:11
210:5
**fought** 190:18
190:21
**found** 43:18,20
44:18 94:2,12
95:4 97:23
100:2,8 101:18
135:21 136:5
192:13 245:12
248:2
**four** 15:14 18:10
22:7 23:19,23
24:15,17 61:1
102:19,19
108:21,23
170:21 184:21
187:8,16
198:22 222:17
222:20
**Franklin** 114:21
**frankly** 151:18
**fraternity** 108:3
108:4

| | | | | |
|---|---|---|---|---|
| **free** 136:10 | 167:10,15 | 94:21 95:18 | 268:6 | 57:16 59:19 |
| 184:3 | 210:1 220:10 | 98:2,21 99:20 | **good** 39:19 40:1 | 63:17 66:13,16 |
| **friction** 190:14 | 231:23 251:20 | 99:23 111:17 | 82:5 91:22 | 75:12 76:20 |
| 190:16 | 253:4 254:14 | 112:5 124:21 | 133:14 160:15 | 78:14 84:1 |
| **friendly** 38:6 | 263:7 267:16 | 154:4 156:5 | 161:4,7 163:1 | 86:6 87:11 |
| **front** 37:6,6 | 270:9 | 160:1,2 162:12 | 163:12 193:18 | 88:9 90:17 |
| 39:14 40:12 | **GIDIERE** 7:10 | 166:22 168:7 | 194:9 212:18 | 91:19 127:9,12 |
| 57:8,21,23 | **Girard** 14:8 | 187:19,20,23 | 212:21 225:22 | 131:23 132:6 |
| 127:12 140:10 | **give** 13:1,7 14:5 | 188:10 189:23 | 235:1 251:10 | 132:14,14 |
| **fullest** 66:11 | 27:8 53:13 | 189:23 190:6,7 | 255:8 265:20 | 133:7 135:9,14 |
| **fully** 257:16,16 | 54:5 85:15 | 190:11 194:20 | 266:1 271:5 | 136:8,21 |
| **Full-time** 154:18 | 111:16 136:1 | 210:4 224:2 | **gotten** 137:17 | 139:11 143:5 |
| **function** 257:20 | 139:13 152:7 | 233:16 246:23 | 187:8 192:4,10 | 143:13,18 |
| 263:16 | 156:14 165:1,4 | 248:21 253:22 | 192:14 | 144:9 149:19 |
| **functioning** | 165:9 171:10 | 257:10 | **governed** 34:7 | 150:5 160:5,18 |
| 213:9 214:7 | 195:12 199:16 | **goal** 61:3 219:18 | **governmental** | 161:13,21 |
| **funds** 64:19 65:1 | 199:17 204:8 | **God** 184:6 | 105:6,7 140:14 | 166:9 167:1,14 |
| 164:4 166:6,7 | 251:4 | **goes** 11:2 12:22 | **governor** 103:20 | 167:20,22,23 |
| 166:11,22 | **given** 34:4 73:18 | 60:8 84:10,11 | **Governor's** | 168:8,13,18,21 |
| 167:2,3,7,10 | 135:20 272:12 | 112:20 124:3 | 110:17 111:22 | 189:4 190:15 |
| 252:13,18 | **Givens** 1:5 7:15 | 125:3 150:2 | **grade** 17:15 | 194:17 195:1 |
| 269:23 | 10:11 133:6 | 168:13,21 | **grades** 243:14 | 209:2,3 226:18 |
| **furniture** 198:16 | 136:7,16 143:5 | 179:15,20 | **graduate** 14:15 | 231:20 233:2 |
| 208:17 | 143:18 169:10 | 180:10 181:11 | 18:12,14 19:4 | 233:12,20 |
| **further** 5:22 6:8 | 169:14,21 | 194:3 252:22 | 108:3 | 234:7 235:5 |
| 14:17 249:12 | 170:1 175:12 | 264:4 | **graduated** 14:8 | 236:2,13 |
| 271:4 272:14 | 175:17 176:5 | **going** 12:9 20:21 | **graduating** 14:7 | 237:22 243:6,7 |
| ——————— | 191:16,21 | 37:9 43:18 | **Grand** 188:21 | 244:14 245:1 |
| **G** | 192:18 193:23 | 47:17 54:18 | **grant** 167:13 | 245:12 246:10 |
| **Gainus** 25:11 | 194:7 227:12 | 90:22 91:2,3 | 168:5 | 252:3 253:4,19 |
| **gambling** | **giving** 53:19 | 91:10 92:14,16 | **granted** 48:22 | 256:12,15 |
| 110:19,19 | 54:3 119:15 | 92:23 97:6 | **grants** 166:14 | 261:13 268:11 |
| 111:11 | **Gloria** 239:21 | 111:3,5,8,13 | 166:18,20,21 | **Greene's** 45:3 |
| **gender** 226:20 | 241:10 242:1 | 111:16 112:18 | 167:7,9,16 | 57:12,19 59:3 |
| 231:4 | **go** 12:10 17:21 | 150:7 165:2,18 | 168:1 | 59:8 83:13 |
| **general** 80:1 | 21:10 25:7 | 168:17 170:7 | **Green** 133:4 | 169:5 194:12 |
| 81:11 | 26:22 38:14 | 187:5 188:17 | **Greene** 1:6 7:16 | 231:19 232:9 |
| **generally** 54:2 | 46:13 49:21 | 189:5 190:17 | 10:11 28:5,20 | 251:16 258:1 |
| 140:13 | 53:19 54:2 | 199:18 205:3 | 29:3,12 36:2 | 259:5 |
| **Georgia** 14:4 | 59:18 60:18 | 209:19 224:13 | 37:2 38:15 | **greenhouses** |
| 18:4 20:8 | 62:13 63:21 | 235:11,16 | 39:10,21 43:17 | 184:18 186:9 |
| **getting** 64:10 | 68:22 69:7 | 237:11 252:19 | 44:7,10 46:5 | **Greg** 147:3 |
| 137:7 158:8 | 78:13 79:5 | 257:3,7 259:12 | 52:2,8,23 | **Gregg's** 29:9 |
| 166:13,17 | 80:17 87:19,22 | 261:9,23 263:6 | 53:14 56:23 | **grievance** |

116:10 120:4
121:2,7,13
122:9,11,15
124:23 125:1
153:23 154:1
220:13 222:11
230:11
**grievances**
154:4
**grievant's** 223:3
223:4
**Griswold** 113:21
114:6,8,12,16
115:14 116:2
154:19,20
157:20 159:11
**grounds** 6:4
188:18
**group** 104:8
**grow** 40:3
**guards** 184:13
**guess** 28:15
63:23 181:16
232:12 266:19
**guidance** 178:9
237:3,5
**guidelines**
230:16 231:1

_____

**H**

**H** 8:7
**habit** 126:3
**habitually** 60:21
**Hal** 201:5,9
**half** 20:14 27:5
**hand** 232:18,18
253:16
**handed** 234:14
**handled** 140:7
**hands** 96:20
**handwriting**
75:18 76:1
**handwritten**
233:13

**happen** 69:21
82:1 217:8
248:17
**happened** 71:11
79:4,16 81:21
83:2 116:5
118:8 119:16
121:18,19
184:7 209:4
217:7
**happening** 82:3
199:20 216:22
217:6
**happens** 222:11
235:2
**happy** 91:6
95:19 254:4
**harassment**
173:11,16
**Harold** 200:22
**Harold's** 200:23
**hat** 42:20
**head** 224:2
**hear** 11:9
153:20 218:22
**heard** 132:18
138:22 139:10
**hearing** 120:5
121:1,2 123:7
123:23 124:5,6
124:10,14,17
138:23 220:17
220:22 221:2,7
221:10 249:2
249:15 250:1,5
250:7,7,10
272:13
**held** 22:6 73:15
179:1,19
**help** 22:1 90:21
91:12 233:21
236:15 237:16
240:10 251:13
**Hendrix** 2:5

7:17 10:12
116:5,9 117:1
118:3,13,20
119:6,11,23
120:9 121:8,17
124:8 186:2
221:1 228:4,9
229:9,19 230:7
249:1,2
**Hendrix's**
115:14 220:12
223:18 228:13
230:12 231:2
**HERNDON**
7:10
**high** 14:7,8,15
149:6 195:14
**higher** 69:7
163:21 218:1
**highest** 154:15
**highly** 138:5,10
**hinderance**
219:21
**HINTON** 7:10
**hired** 21:19
144:1,4 174:8
174:13 175:2
**history** 17:22
131:14
**hold** 20:12 22:3
29:8 135:3
158:4 249:21
257:9
**holds** 28:18
179:5,11
256:10
**hollering** 246:19
**Home** 161:13
**Homosexual**
130:12
**honorary** 16:5,7
16:10,15,16,20
17:1
**hope** 150:9

**hoped** 87:20
**horticulture**
182:19 183:8
183:19 184:4
184:10,12
185:1,4,10,13
185:17,20
228:5
**hostile** 227:18
**hostility** 227:3
**hours** 106:11,11
110:14,15
**Huffstutler**
155:13,17
156:4 186:3
215:3 232:21
232:22 233:11
233:21 234:7
235:1,10,18
236:14,23
237:6,22
238:10,13,20
238:21 239:10
239:22 242:9
242:21 243:6,9
243:12,23
244:3,9 245:13
251:7 253:13
255:19
**Huffstutler's**
240:4
**huh-uh** 11:13
**human** 178:10
**hundred** 108:1
198:18 208:15
240:21 241:14
241:16 256:3
269:6,7

_____

**I**

**idea** 174:7,12
193:19 263:3,4
**identification**
35:5 36:17

39:4 43:22
51:18 52:17
56:8 71:15
78:11 93:21
97:10 106:22
113:3 115:22
129:21 137:1
145:5 233:8
234:4 235:23
236:9 237:18
238:17 239:4
239:18 241:20
242:6 243:20
261:18 262:5
269:11
**identified** 94:3,6
94:12 95:6,6
97:22 98:5
99:2,5,14
153:10 196:19
196:23
**identify** 35:19
35:21,22 36:20
39:8 51:22
52:21 79:22
91:23
**identifying**
81:12 212:16
214:16,17
**ignore** 206:6
**illegal** 64:18
65:2,3,11
150:6
**illegally** 152:3,6
**immediate**
134:18
**immediately**
46:1 261:10
**impacts** 86:12
**implemented**
31:17 268:12
**important** 254:8
**imposes** 182:7
**impress** 209:17

## FREEDOM COURT REPORTING

Page 286

impression
249:14,16
improper
117:20 150:6
170:13 171:14
172:3
improperly
150:21 152:3,6
improve 38:7
47:3 62:16
83:10
improving 62:19
inappropriate
63:10 65:2,4
65:13 218:22
incarcerated
216:5
incident 116:4
229:12
include 54:20
included 31:19
31:22 32:3
40:22 49:12
60:5 61:7 64:4
249:23
including 82:7
166:11 256:18
incorrect 169:22
incorrectly 11:2
248:19 252:16
increase 269:17
increases 149:4
index 140:20
indicate 79:2
215:6
indicated 78:22
192:7 198:15
200:7 205:21
213:3 251:11
indicating 81:9
indication 124:7
indirectly
252:22
individual 173:3

individually
1:10,14 2:9,13
2:19 3:2 4:11
4:16 87:1
172:23
ineffective 69:17
133:12 136:8
231:13
inform 117:5
124:13 223:23
245:21,21
information
55:4 119:15
124:8 168:1,7
168:13 169:3,6
174:20 191:17
238:2 250:2
263:17
informed 136:20
informing 54:9
234:23
Ingram 1:12,16
2:11,16,22 3:4
4:8,13,19 12:1
12:4 25:3,5
27:7 31:1,8,12
33:8 34:15
42:2 48:8
64:16 65:1
71:2 77:21,22
77:23 85:10
88:1 102:6,13
104:8,13
105:20 106:12
106:16 114:2
114:22 115:4
127:14 141:20
142:4 144:15
144:18 150:14
155:17,18
160:12,19,22
174:3,15,16
177:14,22
179:15,21

182:6,14 183:6
187:23 189:6
189:21 202:19
203:14 210:13
212:22 213:2
213:23 215:15
216:18 217:18
218:15,19
251:8 257:20
262:19 264:3
265:11 268:14
269:3,21 270:8
270:13
Ingram's 182:19
initial 229:6
inmate 104:3
116:7,14,15
118:5,13 119:7
120:10 131:5
131:10 170:19
170:23 171:12
171:18,21
180:23 228:14
229:3 230:14
inmates 130:9
172:1,1 173:8
173:16 216:11
219:23 265:16
inmate's 228:4
input 165:5,15
165:17
insensitive 68:20
inside 185:6
Insofar 183:23
instance 110:16
199:1
instances 130:21
instant 53:23
Institute 14:10
institution 3:4
21:2 25:7
29:23 140:1
251:13
instructing

188:22
instruction
28:12 32:18
42:12 114:5
154:22 155:6
155:11 156:11
156:12 159:8
232:15 243:2
245:23
instructional
198:14 232:19
instructor 22:23
270:12,16
instructors
138:4 173:17
184:2 196:1
204:1 212:7
238:11 240:4
244:22
intend 35:15
intending 210:5
interested
272:17
interesting 26:1
interim 25:3,4,7
25:14,15,21
26:8,9,18,21
37:17
intern 19:4
internal 69:15
94:13 95:4
97:20 99:1
196:13 201:20
interview 21:12
21:13 256:11
interviews 174:6
229:6
introduced 31:4
31:6 258:1
inventory 102:6
102:13
investigate
117:3,10
121:10 173:20

investigated
173:22 203:20
investigation
116:19,23
117:7,18,21
174:2,5 204:9
investigative
122:21 250:2
invoice 242:12
invoices 238:21
242:17
involve 87:6
involved 87:8,10
125:15 181:7
192:10,15
204:1,16
involvement
180:15
involves 159:14
181:19
involving 229:6
irregularity
199:15
isolated 183:10
183:11,14
issue 117:3
152:12 154:7
181:19 191:3
193:7 246:22
246:23 248:21
issued 97:19
99:1
issues 83:4
154:6 193:11
items 54:21
81:16 84:8
178:18
i's 151:7
I-85 12:19

_____
         J
_____
J 4:5,9 28:20
Jackson 13:14
Jacquelyn 244:5

# FREEDOM COURT REPORTING

**James** 1:13 2:12
  3:1 4:15
  222:19 225:22
  229:2,17
**January** 132:13
**jeans** 172:8
**Jim** 5:4,19 7:4
  10:9 35:10
  50:10 71:6
  80:8 92:15
  98:15
**job** 17:22 18:11
  18:13 21:8
  46:15 49:12
  83:14,19
  107:17 125:9
  125:11,17
  143:6,9,17,20
  145:1 146:13
  147:10 148:12
  148:14 149:7
  150:10,11
  151:6 158:6
  161:22 162:3,7
  162:9 189:14
  194:18,21,23
  195:2,3,5,7,14
  195:16,17
  225:1,3 226:14
  256:18
**jobs** 148:4,6,8
  150:12,13
  159:18 195:5
  226:3
**John** 4:23 5:16
  10:1 11:18
  21:15 210:9
  266:1
**Johnson** 13:4,15
  13:16 189:1
**Johnson's**
  188:14
**Jones** 85:18
  86:19,22 211:4

**Julie** 1:5 7:15
  10:11 72:12
  170:4 175:11
**July** 20:19 39:12
  57:5,13 79:15
  83:17 84:2,3,4
  84:13 199:4
  234:6 235:9
  243:23
**June** 5:7,20
  198:21 199:6
  233:12 240:1
**junior** 265:2
**Jury** 188:21
**J.F** 4:8,13,19
  12:1,4 25:3,5
  27:7 31:1
  34:15 71:2
  77:21,22 85:10
  88:1 102:13
  104:7 105:20
  106:12,16
  114:2,22 115:4
  150:14 160:12
  160:19,22
  174:3,15,16
  177:14,22
  179:15,21
  182:6,13,19
  183:6 187:23
  189:6,20
  210:12 251:8
  262:19 264:3
  265:11 268:14
  269:3,21 270:8
  270:12
**J.F.I** 180:22
  266:3
**J.L** 113:21 114:6
  115:13

 

## K

**Keahey** 238:1
  238:14

**keep** 41:12,12
  41:23 42:14,23
  72:20 110:7,8
  153:14 160:8
  160:22 176:20
  199:19 216:21
  217:11 219:22
**keeping** 102:12
  166:10 266:22
**keeps** 110:9
**kept** 32:17 41:11
  41:21 119:11
  252:3
**key** 191:17
**Kilby** 219:12
**kin** 13:8,11
  272:15
**kind** 80:17
  122:2 182:13
  183:9 190:18
  200:10 212:11
  232:18 252:11
  263:14
**kinds** 150:20
**knew** 127:4
  136:8 157:4
  212:16
**know** 33:4,5
  34:20,23 35:1
  38:21 44:13
  50:17,18 54:12
  54:15 56:18
  64:20 66:10
  72:19 73:1
  78:1 84:17,19
  86:22,23 87:17
  94:1,11 99:12
  99:18 100:5
  101:5,14
  103:13,21,23
  104:2,5 105:9
  105:11,19,22
  106:14,17
  113:21 116:21

  126:19 129:13
  131:7,18
  133:15 134:3
  137:22 139:8,9
  142:19 143:2
  144:10,13
  145:1 147:15
  148:21 149:16
  156:20 160:14
  161:1 175:13
  175:22 177:1
  184:20 185:22
  186:1,8 187:15
  192:6,19
  193:15 194:18
  194:20 195:13
  195:18,19
  197:10 201:22
  202:6,10,17
  210:18,22
  211:5,18
  219:14 221:1,5
  222:9 223:18
  224:16 225:1
  225:11,19
  228:8 230:10
  233:5,6 235:6
  237:13 249:20
  250:4,6 258:10
  258:11,15
  259:11 265:4
  268:22 269:9
  270:8
**knowing** 171:8
**knowledge**
  38:12 86:3
  105:18 111:23
  112:1 114:17
  117:9,12,22
  131:5,16 140:4
  144:3 146:6
  147:6 148:2
  216:18 224:7
  224:17 225:5

**knowledgeable**
  40:4 66:9,13
**known** 117:8,14
**knows** 139:7
**Knox** 239:21
  241:11 242:1

 

## L

**L** 5:12 85:18
**lab** 203:2
**labeled** 198:10
**ladies** 172:6,14
  172:15,18,22
**lady** 216:7,17
  219:12 245:21
**large** 138:15
  183:2
**largest** 183:5
**Larry** 205:13
**late** 60:21 65:10
  65:14,20
  248:11
**latitude** 111:17
**law** 195:19
**laws** 16:6,9
  141:13
**lawsuit** 111:5
**lawyer** 10:14
  11:5 72:3
  197:19
**lawyers** 10:17
**leadership** 40:1
  40:14 59:23
  80:21 82:6
**leading** 6:2
  213:20 256:14
**leave** 18:11
  60:20,21 93:15
  107:1,2,3
  109:9 110:2
  112:7,7,13
  164:3 181:18
**leaves** 112:10
**leaving** 251:8

# FREEDOM COURT REPORTING

led 188:2
Lee 12:22,23
  13:23
left 20:6 138:23
  148:12,14
  149:7 159:22
  191:8
legal 151:8
  153:18 200:9
  200:10
legally 151:16
legislative
  103:10,15
legislature
  103:20 164:8
  164:11,16
legislatures
  195:10
Leo 103:23
  105:23
Leonard 105:9
  106:1,5,9,16
letter 74:20
  116:1 137:13
  205:1 211:8,9
  211:14,16,16
  211:18,19
  213:16 233:11
  233:21 235:10
  235:17 237:21
  250:17 251:3
  258:22 259:12
letterhead 28:8
letting 251:19
let's 12:10 17:21
  24:13 57:1
  59:21 60:18
  69:23 70:7
  75:1 80:17
  87:22 89:9
  90:20 93:2
  96:21 98:12,19
  98:21 99:23
  138:5 176:13

180:23 198:3
205:8 240:16
248:21 254:17
257:10 268:16
level 17:13
  30:19 124:19
  125:14 224:16
  225:12,13,15
levels 61:2
  159:21
levied 121:5
lie 63:20
line 49:21 65:17
  92:10 143:3
  196:15 197:20
  256:5
lines 74:22
listen 216:22
litigation 50:2
little 69:7 95:19
  185:20 186:4
  192:14 193:11
  240:2
live 14:3 100:18
  198:13,22
  200:17 202:7,8
  202:12,13,18
  203:6,13,17
  206:7 207:4
  208:18 232:14
  233:2,18 235:6
  235:14,19,20
  236:13 238:23
  239:8,21,22
  240:3 242:2
  245:1 266:5
Livingston
  16:18,19
local 108:2,9
located 16:17
  21:6 183:15,16
  183:19
location 183:9,9
long 18:8,22

19:22 20:12
22:3 23:17
24:18 25:21
27:3 132:3
longer 102:21
  172:8 251:12
longest 131:23
  132:2
look 31:2 34:1
  45:1,17 55:1
  57:1,10,15
  59:21 62:13
  68:22 69:23
  75:7 79:3,18
  80:7,14 81:1,8
  82:13,18 87:17
  90:20 98:12,14
  98:19 122:20
  125:17 135:17
  170:21 171:6
  178:13 180:11
  180:13 216:10
  222:7,17
  238:10 240:10
  240:17 241:22
  245:5 247:1
  254:11 259:22
  264:10
looked 58:21
  59:2 73:20
  81:5 159:13
  210:8 222:1
looking 28:8
  46:6,6,7 61:22
  80:8,16 87:14
  89:5,10 92:6,8
  95:11 122:17
  122:19 140:21
  163:3 266:5
looks 75:21
  171:1
loose 251:18
lot 13:3 22:22
  138:3 139:16

172:1 219:2
239:14 250:3
252:8 261:8
270:21
low 79:5
lowest 154:14
lunch 94:21 97:4
lunchtime 97:12
lying 106:19
  170:1

————— M —————
mad 132:16
Madison 5:19
  7:5
mailed 258:19
  258:21
main 128:9
  130:8,20 131:4
  150:12,13
  172:6 173:9,10
  182:19 183:20
  217:18
maintain 48:7
  64:2
maintained 42:6
  42:10 46:16
maintains 61:10
  62:21
maintenance
  145:23
major 135:22
  152:12 153:3
  164:4 167:11
  181:5 207:1
  209:19 215:20
  216:2
majority 98:9
making 74:14
  79:23 81:11
  82:4 137:12
  169:13 242:3
  249:11
Malcolm 2:18

116:6 121:18
124:9
male 128:10,19
  130:9 131:5,10
  146:11 170:15
  173:8,17 174:8
males 130:4
  217:15 218:9
manager 133:14
mandate 32:5
mandated
  178:16,18
manner 223:8
manual 31:2,8
  31:13,19,22
  32:3,16 33:1
  33:10 34:6,8,9
  34:12,15 35:11
  48:10,14,17,20
  64:4,9,10
  70:12,23 78:5
manuals 49:2
March 52:15
  136:6 259:8
mark 44:1 46:12
  92:16,17,19,20
  93:2,6,7,8,9,10
  93:11,12 96:18
  97:6 115:20
marked 35:2,5
  36:17,19 39:4
  39:6 43:6,22
  51:18,21 52:17
  52:20 56:8,11
  71:15 78:11
  92:17 93:3,20
  97:10 98:17
  106:22 109:8
  113:3 115:22
  129:21 137:1,3
  145:5,7 197:18
  233:8 234:4
  235:23 236:9
  237:18 238:17

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 239:4,18 | 122:2,4 131:11 | 107:12,14,16 | 253:10 | 74:15 |
| 241:20 242:6 | 139:13 141:5 | 107:18,22,23 | **Merk's** 31:7 | **missing** 104:14 |
| 243:20 261:18 | 157:9 195:4 | 108:2 254:23 | 35:13,18 42:12 | **mistaken** 100:11 |
| 262:5 269:11 | 199:10,13 | **members** 66:17 | 42:19 119:9 | **mistakes** 214:17 |
| **marking** 196:18 | 212:21 229:14 | 73:5,7 | 122:20 155:8 | **mistook** 209:8 |
| **married** 12:11 | 234:16 241:3 | **memo** 74:14,17 | 222:19 232:2,3 | **misunderstand** |
| 13:17 | 263:14 265:13 | 233:11 235:18 | **met** 44:19 83:8 | 137:15 |
| **master** 32:15 | **means** 17:2,4 | 237:8 238:3 | 136:22 151:9 | **misunderstan...** |
| 86:20 | 34:18 40:21 | **memorandum** | 204:3 206:15 | 138:21 |
| **master's** 14:19 | 66:10 137:23 | 129:23 137:5,7 | 260:5 | **module** 267:14 |
| 14:21 19:15 | 199:14 223:9 | 137:18 138:7 | **mid** 24:19 | 267:16 |
| 224:18,19 | 272:9 | 138:17,20 | **Middle** 1:2 2:2 | **monetary** 17:18 |
| **masturbating** | **meant** 40:15 | 139:4 145:12 | 4:2 12:16 | **money** 10:16,17 |
| 118:14 119:7 | 74:1 99:12 | 149:20 186:3 | **Miller** 103:23 | 102:12,12 |
| 120:12 215:22 | 206:5 | 237:22 239:20 | 104:2 105:23 | 140:7 150:13 |
| 216:6 228:15 | **measures** | 242:8 244:14 | 106:3,18 | 150:21 151:2,9 |
| **masturbation** | 204:15 | 251:17 261:14 | **million** 161:5,9 | 152:2 160:9 |
| 216:4 | **mechanic** | **memorandums** | 162:18 163:1,2 | 164:7,7,10 |
| **material** 50:15 | 242:11,16 | 83:16,23 84:7 | 163:7,8,18 | 165:2,6,16,18 |
| 91:23 94:3,5 | 243:1 | 129:17 138:4 | 269:5,19 | 165:23 241:1,3 |
| 94:14 95:5,7,8 | **mechanics** | 191:22 245:14 | 270:17,18 | 244:2 246:3,4 |
| 97:21 98:4 | 238:22 244:2 | 252:4,9 | **mind** 92:15 | 246:5 253:22 |
| 99:2,6,9,15 | **Medical** 157:2 | **memory** 155:16 | **mine** 31:23 | 255:5,16,18 |
| 101:21 120:5 | **meet** 36:10 | **memos** 83:12 | 46:17 75:21 | 256:10,12,13 |
| 120:14 121:16 | 108:18,23 | **men** 19:6 108:1 | 76:3 110:9 | 256:13,15 |
| 126:1 153:9,10 | **meeting** 46:23 | 128:21 129:7 | 151:14 | 264:1 270:13 |
| 188:19 196:18 | 73:6,15 76:23 | 129:12 130:20 | **minimum** 264:7 | 270:19,21 |
| 197:1,5 270:9 | 77:2 144:14 | 130:21 172:11 | **minor** 14:11 | **Monica** 1:5 7:16 |
| 270:14 | 160:4 172:6,10 | 173:2 215:22 | **minute** 111:3 | 10:10 28:5,20 |
| **materials** 247:2 | 172:14,21 | 216:5 | 142:12 205:8 | 36:2 37:1 |
| 247:16 | 173:1 211:15 | **mentioned** | 256:20 | 39:10 43:17 |
| **matter** 91:15 | 219:10 | 210:10 215:3 | **minutes** 46:23 | 44:6 45:2 46:5 |
| 116:11 117:15 | **meetings** 71:21 | 257:18 260:20 | 47:2,16 72:14 | 52:1,22 56:22 |
| 117:22 194:3 | 72:15 73:21 | **Merk** 3:1 28:10 | 73:6,21 74:12 | 76:11 88:9 |
| 216:19 234:19 | 74:6 83:5,5 | 32:20 42:14 | 74:18 77:5 | 233:12 237:21 |
| **matters** 69:6 | 109:4 117:1,15 | 59:13 63:8,11 | 113:14 218:21 | **monies** 213:13 |
| 188:23 | 134:22 228:10 | 116:18,22 | 247:6 | **Montgomery** |
| **McDuffie** 244:5 | 250:8 | 119:1,3 121:10 | **misbehavior** | 2:18 5:20 7:6 |
| **mean** 13:5 16:23 | **meets** 52:5 53:4 | 121:13 123:10 | 229:3 | 7:12 12:18 |
| 19:3 26:3 38:3 | 57:2 60:22 | 147:2 154:23 | **misconduct** | 15:5 107:23 |
| 40:20 42:20 | 65:18 82:16,19 | 174:21 175:4 | 228:17,21 | 110:20 116:6 |
| 47:12 50:17 | 83:1 | 225:22 229:7 | 229:1 230:14 | 117:1 118:4,12 |
| 55:4,7 58:1 | **member** 70:2 | 230:10 232:4,6 | **mishaps** 69:21 | 118:19 119:5 |
| 73:5,12 113:14 | 107:6,8,9,10 | 249:6 250:9 | **misinterpret** | 119:23 120:11 |

121:6,19 124:9
228:8 229:7
230:13 266:2
272:4
**Montgomery's**
228:3,22
**month** 27:5
259:8
**monthly** 166:2
**months** 18:10
20:2 25:23
27:9,12 102:19
163:5,16 164:2
170:21 268:20
**morale** 214:18
**morning** 138:18
**mother's** 13:6
**motivate** 218:12
**mouth** 240:8
**multi** 22:22
**Murphrey** 72:12
73:22
**Muskogee** 18:4
18:9

_____
**N**
_____
**N** 5:12 7:1 8:1
**name** 11:17 13:9
146:20 200:23
209:11 210:10
**named** 229:8
**names** 13:1,7,21
209:11 210:7
210:19,23
**naming** 210:19
210:23
**narrative** 60:11
79:20
**nature** 65:12
**Nearly** 98:10
**necessarily** 41:3
84:9 104:20
260:19 268:8
268:10 270:20

**necessary** 5:23
58:17 245:17
**necessity** 220:22
**need** 49:22 54:6
63:14 73:23
92:1 94:18
139:18 165:6
178:13 246:1
**needed** 47:3
60:3 83:10
132:20 136:9
189:20 214:15
249:13
**needs** 11:9 43:12
**negative** 41:3
60:3,16,17
61:4,5,14,15
61:20 62:4,8,9
62:10,23 63:2
67:1,16,17
68:1,3,7,11,14
68:15 69:13
70:5,6 81:9
254:21
**negotiable**
159:18
**neither** 272:15
**never** 62:1 64:23
69:3 75:9
86:23 121:20
123:13,20
125:23 132:22
143:8,17
170:10 172:17
173:5 174:2
210:16 215:18
216:17 253:19
254:1
**new** 20:17 21:3
32:4 83:10
209:23 266:16
**nice** 263:15
**Nichols** 200:22
**nine** 67:15,21

163:7
**ninety-eight**
198:19 208:16
**Noem** 21:16
23:16
**noncompliance**
94:6 95:8 99:9
197:5
**non-adherence**
230:23
**non-inmate**
129:2
**Non-profit**
104:16,19
**normally** 38:16
58:19 259:2,14
**North** 200:12
**NORTHERN**
1:3 2:3 4:3
**Notary** 5:18
**note** 75:11 96:22
233:13 234:8
234:10,20,22
**noted** 95:9 99:10
197:6 199:8
203:18
**notes** 72:6,8
74:4,7 138:11
191:22
**notice** 6:9 54:12
169:16
**noticed** 38:18,19
69:14 76:10
**notification**
168:9 169:1
**November**
109:12,21
110:11 242:10
**number** 1:8 2:7
4:7 40:21 57:2
59:21 60:4,7,9
60:18 61:1,10
62:5,20 66:23
67:15,21 69:23

122:12,13
138:9 150:17
222:21 250:22
256:17 266:17
266:20

_____
**O**
_____
**O** 5:12
**oath** 250:13,14
**object** 33:2
53:21 73:9
78:15 85:4
94:9 110:21
117:11 118:15
130:22 137:19
139:6 158:16
188:18 195:11
210:11,14
233:4
**Objection**
213:19
**objections** 6:1,4
**objective** 140:19
**objectives** 141:8
**obviously**
240:19
**occasions** 73:2
192:17
**occupied** 225:3
**occupies** 159:12
**occupying**
158:14,20
**occur** 133:21
206:2
**occurred** 172:4
209:23
**occurring** 212:6
**October** 87:5
88:2
**Offender** 167:13
**offer** 266:11
**offered** 6:6
16:15 143:17
**office** 5:19 19:21

20:1 32:6,17
41:13 42:3,6
42:12,20 43:1
48:4 51:11
63:13 64:11,22
66:18 69:16,22
70:12,23 71:19
86:2 95:22
102:11 110:17
110:18 111:22
112:16 132:7
132:15 133:6
138:23 146:1
162:14 164:12
164:21,23
165:5 169:5
175:5,6 178:11
178:12 186:22
186:23 187:19
187:20 200:14
206:15 211:21
212:2,22 213:4
213:8,9,17,22
213:23 214:12
214:14,22
215:1,9 224:9
231:10,16,16
232:4 236:18
240:13 257:19
257:20 261:3
263:18 265:6
268:7
**officer** 88:8
90:17 91:20
**officers** 217:23
218:2,5
**office's** 214:7
**official** 4:12,17
29:15 32:7
58:16 125:2
207:10 213:7
**off-the-record**
51:16 188:9
257:12

**Oh** 30:20 41:2
114:7,13
130:13 153:20
210:21 234:18
**okay** 11:9 12:3
14:2 18:13
23:5 26:7,21
27:21 28:13
29:8 30:10,20
31:12 32:11,22
36:10,13,15
37:21 41:2,5
42:1,19 43:9
43:14 46:2,10
46:15 48:19
49:1,19 55:16
56:2 57:1,6,15
57:21 59:11
60:18 61:17
62:5,10 65:4
67:4,13 68:20
70:7 71:10
72:7 73:17
74:23 75:3,11
75:22 76:15,23
77:13 78:9
83:21 84:18
89:19,23 90:16
92:13,23 94:23
95:10,16,23
96:6 97:3,17
99:22 100:4,7
101:2,16,20
102:4 103:18
109:20 110:13
112:8,17
114:13,15
116:18,21
118:2 121:12
122:8,23
125:22 126:23
127:8 129:16
139:10 143:4
143:16 144:10

144:16 145:18
146:17 151:23
153:17,20
154:17,19,23
157:18 158:23
164:15 165:20
168:6 170:3
171:14 172:17
173:1 174:7,23
176:5,9,12
177:2 178:17
178:23 179:13
180:17 182:22
190:9,13
192:10 193:23
194:22 198:3
200:2 201:8
202:12 208:11
208:14 235:5
235:16 236:11
236:20 238:9
238:19 239:20
240:16 241:13
241:22 243:18
244:8,21 245:5
250:16 251:2,7
257:5 259:1,4
260:1 266:15
268:22
**old** 32:9 216:7
**Omega** 108:3
**once** 73:2 121:9
133:22 160:2
164:17 165:20
165:22 181:10
**ones** 94:16
167:12 172:15
187:14
**ongoing** 213:11
**opening** 88:3
**operates** 265:11
**operation** 49:14
141:12 165:7
165:10

**opinion** 94:2
97:19 99:1
195:12 206:3
211:5 212:1
**opportunity**
204:5,8,11
248:16
**opposed** 79:23
83:6 174:9,14
**optional** 266:19
**oral** 5:6 62:6,16
**orange** 215:23
**order** 63:14
80:18 100:9
199:5 222:8
241:3 246:11
248:3 253:23
256:4
**ordered** 247:3
263:10
**ordering** 246:7
246:14
**orders** 102:7
212:8 241:1
245:7 251:20
251:22 253:4,8
253:11,14
**organization**
64:23 108:6,8
**organizations**
104:15,17,20
107:6,19,21
**original** 5:5 35:6
36:18 39:5
43:23 51:19
52:18 56:9
71:16 78:12
93:21 97:11
106:23 113:4
115:23 129:22
137:2 145:6
233:9 234:5
236:1,10
237:19 238:18

239:5,19
241:21 242:7
243:21 261:19
262:6 269:12
**outlined** 249:18
**outside** 213:2
**outstanding**
16:12 37:23
38:13
**overage** 208:17
**overages** 208:22
**overall** 37:21
39:17 52:3
**overseeing**
49:14
**overseer** 19:6
**Owensby** 4:5
10:12 117:2
144:11,13,21
145:13 146:4
147:9,16
148:11,22
153:22 157:13
159:11 224:19
226:1 229:7
**Owensby's**
144:16
**o'clock** 257:7

## P

**P** 5:12 7:1,1
**package** 75:8
**page** 8:3,8 57:8
57:21,23 58:1
58:9,20,22
59:4 60:11
62:14 75:15
88:4,17 89:1
89:12,21 91:12
140:20 196:10
198:4,11 206:5
232:12,12
258:5
**pages** 76:13

207:18 208:8
**paid** 65:7,20
106:16 108:16
108:22 139:14
143:9 148:11
148:17,23
175:1 213:6
241:15 242:13
242:17 248:14
**pants** 169:15
170:5,7
**paper** 260:13
**paperwork**
167:15,20
200:18 246:8
247:8 248:4,6
248:13,15
254:16
**paragraph**
123:1 198:6,8
198:9,12
222:20,21
**paraphrase**
255:8
**paraphrasing**
254:21 262:1
**Pardon** 147:20
**park** 184:21
185:6,10
**part** 50:7 91:15
92:8 107:16
122:20 123:7
124:21 153:15
162:9 180:21
182:22 183:10
207:16 208:5
228:18,22
229:2 232:19
**participated**
117:15
**particular** 36:12
112:6 125:13
139:16 159:3
159:16 161:11

161:16,20
209:15 229:14
243:5
**particularly**
141:1 196:13
208:12
**parties** 5:14 6:3
123:3,11,19
124:4 204:1,16
272:16
**parts** 92:2
**part-time** 22:23
114:14
**passed** 31:15
**pattern** 229:22
**Patterson** 266:2
**Paul** 229:8
**pay** 17:15 65:19
106:9 143:11
149:3,14,20
153:23 154:8
154:10 160:8
240:18 241:4
247:15 248:5
**paying** 65:10,14
66:2 139:11
**payments** 212:8
248:12
**payroll** 175:17
175:20,23
191:12,16
266:16,22
267:7,14,16
**Pebble** 11:20
**penalize** 247:19
**penalties** 204:6
**people** 13:8
31:16 77:21
78:6,7 104:8
115:4 126:16
129:17 130:1
135:6 138:11
166:16 175:1
180:7,13 184:3

184:9 188:15
193:19 215:6
216:23 217:2
217:10 218:7
219:18,22
231:9,16,20
232:3,3,9
243:8 246:7
247:12,15
251:19,21
254:6,14 256:8
260:22 261:7
265:1,2,3,7
**peoples** 210:19
**people's** 209:11
**percent** 174:9
241:2,5 245:9
**percentage**
174:8,13 203:1
263:2
**perception**
214:11
**perform** 147:9
**performance**
37:22 38:1
**performed**
266:22
**period** 15:11,19
64:15 79:16
81:22 84:10
96:9 111:1
135:19 263:6
**permission**
48:20
**person** 29:1 36:9
61:19 100:17
127:3 131:21
134:6,15
143:23 150:1
158:13,14,20
256:15
**personal** 61:12
65:21 117:9,12
211:12

**personnel** 14:22
21:21 41:14,16
41:20,21 42:11
42:13,16,18,21
43:11,13,17
45:3,14,15
46:5,16,18,19
50:1,3,4,8
57:11,12 58:22
58:23 59:13
83:13 147:2,3
147:7 174:21
176:19 177:16
177:22 178:2,8
178:8,15,19,20
178:21 179:1
191:12,18,23
192:3 225:21
259:5
**person's** 134:4
134:15,16
**perspective**
207:3
**Phenix** 14:9
21:7 108:9,10
108:11,20
**phenomenon**
260:21
**Phi** 108:3
**phone** 218:23
**phonetically**
187:12
**physical** 131:12
243:8,10
**pick** 135:13
247:16
**picture** 164:18
**piece** 186:11
**place** 46:19
55:13 58:14
59:15 67:14,19
67:23 68:17
69:4 81:3 95:3
98:9 102:19

170:15 182:15
189:19 202:16
221:6 226:23
227:19 254:19
**placed** 43:10,12
150:2 159:15
**placement** 150:3
**places** 94:1
**plaintiff** 2:6 4:6
7:3 35:21
**Plaintiffs** 1:7
**plaintiff's** 8:9,10
8:11,12,13,14
8:15,16,17,18
8:19,20,21,22
8:23 9:1,2,3,4
9:5,6,7,8,9,10
9:11,12,13,14
9:15,16,17,18
31:5,6 34:10
35:2,4,19
36:16,20 39:3
43:21 44:1
51:17,21 52:16
52:20 56:7,11
57:3 71:13,14
75:7 78:10
80:5 82:10,13
82:18 92:19,21
93:4,19 97:7,9
106:21 109:9
113:2 115:21
129:20 136:23
137:4 141:1
145:4,8 197:19
233:7,10 234:1
234:3 235:22
236:8,11
237:17,20
238:16,22
239:3,6,17
241:19,23
242:5 243:19
250:23 259:23

261:17,21
262:4,8 269:10
269:13
**plan** 163:22
**player** 70:1
254:6,7,9,10
254:12,22
255:4,4,7
**playing** 30:2
**please** 5:8 11:17
13:1,2 46:11
51:23 67:20
71:9 75:6
80:12 136:10
198:7 222:23
258:5
**plug** 248:4
**pocket** 106:10
**point** 86:8,13
100:18 124:19
125:5 163:7,7
181:8 182:5
211:11 267:8
269:18,19
**pointed** 49:23
83:18 216:15
239:13 268:7
**pointing** 186:3
236:17 237:23
239:12
**policies** 31:8,13
31:15,21 32:2
32:8,9,15 33:9
35:11 222:9
238:1 253:21
254:3
**policy** 31:16
32:4,5 33:1,8
34:6,8,9,12,14
48:10 65:23
66:1 177:13,18
177:21 178:3
180:20 200:17
202:23 219:3

220:3,6 222:14
222:16 241:7
241:11 249:5,8
255:3,20,23
256:9
**political** 16:13
**population**
128:2
**position** 19:19
20:5,7,9,13,17
20:18,23 21:17
22:4,6,8,13
24:2,4,23 26:5
26:6,11 27:1
29:14 114:3
141:11 144:8
144:17 145:14
158:4,14,15,19
158:21,22
181:7 218:12
**positions** 21:3
22:18,19 28:18
159:12
**positive** 60:2,15
61:4,14,15,17
62:3,7 63:1
66:23 67:3,16
70:4 79:22
80:23
**possession** 59:14
**possibility** 200:8
**possible** 69:5
**Postsecondary**
111:21 178:14
**potential** 117:16
220:9
**practical** 203:2
**practice** 202:15
262:18
**practices** 245:16
**Prattville** 11:21
**prefer** 95:22
**pregnant** 170:21
171:2,7

**prepare** 201:8
201:11 207:21
208:5 244:22
251:21
**prepared** 207:23
**presence** 216:9
**present** 7:14
28:9 29:11
31:7,10 77:7
104:12 131:22
133:5 213:11
**presented** 31:1
45:2 77:4,11
77:15 124:19
141:10 208:9
209:9 211:3
**presenting**
125:20
**presidency** 29:9
**president** 1:11
2:10 4:13 12:1
12:4 23:9 24:5
25:3,5,8,14,19
25:22 26:8,9
26:19,22 27:7
27:15 28:5
29:14 30:11
37:17,18,20
48:23 49:11
64:12 65:15
70:8 81:15
88:6,7 90:3,16
91:17 96:9
122:3 125:1
149:17 150:7
187:22 193:8
199:11,22
245:20
**Presidential**
107:14
**presume** 180:18
**pretty** 86:16,19
186:13 213:16
251:18 252:1

258:13
**prevent** 217:5
**previous** 79:19
79:19 80:3,14
80:16 81:5
136:14
**primary** 40:14
59:23 80:21
**print** 56:1
**prior** 6:6 50:1
84:18 116:21
117:23 245:13
**priority** 195:14
256:17,18
263:12
**prison** 215:19
215:21
**probably** 23:19
50:16 66:16
150:17 185:20
194:23 195:2,4
251:12
**probation**
182:15
**problem** 63:12
89:23 92:21
126:12,16
173:5 191:15
192:23 199:19
204:6 205:7
209:21 213:14
214:23 219:17
232:1 236:17
238:10 240:2,5
245:23 249:12
**problems** 19:12
22:1 60:19
64:10 67:13,18
67:22 68:8,16
68:21 69:2
126:21 139:23
187:10 191:11
192:8 193:6
195:15 202:8

202:18 211:21
212:1,22 213:4
213:18,22
214:14 215:7
215:21 216:2
216:13 219:15
232:5 239:22
240:10,13
244:15 251:14
251:15 254:18
261:2 267:15
**procedure** 5:2
32:1,10 33:1
33:10 35:11
120:4,23 121:3
122:9,12,15
123:21 177:13
177:18,21
178:3 207:2
220:13,18
230:11 266:5,6
**procedures** 31:8
31:13,21 32:3
32:15 122:22
195:18,21
222:10 249:10
266:9
**process** 21:10
27:13 28:2
123:14 125:9
156:6,8 198:20
198:23 202:14
202:19 203:13
204:17 221:5,9
229:6 230:2
247:8,21,22
248:10 249:4
268:17,19
**processed** 261:9
**processing**
262:1
**produce** 50:9,15
51:6
**produced** 45:12

45:23 46:1
50:2,8,13,22
51:2,3,6,11,12
178:3
**producing**
189:19
**production** 45:6
45:7,9
**professional**
61:11,18
**professionals**
140:5
**profit** 203:4
**program** 20:10
63:15 270:8
**programs**
202:15
**prohibited**
220:5
**prohibiting**
220:7
**project** 239:8,23
**projects** 164:5
198:23 232:19
245:1
**proper** 130:1
170:14 171:19
175:2,22 267:1
**properly** 66:2
101:10 125:12
150:14
**property** 185:21
**proposed** 205:15
244:23
**propriety** 189:2
205:18
**prove** 219:8
**proven** 117:13
**provide** 72:2,4
83:21,22
**provided** 43:16
80:3 82:15
205:20 249:17
249:18

# FREEDOM COURT REPORTING

provides 40:13 59:22 80:20
provision 222:10 223:14
provisions 48:15 208:11
Pruitt 116:14,15 230:14
Pruitt's 229:3
psychology 14:12
public 5:18 64:18,19 85:8 93:5 97:8,14 102:2 103:7,14 103:19 135:21 139:19 141:6 141:18 142:2 195:10 204:19 207:11 212:4 249:15
publication 77:17,20,20
pull 46:11 62:12
pulled 103:4
punishment 182:7,11,13
purchase 152:9 186:18 212:7 246:10 247:3 253:4,8,11,14 253:23 256:1 260:22 262:11
purchases 260:21 261:8
purchasing 195:21 246:6 246:14 247:12 262:10,11 266:7
purpose 33:13 75:22 141:14 176:18 206:19
put 36:8 41:9

57:2 58:11 60:12 64:8 70:13 74:19 78:5 82:5 83:7 83:12 94:10 113:9 121:10 129:16,23 149:20 177:11 178:8 193:19 212:6 215:22 233:13 240:7 259:4 268:16
putting 218:5

## Q

qualifications 226:2
qualified 153:12
qualifies 105:19
quantities 138:15
quarterly 166:3
question 12:11 33:3,22 34:20 49:7 51:9 55:18 67:20 80:12,13 89:16 92:12 94:8 106:13 110:22 110:23 111:15 113:5 118:17 136:13 137:20 141:23 149:14 152:8,20 158:17 180:19 188:7,11,18 197:13 210:17 220:20 228:20 229:12 237:4 237:11 241:9 257:1,2,6,13 270:7
questioned 64:23 65:7

88:19 90:6,11 152:1
questioning 49:22 197:20
questions 6:2,3 43:15 50:19 65:9 78:21 92:2 94:22 95:2 103:3 111:6 113:10 188:22 196:4 196:12,15 216:16 220:12 220:17,18 248:23 256:13 271:4 272:8
quick 98:13,22
quicker 193:12
quickly 258:13
quite 13:5 107:15 151:18
quote 69:10 132:20

## R

R 7:1 272:1
race 226:18 231:2
raise 126:6,10 126:19 127:2 143:11 246:20 246:22
raised 127:8,11
raising 126:17
Ralph 21:15
rarely 62:2
rating 39:17
reach 134:23
read 10:19 11:5 11:8 38:3 54:6 60:7 62:11 66:9,13 68:13 74:12,15 78:20 90:2 123:9

136:3 138:18 138:19 139:12 140:12 198:7 222:22 237:10
reading 10:21 11:6 60:1 69:14 82:21 88:23 140:17 140:23 251:16 252:7 267:5,6
reads 73:5
ready 263:16
real 98:13,22 132:16
realize 163:6
realized 120:18
really 37:18 66:10 115:2 185:23 189:9 194:18 212:5 212:11,15
rear 183:15,16
rearranged 155:13
reason 43:14 45:8 92:6 113:9 139:3 149:10 212:13 219:13 222:2 230:19,22
reasons 157:2
recall 23:3 24:12 38:16 39:2 46:8 59:16 83:15 116:3 131:8 133:20 136:19,20 137:6,9,12 139:15 161:12 161:15,19 169:9,13 173:13 196:19 197:1,8 214:2 220:11,13,22

receipt 223:3
receivable 244:15
receive 14:13 32:5 47:17 168:9 258:18
received 14:10 14:19 31:16 54:10 79:1 168:10 206:11 211:8 212:3 213:13 251:5 258:11,17 259:10 263:18
receiver 167:3,4
receives 67:5 169:7
receiving 47:2 102:11
receptionist 244:6
recess 75:4 97:4 142:13 176:16
recognize 35:7 44:3 75:18 76:1 87:23 122:14 145:9 146:13
recognizing 17:4 62:18
recommend 159:23
recommendati... 28:1,2 181:17 186:21 187:18 249:9,11 266:18
recommended 23:12 27:10 186:15,17,20
record 45:5 49:23 50:6 51:13 88:22 95:21 96:22

# FREEDOM COURT REPORTING

110:5,6 176:21
176:22 177:3
188:7 197:17
198:7 222:23
257:10 267:10
**recordings**
72:18
**records** 24:22
102:5 110:7,8
110:9 141:20
142:3 145:23
**recruiter** 19:20
19:23
**redo** 50:16
**Reeder** 146:21
146:22,23
**refer** 115:4
175:23
**referenced**
200:11,15
**referred** 35:17
197:19 232:11
**referring** 82:10
98:3 153:15
222:18
**refers** 137:10
201:20
**refinishing**
198:16 208:17
**reflect** 47:3,16
77:5 247:6
**reflected** 32:23
33:9
**refuse** 62:2
**refused** 193:23
**refusing** 229:18
**regarding**
188:23 196:12
196:13 205:18
212:1 214:7
217:13 218:12
220:3,6 224:3
225:23 228:14
**registrar** 145:16

145:18,21
146:2 147:11
148:5,7 225:4
**registrars** 148:3
**regulation** 33:7
240:23
**regulations**
47:23 48:6
121:22 141:14
**related** 69:2,6
100:11 101:1,3
101:5 102:11
152:20 207:3
265:13,14
**relates** 213:12
**relations** 130:10
**relationship**
63:5,11 64:2
**relationships**
61:12 62:22
214:18 218:23
**relatives** 12:21
**relevance**
110:22 111:7
**relied** 33:20
**rely** 51:4 85:1
260:14,18
**remark** 169:13
169:19
**remember** 11:15
17:23 21:14
24:11 76:12
137:21 142:15
143:5 196:15
200:23 220:18
**remind** 11:16
**reminded** 216:8
216:9
**reminding**
261:15
**remove** 32:9
**Renae** 187:11
**reorganized**
144:9

**repaired** 251:20
**Repeat** 67:20
118:17
**rephrase** 228:20
**replace** 144:1,4
144:6
**report** 85:15
97:8 98:6
99:20,23 103:6
103:9 110:17
111:20 119:9
119:14 121:13
121:15 123:9
125:3,19,23
196:8 199:8
200:4 203:18
209:12 212:3
214:3,6 223:4
239:14 249:6
250:21,22
251:5,9,18
257:18 258:3
258:12,17,18
259:16 260:3,8
262:14 263:21
264:3,8,10
267:7 268:7
**reportable** 94:4
95:6 99:5,13
99:14 196:22
**reported** 88:20
90:7,12 112:3
116:6 229:21
243:11
**reporter** 5:9,17
10:5,20
**reporting** 94:13
95:5 97:21
99:2 196:14
201:21,23
202:9 266:6
**reports** 97:14,17
130:16,18
131:1,2 135:18

201:12 202:4
212:5 213:2,7
214:11 230:14
243:15
**represent** 10:10
**represented**
77:1
**represents**
272:11
**request** 208:2,4
**requested**
118:12,20
259:19 262:23
263:8
**requesting**
164:19 169:9
236:14
**requests** 107:1,2
**require** 47:21
**required** 41:15
41:18,21,23
47:7 88:19
90:7,12 176:23
178:2 187:2
199:21 202:22
**requirement**
41:6
**requirements**
65:18 151:9
178:14
**requires** 92:4
120:4 163:22
177:15
**requisitions**
212:8 247:4
**reserve** 51:9
**resign** 161:22
162:3,6,8
**resisted** 189:10
191:1
**resisting** 189:5
191:2
**resolution** 249:9
**resolve** 83:4

193:7,11 240:4
251:13
**resolved** 127:2
249:12
**resources**
178:10
**respect** 225:9
**respective** 5:15
226:3
**respond** 68:17
207:5 212:14
221:22 224:10
229:18
**responded**
113:12 208:7
224:11 241:9
**responds** 67:14
67:23 68:6,9
**response** 92:5
199:16,17
203:16 204:20
205:9,12,14
206:12 207:6
207:10,19,21
208:6,12,14
211:4,14
216:16 248:23
250:18,21
**responses** 136:3
136:4 153:15
210:7
**responsibilities**
158:7 159:19
180:1,6 181:5
**responsibility**
31:20 40:15
50:9 60:1
80:22 168:20
168:23 169:2
178:17 181:2
181:15 200:3
215:16 216:21
247:14
**responsible**

# FREEDOM COURT REPORTING

166:10,13,17
167:6 179:1,5
179:11,14,20
**rest** 183:13
**result** 218:7
220:21 272:17
**results** 79:22
89:6,13 91:13
97:18 98:23
141:11 196:13
201:15,18
223:7
**retained** 5:9
**retired** 104:11
114:16 142:16
143:4 146:19
156:22 189:9
**retirement** 24:6
**return** 136:21
**returned** 199:4
**revealed** 198:21
**revenue** 198:13
**revenues** 198:16
**review** 74:3,4
76:11 95:18
97:13 198:20
205:14 214:1,4
215:3 221:21
257:19 265:2
**reviewed** 76:6
205:3 221:23
**re-advertised**
26:13,16
**Rickey** 233:11
237:22
**right** 10:19
15:17 25:17
26:12 29:7
34:17 37:8
39:15 40:9
44:17,20,23
49:18 50:23
51:9 55:15
59:1,6,10

60:23 66:19
67:7,10 68:2
68:19 70:14
73:18 75:10,12
75:13,23 80:9
82:12 85:17,20
86:5,12 89:7
89:14 90:19
91:21 98:4
102:3,17 105:3
106:6 115:3
120:21 121:11
122:7,14 126:2
126:2 128:5,8
128:11,14,20
129:5,8 130:15
140:5,7 143:15
143:21,22
148:10 149:9
151:15 154:13
155:2,15,19
156:3 157:6
161:3 164:9
165:11,19,21
166:8 169:20
169:23 170:2
175:19 176:11
177:5 179:2
181:13 182:6
183:22 184:19
185:10 190:2,8
190:12 191:4
195:17 197:7
197:14,15
207:3 208:18
208:19,23
209:1 223:4,12
223:13 230:4,5
232:23 235:12
235:21 236:16
238:5 239:2,8
239:11 240:12
240:14 241:12
242:22 243:13

243:17 244:4
245:4,15,19
246:12,15
248:5,7,13,16
248:20 250:12
252:10 253:12
253:15 254:5
254:10 255:14
261:16 262:3
262:12 263:16
263:19 266:10
268:5,21 269:2
270:6
**right-hand**
258:6
**riot** 216:11
**Robinson** 146:3
146:10,14
147:10,14,19
147:21 148:12
149:7,15,23
225:3,7 226:1
**Robinson's**
224:15
**role** 30:2 61:11
158:6 244:10
**roles** 159:19
**Ron** 211:4
**Ronald** 85:18
86:22
**Round** 107:15
**rule** 5:1 33:7
240:22
**rules** 5:2 47:23
48:6 49:17
122:6
**run** 165:6,10
188:15 214:21
**running** 162:14
191:9 192:5,7
243:8 263:7
——————
**S**
——————
**S** 5:12,12 7:1 8:7

**SACS** 107:11
**safe** 219:22
**safer** 217:11
**safety** 115:15
215:17
**salaries** 175:1,7
**salary** 150:2
158:9,9,13,19
158:23 159:3,7
159:11,18
175:9,11,16
**Sandy** 137:5
**satisfaction**
209:7
**satisfied** 221:13
**Savage** 21:15
**save** 256:12
**saves** 10:15,16
10:16,17
**saw** 46:13 69:15
70:19 118:21
119:12,21
120:10 121:18
150:5 212:12
245:10 269:17
**saying** 50:5 55:3
74:20 84:17
120:11 149:22
149:23 161:19
169:18 190:5
193:15 203:9
209:8 213:5
242:18 255:22
256:7 266:19
**says** 17:1 60:19
67:21 68:4
70:1,8 80:20
89:8 90:4
98:20 122:21
123:2 124:22
124:23 133:1
141:8 143:13
169:21 198:12
234:23 244:22

260:5 266:15
267:13
**scale** 149:15,21
158:9,9,13
159:1,4,7,16
159:17,20,21
160:1
**schedule** 123:6
123:23 154:10
**scheduled** 109:2
109:3
**school** 14:7,9,16
18:12,14 48:12
66:12 114:22
115:1,5,9
161:5 202:14
265:10
**schools** 107:12
265:18
**scope** 140:18
**second** 27:15,18
29:21 30:3
51:14 58:19,22
59:4 123:1
135:4 188:20
257:10
**section** 49:4,10
89:3,3,4,8 90:8
90:9 97:20
102:15 198:10
199:7 222:17
222:20 265:7
267:7
**security** 114:22
180:19,23
181:3,7,8,10
181:20,21
218:12
**see** 10:19 11:5
24:13 31:21
32:2 34:2 45:3
46:3,15 57:17
69:8 70:9
74:12 80:18

# FREEDOM COURT REPORTING

87:18 89:9
92:12 96:19
99:21 109:21
119:17 123:1,7
125:17 136:11
168:21 178:18
203:20 216:6,7
235:2 244:21
252:12 254:17
264:12
seeing 46:8
121:22
seek 62:15
seeking 233:21
seen 56:17 70:15
70:16,18 71:6
75:9 77:22
110:18 116:1
124:7,11
seldom 138:3
selected 22:14
265:5,5
selections 23:10
self-confidence
38:8
send 32:6
149:19 205:11
261:8,14
sending 210:2
245:14 252:3
264:5
senior 142:18,20
sense 132:11,17
152:2 161:23
162:2,5,12
sensitive 67:13
67:18,22 68:5
68:8,16 254:18
sent 83:16,23
109:22,23
138:7 165:23
166:2,3 168:22
168:23 169:1
205:4 214:1

236:14 242:20
244:14 252:8
264:1
separate 42:5,14
172:13
September
37:14 87:6
88:3 93:15
161:12 241:23
268:22
series 43:15
196:11
serious 195:5
206:1 213:4
serve 21:22 25:7
33:14 206:19
served 19:5,11
serves 155:16
services 2:16,22
4:19 14:22
16:11,12 18:5
28:14 145:17
159:5 167:12
213:15
serving 19:4
26:18
set 158:19,20
189:18
sets 49:17
setting 161:16
161:20
seven 62:20
149:3
seventeen 215:4
seventy-five
241:2 245:9
seventy-six
269:7
sexual 173:16
Shannon 169:10
sheet 73:19
shoes 172:8
shootings 220:1
shop 199:3

242:11,16
243:1,9
shops 183:18
184:8 252:13
short 75:4
142:13 176:16
Shorthand 5:17
shortly 156:22
shot 220:8,10
show 28:9 30:23
35:1 36:19
39:6 51:20
52:19 56:10
80:2 92:23
95:2 109:8
115:19 118:4
118:21 119:6
119:12 120:10
120:12 137:3
145:7 196:7
204:13 222:16
233:10 234:1
235:16 236:11
237:20 239:6
257:23 269:13
showed 76:14
77:1 83:14
88:17 120:13
263:21
showing 109:18
109:21 171:9
shown 261:21
262:8
shows 270:2,4
shrewd 269:22
Shubert 21:16
23:16
Si 108:3
side 185:1
sign 10:19 11:5
11:8 37:12,19
44:10,13 52:8
52:11 53:5,16
54:8 55:14

73:4,12,14,17
171:9 266:17
signature 38:20
44:21 54:9
58:13,17 59:7
78:23 211:9
signed 36:5
37:10 38:18
40:6,10 52:14
53:12,17 73:2
79:9,12,13
109:19 250:17
signing 10:22
11:6
signs 73:6
similar 200:12
226:11 239:15
266:6,7,7
similarities
265:17,21,21
similarity
225:23
similarly 226:6
simply 171:6
sir 11:17 13:2
15:2 18:2
21:14 23:15
25:2 38:5
49:16 50:14
51:23 55:5,12
55:15 57:9
58:21 59:4
60:7 80:16
81:4 84:23
85:11 88:16
91:9 94:17
97:16 99:19
100:15 102:1
102:21 112:2
113:16,18
115:17 121:21
122:15 123:15
123:21 125:6
134:21 139:22

141:16 153:17
154:7 184:6,17
186:18 197:9
229:15 234:12
238:7 243:11
244:17 245:10
246:4,9 247:20
255:11,12,17
255:21 258:5
265:20
sit 192:15
sitting 217:2
situated 226:6
situation 127:1
134:9,17
152:22 181:9
181:11 200:12
267:22,23
situations 130:7
six 25:23 62:5
163:5,16 164:2
269:6
sixty 148:23
sixty-four
198:18 208:16
sixty-seven
148:18
size 161:4 171:6
186:12
skills 40:1
slipped 248:1
slot 25:16
slow 261:23
small 138:9
171:8 176:14
Smith 13:5
social 107:18,21
sociology 14:11
solely 212:2
somebody 35:12
86:11 104:14
112:3 149:20
241:15
somebody's 41:9

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| soon 187:5<br>213:16<br>sorry 45:13<br>77:21 78:17<br>162:13<br>source 174:19<br>175:2,7<br>sources 213:1<br>south 12:18 14:8<br>Southern 107:11<br>space 183:5<br>184:5<br>spark 248:4<br>Sparks 13:4,11<br>speak 151:8<br>special 104:8<br>219:11<br>specific 49:3,10<br>60:9,10 61:6<br>specifically<br>94:15 205:11<br>speculating<br>259:9<br>spelled 187:12<br>spend 151:2<br>256:12 270:17<br>spending 65:4<br>102:12 152:19<br>152:20 270:3,5<br>270:5<br>spent 65:1<br>150:21 151:10<br>151:12,16<br>152:2,3,5<br>square 186:10<br>staff 66:17 76:2<br>83:6 174:22<br>staff's 151:6<br>stage 69:11<br>stamp 212:6<br>standard 32:9<br>44:19 53:4<br>standards 36:11<br>52:5 57:2 | 60:22 82:16,20<br>83:1 86:8<br>140:14 260:5<br>standpoint<br>65:21<br>start 87:22 93:1<br>194:19 247:21<br>started 20:19<br>22:21 27:13<br>47:5 81:10,12<br>82:3,4 123:19<br>144:14 230:2<br>257:1 268:17<br>starting 14:6<br>222:22<br>starts 80:4<br>start-up 21:2<br>state 1:12,16<br>2:11,16,22 3:5<br>4:8,14,20<br>10:16 11:17<br>12:2,4 20:8<br>27:21 31:1<br>34:11,14 42:2<br>48:8,10,16<br>49:8,16,22<br>54:17,19 64:16<br>65:18,23 66:1<br>77:23,23 88:2<br>101:15 103:15<br>104:11,18,21<br>104:22 105:1<br>105:16 127:14<br>128:3 131:20<br>141:4,6,20<br>149:4 163:22<br>164:16 166:7<br>168:4 177:1,14<br>177:15,19<br>178:4 195:19<br>195:21 201:2,3<br>201:6 202:23<br>215:15 217:18<br>249:7 257:20 | 260:17 269:4<br>272:3<br>stated 61:21<br>62:15 75:8<br>77:5 119:11<br>162:1 170:17<br>172:3 222:13<br>statement 40:23<br>47:1 66:10,14<br>89:8,22 90:4,8<br>99:10 170:10<br>179:13,18,19<br>251:23 252:2<br>statements 62:1<br>80:1 81:9,12<br>94:7 95:9,11<br>95:15 119:18<br>119:23 120:9<br>120:13 141:10<br>170:12,14<br>197:6<br>states 1:1 2:1 4:1<br>137:13<br>statewide<br>127:20<br>stating 119:12<br>Staton 128:17<br>128:18 130:9<br>130:19 131:3<br>172:22 173:2<br>status 69:9<br>stay 27:3,18,19<br>257:7<br>stays 102:18<br>181:18<br>stenotype 272:8<br>step 62:18<br>103:12 125:14<br>160:2 206:1<br>steps 121:11<br>125:4,13,18<br>159:15 204:6<br>205:2 209:19<br>217:5 249:7,17 | STIPULATED<br>5:13,22 6:8<br>stipulations<br>10:6<br>stop 210:1 239:9<br>246:3,4,5,6,7<br>246:14 247:11<br>247:12 255:20<br>256:8<br>stopped 248:9<br>stopping 111:19<br>stops 122:3<br>storage 184:20<br>STREET 7:11<br>strict 86:16<br>strike 48:15<br>string 169:10<br>strive 160:19,21<br>strong 204:15<br>205:22 207:8<br>stronger 40:3<br>structure 30:6<br>30:10<br>structured<br>30:16,17<br>student 2:15,21<br>4:18 14:22<br>19:12 21:21<br>128:1,6 145:17<br>167:12 170:19<br>181:6,17 184:8<br>213:15 218:23<br>229:8 265:15<br>students 1:16<br>21:23 22:1,10<br>22:12 23:2,6,7<br>23:8,12,14,18<br>24:2,3,6,16<br>25:1 27:2,4<br>28:14 104:13<br>145:17 146:20<br>147:17,22<br>157:14,16,16<br>159:4 181:4 | 182:7,15 184:2<br>216:3,22 219:4<br>229:19<br>student's 229:23<br>study 14:17,23<br>15:3,7,20<br>stuff 203:5<br>212:9 246:7<br>247:13 254:16<br>255:6 257:8<br>subject 216:12<br>submit 109:20<br>164:11,15,17<br>202:5 204:18<br>204:23 207:9<br>submitted 205:1<br>205:9 206:10<br>206:14 229:19<br>submitting<br>125:3 266:23<br>subordinate<br>134:16<br>subordinates<br>134:5,18<br>subsequently<br>26:10 143:23<br>substantially<br>148:11<br>subtitle 198:5<br>sufficient<br>214:21<br>suggested 207:6<br>SUITE 7:11<br>suits 10:15<br>215:23<br>summary 89:5<br>89:12 91:13<br>97:18 98:23<br>196:12 197:23<br>201:14<br>superior 134:4<br>134:15,18<br>supervised<br>231:10 232:9 |

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| **supervises** 29:17 243:15 256:8 | 258:23 259:2 259:10 264:9 264:11 265:7 | 199:18 223:10 242:11,15 272:7 | 2:23 3:5 4:9,14 4:20 12:2,4 31:2 42:3 48:8 | 231:22 **terminate** 218:6 **termination** |
| **supervising** 29:15 | **surplus** 160:13 160:22 161:4 | **takes** 112:23 **talk** 11:4 54:6,7 | 64:16 77:23 78:1 88:2 | 219:5 **terms** 45:21 |
| **supervision** 114:21 | 162:17,20,21 163:8,19,20 | 91:4 111:3,8 125:3 136:9 | 115:2,9 127:14 141:20 177:14 | 136:12 203:7 215:12 226:1 |
| **supervisor** 19:10 67:5,9 159:22 201:3 | **surprised** 271:1 **suspension** 182:16 | 180:23 248:11 **talked** 156:1 **talking** 33:4,6 | 194:23 195:3,5 202:15 215:15 217:18 257:21 | **test** 102:9,15,15 139:21 **testified** 10:2 |
| **support** 2:15,21 4:18 28:14 69:12 84:7 | **sworn** 10:2 **Sylvia** 72:11 **system** 12:1 | 34:9 37:5 39:14 53:22 55:10 66:20 | 264:21 265:3 269:4 **technique** 83:11 | 63:16 210:15 226:5 **testify** 225:23 |
| 145:17 159:5 167:12 213:15 | 34:21 41:6 47:6,20 48:1,7 | 75:14 80:11 81:18 89:15 | 216:1 **tell** 20:21 31:9 | **testimony** 5:6 143:16 272:12 |
| **supports** 40:17 **supposed** 33:16 | 54:18 186:16 187:2 188:16 | 100:13,20 114:11 116:13 | 31:10 58:5 62:10 104:5 | **tests** 139:23 **thank** 33:12 |
| 33:19 38:11 84:23 107:2 | 189:1,2,5,13 189:14,18 | 119:22 129:1 131:13 141:4 | 136:7,17 148:20 154:10 | 76:11 234:23 **theoretically** |
| 125:15 191:18 203:3 253:17 | 190:10,10 191:8,9,13 | 143:19 152:13 152:18 162:11 | 162:16 166:4 168:11 172:11 | 30:16 **thereto** 6:7 |
| 270:10 **sure** 15:21 27:18 | 192:3 215:21 219:3 265:11 | 171:5 179:6,9 184:1 191:1 | 216:23 217:1,3 253:20 254:1 | 272:9 **they'd** 252:21 |
| 33:21 37:18 45:7,9,22 | _____ **T** | 195:1 201:22 202:2,3,6 | 256:7 262:9 **telling** 63:19 | **thing** 11:11 89:15 141:2 |
| 47:22 49:6 50:9 61:22 | **T** 3:1 5:12,12 8:7 272:1,1 | 203:6 216:23 242:1 246:21 | 76:21 77:2 84:7 125:16 | 147:13 153:8 160:15 172:11 |
| 65:18,22 72:4 72:19 74:14 | **Table** 107:15 **take** 10:14 15:13 | 250:20 254:16 255:10,15,17 | 143:5 168:6 203:21 205:2 | 211:12 237:13 239:13 256:14 |
| 76:4 80:8 85:23 87:9 | 20:18 45:17 55:1 75:1,7 | **talks** 170:5 **tape** 11:3 74:3 | 228:9 236:23 237:1 240:17 | 263:20 264:13 **things** 17:2 54:7 |
| 89:15 92:9 96:4 100:19,23 | 81:3,14 94:17 94:20 95:19,21 | **tapes** 73:3 74:6 **taping** 72:14 | 246:13 **tells** 124:22 | 65:10 74:21 79:23 80:15 |
| 101:13 105:17 113:17 114:8 | 96:4 126:23 176:13 204:5 | **task** 86:19 **taught** 147:14 | **temporary** 185:13 | 83:9 133:16,17 151:2 160:7 |
| 122:5,13 125:9 125:12 127:10 | 205:3,22 209:18 217:4 | **teachers** 255:20 255:22 | **ten** 12:6,8 15:19 64:13 69:23 | 169:16 176:23 177:16 178:16 |
| 127:13 139:4 140:3,7 141:22 | 221:13 224:13 240:23 241:2 | **team** 70:1,3 215:3 254:6,7 | 218:19 257:6 270:18 | 180:20 202:23 206:21 212:12 |
| 144:20 150:13 151:6,16 | 241:15 268:20 **taken** 5:6,16 | 254:9,10,12,22 255:1,3,4,7 | **tends** 38:9 40:1 69:1 82:5,6 | 214:16 216:13 217:6 218:22 |
| 176:15 205:23 218:18 222:8 | 15:15 75:5 97:5 125:4 | **teams** 214:2,4 **technical** 1:12 | **tennis** 172:8 **ten-year** 135:18 | 219:2,20 245:11 250:3 |
| 225:17 237:13 254:3 258:20 | 142:14 176:17 | 1:17 2:11,17 | **term** 93:16 | 254:9 |

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| **think** 24:20 | 218:6 | 211:1,2 213:6 | 253:20 254:2 | 272:10 |
| 25:23 28:11 | **three** 10:15 22:6 | 213:11 222:6 | **tolerance** 181:22 | **transition** 87:9 |
| 31:5 33:11 | 23:19,23 24:14 | 222:15 224:12 | **tonight** 257:7 | **Transitional** |
| 59:1 63:20 | 24:16 60:19 | 230:6 233:3 | **Tonya** 170:7 | 167:13 |
| 71:5 79:11 | 72:11 90:9 | 243:5 245:3,13 | **tool** 33:14 | **travel** 152:10 |
| 83:20 87:4 | 94:22 95:1 | 249:3 251:4 | **top** 30:11 73:19 | **treated** 227:6,12 |
| 91:11 93:13,18 | 114:9 122:21 | 261:8,13,13 | 74:20 142:22 | **trial** 6:5 |
| 96:16 97:15,23 | 159:21 160:3 | 263:1,1,5,8,9 | 216:5 231:20 | **tried** 83:4 |
| 98:20 101:19 | 163:5,16,22 | 267:13 271:4 | **tough** 86:19 | 193:22 215:23 |
| 104:7,14 | 184:18,21 | **timeliness** 222:4 | **towers** 184:13 | **tries** 194:4 262:7 |
| 112:17,21 | 186:10 187:8 | **timely** 222:12 | **town** 232:5 | 262:9 |
| 113:10 115:8 | 187:15 192:16 | 223:8,19,21 | **tractor** 100:8,12 | **Trimble's** 170:7 |
| 117:20 121:7 | 193:5 206:4 | 242:3,3 | 101:1 199:2,5 | **trouble** 150:8,21 |
| 129:14 140:10 | 240:21 241:14 | **times** 29:21 | **trade** 114:22 | 195:9 252:20 |
| 140:11 142:1 | 241:16 | 86:18 108:21 | 115:1,5,8 | 253:1 |
| 156:19 164:1 | **tight** 169:15 | 108:23 135:13 | **trail** 255:16,18 | **true** 47:8 73:7 |
| 171:17 175:21 | 170:6 | 137:17 193:5 | **trained** 69:18 | 176:1 207:19 |
| 176:8 179:17 | **tighten** 252:4 | 256:3 | 126:13,15 | 207:20 212:18 |
| 179:18 183:7 | **Tim** 105:9,23 | **timing** 251:10 | 134:1 151:19 | 236:7 272:11 |
| 186:6 187:7 | 106:4 146:3,10 | **title** 37:15 143:2 | **training** 34:4 | **Truman** 122:3 |
| 193:9,18 201:9 | 224:15 225:3,7 | 145:3 154:20 | 66:14 126:20 | **truth** 76:21 77:3 |
| 214:10 216:20 | **time** 6:5,5 10:16 | 155:3 175:22 | 127:6 153:13 | 136:18 |
| 217:6 218:20 | 10:17 15:11 | 176:6 | 153:18 194:15 | **try** 11:15,16 |
| 224:23 239:7 | 22:18 24:21 | **titled** 156:20 | **transcribed** | 79:22 194:1 |
| 245:10 254:19 | 25:20 26:2,3 | **titles** 158:5 | 272:9 | 204:13 216:21 |
| 259:7 261:12 | 27:15,16,17,19 | **today** 66:12,21 | **transcript** 5:5 | 217:4,9,11 |
| 262:13 263:20 | 28:9 29:11 | 66:22 84:15 | 11:3 35:6 | 219:18 222:7 |
| 264:12 265:6,9 | 32:19 36:12 | 143:17 148:23 | 36:18 39:5 | 247:18 254:13 |
| 267:19 269:18 | 37:16 64:15 | 152:14,16 | 43:23 51:19 | 260:22 |
| **thinking** 200:19 | 70:20,20 71:4 | 168:6 216:3 | 52:18 56:9 | **trying** 54:17 |
| **third** 124:21 | 79:17,21 84:10 | 254:11 | 71:16 78:12 | 83:7,10 135:12 |
| **Thomas** 156:19 | 94:17 96:10 | **told** 17:3,3 47:6 | 93:22 97:11 | 163:21 164:2 |
| 156:22 | 100:18 110:10 | 78:19 80:22 | 106:23 113:4 | 192:20 206:21 |
| **thought** 11:1 | 111:1 114:20 | 84:20 106:7,8 | 115:23 129:22 | 206:22 207:1,2 |
| 23:8 125:10 | 115:12 118:18 | 118:7 125:10 | 137:2 145:6 | 209:16,17 |
| 138:21,22 | 121:3 130:8,8 | 132:7,19 133:9 | 233:9 234:5 | 210:1,3 241:6 |
| 139:1 162:13 | 134:11,20 | 136:15 138:21 | 236:1,10 | 241:10 256:5 |
| 207:7 209:16 | 135:12 139:11 | 138:22 143:8 | 237:19 238:18 | **turn** 70:7 198:3 |
| 249:3,4 268:13 | 139:14 148:16 | 163:17 187:4 | 239:5,19 | **turned** 41:13,16 |
| **thousand** | 148:17 151:2 | 192:17 200:21 | 241:21 242:7 | 106:11 200:13 |
| 148:18,23 | 151:23 152:8 | 203:23 205:4 | 243:21 261:19 | **turning** 200:19 |
| 186:10 198:17 | 155:10,12 | 206:16,18 | 262:6 269:12 | **Tuskegee** 14:9 |
| 208:15 269:6 | 156:14 191:5 | 207:7 212:11 | 272:12 | 14:20 18:20,23 |
| **threatened** | 194:5 209:15 | 221:23 231:10 | **transcription** | 19:16,18,23 |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

20:6
**Tutwiler** 128:12
  173:4,6,14
  244:7
**twenty** 266:20
**twenty-eight**
  88:17 89:1,12
  89:21
**twenty-five**
  241:5
**twenty-seven**
  196:11 206:5
**twice** 214:2
  258:16
**two** 17:9,10
  28:18 30:21,22
  39:19 59:21
  60:4,8,9 85:12
  85:13 89:4,8
  90:8 94:20
  104:12 110:14
  110:15 119:17
  120:8,13 124:5
  135:6 158:1,3
  159:12 161:7,8
  161:9 162:18
  162:23 163:2,4
  163:6,7,18
  186:8 188:18
  206:21 214:1
  214:16 222:21
  231:19 247:2
  263:23 264:5
  269:5,18,19
**two-year** 104:12
  182:17 187:3
**type** 97:19 98:23
  164:4 169:16
  217:5 250:8
**typed** 73:14
**types** 72:8 212:8
**typical** 16:14
**t's** 151:7

**U**

**U** 5:12
**uh-huh** 11:12
  105:14 110:1
  123:5 177:9
**ultimate** 212:13
  219:18
**ultimately**
  204:18 207:9
**uncle** 114:7
**uncomfortable**
  139:2
**understand**
  33:21 49:6
  125:6 128:1
  139:5 141:22
  158:17 164:6
  175:9
**understanding**
  41:22 43:9
  112:16 113:11
  140:9 203:8
  209:3 214:22
  221:3 223:6
  225:8 230:17
  249:2
**understood**
  174:16
**unfavorable**
  215:12,13
**unfortunately**
  50:21 51:4
**unified** 54:18
**unique** 128:2
**UNITED** 1:1 2:1
  4:1
**University** 14:10
  14:18 15:1,4,6
  18:19,20,23
  20:8
**unqualified**
  87:15,18,19
  88:11 89:18
**untimely** 223:16

224:3
**unusual** 138:5,6
  138:10,13
  262:8
**update** 32:8
**updated** 31:12
  32:2
**upper** 258:6
**use** 32:14 70:11
  70:22,23 71:19
  72:21 78:6,8
  120:16 202:14
  203:2 211:10
  216:1 260:23
**Usual** 10:5
**usually** 15:18
  32:17 86:10,15
  102:17 126:11
  140:19 159:13

**V**

**vacation** 199:3
**vague** 33:3
  53:22 69:16
  118:16
**validated** 203:22
**Valley** 20:20,22
  21:5,18 22:9
  26:23 155:21
  156:2
**valuable** 38:12
**various** 19:3
  176:10,23
  178:19 180:2,6
**vary** 145:22
**vehicle** 101:17
**vendor** 65:8
  248:6
**vendors** 213:5
  267:1
**verbiage** 201:17
**vice-chancellor**
  206:16
**vice-president**

30:5 264:13,18
  264:23
**violate** 255:23
**violated** 200:16
  200:17
**violates** 255:3
**violating** 238:1
  255:20 256:9
**virtue** 181:6
**visited** 131:11
**voice** 126:6,10
  126:17,20
  127:2,9,11
**vs** 1:8 2:7 4:7

**W**

**W** 7:9
**wait** 65:16 111:2
  256:20
**waiting** 162:14
**waive** 10:21
  11:6 124:5,9
  124:14
**waived** 6:10
  124:6
**want** 11:4,5,14
  25:10 30:23
  35:1 38:3
  51:20 52:19
  56:10 57:10,15
  61:22 64:11
  66:2 79:3 81:1
  92:15,18 94:22
  95:18 109:8
  112:22 132:15
  140:12 162:7
  178:1 196:7
  220:16 233:17
  241:22 254:7
  254:10 257:23
  270:18,22
**wanted** 27:18,19
  92:9 197:10
  221:21

**wanting** 151:2
**wants** 132:9
  270:13
**wardens** 216:8
  218:2,6
**warnings** 210:2
**Washington**
  168:3 213:12
**wasn't** 47:17
  59:4 77:2
  83:14,18 84:21
  91:2 96:9
  100:17 101:20
  110:15 123:16
  130:5 134:12
  135:14,22
  144:1 147:19
  148:19 232:22
  237:5 241:13
  245:9 264:8
**wasted** 270:3
**way** 16:14 30:15
  43:1 62:12
  93:3 94:10
  105:15 108:13
  115:18 123:19
  162:15 165:13
  170:17 172:2
  177:11,12
  187:5 202:10
  206:17 212:14
  218:13 252:22
  255:9 268:16
  270:7
**ways** 62:15
  94:20
**weak** 132:7
  133:10 136:8
  231:11
**weaken** 134:5
**weakness** 97:21
  98:4 99:2,7,13
  99:15 101:22
  135:23 153:9

153:10 196:19
202:9 266:12
266:13 267:2
267:21 268:2,4
268:8,9,13
**weaknesses**
62:17 83:9
91:23 94:3,5
94:14 95:5,8
197:1 267:8
**weapons** 218:22
**wear** 129:12,18
130:1 172:8
**wearing** 170:5
**week** 109:6
213:13
**weeks** 102:19
**Weldon** 5:4,17
272:21
**went** 22:19
24:13 27:4
117:9 156:7
171:7 199:3
**weren't** 93:14
169:15 212:21
245:2
**West** 16:6,8,17
16:20
**we'll** 45:20
46:11 49:2
50:15 80:7
87:22 92:20
93:1,6,7,8,9
93:10,11,12,15
95:20 96:1,4
115:19 257:6
**we're** 34:6,9
39:14 50:20
80:8 81:18
89:15 90:22
91:3 97:6
100:20 111:3,5
111:7,18,18
116:13 122:17

122:19 152:18
164:18 165:2
203:3 213:14
216:3 254:16
255:10,15,17
263:15 266:4,7
267:19,20,23
270:4 271:5
**we've** 10:13
31:14 65:6,9,9
80:3 83:8,8
93:3 114:8
135:19 145:7
152:23 168:10
172:23 173:5
193:22 215:2,5
245:23 251:14
**white** 170:21
174:14 227:4,8
227:14,20
**White's** 171:1
**Willard** 205:13
215:9
**willingly** 67:6
**Wilson** 1:13
2:12 4:15
28:13 63:7,11
117:2 132:1
137:12 144:23
147:18 170:4,6
229:2,7,17
230:8,13
231:11,17
244:8 253:7
**Wilson's** 157:7
181:2,14,17
231:9
**wise** 272:16
**Wisman** 72:12
73:22
**withdraw** 55:17
**witness** 51:10
89:4 117:17
188:21 225:22

272:13
**witnessed**
130:14
**women** 128:22
129:7,12 170:5
215:14
**Wood** 72:13
73:22 170:4
**word** 13:20
32:15 49:13
69:15 153:4
191:2 206:11
**wording** 56:4
58:2
**words** 114:15
132:22 170:20
170:20 240:8
**work** 18:8 20:21
31:16 33:15
63:16 67:14,19
67:23 68:17
100:9,18 102:7
104:7,22
105:20,23
106:14,15
114:20 125:21
135:5,7,15
136:21 144:21
147:12 170:15
172:8 183:4
191:23 192:9
192:20 193:10
193:21 194:1,7
194:12 198:13
198:20,22
199:4,5 200:17
201:1 202:7,8
202:12,13,18
203:7,13,17
206:7 207:4
208:18 215:18
226:23 227:19
232:14,18
233:2,18 235:6

235:14,19,20
236:13 238:23
239:8,21,23
240:3 242:2
245:1,7 251:20
251:21 252:14
254:5,19 256:2
266:3,5,21
**worked** 21:21
87:1 131:11
156:2 192:18
215:4 247:23
267:17
**worker** 18:4,9
38:13 193:9,16
**workers** 38:9
40:2
**working** 20:19
62:21 63:4,12
64:2 106:12
128:22 129:4
144:15 192:19
193:1,6 232:3
267:22,23
**works** 38:7 42:2
61:1 70:2
105:10,11
201:2 254:23
**world** 184:3
**worry** 219:15
253:21
**worse** 190:10
**wouldn't** 59:14
65:14 84:19
138:10 140:4
142:8 149:22
169:5,16
170:13,14
171:15 175:7
183:14 184:4
184:10 186:5,6
189:9 194:18
218:4 246:10
261:11 263:3,4

266:3 268:1
270:19
**Wright** 147:4
**write** 139:3
**write-up** 139:13
**writing** 71:18,20
83:7 233:20
234:7 240:3
**writings** 58:2
**written** 47:19,21
55:6,7,8 62:6
71:22 84:13
137:18 186:2
191:21 211:18
245:7 260:3,9
**wrong** 63:18
89:20 98:8
106:5 112:4
142:4 143:14
168:18 177:6
180:10 253:17
**wrongful** 64:18
**wrote** 221:20
234:8,16,19
248:22 254:13

———————
**X**
———————
**X** 8:1,7

———————
**Y**
———————
**year** 15:19 19:1
20:14 36:3
39:11 47:7,21
52:6 53:1
70:20 71:1
79:4,8 85:9,14
90:18 104:12
108:21 160:10
162:17 163:10
163:22 164:3
165:6,20,22
166:5,5 260:22
261:20,23
269:1
**yearly** 41:7 42:7

# FREEDOM COURT REPORTING

42:23
**years** 12:6,8
17:9,10 22:5,7
23:20,23 24:15
24:17 64:13,13
85:12,13
129:10 149:3
159:14 215:4
216:7 218:19
261:22 268:20
**year's** 153:2
**yelling** 126:4
161:13
**young** 216:5
219:11
**Youth** 114:21
167:13
**y'all** 28:9 34:13
94:21 95:17
142:11 167:9
182:11 186:18
193:20 240:23
247:16 263:6
264:13,17
265:15 267:15
267:22 268:13
268:14,16
269:3 270:2

————— **0** —————
**01** 92:23 93:7,8
**02** 93:1,6,7
161:12
**03** 52:15 92:17
93:3,6
**04** 53:6,7,11
79:12,13 84:19
84:20 92:17
93:3 97:6,7,15
98:16,19,20,21
100:15,22,23
260:4
**05** 84:14 96:11
96:14 97:6,8

97:15 98:16,19
98:20,21
100:16,22,23
**06** 96:12,14

————— **1** —————
**1** 8:9 31:6 34:10
35:2,5,12,16
35:18,20 80:5
80:5 92:18
**1st** 53:6,7,11
79:12 83:17
84:1 88:2
260:5
**10** 8:4,18 93:7
93:20 97:1
141:1 254:19
258:8 259:17
**10th** 260:4
**106** 8:20
**11** 93:8 97:1
**113** 8:21
**116** 8:22
**12** 93:8 97:1
**12th** 199:4
**129** 8:23
**13** 93:9 97:2
258:2
**13th** 109:12
110:11
**137** 9:1
**14** 93:10 97:2
**14th** 57:5,13
79:15 84:3,4
109:12 110:13
110:16 228:6
229:13
**145** 9:2,3
**15** 5:3 39:12
93:12 97:2
**15th** 84:2 109:12
**1505** 5:19 7:5
**16** 8:18 93:12,20
97:2

**16th** 109:13
112:20 137:6
242:10
**17** 8:19 97:7,10
98:19
**17th** 112:18,20
112:23 113:6
113:11,13,19
113:20
**1743** 11:20
**18** 8:20 106:22
109:9
**18th** 234:6 235:9
237:23
**19** 8:21 112:23
113:3 233:12
**196** 8:5
**1972** 14:20 18:7
19:16
**1974** 22:21
**1975** 15:16
**1982** 23:21
**1988** 5:3
**1996** 12:7 25:10
36:4,13 38:18
87:3
**1997** 37:4 38:20
71:3
**1998** 32:23 33:8
39:12 80:20
130:1
**1999** 148:14

————— **2** —————
**2** 8:10 36:17,20
57:16,18 59:3
59:8 122:18,19
222:19
**2nd** 37:14
**2:06-CV-796-...**
4:8
**2:07-CV-21-...**
2:8
**20** 8:22 115:20

115:22
**20th** 109:22
**2000** 45:4 46:4
84:1 93:8,9
132:13
**2001** 45:4 46:4
133:19 233:12
234:6 235:7,10
242:10
**2002** 31:13 33:1
33:9 43:20
44:9,19 54:22
55:9 82:14
91:11 136:6
235:17 236:3
237:23
**2003** 52:7 54:14
54:23 55:9
82:19 88:3
90:14,15 91:11
163:6 196:7
197:16
**2004** 53:2 54:14
79:8 82:1 83:1
83:2,17,17
84:1 87:22,23
88:3 90:13,14
90:15 94:1
163:7 196:7
197:17 238:20
240:1 258:8
259:17 260:5
260:12 261:22
269:17
**2005** 57:5,13
70:21 79:13,15
81:21 83:3,18
84:5,6 198:21
199:6 242:1
243:23 261:22
**2006** 109:15
137:6 228:6
229:13 268:23
**2007** 5:7,21

**21** 8:23 129:21
**21st** 198:21
199:6
**22** 9:1 137:1,4
**22nd** 235:17
241:23
**23** 9:2 145:5,8
**231** 8:4
**233** 9:4
**234** 9:5
**236** 9:6,7
**237** 9:8
**238** 9:9
**239** 9:10,11,12
**24** 9:3 145:5
**24th** 240:1
**242** 9:13
**243** 9:14,15
**25** 9:4 233:8,11
234:9,9,13
**25th** 243:23
**26** 9:5 234:2,4
**26th** 53:18 79:13
**261** 9:16
**262** 9:17
**269** 9:18
**27** 9:6 235:23
**27th** 5:6,21
238:20
**28** 9:7 236:9,12
**28th** 37:4
**29** 9:8 237:18,21
**29th** 109:19

————— **3** —————
**3** 8:11 39:4,7
82:11
**3rd** 44:9,18
**30** 9:9 238:17,22
**30th** 87:6 88:3
268:23
**31** 9:10 239:4,7
**31st** 52:15 199:4
**32** 9:11 239:18

# FREEDOM COURT REPORTING

| | | |
|---|---|---|
| **33** 9:12 241:20 241:23 | **7** | 93:23 97:15 |
| **34** 9:13 242:6 | **7** 8:15 56:8,11 | **98** 40:7 43:19 |
| **35** 8:9 9:14 243:20 | 57:4,22 58:9 | 82:11 93:10,11 |
| **36** 8:10 9:15 243:20 | 58:14 67:2 | **99** 45:4 46:4 |
| **36066** 11:21 | 78:18 79:4,7 | 93:9,10 149:2 |
| **36104** 7:12 | 81:19,20 84:2 | |
| **36107** 7:6 | **7-27-98** 40:10 | |
| **37** 9:16 261:18 261:21 | **70's** 85:22 | |
| **38** 9:16 261:18 261:21 | **71** 8:16 14:14 | |
| **39** 8:11 9:17 262:5,8 | **72** 20:3 | |
| | **73** 20:3,15 | |
| **4** | **74** 15:11 | |
| **4** 8:12 43:22 44:2 55:11,13 55:20 82:14 | **75** 15:12 20:15 20:16,16,18,19 24:14 | |
| **40** 9:18 269:11 269:14 | **78** 8:17 24:15 | |
| **43** 8:12 | **79** 24:15 | |
| **5** | **8** | |
| **5** 8:13 51:18,21 54:13 55:11,13 55:20 82:19 | **8** 8:16 71:13,15 75:7 | |
| **5th** 40:7 | **80's** 24:18,19 | |
| **5(d)** 5:1 | **81** 24:17 | |
| **51** 8:13 | **82** 24:17 | |
| **52** 8:14 | **83** 23:21 | |
| **56** 8:15 | **9** | |
| **6** | **9** 8:17 78:11 93:4 97:1 196:7 207:13 232:11 244:21 250:23 | |
| **6** 8:14 52:17,20 58:1,10 79:3,4 79:6,7,11 80:6 259:23 | **9-20** 38:19 | |
| **60** 7:11 | **9:30** 5:21 | |
| **620.02** 122:12 | **904** 7:11 | |
| **65** 12:20,21 | **93** 8:18 | |
| **67** 14:17 | **94** 96:7 | |
| | **95** 87:5 93:14 96:7,8 | |
| | **96** 27:9,11 38:19 43:18 87:6 93:12,15 96:8 | |
| | **97** 8:19 37:14 43:19 93:11,12 | |

# FREEDOM COURT REPORTING

|  |  |
|---|---|
| **Page 1** | **Page 3** |

**Page 1**

```
 1    IN THE UNITED STATES DISTRICT COURT
 2    FOR THE MIDDLE DISTRICT OF ALABAMA
 3          NORTHERN DIVISION
 4
 5    JULIE GIVENS and MONICA )
 6    GREENE,              )
 7        Plaintiffs,   )
 8    vs.            ) CASE NUMBER:
 9    DOUGLAS CHAMBERS,      ) CV:2:06-CV-852-ID
10    Individually, and in his )
11    capacity as President of )
12    INGRAM STATE TECHNICAL  )
13    COLLEGE; JAMES WILSON,  )
14    Individually, and in his )
15    capacity as Dean of    )
16    Students of INGRAM STATE )
17    TECHNICAL COLLEGE,     )
18        Defendants.   )
19
20
21
22
23
```

**Page 3**

```
 1    JAMES T. MERK,         )
 2    Individually, and in his )
 3    capacity as Dean of    )
 4    Institution of Ingram  )
 5    State Technical College, )
 6        Defendants.   )
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

**Page 2**

```
 1    IN THE UNITED STATES DISTRICT COURT
 2    FOR THE MIDDLE DISTRICT OF ALABAMA
 3          NORTHERN DIVISION
 4
 5    BARBARA HENDRIX,      )
 6        Plaintiff,    )
 7    vs            ) CASE NUMBER:
 8    DOUGLAS CHAMBERS,      ) 2:07-CV-21-MHT
 9    Individually, and in his )
10    capacity as President of )
11    Ingram State Technical  )
12    College; JAMES WILSON,  )
13    Individually, and in his )
14    capacity as Dean of     )
15    Student and Support    )
16    Services of Ingram State )
17    Technical College;     )
18    MALCOLM MONTGOMERY,    )
19    Individually, and in his )
20    capacity as Coordinator )
21    of Student Support     )
22    Services of Ingram State )
23    Technical College; and  )
```

**Page 4**

```
 1    IN THE UNITED STATES DISTRICT COURT
 2    FOR THE MIDDLE DISTRICT OF ALABAMA
 3          NORTHERN DIVISION
 4
 5    BONITA J. OWENSBY,      )
 6        Plaintiff,    )
 7    vs            ) CASE NUMBER:
 8    J.F. INGRAM STATE     ) 2:06-CV-796-WKW
 9    TECHNICAL COLLEGE; J.  )
10    DOUGLAS CHAMBERS,      )
11    Individually, and in his )
12    official capacity as    )
13    President of J.F. Ingram )
14    State Technical College; )
15    and JAMES WILSON,      )
16    Individually, and in his )
17    official capacity as Dean )
18    of Student and Support  )
19    Services at J.F. Ingram )
20    State Technical College, )
21        Defendants.   )
22
23    DEPOSITION OF JAMES EDWARD WILSON
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| Page 5 | |
|---|---|
| 1 | In accordance with Rule 5(d) of |
| 2 | The Alabama Rules of Civil Procedure, as |
| 3 | Amended, effective May 15, 1988, I, Cindy |
| 4 | Weldon, am hereby delivering to Jim |
| 5 | Debardelaben, the original transcript of the |
| 6 | oral testimony taken on the 25th day of |
| 7 | June, 2007, along with exhibits |
| 8 | Please be advised that this is the |
| 9 | same and not retained by the Court Reporter, |
| 10 | nor filed with the Court |
| 11 | |
| 12 | S T I P U L A T I O N S |
| 13 | IT IS STIPULATED AND AGREED, by |
| 14 | and between the parties through their |
| 15 | respective counsel, that the deposition of |
| 16 | JAMES EDWARD WILSON, may be taken before |
| 17 | Cindy Weldon, Certified Shorthand Reporter, |
| 18 | Commissioner and Notary Public, at the |
| 19 | office of Jim Debardelaben, 1505 Madison |
| 20 | Avenue, Montgomery, Alabama, on June the |
| 21 | 25th, 2007 at 9:30 a.m. |
| 22 | IT IS FURTHER STIPULATED AND |
| 23 | AGREED that it shall not be necessary for |

Page 7

1      A P P E A R A N C E S
2
3   FOR THE PLAINTIFF:
4      MR. JIM DEBARDELABEN
5      1505 MADISON AVENUE
6      MONTGOMERY, ALABAMA  36107
7
8   FOR THE DEFENDANT:
9      MR. ANDREW W. CHRISTMAN
10     GIDIERE, HINTON, HERNDON & CHRISTMAN
11     60 COMMERCE STREET, SUITE 904
12     MONTGOMERY, ALABAMA  36104
13
14  ALSO PRESENT:
15     MS. JULIE GIVENS
16     MR. MONICA GREENE
17
18
19
20
21
22
23

| Page 6 | |
|---|---|
| 1 | any objections to be made by counsel to any |
| 2 | questions, except as to form or leading |
| 3 | questions, and that counsel for the parties |
| 4 | may make objections and assign grounds at |
| 5 | the time of trial, or at the time said |
| 6 | deposition is offered in evidence, or prior |
| 7 | thereto. |
| 8 | IT IS FURTHER STIPULATED AND |
| 9 | AGREED that notice of filing of the |
| 10 | deposition by the Commissioner is waived. |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

Page 8

1          I N D E X
2
3   EXAMINATION BY:              PAGE
4   MR. DEBARDELABEN             10
5
6
7
8          E X H I B I T S
9                      PAGE
10  PLAINTIFF'S EXHIBIT NO. 1     40
11  PLAINTIFF'S EXHIBIT NO. 2     43
12  PLAINTIFF'S EXHIBIT NO. 3     56
13  PLAINTIFF'S EXHIBIT NO. 4     60
14  PLAINTIFF'S EXHIBIT NO. 5     66
15  PLAINTIFF'S EXHIBIT NO. 6     79
16  PLAINTIFF'S EXHIBIT NO. 7     82
17  PLAINTIFF'S EXHIBIT NO. 8     90
18  PLAINTIFF'S EXHIBIT NO. 9     103
19  PLAINTIFF'S EXHIBIT NO. 10    105
20  PLAINTIFF'S EXHIBIT NO 11     118
21  PLAINTIFF'S EXHIBIT NO. 12    136
22  PLAINTIFF'S EXHIBIT NO. 13    136
23  PLAINTIFF'S EXHIBIT NO. 14    137

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

<table>
<tr><td colspan="3">Page 9</td></tr>
<tr><td>1</td><td>PLAINTIFF'S EXHIBIT NO. 15</td><td>138</td></tr>
<tr><td>2</td><td>PLAINTIFF'S EXHIBIT NO. 16</td><td>139</td></tr>
<tr><td>3</td><td>PLAINTIFF'S EXHIBIT NO. 17</td><td>144</td></tr>
<tr><td>4</td><td>PLAINTIFF'S EXHIBIT NO. 18</td><td>147</td></tr>
<tr><td>5</td><td>PLAINTIFF'S EXHIBIT NO. 19</td><td>151</td></tr>
<tr><td>6</td><td>PLAINTIFF'S EXHIBIT NO. 20</td><td>154</td></tr>
<tr><td>7</td><td>PLAINTIFF'S EXHIBIT NO. 21</td><td>167</td></tr>
<tr><td>8</td><td>PLAINTIFF'S EXHIBIT NO. 22</td><td>174</td></tr>
</table>

**Page 10**

```
 1            JAMES EDWARD WILSON,
 2      after first being duly sworn, testified
 3            as follows:
 4    EXAMINATION BY MR. DEBARDELABEN:
 5         THE COURT REPORTER:  Usual
 6    stipulations?
 7         MR. CHRISTMAN:  Yes, ma'am.
 8      Q.  Mr. Wilson, this is a Federal
 9    deposition.  And under the Rules of Federal
10    Procedure, for me to be able to use this
11    deposition, you have the right to read and
12    sign or waive the right to read and sign.
13         When you read and sign, you can't
14    change your answers.  You can change
15    something that might have misunderstood.  So
16    you might want to talk to your lawyer to see
17    if you want to read and sign or if you want
18    to waive reading and signing.
19         MR. CHRISTMAN:  The question is
20    whether she took it down accurately or not
21    accurately.
22         MR. DEBARDELABEN:  You can't go
23    back and change your answers.  We all wish
```

**Page 11**

```
 1    we could at times.
 2         MR. CHRISTMAN:  It's just whether
 3    she accurately transcribed what you said
 4    But you have the right to read and sign it
 5    before it's certified or you can waive that
 6    right.
 7         THE WITNESS:  I would like to read
 8    it.
 9         MR. CHRISTMAN:  He'll read it
10      Q.  Mr. Wilson, my name is Jim
11    Debardelaben and I represent in these cases
12    Ms. Givens, Ms. Greene, Ms. Owensby and Ms.
13    Hendrix.
14         Since there are three cases
15    involved, I'm going to be asking you
16    questions relating to all three cases.
17    Probably most of my questions will be
18    grouped together.
19         There's a lot of questions that
20    will be similar for all cases.  So we're
21    just trying to save everybody time and money
22    by doing it this way.
23         But if I ask you a question and
```

**Page 12**

```
 1    you don't understand it, please let me
 2    know.  If at any time you need a break,
 3    please let me know.
 4         But if I ask you the question and
 5    you answer it, I'm going to assume that you
 6    understood what I was asking.  Would you
 7    state your name, please, sir.
 8      A.  James Edward Wilson.
 9      Q.  And what is your date of birth?
10      A.  4-27-52.
11      Q.  What is your present address, Mr.
12    Wilson?
13      A.  341 Pecan Tree Lane, Pike Road
14    36064.
15      Q.  Are you presently married?
16      A.  No.
17      Q.  Do you have any children by a
18    former marriage?
19      A.  I have -- no.  Not by a former
20    marriage.
21      Q.  Do you have any children that
22    reside in the Middle District of Alabama?
23    That's basically Montgomery, Elmore County
```

3  (Pages 9 to 12)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 13

1    south.
2        A.  No.
3        Q.  Do you have any kin people that
4    reside from Elmore County and Autauga County
5    south?
6        A.  Repeat your question.
7        Q.  Do you have any kin folk that
8    reside from Autauga County south basically
9    on the --
10        A.  I have a sister that lives in
11    Montgomery.
12        Q.  What's her name?
13        A.  Katherine Wright.
14        Q.  Does she have any children that
15    are over nineteen years of age?
16        A.  Yes.
17        Q.  And what's their names?
18        A.  Jeffrey and Jason.
19        Q.  Do they reside in Montgomery?
20        A.  One I know that lives here.  And
21    I'm not certain whether Jason -- I mean
22    Jeffrey has moved or not.
23        Q.  Is Ms. Katherine Wright married?

Page 14

1        A.  Yes.
2        Q.  What's her husband's name?
3        A.  Dr. James Wright.
4        Q.  Do you have any other kin people
5    residing in this area?
6        A.  I have an aunt that lives in
7    Montgomery.
8        Q.  What's her name, please?
9        A.  Lila.  Her old name was Pinkston.
10    I'm not certain what her last name is now.
11        Q.  Is that all?
12        A.  Yes.
13        Q.  Where are you presently employed?
14        A.  J.F. Ingram State Technical
15    College.
16        Q.  Let's talk about your educational
17    background.  Where did you graduate from
18    high school?
19        A.  Maplesville.
20        Q.  Maplesville.  When was that?
21        A.  In 1970.
22        Q.  Where did you go after graduation?
23        A.  To Alabama State.

Page 15

1        Q.  And how long did you stay at
2    Alabama State?
3        A.  I graduated undergrad in 1973.
4        Q.  What was your degree in?
5        A.  Business management.
6        Q.  Do you have a further educational
7    degree?
8        A.  A Master's of Science.
9        Q.  And where is that from?
10        A.  Alabama State.
11        Q.  When was that?
12        A.  1976.
13        Q.  Do you have any other degrees?
14        A.  I have post-graduate work.  Not a
15    degree.
16        Q.  Where was your post-graduate work?
17        A.  Alabama State and some at the
18    University of Alabama in Birmingham.
19        Q.  None of these degrees were
20    education degrees, were they?
21        A.  My bachelor is certified in
22    business ed.
23        Q.  Business ed?

Page 16

1        A.  Yes, sir.
2        Q.  So your educational background is
3    in business?
4        A.  My degree is in business
5    management.  And I have a certification of a
6    bachelor's, therefore, in education, in
7    business education.
8        Q.  And where did you get the
9    certification in business education?
10        A.  Alabama State.
11        Q.  And when was that?
12        A.  Around or between 1976 and '78.
13    One of those years.
14        Q.  Any further educational
15    achievement?
16            MR. CHRISTMAN:  You mean honors or
17    degrees?
18            MR. DEBARDELABEN:  Yes, degrees.
19        A.  No.
20        Q.  Honors?
21        A.  No.
22        Q.  Please go through your work
23    history starting when you graduated from

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 17

1  **Alabama State in 1973.**
2      A.  I began at -- I've worked at
3  K-Mart.  I've worked at Gaylords.  I've
4  worked at Union Camp.
5      **Q.  When did you work at K-Mart?**
6      A.  I don't recall exactly the year.
7  But it was between '70 -- I don't recall
8  exactly the date.  But in the early '70's.
9      **Q.  What about Gaylords?**
10     A.  Same.
11     **Q.  Union Camp?**
12     A.  Around '74, I believe, to '75.
13     **Q.  What did -- Where did you go after**
14 **Union Camp?**
15     A.  Briefly back to school to finish
16 up my Master's.  And from there, in -- to
17 Ingram.
18     **Q.  So when did you start at Ingram?**
19     A.  1976, March.
20     **Q.  What was your starting position at**
21 **Ingram?**
22     A.  I was a related education
23 instructor.  They called it related.

Page 18

1      **Q.  Now, what does that mean to us as**
2  **--**
3      A.  You teach the related subjects for
4  the trade like the English, math.
5      **Q.  Okay.  Who was president at that**
6  **time?**
7      A.  Dr. Murry C. Gregg.
8      **Q.  Who was your -- Who did you work**
9  **under?**
10     A.  Mr. Joseph Milton Mulder.
11     **Q.  What was his position?**
12     A.  He was eventually the Dean of
13 Instruction.
14     **Q.  What was -- Do you know his**
15 **position now?**
16     A.  No.  I don't know what it was
17 called then.
18     **Q.  But he was over you when you first**
19 **started working?**
20     A.  Yes, sir.
21     **Q.  What was the hiring process you**
22 **went through?**
23     A.  I was interviewed, filled out an

Page 19

1  application and came back for a second
2  interview and I was hired the second time.
3      **Q.  Who interviewed you the first**
4  **time?**
5      A.  I don't recall.
6      **Q.  Who interviewed you and hired you**
7  **the second time?**
8      A.  The last interview I had, I
9  believe that was Mulder and Dr. Gregg was
10 present.
11     **Q.  Did you have any experience at any**
12 **place working in an environment where you**
13 **were instructing prisoners prior to going to**
14 **work at J.F. Ingram?**
15     A.  I'm sorry?
16     **Q.  Did you have any experience in any**
17 **place to work in an environment where you**
18 **instructed prisoners prior to going to work**
19 **at J.F. Ingram?**
20     A.  Any experience -- repeat your
21 question.
22     **Q.  Did you have any experience in**
23 **instructing inmates prior to going to work**

Page 20

1  at J.F. Ingram?
2      A.  No.
3      **Q.  Did you have any previous teaching**
4  **experience before going to work at J.F.**
5  **Ingram?**
6      A.  Yes, sir.
7      **Q.  And where was that?**
8      A.  At Trenholm State Tech College.
9      **Q.  And what did you do at Trenholm?**
10     A.  I taught business related courses,
11 accounting, adding machines or whatever the
12 course was called.
13     **Q.  And when did you teach at**
14 **Trenholm?**
15     A.  I believe in 1974.
16     **Q.  Who was the president out there**
17 **then? Was it Mr. Dan McCloudy?**
18     A.  No.  It was Mr. Smiley.
19     **Q.  Mr. Smiley.**
20     A.  And at Faulkner, what is now
21 Faulkner University.  But it was Alabama
22 Christian College at that time.
23     **Q.  What did you teach at then Alabama**

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1  Christian?
2      A.  I taught math.
3      Q.  For what time period did you teach
4  math at Alabama Christian?
5      A.  I believe it was two semesters.
6  One semester at Trenholm and two semesters
7  at Alabama Christian adjunct.  It was
8  part-time.
9      Q.  Was that when you were going back
10  for your Master's?
11      A.  I was at Faulkner prior to going
12  to Trenholm.  So it could have been.
13      Q.  Now, when you went to work at J.F.
14  Ingram, did you go through any kind of
15  orientation process?
16      A.  Yes, sir.
17      Q.  Tell me about that orientation
18  process.
19      A.  They explained that it was dealing
20  with inmates in that the difference between
21  things that you can or cannot bring in and
22  security issues and basically the time and
23  hours that you would report to work, what

Page 22

1  time you got off, what lunch hour, and how
2  to report incidents.
3      Q.  Okay.  Was it -- When I say
4  orientation, did you go to any classes?
5      A.  No.
6      Q.  How long did the orientation last?
7      A.  I don't recall.
8      Q.  Was it over a day?
9      A.  I had a person assigned to me for
10  a day or so.
11      Q.  Do you remember that person?
12      A.  Yes, sir.
13      Q.  Who was it?
14      A.  Mr. Smith.
15      Q.  Mr. Smith.  What's his first name?
16      A.  I don't recall his first name.
17      Q.  And what was Mr. Smith's job at
18  J.F. Ingram, if you remember?
19      A.  He was a related instructor.
20      Q.  How long were you a related
21  instructor?
22      A.  From 1976 until 1980, October.
23      Q.  What happened in 1980?

Page 23

1      A.  I was asked to direct the Student
2  Support Services Program.
3      Q.  Who asked you to direct the
4  Student Support Services Program?
5      A.  Dr. Murry Gregg.
6      Q.  Now, what is the Student Support
7  Services Program?
8      A.  I'm sorry?
9      Q.  What is that?
10      A.  It is a Federally funded program
11  to aid students to remain in college and to
12  graduate.
13      Q.  How long were you the -- What
14  would you call yourself, the Director of the
15  Student Support Program?
16      A.  Yes, sir.
17      Q.  How long --
18      A.  It was Director of Special
19  Services for Disadvantaged Students to begin
20  with.  And eventually the name changed to
21  student support services.
22      Q.  Now, what were your duties?
23      A.  To direct that program.

Page 24

1      Q.  Now, what did that consist of?
2      A.  It was to implement all the
3  components of the program which included at
4  that particular time counseling.
5      Q.  What kind of counseling?
6      A.  Based on needs of the student.
7      Q.  Are we talking about educational
8  counseling or are we talking about personal
9  counseling, are we talking about, you know
10  -- What do you mean when you say
11  counseling?
12      A.  Group counseling, individual
13  counseling, academic advisement.
14      Q.  Do you have any background and
15  training in counseling?
16      A.  Master's of Science.
17      Q.  Master's of Science in what?
18      A.  Counseling.
19      Q.  So you got that Master's of
20  Science in counseling in 1976 from Alabama
21  State?
22      A.  Yes, sir.
23      Q.  How long did you remain the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 25

1  director of student needs?
2      A.  Student Support Services.
3      Q.  Student Support Services.
4      A.  Until 19 -- I'm sorry.  2006.
5      Q.  Okay.  What happened in 2006?
6      A.  The college went under
7  restructuring and we named Malcolm
8  Montgomery director of Student Support
9  Services.
10      Q.  And what happened to you?
11      A.  I'm sorry?
12      Q.  What did you do?
13      A.  What did I do?
14      Q.  Yes, sir.  I mean, Mr. Montgomery
15  became director of Student Support
16  Services.  What job did you have?
17      A.  I had director of NED, which is
18  Neglecting Delinquent Student Program.  I
19  was the Dean of Students and also in charge
20  of the counseling on the main campus.  And I
21  became the vice-president or Dean of the
22  College.
23      Q.  When you became the Dean of

Page 26

1  Students, did you go through a competitive
2  process?
3      A.  The college went under
4  restructuring during that period of time and
5  I was named Dean of Students.
6      Q.  Yes, sir.  Did you go through a
7  competitive process or were you just named?
8      A.  We went under restructuring.
9  There was no process other than
10  restructuring through the Chancellor's
11  office.
12      Q.  Did you have any competition for
13  your job that you know of?
14      A.  No, I don't know of.
15      Q.  Did you fill out an application?
16      A.  No.  I don't recall filling one
17  out.
18      Q.  Was there an announcement that the
19  Dean of Student job was open?
20      A.  Not that I know of.
21      Q.  How did you learn that the Dean of
22  Student job was open?
23      A.  I was a part of the cabinet, the

Page 27

1  president's cabinet.
2      Q.  In what position?
3      A.  At that particular time, if I'm
4  not mistaken, that was the director of
5  Student Support Services.
6      Q.  Okay.  Were you considered the
7  dean when you were with Student Support
8  Services?
9      A.  Which dean?
10      Q.  Were you a dean of any type when
11  you were with student support services?
12      A.  Prior to the Dean of Students, I
13  had been the acting assistant Dean of
14  Instruction and Assistant Dean to the
15  College.
16      Q.  And when did you become the acting
17  assistant dean?
18      A.  I don't recall exactly.
19      Q.  Was that -- Did you fill out an
20  application for that job?
21      A.  I don't recall.
22      Q.  So in 1980, you became director of
23  Special Services which went to Student

Page 28

1  Needs.  What was your other position after
2  director of Special Services or Student
3  Needs?
4      A.  We had a competition where I did
5  fill out an application.  And I believe it
6  was the assistant Dean of Instruction.
7      Q.  Okay.
8      A.  And I'm not certain of the date or
9  time period.
10      Q.  Okay.  Now, let me go back and
11  clean up a couple of areas I left out.  Mr.
12  Wilson, have you ever been arrested or
13  charged with a crime before?
14      A.  Yes.
15      Q.  What was that?
16      A.  It wasn't a crime.  You may say a
17  violation.
18      Q.  What was that?
19      A.  One was in '74 or '75 -- I believe
20  '75 -- in Prattville from the Union Camp
21  job.
22      Q.  What was that charge?
23      A.  I never understood the charge,

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 29

1  sir. But it had something to do with a loss
2  of checks and somebody had stole some checks
3  or something.
4      Q.  At Union Camp?
5      A.  Yes, sir.
6      Q.  Did the police arrest you?
7      A.  Yes. As a matter of fact, I spent
8  the night in jail.
9      Q.  Any other instances besides that
10  one arrest?
11      A.  Yes, sir. In South Carolina.
12      Q.  What happened in South Carolina?
13      A.  I was pulled over and the cop
14  asked for my license. I asked him did I
15  need to get it out of the car. I brought
16  back my license, handed it to him. He told
17  me he would teach me for being a smart ass
18  nigger and he arrested me.
19      Q.  What did he arrest you for?
20      A.  Being a smart ass nigger.
21      Q.  What was his charge?
22      A.  I don't recall.
23      Q.  What was the outcome of the arrest

Page 30

1  in South Carolina?
2      A.  The next day about ten o'clock,
3  they let me out to make a phone call. I
4  made a phone call and told my brother-in-law
5  that my car had been impounded and I needed
6  money. And he sent me money.
7          And if I'm not mistaken, he gave
8  me a ride to a little town. I went in, got
9  the money order or union -- Western Union.
10  Paid them their twenty-five or fifty
11  dollars, whatever it was, and that was the
12  end of it.
13      Q.  Did you get your car back?
14      A.  Yes, sir.
15      Q.  Did you have to go to court on
16  this?
17      A.  No, sir.
18      Q.  You made no court appearance?
19      A.  No, sir.
20      Q.  When did that happen?
21      A.  The early '80's.
22      Q.  Early '80's. Have you ever been
23  terminated from any job?

Page 31

1      A.  No, sir.
2      Q.  What was the outcome of the checks
3  at Union Camp that you were arrested for?
4      A.  Null pros.
5      Q.  Null pros. How long did you work
6  for Union Camp after that?
7      A.  I'm not exactly certain. But it
8  was a couple of months.
9      Q.  Okay. Have you ever been involved
10  in a lawsuit?
11      A.  Yes, sir.
12      Q.  What lawsuit have you been
13  involved in?
14      A.  I sued J.F. Ingram State Technical
15  College.
16      Q.  For what reason?
17      A.  Discrimination.
18      Q.  How did they discriminate?
19      A.  They chose an inexperienced --
20  well, a person I felt that I had more
21  experience and more tenure and more
22  experience in the position.
23      Q.  Now, was this age, race or sex

Page 32

1  discrimination?
2      A.  It was race.
3      Q.  Race discrimination. Who did they
4  choose?
5      A.  I'm sorry?
6      Q.  Who did you chose?
7      A.  Bruce Thomas.
8      Q.  What did they choose Mr. Thomas
9  for?
10      A.  I'm sorry?
11      Q.  What position did they choose Mr.
12  Thomas for?
13      A.  Assistant Dean of Instruction.
14      Q.  Did you fill out an application
15  for that position?
16      A.  Yes, sir.
17      Q.  And who all did you sue at J.F.
18  Ingram?
19      A.  Who all?
20      Q.  Yes, sir.
21      A.  The president.
22      Q.  Mr. Gregg?
23      A.  Dr. Gregg.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

|  | Page 33 |
|---|---|
| 1 | **Q. Anyone else?** |
| 2 | A. I don't recall exactly. |
| 3 | **Q. Did you sue anybody in** |
| 4 | **post-secondary?** |
| 5 | A. Generally it does go that way. |
| 6 | **Q. Did you sue Dr. Gainus?** |
| 7 | A. I don't recall. |
| 8 | **Q. Or was that prior to Dr. Gainus?** |
| 9 | A. I'm not certain who was chancellor |
| 10 | at that time. |
| 11 | **Q. When was this lawsuit?** |
| 12 | A. Probably in the mid '90's. |
| 13 | **Q. That probably would have been Dr.** |
| 14 | **Gainus. What was the outcome?** |
| 15 | A. They settled out of court. |
| 16 | **Q. Did you get what you wanted?** |
| 17 | A. I don't understand your question. |
| 18 | **Q. Did you get the results you wanted** |
| 19 | **to get?** |
| 20 | A. They were fairly okay. |
| 21 | **Q. Did you get any monetary** |
| 22 | **settlement?** |
| 23 | A. Yes, sir. |

|  | Page 34 |
|---|---|
| 1 | **Q. How much?** |
| 2 | A. I think it was forty-five |
| 3 | thousand. |
| 4 | **Q. So, Mr. Wilson, you agree that** |
| 5 | **sometimes it's necessary for an employee to** |
| 6 | **bring a lawsuit against their employers,** |
| 7 | **don't you?** |
| 8 | A. In some cases, yes, sir. |
| 9 | **Q. Yes, sir. And that's our American** |
| 10 | **system; is that correct?** |
| 11 | MR. CHRISTMAN: I'm sorry? |
| 12 | **Q. I said that's our American system** |
| 13 | **and we're allowed to do that?** |
| 14 | A. That's our constitutional right. |
| 15 | **Q. Yes, sir. And apparently there** |
| 16 | **has been no retaliation against you since** |
| 17 | **you brought the lawsuit; you have progressed** |
| 18 | **on up, haven't you?** |
| 19 | A. I have been promoted since. |
| 20 | **Q. Yes, sir. Any other lawsuits?** |
| 21 | A. Job related? |
| 22 | **Q. Any related.** |
| 23 | A. I remember one. |

|  | Page 35 |
|---|---|
| 1 | **Q. What was that?** |
| 2 | A. An accident. |
| 3 | **Q. An accident? When was that?** |
| 4 | A. I don't recall. It was between |
| 5 | 1998 and 2000. |
| 6 | **Q. And where were you involved in an** |
| 7 | **accident?** |
| 8 | A. On McDonald Street. |
| 9 | **Q. Did you file the lawsuit or was it** |
| 10 | **filed against you?** |
| 11 | A. I filed. |
| 12 | **Q. Okay. What was -- How were you** |
| 13 | **injured?** |
| 14 | A. You mean physically? |
| 15 | **Q. Yes, sir.** |
| 16 | A. You may want to say whiplash. |
| 17 | **Q. Who represented you?** |
| 18 | A. McPhillips |
| 19 | **Q. McPhillips. Who represented you** |
| 20 | **in your lawsuit against Dr. Gregg and J.F.** |
| 21 | **Ingram?** |
| 22 | A. Thomas, Means and Gillis. |
| 23 | **Q. Which lawyer?** |

|  | Page 36 |
|---|---|
| 1 | A. Thomas and Anita Kelly. |
| 2 | **Q. Any other lawsuits?** |
| 3 | A. Not that I recall. |
| 4 | **Q. Can you identify this document for** |
| 5 | **me?** |
| 6 | A. Yes, sir. It's our policies and |
| 7 | procedures manual. |
| 8 | **Q. And I noticed that -- I want you** |
| 9 | **to look at it because I want to be sure it's** |
| 10 | **up to date. Is that -- I noticed it says** |
| 11 | **2002 on it. Do you know if it's been** |
| 12 | **updated at any time since 2002?** |
| 13 | A. Yes, it has been. Periodically, |
| 14 | it's updated. |
| 15 | **Q. When is the last policy manual** |
| 16 | **that was put out?** |
| 17 | A. Sir, I don't recall. That's not |
| 18 | my responsibility. |
| 19 | **Q. Okay. Have you seen one that** |
| 20 | **doesn't have 2002 on the front page?** |
| 21 | A. No. |
| 22 | **Q. Okay. Who is responsible for** |
| 23 | **updating the policy manual?** |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1    A.  Dr. Merk.
2    Q.  Dr. Merk.  Now, you mentioned
3  you're part of -- Are you still part of the
4  president's cabinet?
5    A.  Yes, sir.
6    Q.  If a policy -- If the policy
7  manual is updated, is that discussed in the
8  president's cabinet?
9    A.  Yes, sir.
10   Q.  Do the cabinet members, the
11 majority of them have to agree for the
12 policy manual to be updated?
13   A.  Yes, sir.  It's basically
14 discussed and agreed upon before it comes
15 out.
16   Q.  Okay.  So any update we've had in
17 the policy manual went through the process
18 of being presented to the president's
19 cabinet?
20   A.  Yes, sir.
21   Q.  Okay.
22     MR. CHRISTMAN:  You gave him
23 this.  Did you want him to identify whether

Page 38

1  this is or is not the policy manual?
2    Q.  Well, if you can look at it
3  because I've got some questions about some
4  specific instances.  I'm not going to put
5  that whole policy manual in because a lot of
6  it just does not apply to what we're doing.
7    A.  Tell me again specifically what am
8  I looking for.
9    Q.  To see if you see anything in that
10 policy manual that you recognize as being
11 outdated or if you recognize that something
12 is left out, meaning that it's been updated
13 and is not in there.
14   A.  I'm not certain that this student
15 advisory committee is in the old -- in the
16 updated one.
17   Q.  Okay.  What section is that?
18   A.  It has a number 203 on it.
19   Q.  Mr. Wilson, if you see something
20 that you think is outdated or should be in
21 there, just tell me the number that appears
22 up on the right-hand top of it.
23   A.  Number 311.03.  I'm not certain

Page 39

1  that is not on the updated.  Number 400 may
2  be updated.  I think number 506 may have
3  been changed and may not have been changed.
4  I'm not certain whether there's an update on
5  that or not.  I think 702.01.
6    Q.  Now, when you say 700 -- let me
7  look at that because I'm confused.  702.01.
8  Okay.  So what you've told me with changing,
9  you had a question about section 203, 311.03
10 400, 506 and 702.01.  Other than those
11 sections, it appears to be up-to-date?
12   A.  In some cases.
13   Q.  Okay.  The only reason it wouldn't
14 be up-to-date would be anything that
15 happened from 2002 forward or should be?
16   A.  Well, in some cases, it mentioned
17 Dean of the College.  And at that time, the
18 Dean of the College was also the
19 instructional dean.  So I'm not certain it
20 was not written primarily because of that.
21   Q.  Okay.  But Dr. Merk is the person
22 who is responsible for the personnel manual?
23   A.  Yes.  Right.

Page 40

1    Q.  Okay.
2      (Whereupon, Plaintiff's Exhibit
3  No. 1 was marked for identification and
4  attached to the original transcript.)
5    Q.  Let me show you what I have marked
6  as Plaintiff's Exhibit 1 and ask you if
7  you're familiar with that memorandum?
8      MR. CHRISTMAN:  It's a multi-page
9  exhibit.  Five pages.
10     MR. DEBARDELABEN:  It's five
11 pages.  You're right.
12   Q.  I want to ask you a question.  Is
13 Plaintiff's Exhibit 1 the document that is
14 presently in place for student dismissal
15 procedures?
16   A.  Yes, sir.
17   Q.  Had no changes to that since 1998?
18   A.  No, sir.
19   Q.  Okay.  But that document on
20 student dismissal at J.F. Ingram State
21 Technical College, the procedure for having
22 problem students, it does not appear in the
23 policies and procedures manual, does it?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 41

1     A.  Not this one, no.
2     Q.  Yes, sir.  Now, since basically,
3  Mr. Wilson, you are now in charge of it, it
4  appears at least the first steps of
5  discipline with the student, when you have
6  new employees to come in, are they given a
7  copy of this procedure?
8     A.  Yes, sir.
9     Q.  And does that copy go into their
10 personnel file?
11    A.  It goes with them.
12    Q.  It goes with them?
13    A.  Yes.
14    Q.  Now, tell me how that is done.
15    A.  When new employees are hired at
16 the college, they go through an orientation
17 with each department.  In reference to this
18 procedure for handling problems with
19 students is done in student services.
20    Q.  And you're over student services?
21    A.  Yes, sir
22    Q.  Okay.  And who does that?  Do you
23 do it personally or are you --

Page 42

1     A.  I'm a part of the process.
2     Q.  Okay.  Are the people when they
3  are hired, are they given a little notebook
4  or something and say these are your
5  documents and procedures and you need to
6  know them?
7     A.  Yes, sir.
8     Q.  So do you have -- Can you give
9  your attorney a copy of that orientation
10 notebook that you give to new hires?
11    A.  That comes from Dr. Merk's
12 office.  What they get from Student Services
13 is an overview of all the forms that are
14 necessary for admitting a student through
15 dropping, grading and discipline and any
16 other forms that we use throughout the
17 student's tenure at the institution.
18    Q.  Are the new hires given that
19 information or are they just given an
20 overview?
21    A.  No.  We have a form, each form
22 that explains -- as we're sitting at a table
23 as we are now -- and each form is gone over

Page 43

1  either by myself or Ms. Owensby.
2     Q.  Yes, sir.  Are the new hires given
3  copies of those forms?
4     A.  Yes, sir.
5     Q.  So are they in any type of bound
6  book?
7     A.  No, sir.
8     Q.  Is there any checklist to show
9  that the new hires have gotten that?
10    A.  Yes, sir.
11    Q.  When did you start this procedure?
12    A.  I didn't start it.  The
13 institution started it as a part of the
14 hiring process.
15    Q.  When was it started?
16    A.  I'm not certain.
17    Q.  When you were hired back in 1976,
18 I think, did you have that procedure?
19    A.  Not that I recall.
20    Q.  I want to show you what we're
21 going to mark as Plaintiff's Exhibit No. 2.
22        (Whereupon, Plaintiff's Exhibit
23 No. 2 was marked for identification and

Page 44

1  attached to the original transcript.)
2     Q.  Can you identify that document for
3  me, please, sir?
4     A.  Yes, sir.
5     Q.  What is that document?
6     A.  It's a copy of the student rules
7  and regulations.
8     Q.  Is that the student rules and
9  regulations as they presently exist at J.F.
10 Ingram?
11    A.  Mostly.  I would have to have the
12 student services handbook in order to say
13 that they are exactly.
14    Q.  Okay.
15    A.  It seems that they are in order.
16    Q.  I've noticed in looking through
17 various documents that sometimes the
18 institution is referred to as Ingram State
19 Technical College and other times it's
20 referred to as J.F. Ingram.  Which is the
21 correct name?
22    A.  J.F. Ingram State Technical
23 College.

11 (Pages 41 to 44)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 45

1    Q.  Okay.  Has that name changed back
2  and forth over the years?
3    A.  Only once that I can recall.
4    Q.  And when was that?
5    A.  It was during the period of time
6  that we were seeking accreditation under
7  SAASC's, The Southern Association of
8  Accreditation of Schools and Colleges.
9    Q.  So the correct name is Ingram
10  State Technical College now?
11    A.  The correct name is J.F. Ingram
12  State Technical College.
13    Q.  When an instructor is having a
14  problem with a student, what are they
15  supposed to do?
16    A.  Go by this, which is Exhibit 1.
17    Q.  Okay.  Are they supposed to write
18  the student up?
19    A.  It says when a problem related to
20  a student behavior occurs in a shop or
21  classroom, the instructor's first response
22  should be an attempt to resolve the problem
23  through normal classroom management.

Page 46

1    Q.  And what training have you
2  provided to the instructors to know how to
3  resolve problems with inmate students?
4    A.  They go through inmate type of
5  training by DOC.
6    Q.  And how long is that?
7    A.  It's an eight hour.
8    Q.  One eight hour course?
9    A.  Yes.
10    Q.  And how often do they have that
11  eight hour course?
12    A.  When they are first hired.
13    Q.  And when did that start?
14    A.  I don't recall when.
15    Q.  Do you have -- Did you have that
16  course prior to 2000?
17    A.  Yes, sir.
18    Q.  Did you have it when Mr. Gregg was
19  the president?
20    A.  No, sir.
21    Q.  It came after?
22    A.  They -- It was not formalized as
23  it is now when Dr. Gregg was there.  DOC

Page 47

1  officials were invited in during
2  professional development.  And periodically
3  the institution would bring in certain
4  agencies to help with the orientation for
5  older employees, new employees, especially
6  for security reasons.
7    Q.  Your campus population of students
8  are all convicted felons, aren't they?
9    A.  Yes, sir.  I would think so.
10    Q.  They have to have at least a year
11  and date sentence to be in the prison
12  system, don't they?
13    A.  I don't know.
14    Q.  You don't know?
15    A.  No, sir.
16    Q.  Do you know the difference between
17  a felon and a misdemeanor?
18    A.  Yes, sir.
19    Q.  Can a person be sentenced to state
20  prison for a misdemeanor?
21    A.  I don't think so.  But I'm not
22  that up on the law.  Can they?
23      MR. CHRISTMAN: He's going to ask

Page 48

1  you the questions today.
2    Q.  Your lawyer can explain it to
3  you.
4    A.  Okay.
5    Q.  On a scale of one to ten, if you
6  can do this, how trustworthy are your
7  students?
8      MR. CHRISTMAN: Form.  You can
9  answer.
10    A.  How trustworthy on a scale of one
11  to ten?
12    Q.  Yes, sir.
13    A.  If you look at the overall in
14  making an average, I would say probably two
15  to three.
16    Q.  Yes, sir.  Now, you're going to
17  have some that are very trustworthy?
18    A.  Very seldom.
19    Q.  More often than not, you're going
20  to have some that you can't believe anything
21  they say?
22    A.  Right.
23    Q.  I want to talk to you about the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 49

1  horticulture department.
2      A.  Yes, sir.
3      Q.  J.F. Ingram is located on about a
4  twenty or thirty acre plot of ground?
5      A.  That's hard to say, sir, because
6  we are on three campus.
7      Q.  I'm talking about the main
8  campus.
9      A.  Main campus.
10     Q.  The one up on Shot Gun Hill.
11     A.  I'm not certain as to how much
12 that is.
13     Q.  But --
14     A.  It doesn't look like thirty acres.
15     Q.  When you first come in, you have
16 the part of the building that is the
17 administrative offices.  It houses most of
18 the administrative staff and administrative
19 offices; is that correct?
20     A.  Yes, sir.
21     Q.  And you go through a gate and kind
22 of around back.  You then have various shops
23 like the welding shop, the car shop, car

Page 50

1  repair shop, the paint shop.  And that's
2  right next to the -- right behind the
3  administrative building?
4      A.  Yes, sir.
5      Q.  And then you go on back behind
6  there a ways and you have your horticulture
7  shop in the back of the facility?
8      A.  Yes, sir.
9      Q.  And horticulture being what
10 horticulture is, it has more open and wide
11 spaces than the other shops, doesn't it?
12     A.  Outside, yes, sir.
13     Q.  Yes, sir.  And it covers larger
14 areas than the other shops?
15     A.  Well, not necessarily.  If you're
16 looking at space in terms of from point A to
17 point B, the furniture refinishing shop
18 would be the largest.
19     Q.  Now, I know from previous
20 depositions it appears that the horticulture
21 has at least one greenhouse that's three
22 thousand square feet?
23     A.  I don't know how many square feet,

Page 51

1  sir.
2      Q.  And then it has two more?
3      A.  I think we have three.
4      Q.  Yes, sir.  Are there any -- strike
5  that.  The furniture refinishing, the
6  automotive shop, be it the paint shop or
7  repair --
8      A.  I didn't understand your question.
9      Q.  The furniture refinishing shop and
10 the automotive shop, be it the paint shop or
11 mechanical repair, they are all up there
12 where the instructors are in fairly close
13 proximity to the administrative building,
14 aren't they?
15     A.  Well, the furniture refinishing
16 shop makes an L on to the administration
17 building.  And it's not necessarily close,
18 but it is hooked on to it.
19     Q.  Let me put it this way.  You can
20 look out the back side windows of the
21 administration building, what I'm calling
22 the administration building -- I think we
23 both agree -- and see the shops?

Page 52

1      A.  You can see the welding shop, the
2  auto upholstery and you can see the
3  upholstery shop looking out of the
4  administration building.  You can't
5  necessarily see the auto mechanic shop and
6  the furniture refinishing shop unless you
7  came outside the building.
8      Q.  And if you look out and look up to
9  the north and look out the window sideways,
10 you can see the paint shop?
11     A.  That's the furniture refinishing.
12     Q.  The automotive paint shop?
13     A.  We don't have an automotive paint
14 shop on that campus.
15     Q.  Y'all don't paint automotive cars
16 anymore?
17     A.  At the Draper Staton campus.
18     Q.  Okay.  You've moved it?
19     A.  Yes, sir.
20     Q.  Now, the horticulture area where
21 Ms. Hendrix works, it's located behind these
22 shops you were just talking about?
23     A.  Yes, sir.

13  (Pages 49 to 52)

# FREEDOM COURT REPORTING

1    Q.  So you have to come out of the
2   administrative building and go back behind
3   the other shops?
4    A.  Yes, sir.
5    Q.  Are there any classes taught in
6   the administrative building?
7    A.  Yes, sir.
8    Q.  Are those related course classes
9   as you were teaching it?
10    A.  And barbering.
11    Q.  You have a barber shop there?
12    A.  Yes, sir.
13    Q.  Would the horticulture area be the
14   most isolated area on the campus?
15    A.  From the administrative building?
16    Q.  Yes, sir.
17    A.  It's the one that is fartherest
18   away from the administration building.
19    Q.  Is it the one that -- Let me put
20   it this way.  To see the horticulture shop,
21   you have to be looking and go through a
22   building to go to it, don't you?
23    A.  No.

1    Q.  Or go around from the
2   administration building?
3    A.  Yes, sir.
4    Q.  Now, the back side of some of --
5   the furniture refinishing and automotive
6   shop, welding shop, you can look out the
7   back side down and see the horticulture
8   shop?
9    A.  Not from furniture refinishing.
10    Q.  But from the others?
11    A.  From the others, yes.
12    Q.  Who made the decision to hire a
13   retired DOC captain to be Barbara Hendrix's
14   assistant, if you know?
15    A.  I don't know.  But I don't think
16   and I'm not certain that he was hired to be
17   her assistant.
18    Q.  I understand you claim that Ms.
19   Hendrix has written up more student reports
20   than any other instructor on campus; is that
21   correct?
22    MR. CHRISTMAN:  Object to the
23   form.  I don't think that's what the -- I

1   don't think the witness has made that
2   assertion.
3    Q.  Let me show you something.
4    MR. CHRISTMAN:  If you know
5   anything about that, you can answer his
6   question.
7    Q.  Mr. Wilson --
8    A.  Yes, sir.
9    Q.  -- who would have more experience
10   in dealing with inmates, you or Mr. Joseph
11   Griswold?
12    A.  I don't know of his -- what his
13   experience is, sir.
14    Q.  So --
15    A.  I know he was a captain.
16    Q.  Who would have more experience in
17   dealing with discipline problems with
18   inmates, you or Mr. Griswold?
19    A.  I don't know.
20    Q.  You don't know what his experience
21   was?
22    A.  Right.
23    Q.  Do you think you would have more

1   training than Captain Griswold in dealing
2   with problem inmates?
3    A.  It would depend on the problem.
4    Q.  Tell me about the training you've
5   had in dealing with problem inmates.
6    A.  It comes from experience.
7    Q.  Comes from experience.  Have you
8   had any special classes that deal with
9   problem inmates?
10    A.  No, sir.
11    Q.  In your facility now where you're
12   located, do you have daily interaction with
13   inmates?
14    A.  Yes, sir.
15    Q.  Are you in any type of classroom
16   setting with inmates daily?
17    A.  Occasionally.
18    Q.  This is a two-page exhibit.
19    (Whereupon, Plaintiff's Exhibit
20   No. 3 was marked for identification and
21   attached to the original transcript.)
22    Q.  Show you what we've marked as
23   Plaintiff's Exhibit No. 3.  It's a two-page

# FREEDOM COURT REPORTING

Page 57

1  exhibit. I'll ask you if you have ever seen
2  this exhibit before, this paper?
3       MR. CHRISTMAN: For the purposes
4  of the record, the second page being a graft
5  was originally produced in a prior
6  deposition in one of these cases as a color
7  exhibit. It appears that Plaintiff's
8  Exhibit 1 has a black and white exhibit.
9       MR. DEBARELABEN: Correct.
10      MR. CHRISTMAN: Pardon me.
11 Plaintiff's Exhibit 3.
12      Q. Are you familiar with that
13 exhibit?
14      A. No, sir.
15      Q. Who keeps tabs --
16      A. I'm familiar with the information.
17      Q. Okay. Where is the information
18 kept on how many complaints a person makes?
19      A. In my office.
20      Q. In your office.
21      A. And when I say office, it's in the
22 office complex.
23      Q. Okay. Now, do you know who

Page 58

1  prepared what I'm referring to as
2  Plaintiff's Exhibit 3?
3       A. This information is prepared from
4  the write-ups that we get and is kept in the
5  day-to-day --
6       MR. CHRISTMAN: I think his
7  question is do you know who prepared the
8  exhibit.
9       A. Oh, no, sir.
10      Q. How often --
11      A. I remember working on it.
12      Q. How often is an exhibit like that
13 prepared?
14      A. You mean in -- repeat your
15 question.
16      Q. How often is an exhibit like
17 Plaintiff's Exhibit 3 prepared?
18      MR. CHRISTMAN: Object to the
19 form. You may answer.
20      Q. What's the purpose of it?
21      A. What's the purpose of it?
22      Q. Yes, sir.
23      A. It tells me how many types of

Page 59

1  write-ups we have in terms of conduct,
2  student conduct.
3       Q. Does it tell you there appear to
4  be more problems down in the horticulture
5  area than any other area?
6       A. Sir, to be honest with you, I have
7  not looked at this in that manner.
8       Q. What manner have you looked at
9  this form?
10      A. I haven't.
11      Q. You haven't. Who -- Did you
12 direct this exhibit to be prepared?
13      A. No, sir.
14      Q. Do you know who directed it to be
15 prepared?
16      A. Yes, sir.
17      Q. Who?
18      A. Dr. Merk.
19      Q. What was the reason for it?
20      A. I have no idea.
21      Q. So Dr. Merk -- When did Dr. Merk
22 direct this exhibit to be prepared?
23      A. He asked me approximately a month

Page 60

1  and a half ago for access to this data base.
2       Q. I noticed many of the complaints
3  we went over have J.L. Griswold and B.
4  Hendrix's name on them.
5       MR. CHRISTMAN: Object to the
6  form.
7       Q. Were -- let's put it this way.
8       MR. CHRISTMAN: Who went over?
9       MR. DEBARDELABEN: I'm fixing to
10 go back.
11      MR. CHRISTMAN: I'm sorry.
12      MR. DEBARDELABEN: Let's take a
13 short break.
14      MR. CHRISTMAN: Sure.
15      (Whereupon, a short recess was
16 taken.)
17      (Whereupon, Plaintiff's Exhibit
18 No. 4 was marked for identification and
19 attached to the original transcript.)
20      Q. I want to show you what I have
21 marked as Plaintiff's Exhibit 4. And I
22 noticed -- Do you know what that document
23 is?

15 (Pages 57 to 60)

# FREEDOM COURT REPORTING

Page 61

1   A.  Yes, sir.
2   **Q.  What is that document?**
3   A.  It's a student classroom report
4   and counseling record.
5   **Q.  Now, is that what an instructor is**
6   **supposed to file if they have a problem with**
7   **a student?**
8   A.  Yes, sir.  This is not complete,
9   but it is a portion of it.
10  **Q.  Okay.  What is lacking on it?**
11  A.  The back part.
12  **Q.  Well, I'll represent to you that**
13  **this is -- What's on the back part of it?**
14  A.  Information for recommendations,
15  information for approval and information for
16  who was interviewed and some more
17  documentation.
18  **Q.  So if these documents don't have**
19  **the back side, it's an incomplete document?**
20  A.  This one is not complete.
21  **Q.  Right.  If they don't have what's**
22  **ever on the back of it, then it would be an**
23  **incomplete document; correct?**

Page 62

1   A.  Yes, sir.
2   **Q.  Okay.  And to be a complete**
3   **document, it's going to have to have a front**
4   **and back side; is that what you're telling**
5   **me?**
6   A.  Yes, sir.
7   **Q.  Okay.  So what we have on this one**
8   **is the front page of a document?**
9   A.  Yes, sir.
10  **Q.  Okay.  And is that your signature**
11  **down there?**
12  A.  Yes, sir.
13  **Q.  What I want to ask you about, what**
14  **we looked at a while ago, Exhibit 3, which**
15  **was Defendant's Exhibit 27 to Hendrix's**
16  **deposition, I don't see the name J.L.**
17  **Griswold on this list of Ms. Hendrix's of**
18  **these instructors or people who write up**
19  **students.  Why is that?**
20       MR. CHRISTMAN:  Form.  If you
21  know.
22  **Q.  If you know.**
23  A.  I don't know.

Page 63

1   **Q.  Would you keep this information in**
2   **your area?**
3   A.  Yes, sir.
4   **Q.  Who has access to it?**
5   A.  Student service personnel and
6   those other persons that request.
7   **Q.  Okay.  Do you know specifically**
8   **who prepared Exhibit 3?**
9   A.  Dr. Merk.
10  **Q.  Dr. Merk himself?**
11  A.  I guess he put it in the form that
12  he wanted it.
13  **Q.  Okay.  And you have no idea why**
14  **Mr. Griswold's does not show up on this**
15  **list?**
16  A.  I see Griswold on that list.
17  **Q.  Where is it?  Maybe I'm reading it**
18  **wrong.  We've got Griswold.  We've got two.**
19  A.  Right.
20  **Q.  Now, is this J.L. Griswold or is**
21  **there another Griswold?**
22  A.  There are two Griswolds.
23  **Q.  There are two Griswolds?**

Page 64

1   A.  Yes, sir.
2   **Q.  So if J.L. Griswold had more -- Do**
3   **you know if that Griswold is J.L. or someone**
4   **else?**
5   A.  I have no idea.
6   **Q.  Okay.  So if there is another --**
7   **If there's more than two with J.L. Griswold**
8   **on there, then we know that's a different**
9   **Griswold.  What's the other Griswold's name?**
10  A.  Bill.
11  **Q.  Bill.  And what does he do?**
12  A.  He's the assistant to the Dean of
13  the College.
14  **Q.  Assistant to the dean.  And you're**
15  **the dean, aren't you?**
16  A.  Yes, sir.
17  **Q.  And what's Mr. Bill Griswold --**
18  **how does he assist you?**
19  A.  By working with Dr. Merk.
20  **Q.  And how does that assist you if he**
21  **works with Dr. Merk?**
22  A.  He helps him with the instruction
23  program.

16  (Pages 61 to 64)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 65

1  Q. Who does he take his instruction
2  from?
3  A. Me and/or Dr. Merk and the
4  president.
5  Q. So he's just a floater between you
6  and Dr. Merk and Mr. Chambers?
7  A. He's an employee.
8  Q. Right. But any of the three of
9  you can tell him what to do?
10  A. Yes, sir.
11  Q. What's his official title,
12  assistant to the Dean of the College?
13  A. Yes, sir.
14  Q. Okay. Mr. Wilson, when y'all are
15  doing a student discipline, are those
16  meetings recorded?
17  A. Notes are taken, yes, sir.
18  Q. And who is responsible for taking
19  the notes?
20  A. Whoever I designate.
21  Q. Huh?
22  A. Whoever I designate.
23  Q. So when you come in, it's who you

Page 66

1  designate?
2  A. Generally, yes, sir.
3  Q. Okay. I want to show you a
4  document here that I believe was Defendant's
5  Exhibit 19 to Ms. Hendrix's deposition.
6  We're going to make it Plaintiff's Exhibit
7  No. 5.
8  (Whereupon, Plaintiff's Exhibit
9  No. 5 was marked for identification and
10  attached to the original transcript.)
11  Q. Do you recall that?
12  A. I've seen this, yes, sir.
13  Q. Okay. What was -- When did this
14  meeting take place?
15  A. I don't recall the date, sir.
16  Q. Okay. Who called this meeting?
17  A. Ms. Hendrix requested it.
18  Q. Ms. Hendrix requested this
19  meeting?
20  A. Yes, sir.
21  Q. Who did she request it with?
22  A. Both Malcolm and myself.
23  Q. Okay. And how did she go about

Page 67

1  requesting this meeting?
2  A. As I was told, she came up to see
3  me and I was not there. And instead, she
4  talked to Malcolm Montgomery.
5  Q. What did she talk to Malcolm
6  about?
7  A. Possibly a student possibly
8  masturbating in the horticulture area.
9  Q. Now, if you are not there, who is
10  she to report that to?
11  A. Generally Malcolm. She has an
12  option to also talk with Dr. Merk.
13  Q. Now, you weren't there. I'm
14  asking you about this meeting. So the
15  meeting we start off here that says J.W. Who is
16  Defendant's Exhibit 19, it says J.W. Who is
17  J.W.?
18  A. You're talking about Exhibit 5?
19  Q. Yes, sir.
20  A. I guess that would be me.
21  Q. Okay. Who recorded this meeting?
22  A. I think Dr. Merk may have.
23  Q. Okay. Dr. Merk recorded it?

Page 68

1  A. Yes, sir.
2  Q. Was there any announcement made
3  that this meeting was going to be recorded?
4  A. I don't know, sir.
5  Q. Is it the usual modus operandi at
6  J.F. Ingram to record meetings?
7  A. In some cases.
8  Q. Okay. Was a tape recorder in the
9  middle of the table?
10  A. I don't recall there being one.
11  Q. Was there -- Was Ms. -- To your
12  knowledge, was Ms. Hendrix informed that
13  this meeting was being recorded?
14  A. I don't know, sir.
15  Q. Did you know it was being
16  recorded?
17  A. Yes, sir.
18  Q. Did Ms. Hendrix -- Did you tell
19  Ms. Hendrix it was being recorded?
20  A. No, sir.
21  Q. Did Mr. Montgomery know it was
22  being recorded?
23  A. I don't know, sir.

17 (Pages 65 to 68)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

<table>
<tr><td>

Page 69

1    Q.  Do you know why this meeting was
2  recorded?
3    A.  I would assume to get
4  information.  To record the information.
5    Q.  To record the information.  Did
6  you designate anybody to keep notes in this
7  meeting?
8    A.  Yes, sir.
9    Q.  And who was that?
10    A.  I believe it was Ms. Owensby.  I'm
11  not certain.
12    Q.  Can you read this over here and
13  tell me where you designated Ms. Owensby to
14  keep notes in this meeting?
15    A.  I designated her when I went over
16  and got her to come and sit in the meeting.
17    Q.  Okay.  So you didn't designate her
18  in the meeting?
19    A.  Sir?
20    Q.  You didn't designate her in the
21  meeting?
22    A.  I asked her if she would bring her
23  pad and sit in on that meeting.

</td><td>

Page 71

1    A.  Yes, sir.
2    Q.  Who is J.T.M?
3    A.  Merk.
4    Q.  That's Dr. Merk?
5    A.  Yes, sir.
6    Q.  Who asked Dr. Merk to be part of
7  this meeting?
8    A.  Ms. Hendrix and I.
9    Q.  Ms. Hendrix requested Dr. Merk?
10    A.  Dr. Merk was in the office when
11  she came up.
12    Q.  He was in whose office?
13    A.  My office.
14    Q.  What was he doing in your office
15  when she came up?
16    A.  Talking to me.
17    Q.  Talking to you.  What was he
18  talking to you about?
19    A.  I don't recall.
20    Q.  After Ms. Hendrix came up, did you
21  ask Malcolm Montgomery to come in?
22    A.  Yes, sir.
23    Q.  Was he in the office prior to Ms.

</td></tr>
<tr><td>

Page 70

1    Q.  Did she keep notes of the meeting?
2    A.  I think so.
3    Q.  Do you have those notes?
4    A.  They are probably on file.
5    Q.  Can you furnish them to your
6  attorney so he can furnish them to me?
7    A.  Sure.  Yes.
8    Q.  How did you come to know that Ms.
9  Hendrix wanted this particular meeting?
10    A.  I called her.
11    Q.  You called her?
12    A.  Yes, sir.
13    Q.  Did you ask her to come to your
14  office?
15    A.  No.  I told her that I was back
16  and I knew that she had been up there to see
17  me and she said she would be back up there.
18    Q.  Who is B.H.?  That's Barbara
19  Hendrix, isn't it?
20    A.  Probably.
21    Q.  Who is P.E.?
22    A.  Probably Paul Edwards.
23    Q.  Isn't that an inmate?

</td><td>

Page 72

1  Hendrix getting there?
2    A.  No.
3    Q.  Okay.  Now, did Ms. Hendrix ask
4  for a Ms. Roberts to come in?
5    A.  No.
6    Q.  Did she ask anybody to come in the
7  meeting?
8    A.  No
9    Q.  So she asked for no one to come in
10  the meeting?
11    A.  She asked Dr. Merk if he minded
12  staying.
13    Q.  That's the only one she requested
14  to come to this meeting was --
15    A.  Yes, sir.
16    Q.  -- Dr. Merk?
17    A.  Yes, sir.
18    Q.  She didn't ask anybody else?
19    A.  No.
20    Q.  You didn't refuse to let her have
21  anybody in that meeting?
22    A.  No.  I just did not agree with who
23  she went out of the meeting and got and

</td></tr>
</table>

18  (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 73

1  brought back.
2      **Q.  Who did she go out of the meeting**
3  **and go get?**
4      A.  Ms. Roberts.
5      **Q.  Did you ask Ms. Roberts to leave?**
6      A.  Yes.
7      **Q.  Where is that in this transcript**
8  **of the meeting?**
9      A.  I don't know.
10     **Q.  Did you then go get Ms. Owensby?**
11     A.  No.
12     **Q.  Was Ms. Owensby already in the**
13  **meeting?**
14     A.  No. I left out and asked Ms.
15  Roberts to go back and finish a task and I
16  asked her to tell Ms. Owensby to come to my
17  office. And when she did, I asked Ms.
18  Owensby to go back and get a pad and keep up
19  with the notes.
20     **Q.  Why did you not want Ms. Roberts**
21  **in the meeting?**
22     A.  Because Ms. Roberts is not
23  accustomed to those types of hearings. She

Page 74

1  does not deal with inmates at all. And Ms.
2  Owensby is a part of that committee.
3      **Q.  Okay. I want you to look at**
4  **Plaintiff's Exhibit 1. Now, on Plaintiff's**
5  **Exhibit 1, was this meeting a non-emergency**
6  **procedure or an emergency procedure?**
7      A.  Non.
8      **Q.  Neither one of them?**
9      A.  Non-emergency.
10     **Q.  Non-emergency. So what is an**
11  **emergency procedure?**
12     A.  When there's a fight or there is
13  danger to an employee or there's an
14  attempted escape.
15     **Q.  What's when a student's behavior**
16  **creates criminal activity? What is that?**
17     A.  It could probably be an emergency.
18     **Q.  All right. Now, give me an**
19  **example of that.**
20     A.  Of what?
21     **Q.  Criminal activity.**
22     A.  Fighting.
23     **Q.  Okay. That's the only one you can**

Page 75

1      think about?
2      A.  No. But that's -- beating on
3  another student.
4      **Q.  Now, would indecent exposure be**
5  **considered criminal activity?**
6      A.  From a perspective of the Court,
7  probably.
8      **Q.  What about with y'all?**
9      A.  I don't know if it would be called
10  criminal activity.
11     **Q.  But would you characterize if what**
12  **Ms. Hendrix was reporting was indecent**
13  **exposure?**
14     A.  She didn't report it as indecent
15  exposure.
16     **Q.  What did she report it as?**
17     A.  She reported it as seeing a
18  student that she thought was masturbating.
19     **Q.  Now, did she use those words?**
20     A.  That's what she used when she came
21  in the office.
22     **Q.  When she came in the office and**
23  **reported it to you this time, tell me**

Page 76

1      **exactly what Ms. Hendrix told you.**
2      A.  I don't recall exactly what she
3  said to me. But I can tell you
4  approximately what she said to me.
5      **Q.  Okay. Now, the meeting you had**
6  **with Ms. Hendrix was recorded by Dr. Merk;**
7  **correct?**
8      A.  Sir, this portion of what you have
9  seems as if it was recorded. But now, I
10  cannot tell you that that was the beginning
11  or the middle or the end of that meeting.
12     **Q.  So you don't know if this portion**
13  **here is all of it or just part of it?**
14     A.  Right.
15     **Q.  But will you agree with me --**
16  **please read that -- that no place in this**
17  **transcript does it show Barbara Hendrix**
18  **using the word masturbation? Read over it.**
19  **I just want to be sure. I might have missed**
20  **something.**
21         MR. CHRISTMAN:  Well, I think the
22  document says what it says. I'm not sure
23  his agreement regarding what's in the

19 (Pages 73 to 76)

# FREEDOM COURT REPORTING

Page 77

1  document is material.
2      MR. DEBARDELABEN: Well, I'm
3  asking him because he was there.
4      A.  What's your question?
5      Q.  Is there any place in this
6  transcription of this meeting that occurred
7  that shows Ms. Hendrix using the word
8  masturbation?
9      A.  Not on that piece of paper.
10     Q.  All right.  Do you know who
11  transcribed this paper?
12     A.  No, sir.
13     Q.  Have you seen this transcript
14  before?
15     A.  Yes, sir.
16     Q.  Where did you see it?
17     A.  Dr. Merk showed it to me.
18     Q.  When did Dr. Merk show you this?
19     A.  Oh, between about three or four
20  months ago, if not shorter.
21     Q.  Was it while he was doing an
22  investigation into this incident?
23     A.  I think it was while the attorney

Page 78

1  asked for the information.
2      MR. CHRISTMAN: No.  We're not
3  going to talk about -- There's an
4  attorney/client privilege regarding anything
5  that y'all talked with me about.  To the
6  extent his question is asking you about
7  attorney/client information --
8      Q.  I don't want you to tell me what
9  your attorney told you or what you told the
10  attorney.  All I want to know is what was
11  said to Dr. Merk.  So this transcript wasn't
12  revealed to you until three or four months
13  ago?
14     A.  Right.
15     Q.  What happened to the student Ms.
16  Hendrix reported engaging in what she
17  believed to be improper conduct?
18     A.  I had a counseling session with
19  him.  And the end result was he withdrew
20  from school.
21     Q.  Did he withdraw or did you have
22  him withdrawn?
23     A.  It was a mutual agreement.

Page 79

1      Q.  Okay.  Did he enroll back into
2  school?
3      A.  I don't know.  I'd have to check
4  the records.
5      Q.  Are you familiar with a student by
6  the name of Raheen Fikes?
7      A.  Yes, sir.
8      Q.  Did I pronounce that correctly?
9      A.  Close.
10     Q.  And Ms. Hendrix has had some
11  problem with Mr. Fikes, hasn't she?
12     A.  Yes, sir.
13     Q.  And she reported in -- written up
14  and reported it to you and Mr. Montgomery on
15  a number of occasions of her problems with
16  Mr. Fikes, hasn't she?
17     A.  Yes, sir.
18     Q.  I want to ask you if you have ever
19  seen -- we'll do this as a composite Exhibit
20  No. 6.
21     (Whereupon, Plaintiff's Exhibit
22  No. 6 was marked for identification and
23  attached to the original transcript.)

Page 80

1      Q.  Are you familiar with those -- I
2  guess that would be half a page of
3  write-ups, the front page of them?
4      MR. CHRISTMAN: Go ahead and
5  review them before you answer.
6      A.  Now, what was your question, sir?
7      Q.  Are you familiar with those
8  write-ups?
9      A.  Yes, sir.
10     Q.  I call them write-up.  Is that the
11  proper term?
12     A.  That's what is commonly used.
13  They call them write-ups.
14     Q.  And how many write-ups there do we
15  have on Mr. Fikes?
16     A.  You have four separate ones and
17  one duplicate.
18     Q.  Okay.  Now, Mr. Fikes, apparently
19  from reading those memoranda, he just didn't
20  get along in Ms. Hendrix's class?
21     A.  He got along well with her.
22     Q.  He got along well with her?
23     A.  Yes, sir.

20  (Pages 77 to 80)

# FREEDOM COURT REPORTING

Page 81

1    Q.  And what's the problem with those
2  write-ups?
3    A.  I don't see no problem with them.
4    Q.  You don't see a problem?
5    A.  No, sir.
6    Q.  So what we have -- But Ms.
7  Hendrix, she was upset with you for not
8  doing something with Mr. Raheem Fikes,
9  wasn't she?
10    A.  No, sir.
11    Q.  Didn't she write a memorandum to
12  Dr. Huffstutler?
13    A.  Yes, sir.
14    Q.  And did you see that memorandum?
15    A.  Yes, sir.
16    Q.  Did you discuss that with Dr.
17  Huffstutler?
18    A.  He had a meeting with both Ms.
19  Hendrix and myself.  There was a Donna
20  Wisman taking notes.
21    Q.  And what was the --
22    A.  It may have been Donna Wisman at
23  that particular time.

Page 82

1    Q.  What was the outcome of that
2  meeting?
3    A.  She told Dr. Huffstutler that she
4  understood the role that I played in dealing
5  with students and the counseling.
6    Q.  And she didn't have any further
7  problem with that?  What happened to Mr.
8  Fikes?
9    A.  He graduated.
10    Q.  Graduated?
11    A.  Yes, sir.
12    (Whereupon, Plaintiff's Exhibit
13  No. 7 was marked for identification and
14  attached to the original transcript.)
15    Q.  I want to show you what's marked
16  as Plaintiff's Exhibit No. 7.
17    MR. DEBARDELABEN:  You'll have to
18  look at that one.  I got kind of out of
19  whack here.
20    A.  And again, sir, these are
21  incomplete documents.
22    Q.  Yes, sir.  I just got them from a
23  previous deposition.  If they are incomplete

Page 83

1  --
2    A.  And action was taken on each one
3  of those.
4    Q.  Yes, sir.  I don't have the
5  complete document because it wasn't in the
6  other deposition.
7    MR. CHRISTMAN:  Well, for the
8  purposes of the record, I'm not sure any of
9  these were in the deposition.  Well, in any
10  depositions we've taken.  These were not a
11  part of any of my exhibits to a prior
12  deposition.
13    Q.  Are you familiar with this
14  document dated July 3rd, 2003?  Are you
15  familiar with that document dated July 3rd
16  of 2003?
17    A.  I don't remember seeing that, no,
18  sir.
19    Q.  Okay.  Have you ever used
20  profanity concerning Ms. Hendrix?
21    A.  No, sir.
22    Q.  If Mr. Griswold and Raheem Fikes
23  and Ms. Daily said you used profanity, would

Page 84

1  they not be telling the truth?
2    A.  I would be suggesting that they
3  would not be telling the truth.
4    Q.  Do you recall a meeting in the
5  Resource Center between Mr. Griswold, Raheem
6  and Ms. Daily and yourself around that time?
7    A.  We had a meeting with this young
8  man sometime back.  And if I'm not mistaken,
9  they were a part of it.
10    Q.  So was anybody taking notes in
11  that meeting?
12    A.  Sir, I'm certain there was.  This
13  student is a special ed student.  He comes
14  under different rules and regulations that
15  governs his behavior problems
16    Q.  Now, would that meeting be
17  recorded by a tape recorder or hand --
18    A.  I have no idea.  Special education
19  people are responsible for that.
20    Q.  And who is the special education
21  person in this incident, Ms. Daily?
22    A.  Ms. Daily.
23    Q.  So Ms. Daily is the one that would

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 85 |
|---|
| 1 have knowledge as to that? |
| 2     A. Yes, sir. And if there are notes, |
| 3 it would be on file dated this date. |
| 4     **Q. And Ms. Daily would keep that?** |
| 5     A. If we took the notes, it would be |
| 6 in the student services files. |
| 7     **Q. But Ms. Daily is special** |
| 8 **education?** |
| 9     A. Yes, sir. |
| 10     **Q. She's not under you?** |
| 11     A. No, sir. |
| 12     **Q. And Mr. Griswold, is he under you?** |
| 13     A. No, sir. |
| 14     **Q. And Raheem, he wouldn't take notes** |
| 15 **because he's an inmate; correct?** |
| 16     A. Correct. |
| 17     MR. CHRISTMAN: When you said |
| 18 Griswold, you're talking about J.L. |
| 19 Griswold? You're not talking about Bill |
| 20 Griswold right now; right? |
| 21     MR. DEBARDELABEN: No, no. It |
| 22 appears to be -- I don't know. It just says |
| 23 Mr. Griswold. |

| Page 86 |
|---|
| 1     MR. CHRISTMAN: There is a |
| 2 Griswold that works under him. |
| 3     **Q. Which Mr. Griswold was in the** |
| 4 **meeting? Was it J.L. or Bill?** |
| 5     A. It was J.L. |
| 6     **Q. And J.L. is the person that** |
| 7 **assisted at that time Ms. Hendrix?** |
| 8     A. He was the person that was hired |
| 9 there to look at that -- after that shop |
| 10 before Ms. Hendrix got there. |
| 11     **Q. Okay. Is he the retired captain?** |
| 12     A. Yes, sir. |
| 13     **Q. So Mr. J.L. Griswold was employed** |
| 14 **before Ms. Hendrix got there?** |
| 15     A. Yes, sir. |
| 16     **Q. When did he leave J.F. Ingram?** |
| 17     A. I'm not certain. |
| 18     **Q. Okay. On all these special** |
| 19 **services meetings you have -- and I say** |
| 20 **all. I've just heard the term -- is it a** |
| 21 **requirement of J.F. Ingram to keep notes of** |
| 22 **the minutes or is that some type of Federal** |
| 23 **requirement?** |

| Page 87 |
|---|
| 1     A. You're saying special services |
| 2 meeting? |
| 3     **Q. Yes, sir. For I understand Mr.** |
| 4 **Raheem Fikes was under special services.** |
| 5     A. I'm not certain of their rules and |
| 6 regulations. |
| 7     **Q. But if they are, it would be under** |
| 8 **Ms. Daily's chain of command, not yours?** |
| 9     MR. CHRISTMAN: You're talking |
| 10 about special education. |
| 11     MR. DEBARDELABEN: Yes. |
| 12     A. Special education comes under Ms. |
| 13 Rosy Edwards. |
| 14     **Q. And Ms. Daily worked under her,** |
| 15 **not you?** |
| 16     A. At that particular time, it was |
| 17 Ms. Kate Perryman. |
| 18     **Q. So it would be under Ms. Perryman;** |
| 19 **correct?** |
| 20     A. Well, she's retired. |
| 21     **Q. She's retired. And when did Ms.** |
| 22 **Perryman retire?** |
| 23     A. I'm not certain. Within the last |

| Page 88 |
|---|
| 1 two years. |
| 2     **Q. Okay.** |
| 3     MR. DEBARDELABEN: It's about |
| 4 twelve o'clock. Do you want to take a break |
| 5 for lunch? |
| 6     MR. CHRISTMAN: Yes, sir. |
| 7     (Whereupon, a lunch recess was |
| 8 taken.) |
| 9     **Q. Mr. Wilson, I remind you, that** |
| 10 **even though we took a break, you're still** |
| 11 **under oath. I always make a habit of doing** |
| 12 **that.** |
| 13     **Do you recall back in October of** |
| 14 **2006 that Ms. Hendrix asked you for a copy** |
| 15 **of the book, Books and Bars?** |
| 16     A. Books and bars? |
| 17     **Q. Yes, sir.** |
| 18     A. No, I don't. |
| 19     **Q. You told her she could check it** |
| 20 **out for two weeks. You don't remember that?** |
| 21     A. She asked me about some books that |
| 22 we have had. Particularly the Books and |
| 23 Bars, I don't know about. But I told her |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 89

1 that she could check with Malcolm or Mr.
2 Trawick.
3    Q.  So if she thought -- If she said
4 you told her she would have to check out
5 Books and Bars for two weeks, you don't
6 dispute that?
7    A.  I would dispute the timetable,
8 yes, sir.
9    Q.  All right.  Did you ever give a
10 copy of that book to any other instructor?
11    A.  I don't know.  I don't recall
12 giving any books to anyone.
13    Q.  Okay.  And during the week of
14 October 9th, 2006, did you ever tell Student
15 A to warn the horticulture students that
16 someone in the automotive shop was out to
17 get the brothers in horticulture and to
18 watch out?
19    A.  No.
20    Q.  You didn't do that?
21    A.  No.
22    Q.  Do you know a student by the name
23 of Michael Evans?

Page 90

1    A.  That doesn't ring a bell, no.
2    Q.  You don't recall any confrontation
3 or situation with Ms. Hendrix over a student
4 named Michael Evans?
5    A.  The name doesn't ring a bell, no.
6    Q.  Okay.
7    A.  No, sir.
8    Q.  Let me show you these write-ups on
9 Mr. Evans and ask you if that helps you.
10 We'll mark these as Exhibit 8.
11       And it apparently is just the
12 front page.  But see if this refreshes your
13 recollection concerning a student named Mr.
14 Michael Evans.
15       (Whereupon, Plaintiff's Exhibit
16 No. 8 was marked for identification and
17 attached to the original transcript.)
18    A.  No, sir.
19    Q.  Okay.  Now, let me ask you -- Will
20 you please look at that.  Look at the second
21 one that has to do with Mr. Evans.  It says
22 student was not in assigned area, bus
23 loading area, when he was supposed to be

Page 91

1 there.  Instead he was found sleeping in
2 break area.
3       When you get these complaint
4 forms, they are in the form as we see the
5 front page of this one.  And the counselor's
6 signature is not there and the
7 recommendation or action taken is not on
8 there and it's not dated, is it?
9       MR. CHRISTMAN:  You mean at the
10 bottom?
11       MR. DEBARDELABEN:  Right.
12    Q.  When you get this, when it comes
13 to your office, you are -- I guess it's
14 either you or Mr. Montgomery receives it;
15 correct?
16    A.  Or someone else.
17    Q.  In your office.  It's not filled
18 out here where it says comments.  It's just
19 filled -- I'm looking at the second page
20 because it's filled in to where it says
21 counselor's signature down here.
22    A.  Right.
23    Q.  When you get them, they are like

Page 92

1 that, aren't they?
2    A.  Generally, yes, sir.
3    Q.  And whatever you do, you fill out
4 that bottom page and then whatever is
5 supposed to be on the back, you fill that
6 out, also?
7    A.  Right.
8    Q.  All right.
9    A.  If I get them.
10    Q.  Right.  Now, how do we know if you
11 get them?
12    A.  It would have my signature on it.
13    Q.  Right.  And when --
14    A.  Or someone's.
15    Q.  Someone's signature.  And when you
16 finish these, do you ever -- what you do, it
17 might be suspend him, it might be to counsel
18 him or it might be to bring him in and tell
19 him to do something else.  You fill out that
20 little area down there that's blank, don't
21 you?
22    A.  Something is initiated at some
23 time.  Sometimes we write it on a piece of

23  (Pages 89 to 92)

# FREEDOM COURT REPORTING

Page 93

1  paper and it is stapled to that.
2      **Q. Okay. Does that then go back to**
3  **the instructor or is it kept at your office?**
4      A.  It's kept in my office.
5      **Q. Is there any communication going**
6  **back to the instructor on any type of**
7  **official form that tells the instructor the**
8  **outcome of the counseling slip?**
9      A.  Not on an official form.  They
10  have a right to review what's on that,
11  recommendation of the files.
12     **Q. Okay. Does -- If the instructor**
13  **-- that's a bad question. To do that, the**
14  **instructor has to initiate to see what's on**
15  **the recommendation?**
16     A.  You mean to see it?
17     **Q. Yes, sir.**
18     A.  Generally they will ask.  But most
19  of the time, I inform them by telephone.
20     **Q. Okay. Now, where are these**
21  **documents kept? When I say these documents,**
22  **the complaint form.**
23     A.  They are kept in the front office

Page 94

1  of student services.
2      **Q. So that's in the main**
3  **administration building?**
4      A.  It's in that main building, yes,
5  sir.
6      **Q. Yes, sir. So where is Ms.**
7  **Hendrix's office?**
8      A.  In her area.
9      **Q. In horticulture?**
10     A.  Horticulture.
11     **Q. On the back part of the campus?**
12     A.  Yes, sir.
13     **Q. Okay. How often -- that's a bad**
14  **question. Does Ms. Hendrix have to come**
15  **into the main building everyday for**
16  **anything?**
17     A.  I see her there at least twenty
18  times a day.
19     **Q. Okay. So she does come back and**
20  **forth?**
21     A.  Yes, sir.
22     **Q. How many other employees at J.F.I.**
23  **work in the horticulture area with Ms.**

Page 95

1  **Hendrix?**
2      A.  Only she.
3      **Q. Only she. If she has an**
4  **assistant, is that an inmate assistant?**
5      A.  Generally, instructors have inmate
6  aids.
7      **Q. So any aid she had would be an**
8  **inmate aid?**
9      A.  Yes, sir.
10     **Q. And approximately how many**
11  **students are in horticulture?**
12     A.  I don't know exact.  But
13  approximately fifteen to seventeen.
14     **Q. All right. Now, help me here, if**
15  **you will. Let me write this down. Is Ms.**
16  **Hendrix in charge of horticulture?**
17     A.  She's over the program.  She's the
18  instructor for horticulture.
19     **Q. But she's over the horticulture**
20  **program?**
21     A.  She's the instructor for
22  horticulture.
23     **Q. Who is her supervisor?**

Page 96

1      A.  Dr. Merk.
2      **Q. Okay. Who is over the welding**
3  **program?**
4      A.  Dr. Merk is over all the
5  instructional programs.
6      **Q. Okay. Who is the instructor for**
7  **the welding program?**
8      A.  Which campus?
9      **Q. Both campuses.**
10     A.  Mr. Arnett is on the main campus.
11  Mr. Wall is on the Draper, Staton campus and
12  Mr. Wade is on Tutwiler.
13     **Q. What about the automotive shop,**
14  **you have mechanics and what else in**
15  **automotive?**
16     A.  Upholstery and auto body repair.
17     **Q. Where is the upholstery shop?**
18     A.  On the main campus.
19     MR. CHRISTMAN:  Auto upholstery
20  shop is what you're asking.
21     MR. DEBARDELABEN:  Yes.  I'm
22  talking about auto upholstery.
23     **Q. And who's over that?**

24  (Pages 93 to 96)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 97

1    A.  Mr. Prossor.
2    **Q.  Mr. Prossor.  Auto repair?**
3    A.  Mr. Chisom and --
4    **Q.  And when I say that, that's**
5    **mechanics like engine transmission.**
6    A.  Mr. Benton.
7    **Q.  Mr. Bentley?**
8    A.  Benton.
9    **Q.  What is the other one you have**
10   **that goes with paint shop?**
11   A.  Auto body repair.
12   **Q.  And who's over there?**
13   A.  Mr. Chisom, Mr. Bail.
14   **Q.  You have a furniture repair**
15   **upholstery shop, don't you?**
16   A.  Furniture upholstery, yes, sir.
17   **Q.  Okay.  Who's over there?**
18   A.  Ms. Caylor.
19   **Q.  Ms. Caylor?**
20   A.  Yes, sir.
21   **Q.  What other do you have with**
22   **furniture?  Is that it?**
23   A.  Cabinet making.

Page 98

1    **Q.  Okay.  Who's cabinet making?**
2    A.  It's without an instructor.  We
3    have a substitute.
4    **Q.  When it was -- How long has it**
5    **been vacant?**
6    A.  Approximately six months.
7    **Q.  Who was over it then?**
8    A.  Mr. Haines.
9    **Q.  Mr. Haines?**
10   A.  Yes, sir.
11   **Q.  Who's the substitute?**
12   A.  Chris Thomas.
13   **Q.  What happened to Mr. Haines?**
14   A.  He's no longer at Ingram.
15   **Q.  What else do you have?**
16   A.  Furniture refinishing.
17   **Q.  Who's over furniture refinishing?**
18   A.  Mr. Keahey.
19   **Q.  Anymore shops?**
20   A.  Barbering.  The barber shop.
21   **Q.  Is that Mr. Luster?**
22   A.  He's over there now.  But the
23   position is Ms. Trimble's.

Page 99

1    **Q.  Ms. Trimble.  What's Mr. Luster?**
2    A.  Mr. Luster is barber instructor
3    for the Draper, Staton campus.
4    **Q.  Where is Ms. Trimble?**
5    A.  She's helping at Tutwiler with
6    cosmetology.
7    **Q.  So at Tutwiler it's Ms. Trimble**
8    **and --**
9    A.  At the present time, Ms. Trimble
10   is over at Tutwiler filling in for vacancy
11   for cosmetology.  Her position is the main
12   campus barber.
13   **Q.  So you've got a cosmetology shop,**
14   **too?**
15   A.  Yes, sir.
16   **Q.  And that's Ms. Trimble?**
17   A.  She's presently holding that
18   position now.
19   **Q.  You got any more shops?**
20   A.  Yes, sir.  Plenty.
21   **Q.  What are they?**
22   A.  At the Draper, Staton campus, we
23   have electrical, we have barbering, we have

Page 100

1    drafting.  We have carpentry, masonry,
2    plumbing, diesel, auto body repair, welding,
3    food service.
4    **Q.  Who's in charge of them?**
5    A.  Of food service?
6    **Q.  Electrical.**
7    A.  Mr. Carlyle.
8    **Q.  Drafting?**
9    A.  Mr. Harris.
10   **Q.  Diesel?**
11   A.  Mr. Spurling.
12   **Q.  What else did you say was over**
13   **there?**
14   A.  Masonry, carpentry.
15   **Q.  Whose in charge of masonry?**
16   A.  Masonry is Mr. Millidge.
17   Carpentry is Gol Smith.  Food services,
18   Blake.
19   **Q.  Who?**
20   A.  Blake.
21   **Q.  Blake who?  Who is Mr. -- Is it**
22   **Mr. Blake?**
23   A.  Mr. Blake.

25  (Pages 97 to 100)

# FREEDOM COURT REPORTING

Page 101

1    Q.  Any more shops?
2    A.  We have welding.  That's Mr.
3  Walls.  Plumbing.
4    Q.  You already gave me Mr. Walls.
5    A.  Mr. Till.
6    Q.  Plumbing is Mr. Till.  Okay.  Any
7  more?
8    A.  Tutwiler.
9    Q.  Who is at Tutwiler?
10    A.  You have Mr. Wade.
11    Q.  Mr. Wade.  You've already gave me
12  Mr. Wade.
13    A.  Mr. Thomas is over office
14  information system.  And we have Ms. Roberts
15  over commercial sewing.
16    Q.  Ms. Roberts?
17    A.  Ms. Roberts, right.
18    Q.  Okay.
19    A.  Mr. Blake is over food service on
20  the campus, also.  And we have auto
21  mechanics.  And I can't remember that guy's
22  name.  He's new.  And we have floor design,
23  which is interior design.  And I don't

Page 102

1  remember her name either.  She's new.  And I
2  believe that's about it on the shops.
3    Q.  Okay.  About six female
4  instructors?
5    A.  Probably.
6    Q.  But on -- How many do you have at
7  the main campus?
8    A.  Cosmetology.  I don't think I
9  mentioned that.
10    Q.  You did.  At the main campus,
11  presently you have two female instructors.
12  But Ms. Trimble is there, but she's over at
13  Tutwiler now?
14    A.  So that makes three.
15    Q.  Three.  But how often does Ms.
16  Trimble come to the main campus now?
17    A.  She was there until the beginning
18  of the summer semester.
19    Q.  At the present time her office is
20  --
21    A.  At Tutwiler.
22    Q.  -- over in Wetumpka?
23    A.  Right.

Page 103

1    Q.  Okay.
2       (Whereupon, Plaintiff's Exhibit
3  No. 9 was marked for identification and
4  attached to the original transcript.)
5    Q.  Let me show you what I have marked
6  as Plaintiff's Exhibit 9.  Do you recognize
7  that memo?
8    A.  Yes, sir.
9    Q.  Now, what action did Ms. Hendrix
10  fail to take?
11    A.  She didn't tell me until some days
12  after, I believe, if I'm not mistaken.
13    Q.  Well, you wrote this memorandum on
14  September the 16th, didn't you?
15    A.  Yes, sir.
16    Q.  And you referred to something on
17  September the 15th.  I believe it was drug
18  use, wasn't it?
19    A.  I'm not certain what she had going
20  on then.
21    Q.  I was looking down here.  And it
22  said, and according to -- look at
23  Plaintiff's Exhibit 1.

Page 104

1     MR. CHRISTMAN:  Exhibit 1?
2     MR. DEBARDELABEN:  Yes, sir.
3    Q.  Would you agree with me, according
4  to Plaintiff's Exhibit 1, that if it was
5  drug use, that's criminal activity?  Would
6  drug use be criminal activity?  Maybe I
7  should ask it that way.
8    A.  In my opinion, it would be.
9    Q.  Okay.  And that would have been an
10  emergency procedure, wouldn't it?
11    A.  To some people.
12    Q.  When student behavior constitutes
13  criminal activity.  Under y'all's rules for
14  number one, that's an emergency procedure,
15  isn't it?
16    A.  Uh-huh.
17    Q.  And --
18    A.  A non-emergency really.  It could
19  be.
20    Q.  Well --
21    A.  She said in the memorandum she was
22  suspicious.
23    Q.  Right.  And appropriate Department

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 105

1  of Corrections personnel will be immediately
2  notified at any time the following
3  conditions exist.  When a student's behavior
4  constitutes a criminal activity.
5      If she was under the impression it
6  was a criminal activity, she should have
7  reported it not to you, but to DOC,
8  shouldn't she, according to y'all's rules?
9      A.  And to me.
10     Q.  Well, sir, but that's not what
11 that says over there, is it?
12     A.  What page are you on?
13     Q.  I'm on page two of Exhibit 1 under
14 emergency procedure.
15     A.  It doesn't say it there.
16     Q.  Yes, sir.
17     A.  But in order for us to take any
18 action, it would have to be reported to us,
19 too.
20     Q.  I'm going to show you what I have
21 marked as Plaintiff's Exhibit 10.
22     (Whereupon, Plaintiff's Exhibit
23 No. 10 was marked for identification and

Page 106

1  attached to the original transcript.)
2      Q.  Have you seen that memorandum?
3      A.  No, sir.
4      Q.  And Dr. Merk is Ms. Hendrix's
5  direct supervisor, isn't he?
6      A.  Yes, sir.
7      Q.  So if she has a problem with
8  something going on in her area, she should
9  really go bring it up with him, shouldn't
10 she?
11     A.  Not in all cases.
12     Q.  So what cases should she not bring
13 it up with Dr. Merk?
14     A.  When it involves students and
15 according to the policies that are out there
16 that direct instructors and other personnel
17 what policies to act upon when it involves
18 students.
19     Q.  Yes, sir.  And an emergency
20 procedure is a criminal activity.  It says
21 go to DOC, doesn't it?
22     A.  Yes.
23     Q.  And apparently she got the report

Page 107

1  to the Department of Corrections if her
2  September 16th, 2005 memo is to be believed?
3      A.  After she had summoned Mr. Benton
4  and Mr. -- someone else she mentioned in
5  here -- and she went back down to Mr. Haines
6  -- that she went down to the greenhouse
7  while her inactions to come to me directly
8  was violating policy.
9      She should have either gone to DOC
10 and to me, not other personnel as it clearly
11 states in the memorandum.
12     Q.  Now, it was -- I thought you told
13 me earlier that when you have a problem, an
14 instructor has what might be a problem with
15 a student, before they write it up or do
16 anything, they need to see if they can work
17 it out themselves?
18     A.  That's the first part.
19     Q.  Yes, sir.  And she's put in a
20 situation of having it reported to her that
21 there are two students in the greenhouse
22 apparently with drugs of some type; is that
23 correct?

Page 108

1      A.  That's what she said in the memo.
2      Q.  Right.  Now, should she walk in
3  that greenhouse by herself if you have two
4  fellows doing drugs?
5      A.  No.
6      Q.  Should she try to get somebody
7  down there ASAP to assist her no matter who
8  it is so she wouldn't be by herself?
9      A.  She should have followed the
10 procedure and called DOC.  And after she
11 called DOC, she should have called me or Dr.
12 Merk.
13     Q.  Well, sir, that's what I'm having
14 a problem with.  To make sure it's a
15 problem, you told me this morning you go in
16 and you check it out before they write
17 anything up or do something.
18     A.  No, I didn't tell you that.
19     Q.  Oh, okay.  So the first part of
20 this about you telling me a student -- a
21 teacher is supposed to try to handle it
22 themselves before they -- step number one,
23 that's only on non-emergency procedures.

27 (Pages 105 to 108)

# FREEDOM COURT REPORTING

Page 109

1    But in this one where she believed
2  it was reported to her it might be drugs
3  going on, she's just supposed to report it
4  without seeing if that's worthy to be
5  believed?
6    A. To DOC.
7    Q. Now, she got the report to DOC,
8  didn't she?
9    A. Sir?
10    Q. She got it to DOC?
11    A. It says here that she told Mr.
12  Caldwell. And he's an officer of the DOC.
13    Q. And Officer Mershire came down to
14  horticulture?
15    A. Mershire.
16    Q. Right. And the first thing the
17  next morning, she spoke to Dr. Merk about
18  it, didn't she?
19    A. I have no idea.
20    Q. That's what she said. This
21  morning, as you know, I spoke with you
22  regarding the incident first thing. How did
23  you find out about the incident?

Page 110

1    A. From the DOC officers.
2    Q. Okay. When did you find out about
3  the incident?
4    A. Right after -- Sometime after they
5  had gone down.
6    Q. So there is some type of unwritten
7  rule in the emergency procedures that she's
8  supposed to report it to you?
9    MR. CHRISTMAN: Object to the
10  form.
11    Q. I'm just looking in the emergency
12  procedures. Where does it say she is
13  supposed to report it to you?
14    A. It says the center director will
15  investigate any such occurrence and make a
16  report to the Dean of Student and Support
17  Services.
18    The dean, or designee, will
19  determine the status of the student and will
20  make appropriate contact with DOC as to the
21  student's future status at J.F. Ingram State
22  Technical College.
23    Q. Yes, sir. And where does it say

Page 111

1  the instructor is supposed to report this to
2  you?
3    A. The center director will
4  investigate any --
5    Q. Who is the center director?
6    A. Dr. Merk.
7    Q. And she reported it to Dr. Merk
8  the morning of the 16th?
9    A. Apparently so.
10    Q. And it -- But she immediately
11  reported it to DOC?
12    A. That's not what she said in her
13  correspondence. Her correspondence say that
14  she got Mr. Haines and Mr. Benton and they
15  went back down there.
16    Q. Right. And to see -- to check out
17  something that had been reported to her?
18    A. They are neither dean nor DOC.
19    Q. Right. But they were trustworthy
20  people close to -- close by her?
21    A. I don't know if they are
22  trustworthy or not.
23    Q. So you don't think Mr. Haines and

Page 112

1  Mr. Benton are trustworthy?
2    A. Sir, the policies and procedures
3  were not followed as far as I was concerned.
4    Q. Okay. And policies and procedures
5  are supposed to be followed, aren't they?
6    A. As close as possible.
7    Q. And anybody who don't follow
8  policies and procedures should be up for
9  reprimand?
10    A. I'm sorry?
11    Q. If you don't follow policies and
12  procedure, you should be up for reprimand?
13    MR. CHRISTMAN: Form.
14    A. That's not my decision.
15    Q. Now, are you aware that Mr. J.L.
16  Griswold has made the statement that every
17  time Ms. Hendrix would take an inmate to Mr.
18  Wilson with a problem, it seemed that Ms.
19  Hendrix would be put on the spot for
20  bringing the inmate in for corrective
21  action?
22    A. No, sir.
23    Q. What reason would he have to make

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 113

1 such a statement if it wasn't true, if you
2 know?
3     A. I have no idea.
4     Q. Were you aware that Mr. J.L.
5 Griswold, Captain Griswold, felt that Ms.
6 Hendrix was at risk being left in the
7 horticulture area by herself without an aide
8 for back up?
9     A. No, sir.
10    Q. Try to help me with this. You
11 have an area in horticulture where you teach
12 classes about the plants; is that correct?
13    A. Yes, sir.
14    Q. And then you have three separate
15 greenhouses?
16    A. Yes, sir.
17    Q. Are the inmates in the greenhouses
18 doing things when others are in the
19 classroom being taught?
20    A. I don't know how she structured
21 her lab classes and her theory classes.
22    Q. So you don't know?
23    A. Well, I'm down there sometimes.

Page 114

1 And most of the times when I'm there, she
2 has her classrooms filled with students when
3 she's teaching and there are sometimes when
4 I'm there she's out in various places with
5 students.
6     Q. As Dean of the College, are you in
7 charge of security?
8     A. We have a sergeant that is in
9 charge of security.
10    Q. Now, the sergeant, he's the DOC?
11    A. Right.
12    Q. Talking about college security,
13 not --
14    A. Yes, sir. As Dean of Students, I
15 am.
16    Q. As Dean of Students, you're in
17 charge of security?
18    A. Yes, sir.
19    Q. To make sure that the students
20 don't escape or don't do things to get in
21 trouble as best you can?
22    A. The escape part is DOC. I only
23 handle the policy as it relates to the two

Page 115

1 year college systems and those policies that
2 we have in effect at Ingram as it relates to
3 student securities.
4     Q. Now, tell me what policies do you
5 have that you're in charge of security on.
6     A. On what students?
7     Q. All students. When I use the
8 phrase security, what does that mean in your
9 vernacular toward the students?
10    A. Behavior, whether or not they are
11 on the bus from -- when they come in, from
12 the time they're there until the time they
13 leave.
14    Q. Okay. Does it have anything to do
15 with them getting class work done on time?
16    A. Not really.
17    Q. Not being disruptive in class?
18    A. That's classroom management. If
19 it gets to where they cannot handle it, if
20 it's the same reoccurring problem, then
21 bring it to my attention.
22    Q. Does security of the students mean
23 keeping up with the students while they are

Page 116

1 in your -- for each instructor, I mean?
2     A. That's the responsibility of the
3 instructors.
4     Q. Okay. Do you know a person named
5 Leo Miller?
6     A. Yes, sir.
7     Q. How do you know Mr. Miller?
8     A. He's used to work at Ingram.
9     Q. What was his job at Ingram?
10    A. He was an instructural aide.
11    Q. Now, was Mr. Miller at one time a
12 student at Ingram?
13    A. Yes, sir.
14    Q. And how long after he was a
15 student at Ingram was he hired to be an
16 instructor at Ingram?
17    A. I don't know. I really don't
18 know.
19    Q. Okay. Now, do you have anything
20 to do as Dean of the College with live work?
21    A. No, sir.
22    Q. So the live work doesn't come
23 under you at all?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 117

1  A. No, sir.
2  Q. Who does that come under?
3  A. Dr. Merk.
4  Q. Dr. Merk. Does Ingram to your
5  knowledge in any way do live work off the
6  college campus?
7  A. Sometimes.
8  Q. And can they do it for a private
9  individual?
10  A. You would have to ask Ms. Greene.
11  She -- It was under her at one time. But we
12  have a little card that tells exactly how
13  it's done.
14  Q. Mr. Christman and I, we don't
15  qualify to get Ingram to do any work for us,
16  do we?
17  A. It is for past students. It is
18  for Federal and State employees and I think
19  City employees and relatives.
20  Q. So unless you fall into that area,
21  it's --
22  A. You don't qualify.
23  Q. You don't qualify. Okay.

Page 118

1  A. And non-profit organizations.
2  Q. Okay.
3  (Whereupon, Plaintiff's Exhibit
4  No. 11 was marked for identification and
5  attached to the original transcript.)
6  Q. Do you know a Melissa P. Wallace?
7  A. Yes, sir.
8  Q. How do you know Ms. Wallace?
9  A. She used to work at Ingram.
10  Q. Was she employed by Ingram or
11  employed through another organization?
12  A. She was with Ingram.
13  Q. Ingram. Have you ever been in a
14  meeting with President Chambers, Ms. Kaye
15  Perryman, Dr. Merk and Ms. Wallace and
16  yourself?
17  A. I believe so.
18  Q. Were you in that meeting on June
19  25th, 2005?
20  A. I'm not certain of the date.
21  Q. Okay. Did you hear President
22  Chambers tell Ms. Wallace that if she ever
23  talked to Barry Blackwell again, he would

Page 119

1  not be giving her another Christmas present
2  like the one he gave her this time?
3  A. I don't recall that, no, sir.
4  Q. Are you saying it didn't happen or
5  you just don't recall one way or the other?
6  A. I don't recall it happening.
7  Q. Have you ever -- Did you hear --
8  let me ask it this way. Did President
9  Chambers raise his voice in this meeting?
10  A. I don't recall.
11  Q. Has President Chambers ever raised
12  his voice at you?
13  A. Yes, sir.
14  Q. Is that quite often?
15  A. Not quite often. But often.
16  Q. Would it be in the presence of
17  other people?
18  A. Yes, sir.
19  Q. Does he have a management style of
20  raising his voice and yelling?
21  A. In a sense.
22  Q. Do you yell back at him?
23  A. Sometimes. But hardly ever.

Page 120

1  Q. Have you heard him yell at other
2  people?
3  A. Yes, sir.
4  Q. Have you ever heard him yell at
5  Ms. Greene?
6  A. Yes, sir.
7  Q. Does he yell in what you call
8  cabinet meetings?
9  A. Yes, sir.
10  Q. Have you ever heard him tell the
11  young lady that was recording the cabinet
12  meetings to cut off the recorder?
13  A. Occasionally.
14  Q. And when that recorder is cut off,
15  what happens?
16  A. He has discussions.
17  Q. Does he raise his voice?
18  A. Sometimes.
19  Q. Has President Chambers ever yelled
20  at you in front of your employees that you
21  supervise?
22  A. Yes, sir.
23  Q. Do you yell at your employees?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 121

1    A. I raise my voice sometimes.
2    **Q. Let's distinguish this, Mr.**
3    **Wilson. I don't mean raising your voice. I**
4    **mean yelling. Do you know the difference**
5    **between yelling and raising your voice?**
6         MR. CHRISTMAN: Form. I don't.
7    A. Give me an example.
8    **Q. This would be a loud invoice.**
9    **This would be yelling (demonstrating).**
10   A. It doesn't get that loud.
11   **Q. It doesn't get that loud. Have**
12   **you ever asked him not to raise his voice at**
13   **you?**
14   A. No, sir.
15   **Q. I want to show you what has been**
16   **marked as Plaintiff's Exhibit No. 11. Did**
17   **you have a conversation or were in a**
18   **conversation with President Chambers and Ms.**
19   **Sandy Caylor where you made the statement**
20   **that nobody in the business office -- that**
21   **the business office gets special treatment**
22   **at Ms. Caylor's plant?**
23   A. No.

Page 122

1    **Q. Have you ever seen this memorandum**
2    **before?**
3    A. Yes, sir.
4    **Q. Is there any truth to this**
5    **memorandum?**
6    A. A little very tiny bit.
7    **Q. Tell me what in this memorandum**
8    **that is not true.**
9    A. Okay. Dean Wilson said that the
10   business office won't let me go. Dean
11   Wilson also stated that if the business
12   office wanted something done for their
13   family or kids, they would send me.
14        As a matter of fact, I don't --
15   she's saying you stated that you knew it was
16   keeping an eye on it. That sentence just
17   doesn't make sense.
18   **Q. You deny saying anything in this**
19   **memorandum that Ms. Caylor credits to you?**
20   A. I'm not finished reading it. What
21   was your question now?
22   **Q. What in this memorandum attributed**
23   **to you is not true?**

Page 123

1    A. Mostly everything that's
2    attributed to me is not true.
3    **Q. So Ms. Caylor wrote President**
4    **Chambers lies about you?**
5    A. She misquoted what I said.
6    **Q. And how did she misquote it?**
7    A. What I said to her was if Ms.
8    Green had a project in there that needed
9    some of that fabric, I bet you it was
10   already gone.
11   **Q. Why did you say that to her?**
12   A. That's what I felt.
13   **Q. All right. What else did she**
14   **misquote?**
15   A. Anything else in there about Dean
16   Wilson is misquoted.
17   **Q. So when --**
18   A. And may I add that it was done in
19   a joking manner. We was laughing and
20   chatting about the fabric and about the sofa
21   she was doing. And I asked her had she got
22   permission from Dr. Merk to go because two
23   or three days before that, she had stopped

Page 124

1    me and said she was trying to get Dr. Merk
2    to give her permission to go down there.
3         So I assumed the reason she had
4    not gone was because of Dr. Merk, not
5    because of Ms. Green.
6    **Q. Now, she said I just sold Dean**
7    **Wilson a class project sofa covered in some**
8    **of the practice fabric. Was that true or**
9    **false?**
10   A. That's true.
11   **Q. He also had a work order for**
12   **this. Is that true or false?**
13   A. That's true.
14   **Q. Okay. So what you're saying, you**
15   **were -- all -- you were doing all this in a**
16   **joking manner?**
17   A. That was the whole tone of the
18   conversation.
19   **Q. But she felt compelled to write**
20   **Dr. -- excuse me -- President Chambers a**
21   **note on this?**
22        MR. CHRISTMAN: Object to the form
23   as to what she was compelled to do.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 125

1    Q.  For some reason, Ms. Caylor wrote
2    President Chambers a note on this
3    memorandum?
4        A.  According to it being Exhibit 11,
5    yes, sir.
6        Q.  Okay.  At the end of the year --
7    Y'all's year ends September the 30th?
8        A.  Yes, sir.
9        Q.  If you have money in your account,
10   do you try to get -- spend that money?
11       MR. CHRISTMAN:  Form.  What money,
12   what account?
13       Q.  As I understand the colleges, each
14   program has a certain amount of money
15   allocated to it; correct?
16       A.  I think so, yes, sir.
17       Q.  Your program has a certain amount
18   of money allocated to it?
19       A.  Yes, sir.
20       Q.  To spend during the year?
21       A.  Yes, sir.
22       Q.  And at the end of the year, if you
23   have say June, July or August really and

Page 126

1    September, if you see you're going to have
2    money left over and you need items, at that
3    time, do y'all try to get rid of that money,
4    spend it, buy the items you need?
5        A.  We try to all during the year.
6        Q.  Right.  But especially at the end
7    of the year, if you're going to have money
8    left, then you try to spend it to get what
9    you need for the following year?
10       A.  Generally it happens sometimes.
11       Q.  Okay.  Now, has Ms. Green to your
12   knowledge ever refused to get you items that
13   there was money in your account to buy and
14   the proper paperwork filled out?
15       A.  Repeat your question, sir.
16       Q.  Has Ms. Green in her position as
17   -- I call it fiscal affairs officer -- has
18   she ever refused to buy items for you when
19   the proper paperwork was filled out and
20   there was money in your budget?
21       A.  Yes, sir.  Well, let me phrase it
22   this way.  I can't say that Ms. Green
23   refused.  I can say that there are some

Page 127

1    times that I have ordered things that it was
2    not ordered.
3        Q.  All right.  And do you know the
4    reason for that?
5        A.  In some cases, she's explained
6    that it had to be bidded.  And in some
7    cases, there was no explanation.  And that
8    was very few times.
9        Q.  What, that she had no explanation?
10       A.  No.  That we did not get what we
11   ordered.
12       Q.  Okay.
13       A.  But there have been times.
14       Q.  Now, as Dean of the Fiscal Office,
15   it's her duty and responsibility to make
16   sure the bid law is complied with, isn't it?
17       A.  Yes, sir.
18       Q.  Do you know what the bid law is?
19       A.  I know approximately.
20       Q.  Do you know -- You've got a
21   general idea?
22       A.  Yes, sir.
23       Q.  But she has to know it

Page 128

1    specifically, doesn't she?
2        A.  Yes, sir.
3        Q.  And you depend on her not to let
4    you get in trouble?
5        A.  Yes, sir.
6        Q.  And if there is a question about
7    what you order, what Dr. Merk orders or Mr.
8    Huffstutler orders or even what Dr. Chambers
9    orders, she should question it, shouldn't
10   she?
11       A.  She has that right, yes.
12       Q.  I mean, she not only has that
13   right, that's her job, isn't it?
14       A.  Her job is to question those
15   things that need to be bid -- not question
16   it, but to bid them.  It is our decision by
17   our signature whether we have approved the
18   item or not.
19       Q.  Right.  But it has to be purchased
20   in a certain way according to the State law?
21       A.  Yes, sir.
22       Q.  And she cannot -- Even if you're
23   the Dean of the College or President

32  (Pages 125 to 128)

# FREEDOM COURT REPORTING

Page 129

1 Chambers can't tell her to buy something or
2 do it in a way that does not comply with
3 State law, can she?
4    A.   Right.
5    Q.   And how long have you been in a
6 supervisory position at J.F. Ingram?
7    A.   Since 1980.
8    Q.   During that period of time, have
9 you known of J.F. Ingram to be called to
10 task by the examiner's for the mis-spending
11 of money?  Probably a better way to put it,
12 the wrongful spending of money?
13    A.   Yes, sir.
14    Q.   Now, where did they wrongfully
15 spend money?
16    A.   I'm sorry?
17    Q.   Where did they wrongfully spend
18 money that you recall?
19    A.   I don't know where they spent it
20 at.
21    Q.   Now, when was this?
22    A.   Oh, it's been some number of years
23 back. I don't recall.

Page 130

1    Q.   Do you know who the Dean of the
2 Fiscal Office was at that time?
3    A.   I think Mr. Powell.
4    Q.   Mr. Powell. During Ms. Greene's
5 term as the Dean of the Fiscal Office, do
6 you recall any exception from the examiner
7 where she wrongfully was spending funds?
8    A.   Not in meetings that I have been a
9 part of where there were such findings. But
10 I don't think the findings said that she
11 mis-spent. Not that I recall.
12    Q.   Would you say you're not worrying
13 about the mis-spending, it just might be
14 hard to get the money out of her sometimes?
15    A.   I'm sorry?
16    Q.   That you don't worry about the
17 mis-spending when she spends money, it just
18 might be hard to get money out of her on
19 some items?
20       MR. CHRISTMAN: Form.
21    A.   Is that question a question?
22    Q.   Yes. Is it she just doesn't want
23 to turn loose of the money sometimes if she

Page 131

1 has a question?  You have to convince her
2 that probably -- If she has a question, she
3 won't spend it, will she?
4    A.   I've not had a problem that much.
5 There have been some things that we've
6 ordered and even she and I have signed it,
7 signing the requisition approving it. But
8 we don't have that item.
9       Now, I have asked her several
10 times when she's said that is it forth
11 coming. Of course, that has been over a
12 year, though.
13    Q.   And that's sometimes out of all
14 y'all's control?
15    A.   Well, she's the business dean.
16    Q.   But you don't have a problem
17 working with Ms. Green?
18    A.   No, sir.
19    Q.   Ever had a problem working with
20 her?
21    A.   It depends on how you're defining
22 problems. We have some disagreements.
23    Q.   Yes, sir. You have

Page 132

1 disagreements. But y'all can work out your
2 disagreements and go forward?
3    A.   Yes, sir.
4    Q.   And as in most jobs, you have
5 disagreements?
6    A.   Yes, sir.
7    Q.   Even President Chambers?
8    A.   Yes, sir.
9    Q.   Even Dean Merk?
10    A.   Yes, sir.
11    Q.   Even with Mr. Montgomery?
12    A.   Yes, sir.
13    Q.   But you work together?
14    A.   Yes, sir.
15    Q.   Okay. Now, let's change horses.
16 Who is Ms. Bonita Owensby?
17    A.   She is the director of admissions
18 and registration.
19    Q.   Who does she work for?
20    A.   Me.
21    Q.   How long has she been working for
22 you?
23    A.   Since 1998.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 133

1    Q.  What was her position in 1998?
2    A.  She was a secretary to the Dean of
3  Students.
4    Q.  Secretary to the Dean of
5  Students.  And you were the Dean of
6  Students; correct?
7    A.  Repeat your question.
8    Q.  She was secretary to the Dean of
9  Students in 1998?
10    A.  In 1998, she was the secretary to
11  the Dean of Students.
12    Q.  And you were the Dean of Students?
13    A.  I was the Dean of Students as of
14  September 1, 1998.
15    Q.  So who had that position before
16  you?
17    A.  Mr. Paul Reeder.
18    Q.  And she was his secretary?
19    A.  Yes, sir.
20    Q.  Okay.  Who was the registrar then?
21    A.  Mr. Tim Robinson.
22    Q.  And what did he do?
23    A.  He was the registrar.  He was a

Page 134

1  counselor and he was the task GED tester and
2  admission tester.
3    Q.  What was his official title?
4    A.  I think his official title was the
5  registrar.
6    Q.  Okay.  And when did Mr. Robinson
7  leave the job as registrar?
8    A.  Sir, I don't recall what his
9  departure date was.
10    Q.  Was he under you?
11    A.  At one time, yes, sir.
12    Q.  Was he under you when he left?
13    A.  Yes, sir.
14    Q.  Who took over his job?
15    A.  I did.
16    Q.  You did?
17    A.  I took over his duties.
18    Q.  Okay.  Were these Mr. Robinson's
19  duties when he left the employment of
20  Ingram?
21    A.  I don't know.
22    Q.  Was he under you at that point in
23  time?

Page 135

1    A.  Yes, sir.  Seems like it was his
2  -- it had been updated.
3    Q.  Is Ms. Owensby a good employee?
4    A.  Yes, sir.
5    Q.  When Mr. Robinson left, did Ms.
6  Owensby take on any of his duties?
7    A.  Not at first.
8    Q.  And that was -- She was just
9  assistant to the Dean of the College, wasn't
10  she?
11    A.  No, she wasn't.
12    Q.  She wasn't?  Were you?
13    A.  I'm sorry?
14    Q.  Who was the assistant to the Dean
15  of the College?
16    A.  I was at one time.
17    Q.  You were?
18    A.  I was assistant Dean of the
19  College.  Not assistant to.
20    Q.  Let me ask you this.  You might
21  can straighten me out on that.  And I'm sure
22  you can.
23       (Whereupon, Plaintiff's Exhibit

Page 136

1  No. 12 was marked for identification and
2  attached to the original transcript.)
3    Q.  Show you what we're going to mark
4  as 13.  It appears to be a two-page
5  document.  I'll ask if you can tell me what
6  this document is.  You might not can.
7       (Whereupon, Plaintiff's Exhibit
8  No. 13 was marked for identification and
9  attached to the original transcript.)
10    A.  Seems like a job description of
11  the assistant to the Dean of the College.
12    Q.  Okay.  Did you ever hold that
13  position?
14    A.  No, sir.
15    Q.  So that does not relate to you at
16  all?
17    A.  No, sir.
18    Q.  Okay.  Show you what we're going
19  to mark as 14 and ask if you can tell me
20  what this document is.
21       (Whereupon, Plaintiff's Exhibit
22  No. 14 was marked for identification and
23  attached to the original transcript.)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 137

1    A.  This is a document that has
2  registrar assistant to the Dean of Students
3  and Support Services on whom they felt and
4  started a process to restructure the college
5  again.
6    Q.  And whose job does that describe?
7    A.  That would be -- described for a
8  person who was going to get -- hopefully put
9  put in that position at that time had the
10  Chancellor approved it.
11    Q.  Did the chancellor not approve it?
12    A.  No, sir.  It did not go through.
13  The process stopped.
14    Q.  Why did the process stop?
15    A.  I don't know, sir.
16    Q.  Did you have somebody in mind for
17  that job?
18    A.  Sir?
19    Q.  Did you have somebody in mind for
20  the job I just showed you Exhibit 14?
21    A.  Yes, sir.
22    Q.  Who was that?
23    A.  Ms. Owensby.

Page 138

1    Q.  Was Ms. Owensby capable of doing
2  that job in your opinion?
3    A.  I think with me helping her and
4  aiding her, she could have.
5    Q.  Show you what we're going to mark
6  as Plaintiff's Exhibit No. 15.
7        (Whereupon, Plaintiff's Exhibit
8  No. 15 was marked for identification and
9  attached to the original transcript.)
10    Q.  I'll ask you if you can tell me
11  what that is a description of?
12    A.  It's another job description for a
13  registrar.
14    Q.  Did you have any input into that
15  job?
16    A.  I think a combination of us worked
17  on this.
18    Q.  Pardon me?
19    A.  I think a combination of us --
20  student services personnel worked on that.
21    Q.  Did you work on it?
22    A.  I had some input.
23    Q.  I'm going to show you what we're

Page 139

1  going to mark as Plaintiff's Exhibit 16.
2        (Whereupon, Plaintiff's Exhibit
3  No. 16 was marked for identification and
4  attached to the original transcript.)
5    Q.  I'll ask you if you're familiar
6  with this document?
7    A.  I'm familiar with it.
8    Q.  Okay.  Is anything in that
9  memorandum dated August 13th, 2004 from Ms.
10  Bonita Owensby to you incorrect?
11    A.  I'm sorry?
12    Q.  Is there anything that Ms. Owensby
13  has written in this document that is
14  incorrect?
15        MR. CHRISTMAN:  This is a two-page
16  document.
17    A.  I'm going to have to read it, sir.
18    Q.  Yes, sir.
19        MR. CHRISTMAN:  The second page is
20  a grievance statement; is that right?
21        MR. DEBARDELABEN:  Apparently,
22  yes.
23        MR. CHRISTMAN:  Is your question

Page 140

1  directed also to the grievance statement?
2        MR. DEBARDELABEN:  You know what.
3  The grievance statement shouldn't be on
4  there.  That was my mistake.
5        MR. CHRISTMAN:  Okay.  Let me
6  detach that from the exhibit.  I'll let you
7  detach it from your exhibit.
8        MR. DEBARDELABEN:  Because I could
9  not put an October 4th grievance on an
10  August the 11th.  I could, but it wouldn't
11  be good.
12        MR. CHRISTMAN:  The witness is now
13  only looking at a one page exhibit which is
14  a memo from Owensby to Wilson, Exhibit 16.
15    A.  The second one, initiated a change
16  in testing procedures.
17    Q.  She didn't do that?
18    A.  No.  That's not her job.  That's
19  my job.  The third dot, she was just doing
20  her job.  Nothing increased in the
21  activity.  She just started doing it.
22    Q.  So prior to August 3rd, 2004, Ms.
23  Owensby wasn't doing her job?

35  (Pages 137 to 140)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 141

1    A.  That's not what I said.  I said to
2    the number three dot, increased activity in
3    transcribing and evaluating transcripts and
4    conferring with other colleges and former
5    students regarding transcripts due -- and
6    then she has a parenthesis -- due to more
7    students enrolling with prior college credit
8    and DOC transitions.
9    **Q.  She did do that, didn't she?**
10   A.  She was doing it.
11   **Q.  And her job -- and it increased?**
12   A.  What increased?
13   **Q.  The transcribing she had to do and**
14   **evaluating the transcripts?**
15   A.  Perhaps it did with more students
16   going to college.  But that -- Those are
17   normal situations in a two-year college
18   system.
19   **Q.  All right.**
20   A.  The last dot, second to the last
21   at the bottom.
22   **Q.  Uh-huh.**
23   A.  She trained no student aides.

Page 142

1    **Q.  Sir?**
2    A.  She trained no student aides.
3    **Q.  What about assist with training**
4    **new staff?**
5    A.  Staff that worked under her.
6    **Q.  Okay.**
7    A.  And the last one, direct and
8    provide assistance with improving existing
9    admission forms, all student services
10   personnel worked with that.
11   **Q.  Okay.  Now, I noticed she signed**
12   **this under her job description registrar and**
13   **assistant to the Dean of Students.  Is that**
14   **what she was on August 13th, 2004?**
15   A.  No, sir.  That was a mistake that
16   came out of that office.  And she signed
17   that.  That was an error.  The president had
18   made no provision for job changes in that
19   either.
20       That was an error in personnel.
21   And Ms. Owensby brought it to my attention
22   and she went to that office to straighten
23   that up and I assumed that it was straight.

Page 143

1    **Q.  So that wasn't her job?**
2    A.  No, sir.
3        MR. CHRISTMAN:  We've been going
4    about an hour.  Can we take a break?  Do you
5    want to finish up something?
6        MR. DEBARDELABEN:  We can go ahead
7    and stop.
8        (Whereupon, a short recess was
9    taken.)
10   **Q.  Have you ever told anyone in your**
11   **office not to communicate with the business**
12   **office?**
13   A.  No.
14   **Q.  You've never told anybody that**
15   **worked for you not to communicate with the**
16   **business office?**
17   A.  No, sir.
18   **Q.  That would hinder everybody,**
19   **wouldn't it?**
20       MR. CHRISTMAN:  Form.
21   **Q.  That would hinder both you and**
22   **your people in the business office, wouldn't**
23   **it?**

Page 144

1    A.  It depends on what matter.
2    **Q.  Okay.  Show you what's marked as**
3    **17.**
4        **(Whereupon, Plaintiff's Exhibit**
5    **No. 17 was marked for identification and**
6    **attached to the original transcript.)**
7    **Q.  Do you recognize that document?**
8    A.  Yes, sir.
9    **Q.  What is that document?**
10   A.  It's an appointment letter.
11   **Q.  From who?**
12   A.  From J. Douglas Chambers.
13   **Q.  To who?**
14   A.  To Bonita J. Owensby.
15   **Q.  And what was she appointed to?**
16   A.  It says the purpose of this memo
17   is to confirm your appointment as registrar,
18   assistant to the Dean of Students and
19   Support Services, beginning effective 1 --
20   September 1, 2003 for the period ending
21   August 31, 2004.
22   **Q.  Now, when I asked you about that**
23   **prior to our little break, you told me that**

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 145

1  was a mistake. Was that a mistake?
2      A. In my opinion, yes, sir.
3      Q. But President Chambers has the
4  right to make that appointment, doesn't he?
5      A. Yes, sir.
6      Q. To your knowledge, was that
7  appointment ever changed?
8      A. According to the document, it did
9  not.
10     Q. Okay. So as of September 1st,
11 2003, was Ms. Bonita J. Owensby the
12 registrar or assistant to the Dean of
13 Students and Support Services?
14     A. According to that document.
15     Q. Well, what other document do you
16 have showing something different that you
17 know of?
18     A. I don't have one.
19     Q. Is there any document that shows
20 anything different?
21     A. No, sir.
22     Q. Okay. I'm a little confused on
23 this document. But this is the way I got

Page 146

1  it. Did you ever go to President Chambers
2  and say, hey, wait a minute, you've got a --
3  she doesn't have this appointment?
4      A. His signature was on it.
5      Q. Sir?
6      A. His signature was on it.
7      Q. Yes, sir.
8      A. He makes the appointments.
9      Q. And he had the right to make that
10 appointment, didn't he?
11     A. He's the president.
12     Q. Did you disagree with it?
13     A. I disagreed with the title and the
14 appointment letter when it was brought down
15 there as well as Ms. Owensby disagreed with
16 it.
17     Q. Now, what did she disagree with it
18 about?
19     A. Because it wasn't a title that she
20 was -- it wasn't her title. And she
21 questioned it and she brought it to my
22 attention.
23     Q. Let me show you what I have marked

Page 147

1  as Plaintiff's Exhibit No. 18.
2      (Whereupon, Plaintiff's Exhibit
3  No. 18 was marked for identification and
4  attached to the original transcript.)
5      Q. Do you recognize that document?
6      A. Yes, sir.
7      Q. What is that document?
8      A. It is an evaluation.
9      Q. And what's the title on that?
10     A. Position title, registrar,
11 assistant to the Dean of Students and
12 Support Services.
13     Q. And what date is that?
14     A. It has October 3, 2005.
15     Q. And you signed it. Is that your
16 signature on the back?
17     A. Yes, sir.
18     Q. October the 6th, '05?
19     A. Yes, sir.
20     Q. And this is of Ms. Bonita J.
21 Owensby?
22     A. Yes, sir.
23     Q. Okay. So Ms. Owensby was the

Page 148

1  registrar?
2      A. According to that document.
3      Q. And she had a different -- even
4  had more duties. She was the assistant to
5  the Dean of Students and Support Services?
6      A. She had that title.
7      Q. Yes, sir. Now, when Mr. Robinson
8  retired, he was the registrar, that was his
9  job title, wasn't it?
10     A. I believe so. I'm not certain.
11     Q. And Mr. Robinson resigned, what,
12 '99?
13     A. I'm not sure of the date. It was
14 sometime seemingly short after I resumed the
15 position of Dean of Students.
16     Q. And Mr. Robinson was a black male?
17     A. Correct.
18     Q. And he was replaced as registrar
19 by Ms. Bonita Owensby, a black female?
20     MR. CHRISTMAN: Form.
21     A. I assumed Mr. Robinson's duties
22 when he resigned.
23     Q. Okay. But by 2003, Ms. Owensby

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 149

1    was named the registrar?
2        A.  According to that document.
3        Q.  Yes, sir.  And her duties were
4    outlined in Exhibit 14, weren't they?
5        A.  No, sir.
6        Q.  As the registrar, assistant to the
7    Dean of Students?
8        A.  Those were -- Where did you get
9    these from?
10       Q.  I have them, sir.
11       A.  Well --
12       Q.  Her --
13       A.  I've not seen these other than --
14       Q.  You haven't seen these?
15       A.  If these were attached to -- in
16   her personnel file behind her job
17   description, then they could very well be.
18       Q.  But you wouldn't know, would you,
19   because personnel files are not what you're
20   supposed to do; correct?
21       A.  I don't go in them.
22       Q.  Okay.  Who is responsible for
23   coming up with the job duties of an

Page 150

1    employee?
2        A.  I'm sorry?
3        Q.  Who is responsible for coming up
4    with the job duties of an employee?  Would
5    that be the personnel department?
6        A.  Generally speaking, yes.
7        Q.  That wouldn't be you?
8        A.  Department heads help.
9        Q.  Right.
10       A.  Yes, sir.
11       Q.  But y'all don't have -- department
12   heads do not have the -- or so they say --
13   the expertise to come up with personnel job
14   descriptions?
15       A.  Sure, we have expertise.
16       Q.  Well, personnel doesn't always
17   agree with you on that, do they?
18       A.  Sometimes they do and sometimes
19   they don't.
20       Q.  Let's see.  Are you familiar with
21   the grievance Ms. Owensby filed in 2004?
22       A.  Yes, sir.
23       Q.  Do you know why she filed that

Page 151

1    grievance?
2        A.  What does it say?
3        Q.  Well, I'm going to show it to
4    you.  This will be No. 19.
5           (Whereupon, Plaintiff's Exhibit
6    No. 19 was marked for identification and
7    attached to the original transcript.)
8           MR. CHRISTMAN:  What was the
9    question?
10       Q.  Are you familiar with the
11   grievance Ms. Owensby filed?
12       A.  Yes, sir.
13       Q.  Did she discuss filing that
14   grievance with you before she filed it?
15       A.  No, sir.
16       Q.  Did she discuss filing that
17   grievance with you after she filed it?
18       A.  No, sir.
19       Q.  Did you play any part in any of
20   the grievance process?
21       A.  I think there was a couple of
22   meetings.
23       Q.  And who were you in those meetings

Page 152

1    with?
2        A.  Dr. Merk, at one time.  I think
3    Ms. Owensby was in one.  And the president.
4        Q.  Did you support Ms. Owensby in her
5    grievance?
6        A.  Not as written.
7        Q.  What about Exhibit 19 do you
8    disagree with?
9        A.  That her dual role was not dual.
10   She had a dual title.
11       Q.  Now, I notice in here that she
12   says something about my responsibility as
13   assistant to the Dean of Students is as
14   equivalent in value as other deans'
15   assistants because I carry out his
16   directives and assist him in meeting overall
17   goals and objectives of the student services
18   department.  Is that a true statement?
19       A.  She's not the only one.
20       Q.  Yes, sir.  But is that a true
21   statement, that she assists you in doing
22   that?
23       A.  She helps.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 153

1    Q.  Does she supervise direct work of
2  others and assists them in completing
3  scheduled tasks?
4    A.  At that particular time, I think
5  she had one person under her -- two people
6  under her supervision that she supervised.
7    Q.  Who supervised her in her job as
8  registrar?
9    A.  I did.
10    Q.  And what did your supervision
11  consist of?
12    A.  Be more specific.
13    Q.  What did you do to supervise her?
14    A.  Everyday functions of student
15  services.
16    Q.  Okay.  Had you ever been the
17  registrar before?
18    A.  I assumed the registrar's position
19  duties when Mr. Robinson left.
20    Q.  And how long did you hold that?
21    A.  I don't know, sir.  I would have
22  to look at records when we made some changes
23  from 1998 up until 2004.

Page 154

1    Q.  Okay.
2    A.  Or 2003 maybe -- whenever it is
3  when her title changed.  And then I
4  continued to do some.  I continue to do some
5  now.
6    Q.  I have another job description
7  apparently.  Let me do this as 20.
8      (Whereupon, Plaintiff's Exhibit
9  No. 20 was marked for identification and
10  attached to the original transcript.)
11    Q.  I'll ask you if you have ever seen
12  this job description as a registrar?  I
13  think that's registrar and assistant to the
14  Dean of Students and Support Services, isn't
15  it?
16    MR. CHRISTMAN:  That's what that
17  says.
18    A.  It seems that that document is
19  confusing.  It has registrar, assistant to
20  the Dean of Students and Support Services.
21  But it says under the supervision of the
22  Dean of Students, the registration and
23  admission coordinator will coordinate and

Page 155

1  direct all activities.
2      And that's why I pointed out to
3  you when this was invented, she was the
4  coordinator of registration and admission.
5  And that's how this confusion got going in.
6  That's why the president signed off on that
7  appointment letter because it wasn't pointed
8  out to him.
9      So whoever invented these job
10  descriptions confused the title.  This to me
11  should have been the coordinator of
12  registration and admissions.
13    Q.  Well, who prepares appointment
14  letters for the president?
15    A.  Dr. Merk and Ms. Turner.
16    Q.  So this would be something, if you
17  want to put it at somebody's feet, would be
18  Dr. Merk and Ms. Turner?
19    A.  Yes, sir.
20    Q.  And who is Ms. Turner?  What is
21  her position?
22    A.  She is the -- I think her title is
23  coordinator of personnel.

Page 156

1    Q.  And she works under Dr. Merk?
2    A.  Yes, sir.
3    Q.  And Dr. Merk, his title is dean of
4  what?
5    A.  Dean of Instruction.
6    Q.  Dean of Instruction?
7    A.  Yes, sir.
8    Q.  And as Dean of Instruction, he's
9  over personnel?
10    A.  Yes, sir.
11    Q.  Who was over it prior to Dr. Merk
12  being over personnel?
13    A.  Mr. Wright.
14    Q.  Mr. Wright.  How long had -- Now,
15  what was Mr. Wright's title?
16    A.  Director of personnel.
17    Q.  Director of personnel?
18    A.  Yes, sir.
19    Q.  And you no longer have a director
20  of personnel at J.F. Ingram?
21    A.  No, sir.  Unless Dr. Merk assumed
22  that responsibility then titled.
23    Q.  So what you have is a dean -- I

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 157

1    mean a coordinator of personnel?
2        A.  Right.
3        Q.  Does the coordinator of personnel
4    basically run the day-to-day operation of
5    the personnel office?
6        A.  With the supervision of Dr. Merk,
7    yes, sir.
8        Q.  All right.  Is the registrar
9    considered an officer or a member of the
10   cabinet at --
11       A.  No, sir.
12       Q.  Okay.  When you go into levels, I
13   know you have the president who's at the top
14   and then you have the deans.  What's the
15   next level under that?
16       A.  Well, depending on who the person
17   is supervised by, that falls under either
18   the business dean, the Dean of Instruction
19   or the Dean of Students.
20       Q.  Yes, sir.
21       A.  Then you have director.
22       Q.  What's your next level down under
23   a dean?  Is it a director?

Page 158

1        A.  Well, it just depends.  Under the
2    Dean of the College, you have -- there's two
3    assistants.  Then you have -- I guess in the
4    organization scale, I would fall up under
5    myself that I am both the Dean of
6    Students and the Dean of the College.
7            And then you have your admissions
8    persons, your directors, your coordinators.
9    It just depends on the department.
10       Q.  Okay.  How many female
11   coordinators are there at J.F. Ingram?
12       A.  I don't know.  I've not counted
13   them.
14       Q.  Okay.  How many female
15   coordinators are there in your department?
16       A.  None.
17       Q.  None?
18       A.  I have no female coordinators.
19       Q.  Okay.  How many female directors
20   in your department?
21       A.  One.
22       Q.  Who is that?
23       A.  Ms. Owensby.

Page 159

1        Q.  How many male coordinators in your
2    department?
3        A.  Two.
4        Q.  How many male directors?
5        A.  No.  I have one coordinator and
6    one male director.
7        Q.  One coordinator and one male
8    director?
9        A.  Well, let's go back and again
10   define coordinator.
11       Q.  How do you define it?
12       A.  Well, there are some that are
13   coordinator of activities.  And they do not
14   supervise people.
15       Q.  Okay.
16       A.  Then there are some that are
17   coordinators of programs and they supervise
18   people.
19       Q.  Okay.  And what is Ms. Owensby?
20       A.  She's a director.
21       Q.  And what does she supervise?
22       A.  She supervises the activities of
23   admission and registration.

Page 160

1        Q.  Okay.  Now, how are students
2    admitted to J.F. Ingram?  I know one thing
3    -- or one of the requirements is they have
4    to be a felon and in prison?
5        A.  And they have to meet the minimum
6    requirements that are afforded by DOC as
7    being within a certain length of time and
8    having the ability to benefit.
9        Q.  Now, I always wanted to ask this
10   question.  If an inmate has six months to
11   serve, can he get into a program that has a
12   nine month requirement?
13       A.  Yes.
14       Q.  So they go into the program
15   knowing he can't finish?
16       A.  Well, it depends on how you're
17   defining finishing.
18       Q.  Getting a degree from J.F.I.?
19       A.  You can't get a degree.  He gets a
20   certificate or he can get a certificate of
21   employability skills.
22       Q.  Okay.  So he can go into a program
23   that's a normal nine month program with only

40  (Pages 157 to 160)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 161

1  six months left on his sentence?
2     A.  We don't encourage that.  But we
3  don't deny them.
4     Q.  All right.
5     A.  We have programs that are one
6  semester, if the student completes nine
7  hours, which is called a short term training
8  program.
9     Q.  Do you know if Mr. Robinson -- Do
10  you know how much money he was making when
11  he left J.F.I. in 1999?
12     A.  No.  I know he was on a C-1 salary
13  schedule.
14     Q.  He was on which salary schedule?
15     A.  C-1.
16     Q.  And which salary schedule is Ms.
17  Owensby on?
18     MR. CHRISTMAN: Now?
19     Q.  When she became the registrar and
20  dean -- assistant to Dean of Student
21  Services?
22     A.  I don't know.  I think it was E.
23     Q.  E.  What's the difference between

Page 162

1  a C and an E salary schedule?
2     A.  Money.
3     Q.  The E salary schedule would be
4  higher than the C salary schedule, wouldn't
5  it?
6     A.  No, sir.
7     Q.  Is it right backwards?
8     A.  Yes, sir.
9     Q.  So the C salary schedule is higher
10  than the E salary schedule?
11     A.  Yes, sir.
12     Q.  Have you ever known a registrar
13  other than Ms. Owensby that was not on the C
14  salary schedule?
15     A.  Not personally knowing them.  But
16  with the evaluation we did in the two-year
17  college system, yes.  There were plenty.
18     Q.  Have you ever known one at J.F.I.
19  that wasn't on the C salary schedule?
20     A.  We've only had these two.
21     Q.  Mr. Robinson and Ms. Owensby?
22     A.  Yes, sir.
23     Q.  Okay.  And Mr. Robinson is a male,

Page 163

1  a black male and Ms. Owensby is a black
2  female; correct?
3     A.  They appear to be, yes.
4     Q.  I haven't met Mr. Robinson.  I
5  wouldn't know.
6     A.  They both have features of one
7  being a black male and the other one has
8  features of being a black female.
9     Q.  Okay.  So in your opinion, they
10  are?
11     A.  Yes.
12     Q.  Okay.
13     MR. CHRISTMAN:  We'll stipulate to
14  that.
15     Q.  I haven't met Mr. Robinson.  I
16  don't know.  He might be a little green man
17  from Mars as far as I know.  Ms. Owensby, is
18  she still on the E salary schedule?
19     A.  No, sir.
20     Q.  She's on the C salary schedule?
21     A.  Yes, sir.
22     Q.  Has the job of registrar always
23  been supervised by you since you've been the

Page 164

1  director?
2     A.  I'm not the director, sir.
3     Q.  Since you became the director of
4  student services and then you became the
5  Dean of Student Services, didn't you?
6     A.  No.
7     Q.  What did you get in 1980?
8     A.  Director of student support
9  services.
10     Q.  Okay.  Was the registrar -- when
11  Mr. Robinson got it, did it come under your
12  supervision?
13     A.  No, sir.
14     Q.  Whose supervision was he under?
15     A.  Mr. Reeder.
16     Q.  Mr. Reeder.  Did Mr. Robinson ever
17  come under your supervision?
18     A.  In 1998.
19     Q.  1998?
20     A.  Yes, sir.  He was under my
21  supervision prior to.  At one point, he was
22  I believe the counselor for student support
23  services.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 165

1    Q.  Will you look at Exhibit No. 15,
2  please, sir.  And is that a job description
3  for a registrar?  Do you know if that job
4  description was ever a working job
5  description for the registrar?
6    A.  I don't think so for either one.
7  These were generic materials pulled together
8  from books, from the internet and from a
9  host of other documents.
10    Q.  Well, I'm just looking down there
11  under supervision and other relationships.
12  It says the registrar works under the
13  direction of the Dean of Students.  That
14  would be you, wouldn't it?
15    A.  If this was a job description of a
16  registrar at J.F. Ingram State Technical
17  College, it would be so.  It would fall
18  under that position.
19    Q.  And who would be the best person
20  to tell us that?
21    A.  Tell us what?
22    Q.  If this is a job description of
23  the registrar at J.F. Ingram State Technical

Page 166

1  College?
2    A.  Ms. Turner.
3    Q.  Ms. Turner.  What is her first
4  name?
5    A.  Erica.
6    Q.  Erica Turner.  She's a coordinator
7  of --
8    A.  Of personnel.
9    Q.  -- personnel?  Change gears one
10  more time.  Did you have anything to do with
11  security cameras being placed in
12  horticulture?
13    A.  I think Mr. Griffin and Mr. Benold
14  put them there.
15    Q.  So what did you have to do with
16  that?
17    A.  Nothing.
18    Q.  Nothing.  So when I asked you the
19  question -- and I'm not trying to cut you
20  short -- if you had anything to do with it,
21  the answer would be no?
22    A.  I'm sorry?
23    Q.  You didn't make a decision whether

Page 167

1  to put them there or a recommendation to put
2  them there?
3    A.  No.  That's not my --
4    Q.  That's not your responsibility.
5  That would be Dr. Merk's responsibility,
6  wouldn't it?
7    A.  Yes.
8    Q.  Okay.
9      (Whereupon, Plaintiff's Exhibit
10  No. 21 was marked for identification and
11  attached to the original transcript.)
12    Q.  Show you what we've marked as
13  Plaintiff's Exhibit No. 21 and ask you if
14  you recall that letter or memorandum from
15  Ms. Greene?
16    A.  Yes, sir, I have.
17    Q.  Was that -- Do you disagree with
18  that letter?
19      MR. CHRISTMAN:  Form.
20    Q.  Did you respond to Ms. Greene's
21  memo?
22    A.  I don't remember whether I
23  responded or not.  Did I respond to it?

Page 168

1      MR. CHRISTMAN:  Just answer if you
2  can remember.
3    A.  I don't know if I responded or
4  not.
5    Q.  This was basically Ms. Greene
6  informing you that she would get to your
7  purchase order requests, but there was quite
8  a number of volumes from your area in a
9  short period of time, wasn't it?
10    A.  There were quite a bit, yes, sir.
11    Q.  Is that as a result of coming to
12  the end of the year trying to spend the
13  funds?
14    A.  Yes.
15    Q.  You have this kind of volume all
16  during the year?
17    A.  It depends on the assessment of
18  program needs and when they make their
19  requests to me.
20    Q.  Do you have your people assessing
21  needs all through the year?
22    A.  Yes, sir.
23    Q.  Do you try not to have them order

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 169

1  all at one time?
2      A.  Yes, sir.  We try to do them as
3  they come in and we try to go through the
4  programs at the beginning, middle and the
5  end of the year, sit down and have
6  discussions with the instructors and try to
7  see what we can afford to supplement their
8  programs with what we can and cannot.
9          And then we have to meet with Dr.
10  Merk to make sure there are no duplications
11  in the requisitions.
12      Q.  As a matter of fact, Ms. Greene
13  told you perhaps if these funds were spent
14  all during the year rather than at the last
15  five months of the year, there would be less
16  of a chance for this type of volume to get
17  backlogged.  Do you agree with that
18  statement?
19      A.  If at all possible it can be done,
20  it would make it easier.  But in most cases,
21  it can't.
22      Q.  When somebody resigned in your
23  section -- I say section.  Under your area

Page 170

1      -- It's your responsibility to do an exit
2  interview, isn't it?
3      A.  I'm sorry?
4      Q.  When somebody leaves employment at
5  J.F.I. and they are working under you, isn't
6  it your responsibility to do an exit
7  interview?
8      A.  If it is, I didn't know it.  I
9  don't think it is, though.
10      Q.  You don't think it is?
11      A.  No, sir.  I think that's
12  personnel.
13      Q.  I'm sorry.  You're not the Dean of
14  the College.  Yes, you are, aren't you?
15      A.  Yes, I am.
16      Q.  Would you read -- I'm looking at
17  the policies and procedures manual, 617.01.
18  What does that say, please?
19      A.  It says the Dean of the College or
20  his/her designee with conduct -- with?  I'm
21  sure there's a typographical there --
22  conduct an exit interview with any employee
23  resigning, retiring, or otherwise leaving

Page 171

1  the employment of J.F. Ingram State
2  Technical College.
3          At the interview, the dean will
4  ensure that the employee has complied --
5  completed all necessary paperwork, turned in
6  keys, if applicable, and has accounted for
7  all inventoried items or equipment for which
8  he/she is responsible.  See attached form.
9          The interview will also provide an
10  opportunity for the exiting employee to
11  provide relevant information to the dean.
12  The employee will be afforded an opportunity
13  to attach a written comment or statement to
14  the exit form.
15          And as I've said to you, when we
16  began this, that that document was dated
17  2002 and it was written for Dr. Huffstutler
18  and that has since become Dr. Merk's duties.
19      Q.  Are you the Dean of the College?
20      A.  Yes, I am.
21      Q.  Do you know whether or not that
22  regulation has been changed?
23      A.  The person that is responsible for

Page 172

1  the exit interview is Dr. Merk.
2      Q.  So are you telling me -- this is
3  what I'm trying to get down -- the
4  regulations have changed, but the people who
5  are in charge of it is changed, but the
6  policies and procedures manual may not
7  reflect that change?
8      A.  It could possibly be that, sir.
9      Q.  Okay.
10      A.  But as it stands today, Dr. Merk
11  has been conducting all the exit interviews.
12      Q.  Dr. Merk has been conducting them?
13      A.  Yes, sir.
14      Q.  But to your knowledge, this form
15  hasn't been -- the procedures manual hasn't
16  been changed?
17      A.  I have not checked it to see.
18      Q.  Okay.
19      A.  But the procedure is still in
20  place.
21      Q.  There's one other document I want
22  to ask you about.  Dean Wilson, if you want
23  to know what a procedure in the policy of

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 173

1   J.F. Ingram is, what document do you go to
2   to find that out?
3       A.   The policies and procedures
4   manual.
5       Q.   But is there a copy of the
6   policies and procedures manual kept in one
7   place at J.F. Ingram that is an up-to-date
8   copy?
9       A.   Well, generally, when they do an
10  update, they pass out the updated sheets so
11  that every employee can put it in their
12  notebook.
13      Q.   Okay.  And when the update is
14  made, how is it updated?  By that, does the
15  cabinet update it or does the president put
16  out a memorandum?
17      A.   Generally, we would discuss it if
18  it's a change that is affecting the entire
19  college.  We discuss it in cabinet meetings
20  and sometimes Dr. Merk brings a change to
21  the cabinet for discussion.
22      Q.   Okay.  And then it's put out?
23      A.   Yes, sir.

Page 174

1       Q.   When I say put out --
2       A.   If it is approved.
3       Q.   That's a terrible word.  It's
4   circulated to the rest of the college; is
5   that correct?
6       A.   Yes, sir.
7       Q.   And who does the circulation?
8       A.   Generally, it would go out over
9   the president's signature.
10      Q.   And now since Dr. Merk is in his
11  position, he would be the one to write heard
12  on that to be sure it's done?
13      A.   To make sure what's done?
14      Q.   That the update goes out in a
15  timely manner?
16      A.   It could be a secretary.
17      Q.   But it falls under his area?
18      A.   Yes, sir.
19          (Whereupon, Plaintiff's Exhibit
20  No. 22 was marked for identification and
21  attached to the original transcript.)
22      Q.   Let me make a copy of this real
23  quick.  Let me show you what I have marked

Page 175

1   as Plaintiff's Exhibit No. 22.  Do you
2   recall Ms. Owensby's resignation?
3       A.   Yes, sir.
4       Q.   Did you attempt to talk her out of
5   resigning?
6       A.   No, sir.
7       Q.   Do you know why she did not
8   resign?
9       A.   Not exactly.
10      Q.   Okay.  Did she talk to you about
11  withdrawing her resignation?
12      A.   Yes, sir.
13      Q.   Did you allow that?
14      A.   The president allowed it.
15      Q.   Were you in favor of it?
16      A.   Yes, sir.
17      Q.   Was she upset over her salary?
18      A.   Upset over her salary?
19      Q.   Yes, sir.
20          MR. CHRISTMAN:  Was she at the
21  time of the letter?
22      Q.   At the time of the letter, was Ms.
23  Owensby upset over her salary?

Page 176

1       A.   No, sir.
2       Q.   Do you know what she was upset
3   over?
4       A.   She wasn't upset at all.
5       Q.   Do you know why she -- Did she
6   give you her reason for resigning?
7       A.   Not in any great form.
8       Q.   Now, were you the Dean of the
9   College then?
10      A.   Yes, sir.
11      Q.   Okay.  But Dr. Merk was the one
12  that was conducting the exit interview?
13      A.   I'm sorry?
14      Q.   Dr. Merk would have been the one
15  conducting an exit interview?
16      A.   Conducting --
17      Q.   An exit interview?
18      A.   With whom?
19      Q.   With Ms. Owensby.
20      A.   Ms. Owensby didn't have an exit
21  interview.
22      Q.   Okay.  How do you know that?  You
23  didn't conduct it.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 177

1   A.  I was there at work. She worked
2   for me.
3       Q.  She worked for you. But you
4   wouldn't have been the one who conducted it
5   anyway, would you?
6       A.  I'm sorry?
7       Q.  You wouldn't have been the one to
8   conduct that interview, would you?
9       A.  You said would or would not?
10      Q.  Would not.
11      A.  No, I would not.
12      Q.  Mr. Wilson, are there some
13  memorandums or letters that you're familiar
14  with that has informed you and/or the rest
15  of the staff at Ingram State Technical
16  College that the Dean of the College is not
17  the one to conduct exit interviews?
18      A.  No. Nor is there one that say
19  that he is. Not memorandums.
20      Q.  Okay. Is there any amendment to
21  the policies and procedures manual that
22  changes the process for the dean of a
23  college to conduct exit interviews that

Page 178

1   you're aware of?
2       A.  No. None that I'm aware of. But
3   there are some memorandums that have gone
4   out to ask the deans or the directors of the
5   programs to have an interview with their
6   people to collect keys and passwords to
7   computers and any material that is property
8   to be left there.
9       Q.  And who sent those out?
10      A.  The president.
11      Q.  The president. And that would be,
12  in this case, President Chambers?
13      A.  In this case, it would be
14  President Chambers.
15      MR. CHRISTMAN:  In this time
16  period you mean.
17      MR. DEBARDELABEN:  Right.
18      Q.  Prior to President Chambers —
19  Well, from 2002. I don't know what happened
20  after 2002. From 2002 forward, the manual
21  has obviously been changed some?
22      A.  I would have to go and look.
23      Q.  Okay.

Page 179

1       MR. DEBARDELABEN:  Let's take
2   about a ten minute break.
3       MR. CHRISTMAN:  Sure.
4       (Whereupon, a short recess was
5   taken.)
6       MR. DEBARDELABEN:  No more
7   questions. Thank you.
8       MR. CHRISTMAN:  I have no none.

Page 180

1           C E R T I F I C A T E
2
3   STATE OF ALABAMA )
4   MONTGOMERY COUNTY)
5
6       I hereby certify that the above
7   and foregoing deposition was taken down by
8   me in stenotype, and the questions and
9   answers thereto were transcribed by means of
10  computer-aided transcription, and that the
11  foregoing represents a true and correct
12  transcript of the testimony given by said
13  witness upon said hearing.
14      I further certify that I am
15  neither of counsel, nor of kin to the
16  parties to the action, nor am I in any wise
17  interested in the result of said cause.
18
19
20  -----------------
21          CINDY WELDON
22
23

45  (Pages 177 to 180)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

**A**

ability 160:8
able 10:10
academic 24:13
access 60:1 63:4
accident 35:2,3
  35:7
account 125:9
  125:12 126:13
accounted 171:6
accounting
  20:11
accreditation
  45:6,8
accurately 10:20
  10:21 11:3
accustomed
  73:23
achievement
  16:15
acre 49:4
acres 49:14
act 106:17
acting 27:13,16
action 83:2 91:7
  103:9 105:18
  112:21 180:16
activities 155:1
  159:13,22
activity 74:16,21
  75:5,10 104:5
  104:6,13 105:4
  105:6 106:20
  140:21 141:2
add 123:18
adding 20:11
address 12:11
adjunct 21:7
administration
  51:16,21,22
  52:4 53:18
  54:2 94:3
administrative
  49:17,18,18

50:3 51:13
  53:2,6,15
admission 134:2
  142:9 154:23
  155:4 159:23
admissions
  132:17 155:12
  158:7
admitted 160:2
admitting 42:14
advised 5:8
advisement
  24:13
advisory 38:15
affairs 126:17
afford 169:7
afforded 160:6
  171:12
age 13:15 31:23
agencies 47:4
ago 60:1 62:14
  77:20 78:13
agree 34:4 37:11
  51:23 72:22
  76:15 104:3
  150:17 169:17
agreed 5:13,23
  6:9 37:14
agreement
  76:23 78:23
ahead 80:4
  143:6
aid 23:11 95:7,8
aide 113:7
  116:10
aides 141:23
  142:2
aiding 138:4
aids 95:6
Alabama 1:2 2:2
  4:2 5:2,20 7:6
  7:12 12:22
  14:23 15:2,10
  15:17,18 16:10

17:1 20:21,23
  21:4,7 24:20
  180:3
allocated 125:15
  125:18
allow 175:13
allowed 34:13
  175:14
Amended 5:3
amendment
  177:20
American 34:9
  34:12
amount 125:14
  125:17
ANDREW 7:9
and/or 65:3
  177:14
Anita 36:1
announcement
  26:18 68:2
answer 12:5
  48:9 55:5
  58:19 80:5
  166:21 168:1
answers 10:14
  10:23 180:9
anybody 33:3
  69:6 72:6,18
  72:21 84:10
  112:7 143:14
anymore 52:16
  98:19
anyway 177:5
apparently
  34:15 80:18
  90:11 106:23
  107:22 111:9
  139:21 154:7
appear 40:22
  59:3 163:3
appearance
  30:18
appears 38:21

39:11 41:4
  50:20 57:7
  85:22 136:4
applicable 171:6
application 19:1
  26:15 27:20
  28:5 32:14
apply 38:6
appointed
  144:15
appointment
  144:10,17
  145:4,7 146:3
  146:10,14
  155:7,13
appointments
  146:8
appropriate
  104:23 110:20
approval 61:15
approve 137:11
approved
  128:17 137:10
  174:2
approving 131:7
approximately
  59:23 76:4
  95:10,13 98:6
  127:19
area 14:5 52:20
  53:13,14 59:5
  59:5 63:2 67:8
  90:22,23 91:2
  92:20 94:8,23
  106:8 113:7,11
  117:20 168:8
  169:23 174:17
areas 28:11
  50:14
Arnett 96:10
arrest 29:6,10
  29:19,23
arrested 28:12
  29:18 31:3

ASAP 108:7
asked 23:1,3
  29:14,14 59:23
  69:22 71:6
  72:9,11 73:14
  73:16,17 78:1
  88:14,21
  121:12 123:21
  131:9 144:22
  166:18
asking 11:15
  12:6 67:14
  77:3 78:6
  96:20
ass 29:17,20
assertion 55:2
assessing 168:20
assessment
  168:17
assign 6:4
assigned 22:9
  90:22
assist 64:18,20
  108:7 142:3
  152:16
assistance 142:8
assistant 27:13
  27:14,17 28:6
  32:13 54:14,17
  64:12,14 65:12
  95:4,4 135:9
  135:14,18,19
  136:11 137:2
  142:13 144:18
  145:12 147:11
  148:4 149:6
  152:13 154:13
  154:19 161:20
assistants
  152:15 158:3
assisted 86:7
assists 152:21
  153:2
Association 45:7

# FREEDOM COURT REPORTING

assume 12:5 69:3
assumed 124:3 142:23 148:21 153:18 156:21
attach 171:13
attached 40:4 44:1 56:21 60:19 66:10 79:23 82:14 90:17 103:4 106:1 118:5 136:2,9,23 138:9 139:4 144:6 147:4 149:15 151:7 154:10 167:11 171:8 174:21
attempt 45:22 175:4
attempted 74:14
attention 115:21 142:21 146:22
attorney 42:9 70:6 77:23 78:9,10
attorney/client 78:4,7
attributed 122:22 123:2
August 125:23 139:9 140:10 140:22 142:14 144:21
aunt 14:6
Autauga 13:4,8
auto 52:2,5 96:16,19,22 97:2,11 100:2 101:20
automotive 51:6 51:10 52:12,13 52:15 54:5 89:16 96:13,15

Avenue 5:20 7:5
average 48:14
aware 112:15 113:4 178:1,2
a.m 5:21

**B**

B 8:8 50:17 60:3
bachelor 15:21
bachelor's 16:6
back 10:23 17:15 19:1 21:9 28:10 29:16 30:13 43:17 45:1 49:22 50:5,7 51:20 53:2 54:4,7 60:10 61:11,13,19,22 62:4 70:15,17 73:1,15,18 79:1 84:8 88:13 92:5 93:2,6 94:11 94:19 107:5 111:15 113:8 119:22 129:23 147:16 159:9
background 14:17 16:2 24:14
backlogged 169:17
backwards 162:7
bad 93:13 94:13
Bail 97:13
Barbara 2:5 54:13 70:18 76:17
barber 53:11 98:20 99:2,12
barbering 53:10 98:20 99:23

Barry 118:23
bars 88:15,16,23 89:5
base 60:1
Based 24:6
basically 12:23 13:8 21:22 37:13 41:2 157:4 168:5
beating 75:2
began 17:2 171:16
beginning 76:10 102:17 144:19 169:4
behavior 45:20 74:15 84:15 104:12 105:3 115:10
believe 17:12 19:9 20:15 21:5 28:5,19 48:20 66:4 69:10 102:2 103:12,17 118:17 148:10 164:22
believed 78:17 107:2 109:1,5
bell 90:1,5
benefit 160:8
Benold 166:13
Bentley 97:7
Benton 97:6,8 107:3 111:14 112:1
best 114:21 165:19
bet 123:9
better 129:11
bid 127:16,18 128:15,16
bidded 127:6
Bill 64:10,11,17

85:19 86:4
Birmingham 15:18
birth 12:9
bit 122:6 168:10
black 57:8 148:16,19 163:1,1,7,8
Blackwell 118:23
Blake 100:18,20 100:21,22,23 101:19
blank 92:20
body 96:16 97:11 100:2
Bonita 4:5 132:16 139:10 144:14 145:11 147:20 148:19
book 43:6 88:15 89:10
books 88:15,16 88:21,22 89:5 89:12 165:8
bottom 91:10 92:4 141:21
bound 43:5
break 12:2 60:13 88:4,10 91:2 143:4 144:23 179:2
Briefly 17:15
bring 21:21 34:6 47:3 69:22 92:18 106:9,12 115:21
bringing 112:20
brings 173:20
brothers 89:17
brother-in-law 30:4
brought 29:15 34:17 73:1

142:21 146:14 146:21
Bruce 32:7
budget 126:20
building 49:16 50:3 51:13,17 51:21,22 52:4 52:7 53:2,6,15 53:18,22 54:2 94:3,4,15
bus 90:22 115:11
business 15:5,22 15:23 16:3,4,7 16:9 20:10 121:20,21 122:10,11 131:15 143:11 143:16,22 157:18
buy 126:4,13,18 129:1
B.H 70:18

**C**

C 7:1 18:7 162:1 162:4,9,13,19 163:20 180:1,1
cabinet 26:23 27:1 37:4,8,10 37:19 97:23 98:1 120:8,11 157:10 173:15 173:19,21
Caldwell 109:12
call 23:14 30:3,4 80:10,13 120:7 126:17
called 17:23 18:17 20:12 66:16 70:10,11 75:9 108:10,11 108:11 129:9 161:7

# FREEDOM COURT REPORTING

calling 51:21
cameras 166:11
Camp 17:4,11
  17:14 28:20
  29:4 31:3,6
campus 25:20
  47:7 49:6,8,9
  52:14,17 53:14
  54:20 94:11
  96:8,10,11,18
  99:3,12,22
  101:20 102:7
  102:10,16
  117:6
campuses 96:9
capable 138:1
capacity 1:11,15
  2:10,14,20 3:3
  4:12,17
captain 54:13
  55:15 56:1
  86:11 113:5
car 29:15 30:5
  30:13 49:23,23
card 117:12
Carlyle 100:7
Carolina 29:11
  29:12 30:1
carpentry 100:1
  100:14,17
carry 152:15
cars 52:15
case 1:8 2:7 4:7
  178:12,13
cases 11:11,14
  11:16,20 34:8
  39:12,16 57:6
  68:7 106:11,12
  127:5,7 169:20
cause 180:17
Caylor 97:18,19
  121:19 122:19
  123:3 125:1
Caylor's 121:22

center 84:5
  110:14 111:3,5
certain 13:21
  14:10 28:8
  31:7 33:9
  38:14,23 39:4
  39:19 43:16
  47:3 49:11
  54:16 69:11
  84:12 86:17
  87:5,23 103:19
  118:20 125:14
  125:17 128:20
  148:10 160:7
certificate
  160:20,20
certification
  16:5,9
certified 5:17
  11:5 15:21
certify 180:6,14
chain 87:8
Chambers 1:9
  2:8 4:10 65:6
  118:14,22
  119:9,11
  120:19 121:18
  123:4 124:20
  125:2 128:8
  129:1 132:7
  144:12 145:3
  146:1 178:12
  178:14,18
chance 169:16
chancellor 33:9
  137:10,11
Chancellor's
  26:10
change 10:14,14
  10:23 132:15
  140:15 166:9
  172:7 173:18
  173:20
changed 23:20

39:3,3 45:1
  145:7 154:3
  171:22 172:4,5
  172:16 178:21
changes 40:17
  142:18 153:22
  177:22
changing 39:8
characterize
  75:11
charge 25:19
  28:22,23 29:21
  41:3 95:16
  100:4,15 114:7
  114:9,17 115:5
  172:5
charged 28:13
chatting 123:20
check 79:3
  88:19 89:1,4
  108:16 111:16
checked 172:17
checklist 43:8
checks 29:2,2
  31:2
children 12:17
  12:21 13:14
Chisom 97:3,13
choose 32:4,8,11
chose 31:19 32:6
Chris 98:12
Christian 20:22
  21:1,4,7
Christman 7:9
  7:10 10:7,19
  11:2,9 16:16
  34:11 37:22
  40:8 47:23
  48:8 54:22
  55:4 57:3,10
  58:6,18 60:5,8
  60:11,14 62:20
  76:21 78:2
  80:4 83:7

85:17 86:1
  87:9 88:6 91:9
  96:19 104:1
  110:9 112:13
  117:14 121:6
  124:22 125:11
  130:20 139:15
  139:19,23
  140:5,12 143:3
  143:20 148:20
  151:8 154:16
  161:18 163:13
  167:19 168:1
  175:20 178:15
  179:3,8
Christmas 119:1
Cindy 5:3,17
  180:21
circulated 174:4
circulation
  174:7
City 117:19
Civil 5:2
claim 54:18
class 80:20
  115:15,17
  124:7
classes 22:4 53:5
  53:8 56:8
  113:12,21,21
classroom 45:21
  45:23 56:15
  61:3 113:19
  115:18
classrooms
  114:2
clean 28:11
clearly 107:10
close 51:12,17
  79:9 111:20,20
  112:6
collect 178:6
college 1:13,17
  2:12,17,23 3:5

4:9,14,20
  14:15 20:8,22
  23:11 25:6,22
  26:3 27:15
  31:15 39:17,18
  40:21 41:16
  44:19,23 45:10
  45:12 64:13
  65:12 110:22
  114:6,12 115:1
  116:20 117:6
  128:23 135:9
  135:15,19
  136:11 137:4
  141:7,16,17
  158:2,6 162:17
  165:17 166:1
  170:14,19
  171:2,19
  173:19 174:4
  176:9 177:16
  177:16,23
colleges 45:8
  125:13 141:4
color 57:6
combination
  138:16,19
come 41:6 49:15
  53:1 65:23
  69:16 70:8,13
  71:21 72:4,6,9
  72:14 73:16
  94:14,19
  102:16 107:7
  115:11 116:22
  117:2 150:13
  164:11,17
  169:3
comes 37:14
  42:11 56:6,7
  84:13 87:12
  91:12
coming 131:11
  149:23 150:3

| | | | | |
|---|---|---|---|---|
| 168:11 | 180:10 | 155:4,11,23 | 164:22 | 47:11 66:15 |
| **command** 87:8 | **concerned** 112:3 | 157:1,3 159:5 | **counselor's** 91:5 | 85:3 118:20 |
| **comment** 171:13 | **concerning** | 159:7,10,13 | 91:21 | 134:9 147:13 |
| **comments** 91:18 | 83:20 90:13 | 166:6 | **counted** 158:12 | 148:13 |
| **COMMERCE** | **conditions** 105:3 | **coordinators** | **County** 12:23 | **dated** 83:14,15 |
| 7:11 | **conduct** 59:1,2 | 158:8,11,15,18 | 13:4,4,8 180:4 | 85:3 91:8 |
| **commercial** | 78:17 170:20 | 159:1,17 | **couple** 28:11 | 139:9 171:16 |
| 101:15 | 170:22 176:23 | **cop** 29:13 | 31:8 151:21 | **day** 5:6 22:8,10 |
| **Commissioner** | 177:8,17,23 | **copies** 43:3 | **course** 20:12 | 30:2 94:18 |
| 5:18 6:10 | **conducted** 177:4 | **copy** 41:7,9 42:9 | 46:8,11,16 | **days** 103:11 |
| **committee** 38:15 | **conducting** | 44:6 88:14 | 53:8 131:11 | 123:23 |
| 74:2 | 172:11,12 | 89:10 173:5,8 | **courses** 20:10 | **day-to-day** 58:5 |
| **commonly** 80:12 | 176:12,15,16 | 174:22 | **court** 1:1 2:1 4:1 | 157:4 |
| **communicate** | **conferring** | **correct** 34:10 | 5:9,10 10:5 | **deal** 56:8 74:1 |
| 143:11,15 | 141:4 | 44:21 45:9,11 | 30:15,18 33:15 | **dealing** 21:19 |
| **communication** | **confirm** 144:17 | 49:19 54:21 | 75:6 | 55:10,17 56:1 |
| 93:5 | **confrontation** | 57:9 61:23 | **covered** 124:7 | 56:5 82:4 |
| **compelled** | 90:2 | 76:7 85:15,16 | **covers** 50:13 | **dean** 1:15 2:14 |
| 124:19,23 | **confused** 39:7 | 87:19 91:15 | **creates** 74:16 | 3:3 4:17 18:12 |
| **competition** | 145:22 155:10 | 107:23 113:12 | **credit** 141:7 | 25:19,21,23 |
| 26:12 28:4 | **confusing** | 125:15 133:6 | **credits** 122:19 | 26:5,19,21 |
| **competitive** 26:1 | 154:19 | 148:17 149:20 | **crime** 28:13,16 | 27:7,9,10,12 |
| 26:7 | **confusion** 155:5 | 163:2 174:5 | **criminal** 74:16 | 27:13,14,17 |
| **complaint** 91:3 | **considered** 27:6 | 180:11 | 74:21 75:5,10 | 28:6 32:13 |
| 93:22 | 75:5 157:9 | **Corrections** | 104:5,6,13 | 39:17,18,19 |
| **complaints** | **consist** 24:1 | 105:1 107:1 | 105:4,6 106:20 | 64:12,14,15 |
| 57:18 60:2 | 153:11 | **corrective** | **cut** 120:12,14 | 65:12 110:16 |
| **complete** 61:8 | **constitutes** | 112:20 | 166:19 | 110:18 111:18 |
| 61:20 62:2 | 104:12 105:4 | **correctly** 79:8 | **CV:2:06-CV-...** | 114:6,14,16 |
| 83:5 | **constitutional** | **correspondence** | 1:9 | 116:20 122:9 |
| **completed** 171:5 | 34:14 | 111:13,13 | **C-1** 161:12,15 | 122:10 123:15 |
| **completes** 161:6 | **contact** 110:20 | **cosmetology** | | 124:6 127:14 |
| **completing** | **continue** 154:4 | 99:6,11,13 | **D** | 128:23 130:1,5 |
| 153:2 | **continued** 154:4 | 102:8 | **D** 8:1 | 131:15 132:9 |
| **complex** 57:22 | **control** 131:14 | **counsel** 5:15 6:1 | **daily** 56:12,16 | 133:2,4,5,8,11 |
| **complied** 127:16 | **conversation** | 6:3 92:17 | 83:23 84:6,21 | 133:12,13 |
| 171:4 | 121:17,18 | 180:15 | 84:22,23 85:4 | 135:9,14,18 |
| **comply** 129:2 | 124:18 | **counseling** 24:4 | 85:7 87:14 | 136:11 137:2 |
| **components** | **convicted** 47:8 | 24:5,8,9,11,12 | **Daily's** 87:8 | 142:13 144:18 |
| 24:3 | **convince** 131:1 | 24:13,15,18,20 | **Dan** 20:17 | 145:12 147:11 |
| **composite** 79:19 | **coordinate** | 25:20 61:4 | **danger** 74:13 | 148:5,15 149:7 |
| **computers** | 154:23 | 78:18 82:5 | **data** 60:1 | 152:13 154:14 |
| 178:7 | **coordinator** | 93:8 | **date** 12:9 17:8 | 154:20,22 |
| **computer-aided** | 2:20 154:23 | **counselor** 134:1 | 28:8 36:10 | 156:3,5,6,8,23 |

# FREEDOM COURT REPORTING

157:18,18,19
157:23 158:2,5
158:6 161:20
161:20 164:5
165:13 170:13
170:19 171:3
171:11,19
172:22 176:8
177:16,22
**deans** 152:14
157:14 178:4
**Debardelaben**
5:5,19 7:4 8:4
10:4,22 11:11
16:18 40:10
60:9,12 77:2
82:17 85:21
87:11 88:3
91:11 96:21
104:2 139:21
140:2,8 143:6
178:17 179:1,6
**DEBARELA...**
57:9
**decision** 54:12
112:14 128:16
166:23
**DEFENDANT**
7:8
**Defendants** 1:18
3:6 4:21
**Defendant's**
62:15 66:4
67:16
**define** 159:10,11
**defining** 131:21
160:17
**degree** 15:4,7,15
16:4 160:18,19
**degrees** 15:13
15:19,20 16:17
16:18
**Delinquent**
25:18

**delivering** 5:4
**demonstrating**
121:9
**deny** 122:18
161:3
**department**
41:17 49:1
104:23 107:1
150:5,8,11
152:18 158:9
158:15,20
159:2
**departure** 134:9
**depend** 56:3
128:3
**depending**
157:16
**depends** 131:21
144:1 158:1,9
160:16 168:17
**deposition** 4:23
5:15 6:6,10
10:9,11 57:6
62:16 66:5
82:23 83:6,9
83:12 180:7
**depositions**
50:20 83:10
**describe** 137:6
**described** 137:7
**description**
136:10 138:11
138:12 142:12
149:17 154:6
154:12 165:2,4
165:5,15,22
**descriptions**
150:14 155:10
**design** 101:22
101:23
**designate** 65:20
65:22 66:1
69:6,17,20
**designated**

69:13,15
**designee** 110:18
170:20
**detach** 140:6,7
**determine**
110:19
**development**
47:2
**diesel** 100:2,10
**difference** 21:20
47:16 121:4
161:23
**different** 64:8
84:14 145:16
145:20 148:3
**direct** 23:1,3,23
59:12,22 106:5
106:16 142:7
153:1 155:1
**directed** 59:14
140:1
**direction** 165:13
**directives**
152:16
**directly** 107:7
**director** 23:14
23:18 25:1,8
25:15,17 27:4
27:22 28:2
110:14 111:3,5
132:17 156:16
156:17,19
157:21,23
159:6,8,20
164:1,2,3,8
**directors** 158:8
158:19 159:4
178:4
**Disadvantaged**
23:19
**disagree** 146:12
146:17 152:8
167:17
**disagreed**

146:13,15
**disagreements**
131:22 132:1,2
132:5
**discipline** 41:5
42:15 55:17
65:15
**discriminate**
31:18
**discrimination**
31:17 32:1,3
**discuss** 81:16
151:13,16
173:17,19
**discussed** 37:7
37:14
**discussion**
173:21
**discussions**
120:16 169:6
**dismissal** 40:14
40:20
**dispute** 89:6,7
**disruptive**
115:17
**distinguish**
121:2
**District** 1:1,2
2:1,2 4:1,2
12:22
**DIVISION** 1:3
2:3 4:3
**DOC** 46:5,23
54:13 105:7
106:21 107:9
108:10,11
109:6,7,10,12
110:1,20
111:11,18
114:10,22
141:8 160:6
**document** 36:4
40:13,19 44:2
44:5 60:22

61:2,19,23
62:3,8 66:4
76:22 77:1
83:5,14,15
136:5,6,20
137:1 139:6,13
139:16 144:7,9
145:8,14,15,19
145:23 147:5,7
148:2 149:2
154:18 171:16
172:21 173:1
**documentation**
61:17
**documents** 42:5
44:17 61:18
82:21 93:21,21
165:9
**doing** 11:22 38:6
65:15 71:14
77:21 81:8
88:11 108:4
113:18 123:21
124:15 138:1
140:19,21,23
141:10 152:21
**dollars** 30:11
**Donna** 81:19,22
**dot** 140:19 141:2
141:20
**Douglas** 1:9 2:8
4:10 144:12
**Dr** 14:3 18:7
19:9 23:5
32:23 33:6,8
33:13 35:20
37:1,2 39:21
42:11 46:23
59:18,21,21
63:9,10 64:19
64:21 65:3,6
67:12,22,23
71:4,6,9,10
72:11,16 76:6

77:17,18 78:11
81:12,16 82:3
96:1,4 106:4
106:13 108:11
109:17 111:6,7
117:3,4 118:15
123:22 124:1,4
124:20 128:7,8
152:2 155:15
155:18 156:1,3
156:11,21
157:6 167:5
169:9 171:17
171:18 172:1
172:10,12
173:20 174:10
176:11,14
drafting 100:1,8
Draper 52:17
96:11 99:3,22
dropping 42:15
drug 103:17
104:5,6
drugs 107:22
108:4 109:2
dual 152:9,9,10
due 141:5,6
duly 10:2
duplicate 80:17
duplications
169:10
duties 23:22
134:17,19
135:6 148:4,21
149:3,23 150:4
153:19 171:18
duty 127:15

**E**

E 7:1,1 8:1,8
161:22,23
162:1,3,10
163:18 180:1,1
earlier 107:13

early 17:8 30:21
30:22
easier 169:20
ed 15:22,23
84:13
education 15:20
16:6,7,9 17:22
84:18,20 85:8
87:10,12
educational
14:16 15:6
16:2,14 24:7
Edward 4:23
5:16 10:1 12:8
Edwards 70:22
87:13
effect 115:2
effective 5:3
144:19
eight 46:7,8,11
either 43:1
91:14 102:1
107:9 142:19
157:17 165:6
electrical 99:23
100:6
Elmore 12:23
13:4
emergency 74:6
74:11,17
104:10,14
105:14 106:19
110:7,11
employability
160:21
employed 14:13
86:13 118:10
118:11
employee 34:5
65:7 74:13
135:3 150:1,4
170:22 171:4
171:10,12
173:11

employees 41:6
41:15 47:5,5
94:22 117:18
117:19 120:20
120:23
employers 34:6
employment
134:19 170:4
171:1
encourage 161:2
ends 125:7
engaging 78:16
engine 97:5
English 18:4
enroll 79:1
enrolling 141:7
ensure 171:4
entire 173:18
environment
19:12,17
equipment
171:7
equivalent
152:14
Erica 166:5,6
error 142:17,20
escape 74:14
114:20,22
especially 47:5
126:6
evaluating 141:3
141:14
evaluation 147:8
162:16
Evans 89:23
90:4,9,14,21
eventually 18:12
23:20
everybody 11:21
143:18
everyday 94:15
153:14
evidence 6:6
exact 95:12

exactly 17:6,8
27:18 31:7
33:2 44:13
76:1,2 117:12
175:9
EXAMINATI...
8:3 10:4
examiner 130:6
examiner's
129:10
example 74:19
121:7
exception 130:6
excuse 124:20
exhibit 8:10,11
8:12,13,14,15
8:16,17,18,19
8:20,21,22,23
9:1,2,3,4,5,6,7
9:8 40:2,6,9,13
43:21,22 45:16
56:18,19,23
57:1,2,7,8,8,11
57:13 58:2,8
58:12,16,17
59:12,22 60:17
60:21 62:14,15
63:8 66:5,6,8
67:16,18 74:4
74:5 79:19,21
82:12,16 90:10
90:15 103:2,6
103:23 104:1,4
105:13,21,22
118:3 121:16
125:4 135:23
136:7,21
137:20 138:6,7
139:1,2 140:6
140:7,13,14
144:4 147:1,2
149:4 151:5
152:7 154:8
165:1 167:9,13

174:19 175:1
exhibits 5:7
83:11
exist 44:9 105:3
existing 142:8
exit 170:1,6,22
171:14 172:1
172:11 176:12
176:15,17,20
177:17,23
exiting 171:10
experience
19:11,16,20,22
20:4 31:21,22
55:9,13,16,20
56:6,7
expertise 150:13
150:15
explain 48:2
explained 21:19
127:5
explains 42:22
explanation
127:7,9
exposure 75:4
75:13,15
extent 78:6
eye 122:16

**F**

F 180:1
fabric 123:9,20
124:8
facility 50:7
56:11
fact 29:7 122:14
169:12
fail 103:10
fairly 33:20
51:12
fall 117:20 158:4
165:17
falls 157:17
174:17

false 124:9,12
familiar 40:7
  57:12,16 79:5
  80:1,7 83:13
  83:15 139:5,7
  150:20 151:10
  177:13
family 122:13
far 112:3 163:17
fartherest 53:17
Faulkner 20:20
  20:21 21:11
favor 175:15
features 163:6,8
Federal 10:8,9
  86:22 117:18
Federally 23:10
feet 50:22,23
  155:17
fellows 108:4
felon 47:17
  160:4
felons 47:8
felt 31:20 113:5
  123:12 124:19
  137:3
female 102:3,11
  148:19 158:10
  158:14,18,19
  163:2,8
fifteen 95:13
fifty 30:10
fight 74:12
Fighting 74:22
Fikes 79:6,11,16
  80:15,18 81:8
  82:8 83:22
  87:4
file 35:9 41:10
  61:6 70:4 85:3
  149:16
filed 5:10 35:10
  35:11 150:21
  150:23 151:11

151:14,17
files 85:6 93:11
  149:19
filing 6:9 151:13
  151:16
fill 26:15 27:19
  28:5 32:14
  92:3,5,19
filled 18:23
  91:17,19,20
  114:2 126:14
  126:19
filling 26:16
  99:10
find 109:23
  110:2 173:2
findings 130:9
  130:10
finish 17:15
  73:15 92:16
  143:5 160:15
finished 122:20
finishing 160:17
first 10:2 18:18
  19:3 22:15,16
  41:4 45:21
  46:12 49:15
  107:18 108:19
  109:16,22
  135:7 166:3
fiscal 126:17
  127:14 130:2,5
five 40:9,10
  169:15
fixing 60:9
floater 65:5
floor 101:22
folk 13:7
follow 112:7,11
followed 108:9
  112:3,5
following 105:2
  126:9
follows 10:3

food 100:3,5,17
  101:19
foregoing 180:7
  180:11
form 6:2 42:21
  42:21,23 48:8
  54:23 58:19
  59:9 60:6
  62:20 63:11
  91:4 93:7,9,22
  110:10 112:13
  121:6 124:22
  125:11 130:20
  143:20 148:20
  167:19 171:8
  171:14 172:14
  176:7
formalized
  46:22
former 12:18,19
  141:4
forms 42:13,16
  43:3 91:4
  142:9
forth 45:2 94:20
  131:10
forty-five 34:2
forward 39:15
  132:2 178:20
found 91:1
four 77:19 78:12
  80:16
front 36:20 62:3
  62:8 80:3
  90:12 91:5
  93:23 120:20
functions
  153:14
funded 23:10
funds 130:7
  168:13 169:13
furnish 70:5,6
furniture 50:17
  51:5,9,15 52:6

52:11 54:5,9
  97:14,16,22
  98:16,17
further 5:22 6:8
  15:6 16:14
  82:6 180:14
future 110:21

_____
**G**
_____

Gainus 33:6,8
  33:14
gate 49:21
Gaylords 17:3,9
gears 166:9
GED 134:1
general 127:21
generally 33:5
  66:2 67:11
  92:2 93:18
  95:5 126:10
  150:6 173:9,17
  174:8
generic 165:7
getting 72:1
  115:15 160:18
GIDIERE 7:10
Gillis 35:22
give 42:8,10
  74:18 89:9
  121:7 124:2
  176:6
given 41:6 42:3
  42:18,19 43:2
  180:12
Givens 1:5 7:15
  11:12
giving 89:12
  119:1
go 10:22 14:22
  16:22 17:13
  21:14 22:4
  26:1,6 28:10
  30:15 33:5
  41:9,16 45:16

46:4 49:21
  50:5 53:2,21
  53:22 54:1
  60:10 66:23
  73:2,3,10,15
  73:18 80:4
  93:2 106:9,21
  108:15 122:10
  123:22 124:2
  132:2 137:12
  143:6 146:1
  149:21 157:12
  159:9 160:14
  160:22 169:3
  173:1 174:8
  178:22
goals 152:17
goes 41:11,12
  97:10 174:14
going 11:15 12:5
  19:13,18,23
  20:4 21:9,11
  38:4 43:21
  47:23 48:16,19
  62:3 66:6 68:3
  78:3 93:5
  103:19 105:20
  106:8 109:3
  126:1,7 136:3
  136:18 137:8
  138:5,23 139:1
  139:17 141:16
  143:3 151:3
  155:5
Gol 100:17
good 135:3
  140:11
gotten 43:9
governs 84:15
grading 42:15
graduate 14:17
  23:12
graduated 15:3
  16:23 82:9,10

graduation
14:22
graft 57:4
great 176:7
green 123:8
124:5 126:11
126:16,22
131:17 163:16
Greene 1:6 7:16
11:12 117:10
120:5 167:15
168:5 169:12
Greene's 130:4
167:20
greenhouse
50:21 107:6,21
108:3
greenhouses
113:15,17
Gregg 18:7 19:9
23:5 32:22,23
35:20 46:18,23
grievance
139:20 140:1,3
140:9 150:21
151:1,11,14,17
151:20 152:5
Griffin 166:13
Griswold 55:11
55:18 56:1
60:3 62:17
63:16,18,20,21
64:2,3,7,9,17
83:22 84:5
85:12,18,19,20
85:23 86:2,3
86:13 112:16
113:5,5
Griswolds 63:22
63:23
Griswold's
63:14 64:9
ground 49:4
grounds 6:4

Group 24:12
grouped 11:18
guess 63:11
67:20 80:2
91:13 158:3
Gun 49:10
guy's 101:21

───────

**H**

H 8:8
habit 88:11
Haines 98:8,9,13
107:5 111:14
111:23
half 60:1 80:2
hand 84:17
handbook 44:12
handed 29:16
handle 108:21
114:23 115:19
handling 41:18
happen 30:20
119:4
happened 22:23
25:5,10 29:12
39:15 78:15
82:7 98:13
178:19
happening
119:6
happens 120:15
126:10
hard 49:5
130:14,18
Harris 100:9
heads 150:8,12
hear 118:21
119:7
heard 86:20
120:1,4,10
174:11
hearing 180:13
hearings 73:23
help 47:4 95:14

113:10 150:8
helping 99:5
138:3
helps 64:22 90:9
152:23
Hendrix 2:5
11:13 52:21
54:19 66:17,18
68:12,18,19
70:9,19 71:8,9
71:20 72:1,3
75:12 76:1,6
76:17 77:7
78:16 79:10
81:7,19 83:20
86:7,10,14
88:14 90:3
94:14 95:1,16
103:9 112:17
112:19 113:6
Hendrix's 54:13
60:4 62:15,17
66:5 80:20
94:7 106:4
**HERNDON**
7:10
hey 146:2
He'll 11:9
he/she 171:8
high 14:18
higher 162:4,9
Hill 49:10
hinder 143:18
143:21
**HINTON** 7:10
hire 54:12
hired 19:2,6
41:15 42:3
43:17 46:12
54:16 86:8
116:15
hires 42:10,18
43:2,9
hiring 18:21

43:14
history 16:23
his/her 170:20
hold 136:12
153:20
holding 99:17
honest 59:6
honors 16:16,20
hooked 51:18
hopefully 137:8
horses 132:15
horticulture
49:1 50:6,9,10
50:20 52:20
53:13,20 54:7
59:4 67:8
89:15,17 94:9
94:10,23 95:11
95:16,18,19,22
109:14 113:7
113:11 166:12
host 165:9
hour 22:1 46:7,8
46:11 143:4
hours 21:23
161:7
houses 49:17
Huffstutler
81:12,17 82:3
128:8 171:17
Huh 65:21
husband's 14:2

───────

**I**

idea 59:20 63:13
64:5 84:18
109:19 113:3
127:21
identification
40:3 43:23
56:20 60:18
66:9 79:22
82:13 90:16
103:3 105:23

118:4 136:1,8
136:22 138:8
139:3 144:5
147:3 151:6
154:9 167:10
174:20
identify 36:4
37:23 44:2
immediately
105:1 111:10
implement 24:2
impounded 30:5
impression
105:5
improper 78:17
improving 142:8
inactions 107:7
incident 77:22
84:21 109:22
109:23 110:3
incidents 22:2
included 24:3
incomplete
61:19,23 82:21
82:23
incorrect 139:10
139:14
increased
140:20 141:2
141:11,12
indecent 75:4,12
75:14
individual 24:12
117:9
Individually
1:10,14 2:9,13
2:19 3:2 4:11
4:16
inexperienced
31:19
inform 93:19
information
42:19 57:16,17
58:3 61:14,15

| | | | | |
|---|---|---|---|---|
| 61:15 63:1 | institution 3:4 | interviewed | 116:9 128:13 | 86:13 112:15 |
| 69:4,4,5 78:1,7 | 42:17 43:13 | 18:23 19:3,6 | 128:14 134:7 | 113:4 |
| 101:14 171:11 | 44:18 47:3 | 61:16 | 134:14 136:10 | **J.T.M** 71:2 |
| **informed** 68:12 | **instructed** 19:18 | **interviews** | 137:6,17,20 | **J.W** 67:16,17 |
| 177:14 | **instructing** | 172:11 177:17 | 138:2,12,15 | |
| **informing** 168:6 | 19:13,23 | 177:23 | 140:18,19,20 | **K** |
| **Ingram** 1:12,16 | **instruction** | **invented** 155:3,9 | 140:23 141:11 | **Kate** 87:17 |
| 2:11,16,22 3:4 | 18:13 27:14 | **inventoried** | 142:12,18 | **Katherine** 13:13 |
| 4:8,13,19 | 28:6 32:13 | 171:7 | 143:1 148:9 | 13:23 |
| 14:14 17:17,18 | 64:22 65:1 | **investigate** | 149:16,23 | **Kaye** 118:14 |
| 17:21 19:14,19 | 156:5,6,8 | 110:15 111:4 | 150:4,13 153:7 | **Keahey** 98:18 |
| 20:1,5 21:14 | 157:18 | **investigation** | 154:6,12 155:9 | **keep** 63:1 69:6 |
| 22:18 31:14 | **instructional** | 77:22 | 163:22 165:2,3 | 69:14 70:1 |
| 32:18 35:21 | 39:19 96:5 | **invited** 47:1 | 165:4,15,22 | 73:18 85:4 |
| 40:20 44:10,18 | **instructor** 17:23 | **invoice** 121:8 | **jobs** 132:4 | 86:21 |
| 44:20,22 45:9 | 22:19,21 45:13 | **involved** 11:15 | **joking** 123:19 | **keeping** 115:23 |
| 45:11 49:3 | 54:20 61:5 | 31:9,13 35:6 | 124:16 | 122:16 |
| 68:6 86:16,21 | 89:10 93:3,6,7 | **involves** 106:14 | **Joseph** 18:10 | **keeps** 57:15 |
| 98:14 110:21 | 93:12,14 95:18 | 106:17 | 55:10 | **Kelly** 36:1 |
| 115:2 116:8,9 | 95:21 96:6 | **isolated** 53:14 | **JULIE** 1:5 7:15 | **kept** 57:18 58:4 |
| 116:12,15,16 | 98:2 99:2 | **issues** 21:22 | **July** 83:14,15 | 93:3,4,21,23 |
| 117:4,15 118:9 | 107:14 111:1 | **item** 128:18 | 125:23 | 173:6 |
| 118:10,12,13 | 116:1,16 | 131:8 | **June** 5:7,20 | **keys** 171:6 178:6 |
| 129:6,9 134:20 | **instructors** 46:2 | **items** 126:2,4,12 | 118:18 125:23 | **kids** 122:13 |
| 156:20 158:11 | 51:12 62:18 | 126:18 130:19 | **J.F** 4:8,13,19 | **kin** 13:3,7 14:4 |
| 160:2 165:16 | 95:5 102:4,11 | 171:7 | 14:14 19:14,19 | 180:15 |
| 165:23 171:1 | 106:16 116:3 | | 20:1,4 21:13 | **kind** 21:14 24:5 |
| 173:1,7 177:15 | 169:6 | **J** | 22:18 31:14 | 49:21 82:18 |
| **initiate** 93:14 | **instructor's** | **J** 4:5,9 144:12 | 32:17 35:20 | 168:15 |
| **initiated** 92:22 | 45:21 | 144:14 145:11 | 40:20 44:9,20 | **knew** 70:16 |
| 140:15 | **instructural** | 147:20 | 44:22 45:11 | 122:15 |
| **injured** 35:13 | 116:10 | **jail** 29:8 | 49:3 68:6 | **know** 12:2,3 |
| **inmate** 46:3,4 | **interaction** | **James** 1:13 2:12 | 86:16,21 | 13:20 18:14,16 |
| 70:23 85:15 | 56:12 | 3:1 4:15,23 | 110:21 129:6,9 | 24:9 26:13,14 |
| 95:4,5,8 | **interested** | 5:16 10:1 12:8 | 156:20 158:11 | 26:20 36:11 |
| 112:17,20 | 180:17 | 14:3 | 160:2 165:16 | 42:6 46:2 |
| 160:10 | **interior** 101:23 | **Jason** 13:18,21 | 165:23 171:1 | 47:13,14,16 |
| **inmates** 19:23 | **internet** 165:8 | **Jeffrey** 13:18,22 | 173:1,7 | 50:19,23 54:14 |
| 21:20 55:10,18 | **interview** 19:2,8 | **Jim** 5:4,19 7:4 | **J.F.I** 94:22 | 54:15 55:4,12 |
| 56:2,5,9,13,16 | 170:2,7,22 | 11:10 | 160:18 161:11 | 55:15,19,20 |
| 74:1 113:17 | 171:3,9 172:1 | **job** 22:17 25:16 | 162:18 170:5 | 57:23 58:7 |
| **input** 138:14,22 | 176:12,15,17 | 26:13,19,22 | **J.L** 60:3 62:16 | 59:14 60:22 |
| **instances** 29:9 | 176:21 177:8 | 27:20 28:21 | 63:20 64:2,3,7 | 62:21,22,23 |
| 38:4 | 178:5 | 30:23 34:21 | 85:18 86:4,5,6 | 63:7 64:3,8 |

# FREEDOM COURT REPORTING

68:4,14,15,21
68:23 69:1
70:8 73:9 75:9
76:12 77:10
78:10 79:3
85:22 88:23
89:11,22 92:10
95:12 109:21
111:21 113:2
113:20,22
116:4,7,17,18
118:6,8 121:4
127:3,18,19,20
127:23 129:19
130:1 134:21
137:15 140:2
145:17 149:18
150:23 153:21
157:13 158:12
160:2 161:9,10
161:12,22
163:5,16,17
165:3 168:3
170:8 171:21
172:23 175:7
176:2,5,22
178:19
**knowing** 160:15
162:15
**knowledge**
68:12 85:1
117:5 126:12
145:6 172:14
**known** 129:9
162:12,18
**K-Mart** 17:3,5

### L

**L** 5:12 51:16
**lab** 113:21
**lacking** 61:10
**lady** 120:11
**Lane** 12:13
**larger** 50:13

**largest** 50:18
**laughing** 123:19
**law** 47:22
127:16,18
128:20 129:3
**lawsuit** 31:10,12
33:11 34:6,17
35:9,20
**lawsuits** 34:20
36:2
**lawyer** 10:16
35:23 48:2
**leading** 6:2
**learn** 26:21
**leave** 73:5 86:16
115:13 134:7
**leaves** 170:4
**leaving** 170:23
**left** 28:11 38:12
73:14 113:6
126:2,8 134:12
134:19 135:5
153:19 161:1
161:11 178:8
**length** 160:7
**Leo** 116:5
**letter** 144:10
146:14 155:7
167:14,18
175:21,22
**letters** 155:14
177:13
**let's** 14:16 60:7
60:12 121:2
132:15 150:20
159:9 179:1
**level** 157:15,22
**levels** 157:12
**license** 29:14,16
**lies** 123:4
**Lila** 14:9
**list** 62:17 63:15
63:16
**little** 30:8 42:3

92:20 117:12
122:6 144:23
145:22 163:16
**live** 116:20,22
117:5
**lives** 13:10,20
14:6
**loading** 90:23
**located** 49:3
52:21 56:12
**long** 15:1 22:6
22:20 23:13,17
24:23 31:5
46:6 98:4
116:14 129:5
132:21 153:20
156:14
**longer** 98:14
156:19
**look** 36:9 38:2
39:7 48:13
49:14 51:20
52:8,8,9 54:6
74:3 82:18
86:9 90:20,20
103:22 153:22
165:1 178:22
**looked** 59:7,8
62:14
**looking** 38:8
44:16 50:16
52:3 53:21
91:19 103:21
110:11 140:13
165:10 170:16
178:20
**loose** 130:23
**loss** 29:1
**lot** 11:19 38:5
**loud** 121:8,10,11
**lunch** 22:1 88:5
88:7
**Luster** 98:21
99:1,2

### M

**machines** 20:11
**Madison** 5:19
7:5
**main** 25:20 49:7
49:9 94:2,4,15
96:10,18 99:11
102:7,10,16
**majority** 37:11
**making** 48:14
97:23 98:1
161:10
**Malcolm** 2:18
25:7 66:22
67:4,5,11
71:21 89:1
**male** 148:16
159:1,4,6,7
162:23 163:1,7
**man** 84:8 163:16
**management**
15:5 16:5
45:23 115:18
119:19
**manner** 59:7,8
123:19 124:16
174:15
**manual** 36:7,15
36:23 37:7,12
37:17 38:1,5
38:10 39:22
40:23 170:17
172:6,15 173:4
173:6 177:21
178:20
**Maplesville**
14:19,20
**March** 17:19
**mark** 43:21
90:10 136:3,19
138:5 139:1
**marked** 40:3,5
43:23 56:20,22
60:18,21 66:9

79:22 82:13,15
90:16 103:3,5
105:21,23
118:4 121:16
136:1,8,22
138:8 139:3
144:2,5 146:23
147:3 151:6
154:9 167:10
167:12 174:20
174:23
**marriage** 12:18
12:20
**married** 12:15
13:23
**Mars** 163:17
**masonry** 100:1
100:14,15,16
**Master's** 15:8
17:16 21:10
24:16,17,19
**masturbating**
67:8 75:18
**masturbation**
76:18 77:8
**material** 77:1
178:7
**materials** 165:7
**math** 18:4 21:2
21:4
**matter** 29:7
108:7 122:14
144:1 169:12
**ma'am** 10:7
**McCloudy**
20:17
**McDonald** 35:8
**McPhillips**
35:18,19
**mean** 13:21
16:16 18:1
24:10 25:14
35:14 58:14
91:9 93:16

115:8,22 116:1
121:3,4 128:12
157:1 178:16
**meaning** 38:12
**means** 35:22
180:9
**mechanic** 52:5
**mechanical**
51:11
**mechanics** 96:14
97:5 101:21
**meet** 160:5
169:9
**meeting** 66:14
66:16,19 67:1
67:14,15,21
68:3,13 69:1,7
69:14,16,18,21
69:23 70:1,9
71:7 72:7,10
72:14,21,23
73:2,8,13,21
74:5 76:5,11
77:6 81:18
82:2 84:4,7,11
84:16 86:4
87:2 118:14,18
119:9 152:16
**meetings** 65:16
68:6 86:19
120:8,12 130:8
151:22,23
173:19
**Melissa** 118:6
**member** 157:9
**members** 37:10
**memo** 103:7
107:2 108:1
140:14 144:16
167:21
**memoranda**
80:19
**memorandum**
40:7 81:11,14

103:13 104:21
106:2 107:11
122:1,5,7,19
122:22 125:3
139:9 167:14
173:16
**memorandums**
177:13,19
178:3
**mentioned** 37:2
39:16 102:9
107:4
**Merk** 3:1 37:1,2
39:21 59:18,21
59:21 63:9,10
64:19,21 65:3
65:6 67:12,22
67:23 71:3,4,6
71:9,10 72:11
72:16 76:6
77:17,18 78:11
96:1,4 106:4
106:13 108:12
109:17 111:6,7
117:3,4 118:15
123:22 124:1,4
128:7 132:9
152:2 155:15
155:18 156:1,3
156:11,21
157:6 169:10
172:1,10,12
173:20 174:10
176:11,14
**Merk's** 42:11
167:5 171:18
**Mershire** 109:13
109:15
**met** 163:4,15
**Michael** 89:23
90:4,14
**mid** 33:12
**middle** 1:2 2:2
4:2 12:22 68:9

76:11 169:4
**Miller** 116:5,7
116:11
**Millidge** 100:16
**Milton** 18:10
**mind** 137:16,19
**minded** 72:11
**minimum** 160:5
**minute** 146:2
179:2
**minutes** 86:22
**misdemeanor**
47:17,20
**misquote** 123:6
123:14
**misquoted** 123:5
123:16
**missed** 76:19
**mistake** 140:4
142:15 145:1,1
**mistaken** 27:4
30:7 84:8
103:12
**misunderstood**
10:15
**mis-spending**
129:10 130:13
130:17
**mis-spent**
130:11
**modus** 68:5
**monetary** 33:21
**money** 11:21
30:6,6,9 125:9
125:10,11,14
125:18 126:2,3
126:7,13,20
129:11,12,15
129:18 130:14
130:17,18,23
161:10 162:2
**MONICA** 1:5
7:16
**Montgomery**

2:18 5:20 7:6
7:12 12:23
13:11,19 14:7
25:8,14 67:4
68:21 71:21
79:14 91:14
132:11 180:4
**month** 59:23
160:12,23
**months** 31:8
77:20 78:12
98:6 160:10
161:1 169:15
**morning** 108:15
109:17,21
111:8
**moved** 13:22
52:18
**Mulder** 18:10
19:9
**multi-page** 40:8
**Murry** 18:7 23:5
**mutual** 78:23

———————
**N**

**N** 5:12 7:1 8:1
**name** 11:10 12:7
13:12 14:2,8,9
14:10 22:15,16
23:20 44:21
45:1,9,11 60:4
62:16 64:9
79:6 89:22
90:5 101:22
102:1 166:4
**named** 25:7 26:5
26:7 90:4,13
116:4 149:1
**names** 13:17
**necessarily**
50:15 51:17
52:5
**necessary** 5:23
34:5 42:14

171:5
**NED** 25:17
**need** 12:2 29:15
42:5 107:16
126:2,4,9
128:15
**needed** 30:5
123:8
**needs** 24:6 25:1
28:1,3 168:18
168:21
**Neglecting**
25:18
**neither** 74:8
111:18 180:15
**never** 28:23
143:14
**new** 41:6,15
42:10,18 43:2
43:9 47:5
101:22 102:1
142:4
**nigger** 29:18,20
**night** 29:8
**nine** 160:12,23
161:6
**nineteen** 13:15
**Non** 74:7
**non-emergency**
74:5,9,10
104:18 108:23
**non-profit** 118:1
**normal** 45:23
141:17 160:23
**north** 52:9
**NORTHERN**
1:3 2:3 4:3
**Notary** 5:18
**note** 124:21
125:2
**notebook** 42:3
42:10 173:12
**notes** 65:17,19
69:6,14 70:1,3

| | | | | |
|---|---|---|---|---|
| 73:19 81:20<br>84:10 85:2,5<br>85:14 86:21<br>**notice** 6:9<br>152:11<br>**noticed** 36:8,10<br>44:16 60:2,22<br>142:11<br>**notified** 105:2<br>**Null** 31:4,5<br>**number** 1:8 2:7<br>4:7 38:18,21<br>38:23 39:1,2<br>79:15 104:14<br>108:22 129:22<br>141:2 168:8<br><br>———O———<br>**O** 5:12<br>**oath** 88:11<br>**Object** 54:22<br>58:18 60:5<br>110:9 124:22<br>**objections** 6:1,4<br>**objectives**<br>152:17<br>**obviously**<br>178:21<br>**Occasionally**<br>56:17 120:13<br>**occasions** 79:15<br>**occurred** 77:6<br>**occurrence**<br>110:15<br>**occurs** 45:20<br>**October** 22:22<br>88:13 89:14<br>140:9 147:14<br>147:18<br>**offered** 6:6<br>**office** 5:19 26:11<br>42:12 57:19,20<br>57:21,22 70:14<br>71:10,12,13,14 | 71:23 73:17<br>75:21,22 91:13<br>91:17 93:3,4<br>93:23 94:7<br>101:13 102:19<br>121:20,21<br>122:10,12<br>127:14 130:2,5<br>142:16,22<br>143:11,12,16<br>143:22 157:5<br>**officer** 109:12<br>109:13 126:17<br>157:9<br>**officers** 110:1<br>**offices** 49:17,19<br>**official** 4:12,17<br>65:11 93:7,9<br>134:3,4<br>**officials** 47:1<br>**Oh** 58:9 77:19<br>108:19 129:22<br>**okay** 18:5 22:3<br>25:5 27:6 28:7<br>28:10 31:9<br>33:20 35:12<br>36:19,22 37:16<br>37:21 38:17<br>39:8,13,21<br>40:1,19 41:22<br>42:2 44:14<br>45:1,17 48:4<br>52:18 57:17,23<br>61:10 62:2,7<br>62:10 63:7,13<br>64:6 65:14<br>66:3,13,16,23<br>67:21,23 68:8<br>69:17 72:3<br>74:3,23 76:5<br>79:1 80:18<br>83:19 86:11,18<br>88:2 89:13<br>90:6,19 93:2 | 93:12,20 94:13<br>94:19 96:2,6<br>97:17 98:1<br>101:6,18 102:3<br>103:1 104:9<br>108:19 110:2<br>112:4 115:14<br>116:4,19<br>117:23 118:2<br>118:21 122:9<br>124:14 125:6<br>126:11 127:12<br>132:15 133:20<br>134:6,18<br>136:12,18<br>139:8 140:5<br>142:6,11 144:2<br>145:10,22<br>147:23 148:23<br>149:22 153:16<br>154:1 157:12<br>158:10,14,19<br>159:15,19<br>160:1,22<br>162:23 163:9<br>163:12 164:10<br>167:8 172:9,18<br>173:13,22<br>175:10 176:11<br>176:22 177:20<br>178:23<br>**old** 14:9 38:15<br>**older** 47:5<br>**once** 45:3<br>**ones** 80:16<br>**open** 26:19,22<br>50:10<br>**operandi** 68:5<br>**operation** 157:4<br>**opinion** 104:8<br>138:2 145:2<br>163:9<br>**opportunity**<br>171:10,12 | **option** 67:12<br>**oral** 5:6<br>**order** 30:9 44:12<br>44:15 105:17<br>124:11 128:7<br>168:7,23<br>**ordered** 127:1,2<br>127:11 131:6<br>**orders** 128:7,8,9<br>**organization**<br>118:11 158:4<br>**organizations**<br>118:1<br>**orientation**<br>21:15,17 22:4<br>22:6 41:16<br>42:9 47:4<br>**original** 5:5 40:4<br>44:1 56:21<br>60:19 66:10<br>79:23 82:14<br>90:17 103:4<br>106:1 118:5<br>136:2,9,23<br>138:9 139:4<br>144:6 147:4<br>151:7 154:10<br>167:11 174:21<br>**originally** 57:5<br>**outcome** 29:23<br>31:2 33:14<br>82:1 93:8<br>**outdated** 38:11<br>38:20<br>**outlined** 149:4<br>**outside** 50:12<br>52:7<br>**overall** 48:13<br>152:16<br>**overview** 42:13<br>42:20<br>**Owensby** 4:5<br>11:12 43:1<br>69:10,13 73:10 | 73:12,16,18<br>74:2 132:16<br>135:3,6 137:23<br>138:1 139:10<br>139:12 140:14<br>140:23 142:21<br>144:14 145:11<br>146:15 147:21<br>147:23 148:19<br>148:23 150:21<br>151:11 152:3,4<br>158:23 159:19<br>161:17 162:13<br>162:21 163:1<br>163:17 175:23<br>176:19,20<br>**Owensby's**<br>175:2<br>**o'clock** 30:2<br>88:4<br><br>———P———<br>**P** 5:12 7:1,1<br>118:6<br>**pad** 69:23 73:18<br>**page** 8:3,9 36:20<br>57:4 62:8 80:2<br>80:3 90:12<br>91:5,19 92:4<br>105:12,13<br>139:19 140:13<br>**pages** 40:9,11<br>**Paid** 30:10<br>**paint** 50:1 51:6<br>51:10 52:10,12<br>52:13,15 97:10<br>**paper** 57:2 77:9<br>77:11 93:1<br>**paperwork**<br>126:14,19<br>171:5<br>**Pardon** 57:10<br>138:18<br>**parenthesis** |

141:6
**part** 26:23 37:3
37:3 42:1
43:13 49:16
61:11,13 71:6
74:2 76:13
83:11 84:9
94:11 107:18
108:19 114:22
130:9 151:19
**particular** 24:4
27:3 70:9
81:23 87:16
153:4
**Particularly**
88:22
**parties** 5:14 6:3
180:16
**part-time** 21:8
**pass** 173:10
**passwords**
178:6
**Paul** 70:22
133:17
**Pecan** 12:13
**people** 13:3 14:4
42:2 62:18
84:19 104:11
111:20 119:17
120:2 143:22
153:5 159:14
159:18 168:20
172:4 178:6
**period** 21:3 26:4
28:9 45:5
129:8 144:20
168:9 178:16
**periodically**
36:13 47:2
**permission**
123:22 124:2
**Perryman** 87:17
87:18,22
118:15

**person** 22:9,11
31:20 39:21
47:19 57:18
84:21 86:6,8
116:4 137:8
153:5 157:16
165:19 171:23
**personal** 24:8
**personally** 41:23
162:15
**personnel** 39:22
41:10 63:5
105:1 106:16
107:10 138:20
142:10,20
149:16,19
150:5,13,16
155:23 156:9
156:12,16,17
156:20 157:1,3
157:5 166:8,9
170:12
**persons** 63:6
158:8
**perspective** 75:6
**phone** 30:3,4
**phrase** 115:8
126:21
**physically** 35:14
**piece** 77:9 92:23
**Pike** 12:13
**Pinkston** 14:9
**place** 19:12,17
40:14 66:14
76:16 77:5
172:20 173:7
**placed** 166:11
**places** 114:4
**Plaintiff** 2:6 4:6
7:3
**Plaintiffs** 1:7
**Plaintiff's** 8:10
8:11,12,13,14
8:15,16,17,18

8:19,20,21,22
8:23 9:1,2,3,4
9:5,6,7,8 40:2
40:6,13 43:21
43:22 56:19,23
57:7,11 58:2
58:17 60:17,21
66:6,8 74:4,4
79:21 82:12,16
90:15 103:2,6
103:23 104:4
105:21,22
118:3 121:16
135:23 136:7
136:21 138:6,7
139:1,2 144:4
147:1,2 151:5
154:8 167:9,13
174:19 175:1
**plant** 121:22
**plants** 113:12
**play** 151:19
**played** 82:4
**please** 5:8 12:1,3
12:7 14:8
16:22 44:3
76:16 90:20
165:2 170:18
**plenty** 99:20
162:17
**plot** 49:4
**plumbing** 100:2
101:3,6
**point** 50:16,17
134:22 164:21
**pointed** 155:2,7
**police** 29:6
**policies** 36:6
40:23 106:15
106:17 112:2,4
112:8,11 115:1
115:4 170:17
172:6 173:3,6
177:21

**policy** 36:15,23
37:6,6,12,17
38:1,5,10
107:8 114:23
172:23
**population** 47:7
**portion** 61:9
76:8,12
**position** 17:20
18:11,15 27:2
28:1 31:22
32:11,15 98:23
99:11,18
126:16 129:6
133:1,15
136:13 137:9
147:10 148:15
153:18 155:21
165:18 174:11
**possible** 112:6
169:19
**possibly** 67:7,7
172:8
**post-graduate**
15:14,16
**post-secondary**
33:4
**Powell** 130:3,4
**practice** 124:8
**Prattville** 28:20
**prepared** 58:1,3
58:7,13,17
59:12,15,22
63:8
**prepares** 155:13
**presence** 119:16
**present** 7:14
12:11 19:10
99:9 102:19
119:1
**presented** 37:18
**presently** 12:15
14:13 40:14
44:9 99:17

102:11
**president** 1:11
2:10 4:13 18:5
20:16 32:21
46:19 65:4
118:14,21
119:8,11
120:19 121:18
123:3 124:20
125:2 128:23
132:7 142:17
145:3 146:1,11
152:3 155:6,14
157:13 173:15
175:14 178:10
178:11,12,14
178:18
**president's** 27:1
37:4,8,18
174:9
**previous** 20:3
50:19 82:23
**primarily** 39:20
**prior** 6:6 19:13
19:18,23 21:11
27:12 33:8
46:16 57:5
71:23 83:11
140:22 141:7
144:23 156:11
164:21 178:18
**prison** 47:11,20
160:4
**prisoners** 19:13
19:18
**private** 117:8
**privilege** 78:4
**probably** 11:17
33:12,13 48:14
70:4,20,22
74:17 75:7
102:5 129:11
131:2
**problem** 40:22

# FREEDOM COURT REPORTING

45:14,19,22
56:2,3,5,9 61:6
79:11 81:1,3,4
82:7 106:7
107:13,14
108:14,15
112:18 115:20
131:4,16,19
**problems** 41:18
46:3 55:17
59:4 79:15
84:15 131:22
**procedure** 5:2
10:10 40:21
41:7,18 43:11
43:18 74:6,6
74:11 104:10
104:14 105:14
106:20 108:10
112:12 172:19
172:23
**procedures** 36:7
40:15,23 42:5
108:23 110:7
110:12 112:2,4
112:8 140:16
170:17 172:6
172:15 173:3,6
177:21
**process** 18:21
21:15,18 26:2
26:7,9 37:17
42:1 43:14
137:4,13,14
151:20 177:22
**produced** 57:5
**profanity** 83:20
83:23
**professional**
47:2
**program** 23:2,4
23:7,10,15,23
24:3 25:18
64:23 95:17,20

96:3,7 125:14
125:17 160:11
160:14,22,23
161:8 168:18
**programs** 96:5
159:17 161:5
169:4,8 178:5
**progressed**
34:17
**project** 123:8
124:7
**promoted** 34:19
**pronounce** 79:8
126:14,19
**property** 178:7
**pros** 31:4,5
**Prossor** 97:1,2
**provide** 142:8
171:9,11
**provided** 46:2
**provision**
142:18
**proximity** 51:13
**Public** 5:18
**pulled** 29:13
165:7
**purchase** 168:7
**purchased**
128:19
**purpose** 58:20
58:21 144:16
**purposes** 57:3
83:8
**put** 36:16 38:4
51:19 53:19
60:7 63:11
107:19 112:19
129:11 137:9
140:9 155:17
166:14 167:1,1
173:11,15,22
174:1
**P.E** 70:21

_____
**Q**
_____
**qualify** 117:15
117:22,23
**question** 10:19
11:23 12:4
13:6 19:21
33:17 39:9
40:12 51:8
55:6 58:7,15
77:4 78:6 80:6
93:13 94:14
122:21 126:15
128:6,9,14,15
130:21,21
131:1,2 133:7
139:23 151:9
160:10 166:19
**questioned**
146:21
**questions** 6:2,3
11:16,17,19
38:3 48:1
179:7 180:8
**quick** 174:23
**quite** 119:14,15
168:7,10

_____
**R**
_____
**R** 7:1 180:1
**race** 31:23 32:2
32:3
**Raheem** 81:8
83:22 84:5
85:14 87:4
**Raheen** 79:6
**raise** 119:9
120:17 121:1
121:12
**raised** 119:11
**raising** 119:20
121:3,5
**read** 10:11,12,13
10:17 11:4,7,9
69:12 76:16,18

139:17 170:16
**reading** 10:18
63:17 80:19
122:20
**real** 174:22
**really** 104:18
106:9 115:16
116:17 125:23
**reason** 31:16
39:13 59:19
112:23 124:3
125:1 127:4
176:6
**reasons** 47:6
**recall** 17:6,7
19:5 22:7,16
26:16 27:18,21
29:22 33:2,7
35:4 36:3,17
43:19 45:3
46:14 66:11,15
68:10 71:19
76:2 84:4
88:13 89:11
90:2 119:3,5,6
119:10 129:18
129:23 130:6
130:11 134:8
167:14 175:2
**receives** 91:14
**recess** 60:15
88:7 143:8
179:4
**recognize** 38:10
38:11 103:6
144:7 147:5
**recollection**
90:13
**recommendati...**
91:7 93:11,15
167:1
**recommendati...**
61:14
**record** 57:4 61:4

68:6 69:4,5
83:8
**recorded** 65:16
67:21,23 68:3
68:13,16,19,22
69:2 76:6,9
84:17
**recorder** 68:8
84:17 120:12
120:14
**recording**
120:11
**records** 79:4
153:22
**Reeder** 133:17
164:15,16
**reference** 41:17
**referred** 44:18
44:20 103:16
**referring** 58:1
**refinishing**
50:17 51:5,9
51:15 52:6,11
54:5,9 98:16
98:17
**reflect** 172:7
**refreshes** 90:12
**refuse** 72:20
**refused** 126:12
126:18,23
**regarding** 76:23
78:4 109:22
141:5
**registrar** 133:20
133:23 134:5,7
137:2 138:13
142:12 144:17
145:12 147:10
148:1,8,18
149:1,6 153:8
153:17 154:12
154:13,19
157:8 161:19
162:12 163:22

# FREEDOM COURT REPORTING

164:10 165:3,5
165:12,16,23
**registrar's**
153:18
**registration**
132:18 154:22
155:4,12
159:23
**regulation**
171:22
**regulations** 44:7
44:9 84:14
87:6 172:4
**relate** 136:15
**related** 17:22,23
18:3 20:10
22:19,20 34:21
34:22 45:19
53:8
**relates** 114:23
115:2
**relating** 11:16
**relationships**
165:11
**relatives** 117:19
**relevant** 171:11
**remain** 23:11
24:23
**remember** 22:11
22:18 34:23
58:11 83:17
88:20 101:21
102:1 167:22
168:2
**remind** 88:9
**reoccurring**
115:20
**repair** 50:1 51:7
51:11 96:16
97:2,11,14
100:2
**repeat** 13:6
19:20 58:14
126:15 133:7

**replaced** 148:18
**report** 21:23
22:2 61:3
67:10 75:14,16
106:23 109:3,7
110:8,13,16
111:1
**reported** 75:17
75:23 78:16
79:13,14 105:7
105:18 107:20
109:2 111:7,11
111:17
**Reporter** 5:9,17
10:5
**reporting** 75:12
**reports** 54:19
**represent** 11:11
61:12
**represented**
35:17,19
**represents**
180:11
**reprimand**
112:9,12
**request** 63:6
66:21
**requested** 66:17
66:18 71:9
72:13
**requesting** 67:1
**requests** 168:7
168:19
**requirement**
86:21,23
160:12
**requirements**
160:3,6
**requisition**
131:7
**requisitions**
169:11
**reside** 12:22
13:4,8,19

**residing** 14:5
**resign** 175:8
**resignation**
175:2,11
**resigned** 148:11
148:22 169:22
**resigning** 170:23
175:5 176:6
**resolve** 45:22
46:3
**Resource** 84:5
**respective** 5:15
**respond** 167:20
167:23
**responded**
167:23 168:3
**response** 45:21
**responsibility**
36:18 116:2
127:15 152:12
156:22 167:4,5
170:1,6
**responsible**
36:22 39:22
65:18 84:19
149:22 150:3
171:8,23
**rest** 174:4
177:14
**restructure**
137:4
**restructuring**
25:7 26:4,8,10
**result** 78:19
168:11 180:17
**results** 33:18
**resumed** 148:14
**retained** 5:9
**retaliation** 34:16
**retire** 87:22
**retired** 54:13
86:11 87:20,21
148:8
**retiring** 170:23

**revealed** 78:12
**review** 80:5
93:10
**rid** 126:3
**ride** 30:8
**right** 10:11,12
11:4,6 34:14
39:23 40:11
48:22 50:2,2
55:22 61:21
63:19 65:8
74:18 76:14
77:10 78:14
85:20,20 89:9
91:11,22 92:7
92:8,10,13
93:10 95:14
101:17 102:23
104:23 108:2
109:16 110:4
111:16,19
114:11 123:13
126:6 127:3
128:11,13,19
129:4 139:20
141:19 145:4
146:9 150:9
157:2,8 161:4
162:7 178:17
**right-hand**
38:22
**ring** 90:1,5
**risk** 113:6
**Road** 12:13
**Roberts** 72:4
73:4,5,15,20
73:22 101:14
101:16,17
**Robinson**
133:21 134:6
135:5 148:7,11
148:16 153:19
161:9 162:21
162:23 163:4

163:15 164:11
164:16
**Robinson's**
134:18 148:21
**role** 82:4 152:9
**Rosy** 87:13
**rule** 5:1 110:7
**rules** 5:2 10:9
44:6,8 84:14
87:5 104:13
105:8
**run** 157:4

_____
**S**

**S** 5:12,12 7:1 8:8
**SAASC's** 45:7
**salary** 161:12,14
161:16 162:1,3
162:4,9,10,14
162:19 163:18
163:20 175:17
175:18,23
**Sandy** 121:19
**save** 11:21
**saying** 87:1
119:4 122:15
122:18 124:14
**says** 36:10 45:19
67:16 76:22,22
85:22 90:21
91:18,20
105:11 106:20
109:11 110:14
144:16 152:12
154:17,21
165:12 170:19
**scale** 48:5,10
158:4
**schedule** 161:13
161:14,16
162:1,3,4,9,10
162:14,19
163:18,20
**scheduled** 153:3

# FREEDOM COURT REPORTING

school 14:18
  17:15 78:20
  79:2
Schools 45:8
Science 15:8
  24:16,17,20
second 19:1,2,7
  57:4 90:20
  91:19 139:19
  140:15 141:20
secretary 133:2
  133:4,8,10,18
  174:16
section 38:17
  39:9 169:23,23
sections 39:11
securities 115:3
security 21:22
  47:6 114:7,9
  114:12,17
  115:5,8,22
  166:11
see 10:16 38:9,9
  38:19 51:23
  52:1,2,5,10
  53:20 54:7
  62:16 63:16
  67:2 70:16
  77:16 81:3,4
  81:14 90:12
  91:4 93:14,16
  94:17 107:16
  111:16 126:1
  150:20 169:7
  171:8 172:17
seeing 75:17
  83:17 109:4
seeking 45:6
seemingly
  148:14
seen 36:19 57:1
  66:12 77:13
  79:19 106:2
  122:1 149:13

149:14 154:11
seldom 48:18
semester 21:6
  102:18 161:6
semesters 21:5,6
send 122:13
sense 119:21
  122:17
sent 30:6 178:9
sentence 47:11
  122:16 161:1
sentenced 47:19
separate 80:16
  113:14
September
  103:14,17
  107:2 125:7
  126:1 133:14
  144:20 145:10
sergeant 114:8
  114:10
serve 160:11
service 63:5
  100:3,5 101:19
services 2:16,22
  4:19 23:2,4,7
  23:19,21 25:2
  25:3,9,16 27:5
  27:8,11,23
  28:2 41:19,20
  42:12 44:12
  85:6 86:19
  87:1,4 94:1
  100:17 110:17
  137:3 138:20
  142:9 144:19
  145:13 147:12
  148:5 152:17
  153:15 154:14
  154:20 161:21
  164:4,5,9,23
session 78:18
setting 56:16
settled 33:15

settlement 33:22
seventeen 95:13
sewing 101:15
sex 31:23
sheets 173:10
shop 45:20
  49:23,23 50:1
  50:1,7,17 51:6
  51:6,9,10,10
  51:16 52:1,3,5
  52:6,10,12,14
  53:11,20 54:6
  54:6,8 86:9
  89:16 96:13,17
  96:20 97:10,15
  98:20 99:13
shops 49:22
  50:11,14 51:23
  52:22 53:3
  98:19 99:19
  101:1 102:2
short 60:13,15
  143:8 148:14
  161:7 166:20
  168:9 179:4
shorter 77:20
Shorthand 5:17
Shot 49:10
show 40:5 43:8
  43:20 55:3
  56:22 60:20
  63:14 66:3
  76:17 77:18
  82:15 90:8
  103:5 105:20
  121:15 136:3
  136:18 138:5
  138:23 144:2
  146:23 151:3
  167:12 174:23
showed 77:17
  137:20
showing 145:16
shows 77:7

145:19
side 51:20 54:4,7
  61:19 62:4
sideways 52:9
sign 10:12,12,13
  10:17 11:4
signature 62:10
  91:6,21 92:12
  92:15 128:17
  146:4,6 147:16
  174:9
signed 131:6
  142:11,16
  147:15 155:6
signing 10:18
  131:7
similar 11:20
sir 12:7 16:1
  18:20 20:6
  21:16 22:12
  23:16 24:22
  25:14 26:6
  29:1,5,11
  30:14,17,19
  31:1,11 32:16
  32:20 33:23
  34:8,9,15,20
  35:15 36:6,17
  37:5,9,13,20
  40:16,18 41:2
  41:8,21 42:7
  43:2,4,7,10
  44:3,4 46:17
  46:20 47:9,15
  47:18 48:12,16
  49:2,5,20 50:4
  50:8,12,13
  51:1,4 52:19
  52:23 53:4,7
  53:12,16 54:3
  55:8,13 56:10
  56:14 57:14
  58:9,22 59:6
  59:13,16 61:1

61:8 62:1,6,9
  62:12 63:3
  64:1,16 65:10
  65:13,17 66:2
  66:12,15,20
  67:19 68:1,4
  68:14,17,20,23
  69:8,19 70:12
  71:1,5,22
  72:15,17 76:8
  77:12,15 79:7
  79:12,17 80:6
  80:9,23 81:5
  81:10,13,15
  82:11,20,22
  83:4,18,21
  84:12 85:2,9
  85:11,13 86:12
  86:15 87:3
  88:6,17 89:8
  90:7,18 92:2
  93:17 94:5,6
  94:12,21 95:9
  97:16,20 98:10
  99:15,20 103:8
  103:15 104:2
  105:10,16
  106:3,6,19
  107:19 108:13
  109:9 110:23
  112:2,22 113:9
  113:13,16
  114:14,18
  116:6,13,21
  117:1 118:7
  119:3,13,18
  120:3,6,9,22
  121:14 122:3
  125:5,8,16,19
  125:21 126:15
  126:21 127:17
  127:22 128:2,5
  128:21 129:13
  131:18,23

# FREEDOM COURT REPORTING

132:3,6,8,10
132:12,14
133:19 134:8
134:11,13
135:1,4 136:14
136:17 137:12
137:15,18,21
139:17,18
142:1,15 143:2
143:17 144:8
145:2,5,21
146:5,7 147:6
147:17,19,22
148:7 149:3,5
149:10 150:10
150:22 151:12
151:15,18
152:20 153:21
155:19 156:2,7
156:10,18,21
157:7,11,20
162:6,8,11,22
163:19,21
164:2,13,20
165:2 167:16
168:10,22
169:2 170:11
172:8,13
173:23 174:6
174:18 175:3,6
175:12,16,19
176:1,10
sister 13:10
sit 69:16,23
169:5
sitting 42:22
situation 90:3
107:20
situations
141:17
six 98:6 102:3
160:10 161:1
skills 160:21
sleeping 91:1

slip 93:8
smart 29:17,20
Smiley 20:18,19
Smith 22:14,15
100:17
Smith's 22:17
sofa 123:20
124:7
sold 124:6
somebody 29:2
108:6 137:16
137:19 169:22
170:4
somebody's
155:17
someone's 92:14
92:15
sorry 19:15 23:8
25:4,11 32:5
32:10 34:11
60:11 112:10
129:16 130:15
135:13 139:11
150:2 166:22
170:3,13
176:13 177:6
south 13:1,5,8
29:11,12 30:1
Southern 45:7
space 50:16
spaces 50:11
speaking 150:6
special 23:18
27:23 28:2
56:8 84:13,18
84:20 85:7
86:18 87:1,4
87:10,12
121:21
specific 38:4
153:12
specifically 38:7
63:7 128:1
spend 125:10,20

126:4,8 129:15
129:17 131:3
168:12
spending 129:12
130:7
spends 130:17
spent 29:7
129:19 169:13
spoke 109:17,21
spot 112:19
Spurling 100:11
square 50:22,23
staff 49:18 142:4
142:5 177:15
stands 172:10
stapled 93:1
start 17:18
43:11,12 46:13
67:15
started 18:19
43:13,15 137:4
140:21
starting 16:23
17:20
state 1:12,16
2:11,16,22 3:5
4:8,14,20 12:7
14:14,23 15:2
15:10,17 16:10
17:1 20:8
24:21 31:14
40:20 44:18,22
45:10,12 47:19
110:21 117:18
128:20 129:3
165:16,23
171:1 177:15
180:3
stated 122:11,15
statement
112:16 113:1
121:19 139:20
140:1,3 152:18
152:21 169:18

171:13
states 1:1 2:1 4:1
107:11
Staton 52:17
96:11 99:3,22
status 110:19,21
stay 15:1
staying 72:12
stenotype 180:8
step 108:22
steps 41:4
stipulate 163:13
STIPULATED
5:13,22 6:8
stipulations
10:6
stole 29:2
stop 137:14
143:7
stopped 123:23
137:13
straight 142:23
straighten
135:21 142:22
Street 7:11 35:8
strike 51:4
structured
113:20
student 2:15,21
4:18 23:1,4,6
23:15,21 24:6
25:1,2,3,8,15
25:18 26:19,22
27:5,7,11,23
28:2 38:14
40:14,20 41:5
41:19,20 42:12
42:14 44:6,8
44:12 45:14,18
45:20 54:19
59:2 61:3,7
63:5 65:15
67:7 75:3,18
78:15 79:5

84:13,13 85:6
89:14,22 90:3
90:13,22 94:1
104:12 107:15
108:20 110:16
110:19 115:3
116:12,15
138:20 141:23
142:2,9 152:17
153:14 161:6
161:20 164:4,5
164:8,22
students 1:16
23:11,19 25:19
26:1,5 27:12
40:22 41:19
46:3 47:7 48:7
62:19 82:5
89:15 95:11
106:14,18
107:21 114:2,5
114:14,16,19
115:6,7,9,22
115:23 117:17
133:3,5,6,9,11
133:12,13
137:2 141:5,7
141:15 142:13
144:18 145:13
147:11 148:5
148:15 149:7
152:13 154:14
154:20,22
157:19 158:6
160:1 165:13
student's 42:17
74:15 105:3
110:21
style 119:19
subjects 18:3
substitute 98:3
98:11
sue 32:17 33:3,6
sued 31:14

# FREEDOM COURT REPORTING

suggesting 84:2
**SUITE** 7:11
summer 102:18
summoned
    107:3
supervise
    120:21 153:1
    153:13 159:14
    159:17,21
supervised
    153:6,7 157:17
    163:23
supervises
    159:22
supervision
    153:6,10
    154:21 157:6
    164:12,14,17
    164:21 165:11
supervisor
    95:23 106:5
supervisory
    129:6
supplement
    169:7
support 2:15,21
    4:18 23:2,4,6
    23:15,21 25:2
    25:3,8,15 27:5
    27:7,11 110:16
    137:3 144:19
    145:13 147:12
    148:5 152:4
    154:14,20
    164:8,22
supposed 45:15
    45:17 61:6
    90:23 92:5
    108:21 109:3
    110:8,13 111:1
    112:5 149:20
sure 36:9 60:14
    70:7 76:19,22
    83:8 108:14

114:19 127:16
135:21 148:13
150:15 169:10
170:21 174:12
174:13 179:3
suspend 92:17
suspicious
    104:22
sworn 10:2
system 34:10,12
    47:12 101:14
    141:18 162:17
systems 115:1

———————
**T**
T 3:1 5:12,12
    8:8 180:1,1
table 42:22 68:9
tabs 57:15
take 60:12 65:1
    66:14 85:14
    88:4 103:10
    105:17 112:17
    135:6 143:4
    179:1
taken 5:6,16
    60:16 65:17
    83:2,10 88:8
    91:7 143:9
    179:5 180:7
talk 10:16 14:16
    48:23 67:5,12
    78:3 175:4,10
talked 67:4 78:5
    118:23
talking 24:7,8,9
    49:7 52:22
    67:18 71:16,17
    71:18 85:18,19
    87:9 96:22
    114:12
tape 68:8 84:17
task 73:15
    129:10 134:1

tasks 153:3
taught 20:10
    21:2 53:5
    113:19
teach 18:3 20:13
    20:23 21:3
    29:17 113:11
teacher 108:21
teaching 20:3
    53:9 114:3
**Tech** 20:8
**Technical** 1:12
    1:17 2:11,17
    2:23 3:5 4:9,14
    4:20 14:14
    31:14 40:21
    44:19,22 45:10
    45:12 110:22
    165:16,23
    171:2 177:15
telephone 93:19
tell 21:17 38:7
    38:21 41:14
    56:4 59:3 65:9
    68:18 69:13
    73:16 75:23
    76:3,10 78:8
    89:14 92:18
    103:11 108:18
    115:4 118:22
    120:10 122:7
    129:1 136:5,19
    138:10 165:20
    165:21
telling 62:4 84:1
    84:3 108:20
    172:2
tells 58:23 93:7
    117:12
ten 30:2 48:5,11
    179:2
tenure 31:21
    42:17
term 80:11

86:20 130:5
    161:7
terminated
    30:23
terms 50:16 59:1
terrible 174:3
tester 134:1,2
testified 10:2
testimony 5:6
    180:12
testing 140:16
**Thank** 179:7
theory 113:21
thereto 6:7
    180:9
thing 109:16,22
    160:2
things 21:21
    113:18 114:20
    127:1 128:15
    131:5
think 34:2 38:20
    39:2,5 43:18
    47:9,21 51:3
    51:22 54:15,23
    55:1,23 58:6
    67:22 70:2
    75:1 76:21
    77:23 102:8
    111:23 117:18
    125:16 130:3
    130:10 134:4
    138:3,16,19
    151:21 152:2
    153:4 154:13
    155:22 161:22
    165:6 166:13
    170:9,10,11
third 140:19
thirty 49:4,14
**Thomas** 32:7,8
    32:12 35:22
    36:1 98:12
    101:13

thought 75:18
    89:3 107:12
thousand 34:3
    50:22
three 11:14,16
    48:15 49:6
    50:21 51:3
    65:8 77:19
    78:12 102:14
    102:15 113:14
    123:23 141:2
**Till** 101:5,6
**Tim** 133:21
time 6:5,5 11:21
    12:2 18:6 19:2
    19:4,7 20:22
    21:3,22 22:1
    24:4 26:4 27:3
    28:9 33:10
    36:12 39:17
    45:5 75:23
    81:23 84:6
    86:7 87:16
    92:23 93:19
    99:9 102:19
    105:2 112:17
    115:12,12,15
    116:11 117:11
    119:2 126:3
    129:8 130:2
    134:11,23
    135:16 137:9
    152:2 153:4
    160:7 166:10
    168:9 169:1
    175:21,22
    178:15
timely 174:15
times 11:1 44:19
    94:18 114:1
    127:1,8,13
    131:10
timetable 89:7
tiny 122:6

title 65:11 134:3
  134:4 146:13
  146:19,20
  147:9,10 148:6
  148:9 152:10
  154:3 155:10
  155:22 156:3
  156:15
titled 156:22
today 48:1
  172:10
told 29:16 30:4
  39:8 67:2
  70:15 76:1
  78:9,9 82:3
  88:19,23 89:4
  107:12 108:15
  109:11 143:10
  143:14 144:23
  169:13
tone 124:17
top 38:22 157:13
town 30:8
trade 18:4
trained 141:23
  142:2
training 24:15
  46:1,5 56:1,4
  142:3 161:7
transcribed 11:3
  77:11 180:9
transcribing
  141:3,13
transcript 5:5
  40:4 44:1
  56:21 60:19
  66:10 73:7
  76:17 77:13
  78:11 79:23
  82:14 90:17
  103:4 106:1
  118:5 136:2,9
  136:23 138:9
  139:4 144:6

147:4 151:7
  154:10 167:11
  174:21 180:12
transcription
  77:6 180:10
transcripts
  141:3,5,14
transitions
  141:8
transmission
  97:5
Trawick 89:2
treatment
  121:21
Tree 12:13
Trenholm 20:8
  20:9,14 21:6
  21:12
trial 6:5
Trimble 99:1,4
  99:7,9,16
  102:12,16
Trimble's 98:23
trouble 114:21
  128:4
true 113:1 122:8
  122:23 123:2
  124:8,10,12,13
  152:18,20
  180:11
trustworthy
  48:6,10,17
  111:19,22
  112:1
truth 84:1,3
  122:4
try 108:6,21
  113:10 125:10
  126:3,5,8
  168:23 169:2,3
  169:6
trying 11:21
  124:1 166:19
  168:12 172:3

turn 130:23
turned 171:5
Turner 155:15
  155:18,20
  166:2,3,6
Tutwiler 96:12
  99:5,7,10
  101:8,9 102:13
  102:21
twelve 88:4
twenty 49:4
  94:17
twenty-five
  30:10
two 21:5,6 48:14
  51:2 63:18,22
  63:23 64:7
  88:1,20 89:5
  102:11 105:13
  107:21 108:3
  114:23 123:22
  153:5 158:2
  159:3 162:20
two-page 56:18
  56:23 136:4
  139:15
two-year 141:17
  162:16
type 27:10 43:5
  46:4 56:15
  86:22 93:6
  107:22 110:6
  169:16
types 58:23
  73:23
typographical
  170:21
_____
        U
_____
U 5:12
Uh-huh 104:16
  141:22
undergrad 15:3
understand 12:1

33:17 51:8
  54:18 87:3
  125:13
understood 12:6
  28:23 82:4
union 17:4,11
  17:14 28:20
  29:4 30:9,9
  31:3,6
UNITED 1:1 2:1
  4:1
University 15:18
  20:21
unwritten 110:6
update 37:16
  39:4 173:10,13
  173:15 174:14
updated 36:12
  36:14 37:7,12
  38:12,16 39:1
  39:2 135:2
  173:10,14
updating 36:23
upholstery 52:2
  52:3 96:16,17
  96:19,22 97:15
  97:16
upset 81:7
  175:17,18,23
  176:2,4
up-to-date 39:11
  39:14 173:7
use 10:10 42:16
  75:19 103:18
  104:5,6 115:7
usual 10:5 68:5
_____
        V
_____
vacancy 99:10
vacant 98:5
value 152:14
various 44:17
  49:22 114:4
vernacular

115:9
vice-president
  25:21
violating 107:8
violation 28:17
voice 119:9,12
  119:20 120:17
  121:1,3,5,12
volume 168:15
  169:16
volumes 168:8
vs 1:8 2:7 4:7
_____
        W
_____
W 7:9
Wade 96:12
  101:10,11,12
wait 146:2
waive 10:12,18
  11:5
waived 6:10
walk 108:2
Wall 96:11
Wallace 118:6,8
  118:15,22
Walls 101:3,4
want 10:16,17
  10:17 35:16
  36:8,9 37:23
  40:12 43:20
  48:23 60:20
  62:13 66:3
  73:20 74:3
  76:19 78:8,10
  79:18 82:15
  88:4 121:15
  130:22 143:5
  155:17 172:21
  172:22
wanted 33:16,18
  63:12 70:9
  122:12 160:9
warn 89:15
wasn't 28:16

# FREEDOM COURT REPORTING

78:11 81:9
83:5 103:18
113:1 135:9,11
135:12 140:23
143:1 146:19
146:20 148:9
155:7 162:19
168:9 176:4
**watch** 89:18
**way** 11:22 33:5
51:19 53:20
60:7 104:7
117:5 119:5,8
126:22 128:20
129:2,11
145:23
**ways** 50:6
**week** 89:13
**weeks** 88:20
89:5
**welding** 49:23
52:1 54:6 96:2
96:7 100:2
101:2
**Weldon** 5:4,17
180:21
**went** 18:22
21:13 25:6
26:3,8 27:23
30:8 37:17
60:3,8 69:15
72:23 107:5,6
111:15 142:22
**weren't** 67:13
149:4
**Western** 30:9
**Wetumpka**
102:22
**we'll** 79:19
90:10 163:13
**we're** 11:20
34:13 38:6
42:22 43:20
66:6 78:2

136:3,18 138:5
138:23
**we've** 37:16
56:22 63:18,18
83:10 131:5
143:3 162:20
167:12
**whack** 82:19
**whiplash** 35:16
**white** 57:8
**wide** 50:10
**Wilson** 1:13
2:12 4:15,23
5:16 10:1,8
11:10 12:8,12
28:12 34:4
38:19 41:3
55:7 65:14
88:9 112:18
121:3 122:9,11
123:16 124:7
140:14 172:22
177:12
**window** 52:9
**windows** 51:20
**wise** 180:16
**wish** 10:23
**Wisman** 81:20
81:22
**withdraw** 78:21
**withdrawing**
175:11
**withdrawn**
78:22
**withdrew** 78:19
**witness** 11:7
55:1 140:12
180:13
**word** 76:18 77:7
174:3
**words** 75:19
**work** 15:14,16
16:22 17:5
18:8 19:14,17

19:18,23 20:4
21:13,23 31:5
94:23 107:16
115:15 116:8
116:20,22
117:5,15 118:9
124:11 132:1
132:13,19
138:21 153:1
177:1
**worked** 17:2,3,4
87:14 138:16
138:20 142:5
142:10 143:15
177:1,3
**working** 18:19
19:12 58:11
64:19 131:17
131:19 132:21
165:4 170:5
**works** 52:21
64:21 86:2
156:1 165:12
**worry** 130:16
**worrying** 130:12
**worthy** 109:4
**wouldn't** 39:13
85:14 104:10
108:8 140:10
143:19,22
149:18 150:7
162:4 163:5
165:14 167:6
177:4,7
**Wright** 13:13,23
14:3 156:13,14
**Wright's** 156:15
**write** 45:17
62:18 81:11
92:23 95:15
107:15 108:16
124:19 174:11
**write-up** 80:10
**write-ups** 58:4

59:1 80:3,8,13
80:14 81:2
90:8
**written** 39:20
54:19 79:13
139:13 152:6
171:13,17
**wrong** 63:18
**wrongful** 129:12
**wrongfully**
129:14,17
130:7
**wrote** 103:13
123:3 125:1

**X**

**X** 8:1,8

**Y**

**year** 17:6 47:10
115:1 125:6,7
125:20,22
126:5,7,9
131:12 168:12
168:16,21
169:5,14,15
**years** 13:15
16:13 45:2
88:1 129:22
**yell** 119:22
120:1,4,7,23
**yelled** 120:19
**yelling** 119:20
121:4,5,9
**young** 84:7
120:11
**y'all** 52:15 65:14
75:8 78:5
126:3 132:1
150:11
**y'all's** 104:13
105:8 125:7
131:14

**0**

**05** 147:18

**1**

**1** 8:10 40:3,6,13
45:16 57:8
74:4,5 103:23
104:1,4 105:13
133:14 144:19
144:20
**1st** 145:10
**10** 8:4,19 105:21
105:23
**103** 8:18
**105** 8:19
**11** 8:20 118:4
121:16 125:4
**11th** 140:10
**118** 8:20
**12** 8:21 136:1
**13** 8:22 136:4,8
**13th** 139:9
142:14
**136** 8:21,22
**137** 8:23
**138** 9:1
**139** 9:2
**14** 8:23 136:19
136:22 137:20
149:4
**144** 9:3
**147** 9:4
**15** 5:3 9:1 138:6
138:8 165:1
**15th** 103:17
**1505** 5:19 7:5
**151** 9:5
**154** 9:6
**16** 9:2 139:1,3
140:14
**16th** 103:14
107:2 111:8
**167** 9:7
**17** 9:3 144:3,5
**174** 9:8

# FREEDOM COURT REPORTING

**18** 9:4 147:1,3
**19** 9:5 25:4 66:5
  67:16 151:4,6
  152:7
**1970** 14:21
**1973** 15:3 17:1
**1974** 20:15
**1976** 15:12
  16:12 17:19
  22:22 24:20
  43:17
**1980** 22:22,23
  27:22 129:7
  164:7
**1988** 5:3
**1998** 35:5 40:17
  132:23 133:1,9
  133:10,14
  153:23 164:18
  164:19
**1999** 161:11

———————
**2**
**2** 8:11 43:21,23
**2:06-CV-796-...**
  4:8
**2:07-CV-21-...**
  2:8
**20** 9:6 154:7,9
**2000** 35:5 46:16
**2002** 36:11,12
  36:20 39:15
  171:17 178:19
  178:20,20
**2003** 83:14,16
  144:20 145:11
  148:23 154:2
**2004** 139:9
  140:22 142:14
  144:21 150:21
  153:23
**2005** 107:2
  118:19 147:14
**2006** 25:4,5

  88:14 89:14
**2007** 5:7,21
**203** 38:18 39:9
**21** 9:7 167:10,13
**22** 9:8 174:20
  175:1
**25th** 5:6,21
  118:19
**27** 62:15

———————
**3**
**3** 8:12 56:20,23
  57:11 58:2,17
  62:14 63:8
  147:14
**3rd** 83:14,15
  140:22
**30th** 125:7
**31** 144:21
**311.03** 38:23
  39:9
**341** 12:13
**36064** 12:14
**36104** 7:12
**36107** 7:6

———————
**4**
**4** 8:13 60:18,21
**4th** 140:9
**4-27-52** 12:10
**40** 8:10
**400** 39:1,10
**43** 8:11

———————
**5**
**5** 8:14 66:7,9
  67:18
**5(d)** 5:1
**506** 39:2,10
**56** 8:12

———————
**6**
**6** 8:15 79:20,22
**6th** 147:18
**60** 7:11 8:13

**617.01** 170:17
**66** 8:14

———————
**7**
**7** 8:16 82:13,16
**70** 17:7
**70's** 17:8
**700** 39:6
**702.01** 39:5,7,10
**74** 17:12 28:19
**75** 17:12 28:19
  28:20
**78** 16:12
**79** 8:15

———————
**8**
**8** 8:17 90:10,16
**80's** 30:21,22
**82** 8:16

———————
**9**
**9** 8:18 103:3,6
**9th** 89:14
**9:30** 5:21
**90** 8:17
**90's** 33:12
**904** 7:11
**99** 148:12