IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JULIE GIVENS and )
MONICA GREENE, )
)
    Plaintiffs, )
)    CASE NO.: 2:06 CV 852-1D
)
v. )
)
DOUGLAS CHAMBERS, et al. )
)
    Defendants. )

**PLAINTIFFS' BRIEF IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

**Statement of Facts**

Plaintiff Monica Greene (hereinafter "Greene") is the only female Dean at J.F. Ingram

Technical College (hereinafter "Ingram") and the only Dean that is left from Dr. Gregg's presidency.

(Chambers depo. p.29, ll.1-13). According to Defendant Douglas Chambers (hereinafter "President

Chambers") Greene is a very professional person. (Chambers depo. p.61, ll.17-19). President

Chambers in his affidavit or in his deposition cannot give specific examples of Greene not providing

adequate supplies for instructors or administrators. It is alleged that Greene does not get along with

Defendant James Wilson (hereinafter "Dean Wilson"). In his deposition when asked about Greene,

Dean Wilson stated:

> Q. Yes. Is it she just doesn't want to turn loose of the money sometimes if she
> has a question? You have to convince her that probably–If she has a question, she
> won't spend it, will she?
>
> A. I've not had a problem that much. There have been some things that we've

1

ordered and even she and I have signed it, signing the requisition approving it. But we don't have that item. Now, I have asked her several times when she's said that is it forth coming. Of course, that has been over a year though.

Q. And that's sometimes out of all y'all's control?

A. Well, she's the business dean.

Q. But you don't have a problem working with Ms. Greene?

A. No, sir.

Q. Ever had a problem working with her?

A. It depends on how you're defining problems. We have some disagreements.

Q. Yes, sir. You have disagreements. But ya'll can work out your disagreements and go forward?

A. Yes, sir.

Q. And as in most jobs, you have disagreements?

A. Yes, sir.

Q. Even Dean Merk?

A. Yes, sir.

Q. Even with Dean Montgomery?

A. Yes, sir.

Q. But you work together?

A. Yes, sir.

(Wilson depo. p.130, ll.22-23; p.131, ll.1-23; p.132, ll.1-14).

It does not appear that Dean Wilson had any more problem working with Greene than he does male counterparts. Apparently, he just complains about it more.

2

President Chambers expounds greatly about Greene not doing her job. However, Greene's annual evaluations performed by President Chambers does not back up his allegations. (Exhibit 1-6). In discussing Greene's annual evaluations in his deposition, President Chambers stated the following:

"Q. Well, let me show you all the previous evaluations we've been provided and ask–which is Exhibit No.–it starts with Exhibit No.1, Plaintiff's Exhibit 1 through 6 there.

MR. CHRISTMAN: We'll look at these Jim, just to make sure we're looking at the right Exhibits.

Q. Now, which evaluation are you talking about?

A. What was your question, please?

Q. Your answer to my question was if I look at the previous evaluations. And I asked you where you check things. And I'm looking at the previous evaluations, sir. Let's kind of go through them in order. And the only evaluation I see where anything is checked besides as is, is evaluation 1998 where it says provides effective leadership in areas of primary responsibility and you told me that was a positive. Now, which evaluations do you want me to look at?

A. You asked me when did the change take place?

Q. Yes, sir. Then you made a comment that if I looked at the previous evaluation where you would check, you decided to–

A. No, I didn't say check. I said if you look where I made the comments. I made statements indicating negative activity. And this–And what I started doing then is not just making general statements. I started identifying them as on the evaluation.

Q. So I can take the –where you said the president directed the employee to and you've got eighteen items there?

A. Yes

MR. CHRISTMAN: Now we're talking about Exhibit 7 ?

3

MR. DEBARDELABEN: 7.

Q. All that happened within the 2005 evaluation period?

A. No

Q. It didn't happen from 2004 of April?

A. It started happening when we–when I started making the comments. When I put employee tends to develop good leadership, tends to get down when confronted, all of this is including–it was building up to this.

Q. Well, that is--The comment you're referring to is Plaintiff's Exhibit No.3 for '98, isn't is?

A. Right

Q. Well, if we look at Plaintiff's Exhibit No. 4 for 2002, which is the next one we have been provided, everything is meets standards as is, isn't it?

A. Yes.

Q. And when we look at Plaintiff's Exhibit No. 5, which is 2003, it's meets standards as well. All that's checked. So if an employee is reading this, everything is fine, isn't it?

A. Yes.

Q. And even 2004 is meets standards as is. So what happened between the 2004 evaluation and the 2005 evaluation?

A. Well, I tried to resolve issues in the cabinet meetings and have meetings with the administrative staff as opposed to trying to put everything in writing. We've met and we've discussed weakness. We discussed things that we needed to improve in. So I was trying a new technique.

Q. Do you have any memos that you put in Ms. Greene's file, personnel file that showed she wasn't doing her job?

A. Not that I recall.

Q. You have memorandums you sent her between 2004 of–April the 1st, 2004, July of 2005 that pointed out she wasn't doing her job?

A. I would think so, yes.

Q. Okay. Can you provide all those to your attorney so he can provide them to me? All your memorandums you sent Ms. Greene from 2000-April 1st, 2004 through–what's the date on No.7, July 15th?

A. July 14th

Q. July 14th

A. 2005

Q. 2005. And you have–Are you telling me you have memorandums to support all these eighteen items?

A. Yes. But not necessarily during that period of time. Some of them goes before that and some goes after that.

Q. Well, certainly if they are after this, it could be written up on the July '05, couldn't it?

A. Well, today, yes. But not then.

Q. But not then?

A. I know what you are saying.

Q. Okay. And if it was prior to April of '04, then she wouldn't know to change. You told her in April of '04 that everything was fines, wasn't it?

A. On the evaluation, yes.

Q. Yes, sir. An employee is supposed to be able to rely on an evaluation, isn't she, any employee?

A. Yes.

MR. CHRISTMAN: Object to the form.

Q. Any employee?

A. Yes."

5

(Chambers depo. p.80, ll.2-23; p.81, ll.1-23, p.82, ll.1-23; p.83, ll.1-23; p.84, ll.1-23; p.85, ll.1-7).

Through 2004 Greene's evaluations showed she was doing a good, acceptable job. President Chambers has no written documentation to support otherwise. It appears that after the Senior Accountant, Mr. Bridgman, retired in 2004, President Chambers increased the pressure on Greene and her department. (Givens depo. p.125, ll.10-23; p.126, ll.1-9). Prior to Bridgman's retiring, the fiscal department was able to have a computer programer work with them two to three times per week. After Bridgman left and the fiscal department became all women, the programer had to be requested. (Givens depo. p.125, ll.10-20). Thus, it appears that after the fiscal department became all female, President Chambers started making it more difficult for the fiscal department to accomplish its mission. In this way President Chambers is able to indicate that Greene was not doing her job. President Chambers was frustrated that the fiscal department had not fully converted to the ACCESS System. (Givens depo. p.130, ll.13-21). However, as long as Bridgman was the senior accountant, apparently President Chambers did not push the complete conversion to the ACCESS Accounting System. (Givens depo. p.125, ll.10-20; p.126, ll.1-23; p.127, ll.1-23).

It is clear when the evidence is reviewed, that when the fiscal department became all female after Bridgman's retirement in 2004, President Chambers began to lower Greene's evaluation. There appears to be a direct connection between Bridgman's retirement and Green's lowered annual evaluation. President Chambers' evaluation and opinion of Greene that she was weak and ineffective is not substantiated by any documentation, other than by Dr. Merk's and Dean Wilson's self serving affidavits.

6

President Chambers admitted in his deposition that the Department of Examiners of Public Accounts come in each year to evaluate Ingram and do an audit report. He admitted that the Examiners are the experts. (Chambers depo. p.85, ll.8-17; p.86, ll.1-5). The Examiners will point out if the college is not handling finances properly and they are usually very strict. (Chambers depo. p.86, ll.6-18). For the entire time President Chambers has been President of Ingram, Greene has been the Dean of Fiscal. Never in that time did the Examiners have a major finding against Ingram. (Chambers depo. pp.87, ll.2-23; pp.88-94, all line).

In 2004 the Examiners did find a weakness in live work, but it was not considered a material weakness. (Chambers depo. p.98, ll.19-23; p.99, ll.1-23). However, as early as July 18, 2001, Greene had pointed out similar weaknesses to President Chambers and Dr. Huffstetler and requested correction. (Chambers depo. p.234, ll.1-23; p.235, ll.1-23;)( Exhibit 7). By memorandum dated April 22, 2002, Greene again addressed her concerns regarding live work to Dr. Huffstetler. (Chambers depo. p.235, ll.16-21; )(Exhibit 8). By memos dated December 9, 2002, December 18, 2002, February 4, 2004, and March 30, 2004, Greene sent memos concerning line work problems and violations to Dr. Huffstetler. (Exhibits 9-12).

On September 30, 2005, Greene forwarded a memo to the live work clerk at the Draper campus, Gloria Knox, with a copy to President Chambers concerning timely deposits on line work projects. (Exhibit 13). On July 25, 2005, Greene forwarded another memo to Dr. Huffstetler concerning line work problems. (Exhibit 14).

Greene was certainly aware of the problem discovered by the Examiners and made numerous attempts to inform both Dr. Huffstetler and President Chambers. However, President Chambers did not take any action until the Examiner's audit and now tries to blame Greene. Greene has preformed

7

her job efficiently, it is President Chambers who is not efficient and effective. Greene informed President Chambers and Dr. Huffstetler of the problems and asked for help on more than one occasion. (Chambers depo. p.236, ll.17-23; p.237, ll.1-23; p.238, ll.1-23; p.239, ll.1-23; p.240, ll.1-23; p.241, ll.1-23; p.242, ll.1-23; p.243, ll.1-23).

President Chambers states that Greene can stop the money. (Chambers depo. p.245, ll.20-23; p.246, ll.1-16). However, when Greene stops the money, people such as Dr. Merk and Dean Wilson complain that she will not provide them with what they order.

President Chambers admits that Greene has one of the most serious jobs on campus. Greene is required to know accounting procedures, state bid law, and state purchasing procedures. Greene also has to insure that all deans and all instructors follow the procedures. (Chambers depo. p.195, ll.4-23; p.196, ll.1-2). President Chambers admitted that he has no training in accounting and could not do Greene's job. (Chambers depo. p.194, ll.14-21). It is interesting that one of President Chambers reasons for giving Greene a negative comment on her 2004 evaluation was "because we continue to have problems with other administrators getting what they want from the business office." (Chambers depo. p.64, ll.7-11). However, President Chambers admitted that each program is getting the material needed. President Chambers when asked responded as follows:

"Q. . . . Do you know any program at J.F. Ingram that is not getting enough material to do what they are suppose to be doing?

A. No.

Q. And every instructor at J.F. Ingram and every dean wants more money and more material, don't they?

A. Most of them, yes."

(Chambers depo. p.270, ll.7-15).

8

President Chambers testified that he is a trained counselor. (Chambers depo. p.134, ll.1-2). President Chambers admitted that when Greene was absent from campus that he called two of Greene's subordinates into his office and told them Greene was weak and ineffective. He did this on more than one occasion. (Chambers depo.p.133, ll.4-23).  As a trained counselor President Chambers was aware that when he criticized Greene to her subordinates that it was weakening Greene effectiveness.  He was aware that it created an adverse situation for the subordinates and the supervisor. (Chambers depo. p.134, ll.1-20).

President Chambers admits he never called anyone that worked for Dean Wilson or Dr. Merk into his office to discuss or criticize Wilson or Merk, when either was out of the office.  However, he did call in Greene's subordinates to discuss and criticize Greene. (Chambers depo. p.231, ll.8-23; p.232, ll.1-10).

In May 2001, Mrs. Julie Givens (hereinafter "Givens") noted that President Chambers called her and Mr. Bridgman (hereinafter "Bridgman") into his office to discuss Greene.  President Chambers told Givens and Bridgman that he knew that Greene was weak and ineffective as a business manager. (Givens depo. p. 71, ll. 8-23, p.72, ll.1-20).  This was not the first time, President Chambers had a pattern of doing this. (Givens depo. p.72, ll.7-10).

In March 2002 and June 2003, President Chambers again called Givens and Bridgman into his office stating Greene was ineffective. (Givens depo. p.79, ll.8-18).  In January 2003, while Greene was out on annual leave, President Chambers called Givens and Bridgman into his office stating that he knew that purchase orders and accounts payable were in a mess because of Greene.(Givens depo. p.81, ll.2-11).  President Chambers expressed to Givens that he did not think that Greene was doing a good job. (Givens depo. p.82, ll.8-11).  When Givens was asked to explain

9

"How is this causing you a hostile environment?" she stated:

"A. Because when you are called in time after time after time, and you're in, let's say because Mr. Chambers is ultimately the boss, and then Ms. Greene is my direct supervisor, and you're caught between these people, you're ultimate boss and then your direct supervisor boss, and you're being strung between these people, and you have these people pulling you back and forth, you are caused stress and anxiety, because you have one person telling you one thing, and then you have this ultimate boss up here saying, you need to come talk to me about this. That makes me have a lot of stress. It does indeed cause me stress and anxiety, and it has for several years now. It upsets me tremendously." (Givens depo.p.82, ll.15-23; p.83, ll.1-8).

Between 2004-2005, President Chambers called Givens into his office on many more occasions for the same type meetings regarding Greene. (Givens depo. p.87, ll.2-17). Givens also testified that it has created a hostile environment for President Chambers to subject only the women on the main campus to meetings concerning appropriate dress attire, and not to have the meeting for all female employees at all Ingram campuses. (Givens depo. p.90, ll.2-17). Givens also believes discrimination exist because the Department of Corrections I & I Division investigated a complaint about men instructors at the Tutwiler campus making sexual advances towards female prisoners. No meeting was called for the males. (Givens depo.p.90, ll.18-23; p.91, ll.1-8). The women are held to a more strict code of conduct on dress attire, while men who are allegedly making advances toward female inmates are not being admonished at all. (Givens depo. p.91, ll.1-22).

Givens is not aware of a dress code for females at the main Inrgam campus. (Givens depo. p. 94, ll. 15-16). There has been several references by President Chambers regarding complaints made by DOC officials, but no written evidence or documentation of one complaint has ever been produced.

Givens was aware of one situation at Tutwiler where a former employee, Ms. Ross, was

asked to put a shirt over her clothing, but no meeting was ever held at Tutwiler to tell people to dress appropriately. (Givens depo. p. 94, ll. 19-23; p.95, ll.1-3). Givens claims President Chambers treated women different than the men because no meeting was held to inform the men concerning the appropriate dress attire. (Givens depo. p. 98, ll.10-20).

On February 13, 2005 President Chambers and Dean Wilson directed Givens to hold a meeting with the main campus of Ingram to talk to them concerning appropriate dress attire. (Givens depo. p. 101, ll.17-23; p.102, ll.1-7). In September 2005, President Chambers called a meeting at 2:45 p.m. and stated that office women could no longer wear blue jeans or capri pants and when asked about the men, he stated he was not talking about the men, only the women. (Givens depo. p. 105, ll.15-23). President Chambers only held meetings with women concerning dress attire, not men. (Givens depo. p.109, ll.18-20).

Givens has a problem with President Chambers concentrating so much on the women, what women wear, and closely observing women in a manner to see if what they are wearing is what he considers inappropriate. (Givens depo.p.14, ll.3-15). Givens feels there is just too much concentration on women's bottoms at Ingram, which had emphasis placed on it when President Chambers commented on a small piece of lent on Greene's bottom. (Givens depo. p.117, ll.11-23).

When men have more education than women, but less time it is used as a justification for a higher salary. However, when Patti Graves, a white female, was hired to essentially replace Bridgman, she had more education, but less time at Ingram and is paid less than Bridgman was. (Givens depo. p.191, ll.1-23). Givens is also aware as she prepares payroll, that Owensby, a black female, is paid substantially less than her predecessor, a black male, although Owensby performs the same job.

11

From 2000-2006 Givens was on the same salary schedule with no raises, only scheduled step raise, although Greene requested raises for Givens. (Givens depo. p.175, ll. 4-16). The only person who received a raise when it was requested by Greene was a black male. (Givens depo. p.175, ll.20-23; p.176, ll.1-5). Givens testified that after she filed her EEOC Complaint she was moved from the E Salary Schedule to the C Salary Schedule. (Givens depo. p. 176, ll.6-11). Givens testified that Beth White, a white female, is paid substantially less than two black females who do substantially equal jobs at other Ingram campuses. White works at the main campus and has a heavier work load, but is paid less. (Givens depo. pp.179-182, ll.1-23).

Greene has been yelled at by President Chambers. However, she has never heard President Chambers yell at Dr. Merk or Dean Wilson. (Greene depo. p. 238, ll.1-23; p. 239, ll.1-3). Greene admitted that President Chambers' management style is a little loud. (Greene depo. p. 239, ll. 17-19). Greene stated that President Chambers has a loud and negative management style. ( Greene depo. p. 241, ll. 6-10).

Greene believes she was yelled at more than was Dr. Merk, Dean Wilson, and Dr. Huffstetler. (Greene depo. p. 432, ll. 14-20). President Chambers has called Greene into a room in front of all of her subordinates and yelled at her about a situation that had already been handled. President Chambers, to her knowledge, has never done that to a male employee. (Greene depo. p. 451, ll. 6-23).

From 2004-2006, records in the payroll office indicated that the majority of the new hires by President Chambers were black. (Greene depo. p. 496, ll. 12-23; 497, ll. 1-5). Greene requested a pay raise for Patti Graves, a white female, in 2006, but Graves did not receive the raise. However, Malcolm Montgomery, a black male, on the same level as Graves received a pay raise. (Greene depo.

12

p. 477, ll. 9-23).   Graves and Montgomery, although in different departments, were in equal positions.(Greene depo. p. 478, ll.1-23).   Montgomery's raise was recommended by Dean Wilson, a black male. (Greene depo. p. 478, ll. 22-23).

In a January 10, 2000 meeting, President Chambers told Greene he wanted her to get mad and curse, that she needed to be a bitch. (Greene depo. p. 457, ll.15-23).   When Dr. Huffstetler left Ingram to take a position at Post Secondary, Dean Wilson was given the position of Dean of the College. (Greene depo.p. 422, ll.17-21).   Greene did not apply because the position was not announced, the staff was just informed that Wilson was the new Dean of the College. (Greene depo. p. 423, ll.1-22).   When Dr. Huffstetler was appointed Dean of the College, he had been a former financial officer in the past, similar to Greene's position. (Greene depo. p. 191, ll. 2-8; p.195, ll.13-16).

### Argument

The main tenor of the Plaintiffs' allegation is hostile work environment.   The Defendants' basic defense is that President Chambers has a loud management style.   It is admitted that President Chambers' management style is loud and loose, but that is what creates the hostile work environment.   Perhaps the closest case on point to the situation at Ingram is *Cross v. State of Alabama*, 49 F. 3d 1490 (11th Cir. 1995).   In this case, the Director of the Taylor Harden Mental Health Facility had an abrasive, loud, "management style" similar to President Chambers.   The Director yelled at women, commented about women and treated the women different from the male employees.   In Cross, supra., the Court set for the elements necessary to establish sexual harassment that creates a hostile work environment as determined in *Henson v. City of Dundee*, 682 F. 2d 897 (11th Cir. 1982) as follows:

13

"1.  The employee complainant must belong to a protected group;

2.  The employee must establish she was subject to unwelcome sexual harassment;

3.  The harassment complained of must be based upon gender; and

4.  The harassment complained of must have affected the condition of the complainants employment."

In Harris v. Forklift Systems, Inc., _____U.S. _____, 114 S. Ct. 367, 370, 126 L. Ed.2d. 295

(1993), the Supreme Court stated:

"When the work place is permeated with `discriminatory intimidation, ridicule, and insult, that is sufficiently severe and pervasive to after the conditions of the victim's employment and create an abusive working environment´, Title VII is violated."

