IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JULIE GIVENS and MONICA GREENE, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. CV 2:06 CV852-1D ) |
| DOUGLAS CHAMBERS, Individually and in his capacity As President of INGRAM STATE TECHNICAL COLLEGE; JAMES WILSON, Individually and in his Capacity as Dean of Students of INGRAM STATE TECHNICAL COLLEGE | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

**REPLY TO PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

COME NOW Defendants Douglas Chambers, individually and in his capacity as President of J.F. Ingram State Technical College, and James Wilson, individually and in his capacity as Dean of Students of J.F. Ingram State Technical College, by and through counsel and hereby submit the following reply to Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment.

The Plaintiff's Opposition to Defendant's Motion for Summary Judgment offers essentially no evidence that any of the employment decisions on the part of the above named defendants were motivated out of discriminatory animus.[1] In fact, the complete

---

[1] The Plaintiffs offer absolutely no evidence or argument that James Wilson took any employment action amounting to disparate treatment or hostile environment under Title VII and Section 1981. There is no mention in the Plaintiffs' brief of any allegedly discriminatory conduct on the part of Wilson. Therefore,

dearth of evidence presented by the Plaintiffs in response to Defendants' Motion for Summary Judgment illuminates the real reason behind the filing of this lawsuit: Greene is trying to avoid getting fired for poor job performance. Although the Plaintiffs assert that there is "no documentation" to support the Defendants' argument that Greene performed poorly as the Dean of Fiscal Affairs, the evidence is actually quite substantial and includes the affidavits of President Chambers, Dean Wilson, and Dean Merk, as well as the President's July 2005 performance evaluation of Greene, Dr. Huffstetler's January 2002 memo to the President regarding business office concerns, the February 2004 Chancellor's peer review report noting numerous and various weaknesses in the business office's functioning, a letter from then Chancellor Roy Johnson acknowledging continuing weaknesses in the business office at Ingram, an audit report in September 2005 noting weaknesses in the live work program at Ingram, and specifically referenced weaknesses regarding Greene's communication and timeliness. In addition to the above cited evidence, the Defendants set forth numerous instances in which communication deficits resulted in problems at the College and with its functioning. (See Exhibits 18, 19, 20, and 21 of Defendant's Motion for Summary Judgment regarding a communication breakdown where Ms. Greene refused to purchase requested items for another Dean of the College; Exhibits 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, and 35 to the deposition of Plaintiff Greene noting numerous deficiencies on the part of Greene in responding to requisitions made by instructors and deans at the College; Dean Merk's affidavit discussing one class at the College that was unable to be completed and

---

Defendant Wilson's Motion for Summary Judgment and the evidence in support thereof is unopposed by the Plaintiffs and due to be granted.

the students received an incomplete on their transcript because the requested supplies for the classroom had not been processed in a timely fashion by the business office.)

To add insult to injury (literally), Defendants produced Exhibits 36 through 42 where customers and others complained of Greene's rude and insulting behavior. The Plaintiffs' curious argument that there is no support for President Chambers' belief that Greene performed poorly is plainly contradicted by the substantial evidence produced by the Defendants.

Ms. Greene is obviously using the Federal Court and this lawsuit as an attempt to shield herself from termination or demotion for reasons related to nothing other than her poor performance. While the Plaintiffs appear to mix arguments and evidence between their claims of hostile environment and disparate treatment, the Defendants will attempt to briefly address the allegations and evidence (or lack thereof) of these two claims in turn.

**A.  Hostile Work Environment.**

In support of their claim of hostile work environment, the Plaintiffs cite seven instances which they contend constitute a hostile work environment based upon their race and gender. Two of those instances involve claims of disparate pay or treatment and will be addressed in the disparate treatment section of the Defendants' reply.

