IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JULIE GIVENS, et al.,                )
                                     )
         Plaintiffs,                 )
                                     )
v.                                   )    Civil Action No. 2:06cv852-ID
                                     )
DOUGLAS CHAMBERS, et al.,            )
                                     )
         Defendants.                 )

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Before the court is a motion for summary judgment, filed by Defendant Douglas

Chambers, individually and in his capacity as president of J. F. Ingram State Technical

College ("Ingram") and by Defendant James Wilson, individually and in his capacity as

Ingram's dean of students. The motion is accompanied by a memorandum of law and

evidence. (Doc. Nos. 9-18.) Defendants move for summary judgment on all claims

brought by Plaintiffs Julie Givens and Monica Greene, who allege that, during their

employment at Ingram, they were subjected to sexual and racial harassment and

discriminated against on the basis of their sex (female) and race (Caucasian), in violation

of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 ("Title VII"),

42 U.S.C. § 1981 (§ 1981), 42 U.S.C. § 1983 (§ 1983), the Fourteenth Amendment's

Equal Protection Clause, and state law. Plaintiffs filed a memorandum of law and

evidence in opposition to Defendants' motion. (Doc. Nos. 20, 21.) Defendants submitted

a reply. (Doc. No. 22.) After careful consideration of the arguments of counsel, the relevant law and the record as a whole, the court finds that summary judgment is due to be entered in Defendants' favor on Plaintiffs' federal claims and that Plaintiffs' state-law claim is due to be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## II.  JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction). Personal jurisdiction and venue are adequately pleaded and not contested.

## III.  STANDARD OF REVIEW

A court considering a motion for summary judgment must construe the evidence and make factual inferences in the light most favorable to the nonmoving party. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) (citations omitted).

Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

2

Fed. R. Civ. P. 56(c).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  <u>Celotex</u>, 477 U.S. at 323.  The movant can meet this burden by presenting evidence showing that there is no dispute of material fact or by showing that the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  <u>Id.</u> at 322-23, 325.  The burden then shifts to the nonmoving party, which "must do more than simply show that there is some metaphysical doubt as to the material facts."  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  Summary judgment will not be entered unless the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.  <u>See</u> <u>id.</u> at 587.

## IV.  STATEMENT OF FACTS

### A. <u>Parties</u>

Ingram is a two-year state technical college in Deatsville, Alabama, which provides occupational training to inmates, male and female, at the adult state correctional institutions in Montgomery and Elmore counties.  (Chambers Aff. (Defs. Ex. 1 to Doc. No. 10.)  Chambers, an African-American male, is the president of Ingram and has been since May 1, 1996.  (<u>Id.</u>)  Wilson, an African-American male, served as Ingram's director

3

of student support services from 1980 until 2006, when Chambers appointed him as dean of the college, a position which is "second in command" to the president.  (Wilson Aff. ¶¶ 1-2); (Greene Dep. at 19.)

Greene, a Caucasian female, began her career at Ingram in 1989, when she was hired as a junior accountant under the supervision of Gene Bridgman ("Bridgman"), the senior accountant and a Caucasian male.  Greene, who has bachelor of science and master's degrees in business administration, has served as Ingram's dean of fiscal affairs since 1994.  (Greene Dep. at 14, 17, 32, 39); (Givens Dep. at 83.)  As dean of fiscal affairs, Greene, among other things, supervises employees in the business department, prepares budgets, makes deposits, accounts for all incoming monies, invests funds where appropriate, and pays all expenses of Ingram including payroll and employee benefits.

Givens, who holds an associate of science degree, is Greene's assistant and has worked at Ingram since 1985.  (Givens Dep. at 8, 13, 17-18, 82.)  Givens is a Caucasian female.  Givens and Greene work at Ingram's main campus where the student population comprises male inmates.  (Chambers Aff. ¶ 10); (Givens Dep. at 90); (Greene Dep. at 178-79.)

## B.  Promotions and Pay

Greene alleges that she was denied a promotion on the basis of her race and sex. In 2006, Chambers promoted Wilson, an African-American male, to dean of the college without soliciting applications.  (Pls. Mem. of Law at 13.)  Greene claims she should

4

have been considered for the dean of the college position, in part, because she had served in a dean position longer than Wilson.  (Greene Dep. at 422-23.)

Givens alleges that she was discriminated against in April or June 2004 when Bridgman retired, leaving open the senior accountant position.  (Givens Dep. at 190.) Although Givens was offered the opportunity to take over for Bridgman, Givens declined because Chambers refused to raise her pay.  (Id.); (Greene Dep. at 498-99.)  Ultimately, Patti Graves ("Graves"), a Caucasian female with a master's degree and fifteen years of experience in the auditor's office, received the position; however, according to Givens, while Graves was paid more than Givens, she (Graves) was "paid less" than Bridgman. (Givens Dep. at 191); (see also Chambers Aff. ¶ 15.)  Relatedly, Givens also complains that on two or three occasions between 2000 and 2006, Greene requested raises for Givens, but without success.  (Givens Dep. at 175); (Pls. Mem. of Law at 12 (Doc. No. 20).)

## C.  Disparate Working Conditions

Plaintiffs contend that Chambers subjected them to disparate working conditions. Plaintiffs correlate the onset of the disparate treatment with Bridgman's retirement which left only female employees working in Greene's business department.  At that time, Chambers required Greene to obtain his permission to request assistance from a computer programmer consultant, when previously he did not require permission.  (Givens Dep. at 125-26.)  Chambers also expressed his frustration and dissatisfaction with the failure of

5

the business office to fully integrate an automated accounting system, but did not

similarly complain when Bridgman objected to the integration.   (Givens Dep. at 130.)


D.  Dress Code

Greene and Givens lodge several complaints against Chambers concerning his

enforcement of an unwritten dress code for female employees at Ingram's main campus

where they worked.  Givens and Greene cite several incidents in which Chambers

admonished female employees concerning their inappropriate dress at work, cautioning

them not to wear jeans, tight clothes and strapless heels or show cleavage.  Chambers also

made comments about female attire; in 2006, for instance, Chambers stated to Givens that

he would not have noticed a loose thread on another female employee's pants if her

"pants weren't so tight on her ass."  (Pls. Resp. to Defs. Interrogs. Nos. 21 & 22 (Defs.

Ex. 11 to Greene Dep.).)  Also once in 2006, Chambers told Greene that she "had

something on her pants," which Greene later discovered was a "small piece of lint on her

bottom," implying to Greene that Chambers was inappropriately staring at her behind.

(Id.)

Moreover, Chambers (or Givens at Chambers' direction) held meetings at the main

campus with female employees about proper dress attire, but Chambers did not hold

meetings with male employees at the main campus or with female employees at Ingram's

satellite campuses.  (Givens Dep. at 90-91, 95, 98, 101-02, 105, 109, 114, 117); (Pls.

Mem. of Law at 10-11.)  Plaintiffs complain that female employees who worked at

6

Ingram's satellite campuses and all male employees were not subjected to the same

scrutiny as they were concerning their work attire.  (Greene Dep. at 181-84.)