The Harris Court went on to state:

"A discriminatory abusive work environment, even one that does not seriously affect employees' psychological well being, can and often will detract from employees' job performance, discourage employees from remaining on the job or keep them from advancing in their careers.  Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their. . .gender. . . offends Title VII's broad rule of work place equality."

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or material origin..." 42 U.S.C. §2000e-2(a)(1).

Since Givens' and Greene's case involves a Title VII claim, it is not required to prove directly that sex or gender is the reason for the employer's decision.  Rather, Greene and Givens may rely on direct or circumstantial evidence to show that the employer discriminated against them.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 526, 113 S. Ct. 2742, 125 L. Ed.2d 407 (1993).  Direct evidence is defined as "evidence which if believed, proves the existence of the fact in issue without inference or presumption."  Merritt v. Dillard Paper Co., 120 F.3d 1131, 1189 (11th Cir.

14

1987).

To prevail on a Title VII claim with circumstantial evidence, the Greene and Givens must

show:

"1.  Membership in a protected class;
 2.  Qualification for the position;
 3.  Suffering of an adverse employment action;
 4.  Treated less favorably than a similarly situated individual outside the protected
class."
See <u>McDonnell Douglas Corp. V. Green</u>, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L.
Ed.2d 688 (1973).

### Are Plaintiffs members of a protected class and do they meet the qualifications for the position?

Both Greene and Givens are white females.  Greene went through a strict application process

for her position and Givens' promotion was approved by the Chancellor's office.  Thus, there is no

issue about both Plaintiffs being qualified for their present positions.

### Is there suffering of an adverse employment action?

First, Greene was placed in the position of being yelled at by President Chambers in front of

her staff.  The yelling by President Chambers at Greene became a pattern.  Secondly, President

Chambers would call both Givens and Bridgman, Greene's subordinates, into his office on numerous

occasions and criticize Greene.  This placed both Givens and Greene in a hostile and adverse

situation.  With his training as a counselor, President Chambers was aware of the effects his actions

of criticizing Greene to her subordinates could have, but he did it any way repeatedly.  Also, even

though she was as qualified as Dean Wilson, Greene was not given the opportunity to apply for the

position of Dean of the College, when Dr. Huffstetler resigned.  Wilson, a black male, was promoted

into the position by President Chambers without competition.

15

Givens' adverse employment action consist of being called into President Chamber's office and being told by President Chambers that her supervisor, Greene, was weak and ineffective. This became a pattern each time Greene was absent. Apparently because Givens did not come forth and support President Chambers unsupportable allegations concerning Greene, Givens was not promoted when a white male, Gene Bridgman, retired. Givens and Bridgman had the same education level and had been working together for several years. When Givens, at Greene's insistence, was finally promoted to Greene's assistant, Givens still was denied the same pay schedule as males in the substantially equal position of responsibility. It was not until after Givens had filed an EEOC Complaint that she was finally placed on the C Salary Schedule, but still not at a pay similar to males in the same responsibility level position.

### Were the Plaintiffs' treated less favorably than similarly situated individuals outside of the protected class?

It is obvious that Greene has been treated less favorably than the male deans, Dr. Merk and Dean Wilson. Both Dr. Merk and Dean Wilson received their promotions to Dean without competition and neither Greene or anyone else was offered the opportunity to apply for the Dean of the College position when Dean Wilson was promoted to Dean of the College. Givens did not receive the promotion she should have been offered, Bridgman's position, and when she did receive a promotion, she received less pay than similarly situated males.

Givens and Greene have a constitutional right to be free from illegal and unlawful discrimination and sexual harassment in public employment. Davis v. Tassman, 442 U.S. 228, 235, 99 S. Ct. 2264, 2271. 60 L. Ed. 2d 846 (1979).

President Chambers' conduct toward Greene has been obvious, flagrant, rampant, and of

16

continued duration. It has created an abusive and hostile work environment for Greene and her staff. President Chambers' inappropriate conduct did not stop with Greene and Givens, but extended to all the women at Ingram's main campus. President Chambers very clearly used the prison environment's dress attire issue as a way to belittle and harass female employees about their "inappropriate" attire. If dress attire was such an important security issue the appropriate way to address it would have been a policy or regulation. This was not done, so no standard was established. Thus, President Chambers could observe women's dress attire and comment on it under the guise of security. With no dress code, he was free to treat women as pawns. It is the old saying "because of the way the woman dresses, she causes the sexual attack." A dress code, rule or regulation could have resolved the issue and made everyone aware of the parameters of dress, including the men.

Circumstantial evidence of gender and race bias is evident at Ingram. Two males are promoted to their positions as deans without competition. Greene is not given an opportunity to apply for the position of Dean of the College because Dean Wilson is promoted with out competition by President Chambers. Givens is denied a promotion and when promoted paid on a lower pay schedule than substantially similarly situated males with jobs of like responsibilities.

### 42 U.S.C. 1981 Claim

In Count II of the Complaint, the Greene and Givens allege that President Chambers and Dean Wilson have discriminated against them based on their race (white), gender (female), and the actions of the Defendants have created a racially hostile and/or gender hostile and abusive working environment.

In Vessels v. Atlanta Independent School System, 408 F. 3d 763 (11th Cir. 2005) the Court

17

pointed out the following:

> "...disparate treatment claims, brought under Title VII, §1981, and §1983, all require proof of discriminatory intent. In order to establish a prima facie case and raise the inference of discriminatory intent, the Plaintiff must only demonstrate:
>
> 1. Membership in a protected class;
> 2. Qualification for the position;
> 3. Suffering of an adverse employment action;
> 4. Treated less favorably than a similarly situated individual outside the protected class."
>
> See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct.1817, 36 L. Ed.2d 688 (1973).

As it is pointed out previously how both Greene and Givens demonstrate the above four requirements, that will not be repeated again.

The Equal Pay Act of 1963, which is a portion of the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. §206(d)(1976) as well as Title VII of the Civil Rights Act of 1964 42 U.S.C. 2000e, et seq., prohibits gender based discrimination in rates of pay to employees. Miranda v. B & B Cash Grocery Store, Inc., 975 F. 2d 1518 (11th Cir. 1992). Givens has established a prima facie case as she has shown her pay was lower than males occupying positions of substantially equal responsibility even though in a different department. To establish a prima facie case, the focus is solely on the primary duties of each job, not duties that are identical or insubstantial. Jones v. Western Urban Health Center, 760 F. Supp. 1575 (S.D. Ga. 1991) (citing Goodrich v. International Brotherhood of Electrical Workers, 815 F. 2d 159, 1524 (D.C. Cir. 1987). To show that the jobs are substantially equal, one must only demonstrate that the skill, effort and responsibility required to perform the jobs are about equal, not that the jobs are identical or the same. Corning Glass Works, 417 U.S. @ 204, 94 S. Ct. @ 2232-33; Broch v. Georgia Southwestern College, 765 F. 2d 1026, 1032 (11th Cir. 1985).

Under the Equal Pay Act, only the skills and the qualifications actually needed to perform

the jobs are considered, not the skill and qualifications of individual employees. Miranda v. B&B

Cash Grocery Store, Inc., 975 F. 2d 1518 (11th Cir. 1992).

It was not announced that the Dean of the College position was open for application,

therefore Greene had no chance to apply. Dean Wilson, a black male, was promoted to the position

by President Chambers without competition. Thus, Greene has made a prima facie case for

discrimination. She was passed over for the position, she is in a protected group, a white female, and

individual of a different race and gender was hired, Dean Wilson, a black male, without competition.

Standard v. A.B.E.L. Servs., Inc., 161 F. 3d 1318, 1333 (11th Cir. 1998). However, President

Chambers it appears does not require competition for any positions at Ingram. Evidence reveals he

selects and promotes select individuals. He did this with all of the Deans, except Greene, who is a

white female and was in place when he arrived at Ingram. His justification are always after the fact,

and not substantiated with any evidence. Just as he alleges Greene is weak and ineffective, neither

her annual reports nor the audits by the Examiners of Public Accounts substantiate his claim. Greene

has never received so much as a reprimand from President Chambers and there have been no

memorandums produced critical of her performance.

In discussing hostile work environment the Supreme Court in National Railroad Passenger

Corp. v. Morgan, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d. 106 (2002) stated:

> "...consideration of the entire scope of [the] claim, including behavior alleged outside
> the statutory time period, is permissible for the purpose of assessing liability, so long
> as an act contributing to that hostile environment takes place within the statutory time
> period." Id. at 105, 122 S. Ct. at 2068.

The Court went on to reason that:

19

"[h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based upon the cumulative effect of individual acts."

"...that the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim."

The Defendants try very hard to analyze individual acts. However, the Supreme Court states all acts are to be considered together. It appears President Chambers started his campaign in late 2000 or early 2001. On January 10, 2001, he told Greene she needed to be a bitch and curse more. It has gone forward to the point of harassing women about their dress attire without having standards because no dress code exist. There have been no complaints by men, but presently there are lawsuits are filed in this District Court by four women, one black and three white, complaining about the hostile work environment and unequal pay at Ingram.

## Immunity

### Are the Defendants entitled to immunity?

No, it is clearly established law that one may not be discriminated against in pay and working conditions based on race and/or gender. "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known." Vinyard v. Wilson, 311 F. 3d 1340, 1346 (11th Cir. 2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 272, 2738 (1982)).

It is admitted that both President Chambers and Dean Wilson are state officials.

20

However, it is undisputed that Title VII and the Equal Pay Act forbids discrimination based on gender, sex, and race. The question is whether the state of the law gave President Chambers and/or Dean Wilson "fair warning" that the treatment of Greene and Givens as concerns her pay was a violation of a clearly established statutory right. Marsh v. Butler County, 268 F. 3d. 1014, 1031 (11th Cir. 2001).

Fair warning is given by case law existing at the time of the violation. Vinyard v. Wilson, 311 F. 3d @ 1351. It has long been held that gender based discrimination in pay rates is prohibited by the Equal Pay Act of 1963 and by Title VII of the Civil Rights Act of 1964. Miranda v. B & B Cash Grocery Store, Inc., 975 F. 2d. 1518 (11th Circ. 1992); Waters v. Turner, 874 F. 2d 797, 801 (11th Cir. 1989); Beall v. Curtis, 603 F. Supp. 1563, 1580 (M.D. Ga.), aff'd without op. 778 F.2d 791 (11th Cir. 1985).

As to the state claims, Defendants have raised the issue of sovereign immunity. Such defense is not applicable in this case, as Plaintiffs are alleging constitutional violations of equal protection and violations of statutory law. In Gunter v. Beasley, 414 So. 2d 41 9 (Ala.1982), the Supreme Court recognized six areas where the sovereign immunity defense did not apply. The Court stated:

> " There are four general categories of actions which in Aland v. Graham, (1971), we stated so not come within the prohibition of §14:(1) actions brought to compel State officials to perform their legal duties; (2) actions brought to enjoin State officials from enforcing an unconstitutional law;(3) actions to compel State officials to perform ministerial acts; and (4) actions brought under the Declaratory Judgments Act., Tit. 7, §156, et seq., seeking construction of a statute its application in a given situation. 287 Ala. at 229-230. Other actions which are not prohibited by § 14 are: (5) valid inverse condemnation actions brought against State officials in their representative capacity; and (6) actions for injunction or damages brought against State officials in their representative capacity and individually where it was alleged that they had acted fraudulently, in bad faith, beyond their authority or in a mistaken interpretation of law. Wallace v. Board of Education of Montgomery County, supra, 280 Ala.639, ; Unzicker v. State, 933 (Ala. 1977); Engelhardt v. Jenkins, 273, Ala.

352, 141 So.2d 193 (1962)."

In <u>Ex Parte Crannan,</u> 792 So. 2d 392 (Ala.2000), the Supreme Court further limited state

agent immunity as follows:

"We therefore restate the rule governing State-agent immunity:

A State agent <u>shall</u> be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's

(1) formulating plans, policies, or designs; or

(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples as:

      (a) making administrative adjudications;

      (b) allocating resources;

      (c) negotiating contracts;

      (d) hiring, firing, transferring, assigning, or supervising personnel; or supervising personnel; or

(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or

(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or

(5) exercising judgment in the discharge of duties imposed by statute, rule or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent <u>shall not</u> be immune from civil liability in his or her personal capacity

(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the

22

purpose of regulating the activities of a governmental agency require otherwise; or

(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

We today only modify Elmore and cases relying upon it so as to preserve the proper balance between §§ 13, 14, 43, and § 6.01 of the Judicial Article. Our decision today strikes a balance between constitutional provisions-between the right to a remedy guaranteed by §13 and the immunity of the State provided for by §14; this decision is informed by the wisdom of the doctrine of separation of powers, as considered in light of the presence of § 14, and this decision should prevent Justice Thomas's point made by exaggeration in his dissenting opinion in Finnell from becoming a mechanism for providing State employees with liability insurance or it can propose a constitutional amendment that would authorize statutory procedures to make the

State amenable to lawsuits for the torts of its agents while protecting State employees from lawsuits."

It is evident that because President Chambers and Dean Wilson's actions were and are in violation of the United States Constitution and statutory laws of the United States, no state agent immunity is applicable.

### Equal Protection

When Title VII and Equal Protection claims brought pursuant to 42 U.S.C. § 1983 are used as parallel remedies, the causes of action are analyzed in the same way. Snider v. Jefferson State Community College, 344 F. 3d 1325, 1328 (11th Cir. 2003); Harris v. Shelby County Board of Education, 99 F. 3d 1078, 1082-83 (11th Cir. 1996). Therefore, Plaintiffs adopt the above argument in full as it relates to Equal Protection. The Plaintiffs are members of a protected class, have suffered adverse employment decisions and have been treated differently from people outside the protected class to the detriment of the Plaintiffs. It is clear the female employees at Ingram are treated much different and paid lower wages than similarly situated male employees.

23

### Conclusion

This case is a situation about an abuse of power and authority that leads to a hostile work environment and discriminatory pay based on sex and gender. The evidence clearly shows that beginning in 2000 through the present President Chambers along with Dean Wilson have created a hostile work environment for the Plaintiffs and other women at Ingram. President Chambers yells at and berates Greene in front of her subordinates. Behind Greene's back he calls her employees in his office on numerous occasions and tells them that she is weak and ineffective. When Givens does not go along with President Chambers efforts, President Chambers does not promote her to Bridgman's position when Bridgman retires. When a position comes open in Greene's area applications are taken, unlike other areas where President Chambers manipulates the system to place his personal choices in those positions. When Givens is finally promoted, she is not given the pay on the same salary schedule as her male counterparts in like positions. Not until Givens filed her EEOC complaint was her pay level elevated.

Greene has been denied the opportunity to apply for positions she was qualified for because President Chambers placed Dean Wilson in the position without opening the position for applications. Both Greene and Givens, as well as all females employed at Ingram's main campus have been subjected to several comments regarding their dress attire. No dress code exist, but women are called into meetings concerning appropriate attire. No similar meetings for men have been conducted. The evidence clearly indicates that women are closely observed and what they wear is commented on. If there was a dress code for all employees, then standards would be established. Now, the Defendants are free to comment and harass women about their attire under the guise of security. If security was a problem, certainly a dress code would alleviate the concern and be a

24

practicable guideline for anyone to follow.

There exist many substantial and genuine issues of material facts and the Defendants' Motion

For Summary Judgment is due to be denied.


Respectfully submitted this the 3rd day of October, 2007.



_JIM L. DeBardelaben_
JIM L. DEBARDELABEN [DEB003]
Attorney for Plaintiffs

**OF COUNSEL:**
Jim L. DeBardelaben
Attorneys At Law
Post Office Box 152
1505 Madison Avenue (36107)
Montgomery, Alabama   36101-0152
(334) 265-9206


## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing document via U. S. Mail, postage prepaid, upon the following on this the 3rd  day of October, 2007:


Andrew W. Christman, Esq.
Gidiere, Hinton, Herndon & Christman
P.O. Box 4190
Montgomery, Alabama 36103


_Jim L. DeBardelaben_
OF COUNSEL

# Administrative Personnel Evaluation Form
## J.F. Ingram State Technical College

Employee: __Monica Greene__    Date: __9-20-96__

Position/Title: __Fiscal Dean__

*The following items should be rated "as is" or "with comment" by the evaluator. Comments may be either positive or negative as needed. Employees may also request a "with comment" rating in order to make their own comments about specific items on this evaluation.*

**Meets standard as is**    **With comment**

PLAINTIFF'S EXHIBIT

(✓)    ( )    1.    Encourages good morale and instills a desire to achieve.

(✓)    ( )    2.    Provides effective leadership in areas of primary responsibility.

(✓)    ( )    3.    Does not create problems by using excessive amounts of leave. Does not habitually arrive late or leave early.

(✓)    ( )    4.    Works effectively with employees at all levels to achieve common goals.

(✓)    ( )    5.    Maintains appropriate balance between professional role and personal relationships with employees.

(✓)    ( )    6.    Communicates effectively in oral and written form.

(✓)    ( )    7.    Develops and maintains appropriate and efficient working relationships with other administrators.

(✓)    ( )    9.    Cooperates with supervisor, accepts directions and receives assignments willingly.

(✓)    ( )    10.    Is sensitive to problems or changes within the workplace and responds appropriately.

(✓)    ( )    11.    Makes effort to be a "team player", works effectively as a member of the college's administrative team.

(✓)    ( )    12.    Participates in appropriate professional development activities.

*Comments relating to specific items on the preceding page should be cross referenced to those items. General comments by either employee or evaluator may also be included in this section. Additional pages may be attached if necessary.*

Comments: _____

Excellent

A Very Caring
person

**I hereby acknowledge that I have seen the full content of my written appraisal. My signature does not necessarily constitute that I agree wholly with the content of this appraisal. I understand that I may submit additional written response regarding any item contained in this appraisal, to be included in my personnel file.**

EMPLOYEE SIGNATURE  *Monica G. Greene*  DATE  9-20-96

TITLE OR POSITION  *Fiscal Dean*

EVALUATOR'S SIGNATURE  *J. Douglas Chambers*  DATE  9-20-96

TITLE  *Interim President*

2

## Administrative Personnel Evaluation Form
### J.F. Ingram State Technical College

Employee: _Monica Greene_      Date: _08-28-97_

Position/Title: _Fiscal Dean_

*The following items should be rated "as is" or "with comment" by the evaluator. Comments may be either positive or negative as needed. Employees may also request a "with comment" rating in order to make their own comments about specific items on this evaluation.*

**As is**       **With comment**

(✓)    ( )    1.    Provides effective leadership in areas of primary responsibility.

(✓)    ( )    2.    Does not create problems by using excessive amounts of leave.

(✓)    ( )    3.    Does not habitually arrive late or leave early.

(✓)    ( )    4.    Works effectively with employees at all levels to achieve common goals.

(✓)    ( )    5.    Maintains appropriate balance between professional role and personal relationships with employees.

(✓)    ( )    6.    Communicates effectively in oral and written form.

(✓)    ( )    7.    Develops and maintains appropriate and efficient working relationships with other administrators.