The remaining five allegations of hostile environment are as follows: (1) Plaintiffs claim that there is no documentation to support the poor work performance of Greene; (2) Plaintiffs claim that Chambers would no longer allow the business office to utilize a private contractor programmer for accounting functions; (3) Chambers called subordinates of Greene into his office to discuss Greene's poor work performance; (4)

3

Chambers frequently admonished the women regarding appropriate dress without enacting a formal dress policy; and (5) President Chambers employed a loud and negative management style.

With respect to the first allegation, the Defendants have above chronicled the numerous and compelling exhibits and affidavits demonstrating that Monica Greene has performed poorly or exhibited weakness as the Dean of Fiscal Affairs. The fact that Greene's poor performance is not reflected through the years in her personnel file by way of annual evaluations by no means diminishes the force or validity of the other compelling evidence of her poor performance. Plaintiffs do not even attempt to establish pretext in their Opposition to Defendants' Motion for Summary Judgment and make no argument that any legitimate reasons for the employment decisions asserted by Chambers and Wilson were a pretext for discrimination.

Conversely, Givens' own testimony demonstrates the legitimate reason why President Chambers grew frustrated with the use of an outside consultant to perform accounting functions. As stated in Defendants' Brief in Support of Motion for Summary Judgment, Chambers had been directed by the Chancellor's office to fully integrate the ACCESS software system which would eliminate the need for private computer programmers. Givens admitted that Chambers grew more and more impatient with the non-implementation of the ACCESS software after the Chancellor had directed him to integrate it within a short timeframe. Givens' testimony clearly shows that Chambers' reluctance in allowing the business office to continue to use a private software programmer rather than the ACCESS system as directed by the Chancellor shows that his motive had nothing to do with the race or gender of either of the Plaintiffs. The Plaintiffs

offer no argument or evidence whatsoever that this legitimate nondiscriminatory reason was a pretext. Moreover, it can hardly be argued that Chambers' impatience with the use of a private software programmer, particularly where he ultimately allowed the use of the programmer, constitutes an adverse employment action sufficiently severe to constitute a hostile environment under Title VII.

Givens and Greene also argue that Chambers created a hostile environment by calling Greene's subordinates into his office to discuss Greene's poor job performance. According to the Plaintiffs, this created an "adverse situation" for both of them. It requires little analysis of the precedent in the Eleventh Circuit to discover that generalized anxiety over complaints about one's job performance, or even complaints about someone else's job performance, does not rise to the level of Title VII harassment. This is also a curious argument in that the Plaintiffs freely admit that Gene Bridgeman was subjected to exactly the same treatment by President Chambers. Since President Chambers called a white male in to have the same conversation about Greene's poor performance, it is irrational to draw the conclusion that Chambers' conduct was motivated out of animus toward the race or gender of Plaintiffs.

Plaintiffs' next argument regarding hostile environment is President Chambers' frequent enforcement of the dress code policy against the females. The Plaintiffs do not dispute that there is an obvious prison security interest on the part of Dr. Chambers in assuring that female dress does not create behavior problems for the all male inmate population on campus. In fact, the Plaintiffs appear to argue that President Chambers should have gone one step further and actually enacted a dress code rule or regulation. How it would be less discriminatory for President Chambers to implement a formal

regulation regarding dress rather than addressing it informally is a mystery. The Plaintiffs offer no evidence to dispute the affidavits of President Chambers or Dean Wilson regarding the security risks associated with the improper attire by female employees at Ingram. Although Plaintiffs argue that there is no written evidence or documentation of any complaints by DOC officials regarding the dress of females, Defendants' Exhibit 9 is in fact a memorandum from Captain Robbie Barnett of the Department of Corrections to Warden Willie Rowl regarding a J.F. Ingram employee who was not dressed appropriately while on campus. Notwithstanding this obvious oversight by the Plaintiffs, President Chambers testified that he has been admonished by DOC officials regarding the dress of females at the Ingram campus. There has been no evidence to contradict or in any way draw that testimony into question. Plaintiffs do not even attempt to prove any type of pretext regarding the legitimate reason for President Chambers keeping a close watch on the appropriate attire of females at the prison institution. Moreover, the Plaintiffs completely fail to demonstrate how complying with the President's directives regarding appropriate dress has in any way created a severe and pervasive environment impacting their terms and conditions of employment.