        Regarding the dress code policy for female employees, Chambers explains in an

affidavit:

> The reason I have instituted a dress code at Ingram is institutional security.
> Because Ingram is an all male inmate institution, the risks associated with
> provocative, revealing, and inappropriate attire by females are self-evident.
> There have been numerous instances of masturbation by inmates in the
> presence of females in the prison setting as a whole and at Ingram.  The
> correctional officers and wardens alike have warned and instructed me on
> numerous occasions to require the female employees under my charge to
> dress appropriately at the institution.  I have never been admonished or
> instructed by the Department of Corrections regarding the dress of male
> employees.  I am aware of no instance in which an inmate inappropriately
> exposed himself or masturbated because of inappropriate male attire.  It is
> incumbent on me to rigorously enforce the appropriate dress of females in
> the prison setting as it is my duty to make every effort in providing for the
> safety and security of my employees and the institution.

(Chambers Aff.); (see also Wilson Aff., attesting, among other things, that "[i]n the

prison setting, the provocative dress of females constitutes a security risk.  This risk is

particularly acute with respect to females as opposed to males.").


                    E.  Chambers' and Greene's Professional Relationship

        It is no secret that Chambers' and Greene's professional relationship is not affable;

Chambers openly expresses his displeasure with Greene's job performance, and Greene

feels that Chambers treats her in an unprofessional and "unfair" manner.  (Greene Dep.

at 49-50); (Chambers Aff.)  According to Greene, her "personality bothers [Chambers]." (Id. at 52.)

On multiple occasions, apparently between 2001 and 2005, Chambers met with Givens and Bridgman, both of whom were Greene's subordinates, and openly criticized Greene, calling her, among other things, "weak and ineffective as a business manager." (Givens Dep. at 71-72, 79, 81, 87); (Chambers Dep. at 133, 231-32); (Pls. Mem. of Law at 9.)  Greene was not included in these meetings.

With one recent exception, Greene has received favorable performance evaluations from Chambers.  Notwithstanding those positive evaluations, Chambers says that Greene has performed poorly.  According to Chambers, Greene does not follow instructions, fails to accept constructive criticism, is the subject of vendor complaints, and fails to timely process purchase orders.  (See, e.g., Defs. Mem. of Law at 5-11.)  Greene denies that her work is substandard, submits evidence in rebuttal to Chambers' arguments, and focuses on the absence of any written documentation to support Chambers' accusations.[1]  (See, e.g., Pls. Mem. of Law at 3-8.)

Chambers also yells.  (Greene Dep. at 238-39.)  In Plaintiffs' words, Chambers' "management style is loud and loose" and "negative."  (Pls. Mem. of Law at 13); (Greene Dep. at 239, 241.)  He screams at Greene about her alleged inferior work and does not

---

[1] The parties focus extensively on Greene's performance, and, thus, the court mentions the controversy.  As discussed later, however, the court finds that the dispute is not material for purposes of resolving the summary judgment motion.

hesitate to belittle her job performance in front of others.  (See Greene Resp. to Defs. Interrog. No. 23 at page 7 (Defs. Ex. 11 to Greene Dep.).)  On one occasion, Chambers yelled at her in front of her subordinates concerning her handling of a "Home Depot bill." (Greene Dep. at 451.)  He not only yells at Greene, but also at Dean of Instruction James Merk and Wilson.  (Wilson Aff. )  Chambers has "raise[d] his voice" at Wilson, individually and in the presence of Wilson's subordinates.  (Wilson Aff. ¶ 5.)  In fact, Wilson yells back.  (Id.)  Wilson also has witnessed Chambers "raise his voice" at other male instructors, including Dr. Ricky Huffstetler, Merk and Bridgman.  Merk confirms that Chambers has screamed at him.  (Merk Aff. ¶ 2.)  Greene, though, believes that Chambers yells at her more.  (Greene Dep. at 432.)

There are no particular allegations that Chambers incorporates cursing into his yelling.  On one occasion in January 2000, however, an occasion that is not described as a yelling incident, Chambers told Greene that he wanted her to act more like a "bitch" and wished that Greene and Wilson could "swap some qualities."  (Greene Dep. at 457, 463); (Pls. Mem. of Law at 13.)  Chambers also told Greene that her management style was "soft."  (Greene Dep. at 457.)

## F.  Complaint

Plaintiffs commenced this lawsuit on September 25, 2006.  The complaint contains four causes of action against Defendants, who are sued in their individual and official capacities.  The "First Cause of Action" (Count I) comprises two Title VII claims against

9

Chambers:  (1) a claim that Chambers "discriminated" against each Plaintiff "based on race and gender"; and (2) a claim that Chambers created a "racially hostile working environment."  (Compl. ¶ 18.)  The "Second Cause of Action" (Count II), while titled "racial discrimination under 42 U.S.C. § 1981," contains allegations that Chambers and Wilson discriminated against Plaintiffs based not only on their race (Caucasian), but also on their sex (female), and created "a racially hostile and/or generally hostile and abusive working environment."  (Id. ¶ 21.)  In the "Third Cause of Action" (Count III), Plaintiffs aver that Chambers "treated them differently than similarly situated male employees, denying them the equal protection of the law[,]" and "created an abusive hostile and intimidating working environment for the Plaintiffs[,]" apparently on the basis of their sex.  (Id. ¶ 24.)  The "Fourth Cause of Action" is titled "State Action – Harassment."  (Id. ¶¶ 26-27.)

## V.  DISCUSSION

### A.  Federal Claims (Counts I, II and III)

In Counts I, II and III of their complaint, Plaintiffs bring racial and sexual discrimination claims which are disparate treatment claims, as well as hostile work environment racial and sexual harassment claims.  Plaintiffs predicate liability under Title VII (Count I), § 1981/§ 1983 (Count II) and the Fourteenth Amendment's Equal Protection Clause (Count III).

10

*1.  Preliminary Observations and Rulings*

Initially, given the convoluted nature of the complaint and the lack of clarity in Plaintiffs' brief, the following observations are helpful.  Count I, as stated, comprises multiple Title VII claims against Chambers in his individual and official capacities. (Compl. ¶ 18.)  Defendants correctly state that Title VII does not permit individual liability on the part of an employer's agent, such as Chambers.  Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991); James v. Montgomery Reg'l Airport Auth., 181 Fed. Appx. 930, 931 (11th Cir. 2006).  Summary judgment, thus, is due to be granted in favor of Defendants on the Title VII individual-capacity claims against Chambers.

Two preliminary observations as concerns Count II, the § 1981 count, will assist in a cleaner analysis on the merits.  First, when a plaintiff seeks vindication of rights secured under § 1981 against a state actor, § 1983 provides the exclusive remedy for obtaining relief.  Butts v. County of Volusia, 222 F.3d 891, 893-94 (11th Cir. 2000); see also Vason v. City of Montgomery, 240 F.3d 905, 906 n.1 (11th Cir. 2001).  Plaintiffs cannot sue Defendants based solely on § 1981, but rather must invoke § 1983 in order to remedy a violation of § 1981.  In other words, Plaintiffs can sue under § 1983 for a violation of § 1981, and the court will assume, without deciding, that Plaintiffs' complaint fairly can be read as alleging such a claim.[2]  (See Compl. at 1.)