(✓)    ( )    8.    Cooperates with supervisor, accepts directions and receives assignments willingly.

(✓)    ( )    9.    Makes effort to work effectively as a member of the college's administrative team.

(✓)    ( )    10.    Participates in appropriate professional development activities.

PLAINTIFF'S EXHIBIT 2

## Overall Performance Appraisal

Circle the number that <u>best summaraizes your overall appraisal</u> of this employee.

1.   **OUTSTANDING, EXCELLENT**--Performance far exceeds requirements.

2.   **VERY GOOD, ABOVE AVERAGE**--Performance exceeds job requirements.

3.   **GOOD, ACCEPTABLE**--Performance meets requirements.

4.   **BELOW AVERAGE, MINIMALLY ACCEPTABLE**--Performance meets some, but not all, requirements.

5.   **UNSATISFACTORY, UNACCEPTABLE**--Performance does not meet job requirements.

Comments: Employee is very friendly and works well with others. She could improve on her self confidence when dealing with other her workers. Tend to allow others to attach her when she is in charge. Her knowledge is most valuable to the College. She is an outstanding worker.

**I hereby acknowledge that I have seen the full content of my written appraisal. My signature does not necessarily constitute that I agree wholly with the content of this appraisal. I understand that I may submit additional written response to my supervisor regarding any item contained in my appraisal.**

EMPLOYEE SIGNATURE _____ DATE _____

TITLE OR POSITION _____

EVALUATOR'S SIGNATURE *J. Douglas Chambers* DATE 9/2/97

TITLE *President*

2

## Administrative Personnel Evaluation Form
## J.F. Ingram State Technical College

Employee: **Greene, Monica**          Date: **July 15, 1998**

Position/Title: **Dean of Fiscal Affairs**

*The following items should be rated "as is" or "with comment" by the evaluator. Comments may be either positive or negative as needed. Employees may also request a "with comment" rating in order to make their own comments about specific items on this evaluation.*

**As is**          **With comment**

( )          (✓)     1.     Provides effective leadership in areas of primary responsibility.

(✓)          ( )     2.     Does not create problems by using excessive amounts of leave.

(✓)          ( )     3.     Does not habitually arrive late or leave early.

(✓)          ( )     4.     Works effectively with employees at all levels to achieve common goals.

(✓)          ( )     5.     Maintains appropriate balance between professional role and personal relationships with employees.

(✓)          ( )     6.     Communicates effectively in oral and written form.

(✓)          ( )     7.     Develops and maintains appropriate and efficient working relationships with other administrators.

(✓)          ( )     8.     Cooperates with supervisor, accepts directions and receives assignments willingly.

(✓)          ( )     9.     Makes effort to work effectively as a member of the college's administrative team.

(✓)          ( )     10.    Participates in appropriate professional development activities.

PLAINTIFF'S
EXHIBIT

3

**Overall Performance Appraisal**

Circle the number that best summarizes your overall appraisal of this employee. A rating of "1" or "5" requires written justification in the form of attachment(s) explaining why the employee received the rating.

1.    **OUTSTANDING, EXCELLENT**--Performance far exceeds requirements.

2.    **VERY GOOD, ABOVE AVERAGE**--Performance exceeds job requirements.

3.    **GOOD, ACCEPTABLE**--Performance meets requirements.

4.    **BELOW AVERAGE, MINIMALLY ACCEPTABLE**--Performance meets some, but not all, requirements.

5.    **UNSATISFACTORY, UNACCEPTABLE**--Performance does not meet job requirements.

Comments: _Employee continues to develop good leadership skills. Tends to get down when confronted by other workers. She continues to grow stronger each day. Very knowledgeable in Business area._

I hereby acknowledge that I have seen the full content of my written appraisal. My signature does not necessarily indicate that I agree wholly with the content of this appraisal. I understand that I may submit additional written response to my supervisor regarding any item contained in my appraisal.

EMPLOYEE SIGNATURE _Monica J. Greene_    DATE _8-5-98_

TITLE OR POSITION _DEAN OF FISCAL AFFAIRS_

EVALUATOR'S SIGNATURE _J. Douglas Chambers_    DATE _7/27/98_

TITLE _President_

ADMINISTRATIVE PERSONNEL EVALUATION FORM

J.F. INGRAM STATE TECHNICAL COLLEGE

EMPLOYEE: MONICA GREENE                    DATE: APRIL 3, 2002

POSITION/ TITLE: DEAN OF FISCAL AFFAIRS

*THE FOLLOWING ITEMS SHOULD BE RATED "AS IS" OR "WITH COMMENT" BY THE EVALUATOR.  COMMENTS*

*MAY BE EITHER POSITIVE OR NEGATIVE AS NEEDED. EMPLOYEES MAY ALSO REQUEST A "WITH COMMENT" RATING I*

*ORDER TO MAKE THEIR OWN COMMENTS ABOUT SPECIFIC ITEMS ON THIS EVALUATION.*

| MEET STANDARD AS IS | WITH COMMENT | |
|---|---|---|
| (✓) | ( ) | 1. ENCOURAGES GOOD MORALE AND INSTILLS A DESIRE TO ACHIEVE. |
| (✓) | ( ) | 2. PROVIDES EFFECTIVE LEADERSHIP IN AREAS OF PRIMARY RESPONSIBILITY. |
| (✓) | ( ) | 3. DOES NOT CREATE PROBLEMS BY USING EXCESSIVE AMOUNTS OF LEAVE. DOES NOT HABITUALLY ARRIVE LATE OR LEAVE EARLY. |
| (✓) | ( ) | 4. WORKS EFFECTIVELY WITH EMPLOYEES AT ALL LEVELS TO ACHIEVE COMMON GOALS. |
| (✓) | ( ) | 5. MAINTAINS APPROPRIATE BALANCE BETWEEN PROFESSIONAL ROLE AND PERSONAL RELATIONSHIPS WITH EMPLOYEES. |
| (✓) | ( ) | 6. COMMUNICATES EFFECTIVELY IN ORAL AND WRITTEN FORM. |
| (✓) | ( ) | 7. DEVELOPS AND MAINTAINS APPROPRIATE AND EFFICIENT WORKING RELATIONSHIPS WITH OTHER ADMINISTRATORS. |
| (✓) | ( ) | 8. COOPERATES WITH SUPERVISOR, ACCEPTS DIRECTIONS AND RECEIVES ASSIGNMENTS WILLINGLY. |
| (✓) | ( ) | 9. IS SENSITIVE TO PROBLEMS OR CHANGES WITHIN THE WORKPLACE AND RESPONDS APPROPRIATELY. |
| (✓) | ( ) | 10. MAKES EFFORT TO BE A "TEAM PLAYER", WORKS EFFECTIVE AS A MEMBER OF THE COLLEGE'S ADMINISTRATIVE TEAM. |
| (✓) | ( ) | 11. PARTICIPATES IN APPROPRIATE PROFESSIONAL DEVELOPMENT ACTIVITIES. |



PLAINTIFF'S
EXHIBIT

4

COMMENTS RELATING TO SPECIFIC ITEMS ON THE PRECEDING PAGE SHOULD BE CROSS-REFERENCED TO THOSE ITEMS. GENERAL COMMENTS BY EITHER EMPLOYEE OR EVALUATOR MAY ALSO BE INCLUDED IN THIS SECTION. ADDITIONAL PAGES MAY BE ATTACHED IF NECESSARY.

COMMENTS:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____          _____
SUPERVISOR'S SIGNATURE                          DATE

# Administrative Personnel Evaluation Form
# J.F. Ingram State Technical College

Employee: Monica Greene                    Date: March 31, 2003

Position/ Title: Dean of Fiscal Affairs

*The following items should be rated "as is" or "with comment" by the evaluator. Comments may be either positive or negative as needed. Employees may also request a "with comment" rating in order to make their own comments about specific items on this evaluation.*

| Meet standard As is | With Comment | |
|---|---|---|
| (✓) | ( ) | 1. Encourages good morale and instills a desire to achieve. |
| (✓) | ( ) | 2. Provides effective leadership in areas of primary responsibility. |
| (✓) | ( ) | 3. Does not create problems by using excessive amounts of leave. Does not habitually arrive late or leave early. |
| (✓) | ( ) | 4. Works effectively with employees at all levels to achieve common goals. |
| (✓) | ( ) | 5. Maintains appropriate balance between professional role and personal relationships with employees. |
| (✓) | ( ) | 6. Communicates effectively in oral and written form. |
| (✓) | ( ) | 7. Develops and maintains appropriate and efficient working relationships with other administrators. |
| (✓) | ( ) | 8. Cooperates with supervisor, accepts directions and receives assignments willingly. |
| (✓) | ( ) | 9. Is sensitive to problems or changes within the workplace and responds appropriately. |
| (✓) | ( ) | 10. Makes effort to be a "team player", works effective as a member of the college's administrative team. |
| (✓) | ( ) | 11. Participates in appropriate professional development activities. |


PLAINTIFF'S
EXHIBIT
5

*Comments relating to specific items on the preceding page should be cross-referenced to those items. General comments by either employee or evaluator may also be included in this section.  Additional pages may be attached if necessary.*

Comments:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____


_____          3/31/03
Supervisor's Signature                          _____
                                                   Date



**Administrative Personnel Evaluation Form**
**J.F. Ingram State Technical College**



PLAINTIFF'S
EXHIBIT
6

**Date:  April 1, 2004**

**Employee:  Monica J. Greene**      **Position/ Title:   Dean of Fiscal Affairs**

*The following items should be rated "as is" or "with comment" by the evaluator.  Comments may be either positive or negative as needed. Employees may also request a "with comment" rating in order to make their own comments about specific items on this evaluation.*

**Meets standard**   **With**
**As is**            **Comment**

( )   1. Encourages good morale and instills a desire to achieve.

( )   2. Provides effective leadership in areas of primary responsibility.

( )   3. Does not create problems by using excessive amounts of leave.
Does not habitually arrive late or leave early.

( )   4. Works effectively with employees at all levels to achieve common goals.

( )   5. Maintains appropriate balance between professional role and personal
relationships with employees.

( )   6. Communicates effectively in oral and written form.

( )   7. Develops and maintains appropriate and efficient working relationships
with other administrators.

( )   8. Cooperates with supervisor, accepts directions, and receives assignments
willingly.

( )   9. Is sensitive to problems or changes within the workplace and responds
appropriately.

( )   10. Makes an effort to be a "team player" and  works effectively as a member of
the College's administrative team.

( )   11. Participates in appropriate professional development activities.

*Comments relating to specific items on the preceding page should be cross-referenced to those items. General comments by either employee or evaluator may also be included in this section. Additional pages may be attached if necessary.*

Comments:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

I hereby acknowledge that I have seen the full content of my written appraisal. My signature does not necessarily constitute that I agree wholly with the content of this appraisal. I understand that I may submit additional written response(s), regarding any item contained in this appraisal, to be included in my personnel file.

Employee   ___Monica J. Greene___   ___Monica J. Greene___
                    (Typed/Printed Name)              (Signature)
           ___Dean of Fiscal Affairs___   ___4/26/04___
                    (Title)                          (Date)

Supervisor  ___J. Douglas Chambers___   ___J. Douglas Chambers___
                    (Typed/Printed Name)              (Signature)
           ___President___   ___4/1/04___
                    (Title)                          (Date)



**I**ngram
 **S**tate
  **T**echnical
   **C**ollege

ISTC
• *Developing Responsible Citizens* •

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

### INGRAM STATE TECHNICAL COLLEGE
June 19, 2001

**MEMORANDUM**

**TO:**        Rickey Huffstutler
              Dean of the College

**FROM:**   Monica J. Greene  *Monica*
              Dean of Fiscal Affairs

**RE:**        Welding/ Main Campus

*Dean Greene —
Thank you
informing Dr. Huff
about this.
Very good!
I will follow
this to
see
what
happen
Joe*

This memorandum is to inform you that Mr. Wade is accepting items in for repair without filling out the proper paperwork.  For example,  yesterday two items came in the gate and were dropped off without any paperwork being signed or initiated by Mr. Wade. I was informed that these items came in and I had to make two phone calls to Mr. Wade to get the estimate forms to us.  Mr. Wade is saying that he needs to fix these items and no materials will be involved.  I am in the process of making a decision on whether the business office will require work orders on items like these or if the estimate sheet will suffice.  I will let you know when this decision is made.

The main point of this memorandum is to let you know that Mr. Wade is trying to get back to business as usual and this is not going to be tolerated.  He does not need to let anyone leave any items without paperwork being initiated and signed.  I need your assistance and support in enforcing matters of this nature.  Thank you for your time and consideration.

cc:  J. Douglas Chambers, President



PLAINTIFF'S
EXHIBIT
7

*P.O. Box 220350  •  Deatsville, Alabama 36022*
*Phone: 334-285-5177  •  Fax: 334-285-5328*



# INGRAM STATE TECHNICAL COLLEGE

April 22, 2002

*Ingram*
*State*
*Technical*
*College*

**ISTC**

∘ *Developing Responsible Citizens* ∘

**J. Douglas Chambers**
President

**MEMORANDUM**

**Rickey A. Huffstutler, Ph.D**
Dean of the College

TO:             Dr. Rickey Huffstutler
                Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

FROM:        Monica J. Greene        *Monica*
             Dean of Fiscal Affairs

RE:             Live Work Estimate & Contact Form

**James E. Wilson**
Dean of Students
and Support Services

Please review very carefully the attached estimate and contact form submitted by Mr. Wade. You will recall that the initial painting of this same trailer by the welding shop was cause for much discussion during our previous audit. You may also note the small price that is estimated. Please let me know if you approve of this job. Thank you for your immediate attention to this matter.

cc: J. Douglas Chambers, President



# J. F. Ingram State Technical College
Post Office Box 220350
Deatsville, Alabama 36022
Telephone Number: 285-5177
Fax Number: 285-5328

## Live Work Contact Form

_WEW_

**Shop**

_Main_

**Campus**

_4-22-02_

**Date of Contact**

_____

**Name of Customer**

_____

**Work Phone Number**

_____

**Home Phone Number**

**Description of Live Work Request:**

_Repaint Trailer_

**Accepted by Shop Instructor**     ___✓___ (yes)     _____ (no)

**If No, please give reason.**

**Estimated Date of Project Completion:**     _5-31-02_

Date

Please allow sufficient time for the Business Office to issue Work Order, process requisitions, and collect deposits when making this estimate.

_Amy Currie_     or     _L Wade_

**Customer's Signature**          **Instructor – Telephone Contact**

APPROVED (___) yes (___) no          _____

Date

_____          _____

**J. Douglas Chambers, President**          **Work Order Number          (Date)**

Form   A 200
December 1, 2001

## J. F. Ingram State Technical College
Post Office Box 220350
Deatsville, Alabama  36022
Telephone Number:  285-5177
Fax Number:  285-5328

**ESTIMATE AMOUNTS ARE
GOOD FOR TEN (10) DAYS ONLY
FROM THE DATE STATED BELOW.**

### ESTIMATE FORM

Shop: _WEV_

Name: _Jo Ann Currie_    Employer: _JFI_    Date: _4-22-02_

Home Address: _____

Phone (W): _____    Phone (H): _____    WO#: _____    INV#: _____

Make: _____    Model: _____    Year: _____    VIN/Serial #: _____

| Materials/Operations | | Percentages | Materials |
|---|---|---|---|
| Repaint Trailer | | | 22 00 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | Misc. | 5% | 1.10 |
| P.O.#_____ | College | 10% | 2.31 |
| | Tax | 5% | 1.10 |
| RECEIPT NUMBER: _____ | | | |
| | DEPOSIT | 75% | ∠$50 |
| TOTAL | | | 26.51 |

Customer's Signature: _Jo Ann Currie_



**INGRAM STATE TECHNICAL COLLEGE**

December 9, 2002

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

**MEMORANDUM**

**TO:**        Dr. Rickey Huffstutler
               Dean of the College

**FROM:**      Monica J. Greene      
               Dean of Fiscal Affairs

**RE:**        Live Work Invoice #18080

This correspondence is written to inform you that Mr. Spurlin did
not estimate the deposit amount correctly on work order #18130.  I
have attached a copy of the final invoice, original estimate, and the
contact form.  This is a violation of our live work policy on taking
a 75% deposit.  I ask that you take the necessary steps so that this
does not happen again.  Please let me know of any action that you
take with Mr. Spurlin.  Thank you for your assistance in this very
important matter.

cc:  J. Douglas Chambers, President

**PLAINTIFF'S
EXHIBIT
9**

P.O. Box 220350  •  Deatsville, Alabama 36022
Phone: 334-285-5177  •  Fax: 334-285-5328

# INVOICE

*J.F. Ingram State Technical College*
P.O. BOX 220350
5375 INGRAM RD.
DEATSVILLE, ALABAMA 36022
PHONE: (334) 285-5177

NAME *Hubbert Griggs*                    DATE 11-19-02

ADDRESS *Department of Correction*       DEPT. DMC

VIN # WBAAD1307H8830321          WORK ORDER # 18130

DOOR DATE: 2-87     8830821              853970 BMW 558625

Description of work  87- BMW 325 I-4  ENGIN 2.5L

P6a1686 Bulb 548608 BMW out of Job  A600384 A600670  A600609 , A602845

Vendor Name / Invoice No. Carquest  A597426 , A597346, A599778, A600406

| NO. ITEMS | MATERIALS | COST |
|---|---|---|
| 1 | STARTER    AMP 31158 | 158.65 |
| 1 | FUEL LINE  27003 | 1.43 |
| 6 | SPARK PLUG  UGR5B39 | 15.13 |
| 1 | BULB CLB H3-55 | 5.03 |
| 1 | OIL FILTER | 5.96 |
| 7 | OTIS OIL  10 W30   1.50 | 10.50 |
| 2 | REAR SHAFT  RDS 11015   59.99 | 131.98 |
| 1 | SET IGN WIRES EC7647 | 118.76 |
| 1 | BULB CLB C5W 18P2 | 3.44 |
| 3 | NUTS 430-010 | .70 |
| 1 | LANDA PROBE | 100.00 |
| 1 | INJ    WTAR | 70.84 |
| 1 | PRESSURE REGULATOR 13-53-1-772-070 | 46.06 |
| 1 | CRAG SENSOR 12-14-1-720-855 | 72.00 |

| TAXABLE AMOUNT: 740.58 | NON-TAXABLE AMOUNT: 192.55 | MISC. CHG. | 37.03 |
|---|---|---|---|
| | | PLUS 20% | 155.52 |
| **INVOICE** | | TAX | 37.03 |
| № 18080 | | TOTAL | 976.16 |
| | | DEPOSIT: | 87.00 |
| | | BALANCE: | 883.16 |

PAID
NOV 19 2002
J.F. INGRAM STATE
TECHNICAL COLLEGE

PAID
NOV 19 2002
J.F. INGRAM STATE
TECHNICAL COLLEGE

*"This is your receipt."*

### J. F. Ingram State Technical College
Post Office Box 220350
Deatsville, Alabama 36022
Telephone Number: 285-5177
Fax Number: 285-5328

ESTIMATE AMOUNTS ARE
GOOD FOR TEN (10) DAYS ONLY
FROM THE DATE STATED BELOW.