Finally, the Plaintiffs allege that President Chambers' management style is loud and negative. That assertion by itself is fatal to the Plaintiffs' claim of hostile environment. If Chambers raising his voice in the workplace is the result of a loud and negative management style, it is not the result of discriminatory animus. The Plaintiffs must prove more than they are uncomfortable and irritated at work. They must prove that the environment imposed upon them by Dr. Chambers was sufficiently severe and pervasive to alter the terms and conditions of employment because of the protected

6

classification of the Plaintiffs. Although Greene argues in her brief (without citation) that she believes no other males have been yelled at like she has been, the evidence to the contrary is undisputed. Both Dean Merk and Dean Wilson testified that Chambers on occasion raises his voice at them in front of their subordinates. The Plaintiffs owns characterization of President Chambers' conduct as a loud and negative management style undermines the argument that he raises his voice because they are women or white. An equal opportunity yeller is not evidence of discrimination under Title VII. Plaintiffs' argument in this regard smacks more of complaining about general civility than stating a claim under Title VII or Section 1981.

The Plaintiffs' arguments of hostile environment, taken individually or as a whole fall far short of the statutory standards as developed by the Eleventh Circuit in proving a case of hostile environment under Title VII or Section 1981. The Plaintiffs have failed to offer evidence that the above cited incidents were sufficiently severe or pervasive to alter the terms and conditions of their employment. Further, they have failed to demonstrate that the frequency, duration, or nature of the alleged harassment was sufficient to constitute severe or pervasive conditions. Finally, they failed to demonstrate that any of the conduct described above was objectively offensive as interpreted under Eleventh Circuit case law. As cited in Defendants' Brief in Support of Motion for Summary Judgment the cases in the Eleventh Circuit demonstrate that far worse and more severe conduct on the part of employers has failed to rise to the level of a Title VII hostile work environment claim. Accordingly, Defendants are entitled to summary judgment on this issue.

**B. Disparate Treatment.**

On page 16 of the Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment, the Plaintiffs appear to argue that they were treated less favorably than similarly situated individuals outside their protected classification. Curiously, an Equal Pay Act claim appears under that section of the brief. There is no Equal Pay Act claim in the Plaintiffs' Complaint. Therefore, any references to an equal pay act cause of action should be ignored and summarily denied.

In support of their argument of disparate treatment, the Plaintiffs set forth essentially six instances of alleged disparate treatment: (1) Plaintiffs allege that Chambers applied a dress code policy only to women at the main Ingram campus rather than all female employees at all the Ingram campuses and that it was not enforced as rigorously against the men; (2) Givens alleges that she was not promoted to Bridgeman's position and given his salary, and, when she was promoted, she was paid less than similarly situated males; (3) another black female employee named Owensby was paid less than her predecessor for performing the same job; (4) payroll records indicate a majority of new hires by President Chambers were black; (5) another white female employee, Patty Graves, was paid less than Malcolm Montgomery; and (6) Greene was passed over for the position of Dean of the College and Wilson was given the job.

As to the dress code issue, the Plaintiffs appear to argue that Chambers is discriminating against them because the women at another campus are <u>not</u> required to attend meetings regarding dress while the women at the main campus are required to attend such meetings. It makes no logical sense how this could be discrimination based upon race or gender. If other white women are receiving more favorable treatment

because they are on another campus, there is no evidence that similarly situated individuals outside the Plaintiffs' protected classification are receiving different or better treatment under Title VII or Section 1981.