---

[2] The court refers to Count II as the "§ 1981/§ 1983" count.

11

Second, Plaintiffs seek redress for sexual discrimination and sexual harassment under § 1981 (see, e.g., Pls. Mem. of Law at 17), but these claims fail because § 1981 provides rights and remedies only with respect to racial discrimination. Anderson v. Conboy, 156 F.3d 167, 170 (2d Cir. 1998) ("It is . . . settled that Section 1981 does not prohibit discrimination on the basis of gender[.]") (citing Runyon v. McCrary, 427 U.S. 160, 167 (1976)); Taylor v. CSX Transp., 418 F. Supp.2d 1284, 1313 (M.D. Ala. 2006) (sexual harassment claim not viable under § 1981). Accordingly, to the extent that Plaintiffs invoke § 1983, seeking redress for a violation of sexual discrimination and sexual harassment under § 1981, the court finds that summary judgment is due to be entered in Defendants' favor on said claims.

Count III – which alleges that Chambers treated Plaintiffs differently than similarly-situated male employees and subjected them to a sexually harassing hostile work environment, denying them the equal protection of the law (Compl. ¶ 24) – does not suffer the legal defects facially apparent in other counts, as discussed above. Plaintiffs correctly observe (see Pls. Mem. of Law at 16) that "[s]ex discrimination and sexual harassment in public employment violate the Equal Protection Clause of the Fourteenth Amendment" and, therefore, are actionable under § 1983. Southard v. Texas Bd. of Crim. Justice, 114 F.3d 539, 550 (5th Cir. 1997). Ultimately, however, as set out below, the evidence is insufficient under the summary judgment standard to warrant a jury trial on the claims in Count III.

12

Finally, the court observes that Defendants have raised Eleventh Amendment and qualified immunity as grounds for summary judgment. Because the court finds that summary judgment is appropriate on the merits, as set out herein, the court pretermits discussion of the immunity issues raised and argued.

### 2. *Statutory Interplay*

It also is helpful for a streamlined analysis to briefly recite the interplay between Plaintiffs' Title VII and § 1983 claims. Plaintiffs' Title VII and § 1981/§ 1983 disparate treatment racial discrimination claims in Counts I and II rest on the same evidence and have identical elements of proof. The same is true of Plaintiffs' Title VII and § 1983 (equal protection) disparate treatment sexual discrimination claims in Counts I and III. Stallworth v. Shuler, 777 F.2d 1431, 1433 (11th Cir. 1985). The court, therefore, need not discuss Plaintiffs' Title VII claims separately from either the § 1981/§ 1983 claims as relates to racial discrimination or the § 1983 (equal protection) claim as relates to sexual discrimination. Id.

Moreover, because Plaintiffs' Title VII (Count I) and § 1981/§1983 (Count II) hostile work environment racial harassment claims rest on the identical proof, the court analyzes these claims together. Busby, 931 F.2d at 777. The court reaches the same conclusion as to Plaintiffs' Title VII (Count I) and § 1983 equal protection (Count III) claims alleging hostile work environment sexual harassment. See Cross v. Dep't of

Mental Health & Mental Retardation, 49 F.3d 1490, 1507-08 (11th Cir. 1995); (see Pls.

Mem. of Law at 23, advocating parallel analysis).  The court turns to the merits.


### 3.  Racial and Sexual Discrimination: Disparate Treatment

The court first considers Plaintiffs' claims of racial and sexual discrimination,

which are disparate treatment claims.  Because Plaintiffs rely on circumstantial evidence

of discrimination (see Pls. Mem. of Law at 14-15), the allocation of proof as to these

claims shifts in accordance with the three-step order of proof established in McDonnell

Douglas Corp. v. Green, 411 U.S. 792 (1972).  Generally, in the first McDonnell Douglas

phase, the plaintiff must produce evidence sufficient to make out a prima facie case, thus

giving rise to a presumption that the employer unlawfully discriminated against him or

her in taking the alleged adverse employment action.  See St. Mary's Honor Ctr. v. Hicks,

509 U.S. 502, 506 (1993).  Next, the employer must rebut this presumption by producing

evidence that the negative employment action was motivated instead by a legitimate,

nondiscriminatory reason.  Id. at 509.  Finally, to avoid summary judgment, the plaintiff

must respond with evidence, which may include previously produced evidence

establishing a prima facie case, which would allow a reasonable jury to conclude that the

reasons given by the employer were not the real reasons for the adverse employment

decision.  See Combs v. Plantation Patterns, Meadowcraft, Inc., 106 F.3d 1519, 1528

(11th Cir. 1997); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143

(2000).

14

It is difficult to discern from Plaintiffs' brief which acts comprise Plaintiffs' disparate treatment claims and which acts comprise the hostile work environment claims, as Plaintiffs merge their analyses.  (See, e.g., Pls. Mem. of Law at 13-20.)  The court has done its best to sift through the muddled brief.

### (a) Plaintiffs' Disparate Treatment Claims against Wilson

The court carefully has reviewed Plaintiffs' brief in opposition to the summary judgment motion.  Therein, Plaintiffs have not made a single argument or cited any evidence that Wilson discriminated against them based upon their race or sex.  Moreover, Plaintiffs have failed to direct the court's attention to any evidence that contradicts Defendants' evidence that Wilson did not influence or have any decisionmaking authority with respect to the jobs of either Greene or Givens.  (Wilson Aff. ¶ 2); see Holifield v. Reno, 115 F.3d 1555, 1563-64 (11th Cir. 1997) ("[t]he biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case") (internal quotations omitted).

It is not the court's function to weed through the summary judgment submissions in search of evidence to support Plaintiffs' claims against Wilson, and the court declines to do so.  See Freeman v. City of Riverdale, No. 1:06-cv-2230- WSD-LTW, 2007 WL 1129004, at *6 (N.D. Ga. April 16, 2007); (Uniform Scheduling Order § 2); (see also Defs. Reply, noting the absence of evidence).  Similarly, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the

15

materials before it on summary judgment." <u>Resolution Trust Corp. v. Dunmar Corp.</u>, 43

F.3d 587, 599 (11th Cir. 1995).  Based upon Plaintiffs' perfunctory brief, the court finds

that Plaintiffs have waived any arguments they may have had in opposition to

Defendants' properly-supported contentions that no genuine issues of material fact exist

on Plaintiffs' disparate treatment claims against Wilson.  Summary judgment, therefore,

is due to be entered in favor of Wilson on these claims.


(b)  Greene's Disparate Treatment Claims against Chambers

Viewing the evidence and inferences in Greene's favor, the court concludes that

Greene places her race- and sex-based disparate treatment claims into six categories:

(1) Chambers' repeated yelling and screaming at the workplace; (2) Chambers' practice

of convening meetings with Greene's subordinates (*i.e.*, Givens and Bridgman) for the

purpose of criticizing Greene's job performance; (3) Chambers' selection of Wilson as

dean of the college in 2006; (4) Chambers' enforcement of an unwritten dress code for

female employees at Ingram's main campus; (5) Chambers' requirement that Greene

obtain permission to use a computer programmer consultant; and (6) Chambers'

frustration with Greene over the failure of her department to implement the automated

accounting system.  (<u>See</u>, <u>e.g.</u>, Pls. Mem. of Law at 6, 15, 19.)