### ESTIMATE FORM

TAG: US 10 CA

Shop: _DMC_

Name: _Hubbert Grigg_    Employer: _DDC_    Date: _8-15-02_

Home Address: _____

Phone (W): _567-2221_  Phone (H): _____  WO#: _18130_  INV#: _18080_

Make: _BMW_    Model: _____  Year: _1987_  VIN/Serial #: _WBAAD1307H88__30_

| Materials/Operations | | Percentages | Materials |
|---|---|---|---|
| Starter | | | 89.00 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Paid Deposit | | | |
| 8-15-02 | | | |
| 87.00 | | | |
| CK #5069 | | | |
| | Misc. | 5% | 4.45 |
| P.O.#_____ | College | 20% | 18.69 |
| | Tax | 5% | 4.45 |
| | | | |
| RECEIPT NUMBER: _____ | | | |
| | DEPOSIT | 75% | 87.00 |
| TOTAL | | | 116.55 |

Customer's Signature: _____

FORM    FIS 300

**J. F. Ingram State Technical College**
Post Office Box 220350
Deatsville, Alabama 36022
Telephone Number: 285-5177
Fax Number: 285-5178

## Live Work Contact Form

_DNC_
Shop

_Diaper/STATION   8-5_
Campus                        Date of Contact

_Hubbert Griggs_
Name of Customer

_567-2221_
Work Phone Number            Home Phone Number

**Description of Live Work Request:**

_Replace Starter_

Accepted by Shop Instructor          _____ (yes)    _____ (no)
If No, please give reason.

Estimated Date of Project Completion:

Date

Please allow sufficient time for the Business Office to issue Work Order, process requisitions, and collect deposits when making this estimate.

Customer's Signature                 or

APPROVED ( ✓ ) yes  ( ) no           Instructor — Telephone Contact

                                     Date

_J. Douglas Chambers, President_     _18130_          _8-15-02_
                                     Work Order Number    (Date)

Form   A 200
December 1, 2001



**INGRAM STATE TECHNICAL COLLEGE**
December 18, 2002

*Ingram*
*State*
*Technical*
*College*

* Developing Responsible Citizens *

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

**MEMORANDUM**

**TO:**  Rickey Huffstutler
Dean of the College

**FROM:**  Monica J. Greene  *Monica*
Dean of Fiscal Affairs

**RE:**  Live Work

This correspondence is to inform you that Mr. Keahey did not follow policy on the following estimate form and work order. Mr. Marty Martin inquired about getting a jewelry chest made by Mr. Keahey. Mr. Keahey told him that he could build it as a class project. When the project was finished Mr. Martin came up front to pay for it and there was not any paperwork on file. This is when Mr. Martin came to me and told me what was going on. This was the first that I knew about the project.

Mr. Keahey has violated more than one policy in this case. First of all, a regular work order, not a class project, should have been written when Mr. Martin originally requested the project. Secondly, if Mr. Keahey was going to take on the job as a class project without getting approval, then he definitely should have an active class project on file and he did not.

Mr. Keahey violated by not writing up a work order and estimate originally. He also violated policy by not getting approval from me to write up as a class project. Lastly, he violated by not preparing the paperwork for a class project.

Dr. Huffstutler it is imperative that our live work policies are followed by our instructors. The auditors are not going to allow these work orders to be written on the same day as the job is finished. I refuse to continue to make excuses for instructors not following policy. I request that the necessary action be taken to stop Mr. Keahey from not following policy. I need your assistance to resolve this matter. Please let me know of any action that you take with Mr. Keahey. I will look forward to hearing from you on this very important matter.

cc:  J. Douglas Chambers, President

**PLAINTIFF'S EXHIBIT**
**10**

*P.O. Box 220350  •  Deatsville, Alabama 36022*
*Phone: 334-285-5177  •  Fax: 334-285-5328*

# INVOICE

*J.F. Ingram State Technical College*

P.O. BOX 220350
5375 INGRAM RD.
DEATSVILLE, ALABAMA 36022
PHONE: (334) 285-5177

NAME Marty Martin

ADDRESS

DATE 12/18/02

DEPT. fur

WORK ORDER # 18830

Description of work jewelry chest

Vendor Name / Invoice No.

| NO. ITEMS | MATERIALS | COST |
|---|---|---|
| | Cherry plywood | 77.00 |
| | 1/4" cherry plywood | 48.00 |
| | 16 board feet - cherry | 64.00 |
| | 6 sets of hinges | 16.00 |
| | piano hinges | 4.00 |
| | stain & finish | 25.00 |
| | | 234.00 |

| TAXABLE AMOUNT: 234.00 | NON-TAXABLE AMOUNT: 36.27 | MISC. CHG. | 11.70 |
|---|---|---|---|

**INVOICE**

№ 18780

| PLUS 20% | 24.57 |
|---|---|
| TAX | 11.70 |
| TOTAL | 281.97 |
| DEPOSIT: | |
| BALANCE: | |

"This is your receipt."

J. F. Ingram State Technical College
Post Office Box 220350
Deatsville, Alabama 36022
Telephone Number: 285-5177
Fax Number: 285-5328

ESTIMATE AMOUNTS ARE
GOOD FOR TEN (10) DAYS ONLY
FROM THE DATE STATED BELOW.

## ESTIMATE FORM

Shop: _____fic_____

Name: Marty Martin    Employer: JFI    Date: 12/17/02

Home Address: _____

Phone (W): V54    Phone (H): _____    WO#: 18830   INV#: 18780

Make: _____  Model: _____  Year: _____  VIN/Serial #: _____

| Materials/Operations | | Percentages | Materials |
|---|---|---|---|
| Cherry plywood | | | 77.00 |
| 1/4" Cherry plywood | | | 48.00 |
| 116 board feet - cherry | | | 104.00 |
| 6 sets hinges | | | 110.00 |
| piano hinges | | | 4.00 |
| stain & finish | | | 25.00 |
| | | | 234.00 |
| | | | |
| | | | |
| | | | |
| | Misc. | 5% | 11.70 |
| P.O.#_____ | College | 10% | 24.57 |
| | Tax | 5% | 11.70 |
| RECEIPT NUMBER: _____ | | | |
| | DEPOSIT | 75% (211.48) | in-stock |
| TOTAL | | | 281.97 |

Customer's Signature: _____

FORM    FIS 300



**INGRAM STATE TECHNICAL COLLEGE**

February 27, 2004

*Ingram*
*State*
*Technical*
*College*

**ISTC**

• *Developing Responsible Citizens* •

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

## MEMORANDUM

**TO:**      Rickey Huffstutler
             Dean of the College

**FROM:**    Monica J. Greene      *Monica*
             Dean of Fiscal Affairs

**RE:**      Invoice #20587 – Auto Mechanics

This correspondence is being sent to inform you that Mr. Benton did not collect a deposit on invoice #20587. I have attached a copy for your review. As you know, Mr. Benton has been instructed about not doing this on several occasions. This practice cannot continue. I need your assistance to make sure that this does not happen again. Thank you for your help with this.



*P.O. Box 220350* • *Deatsville, Alabama 36022*
*Phone: 334-285-5177* • *Fax: 334-285-5328*

handmail

# INVOICE

*J.F. Ingram State Technical College*

P.O. BOX 220350
5375 INGRAM RD.
DEATSVILLE, ALABAMA 36022
PHONE: (334) 285-5177

NAME _Clark Toodle_                      DATE _02-26-04_

ADDRESS _____                  DEPT. _Auri. Mac_

                                         WORK ORDER # _20137_

Description of work _Tune-up & repair brakes_
                                                        _Resale stock_

Vendor Name / Invoice No. _O'Reilly # 1152-117793 / 1152-117819 / 1152-117890_

| NO. ITEMS | MATERIALS | | COST |
|---|---|---|---|
| 1 | GAT K060870 MICRO-V BELT | | 32.99 |
| 6 | MOT AGSF42FM SPARK PLUG | 3.99 | 23.94 |
| 1 | OMS 9334 IGN WIRE SET | | 18.99 |
| 1 | DOR 610-368 Wheel Studs | | 1.72 |
| 1 | BB BH380357 Brake Hose | | 14.49 |
| 1 | BB BH380358 Brake Hose | | 14.49 |
| 1 | BB MKD652 Disc Pad Set | | 18.99 |
| 2 | NAT 9150S Wheel Seal | 8.49 | 16.98 |
| 1 | Wix 51515 Oil Filter | | 4.99 |
| 1 | Wix 46416 Air Filter | | 4.99 |
| 1 | Wix 33296 Fuel Filter | | 9.49 |
| 1 | PIO P95153 Trans. Filter Kit | | 31.99 |
| 1 | DOR 611-103 Wheel Nuts | | 1.76 |
| 1 | CAN Brake Cleaner | | 2.50 |
| 1 | Pt. Brake Fluid | | 4.00 |
| | Rotated And Balanced All Four Tires | 2.00 | 8.00 |
| 5 | Qt. 5W30 Motor Oil | 1.66 | 8.30 |
| 1 | BAS Wheel Bearing Grease | | 2.68 |
| 4 | Qt. Trans. Fluid | 1.50 | 6.00 |
| 1 | Misc. Chemicals | | 8.88 |
| | | | |
| | | | 242.21 |

| TAXABLE AMOUNT: 242.21 | NON-TAXABLE AMOUNT: 0 | MISC. CHG. | 12.11 |
|---|---|---|---|

**INVOICE**          CU177    **PAID**    Ck# 1704
Nº 20587              FEB 27 2004
                  J.F. INGRAM STATE
                  TECHNICAL COLLEGE

| PLUS 20% | k% | 25.43 |
|---|---|---|
| TAX | | 12.11 |
| TOTAL | | 291.86 |
| DEPOSIT: | | |
| BALANCE: | | |

**"This is your receipt."**



*Ingram*
*State*
*Technical*
*College*

**ISTC**

◦ *Developing Responsible Citizens* ◦

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

**INGRAM STATE TECHNICAL COLLEGE**
March 30, 2004

MEMORANDUM

**TO:**        Rickey Huffstutler
              Dean of the College

**FROM:**    Monica J. Greene    *Monica*
              Dean of Fiscal Affairs

**RE:**        Invoice #20807- Auto Mechanics

This correspondence is being sent to inform you that Mr. Benton did not collect a deposit on invoice #20807. I have attached a copy for your review. As you know, Mr. Benton has been instructed about not doing this on several occasions. The last two that I have reported to you have been on Ingram employees. It appears to me that Mr. Benton is trying to rush these employees through by estimating deposit amounts less than $50. When he discovers the problem, he is not following our procedure to stop the job until the additional deposit is collected.

This practice must stop. I need your assistance in this matter because the auditors are going to be looking at invoices such as these. Thank you for your help with this.



**PLAINTIFF'S EXHIBIT**
**12**

*P.O. Box 220350 • Deatsville, Alabama 36022*
*Phone: 334-285-5177 • Fax: 334-285-5328*

# INVOICE

*J.F. Ingram State Technical College*
P.O. BOX 220350
5375 INGRAM RD.
DEATSVILLE, ALABAMA 36022
PHONE: (334) 285-5177

NAME _Kelly Bridgman_

ADDRESS_____

DATE _03-19-04_

DEPT. _Gin·Mac_

WORK ORDER # _00857_

Description of work _Repair brakes & replace oil pressure switch_

Vendor Name / Invoice No._O'Reilly 1152-119397 / 1152-120184_

| NO. ITEMS | MATERIALS | COST |
|---|---|---|
| 2 | WAG BD12562 Brake Rotor    46.99 | 93.98 |
| 1 | WAG DD462 Ceramic Pad | 32.99 |
| 1 | BWD S4018 Oil Press Switch | 6.19 |
| | | 133.16 |

**PAID**
MAR 19 2004
J.F. INGRAM STATE
TECHNICAL COLLEGE

Cash
KC

| TAXABLE AMOUNT: 133.16 | NON-TAXABLE AMOUNT: 0 | MISC. CHG. | 6.66 |
|---|---|---|---|
| | | PLUS 20% 10% | 13.98 |
| | | TAX | 6.66 |
| | | TOTAL | 160.46 |
| | | DEPOSIT: | |
| | | BALANCE: | |

**INVOICE**

Nº 20807

"This is your receipt."



*Ingram*
*State*
*Technical*
*College*

**ISTC**
**• Developing Responsible Citizens •**

# INGRAM STATE TECHNICAL COLLEGE

September 22, 2005

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

MEMORANDUM

TO:        Gloria Knox

FROM:    Monica J. Greene        *Monica*
            Dean of Fiscal Affairs

RE:        Live Work Deposits

This correspondence is written to remind you about making timely deposits. My office found in checking the August deposits that you had a ten day time period between one of your deposits. This is not acceptable. The auditors have allowed us the flexibility of not having to make daily deposits but you cannot allow deposits to span over a weekend or a time period of ten days. You were given dollar amount limits on making deposits on more than one occasion. Please be advised that you are to follow these dollar amounts unless they exceed a weekly time frame. That is, you must make a deposit every Friday regardless of your limits. Do not hold any funds over a weekend. You are to follow the limits during the week and this may entail making several deposits in that one week. Regardless of how many you may have made during the week, a Friday deposit will be necessary if you have any funds on hand at all.

Thank you for your attention to this matter. I hope that this matter will not have to be addressed again.

cc:  J. Douglas Chambers, President
      Buford Lambert, Center Director

**PLAINTIFF'S
EXHIBIT
13**

*P.O. Box 220350  •  Deatsville, Alabama 36022*
*Phone: 334-285-5177  •  Fax: 334-285-2521*



**INGRAM STATE TECHNICAL COLLEGE**
July 25, 2005

J. Douglas Chambers
President

ickey A. Huffstutler, Ph.D
Dean of the College

Monica J. Greene
Dean of
Fiscal Affairs

James E. Wilson
Dean of Students
and Support Services

MEMORANDUM

**TO:**        Rickey Huffstutler
              Dean of the College

**FROM:**    Monica J. Greene         *Monica*
              Dean of Fiscal Affairs

**RE:**        Invoice #22637- Auto Mechanics

This correspondence is being sent to inform you that Mr.
Benton did not collect a deposit on invoice #22637. I have
attached a copy for your review. As you know, Mr.
Benton has been instructed about not doing this on several
occasions. The last two that I have reported to you have
been on Ingram employees. It appears to me that Mr.
Benton is trying to rush these employees through by
estimating deposit amounts less than $50. When he
discovers the problem, he is not following our procedure
to stop the job until the additional deposit is collected.

This practice must stop! I need your assistance in this
matter because these are the type of errors that the
auditors have been looking at. Thank you for your help
with this.

cc: J. Douglas Chambers, President



P.O. Box 220350  •  Deatsville, Alabama 36022
Phone: 334-285-5177  •  Fax: 334-285-5328

# INVOICE

*J.F. Ingram State Technical College*
P.O. BOX 220350
5375 INGRAM RD.
DEATSVILLE, ALABAMA 36022
PHONE: (334) 285-5177

NAME *Jeff Prosser*

DATE *07-22-05*

ADDRESS _____

DEPT. *aum-mac*

WORK ORDER # *22687*

Description of work *Replace freen plugs. Repair oil leak*
*O'Reilly -1152-158770 -15930 -161360*
Vendor Name / Invoice No. *RIVERSIDE 45612 -46223 -45818 -46913 -46725*

| NO. ITEMS | MATERIALS | | COST |
|---|---|---|---|
| 1 | 10217886 SEAL ASM- | | 5.90 |
| 1 | 12553791 SEAL-W/PM | .47 | .94 |
| 8 | 10108629 SEAL-ENG | 468 | 37.44 |
| 2 | 14097133 F-PLUG | 1.23 | 2.46 |
| 2 | 10110897 PLUG-CY | 4.58 | 9.16 |
| 1 | DPL DE1613 ENGINE PAINT | 4.99 | 4.98 |
| 1 | WLTM 65213 DRAIN PLUG | | 2.19 |
| 1 | FEL BS 40520 REAR MAIN SEAL | | 12.99 |
| 2 | 10105299 F-HOSE ASM | 1.99 | 3.98 |
| 1 | 10114350 F-HOSE AM | | 4.73 |
| 1 | 10128961 HOSE -C/CA | | 21.75 |
| 1 | 25095452 PCV VALVE | | 7.68 |
| 1 | 12102651 CONNECTOR | | 6.38 |
| 1 | 10096136 SENSOR AS | | 1.73 |
| 1 | 10456126 SENSOR AS | | 22.43 |
| | | | 36.40 |
| 2 | gals. of Dex-Cool Antifreeze | 10.50 | 21.00 |
| 3 | qts. of Dex III Trans fluid | 1.00 | 3.20 |
| | | | |
| | | | 207.32 |
| | | | |
| | | | |

| TAXABLE AMOUNT: 207.32 | NON-TAXABLE AMOUNT: Ø | MISC. CHG. | 10.37 |
|---|---|---|---|

INVOICE

№ 22637

| | |
|---|---|
| PLUS 20% 10% | 21.77 |
| TAX | 10.36 |
| TOTAL | 249.82 |
| DEPOSIT: | |
| BALANCE: | |

**J. F. Ingram State Technical College**
Post Office Box 220350
Deatsville, Alabama 36022
Telephone Number: 285-5177
Fax Number: 285-5328

ESTIMATE AMOUNTS ARE
GOOD FOR TEN (10) DAYS ONLY
FROM THE DATE STATED BELOW.

## ESTIMATE FORM

Shop: _AUM-MAC_

Name: _Jeff Prosser_          Employer: _JFI_          Date: _6/2/2005_

Home Address: _____

Phone (W): _2003_     Phone (H): _____     WO#: _2268?_ INV#: _2263?_

Make: _Chev._     Model: _Corvette_ Year: _1994_     VIN/Serial #: _____

| Materials/Operations | | Percentages | Materials |
|---|---|---|---|
| Parts S/B less than $50— | | | |
| _(signature)_ | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | Misc. | 5% | |
| P.O.# _____ | College | | |
| | Tax | 5% | |
| RECEIPT NUMBER: _____ | | | |
| | DEPOSIT | 75% | |
| TOTAL | | | |

FORM     FIS 300          Customer's Signature: _(signature)_

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4

5     CASE NUMBER:   2:06-cv852-ID

6

7     JULIE GIVENS and

8     MONICA GREENE,

9          Plaintiffs,

10    vs.

11    DOUGLAS CHAMBERS, Individually

12    and in his capacity as President

13    of INGRAM STATE TECHNICAL COLLEGE;

14    JAMES WILSON, Individually and in

15    his capacity as Dean of Students

16    of INGRAM STATE TECHNICAL COLLEGE,

17         Defendants.

18

19    BEFORE:

20         Cynthia M. Noakes, Commissioner

21         and Court Reporter

22

23    DEPOSITION TESTIMONY OF MONICA GREENE

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 191

1              hereto.)

2    Q.    Do you know who Rickey Huffstutler is?

3    A.    I do.

4    Q.    What is your understanding as to his

5    position at the college at the time he was there

6    when he was dean?

7    A.    He was appointed the Dean of the College,

8    which is similar to a vice president.

9    Q.    This is the same Huffstutler that was not

10   chosen as the dean when you were chosen?  Is this

11   the same?

12   A.    No.

13   Q.    That's Gene Bridgman?

14   A.    Yes.  He's never applied for my job.

15   Q.    No.  Dean Huffstutler was a contemporary,

16   basically, of yours, and he was the Dean of the

17   College?

18   A.    Uh-huh.

19   Q.    But he had interaction with your office on a

20   regular basis?

21   A.    He did.

22   Q.    What is his race and gender?

23   A.    He's a white male.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 195

1    to express certain concerns I have regarding

2    processes and activities associated with the

3    Business Office.  I'm writing this in a positive

4    manner and this is not as a reaction to the recent

5    problem with my personal invoices but to express

6    some observations from my experience as a chief

7    financial officer."