To the extent Plaintiffs are arguing that Chambers' admonishments regarding dress do not apply to men, Chambers' affidavit testimony is undisputed in that the correctional officers and wardens have instructed him to counsel the female employees about dress. Moreover, the documentary evidence attached to Greene's deposition shows a memorandum from Dr. Chambers that the dress code applies to both men and women. Chambers testified in affidavit that he is aware of no instance in which an inmate inappropriately exposed himself or masturbated because of inappropriate <u>male</u> attire. In other words, the legitimate security interests in enforcing a dress code policy regarding the provocative dress of females is unrebutted by the Plaintiffs. In fact, the Plaintiffs' believed that Chambers should have instituted a formal regulation regarding appropriate dress. They advocate not less rigorous requirements for dress but more rigorous requirements. Plaintiffs' arguments clearly do not demonstrate actionable disparate treatment based upon race or gender. The Plaintiffs make no effort to argue that Chambers' legitimate reason for enforcing the dress code policy is institutional security. There is neither evidence nor argument that this security interest is a pretext for discrimination.

Givens' argument that she was treated less favorably than Gene Bridgeman also fails to set a claim of disparate treatment. First of all, Givens fails to argue or prove that she had equal qualifications or experience as Bridgeman. Givens' own deposition testimony on pages 187 through 192 demonstrates that Bridgeman had far more years

9

experience at Ingram than did Givens.  In fact, when Bridgeman started in 1975, Givens was only a junior in high school.  In 1984, Bridgeman became an accountant at J.F. Ingram, and the next year Givens became a secretary at the lowest salary placement.  (Givens depo. p. 188).  Ultimately, Givens even admitted on page 190 of her deposition that she was not contending that she should be making as much as Bridgeman in April or June of 2004.  In other words, Givens has not identified a similarly situated comparator for any of the positions to which she claims entitlement.

Further, Givens must allege and prove that an equally or less qualified individual outside of her protected classification was promoted to the position instead of her.  Patty Graves was put in Bridgeman's position after Dean Greene reorganized the department.  (Affidavit of Chambers).  Graves is a white female.  Therefore, Givens cannot demonstrate that an equally or less qualified individual outside of her protected class was put into the position to which she claims entitlement.  Moreover, Patty Graves is far more qualified (not equally or less qualified) than Givens although Givens offers no testimony or evidence in that regard.  Obviously, Givens does not have a disparate treatment claim where a white female was given a better job than a white female.  As a counterpart to this argument, Givens also argues that, when she was finally promoted to be Dean Greene's assistant, she was paid less than her similarly situated male counterparts.  However, Givens totally fails to identify a single similarly situated comparator.  She makes a conclusory assertion that other similarly situated males were treated better than she.  Without more, this claim of disparate treatment cannot survive summary judgment.

The Plaintiffs argue that other employees such as Owensby and Graves were paid less than their alleged comparators.  However, neither of these other employees are

litigants in this case. This is apparently an attempt to show some sort of pattern and practice evidence. However, the Plaintiffs have not alleged a claim of pattern and practice discrimination on the part of the Defendants. If Patty Graves or Bonita Owensby feel they have suffered disparate treatment, they can file their own lawsuit. In fact, Bonita Owensby has filed her own lawsuit which is pending in this Court. However, any alleged disparate treatment against those individuals does not form the basis of a disparate treatment claim by these Plaintiffs. Moreover, even if it did, the Plaintiffs offer absolutely no evidence as to the qualifications, experience, job responsibilities, departments, or any other evidence of a similarly situated nature of the alleged comparators. Plaintiffs merely make conclusory allegations with absolutely no evidentiary support that white women were treated differently than anyone else at the institution.

      The Plaintiffs allege that the "payroll records" of the institution show that Dr. Chambers has hired more blacks than whites. This is an apparent attempt to demonstrate statistical evidence of discrimination in support of a pattern and practice claim. Again, the Plaintiffs have not alleged pattern and practice discrimination in this lawsuit. Moreover, the bald and unspecified statistics noted by the Plaintiffs, which were not produced as evidence, include no information about what employees were hired, the applicants for the various positions, the gender or race of the applicants, the job responsibilities for the various positions, the qualifications of the applicants, or any other relevant factors that would have influenced the selection of the individuals occupying those positions. Further, there is no logical argument as to how this vague statistic impacts these Plaintiffs on a claim of disparate treatment. There is no allegation here that

these Plaintiffs were treated any differently than a similarly situated comparator outside of their protected classification. Therefore, this irrelevant and unexplainable statistic offers absolutely no support for the Plaintiffs' claims of disparate treatment.