16

*(i)  Categories (1), (2), (5) and (6)*

An "indispensable element" of Greene's prima facie case on both her racial and sexual discrimination claims is proof of an "adverse employment action," which in the disparate treatment analysis, the Eleventh Circuit has defined as a "serious and material change in the terms, conditions, or privileges of employment." Davis v. Town of Lake Park, 245 F.3d 1232, 1239 & 1246 (11th Cir. 2001).  As to category (1), the issue is whether Chambers' verbal mistreatment, as outlined by Greene, meets the threshold level of substantiality set out in Davis.  (See Greene Dep. at 232, 238-39, 241, 451; (Greene Resp. to Defs. Interrog. No. 23 at page 7 (Defs. Ex. 11 to Greene Dep.).)  Greene has not cited any authority to support her argument that she suffered an adverse employment action when she was "being yelled at by President Chambers in front of her staff."  (Pls. Mem. of Law at 15.)  Generally, other courts have concluded that a supervisor's public and loud verbal criticisms are insufficient to satisfy the adverse employment action requirement.  See Smalls v. Allstate Ins. Co., 396 F. Supp.2d 364, 371 (S.D.N.Y. 2005) ("'[b]eing yelled at, receiving unfair criticism . . . do not rise to the level of adverse employment actions'") (citation omitted); Russ v. Van Scoyoc Assocs., 122 F. Supp.2d 29, 32 (D.D.C. 2000) ("[I]t is clear that merely being yelled at by your supervisor does not rise to the level of an adverse employment action."); Leget v. Henderson, No. 99 Civ. 3636, 2001 WL 43615, at *2, *6 (S.D.N.Y.  Jan. 18, 2001) (fact that plaintiff felt "threatened" when supervisor yelled and pointed his fingers at her did not constitute requisite adverse employment action); cf. Munday v. Waste Mgmt. of N. Am., 126 F.3d

239, 241, 243 (4th Cir. 1997) (manager's yelling at employee during public meeting and telling other employees to ignore and spy on her were not adverse employment actions as required to support a Title VII retaliation claim).  After careful consideration of the facts in light of the foregoing authority, the court is persuaded that Greene's complaint concerning Chambers' screaming is not the kind of adversity which satisfies Davis' definition of "adverse employment action."[3]

The court reaches the same conclusion as to Greene's complaints outlined in categories (2), (5) and (6), above; they are neither serious nor material within the meaning of Davis, but rather fall within the confines of non-actionable "tribulations of the workplace."  Davis, 245 F.3d at 1238; see, e.g., Lewis v. City of Buffalo Police Dept., No. 02-CV-0735C(F), 2007 WL 4191810, at *5 (W.D.N.Y. 2007) ("an adverse employment action is not established by proof of excessive work . . . and a supervisor's general negative treatment" or by evidence of "receiving unfavorable schedules or work assignments"); cf. Meder II v. City of New York, No. 05 cv 919(JG), 2007 WL 1231626, at *4 (E.D.N.Y. 2007) (finding under the ADEA that excessive scrutiny and unfair criticism are not adverse employment actions).  Greene, thus, cannot establish a prima

---

[3] As part of her prima facie case, Greene also must demonstrate that she was treated less favorably than a similarly-situated individual outside of her protected class.  See Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).  Her category (1) claim fails on this prong too because, as discussed *infra* as part of Greene's hostile work environment claim, the evidence establishes that Chambers did not differentiate between his subordinates when exercising his management style:  he yelled at African-Americans, Caucasians, males and female alike.

facie case of discrimination on her race- and sex-based disparate treatment claims

predicated on the acts set out in categories (1), (2), (5) and (6), above.[4]

### (ii)  Category (3)

Turning to category (3), above, the prima facie elements of a failure-to-promote

claim are set out in Springer v. Convergys Customer Management Group Inc., 509 F.3d

1344, 1347 n.2 (11th Cir. 2007).  The court assumes, without deciding, that Greene meets

her prima facie burden on her sexual discrimination claim predicated on the denial of a

promotion to the position of dean of the college.[5]

Turning to the second McDonnell Douglas step, Chambers has satisfied his

intermediary burden.  Chambers' stated reasons for selecting Wilson over Greene for the

position of dean of the college are predicated on Chambers' belief that Wilson had more

experience, (Chambers Aff. ¶¶ 13-14), and, separately, that Greene had performed poorly

as Ingram's business office manager.  Because Chambers' reasons are reasonably

specific, nondiscriminatory and supported by evidence, the burden shifts to Greene to

---

[4] The court notes that, for the most part, Greene, as well as Givens, fails to
differentiate between her race-based disparate treatment claims and her sex-based
disparate treatment claims, but given Greene's inability to demonstrate an adverse
employment action as to categories (1), (2), (5) and (6), Greene fails to raise an inference
of either racial or sexual discrimination.

[5] Greene's parallel failure-to-promote racial discrimination claim, though, fails at the
prima facie stage.  Greene concedes that she has no evidence that she was denied the
promotion to dean of the college because she is Caucasian, and the court is not aware of
any such evidence.  (See Greene Dep. at 421.)

"meet [the proffered] reason[s] head on and rebut [them]." Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000). "In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that *each* of the employer's proffered nondiscriminatory reasons is pretextual." Id. at 1037 (emphasis added). Greene has not met this task.

Greene disputes that she has performed poorly, arguing that her annual evaluations which were satisfactory through 2004 belie Chambers' present assertion of substandard work performance and that the downturn in her evaluations is the direct result of Chambers' distaste for an all female-employee business department. (Pls. Mem. of Law at 6.) Her argument, however, does not address head on each reason Chambers asserts for her non-selection. Performance issues aside,[6] Greene has presented no evidence which calls into question Chambers' asserted belief that Wilson was better qualified because he had more supervisory experience than Greene, had formerly worked in a dean position which best honed the skills Chambers deemed essential to the dean of the college position, and had thirty years of institutional knowledge.

At best, Greene quibbles with the skills and experience which Chambers deemed critical for the dean of the college position, arguing for instance that Chambers failed to account for the fact that she had been a dean longer than Wilson. An employer, however,

---

[6] Any disputes concerning Greene's performance do not preclude summary judgment because the disputes are not material; in other words, resolution of the factual dispute would not affect the outcome of these proceedings. Fed. R. Civ. P. 56(e).

is free to prefer one job attribute over another, and Greene "cannot establish her own criteria for judging her qualifications for the promotion," which is what she attempts to do.  Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 269 (4th Cir. 2005); see also Chapman, 229 F.3d at 1030 (a plaintiff cannot establish pretext by "quarreling with the wisdom" of the employer's reason).  Greene simply has not presented any evidence that the "'disparities in qualifications'" between her and Wilson "'[are] of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over [her] for the job in question.'"  Ash v. Tyson Foods, Inc., 546 U.S. 454, 457 (2006) (per curiam) (quoting with approval language from Cooper v. Southern Co., 390 F.3d 695, 732 (11th Cir. 2004)); Hubbard v. M & H Valve Co., 180 Fed. Appx. 899, 899 (11th Cir. 2006).  Overall, after measured consideration, the court finds that Greene has not presented "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Chambers'] proffered legitimate reasons . . . that a reasonable factfinder could find them unworthy of credence."  Combs, 106 F.3d at 1538 (citation and internal quotation marks omitted).  Because Greene fails to establish pretext, summary judgment is due to be granted in favor of Defendants on Greene's sex-based failure-to-promote claim against Chambers.[7]

---

[7] The court notes that Defendants refer to Greene's non-selection for the dean of the college position in 1997.  (Defs. Mem. of Law at 49.)  Greene, however, has not predicated any claim on this employment action; she has not mentioned such a claim either in her complaint or in her brief in opposition to the summary judgment motion. (See, e.g., Pls. Mem. of Law at 15.)  The court, thus, need not consider this employment action.