8              MR. DEBARDELABEN:  Excuse me for a

9    minute.

10             (Witness confers with counsel.)

11             MR. DEBARDELABEN:  Just answer his

12   questions.

13   Q.    Was it your understanding that Dean

14   Huffstutler was, in a previous position, a chief

15   financial officer?

16   A.    He was.

17   Q.    So you would agree with me that he had

18   extensive experience in managing the exact type of

19   affairs that you are responsible for managing?

20   A.    He liked to say he did.  I mean, I didn't

21   work with him.  But he did hold that position at

22   another college.  I don't know what kind of job he

23   did, just like somebody that doesn't work with me

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 238

1    Q.    Understood.  With respect to the yelling,

2    since you brought it up, it is your contention

3    that Dr. Chambers raises his voice in the

4    workplace?

5    A.    Yes.

6    Q.    He raises it at you?

7    A.    Yes.

8    Q.    He raises it at some of your colleagues that

9    are females?

10   A.    I don't know that I've said that.

11   Q.    Okay.  Fair enough.  He raises his voice at

12   other men?

13   A.    I mean, I really am talking about myself

14   here.

15   Q.    Okay.  Well, I'm just asking you.  You can

16   say, I don't know, and that's fine.  That's a

17   perfectly acceptable answer.

18         Do you know whether he's raised his voice at

19   Dr. Merk?

20   A.    No, I don't know.  I would say not as I've

21   been subjected to; I don't think he ever has.

22   Q.    You've never heard him yell at Dr. Merk?

23   A.    I don't think so.

Page 239

1    Q.    Okay.  Have you heard him yell at James

2    Wilson?

3    A.    I don't think so.

4    Q.    Have you ever heard him yelling at any other

5    male employees or deans?

6    A.    He probably has yelled at Huffstutler at

7    times.  It seemed to be when Huffstutler became

8    more supportive of me, in the later time that he

9    was there, it seemed that he seemed to focus on

10   both of us, as he did in the audit and other

11   things.

12   Q.    And you contend that's because he was

13   supportive of you and not just because Huffstutler

14   was independently deserving of some instruction?

15   A.    They had been together a long time, so I

16   think they had gotten along.

17   Q.    Is it fair to say that Dr. Chambers'

18   management style is a little bit loud?

19   A.    Yes.

20   Q.    He yells kind of at everybody; isn't that

21   right?

22   A.    No.  I wouldn't say at everybody.

23   Q.    Well, if I paraded Dr. Merk in here and he

Page 241

1    A.     Right.

2    Q.     It wasn't so much focused on reports of

3    discrimination, racial or gender-based; is that

4    right?

5    A.     Right.

6    Q.     And we were discussing whether Dr. Chambers

7    has a management style of yelling at his

8    employees, and you agreed he has a loud management

9    style; is that true?

10   A.     Loud and negative.

11   Q.     Loud and negative.  And you don't approve of

12   that management style; is that true?

13   A.     True.

14   Q.     You think there's a better way to manage a

15   college as a president than yelling at your

16   employees?

17   A.     I do.  That's my opinion.

18   Q.     And you think he could be more positive as a

19   president?

20   A.     Yes.

21   Q.     And if his management style was better in

22   that regard, do you believe you would have a

23   better working relationship with Dr. Chambers?

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 422

1    It says, "This correspondence is being provided to

2    inform you that Dr. Rickey Huffstutler was

3    appointed Dean of the College December 1997."

4    Q.    Okay.  December 1997.  Do you know if the

5    Dean of the College is an advertised position?

6    A.    I don't know.

7    Q.    Do you know if the Dean of the College

8    position is --

9    A.    It was not advertised.

10   Q.    Is it a position that's normally advertised,

11   is my question.

12   A.    I don't think so.

13   Q.    You said there was another promotion or

14   opportunity that you weren't given.  And I stopped

15   you when we were talking about the Dean of the

16   College one.  Let's go on to the second one.

17   A.    Okay.  When Dr. Huffstutler took the

18   position with the Department of Postsecondary,

19   that Dean of the College position came open again,

20   and Mr. James Wilson was given that position.  So

21   he received 110 percent of his salary.

22        Now, the chancellor's department had

23   increased the being second in command to $2,000.

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 423

1    So that was an additional amount.  So he received

2    that.

3         Mr. Wilson has been at J.F. Ingram longer

4    than me, but Mr. Wilson has not been a dean as

5    long as I have.

6         So there was nothing ever -- we were just

7    told Mr. Wilson was going to be given that

8    position.  And, again, nothing was ever said to

9    me.

10   Q.    Did you express interest in the job at that

11   time?

12   A.    I didn't, because it was already -- we were

13   just told that happened and it was done.  I should

14   have been considered.

15   Q.    And you think you should have been

16   considered based upon what?

17   A.    More years of experience at the college as a

18   dean.  And a lot of colleges use their -- their

19   business manager, you know, would be their --

20   their business dean would be their right hand and

21   knows a lot about the whole workings of the

22   college.

23        So when he made the statement with Dr.

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 432

1  A.    Right.

2  Q.    Your job qualifications and requirements are

3  wholly distinctive, except for small overlaps here

4  and there; isn't that true?

5  A.    True.

6  Q.    The assignment of tasks.  Any other ways

7  that you believe you have been treated

8  differently?  And let me make sure I understand

9  who you are referring to when you say your male

10  counterparts.  Jim Merk, James Wilson --

11  A.    And Huffstutler when he was there.

12  Q.    Huffstutler when he was there.

13  A.    Yes.

14  Q.    Any other ways that you believe they were

15  treated differently than you?

16  A.    I don't think the yelling was the same and

17  the treatment was the same to them as it was to

18  me.

19  Q.    You think you got yelled at more?

20  A.    Yes.

21  Q.    Anything else?

22  A.    No.

23  Q.    In your judgment, is James Wilson your

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 451

1    A.    Because he did that.  I say he did that

2    because I'm a female.

3    Q.    Okay.  What evidence do you have that he

4    said those things because you're white?

5    A.    We don't know why he said them.

6    Q.    Yes, ma'am.  September 6th:  In the presence

7    of your department, he yelled at you about the

8    Home Depot bill.  And then there were some other

9    items in there.

10    A.    Yeah.  And that he called me into a room

11    like this, and brought every one of my workers in

12    there, and yelled at me about something that had

13    been handled.  And I'm sorry, that's just not

14    right.

15    Q.    I understand.

16    A.    He should have taken me in his office again

17    and talked to me about it.

18    Q.    I understand that you believe that it's not

19    right.  I do understand that.

20         What evidence do you have that he was doing

21    that because you're a female?

22    A.    I've never seen him do it to a male

23    employee.

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 457

1    style, which is totally different from his.  This

2    does not mean that I'm weak because I don't rule

3    like him.  This particular day he made the comment

4    "I know that you are soft and all but..." he

5    continued on about me not doing what I need to do

6    because I was weak.  I am consistent which he is

7    not and that would make me strong.

8         I don't think that he would tell a man that

9    he was soft.  And he's saying I'm soft and weak

10   because I'm a woman.  I don't believe he's ever

11   told a man that they're soft.  And there's no

12   reason to tell me I'm soft.  There was nothing to

13   back that up.

14   Q.    Okay.

15   A.    He also, on that page, on 1/10 -- I think

16   that's January 10th of 2000 -- "Mr. Chambers asked

17   me the question, do you curse?  I told him that

18   that was not my style.  He said, 'I want you to

19   get real mad and curse.'  He also told me that I

20   needed to be a b-i-t-c-h.  I have been successful

21   in doing my job by not behaving in this manner.  I

22   certainly am not perfect, but I just don't cuss at

23   employees to get my job done.  This does not mean

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 478

1    to that, because her position -- that's where Mr.

2    Bridgman was, and she took his place.

3    Q.    Right.

4    A.    She's on the C, but it was on the same --

5    she and Malcolm were -- it was like being in the

6    same position.  You know, different departments,

7    but they would be equal positions.

8         And they said in the meeting that we weren't

9    going to do that.  And so that was fine.  We

10   weren't going to do that.  And some other things

11   were approved.  Later though, Mr. Montgomery did

12   get the raise and Patti did not.

13   Q.    Okay.

14   A.    And I think it was significant too.  It was

15   like over a combined positions or something.

16   Q.    When was this?

17   A.    That was this past year.  So it was August

18   or September of '06.

19   Q.    That's not somebody you recommended for a

20   raise though, right?

21   A.    Who?  I recommended Patti Graves for it.

22   Q.    Malcolm Montgomery.

23   A.    No.  Mr. Wilson recommended him.  But I

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 496

1    and verify things that they did.  And then they

2    reported.

3         Like I said, Ms. McDuffie's job description

4    was different, but they said she did the same

5    thing the others did.

6         I think it was Mr. Wilson that I talked to,

7    but I would have to verify that.

8    Q.    Well, we'll all verify that with their sworn

9    testimony, and we'll see what they say about

10   Jackie's job duties.

11   A.    Okay.

12   Q.    Any other instances in which you believe

13   that Chambers consistently hires and promotes

14   black employees over white employees and pays

15   black employees more money for doing the same job?

16   A.    This document, #26, if you'll notice, most

17   of those are black on the new hires.

18   Q.    Where did this document come from?

19   A.    You have it.

20   Q.    Right.  But I got it from you.  These are

21   your responses.

22   A.    Those came from the payroll department.

23   Those are actually records of the new hires from,

Page 497

1    I think, '04 to '06.

2    Q.    And you believe that these new hire records

3    demonstrate --

4    A.    I'm just showing that's a lot.  If you see,

5    the majority of those are black.

6    Q.    I understand.  It doesn't indicate on here

7    what position they are hired to, right?

8    A.    Right.

9    Q.    It doesn't indicate what their

10   qualifications are, does it?

11   A.    Right.

12   Q.    It doesn't indicate what their educational

13   requirement is, does it?

14   A.    No.

15   Q.    It doesn't indicate what the educational

16   requirement is for the position they're going

17   into, does it?

18   A.    No.

19   Q.    Or the education that they have; is that

20   right?

21   A.    No.

22   Q.    Doesn't indicate any of their work

23   experience, right?

## FREEDOM COURT REPORTING

Page 4

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF ALABAMA

3           NORTHERN DIVISION

4

5    BONITA J. OWENSBY,            )

6              Plaintiff,         )

7    vs                           ) CASE NUMBER:

8    J.F. INGRAM STATE            ) 2:06-CV-796-WKW

9    TECHNICAL COLLEGE; J.        )

10   DOUGLAS CHAMBERS,            )

11   Individually, and in his )

12   official capacity as         )

13   President of J.F. Ingram )

14   State Technical College; )

15   and JAMES WILSON,            )

16   Individually, and in his )

17   official capacity as Dean)

18   of Student and Support       )

19   Services at J.F. Ingram )

20   State Technical College, )

21            Defendants.         )

22

23      DEPOSITION OF JOHN DOUGLAS CHAMBERS

## FREEDOM COURT REPORTING

Page 29

1        Q.    And the only person that's the

2    dean now that was a dean when you came on

3    board is Ms. Greene; is that correct?

4        A.    That's correct.

5        Q.    And all the other deans, you have

6    appointed?

7        A.    That's right.

8        Q.    Okay.    But she's a hold over from

9    Dr. Gregg's presidency?

10        A.    Yes.

11        Q.    And at the present time, Ms.

12    Greene is the only female dean?

13        A.    Yes.

14        Q.    In your position as president, are

15    you her supervising official?

16        A.    Yes.

17        Q.    Nobody else supervises her except

18    you?

19        A.    The Dean of the College has the

20    authority as Dean of the College to act as

21    second in command.    So there are times that

22    the Dean of the College is in charge of the

23    institution.

Page 61

1    Q.   Number four, works effectively

2   with employees at all levels to achieve

3   common goal.  And that's with comment.  Is

4   that a positive or a negative comment?

5        A.   It's a negative.

6        Q.   And you don't have a specific

7   comment at that.  It's just included in what

8   you attached?

9        A.   In my comments, yes.

10       Q.   Number five, maintains appropriate

11  balance between professional role and

12  personal relationships with employees.  And

13  that's a --

14       A.   A positive and a negative.

15       Q.   That's a positive and a negative?

16       A.   Yes.

17       Q.   Okay.  How is it positive?

18       A.   Because she's a very professional

19  person.

20       Q.   How is it negative?

21       A.   Well, it's stated in here about

22  that she -- I want to make sure I'm looking

23  at this.  When I said -- Some of the

## FREEDOM COURT REPORTING

Page 64

1      Q.    How has she failed to develop and

2   maintain an efficient working relationship

3   with other administrators?

4      A.    Well, it's included in my

5   comments.  But if you're asking me for

6   examples of what I have in the comments --

7      Q.    I'm asking you how she's done

8   that.  Why did you put that comment?

9      A.    Because we continue to have

10  problems with other administrators getting

11  what they want from the business office.

12     Q.    You've been the president for

13  approximately ten years or eleven years?

14     A.    Yes.

15     Q.    During this entire period of time,

16  has Ingram State Technical College as an

17  entity ever been cited by the examiner's of

18  public account for the illegal or wrongful

19  expenditure of public funds?

20     A.    Not that I know of.

21     Q.    No one has -- Anybody, the

22  Chancellor's office or any other

23  organization has never questioned how the

## FREEDOM COURT REPORTING

Page 80

1    general statements.

2        Q.    Well, let me show you all the

3    previous evaluations we've been provided and

4    ask -- which is Exhibit No. -- it starts

5    with Exhibit No. 1, Plaintiff's Exhibit 1

6    through 6 there.

7            MR. CHRISTMAN:  We'll look at

8    these, Jim, just to make sure we're looking

9    at the right exhibits.

10       Q.    Now, which evaluation are you

11   talking about?

12       A.    What was your question, please?

13       Q.    Your answer to my question was if

14   I look at the previous evaluations.  And I

15   asked you where you check things.  And I'm

16   looking at the previous evaluations, sir.

17           Let's kind of go through them in

18   order.  And the only evaluation I see where

19   anything is checked besides as is, is

20   evaluation 1998 where it says provides

21   effective leadership in areas of primary

22   responsibility and you told me that was a

23   positive.  Now, which evaluations do you

## FREEDOM COURT REPORTING

Page 81

1    want me to look at?

2         A.    You asked me when did the change

3    take place?

4         Q.    Yes, sir.    Then you made a comment

5    that if I looked at the previous evaluation

6    where you would check, you decided to --

7         A.    No, I didn't say check.    I said if

8    you look where I made the comments.    I made

9    statements indicating negative activity.

10            And this -- And what I started

11   doing then is not just making general

12   statements.    I started identifying them as

13   on the evaluation.

14        Q.    So I can take the -- where you

15   said the president directed the employee to

16   and you've got eighteen items there?

17        A.    Yes.

18            MR. CHRISTMAN:    Now we're talking

19   about Exhibit 7?

20            MR. DEBARDELABEN:    7.

21        Q.    All that happened within the 2005

22   evaluation period?

23        A.    No.

## FREEDOM COURT REPORTING

Page 82

1    Q.    It didn't happen from 2004 of

2  April?

3    A.    It started happening when we --

4  when I started making the comments.  When I

5  put employee tends to develop good

6  leadership, tends to get down when

7  confronted, all of this is including -- it

8  was building up to this.

9    Q.    Well, that is -- The comment

10  you're referring to is Plaintiff's Exhibit

11  No. 3 for '98, isn't it?

12    A.    Right.

13    Q.    Well, if we look at Plaintiff's

14  Exhibit No. 4 for 2002, which is the next

15  one we have been provided, everything is

16  meets standards as is, isn't it?

17    A.    Yes.

18    Q.    And when we look at Plaintiff's

19  Exhibit No. 5, which is 2003, it's meets

20  standards as is.  All that's checked.  So if

21  an employee is reading this, everything is

22  fine, isn't it?

23    A.    Yes.

# FREEDOM COURT REPORTING

Page 83

1    Q.    And even 2004 is meets standards

2    as is.  So what happened between the 2004

3    evaluation and the 2005 evaluation?

4    A.    Well, I tried to resolve issues in

5    the cabinet meetings and have meetings with

6    the administrative staff as opposed to

7    trying to put everything in writing.

8           We've met and we've discussed

9    weaknesses.  We discussed things that we

10   needed to improve in.  So I was trying a new

11   technique.

12   Q.    Do you have any memos that you put

13   in Ms. Greene's file, personnel file that

14   showed she wasn't doing her job?

15   A.    Not that I recall.

16   Q.    You have memorandums you sent her

17   between 2004 of -- April the 1st, 2004, July

18   of 2005 that pointed out she wasn't doing

19   her job?

20   A.    I would think so, yes.

21   Q.    Okay.  Can you provide all those

22   to your attorney so he can provide them to

23   me?  All your memorandums you sent Ms.

# FREEDOM COURT REPORTING

Page 84

1    Greene from 2000 -- April 1st, 2004 through

2    -- what's the date on No. 7, July 15th?

3         A.    July 14th.

4         Q.    July 14th.

5         A.    2005.

6         Q.    2005.  And you have -- Are you

7    telling me you have memorandums to support

8    all these eighteen items?

9         A.    Yes.  But not necessarily during

10   that period of time.  Some of them goes

11   before that and some goes after that.

12        Q.    Well, certainly if they are after

13   this, it could be written up on the July

14    '05, couldn't it?

15        A.    Well, today, yes.  But not then.

16        Q.    But not then?

17        A.    I know what you're saying.

18        Q.    Okay.  And if it was prior to

19   April of '04, then she wouldn't know to

20   change.  You told her in April of '04 that

21   everything was fine, wasn't it?

22        A.    On the evaluation, yes.

23        Q.    Yes, sir.  An employee is supposed

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

1    to be able to rely on an evaluation, isn't

2    she, any employee?

3          A.    Yes.

4                MR. CHRISTMAN:   Object to the

5    form.

6          Q.    Any employee?

7          A.    Yes.

8          Q.    Examiners of public accounts are

9     -- they come in every year and evaluate

10   J.F. Ingram, don't they?

11         A.    Yes, sir.

12         Q.    Or every two years?

13         A.    Some every two years.  But mostly

14   every year.

15         Q.    And they give you an audit report;

16   correct?

17         A.    Right.

18         Q.    And Mr. Ronald L. Jones, he's the

19   chief examiner, isn't he?

20         A.    Right.

21         Q.    Been the chief examiner since the

22   '70's, hasn't he?

23         A.    I'm not sure of that.

## FREEDOM COURT REPORTING

Page 86

1    Q.    And they audit everything the

2    business office does, don't they?

3    A.    To the best of my knowledge, yes.

4    Q.    They're the experts?

5    A.    Right.

6    Q.    And they -- If Ms. Greene is not

7    doing something by the acceptable accounting

8    standards, they certainly point that out,

9    don't they?

10    A.    Usually, yes.

11    Q.    Or somebody else at the college is

12    not doing something right and it impacts on

13    the finances, they point that out, don't

14    they?

15    A.    Yes.  Usually.

16    Q.    They're pretty strict, aren't

17    they?

18    A.    Most times.

19    Q.    Mr. Jones is a pretty tough task

20    master, isn't he?

21         MR. CHRISTMAN:  Form.

22    Q.    Do you know Ronald Jones?

23    A.    Yes, I know him.  But I've never

# FREEDOM COURT REPORTING

Page 87

1    worked with him individually.

2         Q.    I have.  And I believe you came in

3    1996, didn't you?

4         A.    I think so.

5         Q.    So this October of '95 through

6    September 30th of '96, would that involve

7    you any?