Finally, Plaintiff Greene alleges that she was passed over for a promotion to Dean of the College. Dr. Chambers' affidavit testimony clearly demonstrates that the position of the Dean of the College was generally one occupied by someone with a wide range of responsibility and experience in the institution as a whole. According to even Plaintiff Greene's testimony, Dr. Chambers believed the best person suited for this position was the person occupying the Dean of Instruction position. The person serving as the Dean of Instruction (and later, Dean of the College) was Dr. Huffstetler. Based upon Dr. Chambers' affidavit, by the time he was filling this position after Dr. Huffstetler's retirement, Dean Greene had already demonstrated her inability to perform as Dean of Fiscal Affairs.

Further, Dr. Chambers stated in his affidavit that Dean Greene had not demonstrated a level of expertise or experience in the institution as a whole necessary to serve as the Dean of the College. Dean Greene does not dispute that she did not express an interest in the position when Dean Wilson took over. It is undisputed that Dr. Chambers believed Mr. Wilson had more extensive experience during his thirty years at J.F. Ingram on an institution wide basis than did Ms. Greene. He is familiar with the various functions of the other departments because of his tenure as the Dean of Students. In Chambers' mind, the Dean of Students was a more closely likened position to the Dean of Instruction in terms of overall institution-wide experience. There was no Dean of Instruction to take the position of Dean of the College at that time as Dr. Huffstetler

held both positions.  Chambers thought that Dean of Students was the closest fit.  Greene offered absolutely no argument or evidence that this legitimate nondiscriminatory reason for placing Dean Wilson into that position was a pretext for discrimination.  Since Dean Greene did not have the institution-wide experience of Dean Wilson and had demonstrated incompetence in her position as Dean of Fiscal Affairs, Dr. Chambers selected Dean Wilson for the position rather than Dean Greene.  There is no evidence in the record to dispute this motive or challenge it as pretext.  Therefore, Dean Greene's argument of disparate treatment regarding the position of Dean of the College must fail.

Since Plaintiffs Givens and Greene have totally failed to identify a single instance in which a similarly situated comparator outside of their suspect classification was treated more favorably than they, their claims of disparate treatment do not amount to even a prima facie case.  Even if they had made a prima facie case of disparate treatment, the Plaintiffs have utterly failed to even challenge as pretext the legitimate nondiscriminatory reasons as set forth in the evidence by the Defendants.  Therefore, the Plaintiffs' claims of disparate treatment should be summarily dismissed.  Based upon the arguments set forth in Defendants' Motion for Summary Judgment, the evidence produced in support thereof, and the rebuttal arguments contained in this reply, the Defendants are entitled to summary judgment on all of the Plaintiffs' claims in the Complaint.

WHEREFORE, the above premises considered, Defendants respectfully request this Honorable Court enter summary judgment in favor of the Defendants and against the Plaintiffs.

Respectfully Submitted,

/s/ Andrew W. Christman_____
Andrew W. Christman (CHR024)
J. Douglas Chambers, individually
and in his capacity as President of J.
F. Ingram State Technical College
and James Wilson, individually and
in his capacity as Dean of Students
and Support Services at J.F. Ingram
State Technical College

OF COUNSEL:
Gidiere, Hinton, Herndon
  & Christman
P. O. Box 4190
Montgomery, AL 36103
Telephone: (334) 834-9950
Facsimile:  (334) 834-1054

CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing was served on the following by placing a copy of same in the United States mail, postage prepaid and properly addressed this 10th day of October, 2007:

Jim L. DeBardelaben
Attorney at Law
1505 Madison Avenue
Montgomery, AL  36107

/s/ Andrew W. Christman_____
Of Counsel