*(iii)  Category (4)*

Greene's complaint that Chambers did not convene meetings concerning an appropriate dress code with female employees on any campus, other than the main campus, or with male employees fails on the similarly-situated prong of the sexual discrimination prima facie case.  See Maniccia, 171 F.3d at 1368; (Pls. Mem. of Law at 10.)  "Where employees, including both members of the protected class and non-members, are treated identically, no particular employee can claim that such treatment manifests discriminatory intent on the part of the employer." Tyndall v. Dynaric, Inc., 997 F. Supp. 721, 725 (E.D. Va. 1998).  By her own argument, Greene concedes that a subset of female employees – *i.e.*,  those employed at Ingram's satellite campuses – was excused from attending dress code meetings, the same as male employees.  Both male and female employees, thus, received the favorable treatment which Greene complains was denied to her.  The court also finds that these meetings convened on the Ingram campus with female employees do not amount to adverse employment actions.  See Davis, 245 F.3d at 1239 & 1246.  Greene's prima facie case, therefore, fails.

Assuming *arguendo* that Greene had established a prima facie case, the court finds that Chambers has presented nondiscriminatory reasons for enforcing an enhanced dress code for female employees at Ingram's main campus.  Among other things, Chambers explains that the main campus provides instruction only for male inmates, that prison officials requested that he impose dress code requirements for females at that campus to

promote "institutional security," and that "the risks associated with provocative, revealing and inappropriate attire by females are self-evident." (Chambers Aff. ¶ 10.) Nowhere in her brief has Greene challenged Chambers' stated reason for his actions or otherwise presented any substantiated argument of pretext. Accordingly, summary judgment is due to be granted in favor of Defendants on Greene's disparate treatment claim against Chambers premised on the dress code meetings.

(c) Givens' Disparate Treatment Claims against Chambers

Givens' race- and sex-based disparate treatment claims overlap, in large part, with Greene's claims, as Givens relies upon categories (1), (2), (4), (5) and (6), above. Namely, Givens complains about the meetings, discussed above, in which Chambers summoned Givens and Bridgman for the purpose of criticizing the job performance of their supervisor, Greene. Givens also complains about selective enforcement of the dress code, her department's restricted access to a computer programmer consultant and failure to fully integrate an automated accounting system, and also possibly Chambers' abrasive management style. (Pls. Mem. of Law at 6, 16-17.) As stated, these averments fail to satisfy the Davis threshold, among other requirements, and it matters not whether Givens or Greene alleges the harm. Summary judgment, therefore, is due to be entered in Defendants' favor on these claims which Givens brings against Chambers.

Givens also alleges that, based upon her sex, she was denied a promotion with a pay increase to the position of senior accountant, a position left vacant when Bridgman

retired in April or June 2004.  (Id. at 16.)  While she does not contend that her pay should have equaled Bridgman's, Givens argues that Chambers discriminated against her by offering her the position of senior accountant without *any* increase in pay.  (Givens Dep. at 190.)

Moving for summary judgment, Defendants argue that the pivotal issue in determining whether Givens raises an inference of discrimination is whether she was replaced by someone outside her protected class, which is the fourth element of the failure-to-promote prima facie case.  Springer, 509 F.3d at 1347 n.2; (Defs. Mem. of Law at 53.)  Defendants point out that, according to Givens herself, Patti Graves was selected for the position.  (Defs. Mem. of Law at 53); (Givens Dep. at 191); (Pls. Mem. of Law at 11, 16); (Greene Dep. at 58, 173.)  Graves is a Caucasian female, the same as Givens. Because an individual in the same protected class was given the job Givens desired, Defendants argue that she cannot make out a prima facie case of failure to promote and, thus, fails to raise an inference of sexual discrimination.  (See Defs. Mem. of Law at 19-20); (Defs. Reply at 8.)

Defendants are correct that under the Springer formulation, Givens' prima facie case fails.  The court, however, finds that because Givens' claim focuses on the disparity in pay between the position when offered to Givens and the position when occupied by Bridgman, it also is appropriate to apply the prima facie framework set out in Cooper v. Southern Co., 390 F.3d 695, 735 (11th Cir. 2004).  In Cooper, the Eleventh Circuit held that to satisfy the prima facie elements of intentional pay discrimination, a plaintiff must

24

establish that (1) she belongs to a protected class; (2) she "received low wages"; (3) "similarly situated comparators outside the protected class received higher compensation"; and (4) she "was qualified to receive the higher wage." Id.

Defendants' arguments also speak to the third element of the Cooper formulation. In this regard, while there appears to be no dispute that Bridgman was paid a salary higher than the one offered to Givens, Defendants contend that Givens fails to argue or prove that she is similarly situated to Bridgman in terms of qualifications and experience, and Defendants cite evidence accentuating the dissimilarities between her and Bridgman. (See Defs. Mem. of Law at 19-20, 43-46 (citing Cooper, supra)); (Defs. Reply at 8, 9-10.) Defendants, thus, argue that Bridgman is not a similarly-situated comparator for purposes of establishing a disparate pay claim. For the reasons to follow, the court agrees.

Discussing the similarly-situated aspect of a prima facie case of discrimination, the Eleventh Circuit has held that a plaintiff must show that the employee with whom he or she seeks comparison is "similarly situated in all relevant respects besides race [or sex], . . . since '[d]ifferent treatment of *dissimilarly* situated persons does not violate' civil rights laws." Jackson v. Bellsouth Telecomms., 372 F.3d 1250, 1273 (11th Cir. 2004) (emphasis in original). A comparator and a plaintiff are dissimilar if they do not have in common "similar levels of experience or education." Cooper, 390 F.3d at 745; see also Mack v. ST Mobile Aero. Eng'g, Inc., 195 Fed. Appx. 829, 843 (11th Cir. 2006) (affirming summary judgment for employer because plaintiff's comparators possessed

25

specialized training and experience that plaintiff did not have and, thus, plaintiff was not similarly situated to his alleged comparators); <u>Radue v. Kimberly-Clark Corp.</u>, 219 F.3d 612, 618-19 (7th Cir. 2000) (holding that employee failed to prove that she was "similarly situated" to her comparators when she did not present evidence that she and coworkers shared similar "attributes, experience, education, and qualifications relevant to the positions sought").