8         A.    It might have involved me in

9    transition.  I'm not sure.

10        Q.    But it definitely involved Ms.

11   Greene, didn't it?

12        A.    It should have, yes.

13        Q.    Now, when you get an audit, aren't

14   you basically looking for your audit to get

15   something called an unqualified audit?

16        A.    Yes.

17        Q.    Now, do you know where to look in

18   here and see if they are unqualified?  And

19   so far as audits go, unqualified is the best

20   that can be hoped for, isn't it?

21        A.    Yes.

22        Q.    Let's start at 2004.  We'll go

23   backward from 2004.  Do you recognize this

## FREEDOM COURT REPORTING

1  as being the audit from the J.F. Ingram

2  State Technical College from October 1st,

3  2003 to September 30th, 2004?  I'm opening

4  to that page.

5      A.    Yes, I do.

6      Q.    And who was the president then?

7      A.    I was president.

8      Q.    Who was the fiscal officer?

9      A.    Ms. Monica Greene.

10     Q.    Was that -- Did they have a

11 finding that that was an unqualified audit?

12     A.    No, they did not according to

13 this.

14     Q.    What did they find?

15     A.    What did they find?

16     Q.    Yes, sir.

17     A.    On page twenty-eight, they showed

18 that there was -- the audit did not disclose

19 any findings or questioned costs required to

20 be reported.

21     Q.    So there was nothing --

22        MR. CHRISTMAN:  For the record,

23 where are you reading from, Dr. Chambers?

# FREEDOM COURT REPORTING

Page 89

1    MR. CHRISTMAN:  Page twenty-eight.

2    MR. CHRISTMAN:  Under what

3    section?  There's more than one section.

4    THE WITNESS:  Section two.

5    Q.  I'm looking at the summary of the

6    examiners results.

7    MR. CHRISTMAN:  All right.

8    Section two says financial statement

9    findings.  Let's see where we can find where

10   he's looking at.

11   MR. DEBARDELABEN:  It should be on

12   page twenty-eight.  It should be the summary

13   of examiners results.

14   MR. CHRISTMAN:  All right.  Make

15   sure we're talking about the same thing.

16   What's your question?

17   MR. DEBARDELABEN:  Was it an

18   unqualified audit.

19   MR. CHRISTMAN:  Okay.

20   Q.  Did they find anything wrong?

21   A.  On page twenty-eight of the

22   financial statement, it's no.

23   Q.  Okay.  So there was no problem

## FREEDOM COURT REPORTING

1    with finances?  Is that --

2          MR. CHRISTMAN:  Well, read the

3    document, President Chambers.

4          A.    It says financial statement

5    findings.  And it say the audit did not

6    disclose any findings or questioned costs

7    required to be reported.  And that was under

8    financial statement findings, section two.

9          Section three, which is Federal

10   awards findings, it say that the audit did

11   not disclose any findings or questioned

12   costs required to be reported.

13         Q.    And that was your 2004 audit,

14   2003, 2004; correct?

15         A.    2003, 2004, yes.

16         Q.    Okay.  And you were the president

17   and Ms. Greene was the fiscal officer that

18   year?

19         A.    That's right.

20         Q.    Now, let's look at -- and this

21   might help us.

22         MR. CHRISTMAN:  We're going to

23   attach this as an exhibit?

## FREEDOM COURT REPORTING

1          MR. DEBARDELABEN:  We can.  No, I

2    wasn't going to attach them as an exhibit.

3          MR. CHRISTMAN:  If we're going to

4    talk about it in the deposition, I would ask

5    that you attach that.

6          MR. DEBARDELABEN:  I will be happy

7    to.  He's got a copy.  These are just copies

8    I got from the examiners.

9          MR. CHRISTMAN:  Yes, sir.

10         Q.   I'm going to ask you about the

11   2002 and 2003 audit.  And I think I got it

12   over to the page that will help you.  The

13   summary of the examiners results.

14         Did the examiners find anything

15   the matter with the fiscal part of it?

16         A.   No, they didn't.

17         Q.   And you were the president?

18         A.   Yes.

19         Q.   And Ms. Greene was the fiscal

20   officer?

21         A.   Right.

22         Q.   Is that a good audit?  They didn't

23   identify any material weaknesses, did they?

## FREEDOM COURT REPORTING

Page 92

1      A.    We need to clear up something.

2   There are parts in an audit where questions

3   are asked that you would have a yes or no.

4   And then there are findings which requires a

5   response and a corrective action.

6           So that's the reason I'm looking

7   through the entire booklet because you're

8   looking at part of it where it say no.   I

9   wanted to make sure that this has -- this is

10  in line with the findings or if there were

11  any findings.   So according to your

12  question, I didn't see any findings.

13     Q.    Okay.

14     MR. CHRISTMAN:   I'm going to --

15  Jim, if you don't mind -- if you don't want

16  to mark these -- I am going to ask these to

17  be marked.   I will mark '03, '04 as

18  Defendant's Exhibit 1 if you don't want to

19  mark those as Plaintiff's exhibits.

20     MR. DEBARDELABEN:   We'll mark them

21  as Plaintiff's exhibits.   I have no problem

22  with that.

23     Q.    Okay.   I'm going to show you '01

# FREEDOM COURT REPORTING

Page 93

1   and '02.  What we'll do is, we'll just start

2   and mark them from backwards.  Let's do it

3   this way.  The '03, '04 we've marked that as

4   Plaintiff's Exhibit No. 9.

5          That's examiners of public

6   accounts audit.  The '02, '03, we'll mark as

7   No. 10.   The '01, '02, we'll mark as No.

8   11.  2000 to '01, we'll mark this as 12.

9   The '99 to 2000, we'll mark as No. 13.   The

10   '98 to '99, we'll mark as No. 14.

11          The '97 to '98, we'll mark as No.

12   15.  And the '96 to '97, we'll mark as 16.

13   And I don't think since you came in at the

14   last, you weren't there all of '95, this

15   September of '96.  We'll just leave that one

16   out.  That doesn't cover your entire term,

17   did it?

18          A.    No, I don't think so.

19          (Whereupon, Plaintiff's Exhibits

20   No. 10 through 16 were marked for

21   identification and attached to the original

22   transcript.)

23          Q.    On all these audits, '97 through

## FREEDOM COURT REPORTING

Page 94

1  2004, do you know of any places that they

2  found -- had an opinion that there were --

3  material weaknesses were identified,

4  reportable conditions that are not

5  considered to be material weaknesses are

6  identified or there was noncompliance with

7  financial statements?

8       MR. CHRISTMAN:  Compound question.

9  Object to the form.  Answer it if you can.

10       Q.   I'll put it this way.  On any of

11  these audits, do you know whether the

12  examiners found that the -- identified

13  internal control over financial reporting

14  contained material weaknesses?

15       A.   Yes.  But I cannot specifically

16  say which ones until I have examined them.

17       Q.   Well, sir, take all the time you

18  need and examine them.

19       MR. DEBARDELABEN:  Drew, we can do

20  this two ways.  We can take a break for

21  lunch and let y'all both go over them

22  because I want to ask you three questions.

23       MR. CHRISTMAN:  Okay.

## FREEDOM COURT REPORTING

1      Q.    And which one was that?

2      A.    Let me go back and find which one.

3            MR. CHRISTMAN:  He was referring

4   to this one right here.  Material weakness

5   identified.

6      A.    Yes.  A report --

7            MR. CHRISTMAN:  One of these.

8      A.    It might have been in the wrong

9   place that said yes.  But the majority of

10  them said no.  Nearly all of them said no.

11     Q.    Said no.  And you say there's one

12  that might have said yes.  Let's look at

13  those real quick.

14          MR. CHRISTMAN:  Look at the most

15  recent one, Jim.

16     Q.    '04, '05?

17          MR. CHRISTMAN:  You just marked

18  it.

19     Q.    It's 17.  Let's look at '04, '05.

20  And I think it says -- here's '04, '05.

21  What does '04, '05 say?  Let's go through

22  that one real quick.  What does it say under

23  summary of examiner's results, type of

## FREEDOM COURT REPORTING

Page 99

1    opinion issued, internal over financial

2    reporting, material weakness identified, the

3    first one?

4        A.    No.

5        Q.    Reportable condition identified

6    that are not considered to be a material

7    weakness?

8        A.    Yes.

9        Q.    And noncompliance material to

10   financial statement noted?

11       A.    No.

12       Q.    Do you know what it meant by

13   reportable weakness -- excuse me -- a

14   reportable condition identified that are not

15   considered to be a material weakness?

16       A.    Yes.

17       Q.    What was that?

18       A.    Do I know what it was?

19       Q.    Yes, sir.

20       A.    I'll have to go through the report

21   to see that.

22       Q.    Okay.  But it's whatever is in the

23   report.  Let's go down -- Is there anything

## FREEDOM COURT REPORTING

Page 133

1    Q.   And if she says you did, you would

2  deny that?

3    A.   Yes, I would.

4    Q.   Have you ever, when Ms. Green was

5  not present on campus, have you ever called

6  Ms. Givens into your office along with Mr.

7  Bridgeman and discussed Ms. Greene?

8    A.   Yes.

9    Q.   Have you ever told them she was

10  weak?

11    A.   Yes.

12    Q.   And ineffective?

13    A.   Yes.

14    Q.   And not a good manager?

15    A.   I don't know about all the other

16  things you're addressing.  But I have had a

17  conversation to the first things that you

18  asked.

19    Q.   And did you do this in 2001?

20    A.   I can't recall the exact date.

21  But it did occur.

22    Q.   Have you done it more than once?

23    A.   Yes.

## FREEDOM COURT REPORTING

Page 134

1      Q.   And you're a trained counselor?

2      A.   Yes.

3      Q.   And you know that when you

4 criticize, don't you, a person's superior to

5 their subordinates, that you weaken that

6 person?

7      A.   Sometimes.

8      Q.   And you were aware of that

9 situation when you were doing it?

10     A.   That was not my focus at that

11 time.

12     Q.   That wasn't your focus?

13     A.   No.

14     Q.   But you were aware that when a

15 person's superior criticizes that person to

16 that person's subordinate, that it can

17 create a very adverse situation for both the

18 subordinates and their immediate superior?

19     A.   Like I said, that was not my focus

20 at that time.

21     Q.   Yes, sir.

22     A.   And our meetings were to do -- to

23 reach another end.  It was not designed to

## FREEDOM COURT REPORTING

Page 194

1  try to work with anybody?

2      A.   No.

3      Q.   As a matter of fact, she goes and

4  tries to get everything done, doesn't she?

5      A.   Most of the time.

6      Q.   Do you have a complaint about Ms.

7  Givens' work?

8      A.   No.

9      Q.   Is she a good employee?

10     A.   Yes.

11     Q.   But you have a complaint about Ms.

12 Greene's work?

13     A.   Yes.

14     Q.   And you do admit, don't you, that

15 you have no training in accounting?

16     A.   Yes.  I admitted that.

17     Q.   And if Ms. Greene said come in and

18 do my job, you wouldn't know really where to

19 start, would you?

20     A.   I would know first not to go in

21 there to do her job.

22     Q.   Okay.  And would you agree that

23 probably her job is the most technical on

## FREEDOM COURT REPORTING

Page 195

1    campus?  When I say Ms. Greene, I'm talking

2    about any fiscal dean's job is probably the

3    most technical job on campus?

4         A.    Probably.  I mean, she has a very

5    technical job.  One of the most serious jobs

6    on the college campus.

7         Q.    And it's the one job on any

8    college campus that can get the college and

9    the administrators in the most trouble with

10   the public and the legislatures and --

11        MR. CHRISTMAN:  Object to the

12   form.  You can give your opinion if you

13   know.

14        A.    It's a high priority job that

15   would cause problems for the college.  But

16   so is my job and other deans.

17        Q.    Right.  And in her job, she has to

18   not only know accounting procedures, she has

19   to know State bid law?

20        A.    Yes.

21        Q.    And State purchasing procedures?

22        A.    Yes.

23        Q.    And ensure that all the deans and

## FREEDOM COURT REPORTING

Page 196

1    instructors follow them?

2          A.    Yes.

3          MR. DEBARDELABEN:  I have no more

4    questions.

5    EXAMINATION BY MR. CHRISTMAN:

6          Q.    I have a few.  Dr. Chambers, I

7    want to show you Exhibit 9, the 2003, 2004

8    audit report that was covered with you by

9    Mr. Debardelaben.

10         He directed your attention to page

11   twenty-seven and asked you a series of

12   questions regarding summary of the examiners

13   results, particularly regarding the internal

14   control or financial reporting.  Do you

15   remember that line of questions?

16         A.    Yes.

17         Q.    And he asked you whether there was

18   a marking on here as to whether material

19   weakness was identified.  Do you recall

20   that?

21         A.    Yes.

22         Q.    And whether there was a reportable

23   condition identified that are not considered

# FREEDOM COURT REPORTING

Page 231

1  guidelines had anything to do with Ms.

2  Hendrix's race?

3       A.   No.

4       Q.   How about her gender?

5       A.   No.

6            MR. CHRISTMAN:   That's all I have.

7  EXAMINATION BY MR. DEBARDELABEN:

8       Q.   Mr. Chambers, have you ever called

9  any of Dean Wilson's people that he

10 supervised in your office and told them Dean

11 Wilson was weak?

12      A.   No.

13      Q.   That he's ineffective?

14      A.   No.

15      Q.   Have you ever called them in his

16 office, his people in your office and

17 criticized Dean Wilson?

18      A.   No.

19      Q.   But you did call Ms. Greene's two

20 top people and criticized Ms. Greene, didn't

21 you?

22      A.   You're using the term criticized.

23 I came in to discuss getting to the end of a

## FREEDOM COURT REPORTING

Page 232

1  problem we were having.

2      Q.    Did you ever call Dean Merk's

3  people -- Dr. Merk's people working under

4  him into your office when Dr. Merk was out

5  of town and discussed problems you were

6  having with Dr. Merk?

7      A.    No.

8      Q.    But you did do it with Dean

9  Greene's people she supervised, didn't you?

10      A.    Yes.

11      Q.    Now, you referred to Exhibit 9,

12  page C -- I guess it's page C -- on the

13  findings; correct?  Who was -- Who's in

14  charge of live work on the campus?

15      A.    The Dean of Instruction in

16  conjunction with the Dean of Fiscal

17  Affairs.  But the activities are approved by

18  -- they kind of work hand in hand.  But the

19  projects itself is an instructional part.

20      Q.    That was Dr. --

21      A.    Huffstutler.

22      Q.    -- Huffstutler, wasn't it?

23      A.    Right.

# FREEDOM COURT REPORTING

Page 234

1      Q.    Show you Plaintiff's Exhibit No.

2   26.

3           (Whereupon, Plaintiff's Exhibit

4   No. 26 was marked for identification and

5   attached to the original transcript.)

6      Q.    It's July 18th, 2001.  That's Dean

7   Greene writing Dr. Huffstutler.  Did you get

8   a copy of that?  Well, you wrote a note on

9   the 25, didn't you?  Exhibit 25, what did

10  your note say?

11     A.    You said did I get a copy of it.

12     Q.    Yes, sir.  You got a copy of

13  Exhibit 25, didn't you?

14     A.    Not that -- You just handed it to

15  me.

16     Q.    Excuse me.  I mean when she wrote

17  it.

18     A.    Oh.  Yes.

19     Q.    As a matter of fact, you wrote a

20  note on it, didn't you?

21     A.    Yes, I did.

22     Q.    And what does that note say?

23     A.    It says thank you informing Dr.

## FREEDOM COURT REPORTING

Page 235

1    Huffstutler about this.  Very good.  I will

2    follow this to see what happens.

3          Q.    Did you?

4          A.    Yes, I did.

5          Q.    Okay.  So Dean Greene has been

6    concerned about live work we know since

7    2001, hasn't she?

8          A.    Yes.

9          Q.    And what's the -- The July 18th,

10   2001 is another letter to Dr. Huffstutler

11   with a copy going to you, isn't it?

12         A.    Right.

13         Q.    And that's again concerned about

14   live work, isn't it?

15         A.    Yes.

16         Q.    Okay.  I'm going to show you a

17   letter dated April 22nd, 2002.  That's

18   another memo to Dr. Huffstutler.  Isn't that

19   a copy to you concerned about live work and

20   live work deposits?

21         A.    That's right.

22              (Whereupon, Plaintiff's Exhibit

23   No. 27 was marked for identification and

**FREEDOM COURT REPORTING**

Page 237

1  she's telling you, isn't she?

2      A.    Yes.

3      Q.    And asking for guidance?

4      A.    Are you asking me a question?

5      Q.    Wasn't she asking for guidance

6  from Dr. Huffstutler?

7      A.    Yes.

8          MR. CHRISTMAN:  Which memo?

9          MR. DEBARDELABEN:  All of them.

10          MR. CHRISTMAN:  Read them all if

11  he's going to ask you a broad question about

12  what they all say, whether they all say the

13  same thing.  Make sure you know what they

14  all say.

15      A.    Yes.  They basically are asking

16  for help.

17          (Whereupon, Plaintiff's Exhibit

18  No. 29 was marked for identification and

19  attached to the original transcript.)

20      Q.    Show you another one, Plaintiff's

21  Exhibit No. 29.  It's a letter from Monica

22  Greene or a memorandum to Rickey Huffstutler

23  dated December the 18th, 2002 pointing out

## FREEDOM COURT REPORTING

1    that Mr. Keahey is violating some policies;

2    is that correct?  And it has the information

3    attached to it to back up the memo, doesn't

4    it?

5         A.    Right.

6         Q.    Didn't you get a copy of that one,

7    too, sir?

8         A.    Yes.

9         Q.    Okay.  And again, she's asking Dr.

10   Huffstutler to look into the problem for one

11   of his instructors, isn't she?

12        A.    Yes.

13        Q.    And Dr. Huffstutler is the one

14   over Mr. Keahey, isn't he?

15        A.    Yes.

16             (Whereupon, Plaintiff's Exhibit

17   No. 30 was marked for identification and

18   attached to the original transcript.)

19        Q.    Okay.  Here's another one to Dr.

20   Huffstutler dated February 27th, 2004.  It's

21   to Dr. Huffstutler concerning invoices in

22   auto mechanics, Plaintiff's Exhibit No. 30.

23   Again, she's concerned about live work,

## FREEDOM COURT REPORTING

Page 239

1  isn't she?

2       A.    That's right.

3             (Whereupon, Plaintiff's Exhibit

4  No. 31 was marked for identification and

5  attached to the original transcript.)

6       Q.    Show you Plaintiff's Exhibit No.

7  31.  I think this is concerning Mr. Benton

8  on a live work project he's not doing right.

9  She said this must stop.  And it's Dr.

10 Huffstutler again, isn't it?

11      A.    That's right.

12      Q.    And that's pointing out about the

13 same thing that was pointed out in the

14 examiner's report, isn't it?  A lot of that

15 is similar?

16      A.    Yes.

17            (Whereupon, Plaintiff's Exhibit

18 No. 32 was marked for identification and

19 attached to the original transcript.)

20      Q.    Okay.  Here's a memorandum to Ms.

21 Gloria Knox on live work with a copy to Dr.

22 Huffstutler concerning problems with a live

23 work project dated -- when is that dated--

## FREEDOM COURT REPORTING

Page 240

1  June 24th, 2004.

2           Just another little problem with

3  live work, isn't it?  And she's writing one

4  of Dr. Huffstutler's instructors to resolve

5  the problem; is that correct?