As Defendants point out, overall Bridgman had a decade more experience at Ingram than Givens, having begun his tenure in 1975 as compared to Givens who started work at Ingram in 1985.  Bridgman also had many more years of experience in the relevant field of accounting, as Bridgman became an accountant at Ingram in 1984, one year prior to Givens being hired in a secretarial position.  Moreover, at least as of 1989 (when Greene was hired), if not earlier, Bridgman was the senior accountant, and eventually Givens worked as Bridgman's assistant.  (Givens Dep. at 187-92); (Greene Dep. at 18-19, 24.)  Defendants' argument that Bridgman's pay was commensurate with his experience and qualifications is bolstered by the unrebutted fact that Graves (the Caucasian female whom Givens claims took over Bridgman's job) earned a higher salary than Givens because she (Graves) had more qualifications, education and experience than Givens.  (<u>See</u> Chambers Aff. ¶ 15); (Chambers Dep. at 141-43); (Defs. Mem. of Law at 19, 53); (<u>see also</u> Greene Dep. 24-28 (discussing salary schedules).)  Moreover, as Defendants recite, Givens testified that she is not claiming that she was entitled to Bridgman's full salary, and this testimony further weakens her assertion that Bridgman is

26

sufficiently similar to serve as a comparator.  (Givens Dep. at 190.)  At best, the court

finds that Givens has demonstrated only that her offered pay was less than Bridgman's

then-actual pay, but this demonstration, in and of itself, does not make a prima facie case.

See Byrd v. Auburn Univ. at Montgomery, No. 2:05cv835, 2007 WL 1140424, *12

(M.D. Ala. Apr. 17, 2007) (explaining that plaintiff "cannot rely on her own

unsubstantiated opinion that the salary decisions were somehow motivated by gender").

In sum, because Givens can point to no one who was not a member of her protected

group and whose circumstances were similar to hers who was paid more than she, Givens

cannot establish a prima facie case of intentional pay discrimination.  Summary judgment,

therefore, is appropriate.[8]

Even assuming that Givens had raised an inference of discrimination by

establishing a prima facie case, she has not shown that the nondiscriminatory reason for

the pay disparity – i.e., Greene's restructuring of the business department after

Bridgman's retirement (see Chambers Aff. ¶ 15; Chambers Dep. at 142-44; Defs. Mem.

of Law at 53) – was a pretext for discrimination.  See Ash, 546 U.S. at 457.  While

Givens quibbles with the wisdom of Defendants' pay decisions, the civil rights statutes

are not designed to make federal courts "sit as a super-personnel department that

---

[8] The court recognizes that in another section of her brief, Givens makes a single-sentence argument that she was paid less than unnamed similarly-situated males, but this unsupported assertion is so conclusory to be devoid of any merit whatsoever.  (Pls. Mem. of Law at 18.)  Givens has not directed the court to any evidence or given the court any inkling as to the identity of these fathom males or how they are similarly situated to her.

reexamines an entity's business decisions." <u>Elrod v. Sears, Roebuck & Co.</u>, 939 F.2d

1466, 1470 (11th Cir. 1991).  After measured consideration, the court finds that Givens

has not presented "such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in [Chamber's] proffered legitimate reasons . . . that a reasonable

factfinder could find them unworthy of credence." <u>Combs</u>, 106 F.3d at 1538 (citation

and internal quotation marks omitted).

Givens also complains that she was discriminated against in the terms of her pay

on the basis of her sex and race because she did not receive any "schedule" raises

between 2000 and 2006, only "step" raises, notwithstanding that Greene requested

"schedule" raises for Givens during this time frame.[9]  (Pls. Mem. of Law at 12.)  Only

one comparator is offered by Givens and that comparator is an African-American male

grounds maintenance employee who received a raise pursuant to Greene's request.

(Givens Dep. at 175-76); (Greene Dep. at 469-73.)  Givens, though, has not demonstrated

or even argued how she is similarly situated to this grounds maintenance employee, and

their dissimilarities are highlighted by the fact that they held different jobs with different

responsibilities.  <u>See</u> <u>Cooper</u>, 390 F.3d at 735 (To be similarly situated, a plaintiff and a

comparator must "perform similar jobs" or, in other words, must "'share[] the same type

_____

[9] In this section of her brief, Givens invokes Title VII and the Equal Pay Act (Pls. Mem. of Law at 18); however, Givens' attempt to argue a violation of the Equal Pay Act is ineffectual because her complaint does not include an Equal Pay Act claim.  <u>See</u> <u>Gilmour v. Gates, McDonald & Co.</u>, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

of tasks.'") (quoting <u>Miranda v. B&B Cash Grocery Store, Inc.</u>, 975 F.2d 1518, 1528 (11th Cir. 1992)).

Givens does not cite any evidence and does not identify any similarly-situated, higher-paid male employee by name, description or otherwise who received a "schedule" raise.  As previously stated, Givens cannot raise an inference of pay discrimination based upon unsubstantiated conclusory assertions.  See <u>Duffy v. Leading Edge Prods.</u>, 44 F.3d 308, 312 (5th Cir. 1995) ("conclusory allegations unsupported by concrete and particular facts will not prevent an award of summary judgment").  Summary judgment, thus, is due to be entered in Defendants' favor on this claim.

(d) Other Evidence

In support of their disparate treatment claims, Plaintiffs also submit evidence for the proposition that Chambers hires predominantly African-Americans and that other Caucasian females, such as Graves (<u>see</u> Givens Dep. at 191), are paid less than their male counterparts.  (Pls. Mem. of Law at 12.)  This proposed evidence of a statistical nature – which contains only information on the employee's race, sex, hiring date and/or salary – is "'virtually meaningless'" because it lacks any "'analytical foundation,'" <u>Wilson</u>, 376 F.3d at 1089, and fails to "eliminate the most common nondiscriminatory explanations for the disparit[ies]." <u>Barnes v. GenCorp, Inc.</u>, 896 F.2d 1457, 1466 (6th Cir. 1990).  Similarly, on the facts of this case, the proposed evidence is not a substitute for proof of the prima facie elements on Plaintiffs' individual disparate treatment claims.  See <u>Wilson</u>,

29

376 F.3d at 1089.  Greene's emphasis on the fact that presently she is the only female

dean at Ingram fails for the same reason.  See id.

### 4.  Hostile Work Environment

Plaintiffs also bring hostile work environment claims predicated on both racial and

sexual harassment.  In the words of Plaintiffs, "the main tenor" of their complaint is

"hostile work environment."  (Pls. Mem. of Law at 13.)  Greene's and Givens' claims

overlap, and, thus, the facts lend themselves to a joint discussion of the claims.

To establish a hostile work environment claim on the basis of racial or sexual

harassment, a plaintiff must demonstrate:

> (1) that . . . she belongs to a protected group;
> (2) that [she] has been subject to unwelcome sexual [or racial] harassment;
> (3) that the harassment [was] based on [her] sex [or race] . . .;
> (4) that the harassment was sufficiently severe or pervasive to alter the terms and
> conditions of employment and create a discriminatorily abusive working
> environment; and
> (5) a basis for holding the employer liable.

Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (brackets added) (sexual

harassment).[10]  The fourth Mendoza element contains an objective and a subjective

---

[10] While the Mendoza court analyzed a claim for hostile work environment sexual
harassment, it serves as equally authoritative precedent for hostile work environment
racial harassment claims.  See AMTRAK v. Morgan, 536 U.S. 101, 116 n.10 (2002)
("Hostile work environment claims based on racial harassment are reviewed under the
same standard as those based on sexual harassment."); Tomczyk v. Jocks & Jills Rests.,
LLC., 198 Fed. Appx. 804, 808 (11th Cir. 2006) (hostile work environment racial
harassment claim).

component.  Miller v. Kenworth of Dothan Inc., 277 F.3d 1269, 1275 (11th Cir. 2002);

Smithers v. Wynne, No. 07-11945, 2008 WL 53245, *2 (11th Cir. 2008).  "When

evaluating the objective severity of the conduct, [the court] consider[s] factors such as

(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct

is physically threatening or humiliating, or a mere offensive utterance; and (4) whether

the conduct unreasonably interferes with the employee's job performance."  Smithers,

2008 WL 53245, *2 (quoting Miller, 277 F.3d at 1276-77).

Plaintiffs scatter allegations of harassment in different sections of their brief,

asserting that Chambers subjected them to a hostile work environment.[11]  The court finds

that it is appropriate to group the various incidents into five general categories.

First, Plaintiffs focus on Chambers' "loud management style."  (Pl. Mem. of Law

at 13.)  Second, Givens complains that Chambers' meetings convened with her and

Bridgman for the purpose of criticizing Greene's job performance created a "hostile work

environment" because she [Givens] felt "caught between" Chambers, who "is ultimately

the boss," and her direct supervisor, Greene.  (Givens Dep. at 82-83); (Pls. Mem. of Law

at 9-10.)  Greene, in turn, also says that these meetings caused her a hostile work

environment because the meetings, which were held in her absence, weakened her

authority and effectiveness as a dean.  (Pls. Mem. of Law at 9); (Defs. Mem. of Law at 30

(citing evidence).)  Givens states that these meetings occurred in May 2001, March 2002,

---

[11] Plaintiffs have not cited any evidence or argued that Wilson contributed to the
alleged harassment.

31

January 2003, June 2003 and at various other unspecified times between 2004 and 2005. (Pls. Mem. of Law at 9-10.)

Third, Plaintiffs say that Chambers created a hostile work environment by subjecting only female employees on the main campus to meetings concerning appropriate dress attire and by holding female employees to "a more strict code of conduct on dress attire" than male employees.  (See, e.g., Pls. Mem. of Law at 10-11 (citing Givens Dep. at 90, 117).)  Fourth and relatedly, Givens and Greene complain that Chambers made offensive and inappropriate comments concerning other female employees' attire, commenting for example on their tight pants, which Plaintiffs say Chambers made under the "guise of security."  (Id. at 20, 24.)  Greene also cites Chambers' comment to her that "she had something on her pants," which implied to Greene that Chambers was staring at and focusing on her behind.  (Pls. Resp. to Defs. Interrogs. Nos. 21 & 22 (Defs. Ex. 11 to Greene's Dep.).)  Fifth, Greene points to the January 2000 meeting when Chambers told her he wanted her to act more like a "bitch." (Pls. Mem. of Law at 20); (Greene Dep. at 457.)

(a) Racial Harassment

Initially, the court observes that in their brief, Plaintiffs make no distinction between Givens' and Greene's hostile work environment claims or between racial and sexual harassment.  Plaintiffs merely complain of a "hostile work environment," but Title VII "does not prohibit harassment alone, however severe and pervasive.  Instead, Title

VII prohibits discrimination, including harassment that discriminates *based on a protected category such as sex*." Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d 1287, 1302 (11th Cir. 2007) (emphasis added).

After careful consideration of the evidence recited above, the court finds that it does not create a genuine issue of material fact on Plaintiffs' claims of hostile work environment racial harassment because Plaintiffs have failed to demonstrate, or even argue, that any of the alleged harassment was related to their race. See Smalls, 396 F. Supp.2d at 372 ("where there is no evidence that an allegedly hostile work environment was motivated by a plaintiff's race, the claim must be dismissed"). The court concludes that Plaintiffs' hostile work environment racial harassment claims are appropriate for summary judgment without further elaboration. The court turns to a discussion of the evidence as relates to the sexual harassment claim and, for the reasons to follow, finds that this claim suffers the same fate.

(b) Sexual Harassment

Defendants contend that Greene and Givens have failed to connect the majority of their allegations to their protected status as females. Alternatively, Defendants argue that the incidents are not severe or pervasive. (Defs. Mem. of Law at 36-37.)

The court agrees that there is scant evidence that Chambers treated Plaintiffs with hostility because they are females, which is the third element of the Mendoza test. The evidence concerning Chambers' loud management style is illustrative. In Baldwin, the

33

Eleventh Circuit explained that "[b]ecause '[a] claim of sexual harassment [under Title VII] is a claim of disparate treatment,' in order to prevail a plaintiff must show 'that similarly situated persons not of [her] sex were treated differently and better.'" 480 F.3d at 1302 (quoting <u>Mendoza</u>, 195 F.3d at 1254 n.3). The court continued, "An equal opportunity curser does not violate a statute whose concern is . . . 'whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" <u>Id.</u>

Here, the evidence establishes that Chambers yelled alike at males and females. Chambers screamed not only at Greene, but also at Wilson, Huffstetler, Merk and Bridgman.[12] (Wilson Aff. ¶ 5); (Merk Aff. ¶ 2.) Chambers is "an equal opportunity" screamer. 480 F.3d at 1302; <u>see</u> <u>also</u> <u>Peterson v. Draper & Kramer Mortgage Corp.</u>, No. 00 C 3889, 2002 WL 1769987, at *5 (N.D. Ill. Aug. 1, 2002) (rejecting sexual harassment cause of action and describing accused senior vice president as "an equal opportunity yeller").

Chambers' management style may have been rude and offensive, but absent evidence that Chambers' harsh style was infected with discriminatory animus against females, Plaintiffs cannot call on the federal civil rights statutes to intervene and provide redress. Because the evidence establishes that Chambers treated male and female employees identically, Plaintiffs cannot claim that such treatment manifests

---

[12] Wilson and Merk are African-American males. The court's analysis, thus, would apply equally to Plaintiffs' hostile work environment racial harassment claim.

discriminatory intent on the basis of their sex.  Accordingly, the court finds that the principal evidence upon which Plaintiffs rely – *i.e.*, Chambers' "loud management style" (see Pls. Mem. of Law at 13) – does not support their sexual harassment claim because there is no evidence that the harassment was based upon Plaintiffs' sex.[13]

Plaintiffs also complain that Chambers did not convene meetings concerning an appropriate dress code with female employees on any campus, other than the main campus, or with male employees, (Pls. Mem. of Law at 10), but as discussed earlier in this opinion concerning the disparate treatment claims, "[w]here employees, including both members of the protected class and non-members, are treated identically, no particular employee can claim that such treatment manifests discriminatory intent on the part of the employer."  Tyndall, 997 F. Supp. at 725; see also Baldwin, 480 F.3d at 1302. Moreover and significantly, Greene testified that overall she "just thinks [her] personality bothers [Chambers]."  (Greene Dep. at 52.)  Greene's admission does not support her claim that she was singled out because of her sex, but rather establishes merely that her turbulent working environment was the result of a personality clash.  See Vore v. Indiana

---

[13] The court notes also that Greene's subjective perception that Chambers yelled at her more than he yelled at her male colleagues is not supported by any objective facts and, thus, is insufficient to defeat summary judgment.  Little v. New York, No. 96 CV 5132(SJ), 1998 WL 306545, at *5 (E.D.N.Y. June 8, 1998) ("[A] Plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn."), aff'd, 173 F.3d 845 (2d Cir. 1999) (table).