6      A.    That's not correct.

7      Q.    What does it do?  Don't let me put

8  words in your mouth.

9      A.    It clearly emphasizes that she's

10  asking him to help look into the problems

11  that she's having.

12      Q.    Right.  And they're creating

13  problems for the fiscal office, not doing it

14  right; is that correct?

15      A.    No, that's not correct.

16      Q.    Okay.  What does that say?  Let's

17  look at that one.  It's telling them the

18  customers, to pay in cash because it had to

19  -- they took a check and it obviously

20  bounced and they had to decrease their

21  deposit by three hundred dollars.

22           That was -- Don't you have a rule

23  and regulation that y'all only take cash or

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 241

1  money orders?

2      A.   We take up to seventy-five percent

3  in cash -- I mean in check or money order or

4  whatever.  But you must pay the last

5  twenty-five percent in cash.

6      Q.   And she's trying to get them to

7  follow that policy, isn't she?

8          MR. CHRISTMAN:  He hasn't

9  responded to the question.

10     Q.   She's trying to get Ms. Gloria

11  Knox to follow the policy of the college?

12     A.   Right.

13     Q.   Okay.  And when it wasn't

14  followed, it had to collect three hundred

15  dollars, take it off, because somebody paid

16  three hundred dollars in cash and it appears

17  the check bounced, didn't it?

18     A.   Yes.

19          (Whereupon, Plaintiff's Exhibit

20  No. 33 was marked for identification and

21  attached to the original transcript.)

22     Q.   Okay.  I want you to look at

23  Plaintiff's Exhibit No. 33, September 22nd,

## FREEDOM COURT REPORTING

Page 242

1    2005.  Talking about to Ms. Gloria Knox

2    again on live work deposits.  That she's not

3    apparently timely -- making timely

4    deposits.

5            (Whereupon, Plaintiff's Exhibit

6    No. 34 was marked for identification and

7    attached to the original transcript.)

8        Q.    Here's another memorandum that you

9    got a copy of to Mr. Huffstutler dated

10   November the 16th, 2001 about automobiles

11   being taken out of the auto mechanic shop

12   and the invoice has not been billed out and

13   paid; is that correct?

14       A.    Is what correct?

15       Q.    That automobiles have been taken

16   out of the automobile mechanic shop and the

17   invoices haven't been paid?

18       A.    That's what she's saying in this

19   document.

20       Q.    And she sent it to Dr.

21   Huffstutler?

22       A.    Right.

23       Q.    And who has the control over the

**FREEDOM COURT REPORTING**

Page 243

1  automobile mechanic shop?

2      A.    The Dean of Instruction and the

3  Dean of Fiscal Affairs.

4      Q.    And who is that?

5      A.    At this particular time, it was

6  Dr. Huffstutler and Dean Greene.

7      Q.    Now, Dean Greene, she didn't have

8  physical control over the people running the

9  shop, did she, that was Dr. Huffstutler?

10     A.    Physical control?

11     Q.    Yes, sir.  They reported to Dr.

12  Huffstutler?

13     A.    That's right.

14     Q.    And he's the one that grades them

15  and annual reports and supervises them,

16  isn't he?

17     A.    Right.

18     Q.    Okay.

19          (Whereupon, Plaintiff's Exhibits

20  No. 35 - 36 were marked for identification

21  and attached to the original transcript.)

22     Q.    Here's another one to Dr.

23  Huffstutler dated July 25th, 2005.  It's

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

1    live work projects.  Ms. Greene had been

2    complaining some of them weren't doing that,

3    hadn't she?  And this is before this time?

4         A.    Right.

5         Q.    Okay.  And if you look through

6    there, she's complaining about some of those

7    work orders being written up for less than

8    fifty dollars where they didn't get their

9    seventy-five percent deposit, wasn't she?

10        A.    I think I saw that, yes, sir.

11        Q.    So some of the very same things

12   the audit found, Ms. Greene was complaining

13   about prior to that time to Dr. Huffstutler

14   and sending you memorandums about; correct?

15        A.    That's right.

16        Q.    Some of the very same practices

17   that you felt necessary to address when you

18   got the audit; correct?

19        A.    Right.

20        Q.    President Chambers, what more can

21   this lady do than inform you and inform the

22   Dean of the College and the Dean of

23   Instruction that we've got a problem,

## FREEDOM COURT REPORTING

Page 246

1  fellows, we need to correct it?  What else

2  can she do?

3      A.   She can stop the money.

4      Q.   Stop the money how, sir?

5      A.   She can stop the money from the

6  beginning.  She can stop purchasing.  She

7  can stop ordering stuff for people until she

8  gets the appropriate paperwork.

9      Q.   But, sir, one of your complaints

10 about Dean Greene is she wouldn't purchase

11 and order?

12     A.   That's right.

13     Q.   And now you're telling me she

14 should stop purchasing and ordering until

15 they do right?

16     A.   Yes.

17     Q.   And if she does that, then you'd

18 complain --

19     A.   You're not hollering, are you?

20     Q.   -- then you'd raise -- I'm just

21 talking like Mr. Christman.  Then you'd

22 raise another issue?

23     A.   No.  The issue is, if you would go

## FREEDOM COURT REPORTING

1    A.    You could say that, yes.

2    Q.    It shows basically y'all not

3  having any wasted spending, doesn't it?

4    A.    Well, it shows that we're not

5  spending as much as we had been spending.

6    Q.    Right.  That might be why some of

7  the -- let me ask the question this way.  Do

8  you know any program at J.F. Ingram that's

9  not getting enough material to do what they

10  are supposed to be doing?

11    A.    No.

12    Q.    And every instructor at J.F.

13  Ingram and every dean wants more money and

14  more material, don't they?

15    A.    Most of them, yes.

16    Q.    And if each instructor had a

17  million dollars to spend and each dean had

18  ten million, they would still want more

19  money, wouldn't they?

20    A.    Not necessarily.  They don't ask

21  for a lot of money.

22    Q.    But they always want more than

23  they've got, don't they?

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 1

1          IN  THE  UNITED  STATES  DISTRICT  COURT

2          FOR  THE  MIDDLE  DISTRICT  OF  ALABAMA

3                    NORTHERN  DIVISION

4

5     CASE  NUMBER:    2:06-cv852-ID

6

7     JULIE  GIVENS  and

8     MONICA  GREENE,                    ◻ COPY

9          Plaintiffs,

10    vs.

11    DOUGLAS  CHAMBERS,  Individually

12    and  in  his  capacity  as  President

13    of  INGRAM  STATE  TECHNICAL  COLLEGE;

14    JAMES  WILSON,  Individually  and  in

15    his  capacity  as  Dean  of  Students

16    of  INGRAM  STATE  TECHNICAL  COLLEGE,

17          Defendants.

18

19    BEFORE:

20          Cynthia  M.  Noakes,  Commissioner

21          and  Court  Reporter

22

23          DEPOSITION  TESTIMONY  OF  JULIE  GIVENS

Page 71

1    us in there.  I don't recall me and Mr. Bridgman

2    approaching Mr. Chambers to discuss problems in

3    the business office.

4    Q.    Yes, ma'am.  But if he testifies that that's

5    exactly what happened, would you disagree with

6    him?

7    A.    Yes, I would.

8    Q.    You say in here, "By then Mr. Chambers had a

9    pattern of calling Mr. Bridgman... and I... to

10   Dean of Finance" -- excuse me -- "and I... in to

11   his office whenever she was not at work."

12        All right.  You're talking there about a

13   pattern.  Are you speaking about a specific

14   incident here in this statement, or are you

15   talking about just kind of a general pattern?

16   A.    Can you repeat that?

17   Q.    Yeah.  You said, By then Mr. Chambers had a

18   habit of calling Mr. Bridgman and I...

19        My question is:  Is this about a specific

20   incident or are you just saying that this was

21   happening in time?

22   A.    I'm saying this particular date I'm talking

23   about, May 2001, was not the first occasion that

Page 72

1    this has happened.

2         At this time and place, when I picked up on

3    my notes that I had made of Mr. Chambers calling

4    Mr. Bridgman and myself in, this was not the first

5    time that this had happened.  He had a pattern of

6    doing this.

7    Q.    I understand.  And he had a pattern of doing

8    it with you and Mr. Bridgman?

9    A.    Yes.  And in some cases me alone, and in

10   some cases of Mr. Bridgman alone.

11   Q.    I see.  And you say in your statement that

12   he stated that he wanted you to feel free to come

13   to him about Ms. Greene, and that he knew she was

14   weak and ineffective as a business manager.

15   That's what your statement says.

16   A.    That's correct.

17   Q.    He wasn't saying you were weak, was he?

18   A.    No, sir.

19   Q.    He was talking about your supervisor?

20   A.    That's correct.

21   Q.    Of course, Gene Bridgman is not a white

22   female, right?

23   A.    No, he's not.

Page 79

1              MR. DEBARDELABEN:  Okay.

2              MR. CHRISTMAN:  Okay.  Let's take about

3    a five-minute break and then come back.

4              (A brief recess was taken.)

5    (BY MR. CHRISTMAN)

6    Q.    Have we talked about March 2002?

7    A.    March 2001.

8    Q.    Let's turn to March 2002.  Ms. Greene was

9    out on annual leave and Mr. Chambers called Mr.

10   Bridgman and you in and stated he knew Ms. Greene

11   was ineffective and if you needed to talk to him

12   concerning this, please come and see him.

13         That's very similar to the previous

14   meetings, right?

15   A.    It is.

16   Q.    Okay.  June of 2002, basically the same

17   thing?

18   A.    Yes, sir.

19   Q.    October of 2002, it says, Mr. Chambers -- by

20   the way, do you know that the president has an

21   honorary doctorate?

22   A.    I heard he did.

23   Q.    Did you not know that before today or

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 81

1    A.    Yes.

2    Q.    Next page, January 2003.

3          Ms. Greene was out on annual leave and Mr.

4    Chambers called you and Mr. Bridgman in and stated

5    that he knew the purchase orders and accounts

6    payable were in a mess because of Ms. Greene.

7          Basically the same thing again?

8    A.    Other than he told us that the vice

9    chancellor, Debbie Dahl, would be calling to talk

10   to us about Ms. Greene.  Which the phone call

11   never took place.

12         And, you know, he keeps saying this about

13   Ms. Greene being weak and ineffective and

14   incompetent; and in my opinion, she's not weak and

15   ineffective and incompetent.

16         And that does bother me because those are

17   not my beliefs, and that bothers me a great deal.

18   Because if I thought that, I'm a very verbal

19   person, and I would be the first person to go to

20   Ms. Greene and tell her that.

21   Q.    Well, but you have gone to Dr. Chambers and

22   you've mentioned to him concerns that you have

23   about some of Ms. Greene's methods, haven't you?

Page 82

1    A.    No, sir.

2    Q.    Of course, it's not unusual in the workplace

3    for you to have an opinion that's different from

4    your boss, is it?

5    A.    Probably not.    Everybody has an opinion.

6    Q.    And they don't always match?

7    A.    That is correct.

8    Q.    And in this particular instance, Dr.

9    Chambers is expressing to you that he thinks Ms.

10   Greene is not doing a good job, right?

11   A.    Yes, sir.    I think that's clear.

12   Q.    And you just don't agree with his opinion,

13   do you?

14   A.    I certainly do not.

15   Q.    How is that causing you a hostile

16   environment?

17   A.    Because when you are called in time after

18   time after time, and you're in, let's say because

19   Mr. Chambers is ultimately the boss, and then Ms.

20   Greene is my direct supervisor, and you're caught

21   between these people, you're ultimate boss and

22   then your direct supervisor boss, and you're being

23   strung between these people, and you have these

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 83

1    people pulling you back and forth, you are caused

2    stress and anxiety, because you have one person

3    telling you one thing, and then you have this

4    ultimate boss up here saying, You need to come

5    talk to me about this.

6         That makes me have a lot of stress.  It does

7    indeed cause me stress and anxiety, and it has for

8    several years now.  It upsets me tremendously.

9    Q.    Is it your understanding that Mr. Bridgman

10   was experiencing the same stress?

11   A.    Yes, it was.

12   Q.    What makes you think that Mr. Chambers was

13   addressing you and Mr. Bridgman about Ms. Greene's

14   performance because you're a white female?

15   A.    Because I am a white female.  Why would I

16   not think that?

17   Q.    Well, because he's a white male, that's why.

18   A.    Well, you know, maybe it was because he was

19   her assistant at that time and I was not, you

20   know.

21        What role did I play in it?  He was Ms.

22   Greene's direct next in line, and I was this

23   person down here somewhere, you know.

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 87

1   A.    No, sir.

2   Q.    The next entry here says, "2004-2005-many

3   more of these type meetings took place."

4         And you just didn't spell out the specifics,

5   but it was, again, he asked you, he asked Mr.

6   Bridgman, or he asked both of you to come in and

7   just said I know what you're going through, feel

8   free to come talk to me about Ms. Greene, right?

9   A.    Yes, sir.

10  Q.    None of those meetings were about you?

11  A.    Not that I recall, no, sir.

12  Q.    But you thought he should go talk directly

13  to Ms. Greene and not come to you?

14  A.    Yes, sir, I did.

15  Q.    You think that's a bad management practice,

16  right?

17  A.    I do.

18  Q.    And you think he should have done the same

19  for Mr. Bridgman?

20  A.    Yes, I do.

21  Q.    He should have gone straight to Ms. Greene

22  instead of talking to Mr. Bridgman?

23  A.    I do.

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 90

1    A.    No, sir.

2    Q.    No one has ever asked you to admonish

3    anybody else about their dress?

4    A.    No, sir.

5    Q.    How has it created a hostile environment for

6    you for Dr. Chambers to admonish and remind the

7    women that tight-fitting clothing or inappropriate

8    clothing is a safety hazard at the main campus?

9    A.    To be subjected to those meetings.

10    Q.    And what is inappropriate that you are being

11    subjected to at a meeting that requests that you

12    wear appropriate clothing at an all-male,

13    inmate-population campus?

14    A.    I think it's unfair for a select group of

15    people to be called together -- all women at one

16    location -- when there's other women located at

17    the Draper location that are all-male also.

18        And then there's men at the Tutwiler

19    location who, I might add, have been written up

20    and been investigated by I&I -- the men at the

21    Tutwiler location -- for advances on female

22    inmates.  But we're not subjecting them to those

23    type meetings.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 91

1        So I feel like that we have been singled out

2    because we are directly in the president's

3    eyesight.  And so I think that the females at main

4    campus are unfairly being subjected to meetings

5    about our dress, whether it is appropriate or

6    inappropriate according to his opinion.  The women

7    at Draper State are not being singled out, and

8    they are in an all-male population.

9        And then the men, who are subjected to the

10   woman at the Tutwiler campus, are not being

11   admonished, and they are the ones who are having

12   charges brought against them.

13   Q.    How do you know they are not being

14   admonished?

15   A.    Well, let's say that I have checked and

16   found that has not happened.

17   Q.    How have you checked?

18   A.    I have called around and checked.

19   Q.    Who have you called?

20   A.    Different people.

21   Q.    Who?

22   A.    Instructors, personnel.

23   Q.    Who?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 94

1    about their dress.

2    Q.    All right.  Who else have you talked to?

3    A.    Talked with Melissa Wallace.

4    Q.    When did you talk with her?

5    A.    I talked with her probably in late 2005.  I

6    can't remember the exact date.  And she said that

7    they had not had any such meetings at the Draper

8    campus location where she worked.  That was before

9    she was terminated from her employment.

10   Q.    Okay.  Who else have you talked to?

11   A.    Those would be the names of the people that

12   I remember talking to.

13   Q.    What makes you think there was ever a

14   problem with the dress at Draper?

15   A.    I don't know that there was.  I don't know

16   that there was ever a problem at the main campus.

17   Q.    Okay.  Well, I'll show you where there was a

18   problem at the main campus.

19         But what makes you think there was a problem

20   with the dress at Tutwiler?

21   A.    Well, I do know of one occasion where Ms.

22   Ross, who was a former employee there, was asked

23   to put on a shirt over her clothing when she

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 95

1   worked there.  But there was never any such

2   meeting held to tell people to dress appropriately

3   there.

4   Q.    Who told Ms. Ross to do that?  How do you

5   know that happened?

6   A.    The guard shack.

7   Q.    How do you know that happened?

8   A.    It was hearsay.

9   Q.    Who did you hear it from?

10  A.    I believe it was somebody in student

11  services.  I don't remember exactly who told me.

12  Q.    You don't know who told you?

13  A.    No.  It was a few years back.

14  Q.    You don't know when they told you?

15  A.    Huh-uh.  She's been gone two or three years

16  or longer.

17  Q.    So there's nobody I can talk to to confirm

18  that conversation?

19  A.    You can probably talk to Mr. Wilson.  He was

20  her supervisor.  He should be aware of it.

21  Q.    Would James Wilson know what Ms. Ross told

22  you?

23  A.    What Ms. Ross told me?

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 98

1    not what he said in the meeting that was held that

2    day on that Friday.

3         I know what the cabinet meeting minutes

4    said, but they did not reflect what was said in

5    the meeting that was held that day.

6    Q.    But ultimately he gave the directive to all

7    the directors of all the departments -- which you

8    are not one of those, right?

9    A.    That is correct.

10   Q.    But he gave the directive to all of the

11   directors that it goes for the men too, right?

12   A.    That's what he said.  But he did not call

13   the men into the meeting, so they were not

14   subjected to the meeting, which is my claim.

15   Q.    Your claim is that you believe you've been

16   discriminated against because you're a woman

17   because he has had more meetings with women than

18   men about dress?

19   A.    No.  My claim is that he's treating men

20   different than women.

21   Q.    Well, would it surprise you to know that

22   Warden DeLoach thinks that the women's dress at

23   the main campus is a problem?  Have you heard

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 101

1   better how to dress appropriately and

2   professionally at the office?  Did you know that?

3   A.    No, sir.

4   Q.    You didn't know that, did you?

5   A.    No, sir.

6         MR. DEBARDELABEN:  Can we take a short

7   break?  It's my son calling.

8         MR. CHRISTMAN:  Oh, sure.  Yeah, yeah.

9         (A brief recess was taken.)

10  (BY MR. CHRISTMAN)

11  Q.    We were going through some examples here.

12  Summer of 2004 he stated that he was fed up with

13  the way people reacted when he told them how to

14  dress, that he did not care how they dressed.

15        That wasn't directed at you, was it?

16  A.    I don't suppose.

17  Q.    Okay.  February 13, 2005, the next one,

18  says, "Ms. Greene under the direction of Mr.

19  Chambers and Mr. Wilson was told to tell the women

20  at Main Campus that low cut, short, tight clothing

21  and high heel strapless shoes should not be worn."

22        How do you know that Ms. Greene was directed

23  by Dr. Chambers and Mr. Wilson to have that

Page 102

1    meeting?

2    A.     She told us.

3    Q.     Well, she didn't tell you that he told her

4    to classify the dress in terms of low cut, short,

5    tight clothing, and high heel, strapless shoes?

6    She didn't tell you that, did she?

7    A.     Best I can recall, she did.

8    Q.     Well, but you wouldn't dispute the fact that

9    she actually came up with those categories by

10   herself and wasn't told to talk about low cut,

11   short, tight clothing?  You don't know anything

12   about that, do you?

13   A.     I don't really recall.

14   Q.     Okay.  And you didn't know that Dr. Chambers

15   asked Ms. Greene to have this meeting with the

16   ladies because he thought she was a good example

17   of professional dress in the workplace?  You

18   didn't know that, did you?