Bell Telephone Co., Inc., 32 F.3d 1161, 1162 (7th Cir. 1994) ("[P]ersonality conflicts between employees are not the business of the federal courts.").

As a final point concerning the third Mendoza element, the court agrees with Defendants that it is questionable whether the "bitch" comment made by Chambers to Greene includes the necessary gender-related connotation to be actionable.  See Mendoza, 195 F.3d at 1247-48; (Defs. Mem. at 35-36); (Greene Dep. at 457, 463.) Although the term "bitch" could in some scenarios denote a woman-hater attitude, by Greene's own account, Chambers made the statement in the context of expressing his wish that Greene had a more aggressive management style.  See Hocevar v. Purdue Frederick Co., 223 F.3d 721, 737 (8th Cir. 2000) ("mere use of the word 'bitch,' without other evidence of sex discrimination, is not particularly probative of a general misogynist attitude."); Mendoza, 195 F.3d at 1248 (citing a case which noted "that the term 'sick bitch' is not necessarily a sexual or gender-related term").

Assuming, though, that all of the evidence cited by Plaintiffs may be weighed on the sexual harassment scale, the court finds that in its totality the evidence fails as a matter of law to sustain a hostile work environment sexual harassment claim under Mendoza's fourth element.  None of the conduct about which Greene and Givens complain was "conditioned upon compliance with the employer's sexual demands" (which is the "paradigm" example of sexual harassment), Mendoza, 195 F.3d at 1245, or was "physically threatening," Smithers, 2008 WL 53245, at *2, and Plaintiffs have not argued to the contrary.  The "bitch" comment about which Greene complains was uttered

36

on a single occasion more than six years prior to the filing of the complaint and was not used in conjunction with other epithets; the court finds that it is more akin to a non-actionable "mere offensive utterance." Miller, 277 F.3d at 1276-77.  Similarly, the court finds as a matter of law that Chambers' inappropriate comments about female employees' tightfitting pants are not sufficiently "serious" to alter the terms and conditions of Plaintiffs' employment.  Mendoza, 195 F.3d at 1245.

Moreover, in a previous section, the court concluded that some of the acts about which Plaintiffs complain contributed to the hostile work environment – *e.g.*, Chambers' yelling and multiple closed-door meetings in which Chambers criticized Greene in her absence – did not meet the adverse employment action in the disparate treatment analysis. The court has considered the effect of these acts on the working environment for purpose of analyzing the hostile work environment sexual harassment claims, but finds that these incidents similarly do not satisfy the Eleventh Circuit's standard for severity.  Nor is there evidence that the acts were sufficiently pervasive.

The court stresses that, while it has provided individual discussion as to the alleged harassing actions, it has considered the acts "in context, not as isolated acts," Mendoza, 195 F.3d at 1246, and finds that collectively the incidents do not satisfy the "baseline" required to survive a summary judgment motion.  Id. at 1244.  The court carefully has reread Mendoza and the opinions cited therein and finds that courts have granted summary judgment to employers in cases where there was stronger evidence of harassment than presented in this case.  See id. at 1246-47 (collecting cases).

37

In sum, Plaintiffs have failed to establish a prima facie case on their hostile work environment sexual harassment claims.  Defendants, thus, are entitled to summary judgment on these claims.

### B.  Supplemental State-Law Claim (Count IV)

Having dismissed the federal claims, the court in its discretion declines supplemental jurisdiction over the remaining state law claim in Count IV.  See 28 U.S.C. § 1367(c)(3); McCulloch v. PNC Bank Inc., 298 F.3d 1217, 1227 (11th Cir. 2002). Defendants' motion for summary judgment on the state-law claim, therefore, is due to be denied as moot, and the state law claim is due to be dismissed without prejudice.  See 28 U.S.C. § 1367(c)(3) & (d).

### VI. ORDER

Accordingly, it is CONSIDERED and ORDERED as follows:

(1) Defendants' motion for summary judgment (Doc. No. 9) be and the same is hereby GRANTED on Plaintiffs' federal claims in Counts I, II and III; and

(2) Defendants' motion for summary judgment be and the same is hereby DENIED as moot on Plaintiffs' supplemental state-law claim in Count IV and the state law claim is hereby DISMISSED without prejudice pursuant to 28 U.S.C. § 1367(c)(3).  A judgment in accordance with this Memorandum Opinion and Order shall be entered separately.

DONE this 29th day of January, 2008.

/s/ Ira DeMent
SENIOR UNITED STATES DISTRICT JUDGE

38

A copy of this checklist is available at the website for the USCA, 11th Circuit at www.ca11.uscourts.gov
Effective on April 9, 2006, the new fee to file an appeal will increase from $255.00 to $455.00.

## <u>CIVIL APPEALS JURISDICTION CHECKLIST</u>

1.    **<u>Appealable Orders</u>:** Courts of Appeals have jurisdiction conferred and strictly limited by statute:

(a)    **Appeals from final orders pursuant to 28 U.S.C. § 1291:** Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C.§ 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. v. Mestre, 701 F.2d 1 365, 1 368 ( 11th Ci r. 1 983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. § 636(c).

(b)    **In cases involving multiple parties or multiple claims,** a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b). Williams v. Bishop, 732 F.2d 885, 885- 86 (11th Cir. 1984). A judg ment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S.196, 201, 108 S.Ct. 1717, 1721-22, 100 L .Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

(c)    **Appeals pursuant to 28 U.S.C. § 1292(a):** Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions . . ." and from "[i]nterlocutory decrees . . . determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

(d)    **Appeals pursuant to 28 U.S.C. § 1292(b) and Fed.R.App.P. 5**: The certification specified in 28 U.S.C. § 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

(e)    **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F.2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964).

                                                                    *Rev.: 4/04*

2.    <u>Time for Filing</u>: The timely filing of a notice of appeal is mandatory and jurisdictional. <u>Rinaldo v. Corbett</u>, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P. 4(a) and (c) set the following time limits:

(a)    **Fed.R.App.P. 4(a)(1):** A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD – no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

(b)    **Fed.R.App.P. 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

(c)    **Fed.R.App.P. 4(a)(4):** If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

(d)    **Fed.R.App.P. 4(a)(5) and 4(a)(6):** Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

(e)    **Fed.R.App.P. 4(c):** If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3.    <u>Format of the notice of appeal:</u> Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. <u>See</u> also Fed.R.App.P. 3(c). A <u>pro se</u> notice of appeal must be signed by the appellant.

4.    <u>Effect of a notice of appeal:</u> A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).