19   A.     I think she told us that he told her that he

20   thought she was a good example so she needed to

21   have the meeting.

22   Q.     Okay.

23   A.     I don't suppose you want me to interject

Page 105

1    Q.    You think they ought to be allowed?

2    A.    Yes, sir.  That's an opinion.

3    Q.    That's just your opinion?

4    A.    Yes, sir.

5    Q.    If the warden says it's a problem, do you

6    think the warden is wrong about that?

7    A.    I personally think that would be an opinion.

8    But if that is a dress code policy, I would say

9    you need to abide by it.

10   Q.    Well, let's say Ms. Greene says it's not a

11   good idea to wear high heel, strapless shoes, do

12   you disagree with her?

13   A.    She's my boss.  I would have to say don't

14   wear them.

15   Q.    Okay.  September 9, '05.  Chambers called a

16   meeting at 2:45 in the staff lunchroom and he

17   stated that office women can no longer wear blue

18   jeans or capri pants, right?

19   A.    That's correct.

20   Q.    And then you asked him about the men.  And

21   he said he's not talking about the men at that

22   time, only the women.

23   A.    That's correct.

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 109

1    A.    She did.

2    Q.    You wouldn't disagree with that, would you?

3    A.    No, sir.

4    Q.    Go to the next page.

5    A.    Uh-huh.

6    Q.    1998 memorandum from Douglas Chambers to all

7    employees on appropriate dress.  He said that all

8    employees refrain from wearing clothing which can

9    easily be interpreted as inappropriate and

10   unprofessional.

11        Do you see that?

12   A.    I do.

13   Q.    That would include the men, wouldn't it?

14   A.    It does, because it says all employees.

15   Q.    So it's not true when you say that he has

16   only required the women to watch their dress.

17   That's not true, is it?

18   A.    It's not true that he has only required the

19   women to watch the dress, but it is true he's only

20   held meetings with the women.

21   Q.    That you know of?

22   A.    Right.  That I know of.

23   Q.    You don't know if he's had any meetings with

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 114

1    problem, isn't it?

2    A.    It is.

3    Q.    So how does that create a hostile

4    environment for you?

5    A.    The fact that he's talking about women's

6    attire.

7    Q.    Well, if her attire was inappropriate, it

8    was inappropriate; isn't that true?

9    A.    True.

10   Q.    So how does it create a hostile environment

11   for you if he's commenting on somebody wearing

12   something that's too tight or too low cut?

13   A.    I have a problem with Mr. Chambers

14   concentrating so much on the women and looking at

15   them in that manner.

16   Q.    Well, if Ms. Cherry was wearing her jeans

17   too tight and too low cut, that's a problem?

18   A.    It is.

19   Q.    How is that a problem for you?

20   A.    Well, it caused a meeting that he called on

21   September 9th.

22   Q.    How do you know that?

23   A.    Because he told Ms. Wood it did.

Page 117

1    with the dress of the women?  Do you know that?

2    A.    No, sir.

3    Q.    Don't you think it's appropriate for

4    somebody to get a handle on a problem with women's

5    dress at the institution, if there is a problem?

6    A.    If there is one.

7    Q.    And to get a handle on it, it's got to be

8    talked about, right?

9    A.    If that's the manner in which it's being

10   talked about.

11   Q.    In 2006, the next one:  Mr. Chambers

12   recently told Ms. Greene that she had something on

13   her pants.  When she went in the bathroom and

14   looked, it was a small piece of lint on her

15   bottom.  He sure had to be looking close.

16         Is that your commentary, "He sure had to be

17   looking close"?

18   A.    It is.  And hers.

19   Q.    And how does that create a hostile

20   environment for you that he told her that she had

21   something on her pants?

22   A.    Again, I just feel like there's too much

23   concentration on women's bottoms up there.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 125

1    at Ms. Greene saying that she should not have let

2    you and Patti ask for permission for the

3    programmer and that it was Ms. Greene's fault that

4    you did not have a programmer already on staff?

5    A.    That's what he said.

6    Q.    And what do you contend Dr. Chambers'

7    comments regarding the computer programmer have to

8    do with a hostile environment against you based

9    upon your race and your gender?

10   A.    When Mr. Bridgman was there, Mr. Englett was

11   being a consultant and had been a consultant for

12   us for years.  And when he was the accountant, as

13   well as the senior accountant, Mr. Englett had

14   worked with us two to three days a week for the

15   time period that I had been at J.F. Ingram.

16        And it was only after his termination of his

17   position that it became necessary for us, once we

18   became all women -- is the only way I know how to

19   put it -- in that department, to ask for him every

20   time we needed him.

21   Q.    I'm sorry.  I did not follow that.  It's

22   probably my fault, but I did not understand what

23   you were saying.

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 126

1   A.     Okay.  Before, it was never necessary for a

2   request to be made for Mr. Englett to come.

3   Q.     Before what?

4   A.     Before Mr. Bridgman retired.

5   Q.     I see.

6   A.     It was just always a given that Mr. Englett

7   would be there two to three times a week.

8   Q.     Right.

9   A.     Whenever he was needed.

10  Q.     Right.  But it's also true that during all

11  of Mr. Bridgman's tenure, the ACCESS software

12  system was not purchased by the college; is that

13  not true?

14  A.     Not completely.

15  Q.     What part of that is not true?

16  A.     Several of our modules were in place during

17  Mr. Bridgman's time there.

18         Like, for instance, before Mr. Bridgman

19  retired, I already had payroll in place; accounts

20  payable module was already in place; some of the

21  general ledger was in place.

22         We just had -- he was admittedly still doing

23  -- had both the general ledger on ACCESS and on

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 127

1   what he would call the old program; and he was

2   running both sets of books because he refused to

3   totally go to ACCESS.

4   Q.    Bridgman did?

5   A.    He did.

6   Q.    He didn't like that system?

7   A.    No, he did not.

8   Q.    When did he retire?

9   A.    I believe Mr. Bridgman retired somewhere --

10  it was when Ms. Graves came on staff.  I want to

11  say he left in 2002, maybe.  2004?

12  Q.    And isn't it true that the business office

13  purchased the ACCESS system in 1998?

14  A.    '98, '99, somewhere around there.

15  Q.    But Mr. Bridgman was certainly resistant to

16  implementing it?

17  A.    He certainly was.

18  Q.    And everybody kind of knew that?

19  A.    Oh, yes.

20  Q.    He made it well known that he did not want

21  to implement it?

22  A.    He did.

23  Q.    In fact, that was one of the reasons he

Page 130

1    it's just according to how it happens to strike

2    him that day.

3    Q.    Okay.  I'm just talking specifically about

4    the request for a consultant.

5         It appeared to frustrate the president that

6    an administrative assistant and an accountant,

7    rather than the dean, was making the request?

8    A.    This particular day it did.

9    Q.    Well, any time that you guys requested a

10   consultant, if it wasn't the dean that was making

11   the request, it frustrated him; isn't that right?

12   A.    According to his documents, it did.

13   Q.    Okay.  And he also expressed that he was

14   frustrated that the business office had not

15   already fully converted to the ACCESS accounting

16   system, right?

17   A.    He did.

18   Q.    And he believed, according to what he was

19   telling you, that full integration would have

20   avoided or diminished the need for Mr. Englett?

21   A.    That's what he believed.

22   Q.    If you'll turn to the next page, that's a

23   memo from you and Ms. Graves to your immediate

Page 175

1  have you, requested and denied?

2  A.    Yes.

3  Q.    Tell me about that.

4  A.    Between the years 2000 and 2006, I sat on

5  the same salary schedule.  I believe it was like

6  six years I sat on salary E-1, Level 1.

7  Q.    You got regular step increases, right?

8  A.    As I was due, yes, sir, and the

9  cost-of-living increases that everybody all over

10  the state got.

11  Q.    Okay.  And did you request a raise in that

12  time period?

13  A.    Ms. Greene requested, I think on two or

14  three different occasions, for me to get raises.

15  Q.    And what was the decision?

16  A.    No.

17  Q.    And did anyone with similar or less

18  qualifications, who was black or male, receive a

19  raise over you, that does what you do?

20  A.    They don't do what I do.  But that was the

21  -- one of those years was the year that a black

22  employee that was a truck driver was moved to the

23  same level that I was.  He was like a maintenance

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 176

1    person.  He moved to an E-1, Level 1.

2    Q.    He doesn't do what you do though?

3    A.    No, he doesn't.

4    Q.    Who was that black employee?

5    A.    Coleman McKeithen.

6    Q.    But last year you were given a schedule

7    increase by being moved off E to C?

8    A.    After filing an EEOC Complaint.

9    Q.    After you filed an EEOC Complaint?

10   A.    Yes, sir.  Probably hoping I wouldn't file a

11   lawsuit.

12   Q.    That didn't stop you though, did it?

13   A.    No, it didn't.  It didn't change my

14   feelings.

15   Q.    Well, it sure gave you a big raise, didn't

16   it?

17   A.    It did.  Not nearly as big as it gave other

18   people.

19   Q.    What other people, that do what you do and

20   are qualified similarly as you, were treated

21   better than you?

22   A.    Not the same qualifications but...

23   Q.    Okay.  Well, that answered my question.

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 179

1    yesterday, I thought they all had basically the

2    same job description.

3    Q.    You don't really know what their job

4    descriptions are though; is that right?  Well, you

5    may know what Beth's is, I'm sure.

6    A.    Well, I have worked all three locations when

7    there would be someone absent, because there would

8    be no coverage at either of the locations.

9         And in sitting in those positions, answering

10   telephones and writing live work orders.  Because

11   for a long period of time at the Tutwiler campus,

12   there was not anybody there.  And I sat at that

13   position.

14        In fact, different people went over and

15   worked at the Tutwiler campus when there was

16   nobody covering that campus, when we had a time

17   frame when there was nobody covering that.

18        And it did entail answering the phone and

19   writing work orders.  Now, unless that's changed

20   since I went over there, there's very little work

21   done there.  And unless that has changed since I

22   was over there, I don't know what her other job

23   duty would be.

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 180

1          MR. CHRISTMAN:  Could she look at your

2     copy of that, Jim?

3          MR. DEBARDELABEN:  Sure.

4     Q.    Okay.  Do you have any idea why the dates of

5     these calculations is October 2004 to September

6     '05?

7     A.    That was at the time when, I believe, Ms.

8     Greene was going to Mr. Chambers with a -- one of

9     the times when Ms. Greene was going to Mr.

10    Chambers to ask for Ms. White a raise, to try to

11    get her in line with the other two people, for

12    their pay.

13    Q.    All right.  Who made this breakout?

14    A.    I believe Patti Graves, who is the

15    accountant, made the chart for Ms. Greene.

16    Q.    And it appears to be calculation of work

17    orders.

18    A.    And bank deposits that are made at those

19    locations.  See where it says "Bank Deposit Log"?

20    Q.    Yes.

21    A.    Detail on Live Work Analysis.

22    Q.    These are bank deposits made based on work

23    orders, right?

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

Page 181

1    A.    That would be correct.  That would be the

2    difference in the live work that's done at those

3    locations during the year.

4    Q.    Right.  And there are more deposits made --

5    more money is deposited at the main campus than at

6    Draper or Tutwiler campuses regarding live work?

7    A.    Obviously.

8    Q.    All right.  And you don't contend that Ms.

9    McDuffie or Ms. Knox, that the only thing they do

10   is live work?  That's not your contention, is it?

11   A.    No, sir.  They do answering the telephones.

12   Q.    And other various administrator

13   responsibilities as they arise, correct?

14   A.    I would assume so.

15   Q.    Okay.  Very good.  And it's your

16   understanding that this raise refusal for Ms.

17   White occurred sometime in the time frame listed

18   here in Exhibit 12, October of '04 to September of

19   '05?

20   A.    That's correct.

21   Q.    Do you know where in that range it was?

22   A.    I would have to say it would be when she

23   went in -- I would say since it was run for that

Page 182

1    time period, I would say it was somewhere along

2    that timeline when she went in and asked him for a

3    raise.

4    Q.    Well, that's a year's timeline, right?

5    A.    Right.  I would say she ran it -- I'm not

6    sure.

7    Q.    Okay.  Any other evidence to support

8    allegation No. 11:  Chambers has refused to raise

9    the salary of white employees that Plaintiff

10   Greene has recommended for a raise?

11   A.    I know she's asked for Kerri Conger raises

12   and Jeanna Givens raises and Patti Graves raises

13   as well.

14   Q.    She's asked for everybody in her department

15   to have a raise?

16   A.    Yes, she has.

17   Q.    And at times Dr. Chambers has not agreed to

18   that?

19   A.    That is correct.

20   Q.    But at times he has agreed to that, right?

21   A.    Last year he did.

22   Q.    Well, but before that.  I mean, you got two

23   raises before that.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 191

1   you?

2   A.   No, I wasn't.

3   Q.   But Patti Graves was hired?

4   A.   She was.

5   Q.   And she's a white female?

6   A.   She is.

7   Q.   And she got paid more than you?

8   A.   She did.

9   Q.   And she has more education than you?

10  A.   She did.  And Mr. Bridgman.  But is paid

11  less than him.

12  Q.   But she hasn't been there as long as he had

13  either?

14  A.   No, she hasn't.  But she has more education

15  than him, doesn't she?

16  Q.   All right.  Any other instances in which you

17  believe men were paid more than women for equal or

18  similar positions?

19  A.   Ms. Owensby.  She's not in our department.

20  Q.   And you're talking about the registrar?

21  A.   Yes.

22  Q.   What is your understanding of her education?

23  A.   I believe it's similar to mine.

# FREEDOM COURT REPORTING

Page 1

```
1        IN THE UNITED STATES DISTRICT COURT
2       FOR THE MIDDLE DISTRICT OF ALABAMA
3              NORTHERN DIVISION
4
5    JULIE GIVENS and MONICA )
6    GREENE,              )
7         Plaintiffs,   )
8    vs.              ) CASE NUMBER:
9    DOUGLAS CHAMBERS,        ) CV:2:06-CV-852-ID
10   Individually, and in his )
11   capacity as President of )
12   INGRAM STATE TECHNICAL   )
13   COLLEGE; JAMES WILSON,   )
14   Individually, and in his )
15   capacity as Dean of    )
16   Students of INGRAM STATE )
17   TECHNICAL COLLEGE,     )
18         Defendants.   )
19
20
21
22
23
```

Page 3

```
1    JAMES T. MERK,       )
2    Individually, and in his )
3    capacity as Dean of    )
4    Institution of Ingram   )
5    State Technical College, )
6         Defendants.   )
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 2

```
1        IN THE UNITED STATES DISTRICT COURT
2       FOR THE MIDDLE DISTRICT OF ALABAMA
3              NORTHERN DIVISION
4
5    BARBARA HENDRIX,      )
6         Plaintiff,    )
7    vs               ) CASE NUMBER:
8    DOUGLAS CHAMBERS,      ) 2:07-CV-21-MHT
9    Individually, and in his )
10   capacity as President of )
11   Ingram State Technical   )
12   College; JAMES WILSON,   )
13   Individually, and in his )
14   capacity as Dean of    )
15   Student and Support    )
16   Services of Ingram State )
17   Technical College;     )
18   MALCOLM MONTGOMERY,    )
19   Individually, and in his )
20   capacity as Coordinator  )
21   of Student Support     )
22   Services of Ingram State )
23   Technical College; and  )
```

Page 4

```
1        IN THE UNITED STATES DISTRICT COURT
2       FOR THE MIDDLE DISTRICT OF ALABAMA
3              NORTHERN DIVISION
4
5    BONITA J. OWENSBY,     )
6         Plaintiff,    )
7    vs               ) CASE NUMBER:
8    J.F. INGRAM STATE     ) 2:06-CV-796-WKW
9    TECHNICAL COLLEGE; J.   )
10   DOUGLAS CHAMBERS,      )
11   Individually, and in his )
12   official capacity as    )
13   President of J.F. Ingram )
14   State Technical College; )
15   and JAMES WILSON,      )
16   Individually, and in his )
17   official capacity as Dean )
18   of Student and Support   )
19   Services at J.F. Ingram   )
20   State Technical College, )
21         Defendants.   )
22
23   DEPOSITION OF JAMES EDWARD WILSON
```

1 (Pages 1 to 4)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 129

1  Chambers can't tell her to buy something or
2  do it in a way that does not comply with
3  State law, can she?
4      A.  Right.
5      Q.  And how long have you been in a
6  supervisory position at J.F. Ingram?
7      A.  Since 1980.
8      Q.  During that period of time, have
9  you known of J.F. Ingram to be called to
10  task by the examiner's for the mis-spending
11  of money?  Probably a better way to put it,
12  the wrongful spending of money?
13      A.  Yes, sir.
14      Q.  Now, where did they wrongfully
15  spend money?
16      A.  I'm sorry?
17      Q.  Where did they wrongfully spend
18  money that you recall?
19      A.  I don't know where they spent it
20  at.
21      Q.  Now, when was this?
22      A.  Oh, it's been some number of years
23  back.  I don't recall.

Page 130

1      Q.  Do you know who the Dean of the
2  Fiscal Office was at that time?
3      A.  I think Mr. Powell.
4      Q.  Mr. Powell.  During Ms. Greene's
5  term as the Dean of the Fiscal Office, do
6  you recall any exception from the examiner
7  where she wrongfully was spending funds?
8      A.  Not in meetings that I have been a
9  part of where there were such findings.  But
10  I don't think the findings said that she
11  mis-spent.  Not that I recall.
12      Q.  Would you say you're not worrying
13  about the mis-spending, it just might be
14  hard to get the money out of her sometimes?
15      A.  I'm sorry?
16      Q.  That you don't worry about the
17  mis-spending when she spends money, it just
18  might be hard to get money out of her on
19  some items?
20      MR. CHRISTMAN:  Form.
21      A.  Is that question a question?
22      Q.  Yes.  Is it she just doesn't want
23  to turn loose of the money sometimes if she

Page 131

1  has a question?  You have to convince her
2  that probably -- If she has a question, she
3  won't spend it, will she?
4      A.  I've not had a problem that much.
5  There have been some things that we've
6  ordered and even she and I have signed it,
7  signing the requisition approving it.  But
8  we don't have that item.
9      Now, I have asked her several
10  times when she's said that is it forth
11  coming.  Of course, that has been over a
12  year, though.
13      Q.  And that's sometimes out of all
14  y'all's control?
15      A.  Well, she's the business dean.
16      Q.  But you don't have a problem
17  working with Ms. Green?
18      A.  No, sir.
19      Q.  Ever had a problem working with
20  her?
21      A.  It depends on how you're defining
22  problems.  We have some disagreements.
23      Q.  Yes, sir.  You have

Page 132

1  disagreements.  But y'all can work out your
2  disagreements and go forward?
3      A.  Yes, sir.
4      Q.  And as in most jobs, you have
5  disagreements?
6      A.  Yes, sir.
7      Q.  Even President Chambers?
8      A.  Yes, sir.
9      Q.  Even Dean Merk?
10      A.  Yes, sir.
11      Q.  Even with Mr. Montgomery?
12      A.  Yes, sir.
13      Q.  But you work together?
14      A.  Yes, sir.
15      Q.  Okay.  Now, let's change horses.
16  Who is Ms. Bonita Owensby?
17      A.  She is the director of admissions
18  and registration.
19      Q.  Who does she work for?
20      A.  Me.
21      Q.  How long has she been working for
22  you?
23      A.  Since 1998.

33  (Pages 129 to 132)